# EXHIBIT E

1 | BRIAN A. PROCEL (State Bar No. 218657)
brian@procel-law.com
2 | MARTIN PRITIKIN (State Bar No. 210845)
marty@procel-law.com
3 | PROCEL LAW, PC
401 Wilshire Boulevard
4 | 12th Floor
Santa Monica, California 90401
5 | Telephone:     (424) 788-4538

6 | Attorneys for Plaintiffs
ERICA VAGO and JOSEPH VAGO

7

8

9 |             **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10 |         **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

11

12 | ERICA VAGO and JOSEPH VAGO,                   CASE NO. 20STCV25050

13 |                 Plaintiffs,                   **JUDGMENT CREDITORS ERICA AND
JOSEPH VAGO'S *EX PARTE***
14 |         v.                                     **APPLICATION FOR: (1) APPOINTMENT
OF RECEIVER; (2) ORDER TO SHOW**
15 | LESLIE KLEIN; LES KLEIN &                     **CAUSE WHY APPOINTMENT OF
ASSOCIATES, INC.; KENNETH KOLEV            RECEIVER SHOULD NOT BE**
16 | KLEIN; and LAW OFFICE OF KENNETH           **CONFIRMED; AND (3) TEMPORARY
KLEIN, P.C.,                               RESTRAINING ORDER IN AID OF**
17 |                                               **RECEIVER**
                Defendants.
18 |                                               **[Declarations of Brian Procel and Brian
Weiss, and [Proposed] Order filed**
19 |                                               **concurrently herewith]**

20 |                                               Assigned for All Purposes to:
                                              Hon. Terry A. Green, Dept. 14
21
                                              Date: February 23, 2023
22 |                                               Time: 8:30 a.m.
                                              Dept.: 14
23

24 |                                               Action Filed:      July 1, 2020
                                              Trial Date:        August 29, 2022
25

26

27

28

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on February 23, 2023 at 8:30 a.m. or as soon as the matter may be heard in Department 14 of the above-referenced Court located at 111 North Hill Street, Los Angeles, California 90012, Judgment Creditors Erica and Joseph Vago move *ex parte* for an order appointing a receiver pursuant to California Code of Civil Procedure ("CCP") sections 526, 527, 564(1), (3), (4), (6), and (9), 708.620, and California Rules of Court Rule 3.1175-3.1184.

Specifically, the Vagos seek an order (i) appointing a receiver over Judgment Debtors Leslie Klein ("Klein") and Leslie Klein & Associates, Inc., ("LK&A," and together with Klein, the "Debtors"), for the purpose of taking over financial management and financial control of Debtors, to take possession of their current and future assets, and to assume and pursue, as appropriate, their claims and rights to payment; and (ii) setting a show cause hearing regarding confirmation of appointment of receiver and preliminary injunction in aid of receiver; and (iii) issuing a temporary restraining order in aid of the receiver (including an order restraining Debtors or third parties from foreclosing upon or otherwise transferring Debtors' property).

Good cause appears for this *ex parte* application. Klein, an attorney, has spent more than a decade stealing money from his clients. The Vagos recently obtained a judgment against Debtors in the amount of $24.3 million. But they have been hindered in their efforts to enforce their judgment. Klein has evaded service of a judgment debtors' exam notice. He has violated an injunction freezing his assets. He has undertaken efforts to conceal and transfer property to evade creditors. He has defaulted on secured loans on multiple properties, which has led to lender foreclosures. This has resulted in a loss of millions of dollars in equity that could have been used to satisfy the Vagos' judgment. And it will result in further losses to the Vagos' unless this Court enjoins future foreclosures, including one scheduled just days from now.

A receiver needs to be appointed immediately. By appointing a receiver, the Court could prevent Klein from concealing assets and transferring property to evade his creditors. A receiver is also necessary to ensure that Klein's property is sold for market value (rather than at foreclosure sales). And a receiver needs to be appointed to trace the money that Klein stole from his clients.

1  Klein has been found by two different courts to have committed widespread fraud, embezzlement

2  and elder abuse.  He cannot be trusted to manage his own financial affairs at this point.

3  　　　　Pursuant to California Rule of Court 3.1203, counsel for the Vagos provided notice of this

4  *Ex Parte* Application prior to 10 am on February 22, 2023, via telephone and email as follows

5  (**Procel Decl., ¶ 41**):

6  　　　　• Jeffrey Slott, counsel for Debtors – jslott@aol.com

7  　　　　• Wilmington Savings Fund Society, FSB OBA Christiana Trust, dba Trustee Corps

8  　　　　　located at 17100 Gillette Ave Irvine, CA 92614 Phone: 949-252-8300; Ref No:

9  　　　　　CA08000405-20-1 – support@trusteecorps.com

10 　　　　• Quality Loan Service Corporation, 2763 Camino Del Rio South, San Diego, CA

11 　　　　　92108, 619-645-7711, Ref No. CA-22-912800-CL –

12 　　　　　customerassistance@qualityloan.com

13 　　　　Pursuant to California Rule of Court 3.1175, Brian Procel's declaration in support of this

14 Application ("Procel Decl.") sets forth, among other things: (1) the nature of the emergency and

15 the reasons irreparable injury would be suffered; (2) the names, addresses, and telephone numbers

16 of LK&A's principal agents and managers, (i.e., Klein); (3) the use being made of LK&A by

17 Klein; and (4) whether the receiver would take control of a "plant, equipment, or stock in trade."

18 　　　　This Motion is supported by this Notice, the attached Memorandum of Points and

19 Authorities, the Declaration of Brian Procel and exhibits thereto, the Declaration of Brian Weiss,

20 the [Proposed] Order, the records and pleadings on file herein, any oral argument of counsel, and

21 on such evidence as may be presented at the time of the hearing.

22 DATED:  February 21, 2023　　　　　　PROCEL LAW, PC

23

24

25 　　　　　　　　　　　　　　　　By:  _____

26 　　　　　　　　　　　　　　　　　　BRIAN PROCEL
　　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs

26 　　　　　　　　　　　　　　　　　　JOSEPH VAGO and ERICA VAGO

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 6

II.     STATEMENT OF FACTS ................................................................................... 7

  A.    Debtors' Litigation Misconduct ....................................................................... 7

  B.    The Trial and Jury Verdict ............................................................................... 8

  C.    Debtors' Post-Trial Misconduct ....................................................................... 9

  D.    Klein's Assets ................................................................................................... 9

  E.    Klein Drained His Bank Accounts ................................................................. 10

  F.    Klein's Recent Bankruptcy and Foreclosures ............................................... 10

  G.    Upcoming Foreclosures .................................................................................. 12

  H.    The Proposed Receiver ................................................................................... 12

III.    LEGAL STANDARDS ..................................................................................... 13

IV.     ARGUMENT .................................................................................................... 14

  A.    The Court Should Appoint a Receiver to Assist in the Collection of Judgment ................. 14

  B.    A Receiver Should Be Appointed Because Debtors Cannot Be Trusted with Their Property
        14

    1.   Debtors Were Found to Have Engaged in Widespread Fraudulent Conduct .................. 15

    2.   Klein Has a Well-Established Practice of Commingling Money .................................... 15

    3.   Klein Violated a Court-Ordered Injunction ................................................................. 16

  C.    A Receiver Is Necessary to Preserve Value for Creditors .............................. 17

  D.    A Receiver Should Be Appointed Because Debtors Are Insolvent ................. 18

  E.    The Receiver Should Be Appointed On An Ex Parte Basis ............................ 18

  F.    This Court Should Enjoin the Foreclosures .................................................... 20

V.      CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

## <u>CASES</u>

**Federal Cases**

*Yufa v. TSI, Inc.*, 666 F. App'x 889 (Fed. Cir. 2016)……………………………………………13


**State Cases**

*City & Cnty. of San Francisco v. Daley*, 16 Cal. App. 4th 734 (1993)……………………………15

*Honchariw v. FJM Private Mortgage Fund, LLC*, 83 Cal. App. 5th 893 (2002)…………………20

*Maggiora v. Palo Alto Inn, Inc.*, 249 Cal.App.2d 706 (1967) ……………………………………13

*O'Flaherty v. Belgum*,115 Cal.App.4th 1044 (2004)……………………………………….…16-17

*Olsan v. Comora*, 73 Cal. App. 3d 642 (1977) ……………………………………………13, 14

*Sachs v. Killeen*, 165 Cal. App. 2d 205 (1958)……………………………...………………13, 14

*Sibert v. Shaver* 113 Cal.App.2d 19 (1952) ……………………………………...………………13, 14


## <u>STATUTES AND RULES</u>

Cal. Civ. Code § 3439.02(c)……………………………………………………………………18

Cal. Code Civil Proc. § 564……………………………………………...……………….…12-14, 16, 18

Cal. Code Civil Proc. § 708.620……………………………………………………………….…12

Cal. Rule of Court 3.1175(a)…………………………………………………….…………………18, 20

# I. **INTRODUCTION**

With this *Ex Parte* Application, Judgment Creditors Erica and Joseph Vago (collectively, the "Vagos") seek an order appointing Brian Weiss as receiver over Judgment Debtors Leslie Klein ("Klein") and his law firm, Leslie Klein & Associates, Inc. ("LK&A") (collectively, "Debtors"), and enjoining foreclosures on Klein's property which will prejudice the Vagos.

Klein is a con man of the worst kind.  He is an attorney who has no problem violating court orders, forging signatures, defrauding friends, lying under oath, concealing documents, and hiding assets, among other things.  He preyed upon the Vagos while they were mourning the loss of close family members.  And he stole their money.  In fact, *two different courts have now found Klein liable for defrauding his own clients out of tens of millions of dollars*.  And now he is hindering the Vagos' efforts to enforce their judgment.  If there was ever a case warranting the appointment of a receiver, this is it.

At trial, the Vagos presented evidence that Klein purported to be their attorney, accountant and investment adviser.  In actuality, he stole more than $8 million of the Vagos' money in a complicated life insurance scam.  Klein made no meaningful attempt to account for the Vagos' money at trial.  The jury found Klein and LK&A jointly and severally liable for intentional fraud, fraudulent concealment, elder abuse and breach of fiduciary duty.  Klein and LK&A were found liable for more than $8 million in punitive damages.  The Court ultimately entered a $24.3 million judgment against them.

In a separate proceeding, Klein was also recently found to have embezzled more than $19 million from the Menlo family.  Again, Klein purported to be their attorney and trustee.  But he used his position to steal their money.  Judgment will be entered in that case shortly.

Not surprisingly, Klein's antics have continued even after the Vagos' judgment was entered against him.  Klein has evaded service of post-judgment subpoenas.  He has violated an injunction freezing his assets.  He is playing games with companies that he controls, including filing a bankruptcy and then dismissing it shortly thereafter.  And he is commingling money and property and then presenting different stories about who owns what.

Perhaps most importantly, ***Klein has absolutely no incentive to preserve his assets***. Two different lenders have already foreclosed on properties Klein owned through an LLC. Klein ***had*** millions of dollars in equity in connection with these properties. He stopped paying on the loans, though, and the lenders foreclosed, taking all of the equity as a windfall—equity that rightfully should have gone to the Vagos to help satisfy their judgment.

The Vagos bring this *Ex Parte* Application to prevent this from happening again. There is another foreclosure scheduled for February 28, 2023. It relates to a property that Klein owns in his individual capacity. The lender is owed at least $1 million less than the property's market value. It is likely that the lender will (again) take the property for the amount of its credit bid, thereby eliminating any equity that could be used to satisfy Klein's creditors. It is unlikely anyone else will bid on this property because of the number of liens and the fact that there is a *lis pendens* recorded. Yet another foreclosure is scheduled for March 22, 2023. And Klein owns numerous other multi-million-dollar properties that could soon face foreclosure under similar circumstances.

Nor should Klein be permitted to retain control over the money and property that he stole. A receiver needs to be appointed to untangle what Klein did with the tens of millions of dollars that has gone missing. To date, Klein has refused to produce his bank records and he has refused to provide an accounting. A receiver with a background in forensic accounting could trace these assets and make them available to creditors.

The Vagos propose appointing Brian Weiss as receiver. Mr. Weiss was appointed in the Central District to serve as the receiver for Eagan Avenatti LLP, disgraced attorney Michael Avenatti's firm. Mr. Weiss is a licensed active CPA, has a background in forensic accounting, has been involved in multiple complex fraud investigations, regularly serves as a fiduciary, and has an extensive real estate background. He is well qualified to hunt down and preserve Klein's assets. Every day that goes by without a receiver is resulting in a loss to Klein's creditors.

## II.    STATEMENT OF FACTS

### A.    Debtors' Litigation Misconduct

The Vagos filed the Complaint on July 1, 2020. (Procel Decl., ¶ 2.) From day one, Klein and LK&A engaged in a scheme to evade discovery and to derail the case.

1    Debtors' discovery misconduct could not have been more egregious.  Debtors served

2    boilerplate objections to all written discovery requests.  They refused to produce documents.  The

3    Vagos then filed several rounds of discovery motions.  The Court granted all of them and entered

4    monetary and issue sanctions against Debtors.  The Court ordered Debtors to produce a

5    responsivity chart and a privilege log.  They did not.  The Court ordered Debtors to produce

6    redacted produce bank records.  They did not.  Debtors filed a motion to quash a third-party

7    subpoena served on Bank of America, which they lost.  Debtors failed to pay their monetary

8    sanctions by the court-ordered deadline (Klein's check bounced) and they failed to comply with

9    court orders requiring supplemental responses.  Making matters worse, Debtors walked out of a

10    court ordered deposition.  They stalled and refused to make Klein available for deposition.

11    Debtors substituted new counsel on the eve of trial.  They filed numerous motions to continue the

12    trial date, all of which were denied.   (Procel Decl., ¶ 3.)

13    **B.    <u>The Trial and Jury Verdict</u>**

14    On August 29, 2022, the trial in this matter commenced.  (*Id.*, ¶ 4.)  Klein's sophisticated

15    deception and financial chicanery were laid bare.

16    Klein defrauded the Vagos' when they were at their most vulnerable—just after Mrs.

17    Vago's brother died and while she was caring for her dying mother in the hospital.  (*Id.*, Exh. A at

18    162:13-163:4.)  Klein initially testified that he had no financial interest in the policies that he

19    purportedly invested the Vagos money in.  (*Id.* at 181:9-15.)  But he later admitted that he invested

20    his own money in these policies.  (*See e.g.*, *id.*, Exh. B at 81:11-20.)

21    Klein drafted and signed promissory notes where he agreed as trustee that the Vagos would

22    be entitled to 12% interest on their money.  (*Id.,* Exh. G.)  But Klein testified at trial that he never

23    had any intention of actually paying the Vagos that interest.  (*Id.*, Exh. B at 88:17-89:2; 90:20-

24    92:1).  Klein utterly failed to explain what these "investments" actually were; whether the Vagos

25    were entitled to make any money from his perspective; or what he did with the Vagos' money.

26    Klein testified at trial that he kept a contemporaneous "ledger" of all transactions relating

27    to the Vagos.  (*See e.g.*, *id.*, Exh. A at 172:15-23.)   This was a bald-faced lie—no such ledger was

28    produced at trial. (Procel Decl., ¶ 8.)  Klein admitted that he provided false and inflated financials

1  to the Vagos on a regular basis.  (*Id.*, Exh. C at 20:1-22:18.)  Klein took out a life insurance policy

2  on an individual named Ann Radow.  Ann Radow testified at trial that she had never met Klein;

3  that he took out an insurance policy on her life without her knowledge or consent; and that Klein

4  created the Ann Radow Trust and made himself the trustee without her knowledge or consent.

5  (*Id.*, Exh. D at 9:15-25; 10:2-8; 12:3-26.)

6        Unbeknownst to the Vagos, Klein surrendered his license to practice accounting after he

7  was accused of embezzling money from an 86-year-old client with dementia.  (*Id.*, Exh. F.)  The

8  State Board of Accountancy disciplined Klein at the same time he was defrauding the Vagos.  (*Id.*)

9        The jury ultimately found that Mrs. Vago had proven her case against Klein for intentional

10  fraud, fraudulent concealment, financial elder abuse and breach of fiduciary duty.  The jury

11  awarded $8.3 million in compensatory damages, plus $8.3 million more in punitive damages.  And

12  the jury awarded Joe Vago an additional $400,000 in emotional distress damages.  (*Id.*, Exh. H.)

13        **C.    Debtors' Post-Trial Misconduct**

14        The Court entered judgment against Debtors on December 2, 2022, in the amount of

15  $24,334,038.99, which included prejudgment interest.  (*Id.*)

16        The Vagos attempted to serve Klein with a notice of judgment debtor's exam on more than

17  six occasions.  (*Id.*, ¶ 14 & Exh. T.)  The Vagos' process server performed a stakeout of Klein's

18  home, but was unable to serve him with any court papers.  (*Id.*)  According to the process server,

19  Klein was home but was evading service.  (*Id.*)  The Vagos attempted to serve Klein personally at

20  a hearing on a temporary injunction application that Klein filed, but he did not show up for the

21  hearing.  (*Id.*)  Brian Procel, the Vagos' counsel, asked Klein's current counsel, Jeffrey Slott, if he

22  or Klein would accept service.  Slott said that Klein would not agree.  (*Id.*, ¶15.)

23        Procel also asked Slott on several occasions if Klein intended to pay any portion of the

24  judgment.  Mr. Slott did not respond.  (*Id.*, ¶ 16.)

25        **D.    Klein's Assets**

26        Klein has admitted to holding title to or having an interest in properties located at: (1) 3752

27  Ocean Drive, Oxnard; (2) 322 N. June Street, Los Angeles; (3) 315 N. Martel Avenue, Los

28  Angeles; (4) 161 N. Poinsettia Place, Los Angeles; (5) 2560 N. Whitewater Club Drive No. 8,

1   Palm Springs; (6) 143 S. Highland Avenue, Los Angeles; and (7) 306 N. Highland Avenue, Los

2   Angeles.  (*Id.*, Exh. E at 22:20-25:7.)  But in the Menlo case, *at least eight additional properties*

3   *that Klein didn't disclose at trial* were identified.  (*Id.*, Exh. I.)  Klein currently lives in a $5

4   million house located in Hancock Park.  (*Id.*, ¶ 17)

5          Klein testified at trial that he has a net worth of around $7.5 million.  (*Id.*, Exh. E at 26:5-

6   9.)  But the equity in his properties in Los Angeles County alone is well in excess of that number.

7   The Vagos believe that the true figure may be exponentially higher and that Klein is concealing

8   assets.  But Klein has yet to produce his bank statements for the relevant period.  And Klein still

9   has not accounted for the money he took from the Vagos.

10         **E.      Klein Drained His Bank Accounts**

11         After obtaining their judgment against Klein, the Vagos served notices of levy and writs of

12  execution on the banks Klein was known to have used.  (Procel Decl., ¶ 19.)  Thus far, it appears

13  those accounts had only a few hundred dollars.  (*Id.*)  Given his palatial home, his numerous

14  properties, and the teams of lawyers he has retained, it strains credulity to believe this is all the

15  cash Klein actually has. But Klein has stymied the Vagos' efforts to question him under oath.

16         **F.      Klein's Recent Bankruptcy and Foreclosures**

17         Klein has clearly used his companies to shield assets from creditors.

18         Klein is the sole officer, director, and shareholder of holding company called Bay Area

19  Development Company ("BADCO").  (*Id.*, Exh. J at 28.)  BADCO's only assets were two real

20  properties: a residential property located at 507 N. Mansfield in Los Angeles (the "Mansfield

21  Property"), and a commercial property located at 12545 Ventura Blvd in Sherman Oaks (the

22  "Ventura Property").  (*Id.* at 9.)  Klein transferred both of these properties—collectively worth

23  over $6 million—to BADCO for no consideration.  (*Id.* & Exhs. M, N.)  Klein transferred the

24  Ventura Property to BADCO *after* the Menlos had already sued him for tens of millions of dollars

25  and the Vagos' lawsuit (this case) was right around the corner.

26         On September 14, 2022—the day before the jury's verdict against him in the Vagos'

27  case—Klein filed a voluntary bankruptcy petition on behalf of Bay Area Development Company

28

1   "BADCO").  (Procel Decl., ¶ 23.)  Klein personally paid BADCO's legal fees in the bankruptcy,

2   apparently from another entity he controlled, Big Boyz Legal LLC.  (*Id.*, Exh. J at 28.)

3       Klein could not keep his story straight as to whether he or BADCO owned the properties.

4   Sometimes Klein claimed that BADCO owned the properties outright, sometimes he claimed he

5   was an owner in his individual capacity.  (*Id.*, Exh. J at 9; Exh. K at 8.)

6       On December 6, 2022—four days after judgment was entered in the Vagos' favor—Klein

7   voluntarily dismissed BADCO's bankruptcy.  (*Id.*, Exh. L.)  He claimed the bankruptcy was filed

8   to forestall an impending nonjudicial foreclosure on the *Mansfield* Property, but that he was

9   "willing and able" to make payments going forward on the Ventura Property—knowing full well

10  that the Menlo court had enjoined him from spending his assets.  (*Id.* at 2-3; Exh. W.)  His

11  dismissal of the bankruptcy paved the way for the lender to foreclose on the Ventura Property.

12      On January 26, 2023, Velocity Capital conducted a nonjudicial foreclosure sale of the

13  Ventura Property.  (Procel Decl., ¶ 27.)  Neither the Vagos nor the Menlos had a judgment against

14  BADCO at this point, and were unable to stop the sale from going forward.[1]  Klein had claimed it

15  was worth an estimated $5 million, with only a $2.2 million mortgage on it.  (*Id.*, Exh. K at 10.)

16  The lender credit bid the full amount outstanding on the loan—approximately $2.5 million—and

17  was the only bidder at the sale.  (*Id.*).  ***The lender thus obtained a windfall of $2.5 million***.  Klein

18  was never going to see any of that equity anyway—but it could have gone to his victims.

19      Notably, prior to the foreclosure, the Vagos' counsel, Mr. Procel, reached out to Debtors'

20  counsel, Mr. Slott.  (*Id.*, ¶ 29.)  Procel asked Slott if Klein would be willing to transfer his interest

21  in the properties to the Vagos.  (*Id.*)  That way, the Vagos could pay the lenders any amount

22  necessary to cure the defaults.  (*Id.*)  The Vagos were prepared to give Klein an offset on the

23  amount of the judgment (and they would have given Klein more than the fair value of Klein's

24  equity in the properties).  (*Id.*)  This would have benefitted both the Vagos *and* Klein.  But Slott

25  indicated that Klein would not agree to any proposal involving the Vagos.  (*Id.*)  This proposal did

26

27  _____

[1] Counsel for the Vagos asked the lender to continue the sale to give the Vagos an opportunity to
add BADCO as an alter ego judgment debtor.  The lender refused to do so and proceeded with the

28  foreclosure.  (Procel Decl., ¶ 28.)

PLAINTIFFS' EX PARTE APPLICATION TO APPOINT RECEIVER

1  not even get off the ground.  (*Id.*)  Indeed, Procel sent two emails to Slott asking if Klein has any

2  intention of paying down the judgment.  (*Id.*)  Slott did not respond.  (*Id.*)

3          **G.**       **Upcoming Foreclosures**

4         A foreclosure sale on the 315 N. Martel Avenue property, owned by Klein in his individual

5  capacity, is scheduled to take place just days from now on February 28, 2023.  (*Id.*, Exh. U.)  As

6  with the Ventura Property, the Martel property is estimated to be worth well over $1 million more

7  than the secured debt.  (*Id.*, Exhs. P-Q ($1.4 million loan on $2.7 million home).)  Thus, there

8  would be enough value to make the secured lender whole *and* provide some compensation to

9  victims.  But if the foreclosure sale goes forward, there is every reason to believe that the secured

10  lender will, as with the Ventura Property, credit bid the full amount of the indebtedness, be the

11  only lender, and get a windfall of the excess equity, leaving Klein's victims in the cold.

12         Just two days ago, the Vagos' counsel received notice of yet another foreclosure sale on

13  one of Klein's properties—2560 N. Whitewater Club Dr., #B, Palm Springs—scheduled for

14  March 22, 2023.  (*Id.,* Exh. V.)  The lender claims that Klein owes only $152,948.70.  (*Id.*)  But

15  online records reflect that the property is worth over $370,000.  (*Id.*, Exh. S.)  There is therefore

16  roughly $200,000 in equity that could be used to pay Klein's victims.

17          **H.**       **The Proposed Receiver**

18         In early 2019, Brian Weiss (the proposed receiver here) was appointed by the U.S. District

19  Court for the Central District of California as a receiver over the financially troubled law firm

20  Eagan Avenatti, LLP.  *See In re Eagan Avenatti, LLP*, Case No. 18-01644-VAP-KES, C.D. Cal.,

21  February 13, 2019 (ECF No. 53).  Mr. Weiss is a CPA and has his MBA from USC, and has two

22  decades of experience in forensic accounting and financial investigation, including numerous

23  fiduciary appointments as a receiver in state and federal courts, forensic accountant to Judge

24  William Fahey, and Chief Restructuring Officer is numerous chapter 11 bankruptcy cases.  Mr.

25  Weiss also has significant real estate experience including the monetization of commercial and

26  residential real property.  (Procel Decl., Exh. O.)  He has the expertise needed to untangle Klein's

27  convoluted web of financial deceit.

28

## III. <u>LEGAL STANDARDS</u>

California Code of Civil Procedure section 564(b) permits the Court to appoint a receiver, among other circumstances: in an action by a creditor "where it is shown that the property or fund is in danger of being lost, removed or materially injured"; "after judgment, to carry the judgment into effect"; "where a corporation is insolvent, or in imminent danger of insolvency, or has forfeited its corporate rights"; and "[i]n all other cases where necessary to preserve the property or rights of any party." Civ. Proc. Code §§ 564(b)(1), (3), (6), and (9).

The court has the authority to appoint a receiver over a corporation or business, including a law firm like LK&A. *See, e.g.,* Civ. Proc. Code § 564(b)(6) (authorizing receivers where corporation is dissolved or insolvent); *O'Flaherty v. Belgium*, 115 Cal. App. 4th 1044, 1061-62 (2004) (appointing receiver over law firm). Indeed, the proposed receiver here, Brian Weiss, was appointed as receiver over Eagen Avenatti LLP, the failed law firm.

Courts also routinely appoint receivers to preserve assets and satisfy judgments against individuals, like Klein. *See, e.g.,* *Sachs v. Killeen*, 165 Cal. App. 2d 205, 208 (1958) (affirming order appointing receiver to "take, care for and keep possession of all property of the Killeens, as described in the complaint, namely, their real property, their automobiles, bank accounts and securities and to manage their business"); *Olsan v. Comora*, 73 Cal. App. 3d 642, 644 (1977) (affirming order appointing receiver to collect money and property from individual defendant to satisfy judgment); *Yufa v. TSI, Inc.*, 666 F. App'x 889, 891 (Fed. Cir. 2016) (affirming, under California state law, order appointing receiver to assist with satisfaction of judgment).

A trial court has wide discretion in deciding whether to appoint a receiver. *Sibert v. Shaver* 113 Cal.App.2d 19, 21 (1952) (an order appointing a receiver "will not be reversed in the absence of a clear showing of an abuse of discretion"); *Maggiora v. Palo Alto Inn, Inc.*, 249 Cal.App.2d 706, 710-11 (1967) ("The discretion of the trial court is so broad that…[t]o justify our interference, it must clearly appear that the appointment was an arbitrary exercise of power.") (citations omitted).

IV.    **ARGUMENT**

A.    **The Court Should Appoint a Receiver to Assist in the Collection of Judgment**

"The court may appoint a receiver to enforce the judgment where the judgment creditor shows that, considering the interests of both the judgment creditor and the judgment debtor, the appointment of a receiver is a reasonable method to obtain the fair and orderly satisfaction of the judgment." Civ. Proc. Code § 708.620.  It is well-settled that the collection of a money judgment is an appropriate task for a receiver.  *Olsan*, 73 Cal. App. 3d at 646 (affirming order appointing receiver to collect monetary judgment); Civ. Proc. Code § 564(b)(3).[2]

Here, appointment of a received is not only a reasonable method of collecting the judgment; it is likely the *only* way. The Vagos have a $24.3 million judgment against Debtors. But despite their diligent efforts since having obtained their judgment nearly three months ago, they have been unable to accomplish one of the first key steps in enforcement—a judgment debtor's exam—because Klein has repeatedly evaded service. They have tried levies and writs of execution; but those tools are of little help if Klein has concealed or fraudulently transferred his assets.

A court-appointed receiver is in the best position to discover what assets Klein has, determine where the money he stole is, and ensure that Klein's assets are utilized appropriately. Indeed, a receiver would act in Klein's best interest by ensuring that his money and property are used to satisfy the judgment, rather than handed over to foreclosing banks and lenders at a tremendous discount.

B.    **A Receiver Should Be Appointed Because Debtors Cannot Be Trusted with Their Property**

Appointment of a receiver is authorized "where it is shown that the property or fund is in

---

[2] Klein filed a notice of appeal in this action.  But the fact that an appeal is contemplated or pending has no bearing on this *ex parte* application.  *See, e.g.*, *Sibert*, 113 Cal. App. 2d at 22 (affirming order appointing receiver while judgment was on appeal for the purpose of preserving assets that may be used to satisfy judgment).

1   danger of being lost, removed or materially injured." Code Civ. Proc. § 564(b)(1).  This Court can

2   and should appoint a receiver based solely on Klein's history of fraudulent conduct, which shows

3   that he has repeatedly commingled, stolen, or dissipated assets, and will likely continue to do so.

4   *See Sachs*, 165 Cal. App. 2d at 214 (affirming *ex parte* order appointing receiver where plaintiffs

5   presented evidence that defendant falsified financials, concealed profits, and that "assets were in

6   danger of being lost . . ."); *City & Cnty. of San Francisco v. Daley*, 16 Cal. App. 4th 734, 744–45

7   (1993) (affirming order appointing receiver where defendant violated court orders and took actions

8   that were designed to evade responsibility for their misconduct).

### 1. Debtors Were Found to Have Engaged in Widespread Fraudulent Conduct

10          The jury found both Klein and LK&A liable for intentional fraud, elder abuse and breach

11  of fiduciary duty.  And the jury imposed punitive damages against Debtors based on a finding that

12  they acted with fraud, oppression or malice.

13          The evidence at trial conclusively established that Klein was running a Ponzi scheme.

14  Klein utterly failed and refused to account for the millions of dollars the Vagos entrusted with

15  him.  The Vagos presented evidence that Klein forged Mrs. Vago's signature on court documents.

16  He took out insurance policies on individuals without their knowledge or consent.  He admittedly

17  used his attorney-client trust account for improper purposes, including using the account to buy

18  and sell life insurance policies.  Klein admitted that he commingled his own funds with client

19  funds, and that he made loans to clients without documenting them.  Klein violated several court

20  orders in refusing to produce his attorney-client trust account statements (and he was sanctioned

21  by the court multiple times).  Klein refused to turn over his financials during the punitive damages

22  phase of the trial.  (*Id.*, Exh. E at 15:23-18:9.)  He sent the Vagos false and fraudulent account

23  statements that reflected massive profits, only to testify at trial that the statements *he created* were

24  entirely false.  Klein even fabricated a meeting with a respected lawyer to cover his tracks (and

25  that lawyer testified at trial that the alleged meeting never happened).

### 2. Klein Has a Well-Established Practice of Commingling Money

27          Klein claims to have paid the BADCO's bankruptcy attorneys with his "personal funds."

28  (*Id.*, Exh. J at 28.)  According to Klein, those "personal funds" were apparently held in account

1  controlled by another wholly owned entity, "Big Boyz Legal, LLC." (*Id.*)  In other words, Klein

2  admittedly used money from one company he controls to pay the debts of another company he

3  controls.  And Klein claims that money held in an LLC are actually his "personal funds."  This is

4  commingling, if not outright fraud.

5      The recorded grant deed indicates that BADCO owned the Ventura property in its entirety.

6  (*Id.*, Exh. M.)  But Klein testified that *he* actually owned half of the Ventura property in his

7  individual capacity.  (*Id.*, Exh. E at 23:24-24:3.)  Klein has a pattern and practice of shifting

8  around title to properties when it suits his purpose.  And he frequently claims that recorded title to

9  properties is not accurate.  A receiver needs to be appointed to untangle this mess and to ensure

10  that Klein is not transferring assets to evade creditors.

11      Klein also transferred a multi-million-dollar property to his adult son Kenneth for no

12  consideration in 2018, ***shortly before the Vagos sued him for fraud***.  (*Id.*, Exh. R.)  Klein is intent

13  on trading around millions of dollars in assets as part of his fraudulent scheme.

14          **3.   <u>Klein Violated a Court-Ordered Injunction</u>**

15      In the Menlo case, Klein used trust funds to pay his personal attorney even after he had

16  been enjoined by the court from doing so.[3]  In Menlo, the trial court entered an order freezing

17  Klein's bank accounts, among other things.  (*Id.*, Exh. W at 9:1-15.)  After the trial court entered

18  that order, Klein decided to pay his lawyers with funds that were held in the frozen bank accounts.

19  Klein blatantly violated a court-ordered injunction concerning his assets.  (*Id.* at 1:17-26.)

20      The Menlo plaintiffs further discovered that Klein retained a real estate broker for the

21  purpose of selling his properties at a discount just days before the plaintiffs obtained writs of

22  attachment.  (*Id.*).  Klein is clearly trying to evade creditors and he is willing to make fraudulent

23  transfers to do it.

24

25

26  _____
[3] The Vagos attach Jeffrey Winter's TRO Application from the Menlo case ("Winter TRO

27  Application").  (Procel Decl., Exh. W.)  There, the trial court granted the Winter TRO Application
on November 17, 2023.  The Vagos do not attach herein all of Winter's supporting evidence (to

28  avoid inundating this Court with information that is not from this case).

1    If Klein refuses to obey court orders, the only way to prevent further abuse is by depriving

2    him of any control over those funds.

3    **C.  <u>A Receiver Is Necessary to Preserve Value for Creditors</u>**

4    Appointment of a receiver is authorized "in all [] cases where necessary to preserve the

5    property or rights of any party." Cal. Code Civ. Proc. § 564(b)(9); *see O'Flaherty v. Belgum*, 115

6    Cal.App.4th 1044, 1048 (2004) (describing purpose of receivership in part to "preserve the

7    Partnership's value").  Klein has shown himself unwilling or unable to prevent multiple

8    foreclosures of properties worth millions.

9    As noted above, on January 26, 2023, Velocity Commercial Capital, LLC foreclosed on

10    property located at 14245 Ventura Blvd., Los Angeles (Klein's office building).  (Procel Decl., ¶

11    27.)  The lender obtained title to the entire building for nothing more than its $2.5 million credit

12    bid.  (*Id.*)  Klein estimated at various points that the property was worth in excess of $5 million.

13    (*Id.*, Exh. E at 23:24-24:3.)  In other words, more than $2.5 million of equity—that could have

14    been used to pay creditors—was eliminated.

15    Klein cannot be counted on to pay his debts or otherwise prevent foreclosures from

16    occurring.  He filed BADCO's bankruptcy ostensibly to prevent a foreclosure on the *Mansfield*

17    property, but gave no indication that the far more valuable Ventura Blvd. property was also in

18    danger of imminent foreclosure.  In fact, he affirmatively represented to the bankruptcy that there

19    was nothing about the Ventura property that would warrant keeping the bankruptcy proceeding

20    open, since he was "willing and able" to make the mortgage payments and promptly pay off any

21    unsecured creditors.  (*Id.,* Exh. L.)  Yet just over a month after the bankruptcy was dismissed

22    pursuant to Klein's stipulation with the Mansfield lender, the Ventura lender foreclosed.[4]  (This

23    was also a bald-faced lie—Klein knew his assets had been frozen months earlier.  (*Id.*, Exh. W.)

24    Klein gratuitously refused to even entertain a proposal that would benefit both his victims

25

26    _____

27    [4] Klein did make a half-hearted attempt to stop the foreclosure, filing an *ex parte* application for a
TRO the day before the sale.  However, his only argument was that a lis pendens on the property
would discourage bidders.  He made no attempt to argue that the lis pendens was likely to be

28    extinguished.  (Procel Decl., ¶ 28.)

1  and Klein himself.  The Vagos' counsel inquired of his counsel if Klein would be willing to

2  transfer his interest in the properties to them (since he was obligated to transfer any equity to them

3  in any event), in exchange for an offset of more than the fair value of Klein's equity.  (Procel

4  Decl., ¶ 29.)  This would provide the Vagos with an opportunity to engage the lenders directly and

5  avoid foreclosures.  But Klein dismissed it out of hand.  (*Id*.)

6  ### D.  <u>A Receiver Should Be Appointed Because Debtors Are Insolvent</u>

7  Section 564(b)(6) of the CCP provides for the appointment of a receiver "where a

8  corporation is insolvent[] or in imminent danger of insolvency."  Debtors are insolvent if they are

9  unable to pay their debts as they come due.  Cal. Civ. Code § 3439.02(c).

10  The Vagos obtained a judgment against LK&A and Klein jointly and severally in the

11  amount of $24.3 million.  The Menlos are on the verge of obtaining a judgment against Klein in

12  the amount of at least $19 million.

13  At trial, Klein claimed that LK&A has no assets.  (*Id*., Exh. E at 18:1-6.)  And he claimed

14  that LK&A had no income in any of the last five years.  (*Id*. at 21:26-22:2.)

15  Klein testified that he has a net worth of around $7.5 million.  (*Id*. at 26:5-9.)  After taking

16  into account the Vagos' judgment, his self-represented net worth is substantially negative (i.e.,

17  Klein is insolvent).   Even assuming he is worth far more than he claims he is, it is highly doubtful

18  that he has enough to satisfy both the Vagos' judgment and the Menlos' impending one.

19  Moreover, Klein has already been failing to pay his debts as they have become due.  In the

20  last two months alone, defaults on loans on which he was the debtor or guarantor led to the

21  foreclosure of two properties held by his wholly owned entity, BADCO—507 N. Mansfield in Los

22  Angeles and 12545 Ventura Blvd. in Sherman Oaks.  And two more foreclosures are imminent.

23  ### E.   <u>The Receiver Should Be Appointed On An *Ex Parte* Basis</u>

24  An *ex parte* application to appoint a receiver must contain a declaration indicating:

25  (1) the nature of the emergency and the reasons irreparable injury would be suffered;

26  (2) the names, addresses, and telephone numbers of the persons in actual possession
of the property or the president, manager, or principal agent of any corporation in

27  possession of the property;

28  (3) the use being made of the property by the persons in possession; and

(4) if the property is a part of the plant, equipment, or stock in trade of any business, the nature and approximate size or extent of the business and facts sufficient to show whether the taking of the property by a receiver would stop or seriously interfere with the operation of the business.

Cal. Rule of Court Rule 3.1175(a).

**Nature of the Emergency.** *Ex parte* relief is appropriate and critical. Every day that Klein remains in control of his own finances gives him yet another opportunity to conceal, fraudulently transfer, or dissipate his assets. And indeed, Klein's assets are quickly diminishing.

Under the best of circumstances, Klein will not be able to satisfy the judgments against him. He stole far more money than he is ever going to repay. Klein owes the Vagos $24.3 million and he will likely owe the Menlos another $19 million or more. Every penny in Klein's possession should be used to compensate his victims.

Instead, lenders are foreclosing on Klein's properties, taking all of the equity away from creditors. A receiver would be in a position to maximize the value of Klein's assets for his creditors. There is no reason for Klein's properties to be sold at foreclosure. If a receiver is authorized to sell the properties in the ordinary course, the lenders will still receive their secured debt in full, and the surplus can be used to pay down Klein's creditors. In other words, secured lenders would not be harmed by the appointment of a receiver, but Klein's victims would be severely harmed if a receiver is not appointed.

But a receiver must be installed before the next foreclosure, which is scheduled for February 28, 2023. In all likelihood, the lender on that property, just as in the last foreclosure, will credit bid the full amount of the secured debt and will be the only bidder, thereby securing for itself all equity in excess of its debt and wiping out any recovery for victims. This issue is therefore incredibly time-sensitive. Yet another foreclosure is scheduled just a few weeks later.

Either Klein's massive fraud *or* impending foreclosures alone would be sufficient grounds to appoint a receiver on an *ex parte* basis. Here, the combination of the two makes the immediate appointment of a receiver—and the halting of foreclosures—absolutely essential.

**Identity of Those in Possession of and Use of the Properties.** Klein is the owner of the properties at issue. He is in possession of the properties. The Vagos are unaware to the extent any

1   of the properties are occupied by tenants or family members (the Vagos would have no way of

2   knowing that).  The Vagos are also unable to effectively investigate if third parties have received

3   fraudulent transfers from Klein of property that rightfully should be used to satisfy the judgment.

4          **Property As Part of a Business.**  According to Klein, LK&A does not possess any assets,

5   and therefore there is no concern about a receiver taking control of a "plant, equipment, or stock in

6   trade." Cal. Rule of Court Rule 3.1175(a)(4).

7          **F.   This Court Should Enjoin the Foreclosures**

8          Klein's lender for the property located at 315 N. Martel, Los Angeles has served a notice

9   of intent to foreclosure on February 28.  The estimated value for the property is $2,653,400.

10  Procel Decl., Exh. P.)  Based on the deed of trust, the lender is owed $1,386,000.  (*Id.*, Exh. Q.)

11  Klein therefore has more than $1 million in equity on this property alone.  There is also another

12  foreclosure scheduled on March 22, 2023 relating to Klein's Palm Springs property.  (*Id.*, Exh. V.)

13  The lenders should be enjoined from proceeding with these foreclosures.

14         The secured lenders will not be prejudiced if there is a delay in selling the property.   The

15  lender on the Martel property is entitled to the full amount outstanding on the loan, but nothing

16  more.  The same holds true for the lender on the Palm Springs Property.  The excess equity should

17  be going to the Vagos, not to the lenders as a windfall.

18          It may also be the case that the lenders are charging improper default interest.  *See*

19  *Honchariw v. FJM Private Mortgage Fund, LLC*, 83 Cal. App. 5th 893 (2002) (holding that lender

20  may not charge default interest on total outstanding balance of loan).  The receiver needs to gain

21  access to the lenders' records to determine whether they have assessed improper default interest

22  (i.e., money that could be used to pay Klein's creditors).

23         The Court can and should enjoin the upcoming foreclosure sales to provide the receiver

24  with the time needed to do his job.

25  **V.      CONCLUSION**

26         For all the foregoing reasons, the Vagos respectfully request that the Court grant this *Ex*

27  *Parte* Application in all respects.

28

1    DATED:  February 21, 2023              PROCEL LAW, PC

2

3

4                                         By:  _____
                                              BRIAN PROCEL
5                                             Attorneys for Plaintiffs
                                              JOSEPH VAGO and ERICA VAGO
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  BRIAN A. PROCEL (State Bar No. 218657)
   brian@procel-law.com
2  MARTIN PRITIKIN (State Bar No. 210845)
   marty@procel-law.com
3  PROCEL LAW, PC
   401 Wilshire Boulevard
4  12th Floor
   Santa Monica, California 90401
5  Telephone:      (424) 788-4538

6  Attorneys for Plaintiffs
   ERICA VAGO and JOSEPH VAGO
7

8

9           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10           **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

11

12  ERICA VAGO and JOSEPH VAGO,          CASE NO. 20STCV25050

13           Plaintiffs,                 **DECLARATION OF BRIAN PROCEL IN**
                                         **SUPPORT OF EX PARTE APPLICATION**
14      v.                               **TO APPOINT RECEIVER**

15  LESLIE KLEIN; LES KLEIN &
    ASSOCIATES, INC.; KENNETH KOLEV      Assigned for All Purposes to:
16  KLEIN; and LAW OFFICE OF KENNETH     Hon. Terry A. Green, Dept. 14
    KLEIN, P.C.,
17                                       Date: February 22, 2023
           Defendants.                   Time: 8:30 a.m.
18                                       Dept.: 14

19
                                         Action Filed:    July 1, 2020
20                                       Trial Date:      August 29, 2022

21

22

23

24

25

26

27

28

**DECLARATION OF BRIAN PROCEL**

1.      I am Brian Procel, counsel for Judgment Creditors Erica and Joe Vago (collectively, the "Vagos") in this action.  I am competent to testify herein, have personal knowledge of the following facts and make this declaration in support thereof.

**Debtors' Litigation Misconduct**.

2.      The Vagos filed their Complaint on July 1, 2020.

3.      Debtors served boilerplate objections to all written discovery requests.  They refused to produce documents.  The Vagos then filed several rounds of discovery motions.  The Court granted all of them and entered monetary and issue sanctions against Debtors.  The Court ordered Debtors to produce a responsivity chart and a privilege log.  They did not.  The Court ordered Debtors to produce redacted produce bank records.  They did not.  Debtors filed a motion to quash a third-party subpoena served on Bank of America, which they lost.  Debtors failed to pay their monetary sanctions by the court-ordered deadline (Klein's check bounced) and they failed to comply with court orders requiring supplemental responses.  Making matters worse, Debtors walked out of a court ordered deposition.  They stalled and refused to make Klein available for deposition.  Debtors substituted new counsel on the eve of trial.  They filed numerous motions to continue the trial date, all of which were denied.

**The Trial and Jury Verdict**

4.      On August 29, 2022, the trial in this matter commenced.  Klein defrauded the Vagos' when they were at their most vulnerable—just after Mrs. Vago's brother died and while she was caring for her dying mother in the hospital.  Relevant excerpts from the trial transcripts for September 6, 2022 are attached hereto as Exhibit A.

5.      Klein initially testified that he had no financial interest in the policies that he purportedly invested the Vagos money in.  But he later admitted that he invested his own money in these policies.  Attached hereto as Exhibit B are relevant excerpts from the trial transcripts for September 7, 2022.

6.      Klein drafted and signed promissory notes where he agreed as trustee that the Vagos would be entitled to 12% interest on their money.  Attached hereto as Exhibit G is the

1   purported Non-Recourse Promissory Note dated September 12, 2012, reflecting his ostensible

2   status as Trustee of the Ann Radow Irrevocable Life Insurance Trust, previously introduced as

3   Exhibit 21 at the trial of *Vago v. Klein*.

4          7.      But Klein testified at trial that he never had any intention of actually paying the

5   Vagos that interest.

6          8.      Klein testified at trial that he kept a contemporaneous "ledger" of all transactions

7   relating to the Vagos.   This was a bald-faced lie—no such ledger was produced at trial.

8          9.      Klein admitted that he provided false and inflated financials to the Vagos on a

9   regular basis.  Attached hereto as <u>Exhibit C</u> are relevant excerpts from the trial transcripts for

10  September 8, 2022.

11         10.     Klein took out a life insurance policy on an individual named Ann Radow.  Ann

12  Radow testified at trial that she had never met Klein; that he took out an insurance policy on her

13  life without her knowledge or consent; and that Klein created the Ann Radow Trust and made

14  himself the trustee without her knowledge or consent.  Attached hereto as <u>Exhibit D</u> are relevant

15  excerpts from the trial transcripts for September 9, 2022.

16         11.     Unbeknownst to the Vagos, Klein surrendered his license to practice accounting

17  after he was accused of embezzling money from an 86-year-old client with dementia.  Attached

18  hereto as <u>Exhibit F</u> is the Accusation filed by the State Board of Accountancy against Klein (Trial

19  Exhibit 14).  The State Board of Accountancy disciplined Klein at the same time he was

20  defrauding the Vagos.

21         12.     The jury ultimately found that Mrs. Vago had proven her case against Klein for

22  intentional fraud, fraudulent concealment, financial elder abuse and breach of fiduciary duty.  The

23  jury awarded $8.3 million in compensatory damages, plus $8.3 million more in punitive damages.

24  And the jury awarded Joe Vago an additional $400,000 in emotional distress damages.  Attached

25  hereto as <u>Exhibit H</u> is the Judgment entered in this action dated December 2, 2022.

26         **Debtors' Post-Trial Misconduct**

27         13.     The Court entered judgment against Debtors on December 2, 2022, in the amount

28  of $24,334,038.99, which included prejudgment interest.

14.     The Vagos attempted to serve Klein with a notice of judgment debtor's exam on more than six occasions. Attached hereto as <u>Exhibit T</u> is the Affidavit of Due Diligence executed by the process server Mohammad Rafiquzzaman of First Legal. The Vagos' process server performed a stakeout of Klein's home, but was unable to serve him with any court papers. According to the process server, Klein was home but was evading service. The Vagos attempted to serve Klein personally at a hearing on a temporary injunction application that Klein filed, but he did not show up for the hearing.

15.     I asked Klein's current counsel, Jeffrey Slott, if he or Klein would accept service. Slott said that Klein would not agree.

16.     I also asked Slott on several occasions if Klein intended to pay any portion of the judgment. Mr. Slott did not respond.

**Klein's Assets**

17.     Klein testified at trial that he title to or an interest in properties located at: (1) 3752 Ocean Drive, Oxnard; (2) 322 N. June Street, Los Angeles; (3) 315 N. Martel Avenue, Los Angeles; (4) 161 N. Poinsettia Place, Los Angeles; (5) 2560 N. Whitewater Club Drive No. 8, Palm Springs; (6) 143 S. Highland Avenue, Los Angeles; and (7) 306 N. Highland Avenue, Los Angeles. But in the Menlo case, ***at least eight additional properties that Klein didn't disclose at trial*** were identified. Attached hereto as Exhibit I is a copy of the December 23, 2022 Order Granting Temporary Restraining Order Enjoining Leslie Klein's Disposition of Real Properties, entered in *In the Matter of Franklin Henry Menlo Irrevocable Trust Established March 1, 1983*, Los Angeles Superior Court Case No. BP136739 (and consolidated cases) (the "Menlo case"), which identifies all seven properties Klein disclosed at trial in the Vago case as well as eight others. Klein also currently lives in a $5 million house located in Hancock Park.

18.     Klein testified at trial that he has a net worth of around $7.5 million. Attached as <u>Exhibit E</u> are trial transcripts dated September 16, 2022, reflecting Klein's testimony concerning the properties he owns and his net worth. But the equity in his properties in Los Angeles County alone is well in excess of that number. The Vagos believe that the true figure may be exponentially

1  higher and that Klein is concealing assets.  But Klein has yet to produce his bank statements for

2  the relevant period.  And Klein still has not accounted for the money he took from the Vagos.

3  **Klein Drained His Bank Accounts**

4  19.     After obtaining their judgment against Klein, the Vagos served notices of levy and

5  writs of execution on the banks Klein was known to have used.  Thus far, it appears those

6  accounts had only a few hundred dollars.  Given his palatial home, his numerous properties, and

7  the teams of lawyers he has retained, it strains credulity to believe this is all the cash Klein

8  actually has. But Klein has stymied the Vagos' efforts to question him under oath.

9  20.     Klein also transferred a multi-million-dollar property to his adult son Kenneth for

10  no consideration in 2018, ***shortly before the Vagos sued him for fraud***.  Attached hereto as

11  Exhibit R is a February 9, 2021 Grant Deed reflecting Klein's transfer of 306 N. Highland., Los

12  Angeles, CA 90036 to his son Kenneth Klein and daughter-in-law Shoshana Shifra Klein.

13  **Klein's Recent Bankruptcy and Foreclosures**

14  21.     Klein has clearly used his companies to shield assets from creditors.

15  22.     Klein is the sole officer, director, and shareholder of holding company called Bay

16  Area Development Company ("BADCO").  Attached hereto as Exhibit J is a true and correct copy

17  of the September 28, 2022 debtors' schedules filed as Docket #18 in the bankruptcy proceedings

18  of Bay Area Development Co. in the Bankruptcy Court for the Central District of California, Case

19  2:22-bk-15031-SK (hereinafter, "BADCO bankruptcy").  BADCO's only assets were two real

20  properties: a residential property located at 507 N. Mansfield in Los Angeles (the "Mansfield

21  Property"), and a commercial property located at 12545 Ventura Blvd in Sherman Oaks (the

22  "Ventura Property").   Klein transferred both of these properties—collectively worth over $6

23  million—to BADCO for no consideration.  Attached as Attached hereto as Exhibit M is the

24  August 22, 2018 Grant Deed reflecting Leslie Klein's transfer of 14245 Ventura Blvd., Los

25  Angeles, CA 91423 to Bay Area Development Company.  Attached hereto as Exhibit N is the

26  November 30, 2004 Grant Deed reflecting Leslie Klein's transfer of 507 N. Mansfield, Los

27  Angeles, CA to Bay Area Development Company.  Klein transferred the Ventura Property to

28

1    BADCO *after* the Menlos had already sued him for tens of millions of dollars and the Vagos'

2    lawsuit (this case) was right around the corner.

3         23.    On September 14, 2022—the day before the jury's verdict against him in the

4    Vagos' case—Klein filed a voluntary bankruptcy petition on behalf of Bay Area Development

5    Company "BADCO").  Klein's bankruptcy filings (Exhibit J) indicate that he personally paid

6    BADCO's legal fees in the bankruptcy, apparently from another entity he controlled, Big Boyz

7    Legal LLC

8         24.    Klein could not keep his story straight as to whether he or BADCO owned the

9    properties. Sometimes Klein claimed that BADCO owned the properties outright, sometimes he

10   claimed he was an owner in his individual capacity.  Attached hereto as <u>Exhibit K</u> is a true and

11   correct copy of the October 18, 2022 amended debtors' schedules filed as Docket #25 in the

12   BADCO bankruptcy.

13        25.    On December 6, 2022—four days after judgment was entered in the Vagos'

14   favor—Klein voluntarily dismissed BADCO's bankruptcy.  Attached hereto as <u>Exhibit L</u> is the

15   bankruptcy dismissal filed by Klein on behalf of BADCO.

16        26.    In his December 6, 2022 dismissal, Klein claimed the bankruptcy had been filed to

17   forestall an impending nonjudicial foreclosure on the *Mansfield* Property, but that he was "willing

18   and able" to make payments going forward on the Ventura Property—knowing full well that the

19   Menlo court had enjoined him from spending his assets.  Attached hereto as <u>Exhibit W</u> is a true

20   and correct copy of Co-Trustee Jeffrey Winter's Ex Parte Application for Temporary Restraining

21   Order Enjoining Leslie Klein's Disposition of Assets and Requesting Disclosure of Assets, filed

22   November 15, 2022 in the Menlo case.

23        27.    On January 26, 2023, Velocity Capital conducted a nonjudicial foreclosure sale of

24   the Ventura Property.  Neither the Vagos nor the Menlos had a judgment against BADCO at this

25   point, and were unable to stop the sale from going forward.   Klein had claimed it was worth an

26   estimated $5 million, with only a $2.2 million mortgage on it (see Exhibit K).  The lender credit

27   bid the full amount outstanding on the loan—approximately $2.5 million—and was the only

28

1  bidder at the sale. *The lender thus obtained a windfall of $2.5 million.* Klein was never going to

2  see any of that equity anyway—but it could have gone to his victims.

3         28.     I asked the lender to continue the sale to give the Vagos an opportunity to add

4  BADCO as an alter ego judgment debtor.  The lender refused to do so and proceeded with the

5  foreclosure.  (As for Klein, he did make a half-hearted attempt to stop the foreclosure, filing an *ex*

6  *parte* application for a TRO the day before the sale.  However, his only argument was that a lis

7  pendens on the property would discourage bidders.  He made no attempt to argue that the lis

8  pendens was likely to be extinguished.)

9         29.     Notably, prior to the foreclosure, I reached out to Debtors' counsel, Mr. Slott.  I

10  asked Slott if Klein would be willing to transfer his interest in the properties to the Vagos.  That

11  way, the Vagos could pay the lenders any amount necessary to cure the defaults.  The Vagos were

12  prepared to give Klein an offset on the amount of the judgment (and they would have given Klein

13  more than the fair value of Klein's equity in the properties).  This would have benefitted both the

14  Vagos *and* Klein.  But Slott indicated that Klein would not agree to any proposal involving the

15  Vagos.  This proposal did not even get off the ground.  Indeed, I sent two emails to Slott asking if

16  Klein has any intention of paying down the judgment.  Slott did not respond.

17        **Upcoming Foreclosures**

18         30.     A foreclosure sale on the 315 N. Martel Avenue property, owned by Klein in his

19  individual capacity, is scheduled to take place just days from now on February 28, 2023.  Attached

20  hereto as Exhibit U is the Notice of Trustee Sale for 315 N. Martel.

21         31.     As with the Ventura Property, the Martel property is estimated to be worth well

22  over $1 million more than the secured debt.  Attached hereto as Exhibits P and Q are a printout

23  from Zillow showing the fair market value as $2,653,400 for the Martel Property as of February

24  19, 2023, and the August 2, 2018 Deed of Trust on 315 N. Martel securing a $1,368,000 loan from

25  OCMBC, Inc. to Leslie Klein.  Thus, Klein has more than $1 million equity in the Martel

26  property.

27         32.     Just two days ago, I received notice of yet another foreclosure sale on one of

28  Klein's properties—2560 N. Whitewater Club Dr., #B, Palm Springs—scheduled for March 22,

1    2023.  Attached hereto as <u>Exhibit V</u> is the Notice of Trustee Sale for the Palm Springs Property.

2    The lender claims that Klein owes only $152,948.70.

3         33.    But online records reflect that the property is worth over $370,000.  Attached

4    hereto as <u>Exhibit S</u> is a printout from Zillow for the Palm Springs Property as of February 19,

5    2023.  There is therefore roughly $200,000 in equity that could be used to pay Klein's victims.

6    **<u>Cal. Rule of Court 3.1175(a) Requirements for <i>Ex Parte</i> Appointment of Receiver</u>**

7         34.    **Nature of the Emergency.**  *Ex parte* relief is appropriate and critical.  Every day

8    that Klein remains in control of his own finances gives him yet another opportunity to conceal,

9    fraudulently transfer, or dissipate his assets.  And indeed, Klein's assets are quickly diminishing.

10        35.    Under the best of circumstances, Klein will not be able to satisfy the judgments

11   against him.  He stole far more money than he is ever going to repay.  Klein owes the Vagos $24.3

12   million and he will likely owe the Menlos another $19 million or more.  Every penny in Klein's

13   possession should be used to compensate his victims.

14        36.    Instead, lenders are foreclosing on Klein's properties, taking all of the equity away

15   from creditors.  A receiver would be in a position to maximize the value of Klein's assets for his

16   creditors.  There is no reason for Klein's properties to be sold at foreclosure.  If a receiver is

17   authorized to sell the properties in the ordinary course, the lenders will still receive their secured

18   debt in full, and the surplus can be used to pay down Klein's creditors.  In other words, secured

19   lenders would not be harmed by the appointment of a receiver, but Klein's victims would be

20   severely harmed if a receiver is not appointed.

21        37.    But a receiver must be installed before the next foreclosure, which is scheduled for

22   February 28, 2023.  In all likelihood, the lender on that property, just as in the last foreclosure, will

23   credit bid the full amount of the secured debt and will be the only bidder, thereby securing for

24   itself all equity in excess of its debt and wiping out any recovery for victims.  This issue is

25   therefore incredibly time-sensitive.  Yet another foreclosure is scheduled just a few weeks later.

26        38.    Either Klein's massive fraud *or* impending foreclosures alone would be sufficient

27   grounds to appoint a receiver on an *ex parte* basis.  Here, the combination of the two makes the

28   immediate appointment of a receiver—and the halting of foreclosures—absolutely essential.

39. **Identity of Those in Possession of and Use of the Properties.** Klein is the owner of the properties at issue. He is in possession of the properties. The Vagos are unaware to the extent any of the properties are occupied by tenants or family members (the Vagos would have no way of knowing that). The Vagos are also unable to effectively investigate if third parties have received fraudulent transfers from Klein of property that rightfully should be used to satisfy the judgment.

40. **Property As Part of a Business.** According to Klein, LK&A does not possess any assets, and therefore there is no concern about a receiver taking control of a "plant, equipment, or stock in trade." Cal. Rule of Court Rule 3.1175(a)(4).

**Notice of _Ex Parte_ Application**

41. Prior to 10:00 a.m. on February 21, 2023, I gave notice via telephone and email of this _ex parte_ application and that it will be hard tomorrow at 8:30 a.m. in Dept. 14, to:

1) Counsel for Debtors - Jeffrey Slott, jslott@aol.com, (818) 995-1955

2) Trustee Corps., the lender seeking to foreclose on the 315 N. Martel property on February 28, 2023 – Amy and Bobbi Leflower, (949) 252-8300 support@trusteecorps.com

3) Quality Loan Service Corporation, on behalf of the lender seeking to foreclose on the Palm Springs property on March 22, 2023 – Mary Lou, customerassistance@qualityloan.com (619) 645-7711

They have not indicated whether they intend to appear or oppose the application.

I declare under penalty of perjury according to the laws of the State of California that the foregoing is true and correct and that this declaration was signed by me on February 21, 2023 in Santa Monica, California.

_____

Brian Procel

**INDEX OF EXHIBITS TO DECLARATION OF BRIAN A. PROCEL**

| PAGES | EXHIBIT | DESCRIPTION |
|-------|---------|-------------|
| 11-23 | A | Excerpts from Reporter's Sep. 6, 2022 trial transcript, *Vago v. Klein* |
| 24-34 | B | Excerpts from Reporter's Sep. 7, 2022 trial transcript, *Vago v. Klein* |
| 35-41 | C | Excerpts from Reporter's Sep. 8, 2022 trial transcript, *Vago v. Klein* |
| 42-49 | D | Excerpts from Reporter's Sep. 9, 2022 trial transcript, *Vago v. Klein* |
| 50-66 | E | Excerpts from Reporter's Sep. 16, 2022 trial transcript, *Vago v. Klein* |
| 67-87 | F | Leslie Klein CPA suspension documents, June 2019 – April 2020 (*Vago v. Klein* Trial Exhibit 14) |
| 88-92 | G | Sep. 12, 2012 Non-Recourse Promissory Note Re Ann Radow Irrevocable Life Insurance Trust (*Vago v. Klein* Trial Exhibit 21) |
| 93-116 | H | Dec. 2, 2022 Judgment on Special Verdict in *Vago v. Klein* |
| 117-120 | I | Dec. 23, 2022 Order Granting Temporary Restraining Order, *In The Matter Of Franklin Henry Menlo Irrevocable Trust*, L.A. Sup. Ct. Case No. Bp136739 (and consolidated cases) |
| 121-153 | J | Sep. 28, 2022 BADCO debtors' schedules [Docket #18] |
| 154-173 | K | Oct. 18, 2022 BADCO amended debtors' schedules [Docket #25] |
| 174-182 | L | Dec. 6, 2022 Stipulation For Voluntary Dismissal [Docket #29] |
| 183-185 | M | Aug. 22, 2018 Grant Deed, Leslie Klein To BADCO, 14245 Ventura Blvd. |
| 186-187 | N | Nov. 30, 2004 Grant Deed, Leslie Klein To BADCO, 507 N. Mansfield, Los Angeles, CA |
| 188-190 | O | Professional Summary, Brian Weiss, CPA, MBA, Force Ten Partners |
| 191 | P | Zillow estimate for 315 N. Martel, L.A., CA 90036 |
| 192-206 | Q | Aug. 2, 2018 Deed of Trust on 315 N. Martel |
| 207-08 | R | Feb. 9, 2021 Grant Deed, Leslie Klein to Kenneth and Shoshanna Klein, of 306 N. Highland |
| 209 | S | Zillow estimate for 2560 N. Whitewater Club Dr. #B, Palm Springs |
| 210-211 | T | Jan. 30, 2023 Affidavit of Due Diligence by First Legal |
| 212 | U | Notice of Feb. 28, 2023 Trustee Sale of 315 N. Martel |
| 213 | V | Notice of Mar. 22, 2023 Trustee Sale of 2560 N. Whitewater Dr. #B |
| 214-237 | W | Nov. 15, 2022 Winter *Ex Parte* Application in the Menlo case |

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2          FOR THE COUNTY OF LOS ANGELES

3

4    DEPARTMENT 14  HON. TERRY A. GREEN, JUDGE

5  JOSEPH VAGO AND ERICA VAGO,    )
                         )
6          PLAINTIFF,     )
                         )
7   VS.               )  NO. 20STCV25050
                         )
8  LESLIE KLEIN; LES KLEIN &amp;   )
  ASSOCIATES, INC.; KENNETH KOLEV  )
9  KLEIN; AND LAW OFFICE OF KENNETH )
  KLEIN, P.C.,           )
10
          DEFENDANTS.
11  _____

12

13

14      REPORTER'S TRANSCRIPT OF PROCEEDINGS

15         SEPTEMBER 6, 2022

16

17  APPEARANCES:

18

19  FOR PLAINTIFFS:    PROCEL LAW, PC
                 BY:  BRIAN A. PROCEL, ESQ.
20               401 WILSHIRE BOULEVARD
               12TH FLOOR
21               SANTA MONICA, CALIFORNIA 90401

22

23  FOR DEFENDANTS:    LAW OFFICES OF JEFFREY A. SLOTT, APC
                 BY:  JEFFREY A. SLOTT, ESQ.
               15760 VENTURA BOULEVARD
24               SUITE 1600
               ENCINO, CA 91436
25

26

27               KRISTINE M. HICKS, CSR NO. 13634
               OFFICIAL REPORTER PRO TEMPORE
28

ROUGH DRAFT

1

```
 1   CASE NUMBER:              20STCV25050

 2   CASE NAME:                VAGO V. KLEIN

 3   LOS ANGELES, CALIFORNIA   TUESDAY, SEPTEMBER 6, 2022

 4   DEPARTMENT: 14            HON. TERRY A. GREEN, JUDGE

 5   APPEARANCES:              (AS HERETOFORE NOTED.)

 6   REPORTER:                 KRISTINE HICKS, CSR NO. 13634

 7   TIME:                     A.M. SESSION

 8

 9                    ---OOO---

10

11        (THE FOLLOWING PROCEEDINGS WERE HELD IN

12         OPEN COURT OUTSIDE THE PRESENCE OF THE

13         JURY:)

14

15        THE COURT:  ON THE RECORD.  THE JURY IS NOT

16   PRESENT.  COUNSEL IS PRESENT.  SO MR. COHEN COULDN'T

17   SOLVE THE NANNY PROBLEM.  HE INFORMED US THAT HE'S NOT

18   COMING BACK.

19        MR. RYAN WAS IN AN AUTO ACCIDENT, AND HE'S

20   TRYING TO GET HERE ON TIME.

21        MR. PROCEL:  DO WE JUST FILL MR. COHEN'S SLOT?

22        THE COURT:  WELL, WHAT WILL HAPPEN IS DEFENSE

23   WILL FINISH QUIZZING JURORS 15 THROUGH 21.  THEN BEFORE

24   YOU DO ANYTHING, THEN I'LL SEAT MR. O'BRIEN, IT LOOKS

25   LIKE, IN MR. COHEN'S SEAT.

26        AND THEN DEPENDING ON WHERE MR. RYAN IS, IF

27   MR. RYAN IS NOT WITH US, THEN MS. HUANG WILL BE IN

28   NUMBER 4 AND THEN SAME DRILL.  ANYONE SITTING IN SEAT 1
```

2

```
 1              MR. PROCEL:  WE'LL BLOW IT UP.

 2              SO IT'S A CHECK FROM ERICA VAGO --

 3              MR. SLOTT:  NO OBJECTION.

 4              THE COURT:  IT WILL BE RECEIVED.

 5

 6              (DEFENDANT'S EXHIBIT NO. 109 WAS

 7              RECEIVED INTO EVIDENCE BY THE COURT.)

 8

 9    BY MR. PROCEL:

10        Q    MR. KLEIN, THIS IS A CHECK FROM ERICA VAGO TO

11    LES KLEIN & ASSOCIATES, DATED OCTOBER OF 2012.

12              DO YOU SEE THAT?

13        A    YES.

14        Q    AND IT'S IN THE AMOUNT OF $5,800.00?

15        A    CORRECT, YES.

16        Q    AND YOU, IN FACT, INITIALLY DID CHARGE THE

17    VAGOS?

18        A    THAT IS NOT CORRECT.  I DIDN'T CHARGE THE

19    VAGOS.  THIS WAS THE EXPENSE FOR TAKING A TRIP TO

20    LONDON AND MEETING WITH DR. JESSELSOHN AND THE AIRPLANE

21    AND ALL THE OTHER EXPENSES.

22        Q    DO YOU SEE THE MEMO LINE OF THE CHECK

23    MR. KLEIN?  IT SAYS "PROBATE" ON IT.  THIS IS NOT --

24    YOU SEE THE MEMO LINE?

25        A    THESE WERE NOT FEES.  I DON'T KNOW WHY IT SAYS

26    "PROBATE" SOMETHING, BUT THIS WAS EXPENSES TO FLY TO

27    LONDON.

28        Q    OKAY.  WELL, WE'RE HERE SOME OTHER TESTIMONY
```

161

1    ABOUT THAT, MR. KLEIN.

2        A    OKAY.  FINE.

3        Q    AND SO YOU INITIALLY WERE GOING TO CHARGE THE

4    VAGOS MONEY, BUT THEN WHEN YOU REALIZED YOU COULD STEAL

5    THEIR MONEY, YOU STOPPED CHARGING THEM; ISN'T THAT

6    RIGHT, MR. KLEIN?

7        A    NO, THAT IS NOT TRUE.

8        Q    OKAY.  DO YOU OFTEN DO SEVEN YEARS WORTH OF

9    LEGAL WORK FOR FREE?

10       A    NEVER.  THIS IS THE ONLY CASE I EVER DID THAT.

11       Q    OKAY.  NOW, I WANT TO GO TO -- I WANT TO START

12   TALKING ABOUT THIS LIFE INSURANCE BUSINESS.

13           YOU APPROACHED THE VAGOS ABOUT INVESTING IN

14   LIFE INSURANCE TRUSTS; RIGHT?

15       A    THAT'S CORRECT.

16       Q    AND AT THE TIME THAT YOU DID THAT, YOU KNEW

17   THAT MR. ROBERT SCHWEITZER HAD JUST PASSED AWAY; RIGHT?

18       A    NOT SURE WHEN WE INVESTED IN INSURANCE TRUST,

19   WHAT YEAR.  BUT I DIDN'T KNOW IF HE HAD JUST PASSED

20   AWAY.  IT COULD HAVE BEEN A WHILE LATER.  I'M NOT SURE.

21       Q    YOU KNEW THAT MR. LOUIS LOWINGER, MS. VAGO'S

22   UNCLE, HAD RECENTLY PASSED AWAY?

23       A    YES, I KNEW.

24       Q    AND YOU KNEW THAT MS. VAGO WAS LIVING IN THE

25   HOSPITAL WITH HER MOTHER BECAUSE YOU WENT TO DO HER

26   MOTHER'S WILL IN THE HOSPITAL; RIGHT?

27       A    I KNEW THAT MS. VAGO WAS IN THE HOSPITAL, YES.

28   AND I KNEW THAT HER MOTHER WAS VERY SICK, AND SHE WAS

162

1    IN THE HOSPITAL FOR A NUMBER OF YEARS.

2        Q    AND YOU KNEW THAT MS. VIAGRA WAS LIVING THERE,

3    TAKING CARE OF HER MOTHER?

4        A    YES.

5        Q    AND YOU CHOSE THAT AS THE TIME TO GO TO THEM

6    AND SAY, "I'VE GOT THESE GREAT INVESTMENTS.  LET'S TAKE

7    MILLIONS OF DOLLARS AND PUT THEM INTO THESE LIFE

8    INSURANCE PRODUCTS"; RIGHT?

9            MR. SLOTT:  OBJECTION.  VAGUE AS TO TIME.

10           THE COURT:  OKAY.  YOU SAID THAT TIME WHEN THE

11   MOTHER WAS IN THE HOSPITAL, AND THE TESTIMONY IS THE

12   MOTHER WAS IN THE HOSPITAL FOR A LONG PERIOD OF TIME.

13           SO WHY DON'T YOU PIN IT DOWN AS TO A YEAR.

14   BY MR. PROCEL:

15       Q    DO YOU RECALL WHEN YOU FIRST WENT TO --

16   APPROACHED THE VAGOS ABOUT INVESTING THE MONEY IN THE

17   LIFE INSURANCE PRODUCTS?

18       A    I WAS TOLD BY DR. JESSELSOHN NOT TO KEEP THE

19   MONEY IN CASH.  SO BASICALLY I ASKED DR. JESSELSOHN

20   WHAT DID HE INVEST THE MONEY IN.  SO HE TOLD ME, "IT'S

21   NOT YOUR BUSINESS.  WHAT I DID, I DID.  AND NOBODY IS

22   EVER GOING TO ASK ME WHAT I INVESTED IN.  AND YOU DO

23   WHAT YOU FEEL, AS THE MANAGER, IS RIGHT.  BUT YOU MAKE

24   SURE THAT THAT MONEY IS NOT GOING TO BE LOST.  WHATEVER

25   YOU PUT THE MONEY IN, BECAUSE THAT'S THE GOVERNMENT'S

26   MONEY, NOT THE VAGO'S MONEY.  YOU MAKE SURE THAT THAT

27   MONEY IS GOING TO BE THERE."

28           SO I BASICALLY DECIDED, AS THE MANAGER, THAT

163

```
1    THE SAFEST THING TO INVEST IN IS LIFE INSURANCE

2    POLICIES.  THAT WAS MY DECISION, THAT'S CORRECT.

3        Q    OKAY.  I'M GOING TO MOVE TO STRIKE THAT

4    RESPONSE, YOUR HONOR.

5             I ASKED YOU FOR THE DATE WHEN YOU FIRST

6    APPROACHED THE VAGOS.

7             THE COURT:  WHEN WAS THIS.

8             THE WITNESS:  THIS WAS, I THINK, EITHER IN

9    2015 OR '14.

10            THE COURT:  OKAY.  MOTION DENIED.

11            MR. PROCEL:  THANK YOU.

12   BY MR. PROCEL:

13       Q    AND WHEN YOU DID APPROACH THE VAGOS, YOU HAD A

14   MEETING IN THEIR HOUSE WITH THEM; CORRECT?

15       A    DON'T REMEMBER, BUT I THINK SO, YES.

16       Q    AND MR. VAGO TOLD YOU, "WE DON'T UNDERSTAND

17   ANYTHING ABOUT LIFE INSURANCE INVESTMENTS"?

18       A    RIGHT.  SO I EXPLAINED TO HIM AND I TOLD

19   HIM --

20       Q    HOLD ON, MR. KLEIN.  LET'S NOT GET AHEAD OF

21   OURSELVES.

22            DID MR. VAGO TELL YOU, "I DON'T KNOW ANYTHING

23   ABOUT LIFE INSURANCE INVESTMENTS"?  YES OR NO?

24       A    HE TOLD ME THAT I SHOULD EXPLAIN TO HIM WHAT

25   LIFE INSURANCE INVESTMENTS ARE, AND I DID.

26       Q    BECAUSE HE DON'T KNOW ANYTHING ABOUT IT;

27   RIGHT?

28       A    FINE.
```

164

```
 1            NOW, AS AN ATTORNEY WHO WAS HOLDING MONEY IN
 2   TRUST FOR SOMEONE ELSE, WHETHER THE IRS OR THE VAGOS OR
 3   ANYONE, YOU UNDERSTAND THAT YOU HAVE AN OBLIGATION TO
 4   ACCOUNT FOR THAT MONEY; RIGHT?
 5        A    NOT A PROBLEM.  I CAN ACCOUNT FOR THE MONEY.
 6        Q    YOU'RE AWARE THAT -- YOU KNOW WHAT THE RULES
 7   OF PROFESSIONAL CONDUCT ARE?
 8        A    YES.
 9        Q    THE RULES OF PROFESSIONAL CONDUCT ARE THE
10   ETHICAL OBLIGATIONS OF A LAWYER; RIGHT?
11        A    OKAY.
12        Q    YOU KNOW THAT?
13        A    YES.
14        Q    AND YOU'VE REVIEWED THOSE, YOU'RE FAMILIAR
15   WITH THEM?
16        A    YES.
17        Q    YOU'RE AWARE THAT RULES OF PROFESSIONAL
18   CONDUCT 1.15(E) SAYS THAT A LAWYER SHALL, FROM THE DATE
19   OF RECEIPT OF FUNDS OF THE CLIENT OR OTHER PERSON,
20   THROUGH THE PERIOD ENDING FIVE YEARS FROM THE DATE OF
21   APPROPRIATE DISBURSEMENT OF SUCH FUNDS, MAINTAIN A
22   WRITTEN LEDGER INDICATING THE NAME OF THE CLIENTS, THE
23   AMOUNT AND SOURCE OF ALL FUNDS, THE DATE OF ANY
24   DISTRIBUTIONS, AND THE CURRENT BALANCES.
25            SO YOU UNDERSTOOD, MR. KLEIN, THAT IF ALL OF
26   THESE MILLIONS OF DOLLARS WERE IN YOUR CLIENT TRUST
27   ACCOUNT, YOU WERE RESPONSIBLE FOR KEEPING A LEDGER
28   SHOWING WHERE THE MONEY WAS; CORRECT?
```

171

1    A    YES.

2    Q    OKAY.  AND YOU KNEW THAT AT THE TIME?

3    A    YES.

4    Q    WHERE IS THAT LEDGER?

5    A    THE LEDGER IS -- I'M NOT SURE WHERE THE LEDGER

6    IS, BUT THE LEDGER IS IN MY HEAD.  THERE'S NO ISSUE

7    HERE.  I AM PREPARED TODAY TO INTERPLEAD ALL THESE

8    FUNDS INTO COURT, AND IT'S NOT A PROBLEM.  I DIDN'T

9    STEAL A PENNY HERE.

10    Q    I DON'T WANT TO GET SIDETRACKED BY WHAT YOU

11    JUST SAID.  SO LET'S JUST BE CLEAR.

12         YOU DID NOT KEEP A LEDGER?

13         THE COURT:  DID YOU KEEP A LEDGER.

14    BY MR. PROCEL:

15    Q    DID YOU KEEP A LEDGER AT THE TIME OF WHERE ALL

16    THESE MILLIONS OF DOLLARS WAS COMING AND GOING?

17    A    YES.  I HAVE A LEDGER OF ALL THE MONEYS I GAVE

18    THE VAGOS, AND I HAVE A LEDGER OF ALL THE MONEYS THAT

19    I'M HOLDING IN THIS INSURANCE POLICIES, YES.

20    Q    OKAY.  THAT'S A LEDGER THAT YOU PREPARED AT

21    THE TIME?

22    A    THAT'S A LEDGER THAT I HAVE -- NOTES THAT I

23    HAVE IN THE VAGO FILE, YES.

24    Q    OKAY.  I LOOK FORWARD TO SEEING THAT.

25         AND THAT SHOWS THE PREMIUM PAYMENTS THAT YOU

26    MADE?

27    A    I DON'T KNOW IF IT SHOWS THE PREMIUM PAYMENTS

28    THAT I MADE BECAUSE IT BECAME VERY COMPLICATED.

172

```
 1    BASICALLY, THE WAY INSURANCE WORKS IS --
 2         Q    MR. KLEIN, I'M NOT ASKING HOW INSURANCE WORKS.
 3         A    I HAVE TO TELL YOU HOW INSURANCE WORKS.
 4    OTHERWISE, I CAN'T GIVE YOU AN ANSWER.
 5              THE COURT:  OKAY.  YOUR ATTORNEY WILL HAVE A
 6    CHANCE TO ASK YOU THESE QUESTIONS, BUT RIGHT NOW WE
 7    HAVE TO KEEP FOCUSED.
 8    BY MR. PROCEL:
 9         Q    MR. KLEIN, YOU'RE AN ACCOUNTANT; RIGHT?
10         A    I'M NOT AN ACCOUNTANT.  I NEVER PRACTICED
11    ACCOUNTING.  I HAVE BEEN AN ACCOUNTANT FOR 50 YEARS,
12    BUT I NEVER PRACTICED.  I WAS A LAWYER.
13         Q    YOU WERE LICENSED TO PRACTICE ACCOUNTING?
14         A    I NEVER PRACTICED ACCOUNTING.
15         Q    I'M NOT ASKING YOU THAT, MR. KLEIN.  I'M
16    ASKING YOU, WERE YOU LICENSED TO PRACTICE ACCOUNTING?
17         A    YES.
18         Q    YOU TOOK CLASSES ON ACCOUNTING?
19         A    YES.
20         Q    YOU UNDERSTAND HOW TO KEEP TRACK OF MONEY
21    GOING IN AND OUT OF AN ACCOUNT; RIGHT?
22         A    YES.
23         Q    YOU DID NOT DO THAT WITH RESPECT TO THE VAGO
24    MONEY, DID YOU?
25         A    I DID.
26         Q    AND YOU THINK THAT YOU HAVE A DOCUMENT THAT
27    SHOWS THAT?
28         A    WE HAVE FILED WITH YOU A DOCUMENT THAT SHOWS
```

173

1    SCHWEITZER IN HONG KONG, AND HE ALWAYS TOLD ME THAT

2    HE'S -- HE HAS NO MONEY BECAUSE HE STOLE IT FROM --

3           MR. PROCEL:  NONRESPONSIVE, YOUR HONOR.

4    HEARSAY AND NONRESPONSIVE.

5           THE COURT:  SUSTAINED.

6           MR. PROCEL:  THANK YOU, YOUR HONOR.

7           THE WITNESS:  WELL --

8           MR. PROCEL:  NO QUESTION YET, MR. KLEIN.

9    BY MR. PROCEL:

10       Q    MY QUESTION TO YOU IS WHICH STORY DO YOU WANT

11   THIS JURY TO BELIEVE?  THAT YOU KNEW ABOUT THE LOWINGER

12   MONEY IN 2012, OR THAT YOU FIRST LEARNED ABOUT IT IN

13   2018?

14       A    WELL, I KNEW ABOUT THE LOWINGER MONEY,

15   PROBABLY IN 2008, 2007, FROM ROBERT SCHWEITZER HIMSELF.

16   BUT I HAD IT VERIFIED IN 2018.

17       Q    OKAY.

18          MR. PROCEL:  THIS IS A GOOD STOPPING POINT,

19   YOUR HONOR.

20          THE COURT:  LET'S GO TO 4:30.

21          MR. PROCEL:  I CAN DO THAT.

22   BY MR. PROCEL:

23       Q    WHEN THE VAGOS INITIALLY SPOKE TO YOU ABOUT

24   THESE LIFE INSURANCE INVESTMENTS, DID YOU TELL THEM

25   THAT YOU OWNED THE POLICIES?

26       A    I TOLD THEM THAT I WAS THE TRUSTEE ON ALL OF

27   THESE INSURANCE TRUSTS BECAUSE I DIDN'T WANT THE

28   INSURERS TO STEAL THE POLICIES.

1          IN OTHER WORDS, IF I SET UP A POLICY FOR

2    MR. AND MS. JONES AND THEN THEY NAME THEIR DAUGHTERS AS

3    THE TRUSTEE, MR. AND MS. JONES WOULD BE ABLE TO STEAL

4    THE POLICY.

5          SO I, REPRESENTING THE INVESTORS, WOULD MAKE

6    SURE THAT I WOULD BE THE TRUSTEE OF THE JONESES' TRUST

7    SO THEIR CHILDREN WOULDN'T BE ABLE TO STEAL THE POLICY.

8    THAT'S WHAT I TOLD THE VAGOS.

9      Q    LET ME ASK IT A DIFFERENT WAY.

10          DID YOU HAVE ANY INTEREST IN THE LIFE

11    INSURANCE POLICIES THAT DR. JESSELSOHN'S MONEY WENT

12    INTO, YES OR NO?

13      A    NO.

14      Q    OKAY.  YOU DIDN'T OWN ANY PORTION OF THAT?

15      A    I DIDN'T OWN ANY PORTION OF IT.

16      Q    SO AS OF 2014, IF AN INSURED WERE TO PASS AWAY

17    AND THE INSURANCE COMPANY PAYS MONEY, YOU DON'T GET ANY

18    OF THAT MONEY?

19      A    THAT IS CORRECT.

20      Q    NOW, BEFORE THE VAGOS INVEST IN THESE LIFE

21    INSURANCE POLICIES, YOU DID NOT DISCLOSE ANY RISKS TO

22    THEM IN WRITING; CORRECT?

23      A    I DISCLOSED THE RISKS TO THEM IN PERSON.  I

24    TOLD THEM THERE WERE RISKS.  PEOPLE COULD LIVE TOO LONG

25    AND YOU COULD LOSE YOUR MONEY.

26          MR. PROCEL:  I'M GOING TO MOVE TO STRIKE.

27          THE COURT:  OVERRULED.  DENIED.

28

181

1    BY MR. PROCEL:

2        Q    MY QUESTION TO YOU IS:  DID YOU DISCLOSE ANY

3    OF THE RISKS TO THE VAGOS IN WRITING --

4        A    NO.

5        Q    DID YOU HAVE THE VAGOS SIGN A CONFLICT OF

6    INTEREST WAIVER?

7        A    NO.

8        Q    YOUR COUNSEL MENTIONED THAT THERE'S A STACK OF

9    CONTRACTS RELATING TO THIS CASE, THESE PROMISSORY

10   NOTES.  DO YOU RECALL THAT?

11       A    YES, I DO.

12       Q    YOU DIDN'T HAVE -- THE VAGOS DIDN'T SIGN ANY

13   OF THOSE, DID THEY?

14       A    I DON'T THINK SO, NO.

15       Q    YOU DIDN'T GIVE THEM THE INSURANCE POLICIES

16   THAT YOU WERE ALLEGEDLY PUTTING THEIR MONEY INTO;

17   RIGHT?

18       A    NO.

19       Q    AND WE JUST -- BEFORE WE CLEARED UP THE FACT

20   THAT YOU DIDN'T SEND THEM THE BILLS EITHER; RIGHT?

21       A    DIDN'T PAY THEM ANYTHING, THAT'S CORRECT.

22       Q    YOU DIDN'T SEND THEM THE BILLS, CORRECT?

23       A    THEY DIDN'T PAY A PENNY.

24            THE COURT:  DID YOU SEND THEM THE BILLS.

25            THE WITNESS:  NO, I DIDN'T SEND THEM THE

26   BILLS.

27   BY MR. PROCEL:

28       Q    YOU DIDN'T TELL THE VAGOS BEFORE THEY INVESTED

1            COURT OF THE STATE OF CALIFORNIA

2             FOR THE COUNTY OF LOS ANGELES

3

4      DEPARTMENT 14   HON. TERRY A. GREEN, JUDGE

5 JOSEPH VAGO AND ERICA VAGO,        )
                                    )

6              PLAINTIFF,       )
                                    )

7    VS.                       )   NO. 20STCV25050
                                    )

8 LESLIE KLEIN; LES KLEIN &      )
ASSOCIATES, INC.; KENNETH KOLEV   )

9 KLEIN; AND LAW OFFICE OF KENNETH   )
KLEIN, P.C.,                   )

10                                     )

11            DEFENDANTS.     )
_____ )

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            SEPTEMBER 7, 2022

16

17 APPEARANCES:

18

19 FOR PLAINTIFFS:      PROCEL LAW, PC

20                      BY:  BRIAN A. PROCEL, ESQ.
                     401 WILSHIRE BOULEVARD
                     12TH FLOOR

21                      SANTA MONICA, CALIFORNIA 90401

22

23 FOR DEFENDANTS:     LAW OFFICES OF JEFFREY A. SLOTT, APC

24                      BY:  JEFFREY A. SLOTT, ESQ.
                     15760 VENTURA BOULEVARD
                     SUITE 1600

25                      ENCINO, CALIFORNIA 91436

26

27                      KRISTINE M. HICKS, CSR NO. 13634
                     OFFICIAL REPORTER PRO TEMPORE

28

ROUGH DRAFT

1

```
 1   CASE NUMBER:                  20STCV25050

 2   CASE NAME:                    VAGO V. KLEIN

 3   LOS ANGELES, CALIFORNIA       WEDNESDAY, SEPTEMBER 7, 2022

 4   DEPARTMENT: 14                HON. TERRY A. GREEN, JUDGE

 5   APPEARANCES:                  (AS HERETOFORE NOTED.)

 6   REPORTER:                     KRISTINE HICKS, CSR NO. 13634

 7   TIME:                         A.M. SESSION

 8

 9                      ---OOO---

10

11          (THE FOLLOWING PROCEEDINGS WERE HELD IN

12           OPEN COURT OUTSIDE THE PRESENCE OF THE

13           JURY:)

14

15          THE COURT:  OKAY.  ON THE RECORD.  THE JURY IS

16   NOT PRESENT.  COUNSEL IS PRESENT.

17          ALL RIGHT.  WE WERE HERE UNTIL 7:00 O'CLOCK OR

18   SO LAST NIGHT.  PLAINTIFF WAS GOING TO GIVE US A HARD

19   COPY OF THE JURY INSTRUCTIONS AS HE WENT THROUGH, AND

20   PLAINTIFF WAS ALSO GOING TO GIVE US A HARD COPY OF THE

21   JURY INSTRUCTIONS -- I MEAN, THE JURY VERDICTS.

22          SO HERE'S THE GAME PLAN.  I GIVE A COPY OF

23   JURY INSTRUCTIONS AND VERDICT FORMS TO EACH JUROR.  THE

24   PERSON WITH THE LARGEST LAW FIRM IS DEEMED HAVING THE

25   TASK OF DOING ALL THE COPYING.  THE LARGEST LAW FIRM IS

26   DEEMED WITH THE TAX OF COPYING.  I ASSUME YOUR FIRM HAS

27   MORE THAN TWO PEOPLE.

28          MR. PROCEL:  WE'LL DO IT, YOUR HONOR.
```

2

```
1        A    EVERY POLICY HAS TO HAVE AN OWNER.  EVERY

2    POLICY.  NO EXCEPTION.  INSURANCE COMPANIES ARE NOT

3    GOING TO ISSUE POLICIES UNLESS THERE ARE BENEFICIARIES

4    OR OWNERS.

5             SO THE JUST AS AN EXAMPLE, HIS CHILDREN ARE

6    THE BENEFICIARIES AND HE'S THE OWNER.

7             THE COURT:  I AM THE OWNER BECAUSE I APPLIED

8    FOR IT MYSELF.

9             THE WITNESS:  THAT'S CORRECT.  YOU ARE THE

10   OWNER, AND YOU CAN ALSO CHANGE THE BENEFICIARY.  THE

11   OWNER CAN CHANGE THE BENEFICIARY.

12             LET'S SAY, GOD FORBID, YOU HAVE A FIGHT WITH

13   ONE OF YOUR CHILDREN, OR LET'S SAY ONE OF THEM DIES OR

14   WHATEVER, YOU HAVE THE RIGHT TO PICK WHO GETS IT.  THE

15   OWNER IS THE ONE WHO GETS TO PICK WHO THE BENEFICIARIES

16   ARE.  AND IF THINGS CHANGE, YOU HAVE A RIGHT AS AN

17   OWNER TO CHANGE THE BENEFICIARY.

18             ON THE RADOW POLICY, THE OWNER IS HER TRUST.

19   IRREVOCABLE TRUST.  AND THE REASON WHY THE IRREVOCABLE

20   TRUST IS THE OWNER IS BECAUSE UNDER THE TAX CODE, WHEN

21   MS. RADOW DIES, YOU HAVE $2 MILLION, YOU DON'T WANT TO

22   GIVE THE GOVERNMENT A MILLION DOLLARS IN TAXES.

23             IF YOU ARE NOT AN IRREVOCABLE LIFE INSURANCE

24   TRUST --

25             THE COURT:  IRREVOCABLE LIFE INSURANCE.

26             THE WITNESS:  IN OTHER WORDS, THIS TRUST THAT

27   MS. RADOW SET UP, SHE CAN NEVER CHANGE.  IN OTHER

28   WORDS, 10 PERCENT GOES TO HER KIDS AND 90 PERCENT TO
```

80

1    THE INVESTORS.  AND THE OWNER IS THE IRREVOCABLE LIFE

2    INSURANCE TRUST FOR TWO REASONS.

3         ONE, THE INVESTORS PUT IN MY EXAMPLE,

4    $250,000, AND MS. RADOW CAN'T TAKE THAT MONEY AWAY FROM

5    THEM EVEN THOUGH SHE IS INSURED, EVEN THOUGH HER KIDS

6    ARE THE BENEFICIARIES, THE INVESTORS ARE LOCKED IN.

7         THE COURT:  SO IT'S A CASE WHERE THE INSURED

8    IS NOT THE OWNER.

9         THE WITNESS:  THAT IS CORRECT.

10   BY MR. PROCEL:

11      Q    AND LET ME ASK YOU THIS, MR. KLEIN.  DID YOU

12   PUT ANY OF YOUR OWN MONEY INTO PAYING THE PREMIUMS ON

13   THIS POLICY?

14      A    YES, I DID.  THERE WERE SOMETIMES WHERE THERE

15   WERE NO INVESTORS.  AND THIS POLICY WAS ONE THAT I PUT

16   MY OWN MONEY INTO IT NOT TO LOSE IT.

17      Q    HOW MUCH MONEY DID YOU PUT INTO IT?

18      A    AS I SIT HERE RIGHT NOW, I DON'T KNOW.  BUT

19   WHATEVER WAS NEEDED, IN OTHER WORDS, I PUT IN WHATEVER

20   WAS NEEDED.  BECAUSE THIS IS A VERY GOOD POLICY.

21        I DON'T HAVE TOO MANY RETURN-OF-PREMIUM

22   POLICIES.

23        THERE WAS A TIME WHEN AMERICAN GENERAL WAS

24   HAVING TERRIBLE FINANCIAL PROBLEMS.  THEY WERE ON THE

25   VERGE OF GOING OUT OF BUSINESS AND GOING BANKRUPT.  AND

26   THEY ISSUED MAYBE A HUNDRED SOMETHING IN POLICIES, AND

27   I TRIED TO GET AS MANY AS I COULD AND I GOT A FEW BUT

28   THEY WERE VERY, VERY MUCH IN DEMAND.

81

1          Q    LET ME ASK IT THIS WAY TO MAKE IT CLEAR.  THIS
2     IS A $2.25 MILLION POLICY?
3          A    1.75.
4          Q    SO LET'S SAY 1.75.  WHO GETS THE MONEY WHEN
5     ANN RADOW DIES?
6          A    THE TRUST.  THE ANN RADOW TRUST GETS THE
7     MONEY.
8          Q    SO HOLD ON.  LET'S SAY THAT ANN RADOW DIED THE
9     DAY AFTER THIS POLICY GOT ISSUED.
10         A    YES.
11         Q    WHO WOULD GET THE MONEY?
12         A    THE ANN RADOW IRREVOCABLE LIFE INSURANCE
13    TRUST.
14         Q    AND WHO OWNED THAT?
15         A    THE INVESTORS.  WHOEVER PUT MONEY INTO IT.
16              IN OTHER WORDS, THE POLICY IS OWNED BY THE
17    CHILDREN OF ANN RADOW.
18              SO LET'S SAY SHE DIED A DAY LATER, AND LET'S
19    SAY WE GET A CHECK FOR $2 MILLION.
20              BUT WE'LL GET A CHECK FOR 1,000,750.
21              SO HER CHILDREN WOULD GET TEN PERCENT, WHICH
22    WOULD BE $175,000.  AND THE INVESTORS WOULD GET A
23    MILLION 750.  SO WHOEVER THE INVESTORS ARE WOULD GET
24    THAT MONEY.
25         Q    AND I'M TRYING TO FIND OUT, HOW MUCH MONEY
26    WOULD YOU HAVE RECEIVED?
27         A    NOTHING.  I DON'T GET A PENNY.
28         Q    NOW, LET'S LOOK AT WHAT YOU SAID IN YOUR

82

1    VAGOS, THEY NEVER SIGNED THIS; CORRECT?

2        A    THEY'RE NOT THE TRUSTEES OF THE RADOW

3    IRREVOCABLE LIFE INSURANCE TRUST.  I AM THE TRUSTEE OF

4    THE RADOW IRREVOCABLE LIFE INSURANCE TRUST.  THE VAGOS

5    WOULDN'T SIGN THIS.

6        Q    WE'RE GOING TO LOOK AT WHAT THIS DOES IN A

7    SECOND.  BUT I JUST WANT AN ANSWER TO MY QUESTION

8    FIRST.

9            THE VAGOS DID NOT SIGN THIS DOCUMENT, CORRECT?

10           THE COURT:  DID THE VAGOS SIGN THE DOCUMENT?

11           MR. PROCEL:  DID THE VAGOS DID NOT SIGN THIS

12   DOCUMENT.  THANK YOU, YOUR HONOR.

13       A    NO.  THE VAGOS DID NOT SIGN THE DOCUMENT.  BUT

14   THE VAGOS GOT A COPY OF THIS DOCUMENT AND THEY KNEW

15   WHAT WAS IN THIS DOCUMENT.

16   BY MR. PROCEL:

17       Q    LET'S GO TO THE TOP NOW AND GO THROUGH THE

18   DOCUMENT.

19           AND THIS IS WHAT YOU CLAIM IS THE VAGO'S

20   INVESTMENT; IS THAT RIGHT?

21       A    WELL, THIS $500,000 IS WHAT THE VAGOS PUT INTO

22   THE ANN RADOW IRREVOCABLE LIFE INSURANCE TRUST POLICY,

23   YES.

24       Q    AND YOU'RE SAYING THIS IS WHAT THEY PUT INTO

25   THE POLICY; RIGHT?

26       A    RIGHT.

27       Q    NOW CAN YOU EXPLAIN TO THE JURY IN YOUR WORDS,

28   WHAT ARE THE VAGOS -- SO IT SAYS HERE $500,000; RIGHT?

87

1       A     RIGHT.

2       Q     AT THE TOP.  AND THAT'S WHAT YOU CLAIM THE

3   VAGOS HAVE INVESTED IN THIS POLICY; RIGHT?

4       A     WELL, THEY HAD THIS INVESTED IN THE POLICY AS

5   OF THIS DATE, WHENEVER I SIGNED THIS NOTE.

6            BUT THE PROBLEM FOR THE VAGOS WAS THAT THE

7   VAGOS COULDN'T INVEST MORE MONEY INTO THIS POLICY.

8            IN OTHER WORDS, THE VAGOS TOOK THE MONEY OUT.

9   THEY TOOK WHATEVER, $6 MILLION DOLLARS OUT FROM THE

10  MONEY THAT CAME IN, AND THE VAGOS HAD NO MONEY TO PAY

11  PREMIUMS.

12      Q     MR. KLEIN, YOU CLAIM THAT THE VAGOS PUT

13  $500,000 INTO SOMETHING RELATING TO THE ANN RADOW

14  POLICY; RIGHT?

15      A     RIGHT.  BUT --

16      Q     THAT WAS THE QUESTION.

17           NOW, I WANT TO ASK YOU:  FIRST OF ALL, IN YOUR

18  OWN WORDS, OKAY, TELL US WHAT THE VAGOS ARE SUPPOSED TO

19  GET FOR THAT $500,000 THAT ALLEGEDLY WENT INTO THIS

20  POLICY?  HOW DID THEY MAKE MONEY ON THIS?

21      A     THEY DON'T MAKE ANY INTEREST.  ALL THEY MAKE

22  IS THE $500,000 BACK.

23      Q     THEY DON'T GET ANY INTEREST?

24      A     THEY DON'T GET ANY INTEREST.

25      Q     SO THEY GAVE YOU $500,000 TO HOPEFULLY SOME

26  DAY GET BACK THEIR $500,000?

27      A     THAT'S RIGHT.  THEY HAD A LIEN ON THE ANN

28  RADOW POLICY THAT WHEN ANN RADOW DIES, THEY WILL GET

1    BACK THEIR $500,000.

2            IT'S A TOTAL GET.  THEY HAVE NO INTEREST HERE.

3            THE COURT:  SO THIS IS A LOAN TO YOU, THEN?

4            MR. PROCEL:  I'M GOING TO GET THERE.

5            THE WITNESS:  NO, NO.  IT'S NOT A LOAN TO ME.

6    IT'S A LOAN TO THE RADOW IRREVOCABLE LIFE INSURANCE

7    TRUST TO MAKE THE PREMIUM PAYMENTS FOR THOSE YEARS '12,

8    '13, '14.

9            IT'S NOT A LOAN TO ME.  I DON'T GET A PENNY

10   HERE.  THIS MONEY GOES TO AMERICAN GENERAL.

11   BY MR. PROCEL:

12      Q    GREAT.  LET'S GO WITH THIS.

13           BUT SO BEST CASE SCENARIO, FOR THE VAGOS,

14   OKAY?

15           THE MOST MONEY THEY CAN POSSIBLY MAKE,

16   ACCORDING TO YOU, IS TO GET THEIR $500,000 BACK THAT

17   THEY GAVE YOU?

18      A    YEAH.  WHEN THEY GAVE ALL THIS MONEY TO

19   JESSELSOHN, THE VAGOS, JESSELSOHN, GOT, THEY SAY,

20   $18 MILLION.  THEY GOT BACK $15 MILLION.  THEY GAVE

21   JESSELSOHN $3 MILLION, PLUS HE HAD THE MONEY INVESTED

22   SOMEWHERE.  HE HAD THE MONEY INVESTED IN WHATEVER.

23           THEY DIDN'T GET A PENNY OF INTEREST FROM

24   JESSELSOHN.  WHEN JESSELSOHN GOT THIS MONEY FROM

25   LOWINGER, WHOEVER'S MONEY THIS WAS, WHETHER IT WAS

26   VAGO'S BROTHER, WHETHER IT WAS WHOEVER ELSE, THEY

27   AGREED THAT JESSELSOHN ON THIS MONEY WILL NEVER PAY

28   INTEREST.  NEVER.

89

```
1         Q    OKAY.  MR. KLEIN, SO --

2         A    SO I TOOK OVER JESSELSOHN'S POSITION, AND THE

3    VAGOS KNEW THIS.  BUT I INVESTED IN LIFE INSURANCE

4    POLICIES.

5              I REALLY WANT TO KEEP THE MONEY IN A BANK

6    ACCOUNT, AND THEN WE WILL EARN LESS THAN 1 PERCENT

7    INTEREST.  NOTHING.

8              THE POINT IS THE VAGOS AGREED TO THIS.  I

9    DIDN'T DO THIS ON MY OWN.  AND THE VAGOS ALSO AGREED,

10   IF THEY RAN OUT OF MONEY, LIKE IN RADOW, THE WHOLE IDEA

11   OF THE PREMIUMS WAS TO ADD TO IT, THE AMOUNT OF

12   $500,000.

13        Q    OKAY.

14        A    SO THEY AGREED THAT I COULD TRANSFER IT TO

15   OTHER POLICIES AND FIND OTHER INVESTORS WHO WILL MAKE

16   ALL THE PREMIUMS, WHICH I DID.

17        Q    OKAY.

18             I WANT TO GO THROUGH THAT ONE BY ONE, MR.

19   KLEIN.

20             SO IT SAYS HERE IN THIS CONTRACT IN BOLD THAT

21   YOU DRAFTED; RIGHT?  THAT YOU DRAFTED -- RIGHT?

22        A    I'M NOT SURE IF I DRAFTED OR SOMEBODY ELSE

23   DRAFTED IT.  BUT I TAKE RESPONSIBILITY FOR THIS

24   DOCUMENT.

25        Q    OKAY.  GOOD.  IT SAYS HERE AT THE TOP, "FOR

26   VALUE RECEIVED, THE UNDERSIGNED, LESLIE KLEIN, AS

27   TRUSTEE OF THE ANN RADOW IRREVOCABLE LIFE INSURANCE

28   TRUST"?
```

1        A     RIGHT.

2        Q     YOU WERE THE TRUSTEE OF THE ANN RADOW

3   IRREVOCABLE LIFE INSURANCE TRUST; CORRECT?

4        A     YES.

5        Q     WITH OFFICES AT 14245 VENTURA BOULEVARD.

6   THAT'S YOUR OFFICE ADDRESS?

7        A     THAT'S CORRECT.

8        Q     OKAY.  "HEREBY PROMISES TO PAY TO THE ESTATE

9   OF ROBERT SCHWEITZER OR HIS REGISTERED ASSIGNS, THE

10  PRINCIPLE SUM OF $500,000, PLUS INTEREST OF

11  12 PERCENT."  DO YOU SEE THAT?

12       A     YES.

13       Q     DIDN'T YOU JUST SAY A MINUTE AGO THAT THEY

14  WEREN'T ENTITLED TO ANY INTEREST?

15       A     THAT IS CORRECT.

16       Q     OKAY.  SO WHAT DOES THAT DOCUMENT MEAN?

17       A     IT DOESN'T MEAN ANYTHING, BECAUSE THE VAGOS

18  KNEW, FROM DAY ONE, WHEN WE MET WITH JESSELSOHN,

19  JESSELSOHN TOLD US -- BECAUSE I WAS VERY UPSET THAT HE

20  WOULDN'T PAY ANY INTEREST.  HERE HE HAD THIS MONEY FOR

21  5, 6 YEARS AND HE WOULDN'T PAY INTEREST.

22             AND HE SAID:  I'M NOT PAYING A PENNY INTEREST.

23  IF YOU DON'T LIKE IT, I'M NOT GIVING YOU ANY MONEY.  NO

24  GOING TO GIVE YOU A DIME.

25       Q     I WANT TO BE CLEAR.  WHEN YOU SIGNED THIS

26  DOCUMENT, MR. KLEIN, YOUR INTENTION WAS NEVER TO PAY

27  THE VAGOS ANY INTEREST?

28       A     THAT IS CORRECT.  THE VAGOS WERE NOT ENTITLED

91

1    TO ANY INTEREST.

2         Q    AND WHEN YOU SIGNED THIS DOCUMENT, YOUR

3    INTENTION WAS NEVER TO PAY THE ESTATE OF ROBERT

4    SCHWEITZER ANY INTEREST; CORRECT?

5         A    THAT IS CORRECT.

6         Q    OKAY.  NOW --

7         A    WELL, ACTUALLY, I MEAN, THE LAWSUIT HERE, I

8    WASN'T SUED BY THIS ROBERT SCHWEITZER.  I WAS SUED BY

9    ERICA VAGO AND JOSEPH VAGO.

10          SO THERE'S NO ROBERT SCHWEITZER HERE.

11        Q    NOW I WANT TO TALK ABOUT WHERE THIS MONEY

12   WENT, OKAY?

13          SO THIS IS A DOCUMENT THAT -- LET'S GO BACK A

14   STEP.

15          A PROMISSORY NOTE IS AN AGREEMENT THAT GETS

16   SIGNED WHEN SOMEBODY LOANS MONEY TO SOMEBODY ELSE;

17   RIGHT?

18        A    RIGHT.

19        Q    THIS IS LIKE WHEN YOU GO TO A BANK AND YOU

20   WANT TO TAKE OUT A CAR LOAN OR A HOME LOAN, YOU SIGN A

21   PROMISSORY NOTE WITH THE BANK; RIGHT?

22        A    OKAY.

23        Q    OKAY.  SO IN THIS NOTE, YOU'VE GOT A LENDER

24   AND A BORROWER, RIGHT?  SOMEONE IS LOANING MONEY TO

25   SOMEBODY ELSE; CORRECT?

26        A    RIGHT.

27        Q    OKAY.  SO ACCORDING TO THIS NOTE, THE ESTATE

28   OF ROBERT SCHWEITZER IS LOANING THE MONEY; CORRECT?

92

1      A    THAT'S CORRECT.

2      Q    OKAY.  AND THE -- ROBERT SCHWEITZER IS LOANING

3   $500,000; CORRECT?

4      A    THAT IS CORRECT.

5      Q    NOW, WHO'S THE BORROWER?

6      A    THE ANN RADOW IRREVOCABLE LIFE INSURANCE

7   TRUST.

8      Q    GREAT.  OKAY.

9           NOW, YOU, MR. KLEIN, ARE THE TRUSTEE OF THE

10  ANN RADOW IRREVOCABLE LIFE INSURANCE TRUST; RIGHT?

11     A    THAT IS CORRECT.

12     Q    YOU ARE THE ONLY ONE WHO HAS AUTHORITY TO GET

13  THAT MONEY OR CONTROL IT; RIGHT?  YOU'RE THE TRUSTEE?

14     A    YEAH.  I MEAN, IT'S MY RESPONSIBILITY TO PAY

15  THE PREMIUMS.  THAT $500,000 IS NOT MY MONEY.  THAT

16  $500,000 IS PAID TO AMERICAN GENERAL.

17     Q    OKAY.  ANN RADOW, THE PERSON WHO IS LISTED

18  HERE, SHE HAS ABSOLUTELY NO RIGHT TO THIS $500,000;

19  RIGHT?

20     A    THAT IS CORRECT.

21     Q    YOU'RE THE ONLY ONE WHO GETS TO CONTROL THAT

22  MONEY; CORRECT?

23     A    WELL, I MEAN ANN RADOW WILL GET -- THIS

24  $500,000 GETS PAID WHEN ANN RADOW DIES.

25     Q    MR. KLEIN, MY QUESTION WAS:  YOU WERE THE ONLY

26  ONE WHO GETS TO CONTROL THAT $500,000; CORRECT?

27     A    WELL, THE ANSWER TO YOU IS, YEAH, I'M THE ONE

28  WHO IS PAYING THE PREMIUMS HERE, YES.

93

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF LOS ANGELES

 3

 4       DEPARTMENT 14   HON. TERRY A. GREEN, JUDGE

 5   JOSEPH VAGO AND ERICA VAGO,        )
                                        )
 6              PLAINTIFFS,             )
                                        )
 7     VS.                              )   NO. 20STCV25050
                                        )
 8   LESLIE KLEIN; LES KLEIN &          )
     ASSOCIATES, INC.; KENNETH KOLEV    )
 9   KLEIN; AND LAW OFFICE OF KENNETH   )
     KLEIN, P.C.,                       )
10                                      )
                DEFENDANTS.             )
11   _____)

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    SEPTEMBER 8, 2022

16

17   APPEARANCES:

18

19   FOR PLAINTIFFS:      PROCEL LAW, PC
                          BY:  BRIAN A. PROCEL, ESQ.
20                        401 WILSHIRE BOULEVARD
                          12TH FLOOR
21                        SANTA MONICA, CALIFORNIA 90401

22
     FOR DEFENDANTS:      LAW OFFICES OF JEFFREY A. SLOTT, APC
23                        BY:  JEFFREY A. SLOTT, ESQ.
                          15760 VENTURA BOULEVARD
24                        SUITE 1600
                          ENCINO, CALIFORNIA 91436
25

26

27                        KRISTINE M. HICKS, CSR NO. 13634
                          OFFICIAL REPORTER PRO TEMPORE
28
```

ROUGH DRAFT

1

```
 1   CASE NUMBER:                  20STCV25050
 2   CASE NAME:                    VAGO V. KLEIN
 3   LOS ANGELES, CALIFORNIA       THURSDAY, SEPTEMBER 8, 2022
 4   DEPARTMENT: 14                HON. TERRY A. GREEN, JUDGE
 5   APPEARANCES:                  (AS HERETOFORE NOTED.)
 6   REPORTER:                     KRISTINE HICKS, CSR NO. 13634
 7   TIME:                         A.M. SESSION
 8
 9                         ---OOO---
10
11        (THE FOLLOWING PROCEEDINGS WERE HELD IN
12        OPEN COURT OUTSIDE THE PRESENCE OF THE
13        JURY:)
14
15        THE COURT:  ON THE RECORD, JURY IS NOT
16   PRESENT.  COUNSEL IS PRESENT.  WHAT'S GOING ON,
17   PLAINTIFF?
18        MR. PROCEL:  NOTHING, YOUR HONOR.  WE'RE READY
19   TO GO.
20        THE COURT:  DEFENSE, WHAT'S GOING ON?
21        MR. SLOTT:  READY TO PROCEED.
22        THE COURT:  DID YOU SETTLE THE CASE LAST
23   NIGHT?
24        MR. SLOTT:  ALMOST.
25        MR. PROCEL:  TWICE.
26        THE COURT:  GLAD TO SEE WE HAVEN'T LOST OUR
27   SENSE OF HUMOR.  WHAT'S ON TODAY?
28        MR. PROCEL:  WE'RE GOING TO CALL DENNIS PEREZ
```

2

1    AN INTERPRETER IS A VALUABLE COMMODITY.   WE HAVE TO

2    WAIT OUR TURN.

3           ALL RIGHT, PLAINTIFF.   THE FLOOR IS YOURS.

4           MR. PROCEL:   THANK YOU, YOUR HONOR.   WE WOULD

5    LIKE TO RECALL MR. KLEIN.

6           THE COURT:   MR. KLEIN, TAKE A SEAT.   YOU'RE

7    STILL UNDER OATH, SIR.

8

9           LESLIE KLEIN (CONTINUED),

10   WAS RE-CALLED AS A WITNESS AND, HAVING BEEN PREVIOUSLY

11     DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

12

13

14              DIRECT EXAMINATION

15   BY MR. PROCEL:

16       Q    I WANT TO TRY TO STREAMLINE THIS TO THE EXTENT

17   WE CAN.

18           SO MR. KLEIN, YOU TESTIFIED YESTERDAY THAT

19   WHEN YOU SIGNED THE PROMISSORY NOTE AGREEMENTS, YOU HAD

20   NO INTENTION OF PAYING THE VAGOS ANY INTEREST; CORRECT?

21       A    THAT IS CORRECT.   THAT WAS THE AGREEMENT, YES.

22       Q    LET'S PULL UP EXHIBIT 30, PLEASE.

23           EXHIBIT 30 IS A WRITTEN AGREEMENT SIGNED BY

24   MR. KLEIN FROM 2016.

25           THE COURT:   ANY OBJECTION?

26           MR. SLOTT:   NO OBJECTION.

27           THE COURT:   RECEIVED.

28

19

1          (DEFENDANT'S EXHIBIT NO. 30 WAS

2          RECEIVED INTO EVIDENCE BY THE COURT.)

3

4   BY MR. PROCEL:

5       Q    AND LET'S BLOW THIS UP A LITTLE.

6            THIS SAYS, "THIS AGREEMENT MADE AND ENTERED

7   INTO THIS 20TH DAY OF JUNE 2016 BETWEEN THE ESTATE OF

8   ROBERT SCHWEITZER AND LESLIE KLEIN."

9            ARE YOU FAMILIAR WITH THIS AGREEMENT,

10  MR. KLEIN?

11      A    LOOKING AT IT, YES.

12      Q    CAN YOU SCROLL DOWN, PLEASE.

13           IS THAT YOUR SIGNATURE?

14      A    YES.

15      Q    OKAY.   NOW, LET'S GO BACK UP.

16           SO HOW MUCH MONEY DO YOU CLAIM THAT THE VAGOS

17  GAVE YOU TO INVEST IN INSURANCE POLICIES?

18      A    MY RECOLLECTION IS THEY GAVE ME APPROXIMATELY

19  6.5 MILLION.

20      Q    OKAY.   NOW LET'S SCROLL DOWN AND IT SAYS HERE

21  ON NUMBER 1, "THE ESTATE HAS A LIEN ON THE FOLLOWING

22  POLICIES IN THE FOLLOWING AMOUNTS."   AND THEN IT LISTS

23  SIX POLICIES THERE.   DO YOU SEE THAT?

24      A    YES.

25      Q    AND IF WE DO SOME QUICK MATH, THE NUMBERS ON

26  THE RIGHT ADD UP TO 8.5.   TWO PLUS TWO PLUS TWO AND SIX

27  PLUS ONE IS SEVEN, AND THEN 900,000 AND 600,000, THAT'S

28  1.25, THAT'S 8.5.   RIGHT, MR. KLEIN?

1      A      THAT'S CORRECT.

2      Q      SO HOW DID THEY HAVE 8.5 MILLION IF YOU'RE

3  SAYING THEY ONLY GAVE YOU 6.5 MILLION?

4      A      THEY ONLY HAD A LIEN FOR 6.5 MILLION.  THIS

5  DOCUMENT WAS PREPARED FOR THE IRS.

6      Q      LET'S BACK UP A STEP.  YOU PREPARED THIS

7  DOCUMENT; RIGHT?

8      A      THAT IS CORRECT.

9      Q      ARE YOU NOW SAYING THAT THIS DOCUMENT THAT YOU

10  PREPARED AND SIGNED IS INCORRECT?

11      A      THAT IS CORRECT.

12      Q      OKAY.  SO YOU'RE SAYING THAT THE NUMBERS THAT

13  YOU AFFIXED TO THIS DOCUMENT ARE WHAT, TOO MUCH

14  INFLATED?

15      A      THAT IS CORRECT.

16      Q      OKAY.  NOW YOU TESTIFIED YESTERDAY THAT THE

17  VAGOS ARE NOT ENTITLED TO ANY INTEREST; RIGHT?

18      A      THAT IS CORRECT.

19      Q      IT SAYS HERE, IT SAYS, "SEE ATTACHMENT NUMBER

20  1."

21          MR. PROCEL:  CAN YOU HIGHLIGHT THAT, PLEASE,

22  MR. PARK?

23  BY MR. PROCEL:

24      Q      THE INTEREST IS AS FOLLOWS:  2012 WAS 85,000.

25  2013 WAS 650,000; 2014 WAS 720,000.  YOU SEE THAT?

26      A      YES.

27      Q      AND JUST TO BE CLEAR, YOU GAVE THIS DOCUMENT

28  TO THE VAGOS; RIGHT?

21

```
 1        A     THAT IS CORRECT.

 2        Q     OKAY.  SO YOU'RE TELLING THEM THAT THEY'RE

 3   ENTITLED TO INTEREST EVEN THOUGH YOU'RE SAYING THAT YOU

 4   WERE NEVER GOING TO PAY THEM ANY INTEREST?

 5        A     THAT IS CORRECT.  BECAUSE THE DEAL WAS WITH

 6   THE VAGOS THAT THEY'RE GOING TO GET ALL THIS MONEY,

 7   BASICALLY, TAX FREE.

 8              IN OTHER WORDS, THEY'RE GOING TO GET

 9   6.5 MILLION TAX FREE.  THEY'RE NOT GOING TO PAY THE

10   50 PERCENT FOREIGN TAX PENALTY, NOT GOING TO PAY

11   INTEREST TO THE IRS.

12        Q     SO YOUR TESTIMONY AS YOU SIT HERE TODAY IS

13   THAT THE FIGURES THAT YOU PUT ON THAT DOCUMENT FOR THE

14   LIEN AMOUNTS, THE 8.5 MILLION, THAT'S INCORRECT?

15        A     THAT IS INCORRECT.

16        Q     AND YOU'RE SAYING THAT THE INTEREST IS ALSO

17   INCORRECT?

18        A     THAT IS CORRECT.

19        Q     NOW I WANT TO LOOK AT NUMBER 2.

20              YOU'VE MENTIONED IT SEVERAL TIMES THAT YOU,

21   MR. KLEIN, HAVE THE RIGHT TO SUBSTITUTE POLICIES;

22   RIGHT?

23        A     THAT IS CORRECT.

24        Q     AND YOUR TESTIMONY IS THAT YOU PUT THE VAGOS'

25   MONEY INTO CERTAIN INSURANCE POLICIES, BUT THEN YOU'RE

26   ALLOWED TO SWAP THEM AND SELL THEM AND BUY THEM AND DO

27   WHATEVER YOU WANT WITH THEM WITHOUT TELLING THE VAGOS;

28   RIGHT?
```

22

1       A      I WOULDN'T SAY I CAN DO WHATEVER I WANT WITH

2   THEM, BUT I HAVE TO MAKE SURE THAT I DON'T LOSE THEIR

3   MONEY.

4            IN OTHER WORDS, IF I WOULD HAVE KEPT

5   WEINBERGER OR SILBERBERG, THE PREMIUMS KEEP ON GOING UP

6   AND THEY'RE STILL AROUND, THEY'RE BOTH AROUND, IT MAKES

7   NO ECONOMIC SENSE TO KEEP ON PAYING ON THESE POLICIES

8   AND THEN YOU'RE GOING TO LOSE THE MONEY.

9            SO WHAT I DID IS START PAYING PREMIUMS, WHICH

10  I HAD TO PAY, THEY DIDN'T PAY ANY PREMIUMS AT ALL.  I

11  SWITCHED THEM INTO POLICIES THAT'S SOMEBODY ELSE PAID

12  THE PREMIUMS.

13      Q      AND YOUR TESTIMONY IS THAT YOU HAVE THE RIGHT

14  TO DO THAT?

15      A      THAT IS CORRECT; ABSOLUTELY.

16      Q      AND THIS THING THAT GIVES YOU THE RIGHT TO DO

17  THAT IS THIS AGREEMENT; RIGHT?

18      A      THAT IS CORRECT.

19      Q      LET'S SCROLL DOWN TO THE BOTTOM, THE SIGNATURE

20  PAGE.

21            YOU'RE THE ONLY ONE WHO SIGNED THIS AGREEMENT,

22  RIGHT; MR. KLEIN?

23      A      I MET WITH THE VAGOS AND THEY AGREED TO IT.

24  WE WERE SITTING TOGETHER AND I EXPLAINED TO THEM WHY I

25  HAD TO DO THIS AND THEY SAID FINE.

26      Q      MR. KLEIN, MY QUESTION TO YOU WAS, YOU WERE

27  THE ONLY ONE WHO SIGNED THIS CONTRACT; CORRECT?

28      A      THAT IS CORRECT.

23

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                 FOR THE COUNTY OF LOS ANGELES

3       DEPARTMENT 14              HON. TERRY A. GREEN, JUDGE

4

5       JOSEPH VAGO AND ERICA VAGO,      )
                                         )
6                 PLAINTIFFS,            )
                                         )
7                 V.                     ) NO. 20STCV25050
                                         )
8       LESLIE KLEIN, ET AL.,            )
                                         )
9                 DEFENDANTS.            )
        _____)

10

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                    SEPTEMBER 9, 2022

14                       9:46 A.M.

15

16      APPEARANCES:

17      FOR THE PLAINTIFFS:

18                  PROCEL LAW, PC
                    BY:  BRIAN A. PROCEL
19                  401 WILSHIRE BOULEVARD
                    12TH FLOOR
20                  SANTA MONICA, CALIFORNIA 90401
                    424.788.4538
21                  BRIAN@PROCEL-LAW.COM

22      FOR THE DEFENDANTS:

23                  LAW OFFICES OF JEFFREY A. SLOTT
                    BY:  JEFFREY A. SLOTT
24                  15760 VENTURA BOULEVARD
                    SUITE 700
25                  ENCINO, CALIFORNIA 91436
                    818.995.1955
26                  JSLOTT@AOL.COM

27      REPORTED BY:  RONALD L. COOK, CSR NO. 13928
                      OFFICIAL REPORTER PRO TEMPORE
28

```
1    CASE NUMBER:              20STCV25050

2    CASE NAME:                VAGO V. KLEIN

3    LOS ANGELES, CALIFORNIA   FRIDAY, SEPTEMBER 9, 2022

4    DEPARTMENT 14             HON. TERRY A. GREEN, JUDGE

5    APPEARANCES:              (AS HERETOFORE NOTED.)

6    REPORTER:                 RONALD L. COOK, CSR NO. 13928

7    TIME:                     9:46 A.M.

8

9              (THE FOLLOWING PROCEEDINGS WERE

10              HELD IN OPEN COURT OUTSIDE THE

11              PRESENCE OF THE JURY:)

12

13        THE COURT:  ON THE RECORD.  GOOD MORNING.

14        MR. SLOTT:  GOOD MORNING, YOUR HONOR.

15        MR. PROCEL:  GOOD MORNING, YOUR HONOR.

16        THE COURT:  ARE YOU GUYS ALL READY?

17        MR. PROCEL:  WE'RE READY.

18        MR. SLOTT:  YES, YOUR HONOR.

19        THE COURT:  CAN WE BRING THE JURY IN, PLEASE?

20        MR. SLOTT:  YOUR HONOR?

21        THE COURT:  I'M SORRY?

22        MR. SLOTT:  I APOLOGIZE.  THE LAST QUESTION THAT

23   CAME OUT FROM THE JUROR WAS DIRECTED TO THE COURT, AND

24   I WONDERED IF WE WERE GOING TO -- IF THE -- IF YOUR

25   HONOR WAS GOING TO ADDRESS THAT OR IF WE --

26        THE COURT:  OH, ABOUT WHY YOU DIDN'T ASK THAT

27   QUESTION?

28        MR. SLOTT:  YEAH.
```

1          SO WHAT HAPPENED -- SOMEBODY CAME TO YOUR

2    HOUSE, YOU SAID --

3          A.    YEAH.  SOMEBODY -- I TALKED TO DAVID ABOUT

4    IT, AND I SAID, GEE, THIS SOUNDS LIKE A GOOD DEAL.  SO

5    SOMEBODY CAME TO MY HOUSE, AND I HAD AN EKG, AND THEY

6    LISTENED TO MY CHEST, AND MY OTHER FRIEND WHO WAS GOING

7    TO DO IT, SHE WASN'T GOING TO DO IT BECAUSE SHE WOULD

8    NOT EVER HAVE AN EKG.  AND THEN THAT WAS IT.  I NEVER

9    HEARD ANYMORE, AND I -- SOMETIME LATER I SAID TO DAVID,

10   YOU KNOW, WHAT HAPPENED WITH THAT, AND HE SAID, OH,

11   WE'RE NOT DOING THAT ANYMORE.  OKAY.

12         Q.    OKAY.

13         SO YOU WERE TOLD THAT LIFE INSURANCE FOR

14   YOU DIDN'T GO THROUGH?

15         A.    THEY JUST -- THEY SAID THEY WEREN'T DOING

16   IT ANYMORE, SO I HAVE TO -- YOU KNOW.

17         Q.    OKAY.

18         NOW -- SEE IF WE CAN GET THIS FOCUSED.

19         A.    RIGHT.

20         Q.    DID YOU SIGN THIS DOCUMENT?

21         A.    NO.

22         Q.    IS THERE SOMETHING THERE THAT LOOKS LIKE

23   YOUR SIGNATURE?

24         A.    IT DOES.

25         Q.    BUT IT'S NOT YOUR SIGNATURE?

26         A.    NO.

27         Q.    OKAY.

28         NOW, I ALSO WANT TO SHOW YOU ANOTHER

1    DOCUMENT -- MAYBE.  WE'LL SEE.  WE'RE TRYING TO GET OUR

2    TECHNICAL EQUIPMENT UP AND RUNNING.  IT'S GOING TO BE

3    EXHIBIT 19?

4         THE COURT:  19 IS IN EVIDENCE.

5         MR. PROCEL:  YES.  19-4.

6              AND SO WHILE WE'RE DOING THAT, MS. RADOW,

7    WE SAW -- WE'VE SEEN DOCUMENTS IN THIS CASE ABOUT

8    SOMETHING CALLED THE ANN RADOW LIFE INSURANCE TRUST.

9    HAVE YOU HEARD OF THAT.

10        THE WITNESS:  (NO AUDIBLE RESPONSE.)

11        Q.    BY MR. PROCEL:  YOU HAVE TO SAY YES OR

12   NO.

13        A.    NO.  NO.

14        Q.    OKAY.

15              ARE YOU AWARE THAT SOMEONE OPENED A TRUST

16   WITH YOUR NAME ON IT?

17        A.    NO.  I HAVE THE ANN RADOW FAMILY TRUST,

18   BUT THAT'S WHAT I OPENED AFTER MY HUSBAND DIED.

19        Q.    RIGHT.  BUT THAT HAS NOTHING TO DO --

20        A.    I DON'T KNOW ABOUT ANY OTHER TRUST.

21        Q.    ARE YOU AWARE THAT -- WELL, FIRST OF ALL,

22   DO YOU KNOW THIS INDIVIDUAL HERE?

23        A.    NO.

24        Q.    OKAY?

25        THE COURT:  POINTING TO MR. KLEIN.

26        Q.    BY MR. PROCEL:  AND MR. KLEIN HAS SAID

27   THAT HE IS THE TRUSTEE OF THE ANN RADOW LIFE INSURANCE

28   TRUST.  HAVE YOU --

10

```
 1          A.    OKAY.

 2          Q.    BEFORE THIS HAVE YOU HEARD ABOUT MR. KLEIN

 3   BEING THE TRUSTEE OF THE ANN RADOW LIFE INSURANCE

 4   TRUST?

 5          A.    NO.

 6          Q.    DID YOU EVER GIVE MR. KLEIN PERMISSION TO

 7   BE THE TRUSTEE OF AN ANN RADOW INSURANCE TRUST?

 8          A.    NO.

 9          Q.    NOW, I WANT TO TELL YOU A LITTLE BIT ABOUT

10   WHAT THE TRUST DOES, SINCE YOUR NAME IS ON IT.

11   MR. KLEIN HAS BEEN BORROWING MONEY, HUNDREDS OF

12   THOUSANDS OF DOLLARS, AND PUTTING IT INTO THE ANN RADOW

13   LIFE INSURANCE TRUST.

14          A.    IS HE GOING TO SHARE SOME WITH ME?

15          Q.    IT'S A GOOD QUESTION.

16                ARE YOU AWARE THAT MR. KLEIN HAS BEEN

17   TAKING HUNDREDS OF THOUSANDS OF DOLLARS AND PUTTING IT

18   INTO THE ANN RADOW LIFE INSURANCE TRUST?

19          A.    NO.

20          MR. SLOTT:  YOUR HONOR, I'M GOING TO HAVE TO

21   OBJECT.  I THINK IT MISSTATES -- I DON'T KNOW WHOSE

22   TESTIMONY THAT IS, BUT IT MISSTATES -- CERTAINLY

23   MISSTATES MR. KLEIN'S TESTIMONY.  I HAVEN'T HEARD

24   ANYONE ELSE TESTIFY THAT WAY.  SO --

25          THE COURT:  OKAY.  THE JURY HAS HEARD AND WILL

26   HEAR THE EVIDENCE.  THEY'LL BE THE ONES WHO DECIDE IF A

27   QUESTION ACCURATELY POSES -- IF A FACTUAL BASIS OR NOT.

28   SO --
```

```
1            MR. PROCEL:  I DON'T WANT TO MISREPRESENT

2     ANYTHING.  SO LET'S GO TO -- CAN WE SHOW A DOCUMENT

3     NOW, JOHN?

4            MR. PARK:  IT'S UP THERE.

5            Q.    BY MR. PROCEL:  LET'S GO THROUGH THIS

6     VERY QUICKLY FIRST, THEN.  LET'S GO TO PAGE 4, PLEASE.

7                 AND IF IT'S EASIER FOR YOU, MS. RADOW, IS

8     IT OKAY ON THE SCREEN OR IS IT BETTER UP THERE?

9            A.    YEAH.

10           Q.    LET'S BLOW IT UP AS BIG AS WE CAN, PLEASE,

11    MR. PARK.

12                 GREAT.

13                 SO THIS IS THE DOCUMENT THAT I WAS

14    REFERRING TO, THE ANN RADOW IRREVOCABLE LIFE INSURANCE

15    TRUST.  HAVE YOU SEEN THIS BEFORE?

16           A.    NO.

17           Q.    LET'S DOWN TO THE SIGNATURE BLOCK.

18                 AND THERE'S A SIGNATURE BLOCK THERE FOR

19    YOU THAT SAYS ANN RADOW.  DID YOU SIGN A DOCUMENT LIKE

20    THIS?

21           A.    NO.

22           Q.    NOW, MR. SLOTT JUST A MOMENT AGO INDICATED

23    SOMETHING ABOUT NO ONE TESTIFYING TO THE QUESTION THAT

24    I ASKED, SO LET'S GO TO EXHIBIT 21, PLEASE.

25                 AND BLOW THIS UP AS BIG AS YOU CAN,

26    PLEASE.

27                 THERE WE GO.

28                 SO THIS IS CALLED A NONRECOURSE PROMISSORY
```

12

1    NOTE.  HAVE YOU SEEN THIS BEFORE, MRS. RADOW?

2         A.    NO.

3         Q.    THIS IS FOR VALUE RECEIVED, THE

4    UNDERSIGNED, LESLIE KLEIN, AS TRUSTEE OF THE ANN RADOW

5    IRREVOCABLE LIFE INSURANCE TRUST," AND THEN IT HAS ITS

6    ADDRESS THERE.  HERE BY PROMISES TO PAY THE ESTATE OF

7    ROBERT SCHWEITZER, AND THEN IT HAS THE SUM OF $500,000.

8    ARE YOU AWARE THAT MR. KLEIN, AS TRUSTEE OF THE ANN

9    RADOW LIFE -- IRREVOCABLE LIFE INSURANCE TRUST WAS

10   BORROWING HUNDREDS OF THOUSANDS OF DOLLARS?

11        A.    NO.

12        Q.    OKAY.

13              DID ANYBODY TELL YOU THAT WHEN YOU PASS

14   AWAY, YOUR CHILDREN ARE GOING TO GET SOMETHING IN

15   CONNECTION WITH ANY LIFE INSURANCE POLICIES?

16        A.    NO.

17        Q.    IN THE LAST 10 YEARS -- OR ACTUALLY, EVER,

18   HAS ANYONE SHOWN YOU THAT THEY ARE PAYING PREMIUMS --

19   LET ME ASK IT AGAIN SO IT'S CLEAN.  HAS ANYONE EVER

20   SHOWN YOU A STATEMENT FROM AN INSURANCE COMPANY

21   INDICATING THAT THEY ARE PAYING PREMIUMS ON A LIFE

22   INSURANCE POLICY ON YOUR LIFE?

23        A.    NO.

24        Q.    DID YOU KNOW THAT MR. KLEIN IS SELLING AN

25   INTEREST IN A LIFE INSURANCE POLICY INVOLVING YOU?

26        A.    NO.

27        Q.    OKAY.  I HAVE NOTHING FURTHER?

28        THE COURT:  THANK YOU.  CROSS?

```
 1              MR. SLOTT:  YEAH.  THANK YOU, YOUR HONOR.

 2         Q.    BY MR. SLOTT:  GOOD MORNING, MS. RADOW.

 3    THANKS FOR BEING HERE, AND I REPRESENT MR. KLEIN,

 4    AND -- SO I HAVE A FEW QUESTIONS.

 5              IF I MAY HAVE EXHIBIT 18.

 6              EXHIBIT 18.

 7              THANK YOU.

 8              AND PLEASE SCROLL DOWN TO THE SIGNATURE

 9    BLOCK.

10              THANK YOU.

11              SO, MS. RADOW, I'M READING THERE SOMETHING

12    THAT LOOKS LIKE THE LAST NAME SAYS RADOW.  DO YOU SEE

13    THAT SIGNATURE?

14         A.    YES.

15         Q.    YOU'RE SAYING THAT IS NOT YOUR SIGNATURE?

16         A.    IT'S NOT MY SIGNATURE.

17         Q.    AND YOU DID SAY THAT SOMEONE CAME TO VISIT

18    VERY HAVE VISIT YOU IN 2006?

19         A.    I CAN'T EXACTLY REMEMBER THE DATE, BUT IT

20    WAS A LONG TIME AGO.

21         Q.    16 YEARS AGO IS WHAT THE DOCUMENT

22    REFLECTS.

23         A.    YEAH.

24         Q.    DO YOU REMEMBER THE PERSON?

25         A.    ONLY A WOMAN WHO CAME AND TOOK -- GAVE ME

26    AN EKG.

27         Q.    OH.  OKAY.

28         A.    AND LISTENED TO MY CHEST.
```

```
 1           SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                 FOR THE COUNTY OF LOS ANGELES

 3

 4        DEPARTMENT 14   HON. TERRY A. GREEN, JUDGE

 5   JOSEPH VAGO AND ERICA VAGO,        )
                                        )
 6                PLAINTIFFS,           )
                                        )
 7      VS.                             )  NO. 20STCV25050
                                        )
 8   LESLIE KLEIN; LES KLEIN &          )
     ASSOCIATES, INC.; KENNETH KOLEV    )
 9   KLEIN; AND LAW OFFICE OF KENNETH   )
     KLEIN, P.C.,                       )
10                                      )
                  DEFENDANTS.           )
11   _____)

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   SEPTEMBER 16, 2022

16

17   APPEARANCES:

18

19   FOR PLAINTIFFS:      PROCEL LAW, PC
                          BY:   BRIAN A. PROCEL, ESQ.
20                        401 WILSHIRE BOULEVARD
                          12TH FLOOR
21                        SANTA MONICA, CALIFORNIA 90401

22

23   FOR DEFENDANTS:      LAW OFFICES OF JEFFREY A. SLOTT, APC
                          BY:   JEFFREY A. SLOTT, ESQ.
24                        15760 VENTURA BOULEVARD
                          SUITE 1600
25                        ENCINO, CALIFORNIA 91436

26

27
                          KRISTINE M. HICKS, CSR NO. 13634
28                        OFFICIAL REPORTER PRO TEMPORE
```

1          I N D E X

2
            SEPTEMBER 16, 2022
3

4        CHRONOLOGICAL INDEX OF WITNESSES

5

6
  WITNESSES:                                    PAGE
7
  LESLIE KLEIN (PHASE II)
8      DIRECT EXAMINATION BY MR. PROCEL          15
       CROSS-EXAMINATION BY MR. SLOTT            26
9

10
                  EXHIBITS
11

12  PLAINTIFF'S            MARKED  RECEIVED   REJECTED

13  123                             19

14

15  DEFENDANT'S            MARKED  RECEIVED   REJECTED

16  (NONE.)

17

18

19

20

21

22

23

24

25

26

27

28

                                                    2

```
 1    YOU'VE ALREADY BEEN GIVEN THEM.  [AS READ:]
 2              "203:  YOU MAY CONSIDER THE ABILITY OF
 3              EACH PARTY TO PROVIDE EVIDENCE.  IF A
 4              PARTY PROVIDED WEAKER EVIDENCE WHEN IT
 5              COULD HAVE PROVIDED STRONGER EVIDENCE,
 6              YOU MAY DISTRUST THE WEAKER EVIDENCE."
 7          THE OTHER ONE IN YOUR PACKET IS 204.
 8              "YOU MAY CONSIDER WHETHER ONE PARTY
 9              INTENTIONALLY CONCEALED OR DESTROYED
10              EVIDENCE.  IF YOU DECIDE THAT A PARTY DID
11              SO, YOU MAY DECIDE THAT THE EVIDENCE
12              WOULD HAVE BEEN UNFAVORABLE TO THAT
13              PARTY."
14          AGAIN, YOU WILL DECIDE WHETHER THESE
15    INSTRUCTIONS APPLY.  AND IF SO, WHAT IMPACT THAT WILL
16    HAVE.
17          ALL RIGHT.  PLAINTIFF, HOW DO YOU WISH TO
18    PROCEED?
19          MR. PROCEL:  THANKS, YOUR HONOR.
20          TO STREAMLINE THIS, WE'RE PREPARED TO WAIVE
21    OPENING ARGUMENT AND GO STRAIGHT INTO THE EXAMINATION
22    OF MR. KLEIN.
23          THE COURT:  ALL RIGHT.  DO YOU WISH TO CALL
24    MR. KLEIN AS A WITNESS?
25          MR. PROCEL:  YES.
26          THE COURT:  MR. KLEIN, SIR, TAKE THE WITNESS
27    STAND.  YOU'RE STILL UNDER OATH.
28          THE WITNESS:  THANK YOU, YOUR HONOR.
```

14

```
 1
 2                    LESLIE KLEIN (PHASE II),
 3      WAS RE-CALLED AS A WITNESS AND, HAVING BEEN PREVIOUSLY
 4        DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:
 5
 6             THE COURT:  PLEASE PROCEED.
 7             MR. PROCEL:  THANK YOU, YOUR HONOR.
 8
 9                    DIRECT EXAMINATION
10      BY MR. PROCEL:
11        Q    MR. KLEIN, YOU'RE AWARE THAT MY OFFICE SERVED
12      A REQUEST TO PRODUCE DOCUMENTS RELATED TO YOUR NET
13      WORTH?
14        A    YES.
15        Q    OKAY.  AND YOU WERE ASKED TO PRODUCE A SERIES
16      OF DOCUMENTS RELATING TO YOUR FINANCIAL CONDITION AND
17      NET WORTH; CORRECT?
18        A    I WAS TOLD I NEEDED TO PRODUCE A BALANCE
19      SHEET.
20        Q    DID YOU READ THE NOTICE TO PRODUCE DOCUMENTS
21      THAT WAS SENT TO YOU?
22        A    NO, I DIDN'T.
23        Q    OKAY.  NOW, YOU'RE AWARE THAT THIS PROCEEDING
24      IS DESIGNED TO DETERMINE, IN PART -- OR AT LEAST
25      THERE'S AN OPPORTUNITY FOR YOU TO PRESENT EVIDENCE
26      REGARDING YOUR NET WORTH?
27        A    YES.
28        Q    YOU DID NOT BRING WITH YOU ANY BANK STATEMENTS
```

15

1    AT ALL?

2         A    THAT IS CORRECT.  I WENT LAST NIGHT TO THE

3    BANK, AND I WAS TRYING TO GET BANK STATEMENTS --

4         Q    MR. KLEIN, MY QUESTION WAS --

5         A    THE ANSWER IS NO.  THE ANSWER IS NO.

6         Q    THANK YOU.

7              YOU DID NOT BRING WITH YOU ANY TAX RETURNS AT

8    ANY TIME?

9         A    THAT IS CORRECT.

10        Q    OKAY.  YOU'RE AWARE THAT YOU WERE ASKED TO

11   BRING THOSE DOCUMENTS?

12        A    AS FAR AS I AM AWARE, I WAS ONLY SUPPOSED TO

13   BRING A BALANCE SHEET.

14        Q    OKAY.  YOU DID NOT BRING ANY BROKERAGE

15   STATEMENTS WITH YOU?

16        A    THAT IS CORRECT.

17        Q    YOU DID NOT BRING ANY EVIDENCE OF STOCKS OR

18   BONDS THAT YOU OWN?

19             THE COURT:  "DID YOU BRING ANY?"

20             THE WITNESS:  NO.

21   BY MR. PROCEL:

22        Q    DID YOU BRING ANY EVIDENCE OF ANY CERTIFICATES

23   OF DEPOSIT THAT YOU MAY HAVE HELD AT ANY POINT IN TIME?

24        A    NO.

25        Q    DID YOU BRING ANY MORTGAGE STATEMENTS FROM ANY

26   PERIOD OF TIME?

27        A    NO.

28        Q    DID YOU BRING ANY RECORDS OF SAFETY DEPOSIT

16

1    BOX CONTENTS AT ANY POINT IN TIME?

2         A    NO.

3         Q    DID YOU BRING ANY ESCROW RECORDS FROM ANY

4    POINT IN TIME?

5         A    NO.

6         Q    DID YOU BRING ANY LEASE AGREEMENTS FROM ANY

7    POINT IN TIME?

8         A    NO.

9         Q    DID YOU BRING ANY RECORDS OF ANY INSURANCE

10   POLICIES THAT YOU OWN FROM ANY POINT IN TIME?

11        A    NO.

12        Q    DID YOU BRING ANY RECORDS OF ANY AUTOMOBILES

13   THAT YOU OWN?

14        A    ACTUALLY, I LEASE MY AUTOMOBILES.  I DON'T OWN

15   AUTOMOBILES.

16        Q    HAVE YOU EVER OWNED AN AUTOMOBILE?

17        A    EVER?  YES.

18        Q    DID YOU BRING ANY RECORDS RELATING TO ANY

19   AUTOMOBILES YOU MAY HAVE OWNED AT ANY POINT IN TIME?

20        A    NO.

21        Q    DID YOU BRING ANY RECORDS OF ANY COMPANIES IN

22   WHICH YOU HOLD AN INTEREST?

23        A    NO.

24        Q    DID YOU BRING ANY RECORDS OF ANY REAL ESTATE

25   HOLDINGS THAT YOU HAVE?

26        A    NO.

27        Q    DID YOU BRING ANY PROPERTY TAX STATEMENTS?

28        A    NO.

17

1    Q    AND, NOW, THE SAME QUESTIONS FOR YOUR LAW
2  FIRM, LES KLEIN & ASSOCIATES.
3         DID YOU BRING ANY RECORDS OF ANYTHING RELATING
4  TO LESLIE KLEIN & ASSOCIATES?
5    A    LESLIE KLEIN & ASSOCIATES DOES NOT OWN
6  ANYTHING.
7    Q    MY QUESTION TO YOU WAS, DID YOU BRING ANY
8  RECORDS RELATING TO LESLIE KLEIN & ASSOCIATES?
9    A    NO.
10   Q    LESLIE KLEIN & ASSOCIATES HAS A BANK ACCOUNT;
11 CORRECT?
12   A    THAT IS CORRECT.
13   Q    DID YOU BRING ANY BANK STATEMENTS FOR LESLIE
14 KLEIN & ASSOCIATES?
15   A    NO.
16   Q    DID YOU BRING ANY RECORDS RELATING TO THE
17 CLIENT TRUST ACCOUNT HELD BY LESLIE KLEIN & ASSOCIATES?
18   A    NO.
19   Q    DID YOU BRING ANY LEASE AGREEMENTS RELATING TO
20 LESLIE KLEIN & ASSOCIATES?
21   A    THERE ARE NO LEASE AGREEMENTS FOR LESLIE KLEIN
22 & ASSOCIATES.
23   Q    DID YOU BRING ANY TAX RETURNS FOR LESLIE KLEIN
24 & ASSOCIATES?
25   A    NO.
26   Q    OKAY.  SO YOU'VE COME TO COURT WITH NO RECORDS
27 OTHER THAN SOME HANDWRITTEN DOCUMENTS THAT YOU CREATED
28 LAST NIGHT; IS THAT RIGHT?

18

1      A    ACTUALLY, I CREATED THESE DOCUMENTS MAYBE A

2  WEEK AGO, AND I ADDED TO IT BECAUSE SOME THINGS HAVE

3  CHANGED.  SO THESE ARE AS OF LAST NIGHT.

4      Q    SO WE'RE GOING TO BRIEFLY SHOW YOU WHAT WE

5  RECEIVED LATE LAST NIGHT FROM MR. KLEIN.  WE'LL GO ONE

6  BY ONE, BUT THEY'RE VERY QUICK.

7           THE COURT:  ANY OBJECTION TO THESE BEING

8  ADMITTED?

9           MR. SLOTT:  I HAVEN'T SEEN THEM.  I'M ASSUMING

10  THAT THEY'RE THE ONES THAT WERE PRODUCED BY MR. KLEIN

11  LAST EVENING.  SO SUBJECT TO SOME SHOCKING SURPRISE

12  THAT I SEE SOMETHING I DON'T RECOGNIZE, NO OBJECTION.

13           THE COURT:  OKAY.  THEY'LL BE RECEIVED.

14           MR. PROCEL:  THANK YOU.

15

16           (PLAINTIFF'S EXHIBIT NO. 123 WAS

17           RECEIVED INTO EVIDENCE BY THE COURT.)

18

19  BY MR. PROCEL:

20      Q    SO YOU HAVE TO SCROLL DOWN.  THIS IS THE

21  FOREWORD FROM MR. SLOTT TO ME LAST NIGHT.  AND IF YOU

22  GO DOWN.

23           SO YOU TOOK A PICTURE OF A DOCUMENT THAT SAYS

24  $17,641.11; IS THAT RIGHT?

25      A    CORRECT.

26      Q    OKAY.  THERE'S NO NAME ON THAT DOCUMENT?

27      A    LESLIE KLEIN.

28      Q    OKAY.  AND THIS IS A ONE-PAGE PHOTOGRAPH THAT

19

1    YOU TOOK?

2         A    THAT IS CORRECT.

3         Q    OKAY.  LET'S GO TO THE NEXT ONE.

4              THIS IS ANOTHER ONE-PAGE DOCUMENT.  IT SAYS --

5    APPEARS TO SAY, "YOUR TRANSACTION HAS ENDED."

6              YOU TOOK A PICTURE OF THAT AND SENT IT TO US

7    LAST NIGHT?

8         A    THAT IS CORRECT.

9         Q    OKAY.  NEXT ONE.

10             AND THIS IS A DOCUMENT THAT SAYS "BALANCE

11   SHEET, OCTOBER 15, 2022."

12             SO THIS IS A BALANCE SHEET FROM THE FUTURE?

13        A    NO.  IT WAS A MISTAKE.  IT WAS 9/15.  IT WAS

14   LAST NIGHT.  I WROTE IT LAST NIGHT.  SO -- AFTER I WENT

15   TO THE BANK, THEN I WROTE THIS.

16        Q    OKAY.

17        A    SO IT'S 9/15.  IT'S A TYPOGRAPHICAL ERROR.

18        Q    AND THIS IS THE BALANCE SHEET FOR YOUR LAW

19   FIRM?

20        A    NO.  EKLK.

21        Q    OH, IKLK.  GOT IT.

22        A    EKLK IS THE FOUNDATION.  EKLK FOUNDATION

23   BALANCE SHEET AS OF 9/15/22.  NO ASSETS AND NO

24   LIABILITIES.

25        Q    THE ONE ON THE RIGHT IS EKLK.

26             THE ONE ON THE LEFT IS LESLIE KLEIN &

27   ASSOCIATES; RIGHT?

28        A    OKAY.  NOW I'M LOOKING AT THE LES KLEIN &

20

1    ASSOCIATES, THAT IS CORRECT.

2        Q    SO YOU'RE TELLING THE JURY THAT THESE ARE THE

3    BALANCE SHEETS FOR YOUR LAW FIRM AND THE FOUNDATION?

4        A    THAT IS CORRECT.

5        Q    AND YOU DID THESE LAST NIGHT?

6        A    I DID THESE LAST NIGHT, THAT IS CORRECT.

7        Q    DID YOU LOOK AT ANY DOCUMENTS TO CREATE THESE

8    BALANCE SHEETS?

9        A    WELL, EKLK FOUNDATION GETS A STATEMENT EVERY

10   MONTH, AND BASICALLY THE BALANCE IN THE BANK ACCOUNT IS

11   ZERO.  AND EKLK HAS NO LIABILITY.  SO IT HAS NO ASSETS

12   AND NO LIABILITIES.  THIS HAS BEEN THE CASE FOR AT

13   LEAST SIX MONTHS, MAYBE A YEAR.

14       Q    OKAY.  MY QUESTION WAS, DID YOU LOOK AT ANY

15   DOCUMENTS TO CREATE THESE BALANCE SHEETS?

16       A    NO.  I KNOW WHAT THE SITUATION IS WITH EKLK.

17   I DIDN'T LOOK AT ANY DOCUMENTS, NO.

18       Q    AND YOU DIDN'T LOOK AT ANY DOCUMENTS TO CREATE

19   A BALANCE SHEET FOR YOUR LAW FIRM?

20       A    AGAIN, BASICALLY, I HAVE DECIDED TO NOT TAKE

21   ANY NEW CLIENTS.  SO ALL THE LAW FIRM HAS IS THE

22   FURNITURE AND THE GOODWILL.  NOTHING ELSE.

23       Q    OKAY.  BUT WE HAVE NO RECORD OF YOUR LAW

24   FIRM'S REVENUE FOR THE LAST FIVE YEARS; RIGHT?

25       A    THAT IS CORRECT.

26       Q    OKAY.  JUST TO BE CLEAR, YOU HAVE TAX RETURNS.

27   YOU FILE TAX RETURNS ON BEHALF OF LES KLEIN &

28   ASSOCIATES; CORRECT?

21

1      A      YES, I DID.  BUT FOR THE LAST FIVE YEARS,

2   EVERY YEAR THE TAX SHOWS LOSSES.

3      Q      YOU DECIDED NOT TO BRING THOSE TAX RETURNS?

4      A      THAT'S CORRECT.

5      Q      OKAY.  AND YOU HAVE BANK STATEMENTS AS WELL,

6   BUT YOU DECIDED NOT TO BRING THEM?

7      A      THAT'S CORRECT.

8      Q      OKAY.  NOW LET'S GO TO THE NEXT ONE.

9             AND THIS IS, I GUESS, WHAT YOU'RE SAYING IS A

10  BALANCE SHEET FOR YOU?

11     A      THAT IS CORRECT.

12     Q      LESLIE KLEIN, INDIVIDUALLY, CORRECT?

13     A      THAT IS CORRECT.

14     Q      SO YOU DRAFTED A DOCUMENT LAST NIGHT WITH THE

15  DATE, OCTOBER 15, AND THEN TOOK A PICTURE OF IT AND

16  E-MAILED IT TO US?

17     A      ACTUALLY, A MISTAKE.  IT WAS -- LAST NIGHT WAS

18  9/15, NOT 10/15.  ACTUALLY THIS WAS A REVISION OF AN

19  EARLY ONE THAT I DRAFTED MAYBE A WEEK AGO.

20     Q      OKAY.  AND YOU'RE NOT PRESENT IN COURT WITH

21  ANY DOCUMENTS TO SUPPORT ANY OF THE FIGURES THAT ARE IN

22  HERE; IS THAT RIGHT?

23     A      THAT IS CORRECT.

24     Q      SO JUST REAL QUICKLY, IF WE GO THROUGH THESE,

25  IT SAYS 143 SOUTH HIGHLAND, 2 MILLION, 1 MILLION, 1

26  MILLION.

27            WHAT IS THAT SUPPOSED TO BE?

28     A      SINGLE HOME AT 143 SOUTH HIGHLAND.  I THINK

1    THE FAIR MARKET VALUE IS 2 MILLION.  THERE'S A MORTGAGE

2    OF A MILLION, AND THE EQUITY IS A MILLION.

3        Q    OKAY.  SO YOUR BEST ESTIMATE IS THAT THE

4    HOME -- AND YOU OWN THIS HOME?

5        A    YES.

6        Q    OKAY.  AND YOUR BEST ESTIMATE IS THAT IT'S

7    WORTH 2 MILLION?

8        A    THAT IS CORRECT.

9        Q    AND YOU BROUGHT NO DOCUMENTS SUBSTANTIATING

10   THE AMOUNT OF THE LOAN THAT'S ON THE HOUSE, THE

11   MORTGAGE; RIGHT?

12       A    I DIDN'T BRING IT WITH ME, BUT I DEFINITELY

13   HAVE LOAN DOCUMENTS.

14       Q    YOU JUST --

15       A    I MEAN, I HAVE STATEMENTS IS WHAT I HAVE.

16       Q    YOU DECIDED NOT TO BRING THEM?

17       A    I DIDN'T BRING THEM, THAT'S CORRECT.

18       Q    315 NORTH MARTEL.  THAT'S ANOTHER PROPERTY

19   THAT YOU OWN?

20       A    ALSO SINGLE HOUSE.

21       Q    AND THAT'S WORTH 2.3 MILLION?

22       A    THAT'S CORRECT -- I MEAN, I DON'T KNOW, BUT I

23   THINK SO, YES.

24       Q    14245 VENTURA.  THAT'S YOUR OFFICE BUILDING?

25       A    THAT IS CORRECT.

26       Q    AND YOU'RE SAYING THAT'S WORTH 2.5 MILLION?

27       A    NO, HALF INTEREST.  BASICALLY, 14245 VENTURA

28   BOULEVARD IS OWNED 50 PERCENT BY LESLIE KLEIN AND 50

23

1    PERCENT BY BAY AREA DEVELOPMENT COMPANY.  SO I THINK

2    THE BUILDING WAS WORTH 5 MILLION, AND THE MORTGAGE IS 2

3    MILLION.

4        Q    YOU'RE SAYING HALF IS OWNED BY "BAY"?

5        A    BAY AREA DEVELOPMENT COMPANY.

6        Q    WHO OWNS BAY AREA DEVELOPMENT COMPANY?

7        A    BAY AREA DEVELOPMENT COMPANY IS RIGHT NOW IN

8    CHAPTER 11 BANKRUPTCY.

9        Q    MR. KLEIN, MY QUESTION WAS, WHO OWNS BAY AREA

10   DEVELOPMENT COMPANY?

11       A    ME, LESLIE KLEIN.

12       Q    SO YOU'RE INDICATING HERE THAT YOU HAVE A

13   ONE-HALF INTEREST, BUT YOU ACTUALLY OWN THE WHOLE

14   THING; RIGHT?  YOU JUST OWN HALF THROUGH ANOTHER

15   COMPANY?

16       A    RIGHT, THAT'S CORRECT.

17       Q    OKAY.  SO YOU OWN THE FULL AMOUNT.  SO IS

18   IT -- IS THE FULL AMOUNT 5 MILLION, OR IS THE FULL

19   AMOUNT 2.5 MILLION?

20       A    THE FULL AMOUNT IS 5 MILLION.  THE MORTGAGE IS

21   2 MILLION, YES.

22       Q    OKAY.  SO $5 MILLION ON 14245 VENTURA.

23            3752 OCEAN BOULEVARD IN OXNARD.  THAT'S A

24   BEACH HOUSE IN OXNARD?

25       A    THAT IS CORRECT.

26       Q    YOU OWN THAT?

27       A    YES.

28       Q    AND THAT, YOU SAY, IS WORTH 2.2 MILLION?

24

```
1        A    I THINK SO, YES.
2        Q    322 NORTH JUNE.  WHO OWNS THE OTHER HALF OF
3    322 NORTH JUNE?
4        A    MY DECEASED WIFE.
5        Q    OKAY.  AND WHO IS ENTITLED TO HER INTEREST IN
6    THE HOUSE?
7        A    MY KIDS.
8        Q    OKAY.  AND THEN YOU HAVE VARIOUS ACCOUNTS
9    HERE.  OKAY.
10       A    YEAH.
11       Q    AND THEN YOU HAVE A SURCHARGE, MENLO, FOR $10
12   MILLION.  WHAT DOES THAT MEAN?
13       A    THERE IS NOT AN ORDER, BUT ADVISORY ORDER FROM
14   THE REFEREE THAT ON MENLO SHOULD BE SURCHARGE,
15   $30 MILLION.  I DON'T THINK THAT IS CORRECT, BUT
16   THERE'S A HEARING TODAY, AND WE'RE GOING TO SEE WHAT
17   HAPPENS, BUT I PUT DOWN 10 MILLION, BUT RIGHT NOW THE
18   ADVISORY OPINION IS 30 MILLION.
19       Q    OKAY.  BUT AS YOU TESTIFIED TO EARLIER IN THE
20   CASE, THERE IS NO JUDGMENT, RIGHT, MR. KLEIN?
21       A    THAT IS CORRECT.
22       Q    SO YOU DON'T OWE ANYTHING AT THIS POINT?
23       A    WELL, THAT'S WHY I PUT DOWN 10 MILLION BECAUSE
24   MY GUESS IS THAT IT'S GOING TO BE -- YOU'RE RIGHT, I
25   HOPE IT'S GOING TO BE ZERO.  YES, I DEFINITELY HOPE
26   IT'S GOING TO BE ZERO, YES.
27            MR. PROCEL:  OKAY.  THAT'S ALL I HAVE, YOUR
28   HONOR.
```

25

```
 1            THE COURT:  CROSS?

 2

 3                    CROSS-EXAMINATION

 4    BY MR. SLOTT:

 5        Q    MR. KLEIN, IF WE DON'T TAKE INTO CONSIDERATION

 6    THE MENLO FIGURE, CAN YOU ADD UP THE NET FIGURES AND

 7    GIVE US A TOTAL NET WORTH THAT YOU ARE REPORTING?

 8        A    SURE.  GIVE ME ONE SECOND.

 9             I WOULD SAY ABOUT $7.5 MILLION.

10             MR. SLOTT:  NOTHING FURTHER.

11             THE COURT:  REDIRECT?

12             MR. PROCEL:  NO, YOUR HONOR.

13             THE COURT:  ALL RIGHT.  THANK YOU, SIR.

14    YOU'RE EXCUSED.

15             THE WITNESS:  THANK YOU VERY MUCH.

16             THE COURT:  ANYTHING FURTHER, PLAINTIFF?

17             MR. PROCEL:  JUST CLOSING.

18             THE COURT:  ALL RIGHT.  BOTH SIDES REST IN

19    THIS PHASE?

20             MR. PROCEL:  YES.

21             MR. SLOTT:  YES, YOUR HONOR.

22             THE COURT:  ALL RIGHT.  PLEASE PROCEED WITH

23    THE CLOSING ARGUMENT.

24             MR. PROCEL:  ALL RIGHT.  INTO THE CLOSING

25    TERRITORY.  THANK YOU.  THAT MOVED QUICKLY.

26             SO FIRST OF ALL, I WANT TO SAY THANK YOU FOR

27    THE AMOUNT OF TIME THAT YOU'VE PUT INTO THIS.  WE SAW

28    YOUR QUESTIONS THAT YOU ASKED DURING THE DELIBERATIONS.
```

26

```
1    IT'S CLEAR THAT YOU GUYS HAVE BEEN EXTREMELY

2    THOUGHTFUL.  I UNDERSTOOD, I BELIEVE, EXACTLY WHAT YOU

3    DID WITH THE RULINGS; AND, AGAIN, IT WAS VERY

4    THOUGHTFUL.  I HAD TO EXPLAIN EVERYTHING TO MR. AND

5    MS. VAGO YESTERDAY.  THEY ARE VERY GRATEFUL AND WOULD

6    LIKE TO SAY THANK YOU.

7         WE ARE NOW HERE TO TALK ABOUT PUNITIVE

8    DAMAGES, AND I THINK WHAT YOU JUST SAW RIGHT THERE IS

9    WHY WE HAVE PUNITIVE DAMAGES.  MR. KLEIN CAME IN TODAY

10   KNOWING THAT HE WAS EXPECTED TO PRODUCE DOCUMENTS,

11   KNOWING THAT WE HAD REQUESTED DOCUMENTS RELATING TO HIS

12   NET WORTH, AND HE JUST DECIDED NOT TO TURN THEM OVER TO

13   YOU AGAIN.

14        HE HAS BANK STATEMENTS.  HE HAS MORTGAGE

15   STATEMENTS.  HE HAS TAX RETURNS.  HE HAS ALL THESE

16   DOCUMENTS THAT CLEARLY RELATE TO HIS NET WORTH, AND HE

17   DECIDED NOT TO TURN OVER A SINGLE PAGE OF ANY OF THEM.

18   AND THERE'S A REASON FOR THAT, AND THAT'S THAT

19   MR. KLEIN DIDN'T GET THE MESSAGE THAT YOU SENT WITH THE

20   RULING, THE VERDICT FROM YESTERDAY.  AND I WANT TO

21   EXPLAIN THAT.

22        REALLY, WHAT YOU DID WITH YOUR VERDICT IS YOU

23   ORDERED MR. KLEIN TO RETURN THE MONEY THAT HE STOLE --

24   IT'S NOT HIS MONEY -- AND HE HAS TO GIVE THAT BACK, AND

25   MR. AND MS. VAGO ARE EXTREMELY GRATEFUL FOR THAT.  BUT

26   IT'S NOT REALLY A PUNISHMENT.  IT'S JUST MONEY THAT HE

27   NEVER SHOULD HAVE HAD IN THE FIRST PLACE.  THAT'S THE

28   REASON THAT WE HAVE PUNITIVE DAMAGES.
```

27

```
 1                SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                     FOR THE COUNTY OF LOS ANGELES

 3

 4         DEPARTMENT 14   HON. TERRY A. GREEN, JUDGE

 5     JOSEPH VAGO AND ERICA VAGO,        )
                                          )
 6                 PLAINTIFFS,            )
                                          )
 7        VS.                             )  NO. 20STCV25050
                                          )
 8     LESLIE KLEIN; LES KLEIN &          )
       ASSOCIATES, INC.; KENNETH KOLEV    )
 9     KLEIN; AND LAW OFFICE OF KENNETH   )
       KLEIN, P.C.,                       )
10                                        )
                   DEFENDANTS.            )
11     _____)

12

13

14             I, KRISTINE M. HICKS, OFFICIAL REPORTER

15     PRO TEMPORE OF THE SUPERIOR COURT OF THE STATE OF

16     CALIFORNIA, FOR THE COUNTY OF LOS ANGELES, DO HEREBY

17     CERTIFY THAT I DID CORRECTLY REPORT THE PROCEEDINGS

18     CONTAINED HEREIN AND THAT THE FOREGOING PAGES 1 THROUGH

19     44, COMPRISE A FULL, TRUE AND CORRECT TRANSCRIPT OF THE

20     PROCEEDINGS AND TESTIMONY TAKEN IN THE MATTER OF THE

21     ABOVE-ENTITLED CAUSE ON SEPTEMBER 16, 2022.

22

23             EXECUTED THIS DAY, JANUARY 18, 2023, AT

24     GLENDALE, CALIFORNIA.

25

26     _____

27             KRISTINE M. HICKS, CSR NO. 13634

28
```

BEFORE THE
CALIFORNIA BOARD OF ACCOUNTANCY DEPARTMENT OF CONSUMER AFFAIRS
STATE OF CALIFORNIA



In the Matter of the Accusation Against:

LESLIE KLEIN
322 N. June Street
Los Angeles, CA 90004

Certified Public Accountant Certificate No. 67454

Respondent.

Case No. AC-2019-62 OAH No. 2019090073

**Exhibit
0010**



DECISION AND ORDER

The attached Stipulated Surrender of License and Order is hereby adopted by the California
Board of Accountancy, Department of Consumer Affairs, as its Decision in this matter.

FOR THE CALIFORNIA BOARD OF ACCOUNTANCY DEPARTMENT OF CONSUMER
AFFAIRS



This Decision shall become effective on ---------- It is so ORDERED April 13, 2020

May 13, 2020



1    XAVIER BECERRA
    Attorney General of California
2    MARC D. GREENBAUM
    Supervising Deputy Attorney General
3    WILLIAM D. GARDNER
    Deputy Attorney General
4    State Bar No. 244817
    300 So. Spring Street, Suite 1702
5    Los Angeles, CA  90013
    Telephone:  (213) 269-6292
6      Facsimile:  (916) 731-2126
    *Attorneys for Complainant*

7

8                  **BEFORE THE**

9         **CALIFORNIA BOARD OF ACCOUNTANCY**
       **DEPARTMENT OF CONSUMER AFFAIRS**
10           **STATE OF CALIFORNIA**

11

12 In the Matter of the Accusation Against:    |    Case No. AC-2019-62

13 **LESLIE KLEIN**    |    OAH No. 2019090073
  **322 N. June Street**
  **Los Angeles, CA  90004**    |    **STIPULATED SURRENDER OF**
14                         **LICENSE AND ORDER**
  **Certified Public Accountant Certificate No.**
15   **67454**

16                Respondent.

17

18     IT IS HEREBY STIPULATED AND AGREED by and between the parties to the above-

19 entitled proceedings that the following matters are true:

20                   **PARTIES**

21     1.   Patti Bowers (Complainant) is the Executive Officer of the California Board of

22 Accountancy (CBA).  She brought this action solely in her official capacity and is represented in

23 this matter by Xavier Becerra, Attorney General of the State of California, by William D.

24 Gardner, Deputy Attorney General.

25     2.   Respondent Leslie Klein is represented in this proceeding by attorney Randall Dean,

26 whose address is:  11900 W. Olympic Boulevard, Suite 800, Los Angeles, California 90064.

27     3.   On or about September 30, 1994, the California Board of Accountancy issued

28 Certified Public Accountant Certificate Number 67454 to Leslie Klein ("Respondent").  The

                           1

                         Stipulated Surrender of License (Case No. AC-2019-62)

1  Certified Public Accountant Certificate was in full force and effect at all times relevant to the

2  charges brought in Accusation No. AC-2019-62 and will expire on January 31, 2021, unless

3  renewed.

4                                   **JURISDICTION**

5      4.     Accusation No. AC-2019-62 was filed before the CBA, and is currently pending

6  against Respondent.  The Accusation and all other statutorily required documents were properly

7  served on Respondent on June 7, 2019.  Respondent timely filed his Notice of Defense contesting

8  the Accusation.  A copy of Accusation No. AC-2019-62 is attached as Exhibit A and incorporated

9  by reference.

10                           **ADVISEMENT AND WAIVERS**

11     5.     Respondent has carefully read, fully discussed with counsel, and understands the

12 charges and allegations in Accusation No. AC-2019-62.  Respondent also has carefully read, fully

13 discussed with counsel, and understands the effects of this Stipulated Surrender of License and

14 Order.

15     6.     Respondent is fully aware of his legal rights in this matter, including the right to a

16 hearing on the charges and allegations in the Accusation; the right to confront and cross-examine

17 the witnesses against him; the right to present evidence and to testify on his own behalf; the right

18 to the issuance of subpoenas to compel the attendance of witnesses and the production of

19 documents; the right to reconsideration and court review of an adverse decision; and all other

20 rights accorded by the California Administrative Procedure Act and other applicable laws.

21     7.     Respondent voluntarily, knowingly, and intelligently waives and gives up each and

22 every right set forth above.

23                                   **CULPABILITY**

24     8.     Respondent understands that the charges and allegations in Accusation No. AC-2019-

25 62, if proven at a hearing, constitute cause for imposing discipline upon his Certified Public

26 Accountant Certificate.

27     9.     For the purpose of resolving the Accusation without the expense and uncertainty of

28 further proceedings, Respondent agrees that, at a hearing, Complainant could establish a factual

                                        2

EXHIBIT 14-5

1    basis for the charges in the Accusation and that those charges constitute cause for discipline.

2    Respondent hereby gives up his right to contest that cause for discipline exists based on those

3    charges.

4        10.    Respondent understands that by signing this stipulation he enables the CBA to issue

5    an order accepting the surrender of his Certified Public Accountant Certificate without further

6    process.

7                                    **RESERVATION**

8        11.    The admissions made by Respondent herein are only for the purposes of this

9    proceeding, or any other proceedings in which the CBA is involved and shall not be admissible in

10   any other criminal or civil proceeding.

11                                   **CONTINGENCY**

12       12.    This stipulation shall be subject to approval by the CBA.  Respondent understands

13   and agrees that counsel for Complainant and the staff of the CBA may communicate directly with

14   the CBA regarding this stipulation and surrender, without notice to or participation by

15   Respondent or his counsel.  By signing the stipulation, Respondent understands and agrees that he

16   may not withdraw his agreement or seek to rescind the stipulation prior to the time the CBA

17   considers and acts upon it.  If the CBA fails to adopt this stipulation as its Decision and Order, the

18   Stipulated Surrender and Disciplinary Order shall be of no force or effect, except for this

19   paragraph; it shall be inadmissible in any legal action between the parties, and the CBA shall not

20   be disqualified from further action by having considered this matter.

21       13.    The parties understand and agree that Portable Document Format (PDF) and facsimile

22   copies of this Stipulated Surrender of License and Order, including PDF and facsimile signatures

23   thereto, shall have the same force and effect as the originals.

24       14.    This Stipulated Surrender of License and Order is intended by the parties to be an

25   integrated writing representing the complete, final, and exclusive embodiment of their agreement.

26   It supersedes any and all prior or contemporaneous agreements, understandings, discussions,

27   negotiations, and commitments (written or oral).  This Stipulated Surrender of License and Order

28

                                           3
                                _____
                         Stipulated Surrender of License (Case No. AC-2019-62)

1   may not be altered, amended, modified, supplemented, or otherwise changed except by a writing

2   executed by an authorized representative of each of the parties.

3         15.    In consideration of the foregoing admissions and stipulations, the parties agree that

4   the CBA may, without further notice or formal proceeding, issue and enter the following Order:

5                                        **ORDER**

6         IT IS HEREBY ORDERED that Certified Public Accountant Certificate No. 67454, issued

7   to Respondent Leslie Klein, is surrendered and accepted by the CBA.

8         1.     The surrender of Respondent's Certified Public Accountant Certificate and the

9   acceptance of the surrendered license by the CBA shall constitute the imposition of discipline

10  against Respondent. This stipulation constitutes a record of the discipline and shall become a part

11  of Respondent's license history with the CBA.

12        2.     Respondent shall lose all rights and privileges as a certified public accountant in

13  California as of the effective date of the CBA's Decision and Order.

14        3.     Respondent shall cause to be delivered to the CBA his pocket license and, if one was

15  issued, his wall certificate on or before the effective date of the Decision and Order.

16        4.     If Respondent ever files an application for licensure or a petition for reinstatement in

17  the State of California, the CBA shall treat it as a petition for reinstatement. Respondent must

18  comply with all the laws, regulations and procedures for reinstatement of a revoked or

19  surrendered license in effect at the time the petition is filed, and all of the charges and allegations

20  contained in Accusation No. AC-2019-62 shall be deemed to be true, correct and admitted by

21  Respondent when the CBA determines whether to grant or deny the petition.

22        5.     Respondent shall pay the agency its costs of investigation and enforcement in the

23  amount of $30,000.00 prior to issuance of a new or reinstated license.

24                                     **ACCEPTANCE**

25        I have carefully read the above Stipulated Surrender of License and Order and have fully

26  discussed it with my attorney. I understand the stipulation and the effect it will have on my

27  Certified Public Accountant Certificate. I enter into this Stipulated Surrender of License and

28  ///

                                           4

Stipulated Surrender of License (Case No. AC-2019-62)

Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order
of the California Board of Accountancy

DATED: 3/19/2020 _____ _____
LESLIE KLEIN
*Respondent*

I have read and fully discussed with Respondent Leslie Klein the terms and conditions and
other matters contained in this Stipulated Surrender of License and Order. I approve its form and
content

DATED: _____ _____

*Attorney for Respondent*

## ENDORSEMENT

The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted
consideration by the California Board of Accountancy of the Department of Consumer
irs.

ED: _____

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
MARC D. GREENBAUM
Supervising Deputy Attorney General

WILLIAM D. GARDNER
Deputy Attorney General
*Attorneys for Complainant*

9
ender of License and Order.docx

1    Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order

2    of the California Board of Accountancy.

3

4    DATED: _____    _____

5                                      LESLIE KLEIN
                                       *Respondent*

6            I have read and fully discussed with Respondent Leslie Klein the terms and conditions and

7    other matters contained in this Stipulated Surrender of License and Order.  I approve its form and

8    content.

9    DATED:    March 19, 2020             *Randall J. Dean*

10                                       *Attorney for Respondent*

11

12                              **ENDORSEMENT**

13           The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted

14    for consideration by the California Board of Accountancy of the Department of Consumer

15    Affairs.

16    DATED: _____         Respectfully submitted,

17                                            XAVIER BECERRA
                                              Attorney General of California
18                                            MARC D. GREENBAUM
                                              Supervising Deputy Attorney General
19

20

21                                            WILLIAM D. GARDNER
                                              Deputy Attorney General
22                                            *Attorneys for Complainant*

23

24    LA2019501499
      Stipulated Surrender of License and Order.docx
25

26

27

28

                                    5

                    Stipulated Surrender of License (Case No. AC-2019-62)

1  Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order

2  of the California Board of Accountancy.

3

4  DATED: _____          _____

5                                              LESLIE KLEIN
                                               *Respondent*

6        I have read and fully discussed with Respondent Leslie Klein the terms and conditions and

7  other matters contained in this Stipulated Surrender of License and Order.  I approve its form and

8  content.

9  DATED: _____          _____

10                                             *Attorney for Respondent*

11

12                          **ENDORSEMENT**

13       The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted

14  for consideration by the California Board of Accountancy of the Department of Consumer

15  Affairs.

16  DATED: 3/20/2020                    Respectfully submitted,

17                                        XAVIER BECERRA
                                          Attorney General of California
18                                        MARC D. GREENBAUM
                                          Supervising Deputy Attorney General
19

20

21                                        WILLIAM D. GARDNER
                                          Deputy Attorney General
22                                        *Attorneys for Complainant*

23

24  LA2019501499
    Stipulated Surrender of License and Order.docx
25

26

27

28

                                  5
                            Stipulated Surrender of License (Case No. AC-2019-62)

**Exhibit A** Accusation No. AC-2019-62

1 | XAVIER BECERRA
Attorney General of California
2 | ARMANDO ZAMBRANO
Supervising Deputy Attorney General
3 | KEVIN J. SCHETTIG
Deputy Attorney General
4 | State Bar No. 234240
300 So. Spring Street, Suite 1702
5 | Los Angeles, CA  90013
   Telephone:  (213) 269-6272
6 |  Facsimile:  (213) 897-2804
*Attorneys for Complainant*

7

8 | **BEFORE THE**
**CALIFORNIA BOARD OF ACCOUNTANCY**
9 | **DEPARTMENT OF CONSUMER AFFAIRS**
**STATE OF CALIFORNIA**
10

11

12 | In the Matter of the Accusation Against:          Case No. AC-2019-62

13 | **LESLIE KLEIN**
14 | 322 N. June Street
Los Angeles, CA  90004          **ACCUSATION**
15
**Certified Public Accountant Certificate No.**
16 | **67454**

17 | Respondent.

18

19

20

21 | Complainant alleges:

22 | **PARTIES**

23 | 1.     Patti Bowers ("Complainant") brings this Accusation solely in her official capacity as

24 | the Executive Officer of the California Board of Accountancy, Department of Consumer Affairs.

25 | 2.     On or about September 30, 1994, the California Board of Accountancy issued

26 | Certified Public Accountant Certificate Number 67454 to Leslie Klein ("Respondent").  The

27 | Certified Public Accountant Certificate was in full force and effect at all times relevant to the

28 | charges brought herein and will expire on January 31, 2021, unless renewed.

1

(LESLIE KLEIN) ACCUSATION

## JURISDICTION

3.    This Accusation is brought before the California Board of Accountancy ("CBA"),
Department of Consumer Affairs, under the authority of the following laws. All section
references are to the Business and Professions Code unless otherwise indicated.

4.    Section 5100.5, subdivision (a), states, "After notice and hearing the board may, for
unprofessional conduct, permanently restrict or limit the practice of a licensee or impose a
probationary term or condition on a license, which prohibits the licensee from performing or
engaging in any of the acts or services described in Section 5051."

5.    Section 5109 states that "[t]he expiration, cancellation, forfeiture, or suspension of a
license, practice privilege, or other authority to practice public accountancy by operation of law or
by order or decision of the board or a court of law, the placement of a license on a retired status, or
the voluntary surrender of a license by a licensee shall not deprive the board of jurisdiction to
commence or proceed with any investigation of or action or disciplinary proceeding against the
licensee, or to render a decision suspending or revoking the license."

## STATUTORY PROVISIONS

6.    Section 5100 states:

"After notice and hearing the board may revoke, suspend, or refuse to renew any permit or
certificate granted under Article 4 (commencing with Section 5070) and Article 5 (commencing
with Section 5080), or may censure the holder of that permit or certificate for unprofessional
conduct that includes, but is not limited to, one or any combination of the following causes:

. . .

(g) Willful violation of this chapter or any rule or regulation promulgated by the board
under the authority granted under this chapter.

. . .

(i) Fiscal dishonesty or breach of fiduciary responsibility of any kind.

(j) Knowing preparation, publication, or dissemination of false, fraudulent, or materially
misleading financial statements, reports, or information.

. . ."

2

(LESLIE KLEIN) ACCUSATION

1   **REGULATORY PROVISIONS**

2       7.   California Code of Regulations, title 16, section 52, states:

3       "(a) A licensee shall respond to any inquiry by the Board or its appointed representatives

4   within 30 days. The response shall include making available all files, working papers and other

5   documents requested.

6       (b) A licensee shall respond to any subpoena issued by the Board or its executive officer or

7   the assistant executive officer in the absence of the executive officer within 30 days and in

8   accordance with the provisions of the Accountancy Act and other applicable laws or regulations.

9       (c) A licensee shall appear in person upon written notice or subpoena issued by the Board

10  or its executive officer or the assistant executive officer in the absence of the executive officer.

11      (d) A licensee shall provide true and accurate information and responses to questions,

12  subpoenas, interrogatories or other requests for information or documents and not take any action

13  to obstruct any Board inquiry, investigation, hearing or proceeding."

14      8.   California Code of Regulations, title 16, section 58, states:

15      "Licensees engaged in the practice of public accountancy shall comply with all applicable

16  professional standards, including but not limited to generally accepted accounting principles and

17  generally accepted auditing standards."

18      **COST RECOVERY AND ADMINISTRATIVE PENALTIES**

19      9.   Section 5107 of the Code states, in pertinent part:

20      "(a)   The executive officer of the board may request the administrative law judge, as part

21  of the proposed decision in a disciplinary proceeding, to direct any holder of a permit or

22  certificate found to have committed a violation or violations of this chapter to pay to the board all

23  reasonable costs of investigation and prosecution of the case, including, but not limited to,

24  attorneys' fees. The board shall not recover costs incurred at the administrative hearing.

25      (b)   A certified copy of the actual costs, or a good faith estimate of costs where actual

26  costs are not available, signed by the executive officer, shall be prima facie evidence of

27  reasonable costs of investigation and prosecution of the case."

28  ///

3

(LESLIE KLEIN) ACCUSATION

10.    Section 5116 of the Code states in part:

"(a) The board, after appropriate notice and an opportunity for hearing, may order any licensee or applicant for licensure or examination to pay an administrative penalty as provided in this article as part of any disciplinary proceeding or other proceeding provided for in this chapter.

…

(d) Administrative penalties assessed under this article shall be in addition to any other penalties or sanctions imposed on the licensee or other person, including, but not limited to, license revocation, license suspension, denial of the application for licensure, denial of the petition for reinstatement, or denial of admission to the licensing examination. Payment of these administrative penalties may be included as a condition of probation when probation is ordered."

## PROFESSIONAL STANDARDS

11.    The CBA incorporates the following standards to all California licensees through California Code of Regulations, title 16, section 58.

### AICPA Code of Professional Conduct (Version 2014)

12.    The American Institute of Certified Public Accountants ("AICPA") Code of Professional Conduct is part of *AICPA Professional Standards*. It includes The Rules of Conduct, Interpretations of Rules of Conduct, and Ethics Rulings. The version relevant herein was effective on December 15, 2014, and among the sections relevant herein are: section 0.100 (Principles and Rules of Conduct), section 0.200 (Structure and Application of the AICPA Code), section 0.300 (Principles of Professional Conduct), section 0.400 (Definitions), section 1.000 (Members in Public Practice), section 1.110 (Conflicts of Interest), section 1.300 (Competence), and section 1.310 (Compliance with Standards).

### Statement on Standards in Personal Financial Planning

13.    Standards applicable to personal financial planning services are discussed in the Statement on Standards in Personal Financial Planning ("SSPFP"). The standards have been issued by the Personal Financial Planning Executive Committee, the senior committee of the AICPA designated to promulgate enforceable standards of Personal Financial Planning practice. The statements are codified by "SSPFP" number with the pertinent section 100 applicable to the

4

(LESLIE KLEIN) ACCUSATION

1  issues herein.

2  **FACTUAL BACKGROUND**

3     14.  On or about January 9, 2017, the CBA received a complaint from consumer J.C.S.

4  alleging issues related to her husband's trust (the "Trust Agreement"), dated December 24, 1992.

5  Consumer J.C.S. alleged Respondent embezzled funds, comingled funds, misrepresented

6  investments purchased, repeatedly produced quarterly financial reports that were misleading and

7  exerted undue influence over her husband, consumer H.S.

8     15.  According to consumer J.C.S.'s complaint, Respondent insisted on doing all

9  investments, taxes, and monitoring of H.S.'s financial accounts.  Further, consumer J.C.S.

10  provided information that H.S., the trustor of the Trust Agreement, was 86 years old with

11  dementia.  Respondent was trustee of the Trust Agreement.  Consumer H.S. died on December 4,

12  2016.

13     16.  On May 20, 2015, in a conservatorship case bearing Case No. BP161682, the

14  Superior Court of California, County of Los Angeles, appointed a temporary conservator and

15  suspended all powers of attorney for consumer H.S.

16     17.  On February 4, 2016, in Case No. BP161682, the Superior Court of California,

17  County of Los Angeles, appointed conservators for consumer H.S.'s estate and person, suspended

18  Respondent as trustee, and ordered Respondent not to have any direct contact with consumers

19  H.S. and J.C.S.

20     18.  In 2005, consumer H.S.'s son died and H.S. received life insurance proceeds.  In

21  2010, H.S. inherited a substantial sum upon the death of his brother.  From 2011 to 2015,

22  Respondent received $2,420,000 from consumer H.S.  In a declaration dated April 8, 2016,

23  Respondent stated, "I was the financial planner for [H.S.] from 2011 to 2016."

24     19.  Respondent failed to act in the best interest of consumer H.S.:

25       a.  Respondent implemented investments that were improper due to the lack of

26  liquidity and diversification given consumer H.S.'s age, which was 85 as of November 18, 2015.

27         i.  Each of the Non-Recourse Promissory Notes with an Irrevocable Life

28  Insurance Trust ("ILIT") was due and payable only upon the death of the policyholder.  If the

5

(LESLIE KLEIN) ACCUSATION

1   premiums were not paid, the policy would lapse, rendering the Promissory Note worthless.

2   According to the accounting Respondent filed with the Los Angeles County Superior Court, as of

3   February 29, 2016, such promissory notes comprised $2,270,000, or 85% of consumer H.S.'s

4   "investments."

5           ii.     Each of the Non-Recourse Promissory Notes with Bay Area Development

6   Co. have identical terms. There were three notes in the amounts of $300,000, $100,000, and

7   $400,000. The $400,000 note was a replacement of the two prior notes. Each of the notes were

8   only due upon the sale of the property, were not recorded with the County Recorder, and did not

9   state who owned the property. There was no requirement or triggering event for the sale of the

10   property. Consequently, the borrower could hold onto the property indefinitely and never have to

11   repay the notes. In addition, the notes were poorly drafted. They each stated they were due upon

12   the sale of the real property, but also state that they were secured by the policies of life insurance.

13           iii.    The promissory note dated February 1, 2015, for $400,000, made up the

14   remaining 15% of consumer H.S.'s "investments."

15           iv.    The only liquid asset reported in Respondent's accounting was $8,100

16   held in the Leslie Klein & Associates Attorney Client Trust Account.

17       20.    Respondent made investments that were self-serving. Consumer H.S.'s funds were

18   invested in loans to companies connected to Respondent, or as loans to ILITs where Respondent

19   was the sole trustee of each ILIT. Respondent's connections to those companies and the ILITs

20   create a conflict of interest and are documented as follows:

21           i.     President of Bay Area Development Co.;

22           ii.    Member/manager/partner of BW Life Settlements LLC;

23           iii.   Member/manager/partner of GMR Life Settlements LLC;

24           iv.    President of Times Square Media Inc.; and

25           v.     Each of the ILIT loans are signed by Respondent as trustee for the ILIT.

26       21.    Respondent failed to properly manage investments. Two of the companies involved,

27   BW Life Settlement LLC and GMR Life Settlements LLC, have been suspended by the Franchise

28   Tax Board or the Secretary of State.

6

(LESLIE KLEIN) ACCUSATION

1   22.   Respondent deceived consumer H.S. as to the actual investments as follows:

2        a.    In a letter to consumer H.S. dated June 10, 2011, Respondent stated funds were

3   or will be invested as follows:

4             i.    $500,000 loan to purchase a $5 million policy on the life of M.G.;

5             ii.   $500,000 loan to purchase a $5 million policy on the life of Y.Z.;

6             iii.  $190,901.50 invested in Daktronics along with $209,100 from H.S.'s

7   checking account as a loan of $400,000 to purchase a light emitting diode (LED) display in

8   Beaumont, California;

9             iv.   "[T]he balance ... will be invested in various stocks that will pay

10  dividends of 5% in an account at Citibank, Smith Barney in stocks that will pay dividends.  We

11  plan to invest in the following stocks: AT&T, McDonalds, Verizon, Philip Morris, and Coca

12  Cola."

13       b.    In a letter to consumer H.S. dated August 1, 2011, Respondent stated funds

14  were or will be invested as follows:

15            i.    $500,000 in the M.G. policy;

16            ii.   $500,000 in the Y.Z. policy;

17            iii.  $750,000 with Times Square Media to purchase LEDs;

18            iv.   The balance to be invested with the next ten days either in real estate on

19  the 1st Trust Deed on the property or in insurance policies from our various hedge funds.

20  Respondent advised that, "All of the above will pay a minimum interest of 8% due and payable

21  three years from today's date."

22       c.    There is no evidence of the Daktronics or various stock investments, and they

23  are not reported in Respondent's accounting.  In addition, the investment in Times Square Media

24  is not reported in Respondent's accounting.

25       d.    When the Probate Investigator stated to Respondent, "So, in essence none of

26  these investments are in [consumer H.S.'s] name, but all are in your name and the fact is that

27  these are not investments, but you have borrowed these amounts of monies ... and these amounts

28  are in your name and you have agreed to pay [H.S.] 8% on these monies, but you have paid

7

(LESLIE KLEIN) ACCUSATION

1  nothing to date," Respondent indicated, in the presence of consumers H.S. and J.C.S., that the

2  Probate Investigator was correct.

3      23.    Respondent failed to maintain appropriate records of the invested funds.  Respondent

4  stated in a letter dated August 1, 2011 that, "... this law firm has received from [H.S.] a total of

5  $2,860,901.50."  A comparison of the funds provided to Respondent for investments with the

6  cancelled checks provided by consumer J.C.S. and Respondent's accounting indicates the subtotal

7  invested as of August 1, 2011, is $3,700,000, and the total invested as of February 1, 2015, is

8  $5,048,000.  Both amounts are significantly more than the amount of $2,860,901.50 reported by

9  Respondent as received for investment.  While some of the Promissory Notes may have been

10  repaid and funds reinvested, there is no documentation of any repayment of either the Promissory

11  Notes or receipt of the related interest earned.

12      24.    Despite multiple written requests from consumer H.S., Respondent failed to provide

13  accurate reports or statements to H.S.  Further, Respondent provided consumer H.S. with false or

14  misleading information about the "investment" of his funds.

15      25.    Respondent, through his attorney, stated in a letter dated June 29, 2018, that

16  Respondent was not consumer H.S.'s tax preparer or advisor.  In this letter, Respondent also

17  asserted that he did not have personal knowledge as to the tax treatment of the interest statements

18  or whether that was reflected on H.S.'s tax returns.  These statements were not true and accurate.

19  Respondent was associated with consumer H.S.'s tax returns for 2012, 2013, and 2014.  Further,

20  Respondent signed consumer H.S.'s income tax returns for 2014 as the paid tax preparer.  In

21  addition, in a letter dated May 12, 2011, from Respondent to Mr. Levin of BW Life Insurance

22  Settlements LLC, Respondent stated, "You will not issue a 1099 form to [consumer H.S.] as the

23  interest payment will be paid from the death proceeds."

24      26.    Respondent exerted undue influence over consumer H.S.  The Probate Investigator's

25  Report dated May 8, 2015, describes her interviews with consumers H.S., J.C.S. and Respondent

26  on May 5, 2015.  The Probate Investigator noted, "There appears to be substantial undue

27  influence by the attorney/Financial Advisor/Trustee, which is not and has not been in the best

28  interest of the proposed conservatee to date."

8

(LESLIE KLEIN) ACCUSATION

**FIRST CAUSE FOR DISCIPLINE**

**(Breach of Fiduciary Responsibility)**

27.    Respondent is subject to disciplinary action under section 5100, subdivision (i), in that Respondent breached his fiduciary responsibility as Trustee to consumer H.S. Respondent implemented investments that were improper due to the lack of liquidity and diversification given consumer H.S.'s advanced age, made investments that were self-serving, failed to properly manage investments, deceived consumer H.S. as to the actual investments, failed to maintain appropriate records of the invested funds, and despite multiple written requests from consumer H.S., Respondent failed to provide accurate reports or statements to consumer H.S. Complainant refers to and by this reference incorporates the allegations set forth above in paragraphs 14 through 26, inclusive, as though set forth fully herein.

**SECOND CAUSE FOR DISCIPLINE**

**(Knowing Preparation of Misleading Financial Information)**

28.    Respondent is subject to disciplinary action under section 5100, subdivision (j), in that Respondent provided consumer H.S. with false or misleading information about the "investment" of consumer H.S.'s funds. Complainant refers to and by this reference incorporates the allegations set forth above in paragraphs 14 through 26, inclusive, as though set forth fully herein.

**THIRD CAUSE FOR DISCIPLINE**

**(Failure to Comply with Professional Standards)**

29.    Respondent is subject to disciplinary action under section 5100, subdivision (g), in conjunction with Code of Regulations, title 16, section 58, in that Respondent failed to perform his responsibilities in accordance with professional standards promulgated by the AICPA Code of Professional Conduct and Statement on Standards in Personal Financial Planning. Complainant refers to and by this reference incorporates the allegations set forth above in paragraphs 14 through 26, inclusive, as though set forth fully herein.

///

///

9

(LESLIE KLEIN) ACCUSATION

1

**FOURTH CAUSE FOR DISCIPLINE**

2

**(Failure to Respond to CBA Inquiry)**

3    30.    Respondent is subject to disciplinary action under section 5100, subdivision (g), in

4    conjunction with Code of Regulations, title 16, section 52, in that Respondent, through his

5    attorney, made statements to the CBA that were not true and accurate.  Complainant refers to and

6    by this reference incorporates the allegations set forth above in paragraphs 14 through 26,

7    inclusive, as though set forth fully herein.

8

**FIFTH CAUSE FOR DISCIPLINE**

9

**(Unprofessional Conduct)**

10    31.    Respondent is subject to disciplinary action under section 5100, in that Respondent

11    exerted undue influence over consumer H.S.  Complainant refers to and by this reference

12    incorporates the allegations set forth above in paragraphs 14 through 26, inclusive, as though set

13    forth fully herein.

14

**SIXTH CAUSE FOR DISCIPLINE**

15

**(Willful Violation)**

16    32.    Respondent is subject to disciplinary action under section 5100, subdivision (g), in

17    that Respondent willfully violated provisions of Business and Professions Code, Division 3,

18    Chapter 1, failed to comply with professional standards, failed to comply with court orders, and

19    made false statements in response to the CBA's inquiry.  Complainant refers to and by this

20    reference incorporates the allegations set forth above in paragraphs 14 through 26, inclusive, as

21    though set forth fully herein.

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

10

(LESLIE KLEIN) ACCUSATION

1

## PRAYER

2      WHEREFORE, Complainant requests that a hearing be held on the matters herein alleged,

3  and that following the hearing, the California Board of Accountancy issue a decision:

4      1.      Revoking or suspending, restricting, limiting or otherwise imposing discipline upon

5  Certified Public Accountant Certificate Number 67454, issued to Leslie Klein;

6      2.      Ordering Leslie Klein to pay the California Board of Accountancy the reasonable

7  costs of the investigation and enforcement of this case, pursuant to Business and Professions

8  Code section 5107;

9      3.      Ordering Leslie Klein to pay the California Board of Accountancy an administrative

10  penalty pursuant to Business and Professions Code section 5116; and,

11      4.      Taking such other and further action as deemed necessary and proper.

12

13  DATED: June 5, 2019

PATTI BOWERS
14  Executive Officer
California Board of Accountancy
15  Department of Consumer Affairs
State of California
16  *Complainant*

17

18  LA2019501499
53407725.docx
19

20

21

22

23

24

25

26

27

28

11

(LESLIE KLEIN) ACCUSATION

## NON-RECOURSE PROMISSORY NOTE

**Principal Sum:**    **$500,000**           **September 12, 2012**
**Due Date:**        **Upon the death of Ann Radow**    **State of California**

**FOR VALUE RECEIVED**, the undersigned, **LESLIE KLEIN** as Trustee of **THE ANN RADOW IRREVOCABLE LIFE INSURANCE TRUST** with offices at 14245 Ventura Boulevard, Sherman Oaks, California (the "Borrower"), hereby promises to pay to **Estate of Robert Schweitzer** or his registered assigns (the "Holder"), the principal sum of **$500,000,** plus interest of **12%** and all costs, fees and expenses (including without limitation reasonable attorneys' fees and disbursements) that the Holder incurs in order to collect any amount due under this Note, to negotiate or document a workout or restructuring, or to preserve its rights or realize upon any security for the payment of this Note now or hereafter granted ("Expenses").

**Security Agreement; Collateral Assignments.** This Note is a secured, non-recourse promissory note, secured by the policies of life insurance on the live(s) of the individual(s) above named. Pursuant to and in accordance with this agreement this Note is secured by the borrower and the borrower has granted to the lender a continuing first priority security interest in the policies and the proceeds thereof pursuant to this agreement.

**"Policy"** means any of, and **"Policies"** means all of, the life insurance policies listed on the attached Schedule "A".

**Additional Advances.** In the event that Holder makes any payment of additional premiums, adjustments to premiums or other required payments on or under any Policy or Policies on Borrower's behalf, the amount of any such advances automatically shall be deemed to be, and shall be, added to the outstanding principal balance of this Note as of the date of such advance and shall earn interest from such date.

**Interest Rate.** The outstanding principal balance of this Note shall earn interest, calculated on the basis of a 360-day year comprised of twelve 30-day months, from the date hereof until the date all amounts due hereunder are paid in full, at the rate of 12 % percent per annum.

**Payment.** The entire principal balance hereof, together with an interest accrued thereon, shall be due and payable on **Upon the death of Ann Radow**, or at such time, if earlier, as the Holder has accelerated the maturity of the Note after the occurrence and during the continuation of an Event of Default
under this Note or any of the other Loan Agreements. Payment shall be made in immediately available United States funds at such address as the Holder may specify in writing.

**Prepayment.** The Borrower, upon not less than three business days prior written notice, may prepay the outstanding principal amount of this Note, in whole or in part, together with accrued

**Exhibit
0017**

**Page 74**

KLEIN0001876
Page 109 of **EXHIBIT 21-1**

EXHIBIT E
88