Jeffrey W. Dulberg (CA State Bar No. 181200)
John Lucas (CA State Bar No. 271038)
Jeffrey P. Nolan (CA State Bar No. 158923)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: 310/277-6910
Facsimile: 310/201-0760
E-mail:  jdulberg@pszjlaw.com
             jlucas@pszjlaw.com
             jnolan@pszjlaw.com

[Proposed] Counsel to Bradley D. Sharp, Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>LESLIE KLEIN,<br><br>                              Debtor. | Case No.: 2:23-bk-10990-SK<br><br>Chapter 11<br><br>**NOTICE OF HEARING ON MOTION OF CHAPTER 11 TRUSTEE, FOR ORDER ENFORCING THE AUTOMATIC STAY AGAINST THE MENLO TRUST AND RELATED RELIEF**<br><br>**[Relates to Docket Nos. 303, 304, and 306]**<br><br>Date:        September 6, 2023<br>Time:        9:00 a.m.<br>                 Courtroom 1575<br>                 255 East Temple Street<br>                 Los Angeles, CA 90012<br><br>Judge:      Hon. Sandra R. Klein |

**TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE,**

**PARTIES ENTITLED TO NOTICE HEREOF, AND THE OFFICE OF THE UNITED**

**STATES TRUSTEE:**

**PLEASE TAKE NOTICE** that, pursuant to an *Order Granting Application and Setting*

*Hearing on Shortened Notice* (the "Order") [Docket No. 306], a copy of which is attached hereto as

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Exhibit A**, a hearing will be held on **September 6, 2023** at **9:00 a.m.** before the Honorable Sandra R. Klein at the United States Bankruptcy Court, located at 255 East Temple Street, Los Angeles, California 90012, to consider the *Motion of Chapter 11 Trustee, For Order Enforcing the Automatic Stay Against the Menlo Trust and Related Relief* (the "**Motion**") [Docket No. 303]. The Motion, a copy of which is attached hereto as **Exhibit B**, seeks an order enforcing the automatic stay against the Franklin Henry Menlo Irrevocable Trust Established March 1, 1983.

 **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Order, oppositions to the Motion must be filed with the Court and served on all parties entitled to notice no later than August 31, 2023 at 12:00 p.m. (Pacific Time). Replies to oppositions to the Motion must be filed with the Court and served on all parties entitled to notice no later than September 1, 2023 at 4:00 p.m. (Pacific Time).

Dated: August 29, 2023

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Jeffrey P. Nolan*
 Jeffrey W. Dulberg
 John W. Lucas
 Jeffrey P. Nolan

 Proposed Attorneys for
 Bradley D. Sharp, Chapter 11 Trustee

2

# EXHIBIT A

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Jeffrey W. Dulberg (CA State Bar No. 181200)<br>John Lucas (CA State Bar No. 271038)<br>Jeffrey P. Nolan (CA State Bar No. 158923)<br>Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>Telephone: 310/277-6910<br>Facsimile:  310/201-0760<br>E-mail:  jdulberg@pszjlaw.com<br>          jlucas@pszjlaw.com<br>          jnolan@pszjlaw.com<br><br>☐ *Individual appearing without attorney*<br>☒ *Attorney for*: [Proposed] Counsel to Bradley D. Sharp, Chapter 11 Trustee | **FILED & ENTERED**<br><br>**AUG 29 2023**<br><br>**CLERK U.S. BANKRUPTCY COURT**<br>**Central District of California**<br>**BY may          DEPUTY CLERK** |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

| In re:<br><br><br>LESLIE KLEIN,<br><br><br><br><br><br><br>                                          Debtor. | CASE NO.:  2:23-bk-10990-SK<br><br>CHAPTER:  11<br><br>**ORDER:**<br><br>☒ **GRANTING APPLICATION AND SETTING HEARING ON SHORTENED NOTICE**<br><br>☐ **DENYING APPLICATION FOR ORDER SETTING HEARING ON SHORTENED NOTICE**<br><br>**[LBR 9075-1(b)]** |
|---|---|
| **Movant** (*name*): Bradley D. Sharp, Chapter 11 Trustee of the estate of Leslie Klein, Debtor ||

1.  Movant filed the following motion together with supporting declaration and (if any) supporting documents:

    a.  *Title of motion*: Motion of Chapter 11 Trustee, for Order Enforcing the Automatic Stay Against the Menlo Trust and Related Relief  [Docket No. 303]

    b.  *Date of filing of motion:*  August 28, 2023

---

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2013*                          Page 1                          **F 9075-1.1.ORDER.SHORT.NOTICE**

2.  Pursuant to LBR 9075-1(b), movant also filed an Application for Order Setting Hearing on Shortened Notice
(Application) together with supporting declaration:

*Date of filing of Application*: August 28, 2023 [Docket No. 304]

3.  Based upon the court's review of the application, it is ordered that:

a.  ☐  The Application is denied.  The motion may be brought on regular notice pursuant to LBRs.

b.  ☒  The Application is granted, and it is further ordered that:

(1)  ☒  A hearing on the motion will take place as follows:

| | |
|---|---|
| **Hearing date: 9/6/2023** | **Place:** |
| **Time:** 9:00 a.m. | ☒ **255 East Temple Street, Los Angeles, CA 90012** |
| **Courtroom:** 1575 | ☐ **21041 Burbank Boulevard, Woodland Hills, CA 91367** |
| | ☐ **3420 Twelfth Street, Riverside, CA 92501** |
| | ☐ **411 West Fourth Street, Santa Ana, CA 92701** |
| | ☐ **1415 State Street, Santa Barbara, CA 93101** |

(2)  ☐  No later than the deadlines given, **telephonic notice** of the hearing must be provided to all
persons/entities listed:

| (A) *Deadlines:* | (B) *Persons/entities to be provided with telephonic notice:* |
|---|---|
| Date: | |
| Time: | |
| | ☐ See attached page |
| | (C) *Telephonic notice is also required upon the* United States trustee |

(3)  ☒  No later than the deadlines given, **written notice of the hearing** and a **copy of this order** must be
served upon all persons/entities listed using:  ☐ one of the methods checked  ☒ all of the
methods checked

(A)  ☐ Personal Delivery  ☒ Overnight Mail  ☐ First class mail  ☐ Facsimile*  ☒ Email*

| (B) *Deadlines:* | (C) *Persons/entities to be served with written notice and a copy of this order:* |
|---|---|
| Date: 8/29/23 | -- All required parties. |
| Time: 5:00 p.m. | |
| | ☐ See attached page |
| | (D) *Service is also required upon*: |
| | -- United States trustee *(electronic service is not permitted)* |

---

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

(4) ☒  No later than the deadlines given, a copy of the motion, declarations, and supporting documents (if any), must be served on all persons/entities listed using: ☐ one of the methods checked  ☒ all of the methods checked

(A) ☐ Personal Delivery   ☒ Overnight Mail   ☐ First Class Mail   ☐ Facsimile*   ☒ Email*

| (B) *Deadlines:* | (C) *Persons/entities to be served with motion, declarations, supporting documents:* |
|---|---|
| Date: 8/29/23 | -- All required parties. |
| Time: 5:00 p.m. | |
| | ☐ See attached page |
| | (D) *Service is also required upon*: |
| | -- United States trustee (*no electronic service permitted*) |

(5) ☒  Regarding **opposition to the motion**

☐ opposition to the motion may be made **orally** at the hearing

☒ no later than the deadlines given, **written opposition to the motion** must be filed with the court and served upon all persons/entities listed using: ☐ one of the methods checked  ☒ all of the methods checked

(A) ☐ Personal Delivery   ☒ Overnight Mail   ☐ First Class Mail   ☐ Facsimile*   ☒ Email*

| (B) *Deadlines:* | (C) *Persons/entities to be served with written opposition to the motion:* |
|---|---|
| Date: 8/31/23 | All required parties. |
| Time: 12:00 p.m. | |
| | (D) *Service is also required upon*: |
| | -- United States trustee (*electronic service is not permitted*) |

(6) ☒  Regarding a **reply to an opposition:**

☐ a reply to opposition may be made **orally** at the hearing.

☒ no later than the deadlines given, a **written reply to an opposition** must be filed with the court and served on all persons/entities listed using: ☐ one of the methods checked  ☒ all of the methods checked

(A) ☐ Personal Delivery   ☒ Overnight Mail   ☐ First Class Mail   ☐ Facsimile*   ☒ Email*

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2013*                          Page 3                          **F 9075-1.1.ORDER.SHORT.NOTICE**

---

(B) _Deadlines:_

Date: 9/1/23

Time: 4:00 p.m.

(C) _Persons/entities to be served with written reply to opposition:_

-- All required parties.

(D) _Service is also required upon_:

-- United States trustee _(electronic service is not permitted)_

---

(7) ☒  Other requirements:

No further briefing will be allowed or considered.

(8) ☒  No later than the deadlines given, movant must file a **Declaration of Notice and Service** establishing that telephonic notice, written notice, and service of the motion and this order was completed as set forth above:

☒ at least 2 days before the hearing.

☐ no later than:    Date:    Time:

* Service by electronic means (facsimile or email) requires compliance with F.R.Civ.P. 5(b)(2)(E).

### ###

Date: August 29, 2023

Sandra R. Klein
United States Bankruptcy Judge

---

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_December 2013_                                Page 4                        **F 9075-1.1.ORDER.SHORT.NOTICE**

# EXHIBIT B

Jeffrey W. Dulberg (CA State Bar No. 181200)
John Lucas (CA State Bar No. 271038)
Jeffrey P. Nolan (CA State Bar No. 158923)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: 310/277-6910
Facsimile: 310/201-0760
E-mail:   jdulberg@pszjlaw.com
              jlucas@pszjlaw.com
              jnolan@pszjlaw.com

[Proposed] Counsel to Bradley D. Sharp, Chapter 11 Trustee

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.: 2:23-bk-10990-SK |
| LESLIE KLEIN, | Chapter 11 |
| Debtor. | **MOTION OF CHAPTER 11 TRUSTEE, FOR ORDER ENFORCING THE AUTOMATIC STAY AGAINST THE MENLO TRUST AND RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF JEFFREY P. NOLAN IN SUPPORT THEREOF** |
| | Hearing Date Requested:  September 6, 2023 Hearing Time Requested:  9:00 a.m. |
| | [Application For Order Setting Hearing On Shortened Notice Filed Concurrently Herewith] |

**TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE;**

**THE OFFICE OF THE UNITED STATES TRUSTEE; AND PARTIES ENTITLED TO**

**NOTICE HEREOF:**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

**Pages**

I.    PRELIMINARY STATEMENT ...................................................................................... 2

II    PROCEDURAL BACKGROUND.................................................................................. 4

      Filing of the Bankruptcy Case ................................................................................ 4

III.    FACTUAL BACKGROUND ........................................................................................ 4

      Allegations In The Bankruptcy Court...................................................................... 4

      Administrative Proceedings ..................................................................................... 7

      Post-Petition Events In Menlo Superior Court Proceedings................................... 7

      Life Insurance Policy Proceeds .............................................................................. 9

IV    ARGUMENT ................................................................................................................ 9

      The Automatic Stay Provides Fair And Equal Protection To Creditors'
      Interests In Order To Realize The Goals Of The Bankruptcy Code..................... 9

      Commingled Funds in The Law Firm Account, An Account Controlled By
      The Debtor, Triggers "Interests Of The Debtor" in The Law Firm Trust
      Account ................................................................................................................ 11

      The Trustee's Concern That Victims' Monies Were Commingled in The
      Single Law Firm Trust Account And Used to Purchase the Menlo Life
      Insurance Policies Implicates Rights of All Creditors ......................................... 15

      What Is, Or Is Not, An Interest of the Debtor in Property Is an Issue Within
      the Bankruptcy Court's Core Jurisdiction............................................................. 15

      The Menlo Trust Efforts to Adjudicate the Life Insurance Policy Proceeds In
      State Court Without Notice To Creditors Of The Bankruptcy Estate, While
      Refusing to Cooperate With the Trustee, Will Create a Maelstrom Of
      Litigation.............................................................................................................. 16

      The Debtor's Conduct Has No Bearing on the Legal Issues in the Bankruptcy
      Case...................................................................................................................... 18

V.    CONCLUSION............................................................................................................ 19

DOCS_LA:350773.8 78512/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF AUTHORITIES

**Pages**

## CASES

*All Am. Laundry Serv. v. Ascher* (*In re Ascher*)
128 B.R. 639 (Bankr. N.D. Ill. 1991) .................................................................. 15

*Bank of Los Angeles v. Official PACA Creditors' Comm.* (*In re Southland + Keystone*)
132 B.R. 632 (9th Cir. B.A.P. 1991) .................................................................. 15

*Brandon v. Sherwood* (*In re Sann*)
555 B.R. 721 (Bankr. Mont. 2016) .................................................................... 16

*Brown v. Dellinger* (*In re Brown*)
734 F.2d 119 (2d Cir. 1984) ............................................................................... 12

*Caminetti v. United States*
242 U.S. 470, 37 S. Ct. 192, (1917) ................................................................... 12

*Celotex Corp. v. Edwards*
514 U.S. 300, 115 S. Ct. 1493, 131 L. Ed. 2d 403 (1995) ................................. 17

*Cent. Va. Cmty. Coll. v. Katz*
546 U.S. 356, 126 S. Ct. 990, 163 L. Ed. 2d 945 (2006) ................................... 17

*Chase Manhattan Bank v. Jacobs* (*In re Jacobs*)
48 B.R. 570 (Bankr. S.D. Cal. 1985) ................................................................. 15

*Danning v. Bozek* (*In re Bullion Reserve of N. Am.*)
836 F.2d 1214 (9th Cir. 1988) ........................................................................... 13

*Debilio v. Golden* (*In re Debilio*)
No. CC-13-1441-TaPaKi, 2014 Bankr. LEXIS 3886, *9 (B.A.P. 9th Cir. Sep. 11, 2014) ........... 17

*Elbar Invs., Inc. v. Pierce* (*In re Pierce*)
272 B.R. 198 (Bankr. S.D. Tex. 2001) ................................................................. 9

*Elliot v. Frontier Properties* (*In re Lewis W. Shurtleff, Inc.*)
778 F.2d 1416 (9th Cir. 1985) ........................................................................... 13

*Frazer v. Drummond* (*In re Frazer*)
377 B.R. 621 (B.A.P. 9th Cir. 2007) .................................................................. 18

*Gandara v. Bitterroot Rock Products* (*In re Gandara*)
257 B.R. 549 (Bankr. D. Mont. 2000) ............................................................... 11

*Geltzer v. Soshkin* (*In re Brizinova*)
588 B.R. 311 (Bankr. E.D.N.Y, 2018) ............................................................... 15

*Girardi v. Miller* (*In re Keese*),
No. CV 22-5176 DSF, 2023 U.S. Dist. LEXIS 75752, *16 (C.D. Cal. 2023) ............. 13

*Glendenning v. Third Fed. Sav. Bank* (*In re Glendenning*)
243 B.R. 629 (Bankr. E.D. Pa. 2000) ................................................................. 10

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*
530 U.S. 1, 120 S. Ct. 1942 (2000) .................................................................... 12

*Homer Nat'l Bank v. Namie*
96 B.R. 652 (W.D. La. 1989) ............................................................................. 10

*Hunt v. Bankers Trust Co.*
799 F.2d 1060 (5th Cir. 1986) ............................................................................. 9

*In re Arcapita Bank B.S.C.(c)*
2014 Bankr. LEXIS 2237, 2014 WL 2109931, at *2 (Bankr. S.D.N.Y. May 20, 2014) ............... 15

*In re Brooks*
871 F.2d 89 (9th Cir. 1989), aff'd Brooks, 79 B.R. 479 (9th Cir. B.A.P. 1987) ............... 10

*In re Bullion Reserve of N. Am.*
836 F2d. 1214 (9th Cir. 1988) ........................................................................... 12

*In re Cochise College Park, Inc.*
703 F.2d 1339 (9th Cir. 1983) ........................................................................... 14

*In re Easterday Ranches, Inc.*
647 B.R. 236 (Bankr. E.D. Wash. 2022) ............................................................ 18

ii

*In re Penn Cent. Transp. Co.*
   486 F.2d 519 (3d Cir. 1973), 1973 U.S. App. LEXIS 7600 ............................................ 13

*In re Pointer*
   952 F.2d 82 (5th Cir. 1992) ........................................................................................ 10

*In re Reserves Dev. Corp.*
   78 B.R. 951 (W.D. Mo. 1986), rev'd on other grounds, 821 F.2d 520 (8th Cir. 1987) .................. 10

*In re Rigden*
   795 F.2d 727 (9th Cir. 1986) ...................................................................................... 14

*In re Wash. Mutual, Inc.*
   461 B.R. 200 (Bankr. D. Del. 2011) ........................................................................... 15

*Lamie v. U.S. Trustee*
   540 U.S. 526 124 S. Ct. 1023 (2004) .......................................................................... 12

*Pereira v. Foong (In re Ngan Gung Restaurant)*
   2000 Bankr. LEXIS 1342, *10, 11 (Bankr. SD NY, 2000) ............................................. 14

*Reusser v. Wachovia Bank, N.A.*
   525 F.3d 855, 2008 U.S. App. LEXIS 9822, *15-16, Bankr. L. Rep. (CCH) P81,237 .............. 17

*Sherwood Partners, Inc. v. Lycos, Inc.*
   394 F.3d 1198 (9th Cir. 2005) .................................................................................... 16

*Tawansy v. Leslie (In re Raymenond Renaissance Theater, LLC)*
   583 B. R. 735 (Bankr. C.D. Cal. 2018) ........................................................................ 13

*Teel v. Teel (In re Teel)*
   34 B.R. 762 (9th Cir. BAP 1983) ............................................................................... 17

*Tenn. Student Assistance Corp. v. Hood*
   541 U.S. 440, 124 S. Ct. 1905, 158 L. Ed. 2d 764 (2004) ............................................... 17

*United States v. Miller*
   2003 U.S. Dist. LEXIS 24884,*22 (N.D. Tex. Dec 22, 2003) ......................................... 10

*United States v. One 2009 Maserati Granturismo*
   2016 U.S. Dist. LEXIS 119383, 2016 WL 4502457, at *4 (C.D. Cal. June 6, 2016) ............... 18

*United States v. Ron Pair Enterprises, Inc.*
   489 U.S. 235, 109 S. Ct. 1026 (1989) ......................................................................... 12

*United States v. Whiting Pools*
   462 U.S. 198, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983) ................................................ 11

*Wolf v. Collins (In re Collins)*
   017 Bankr. LEXIS 2064 (Bankr S.D. Cal., 2017) ......................................................... 16

*Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*
   839 F.2d 610 (9th Cir. 1988) ..................................................................................... 17

**STATUTES**

11 U.S.C. § 323 ........................................................................................................... 14

11 U.S.C. § 541 .............................................................................................. 11, 12, 17, 18

11 U.S.C. §362 ......................................................................................................... 2, 10

11 U.S.C. §523 .............................................................................................................. 5

11 U.S.C. § 1106 ......................................................................................................... 14

11 U.S.C. § 1107 ......................................................................................................... 18

28 U.S.C. § 1334 ......................................................................................................... 15

28 U.S.C. § 157 ............................................................................................................ 4

28 U.S.C. §1408 ........................................................................................................... 4

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

iii

1

28 U.S.C. §1409 ................................................................................................................ 4

2

## OTHER AUTHORITIES

3  16 Moore's Federal Practice § 108.70[1], [**16], p. 108-106 (3d ed. 2004) ...................................... 17

4  H. R. Rep. No. 95-595, p. 367 (1977) ................................................................................ 12

5  U.S. Const. art. I, § 8, cl. 4 .............................................................................................. 16

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:350773.8 78512/001

**PLEASE TAKE NOTICE THAT** Bradley D. Sharp, the duly appointed chapter 11 trustee (the "Trustee") of the bankruptcy estate (the "Estate") of Leslie Klein (the "Debtor"), hereby files this *Motion of Chapter 11 Trustee for Order Enforcing the Automatic Stay Against the Menlo Trust and Related Relief* (the "Motion") seeking an order enforcing the automatic stay against the Franklin Henry Menlo Irrevocable Trust Established March 1, 1983 (the " Menlo Trust") as represented by Jeffrey Winter and Frank Menlo, Co-Trustees of the Menlo Trust (the "Co-Trustees") and awarding attorneys' fees to the Trustee  pursuant to section 362(k) of the Bankruptcy Code.  In support of the Motion, the Debtors represent as follows.

## I.
## PRELIMINARY STATEMENT

The record before the Bankruptcy Court memorializes a debtor, who as an attorney and certified public accountant, misappropriated client trust funds of numerous trusts to the detriment of the trusts' beneficiaries.  The Debtor utilized the Les Klein & Associates, Inc. (the "Law Firm") trust account to divert these trust funds.  Via the Law Firm trust account, the Debtor invested in various life insurance policies that would pay out death benefits on behalf of his clients, himself, and others.  Numerous adversary proceedings now pending before the Bankruptcy Court seek exceptions to the Debtor's discharge.  The complaints document the Debtor utilizing the Law Firm trust account to receive and divert trust funds into "one big pot" of commingled funds among the Debtor's numerous clients.  Similarly, issues are implicated with the Debtor failing to segregate his personal funds or funds of the Law Firm.  Given the findings and allegations, the Trustee is concerned that commingled funds were utilized to pay the premiums of insurance policies held in the name of the Menlo Trust.

In the Ninth Circuit, it is clear that commingled funds, where funds have lost their separateness, controlled by a debtor are *presumptively property of such debtor*'s *estate* as they involve "an interest of the debtor in property."  Such funds are property of the estate to be used to satisfy allowed claims against the debtor's estate. This presumption should prevail unless it can be disproven by the party seeking to establish the separate nature of the funds in the commingled

account.  Without reversal of the presumption, commingled funds are and remain property of the estate.

The Menlo Trust is one victim among a myriad of victims.  Rather than respect the automatic stay in place as a matter of law, the Menlo Trust has imposed its will in a Superior Court proceeding to push itself ahead of other estate creditors in the exact manner the Bankruptcy Court repudiated when considering whether to dismiss this chapter 11 case.  In the Superior Court proceeding, the Menlo Trust trustees have urged the judge to issue an order distributing six million dollars of life insurance policy proceeds acquired pre-petition (using commingled funds) which the Menlo Trust beneficiaries claim as their separate property that legally are presumptively property of the Debtor's estate.  In exercising his statutory duties, the Trustee requested documents from the trustees of the Menlo Trust to document the separate nature of the life insurance policies. While professing to cooperate with the Trustee, the Menlo Trust has produced no policy-related documents to the Trustee.  In the interim, the Menlo Trust convinced the Superior Court to issue an order on August 18, 2023 (the "Aug. 18 Minute Order") to distribute, on August 30, 2023, $6,000,000 of the $30,000,000 in life insurance proceeds to the Menlo Trust, and similarly issued an OSC to the Debtor and the Trustee to provide writings to demonstrate the Debtor's interest in the life insurance policies. Ironically, the Aug. 18 Minute Order requests the Trustee to produce what the Menlo Trust refused, and refuses to this day, to produce to the Trustee. The Aug. 18 Minute Order was accomplished over the Trustee's adamant objection.

The Aug. 18 Minute Order is a clear violation of the automatic stay and void *ab initio*.  Equitable orders of any court cannot replace congressional intent to create one uniform statutory framework for creditor rights implicated by a bankruptcy filing, i.e. the Bankruptcy Code. The Aug. 18 Minute Order offends notions of equity and fairness in that the Menlo Trust's lack of cooperation with the Bankruptcy Court-appointed Trustee has created the untenable situation where one creditor is racing to the court house to disenfranchise other creditors outside the presence of the Bankruptcy Court.  The Trustee, however, is duty-bound to protect all creditors' interests collectively, but the recent actions of the Menlo Trust have caused the Trustee to expend precious

resources to file the Motion, appear in Superior Court on multiple occasions and delay investigations

surrounding events prior to the commencement of this chapter 11 case.

## II
## PROCEDURAL BACKGROUND

### Filing of the Bankruptcy Case

On February 22, 2023, the Debtor filed a voluntary petition for relief under

subchapter V of Chapter 11 of the Bankruptcy Code.

On April 24, 2023, creditors Erica and Joseph Vago filed a *Motion for Order

Dismissing Debtor's Chapter 11 Bankruptcy Case* (the "Motion to Dismiss") [Docket No. 79].

On May 17, 2023, at a hearing held on the Motion to Dismiss, the Court ruled that the

appointment of a chapter 11 trustee, and not dismissal of the case, was in the best interests of the

estate.

On May 23, 2023, the UST filed a *Notice of Appointment of Chapter 11 Trustee*

[Docket No. 151].

On May 24, 2023, the UST filed an *Application for Order Approving Appointment of

Trustee and Fixing Bond* [Docket No. 154], approved by order entered the same day [Docket No.

155]. On that same day, the Trustee accepted his appointment [Docket No. 156].

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant

to 28 U.S.C. §§ 1408 and 1409.

## III.
## FACTUAL BACKGROUND

### Allegations In The Bankruptcy Court

On May 11, 2013, Adi Vendriger, Co-Trustee and beneficiary of the First

Amendment Trust, filed its "Complaint to Determine the Nondischargeability of Debts, and to Deny

Discharge."[1]  The Vendriger claims are based upon a state court complaint filed August 27, 2021,

against the Debtor and the Law Firm asserting various tort causes of action, including fraud,

conversion of property, and money had and received.  The complaint alleges multiple improper acts

---

[1] *See* Adv. Case 23-ap-01151-SK; Dkt. No. 1.

by the Debtor including comingling and misappropriation of trust funds. (*See* State Court Complaint for (1) Fraud; (2) Breach of Fiduciary Duty; (3) Conversion; (4) Money Had And Received; (5) Unjust Enrichment and (6) Accounting (the "<u>Vendriger Complaint</u>", ¶¶22, 24, 30), attached to the Declaration of J. Nolan ("<u>Decl. of J. Nolan</u>") as **Exhibit A.**)  The Vendriger Complaint alleges the Debtor utilized the Law Firm's trust accounts as his "own private bank account." (Vendriger Complaint, ¶30).  On April 10, 2023, a Notice of Stay of Proceedings was filed.

On May 11, 2013, the Co-Trustees of the Franklin Henry Menlo Irrevocable Trust Established March 1, 1983 (the "<u>Menlo Trust</u>") filed a "Complaint for Nondischargeability of Debts, and To Denial of Discharge.[2]  The Complaint attached the August 29, 2022, "Report and Recommendation of the Court-Appointed Referee on Examination and Adjudication of the Trustee's First, Second, and Third Accountings On Each of the Twenty-Four Trusts At Issue For the Trust Periods September 10, 1996-June 30, 2013, July 1, 2013-December 31, 2016 and January 1, 2017-September 30, 2018" (the "<u>Referee's Report</u>", attached to the Decl. of J. Nolan as **Exhibit B**).  The Referee's Report outlines a multitude of improper acts taken by the Debtor including the transfer, misappropriation and commingling of trust funds. (See **Exhibit B**, p. 21).  The Law Firm trust account was noted to be "one big pot" with commingled funds of all of the Debtor's clients.  (See **Exhibit B**, p. 18, fn. 21).  The Superior Court did not stay these proceedings.  Rather, the Superior Court has been holding multiple hearings each month involving the Debtor including over the issue of deep concern to the Trustee – the disbursal post-petition of approximately $6 million in life insurance policy proceeds currently in the custody of an insurance carrier.

On May 10, 2013, Erica and Joseph Vago filed a "Complaint to Determine the Nondischargeability of Certain Debts owed by Debtor Leslie Klein to Erica and Joseph Vago Pursuant to 11 U.S.C. §523, and To Deny Discharge Pursuant to Section 727(A)(12)."*[3]*  The Vago Complaint alleges that the Vagos transferred $15 million to the care of the Debtor between 2013 and 2017. (See Complaint for Nondischargeability (the "<u>Vago Complaint</u>") attached to the Decl. of J. Nolan as **Exhibit C**, ¶¶17, 26).  The Debtor sold the Vagos on a business scheme wherein the Vagos

---

[2] *See* Case 23-ap-01152-SK; Dkt. No. 1

[3] *See* Case 23-ap-01150-SK; Dkt. No. 1]

5

would wire monies to the Debtor, presumably into the Law Firm client trust accounts, to be invested in life insurance policies. (Vago Complaint, ¶23).  The Vagos were also told to wire monies for charitable purposes to a Debtor owned and controlled entity named EKLK Foundation ("EKLK").[4]  The Debtor admitted he "invested his own money in the life insurance policies." (Vago Complaint, ¶23-25).  The Debtor indicated he would invest the monies into life insurance policies as they were sound, in fact, he invested his own monies in the life insurance policies. (Vago Complaint, ¶ 25, 30). The Vago Complaint asserts that life insurance policies utilizing funds included multiple other investors the identities and amounts which were concealed. (*See* **Exhibit C**, ¶¶30). The Vago Complaint alleges that the Debtor commingled trust funds with his personal funds and breached his fiduciary duties when he admitted he used his own personal monies to invest in the trust life insurance policies. (*See* **Exhibit C**, ¶46).  The Vago Complaint attaches a judgment in the amount of $24,334,038 against the Debtor.  The Vago parties obtained an abstract of judgment and liens against the Debtor but stayed all collection proceedings.

On May 12, 2023, Robert and Esther Mermelstein filed a *Complaint for Nondischargeability of Debt Pursuant to 11 USC §523(a)(2)(A), 11 USC §523(a)(4) & 11 USC §523(a)(6) & for Denial Of Discharge Pursuant to 11 USC §727(a)(2)(A); 11 USC §727(a)(2)(B); 11 USC §727(a)(3); 11 USC §727(a)(4); 11 USC §727(a)(5)*[5] (the "Mermelstein Complaint"), attached to the Decl. of J. Nolan as **Exhibit D**.  From 2009-2021, the Debtor solicited the Mermelsteins to invest in seven (7) life insurance death policies, or investment opportunities.  (*See* Mermelstein Complaint ¶10).  These policies are alleged to have resulted in significant recoveries to the Debtor which sums were converted by the Debtor and concealed from the Mermelstein beneficiaries.  (*See* Mermelstein Complaint, ¶¶14, 20, 31).  Ultimately, the Debtor commingled the funds through the Law Firm trust account and diverted the monies. (*See* Mermelstein Complaint, ¶60).  The Mermelstein plaintiffs have filed proofs of claims in the Bankruptcy Case exceeding $1 million. (*See* Mermelstein Complaint, ¶41). The Trustee is not aware of the underlying state court proceedings, if any, and if they have been stayed.

---

[4] The Trustee believes EKLK is an acronym for Ellen Klein & Leslie Klein.

[5] *See* Case 23-ap-01153-SK; Dkt. No.1

6

On May 12, 2013, Jeffrey Siegel, Successor Trustee to the Scott Trust, (the "Scott Trust") filed a "Complaint For Nondischargeability of Debts, and Denial of Discharge."[6]  The Debtor was the trustee of the Scott Trust and is alleged to have misappropriated trust funds, created non-recourse note and fake investments, and commingled trust funds which damaged the Scott Trust in an amount not less than $2.67 million. (See the "Scott Complaint"; ¶¶34-37, 87, 113, attached to the Decl. of J. Nolan as **Exhibit E**).

### Administrative Proceedings

On May 13, 2020, the California Board of Accountancy, Department of Consumer Affairs, State of California, issued its Decision and Order in which the Debtor surrendered his license. (See Decision and Order, Stipulated Surrender of License and Order and Accusation (the "Accusation") attached to the Decl. of J. Nolan as **Exhibit F**).  The Accusation documents the Debtor issuing promissory notes in the name of the Debtor, to entities in which he owned a substantial interest or controlled, as well as mischaracterizing investments to clients which in reality were merely non-recourse loans utilizing the Law Firm and Law Firm trust account.  The Debtor caused to be issued promissory notes and utilized the funds as he alone directed. (See Accusation, **Exhibit F**, ¶¶ 19(iv), 22(d)).

### Post-Petition Events In Menlo Superior Court Proceedings

On June 5, 2023, the Trustee appeared for the first time in the Superior Court, State of California, County of Los Angeles, Dept. 3 ("Superior Court") before the Honorable Ana Maria Luna, Judge of the Superior Court.  Counsel for the Trustee believed the hearing to be an OSC re: Contempt of Civil Court against the Debtor for failure to follow a Superior Court order.  Instead, it turned into a hearing related to demands by certain members of the Menlo Trust to unfreeze life insurance policy proceeds that were held in the custody of various insurance companies.  The Superior Court instructed that such funds could be disbursed by the various insurance companies to the Co-Trustees but were to be held and not distributed to any beneficiaries until further order of the Superior Court. (See Interim Order dated June 5, 2023, attached to the Decl. of J Nolan as **Exhibit G**).  The Superior Court ordered the Menlo Trustees and the Debtor to turn over all documents

---

[6] *See* Case 23-ap-01154-SK; Dkt. No. 1.

7

requested by the Trustee "within 72 hours of being requested to do so." (*See* Interim Order dated

June 5, 2023 (the "June 5th Interim Order") attached to the Decl. of J. Nolan as **Exhibit G**, p. 2, ¶4).

On July 7, 2023, the Trustee issued his "Response to the Declaration of the Debtor,

Leslie Klein, re: Claims Against Unfrozen Funds Held by Trustee of 24 Trusts." (*See* Response,

attached to the Decl. of J. Nolan as **Exhibit H**).  The Response emphasized to the parties and to the

Superior Court the Trustee's position that the automatic stay was in effect, divesting the Debtor of

any control over property of the Estate, outlining the multiple occasions on which the Trustee

requested documents concerning the life insurance policies, the fact no such documents had been

provided to the Trustee, and reiterating that the life insurance policies were potentially property of

the estate.

On August 4, 2023, the Trustee scheduled a conference call with counsel for the

Menlo Trust to facilitate the exchange of information and documents surrounding the life insurance

policies.  The Trustee renewed his request for documents from the Menlo Trust.  Notwithstanding

this good faith effort on the Trustee's part, **the Trustees of the Menlo Trust subsequently**

**provided no documents to the Trustee**.  (*See* Decl. of J. Nolan, ¶11)

On August 7, 2023, counsel for the Trustee forwarded to counsel for the Menlo Trust

a stipulation to facilitate the exchange of information surrounding the life insurance policy proceeds

and to expedite matters before the Bankruptcy Court. (*See* email and Correspondence, attached to the

Decl. of J. Nolan as **Exhibit I**).  Once more, no responsive documents were provided to the Trustee.

(*See* Decl. of J Nolan, ¶12).

On August 11, 2023, the Menlo Trustees filed their Motion for Relief from Stay. (*See*

Dkt. No. 249).

On August 14, 2023, counsel for the Trustee again reached out to the Menlo Trust

and requested documents concerning the life insurance policies and how they were paid.  (*See*

Correspondence, attached to the Decl. of J. Nolan as **Exhibit J**).  A pattern was now

developing….once again, no documents were provided to the Trustee. (See Decl. of J Nolan, ¶13).

On August 18, 2023, before the Superior Court, Dept. 3, the Menlo Trust appeared

and argued for the Superior Court to authorize the disbursement of the Life Insurance Policy

Proceeds (a) **despite the fact** they had not produced the life insurance policies and related

documents to the Trustee and (b) **despite the fact** the Menlo Trust had pending Motions for Relief

From Stay addressing the issue to the Bankruptcy Court. (*See* Dkt. Nos. 84, 249 and Decl. of J.

Nolan, ¶11-13).  The Superior Court, over the objection of the Trustee, issued the Aug. 18 Minute

Order wherein the Superior Court:  (1) issued an OSC re:  production of any writing that

substantiates a claim to the insurance policy proceeds by former Trustee, Leslie Klein, and (2)

authorized the sum of $6 million to be distributed by the insurance carrier American General to the

Menlo Trust.  (*See* Minute Order dated August 18, 2013, attached to Decl. of J. Nolan as **Exhibit K**).

As of the date of the filing of this Motion, the Menlo Trust has provided no

documents to the Trustee with respect to the life insurance policies.  (*See* Decl. of J Nolan, ¶17)

The Trustee has not sought to hold the Menlo Trust in contempt of court for violating

the June 5, 2023, Minute Order.  Appreciating the tribulations experienced by the Menlo Trust and

believing the Menlo Trust was compiling responsive documents, the Trustee sought to resolve the

issue informally.

### Life Insurance Policy Proceeds

As of June 5, 2023, the Life Insurance Policy Proceeds resided with the various

insurance companies. (See June 5th Minute Order, See Exhibit G).  The Trustee believes the Life

Insurance Policy Proceeds are still maintained in the custody of the life insurance companies.

However, the Proceeds may be with the Menlo Trust subject to order of the Superior Court.

**IV**
**ARGUMENT**

### The Automatic Stay Provides Fair And Equal Protection To Creditors' Interests In Order To Realize The Goals Of The Bankruptcy Code

In short, the automatic stay provides fair and equal protection to creditors' interests in

order to realize the goals of the Bankruptcy Code.  (*See Elbar Invs., Inc. v. Pierce (In re Pierce)*, 272

B.R. 198, 204 (Bankr. S.D. Tex. 2001)) ("The stay is intended to benefit both debtors and creditors

by assuring an equitable distribution of the debtor's assets and by preventing a race to the

courthouse"); *Hunt v. Bankers Trust Co*., 799 F.2d 1060, 1069 (5th Cir. 1986) (preventing a "chaotic

and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in

9

different courts"); *Homer Nat'l Bank v. Namie*, 96 B.R. 652, 655 (W.D. La. 1989) ("The purpose of the automatic stay is to protect creditors in a manner consistent with the bankruptcy goal of equal treatment").

The Aug 18 Minute Order reflects the erroneous argument promoted by the Menlo Trust that the Debtor, Leslie Klein, determines what is, and is not, "property of the estate." Under this specious approach, the transgressions of the Debtor are "held against" the Trustee and all creditors. On the contrary, the Trustee is duty bound not to "side" with the Debtor, or one creditor versus another, and the Trustee is not opposed to the Menlo Trust's ultimately demonstrating its separate property rights. However, the Bankruptcy Code forbids the Menlo Trust from adjudicating claims of other victims/creditors against the Debtor's estate in a forum outside of their – and the Trustee's – presence. It is obvious that permitting the Menlo Trust to do so will undermine the purposes of the Bankruptcy Code.

The automatic stay provided by section 362 is intended to serve two separate interests. One interest served is that of the debtor, by providing him or her with a "breathing spell." "However, a less obvious but no less important interests protected by §362 are those of creditors, who are 'clearly intended to benefit from §362.'" *United States v. Miller*, 2003 U.S. Dist. LEXIS 24884,*22 (N.D. Tex. Dec 22, 2003), citing to *In re Pointer*, 952 F.2d 82, 86 (5th Cir. 1992) ("The stay is intended to benefit both debtors and creditors"); *Glendenning v. Third Fed. Sav. Bank (In re Glendenning)*, 243 B.R. 629, 634 (Bankr. E.D. Pa. 2000) (noting that protection of creditors' interests is confirmed by fact that automatic stay arises even in the face of debtor's dereliction in raising it). Congress intended to confer rights upon creditors as parties for whose benefit the automatic stay was promulgated. (*See In re Brooks*, 871 F.2d 89, 90 (9th Cir. 1989), aff'd Brooks, 79 B.R. 479 (9th Cir. B.A.P. 1987)). Creditors "are clearly parties in interest under the meaning of the Bankruptcy Code [where] they have a pecuniary interest that was adversely affected" by a post-petition transfer of property. *In re Reserves Dev. Corp.*, 78 B.R. 951, 957 (W.D. Mo. 1986), rev'd on other grounds, 821 F.2d 520 (8th Cir. 1987). The legislative history of section 362 clearly recognizes that creditors are beneficiaries when it states:

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against debtor's property. Those who acted first would obtain payment of their claim in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally."

The Aug. 18 Minute Order undeniably seeks to effectuate a post-petition transfer of pre-petition property.  Granting of the instant Motion protects the rights of all creditors, including the Menlo Trust, as to the Life Insurance Policy Proceeds.

**Commingled Funds in The Law Firm Account, An Account Controlled By The Debtor, Triggers "Interests Of The Debtor" in The Law Firm Trust Account**

The Menlo Trust <u>incorrectly</u> framed the issue to the Superior Court by stating that "unless <u>Klein</u> can provide proof positive to the Court that any funds in issue belong to his estate, or belong to third-parties who are not Menlo family members, this [Superior] Court must give no weight at all to the Klein Declaration or the Trustee Response." (See Decl. of D Saltzman, ¶11, lns. 1-3, attached to the Decl. of J. Nolan as **Exhibit L**, ¶15).  The statement that a Debtor should come forward <u>post-petition</u> to define "an interest of the debtor in property" of the estate is simply a misstatement of basic principles of the Bankruptcy Code.  The correct legal standard is as follows: Is there "an interest of the debtor" in the life insurance policies?  As thoroughly outlined in the above "Factual Background," abundant examples exist that the Debtor utilized the Law Firm trust fund bank account as "one big pot" of commingled funds of the Debtor's clients and his own.  (See ¶9 herein).

Section 541(a)(1) provides that the commencement of a case creates an estate which "is comprised of all the following property, wherever located **and by whomever held** . . . [e]xcept as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case." § 541(a)(1) (emphasis added); *United States v. Whiting Pools*, 462 U.S. 198, 204-05, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983); *Gandara v. Bitterroot Rock Products (In re Gandara)*, 257 B.R. 549, 553 (Bankr. D. Mont. 2000); *see also In re Beccari*, 20 Mont. B.R. 282, 290-91 (Bankr. D. Mont. 2002) (emphasis added).  In *Brandon v.*

11

*Sherwood (In re Sann)*, 555 B.R. 721,735 (Bankr. Mont. 2016), the Bankruptcy Court noted that the

Supreme Court has emphasized the broad scope of section 541(a):

> [Section] 541(a) provides that the "estate is comprised of all of the
> following property, wherever located: . . . all legal or equitable
> interests of the debtor in property as of the commencement of the
> case." 11 U.S.C. § 541(a)(1).

Given the plain language of section 541(a)(1), it is appropriate to note the basic canon

of statutory construction that when the language of a statute is plain, the sole function of a court is to

enforce it according to its terms, unless the disposition required by the text is absurd. *Lamie v. U.S.

Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023 (2004); *Hartford Underwriters Ins. Co. v. Union

Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942 (2000) (quoting *United States v. Ron Pair

Enterprises, Inc.*, 489 U.S. 235, 241, 109 S. Ct. 1026 (1989) (in turn quoting *Caminetti v. United

States*, 242 U.S. 470, 485, 37 S. Ct. 192, (1917)).  The plain language of section 541(a)(1) defines

property of the estate to include property "wherever located and by whomever held."  Thus, the fact

that certain funds are held by the Debtor in his trust account, and not yet deposited into Debtor's

bank account, does not exclude it from being property of the estate. *Whiting Pools*, 462 U.S. at 204.

Whether the property is in the custody of the insurance companies, the Menlo Trust

or another party, makes no difference to this analysis.  Property of the estate maintains its character

wherever that property is located.  The House and Senate Reports on the Bankruptcy Code indicate

that section 541(a)(1)'s scope is broad.  Most importantly, in the context of this case, section

541(a)(1) is intended to include in the estate any property made available to the estate by other

provisions of the Bankruptcy Code.  *See* H. R. Rep. No. 95-595, p. 367 (1977).  Several of these

provisions bring into the estate property in which the debtor did not have a possessory interest at the

time the bankruptcy proceedings commenced.  "The phrase 'all legal or equitable interests of the

debtor in property' has been given the broadest possible interpretation and the term equitable interest

has generally not been interpreted as limited to a debtor's equity in property." *See Brown v.

Dellinger (In re Brown)*, 734 F.2d 119, 123 (2d Cir. 1984); *In re Bullion Reserve of N. Am.*, 836 F2d.

1214, 1217 (9th Cir. 1988) (The term "property of the debtor" is not defined in the Bankruptcy

Code. However, we define the term broadly. *Elliot v. Frontier Properties (In re Lewis W. Shurtleff,*

12

*Inc.*), 778 F.2d 1416, 1419 (9th Cir. 1985). Generally, property belongs to the debtor for purposes of §547 if its transfer will deprive the bankruptcy estate of something which could otherwise be used to satisfy the claims of creditors.) In the present case, commingled funds in the Law Firm trust account is property which could be used to satisfy other creditors if not able to be adequately traced.

The Trustee recognizes that as a trustee for numerous beneficiaries, including the Menlo Trust, the Debtor had no equitable interest in funds he held solely in trust. Indeed, that is the classic definition of a trust - the beneficiary has an equitable interest in the trust property while legal title is vested in a trustee. A trust is defined in Restatement (Second) of Trusts § 2 (1959) as: [A] fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it. *In re Penn Cent. Transp. Co.*, 486 F.2d 519, 524 (3d Cir. 1973), 1973 U.S. App. LEXIS 7600. Monies held in an express trust for another is not property of the estate. *Girardi v. Miller (In re Keese),* No. CV 22-5176 DSF, 2023 U.S. Dist. LEXIS 75752, *16 (C.D. Cal. 2023). In order to determine whether a debtor holds property in trust for another, the court must look to applicable state law to see whether or not an enforceable trust exists". *Tawansy v. Leslie (In re Raymenond Renaissance Theater, LLC*), 583 B. R. 735, 744 (Bankr. C.D. Cal. 2018) However, "a party seeking to keep a trust res out of a bankruptcy estate will not succeed if the trust res has been comingled with non-trust assets of the debtor, unless he can trace his funds through the commingled account". *See Raymenond* at 748 (finding that the disputed funds were not property of the bankruptcy estate because there was no commingling). Commingled funds in a bank account controlled by the Debtor are presumptively estate property. *Girardi v. Miller (In re Keese)*, 2023 U.S. Dist. LEXIS 75752, *16, citing to *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1217 (9th Cir. 1988) ("the money [the debtor] used to purchase bullion came from commingled bank accounts under [the debtor]'s control and this money could have been used to pay other creditors, it presumptively constitutes property of the debtor's estate"). By all accounts, the life insurance policies appear to be purchased with monies from the commingled Law Firm trust account.

13

In the three months since the Trustee's appointment, the Trustee notes ample evidence of the Debtor diverting and commingling (a) the trust funds of various victims (Menlo, Vago, Mermelstein, Vendriger, and Scott claimants) in a single account, the Law Firm trust account, as well as (b) depositing his own personal funds in that account. As the Referee characterized it in the Menlo litigation, the Law Firm trust account was "one big pot" where the Debtor diverted the Menlo's and Klein's "other clients'" funds. (Referee's Report, **Exhibit B**, p. 18, ftnt. 21). The Vendriger, Mermelstein and Vago Complaints each note evidence and findings of improper diversion and commingling of client funds in the Law Firm trust account. Similarly, the Trustee cannot ignore multiple sources of credible evidence that the Debtor mixed his personal funds into the Law Firm trust account: namely, his admission at trial in the Vago litigation that he breached his fiduciary duty by using his own monies to invest in insurance policies, the same policies he was soliciting his clients to invest in. (Vago Complaint, **Exhibit C**, ¶46). The Debtor also obtained credit lines for loans in the Debtor's name and others as secured by brokerage accounts. (Referee's Report, **Exhibit B**, p. 18, ftnt. 21). The Debtor had sole control and is the custodian of the Law Firm trust accounts. (See Decl. of J. Nolan, ¶16). These events caused the Trustee to pause and request documents from both the Debtor and the Menlo Trust. However, neither party has produced the life insurance policies nor any other supporting documents to the Trustee. The Trustee has been forced to file a Motion for 2004 Examination of the Menlo Trust given the lack of responsiveness. (Dkt No. 301). A trustee has the statutory duty to protect and preserve property of the estate for the purpose of maximizing a distribution to creditors. 11 U.S.C. § 1106(a). Bankruptcy trustees are representatives of the bankruptcy estate. 11 U.S.C. § 323(a). As representatives of the estate, a bankruptcy trustee owes a fiduciary duty to creditors of a bankruptcy estate. *In re Cochise College Park, Inc*., 703 F.2d 1339, 1357 (9th Cir. 1983). Part of the bankruptcy trustee's fiduciary duty is to conserve assets of the estate and maximize distributions to creditors. *In re Rigden,* 795 F.2d 727, 730 (9th Cir. 1986). As such, a trustee has a duty to treat all creditors fairly and exercise the measure of care and diligence that an ordinary prudent person under similar circumstances would exercise. *Pereira v. Foong (In re Ngan Gung Restaurant*), 2000 Bankr. LEXIS 1342, *10, 11 (Bankr. SD NY, 2000).

14

**The Trustee's Concern That Victims' Monies Were Commingled in The Single Law Firm Trust Account And Used to Purchase the Menlo Life Insurance Policies Implicates Rights of All Creditors**

Commingled monies used to purchase or pay premiums on life insurance policies are "an interest of the debtor" in property.  A change in the form of an asset from cash to a life insurance policy does not undo the effect of commingling.  The fact that commingled funds are transferred into life insurance policies does not change the result that "an interest of the Debtor" in property is implicated.  *Geltzer v. Soshkin (In re Brizinova)*, 588 B.R. 311, 326 (Bankr. E.D.N.Y, 2018) (the change in an asset's form from one type, such as real estate or shares of a corporation, to another, such as cash, should not lead to a change in whether it is a part of a debtor's bankruptcy estate).  *In re Arcapita Bank B.S.C.(c)*, 2014 Bankr. LEXIS 2237, 2014 WL 2109931, at *2  (and "[t]he broad definition of property of the estate clearly encompasses a debtor's interest in another corporation's stock.").  If the life insurance policies were acquired with the commingled funds, the fact that the funds were used or transferred into a policy of insurance does not change the fact the policies represent "an interest of the Debtor" and part of the bankruptcy estate.  The Trustee has been unable to make these important determinations given the failure of the Menlo Trust to produce relevant documents.

**What Is, Or Is Not, An Interest of the Debtor in Property Is an Issue Within the Bankruptcy Court's Core Jurisdiction.**

The determination of whether assets are property of the estate is a core matter of bankruptcy court jurisdiction.  *Bank of Los Angeles v. Official PACA Creditors' Comm.* (*In re Southland + Keystone*), 132 B.R. 632, 638 (9th Cir. B.A.P. 1991) ("Clearly, a determination of whether assets are property of the bankruptcy estate concerns administration of the estate."); *In re Wash. Mutual, Inc.*, 461 B.R. 200, 217 (Bankr. D. Del. 2011); 28 U.S.C. § 1334(e) jurisdiction over property of the estate "includes jurisdiction to decide whether disputed property is, in fact, property of the estate"); *All Am. Laundry Serv. v. Ascher* (*In re Ascher*), 128 B.R. 639, 643 (Bankr. N.D. Ill. 1991) ("When a debtor and its creditors assert interests in property asserted to be part of the estate, **the bankruptcy court has core jurisdiction to adjudicate all of those interests**.") (emphasis added); *Chase Manhattan Bank v. Jacobs* (*In re Jacobs*), 48 B.R. 570, 572 (Bankr. S.D. Cal. 1985) (similar holding).

DOCS_LA:350773.8 78512/001

The Superior Court is not the proper forum to determine what is, and is not, an

"interest of a debtor in property." Indeed, the Menlo Trust cited no case law to the Superior Court.

To the contrary, the Menlo Trust demanded the Superior Court utilize equitable powers to fashion a

remedy to assist them specifically. However, it should be clear the Menlo Trust is but one set of

victims of the Debtor's unscrupulous acts.[7] Further, one court's equitable powers – exercised even

with the best of intentions – cannot override specific mandates of the Bankruptcy Code. *Brandon v.*

*Sherwood (In re Sann),* 555 B.R. 721 (Bankr. Mont. 2016); *Wolf v. Collins (In re Collins),* 2017

Bankr. LEXIS 2064 (Bankr S.D. Cal., 2017) ("Bankruptcy courts are courts of equity but must

follow the law and cannot ignore express statutory commands."). Similarly, the Superior Court

cannot ignore the clear legal dictates of the Bankruptcy Code in sections 362 and 541 by deciding

the issue.[8] Federal law applies to this issue and the determination of what is "an interest of the

debtor in property" is best reserved for the uniform standards applied in the federal bankruptcy court

system not to the dictates of individual state courts. *See Sherwood Partners, Inc. v. Lycos, Inc.*, 394

F.3d 1198, 1205 (9th Cir. 2005) (there can be no doubt that federal bankruptcy law is "pervasive"

and involves a federal interest "so dominant" as to "preclude enforcement of state laws on the same

subject"--much like many other areas of congressional power listed in Article I, Section 8, of the

Constitution, such as patents, copyrights, currency, national defense and immigration. The

Bankruptcy Clause, which grants Congress the power to make bankruptcy laws, U.S. Const. art. I, §

8, cl. 4, stresses that such rules must be "uniform.")

Failure to grant the Motion and enforce the automatic stay would create the potential

for fragmented interpretations of the Bankruptcy Code and harm to creditors of this estate.

### **The Menlo Trust Efforts to Adjudicate the Life Insurance Policy Proceeds In State Court Without Notice To Creditors Of The Bankruptcy Estate, While Refusing to Cooperate With the Trustee, Will Create a Maelstrom Of Litigation**

Absent the granting of this Motion, the Aug. 18 Minute Order will create a litany of

lawsuits as the Superior Court ruling will disenfranchise other victims of the Debtor.

---

[7] The Trustee is cognizant of the wrongs committed by the Debtor against the Menlo Trust.

[8] *Johnston v. Parker (In re Johnston)*, 321 B.R. 262, 274 (D. Ariz. 2005) citing to *Sommer & McGarity*, *supra*, P 5.05[1]; see also *Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1082 (9th Cir. 2000) ("Actions taken in violation of the automatic stay are void.").

The Supreme Court recently noted that "bankruptcy jurisdiction, at its core, is *in rem*," such that it "is premised on the debtor and his estate, and not on the creditors." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 362, 369-70, 126 S. Ct. 990, 163 L. Ed. 2d 945 (2006) (internal quotation marks omitted).  Thus, a final order lifting an automatic stay is binding as to the property equitable. *See Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 448, 124 S. Ct. 1905, 158 L. Ed. 2d 764 (2004) ("A bankruptcy court's *in rem* jurisdiction permits it to 'determine all claims that anyone, whether named in the action or not, has to the property or thing in question. The proceeding is 'one against the world.' ") (quoting J. Moore, *et al.*, 16 Moore's Federal Practice § 108.70[1], [**16], p. 108-106 (3d ed. 2004)).  The purpose of bankruptcy courts' "comprehensive jurisdiction" is to enable them to "deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, 115 S. Ct. 1493, 131 L. Ed. 2d 403 (1995) (internal quotation marks omitted).  *Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 861, 2008 U.S. App. LEXIS 9822, *15-16, Bankr. L. Rep. (CCH) P81, 237.

The Trustee has repeatedly expressed his concern in the appearances before the Superior Court that whatever the determination is to be made with respect to the life insurance policies, it must be made before the Bankruptcy Court.  A final order lifting the automatic stay as briefed and submitted to the Bankruptcy Court by the Menlo Trust would be binding as to the property or interest in question as to all creditors of the estate.  *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 448, 124 S. Ct. 1905, 158 L. Ed. 2d 764 (2004)  The Aug. 18th Minute Order, if upheld, will simply create a fire-storm of litigation.  The bankruptcy court has exclusive jurisdiction over property of the estate.  This is so even when there is a concurrent proceedings in state court. *See Teel v. Teel (In re Teel)*, 34 B.R. 762, 763-64 (9th Cir. BAP 1983) (referencing dissolution of marriage proceedings in state court). *Debilio v. Golden (In re Debilio)*, No. CC-13-1441-TaPaKi, 2014 Bankr. LEXIS 3886, *9 (B.A.P. 9th Cir. Sep. 11, 2014) (bankruptcy court has exclusive jurisdiction over property of a debtor's bankruptcy estate).

Granting the Motion is necessary to protect the rights of all creditors of the Debtor's estate, to prevent piecemeal litigation in various non-bankruptcy courts, and to avoid the unnecessary depletion of estate resources.

17

**The Debtor's Conduct Has No Bearing on the Legal Issues in the Bankruptcy Case**

It is black letter law, that when a bankruptcy petition is filed, an estate is created consisting of all legal or equitable "interests of a debtor in property" as of commencement of the case, as created and defined by non-bankruptcy law; in other words, the rights a debtor has in property at commencement of a case continue in bankruptcy as they existed at the commencement of the case. 11 U.S.C. § 541(a); *Frazer v. Drummond* (*In re Frazer*), 377 B.R. 621, 626 (B.A.P. 9th Cir. 2007). (Emphasis Added)  The Debtor's improper conduct, false declarations, and the Aug. 18 Minute Order directing the Debtor to document what is, and is not, property of the estate, is misdirected.  The Debtor, and his post-petition conduct, have no impact on what is an "interest of a debtor in property," especially in a case where the Trustee was appointed.

Where a chapter 11 trustee has been appointed, either for cause or in the interests of creditors, the duties and obligations set forth in section 1107 of the Bankruptcy Code are transferred to the trustee, in addition to the statutory duties set out in section 1106 of the Bankruptcy Code. As a result, a chapter 11 trustee stands in the shoes of the debtor and thereafter performs the fiduciary debtor-in-possession duties.  *United States v. One 2009 Maserati Granturismo*, 2016 U.S. Dist. LEXIS 119383, 2016 WL 4502457, at *4 (C.D. Cal. June 6, 2016). See *In re Easterday Ranches, Inc.*, 647 B.R. 236, 256, ftnt. 27 (Bankr. E.D. Wash. 2022) (explaining how "the duty of the trustee or debtor-in-possession is to gather estate assets for pro rata distribution to all creditors, which creates "a fiduciary duty to all creditors . . . to protect the interests of all creditors collectively.")

The Superior Court's continuation of various hearings post-petition, other than to hold the Debtor in contempt for violations of orders or decorum of the Superior Court, seeks to displace the role of the Trustee and the Bankruptcy Court.  These demands have the potential to harm creditors of the Estate, waste judicial resources and create the potential for even more litigation.  The Trustee was and is prepared to work with the Menlo Trust to determine its rights or claim to separate property.  However, first and foremost, the Menlo Trust must be forthcoming in its representations to produce documents rather than the current course to improve its position among general unsecured creditors.  (See Decl. of J. Nolan, ¶17)

18

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**V.**
**CONCLUSION**

For the reasons set forth above, the Trustee respectfully requests that this Court enter an order to be lodged consistent with the Motion, granting this Motion in its entirety, retaining jurisdiction for the filing of a motion for fees and costs associated with the violation of the automatic stay, and granting such other and further relief as this Court deems just and proper.

Dated:  August 28, 2023                PACHULSKI STANG ZIEHL & JONES LLP


By: */s/ Jeffrey P. Nolan*
    Jeffrey W. Dulberg
    John W. Lucas
    Jeffrey P. Nolan

    Proposed Attorneys for
    Bradley D. Sharp, Chapter 11 Trustee

DOCS_LA:350773.8 78512/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# DECLARATION OF JEFFREY P. NOLAN

I, Jeffrey P. Nolan, declare:

1.      I am an attorney at law duly licensed to practice before all courts in the State of California.  I am an attorney with the law firm of Pachulski Stang Ziehl & Jones LLP, proposed attorneys of record for Bradley D. Sharp, Chapter 11 Trustee of the estate of Leslie Klein ("Klein" or the "Debtor").  The facts stated herein are of my own personal knowledge, or made known to me from a review of the files and pleadings in this action which are maintained in the ordinary course of business.  If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.

2.      The examination requested through the Motion cannot proceed under Federal Rules of Bankruptcy Procedure 7030 or 9014 because no adversary proceeding or contested matter is currently pending encompassing the matters subject to inquiry.

3.      Attached hereto as **Exhibits A,** is a true and correct copy of the Complaint for (1) Fraud; (2) Breach of Fiduciary Duty; (3) Conversion; (4) Money Had And Received; (5) Unjust Enrichment and (6) Accounting filed in the Superior Court of the State of California, Case Number 21 ST CV 31915, *Vendriger, et al., v. Klein*.

4.      Attached hereto as **Exhibit B,** is a true and correct copy of the Report and Recommendation of the Court-Appointed Referee on Examination and Adjudication of the Trustee's First, Second, and Third Accountings On Each of the Twenty-Four Trusts At Issue For the Trust Periods September 10, 1996-June 30, 2013, July 1, 2013-December 31, 2016 And January 1, 2017-September 30, 2018, as attached to proof of claim 13-2 filed by the Menlo Parties in the United States Bankruptcy Court, Central District of California, in case number 2:23-bk-10990-SK.

5.      Attached hereto as **Exhibit C** is a true and correct copy of the Vago v. Klein Complaint to Determine the Nondischargeability of Certain Debts owed by Debtor Leslie Klein to Erica and Joseph Vago Pursuant to 11 U.S.C. §523, and To Deny Discharge Pursuant to Section 727(A)(12) and filed in the United States Bankruptcy Court, Central District of California, in case number 2:23-bk-10990-SK.

6.      Attached hereto as **Exhibit D** is a true and correct copy of the Mermelstein v. Klein

Complaint for Nondischargeability of Debt Pursuant to 11 U.S.C. §523(a)(2)(A), 11 U.S.C. §523(a)(4) & 11 U.S.C. §523(a)(6) & for Denial Of Discharge Pursuant to 11 USC §727(a)(2)(A); 11 USC §727(a)(2)(B); 11 USC §727(a)(3); 11 USC §727(a)(4)' 11 USC §727(a)(5), and filed in the United States Bankruptcy Court, Central District of California, in case number 2:23-bk-10990-SK.

7.    Attached hereto as **Exhibit E** is a true and correct copy of the Jeffrey Siegel , successor trustee of the Scott Trust v. Klein Complaint for To Deny dischargeability of Debt and Denial of Discharge Pursuant to 11 U.S.C. §523(a)(2), 11 U.S.C. §523(a)(4) & 11 U.S.C. §523(a)(6) and filed in the United States Bankruptcy Court, Central District of California, in case number 2:23-bk-10990-SK.

8.    Attached hereto as **Exhibits F** is a true and correct copy of the Decision and Order, Stipulated Surrender of License and Order and Accusation issued by the California Board of Accountancy, Department of Consumer Affairs, State of California, as printed from the state website.

9.    Attached hereto as **Exhibits G** is a true and correct copy of the Interim Order after Hearing dated June 5, 2023, as issued by the Hon. Ana Maria Luna.

10.    Attached hereto as **Exhibits H** is a true and correct copy of the Trustee's Response filed prior to the July 10, 2023 hearing in the Superior Court, State of California.

11.    On August 4, 2023, the Trustee scheduled a conference call with counsel for the Menlo Trust to facilitate the exchange of information and documents surrounding the life insurance policies.  The Trustee was present as well as his counsel and advisors.  The Trustee renewed his request for documents from the Menlo Trust.  Notwithstanding this good faith effort on the Trustee's part, the Trustees of the Menlo Trust subsequently provided no documents to the Trustee.

12.    On August 7, 2023, the Trustee issued a proposal to the Menlo Trust to requesting again  the documents and a schedule to allow the Trustee to review the documents.  Attached hereto as **Exhibit I** is a true and correct copy of an email and stipulation exchanged between counsel for the Trustee and the Menlo Trust.  The Menlo Trust refused to sign the Stipulation and more importantly did not forward documents with respect to the life insurance policies.

13.    Attached hereto as **Exhibit J** is a true and correct copy of an email attaching the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2

correspondence dated August 14, 2023, as addressed to counsel to the Menlo Trust. The Menlo Trust provided no documents to the Trustee in response to the correspondence.

14.     Attached hereto as **Exhibits K** is a true and correct copy of the Minute Order dated August 18, 2023, as issued by the Hon. Ana Maria Luna of the Superior Court. County of Los Angeles.

15.     Attached hereto as **Exhibits L** is a true and correct copy of the Response filed by one of the Co-Trustees of the Menlo Trust, as dated July 7, 2023.

16.     On July 24, 2023 the Trustee filed a Motion for the Examination of Les Klein and Associates, Inc., a professional law corporation, pursuant to Fed. R. Bankr. 2004 . On August 18, 2023, the Court entered an Order granting the 2004 Examination [Dkt. No. 272].  I have been in contact with counsel for the Law Firm regarding the production of documents and the Debtor has been identified as the custodian of the Law Firm records including the bank records and responsive documents outlined in the subpoena.

17.     As of the date of the filing of this Motion, the Menlo Trust has provided no documents to the Trustee with respect to the life insurance policies.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed this 28th day of August, 2023, at Los Angeles, California.


         */s/ Jeffrey P. Nolan*
         Jeffrey P. Nolan

# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 08/27/2021 06:09 PM Sherri R. Carter, Executive Officer/Clerk of Court, by H. Flores-Hernandez,Deputy Clerk

1  **SHUMAKER MALLORY LLP**
   Clarisse Young Shumaker (SBN 106505)
2  youngshumaker@smcounsel.com
   Brett J. Wasserman (SBN 315058)
3  wasserman@smcounsel.com
   333 S. Grand Ave., Suite 3400
4  Los Angeles, California 90071
5  **Mailing Address**
   1 Ringbit Rd. W.
6  Rolling Hills, CA 90274
   Telephone: (213) 793-2020
7  Facsimile: (213) 674-4268
8
   Attorneys for Plaintiff ADI VENDRIGER
9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                      COUNTY OF LOS ANGELES

12  ADI VENDRIGER, an individual, as Co-       ) Case No.   21STCV31915
    Trustee of the FIRST AMENDMENT TRUST       )
13  WENDRIGER FAMILY; and ADI                  )
    VENDRIGER, an individual                   ) **COMPLAINT FOR:**
14                                             ) **1) FRAUD;**
                                               ) **2) BREACH OF FIDUCIARY DUTY;**
15              Plaintiffs,                     ) **3) CONVERSION;**
    v.                                         ) **4) MONEY HAD AND RECEIVED;**
16                                             ) **5) UNJUST ENRICHMENT; and**
    LESLIE KLEIN, ESQ., an individual; and     ) **6) ACCOUNTING**
17  LES KLEIN & ASSOCIATES, a California       )
    Professional Law Corporation; and DOES 1-  ) **(Filed concurrently with Petition to Return**
18  50, inclusive,                             ) **Trust Property; For Damages, Attorney's**
                                               ) **Fees, And Costs; and Award of Damages,**
19              Defendants.                     ) **Attorney's Fees, and Costs)**
                                               )
20                                             )
                                               ) Complaint Filed: August 27, 2021
21                                             ) Trial Date:
                                               ) Dept:
22                                             )
    _____        )
23                                             ) **DEMAND FOR JURY TRIAL**

24        Plaintiff ADI VENDRIGER, successor co-Trustee of the First Amendment Trust

25  Wendriger Family dated May 7, 1990, as amended thereafter, hereby alleges as follows:

26  ///

27  ///

**COMPLAINT**

## **GENERAL ALLEGATIONS**

1.      Plaintiff ADI VENDRIGER is an individual who resides in Tel Aviv, Israel.  ADI VENDRIGER is a successor co-Trustee of the First Amendment Trust Wendriger Family dated May 7, 1990, as amended.  A true and correct copy of the First Amendment Trust Wendriger Family dated May 7, 1990, as amended ("Trust"), is attached hereto as Exhibit A and made a part hereof.  At all times relevant herein, the Trust was being administered in the State of California, County of Los Angeles.

2.      Respondent LESLIE KLEIN, ESQ. ("Klein") is an individual who on information and belief resides in Los Angeles County, California.  Upon information and belief, at all times relevant herein, Klein was doing business in the State of California, County of Los Angeles. Pursuant to the State Bar of California website, Klein is an Active member, State Bar Number 50908.  Pursuant to the California Department of Consumer Affairs website, Klein formerly held a license as a Certified Public Accountant, License No. 67454, which was surrendered on January 31, 2021.  On March 24, 2010, Klein filed an Ex Parte Application for Issuance of Letters of Special Administration in the Estate of Tania Wendriger in Los Angeles Superior Court, Case No. LP015084 ("Petition for Special Administrator").  Klein was appointed Special Administrator of the Estate of Tania Wendriger under an Ex Parte Order for Probate dated March 24, 2010 and received Letters of Special Administration dated March 24, 2010.

3.      Respondent LES KLEIN & ASSOCIATES, INC., A PROFESSIONAL LAW CORPORATION ("Firm") is a California professional corporation engaged in the practice of law with offices in the State of California, County of Los Angeles, City of Sherman Oaks.

4.      Plaintiff is ignorant of the true names and capacities, whether individual, corporate, or otherwise, of the Defendants identified in this Petition as DOES 1 through 50, inclusive, and therefore, sues such Defendants by the fictitious names.  Plaintiff will amend this Plaintiff to set forth the true names and capacities of said Defendants as soon as such names have been ascertained.   Plaintiff is informed and believes and based upon such information and belief alleges that each Defendant designated herein as DOES 1 through 50, inclusive, is responsible in

**COMPLAINT**

some way and/or manner for the acts and occurrences herein alleged, whether such acts and

occurrences were committed intentionally, negligently, recklessly, or otherwise, and that each

said DOE Defendant is liable to Plaintiff for the damages suffered by Plaintiff.

### JURISDICTION AND VENUE

5.      Jurisdiction and venue in the Los Angeles Superior Court arises from the

administration of the Trust and Defendants residing and functioning in the County of Los

Angeles, State of California.

### FACTS

6.      On May 7, 1990, OSCAR WENDRIGER and TANIA WENDRIGER established

the FIRST AMENDMENT TRUST WENDRIGER FAMILY ("Trust"), which replaced the prior

Trust Agreement dated July 10, 1986. OSCAR WENDRIGER and TANIA WENDRIGER were

the initial co-Trustees of the Trust. Plaintiff ADI VENDRIGER, and his brother Jacob

Vendriger, also known as Yaacov Vendriger, are the only children of OSCAR WENDRIGER

and TANIA WENDRIGER, and were named the successor co-Trustees of the Trust. Pursuant to

the terms of the Trust, as amended on March 18, 1993, upon the death of the Surviving Trustor,

the Trust Estate shall be distributed as follows: (i) each grandchild shall receive the sum of

$10,000, increased six percent (6%) per annum, cumulatively; and (ii) the remainder of the Trust

Estate shall be divided equally between ADI VENDRIGER and Jacob Vendriger.

7.      On May 7, 1990, OSCAR WENDRIGER and TANIA WENDRIGER contributed

the following three (3) real properties to the Trust as follows:

- Quitclaim Deed transferring 1435 Fairfax Avenue #20, Los Angeles, CA (APN 5554-001-033) from OSCAR WENDRIGER and TANIA WENDRIGER to OSCAR WENDRIGER and TANIA WENDRIGER, Cotrustees of the Wendriger Family Trust, U/D/T 5-7-90, which was recorded in Official Records of Los Angeles County as Instrument No. 90-923693 on May 22, 1990 ("Fairfax Quitclaim Deed").

///

///

///

**COMPLAINT**

- Quitclaim Deed transferring 1217 Havenhurst Drive, Los Angeles, CA (APN 5554-016-011) from OSCAR WENDRIGER and TANIA WENDRIGER to OSCAR WENDRIGER and TANIA WENDRIGER, Co-trustees of the Wendriger Family Trust, U/D/T 5-7-90, which was recorded in Official Records of Los Angeles County as Instrument No. 90-923694 on May 22, 1990 ("Havenhurst Quitclaim Deed").
- Quitclaim Deed transferring 948 N. Martel Avenue, Los Angeles, CA (APN 5531-020-002) from OSCAR WENDRIGER and TANIA WENDRIGER to OSCAR WENDRIGER and TANIA WENDRIGER, Cotrustees of the Wendriger Family Trust, U/D/T 5-7-90, which was recorded in Official Records of Los Angeles County as Instrument No. 90-923692 on May 22, 1990 ("Martel Quitclaim Deed").

8.      On May 28, 1996, OSCAR WENDRIGER and TANIA WENDRIGER contributed the following property to the Trust as follows:

- Grant Deed transferring 1435 Fairfax Avenue #4, Los Angeles, CA (APN 5554-001-017) from OSCAR WENDRIGER and TANIA WENDRIGER to OSCAR WENDRIGER and TANIA WENDRIGER, Cotrustees of the Wendriger Family Trust dated 5/7/90, which was recorded in Official Records of Los Angeles County as Instrument No. 96-969585 on June 19, 1996 ("Fairfax Grant Deed").

9.      All four (4) Trust properties are managed by Holley Property Management Company.  Klein is not the Property Manager, but has inserted himself as a middle man between the property management company and the co-Trustees of the Trust.

10.      Pursuant to the Petition for Special Administrator filed by Klein, on October 30, 1999, OSCAR WENDRIGER and TANIA WENDRIGER executed a Note Secured by Trust Deed ("Secured Note") in the sum of $258,815.05, the terms of which provided for all unpaid principal and interest to be due and payable on October 24, 2009.  Pursuant to the Petition for Special Administrator filed by Klein, the Secured Note was secured by a Deed of Trust dated August 2, 1979, and recorded as Instrument No. 79-945848.

11.      On August 23, 2007, OSCAR WENDRIGER, also known as Oscar Vendriger, died.

12.      On November 23, 2007, TANIA WENDRIGER, also known as Tania Vendriger and Tanya Vendriger, died.

13.      Pursuant to the Petition for Special Administrator, at TANIA WENDRIGER's death there was a Chase Account (Account No. 195-248884-9), which was held by OSCAR

**COMPLAINT**

WENDRIGER and TANIA WENDRIGER, as joint tenants.  At the time of TANIA

WENDRIGER's death, the Chase Account held $194,000, which was in excess of the statutory

limits under Probate Code § 13100.

14.    On March 24, 2010, Klein filed the Petition for Special Administrator in the

Estate of Tania Wendriger in Los Angeles Superior Court, Case No. LP015084.  Klein requested

the following powers: (i) to withdraw all sums on deposit in the Chase Account; (ii) With said

sums, to apply toward payment in full, including all accrued interest until such payment that

certain Note Secured by Deed of Trust, dated October 30, 1990, in favor of Harry Halpin and

Rose Shapiro the final payment on which, in the sum of $200,330.10, was due on October 24,

2009; (iii) to execute and deliver any checks, drafts, withdrawals, or other instruments drawn on

the Chase Account for the payment of the money on deposit in the Chase Account to pay in full

including all accrued interest until such payment, the Secured Note, the final payment of which,

in the sum of $200,330.20, was due on October 24, 2009; and (iv) if necessary, to open any bank

account necessary in the name of the Estate and to deposit in such account any and all sums

withdrawn from said Chase Account.  Thereafter, to execute and deliver any checks, drafts,

withdrawals, or other instruments drawn on such Account for payment of the money on deposit

in such Account to pay in full including all accrued interest until such payment, the Secured

Note, the final payment of which, in the sum of $200,330.20, was due on October 24, 2009.

15.    On March 24, 2010, Klein was issued Letters of Special Administration.  Klein

specifically affirmed the requirement to perform the duties of personal representative according

to law in the Letters filed with the Court.

16.    The Petition for Special Administrator included Nominations of Leslie Klein by

ADI VENDRIGER and Jacob Vendriger, for the purpose of withdrawing the funds in the Chase

account and applying such funds to the payment of the Secured Note, as well as a Power of

Attorney in favor of Leslie Klein, dated February 5, 2010, signed by ADI VENDRIGER and

Jacob Vendriger.  The Petition for Special Administrator also included a Declaration by Leslie

Klein, which specifically notes the Power of Attorney dated February 5, 2010 is in regards to the

**COMPLAINT**

1  Chase Account for the specific purpose of obtaining the funds in the Chase Account and

2  applying said funds toward payment on the Secured Note.

3       17.    On March 24, 2010, an Order for Special Administrator was issued granting Klein

4  the following powers: (i) to withdraw all sums on deposit in the Chase Account; (ii) With said

5  sums, to apply toward payment in full, including all accrued interest until such payment that

6  certain Note Secured by Deed of Trust, dated October 30, 1990, in favor of Harry Halpin and

7  Rose Shapiro the final payment on which, in the sum of $200,330.10, was due on October 24,

8  2009; (iii) to execute and deliver any checks, drafts, withdrawals, or other instruments drawn on

9  the Chase Account for the payment of the money on deposit in the Chase Account to pay in full

10  including all accrued interest until such payment, the Secured Note, the final payment of which,

11  in the sum of $200,330.20, was due on October 24, 2009; and (iv) if necessary, to open any bank

12  account necessary in the name of the Estate and to deposit in such account any and all sums

13  withdrawn from said Chase Account.  Thereafter, to execute and deliver any checks, drafts,

14  withdrawals, or other instruments drawn on such Account for payment of the money on deposit

15  in such Account to pay in full including all accrued interest until such payment, the Secured

16  Note, the final payment of which, in the sum of $200,330.20, was due on October 24, 2009.

17       18.    To date, Klein has not filed a single accounting with the Court as Special

18  Administrator.

19       19.    On July 27, 2011, Klein sent correspondence to ADI VENDRIGER and Jacob

20  Vendriger which indicated Klein had received $255,792 from Holley Property Management

21  company from March 2010 to June 2011. Klein noted expenses as follows: (i) paying off the

22  Trust Deed in the amount of $205,987.15, $192,824 of which came from "monies held in various

23  bank accounts"; (ii) $10,000 of attorney's fees; (iii) $4,200 for CPA fees, Court costs, and

24  Bonding fees; and (iv) $156,684 in taxes paid for 2008, 2010, and 2011.  Klein noted a balance

25  of $61,349.85 in his account for the benefit of Plaintiff and Jacob after issuance of a $10,400

26  check to Jacob to "reimburse him for his one half of the taxes which [Klein] paid to the IRS for

27  the fees that were bounced by [Plaintiff]."

COMPLAINT

20.     To date, Klein has not filed a Petition for Discharge as Special Administrator despite acknowledging having paid off the Trust Deed prior to July 27, 2011.  Upon information and belief, Klein has charged Plaintiff and Jacob a yearly fee to act as a fiduciary.  In addition, upon information and belief, Klein has wasted Trust funds by paying $800 per year for a Bond that is entirely unnecessary.

21.     Upon information and belief, Klein represented to Holley Property Management Company that he was legally authorized as Trustee and/or Special Administrator to collect the rental income from the Trust properties.

22.     Upon information and belief, despite having no legal authority to handle the rental income of the Trust properties, Klein has collected all of the rental income from the four (4) properties titled in the name of the Trust from Holley Property Management Company from March of 2010 through March of 2021, for ADI VENDRIGER, and August of 2021, for Jacob Vendriger.

23.     Upon information and belief, Klein has failed to provide sufficient and accurate accountings to Plaintiff, as required by <u>Probate Code</u> §1060 et seq., despite numerous requests to do so.

24.     Upon information and belief, Klein has failed to accurately report the actual distributions made to the Plaintiff and/or the proper taxing authorities. For example, in 2020, Klein filed a fiduciary tax return for the Trust indicated a Distributable Net Income of $226,536 and actual distributions of $240,000 ($120,000 to ADI and $120,000 to Jacob); however, ADI only actually received distributions totaling $90,000.  In addition, statements provided by Holley Property Management Company show actual owner distributions totaling almost $346,000, which leaves $116,000 unaccounted for.

25.     Upon information and belief, Klein has engaged in a similar practice of over-reporting the actual distributions made to Plaintiff.  Upon information and belief, such over-reporting was done in efforts to cover Klein's misappropriation of client fund.

///

**COMPLAINT**

26.     Upon information and belief, Klein has failed to accurately report the reserves being held for the benefit of Plaintiff to the Plaintiff and/or the proper taxing authorities.  For example, upon information and belief, Klein should have approximately $1,400,000 held in his account for the benefit of Plaintiff and Jacob.  On March 24, 2021, Klein indicated he held a balance of only $220,000 in his attorney expense account because of an IRS claim for $80,000.

27.     Upon information and belief, Klein's failure to prepare declarations to be submitted to the Israeli Taxing Authorities indicating the reserves held by Klein, despite Plaintiff's numerous demands for Klein to do so, have put Plaintiff in jeopardy of incurring additional taxes and penalties imposed by the Israeli Taxing Authorities.

28.     Upon information and belief, Klein has misappropriated the funds that constitute the difference between the amount Klein is believed to be holding on behalf of Plaintiff and Jacob and the amount Klein is reporting to be holding on their behalf.

29.     Upon information and belief, Klein has also played favorites and has made distributions to Jacob while simultaneously withholding distributions from Plaintiff, despite Plaintiff's repeated demands for distributions to be made to avoid Plaintiff becoming destitute and filing for bankruptcy due to an inability to pay his creditors.

## RECOVERY AND DAMAGES

30.     Plaintiff hereby seeks recovery of the funds wrongfully held by Klein in full plus interest.  Plaintiff also seeks punitive damages against Klein for fraud, conversion, and breach of fiduciary duty.  Law firm trust accounts comprised of funds belonging to other people cannot be used as a lawyer's private bank account.  Misuse of an attorney's trust account is among the most egregious misconducts an attorney can commit.  This is the sort of conduct that leads to the public's mistrust of the legal profession.

31.     Plaintiff is seeking damages and attorney's fees and costs under Probate Code § 859 as a result of Klein's bad faith wrongful taking, concealing, and/or disposing of property belonging to a trust.

///

**COMPLAINT**

32.     Plaintiff also seeks recovery of attorney fees and costs against all defendants on the grounds of tort of another for fraud, breach of fiduciary duty, and conversion.  Plaintiff has been required through the tort of another to act in the protection of their interests by bringing this action against all Defendants. Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

## FIRST CAUSE OF ACTION

### (Fraud – Against All Defendants)

33.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 32, inclusive, above as if fully set forth herein.

34.     When Klein filed the Petition for Special Administrator, he expressly represented to the Court and to Plaintiff and Jacob that the powers he would exercise, including those obtained under the Power of Attorney, would be limited to paying the Trust Deed with the funds from the Chase Account, both of which were held by TANIA WENDRIGER, personally, and not in the name of the Trust.

35.     Upon information and belief, when Klein made such representation, Klein knew such representations to be false.  Upon information and belief, Klein knew that he would use the appointment as Special Administrator to gain access and control over Trust funds in order to misappropriate the same.

36.     Upon information and belief, Klein made representations to Holley Property Management Company that he had legal authority, as Special Administrator or as a Trustee, to collect and hold the rental income derived from the Trust properties.

37.     Upon information and belief, when Klein made such representation, Klein knew such representations to be false.

38.     Upon information and belief, Klein made representations to Plaintiff and the IRS, FTB, and Israeli Taxing Authorities that Klein has reported made distributions to Plaintiff in amounts differing from those actually distributed to Plaintiff.  For example, in 2020, Klein reported distributing $120,000 to Plaintiff, who actually received only $90,000 in distributions.

9

**COMPLAINT**

39.     Upon information and belief, when Klein made such representation, Klein knew such representations to be false.  Upon information and belief, Klein made such misrepresentations to cover the tracks of his misappropriation of client funds.

40.     Plaintiff justifiably relied upon Klein's representations to the Court and Plaintiff as well as Klein's reputation as an officer of the Court that Klein would follow the rules the administration of Estates and the California State Bar's Rules of Professional Conduct.

41.     Plaintiff has been damaged in an amount of not less than $780,000 plus interest as a result of funds that have been wrongfully withheld and/or improperly not distributed.  Klein had no legal authority to collect the rental income of Trust property let alone retain it.  Despite repeated demand by Plaintiff, the funds in Klein's possession have not been returned to Plaintiff.

42.     As the direct, proximate, and foreseeable consequence of the fraudulent conduct of Klein as herein alleged, Plaintiff has suffered actual damages of not less than $780,000, together with interest on that amount as allowed by law.

43.     The conduct of Klein as alleged herein is intentional, malicious, outrageous, and/or carried out with conscious disregard so as to justify an award of exemplary and punitive damages in an amount according to proof.

44.     Plaintiff also seeks recovery of attorney fees and costs against Klein on the grounds of tort of another.  Plaintiff has been required through the tort of another to act in the protection of his interests by bringing this action against Klein.  Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty – Against All Defendants)

45.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 44, inclusive, above as if fully set forth herein.

46.     Klein, as Special Administrator, as Agent under Power of Attorney, as an attorney, and as a CPA, was a fiduciary to Plaintiff and owed Plaintiff certain fiduciary duties

**COMPLAINT**

1  including the duties of good faith, integrity, undivided service, competence, candor, diligence,

2  loyalty, and full and fair disclosure.

3      47.    Upon information and belief, Klein materially and willfully breached his fiduciary

4  duties to Plaintiff by wrongfully representing he had legal authority to act on behalf of the Trust

5  and collect rental income from Trust properties to third parties, including Holley Property

6  Management Company, by wrongfully withholding Plaintiff's funds, by over-reporting

7  distributions to Plaintiff, by paying himself a fiduciary fee despite not being a Trustee and the

8  purpose of appointment of Special Administrator lapsing almost a decade ago, by failing to

9  provide sufficient and accurate accountings, by failing to provide the proper requested

10  documentation for taxing authorities, and by distributing funds in favor of Jacob while

11  concurrently holding Plaintiff's funds without reasonable cause.

12      48.    Plaintiff has been harmed by Klein's conduct described herein, including the

13  breach of his fiduciary duties to Plaintiff by wrongfully representing he had legal authority to act

14  on behalf of the Trust and collect rental income from Trust properties to third parties, including

15  Holley Property Management Company, by wrongfully withholding Plaintiff's funds, by over-

16  reporting distributions to Plaintiff, by paying himself a fiduciary fee despite not being a Trustee

17  and the purpose of appointment of Special Administrator lapsing almost a decade ago, by failing

18  to provide sufficient and accurate accountings, by failing to provide the proper requested

19  documentation for taxing authorities, and by distributing funds in favor of Jacob while

20  concurrently holding Plaintiff's funds without reasonable cause.

21      49.    By doing the acts alleged above, Klein breached his fiduciary duties of good faith,

22  integrity, undivided service, competence, candor, diligence, loyalty, and full and fair disclosure

23  toward Plaintiff by acting in his own interests, and in a manner adverse to Plaintiff's best interests.

24      50.    As a direct, proximate, and foreseeable result of the Klein's breach of his fiduciary

25  duties, Plaintiff has suffered actual damages of not less than $780,000, together with interest on that

26  amount as allowed by law.

27  ///

**COMPLAINT**

51.     Plaintiff is informed and believe and thereon allege that the aforementioned conduct of Klein, was an intentional misrepresentation, deceit, or concealment of material facts known Klein, and was despicable conduct carried out in conscious disregard of his duties and obligations to Plaintiff. Thus, Plaintiff is entitled to recover exemplary and punitive damages against Klein in an amount according to proof at the time of trial.

52.     Plaintiff also seeks recovery of attorney fees and costs Klein on the grounds of tort of another.  Plaintiff has been required through the tort of another to act in the protection of their interests by bringing this action against Klein.  Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

## THIRD CAUSE OF ACTION

### (Conversion – Against All Defendants)

53.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 52, inclusive, above as if fully set forth herein.

54.     Plaintiff, as a 50% beneficiary of the Trust, the terms of which required distribution of the Trust Estate almost one decade ago, owned and had a right to possess the Plaintiff's share of the rental income held by Klein.

55.     Klein intentionally and substantially interfered with Plaintiff's property by taking possession of the Plaintiff's share of the rental income and by refusing to return the Plaintiff's share of the rental income after demand was made for return of the same.

56.     Plaintiff did not consent to Klein's receipt or retention of Plaintiff's share of the rental income.

57.     Plaintiff was harmed by Klein's receipt and retention of the Plaintiff's share of the rental income.

58.     Klein's conduct in receiving and refusing to return the Plaintiff's share of the rental income was a substantial factor in the harm caused to Plaintiff.

///

12

**COMPLAINT**

59.     Plaintiff has suffered actual damages in the amount of not less than $780,000, plus costs and prejudgment interest at the maximum legal rate provided by law.

60.     Klein's acts and the conduct of Klein was engaged with oppression, malice, and/or fraud. Thus, Plaintiff is entitled to recover exemplary and punitive damages against Klein in an amount according to proof at the time of trial.

61.     Plaintiff also seeks recovery of attorney fees and costs against Klein on the grounds of tort of another.  Plaintiff has been required through the tort of another to act in the protection of their interests by bringing this action against Klein.  Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

### FOURTH CAUSE OF ACTION

### (Money Had and Received – Against All Defendants)

62.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 61, inclusive, above as if fully set forth herein.

63.     Klein received money in the form of the Plaintiff's share of the rental income.

64.     The Plaintiff's share of the rental income received by Klein was not used for the benefit of Plaintiff.

65.     Klein has not given the money received in the form of the Plaintiff's share of the rental income to Plaintiff.

66.     Plaintiff has suffered actual damages in the amount of not less than $780,000, plus costs and prejudgment interest at the maximum legal rate provided by law.

### FIFTH CAUSE OF ACTION

### (Unjust Enrichment– Against All Defendants)

67.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 66, inclusive, above as if fully set forth herein.

68.     Klein received the Plaintiff's share of the rental income from the Trust properties.

///

**COMPLAINT**

69.     Klein was not entitled to receive the Plaintiff's share of the rental income from the Trust properties.

70.     Klein's receipt of the Plaintiff's share of the rental income came at the expense of Plaintiff.

71.     Plaintiff has suffered actual damages in the amount of not less than $780,000, plus costs and prejudgment interest at the maximum legal rate provided by law.

## ACCOUNTING

72.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 71, inclusive, above as if fully set forth herein.

73.     Klein, as Special Administrator, as Agent under Power of Attorney, as an attorney, and as a CPA, was a fiduciary to Plaintiff.

74.     Plaintiff is unable to ascertain and has demanded a full accounting by Klein in order to determine the amount of Plaintiff's assets wrongfully held by Klein.

75.     Upon information and belief, Plaintiff does not have access to view the funds held by Klein since Plaintiff's assets are held in accounts titled in Klein's name or the in the Firm's name.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows:

### ON THE FIRST CAUSE OF ACTION

1.     Damages in an amount of not less than $780,000;

2.     Interest at the legal rate from and after a date to be proven at trial;

3.     Exemplary and punitive damages in an amount according to proof;

4.     Attorney fees and costs in an amount according to proof;

5.     An accounting of all funds received, disbursed, and held by Klein;

### ON THE SECOND CAUSE OF ACTION

6.     Damages in an amount of not less than $780,000;

14

**COMPLAINT**

7.     Interest at the legal rate from and after a date to be proven at trial;

8.     Exemplary and punitive damages in an amount according to proof;

9.     Attorney fees and costs in an amount according to proof;

10.     An accounting of all funds received, disbursed, and held by Klein;

### ON THE THIRD CAUSE OF ACTION

11.     Damages in an amount of not less than $780,000;

12.     Interest at the legal rate from and after a date to be proven at trial;

13.     Exemplary and punitive damages in an amount according to proof;

14.     Attorney fees and costs in an amount according to proof;

### ON THE FOURTH CAUSE OF ACTION

15.     Damages in an amount of not less than $780,000;

16.     Interest at the legal rate in an amount according to proof;

### ON THE FIFTH CAUSE OF ACTION

17.     Damages in an amount of not less than $780,000;

18.     Interest at the legal rate from and after a date to be proven at trial;

### ON THE SIXTH CAUSE OF ACTION

19.     An accounting of all funds received, disbursed, and held by Klein;

### ON ALL CAUSES OF ACTION

20.     For general damages to be proven at trial;

21.     For consequential damages to be proven at trial;

22.     For interest as allowed by law;

23.     For restitution as allowed by law;

///
///
///
///
///

**COMPLAINT**

24.     For reasonable attorney fees and costs; and

25.     For such other and further relief as the Court deems just and proper.

Dated:  August 27, 2021                          SHUMAKER MALLORY, LLP


                                        By: _____
                                            CLARISSE YOUNG SHUMAKER
                                            BRETT J. WASSERMAN
                                            Attorneys for Plaintiff
                                            ADI VENDRIGER, as Co-Trustee and
                                            individually

**COMPLAINT**

# EXHIBIT A

ADI <vendriger.prop@gmail.com> &
To Jaffe Hilda <hijaffe1@verizon.net>, מדריגר ברברה רהי <vendriger@hotmail.com>
Amendment to the amendment- Adi's

February 16 20?? 11 06 AM

2 Attachments, 429 KB

AMENDMENT TO FIRST AMENDMENT DECLARATION OF TRUST
(OSCAR and TANIA WENDRIGER a.k.a.
VENDRIGER FAMILY TRUST)

THE FIRST AMENDMENT DECLARATION OF TRUST executed on
the 7th day of May 1990, by OSCAR WENDRIGER and TANIA
WENDRIGER as Trustors, and OSCAR WENDRIGER and TANIA
WENDRIGER as Trustees, is hereby amended by said Trustors and
Trustees pursuant to the right to amend reserved under the
original DECLARATION OF TRUST. This amendment shall replace
in pertinent part any provisions to the contrary in the
original DECLARATION OF TRUST, and shall otherwise amend said
DECLARATION OF TRUST as follows:

1. Upon the death of the Surviving Trustor, the
Trustee shall distribute the Trust Estate as follows:

(a) Each grandchild of the Trustors shall
receive the sum of Ten Thousand Dollars ($10,000), increased
six percent (6%) per annum, cumulatively;

(b) The remainder of the Trust Estate shall
be divided one-half (1/2) to JACOB VENDRIGER, son of the
Trustors, and one-half (1/2) to ADI VENDRIGER, son of the
Trustors, per stirpes.

IN WITNESS WHEREOF, the Original Trustor and Trustee
have executed this Amendment to the DECLARATION OF TRUST this
_18th_ day of _March_, 19_9?_.

TRUSTOR:                        TRUSTEE:

_Oscar Wendriger_               _Oscar Wendriger_
OSCAR WENDRIGER                 OSCAR WENDRIGER

_Tania Wendriger_               _Tania Wendriger_
TANIA WENDRIGER                 TANIA WENDRIGER

STATE OF CALIFORNIA     }
                        } SS.
COUNTY OF LOS ANGELES   }

On _March 18_____, 199_3_, before me, the undersigned, a
Notary Public, in and for said State, personally appeared
_Oscar Umberto Main Guadamy_____, personally known
to me or proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed to the
within instrument, and acknowledged that he/she/they executed
the same.

                    WITNESS my hand and official seal this _18th_
day of _March_____, 1993 _rd_

                    _____
                    Notary Public in and for said
                    County and State

OFFICIAL SEAL
Frances Cuughlin Mayall
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
My comm. expires APR 12, 1995

FIRST AMENDMENT TRUST
WENDRIGER FAMILY

THIS FIRST AMENDED TRUST AGREEMENT replaces the prior Trust
Agreement dated July 10, 1986, and is entered into by and
between OSCAR WENDRIGER and TANIA WENDRIGER, "Husband" and
"Wife," respectively, of the County of Los Angeles, in the
State of California, hereinafter called "Trustors," and OSCAR
WENDRIGER and TANIA WENDRIGER of the State of California,
hereinafter referred to as "Cotrustees."

In construing this Trust the following definitions shall
apply:

1.    Whenever used herein the expression "Trustors" shall
refer to OSCAR WENDRIGER and TANIA WENDRIGER.
2.    Whenever used herein the expression "Original
Cotrustees" shall refer to OSCAR WENDRIGER and TANIA
WENDRIGER.
3.    Whenever used herein the expression "Original Cotrustee"
shall refer to either OSCAR WENDRIGER or TANIA WENDRIGER.
4.    Whenever used herein the expression "Successor Trustee"
shall refer to JACOB a.k.a. YAACOV VENDRIGER and ADI
VENDRIGER.
5.    Whenever used herein the expression "Alternate Trustee"
shall refer to the surviving Successor Trustee and SHLOMO
MENKES.
6.    Whenever used herein the expression "Trustee" shall be
deemed a reference to whomever is serving as Trustee, or
Cotrustees, whether original, successor or alternate.
7.    The initial primary beneficiaries of this Trust Estate
shall be OSCAR WENDRIGER and TANIA WENDRIGER.
8.    The effective date of this Trust Agreement shall be its
date of execution.

I.    TRUST PROPERTY

    A.  Original Trust Estate

        The Trustors acknowledge that they have transferred
to the Trustee without consideration the sum of ten dollars,
along with the following:

PERSONAL PROPERTY:  All tangible and intangible held personal
property that the Trustors, either separately or as community
property, now own or do hereafter acquire, including but not

REVOCABLE LIVING TRUST Page 1

limited to household furniture, furnishings, and utensils;
equipment and appliances; art; clothing; cash; personal
effects; bank accounts; registered and unregistered
securities; notes receivable; security interests and liens;
interests in partnerships, firms, businesses (including
inventory), and corporations; contract rights; and amounts
due from employers; excluding, however, any and all such
property subject to any (other) trust or power of
appointment; and any property subject to a pledge, security
agreement or legal restriction on transfer.

All such property owned by Trustors shall be considered and
treated as community property unless listed as separate
property in this Trust on Schedule B (the separate property
of husband, if any), and in Schedule C (the separate property
of wife, if any).

All such property, which is hereby delivered by the Trustors
to the Trustee, shall be held, administered, and distributed
by the Trustee as hereinafter set forth.

B.  Additions to Trust Estate

Additional property may be added to the Trust Estate
at any time by the Trustors or either of them, or by any
person or persons, by inter vivos or testamentary transfer.
All such original and additional property is referred to
herein collectively as the Trust Estate, and shall be held,
managed and distributed as herein provided.

1.  Employee Benefit Plans

In the event that any designation of the Trustee
of this Trust as Beneficiary in any employee benefit plan in
which the Trustors may have an interest shall be ineffectual
in whole or in part, the Trustors specifically request that
the committee, or other group having authority to do so under
any such plans, select the Trustee of the Trust as
beneficiary of such plans to the maximum extent possible.
The Trustee may elect the mode of payment which, in the
Trustee's discretion, appears to be the most advantageous
option available to the Trust and/or its then current income,
Beneficiaries in terms of income tax, estate and inheritance
tax, and/or investment return considerations, based on the
Trustee's evaluation of the facts and circumstances relevant
to such considerations as they exist at the time the Trustee
makes such election.  Further, the Trustee may, predicated
upon the foregoing consideration, elect in writing not to
treat the death benefits as a lump sum distribution for
income tax purposes and thus exclude the maximum allowed from

REVOCABLE LIVING TRUST Page 2

estate taxes.  An election by a Trustee in good faith in the
exercise of the discretionary power conferred upon it shall
be final and binding upon all persons whomsoever and shall be
a full acquittance and discharge to the Trustee, and the
Trustee shall not be liable to any person by reason of its
exercise of such discretionary power.

### C.  Character of Property Unchanged

The property comprising the original corpus of the
Trust Estate is community property of the Trustors, except as
otherwise specifically indicated. During the joint lives of
the Trustors, any property transferred to this Trust shall
retain its original character.  All such property shall be
assumed to be community property unless otherwise
specifically indicated in writing by the Trustors.  In the
event of revocation, the Trustee shall distribute such
property to the Trustors based on the same property rights
they had prior to transfer to the Trust. Any and all gifts
made by the Trustors of Trust assets shall constitute a
revocation by the Trustors as to such property, and,
therefore, a gift by any Trustor having an interest in that
property would also constitute a revocation.

## II.  ORIGINAL AND SUCCESSOR TRUSTEES

### A.  Original Cotrustees

The Original Cotrustees under this Declaration of
Trust shall be as hereinabove defined, to serve with all of
the obligation, powers, and authority contained within this
Trust Agreement.

### B.  Death or Resignation of Original Cotrustee

In the event of the death of either Original
Cotrustee, or if for any reason whatsoever he or she ceases
to serve as Cotrustee hereunder, the Trustors nominate and
appoint the remaining Cotrustee to serve as Trustee hereunder
without the approval of any Court.

In the event of the death of both Original
Cotrustees, or if for any reason whatsoever both cease to
serve as Trustee hereunder, the Trustors nominate and appoint
the Successor Trustee as hereinabove defined to serve as
Trustee hereunder without the approval of any Court.  In the
event that the abovenamed Successor Trustee consists of more
than one person then if for any reason whatsoever any of the
aforesaid do not serve or cease to serve as Cotrustee
hereunder, the Trustors nominate and appoint whomsoever of

REVOCABLE LIVING TRUST Page 3

the aforenamed shall be available to serve as Successor
Trustee hereunder without the approval of any court.

In the event of the death of the Successor Trustee
as hereinabove defined, or if for any reason whatsoever he,
she, or they cease(s) to serve or for any reason refuses to
serve as Trustee hereunder, the Trustors nominate and appoint
the designated Alternate Trustee to serve as Trustee
hereunder without the approval of any Court.  In the event
that the Alternate Trustee consists of more than one person
then if for any reason whatsoever any of the aforesaid do not
serve or cease to serve as Cotrustee hereunder, the Trustors
nominate and appoint whomsoever of the aforenamed shall be
available to serve as Successor Trustee hereunder without the
approval of any court.

In the event of the death of the Original Trustors
hereof, and in the event that neither the aforenamed
Successor Trustee or the aforementioned Alternate Trustee is
available then the majority of then living beneficiaries
hereunder who are issue of the Original Trustors hereof shall
have the right to select another Successor Trustee hereunder
to serve without approval of any court.  In the case of minor
beneficiaries, then any guardian of such a beneficiary shall
act on behalf of such minor beneficiary to select a Successor
Trustee.

C.  Discharge or Resignation of Trustee

The Trustors shall have the right to discharge the
Trustee of any Trust hereunder.  Discharge of a Trustee shall
be by delivery to such Trustee of thirty (30) days' written
notice of discharge, accompanied by the name of the intended
Successor Trustee.

D.  Duties and Responsibilities of Successor Trustees

No Successor Trustee shall have any responsibility
for any acts or omissions of any prior Trustee and no duty to
audit or investigate the accounts or administration of any
such Trustee; nor, unless in writing requested to do so by a
person having a present or future beneficial interest under a
Trust hereunder, any duty to take action to obtain redress
for breach of trust.  It is the intent of the Original
Trustors that the Successor Trustee shall not be required to
obtain Court approval, discharge, or pursue any other Court
proceedings at the request of income Beneficiaries without
first attempting to obtain releases from the majority of the
adult income Beneficiaries with such release and discharge
being completely adequate as to all responsibilities

REVOCABLE LIVING TRUST Page 4

incumbent upon the Trustee.  However, under any
circumstances, any claim or action against any previous
Trustee must in any event be asserted or filed by any
Beneficiary within one (1) year after the appointment of a
Successor Trustee.

    E.  Bond

        No Trustee shall be required to post bond or any
other security for the faithful performance of any duties or
obligations of such office.

## III. INITIAL TRUST

        The Trustee shall hold, manage, invest, and reinvest the
Trust Estate and shall collect the income thereof, and shall,
upon demand of the Trustors, pay to the Trustors during their
joint lives all community net income of the Trust Estate and
shall pay to each Trustor all separate net income from his or
her respective share of the Trust Estate.  In the event that
the Trustors do not demand payment of the net income of
community property, or if either of the Trustors fails to
demand distribution of separate property net income, then the
Trustee may at his discretion accumulate such income, and
such income will become property of the Trust Estate.

        The Trustee shall further pay community property
principal, up to the whole thereof, to the Trustors upon
written request.  Upon the written request of the Trustor who
transferred separate estate property to the Trust, the
Trustee shall pay so much of the principal of the separate
estate established by such Trustor, up to the whole thereof,
as he or she shall request.

## IV.  REVOCATION AND AMENDMENT

        Either of the Trustors, during their joint lives, may at
any time and upon successive occasions, revoke this Trust in
whole or in part.  The Trustors may jointly alter or amend
any of its provisions.  Any Amendment may be similarly
cancelled or amended.  If a Trustor is incompetent, such
power to revoke, alter or amend the Trust may be exercised by
the guardian or conservator at the direction of a Court of
competent jurisdiction where such court approval is required.

        From and after the death of either of the Original
Trustors, this Agreement, insofar as it relates to the
SURVIVOR'S TRUST, may be revoked or amended at any time and
from time to time by the Survivor delivering written notice
of revocation or amendment to the Trustee; provided, however,

REVOCABLE LIVING TRUST Page 5

that the duties and liabilities of the Trustee cannot be
increased without its consent. In the event of any
revocation, the revoking party or parties shall indemnify the
Trustee in a manner satisfactory to it against liabilities
lawfully incurred by the Trustee in the conduct of its
office. If a Survivor is incompetent, such power to revoke,
alter or amend the Trust may be exercised by the guardian or
conservator at the direction of a Court of competent
jurisdiction. Except as hereinabove provided, this
Agreement, and the Trusts evidenced hereby, are irrevocable
and shall not be subject to amendment.

## V. DISTRIBUTIONS ON DEATH OF EITHER TRUSTOR

Upon the death of the Original Trustor hereof whose
death shall occur first, the Trustee shall make any such
distributions of specific gifts which are itemized and listed
on Schedule D (the Specific Gift Distribution Schedule) which
is attached hereto and incorporated herein by reference.
With reference to any specific gifts made in accordance with
Schedule D, whether referenced in this Article V or Article
VI below, the following shall apply. In the event that a
Beneficiary does not survive the decedent spouse, any gift to
the deceased Beneficiary shall lapse and pass as part of the
rest and residue of the Trust Estate.

Thereafter, the Trustee shall divide the Trust Estate,
including all property received as a result of the Decedent's
death, into two parts, each part to be administered as a
separate Trust to be known respectively as the "SURVIVOR'S
TRUST," and the "DECEDENT'S TRUST." Reference hereafter to
the "DECEDENT" shall refer to either of the Trustors whose
death shall first occur, and reference to the "SURVIVOR"
shall refer to the Surviving Trustor.

### A. Decedent's Trust

The DECEDENT'S TRUST shall include an amount equal
to the lesser of the equivalent Estate Tax Exemption in
effect during the year of the death of the decedent, or one-
half (1/2) of the Trust Estate.

As a method of illustration of specific amounts for
the Estate Tax Exemption, the Trustee is directed to

REVOCABLE LIVING TRUST Page 6

distribute to the DECEDENT'S TRUST an amount equal, in each
year, to the amounts as indicated below.

| DATE OF DEATH | EQUIVALENT ESTATE TAX EXEMPTION |
|---|---|
| 1990 and after | $600,000 |

In determining the equivalent Estate Tax Exemption,
the Trustee is to take into consideration any lifetime gifts
made which may decrease the actual amount available to
transfer to the DECEDENT'S TRUST. The Trustors acknowledge
that their intent is that the amount to be distributed to the
DECEDENT'S TRUST shall not exceed an amount which will
provide for a zero (0) tax upon the death of the first of the
Trustors to die.

B. Survivor's Trust

All of the rest and residue of the assets of the
Trust Estate shall be allocated to the SURVIVOR'S TRUST.

C. Other Transfers

In the event that property is received by the
Trustee, either by Inter Vivos or Testamentary Transfer, and
directions are contained in the Instrument of Transfer for
allocation to or between the SURVIVOR'S TRUST and the
DECEDENT'S TRUST, then the Trustee shall make allocation in
accordance with such directions, anything to the contrary
notwithstanding. In the event no specific instructions are
given as to allocation, such property as is received from a
source other than the Trustors (or either of them), shall be
placed in the SURVIVOR'S TRUST.

VI. SURVIVOR'S TRUST

A. Distribution of Income

All the net income shall be distributed in
convenient installments not less frequently than quarterly to
the Survivor during his or her lifetime.

B. Powers of Appointment of Principal

During his or her lifetime, the Survivor shall have
a general power to appoint the principal and any
undistributed income of the SURVIVOR'S TRUST or any part
thereof, to himself or herself, or to any person or persons.

REVOCABLE LIVING TRUST Page 7

Upon the death of the Survivor, he or she shall have the power to appoint the principal and any undistributed income of the SURVIVOR'S TRUST or any part thereof to his or her Estate or any person or persons, or to the DECEDENT'S TRUST. Such power of appointment shall be exercised only by means of written directions executed by the Survivor and delivered to the Trustee during the lifetime of the Survivor. If the Survivor executes and delivers more than one such written direction to the Trustee, the last one shall control unless, by its context, the Survivor clearly indicates otherwise.

### C. Death of Survivor

Upon the death of the Survivor, the SURVIVOR'S TRUST shall terminate. The Trustee shall distribute the Trust Estate in accordance with and to the extent provided by the Survivor's exercise of his or her power of appointment. All specific gifts itemized and listed on Schedule D hereof to be distributed by the Trustee at that time shall then be distributed by the Trustee. Any part of the Trust Estate with respect to which the Survivor shall not have exercised his or her power of appointment shall become a part of the trust established under Article VIII hereof, and be administered by the Trustee, in accordance with the provisions set forth herein.

## VII. DECEDENT'S TRUST

### A. Distribution of Income

All of the net income shall be distributed in convenient installments, not less frequently than quarterly, to the Survivor during his or her lifetime.

### B. Distribution of Principal

The Trustee shall also distribute principal to the Survivor, which in the sole discretion of the Trustee is necessary to provide proper support for the Survivor as defined under Article IX and Article XXXI. A.2.

### C. Survivor's Power of Appointment

The Survivor, during his or her lifetime, shall have the power to appoint the principal and undistributed income of the Trust Estate, or any part thereof, to himself or to herself, or to any person or persons; however, the Survivor may exercise said power of appointment during any calendar year only to the extent of Five Thousand Dollars ($5,000) or

REVOCABLE LIVING TRUST Page 8

five percent (5%) of the aggregate value of the Trust Estate,
whichever amount shall be greater. Any such power of
appointment shall not be construed to be cumulative and if
not exercised in any calendar year, such power shall be
terminated as to that year. Such power of appointment shall
be exercised only by means of written direction executed by
the Survivor and delivered to the Trustee during the lifetime
of the Survivor. If the Survivor executes and delivers more
than one such written direction to the Trustee, the last one
shall control unless, by its context, the Survivor clearly
indicates otherwise.

### D. Death of Survivor

Upon the death of the Survivor, the DECEDENT'S TRUST
shall terminate, and shall become a part of the Trust created
under Article VIII, and be administered in accordance with
the provisions of said Article.

## VIII. CHILDREN'S TRUST

### A. Income and Principal Prior to Division

Prior to division of the Children's Trust as
provided for in Paragraph C hereinafter, the Trustee is
directed to add any undistributed income to the principal.

### B. Advancements

#### 1. Request for Advancements

Any Beneficiary of this Trust may, at any time,
and upon successive occasions, by written instrument filed
with the Trustee, request an advancement or advancements on
his or her ultimate anticipated share of the Children's
Trust. If, in its sole discretion, the Trustee determines
that the requested advancement or advancements will be used
for a worthy objective then the Trustee may make such
advancement or advancements in whole or in part from the
Beneficiary's share of the Trust. As used herein, the term
"worthy objectives" may include, but not be limited to, the
purchase of a home appropriate to the needs and circumstances
of the Beneficiary; the acquisition of a business interest in
keeping with the age, training and experience of the
Beneficiary, provided that such business interest is needed
for the support of the Beneficiary and his or her family, and
further provided that there is a reasonable probability of
success in the judgment of the Trustee; and the continuance
of the education of any Beneficiary on a full-time program in
an institution of higher learning either on an undergraduate

REVOCABLE LIVING TRUST Page 9

or graduate level or at a trade or vocational school, with expenses including, but not limited to, tuition, books, laboratory fees, room, board and a reasonable spending allowance. The Trustee shall incur no liability or obligation to any Beneficiary or any other person by an exercise, or nonexercise, in good faith of its discretion hereunder.

C.   Division of Children's Trust

1.   Time of Division

The Children's Trust shall be divided into shares immediately upon the death of the survivor of the Original Trustors.

2.   Terms of Division

The Trustee shall divide two-thirds of all of the assets then remaining in the Children's Trust, without making any adjustments for payments for support and maintenance for any Beneficiary as provided for under Article X, into equal shares with one share for each of the Trustors' then living children and one share for each deceased child of the Trustors who then has issue surviving. The sole children of the Trustors are YAACOV a.k.a. JACOB VENDRIGER and ADI VENDRIGER.

The Trustee shall divide the remaining one-third of the Trust Estate into as many shares as there are then living grandchildren. The share arising out of the existence of each grandchild shall be added to the share of the parent of such grandchild for the benefit of said parent.

The division shall be on a per stirpes basis, except that if none of the Trustors' children survive and if only grandchildren survive, the division into shares shall be on a per capita basis. The share of each deceased child shall be divided into proportionate smaller shares, or subshares, for each of such deceased child's then living issue. After the division of the assets into shares and subshares as provided above, the shares shall be distributed and/or held as hereinafter provided.

D.   Distribution and Administration of Children's Trust

The Trustee shall distribute the respective share or subshare to any Beneficiary who is a child of the Trustors immediately upon the death of the Survivor of the Trustors.

REVOCABLE LIVING TRUST Page 10

Trustee shall distribute the respective share or subshare to any Beneficiary who has attained the age of thirty years old. For any Beneficiary who has not attained the age of 30, the following procedures shall govern.

Upon the division of the Children's Trust into shares and subshares and subsequent thereto; income from each share or subshare therefrom shall be paid not less than quarter-annually to or for the benefit of the respective Beneficiary. In addition to income, the Trustee shall distribute the principal from the respective share or subshare to the Beneficiary upon the Beneficiary's attaining or having attained the age of 30.

In the event a Beneficiary of the Trustors dies with funds remaining in his or her share or subshare, then such funds shall be paid to his or her then living issue, or if there be no living issue, then to the remaining Beneficiaries of the Trustors, as and in the manner provided for under "Terms of Division."

In the event a Beneficiary elects to have the Trustee continue to administer the distributed portion of the share or subshare, to which such Beneficiary is entitled as hereinbefore provided, or any part thereof, the Trustee may continue to administer such Beneficiary's interest as a separate Trust share in accordance with the terms of Article X and XI hereof, subject to the continuing right of such Beneficiary to withdraw at any time the amounts of said separate Trust share. If a Beneficiary dies with funds remaining in his or her separate Trust share, such funds shall be paid as he or she designated by testamentary or inter vivos disposition, and failing same, to his or her estate. Upon the termination of any share, if any assets are distributable to a person who is not yet entitled to distribution, then the distributable share of such Beneficiary shall at once vest in him or her, but the Trustee in its sole discretion, may continue to hold such distributable share until said Beneficiary is entitled to distribution, using so much of the income and/or principal thereof as may be necessary in the opinion of the Trustee for the support of such beneficiary and paying to such Beneficiary the then remaining assets of his or her share upon his or her becoming entitled to distribution. If the said Beneficiary dies prior to such time as he or she would be entitled to distribution, all the remaining assets of such individual's interest in the Trust share otherwise payable to him or her shall be paid to the estate of such Beneficiary.

REVOCABLE LIVING TRUST Page 11

E.  Provision for Grandchildren

If, prior to the termination of the Children's
Trust, any of the Trustors' children are deceased with issue
surviving, then the Trustee may, in its discretion, support
such issue of deceased children as though they were children
of the Trustors.

F.  Termination

1.  No Issue Surviving

In the event that no issue of the Trustors
survive the Trustors' deaths, or survive the distribution of
the Trust Estate, then and in that event all of the assets
that would have been a part of the Trust Estate shall be
distributed in the following manner: any assets of the Trust
Estate which for any reason cannot be distributed in this
manner shall be distributed fifty percent to the otherwise
lawful heirs free of trust and fifty percent to charitable
facilities in Israel for the benefit of injured soldiers.

2.  Discretionary Termination

Any time that a Trust or Trust share created
under this Agreement has, in the judgment of the Trustee, a
value so low that the expenses of maintaining the Trust
cannot be reasonably justified, the Trustee may, in its
discretion, but is not required to, terminate such Trust or
Trust share.  In case of such termination, the Trustee shall
distribute forthwith the share so terminated to the primary
Beneficiaries thereof.

3.  Mandatory Termination

The Trust Estate shall terminate in any and all
events not later than twenty-one (21) years after the death
of the last surviving Beneficiary herein named who is living
at the time of death of the Decedent, it being the intent of
the Trustors that this Trust Agreement shall be interpreted
so as not to violate the Rule Against Perpetuities.  The
Trust Estate, upon such termination, shall be distributed to
the Beneficiaries for whom, at that time, a share or subshare
has been set aside, each such Beneficiary to receive his or
her share or subshare and any accumulations thereon.

IX.  SUPPORT AND MAINTENANCE

If the Trustee of any Trust hereunder deems the net
income payable from such Trust not sufficient to support any

REVOCABLE LIVING TRUST Page 12

Beneficiary entitled to receive such support pursuant to the
terms of this Trust Agreement, then the Trustee may, as often
as it deems necessary, pay to or apply for the use and
benefit of such Beneficiary such part of the principal of
such Trust, up to and including the whole thereof, as the
Trustee in its discretion believes necessary for the support
of such Beneficiary.

### A. Standards

In exercising its discretion hereunder, the Trustee
shall take into consideration the income, earning capacity,
resources and other sources of receipt of the Beneficiary,
together with any other factor which the Trustee may deem
pertinent, including the accustomed manner of living of such
Beneficiary, but need not require the exhaustion of personal
resources as a condition for making disbursements under the
authority of this paragraph. The judgment of the Trustee as
to the propriety and amount of all such payments shall be
conclusive.

Notwithstanding any provision to the contrary, the
Trustee shall not distribute principal except within the
standards of Internal Revenue Code 2041.

### B. Evidence of Need

The Trustee may, in its discretion, require as a
condition precedent to the distribution of any Trust assets
for support or advancement, that the Beneficiary furnish
evidence of his or her financial condition, income, earning
capacity and assets, in form and content satisfactory to the
Trustee. The Trustee shall be entitled to rely upon the
written certification of such Beneficiary or the guardian of
such Beneficiary as to the nature and extent of such
Beneficiary's needs for support, and the inadequacy of such
Beneficiary's resources apart from the Trust. The Trustee
shall not be required to make further inquiry as to the
authenticity of the facts so certified.

### C. Preferences

In exercising its discretion hereunder, the Trustee
is to consider the needs of the Survivor for support as the
primary purpose of the Trusts during his or her lifetime,
even if the satisfaction of such needs requires invasion of
the entire Trust Estate.

After the death of the Survivor, the support of the
children shall be paramount to the conservation of the Trust

Estate for the benefit of those who will be entitled to take
it on termination.  The Trustee shall, in exercising the
discretion given herein for the benefit of the children or
their issue, do so in such a manner as will encourage thrift,
industry, and self-reliance to the maximum extent practicable
by the respective Beneficiaries, and discourage extravagance
or indolence on the part of any such Beneficiary.

### D.  Guardian's and Conservator's Expenditures

The Trustors do not desire that the guardian or
Conservator of any Beneficiary should incur personal expense
for the support of such Beneficiary.  The Trustee shall
disburse funds from such Beneficiary's Trust Estate for the
purpose of reimbursing such guardian or conservator for
reasonable expenses incurred in accommodation of such
Beneficiary.

### X.  POWERS OF TRUSTEE

The Trustee shall have the following powers, duties and
discretions in addition to those otherwise granted herein or
by law, and except as elsewhere herein specifically
restricted.

### A.  Retention

The Trustee shall have the power to retain, without
liability for loss or depreciation resulting from such
retention, the original assets and all other property
hereafter transferred, devised or bequeathed to the Trustee,
although such property may not be of the character prescribed
by law or by the terms of this instrument for the investment
of other Trust assets; and, although it represents a large
percentage or all of the Trust Estate, this said original
property may accordingly be held as a permanent investment.

The Trustee shall have the power, with respect to
any business interest that may become a part of the Trust
Estate, whether organized as a sole proprietorship,
partnership, or corporation, and upon such terms for such
time and in such manner as it may deem advisable, to hold,
retain and continue to operate such business solely at the
risk of the Trust Estate and without liability on the part of
the Trustee for any losses resulting therefrom; to dissolve,
liquidate, or sell at such time and upon such terms as the
Trustee may deem advisable; to incorporate such business and
hold the stock as an asset of the Trust Estate; to use the
general assets of the Trust for the purpose of the business;
to borrow money for business purposes and pledge or encumber

the assets of the business or the other assets of the Trust
Estate to secure the loan; to employ such officers, managers,
employees or agents as it may deem advisable in the
management of such business, including electing directors,
officers, or employees of the Trustee to take part in the
management of such business as directors or officers.

B.  General Property Powers

The Trustee shall have all such powers and is
authorized to do all such acts, take all such proceedings and
exercise all such rights and privileges in the management of
the Trust Estate as if the absolute owner thereof, including,
without limiting the generality of the terms, the right to
manage, control, sell, convey, exchange, partition, assign,
divide, subdivide, improve, or repair; to grant options and
to sell upon deferred payments; to lease for terms within or
extending beyond the duration of the Trust concerned for any
purpose, including the exploration for and removal of oil,
gas and other minerals; to enter into community oil leases,
pooling and unitization agreements; to create restrictions,
easements and other servitudes; to compromise, arbitrate or
otherwise adjust claims in favor of or against the Trust; to
institute, compromise and defend actions and proceedings at
the expense of the Trust Estate; and to carry such insurance
as the Trustee may deem advisable.

C.  Powers Regarding Securities

The Trustee shall have, respecting securities, all
the rights, powers and privileges of an owner, including the
right to vote stock, give proxies, pay assessments and other
sums deemed by the Trustee to be necessary for the protection
of the Trust Estate; to participate in voting trusts, pooling
agreements, foreclosures, reorganizations, consolidations,
mergers and liquidations, and in connection therewith, to
deposit securities with and transfer title to any protective
or other committee under such terms as the Trustee may deem
advisable; to exercise or sell stock subscription or
conversion rights; to open an account with a brokerage firm
of the choosing of the Trustee in the Trustee's name, in its
own behalf for the purpose of purchasing and selling of all
kinds of securities and authorizing such brokerage firm to
act upon any orders, including margin orders, options, both
covered and uncovered, instructions with respect to such
accounts and/or the delivery of securities or money therefrom
and received from said Trustee; and to retain as an
investment any securities or other property received through
the exercise of any of the foregoing powers.  The Trustee is
further authorized to sign, deliver and/or receive any

REVOCABLE LIVING TRUST Page 15

documents necessary to carry out the powers contained within
this paragraph.

### D. Exercise Stock Options

The Trustee is expressly authorized in the Trustee's
sole discretion to exercise any option to purchase stock
under any stock option purchase plan in which any Decedent
Beneficiary is a participant or may hold such option rights
to the extent that any such option rights may be exercised by
the Trustee even though the stock involved is stock of a
corporation which may be serving as corporate Trustee
hereunder, regardless of the amount of such stock or the
percentage of the Trust Estate which may be invested in such
stock before or after any purchase under such option.

### E. Investment Powers

#### 1. General

The Trustee has the power to invest and reinvest
principal and income, to purchase or acquire therewith every
kind of property, real, personal or mixed, and every kind of
investment, specifically including, but not by way of
limitation, shares in one or more mutual funds, in any Common
Trust Funds administered by the Trustee, corporate
obligations of every kind, and stock, preferred or common,
which persons of prudence and discretion and intelligence
acquire for their own accounts.

The Trustee is further authorized to buy, sell
and trade in securities of any nature (including short sales)
on margin, and for such purposes may maintain and operate
margin accounts with brokers, and may pledge any securities
held or purchased by him with such brokers as security for
loans and advances made to the Trustee.

#### 2. Life Insurance and Annuities

The Trustee is authorized in the Trustee's
discretion to maintain and/or purchase policies of life
insurance and/or annuities on the life or for the benefit of
any Trust Beneficiaries and to hold and pay for the same as
an investment and asset of the Trustee, at any time and upon
successive occasions, the premiums to be charged against
income or principal, as the Trustee shall determine.

The Trustee shall have the following powers,
duties and discretions with respect to policies of life
insurance held as a part of the Trust Estate:

REVOCABLE LIVING TRUST  Page 16

      a.  The Trustee may pay premiums, assessments or other charges with respect to such policies together with all other charges upon such policies or otherwise required to preserve them as binding contracts, but shall be under no duty to do so.

      b.  In the event that the Trustee intends not to pay any premium, assessment or other charge with respect to any policy held by it, or otherwise intends to cancel, convert or substantially modify any such policy, it shall first give the insured, or the guardian of the person of an insured under disability, at least fifteen (15) days' advance written notice of its intention to take such action.

      c.  Any amounts received by the Trustee with respect to any policy as a dividend shall be treated as principal.

      d.  Upon the receipt of proof of death of any person whose life is insured for the benefit of any Trust hereunder, or upon maturity of any policy payable to a Trustee prior to the death of the insured, the Trustee shall collect all sums payable with respect thereto and shall thereafter hold such sums as principal of the respective Trust Estate, except that any interest paid by the insurer for a period subsequent to maturity shall be considered as income.

      e.  The Trustee may accept any payments due it under any settlement arrangement made before or after the death of the insured and may exercise any rights available to it under such arrangement.

      f.  The Trustee may compromise, arbitrate or otherwise adjust claims upon any policies, and may, but shall not be required to exercise any settlement options available under such policies.  The receipt of the Trustee to the insurer shall be a full discharge and the insurer is not required to see to the application of the proceeds.

  F.  Determination of Income and Principal

      The Trustee shall have the power and the authority to determine income and principal, and how receipts and disbursements, including the fees of the Trustee, shall be credited, charged or apportioned as between income and principal; however, all such determination shall be made in accordance with the law of the state of the situs of the Trust and the decision and the accounts of the Trustee in

REVOCABLE LIVING TRUST   Page 17

accordance with said provisions shall be binding on all persons in interest.

Notwithstanding the foregoing, the Trustee shall: (1) allocate to principal all dividends or other payments made by any corporation or mutual investment company that are designated by the company as a distribution of capital gains; (2) where a premium has been paid or a discount received in connection with the purchase of a bond, amortize such premium or discount by making an appropriate charge or credit to income as the case may be; and (3) charge income from time to time with a reasonable reserve for (a) depreciation of all income-producing depreciable real or personal property, and capital improvements and extraordinary repairs on income-producing property; (b) depletion of all depletable natural resources; and (c) all intangible property having a limited economic life. Such allocations and charges need not be made, however, if written consents are obtained from all income Beneficiaries and remaindermen, vested or contingent, living and competent to act.

G.  Authority to Borrow and Encumber

Trustee shall have the power to borrow money for any Trust purpose upon such terms and conditions as the Trustee may deem proper, and to obligate the Trust Estate for repayment and to encumber the Trust Estate or any of its property by mortgage, deed of trust, pledge or otherwise, using such procedure to consumate the transaction as the Trustee may deem advisable.

In addition to the power to encumber property for a loan bring made to the Trust, the Trustee is specifically authorized and empowered to obligate, hypothecate and encumber the estate by mortgage, deed of trust, pledge or otherwise, or whatever form the Trustee deems appropriate, or to act as a third party guarantor to guarantee private borrowings of the Trustors or either of them during their joint lifetime. Upon the death of the decedent, such guarantee may only be made from the Survivor's Trust.

H.  Loans

1.  To Trust

The Trustee shall have the power to, in the Trustee's discretion, advance funds to any Trust herein created for any Trust purpose, such advances with interest at current rates to be a first lien on and be repaid out of principal and as an expense of the Trust; and to reimburse

REVOCABLE LIVING TRUST   Page 18

the Trustee from principal or accumulated income for any loss or expense incurred by reason of the Trustee's ownership or holding of any property in this Trust.

### 2.  To Beneficiaries

The Trustee may, at any time and upon successive occasions, loan such sums to the Beneficiaries or any of them as the Trustee shall deem advisable and in the best interest of the Beneficiaries, such loan or loans, if made, to bear interest at the prevailing rate and to be unsecured or secured, as the Trustee may, in the Trustee's discretion, direct.  Provided, however, that the Trustee shall have wide discretion in the making or denial of any such loan, and the Trustee's judgment in the matter shall be conclusive and binding on any Beneficiary requesting any such loan.

### I.  Distributions to or for Minor or Incompetent

If at any time any Beneficiary entitled to receive income and/or principal hereunder shall be a minor or an incompetent or a person whom the Trustee deems to be unable, wisely or properly, to handle funds if paid to him or her directly, the Trustee may make any such payments, in the Trustee's discretion, in any one or more, or any combination, of the following ways:

1.  Directly to such Beneficiary, or

2.  To the natural guardian or the legally appointed guardian, conservator or other fiduciary of the person or estate of such Beneficiary, or

3.  To any person or organization furnishing support for such Beneficiary, or

4.  By the Trustee retaining the principal and making expenditures directly for the support of such Beneficiary.

The Trustee shall not be required to see to the application of any funds so paid or applied, and the receipt of such payee if disbursed for such purpose in the best judgment of the Trustee shall be full acquittance to the Trustee.  The decision of the Trustee as to direct payments or application of funds in the manner herein prescribed shall be conclusive and binding upon all parties in interest if made in good faith.  The Trustee is requested to make all such disbursements in a way calculated to dispense with the necessity of guardianship proceedings.

REVOCABLE LIVING TRUST  Page 19

The Trustee may, in its sole and absolute
discretion, require such reports and take such steps as it
may deem requisite to assure and enforce the due application
of such money to the purposes aforesaid.

J.  Disbursement for Funeral and Last Illness

The Trustee may pay for the last illness, funeral
and burial expenses of either Trustor or of any other
Beneficiary of this Trust unless adequate provision shall
have been made therefor through his or her Probate Estate or
otherwise.

K.  Notification of Trustee

Until the Trustee shall receive written notice of
any birth, marriage, death, or other event upon which the
right to payment from this Trust may depend, the Trustee
shall incur no liability for disbursements or distributions
made or omitted in good faith.

L.  Division of Trusts

In making the distributions to any Trust or share
created under this Agreement, the judgment of the Trustee
concerning the valuation of assets distributed shall be
binding and conclusive upon all Beneficiaries.  The Trustee
may distribute the shares to the various Trusts or to
Beneficiaries by making distribution in cash, or in kind, or
partly in cash and partly in kind, or in undivided
interests, in such manner as the Trustee, in its sole and
absolute discretion, deems advisable.  The Trustee may sell
such property as it deems necessary to make any such division
or distribution.  The Trustee shall not be required to make
physical division of the Trust property, except when
necessary for the purposes of distribution, but may, in the
Trustee's discretion, maintain and keep the assets of any
separate trusts in one or more consolidated trust funds, and
as to each consolidated trust fund, the division into various
shares comprising such trust fund need to be made only upon
the Trustee's books of account, in which each separate trust
shall be allotted its proportional share of the principal and
income of the consolidated fund and shall be charged with its
proportionate part of expenses thereof.

M.  Provision for Taxes

Upon the death of either Trustor or of any other
Beneficiary, any estate, inheritance, succession or other

REVOCABLE LIVING TRUST  Page 20

death taxes, duties, charges or assessments, together with
interest, penalties costs, Trustee's compensation and
attorney's fees which shall become due by reason of the Trust
Estate or any interest therein being includable in the Estate
of either Trustor, or of such other Beneficiary, for such tax
purposes, may be paid from the Trust Estate by the Trustee,
in its discretion, unless other adequate provision shall have
been made therefore.  Any such payments shall be charged to
the principal of the Trust Estate.  The Trustee may make such
payments directly, or to the Executor or other fiduciary of
the Trustors or such other Beneficiary, and may rely upon the
written statement of such fiduciary as to the amount and
propriety of such taxes, interest, penalties and other costs.
The decision of the Trustee as to any such payments shall be
conclusive and binding upon all parties interested in this
Trust or such Estate.  If the Trust Estate shall be then
insufficient or if it be then terminated the Trustee shall be
reimbursed by the persons to whom the Trust Estate shall have
been distributed, to the extent of the amount received by
each distributee.  The Trustee, before making any
distribution of either income or principal, may accordingly
require a refunding agreement or may withhold distribution
pending determination or release of any tax lien.

        The Trustee is authorized to acquire by purchase,
exchange or otherwise, property, real, personal or mixed.,
from the Executor or Administrator of the Estate of any
Beneficiary of this Trust, even though such property may not
be of a character prescribed by law or by the terms of the
Trust instrument for the investment of Trust funds, and
although the acquisition of such property may result in a
large percentage or all of the Trust Estate being invested in
one class of property.  The Trustee is expressly authorized
to retain the property so acquired so long as it shall deem
this advisable and to make secured or unsecured loans to the
Executor or Administrator of such Estate upon such terms as
the Trustee shall deem advisable, such procedures being
authorized to the extent that they do not adversely affect or
diminish the marital deduction available to the Estate.  Such
purchases or loans shall be without liability to the Trustee
for loss resulting to the Trust Estate therefrom.  In any
dealings with the fiduciary of the Estate, the Trustee may
rely upon the statement of such fiduciary as to all material
facts.

        Any portion of the Trust Estate which was received
from any qualified plan as described in Section 2039 of the
Internal Revenue Code of 1954, as amended, or any subsequent
like or similar law, may not be used for any purpose
described in this Article, which would result in inclusion of

                REVOCABLE LIVING TRUST  Page 21

said funds in the taxable Federal Estate of the Trustor so
long as other sources of funds are available.

If the Trustee considers that any distribution from
a Trust hereunder other than pursuant to a power to withdraw
or appoint is a taxable distribution subject to a generation-
skipping tax payable by the distributee, the Trustee shall
augment the distribution by an amount which the Trustee
estimates to be sufficient to pay the tax and shall charge
the same against the Trust to which the tax relates. If the
Trustee considers that any termination of an interest in or
power over Trust property hereunder is a taxable termination
subject to a generation-skipping tax, the Trustee shall pay
the tax from the Trust property to which the tax relates,
without adjustment of the relative interests of the
Beneficiaries. If the tax is imposed in part by reason of
Trust property hereunder and in part by reason of other
property, the Trustee shall pay that portion thereof which
the value of the Trust property bears to the total property
taxed, taking into consideration deductions, exemptions, and
other factors which the Trustee deems pertinent.

N.   Payment of Trust Expenses

The Trustee shall have the authority to pay all
costs, charges and expenses of the Trust Estate, together
with reasonable compensation for the Trustee's services
hereunder, including services in whole or partial
distribution of the Trust Estate; and to employ and
compensate from the Trust Estate such agents, assistants and
attorneys as in the Trustee's judgment shall be necessary to
protect and manage the Trust property.

O.   Estate Settlement

The Trustee is hereby requested to direct any legal
questions or requirements concerning settlement of this Trust
Estate to Stewart Levin, the Trustor's legal counsel.

P.   Right of Trustee to Probate Trust Assets

Notwithstanding any other provisions of this Trust
Agreement, the Trustee may, in its sole discretion, direct
the Executor of the Will of either or both of the Trustors,
to subject up to and including all Trust assets to the
jurisdiction of the Probate Court as if no living transfers
had been made to the Trust.

REVOCABLE LIVING TRUST   Page 22

Q.   Power of Cotrustees To Act Independently

        Notwithstanding any other provision to the contrary,
the Trustors specifically authorize only either of the
original Cotrustees during their joint lives and while
serving as Cotrustees, to act independently of the other and
have the authority to perform all powers and acts as granted
under this Declaration of Trust, except as affects an
interest in real property, by example, but not limited
thereto, to sell, transfer, assign, mortgage, hypothecate or
otherwise encumber the real property of the Trust Estate,
which will necessitate the concurrence of both Original
Cotrustees as long as both are alive.

        Notwithstanding any other provision to the contrary,
the Trustors specifically do not authorize any Successor
Cotrustees during their joint lives and while serving as
Cotrustees, to act independently of the other with respect to
performance of any and all powers and acts as granted under
this Declaration of Trust.

R.   Commence or Defend Litigation

        The Trustee may commence or defend such litigation
with respect to the Trust or any property of the Trust Estate
as the Trustee may deem advisable at the expense of the
Trust.

S.   Compromise Claims

        The Trustee may compromise or otherwise adjust any
claims or litigation against or in favor of the Trust.

T.   Adjustment for Tax Consequences

        The Trustee shall have the power, in the Trustee's
absolute discretion, to take any action and to make any
election to minimize the tax liabilities of this Trust and
its Beneficiaries and to allocate the benefits among the
various Beneficiaries and to make adjustments in the rights
of any Beneficiaries or between the income and principal
accounts, to compensate for the consequence of any tax
election or any investment or administrative decision that
the Trustee believes has had the effect of directly or
indirectly preferring one Beneficiary or group of
Beneficiaries over others.

REVOCABLE LIVING TRUST   Page 23

U.  Budget Income and Expenses

The Trustee shall have the power to budget the
estimated annual income and expenses of the Trust or Trust
share in such manner as to equalize as far as possible
periodic income payments to Beneficiaries.

V.  Interest

The Trustee shall not pay interest on any
distributions required to be made in the Trust Agreement.

XI.  REPLACEMENT OF TRUSTEE

During the time that either of the Original Trustees are
acting as a Trustee, his or her capacity to continue to so
function as a Trustee may be terminated by the written
concurrence of the medical physician who is overseeing the
general health of that Trustee and the remaining Original
Cotrustee or the Successor Trustee who would next be
nominated and appointed to serve as Trustee hereunder.  In
the event that these two designated parties are in agreement,
that one of the Original Trustees or both of them should be
removed as a Trustee, they should deliver their
recommendation to the Successor Trustee who would next be
nominated and appointed to serve as Trustee hereunder, who
shall have the authority to then assume full responsibility
as Trustee of this Trust.  In the event that said Successor
Trustee is unavailable then Alternate Trustee named
hereinabove shall provide all functions of said Successor
Trustee hereunder and shall serve as Trustee.

XII. GENERAL PROVISIONS

The administration of any Trust provided for herein
shall be subject to the following general provisions.

A.  Supplementary Definitions

1.  Children and Issue

The words "children" and "issue" as used herein
shall include natural children and issue of children, and not
legally adopted children and the lawful issue of legally
adopted children.  The word "living" shall include unborn
persons in the persons in the period of gestation.

REVOCABLE LIVING TRUST   Page 24

### 2. Support

The term "support" as used herein shall include proper support, maintenance, medical care, and education, including private grade, secondary or high schools, private or public institutions of higher learning at both undergraduate and graduate levels, professional education, vocational and trade schools, depending upon the abilities and ambitions of the respective Beneficiary.

### B. Annual Accounting

The Trustee shall render an annual accounting to the Beneficiary or Beneficiaries of the Trust not more than one hundred twenty (120) days following the close of the fiscal year of the Trust.

### C. Spendthrift Clause

The interests of the Beneficiaries in the principal and/or income of the Trust shall not be subject to the claim or claims of their creditors or others, nor to legal process, and may not be voluntarily or involuntarily alienated or encumbered.

### D. Partial Invalidity

If any provision of this instrument is void, invalid or unenforceable, the remaining provisions shall nevertheless be valid and carried into effect. If any Trust herein established exceeds the longest permissible period, it shall persist in its period for the longest period permissible, then terminate.

### E. Headings

The headings in this instrument are for convenience only and are not part of the text.

### F. Situs of Trust

The situs of the Trust Estate shall be the state of California. The situs of the Trust Estate may be transferred from California to such other jurisdiction as the majority of the income Beneficiaries may designate, however, only upon written notice given to the Trustee.

REVOCABLE LIVING TRUST   Page 25

### G. Simultaneous Death

If there be no sufficient evidence that the Trustors died otherwise than simultaneously, then for the purposes of this Agreement and the tax effect of this Agreement, it shall be presumed that the Decedent shall be the Husband and the Survivor shall be the Wife.

### H. Counterparts

The Agreement may be executed in any number of counterparts and each shall constitute an original of one and the same instrument.

### I. Application to Probate Court

If any disputes arise as to interpretation of this Agreement, or there is need to obtain Court approval of any accounting or any interpretation in regard to this Agreement, the Trustors direct the Trustee to make application to the Probate Court, it being the intent of the Trustors that the Probate Court shall not assume continuing jurisdiction, except as may be required by law.

### J. Number and Gender

As used in this Trust Agreement, the masculine, feminine and neuter gender, and the plural and singular number shall each be deemed to include the others when the context so indicates.

### K. Trust Shares or Subshares

For purposes of simplicity, the Trustors have used in this Trust Agreement the terms "shares" and "subshares." The Trustors intend, however, that each share or subshare shall be a separate Trust.

### L. No Contest Provision

If any beneficiary in any manner, directly or indirectly, contests this instrument or any of its provisions, any share or interest in the trust given to that contesting beneficiary under this instrument is revoked and shall be disposed of as if that contesting beneficiary had predeceased the Trustors.

This is to witness that We, the undersigned Trustors, respectively, have read the provisions of this Trust Agreement and understand the provisions therein, and it

REVOCABLE LIVING TRUST   Page 26

is our intent to enter into this Trust Agreement in
accordance with Community Property law, allowing a Husband
and Wife to enter into a contract with each other regarding
community property.

        IN WITNESS WHEREOF, the provisions of this
Declaration of Trust shall bind OSCAR WENDRIGER and TANIA
WENDRIGER as Trustors, and OSCAR WENDRIGER and TANIA
WENDRIGER as Cotrustees; Successor Trustees assuming the role
of Trustee hereunder, and the Beneficiaries of this Trust, as
well as their successors and assigns.

        Dated at _Lo, Ang___, California,
this _7_ day of _May_, 1990.

TRUSTORS:

_Oscar Wendriger_
OSCAR WENDRIGER

_Tania Wendriger_
TANIA WENDRIGER


                              COTRUSTEES:

                              _Oscar Wendriger_
                              OSCAR WENDRIGER

                              _Tania Wendriger_
                              TANIA WENDRIGER


REVOCABLE LIVING TRUST    Page 27

STATE OF CALIFORNIA  )
                     )
COUNTY OF LOS ANGELES )

On _____, 1990, before me, the
undersigned, a Notary Public in and for said County and
State, personally appeared OSCAR WENDRIGER and TANIA
WENDRIGER, personally known to me or proved to me on the
basis of satisfactory evidence to be the person(s) whose
name(s) is/are subscribed to the within instrument and
acknowledged that he/she/they executed the same.

WITNESS my hand and official seal, this ___ day of
_____, 1990.

_____
Notary Public in and for
said County and State

OFFICIAL SEAL
Frances Dauphin Shapiro
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
My comm. expires AUG 27, 1993

REVOCABLE LIVING TRUST   Page 28

# EXHIBIT B

# EXHIBIT 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NOTICE OF ERRATA

1    Hon. Glen M. Reiser (Ret.)
     JAMS
2    555 West 5th Street 32nd Floor
3    Los Angeles, CA 90013
     Tel: 213-253-9796
4
     COURT-ORDERED §639 REFEREE
5    ON SETTLEMENT OF ACCOUNT

6

7

8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                            **COUNTY OF LOS ANGELES**

10
     IN THE MATTER OF                          **Case No.: BP136769**[1]
11   THE FRANKLIN HENRY MENLO
     IRREVOCABLE TRUST                         Assigned to LASC Dept. 3
12   ESTABLISHED                               Judge: Hon. Ana Maria Luna
     MARCH 1, 1983
13                                             JAMS Reference # 1220070187
14   AND CONSOLIDATED MENLO
     FAMILY TRUST CASES
15                                             **REPORT AND RECOMMENDATION OF THE
                                               COURT-APPOINTED REFEREE ON
16                                             EXAMINATION AND ADJUDICATION OF
                                               THE TRUSTEE'S FIRST, SECOND, AND
17                                             THIRD ACCOUNTINGS ON EACH OF THE
                                               TWENTY-FOUR TRUSTS AT ISSUE FOR
18                                             THE TRUST PERIODS SEPTEMBER 10, 1996-
                                               JUNE 30, 2013, JULY 1, 2013-DECEMBER 31,
19                                             2016 AND JANUARY 1, 2017-SEPTEMBER 30,
                                               2018**
20
                                               **[Code Civ. Proc. §639]**
21
                                                 Referee: Hon. Glen M. Reiser (Ret.)
22

23

24

25
     [1] Consolidated with LASC Case Nos BP139977; BP139978; BP139999; BP140000; BP140001;
26   BP140002; BP140003; BP140004; BP140005; BP140007; BP140008; BP140009; BP140010; BP140011;
     BP140012; BP140013; BP140014; BP140015; BP140016; BP140017; BP140018; BP140019; BP140020;
27   and BP154676.

28
                    REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
                                               1

## MATTERS APPLICABLE TO ALL THREE REFEREE'S REPORTS and STATEMENT OF THE CASE

### The Children's Trusts

Sam Menlo ("Sam") and Vera Menlo ("Vera") raised five children: Madeline, Judith, Franklin, Deborah and Norine. In 1983, irrevocable trusts were created for the four oldest children and in 1985, an irrevocable trust was created for Norine.

The named grantor in each of the Children's Trusts is its beneficiary, not Sam or Vera. Under the trust terms, Frank's irrevocable trust, in which he is the named grantor, is to be distributed 25% of trust principal on his 30th birthday (March 1, 1990), 33% on his 35rd birthday (March 1, 1995), and the balance on his 40th birthday (March 1, 2000). Each of the four daughters' irrevocable trusts, in which each of them are the named grantor, is to be distributed 50% of trust principal on their respective 40th birthdays (extending from August 9, 1998 [Madelyn] to April 25, 2006 [Norine]), and 50% on their respective 50th birthdays (extending from August 9, 2008 [Madelyn] to April 25, 2016 [Norine].)[2]

Each of the Children's Trust agreements vests the Trustee with the management rights of an "absolute owner." Each of the Children's Trust agreements exculpates the Trustee from liability for any actions or failures to act of conducted "reasonably and in good faith." Each of the trust agreements authorizes an annual trustee fee of .05% of the sum of trust assets under management and that year's trust income.

The originally appointed co-trustees of the Children's Trusts died long ago. After a brief period of time in which family members, including Frank, served as a co-trustee, **on September 10, 1996**, Leslie Klein ("Klein"), a Beverly Hills estate planning attorney and certified public accountant, accepted his role as sole successor trustee of the Children's Trusts.

---

[2] Judith died on June 15, 2011. Accountings of Judith's trust have not been presented to the Referee nor are they part of the assigned reference determinations.

**The Grandchildrens' Trusts.**

Sam and Vera, both now deceased, had 36 grandchildren at the time of Vera's recent passing. In 1985, several months after the creation of Norine's trust, Sam and Vera had ten grandchildren: Dov Lipchitz, Rochelle Lipchitz, Avi Lipchitz, Faye Lipchitz, Asher Frankel, Yeshaya Frankel, Moishe Frankel, Mordechai Deutsch, Zev Deutsch and Jonathan Menlo. Sam and Vera established an irrevocable trust for each of them in October 1985.

Ten additional grandchildren were born between 1986 and 1993: Jeremy Winter, Michael Winter, Amanda Winter, Daniel Winter, Rochelle Deutsch, Abraham Deutsch, Samuel Deutsch, Esther Deutsch and Tanya Menlo. Sam and Vera established an irrevocable trust for each of them on various dates between November 1986 and October 1997.[3]

A trust also appears to have been created by Sam and Vera in December 2002 in favor of Jonathan Lifschutz, the husband of Sam and Vera's granddaughter, Rochelle Lipchitz. Accountings have been submitted by Klein with respect to Jonathan Lifschutz' trust, and have been the subject of objections included within the reference to the undersigned. The Jonathan Lifschutz Trust dated December 26, 2002 is intended to be included within the term "Grandchildren's Trusts."

Unlike the Children's Trusts, Sam and Vera were the named co-grantors of each of the Grandchildren's Trusts. Though virtually identical to the Children's' Trusts with respect to the breadth of trustee powers, exculpation from good faith actions or failures, and authorization for trustee fees, each of the Grandchildren's Trusts specifically articulates the Trustee's duty to account to each of the beneficiaries "annually or in other reasonable increments."

---

[3] The remaining sixteen grandchildren, all of whom were born after 1993, each have separate trusts managed by Klein; however, none of those remaining trusts are the subject of the instant accounting reference. The term "Grandchildren's Trusts" as used in this Report and Recommendation, therefore, is intended to exclude the trusts of any and all grandchildren born after 1993.

The distributive calculus of the Children's Trusts is replicated in the Grandchildren's Trusts; *i.e.*, 25% principal distribution to the males at age 30, 33% at age 35, the balance at age 40, with 50% principal distribution to the females at age 40 and the balance at age 50.[4]

As with the Children's Trusts, Klein agreed to serve as sole successor trustee of each of the Grandchildren's' Trusts effective September 10, 1996, with the exception of the two subject trusts created after that date, Daniel Winter and Jonathan Lifschutz, as to which Klein accepted the appointment as sole trustee upon trust creation in October 20, 1997 and December 26, 2002, respectively.[5]

### The Accounting Petitions in Their Statutory and Procedural Contexts.

In 1990, six years before Klein assumed trusteeship of the Children's Trusts and the Grandchildren's Trusts, the California Legislature repealed and then reenacted the California Probate Code. (Stats. 1990, ch.79.) [6] One of the provisions repealed and reenacted is Probate Code §16062(a), which stated at the time of its enactment in 1986:

> "Except as provided in Section 16064, **the trustee shall account at least annually**, at the termination of the trust, and upon a change of trustees, to each beneficiary to whom income or principal is required or authorized in the trustee's discretion to be currently distributed." (Emphasis added.) [7]

---

[4] Klein testified at trial that he has never had any intention of distributing under these terms.

[5] Klein testified at trial that, in addition to being the named Trustee, he was the draftsman of these later trusts.

[6] Section 16062 was added by 1986 Cal. Stat. ch. 820 § 40 and amended by 1987 Cal. Stat. ch. 128 § 13. Subdivision (a) superseded parts of subdivisions (b) and (c) of former Probate Code Section 1120.1a and parts of former Probate Code Sections 1121 and 1138.1(a)(5) (provisions repealed by 1986 Cal. Stat. ch. 820 § 31). The requirement of an annual account is drawn from the statute formerly applicable to testamentary trusts created before July 1, 1977. See former Prob. Code § 1120.1a (repealed by 1986 Cal. Stat. ch. 820 § 31). [California Law Revision Commission, Recommendation Proposing New Probate Code, December 1989.]

The code section preface was amended to state "Except as otherwise provided in this section and in Section 16064" in 1983 when additional code subsections, none of which are applicable here, were added to §16062. [Stats. 1993 ch 293 §6.5.]

[7] Probate Code §16064 permits the language of a trust agreement to waive an accounting, and separately authorizes a beneficiary to waive an account in writing. None of the Children's Trusts or the Grandchildren's Trusts contain language waiving an account. The Grandchildren's Trusts require an

From the time of Klein's acceptance of 22 trusteeships in 1996, one in 1997, and one in 2002, until ordered by the Court in 2013, Klein never once accounted to any of the 24 beneficiaries.

While Klein did from time-to-time forward institutional brokerage account statements to one or more of the beneficiaries, the brokerage assets represent only a fraction of the scope of the Children's and Grandchildren's Trusts, which trusts were specifically designed to subsidize and ultimately distribute tens of millions of dollars in life insurance policy benefits taken on the joint lives of Sam and Vera Menlo. Insurance policy information, loans between the trusts, and loans and withdrawals taken by Klein utilizing the accounts and insurance policies as collateral, for example, were not provided.

Probate Code §16063(a), enacted in 1997 (Stats 1997 ch 724 §26), clarifies that a trustee's required annual account *must* include a statement of receipts and disbursements of annual principal and income; a statement of the current assets and liabilities of the trust; the trustee's compensation for the last complete fiscal year; the agents hired by the trustee, their relationships to the trustee and their compensation for the last complete fiscal year; a statement that the beneficiary may petition the court under Probate Code §17200 to review the accounting and the acts of the trustee; and a statement of the three-year limitations period to bring an action after receipt of the account. Klein did none of these things beyond periodically forwarding selected banking/brokerage statements.

On September 18, 2012, nearly ten years ago, Franklin Menlo filed a petition in BP136679 attempting to file a single action on behalf of numerous Menlo trust beneficiaries against Klein, seeking Klein's removal as trustee, demanding an accounting and requesting surcharge. Upon a verified October 24, 2012 "preliminary" objection from Klein, *inter alia*, that

---

accounting "annually or in other reasonable increments," thereby providing the trustee with slightly more flexibility in the timing of those accountings than with respect to the Children's Trusts, which contain no accounting language whatsoever, thereby defaulting to the requisite annual requirement of Probate Code §16064. No evidence was submitted that any of the 24 Children's or Grandchildren's Trust beneficiaries ever waived an accounting in writing or otherwise.

1  a single action involving multiple trusts would be "procedurally impermissible," the Menlo

2  children and grandchildren filed 24 separate verified petitions filed with the Superior Court on

3  March 22, 2013 [see respective case nos. at fn. 1, *ante*].

4     In their verified petitions, the 24 litigating Menlo children and grandchildren each

5  petitioned to remove Klein as their trustee and for an accounting and surcharge.[8] Each verified

6  petition alleges, at ¶ 11:

8        "Respondent Klein, as Trustee of the [Name of Beneficiary] Trust, has violated the duty
         owed to Petitioner as beneficiary of the Trust, in that he has failed and refuses to provide
9        an accounting for the Trust as required by law (California Probate Code §16060 et seq.,
         §16062, §17200 et seq.), notwithstanding written and oral demands from Petitioner for
10       such an accounting commencing in 2011. Klein has never produced an accounting in the
         entire 17 years he has been Trustee of the Trust. The Trust does not waive accounting."
11

12

13     Each petition attaches, as exhibits, written accounting demands previously submitted to

   Klein.

14     On September 18, 2013, in each of the 24 cases, Klein filed a verified first account and

15  report of trustee and petition for approval. Klein began each of those accounting periods not in

16  1996 when he accepted trusteeship of the 22 of the 24 trusts in issue and/or at the time Klein

17  began to manage trust assets, but on seemingly random dates between February 1, 2003 and

18  April 13, 2009.[9]

19

20  _____

21  [8] On May 22, 2013, the Hon. Roy Paul determined each of the 24 trust petitions to be "related" cases.
   On December 20, 2013, the Hon. David J. Cowen ruled that discovery across the related cases would
22  apply to all of the Menlo Trust cases and would not need to be separately propounded. All 24 actions
   were consolidated.
23
   Across the 24 separate cases and the three accountings in each case being litigated, the breadth of the
24  collective register of actions is formidable. In the "lead" case BP136769, there are 1600 documents on
   file, consisting of many hundreds of party submissions and minute orders spanning a decade.
25
   [9] Despite trusteeship since 1996 and many thousands of transactional activities across all 24 Children's
26  Trusts and Grandchildren's Trusts at issue, the "opening" dates utilized in Klein's "first" and
   "supplemental" first accounting are as follows:
27  May 18, 2009 -- Abraham Deutsch
   April 13, 2009 -- Jonathan Lifschultz
28

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
6

Each of the 24 Menlo family beneficiaries filed objections to Klein's account on November 14, 2013.

By formal order filed in the "lead" case on December 20, 2013, then-Commissioner David J. Cowan determined Klein's accountings to be inadequate, specifically directing the trustee to file with the Court a supplemental account containing "a complete accounting" of all transactions made by Klein as trustee, including withdrawals of all funds for loans, investments and purchases, all deposits of funds, and any lines of credit opened utilizing each trust for collateral; a complete accounting with respect to every trust-owned life insurance policy including premiums paid, sources of premium funds, a listing of all loans and cash advances against each policy, and a complete listing of any repayments; a complete accounting of all life insurance policy funds, including loans, utilized by Klein "in part or whole for his own purposes;" a listing of dates, amounts and lending institutions associated with Klein's personal lines of credit utilizing the resources of the trusts or any of its insurance policies; a listing of draws against Klein's personal lines of credit and repayments utilizing trust assets; a complete accounting of all funds provided to Klein by Menlo family members for purposes of subsidizing trust insurance policies or for any other purpose; all business reasons for allowing trust insurance policies to lapse; "[a ]complete and accurate account of the present fair market value of all assets of the Trust," including trust insurance policies; all fees taken by Klein with respect to the trusts,

---

February 27, 2009 -- Rachel Deutsch, Samuel Deutsch, Deborah Deutsch, Zev Deutsch, Esther Deutsch and Mordecai Deutsch
July 23, 2008 -- Franklin Menlo and Tanya Menlo
January 1, 2008 -- Jonathan Menlo
May 23, 2006 -- Rochelle Lipchutz, Yeshia Frankel and Asher Frankel
May 22, 2006 -- Madelein Lipscuitz
May 19, 2006 -- Moise Frankel, Avi Lipchutz, Faye Lipchutz and Dov Lipchutz
February 1, 2003 -- Michael Winter, Daniel Winter, Jeremy Winter, Amanda Winter and Norine Winter

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
7

and any other information necessary to be fully compliant with Probate Code §16063 and §§ 1060 *et seq.*

Commissioner Cowan's order *required Klein's supplemental accounting include "the time period commencing when Leslie Klein first became trustee of the Trust,* to the present day." To the extent Klein was unable to comply with any portion of Commissioner Cowan's order, he was directed to provide a detailed explanation for such failure by January 30, 2014.

Klein filed a verified supplement to each of his 24 verified first amended accounts on January 30, 2014, adding additional financial information *but continuing to commence his accounting periods on the same 2003-2009 dates* previously utilized. Klein's explanation in each of the verified supplements declares that "the Trustee does not currently have detailed financial records for the periods prior to the commencement date" of the respective trust accountings. As Klein goes on to declare, "This is because the Trustee sent such records to Sam Menlo, one of the two Trustors, per Sam Menlo's request. The Trustee did not keep copies of the records he sent at Sam Menlo's request."

Klein testified at trial before the undersigned that Sam Menlo continued to exclusively manage the trusts, despite Klein's sole trusteeship, until Mr. Menlo suffered a debilitating stroke in 2005.[10] Klein's claim that the 1996-2005 trust records were in files in the possession of Sam Menlo, however, could not be corroborated through any other witness or through documentary evidence. Klein also provided no credible explanation as to why all but five of Klein's 24 trust accountings have opening account dates *after* 2005.

Declarations in opposition to Klein's first amended and supplemental accountings over the 24 trusts were filed by the respective Menlo beneficiaries on June 30, 2014. Klein submitted a verified reply on August 1, 2014.

---

[10] This date was contested by Sam Menlo's son, Franklin ("Frank"), who testified that the cerebral hemmorhages rendering Sam Menlo incompetent occurred in 2001 and 2002, at which time Frank took over management of his father's businesses.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

8

On July 14, 2015, over opposition, the Hon. Maria E. Stratton granted the Menlo petitioners' applications to amend their pending petitions in order to name Les Klein & Associates, a Professional Law Corporation ("LKA") as an additional respondent. After a demurrer filed by LKA was granted with leave to amend, on March 24, 2016, the Menlo petitioners filed a second amendment to their September 18, 2013 accounting, removal and surcharge petition. Once a further demurrer filed by LKA was granted with leave to amend, on September 30, 2016, petitioners filed a third amendment to their petitions, again adding LKA as a party respondent. After LKA's successful motion to strike petitioners' third amendment, petitioners filed a fourth amendment on January 25, 2017.[11] LKA filed its answer to the respective petitions on February 21, 2017.

The various Menlo Trust principal distribution dates, as noted at the outset, were based upon the respective age and gender of each beneficiary. As of 2016, many of those dates had passed without a single distribution to any Menlo beneficiary, with the exception of Norine Winter ("Norine"). In March 2016, principal distributions were requested by the Menlo beneficiaries [see factual recitation and analysis in *Menlo v. Klein* (July 20, 2018), case B281058, 2nd Appellate District, Division 3.] As now also contended at trial (see *infra*), Klein claimed that Sam Menlo, who was no longer competent in 2016, had dictated oral instructions to Klein not to distribute, despite the express terms of the trust instruments. As summarized by the Court of Appeal:

> "Although Klein insisted he was simply following Sam's orders, the beneficiaries observed that Klein did not produce a single document corroborating Sam's oral instructions. Klein admitted he never attempted to amend the Menlo Trusts to reflect those instructions. Also, Sam's wife and seller] Vera was unaware that Klein had withheld distribution of funds ... ." [Slip opin., at 6.]

On May 23, 2016, Klein petitioned the trial court for instructions, requesting the ability to make principal distributions, but with the authority to withhold one-half of those distributions to

---

[11] At or about this time, Klein and LKA successfully moved to disqualify the law firm of Sheppard Mullin Richter & Hampton LLP from its representation of the Menlo beneficiaries.

pay for his attorneys in the instant litigation, for continued trust administrative expenses and, *inter alia,* "reconciliation of amounts owned by any Trust to another Trust for money previously advanced." The Menlo beneficiaries contended:

> "[N]one of Klein's proffered reasons for withholding funds from the asset distributions was valid. First, the beneficiaries would pay their pro-rata share of the insurance premiums. They had already asked Klein for payment amounts. Second, they argued, the Trusts did not provide for creation of lines of credit, and *Klein had taken millions of dollars from the lines of credit for which he had not accounted.* Finally, they contended that Klein was not entitled to withhold 'anticipated future litigation expenses' from Trusts that by their terms had already called for a full or partial distribution to beneficiaries." (Italics added.) [Slip opin., at 7.]

On February 22, 2017, Judge Stratton denied Klein's petition for instructions. The Court of Appeal affirmed, determining that Klein, *inter alia*, was "seeking a prophylactic judicial declaration that withholding … funds from the distribution of the Trusts' principal would be in good faith and for the benefit of the Trusts so that Klein could not later be held liable for a surcharge." [Slip opin., at 12.] The California Supreme Court denied Klein's petition for review. Despite the Menlo beneficiaries' requests for principal distributions, despite the express language of the trust instruments, and despite Judge Stratton's ruling and the appellate court's affirmance, Klein to this day has failed to distribute any portion of trust principal to the litigating petitioning Menlo family members other than Norine.

The Menlo beneficiaries, based upon contentions that Klein "withdrew for his own benefit the cash value of the life insurance policies that were supposed to fund the trusts upon the death of Sam and Vera Menlo, used the trust assets to obtain lines of credit against which [Klein] borrowed money for his personal use and benefit, and misappropriated trust assets in order to pay down his personal lines of credit," issued document subpoenas for the production of Klein's personal and business records. Klein and LKA moved to quash delivery of the requested bank records. On March 13, 2017, after the issues were fully addressed before Judge Robert Letteau (Ret.) in his capacity as discovery referee, Judge Stratton approved Judge Letteau's recommendation denying Klein and LKA's motion to quash discovery.

Sam Menlo died on February 5, 2018.[12]

On April 19, 2018, Klein filed a verified Second Account and Report and Petition for Approval for each of the 24 accountings, covering the trust period June 30, 2013-December 31, 2016.[13] The Menlo petitioners filed objections to Klein's second account in the form of declarations on June 27, 2018. Klein filed verified supplements to his 24 second accountings on September 17, 2018. The Menlo petitioners submitted objections to the Klein supplements in the form of a declaration filed on November 1, 2018.

On August 3, 2018, Klein amended his response to the 24 initiating petitions to add additional affirmative defenses.

On November 27, 2018, Klein, joined by LKA, moved to dismiss all 24 initiating Menlo petitions on the procedural ground that the petitions had not been brought to trial within the statutory five years. On March 8, 2019, Judge [previously Commissioner] Cowan determined the motion to be without merit and, in light of a written stipulation by Klein not to rely on the dismissal statute, found Klein to be judicially estopped from taking such a position.[14]

On March 5, 2019, the Menlo petitioners filed a fifth amendment to their initiating pleadings, amending claims against LKA. In the fifth amendment, six Menlo trust beneficiaries -- Deborah Deutsch (through Rafael Deutsch), Madeline Lipschutz, Rochelle Lipchitz, Jonathan Lipschutz, Norine Menlo and Frank Menlo, across the approximately 16,000 Klein-initiated transactions, allege "by way of partial example only" that Klein wrote 23 specific checks totaling

---

[12] Children's Trust beneficiary Judith Frankel predeceased Sam and Vera Menlo and is not a party to this litigation. On June 27, 2015, daughter and Children's Trust beneficiary Deborah Deutsch passed away *pendente lite*. Ms. Deutsch's husband, Rafael Deutsch, formally substituted into the litigation on November 8, 2017 on Ms. Deutsch's behalf.]

[13] Despite the possible latitude of the accounting frequency language in the Grandchildren''s Trusts, the second accounting period of 3.5 years of once again contravenes the "at least annually" mandate of Probate Code §16064 as it relates to the Children's Trusts.

[14] After a denial of reconsideration on the motion to dismiss, Klein petitioned for writ of mandate with the Court of Appeal. (2nd Civil B298667.) Writ relief was denied by the Court of Appeal on September 5, 2019.

$623,500 on individual Trust accounts, including MCT, made payable to LKA. The six petitioners allege that LKA aided and abetted or otherwise conspired with Klein to misappropriate Trust assets. On April 8, 2019, LKA filed its objections and response.

On March 12, 2019, Judge Cowan issued a discovery order based upon representations of Klein and his counsel that Klein "took no part in preparation of the accountings [Klein] had filed." Rather, it was determined that each of Klein's verified accountings, which the undersigned is tasked to settle, were instead prepared by the accounting firm of White, Zuckerman, Warsavsky, Luna & Hunt ("WZ"). At deposition, Klein was directed by his counsel not to answer questions relating to WZ on the basis of attorney-client privilege and work product protection. At the same time, WZ itself was being shielded from discovery as a non-designated consultant of Klein's counsel. The Menlo petitioners claimed that they were being denied essential discovery.

In his 14-page ruling, Judge Cowan concluded in the context of verified accounting approval, Klein had impliedly waived attorney-client privilege with respect to WZ, and that work product protections were inapplicable where the beneficiaries' "understanding the transactions for which WZ prepared accountings… outweighs the interest of attorneys in not having to share their efforts with the opposing party." Klein was directed by Judge Cowan to provide all information and communications by, to and from WZ upon which the verified accounts were based, including those claimed to be privileged.[15]

On May 7, 2019, Klein filed an Amended Second Account and Report for each of the 24 trusts. The Menlo beneficiaries filed objections to the Amended Second Account through declarations filed on July 2, 2019.

---

[15] On April 16, 2019, in coordination with *amicus curiae* The Southern California Association of Defense Counsel, Klein sought appellate relief from Judge Cowan's ruling by petition for writ of mandate with request for immediate stay. (2nd Civil B296957). Writ relief was denied by the Court of Appeal on June 17, 2019. Klein's petition for review and application for stay in the California Supreme Court was denied on June 26, 2019.

On October 25, 2019, as to each of the 24 trusts at issue, Klein filed a Third Account and Report and Petition for Approval for the trust period January 1, 2017-September 30, 2018.[16] On March 5, 2020, the Menlo beneficiaries filed objections to the third account in the form of declarations.

On November 4, 2019, Klein moved to dismiss every initiating petition except the petition of Franklin Menlo ("Frank"), on the theory that Frank was without authority to prosecute the remaining petitions under a written power of attorney delivered to Frank from the respective Menlo trust beneficiaries. In eight-page ruling issued by Judge Cowan on December 10, 2019, Klein's motion to dismiss was denied on a variety of grounds including, once again, judicial estoppel. No writ petition was filed.

Also on December 10, 2019, Judge Cowan granted Klein's motion to bifurcate issues to first "hold a separate trial for the review of each set of the Trustee's Accountings," with each accounting trial to "include any surcharge items resulting from the review of the Accountings at issue." Issues concerning surcharge for professional fees and liability for prejudgment interest were ordered addressed and resolved *after* the Court issues a statement of decision on the accountings.

On September 15, 2021, the Hon. Paul T. Suzuki issued an order appointing the undersigned as a Code of Civil Code Procedure §639(a)(1) referee to conduct consecutive trials on each of Klein's three accounting petitions to commence on or after December 1, 2021.

On November 16, 2021, Klein filed a verified second supplement to each of his first account approval petitions and a verified first supplement to each of his second account approval petitions. The following day, on November 17, 2021, Klein filed a verified first supplement to each of his third account approval petitions. Each of those petitions requests Trustee fees.

---

[16] While the trustee's accounting period intervals had been improving at the time of the third account, from 17 years (1996-2013) to 4½ years (6/30/13-12/31/16) to 1¾ years (1/1/17-9/30/18), the 21-month third accounting period continued to violate the 12-month accounting mandate of Probate Code §16064 as to the Children's Trusts. Currently, no accounting has been filed by Klein since the trust period ending September 30, 2018 (>3¾ years through June 30, 2022), though he continues to serve as trustee for each of the 24 trusts in question.

On January 4, 2022, Judge Suzuki issued an order prohibiting Klein from paying attorney fees and costs from loans taken against insurance policies held by the Menlo Trusts, from the lines of credit created by Klein pledged against institutional brokerage assets, or from the trusts of non-litigating Menlo family members. Judge Suzuki granted Klein's petition for attorney fees without prejudice to the Menlo beneficiaries' pending claims of surcharge.

Co-settlor Vera Menlo died on June 29, 2022, giving rise to tens of millions of dollars in payouts to the Menlo Trusts under the remaining "joint life" life insurance policies which the 24 Menlo Trusts had long subsidized through premium payments. On July 27, 2022, the Hon. Ana Maria Luna ordered that any lines of credit collateralized by the insurance policies were to be frozen.

**The Reference Hearing on the Settlement of Accounts**

Under Judge Suzuki's September 15, 2021 order for reference, the Referee's tasks are as follows:

"1. The Referee shall hold separate trials, to consider all factual and legal issues raised by the parties in connection with the Trustee's three separate acts of accountings, with certain exceptions, as further discussed and ordered below.

2. The Referee shall commence trial on December 1, 2021, or the close estate thereafter that is convenient to the Referee's calendar.

3. The Referee shall hold a separate trial for the review of each set of the Trustee's Accountings (e.g., the trial on the Trustee's First Accountings shall be conducted separate from the trial on the Trustee's Second Accountings). Except as stated below, each separate trial shall include any surcharge issues resulting from the review of the Accountings at issue.

4. Respondent Les Klein and Associates, Inc. shall be included as a respondent in all trial hearings. During the course of the trials on Trustee's accountings, the Referee shall also determine all issues raised in the Amendments to Petitions against Respondent Les Klein and Associates, Inc., including but not limited to all Probate Code Section 850 and 859 issues and all other damages mentioned in Petition's Fifth Amended Petition, except the cause of action for Removal of Trustee. Referee to designate breach cause of action for damages what the relief is.

5. The Referee shall conduct the trial of Trustee's Second Accountings immediately upon the conclusion of the Trustee's First Accountings. The Referee shall conduct the trial of the Trustee's Third Accountings immediately following the conclusion of the trial of Trustee's Second Accountings. The Referee shall have the ability to schedule reasonably brief breaks between trials, as may be necessary, with the overall goal of concluding the three trials in his brief a period of time as is convenient to the Referee's calendar.

6. Certain issues shall be excepted from the scope of trial by Referee and shall be reserved for the Trial Court, as follows: (i) surcharge of Trustee for professional fees, and (ii) liability of Trustee for prejudgment interest. These issues shall be addressed and determined by the Trial Court in a separate hearing following the trials by Referee. This separate hearing be conducted as a second phase of the trials on the accountings at issue, rather than as a completely separate trial.

7. Following the conclusion of the trial of Trustee's Third Accounting, the Referee shall report to the Court his reports concerning the trial of all three of Trustee's accountings, as specified in paragraph number 8.b.2 of [the order for reference]."

In addition to those directions, Judge Suzuki proposed dates for delivery of the Referee's reports, objections to those reports, and the ensuing trial court hearing dates, none of which delivery dates co and uld be accomplished given the schedules of the parties and the Referee, and the sheer magnitude of matters which needed to be heard and determined.

Hearing on the respective accountings was conducted in person in the presence of a certified shorthand reporter over the following days:

First Account: December 15, 2021, December 17, 2021, January 18, 2022, February 1, 2022, February 2, 2022, February 3, 2022, February 8, 2022, February 9, 2022, February 10, 2022, February 15, 2022, February 16, 2022, February 17, 2022, February 23, 2022, March 3, 2022, March 8, 2022 and March 9, 2022 [partial day].

Second account: March 9, 2022 [partial day], March 10, 2022, March 15, 2022 and March 22, 2022.

Third account: March 24, 2022, March 29, 2022 and March 30, 2022.

Petitioning trust beneficiaries Abraham Deutsch, Amanda Winter, Asher Frankel, Avi Lipschutz, Daniel Winter, Deborah Deutsch (by and through her husband, Rafael Deutsch), Dov Lipschutz, Esther Deutsch, Faye Lipschutz, Franklin Menlo, Jeremy Winter, Jonathan Lipschutz, Jonathan Menlo, Madalyn Lipschutz, Michael Winter, Moishe Frankel, Mordechai Deutsch,

Norine Winter, Rachel Deutsch, Rochelle Lipschutz, Samuel Deutsch, Tanya Menlo, Yeshia Frankel and Zev Deutsch appeared at the hearings through their attorney, Donald L. Saltzman of the Law Offices of Donald L. Saltzman. Trustee Les Klein appeared through his attorneys, Terence S. Nunan and Alan D. Weinfeld of Parker, Milliken, Clark, O'Hara and Samuelian. LKA appeared through its attorney, Candice K. Rogers of Hahn & Hahn LLP. All counsel appeared in person except Ms. Rogers, who attended each trial session remotely on the Zoom platform.

The following witnesses appeared either in person or remotely on the Zoom platform and were sworn and testified under oath:

First Account: Leslie Klein (Day 1-Day 3, Day 6-Day 9, Day 15), Dov Lipchutz (Day 4), Jeremy Winter (Day 4), Moishe Frankel (Day 4), Asher Frankel (Day 5), Faye Lipshutz (Day 5), Esther Deutsch (Day 5), Amanda Winter (Day 5)[17], Frank Menlo (Day 5-Day 6), Edward Wirtz (Day 10, Day 16), Duross O'Bryan (Day 11-Day 14, Day 16), Jennifer Magnes (Day 12) and Irwin Lowi (Day 15).

Second Account: Leslie Klein (Day 1, Day 3-4), Duross O'Bryan (Day 2-Day 3), Ed Wirtz (Day 2-Day 3) and Jennifer Magnes (Day 3).

Third Account: Leslie Klein (Day 1-Day 3), Duross O'Bryan (Day 1, Day 3), Jennifer Magnes (Day 2), Ed Wirtz (Day 2) Steven Burgess (Day 2)[18] and Frank Menlo (Day 3).

Many hundreds if not thousands of pages of documentary exhibits beyond the accounts themselves were offered and received into evidence over the course of the respective trials.

---

[17] As to all Menlo family members called to testify other than Frank Menlo, the parties stipulated that their testimony during the trial of the Trustee's First Account should also be deemed testimony received during the trial of the Trustee's Second Account and the Trustee's Third Account.

[18] With respect to Mr. Burgess, the Trustee's life insurance expert, health issues precluded Mr. Burgess' attendance at the trial of the Trustee's First Account and the trial of the Trustee's Second Account. The Referee could not begin to deliberate on the First Account or the Second Account until after Mr. Burgess testified. Mr. Burgess testified during the hearing on the Third Account. The parties stipulated that Mr. Burgess' expert testimony during the Trustee's Third Account should be also deemed testimony received during the trial of the Trustee's First Account and the Trustee's Second Account.

After the final day of testimony, on May 25, 2022, Klein filed a consolidated closing brief across all three accountings. Also on May 25, 2022, LKA filed a motion for judgment.     On June 13, 2022, the Menlo petitioners filed a closing brief on the Trustee's First Account.     On June 16, 2022, the Menlo petitioners filed a closing brief on the Trustee's Second Account and a separate closing brief on the Trustee's Third Account. On July 1, 2022, Klein and LKA each submitted a consolidated reply to the Menlo petitioners' closing brief.[19]

**Klein and LKA's Post-Hearing Contentions**

In his consolidated post-hearing brief, Klein contends that the evidence established that the 24 Menlo trusts were "sabotaged" by Frank Menlo, who stopped paying Klein cash annual exemption gifts in 2012 which had been used, in part, to subsidize the various trust insurance policy payments. Klein references his own testimony that he followed the "wishes and instructions" of the Trusts' co-settlers, Sam and Vera Menlo, at all times.

While Klein did allow four large Phoenix Life Insurance policies to lapse at various points of his trusteeships, Klein contends, consistent with his expert's testimony, that he was acting prudently at the time. Claimant notes that the lapse of Phoenix policies had been recommended in 2011 by a commercial life underwriter, and that Phoenix itself had been on the verge of insolvency.[20]

Klein asks the Referee to disregard the testimony of the Menlo petitioners' forensic economic expert, Duross O'Bryan ("O'Bryan"), on the basis that O'Bryan's review was (a) "tainted" by attorney-client privilege due to the discovery authorized by Judge Cowan's March

---

[19] The Referee at the time of hearing had directed the parties to file single, simultaneous briefs to be filed on or before May 25, 2022. Due to health issues, the Menlo beneficiaries' counsel was unable to comply. Because of the unintended staggered briefing, the Referee authorized Klein and LKA to submit a reply, which they did.

[20] Klein testified that it was his standard practice as Trustee to allow all of the collective tens of millions of dollars of Menlo insurance policies to have their premiums remain unpaid until just before their respective lapse period was set to expire due to nonpayment. Evidence established that this had *not* been the practice prior to 2005, despite Klein's testimony to the contrary.

12, 2019 discovery order; and (b) based upon voluminous pages of institutional banking and insurance documents alleged to be hearsay in contravention of *People v. Sanchez* (2016) 63 Cal. 4th 665 ("*Sanchez*"). Klein further contends his fair trial rights were compromised as the Menlo petitioners filed their exhibit list late, and continued to update their exhibits throughout the hearings.

Klein argues that even if the Referee finds breach(es) of trust, the Menlo trust instruments expressly exculpate Klein from liability for all trust breaches committed "reasonably and in good faith." In this vein, Klein contends that irrespective of the written terms of the Children's Trusts and the Grandchildren's Trusts, he accepted the trusteeships with the understanding that he would do whatever was asked of him by co-settlor Sam Menlo. After Sam Menlo's stroke disabled Sam from involvement, Klein contends that he thereafter did whatever co-settlor Vera Menlo asked, including purchasing homes for a number of the Menlo trust beneficiaries, without regard to such beneficiary's right or entitlement under the respective trust instruments, or the balance in their accounts. Through a series of credit lines debited against the more robust Menlo Trusts, and through multiple loans amongst the various Menlo Trusts (with no corresponding ledgers or reconciliations), and with thousands of Trust transactions filtered through his attorney-client trust account,[21] Klein testified that he timely paid premiums on those Trust-owned insurance policies that he did not intend to lapse, while providing funds for home purchases by Menlo grandchildren as requested by Vera.

Other than a $750,000 sum which Klein paid himself from the Menlo Trusts in 2005, which Klein testified that Sam Menlo had verbally authorized him to withdraw as a retroactive

---

[21] Klein testified, and the record is unequivocal, that Klein ran literally thousands of Trust transactions, including cash from Frank Menlo intended for individual Trust beneficiary accounts, cash from the individual Trust brokerage accounts themselves, cash from funds paid from loans requested by Klein against Trust insurance policies, cash purportedly designed to reimburse one particular Trust through the assets of another, and credit line loans applied for by Klein against certain brokerage accounts, directly into LKA's attorney-client trust account, where it commingled as "one big pot" with the funds of Klein's other clients. Through the LKA attorney-client trust account, Trust disbursements were also made, but leaving the financial disparity between Trust monies received by Klein and LKA and Trust monies disbursed by them for the benefit of the Menlo beneficiaries in the millions of dollars.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
18

trustee fee, Klein contends that he is entitled to an additional $1,034,477.58 in trustee fees for the period of the First Account after 2005, $533,578.70 on the Second Account, and $180,114.70 on the Third Account; each calculated at a rate of .05% per annum of the alleged sum of trust assets under management plus that year's trust income.[22]

In its combined and consolidated motion for judgment/closing brief, LKA contends that the only evidence received at trial that LKA "aided and abetted" Klein's alleged breaches of trust was that "trust funds were deposited into its [law firm client trust account] for convenience purposes, and that payments were made from the account for the benefit of all [Menlo Trust beneficiaries]." LKA contends that there was no evidence presented that Klein's law firm either conspired with its owner or that it aided and abetted Klein in the misappropriation of assets. As noted by LKA, "LKA was presented as merely a passive bank account, money-in and money-out." LKA contends that it had no duty to the Menlo beneficiaries, fiduciary or otherwise, nor is there evidence that it financially benefited from Klein's acts. There was evidence, according to LKA and as testified by Klein at trial, that lapse period payments to Trust insurers would "clear faster" when Menlo Trust beneficiaries' brokerage checks were paid directly into the LKA trust account.

LKA contends that any actions taken by the law firm from prior to August 7, 2012 should be barred by the applicable three-year period of limitations calculated from the time of LKA's joinder by the Menlo beneficiaries. LKA contends that the inclusion of Klein's law firm as a party by the six Menlo beneficiaries adding LKA has been merely an "afterthought."

---

[22] Referee's note: There appear to be four provisions of the 24 respective Menlo Family Trusts that Klein appears to be asking the Referee to honor: (1) Klein's appointment in each Trust as sole trustee; (3) the breadth of Klein's financial powers under the Trusts; (3) the Trust's liability preclusion for "reasonable and good faith" actions; and (4) the right of Klein to earn trustee fees based upon a percentage of trust assets. It appears Klein is simultaneously asking the Referee to disregard the fact that no Trust agreement contains an accounting waiver and/or gives either co-settlor any continued right or authority over the Trustee after appointment. It also appears Klein is asking the Referee to completely disregard the distributive provisions of each and every Trust.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

19

**The Menlo Beneficiaries' Post-Hearing Contentions on the First Accounting**

The Menlo beneficiaries contend the evidence at trial showed that "based upon a mythical 'instruction' from Sam Menlo, Trustee Klein "set up a serpentine labyrinth of transfers between trust accounts, lines of credit, insurance policies and Mr. Klein's bank accounts, both personal and business,"[23] in order to misappropriate assets.

In their closing brief on the First Account, the Menlo beneficiaries contend that Klein, as evidenced by his trial testimony after years of pre-trial statements and representations, "has no qualms about making things up as he goes along." By way of example, the Menlo beneficiaries reference proof of contradictory narratives presented by Klein over time with respect to, *inter alia*, Klein's unrepaid loans to himself paid from Trust assets secured against Trust lines of credit; the refusal by Klein to provide information on Trust insurance policies until it was discovered that "Klein ha[d] borrowed millions on these policies;" annual exclusion gift payments made to Menlo Trust beneficiaries which never found their way into the gifted beneficiaries' Trust accounts; claims by Klein of the need to borrow significant sums to cover Trust tax obligations when, according to the Trust's CPA, annual tax obligations were negligible; and Klein's continued refusal to account.

Through Frank Menlo, who succeeded management and control of Sam's businesses in the year 2000, the Menlo beneficiaries point to evidence at trial that Sam Menlo's cerebrovascular strokes, which precluded Sam's ability to conduct or comprehend business transactions, occurred in 2000 and 2001, not June 2005 as contended by Klein. It is in 2005, however, that Klein contends that that he "negotiated" a flat $750,000 trustee fee with Sam to compensate Klein for his trustee services with no written corroboration.

The Menlo beneficiaries cite trial testimony where Klein was impeached, *inter alia*, after Klein's false denial of a State Bar disciplinary record with respect to trust administration work;

---

[23] Rather than attempt to organize the Menlo beneficiaries' arguments, for purposes of identifying their contentions, the Referee addresses them in the order presented in their three-part closing brief on the First Account.

false denial of his admission to dishonesty charges leading to Klein's license revocation before the California Board of Accountancy; and false denials that he had ever previously been sued as a trustee, when in fact he had been so sued, and was represented in such litigation by his current counsel.[24]

Relative to this case, the Menlo beneficiaries cite Klein's trial testimony that he had received no commission(s) on the purchase of insurance policies for the Menlo Trusts. Klein was subsequently impeached by his own insurance expert, Mr. Lowi, who testified that Klein had received $326,023.78 in such commissions. (15 Tr. 2891-2892.)

Klein testified that in 2012 he created a stand-alone bank account for the "Menlo Children's Trust of 1986" ("MCT"). Substantial evidence was presented at trial that Klein used the MCT account as additional conduit to move substantial assets and liabilities to and from from the 24 Menlo Trusts in question, including the transfer of Trust insurance policy loan funds into Klein's accounts, and as a source of overdraft protection to allow Klein to charge well over $1,175,151 in personal expenses on his own credit cards against the litigating Menlo Trusts. Klein excluded any mention of the MCT in his accountings.

The Menlo beneficiaries reference the trial testimony of Jennifer Magnes ("Magnes"), the CPA at WZ in charge of preparation of Klein accountings, in which she testified that inclusion of the MCT as a Trust sourcing mechanism, though she had some of the records, was "beyond the scope of [her] assignment." Magnes further testified at trial that she was not authorized to review Klein's personal bank records, nor the LKA law firm records, nor was she authorized to contact the relevant insurance companies for information, nor was she provided with the voluminous institutional banking and insurance records subpoenaed by the parties. The Menlo beneficiaries contend that by so artificially limiting the information upon which the verified Klein First

---

[24] When Klein testified provably falsely at trial on these collateral matters, the Referee had concern that Klein's short-term and long-term memory failures could be due to a combination of age and mild cognitive deficits. After 22 days in trial with Mr. Klein, however, the Referee concludes that Mr. Klein, while testifying, reflexively opted for any means of possible liability avoidance and scrutiny, often self-contradictory and easily disproven, over any legitimate concern for factual accuracy.

Account was prepared, the First Account is "virtually useless as a bellwether of Mr. Klein's true activities with [the Menlo] [T]rusts."

The Menlo beneficiaries cite Probate Code §16014(b) for the proposition that Klein, as a licensed trusts and estates attorney, until recently as a licensed CPA, and as a self-proclaimed expert in life insurance investments, has special skills and must be held to the standards of those special skills.

The Menlo beneficiaries also cite Probate Code §16000 for the further proposition that **Klein, as a trustee, has a statutory duty "to administer the trust according to the trust instrument."**

Each of the Menlo trust instruments are irrevocable by their terms. Neither Sam Menlo nor Vera Menlo had any ability after execution to amend the trust terms or to exercise any authority over the Trustee. The Menlo beneficiaries contend that any alleged oral "instructions" purportedly given to Klein by Sam Menlo to ignore the terms of the Menlo Trusts are pure fabrications and in contravention of Klein's statutory duties as a trustee.

The Menlo beneficiaries note that Klein, as an experienced estate planning practitioner, testified that despite his acceptance of the Trusteeships in 1996, and Sam Menlo's subsequent incapacity, Klein's deposition in this lawsuit was the first time anyone had suggested to him that he stood in a fiduciary relationship to the Menlo Trust beneficiaries. (8 Tr: 1673.) Klein further testified that he has never had any intention of honoring the distributive provisions of the 24 trusts.[25]

---

[25] Though the authorization is unclear from Judge Suzuki's September 15, 2021 order for reference, the Menlo beneficiaries ask the Referee to recommend Klein's removal as trustee. The trial court has always had removal power *sua sponte* since this action was commenced (see *Schwartz v. Labow* (2008) 164 Cal.App.4th 417), and it is possibly because Klein is a licensed member of the State Bar that suspension and removal has not already taken place. Notwithstanding Klein's rationale based upon what he claims to be the co-settlors' unwritten "wishes," as noted above, Klein concedes that he never intended to follow the express terms of the Trusts. In a case where the fiduciary's compass has had no sense of literal direction from its inception, Klein's removal appears to be a *fait accompli* regardless of whether or not it is a part and parcel of the current reference. The Referee defers determination of this issue to the trial judge.

The Menlo beneficiaries take great issue with Klein's scattered selection of starting dates for each of his 24 First Accounts. The starting dates of the respective Klein First Accounts are not, as the law requires, based upon the dates Klein first received and began managing the respective Trusts and their assets, but rather based, according to Klein. upon whatever date(s) the institutional brokerage houses could locate records in their archives with respect to each of the various Menlo Trusts managed by Klein.

The Menlo beneficiaries note that Klein's verified accountings, despite utilizing "starting dates" long after Klein accepted his trusteeships, nevertheless infuse selected pre-starting date transactions into the First Accountings which infuse capital or identify legitimate disbursements, all of the while ignoring literally thousands of other Trust-related transactions evidencing malfeasance and misappropriation.

The Menlo beneficiaries recite the Trustee's statutory duty to maintain records sufficient to *fully* account to the Trust beneficiaries, and to provide all supporting data upon request, including invoices, receipts and transactional documentation.

Here, Klein maintained no trust files of his own and had no legitimate recordkeeping system. Complex loan transactions between the 24 separate Menlo Trusts were never memorialized or reconciled, nor was application of large sums taken by Klein from the MCT separately tracked. No spreadsheets were prepared by Klein identifying the recipient(s) of the loan funds for which Klein borrowed against the Trusts' insurance policies, or for identifying the recipient(s) of the funds Klein borrowed on the lines of credit debiting the Menlo beneficiaries' brokerage accounts through whose Trust accounts those loans were serviced. (The recipients, as it turned out, were principally Klein and his law firm.) At trial, Klein testified that the filed trust accountings, which he conceded he did *not* prepare. constituted his "records," while all of the many thousands of specific underlying transactions were otherwise maintained "in [his] head."

The Menlo beneficiaries contend the evidence at trial established that that their individual Trust balances had been adequate to subsidize all ongoing Trust expenses, and suggest that Klein's only reason to collateralize the brokerage accounts through interest-bearing lines of

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

23

credit was to generate capital for Klein himself, virtually none of which Klein appears to have repaid. The Menlo beneficiaries also point to evidence that Klein borrowed $3,675,000 from the Trust's insurance policies, again virtually none of which was used to pay premiums.

The Menlo beneficiaries further object to Klein's decision to allow $20,000,000 in Phoenix life insurance coverage to lapse at a time when Sam Menlo was uninsurable, and therefore the coverages could not be replicated. The evidence showed that the Phoenix policies were allowed to lapse, in part, because of the policies' significantly reduced values, *after* Klein had reduced those values through millions of dollars in loans he had taken out against those policies, which funds were for the most part, if not entirely, retained by Klein.[26]

At trial, as noted by the Menlo beneficiaries, Klein admitted taking large personal loans from the Menlo Trusts without permission. Klein conceded regularly using funds from certain Trusts to pay the obligations of other Trusts, often when Klein, according to his testimony, would feel it was "fair" to do so.

Klein also admitted at trial setting up the MCT bank account as a source of overdraft protection for the personal bank accounts of Klein and his wife, Erika. The evidence at trial established that Klein utilized $1,218,519 of MCT funds to pay his personal debts by way of the overdraft protection, with no evidence (other than Klein's uncorroborated testimony) that those funds were ever reimbursed. Nowhere in Klein's accountings is there reference to those funds at all.

Though Klein testified at trial that the $3,625,000 of loans taken against the Trusts' Phoenix Life policies was conceptualized by Sam Menlo, the written evidence established that all of these loans were personally applied for and distributed by Klein to Klein through his attorney-client trust account between 2005 and 2009. While Klein testified that the Phoenix

---

[26] At the time Klein commenced his Trusteeships in 1996, the Menlo Trusts owned $54,000,000 in prospective whole and universal life insurance policy benefits upon the deaths of Sam and Vera Menlo. Both Sam and Vera Menlo are now deceased. However, over the course of the three accounting periods which are a subject of the order of reference, Klein allowed a collective $20,000,000 of those policies to lapse due to Klein's nonpayment of premiums.

policy loan funds were used to pay premiums on other Trust insurance policies, Klein was unable to establish at trial that was in fact the case.

The Menlo beneficiaries cite the testimony of First Account preparer Magnes that she did not attempt to trace the flow of millions of dollars of insurance loan funds from the insurance companies through Klein's LKA business account toward some beneficial Trust purpose. Magnes did admit that Klein had not provided her with all records of transactions which had occurred during the periods of Klein's Trusteeships.

The Menlo beneficiaries contend the evidence was undisputed at trial that Klein, beginning in 2005, borrowed $3,625,000 from four of the Trusts' Phoenix Life Insurance policies. According to the Menlo beneficiaries, these loans, which they claim to be misappropriated by Klein in whole or in large part, each bore accruing unpaid interest to the point that the constantly increasing debt ultimately exceeded the value of retaining the four policies, given Frank and Vera's joint life expectancies and the size of the ever-increasing interest accruing from the unpaid loans. Had an insurance broker been consulted in 2005, according to the Menlo Trust beneficiaries' insurance expert Ed Wirtz ("Wirtz"), the recommendation would have been to maintain the policies' *status quo*, given Sam Menlo's then-uninsurability. Instead, Klein withdrew millions of dollars in cash from those policies, failed to repay those loans, allowed additional substantial sums to accrue in interest on those loans, failed to repay the interest, and by the time of a 2011 underwriting review, one or more of the Phoenix policies was deemed expendable.

The first of the four Phoenix Insurance policies that Klein allowed to lapse occurred during the First Accounting period. In light of the policy's face amount payouts, less amounts necessary to sustain the policies through the then-actuarial balance of Vera's life, Wirtz

determined collective damages to the Trusts, discounted to present value, to total **$1,790,231** at the time of trial by virtue of Klein's policy lapse decision.[27]

The Menlo Beneficiaries cite *Bogert's The Law of Trusts and Trustees* §961 (June 2021 Update) for the proposition that:

> "The burden of accounting for trust assets, receipts, disbursements, and exchanges is on the trustee. **Where the trustee failed to keep sufficient records, all doubts with respect to the trustee's administration of the trust are resolved against the trustee. If the trustee failed to keep adequate records for the trust, it is liable for any resulting loss. The court may also reduce or deny the trustee's compensation, or charge the trustee with part or all of the costs related to an accounting**, if the trustee does not keep adequate records. If the failure to keep records is serious enough, the trustee may be removed." (Emphasis added.)

Utilizing Klein's multiple alleged trust breaches to suggest that Klein is entitled to no trustee fees at all, the Menlo beneficiaries contend that the trustee fees demanded by Klein should not be based upon the percentage of the face value of the insurance policies when the beneficiaries pass and the policies are paid, but should rather be assessed at "no fee... or... a flat annual fee of between $500 and $1000."

At trial, the Menlo beneficiaries relied almost exclusively on the testimony of their forensic expert, O'Bryan. O'Bryan and his staff conducted exhaustive studies of all Menlo Trust monies being paid into and out of the LKA account, the beneficiary brokerage accounts, the insurance policy accounts, the various Trust lines of credit, Klein's personal bank accounts, and the MCT account, including Klein's use of the latter to pay Klein's personal debts through overdraft protection. In doing his work, O'Bryan repeatedly testified that he had not reviewed and was not relying in any way upon documents claimed privilege by Klein but ordered produced by Judge Cowan.

The O'Bryan testimony noted, without contradiction, that Klein's submitted accountings through Magnes failed to include a massive number of transactions which Klein initiated,

---

[27] The Wirtz calculation does not assume that the loan against the policy taken by Klein would be repaid. Rather, the calculation assumes that a prudent trustee would have paid the loan interest current from Trust funds until payout, along with the premium, thereby holding the death benefit at policy amount less loan principal, rather than allow the accrued loan interest to continually reduce the death benefit.

including thousands of transactions associated with the Morgan Stanley brokerage accounts, the UBS brokerage accounts, the AIG insurance statements, the UBS line of credit activities, use of the MCT account, multiple loans and debits/credits between the Trust themselves, and use of the co-mingled LKA attorney-client trust account as a further clearinghouse for Trust and intra-Trust transactions.[28]

In the trust periods after Klein accepted Trusteeships and began managing the Menlo Trusts, but before Klein arbitrarily decided to begin his reported accounting periods, O'Bryan calculated that Klein had removed $4,353,624 from the Menlo Trusts into LKA and his personal accounts and expenses as follows:

(1) $824,652 cash from the respective Menlo beneficiaries' brokerage accounts;

(2) $1,658,000 in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

(3) $1,432,781 in loans taken by Klein against Trust-owned insurance policies;

(4) $198,190 taken from the MCT account; and

(5) $240,000 from monies payable to the Menlo trusts that Klein signed over into his law firm account.

During the same pre-accounting time period of his Menlo Trusts management, Klein used monies collected from the various trust and insurers to pay for legitimate expenses of the Menlo Trusts in the total sum of $192,736, directly and through the vehicle of Klein's attorney-client trust account. The net difference between sums taken in by Klein and the sums paid out for the benefit of the Menlo Trusts or its beneficiaries, as calculated by O'Bryan, is $4,160,888.

On top of that sum, the Trusts paid interest on Klein's pre-accounting loans secured by Klein-initiated Trust lines of credit in the sum of $125,677. The interest charged by Phoenix Life

---

[28] Klein testified at trial that funds from loans against Menlo Trust insurance policies, which policies were each owned by specific Menlo Trusts, funds from the lines of credit borrowed by Klein against certain Menlo beneficiaries' brokerage accounts, and funds received from Frank Menlo for annual exemption gifts to the various Menlo children and grandchildren, were "first" deposited into Klein's LKA attorney-client trust account. Despite the fact the funds in that general account were neither segregated between individual Menlo Trusts or from the assets of Klein's other clients, Klein nevertheless testified that he had no comingling concerns.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

27

Insurance and Lincoln Life Insurance on the insurance policies upon which Klein took loans during this pre-accounting period was an additional $104,732. Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, before the time Klein opted to commence his formal accountings, totals $4,391,297.

In addition to those sums, according to O'Bryan's comprehensive audit, are the verified portions of the First Accounting period for which Klein *has* chosen to account. When the "refused" Klein First Accounting periods are included within the Klein-submitted First Accounting periods in order to constitute the true First Account, through and including June 30, 2013 **the full First Accounting period** audit calculations are as follows:

In the entire period of what should be Klein's first accounting across **the** 24 Trusts, across approximately 10,000 Trust transactions, O'Bryan calculated that Klein removed a net **$6,852,660** from the Menlo Trusts into LKA and to his personal accounts and expenses during the full First Accounting period as follows:

(1) **($105,416)** cash infused by Klein into the respective Menlo beneficiaries' brokerage accounts (credit to Klein);

(2) **$1,959,374** in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

(3) **$2,753,152** in loans taken by Klein against Trust-owned insurance policies;

(4) **$1,046,418** taken from the MCT account into Klein's personal overdraft account;

(5) **$874,550** taken from the MCT account by Klein for other non-Trust purposes; and

(6) **$324,582** from monies payable to the Menlo Trusts that Klein deposited into his law firm or personal accounts.

During the entirety of the true First Accounting time period, Klein paid monies collected from the various Trust beneficiaries' brokerage accounts and Trust life insurance policies, and monies paid to Klein as Trustee for deposit into the Menlo Trusts, directly and through the vehicle of his attorney-client trust account, to pay for legitimate expenses of the Menlo Trusts in the total sum of **$628,112** (*i.e.*, credit to Klein), consisting of insurance premiums, accounting fees, and funds paid to Madeline Lipchutz in a family law matter. The net difference between

sums taken in by Klein over and beyond the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$6,224,548.**

Beyond that vast sum of unrepaid cash from Klein to the Menlo Trusts, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit in the sum of **$300,049** during the entirety of the true First Accounting period. The interest charged by Phoenix Life Ins. and Lincoln Life Insurance on the insurance policies upon which Klein took loans during the First Account was an additional **$1,693,048.** The loss due to Klein's intentional lapse  of a Phoenix Life Insurance policy during the First Accounting period, as testified to by insurance expert Wirtz, to the extent there is liability for that policy lapse, totaled **$1,790,231.**[29] Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged damages on Klein's lapse of a Phoenix Insurance policy, totals **$3,783,328** for the period of the First Account.

The Menlo beneficiaries contend that the evidence shows that, at the end of the First Account, Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the principal amount of **$10,007,876** (*i.e.*, $6,224,548 + $3,783,328). If there is no liability to Klein on the lapse of the Phoenix life insurance policy, the only issue Klein truly contests, either because he was not negligent or because he was acting "reasonably and in good faith," the principal surcharge reduces to **$8,217,645** (*i.e.* $10,007,876 - $1,790,231) owed by Klein to the collective Trusts at the close of the First Account.[30]

---

[29] Evidence at trial established that premiums had been paid on this policy until the time of Klein's trusteeship in 1996; then never again, forcing the policy to borrow against itself to sustain both future premium payments and interest on the subsequent loans which Klein took against cash value. In insurance jargon, these obligations created a "drag" on the policy, reducing its value to the policyholder.

[30] Of that sum, Klein claims that $750,000 was a verbal "trustee fee" authorization from Sam Menlo in 2005.

**The Menlo Beneficiaries' Post-Hearing Contentions on the Second Accounting**

In their opposition to Klein's Second Accounting, the Menlo beneficiaries render the following observation:

"Neither [Klein] nor LKA introduced any witnesses at trial to dispute the accuracy of the calculations of Mr. O'Bryan and Mr. Wirtz. In fact, [Klein] did not dispute the many claims of misappropriation of trust funds to which Mr. O'Bryan testified and offered detailed damage figures."

As it relates specifically to evidence presented on the Second Account, the Menlo Beneficiaries highlight an additional point:

"[Klein] acknowledged during the second accounting trial that, quite literally, he had created a system with the trusts where every single trust at some point transferred money to every one of the other 24 trusts usually in the form of 'loans' or 'repayment of loans' that [Klein] had created. The maze of 'loans' and 'repayments' is simply incredible. … [Klein] did not establish that many or even most of these trusts even needed loans from another trust to pay their share of [insurance] premiums. [Klein] admitted that he never informed the [Menlo Trust] beneficiaries that he was taking loans from their trusts, whatever the purpose of the loan may be. Whereas the Probate Code requires [Klein] to keep the funds of each trust separate and accounted for, [Klein's] management was exactly the opposite. [Klein] transferred funds back and forth so often that a diagram would look like a U. S. route map for American Airlines." [31]

When asked, Klein testified during the Second Accounting trial that he failed to turn over his LKA financial records, where substantial Trust funds were deposited and dispersed, to his account-preparer Magnes, because "he did not want her looking through the records of his clients." (18 Tr. 3476.) This was confirmed by Ms. Magnes, who also was not provided information from Klein regarding his use of overdraft accounts to access the MCT accounts to cover Klein's personal credit card spending. Magnes conceded that in the Second Accounting period, significantly more monies were taken by Klein from the Trusts than were utilized to cover expenses for the benefit of the Menlo beneficiaries.

---

[31] The Referee finds, based upon circumstantial evidence, that Klein's intention in maximizing the number of intra-Trust loans and repayments within the context of an already multi-client commingled LKA attorney-client trust account was to render the scope and breadth of Klein's misappropriations incalculable and untraceable.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
30

Klein allowed two additional Phoenix insurance policies to lapse during the Second Accounting period. According to Wirtz' calculations, without regard to Klein's misappropriation of the loan proceeds themselves, a prudent trustee would have paid the policy loans current along with the premiums, the failure of Klein to accomplish resulting in damages to the Trusts of **$2,001,658** and **$2,487,533**, respectively, based upon Sam and Vera's actuarial life expectancies at the time of Klein's policy lapse decisions, discounted to present value.[32]

The Menlo beneficiaries' forensic expert, O'Bryan, testified that during the Second Accounting period, across an additional approximately 4000 Trust transactions, Klein filtered between one-third to one-half of all transactions, including countless payments between the Trusts themselves, through his LKA client trust account. Once again, without review any of the communications which Klein claimed to be privileged (though Judge Cowan held were not privileged), O'Bryan calculated that Klein had removed a net **$1,712,379** from the Menlo Trusts into LKA and his personal accounts and expenses as follows:

(1) **$254,649 in Trust** cash taken by Klein from the respective Menlo beneficiaries' brokerage accounts;

(2) **$1,282,733** in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

(3) **$172,101** taken from the MCT account into Klein's personal overdraft account;

(4) **($73,061)** net credit to Klein for funds returned to the MCT account; and

(5) **$75,956** from monies payable to the Menlo Trusts that Klein deposited into his law firm or personal accounts.

During the Second Accounting period, according to O'Bryan, Klein used monies collected from the various Trust beneficiaries' brokerage accounts, and monies paid to Klein for deposit into the Trusts, often through the vehicle of his attorney-client trust account, to pay for expenses of the Menlo Trusts in the total sum of **$559,150** (*i.e.*, credit to Klein), consisting

---

[32] Vera was still living at the time of trial. She did not survive to her calculated 2023 actuarial life expectancy as determined several months earlier. Had the trial been conducted today, Wirtz's damage calculations to the Trusts would be higher, since less interest and premium payments would be paid from the Trusts than previously calculated to her actuarial date of death.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
31

entirely of insurance premiums. As noted by O'Bryan, the net difference between sums taken in by Klein during the Second Accounting period over and above the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$1,153,229**.

Beyond that sum, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit during the Second Accounting period in the sum of **$17,542**. The interest charged by Phoenix Life Insurance and Lincoln Life Insurance on the policies upon which Klein took loans during that period was an additional **$409,134**. The loss due to Klein's lapse of the two Phoenix policies, as testified to by insurance expert Wirtz, to the extent there is liability, totaled **$4,489,210.** Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged liability for Klein's lapse of two additional Phoenix life Insurance policies, totals **$4,915,886.**[33]

The Menlo beneficiaries contend that the evidence shows that, at the end of the second account, Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the additional principal amount of **$6,069,115** (i.e., $1,153,229 + $4,915,886). If there is no liability to Klein on the lapse of the two additional Phoenix life insurance policies, the only issue Klein truly contests, either because he was not negligent or because he was acting "reasonably and in good faith," the principal surcharge reduces to an additional **$1,579,905** (i.e. $6,069,115 - $4,489,210) owed by Klein to the collective Trusts at the close of the Second Account.

To summarize, according to the Menlo beneficiaries forensic expert, the "rolling" surcharge to Klein for cash taken by Klein from the Trusts, plus actual interest paid by the Trust on those Trust funds in Klein's possession, less monies Klein applied to Trust expenses, through the closing date of the Second Account, totals **$9,796,750** (i.e. $8,217,645 +$1,579,105). If Klein

---

[33] The Menlo beneficiaries also contend that Klein's lapse of the Phoenix insurance policies during the Second Accounting period had negative income tax ramifications to the Trust for the Second Accounting period in the sum of $1,493,423. Klein's position was that he had filed no tax returns noting such sums to be due and payable, and therefore, once the applicable statute of limitations passes, there will be no actual loss to the Trusts. The Referee is inclined only to surcharge a fiduciary where losses have been realized and are not theoretic. If such tax liabilities become an actuality, assuming liability to Klein, it is not the Referee's intention to foreclose the Menlo beneficiaries from seeking indemnity from Klein at that time, nor should Klein be discharged from that contingent liability.

is also liable for lapse of the three Phoenix insurance policies through the First and Second Accounts, the additional "rolling" claim for damages utilizing the Wirtz calculations is an additional **$6,279,441** (i.e., $1,790,231 + $4,489,210), excluding the Menlo beneficiaries' additional claim for tax liability.

### The Menlo Beneficiaries' Post-Hearing Contentions on the Third Accounting

Moving to Klein's Third Account, the closing brief of the Menlo beneficiaries challenges Klein's claim that Frank Menlo "sabotaged" the Trust by refusing in 2012 to make further annual cash exemption gifts to each of the Menlo beneficiaries. As calculated the Menlo beneficiaries, had Klein not misappropriated the insurance policy loan funds for himself, by the end of the Third Accounting period, all policy premiums could have easily been paid "without problem, with approximately $4 million left over," with no need to ever access the funds held in the Menlo beneficiaries' brokerage accounts. Klein conceded during the trial on the Third Account that "whatever cash was in this trust when I took over, by the end of the Third Accounting, all of that was gone." (21 Tr. 3943.)

Klein testified during his testimony on the Third Account that he has never used *non-petitioner* Menlo Trust funds to subsidize the asset-depleted Trusts at issue here. The Menlo beneficiaries request that the Referee to take judicial notice of a June 10, 2022 report to Judge Luna in which Klein, in contravention of his testimony and a prior court order, concedes use of non-petitioner trust funds to pay the obligations of the subject Trusts for, *inter alia*, "[m]argin interest on lines of credit," life insurance premiums, and legal fees and retainers.[34]

On the Third Accountings, the Menlo beneficiaries reiterate their claim that the accountings were artificially manufactured by inhibiting CPA Magnes' access to the LKA records, to the MCT records, and to Klein's personal bank accounts, as a strategy to avoid

---

[34] Accounting issues associated with Trusts in favor of non-petitioner Menlo beneficiaries are outside the scope of the 72 accounting petitions across the 24 Trusts being adjudicated by the Referee pursuant to the order for reference. Possible contempt issues associated with Klein's alleged disregard of orders relating to non-petitioner Trusts in this case are likewise outside the scope of the reference under consideration. The Referee declines the request for judicial notice.

detection of millions of dollars in Trustee misappropriations under the façade of verified accounts.[35]

Klein allowed a fourth Phoenix insurance policy to lapse during the Third Accounting period. According to Wirtz' calculation, without regard to Klein's misappropriation of the loan proceeds, a prudent trustee would have paid the policy loan current along with the premiums, resulting in damages to the Trusts of **$2,339,334**, respectively, based upon Vera's actuarial life expectancy at the time of trial, discounted to present value.

The Menlo beneficiaries' forensic expert, O'Bryan, testified that during the Third Accounting period, Klein filtered approximately 20% of an estimated 2000 Trust transactions, including numerous payments between the Trusts themselves, through his LKA client trust account. Once again, without review of any of the communications which Klein claimed to be privileged but Judge Cowan found to be not privileged, O'Bryan calculated that Klein had removed a net $1,055,576 from the Menlo Trusts into LKA and for his personal accounts and expenses as follows:

---

[35] At trial, Magnes testified that she was essentially a scrivener, doing whatever she was told [content of communications themselves excluded by the Referee in light of Klein's objections], having no prior experience in the preparation of Probate Code or fiduciary accountings. Magnes testified, *inter alia*, that in preparing that Klein accountings she sought but did not receive documents dating back to Klein's acceptance of the Menlo Trusteeships in 1996; was unable to access relevant Trust transactions; did not ask for permission to access data from the Trust's life insurance companies; did not access subpoenaed records; never saw Klein's Trust files, if any; never reviewed a general ledger, QuickBooks or financial statements for Klein's administration of the Menlo Trusts; did not determine the commencement date to be covered by the First Accountings; *did* use Trust fund disbursements between 1999 and 2002 to log Menlo insurance policy premium transactions for purposes of calculating Trustee fees; and *did* see Menlo Trust funds deposited into the LKA accounts but was not authorized to trace those monies to their ultimate recipient(s).

The Referee, when considering such deficiencies in light of O'Bryan's comprehensive audit and the voluminous supporting records, accepts the Menlo beneficiaries' contention that the verified Klein accountings were manipulated in order to mislead with respect to the disposition of Menlo Trust funds. The extraordinary difficulties encountered by the Menlo Trust beneficiaries in discovering, accessing and then sorting out the relevant Trust information, underscores historic trust law policy resolving "any doubt arising" from an incomplete accounting against the fiduciary.

(1) **$165,905** in Trust cash taken by Klein from the respective Menlo beneficiaries'
brokerage accounts; and

(2) **$889,671** in loans taken by Klein against letters of credit against Menlo beneficiaries'
brokerage accounts;

During the Third Accounting period, as reported by O'Bryan, Klein used monies collected from the various Trust beneficiaries' brokerage accounts, and monies paid to Klein for deposit into the Trusts, often through the vehicle of his attorney-client trust account, to pay for legitimate expenses of the Menlo Trusts in the total sum of **$547,641** (*i.e.*, credit to Klein), consisting entirely of insurance premiums, As calculated by O'Bryan, during the Third Accounting period, the net difference between sums taken in by Klein over and beyond the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$507,935**.

Beyond that sum, during the Third Accounting period, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit in the sum of **$92,252**. The interest charged by Phoenix Life Insurance and Lincoln Life Insurance on the insurance policies upon which Klein took loans was an additional **$208,454**. These interest obligations were paid by the Menlo Trusts, for apparent Trust no benefit except to Klein. The losses due to Klein's lapse of the final Phoenix policy, as testified to by insurance expert Wirtz, to the extent there is liability, discounted to present value, totaled **$2,339,334**. Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged liability for Klein's lapse of the additional Phoenix life Insurance policy, totals **$2,640,041** during the period of the Third Account.[36]

---

[36] The Menlo beneficiaries also contend that Klein's lapse of the Phoenix insurance policy during the Third Accounting period has negative income tax ramifications to the Trust in the sum of $1,483,536. Klein's position was that he had filed no tax returns noting such sums were due and payable, and therefore, once the applicable statute of limitations passes, there will be no actual loss. As noted earlier, Referee is inclined only to surcharge a fiduciary where losses have been realized and are not theoretic. To the extent such tax liabilities become an actuality, assuming liability, it is not the Referee's intention to foreclose the Menlo beneficiaries from seeking indemnity from Klein at that time, nor should Klein be discharged from that contingent liability.

The Menlo beneficiaries contend that the evidence shows, at the end of the Third Account, that Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the additional principal amount of **$3,147,976** (i.e., $507,935 + $2,640,041). If there is no liability to Klein on the lapse of the Phoenix life insurance policy, the only issue Klein truly contests, either because he was not negligent or because he was acting "reasonably and in good faith," the principal surcharge reduces to additional **$808,642** (*i.e.* $3,147,976 - $2,339,334) owed by Klein to the collective Trusts at the close of the Second Account.

To summarize, according to the Menlo beneficiaries forensic expert, the "rolling" surcharge to Klein for cash taken by Klein from the Trusts, plus actual interest paid by the Trust on those Trust funds in Klein's possession, less monies Klein applied to Trust expenses, through the September 30, 2018 closing date of the Third Account, totals **$10,605,392** (*i.e.* $8,217,645 +$1,579,105 + $808,642). If Klein is also liable for lapse of the four Phoenix insurance policies through the Third Account, the additional "rolling" claim for damages utilizing the Wirtz calculations is an additional **$8,618,775** (i.e., $1,790,231 + $4,489,210 + $2,339,334), excluding the Menlo beneficiaries' additional claims for tax liabilities.

### Klein and LKA's Contentions in Reply

In his consolidated reply to the Menlo beneficiaries' post-trial contentions on each of the three Klein accountings, Klein correctly notes that the order for reference does not encompass issues with respect to Trustee removal, but also takes the position that "claims relating to matters before the First Accountings" are outside the Referee's authority.[37]

Klein requests that the Referee strike the Menlo beneficiaries' closing briefs because they were not filed concurrently with Klein's closing briefs as previously directed, a situation resulting from the health constraints of the Menlo beneficiaries' counsel. Klein contends that the Referee's order permitting Klein to file a reply brief, a right not given or afforded to the Menlo

---

[37] To the extent Klein is asserting that he can arbitrarily commence his first accountings at arbitrary points in time, skipping years of Klein's post-Trustee acceptance, management and control, as an artifice to avoid millions of dollars in interim Trust asset misappropriation, Klein is sorely mistaken, (See analysis and discussion. *infra*.).

beneficiaries, "is insufficient to remedy" the untimely filings. The Referee considers Klein's

added right to file a reply brief to be an advantage, not a disability, with absolutely no prejudice

whatsoever to Klein. Klein's motion to strike the Menlo beneficiaries' closing briefs is denied.

In further reply, Klein accurately recites Probate Code §16440(b), which affords a trial

court the discretion to excuse a trustee from liability for breach of trust committed reasonably

and in good faith, "if it would be equitable to do so," including where the trustee believes

he/she/it/they are following the wishes of the settlor, despite the language of the trust instrument,

citing *Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 296.

Referencing the testimony of its insurance expert, Steven Burgess ("Burgess"), Klein

suggests that the downgraded financial condition of Phoenix Life Insurance, in and of itself, is

sufficient to render Klein's decision to lapse four of those policies reasonable. Further, Burgess

testified that "insurance companies routinely promote and encourage borrowing from policies."

Along with the Referee, Klein takes the position that unrealized income tax liabilities

arising out of the lapse of the Phoenix Insurance policies are speculative. Klein cites *Jones v.

Wachovia Bank* (2014) 230 Cal.App.4th 935, 952.

Klein reiterates the position taken in his initial closing brief that the Referee should

disregard the testimony of forensic expert O'Bryan because of (1) the alleged "taint" of Judge

Cowan's order compelling disclosure of communications to and from Klein's account preparer

Magnes, which communications Klein contended were protected by attorney-client privilege and

work product; and (2) O'Bryan's reliance upon Trust banking and insurance documents,

including Klein's own personal and law firm bank accounts, which Klein contends violate the

constraints of *People v. Sanchez, supra,* 63 Cal.4th 665.

Klein also correctly notes that O'Bryan's calculations of funds not used to benefit the

Menlo Trusts include lines of credit which "could have been used for, *inter alia,* [Klein's]

accounting and legal fees." The Referee understands that paragraph 6 of Judge Suzuki's order for

reference expressly carves out for future trial court determination the issues of "(i) surcharge of

Trustee for professional fees and (ii) liability of Trustee for prejudgment interest." To the extent

the Referee recommends Klein be surcharged for breach(es) of trust, utilizing O'Bryan's calculations, Klein shall be entitled to potential credit for professional fees, including accounting and legal fees, if any, which the trial judge determines in Phase II of this bifurcated trial were properly incurred by Klein as a legitimate trust expense. Because that issue is deferred for future trial court determination, the Referee takes no position as to the propriety of any offset against surcharge for Klein's attorney fees and costs.[38]

Klein's reply reiterates his contention that he is entitled to $1,827,548.04 in trustee fees above and beyond the $750,000 which Klein paid himself in 2005. Klein contends "it makes no difference whether the $750,000 trustee fee payment was authorized at the time," as that sum has been reduced from Klein's total entitlement calculation. Klein challenges the "industry standard" testimony offered by O'Bryan with respect to trustee fees for the management of unmatured whole and life insurance policies in a trust portfolio, as hearsay.[39]

Klein asks the Referee to approve all three accountings and to award him an additional $1,748,170.98 in trustee fees.

LKA, in its reply, observes that the six Menlo Trust beneficiaries who are seeking damages against LKA "dedicate very little real estate in their Closing Briefs to issues related to LKA." Specifically, it is argued by LKA that there was "no evidence that LKA misused funds belonging to the Six Petitioners, took any funds for its own purposes, or conspired with or aided and abetted the Trustee in any way."

---

[38] "[L]itigation seeking to remove or surcharge a trustee for mismanagement of trust assets would not warrant the trustee to hire counsel at the expense of the trust. Such litigation would be for the benefit of the trustee, not the trust." *Butler v. LeBouef,* (2016) 248 Cal. App. 4th 198, 213, quoting *Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221, 1227. Fee awards have been denied or reduced, *inter alia*, where the attorneys helped prepare an inaccurate accounting (*Estate of Keyston* (1951) 102 Cal.App.2d 223, 231–232); unsuccessfully defended an accounting (*Estate of Vokal* (1953) 121 Cal.App.2d 252, 258); or unsuccessfully defended a petition to remove or surcharge the trustee (*Estate of Miller* (1968) 259 Cal.App.2d 536, 546–547).

[39] The Referee sustains Klein's hearsay objection on this particular point. Nor may forensic accountant O'Bryan testify as an expert on this specific issue, given his lack of personal experience assessing carry value on unmatured whole and universal life policies in the context of Probate Code §1060 *et seq.* accounting schedules. Both sides are actually incorrect on this issue, as the proper carry value is expressly detailed in the CEB *Fiduciary Accounting Handbook* text (see discussion, *infra*).

LKA references forensic expert O'Bryan's concession that he had "no information as to whether LKA used the Six Petitioners' funds for its own purpose or for other trust purposes." Unlike Trustee Klein, LKA is not a trustee. As correctly noted by LKA, it is the Menlo beneficiaries' burden to establish liability and damages as to LKA.

## STATEMENT OF DECISION AND
## SETTLEMENT OF THE TRUSTEE'S FIRST ACCOUNT

### When Does the Trustee's First Account Begin?

As stated above, Klein accepted 22 of his 24 trusteeships in 1996. The remaining two trusteeships were accepted by Klein in 1999 (Daniel Winter) and 2002 (Jonathan Lifschutz), respectively.

Klein, in his First Accountings, reluctantly admitted his role in paying Trust obligations as Trustee from and after **1996**. [See, e.g., Supplement[s] to First Account and Report, for Frank Menlo, at verified Report, ¶ 45]. Klein, in his capacity as Trustee, conceded making all of the accounting log contribution payments from the Menlo Trust beneficiaries on Trust insurance policies beginning February 23, 1998 (American General Insurance) and January 22, 1999 (Transamerica Insurance). [Id., at Exs. 8-9 and verified Report, ¶¶ 41-42]. Klein's First Accountings include written correspondence by Klein to a number of the 24 Menlo beneficiaries establishing Klein's management and control of the Trust brokerage accounts by March 11, 2002 [Id., at Ex. 14], after, as credibly testified to by Frank Menlo, Sam Menlo's second stroke had rendered Sam incompetent to conduct or advise on business matters of any kind.

In addition, Klein testified at trial and reported in the First Account that he paid himself a $750,000 Trustee Fee "as a partial deposit" **for his retroactive management** of the 24 Menlo Trusts **prior to June 2005**. [See, e.g., Supplement[s] to First Account and Report for Frank Menlo, at verified Report, ¶44.]

Despite Klein's acceptance of all but two of the 24 Trusteeships in 1996; Klein's post-1996 actions fully consistent with fiduciary administration and management; what the Referee

finds to be Klein's unequivocal supervision and control of all Menlo Trust decision-making no later than 2002; and Klein's withdrawal of $750,000 from Trust insurance policies in June 2005 as compensation for *prior* Trustee services rendered, Klein's 24 First Accounts nevertheless select arbitrary opening dates of trusteeship between February 1, 2003 and April 13, 2009, with only the five Winter family accounts having a First Account starting date prior to May 19, 2006. [See fn. 9, *ante*.][40]

At trial, during voir dire by Klein's counsel on the qualifications of forensic expert O'Bryan, counsel held in his hand the CEB text *Fiduciary Accounting Handbook*, and asked O'Bryan:

"What is a leading treatise in California on fiduciary accounting?"

And though Klein does not now cite that treatise in his closing briefs, the text is insightful on how to set a Trustee's opening account date. Where Trustees, as here, succeed one another "in lock step," the succeeding Trustee's account commences "the day after the ending date of the prior account." CEB, *Fiduciary Accounting Handbook* (2022), §4.6, p. 161.

To the extent there may be one or more days vacancy between the prior trustee's resignation(s) and Klein's acceptance, or, as here, where there was no prior accounting, the CEB text advises that "the trustee who assumes office after vacancy may wish to use at his or her beginning date the date he or she accepts the trust." CEB, *Fiduciary Accounting Handbook*, *supra*, §4.8, p.164. As noted in the treatise, **"[t]he beginning date of the trustee's account signifies the date that a person becomes accountable to the beneficiaries."** Here, the Referee determines that Klein became accountable to the Menlo beneficiaries on the day he accepted each of the 24 Trusteeships.

---

[40] Given the many hundreds of Trust transactions Klein managed and administered prior to the arbitrary starting dates of many if not most of his First Accountings, and given Klein's complete lack of any corroborating evidence, Klein's contention that Sam and/or Vera Menlo served as *de facto* trustees during these periods is not credible. The Referee factually finds that Sam Menlo was without competence in and after 2002, and that Klein kept Vera Menlo completely in the dark with respect to her understanding of the Trusts' terms and any and all actions Klein transacted within the Trusts (other than providing certain grandchildren financial assistance in home purchases).

To the extent Klein contends that *as a condition of* acceptance of the 24 trusteeships, he delegated decision-making to the co-settlors, loss becomes only a question of liability due to improper fiduciary delegation,[41] not a question of when to commence the Trustee's periods of accounting.

### How Must the Court Assess the 24 Missing Accounting Periods?

The date of Klein's acceptance of the respective Trusteeships, to the date that Klein elected to first account, are deemed periods of missing accounting, accentuated by then- Commissioner Cowan's December 20, 2013 explicit order that Klein account from *"the time period commencing when Leslie Klein first became trustee of the Trust*, to the present day."* Those missing account periods are specifically as follows:

Abraham Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Samuel Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Esther Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Rachel Deutsch – 9/10/96-2/26/09 (12 yrs., 5 mos.)

Mordechai Deutsch – 9/10/96-2/26/09 (12 yrs., 5 mos.)

Deborah Deutsch – 9/10/96-2/26/09 (12 yrs., 5 mos.)

Zev Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Tanya Menlo -- 9/10/96-7/22/08 (11 yrs., 10 mos.)

Franklin Menlo -- 9/10/96-7/22/08 (11 yrs., 10 mos.)

Jonathan Menlo – 9/10/96-12/31/07 (11 yrs., 3 mos.)

Yeshia Frankel -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Rochelle Lipschutz -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Moishe Frankel -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

---

[41] As stated in Probate Code 16012(a):

> "**The trustee has a duty not to delegate** to others the performance of acts that the trustee can reasonably be required personally to perform and may not transfer the office of trustee to another person nor delegate the entire administration of the trust to a cotrustee or other person." (Emphasis added.)

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

41

Madeline Lipschutz -- 9/10/96-5/21/06 (9 yrs., 8 mos.)

Faye Lipschutz -- 9/10/96-5/17/06 (9 yrs., 8 mos.)

Avi Lipschutz -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

Dov Lipschutz -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

Asher Frankel -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Norine Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Michael Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Jeremy Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Amanda Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Jonathan Lifschutz -- 12/26/02-4/12/09 (6 yrs., 3 mos.)

Daniel Winter -- 10/28/97-1/31/03 (5 yrs., 3 mos.)


Quoting the California Supreme Court in _Blackmon v. Hale_ (1970) 1 Cal. 3d 548, 560:

**"Trustees are . . . under an obligation to render to beneficiaries a full account of all their dealings with the trust property, and where there has been a negligent failure to keep true accounts all presumptions are against them upon a settlement** [citing _Estate of McCabe_ (1950) 98 Cal.App.2d 503, 505 ("_McCabe_") and _Purdy v. Johnson_ (1917) 174 Cal. 521, 527 ("_Purdy_")]." (Emphasis added.)

As held in the referenced appellate opinion in _McCabe_, _supra_:

**Trustees are ... under the duty to prove every item of their account by "satisfactory evidence"; the burden of proof is on them and not on the beneficiary; and any doubt arising from [the Trustee's] failure to keep proper records, or from the nature of the proof they produce, must be resolved against them** [citing _Purdy_]. (98 Cal. App. 2nd at 505.) (Emphasis added.)

If the 24 litigating Trusts are combined, there are a collective **156 years of missing first accountings**. Klein purported to have maintain _no records_ of those Trusts during the entirety of the First Accounting period, other than the court-filed accounting which was crafted after-the-fact in 2013, for certain years only, prepared someone other than Klein with very limited document access. Meanwhile, the forensic accountant retained by the Menlo beneficiaries _located records_ of more than 10,000 Trust transactions across what should be the First

Accounting period, including voluminous records associated with Klein's personal bank accounts and his LKA law firm account. Klein's response is not to object to the accuracy of those thousands of transactions, but rather, to object on hearsay grounds to the consideration of *all* applicable Trust insurance, banking and personal records which were Klein's duty to make available in the first instance. No claim has been made by Klein or LKA that the underlying Trust or personal records are untrustworthy.

**Does Klein Have a Valid *Sanchez* Hearsay Defense to Undisputed Forensic Accounting Testimony?**

Under *Sanchez, supra*, where an expert testifies to "case specific" out-of-court statements to explain the basis for an opinion, the out-of-court statements must be properly admitted through an applicable hearsay exception. (63 Cal.4th at 684.)

Throughout the trial, both Klein and LKA, on behalf of the Trustee and his law firm, rendered continuing objections to prevent the admission of any records of Trust transactions procured from an institutional third party custodian of records. Most of those records were obtained directly by the Menlo beneficiaries through records subpoenas to the Trust's banks and insurance companies; while the LKA records were handed over by counsel for LKA to counsel for the Menlo beneficiaries during discovery.

In formulating his conclusions, forensic expert O'Bryan relied upon business records received from five insurers (Aetna/Lincoln; Phoenix; AIG; Transamerica and Union Central); two institutional brokerage houses (Morgan Stanley and UBS); and the Bank of America. The Bank of America records consisted of the LKA bank records, the MCT account opened by Klein, and Klein's personal bank records.

In light of the *Sanchez* objection, the Menlo beneficiaries were directed by the Referee to submit evidence of authentication of the business records relied upon by O'Bryan to establish the thousands of Trust transactions which formed the basis for his calculations

In a filing on March 9, 2022, the Menlo beneficiaries provided a sworn certification from Phoenix Insurance dated July 20, 2014 and a further certification dated October 13, 2014. Both certifications satisfy the criteria of Evidence Code §§1561-1562, rendering the Phoenix insurance records admissible as business records under Evidence Code §1271. The documents from American General Insurance (AIG) were received through its litigation counsel in a formal discovery production response on August 13, 2014. The documents from Transamerica Insurance were delivered with the certification from its custodian of records on July 21, 2014. The Referee determines those deliveries and certifications trustworthy and compliant with the Evidence Code authorization permitting verified business records to be admissible in lieu of the personal testimony of each company's custodian of records.

In the same submission, the Menlo beneficiaries provided a June 22, 2017 declaration from the authorized records custodian for Morgan Stanley, which declaration satisfies the criteria of Evidence Code §§1561-1562, rendering the Morgan Stanley records for the applicable Menlo beneficiaries admissible as business records under Evidence Code §1271. The custodian of records for the Bank of America also authenticated its records in a notarized declaration filed August 11, 2017, rendering admissible its bank records for the MCT and the bank records, credit card account statements and safe-deposit box records for Klein himself.

In a follow-up filing on March 22, 2022, the Menlo beneficiaries submitted a March 21, 2022 declaration from the authorized records custodian for Ameritas Life Insurance, verifying the records of its predecessor company, Union Central Insurance, plus a March 21, 2022 declaration from the custodian of records for Lincoln National Life Insurance (formerly Aetna); each entity properly authenticating the records of the Menlo Trusts. The Menlo beneficiaries also submitted the June 26, 2017 declaration from UBS authenticating the institutional brokerage records for those Menlo beneficiaries with Trust accounts outside of Morgan Stanley.

The only remaining set of records relied upon by O'Bryan in his compilation and analysis of Trust transactions are the bank records of Klein's law firm, LKA, which, according to the aforementioned submissions by the Menlo beneficiaries, were delivered directly to counsel for

the Menlo Beneficiaries from LKA's counsel. Evidence Code §1221 codifies the hearsay exception for adoptive admissions by providing that "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his [or her] adoption or his [or her] belief in its truth." The delivery to the Menlo beneficiaries by LKA of LKA bank records renders the documents admissible as an adoptive admission.

A California trial court has wide discretion to determine whether there is a sufficient foundation to qualify evidence as a business record. *Conservatorship of S.A.* (2018) 25 Cal. App. 5th 438, 447. As previously determined during the trial, the Referee finds that the records relied upon by O'Bryan to be trustworthy and all supported by sufficient foundation to be admissible. Klein and LKA's *Sanchez* hearsay objections to O'Bryan's reliance upon Trust records from the relevant insurance companies and brokerage houses, and Klein's personal and business records from the Bank of America, were and remain overruled.


### What are Klein and LKA's Claims of "Taint" from the Poisonous Tree?

The Menlo beneficiaries, whipsawed between Klein's claims of no Trust records and Klein's exclusion from participation in the preparation of his own verified accountings, on one hand, and Klein's tactical decision to shield his anointed account preparer, Magnes, from discovery as a privileged consultant, on the other, the Menlo beneficiaries requested and received relief from Judge Cowan, ordering Magnes' work product subject to discovery without attorney-client privilege or work product protection.

Despite Klein's unsuccessful efforts to overturn Commissioner Cowan's ruling through and including requests for extraordinary relief in the California Supreme Court, Klein asked the Referee to exclude from evidence at trial any communications between Ms. Magnes and Klein's counsel, or any communications between Magnes and Klein in the presence of or copied to counsel.

The matter was briefed and argued. While concepts of fundamental fairness had been utilized to allow the Menlo beneficiaries in pretrial discovery to learn how and under what direction Klein's accountings were prepared, the Referee determined that whatever communications Magnes may have had with or in the presence of counsel, written or verbal, would not be critical to a factual determination of the facial sufficiency of the accountings. Inasmuch as Judge Cowan's intended purpose was accomplished at the pretrial stage, the Referee found no need to expand issues for review as the accountings are by law required to be complete and supported by corroborative documentary evidence, subject to adverse presumptions where there are accounting deficiencies. Over the objection of the Menlo beneficiaries, the Referee granted Klein's requested exclusion order.

During testimony, particularly with both with Klein and Magnes, the Referee made diligent efforts to admonish witnesses not to involuntarily disclose any information which Klein's counsel contended to be privileged. To the Referee's information and belief, no such information was ever presented at trial. In the presentation of his forensic testimony, expert O'Bryan testified that he *never* reviewed information or documentation which Klein claimed to be privileged or work product, in the formulation of his calculations, opinions or otherwise. With the record so sanitized, and outside the purview of the testifying experts, the Referee is satisfied that the exclusion order was honored throughout the trial.

Despite these efforts, in his closing briefs, Klein notes that pretrial records containing such information had at some point been made available to O'Bryan's accounting firm. Despite O'Bryan's unequivocal testimony that those records had been segregated from his personal review and consideration, Klein contends that O'Bryan's opinions and calculations were nevertheless "tainted" by what Klein claims to be attorney-client and work product discovery authorized by Judge Cowan.[42]

_____

[42] See, *e.g.*, 14 Tr. 2742-2743 (First Accounts), O'Bryan testifying:

The Referee finds no prejudice to Klein by virtue of Klein's involuntary compliance with Judge Cowan's order combined with the Referee's exclusion of any such evidence at trial. Arguable prejudice was directly eliminated by the Referee's refusal to entertain consideration of any document or communication which Klein contended to fall within such protections.

**The Menlo Beneficiaries' "Floating" Exhibit List**

Klein claims generic prejudice by virtue of the Menlo beneficiaries' exhibit list late filing and subsequent modifications during the course of the trial. Klein, however, points to no specific exhibit, the production of which in any way was previously undisclosed or otherwise prejudicial to Klein.

For the most part, mid-trial modifications of the Menlo beneficiaries' exhibit list consisted of previously shared illustrative exhibits of forensic expert O'Bryan, as to which the Referee ordered recalculations in order to delete factual or legal theories of liability that the Referee determined to be inapplicable. In other words, most if not all of the modified illustrative exhibits were beneficial, not prejudicial, to Klein.

---

"Q. Okay. And I think you told me earlier, though, that even though it appears that your firm spent more than 20 hours at a minimum reviewing the White Zuckerman documents, none of it was used in preparing your analysis for this case?
A. That's correct."

Also see 17 Tr. 3205 (Second Accounts), O'Bryan testifying:

"Q. Did you -- did you use any of the privilege[] log documents in the preparation of this database?
A. No, the privilege[] log documents had nothing to do with the financial transactions."

Also see 20 Tr. 2813 (Third Accounts), O'Bryan testifying:

"Q. Okay. Did you use any of [Klein's privilege log] documents in the preparation of your database?
A. No.
Q. Did you use any of those documents in your analysis of the damages cost to the trust in the third accountings?
A. No."

### Should Klein Be Surcharged on the First Account?

The cross-account transactional audit conducted by forensic accounting expert O'Bryan on the true First Accounting periods for the 24 Trusts, as well as the lesser time periods for which Klein elected to account, were exhaustive. The approximately 10,000 transactions conducted by Klein on behalf of the Trusts during the true First Accounting periods, most of which transactions are completely ignored in Klein's verified First Accounts, were separately detailed by O'Bryan. (Ex. 828A.)

The testimony of O'Bryan was clear, convincing and credible. Thousands of the transactions conducted by Klein on behalf of the Trusts, identified by O'Bryan, were *excluded* from Klein's verified First Accounts.

The Referee finds that through an elaborate scheme to pay himself by co-mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-paying debts -- filtered with stunning frequency through Klein's personal and business accounts with multiple other sources of income and receipts and outgoing payments, Klein was able to collectively embezzle millions of dollars from the Menlo Trusts.

Menlo Trust transactional funds were moved by Klein into and out of his LKA attorney-client trust account, in the words of O'Bryan and as established in the audit, "all the time." During the entirety of the true First Accounting periods across the 24 Menlo Trusts, $2,753,152 was removed by Klein as loans taken by Klein either personally or through LKA against Menlo Trust insurance policies; $1,959,334 was removed by Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts; $1,046,418 was taken by Klein into the personal accounts of Klein and his wife Erika as overdraft protection against the Bank of America "MCT" account opened by Klein and funded by Menlo Trust assets; $874,550 was taken by Klein from the Menlo Trust-funded "MCT" into the Klein's LKA law firm account and for other Klein uses; and $324,582 in Menlo Trust checks and funds were taken by Klein directly into Klein's LKA law firm account and for other Klein uses. (Ex. 834, at 11.)

Against these sums, over the entire true First Account periods across the 24 Trusts, a net credit of ($105,416) in cash was returned by Klein to various Menlo Trusts and ($628,112) was paid by Klein for Trust insurance premiums, accounting fees and for attorney fees to Madeline Lipschutz in a family law matter. (*Ibid.*)

As noted above, subject to any Phase II credit(s) given by the trial judge to Klein on the First Accountings for attorney fees and litigation expenses in preparation of grossly and intentionally incomplete verified accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the true periods of the First Accounting, and never returned, in terms of outright misappropriations, totals $6,224,540.**

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. The 24 verified First Accountings submitted by Klein, by Magnes' admission, completely ignore funds diverted from the Menlo Trusts to and from the MCT account, the LKA account, and Klein's personal bank accounts. Magnes appears to have been spoon-fed documents and numbers that Klein, through his counsel, wanted Magnes to include, to the exclusion of the client's known business and personal accounts, and a separate Klein-created Trust bank account, through all of which the Referee finds that Klein was able to and did misappropriate $6,224,540 in funds for his personal use during the First Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon settlement rendered against Klein. where, as here, the Referee finds "a ... failure to keep true accounts" (*Blackmon v. Hale, supra,* 1 Cal. 3d at 560); and also where, as here, "any doubt from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe, supra,* 98 Cal.App.2d at 505), **Klein is surcharged in the principal sum of $6,224,540 for outright cash misappropriations across the 24 Trusts during the true periods of the First Account, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013.**

It is not simply the misappropriations, however, that damaged the Menlo Trusts during the true First Accounting periods. The misappropriations, in part, came from $2,753,152 in loans taken by Klein against the value of Trust insurance policies, and $1,959,374 in loans taken against lines of credit against Trust Brokerage Accounts. The Menlo Trusts, not Klein, serviced in some form or fashion *all of the interest* due and owing on those combined $4,712,526 in loans. The interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the true First Accounting periods totaled $1,693,048. The interest charged by brokerage houses to service Trust lines of credit taken by Klein during the true First Accounting periods totaled $300,049.

Absent the $6,224,540 in misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the appropriate First Accounting periods, there would have been no need for the Trust to borrow funds and to subsequently service those loans. In light of the massive disparity between the millions of dollars in cash debits taken by Klein and the modest credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein from Trust assets during the First Accounting periods were for purposes of non-Trust use and therefore misappropriation.

As declared in Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

> "(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:
>
> (1) **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
> (2) Any profit made by the trustee through the breach of trust, with interest.
> (3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.
>
> (b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly the combined $1,993,097 in interest obligations **paid by the Menlo Trusts** during the First Accounting periods to subsidize the $4,712,526 in loan funds taken personally by Klein during the First Accounting periods are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $1,993,097, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013, for diminution in value to the Menlo Trusts for actual interest paid by the Trusts on loan funds taken by Klein during the First Account.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts. The Referee finds unequivocally that none of Klein's acts resulting in surcharge were performed reasonably or in good faith.

The third and final surcharge question is whether Klein breached the relevant Trusts during the true First Accounting periods by causing a $5,000,000 face value Phoenix Insurance universal life policy (#2346693) to lapse. At the time of the lapse decision, Klein was represented by counsel. On April 24, 2013, Klein sent a letter to the Menlo beneficiaries asking their position with respect to the lapse of the Phoenix policies 2265404 and 2346693. (Ex. 850.) The Menlo beneficiaries, through counsel, responded that it appeared Klein, through "wrongful borrowings," had depleted the value of the policies, but without a full accounting, the propriety of lapse decisions could not be gauged. (Ex.851.) Klein, through counsel, responded (ironically) that he would need to "invade the assets of the Irrevocable Trusts to fund the premiums due."

(Ex. 852.) Klein subsequently asserted, through counsel, that he would forthwith be liquidating the Menlo beneficiaries assets to pay Phoenix premiums. (Ex.854.)[43]

The evidence was undisputed that at the time of the Phoenix 2346693 policy lapse, including through Klein's insurance expert Burgess, that it was a reasonable decision for Klein to allow the policy to lapse due to the combination of loans *taken by Klein personally* against the Phoenix policy, continued unpaid interest accruing on those loans, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, further reducing policy value.[44]

The core cause of the Phoenix policy lapse was the loan funds taken by Klein against the lapsed Phoenix policy, which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policy was exclusively the result of Klein's misappropriation of trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums (see, e.g., Ex.434, at 3). The Referee finds not credible Klein's claim that Sam Menlo had directed the Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the Phoenix loan proceeds for himself.

---

[43] By this point, Klein, through many hundreds of loan transactions and asset transfers in and out of different accounts, had been liquidating Menlo Trust assets for years for his own personal benefit.

[44] The audits establish that between 2004 and 2012, a net $4,588,152 in cash loans was taken by Klein as against Phoenix and Lincoln Life insurance policies owned by the relevant Menlo Trusts. From Lincoln, Klein withdrew $100,000 cash in 2004 and $872,153 cash in 2008. From Phoenix, Klein withdrew $750,000 cash in 2005, $1,000,000 cash in 2007, $775,000 cash in 2008, $350,000 cash in 2010, and $1,050,000 cash in 2012. $300,000 cash was returned by Klein to Phoenix in 2009. Of the net $4,588,152 cash removed by Klein from the insurers, $2,773,152 were sent to deposited to LKA or to Klein individually. The balance of $1,825,000 was deposited into Klein's "MCT" account. As noted earlier, no reference to asset dispositions into the LKA account, Klein's personal accounts, nor the MCT accounts found their way into Klein's verified accountings, nor was Magnes authorized to inquire into or examine that data. (Ex. 434.)

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
52

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the $5,000,000 policy death benefit, less the principal amount of loans, thereby retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse, and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans, according to Wirtz, there should still have been $1,790,231 remaining in policy value.

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the First Accounting period of $1,790,231. **Klein is surcharged an additional $1,790,231 for the unreasonable diminution in value of the collective corpus of the 24 Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013.**

**The total principal surcharge to Klein for the true period of the First Accountings is determined to be $10,007,876** (*i.e.*, $6,224,540 + $1,993,097 + $1,790,231) (Ex. 834, at 11), less any attorney fees and costs incurred by Klein during the period of the First Accounts determined by the trial judge in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the net surcharge, if any, as further determined by the trial judge in Phase II.

Breaking down the net collective surcharge on an individual Trust basis, the surcharge sums (or credits) for the First Account are found, based upon substantial evidence, to be allocable as follows:

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
53

1   Abraham Deutsch -- ($165,044)

2   Samuel Deutsch – ($56,424)

3   Esther Deutsch – ($67,214)

4   Rachel Deutsch – ($27,220)

5   **Mordechai Deutsch -- $696,646**

6   **Deborah Deutsch -- $1,516,890**

7   **Zev Deutsch -- $738,752**

8   **Tanya Menlo -- $66,597**

9   **Franklin Menlo -- $51,741**

10   **Jonathan Menlo -- $693,714**

11   **Yeshia Frankel -- $658,620**

12   **Rochelle Lipschutz -- $780,115**

13   **Moishe Frankel -- $739,603**

14   **Madeline Lipschutz -- $793,217**

15   **Faye Lipschutz -- $703,514**

16   **Avi Lipschutz -- $680,133**

17   **Dov Lipschutz -- $785,301**

18   **Asher Frankel -- $751,428**

19   **Norine Winter -- $145,601**

20   **Michael Winter -- $60,225**

21   **Jeremy Winter -- $60,226**

22   **Amanda Winter -- $61,333**

23   **Jonathan Lifschutz -- $30,302**

24   **Daniel Winter -- $60,224 (Ex. 834, at 12.)**[45]

25   [45] One of the many reasons these sums are so widely variable among the 24 Menlo beneficiaries is because O'Bryan was required to and did reconcile the many hundreds of cross-Trust loans and transfers Klein had made between and among the 24 Menlo beneficiaries. In addition, *inter alia*, only certain Menlo beneficiaries' accounts were utilized to subsidize the line of credit loans taken by Klein; while percentage ownerships of the Menlo Trust life insurance policies varied across the 24 Trusts, with the insurance policy loan funds taken by Klein affecting only certain Menlo beneficiaries.

Four of the Menlo Trust beneficiaries, Abraham Deutsch, Samuel Deutsch, Esther Deutsch and Rachel Deutsch, are accordingly not entitled to surcharge judgment against Klein on the First Accounting. The remaining 20 Menlo Trust beneficiaries are entitled to surcharge judgments in the respective principal sums identified above.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 20 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's First Accountings?**

In their respective initiating accounting, removal and surcharge petitions, the 20 prevailing Menlo beneficiaries pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a... trust... the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $8,217,645 of Menlo Trust cash during the period of the true First Accountings, including interest paid for which Klein should be liable; laundering funds through many hundreds of unnecessary intra-trust transactions and multiple repositories, including, *inter alia*, the commingling of assets of 24 individual Trusts and then frequently across Klein and his other clients' assets via his law firm attorney-client trust account; the use of the MCT account as a clearinghouse for additional misappropriated funds; and use of Menlo Trust cash to pay

$1,046,418 of his own personal credit card expenses through undisclosed overdraft authorization on the surreptitious MCT fund transfer account.

The remaining surcharge award associated with Klein's lapse of the Phoenix insurance policy is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as properly adjusted. Klein's direct cash misappropriations associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the four non-prevailing beneficiaries are filtered out, total **$8,533,547, payable in the following additional sums**:

**Mordechai Deutsch -- $535,525**

**Deborah Deutsch -- $1,516,890**

**Zev Deutsch -- $577,631**

**Tanya Menlo -- $66,597**

**Franklin Menlo -- $51,741**

**Jonathan Menlo -- $532,593**

**Yeshia Frankel -- $497,507**

**Rochelle Lipschutz -- $618,994**

**Moishe Frankel -- $578,482**

**Madeline Lipschutz -- $793,217**

**Faye Lipschutz -- $542,393**

**Avi Lipschutz -- $519,012**

**Dov Lipschutz -- $624,180**

**Asher Frankel -- $590,307**

**Norine Winter -- $145,601**

**Michael Winter -- $60,225**

**Jeremy Winter -- $60,226**

**Amanda Winter -- $61,333**

**Jonathan Lifschutz -- $30,302**

**Daniel Winter -- $60,224** (Ex. 834, at 12.)

It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the First Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5[th] 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's First Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the First Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the First Account. While four of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the First Account, had Klein maintained and delivered an appropriate and accurate First Account for each of the 24 Menlo Trusts, they would not have had to engage in a ten-year litigation to unravel proper debits and credits as to the allocation of Klein's misappropriations. Klein breached multiple trust obligations to each of those four beneficiaries, including with respect to Klein's complete lack of record keeping and failure to timely and accurately account. (*Smith v. Szeyller, supra,* 31 Cal.App.5[th] at 461-462.)

## STATEMENT OF DECISION ON
## SETTLEMENT OF THE TRUSTEE'S SECOND ACCOUNT

The Referee incorporates by reference as though fully set forth herein the evidentiary rulings associated with Klein and LKA's *Sanchez* objections, allegations of "taint" associated with Judge Cowan's rulings on discovery regarding preparation of Klein's accountings, and

arguments regarding the timing of receipt of the Menlo beneficiaries' exhibits. For the reasons

articulated above, those objections are again overruled.


### Should Klein Be Surcharged on the Second Account?

The cross-account transactional audit conducted by forensic accounting expert O'Bryan

on Klein's Second Accounts for the 24 Trusts was extensive. The approximately 4000

transactions conducted by Klein on behalf of the Trusts during the Second Accounting period,

hundreds of which transactions were completely ignored in Klein's verified Second Accounts,

were separately detailed by O'Bryan. (Ex. 843.)

As previously determined in the Referee's Statement of Decision on Klein's First

Accounts, the testimony of O'Bryan on Klein's Second Accounts was clear, convincing and

credible. Though at the time litigating against the Menlo beneficiaries and represented by current

counsel, many hundreds of transactions conducted by Klein on behalf of the Menlo Trusts,

identified by O'Bryan, remained *excluded* from Klein's verified Second Accounts.

The Referee finds that through an elaborate scheme to continue to pay himself by co-

mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-

paying debts -- filtered with stunning frequency through Klein's personal and business accounts

containing multiple other sources of income and receipts and outgoing payments, Klein was able

in the Second Accounts to perpetuate and further extend his design to misappropriate funds from

the Menlo Trusts.

Menlo Trust transactional funds continued to be moved by Klein into and out of his LKA

attorney-client trust account. During the entirety of the Second Account across the 24 Menlo

Trusts, a net $254,649 in cash was removed by Klein from the Menlo Trusts and not returned by

the December 31, 2016 Second Account closing date; an additional $1,282,783 was removed by

Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts; an

additional $172,101 was taken by Klein into the personal accounts of Klein and his wife Erika as

overdraft protection against the Bank of America "MCT" account opened by Klein and funded

by Menlo Trust assets; and $75,956 in Menlo Trust checks and funds were taken by Klein directly into Klein's LKA law firm account and for other Klein uses. (Ex. 842, at 3.)

Against these sums, over the Second Accounting across the 24 Menlo Trusts, a net credit of ($73,061) in cash was returned by Klein to his MCT Bank of America account and ($559,190) was paid by Klein for Trust insurance premiums to pay for insurance premiums on Trust insurance policies not yet lapsed (*Ibid.*)

As noted above, subject to any Phase II credit(s) given by the trial judge to Klein on the Second Accountings for attorney fees and litigation expenses in preparation of the incomplete accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the Second Accounting period, and never returned, totals $1,153,228**.

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. The 24 verified Second Accountings submitted by Klein, by Magnes' admission, once again ignore the disposition of funds diverted from the Menlo Trusts to and from the MCT account, the LKA account, and Klein's personal bank accounts. The Referee finds that Klein was able to and did misappropriate $1,153,228 in funds for his personal use during the Second Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon its settlement rendered against Klein; where, as here, the Referee finds "a ... failure to keep true accounts" (*Blackmon v. Hale, supra*, 1 Cal. 3d at 560); and also where, as here, "any doubt from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe, supra*, 98 Cal.App.2d at 505). **Klein is surcharged in the principal sum of $1,153,228 for net cash misappropriations across the 24 Trusts during the Second Account, plus any interim prejudgment interest to be determined to have accrued after the close of the** Second **Accounting period on December 30, 2016.**

It is not only the cash misappropriations damaging the Menlo Trusts during the Second Accounting period. The misappropriations, in part, came from $1,282,783 *in additional loans* taken by Klein during the Second Accounting period against lines of credit obligating Menlo Trust Brokerage Accounts. The Menlo Trusts, not Klein, serviced *all of the interest* due and owing on those additional loans, and in continuing interest charged on the $4,712,486 in prior insurance and brokerage loans taken by Klein during the period covered by the First Account. The *additional* interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the First Accounting periods, but paid by Klein from Trust funds during the Second Accounting period, totaled $409,134. The *additional* net interest charged by brokerage houses to service Trust lines of credit taken out by Klein during either the First Accounting period or Second Accounting period, but paid by the Trusts during the Second Account, totaled $17,642.

Absent the cash misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the First Accounting and Second Accounting periods, there would have been no need for the Trusts to subsequently service those loans. In light of the disparity between the cash debits taken by Klein without repayment to the Trusts and the credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein against Trust assets during the Second Accounting period were for purposes of non-Trust use and therefore misappropriation.

Pursuant to Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

"(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:

(1) **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
(2) Any profit made by the trustee through the breach of trust, with interest.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
60

(3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

(b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly $426,776 in *additional* interest obligations **paid by the Menlo Trusts** during the during the Second Accounting period to subsidize the $5,995,259 in total loan funds taken personally by Klein during the First and Second Accounting periods, are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $426,776, plus any interim prejudgment interest to be determined to have accrued after the close of the Second Accounting period on December 31, 2016, for diminution in value to the Menlo Trusts for additional interest paid by the Trusts on loan funds taken by Klein during the First and Second Account periods.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts. The Referee finds that none of Klein's acts resulting in surcharge on the Second Accounts were performed reasonably or in good faith.

The remaining surcharge question on the Second Accounts is whether Klein breached the relevant Trusts during the Second Accounting period by causing two additional $5,000,000 face value Phoenix Insurance universal life policies (#2265404 and #2356295) to lapse. The evidence was undisputed that *at the time* of those policy lapses, as defined by Klein's insurance expert Burgess, it was a reasonable decision for Klein to allow the two insurance policies to lapse due to the combination of loans *taken by Klein personally* against those Phoenix policies, continued unpaid interest accruing on those policy loans, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, significantly reducing the respective policy values.

The core cause of the additional two Phoenix policy lapses was the loan funds taken by Klein against the lapsed Phoenix policies, which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policies was exclusively the result of Klein's misappropriations of Trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums. The Referee finds not credible Klein's claim that Sam Menlo had directed Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the respective Phoenix loan proceeds for himself.

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the additional $10,000,000 in policy death benefits, less the principal amount of loans all the while retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse (calculated to pay out in 2023), and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans, according to Wirtz, there should still have been $4,489,210 remaining in policy values over the two additional lapsed policies. (Ex. 844.)

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the First Accounting period of $4,489,210. **Klein is surcharged an additional**

1  $4,489,210 for the unreasonable diminution in value of the collective corpus of the 24

2  Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued

3  after the close of the Second Accounting period on December 31, 2016.

4       The total principal surcharge to Klein for the Second Accountings is found to be

5  $6,069,214 (*i.e.*, $1,153,228 + $426,776 + $4,489,210) (Ex. 842, at 3), less any attorney fees and

6  costs incurred by Klein during the period of the Second Accounts determined by the trial judge

7  in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the

8  net surcharge, if any, as further determined by the trial judge in Phase II.

9       Breaking down the net collective surcharge on an individual Trust basis, the surcharge

10 sums (or credits) for the Second Account are found, based upon substantial evidence, to be

11 allocable as follows:

12 Abraham Deutsch -- ($7211)

13 Samuel Deutsch – ($7211)

14 Esther Deutsch – ($7211)

15 Rachel Deutsch – ($7211)

16 Norine Winter – ($7256)

17 **Mordechai Deutsch -- $463,492**

18 **Deborah Deutsch -- $533,505**

19 **Zev Deutsch -- $462,492**

20 **Tanya Menlo -- $37,179**

21 **Franklin Menlo -- $66,811**

22 **Jonathan Menlo -- $494,494**

23 **Yeshia Frankel -- $461,095**

24 **Rochelle Lipschutz -- $461,095**

25 **Moishe Frankel -- $461,095**

26 **Madeline Lipschutz -- $849,571**

27 **Faye Lipschutz -- $462,492**

28 **Avi Lipschutz -- $465,111**

Dov Lipschutz -- $462,492

Asher Frankel -- $461,095

Michael Winter -- $51

Jeremy Winter -- $51

Amanda Winter -- $51

Jonathan Lifschutz -- $2059

Daniel Winter -- $51 (Ex. 842, at 16-38.)[46]

It should be clarified that these calculations are not "running" totals, but rather, are intended to constitute separate surcharge judgments exclusively for the Second Accounting period, independent of the calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the period of the First Accountings as of June 30, 2013.

Five of the Menlo Trust beneficiaries, Abraham Deutsch, Samuel Deutsch, Esther Deutsch, Rachel Deutsch and Norine Winter, are accordingly not entitled to surcharge judgment against Klein on the Second Accounting. The remaining 19 Menlo Trust beneficiaries are entitled to additional surcharge judgments in the respective principal sums identified above.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 19 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's Second Accounts?**

In their initiating accounting, removal and surcharge petitions, the 19 prevailing Menlo beneficiaries on the Second Account pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

---

[46] The Referee's surcharge calculations are exclusive of potential adverse tax consequences associated with income realization upon lapse of the two Phoenix insurance policies during the Second Accounting period. As noted earlier, the Referee determines those potential tax losses to be speculative and not currently recoverable, while not relieving Klein of contingent liability to the extent those tax consequences become realized.

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a… trust… the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $1,580,004 of Menlo Trust cash during the period of the Second Accountings, including interest paid for which Klein should be liable; laundering funds through many hundreds of unnecessary intra-trust transactions and multiple repositories, including, *inter alia*, the commingling of assets of 24 individual Trusts and then frequently across Klein and his other clients' assets via Klein's law firm attorney-client trust account; the use of the MCT account as a clearinghouse for additional misappropriated funds; and use of Menlo Trust cash to pay an additional $172,101 of his own personal expenses through undisclosed overdraft authorization on the surreptitious MCT account.

The remaining surcharge award associated with Klein's lapse of the two additional Phoenix insurance policies is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as adjusted. Klein's direct cash misappropriations associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the five non-prevailing beneficiaries are filtered out, total **$1,625,311, payable in the following additional sums:**

**Mordechai Deutsch -- $14,571**

**Deborah Deutsch -- $533,505**

**Zev Deutsch -- $13,571**

**Tanya Menlo -- $37,179**

Franklin Menlo -- $66,811

Jonathan Menlo -- $45,573

Yeshia Frankel -- $12,174

Rochelle Lipschutz -- $12,174

Moishe Frankel -- $12,174

Madeline Lipschutz -- $849,571

Faye Lipschutz -- $13,571

Avi Lipschutz -- $16,190

Dov Lipschutz -- $13,571

Asher Frankel -- $12,174

Michael Winter -- $51

Jeremy Winter -- $51

Amanda Winter -- $51

Jonathan Lifschutz -- $2059

Daniel Winter -- $51

It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the Second Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5th 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's Second Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the Second Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the Second Account. While five of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the Second Account, had Klein maintained and delivered an appropriate and accurate Second Account for each of the 24 Menlo Trusts, they would not have had to engage in a multi-year litigation to unravel proper debits and credits as to the allocation of Klein's misappropriations. Klein breached multiple trust obligations to each of those five beneficiaries, including with respect to Klein's complete lack of record keeping and failure to timely and accurately account. (*Smith v. Szeyller*, *supra*, 31 Cal.App.5th at 461-462.)

### STATEMENT OF DECISION ON
### SETTLEMENT OF THE TRUSTEE'S THIRD ACCOUNT

The Referee incorporates by reference as though fully set forth herein the evidentiary rulings associated with Klein and LKA's *Sanchez* objections, allegations of "taint" associated with Judge Cowan's rulings on discovery regarding preparation of Klein's accountings, and arguments regarding the timing of receipt of the Menlo beneficiaries' exhibits. For the reasons articulated above, those objections are again overruled.

#### Should Klein Be Surcharged on the Third Account?

The cross-account transactional audit conducted by forensic accounting expert O'Bryan on Klein's Third Accounts for the 24 Trusts was extensive. The approximately 2000 transactions conducted by Klein on behalf of the Trusts during the Third Accounting period, many of which transactions were ignored in Klein's verified Third Accounts, are painstakingly detailed in O'Bryan's database. (Ex. 860.)

As previously determined in the Referee's Statement of Decision on Klein's First and Second Accounts, O'Bryan's testimony on Klein's Third Accounts was clear, convincing and credible. The Referee finds that through an elaborate scheme to continue to pay himself by co-

mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-paying debts -- filtered with frequency through Klein's business account containing multiple other sources of income and receipts and outgoing payments, Klein was able to continue in the Third Accounts to perpetuate his pattern of misappropriation.

Menlo Trust transactional funds continued to be moved by Klein into and out of his LKA attorney-client trust account. During the entirety of the Second Account across the 24 Menlo Trusts, a net $165,905 in cash was removed by Klein from the Menlo Trusts and not returned by the September 30, 2018 Third Account closing date; and an additional $889,671 was removed by Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts (Ex. 862, at 3.) Against these sums, over the Third Accounting across the 24 Menlo Trusts, a net credit of ($547,641) was paid by Klein for Trust insurance premiums on policies not yet lapsed. (*Ibid.*)

As noted earlier, subject to any Phase II credit(s) given by the trial judge to Klein on the Third Accountings for attorney fees and litigation expenses in preparation of the incomplete accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the Third Accounting period, and never returned, totals $507,935.**

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. In preparation of the Third Accounts, Magnes testified that she was not asked to determine if Klein had taken funds for his own use, nor was she seeking evidence of misappropriation. Based upon O'Bryan's comprehensive audit, the Referee finds that Klein was able to and did misappropriate an additional $507,935 in funds for his personal use during the Third Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon its settlement rendered against Klein; where, as here, the Referee finds "a ... failure to keep true accounts" (*Blackmon v. Hale, supra,* 1 Cal. 3d at 560); and also where, as here, "any doubt

from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe*, *supra*, 98 Cal.App.2d at 505), **Klein is surcharged in the principal sum of $507,935 for net cash misappropriations across the 24 Trusts during the Third Account, plus any interim prejudgment interest to be determined to have accrued after the close of the Third Accounting period on September 30, 2018.**

It is not only the cash misappropriations damaging the Menlo Trusts during the Second Accounting period. The misappropriations, in part, came from $889,671 *in additional loans* taken by Klein during the Third Accounting period against lines of credit obligating Menlo Trust brokerage accounts. The Menlo Trusts, not Klein, serviced *all of the interest* due and owing on those additional loans, and in continuing the payment of interest charged on unpaid insurance and brokerage loans taken by Klein during the periods covered by the First Account and Second Account. The *additional* interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the First Accounting periods, but paid by Klein from Trust funds during the Third Accounting period, totaled $208,454. The *additional* net interest charged by brokerage houses to service Trust lines of credit taken out by Klein during either the First, Second or Third Accounting periods, but paid by the Trusts during the Third Account, totaled $92,252.

Absent the cash misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the First, Second and Third Accounting periods, there would have been no need for the Trusts to subsequently service those loans. In light of the disparity between the cash debits taken by Klein without repayment to the Trusts and the credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein against Trust assets during the Second Accounting period were for purposes of non-Trust use and therefore misappropriation.

Pursuant to Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

"(a)  If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:

(1)  **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
(2)  Any profit made by the trustee through the breach of trust, with interest.
(3)  Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

(b)  If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly $300,706 in *additional* interest obligations **paid by the Menlo Trusts** during the during the Third Accounting period to subsidize the **$6,884,930 in total loan funds taken personally by Klein during the First, Second and Third Accounting periods,** are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $300,706, plus any interim prejudgment interest to be determined to have accrued after the close of the Second Accounting period on December 31, 2016, for diminution in value to the Menlo Trusts for additional interest paid by the Trusts in the Third Accounting period on loan funds taken by Klein for his non-Trust use during the First, Second and Third Account periods.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts. The Referee finds that none of Klein's acts resulting in surcharge on the Third Accounts were performed reasonably or in good faith.

The remaining surcharge question on the Third Accounts is whether Klein breached the relevant Trusts during the Third Accounting period by causing a fourth $5,000,000 face value Phoenix Insurance universal life policy (#2499115) to lapse. The evidence was undisputed that *at*

*the time* of that policy lapse, as opined by Klein's insurance expert Burgess, it was a reasonable decision for Klein to allow the fourth Phoenix policy to lapse due to the combination of loans *taken by Klein personally* against that Phoenix policies, continued unpaid interest accruing on that policy loan, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, significantly reducing the policy's value.

The core cause of the fourth Phoenix policy lapse was the loan funds taken by Klein against the policy which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policy was exclusively the result of Klein's misappropriations of Trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums. The Referee finds not credible Klein's claim that Sam Menlo had directed Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the lapsed Phoenix loan proceeds for himself.

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the additional $5,000,000 in policy death benefits, less the principal amount of loans all the while retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse (calculated to pay out in 2023), and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans,

according to Wirtz, there should still have been $2,339,334 remaining in policy value on the fourth lapsed policy. (Ex. 873.)

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the Third Accounting period of $2,339,334. **Klein is surcharged an additional $2,339,334 for the unreasonable diminution in value of the collective corpus of the 24 Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued after the close of the Third Accounting period on September 30, 2018.**

**The total principal surcharge to Klein for the Third Accountings is found to be $3,147,975** (*i.e.*, $507,935 + $300,706 + $2,339,334) (Ex. 842, at 3), less any attorney fees and costs incurred by Klein during the period of the Second Accounts determined by the trial judge in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the net surcharge, if any, as further determined by the trial judge in Phase II.

Breaking down the collective net surcharge on an individual Trust basis, the surcharge sums (or credits) for the Third Account are found, based upon substantial evidence, to be allocable as follows:

**Abraham Deutsch -- $10,289**

**Samuel Deutsch – $10,289**

Esther Deutsch – ($1114)

Rachel Deutsch – ($1114)

Norine Winter – ($27,134)

**Mordechai Deutsch -- $195,449**

**Deborah Deutsch -- $350,436**

**Zev Deutsch -- $195,449**

**Tanya Menlo -- $10,289**

Franklin Menlo – ($15,688)

Jonathan Menlo -- $206,852

Yeshia Frankel -- $206,852

Rochelle Lipschutz -- $203,478

Moishe Frankel -- $206,852

Madeline Lipschutz -- $585,286

Faye Lipschutz -- $195,449

Avi Lipschutz -- $187,226

Dov Lipschutz -- $195,449

Asher Frankel -- $206,852

Michael Winter -- $12,316

Jeremy Winter -- $12,316

Amanda Winter -- $12,316

Jonathan Lifschutz -- $2047

Daniel Winter -- $12,316 (Ex. 862, at 14-37.)[47]

It should be clarified that these calculations are not "running" totals, but rather, are intended to constitute separate surcharge judgments exclusively for the Third Accounting period, independent of the calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the period of the First Accountings as of June 30, 2013, and independent of the separate calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the Second Accounting period on December 31, 2016.

Four of the Menlo Trust beneficiaries, Esther Deutsch, Rachel Deutsch, Norine Winter and Frank Menlo are accordingly not entitled to surcharge judgment against Klein on the Third Accountings. The remaining 20 Menlo Trust beneficiaries are entitled to additional surcharge judgments in the respective principal sums identified above.

---

[47] The Referee's surcharge calculations are exclusive of potential adverse tax consequences associated with income realization upon lapse of the fourth Phoenix insurance policy during the Third Accounting period. As noted earlier, the Referee determines those potential tax losses to be speculative and not currently recoverable, while not relieving Klein of contingent liability to the extent those tax consequences become realized.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 19 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's Third Accounts?**

In their initiating accounting, removal and surcharge petitions, the 19 prevailing Menlo beneficiaries on the Second Account pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a... trust... the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $808,641 of Menlo Trust cash during the period of the Third Accountings, including interest paid for which Klein should be liable; laundering funds through unnecessary intra-trust transactions and repositories, including, *inter alia*, the commingling of assets of the 24 individual Trusts, then frequently spreading those assets across Klein and his other clients' assets via his law firm attorney-client trust account.

The remaining surcharge award associated with Klein's lapse of the two additional Phoenix insurance policies is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as adjusted. Klein's direct cash misappropriations

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
74

associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the five non-prevailing beneficiaries are filtered out, total **$1,017,900, payable in the following additional sums:**

**Abraham Deutsch -- $10,289**

**Samuel Deutsch – $10,289**

**Deborah Deutsch -- $350,436**

**Tanya Menlo -- $10,289**

**Madeline Lipschutz -- $585,286**

**Michael Winter -- $12,316**

**Jeremy Winter -- $12,316**

**Amanda Winter -- $12,316**

**Jonathan Lifschutz -- $2047**

**Daniel Winter -- $12,316**

It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the Third Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5th 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's Third Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the Third Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the Second Account. While four of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the Third Account, had Klein

1   maintained and delivered an appropriate and accurate Third Account for each of the 24 Menlo

2   Trusts, they would not have had to engage in a multi-year litigation to unravel proper debits and

3   credits as to the allocation of Klein's misappropriations. Klein breached multiple trust

4   obligations to each of those five beneficiaries, including with respect to Klein's complete lack of

5   record keeping and failure to timely and accurately account. (*Smith v. Szeyller, supra,* 31

6   Cal.App.5th at 461-462.)

7

8                    **STATEMENT OF DECISION ON REMAINING**
                     **ISSUES RELATING TO ALL ACCOUNTINGS**

9

10  **Is Klein Entitled to Trustee Fees, and if so, How Much?**

11       Long after Klein's three sets of accountings were filed in 2013, 2018 and 2019,

12  respectively, on November 16 and November 17, 2021, on the eve of trial before the Referee,

13  Klein filed 72 sets of *verified* supplements to his earlier accountings, across each of the 24 Menlo

14  Trusts, demanding Trustee fees in the collective sum of $1,034,477.58 beyond the $750,000

15  claimed by Klein in 2005.

16       Under the provision of Children's Trusts and the Grandchildren's Trusts authorizing an

17  annual trustee fee of .05% of the sum of trust assets under management, Klein attempted in the

18  November 2021 filings to use the *total death payout sums* of Trust life insurance policies,

19  including those Klein in the interim had caused to lapse, to inflate the carrying value of Trust

20  assets for purposes of geometrically increasing his Trustee fee.

21       By way of example, in the Second Supplement to the First Account for Menlo

22  beneficiary Asher Frankel, filed November 16, 2021, instead of relying upon the $51,387 in cash

23  and $72,089 in securities as the carrying value of that Trust, Klein includes in the carry value

24  $55,500,000 in unmatured face value life insurance policies of which that Trust was a partial

25  beneficiary, including the four subsequently lapsed Phoenix policies. Klein then subtracts from

26  the beneficiary's allocable percentages of unmatured death payments on those policies the cash

27  loans Klein withdrew from those policies, further reduced by anticipated premium payments

28  through the anticipated actuarial date of Vera Menlo's passing. In this fashion, Klein was able to

    increase $123,476 in Trust assets to, in the case of Asher Frankel, a claim of $1,954,516 of

"assets on hand" for purposes of calculating Klein's Trustee fees. Klein uses this same protocol across all 24 Menlo beneficiaries and all 72 accountings.

There is a proper method to account for life insurance policies in an irrevocable insurance trust, and it is stated very clearly in the very CEB text that Klein's counsel held up as the "leading treatise in California on fiduciary accounting." In the 2021 supplement to the 2020 addition of the *Fiduciary Accounting Handbook*, and now in the main volume of the current 2022 addition, there is a separate section entitled in bold: **"How Do I Account for an Irrevocable Life Insurance Trust."** Given its use as a prop at trial, it defies credulity to suggest that Klein and his counsel were unaware of the proper accounting protocol.

According to the respective texts, at §16.28, before a life insurance policy matures (which is the case as to **all** of Klein's filed accountings), the carrying value of such a policy prior to maturity consists *solely* of the premium payments made. At the time of maturity (i.e., the death of the insured), the accounting will reference *a gain* in the amount of the policy payout over the sum of premium payments.

Klein assiduously avoided making policy premium payments whenever possible, at least according to his testimony at trial, resulting in the loss of $20,000,000 in Phoenix policies at a minimum and reduction in principal payout sums on others. While one may understand why Klein opted to invent an unorthodox accounting methodology to receive more Trustee fees than permissible, at what point does a combination of millions in cash asset misappropriations, laundering of funds, suppression of relevant documents and "creative" improper accounting become an attempted fraud upon the parties and the Court?

Klein testified that Sam Menlo directed him to take $750,000 in Trustee fees in 2005 as a lump sum for prior Trust services rendered. The Referee finds that Sam Menlo was not competent in 2005 to authorize that payment, nor is there any corroborating evidence to support Klein's claim.[48] Rather, the written record supports something entirely different.

---

[48] Per the credible testimony of Frank Menlo:

"Q.   In your opinion was your -- in about June of 2005 or even earlier in 2005, was your father mentally capable of making a decision as to how to pay trustee's fees to Mr. Klein?

A.   Absolutely not." (6 Tr. 1199.)

On June 6, 2005, through records produced by the successor to Phoenix, three $250,000 cash loans were requested by Klein with signature authorizations which appeared to include Frank Menlo. Whatever the amount of those authorizations as presented, the original numbers were scribbled out and altered in favor of a series of three $250,000 loan requests, which were then faxed to Phoenix Insurance. (Exs. 309-311.)

To its credit, Phoenix refused to honor what appeared to be altered documents, in favor of proper authorizations without the scribbling and interlineation of amounts. In the replacement documents faxed the following day by Klein to Phoenix Insurance (Exs. 312-314), Frank Menlo testified that the signature purporting to be his is not his signature. (6 Tr. 1217-1218.) The signatures clearly do not match.

With no further evidence, and upon Frank Menlo's unequivocal testimony that he did not authorize $750,000 in payments to Klein, the most logical inference is that Klein or someone on his behalf forged Frank Menlo's initials. The Referee finds that while Klein clearly took $750,000 in his fiduciary capacity against Menlo Trust assets, never returning one cent of those funds (or any other loan funds for that matter, or any interest on any funds), there is no credible evidence that the $750,000 was payment made to Klein for Trustee fees.

Where the trustee commits a breach of trust, the trial court may deny the trustee all compensation. *Estate of Gump* (1991) 1 Cal.App.4th 582, 597; *Butler v. LeBouef* (2016) 248 Cal. App. 4th 198, 213. It is undeniable that Klein has managed the 24 Menlo Trusts principally for his own personal benefit and enrichment.[49] Klein embezzled what has been accurately calculated to be $19,225,065 in Trust assets for which he has no response. Klein refused to account for many years until forced to do so by the Court, and, even after a decade of litigation, still refuses to account for 156 years of collective trust management. Klein has ignored the distributive terms of every single Menlo Trust except one. Klein claimed to have no Trust documents upon which to account. Klein has borrowed many millions of dollars against Trust

---

[49] During the course of the trial, Klein not uncommonly referred to Menlo Trust assets as "my" money.

assets as to which he has never shown any interest in repaying. Klein has deliberately filtered thousands of Trust transactions through his own attorney-client trust account for no legitimate reason. Klein torpedoed $20,000,000 in valuable Trust life insurance policies because of his compulsion to divert Menlo Trust assets for non-Trust purposes. Klein unabashedly used Menlo Trust accounts as overdraft protection on his personal credit cards as a means to misappropriate many additional hundreds of thousands of Trust dollars. Klein submitted 72 incomplete and misleading accountings to the Court intending to mask his many years and millions of dollars of fiduciary misappropriation.

The Referee denies all Trustee fees.


**What About LKA?**

Beyond its obvious participation as a financial clearinghouse for thousands of Trust transactions, including millions of dollars in Menlo Trust assets never returned by Klein to the Trusts for a beneficial trust purpose, it is not clear why LKA was added to trust accounting litigation on what is essentially a civil conspiracy count.

Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* *(1994) 7 Cal. 4th 503, 510-511.* "A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage." *Id.*, quoting *Doctors' Co.* v. *Superior Court* (1989) 49 Cal.3d 39, 44.

It was Klein, not LKA, who moved Menlo Trust funds into and out of the LKA attorney-client trust account. There is no suggestion that LKA used Menlo Trust funds for its own purposes, or that LKA somehow had dispositional control over the funds on deposit.

LKA was not the Trustee of the Menlo Trusts. LKA was not in an attorney-client relationship with the Menlo Trusts. Klein's statutory obligations and adverse presumptions

associated with his incomplete and false accountings have nothing to do with civil conspiracy claims against LKA, which accountings LKA did not prepare and for which LKA had no participation or responsibility.

It is *the burden of the six Menlo beneficiaries* naming LKA as a party to prove both liability and damages associated with LKA. While the 24 Menlo beneficiaries established clearly and convincingly that (in addition to their consequential losses on the four lapsed Phoenix Life Insurance policies) Klein withdrew $19,225,065 in Menlo Trust cash that he never returned or applied to a beneficial Trust purpose, nowhere over the 22 days of trial did the five Menlo beneficiaries suing LKA prove that the 23 checks identified in their Fifth Amendment were among the millions of dollars in funds improperly retained by Klein.

The Menlo beneficiaries did a commendable job of specifying with certainty all transactions on funds removed by Klein from the Trusts, all transactions on funds intended for the Trusts from third party sources that were either waylaid or redirected by Klein, all transactions within the Trusts themselves, and all transactions involving funds utilized by Klein for *bona fide* Trust purposes. And no time, however, did the Menlo beneficiaries, or at least the six beneficiaries litigating against LKA, drill down to the *ultimate* disposition of LKA proceeds beyond those utilized for the legitimate Trust purposes. It is currently unknown whether the 23 checks identified in the Fifth Amendment filed March 5, 2019 were among the millions in funds misappropriated by Klein or were among the funds utilized for a proper trust purpose.[50]

---

[50] As testified by O'Bryan at trial:

"Q. As part of your scope of work for L.K.A., you essentially did a money in money out analysis, correct?
A. That's correct.
Q. Okay. So you have no idea, as you sit here today, whether any funds that landed in the L.K.A. trust account were used for L.K.A. purposes, correct?
A. I do not.
And as you sit here today, you don't know whether or not any of the funds that landed in the L.K.A. bank account were eventually used for other trust purposes, correct?
A. That's correct.
Q. And as you sit here today, you don't know whether any funds that landed in the L.K.A. bank accounts were used for payment of legal or accounting expenses related to the trust, correct?

The six Menlo beneficiaries failed to satisfy their burden of proof with respect to their civil conspiracy claim against LKA. LKA's motion for judgment is granted.

**Allocation of Referee Fees**

Referee fees on settlement of the 72 contested Menlo Trust accountings have been collectively charged throughout at a rate of $880 per hour. From the introductory calendaring conference with counsel on September 24, 2021 through completion of this Report and Recommendation on August 27, 2022, a collective 336.20 referee hours have been entered, including but not limited to 22 days of trial, the subsequent sifting through trial notes, exhibits and testimony, and the research and preparation of this Report and Recommendation on the adjudication and settlement of each of the 72 accounting petitions. The Referee calculates total professional fees to date to be $295,856,[51] with an additional $36,723.24 charged in case management fees.

For all of the reasons set forth in this Report and Recommendation, the Referee recommends that the Menlo beneficiaries be ordered reimbursed by Klein for the entirety of their contributions to the Referee's invoicing, as part of a consolidated itemized cost memorandum.

**SUMMARY OF RECOMMENDATIONS ON SETTLEMENT OF ACCOUNTS**

**On the 24 First Accountings:**

1. That Klein be **surcharged** in the net principal sum of **$10,007,876**, such sum to be allocated (including adjustments to be made between Trusts to eliminate the four negative balances) among the 24 Menlo Trusts as specifically itemized above on the First Accounts;

---

A. I believe that's correct.
Q. And as you sit here today, you have no idea whether L.K.A. is still holding onto any funds from the trust accounts, correct?
A. You mean as of today?
Q. As of today?
A. Yeah, I don't know." (17 Tr. 3294-3295.)

[51] The Referee's consolidated professional fee translates to $4034 per petition.

2.  That Klein be **further surcharged** in the sum of **$8,533,547** under Probate Code §859, such sum to be specifically allocated among the identified 20 Menlo Trusts as itemized above on the First Accounts;

3.  That the net surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the First Accountings on June 30, 2013, as contemplated by Probate Code §§16440(a)(1) and 16441;

4.  That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his First Accountings and in the defense of related surcharge claims;

5.  That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the 24 Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein on the First Account;

6.  That Klein be denied Trustee fees;

7.  That LKA's motion for judgment be granted;

8.  That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the First Accounts; and that costs be awarded to LKA from the six litigating Menlo petitioners.

**On the 24 Second Accountings:**

1.  That Klein be **surcharged** in the net principal sum of **$6,069,214**, such sum to be allocated (including adjustments to be made between Trusts to eliminate the five negative balances) among the 24 Menlo Trusts as specifically itemized above on the Second Accounts;

2.  That Klein be **further surcharged** in the sum of **$1,625,311** under Probate Code §859, such sum to be specifically allocated among the identified 19 Menlo Trusts as itemized above on the Second Accounts;

3.  That Klein be ordered to fully indemnify the applicable Menlo Trust beneficiaries for any future adverse Trust or individual beneficiary tax consequence associated with Klein's lapse of Trust life insurance policies during the period of the Second Accounts;

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

82

4. That the surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the Second Accountings on December 31, 2016, as contemplated by Probate Code §§16440(a)(1) and 16441;

5. That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his Second Accountings and in the defense of related surcharge claims;

6. That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein;

7. That Klein be denied Trustee fees;

8. That LKA's motion for judgment be granted; and

9. That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the Second Accounts; and that costs awarded to LKA from the six litigating Menlo petitioners.

**On the 24 Third Accountings:**

1. That Klein be **surcharged** in the net principal sum of **$3,147,975** such sum to be allocated among the 24 Menlo Trusts as specifically itemized above on the Third Account.

2. That Klein be **further surcharged** in the sum of **$1,017,900** under Probate Code §859, such sum to be allocated among the ten Menlo Trusts as specifically itemized above on the Third Accounts;

3. That Klein be ordered to fully indemnify the applicable Menlo Trust beneficiaries for any future adverse Trust or individual beneficiary tax consequence associated with Klein's lapse of the Trust life insurance policy during the period of the Third Account;

4. That the surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the Third Accountings on September 30, 2018, as contemplated by Probate Code §§16440(a)(1) and 16441;

5. That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his Third Accountings and in the defense of related surcharge claims;

6. That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein;

7. That Klein be denied Trustee fees;

8. That LKA's motion for judgment be granted; and

9. That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the Third Accounts; and that costs be awarded to LKA from the six litigating Menlo petitioners.[52]

Dated: August 29, 2022

*Glen M. Reiser*

Judge Glen Reiser (Ret,)
§639 Referee

IT IS SO ORDERED.

_____
Judge of the Superior Court

---

[52] Over the settlement of all 72 accountings, through the respective accounting periods presented, and deferring the prejudgment interest calculations to the trial court, the total principal surcharge recommendation against Klein is $19,225,065. The additional consolidated Probate Code §859 recommendation is $11,176,758. The recommended collective surcharge judgment, prior to Phase II interest and attorney fees/cost debits or credits, is therefore $30,401,823.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
84

## PROOF OF SERVICE BY E-Mail

Re: In re: Franklin Henry Menlo Irrevocable Trust, Established March 1, 1983
Reference No. 1220070187

I, Stephanie Barraza, not a party to the within action, hereby declare that on August 29, 2022, I served the attached REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE ON EXAMINATION AND ADJUDICATION OF THE TRUSTEE'S FIRST, SECOND, AND THIRD ACCOUNTINGS ON EACH OF THE TWENTY-FOUR TRUSTS AT ISSUE FOR THE TRUST PERIODS SEPTEMBER 10, 1996-JUNE 30, 2013, JULY 1, 2013-DECEMBER 31, 2016 AND JANUARY 1, 2017-SEPTEMBER 30, 2018 on the parties in the within action by electronic mail at Los Angeles, CALIFORNIA, addressed as follows:

Donald L. Saltzman Esq.
L/O Donald L. Saltzman
10537 Butterfield Rd
Los Angeles, CA   90064
Phone: 310-617-3073
dlslawcorp@aol.com
   Parties Represented:
   Franklin Henry Menlo, et al.

Terence S. Nunan Esq.
Alan D. Weinfeld Esq.
Parker, Milliken, Clark, et al.
555 S. Flower St.
30th Floor
Los Angeles, CA   90071-2440
Phone: 213-683-6500
tnunan@pmcos.com
aweinfeld@pmcos.com
   Parties Represented:
   Leslie Klein, Trustee, et al.

Candice K. Rogers Esq.
Hahn & Hahn
301 E. Colorado Blvd.
9th Floor
Pasadena, CA   91101
Phone: (626) 796-9123
crogers@hahnlawyers.com
   Parties Represented:
   Les Klein & Associates

Michael L. Wachtell Esq.
Buchalter, APC
1000 Wilshire Blvd.
Suite 1500
Los Angeles, CA   90017-2457
Phone: 213-891-0700
mwachtell@buchalter.com
   Parties Represented:
   Leslie Klein, Trustee, et al.

VIA ONE LEGAL TO:
Hon. Ana M. Luna
Los Angeles County Superior Court
111 N Hill St
Dept 3

Los Angeles, CA   90012
Phone: 213-830-0850

       I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles,

CALIFORNIA on  August 29, 2022.


/s/ Stephanie Barraza

_____
Stephanie Barraza
JAMS
SBarraza@jamsadr.com

1

**PROOF OF SERVICE**

2

**In the Irrevocable Trust u/a/d September 26, 1990 f/b/o Abraham Deutsch**
**Case No.: 22STPB10823**

3

4

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

5

6          I am employed in the County of Los Angeles, State of California.  I am over the age of 18
and not a party to the within action; my business address is 16133 Ventura Boulevard, Penthouse

7    Suite, Encino, CA 91436.

8          On November 3, 2022, I served the foregoing documents described as: **NOTICE OF**
**ERRATA** on the interested parties in this action as stated below:

9

10   [ X ]    BY MAIL.  I caused such envelope to be deposited in the mail at Encino, California.  The
envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's

11   practice of collection and processing correspondence for mailing.  Under that practice it would be
deposited with U.S. postal service on that same day with postage thereon fully prepaid at Encino,

12   California in the ordinary course of business.  I am aware that on motion of the party served, service
is presumed invalid if postal cancellation date or postage meter date is more than one day after date

13   of deposit for mailing an affidavit:

14        Leslie Klein                                    Jeffrey Slot, Esq.

15        14245 Ventura Boulevard, 3rd Floor         15760 Ventura Boulevard, Suite 1600
          Sherman Oaks, CA 91423                          Encino, CA 91436

16
          Franklin Menlo                                  Jeffrey Winter
17        c/o Donald L. Saltzman, Esq.                    c/o Alex Weingarten, Esq.
          10537 Butterfield Road                          2029 Century Park East, Suite 3400
18        Los Angeles, CA 90064                           Los Angeles, CA 90067

19   [ ]    BY ELECTRONIC MAIL TRANSMISSION (WITH ATTACHMENT).  On this date, by

20   causing transmission of the above-mentioned document(s) by electronic mail transmission, to the
persons whose e-mail addresses appear below:

21

22   [ ]    BY ELECTRONIC SERVICE: I served the document(s) on the persons listed below by
submitting an electronic version of the document(s) to One Legal, LLC, through the user interface

23   at 222.onelegal.com:

24   [ ]    BY OVERNIGHT MAIL.  I caused said document to be deposited with an express service
carrier in a sealed envelope designated by the carrier as an express mail envelope, with fees and

25   postage prepaid.

26   [ ]    BY FACSIMILE.  I personally served this document by facsimile to the offices of the

27   party(ies) on attached Service List.

28

PROOF OF SERVICE

1  [  ]    BY PERSONAL DELIVERY.  I delivered such document(s) by hand to the address(es) of
2  the addressee(s).

3  [ X ]    STATE.  I declare under penalty of perjury under the laws of the State of California that the
   above is true and correct.

4
5        Executed on November 3, 2022, at Encino, California.

6
7
8                                                    _Julie J. Thomas_
                                                        Julie J. Thomas
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

ROBERT P. GOE (State Bar No. 137019)
rgoe@goeforlaw.com
REEM J. BELLO (State Bar No. 198840)
rbello@goeforlaw.com
**GOE FORSYTHE & HODGES LLP**
17701 Cowan Avenue, Suite 210, Bldg. D
Irvine, CA 92614
Telephone: (949) 798-2460
Facsimile: (949) 955-9437

BRIAN A. PROCEL (State Bar No. 218657)
brian@procel-law.com
MARTIN H. PRITIKIN (State Bar No. 210845)
marty@procel-law.com
**PROCEL LAW, PC**
401 Wilshire Boulevard, 12th Floor
Santa Monica, California 90401
Telephone: (424) 788-4538

Attorneys for Judgment Creditors and Plaintiffs
Erica and Joseph Vago

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>LESLIE KLEIN,<br><br>        Debtor.<br>──────────────────────<br>ERICA VAGO and JOSEPH VAGO,<br><br>        Plaintiffs,<br><br>      vs.<br><br>LESLIE KLEIN and DOES 1 through 10,<br><br>        Defendants. | Case No. 2:23-bk-10990-SK<br><br>Chapter 11<br><br>Adv. Case No.<br><br><br>**COMPLAINT TO DETERMINE THE NONDISCHARGEABILITY OF CERTAIN DEBTS OWED BY DEBTOR LESLIE KLEIN TO ERICA AND JOSEPH VAGO PURSUANT TO 11 U.S.C. § 523 AND TO DENY DISCHARGE PURSUANT TO SECTION 727(A)(12)** |

1

Plaintiffs Erica ("Erica") and Joseph Vago ("Joseph") (collectively, the "Vagos"), allege as follows on personal knowledge:

**<u>Nature of the Case</u>**

1.      Defendant and Debtor Leslie Klein ("Defendant" or "Debtor") stole more than $8 million from Erica in a complicated life insurance scam.

2.      Defendant was the Vagos' friend for more than 40 years.  Defendant preyed on the Vagos during a time of vulnerability and desperation.  Defendant convinced the Vagos to entrust him with Erica's $15 million inheritance.  Defendant claimed he would act as the Vagos' lawyer, accountant and investment adviser.

3.      In truth, Defendant is a con man who systematically embezzled the Vagos' money and lied to them every step of the way.  Defendant created false financial statements.  Defendant misrepresented the nature of the Vagos' "investments."  Defendant talked in circles and provided documents that were designed to confuse.  Defendant sold insurance policies without telling the Vagos.  Defendant fabricated meetings that never happened.  Defendant made himself the trustee over life insurance trusts that purportedly held the Vagos' money.

4.      In the end, Erica's money simply vanished.  Defendant forced the Vagos to take their case to trial.  Defendant attempted to derail the litigation at every possible moment. Defendant refused to participate in discovery.  The trial court sanctioned Defendant on multiple occasions.  At trial, Defendant—who was a CPA for decades—could not account for what happened to $8 million in Erica's inheritance.  On cross-examination, Defendant admitted that he had no intention of ever giving Erica a return on her money.  This was a scam from start to finish.

5.      The jury ultimately returned a verdict holding Defendant liable for intentional fraud, fraudulent concealment, breach of fiduciary duty and elder abuse.  The jury awarded more than $8 million in punitive damages.  And the trial court entered judgment in the amount of $24.3 million.

6.      This debt is not dischargeable in bankruptcy.  The Vagos' judgment emanates from a widespread, deliberate and calculated fraud on the part of Defendant.

**Jurisdiction and Venue**

7. On February 22, 2023 (the "Petition Date"), Defendant filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court, Central District of California, Los Angeles Division.

8. This action is a civil proceeding arising in the above-captioned chapter 11 bankruptcy case, which is now pending in this judicial district, and arising under, and arising in and related to title 11 of the United States Code.

9. This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(2)(J) to hear and determine this proceeding and to enter an appropriate final order and judgment.

10. This matter is a core proceeding pursuant to 28 U.S.C. § 157.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

**The Parties**

12. The Vagos are judgment creditors in the above-captioned Chapter 11 bankruptcy case.

13. Defendant is the debtor in the above-captioned Chapter 11 bankruptcy case.

**General Allegations**

**A. The Friendship**

14. Joseph first met Defendant in 1970. They are both Orthodox Jews and they were members of the same temple.

15. Over the years, the Vagos and Defendant interacted at family and religious events, including birthdays, holidays, shabbat dinners, bar mitzvahs, and weddings. Defendant and the Vagos were friends.

**B. Legal Services**

16. In June 2012, Erica's uncle died. In October 2012, Erica's brother died. A few months later, in July 2013, Erica's mother died. Erica and Joseph had to deal with three lost loved ones in short succession.

3

17. Erica's brother, Robert Schweitzer ("Schweitzer"), died on October 3, 2012. Schweitzer willed the bulk of his estate to Erica. Schweitzer's estate included roughly $18 million in a foreign bank account.

18. A few days following Schweitzer's death, the Vagos were at their home mourning the loss of Schweitzer. Defendant went to the Vagos to pay his respects. At that time, Defendant also offered his services as a lawyer and accountant. Defendant said he could handle any issues that might come up with Schweitzer's estate. The Vagos ultimately agreed to retain their longtime friend. The Vagos and Defendant arranged to meet the following week.

**C. The Life Insurance Policies**

19. About a week later, the Vagos and Defendant met to discuss Schweitzer's estate. Erica learned before the meeting that Schweitzer had left her more than $18 million, located in a foreign bank account. The Vagos did not know how to handle the will, probate, inheritance, foreign bank accounts, and estate taxes. At the meeting, Erica told Defendant about the inheritance.

20. Defendant said this issue was his "specialty." Defendant told Erica that he was a jack-of-all-trades—he was a lawyer, CPA, and financial adviser. Defendant told Erica he could deal with the will. Defendant told Erica he could prepare the estate tax returns. Defendant told Erica he could figure out the best way to repatriate the money from the foreign bank account. Defendant told Erica he could even set up investments for the money once the Vagos received it.

21. The Vagos agreed to let Defendant guide them through this unfamiliar territory. Erica wrote Defendant a $7,000 check that day for the legal services he promised to provide through his law firm Leslie Klein & Associates ("LK&A").

22. Defendant also recommended that the Vagos invest the inheritance in life insurance policies. Defendant explained the safety and benefits of this strategy. Defendant said that each investment would garner 10 to 12% interest each year, plus a premium on the principal in some cases, all to be paid when the Vagos cashed out. And Defendant emphasized how simple cashing out would be. Defendant advised that investments in these policies were "just like cash." Defendant promised the Vagos they could "sell them for cash any time [they] wanted."

23. Defendant added that the best way to effect the transaction would be to wire the money to the LK&A client trust account. Defendant would then invest the money from the LK&A client trust account into life insurance policies. When the Vagos mentioned they wanted to donate substantial sums to charity, Defendant suggested they wire the money to the EKLK Foundation, which Defendant set up and controlled. Defendant said the EKLK Foundation would then distribute funds to charities the Vagos chose.

24. Finally, Defendant said that if the Vagos wanted cash from Erica's inheritance for themselves, they should ask him for it. He would write them a check from the LK&A client trust account.

25. Defendant reassured the Vagos that the strategy was sound. Defendant said he performed the same transactions for "all my clients" as well as his family. Defendant told the Vagos that he invested his own money in the life insurance policies. Defendant added that prominent tax attorneys and accountants "in Century City" confirmed to him that this was a safe and proper strategy. Defendant claimed to have invested in life insurance policies for several prominent members of the Jewish community.

**D.    The Scam**

26. Over the next four years, Erica arranged more than $15 million in wire transfers from the foreign bank account holding her inheritance. Erica made each transfer at Defendant's direction and to accounts Defendant controlled.

27. About $12.4 million went to the LK&A client trust account, and the rest went to Defendant's EKLK Foundation.

28. As the money came in, Defendant represented to the Vagos that he was executing the investment strategy he had convinced them to follow. Defendant told the Vagos he was investing much of Erica's inheritance in life insurance policies.

29. The life insurance "investments" were not really investments; they were non-recourse loans to irrevocable life insurance trusts. Each life insurance trust purportedly contained a life insurance policy or policies—on the life of a complete stranger to the Vagos—which served as the sole security for the Vagos' loan. The principal and interest on each loan were not due until

5

the death of the policyholder.  For Erica and Joseph—who were respectively 59 and 61 when

Schweitzer passed—this term rendered the loans almost valueless.  They did not know when—if

ever—the loans would become due.

30.     The Vagos did not know the identities of the other "investors" in each life

insurance trust.  The Vagos did not know how much money Defendant received from other

"investors."  The Vagos had no way to independently verify whether Defendant was paying the

premiums on the insurance policies.  The Vagos had no way to determine whether the insureds

were alive or not.  The Vagos could not find out whether any insurance companies had paid

Defendant money in connection with the policies they "invested" in.  The Vagos had no way to

know whether Defendant sold the policies they thought they invested in.  The Vagos were

completely in the dark and at the mercy of Defendant.

31.     The Vagos' names were nowhere to be found on the promissory notes or on the life

insurance policies.  Rather, the promissory notes were executed for the benefit of the "Estate of

Robert Schweitzer."  It could not be more evident that Defendant structured these "investments" in

a manner designed to confuse and deceive the Vagos.  Defendant knew that these "investments"

were never going to pay out.

32.     Though these promissory notes were nearly worthless to the Vagos, by Defendant's

doing, they still had a huge carrying cost.  To keep the underlying life insurance policies from

lapsing, Defendant told the Vagos that they would have to pay hundreds of thousands of dollars

per year toward insurance premiums.  This money was in addition to the millions already loaned

to the life insurance policy trusts.

33.     By 2019, Defendant claimed to have "invested" $8.3 million of the Vagos' money

in life insurance policies.

**E.     The Misrepresentations**

34.     Defendant routinely visited the Vagos at their house.  During these visits,

Defendant would give the Vagos a memo on the letterhead of LK&A that purported to show the

status of their "investments."  In a July 1, 2017 memorandum, Defendant stated that the Vagos'

"investment" had increased in value to $9.4 million. And the memorandum indicated that the Vagos were entitled to $3,205,000 in interest since their initial "investment" in 2012.

35.     Defendant provided a memorandum in 2018 that indicated the Vagos' "investments" were worth $10.2 million and the interest was $3,685,000. These written memoranda were all lies.

### F.     The Vagos Discover Defendant's Fraud

36.     On or around September 15, 2019, Defendant went to the Vagos' home for their regular meeting. At this meeting, Erica told Defendant she needed to cash out roughly $1 million. Defendant responded that the "interest" that had accrued on the Vagos' investment was all gone. Defendant falsely stated that "hedge funds are not paying interest anymore" on life insurance policies, so their earnings over the past seven years had vanished.

37.     The Vagos demanded that Defendant refund their money. Defendant refused.

### G.     The State Board of Accountancy

38.     At the same time Defendant was defrauding the Vagos, he was accused of stealing money from his client Hubert Scott ("Scott"). The California State Board of Accountancy (the "State Board") brought charges against Defendant in 2019.

39.     The State Board alleged that Scott inherited money when his brother and son died. Defendant purported to serve as Scott's tax preparer, financial planner and investment adviser. Scott, at that time, was 86 years old and had dementia. Defendant had himself appointed as the trustee of Scott's trust agreement. Over the course of five years, Scott gave Defendant $2.42 million.

40.     Defendant purported to "invest" Scott's money in non-recourse promissory notes with irrevocable life insurance trusts (i.e., the exact same investments that are at issue here). Defendant invested 85% of Scott's money in these life insurance trusts. Even though Scott was 86 years old, he would only be paid out when the insured passed away. Defendant also invested Scott's money in companies with which Defendant was affiliated. Among others, Defendant purportedly invested $750,000 of Scott's money in LEDs sold by Time Square Media, Inc. ("Time Square Media"). Defendant was the president of Time Square Media. This $750,000 investment

purportedly made by Defendant was not reflected in any accounting. The State Board noted that none of the transactions were made in Scott's name. Instead, Defendant admitted that he did not invest the money in life insurance policies on behalf of his clients, but that he actually borrowed the money himself from his clients.

41.     The State Board alleged that Defendant failed to provide an accounting, and instead periodically provided documents showing inflated values that were inaccurate on their face. Defendant ultimately denied that he was Scott's tax preparer or adviser.

42.     A conservator was appointed in 2016, and Defendant was removed as trustee. The State Board filed the Accusation in 2019, based on allegations of fraud, breach of fiduciary duty, embezzlement, commingling funds and undue influence. Defendant entered into a stipulation with the State Board that resulted in the surrender of his accounting license.

**H.     The Litigation and Defendant's Failure to Comply with Court Orders**

43.     The Vagos filed a state court complaint against Defendant on July 1, 2020. From day one, Defendant and LK&A engaged in a scheme to evade discovery and to derail the case.

44.     Defendant served boilerplate objections to all written discovery requests and refused to provide substantive responses. Defendant refused to produce documents. The Vagos then filed several rounds of discovery motions. The Court granted all of them and entered monetary and issue sanctions against Defendant. The Court ordered Defendant to produce a responsivity chart and a privilege log. Defendant did not. The Court ordered Defendant to produce bank records. Defendant did not. Defendant filed a motion to quash a third-party subpoena served on Bank of America, which he lost. Defendant failed to pay the court-ordered monetary sanctions by the deadline and failed to comply with court orders requiring supplemental responses. Defendant even walked out of a court ordered deposition. Defendant stalled and refused to make himself available for deposition. Defendant substituted new counsel on the eve of trial. Defendant filed numerous motions to continue the trial date, all of which were denied

**I.     The Trial, Jury Verdict and Judgment**

45.     On August 29, 2022, the trial in the Vagos' state court matter commenced.

8

46.     At trial, the Vagos presented evidence that Defendant sought out to defraud them when they were at their most vulnerable—just after Erica's brother died and while she was caring for her dying mother in the hospital.  Defendant initially testified that he had no financial interest in the policies that he purportedly invested the Vagos' money in.  But Defendant later admitted that he invested his own money in these same policies.

47.     Defendant drafted and signed promissory notes where he agreed as trustee that the Vagos would be entitled to 12% interest on their money.  But Defendant testified at trial that he never had any intention of actually paying the Vagos that interest.  Defendant utterly failed to explain what these "investments" actually were; whether the Vagos were entitled to make any money from his perspective; or what he did with the Vagos' money.

48.     Defendant testified at trial that he kept a contemporaneous "ledger" of all transactions relating to the Vagos.  This was a lie—no such ledger was produced at trial. Defendant admitted that he provided false and inflated financials to the Vagos on a regular basis. Defendant took out a life insurance policy on an individual named Ann Radow.  Ann Radow testified at trial that she had never met Defendant; that he took out an insurance policy on her life without her knowledge or consent; and that Defendant created the Ann Radow Trust and made himself the trustee without her knowledge or consent.

49.     Unbeknownst to the Vagos, Defendant surrendered his license to practice accounting after he was accused of embezzling money from Scott, an 86-year-old client with dementia. The State Board disciplined Defendant at the same time he was defrauding the Vagos.

50.     The jury ultimately found that Erica had proven her case against Defendant for intentional fraud, fraudulent concealment, financial elder abuse and breach of fiduciary duty.  The jury awarded Erica $8.3 million in compensatory damages, plus $8.3 million more in punitive damages.  And the jury awarded Joseph an additional $400,000 in emotional distress damages. The Court then awarded $7,334,038.99 in prejudgment interest and entered judgment in the amount of $24,334,038.99 ("Judgment").  A true and correct copy of the Judgment is attached as **Exhibit 1**.

### FIRST CLAIM FOR RELIEF

### (Nondischargeability of Debt - 11 U.S.C. § 523(a)(2)(A))

51.     The Vagos reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

52.     At all relevant times, Defendant acted as the Vagos' fiduciary.  Defendant was their attorney, accountant and investment adviser.  Erica entrusted Defendant implicitly with her entire inheritance (more than $15 million).

53.     Defendant owed the Vagos fiduciary duties at all relevant times, including the duty of loyalty and candor.  Defendant further owed a duty to use Erica's funds for legitimate business purposes and to refrain from using her funds and other property for his own personal non-business purposes.

54.     Defendant embezzled and stole from the Vagos.  Defendant misrepresented information to the Vagos for the purpose of convincing Erica to deposit more than $12 million into the LK&A client trust account.  Defendant then stole more than $8 million of Erica's money in a complicated life insurance scam.

55.     A jury found Defendant liable for intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse as set forth in the Judgment.  The jury awarded Erica $8.3 million in punitive damages after finding that Defendant acted with fraud, oppression and malice. The trial court ultimately entered the Judgment against Defendant in the amount of $24.3 million.

56.     Defendant's misappropriation of Erica's funds and other property was unauthorized, without her consent and fraudulent.  Defendant acted with the intent to permanently deprive Erica of the possession, use and benefit of her funds and other property.

57.     As a result of Defendant's unauthorized and fraudulent misappropriation of Erica's funds and other property and Defendant's false pretenses, false representations, and actual fraud set forth herein, the Vagos have suffered damages in the amount of not less than $26,386,891.00.

58.     Defendant's debt to the Vagos is nondischargeable under 11 U.S.C. § 523(a)(2) because it was incurred as a result of false pretenses, false representations, and actual fraud.

59.     The damages arising from Defendant's willful and malicious false pretenses, false representation and actual fraud to the Vagos constitutes a debt against Defendant that is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2).

## SECOND CLAIM FOR RELIEF

### (Nondischargeability of Debt - 11 U.S.C. § 523(a)(4))

60.     The Vagos reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

61.     At all relevant times, Defendant acted as the Vagos' fiduciary.  Defendant was their attorney, accountant and investment adviser.  Erica entrusted Defendant implicitly with her entire inheritance (more than $15 million).

62.     Defendant owed the Vagos fiduciary duties at all relevant times, including the duty of loyalty and candor.  Defendant further owed a duty to use Erica's funds for legitimate business purposes and to refrain from using her funds and other property for his own personal non-business purposes.

63.     Defendant embezzled and stole from the Vagos.  Defendant misrepresented information to the Vagos for the purpose of convincing Erica to deposit more than $12 million into the LK&A client trust account.  Defendant then stole more than $8 million of Erica's money in a complicated life insurance scam.

64.     A jury found Defendant liable for intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse as set forth in the Judgment.  The jury awarded Erica $8.3 million in punitive damages after finding that Defendant acted with fraud, oppression and malice. The trial court ultimately entered the Judgment against Defendant in the amount of $24.3 million.

65.     Defendant's misappropriation of Erica's funds and other property was unauthorized, without her consent and fraudulent.  Defendant acted with the intent to permanently deprive Erica of the possession, use and benefit of her funds and other property.

66.     As a result of Defendant's unauthorized and fraudulent misappropriation of Erica's funds and other property while acting in a fiduciary capacity and Defendant's false pretenses, false

representations, and actual fraud set forth herein while acting in a fiduciary capacity, the Vagos

have suffered damages in the amount of not less than $26,386,891.00.

67.    The damages to the Vagos arising from Defendant's fraud, defalcation,

embezzlement and larceny while acting in a fiduciary capacity constitutes a debt against

Defendant that is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

## THIRD CLAIM FOR RELIEF

### (Nondischargeability of Debt - 11 U.S.C. § 523(a)(6))

68.    The Vagos reallege and incorporate by reference all of the prior and subsequent

allegations in this Complaint as though fully set forth herein.

69.    At all relevant times, Defendant acted as the Vagos' fiduciary.  Defendant was their

attorney, accountant and investment adviser.  Erica entrusted Defendant implicitly with her entire

inheritance (more than $15 million).

70.    Defendant owed the Vagos fiduciary duties at all relevant times, including the duty

of loyalty and candor.  Defendant further owed a duty to use Erica's funds for legitimate business

purposes and to refrain from using her funds and other property for his own personal non-business

purposes.

71.    Defendant embezzled and stole from the Vagos.  Defendant misrepresented

information to the Vagos for the purpose of convincing Erica to deposit more than $12 million

into the LK&A client trust account.  Defendant then stole more than $8 million of Erica's money

in a complicated life insurance scam.

72.    A jury found Defendant liable for intentional fraudulent, fraudulent concealment,

breach of fiduciary duty and elder abuse as set forth in the Judgment.  The jury awarded Erica $8.3

million in punitive damages after finding that Defendant acted with fraud, oppression and malice.

The trial court ultimately entered the Judgment against Defendant in the amount of $24.3 million.

73.    Defendant's misappropriation of Erica's funds and other property was

unauthorized, without her consent and fraudulent.  Defendant acted with the intent to permanently

deprive Erica of the possession, use and benefit of her funds and other property.

74.     As a result of Defendant's unauthorized and fraudulent misappropriation of Erica's funds and other property while acting in a fiduciary capacity and Defendant's false pretenses, false representations, and actual fraud set forth herein while acting in a fiduciary capacity, the Vagos have suffered damages in the amount of not less than $26,386,891.00.

75.     The damages arising from Defendant's willful and malicious injury to the Vagos constitutes a debt against Defendant that is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

## FOURTH CLAIM FOR RELIEF

### (For Denial of Discharge - 11 U.S.C. § 727(a)(12))

76.     The Vagos reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

77.     Pursuant to 11 U.S.C. § 727(a)(12), the court shall grant the debtor a discharge unless- the court after notice and a hearing held not more than 10 days before the date of the entry of the order granting the discharge finds that there is reasonable cause to believe that—(A) section 522(q)(1) may be applicable to the debtor; and (B) there is pending any proceeding in which the debtor may be found guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B).

78.     On April 11, 2023, the Vagos filed a motion [Docket No. 71] seeking disallowance of Debtor's claim of exemption in the real property located at 322 N. June Street, Los Angeles, CA 90004 (the "Property") in any amount exceeding $189,050.00 pursuant to Section 522(q) of the Bankruptcy Code.

79.     Section 522(q) operates to reduce any state law homestead exemption claim to $189,050.00 where debtor owes a debt arising from "fraud, deceit, or manipulation in a fiduciary capacity." 11 U.S.C. § 522(q)(1)(B)(ii).

80.     As set forth herein, Debtor owes a debt to the Vagos in an amount of not less than $26,386,891.00 based upon the Judgment which arose from "fraud, deceit, or manipulation in a fiduciary capacity." 11 U.S.C. § 522(q)(1)(B)(ii).

81.     Accordingly, Debtor is not entitled to a discharge of his debts pursuant to 11 U.S.C. § 727(a)(12).

**Prayer for Relief**

WHEREFORE, Plaintiffs request judgment on the Complaint as follows:

1. On the First Claim for Relief, the Vagos seek an order determining that Defendant is indebted to the Vagos in an amount not less than $26,386,891.00 and that Defendant's debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2);

2. On the Second Claim for Relief, the Vagos seek an order determining that Defendant is indebted to the Vagos in an amount not less than $26,386,891.00 and that Defendant's debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4);

3. On the Third Claim for Relief, the Vagos seek an order determining that Defendant is indebted to the Vagos in an amount not less than $26,386,891.00 and that Defendant's debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6);

4. On the Fourth Claim for Relief, the Vagos seek an order denying Defendant his discharge pursuant to 11 U.S.C. § 727(a)(12);

5. For costs of suit incurred herein; and

6. For such other and further relief as the Court may deem appropriate.

        Respectfully submitted,

Dated: May 10, 2023     **GOE FORSYTHE & HODGES LLP**

        By: /s/Robert P. Goe
          Robert P. Goe
          Attorneys for Plaintiffs Erica Vago and
          Joseph Vago

14

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 17701 Cowan, Bldg. D., Suite 210, Irvine, CA 92614

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF MOTION AND MOTION FOR ORDER DISMISSING DEBTOR'S CHAPTER 11 BANKRUPTCY CASE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ERICA VAGO, BRIAN PROCEL; AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF SAME** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) May 10, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒    Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) May 10, 2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒    Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) May 10, 2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- The Honorable Sandra R. Defendant, USBC, 255 E. Temple Street, Ctrm 1575, Los Angeles, CA 90012

1

☐     Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 10, 2023 | Susan C. Stein | /s/Susan C. Stein |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

2

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

**Mailing Information for Case 2:23-bk-10990-SK**

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Reem J Bello**   rbello@goeforlaw.com, kmurphy@goeforlaw.com
- **Michael Jay Berger**   michael.berger@bankruptcypower.com,
  yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Greg P Campbell**   ch11ecf@aldridgepite.com,
  gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
- **Theron S Covey**   tcovey@raslg.com, sferry@raslg.com
- **Dane W Exnowski**   dane.exnowski@mccalla.com,
  bk.ca@mccalla.com,mccallaaecf@ecf.courtdrive.com
- **Robert P Goe**   kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- **Michael Jones**   michael.jones4@usdoj.gov
- **Ron Maroko**   ron.maroko@usdoj.gov
- **Joshua L Scheer**   jscheer@scheerlawgroup.com, jscheer@ecf.courtdrive.com
- **Mark M Sharf (TR)**   mark@sharflaw.com,
  C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
- **Alan G Tippie**   Alan.Tippie@gmlaw.com,
  atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com
- **United States Trustee (LA)**   ustpregion16.la.ecf@usdoj.gov
- **Michael L Wachtell**   mwachtell@buchalter.com
- **John P. Ward**   jward@attleseystorm.com, ezhang@attleseystorm.com
- **Clarisse Young**   youngshumaker@smcounsel.com, levern@smcounsel.com
- **Paul P Young**   paul@cym.law, jaclyn@cym.law

3

# EXHIBIT 1

# EXHIBIT 1

Electronically Received 11/15/2022 10:32 AM

1 | BRIAN A. PROCEL (State Bar No. 218657)
brian@procel-law.com
2 | PROCEL LAW, PC
401 Wilshire Boulevard
3 | 12th Floor
Santa Monica, California 90401
4 | Telephone:    (424) 788-4538

5 | Attorneys for Plaintiffs
ERICA VAGO and JOSEPH VAGO

6

7

**FILED**
Superior Court of California
County of Los Angeles

**12/02/2022**

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ M. Ventura _____ Deputy

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

10

11 | ERICA VAGO and JOSEPH VAGO,

12 |     Plaintiffs,

13 |     v.

14 | LESLIE KLEIN; LES KLEIN &
ASSOCIATES, INC.; KENNETH KOLEV
15 | KLEIN; and LAW OFFICE OF KENNETH
KLEIN, P.C.,
16
    Defendants.
17

**CASE NO. 20STCV25050**

**[PROPOSED] JUDGMENT ON SPECIAL VERDICT**

Assigned for All Purposes to:
Hon. Terry A. Green, Dept. 14

Action Filed:    July 1, 2020
Trial Date:    August 29, 2022

18

19

20

21

22

23

24

25

26

27

28

This action came on regularly for trial on August 29, 2022, in Department 14 of the
Superior Court, the Honorable Terry A. Green, Judge Presiding;

Plaintiffs Erica and Joseph Vago (collectively, "Plaintiffs") appearing by attorney Brian
Procel , Esq.; and Defendants Leslie Klein and Les Klein & Associates, Inc. (collectively,
"Defendants") appearing by attorney Jeffrey Slott.

A jury of twelve (12) persons was regularly impaneled and sworn and agreed to try the
cause. Witnesses were sworn and testified. After hearing the evidence and arguments of counsel,
the jury was duly instructed by the Court and the cause was submitted to the jury with directions
to return a special verdict. The jury deliberated and thereafter returned to court with its special
verdict submitted to the jury and the answers given thereto by the jury, which verdict was in words
and figures as follows, to wit:

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (BY ERICA VAGO AGAINST DEFENDNTS)

1. Was Mr. Klein's conduct outrageous?

   __X___ Yes _____ No

   If your answer to question 1 is yes, then answer question 2. If you answered no,
   stop here, answer no further questions, and have the presiding juror sign and date
   this form.

2. Did Mr. Klein intend to cause Erica Vago emotional distress?

   _____ Yes ___X__ No

   If your answer to question 2 is yes, then answer question 4. If you answered no, go
   to question 3.

3. Did Mr. Klein act with reckless disregard of the probability that Erica Vago would
   suffer emotional distress, knowing that Erica Vago was present when the conduct
   occurred?

   __X___ Yes _____ No

[PROPOSED] JUDGMENT

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Did Erica Vago suffer severe emotional distress?

_____ Yes    __X___ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Was Mr. Klein's conduct a substantial factor in causing Erica Vago's severe emotional distress?

_____ Yes    _____ No

If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. What are Erica Vago's damages for pain and suffering?

$ ___N/A_____

TOTAL $

___N/A_____

Signed: ___/Signature_____
              Presiding Juror

Dated: September 15, 2022

[PROPOSED] JUDGMENT

## INTENTIONAL MISREPRESENTATION

## (BY ERICA VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein make a false representation of a fact to Erica Vago?

   __X___ Yes  _____ No

   If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein know that the representation was false, or did he make the representation recklessly and without regard for its truth?

   _X____ Yes  _____ No

   If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Erica Vago reasonably rely on the representation?

   __X___ Yes  _____ No

   If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Erica Vago's reliance on Mr. Klein's representation a substantial factor in causing harm to Erica Vago?

   __X___ Yes  _____ No

   If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Erica Vago's economic damages?

   $ __8,300,000_____

4

[PROPOSED] JUDGMENT

Please answer question 6.

6. What are Erica Vago's noneconomic damages for pain and suffering?

$ __0_____

TOTAL $ 8,300,000

Signed: ___/Signature_____
              Presiding Juror

Dated: September 15, 2022

## CONCEALMENT
## (BY ERICA VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein intentionally fail to disclose a fact that Erica Vago did not know and could not reasonably have discovered?

   _X____ Yes    _____ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein intend to deceive Erica Vago by concealing the fact?

   __X___ Yes    _____ No

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Had the omitted information been disclosed, would Erica Vago reasonably have behaved differently?

   __X___ Yes    _____ No

5

[PROPOSED] JUDGMENT

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Mr. Klein's concealment a substantial factor in causing harm to Erica Vago?

___X___ Yes _____ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Erica Vago's economic damages?

$ 8,300,000

Please answer question 6.

6. What are Erica Vago's noneconomic damages for pain and suffering?

$ __0_____

TOTAL $ 8,300,000

Signed: ___/Signature_____
          Presiding Juror

Dated: September 15, 2022

**FALSE PROMISE**

**(BY ERICA VAGO AGAINST DEFENDNTS)**

We answer the questions submitted to us as follows:

1. Did Mr. Klein make a promise to Erica Vago?

   __X___ Yes _____ No

   If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein intend to perform this promise when he made it?

   __X____ Yes _____ No

   If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Mr. Klein intend that Erica Vago rely on this promise?

   _____ Yes _____ No

   If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Did Erica Vago reasonably rely on this promise?

   _____ Yes _____ No

   If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Did Mr. Klein fail to perform the promised act?

   _____ Yes _____ No

7

1    If your answer to question 5 is yes, then answer question 6. If you answered no,

2    stop here, answer no further questions, and have the presiding juror sign and date

3    this form.

4    6.   Was Erica Vago's reliance on Mr. Klein's promise a substantial factor in causing

5         harm to Erica Vago?

6         _____ Yes       _____ No

7    If your answer to question 6 is yes, then answer question 7. If you answered no,

8    stop here, answer no further questions, and have the presiding juror sign and date

9    this form.

10   7.   What are Erica Vago's economic damages?

11        $ _N/A_____

12        Please answer question 8.

13   8.   What are Erica Vago's noneconomic damages for pain and suffering?

14        $ __N/A_____

15

16                                                    TOTAL $ _N/A_____

17

18   Signed: ___/Signature_____

19              Presiding Juror

20   Dated:  September 15, 2022

21

22

23

24

25

26

27

28

1                                **FINANCIAL ABUSE**

2                **(BY ERICA VAGO AGAINST DEFENDANTS)**

3

4   We answer the questions submitted to us as follows:

5     1. Did Mr. Klein retain Erica Vago's money or property?

6        __X___ Yes    _____ No

7        If your answer to question 1 is yes, then answer question 2. If you answered no,

8        stop here, answer no further questions, and have the presiding juror sign and date

9        this form.

10     2. Were Erica Vago 65 years of age or older at the time of the conduct?

11        __X___ Yes    _____ No

12        If your answer to question 2 is yes, then answer question 3. If you answered no,

13        stop here, answer no further questions, and have the presiding juror sign and date

14        this form.

15     3. Did Mr. Klein retain the money or property for a wrongful use or with the intent to

16        defraud?

17        __X___ Yes    _____ No

18        If your answer to question 3 is yes, then answer question 4. If you answered no,

19        stop here, answer no further questions, and have the presiding juror sign and date

20        this form.

21     4. Were Erica Vago harmed?

22        __X___ Yes    _____ No

23        If your answer to question 4 is yes, then answer question 5. If you answered no,

24        stop here, answer no further questions, and have the presiding juror sign and date

25        this form.

26     5. Was Mr. Klein's conduct a substantial factor in causing Erica Vago's harm?

27        __X___ Yes    _____ No

28

If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. What are Erica Vago's economic damages?

$ 8,300,000

TOTAL $8,300,000

Signed: __/Signature_____,
          Presiding Juror

Dated: September 15, 2022

## PUNITIVE DAMAGES
### (BY ERICA VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

__X___ Yes _____ No

Signed: __/Signature_____
          Presiding Juror

Dated: September 15, 2022

## PUNITIVE DAMAGES AGAINST EMPLOYER OR PRINCIPAL FOR CONDUCT OF A SPECIFIC AGENT OR EMPLOYEE
### (BY ERICA VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

__X___ Yes _____ No

10

[PROPOSED] JUDGMENT

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

Signed:  __/Signature_____
            Presiding Juror

Dated:  September 15, 2022

## BREACH OF FIDUCIARY DUTY

## (BY ERICA VAGO AGAINST DEFENDNTS)

1.  Mr. Klein owed Erica Vago fiduciary duties to act with the utmost loyalty and honesty.

2.  Did Mr. Klein breach his fiduciary duties?

    __X___ Yes      _____ No

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3.  Was Erica Vago harmed?

    __X___ Yes      _____ No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4.  Was Mr. Klein's conduct a substantial factor in causing Erica Vago's harm?

    __X___ Yes      _____ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5.  What are Erica Vago's economic damages?

    $ 8,300,000

                              TOTAL $ 8,300,000

11

[PROPOSED] JUDGMENT

Signed: __/Signature_____
              Presiding Juror

Dated: September 15, 2022

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (BY JOSEPH VAGO AGAINST DEFENDNTS)

1. Was Mr. Klein's conduct outrageous?

    a. __X___ Yes _____ No

    b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein intend to cause Joseph Vago emotional distress?

    a. _____ Yes ___X__ No

    b. If your answer to question 2 is yes, then answer question 4. If you answered no, go to question 3.

3. Did Mr. Klein act with reckless disregard of the probability that Joseph Vago would suffer emotional distress, knowing that Joseph Vago was present when the conduct occurred?

    a. __X___ Yes _____ No

    b. If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Did Joseph Vago suffer severe emotional distress?

    a. __X___ Yes _____ No

    b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Was Mr. Klein's conduct a substantial factor in causing Joseph Vago's severe emotional distress?

    a. _X____ Yes _____ No

    b. If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. What are Joseph Vago's damages for pain and suffering?

    a. $ 400,000

                                                    TOTAL $400,000

Signed: ___/Signature_____
            Presiding Juror

Dated: September 15, 2022

## INTENTIONAL MISREPRESENTATION
## (BY JOSEPH VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein make a false representation of a fact to Joseph Vago?

    a. __X___ Yes _____ No

    b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein know that the representation was false, or did he make the representation recklessly and without regard for its truth?

    a. _X____ Yes _____ No

13
[PROPOSED] JUDGMENT

b. If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Joseph Vago reasonably rely on the representation?

   a. __X__ Yes _____ No

   b. If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Joseph Vago's reliance on Mr. Klein's representation a substantial factor in causing harm to Joseph Vago?

   a. __X__ Yes _____ No

   b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Joseph Vago's economic damages?

   a. $ __0__

   b. Please answer question 6.

6. What are Joseph Vago's noneconomic damages for pain and suffering?

   a. $ __0__

TOTAL $ __0__

Signed: __/Signature__
    Presiding Juror

Dated: September 15, 2022

**CONCEALMENT**
**(BY JOSEPH VAGO AGAINST DEFENDNTS)**

14
[PROPOSED] JUDGMENT

We answer the questions submitted to us as follows:

1. Did Mr. Klein intentionally fail to disclose a fact that Joseph Vago did not know and could not reasonably have discovered?

   a. _X____ Yes    _____ No

   b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein intend to deceive Joseph Vago by concealing the fact?

   a. __X___ Yes    _____ No

   b. If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Had the omitted information been disclosed, would Joseph Vago reasonably have behaved differently?

   a. __X___ Yes    _____ No

   b. If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Mr. Klein's concealment a substantial factor in causing harm to Joseph Vago?

   a. __X___ Yes    _____ No

   b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Joseph Vago's economic damages?

   a. $____0_____

   b. Please answer question 6.

6. What are Joseph Vago's noneconomic damages for pain and suffering?

   a. $__0_____

TOTAL $____0_____

Signed:   __/Signature_____
          Presiding Juror

Dated:  September 15, 2022

## FALSE PROMISE

## (BY JOSEPH VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

   1.  Did Mr. Klein make a promise to Joseph Vago?

      a.   __X___ Yes  _____ No

      b.  If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

   2.  Did Mr. Klein intend to perform this promise when he made it?

      a.  _X_____ Yes  _____ No

      b.  If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

   3.  Did Mr. Klein intend that Joseph Vago rely on this promise?

      a.  _____ Yes  _____ No

      b.  If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

   4.  Did Joseph Vago reasonably rely on this promise?

      a.  _____ Yes  _____ No

16

[PROPOSED] JUDGMENT

b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Did Mr. Klein fail to perform the promised act?

    a.   \_\_\_\_\_ Yes      \_\_\_\_\_ No

    b. If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. Was Joseph Vago's reliance on Mr. Klein's promise a substantial factor in causing harm to Joseph Vago?

    a.   \_\_\_\_\_ Yes      \_\_\_\_\_ No

    b. If your answer to question 6 is yes, then answer question 7. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

7. What are Joseph Vago's economic damages?

    a. $ \_N/A_____

    b. Please answer question 8.

8. What are Joseph Vago's noneconomic damages for pain and suffering?

    a. $ \_\_N/A_____

TOTAL $ \_N/A_____

Signed:    /Signature_____
                Presiding Juror

Dated: September 15, 2022

**FINANCIAL ABUSE**

**(BY JOSEPH VAGO AGAINST DEFENDANTS)**

We answer the questions submitted to us as follows:

1. Did Mr. Klein retain Joseph Vago's money or property?

    a. _____ Yes    __X___ No

    b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Were Joseph Vago 65 years of age or older at the time of the conduct?

    a. _____ Yes    _____ No

    b. If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Mr. Klein retain the money or property for a wrongful use or with the intent to defraud?

    a. _____ Yes    _____ No

    b. If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Were Joseph Vago harmed?

    a. _____ Yes    _____ No

    b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Was Mr. Klein's conduct a substantial factor in causing Joseph Vago's harm?

    a. _____ Yes    _____ No

b. If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. What are Joseph Vago's economic damages?

    a. $___N/A_____

                                                   TOTAL $__N/A_____

Signed: ___/Signature_____
            Presiding Juror

Dated: September 15, 2022

## PUNITIVE DAMAGES

### (BY JOSEPH VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

    a. __X___ Yes _____ No

Signed: ___/Signature_____
            Presiding Juror

Dated: September 15, 2022

## PUNITIVE DAMAGES AGAINST EMPLOYER OR PRINCIPAL FOR CONDUCT OF A SPECIFIC AGENT OR EMPLOYEE

### (BY JOSEPH VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

    a. __X___ Yes _____ No

19

[PROPOSED] JUDGMENT

b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

Signed:     /Signature
            Presiding Juror

Dated:  September 15, 2022

## BREACH OF FIDUCIARY DUTY
## (BY JOSEPH VAGO AGAINST DEFENDNTS)

1.  Mr. Klein owed Joseph Vago fiduciary duties to act with the utmost loyalty and honesty.

2.  Did Mr. Klein breach his fiduciary duties?

    a.  __X___ Yes        _____ No

    b. If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3.  Was Joseph Vago harmed?

    a.  __X___ Yes        _____ No

    b. If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4.  Was Mr. Klein's conduct a substantial factor in causing Joseph Vago's harm?

    a.  __X___ Yes        _____ No

    b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5.  What are Joseph Vago's economic damages?

20
[PROPOSED] JUDGMENT

a.  $ _____0_____

i.  TOTAL $ _____0_____

Signed:  __/Signature_____
             Presiding Juror

Dated:  September 15, 2022

1    It appearing by reason of said special verdict that Plaintiff Erica Vago is entitled to

2  judgment against Defendants Leslie Klein and Leslie Klein & Associates.

3    NOW THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that said Erica

4  Vago shall have and recover from Defendants, jointly and severally:

5    1.    Compensatory damages in the sum of $8,300,000;

6    2.    Prejudgment interest at the rate of 7 (seven) percent in the amount of

7        $7,334,038.99;

8    3.    Punitive damages in the sum of $8,300,000,

9    4.    And interest thereon at the rate of ten percent per annum from the date of the

10  verdict until paid together with costs and disbursements.

11

12    It further appearing by reason of said special verdict that Plaintiff Joseph Vago is entitled

13  to judgment against Defendants Leslie Klein and Leslie Klein & Associates.

14    NOW THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that said Joseph

15  Vago shall have and recover from Defendants, jointly and severally:

16    1.    $400,000 for emotional distress

17    2.    And interest thereon at the rate of ten percent per annum from the date of the

18  verdict until paid together with costs and disbursements.

19

20    The total amount of the judgment against Defendants jointly and severally is

21  **$24,334,038.99.**

22

23  Dated: _____12/02/2022_____

24

**Terry Green**

Terry Green / Judge

Hon. Terry Green

Judge of the Superior Court

25

26

27

28

1   DATED:  November 15, 2022              PROCEL LAW, PC

2

3

4                                          By: _____
                                               BRIAN PROCEL
5                                              Attorneys for Plaintiffs
                                               JOSEPH VAGO and ERICA VAGO
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          3
                                   [PROPOSED] JUDGMENT

1

2

3 **PROOF OF SERVICE**

4 **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

5     At the time of service, I was over 18 years of age and not a party to this action. I am
employed in the County of Los Angeles, State of California. My business address 401 Wilshire
6 Boulevard, 12th Floor, Santa Monica, California 90401.

7     On November 15, 2022, I served true copies of the following document(s) described as:

8     **[PROPOSED] JUDGMENT ON SPECIAL VERDICT**

9 on the interested parties in this action as follows:

10         **SERVICE LIST**

11 Jeffrey A. Slott               *Attorneys for Defendants*
    LAW OFFICES OF JEFFREY A. SLOTT, APC
12     15760 Ventura Blvd., Suite 1600     LESLIE KLEIN and
    Encino, CA 91436              LES KLEIN & ASSOCIATES, INC.
13     Telephone:   (818) 995-1955
    Facsimile:    (818) 995-0955
14     Email:       jslott@aol.com

15

16     **BY E-MAIL:** I caused a copy of the document(s) to be sent from e-mail address
johnpark@procel-law.com to the person(s) at the e-mail address(es) listed in the Service List. I
did not receive, within a reasonable time after the transmission, any electronic message or other
17 indication that the transmission was unsuccessful.

18     I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct.
19

20     Executed on November 15, 2022, at Santa Monica, California.

21                      /s/ Brian Procel
                     Brian Procel
22

23

24

25

26

27

28

                           4
                 [PROPOSED] JUDGMENT

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>ERICA VAGO and JOSEPH VAGO, | DEFENDANTS<br><br>LESLIE KLEIN and DOES 1 through 10, |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>GOE FORSYTHE & HODGES LLP<br>17701 Cowan Avenue, Suite 210, Bldg. D, Irvine, CA 92614<br>Telephone: (949) 798-2460 / Facsimile: (949) 955-9437 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>□ Debto          □ U.S. Trustee/Bankruptcy Admin<br>□ **X Creditor**     □ Other<br>□ Trustee | **PARTY** (Check One Box Only)<br>□ **X Debtor**      □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor       □ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint to Determine the Nondischargeability of Certain Debts Owed by Debtor Leslie Klein to Erica and Joseph Vago
Pursuant to 11 U.S.C. § 523 and to Deny Discharge Pursuant to Section 727(a)(12)

| NATURE OF SUIT |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

**FRBP 7001(1) – Recovery of Money/Property**
□ 11-Recovery of money/property - §542 turnover of property
□ 12-Recovery of money/property - §547 preference
□ 13-Recovery of money/property - §548 fraudulent transfer
□ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
□ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
□ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
[2] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
□ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
□ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
□ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
   actual fraud
[1] 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement,
   larceny
   **(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
□ 61-Dischargeability - §523(a)(5), domestic support
□ 68-Dischargeability - §523(a)(6), willful and malicious injury
□ 63-Dischargeability - §523(a)(8), student loan
□ 64-Dischargeability - §523(a)(15), divorce or separation obligation
   (other than domestic support)
□ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
□ 71-Injunctive relief – imposition of stay
□ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
□ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
□ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
□ 01-Determination of removed claim or cause

**Other**
□ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
□ 02-Other (e.g. other actions that would have been brought in state court
   if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ 26,386,891.00 |

| Other Relief Sought |
|---|

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>LESLIE KLEIN | BANKRUPTCY CASE NO.<br>2:23-bk-10990-SK | |
| DISTRICT IN WHICH CASE IS PENDING<br>CENTRAL | DIVISION OFFICE<br>LOS ANGELES | NAME OF JUDGE<br>SANDRA KLEIN |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*/s/Robert P. Goe* | | |
| DATE<br>May 10, 2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Robert P. Goe | |

**INSTRUCTIONS**

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| ROBERT P. GOE (State Bar No. 137019) rgoe@goeforlaw.com REEM J. BELLO (State Bar No. 198840) rbello@goeforlaw.com GOE FORSYTHE & HODGES LLP 17701 Cowan Avenue, Suite 210, Bldg. D Irvine, CA 92614 Telephone: (949) 798-2460 Facsimile: (949) 955-9437 | |
| *Attorney for Plaintiff* | |

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| In re:<br><br>LESLIE KLEIN,<br><br><br>Debtor(s). | CASE NO.: 2:23-bk-10990-SK<br><br>CHAPTER: 11<br><br>ADVERSARY NO.: |
|---|---|
| ERICA VAGO and JOSEPH VAGO,<br><br><br><br>Plaintiff(s)<br><br>Versus<br><br>LESLIE KLEIN and DOES 1 through 10,<br><br><br>Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| **Hearing Date:** _____ | **Address:** |
|---|---|
| **Time:** _____ | ☒ 255 East Temple Street, Los Angeles, CA 90012 |
| **Courtroom:** __1575__ | ☐ 3420 Twelfth Street, Riverside, CA 92501 |
| | ☐ 411 West Fourth Street, Santa Ana, CA 92701 |
| | ☐ 1415 State Street, Santa Barbara, CA 93101 |
| | ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

**KATHLEEN J. CAMPBELL**
**CLERK OF COURT**

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
Deputy Clerk

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                    Page 2                    **F 7004-1.SUMMONS.ADV.PROC**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

17701 Cowan Avenue, Suite 210, Bldg. D
Irvine, CA 92614

A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:

Complaint to Determine the Nondischargeability of Certain Debts Owed by Debtor Leslie Klein to Erica and Joseph Vago

Pursuant to 11 U.S.C. § 523 and to Deny Discharge Pursuant to Section 727(a)(12)

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| Date | Printed Name | Signature |
|------|-------------|-----------|

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# EXHIBIT D

Baruch C. Cohen, Esq. (SBN 159455)
LAW OFFICE OF BARUCH C. COHEN
   A Professional Law Corporation
4929 Wilshire Boulevard, Suite 940
Los Angeles, California 90010
Tel: (323) 937-4501   Fax: (888) 316-6107
email: baruchcohen@baruchcohenesq.com

*Attorney For Plaintiffs Robert & Esther Mermelstein*

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES ANA DIVISION

| | |
|---|---|
| In re | Case No. 2:23-bk-10990-SK |
| LESLIE KLEIN, | Hon.  Sandra Klein |
|     Debtor and Debtor in Possession, | Chapter 11 |
| ROBERT & ESTHER MERMELSTEIN, | **COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT TO  11 USC § 523(a)(2)(A),  11 USC § 523(a)(4), & 11 USC § 523(a)(6); & FOR DENIAL OF DISCHARGE PURSUANT TO 11 USC § 727(a)(2)(A); 11 USC § 727(a)(2)(B); 11 USC § 727(a)(3); 11 USC § 727(a)(4); 11 USC § 727(a)(5)** |
|     Plaintiffs | |
| vs. | |
| LESLIE KLEIN | |
|     Defendant | |

**TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE, THE DEBTOR AND HIS COUNSEL, AND ALL OTHER INTERESTED PARTIES**:

Plaintiffs-Creditors, Robert & Esther Mermelstein ("Plaintiffs"), complain for nondischargeability of debt & for denial of discharge against Defendant-Debtor, Leslie Klein ("Defendant"), and alleges respectfully as follows:

**CORE/NON-CORE DESIGNATION**

1.    In accordance with Local Bankruptcy Rule 7008-1, Plaintiffs allege that this adversary proceeding constitutes a core proceeding under 28 USC § 157(b)(2). Plaintiffs acknowledge that the Court has the power to enter final orders and judgments in this

matter. Plaintiffs also consent to the Court's entry of final orders and judgments in this

matter under FRBP Rule 7008..

## JURISDICTION, VENUE & STANDING

2.  This adversary proceeding arises under *In re Klein*, 2:23-bk-10990-SK, a Chapter 11 case

commenced in the United States Bankruptcy Court for the Central District of California

("Bankruptcy Case"). The Court has jurisdiction under 11 USC §§ 523 and 727, and 28

USC §§ 157 and 1334.

3.  The venue is proper in this Court pursuant to 28 USC § 1409.

4.  Plaintiffs have standing to bring this action because Plaintiffs are creditors in the

Bankruptcy Case under 11 USC § 101(10).

## PARTIES

5.  The following is a description of the relevant parties involved in the facts forming the

basis of this Complaint.

6.  Plaintiffs are individuals, senior citizens residing in Brooklyn, NY.

7.  Defendant is an individual, whose principal residence is in Los Angeles County,

California and who regularly conducted business from Los Angeles County, California.

Defendant was a certified public accountant, formerly licensed by the State of California,

and a former, and an attorney licensed by the State of California.[1] Defendant is the debtor

in the above-captioned Chapter 11 bankruptcy case.

///

---

[1]    On September 10, 1992, the Supreme Court of the State of California, in State Bar
Court Case No. 86-O-14258, ordered that Defendant be suspended from the practice
of law for 18 months and further ordered that he take and pass the California
Professional Responsibility Examination ("CPRE"). Defendant failed the November
1993 and January 1994 CPREs. In Case No. 86-O-14258, Defendant admitted to
intentional misrepresentations. On August 3, 1995, the Supreme Court of the State
of California, in State Bar Court Case No. 92-O-11716 (consolidated with Case Nos.
93-O-11825, 94-O-13951, 94-O12055, and 94-O15901) ordered that Defendant be
suspended from the practice of law for one year. In Case No. 92-O-11716, as
consolidated, Defendant admitted to willful violations of Rules of Professional
Conduct concerning client trust accounts and conflicts of interest.

**GENERAL ALLEGATIONS**

8.    The following general allegations form the background for the Plaintiffs' claims for relief against Defendant.

9.    Plaintiffs are family relatives of Defendant, are Orthodox Jews, and are the settlors and beneficiaries of the Mermelstein Charitable Remainder Unitrust Dated July 27, 2009, (the " Mermelstein Trust").

10.    Defendant,  on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") solicited Plaintiffs to invest in at least seven (7) life insurance policies: (1) Garza; (2) Times Square; (3) Ganz; (4) Spitzer; (5) Kohn; (6) Friedman; & (7) Zimmerman.

**GARZA**

11.    On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture (the "Garza Memo"). The purpose of the Garza Memo, was to purchase a $1,000,000.00 life insurance Policy ("Garza Policy"); American General on the life of Emanuel Garza ("Garza"). In furtherance of the Garza Memo, Plaintiffs paid Klein $100,000.00 towards the purchase of the Garza Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Garza Memo, Defendant promised to pay the Mermelstein Trust $500,000.00 ($400,000.00 plus return of premiums paid; plus $100,000.00).

12.    On 4-30-2021, Defendant executed a First Amendment to the Memorandum of Agreement for Joint Venture (Garza), changing the recipient of the $500,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

13.    Plaintiffs are informed and believe that Defendant sold 50% to the Garza Policy, to the Longevity Fund of NY and partially to the Longevity Fund of Michigan without their consent.

14.    Plaintiffs are informed and believe that Garza apparently died in 2018, and on or about 7-

2-2018, Defendant collected the Garza Proceeds, on the Garza Policy. Defendant concealed this information from Plaintiffs, misappropriated & kept the Garza Proceeds for himself, and failed to pay Plaintiffs the $500,00.00 per the Garza Memo.

**TIMES SQUARE**

15. On 7-16-2012, Defendant issued Plaintiffs a Non-Recourse Promissory Note, in the amount of $333,333.00, due and payable by 7-16-2013, by Defendant on behalf of the Times Square Media Inc., containing a "*Heter Iska*" document (an approved way of restructuring a loan or debt so that it becomes an investment instead of a loan, per *Halacha* - Jewish law).

16. Plaintiffs are informed and believe that Defendant had no intention of paying the Times Square Non-Recourse Promissory Note, as Plaintiffs made no payments whatseoever.

**GANZ**

17. On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with plaintiffs (the "Ganz Memo"). The purpose of the Ganz Memo, was to purchase a $1,000,000.00 life insurance Policy ("Ganz Policy"); American General on the life of Emanuel Ganz ("Ganz"). In furtherance of the Ganz Memo, Plaintiffs paid Klein $100,000.00 towards the purchase of the Ganz Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Ganz Memo, Defendant promised to pay the Mermelstein Trust $500,000.00 ($400,000.00 plus return of premiums paid; plus $100,000.00).

18. On 4-30-2021, Defendant executed a First Amendment to the Memorandum of Agreement for Joint Venture (Ganz), changing the recipient of the $500,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

19. Plaintiffs are informed and believe that Defendant apparently sold 50% to the Ganz Policy, to the Longevity Fund of NY and partially to the Longevity Fund of Michigan, without Plaintiff's consent.

20. Plaintiffs are informed and believe that Ganz apparently died in 2018, and on or about 7-2-2018, Defendant collected the Ganz Proceeds, on the Ganz Policy. Defendant concealed this information from Plaintiffs, misappropriated & kept the Ganz Proceeds for himself, and failed to pay Plaintiffs the $500,00.00 per the Ganz Memo.

### SPITZER

21. On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with Plaintiffs (the "Spitzer Memo"). The purpose of the Spitzer Memo, was to make premium payments of a $5,000,000.00 life insurance Policy Number: US 0023546L ("Spitzer Policy"); American General on the life of Malvine Spitzer ("Spitzer"). In furtherance of the Spitzer Memo, Plaintiffs paid Defendant $250,000.00 towards the purchase of the Spitzer Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Spitzer Memo, Defendant promised to pay the Mermelstein Trust $2,250,000.00 ($2,000,000 plus $250,000 and all premiums paid of the proceeds).

22. On 4-30-2021, Defendant executed a First Amendment to the Memorandum of Agreement for Joint Venture (Spitzer), changing the recipient of the $2,250,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

23. Plaintiffs are informed and believe that Defendant apparently sold portions of the Spitzer Policy, without their consent - but Plaintiffs do not know to whom. Defendant concealed this information from Plaintiffs.

### KOHN

24. On 3-10-2010, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with Plaintiffs (the "Kohn Memo"). The purpose of the Kohn Memo, was to make premium payments of a $3,000,000.00 life insurance Policy ("Kohn Policy"); American General on the life of Eugene Kohn ("Kohn"). In furtherance of the Kohn

Memo, Plaintiffs paid Defendant $200,000.00 towards the purchase of the Kohn Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Kohn Memo, Defendant promised to pay the Mermelstein Trust $1,200,000.00 ($200,000 and $1,000,000 and all premiums paid of the proceeds).

25. On 4-30-2021, Klein executed a First Amendment to the Memorandum of Agreement for Joint Venture (Kohn), changing the recipient of the $1,200,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

26. Plaintiffs are informed and believe that Defendant paid premiums of the Kohn Policy up to 2011. Thereafter, Defendant apparently sold portions or the entirety of the Kohn Policy - without Plaintiffs' consent - to Life Capital Group, LLC ("LCG"), where Shlomo Yehuda Rechnitz ("Rechnitz") was to resume paying the Kohn Policy premiums from 2011 onwards. Defendant concealed this information from Plaintiffs.

27. According to information recently received by Plaintiffs an unsigned Amended and Restated Limited Liability Company Agreement of Life Capital Group, LLC, Defendant and Rechnitz agreed that upon the death of Kohn, Defendant and Rechnitz would be reimbursed the premiums that they paid, plus interest on the premiums. Thereafter, Defendant and Rechnitz would split the profits 50/50 of the Kohn Policy, and that Plaintiffs would receive their $1,200,000.00.

**FRIEDMAN**

28. On 3-1-2010, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with Plaintiffs (the "Friedman Memo"). The purpose of the Friedman Memo, was to purchase a $1,500,000.00 life insurance Policy ("Friedman Policy"); American General on the life of Goldie Friedman ("Friedman"). In furtherance of the Friedman Memo, Plaintiffs paid Klein $250,000.00 towards the purchase of the Friedman Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Friedman Memo, Defendant promised to pay the

Mermelstein Trust $1,000,000.00 ($250,000.00 and $750,000.00 and all premiums paid of the proceeds).

29. On 4-30-2021, Defendant executed a First Amendment to the Memorandum of Agreement for Joint Venture (Friedman), changing the recipient of the $1,000,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

30. Plaintiffs are informed and believe that Defendant apparently sold portions of the Friedman Policy, to the Longevity Fund of NY and partially to the Longevity Fund of Michigan, without Plaintiff's consent.

31. Plaintiffs are informed and believe that Friedman apparently died in 2020, and Defendant collected the Friedman Proceeds, on the Friedman Policy. Defendant concealed this information from Plaintiffs, misappropriated & kept the Friedman Proceeds for himself, and failed to pay Plaintiffs the $1,000,000.00 per the Friedman Memo.

**ZIMMERMAN**

32. On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with Plaintiffs (the "Zimmerman Memo"). The purpose of the Zimmerman Memo, was to purchase a $9,000,000.00 life insurance Policy ("Zimmerman Policy"); American General Policy # US 0023738L on the life of Rozy Pearl Zimmerman ("Zimmerman"). In furtherance of the Zimmerman Memo, Plaintiffs paid Defendant $150,000.00 towards the purchase of the Zimmerman Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Zimmerman Memo, Defendant promised to pay the Mermelstein Trust $2,400,000.00 ($2,250,000.00 plus $150,000.00).

33. On 4-30-2021, Defendant executed a First Amendment to the Memorandum of Agreement for Joint Venture (Zimmerman), changing the recipient of the $2,400,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

34. Plaintiffs are informed and believe that Defendant paid premiums of the Zimmerman

Policy up to 2011. Thereafter, Defendant apparently sold portions or the entirety of the

Zimmerman Policy to Life Capital Group, LLC ("LCG") - without Plaintiffs' consent - ,

where Shlomo Yehuda Rechnitz ("Rechnitz") was to resume paying the Zimmerman

Policy premiums from 2011 onwards. Defendant concealed this information from

Plaintiffs.

35. Defendant, as Trustee of the Rozy Pearl Zimmerman Irrevocable Life Insurance Trust

(the "Zimmerman Trust") issued three Non-Recourse Promissory Notes  (the

"Zimmerman Notes") to Plaintiffs secured by the Zimmerman Policy in the amount of

$2,357,679.50:

    a.     Non-Recourse Promissory Notes # 1, principal sum of $1,412,679.53, dated June

           15, 2011 - due June 15, 2020 (the "$1,412,679.53 Zimmerman Note");

    b.     Non-Recourse Promissory Notes # 2, principal sum of $570,000.00, dated

           December 7, 2009 - due December 7, 2019 (the: "$570,000.00 Zimmerman

           Note");

    c.     Non-Recourse Promissory Notes # 2, principal sum of $375,000.00, dated

           January 14, 2010 - due January 14, 2020 (the "$375,000.00 Zimmerman Note").

    d.     Interest on the three Non-Recourse Zimmerman Notes until 4-30-2023 comes to

           $2,939,936.84. Therefore the total amount of the claim is: $7,697,616.34

           ($2,400,000.00 (Zimmerman Policy) + $2,357,679.50 (3 Zimmerman Notes) +

           2,939,936.84 (interest) =  $7,697,616.34.

36. According to information recently received by Plaintiffs, an unsigned Amended and

Restated Limited Liability Company Agreement of Life Capital Group, LLC, Defendant

and Rechnitz agreed that upon the death of Zimmerman, Defendant and Rechnitz  would

be reimbursed the premiums that they paid, plus interest on the premiums. Thereafter,

Defendant and Rechnitz would split the profits 50/50 of the Zimmerman Policy, and that

Plaintiffs would receive their $2,400,000.00.  Defendant concealed this information from

Plaintiffs.

**PERIODIC PAYMENTS TO PLAINTIFFS FROM DEFENDANT'S IOLTA ACCOUNT**

37. During this entire time, Defendant repeatedly assured Plaintiffs that their investments in the 7 policies were secure and accruing interest. Defendant mailed Plaintiffs periodic monthly checks of $5,000.00 issued from Defendant's IOLTA - Attorney Client Trust Account.

**PLAINTIFFS' DISCOVERY OF DEFENDANT'S FRAUD**

38. On or about 1-21-2021, Plaintiffs discovered the above-referenced frauds and concealment.

39. On or about 6-22-2022, Defendant wrote Plaintiffs assuring them that their investments were "secure" when in reality, Defendant sold them off to third parties without Plaintiffs' consent:

I received you e mail and I disagree. I paid in on the Zmerman policy over $1,000,000. The interest for the last 10 years is over $2,300,000 . I also own 25%of the profits. ***You are well secured***. You can call me if you have any questions. [Emphasis Added]

40. On or about 7-18-2022, Defendant wrote Plaintiffs admitting that he used Plaintiffs' monies from the Friedman Garza and Gans to pay for his legal fees in his lawsuit with Rechnitz.

I got your email. I want to make it very clear we are family and I don't want to fight. I think I can make a deal with Rechnitz because I have the best lawyers in LA. If not we will go to court. I have big leverage on Rechnitz due to the Menlo case. I am not assigning the Zimmerman case to you. ***I am using the money from the Friedman Garza and Gans cases for attorney fees in the Rechnitz case***. On Zimmerman Rechnitz and I paid $4,000,000 in premiums but it is return of premium. We also gave Mrs Zimmerman $200,000. I am sure they will sue to get more. It is a big policy and all big policies have big fights. [Emphasis Added]

**PLAINTIFFS' PROOF OF CLAIMS**

41. Plaintiffs timely filed seven (7) *Proofs of Claim* against Defendant totaling $13,480,949, primarily based on Defendant misappropriating insurance policies and the proceeds, as follows:

    a.   Claim # 19-1 (Garza) $500,000.00;

    b.   Claim # 20-1 (Times Square) $333,333.00;

c.    Claim # 21-1 (Ganz) $500,000.00;

d.    Claim # 22-1 (Spitzer) $2,250,000.00;

e.    Claim # 23-1 (Kohn) $1,200,000.00;

f.    Claim # 24-1 (Friedman) $1,000,000.00; &

g.    Claim # 25-2 (Zimmerman) $7,697,616.34.

    TOTAL:    **$13,480,949**

### FIRST CLAIM FOR RELIEF
### (Nondischargeability of Debt - 11 USC § 523(a)(2)(A))

42.    Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

43.    At all relevant times, Defendant acted as Plaintiffs' fiduciary - investment adviser. Plaintiffs entrusted Defendant implicitly with their investments in the insurance policies.

44.    Defendant owed Plaintiffs fiduciary duties at all relevant times, including the duty of loyalty and candor. Defendant further owed a duty to use Plaintiffs' funds for legitimate business purposes and to refrain from using their funds and other property for his own personal non-business purposes.

45.    Defendant embezzled and stole from Plaintiffs. Defendant misrepresented the above-referenced information to Plaintiffs for the purpose of convincing Plaintiffs to invest in additional policies into Defendant's IOLTA client trust account. Defendant then stole more than $13,480,949 of Plaintiffs' money in a complicated life insurance scam, constituting intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse.

46.    Defendant's misappropriation of Plaintiffs' funds and other property was unauthorized, without their consent and fraudulent. Defendant acted with the intent to permanently deprive Plaintiffs of the possession, use and benefit of their funds and other property.

47.    As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiffs' funds and other property and Defendant's false pretenses, false representations, and actual fraud set forth herein, Plaintiffs have suffered damages in the amount of not less

1   than $13,480,949.

2   48.   Defendant's debt to Plaintiffs is nondischargeable under 11 USC § 523(a)(2) because it

3         was incurred as a result of false pretenses, false representations, and actual fraud.

4   49.   The damages arising from Defendant's willful and malicious false pretenses, false

5         representation and actual fraud to Plaintiffs constitutes a debt against Defendant that is

6         nondischargeable pursuant to 11 USC § 523(a)(2)(A).

7                       **SECOND CLAIM FOR RELIEF**
                **(Nondischargeability of Debt - 11 USC § 523(a)(4))**
8

9   50.   Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations

10        in this Complaint as though fully set forth herein.

11  51.   At all relevant times, Defendant acted as Plaintiffs' fiduciary - investment adviser.

12        Plaintiffs entrusted Defendant implicitly with their investments in the insurance policies.

13  52.   Defendant owed Plaintiffs fiduciary duties at all relevant times, including the duty of

14        loyalty and candor. Defendant further owed a duty to use Plaintiffs' funds for legitimate

15        business purposes and to refrain from using their funds and other property for his own

16        personal non-business purposes.

17  53.   Defendant embezzled and stole from Plaintiffs. Defendant misrepresented the above-

18        referenced information to Plaintiffs for the purpose of convincing Plaintiffs to invest in

19        additional policies into Defendant's IOLTA client trust account. Defendant then stole

20        more than $13,480,949 of Plaintiffs' money in a complicated life insurance scam,

21        constituting intentional fraudulent, fraudulent concealment, breach of fiduciary duty and

22        elder abuse.

23  54.   Defendant's misappropriation of Plaintiffs' funds and other property was unauthorized,

24        without their consent and fraudulent. Defendant acted with the intent to permanently

25        deprive Plaintiffs of the possession, use and benefit of their funds and other property.

26  55.   As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiffs'

27        funds and other property and Defendant's false pretenses, false representations, and

28        actual fraud set forth herein, Plaintiffs have suffered damages in the amount of not less

1   than $13,480,949.

2   56.   The damages to Plaintiffs arising from Defendant's fraud, defalcation, embezzlement and

3   larceny while acting in a fiduciary capacity constitutes a debt against Defendant that is

4   non-dischargeable pursuant to 11 USC § 523(a)(4).

5   
### THIRD CLAIM FOR RELIEF
#### (Nondischargeability of Debt - 11 USC § 523(a)(6))

6   

7   57.   Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations

8   in this Complaint as though fully set forth herein.

9   58.   At all relevant times, Defendant acted as Plaintiffs' fiduciary - investment adviser.

10   Plaintiffs entrusted Defendant implicitly with their investments in the insurance policies.

11   59.   Defendant owed Plaintiffs fiduciary duties at all relevant times, including the duty of

12   loyalty and candor. Defendant further owed a duty to use Plaintiffs' funds for legitimate

13   business purposes and to refrain from using their funds and other property for his own

14   personal non-business purposes.

15   60.   Defendant embezzled and stole from Plaintiffs. Defendant misrepresented the above-

16   referenced information to Plaintiffs for the purpose of convincing Plaintiffs to invest in

17   additional policies into Defendant's IOLTA client trust account. Defendant then stole

18   more than $13,480,949 of Plaintiffs' money in a complicated life insurance scam,

19   constituting intentional fraudulent, fraudulent concealment, breach of fiduciary duty and

20   elder abuse.

21   61.   Defendant's misappropriation of Plaintiffs' funds and other property was unauthorized,

22   without their consent and fraudulent. Defendant acted with the intent to permanently

23   deprive Plaintiffs of the possession, use and benefit of their funds and other property.

24   62.   As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiffs'

25   funds and other property and Defendant's false pretenses, false representations, and

26   actual fraud set forth herein, Plaintiffs have suffered damages in the amount of not less

27   than $13,480,949.

28   63.   The damages to Plaintiffs arising from Defendant's willful and malicious injury to

-12-

Plaintiffs constitutes a debt against Defendant that is non-dischargeable pursuant to 11

USC § 523(a)(6).

### FOURTH CAUSE OF ACTION
#### (Objection to Debtor's Discharge  11 USC § 727(a)(2)(A))

64.    Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations

in this Complaint as though fully set forth herein.

65.    Plaintiffs are informed and believe that within one year before the Petition, Defendant

transferred, removed, and/or concealed, or permitted to be transferred, removed, and/or

concealed, Defendant's property.

66.    As of the dates of the transfers, removals, and/or concealments of Defendant's property,

Defendant had one or more unsecured creditors.

67.    The transfers, removals, and/or concealments of Defendant's property prevented the

distribution of Defendant's property to Defendant's unsecured creditors.

68.    Defendant, with intent to hinder, delay, and/or defraud at least one of Defendant's

creditors, including, without limitation, Plaintiffs, transferred, removed, and/or

concealed, or permitted to be transferred, removed, and/or concealed, Defendant's

property.

69.    By transferring, removing, concealing, and/or permitting the transfer, removal, and/or

concealment of Defendant's property with the intent to hinder, delay, and/or defraud at

least one of Defendant's creditors, Defendant violated 11 USC § 727(a)(2)(A).

70.    Defendant failed to list valuable property on his schedule of assets and failed in his

statement of affairs to disclose property transfers.

71.    Defendant has a reckless indifference to the truth.

### FIFTH CAUSE OF ACTION
#### (Objection to Debtor's Discharge  11 USC § 727(a)(2)(B))

72.    Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations

in this Complaint as though fully set forth herein.

73.    Plaintiffs are informed and believe that After the Petition, Defendant transferred,

74. As of the dates of the transfers, removals, and/or concealments of the property of the estate, Defendant had one or more unsecured creditors.

75. The transfers, removals, and/or concealments of the property of the estate prevented the distribution of this property to Defendant's unsecured creditors.

76. Defendant, with intent to hinder, delay, and/or defraud at least one of Defendant's creditors, transferred, removed, and/or concealed, or permitted to be transferred, removed, and/or concealed, property of the estate.

77. By transferring, removing, concealing, and/or permitting the transfer, removal, and/or concealment of estate property, with the intent to hinder, delay, and/or defraud at least one of Defendant's creditors, Defendant violated 11 USC § 727(a)(2)(B).

78. Defendant failed to list valuable property on his schedule of assets and failed in his statement of affairs to disclose property transfers.

79. Defendant has a reckless indifference to the truth.

## SIXTH CAUSE OF ACTION
### (Objection to Debtor's Discharge  11 USC § 727(a)(3))

80. Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

81. Plaintiffs are informed and believe that Defendant has not maintained adequate books and records from which Debtor's financial condition can be ascertained. Debtor has consistently not maintained adequate books and records. His failure to keep adequate books and records is not justified considering the circumstances articulated in this Complaint.

82. Defendant has concealed, destroyed, falsified, and/or failed to keep or preserve information from which Defendant's financial condition and/or business transactions might be ascertained.

83. Defendant has not been cooperative with the Office of the United States Trustee

("OUST") or with his creditors. Defendant has intentionally withheld records, books, documents, and/or other papers relating to Defendant's property and/or financial affairs.

84.    Considering the foregoing, Defendant's discharge must be denied under 11 USC § 727(a)(3).

**SEVENTH CAUSE OF ACTION**
**(Objection to Debtor's Discharge  11 USC § 727(a)(4)**

85.    Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

86.    Plaintiffs are informed and believe that Defendant has not made simple isolated errors or omissions in his Bankruptcy filings. Defendant's filings, such as his schedules and statement of affairs, do not reflect inadvertence or incompetence; rather, they exhibit fraudulent intent.

87.    Defendant has a pattern of misleading conduct.

88.    Defendant has a reckless indifference to the truth.

89.    Defendant has failed to list assets in his schedules.

90.    Defendant has falsely testified in the 341 Meeting.[2]

---

[2]    At the 3-13-2023 341(a) Meeting, Defendant at circa 11:15 testified in response to omissions to be brought to the attention of the United States Trustee ("UST"), that there were only "three minor errors" which he thought that his attorney corrected. Defendant testified that there were "no" errors related to any assets that he owns. At circa 12:52, Defendant testified that he identified all assets on his schedules. Defendant at circa 1:18:30-1:09:21 testified that in the year before the Bankruptcy, he received no commissions from his third-party life insurance deals. At circa 1:20:18, Defendant testified that he has not ever collected money on his third-party life insurance deals. At circa 1:22:18, Defendant testified that he has never received a payoff on his third-party life insurance deals. At circa 1:23:21, Defendant testified that four people have died and that he has received no money. Defendant at circa 1:39:00 testified, in response to whether he had transactions with Shlomo Rechnitz in the last five or six months relating to the thirdparty life insurance policies, "nope." Defendant testified that he does not remember paying the premiums for these policies out of his attorney client trust account at any time. Defendant at circa 1:40:03 testified that he does not remember depositing his own funds into his attorney-client trust account so that these insurance premiums could be paid. In response to the question of whether Defendant traveled out of the country anywhere recently, other than Israel, Defendant at circa 2:23:00 testified, "nope." In response

-15-

91. Defendant has knowingly and fraudulently made false oaths and/or accounts in the Bankruptcy Case.

92. Defendant has failed to provide records which are necessary for the OUST and his creditors to properly understand Defendant's financial condition and/or recent business transactions.

93. Considering the foregoing, Defendant's discharge must be denied under 11 USC § 727(a)(4).

**EIGHTH CAUSE OF ACTION**
**(Objection to Debtor's Discharge  11 USC § 727(a)(5))**

94. Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

95. Defendant has failed to explain satisfactorily his deficiency and/or loss of assets to meet Debtor's liabilities. No determination has yet been made of an entitlement to a discharge in this Bankruptcy Case.

96. Considering the foregoing, Defendant's discharge must be denied under 11 USC § 727(a)(5).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request judgment on the Complaint as follows:

1. On the First Claim for Relief, Plaintiffs seek an order determining that Defendant is indebted to Plaintiffs in an amount not less than $13,480,949 and that Defendant's debt is excepted from discharge pursuant to 11 USC § 523(a)(2)(A);

2. On the Second Claim for Relief, Plaintiffs seek an order determining that Defendant is indebted to Plaintiffs in an amount not less than $13,480,949 and that Defendant's debt is excepted from discharge pursuant to 11 USC § 523(a)(4);

3. On the Third Claim for Relief, Plaintiffs seek an order determining that Defendant is

---

to the question of whether Defendant has bank accounts in Israel, Defendant at circa 2:26:48 testified, "nope." Defendant at circa 2:59:15 testified that he has not transferred any assets within the last year to a third party. Defendant at circa 2:59:33 testified that he has not given any gifts more than $12,000.00 to his family.

indebted to Plaintiffs in an amount not less than $13,480,949 and that Defendant's debt is

excepted from discharge pursuant to 11 USC § 523(a)(6);

4.     On the Fourth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge

pursuant to 11 USC § 727(a)(2)(A);

5.     On the Fifth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge

pursuant to 11 USC § 727(a)(2)(B);

6.     On the Sixth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge

pursuant to 11 USC § 727(a)(3);

7.     On the Seventh Claim for Relief, Plaintiffs seek an order denying Defendant his

discharge pursuant to 11 USC § 727(a)(4);

8.     On the Eighth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge

pursuant to 11 USC § 727(a)(5);

9.     For costs of suit incurred herein; and

10.    For such other and further relief as the Court may deem appropriate.

DATED:       May 12, 2023                LAW OFFICE OF BARUCH C. COHEN
                                         A Professional Law Corporation

                                         By    /S/ Baruch C. Cohen
                                         Baruch C. Cohen, Esq.
                                         *Attorney For Creditors Robert & Esther*
                                         *Mermelstein*

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>ROBERT & ESTHER MERMELSTEIN | DEFENDANTS<br><br>LESLIE KLEIN |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br><br>Baruch C. Cohen, Esq. (SBN 159455)    (323) 937-4501<br>LAW OFFICE OF BARUCH C. COHEN, A Professional Law Corporation<br>4929 Wilshire Boulevard, Suite 940, Los Angeles CA 90010 | **ATTORNEYS** (If Known) |

| PARTY (Check One Box Only)<br>☐ Debtor         ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor      ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☒ Debtor         ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT TO  11 USC § 523(a)(2)(A),  11 USC § 523(a)(4), & 11 USC § 523(a)(6); & FOR DENIAL OF DISCHARGE PURSUANT TO 11 USC § 727(a)(2)(A); 11 USC § 727(a)(2)(B); 11 USC § 727(a)(3); 11 USC § 727(a)(4); 11 USC § 727(a)(5)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property**<br>☐ 11-Recovery of money/property - §542 turnover of property<br>☐ 12-Recovery of money/property - §547 preference<br>☐ 13-Recovery of money/property - §548 fraudulent transfer<br>☐ 14-Recovery of money/property - other | **FRBP 7001(6) – Dischargeability (continued)**<br>☐ 61-Dischargeability - §523(a)(5), domestic support<br>☒ 68-Dischargeability - §523(a)(6), willful and malicious injury<br>☐ 63-Dischargeability - §523(a)(8), student loan<br>☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation<br>        (other than domestic support)<br>☐ 65-Dischargeability - other |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien**<br>☐ 21-Validity, priority or extent of lien or other interest in property | |
| **FRBP 7001(3) – Approval of Sale of Property**<br>☐ 31-Approval of sale of property of estate and of a co-owner - §363(h) | **FRBP 7001(7) – Injunctive Relief**<br>☐ 71-Injunctive relief – imposition of stay<br>☐ 72-Injunctive relief – other |
| **FRBP 7001(4) – Objection/Revocation of Discharge**<br>☒ 41-Objection / revocation of discharge - §727(c),(d),(e) | **FRBP 7001(8) Subordination of Claim or Interest**<br>☐ 81-Subordination of claim or interest |
| **FRBP 7001(5) – Revocation of Confirmation**<br>☐ 51-Revocation of confirmation | **FRBP 7001(9) Declaratory Judgment**<br>☐ 91-Declaratory judgment |
| **FRBP 7001(6) – Dischargeability**<br>☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims<br>☒ 62-Dischargeability - §523(a)(2), false pretenses, false representation,<br>        actual fraud<br>☒ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny | **FRBP 7001(10) Determination of Removed Action**<br>☐ 01-Determination of removed claim or cause<br><br>**Other**<br>☐ SS-SIPA Case – 15 U.S.C. §78aaa *et.seq.*<br>☐ 02-Other (e.g. other actions that would have been brought in state court<br>        if unrelated to bankruptcy case) |
| **(continued next column)** | |

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ 13,480,949 |

| Other Relief Sought |
|---|

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR <br> **LESLIE KLEIN** | BANKRUPTCY CASE NO. <br> 2:23-bk-10990-SK | |
| DISTRICT IN WHICH CASE IS PENDING <br> Central District of California | DIVISION OFFICE <br> Los Angeles | NAME OF JUDGE <br> Klein |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE <br> 5/12/2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF) <br> Baruch C. Cohen, Esq. | |

## INSTRUCTIONS

      The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

      A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

      The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

| | |
|---|---|
| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address<br><br>Baruch C. Cohen, Esq. (SBN 159455)<br>LAW OFFICE OF BARUCH C. COHEN<br>A Professional Law Corporation<br>4929 Wilshire Boulevard, Suite 940<br>Los Angeles, California 90010<br>(323) 937-4501 Facsimile: (888) 316-6107<br>Email: baruchcohen@baruchcohenesq.com<br><br><br>*Attorney for Plaintiff* | FOR COURT USE ONLY |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA - **LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br>LESLIE KLEIN<br><br><br><br>Debtor(s). | CASE NO.: 2:23-bk-10990-SK<br><br>CHAPTER: 11<br><br>ADVERSARY NO.: |
| ROBERT & ESTHER MERMELSTEIN<br><br><br><br>Plaintiff(s)<br><br>LESLIE KLEIN          Versus<br><br><br><br>Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING**<br>**[LBR 7004-1]** |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| | |
|---|---|
| **Hearing Date:** _____<br>**Time:** _____<br>**Courtroom:** _____ | **Address:**<br>☐ 255 East Temple Street, Los Angeles, CA 90012<br>☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101<br>☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.**  All parties must read and comply with the rule, even if you are representing yourself.  You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference.  A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH).  If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference.  **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

        **KATHLEEN J. CAMPBELL**
        **CLERK OF COURT**

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
             Deputy Clerk

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

_December 2016_                   Page 2                   **F 7004-1.SUMMONS.ADV.PROC.**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:


A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:

_____

_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____     _____          _____
*Date*                          *Printed Name*                                *Signature*

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

1   STEVEN M. MAYER, ESQ. (Bar No. 170548)
    MAYER LAW GROUP, A.P.C.
2   16133 Ventura Blvd., PH-A
3   Encino, California 91436
    Telephone: (818) 528-2858
4   Facsimile: (818) 514-2728
    smayer@MayerLawLA.com
5
6   NATHAN TALEI, ESQ. (Bar No. 281498)
    OLDMAN, SALLUS & GOLD, L.L.P.
7   16133 Ventura Blvd., PH-A
    Encino, California 91436
8   Telephone: (818) 986-8080
    Facsimile: (818) 789-0947
9   ntalei@oclslaw.com

10  Attorneys for Plaintiff JEFFREY SIEGEL,
11  Successor Trustee, Scott Trust Agreement
    dated December 24, 1992

12

13              **UNITED STATES BANKRUPTCY COURT**
14               **CENTRAL DISTRICT OF CALIFORNIA**
                      **(LOS ANGELES DIVISION)**
15

16
17  In re:                             )  Case No. 2:23-bk-10990-SK
                                       )
18  LESLIE KLEIN,                      )   Chapter 11
                                       )
19           Debtor.                   )  Adv. Proc. No. _____
    _____        )
20  JEFFREY SIEGEL, SUCCESSOR          )  **COMPLAINT TO DENY**
21  TRUSTEE, SCOTT TRUST AGREEMENT     )  **DISCHARGEABILITY OF DEBT AND**
    DATED DECEMBER 24, 1992            )  **DENIAL OF DISCHARGE**
22                                     )
             Plaintiff                 )  **[11 U.S.C. §§523(a)(2), 523(a)(4), and**
23                                     )  **523(a)(6)]**
         v.                            )
24                                     )  Status Conference
25  LESLIE KLEIN,                      )  To be set by court
                                       )
26           Defendant                 )
    _____        )
27
28
                              1
    ───────────────────────────────────────────
                         COMPLAINT

Jeffrey Siegel, Successor Trustee of the Scott Trust Agreement dated December 24, 1992 ("Siegel"), the Plaintiff in the instant adversary proceeding and a scheduled creditor in the underlying Chapter 11 case, respectfully alleges as follows:

**STATEMENT OF CONSENT**

1.       Pursuant to Rule 7008(a) of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy 7008-1, Siegel consents "to entry of final orders or judgment by the bankruptcy court."

**JURISDICTION AND VENUE**

2.       On February 23, 2023, Defendant/Debtor Leslie Klein ("Klein") filed a voluntary petition under Chapter 11, Title 11 of the United States Code, in the United States Bankruptcy Court, Central District of California, pending in the Los Angeles Division, as case number 2:23-bk-10990-SK.

3.       This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§1334(b) and 1334(d), in that it arises in or is related to the above-captioned bankruptcy case pending under Chapter 11 of Title 11 of the United States Code.

4.       Siegel is scheduled as a creditor in Klein's bankruptcy case.

5.       This action is a "core proceeding" which may be referred to the United States Bankruptcy Court pursuant to 28 U.S.C. §157(b), in that it is a proceeding to determine the dischargeability of a debt under 11 U.S.C. §§523(a)(2)(A), 523(a)(4), and 523(a)(6).

6.       Venue of this action is proper under 28 U.S.C. §1409 in that it arises in or relates to the above-captioned case under Title 11 of the United States Code, which case is currently pending in the Central District of California, Los Angeles Division.

**INTRODUCTORY ALLEGATIONS**

7.       This Complaint for denial of a discharge of indebtedness arises from allegations of intentional and willful financial fraud and misconduct, and breach of fiduciary duties, committed by

Klein, to the harm, loss, and detriment of Siegel, in his capacity as Successor Trustee of the Scott

Trust Agreement dated December 24, 1992 ("the Trust"), in an amount not less than $2,670,000.

8.    The allegations herein are the subject of a pending probate court accounting trial, in

the Los Angeles Superior Court (sometimes referred to herein as the "Probate Court"), arising from

Klein's accountings of funds before the Probate Court. The damages stemming from Klein's

conduct are memorialized by Siegel's petition to surcharge Klein for the financial losses suffered

by Klein's conduct. Trial on the accountings and petition for surcharge commenced on February 1,

2023. Conclusion of the trial was stayed by Klein's filing of the underlying bankruptcy case on

February 23, 2023.

### THE PARTIES

9.    Siegel is a resident of Los Angeles County, California, and a private professional

fiduciary licensed by the California Department of Consumer Affairs, Professional Fiduciaries

Bureau.

10.    Siegel was appointed as Successor Trustee of the Trust by the Order dated May 20,

2016, entered in the *Conservatorship of the Person and Estate of Hubert Scott*, having Los Angeles

Superior Court Case Number BP161682. Hubert Scott is referred to herein as "Mr. Scott." Mr. Scott

passed away on December 4, 2016.

11.    Siegel is informed and believes that Klein is, and at all relevant times was, a resident

of Los Angeles County, California.

12.    Siegel is further informed and believes that Klein is, and at all relevant times was, a

licensed member of the California State Bar (State Bar Number 50908), and the California Board

of Accountancy, and was Mr. Scott's lawyer, accountant, financial and investment advisor.

///

///

3

COMPLAINT

**GENERAL ALLEGATIONS**

**Siegel's Appointment as Successor Trustee; Klein as Predecessor Trustee**

13.     Siegel is the former Conservator of the Person and Estate Hubert Scott under Los Angeles Superior Court Case Number BP161682, by Orders dated June 16, 2015 (temporary conservator) and April 19, 2016 (permanent conservator). Siegel was appointed as Successor Trustee of the Trust by Order dated May 20, 2016, entered in the conservatorship matter, BP161682. Siegel was later appointed as the permanent Successor Trustee pursuant to an Order for Substituted Judgment, entered on October 7, 2016 in BP161682. Around this time, Leslie Klein was ordered to file a supplemental accounting in the conservatorship, BP161682. Instead of doing so, Klein filed an accounting in a new trust matter, which was assigned Los Angeles Superior Court Case Number BP172432. Thereafter, the Trust was supervised under Los Angeles Superior Court Case Number BP172432. The BP161682 and BP172432 cases have been ordered related and are collectively referred to as "the Probate Court Cases."

14.     Siegel is informed and believes, and thereon alleges, that at an exact date to be determined, but which is believed to pre-date the acts complained of herein, Klein became trustee of the Trust.

15.     Klein drafted an amendment to the Trust that appointed him as trustee. Additionally, Klein sent a letter to Siegel's counsel on December 7, 2015, representing that he was the trustee of the Trust. In either instance, as a trustee of the Trust and its assets, Klein, at all relevant times, was a fiduciary of the Trust assets and had and owed fiduciary duties Mr. Scott and the Trust beneficiaries, which rights and claims Siegel has standing to assert herein.

16.     Siegel is also informed and believes that Klein is and/or was the trustee of at least 24 other irrevocable trusts as discussed in the unpublished Opinion by the Court of Appeal of California, Second Appellate District, Case No. B281058.

4
COMPLAINT

**Klein's Accountings in the Probate Court Cases; Siegel's Petition for Surcharge**

17. A dispute arose in the Probate Court Cases concerning Klein's accountings therein.

18. At the direction of the Probate Court, Siegel filed a Petition to Surcharge Klein (the "Petition for Surcharge"), in LASC Case No. BP172423, to memorialize the damages available based on the objections to Klein's various accountings in an amount equal to all funds Klein received from Mr. Scott. The Petition for Surcharge included all of the funds Klein received from Mr. Scott.

19. On information and belief, Siegel alleges that the amount of Klein's debt (sometimes referred to herein as the amount sought to be surcharged), is not less than $2,670,000.00, along with interest, double damages, and attorneys' fees.

**Calculation of the Base Amount of the Debt that is Subject of Siegel's Petition for Surcharge**

20. The $2,670,000.00 base amount of the debt is equal to four alleged investments that Klein made using Mr. Scott's Trust funds:

    (a) Genevieve Page Irrevocable Life Insurance Trust ($625,000.00).

        i. August 15, 2012, $500,000.00 at 8% interest.

        ii. September 14, 2014, $125,000.00 at 8% interest

    (b) Stuart Yorkshire Irrevocable Life Insurance Trust ($625,000.00).

        i. June 1, 2011, $500,000.00 at 8% interest.

        ii. September 14, 2014, $125,000.00 at 8% interest.

    (c) Rosalia Feldman Irrevocable Life Insurance Trust ($1,020,000.00).

        i. June 11, 2011, $750,000.00 at 8% interest.

        ii. January 1, 2014, $270,000.00 at 8% interest.

    (d) Bay Area Development Company ($400,000.00).

        i. June 1, 2011, $300,000.00 on 730 N. Laurel Avenue, Los Angeles, California 90046 ("730 N. Laurel Avenue"), which was due upon sale.

ii. September 14, 2014, $100,000.00 on 730 N. Laurel Avenue, which was due upon sale.

iii. These two promissory notes were allegedly "transferred" by way of a Promissory Note dated February 1, 2015, in the amount of $400,000.00 on 161 N. Poinsettia Place, Los Angeles, California 90036 ("161 N. Poinsettia Place"), which is due upon sale.

21.    Klein admits that all of the above funds were obtained by him from the Trust.

**Statutory Additions to the Base Amount of the Debt**

22.    In addition, Siegel seeks and is entitled to recover as part of Klein's debt, the following:

(a)    Prejudgment interest at the maximum rate allowed by law on all funds received by Klein from  Mr. Scott or the Trust, calculated from the time that Klein received any sum from Mr. Scott or the Trust to the time of judgment, pursuant to Cal. Probate Code ("Probate Code") §16441 (subsection (a)(1) sets the rate of interest on damages incurred as a result of breach of trust as the legal rate of interest applicable to judgments); and

(b)    An award of double damages, costs, and attorneys' fees for all litigation related to Klein's accountings, pursuant to Probate Code §859, because Klein's taking of Trust assets was wrongful and in bad faith. Worse yet, Klein has refused to turn over assets despite two Probate Court orders requiring that he do so.  Alternatively, Siegel requests that the Court issue an award of attorneys' fees and costs for all litigation related to Klein's accountings pursuant to Probate Code section 17211, because Klein was a trustee of the Trust.

**Klein's Conservatorship and Trust Accountings in the Probate Court Cases**

23.    On May 20, 2015, the Probate Court ordered Klein to file an accounting by July 15, 2015, of all assets belonging to Mr. Scott for the period of January 1, 2005, through May 31, 2015.

COMPLAINT

24. Klein did not file an accounting in time; consequently, the Probate Court ordered Klein to file a proper accounting by no later than September 18, 2015.

25. On September 18, 2015, Klein filed an "Accounting of Leslie Klein RE: Assets" under LASC Case No. BP161682 (the "Conservatorship Accounting").

26. Shortly thereafter, the Probate Court ordered Klein to file a supplement ("Supplement") by January 21, 2016, because of material deficiencies therein.

27. The Probate Court further ordered (a) Klein to turn over all assets of Mr. Scott to Siegel, (b) that Klein shall have no further contact with Mr. Scott or Mrs. Scott, and (c) continued the matter to February 4, 2016.

28. Klein's Supplement was not submitted to the Court until January 25, 2015.

29. Despite having more than six (6) months to file an accounting, the Supplement did not provide the information required by Probate Code §1060, *et seq.*, and only indicated that Klein would present "correcting schedules" and "disclosures required by the probate code as soon as possible."

30. The Supplement represented that Klein obtained promissory notes for Mr. Scott, as trustee of the Trust, against various life insurance policies of which Klein was the trustee, as well as a promissory note for the development of a piece of property that was owned by a company of which Klein is believed to have been the incorporator and president, Bay Area Development Company.

31. During the February 4, 2016 hearing, among other things, Klein was ordered to file a complete accounting by no later than March 25, 2016.

32. On or about March 25, 2016, Klein filed the "Accounting of Investments Made by Hubert Scott and Report of Leslie Klein" (the "Trust Accounting"); however, instead of filing it in the conservatorship matter as ordered by the Probate Court, Klein opened a new matter, which was assigned LASC Case No. BP172432.

**Inconsistencies Between Accountings**

33.  Klein's accountings contain conflicting representations.

34.  For example, Klein first claimed that he invested $2,420,000.00 on three life insurance policies (Genevieve Page, Stuart Yorkshire, and Rosalie Feldman) and one property (730 N. Laurel Avenue). Klein later represented that Mr. Scott lent him $2,050,000.00 on the same three life insurance policies (Genevieve Page, Stuart Yorkshire, and Rosalie Feldman) and two properties (730 N. Laurel Avenue and 161 N. Poinsettia Place). Then, Klein represented that he was holding $2,670,000.00 in promissory notes on the same three life insurance policies (Genevieve Page, Stuart Yorkshire, and Rosalie Feldman) but that the two notes on 730 N. Laurel Avenue) were converted to the single note on the Poinsettia Property.

35.  Klein also represented that some of the funds were available, but with only $31,277.78 in interest, which amounts to about 1% per year, not 8% as indicated in the subject promissory notes. In addition, the dates changed from Klein's first accounting to the second.

36.  Moreover, the Trust Accounting is the first accounting that Klein mentioned anything about LED deals in China or life insurance policies on two different individuals—Morris Gluck and Yefim Zayonts.

37.  Further, all three versions of Klein's accountings conflict with documents that Siegel obtained directly before the August 30, 2017 deposition of Mrs. Scott. These documents include, among other things, letters that Klein sent to Mr. Scott representing that he made various investments with Mr. Scott's money, none of which were reflected in the Conservatorship accounting.

38.  Siegel believes that these documents were sent at a time when Mr. Scott was suffering from dementia and, thus, incompetent.

39.  Siegel believes that these documents are part of a series of conduct by Klein

8
COMPLAINT

continuing through present and relate to transactions that were only revealed in the Conservatorship and Trust Accountings.

40. These documents show that Mr. Scott believed, and Klein represented, that Trust funds were placed with two different policies (on the lives of Morris Gluck and Yefim Zayonts) and in Daktronics LED, that Klein had already received $2,860,901.50 by August 2011, and that Klein agreed to pay 8% within three years (or by 2014).

**Impropriety of the Alleged Investments and Non-Recourse Promissory Notes**

41. Siegel filed objections to the Trust Accounting on May 31, 2016. Therein, Siegel discussed the impropriety and unsuitability of the aforementioned promissory notes because they do not afford any security.

42. The promissory notes state that the borrower will be in default if it fails to pay any additional premiums or adjustments to premiums required on the policy, notwithstanding payment of such amounts by the holder.

43. More specifically, the promissory notes provide that upon default, the holder of the note may accelerate the due date of repayment. However, the notes' "Non-Recourse" provision provides that, "the Borrower's liability to the Holder under this Note shall be limited exclusively to the extent of the lender's security interest in the Policy or Policies, or proceeds thereof. If any proceeds shall be brought to enforce the provisions of this Note, the Holder shall have recourse hereunder against the Borrower only to the extent of Borrower's interest in the Policy or Policies."

44. Although Mr. Scott never signed the promissory notes, and thus the following provision would not be enforceable against Mr. Scott, Klein even attempts to escape personal liability by including that "[n]either Borrower nor any of its trustees, fiduciaries, or beneficiaries shall be personally liable or otherwise have any obligation hereunder." As a result, there is no requirement that Klein actually pay into any of the life insurance policies.

45.     Should Klein have merely taken Mr. Scott's funds and never paid into the life insurance policies, if these notes were held to be valid (which they are not), Mr. Scott would have no chance of recovery because he would be limited to the extent of Klein's interest in the policies, which could be nothing.

46.     The promissory notes do not have any security or method of foreclosure.

47.     Further, Klein does not provide a loan agreement for any single life insurance policy, as is customary practice.

48.     There are no statements concerning the mechanics of these deals or the individuals involved.

49.     There are no indications that the persons involved, such as Stuart Yorkshire or Rosalia Feldman, are (or were) alive, when they were born, why they decided to enter into these agreements, or even if they know about or decided to enter into these agreements.

50.     Klein also omitted a key element of his capacity in these deals—his commission structure or payment therefrom.

51.     With respect to the real properties, Klein used the same exact promissory notes for the real properties that he used on the life insurance policies. As such, there are references to "life insurance policies" that are nonsensical.

52.     Although each promissory note provides that payment is due upon the sale of the subject property, the borrower does not confirm that it is the owner of the property and is not actually obligated to sell the property.

53.     The promissory notes provide they are each secured by a "continuing first priority security interest" in the respective borrower's life insurance policies. However, there are no separate collateral assignment of life insurance agreements securing the notes. Nor are the borrowers actually required to pay into the property at all.

54. In other words, a borrower could hold onto the property indefinitely (if the borrower owns the property) and would never have to repay the note. There are no "premiums" to be paid on a piece of property, so the default provisions become worthless.

55. Additionally, the investments themselves were entirely improper. Klein alleged in the Probate Court Cases that Mr. Scott wanted to invest in life insurance policies on the lives of older individuals; however, Mr. Scott himself was an older individual. It would have been unsuitable for a man of Mr. Scott's age to put his entire fortune out of reach and wager on the lives of other people.

56. As represented by Klein in his Trust Accounting, the promissory notes on 730 N. Laurel Avenue were "transferred" to 161 N. Poinsettia Place because the tenants decided to move out. However, shortly after "transferring" the notes, Klein's Bay Area Development Company sold 730 N. Laurel Avenue. As a result, the note on 161 N. Poinsettia Place is still pending and Klein did not pay the Trust as he should have under the 730 N. Laurel Avenue notes.

57. Klein has admitted that neither Mr. Scott nor Siegel, in any representative capacity, ever signed any document allowing Klein to "transfer" the notes.

58. Further, the only life insurance trust to have paid out is the Genevieve Page policy, which should have generated 8% interest. Klein's Trust Accounting, however, alleges that only $31,277.78 in interest was available, which amounts to about 1% per year.

**Bad Faith Opposition by Respondent**

59. As a result of Klein's conduct, Siegel was forced to incur significant legal fees to litigate against Klein's accountings and uncover his dealings.

60. Siegel believes that Klein's opposition to the objections to accountings and the opposition to the Petition to Surcharge were in bad faith because each of Klein's accountings conflicts with the next, the accountings do not comport with documents that Mr. Scott and Klein

1   sent each other, and Klein even attempted to thwart the most basic of written discovery that

2   attempted to verify any of his claims.

3       61.    For example, Klein objected to written discovery by asserting that he was not a party

4   for the purposes of discovery. Despite a Probate Court order finding that he is a party, Klein still

5   referred to himself as a "non-party." Further, although Klein was ordered to turn over funds from

6   the Genevieve Page policy forthwith, he post-dated the checks and had insufficient funds in his

7   account, thereby both violating the Probate Court's order and contradicting his claim that he had the

8

9   money.

**Orders to Turn Over Assets**

10

11      62.    The Probate Court ordered Klein to turn over all assets that belong to Mr. Scott, along

12  with all documents related to the same, to Siegel forthwith, including on December 17, 2015, in

13  BP161682 (Order dated January 22, 2016), and April 8, 2016, in BP161682 (Order dated May 20,

14  2016). Despite these orders, Siegel believes Klein still holds on to substantial funds of the Trust.

15

**Breaches of Fiduciary Duties**

16

17      63.    Siegel is informed and believes that Mr. Scott met Klein through a marketing panel

18  program presented by Klein at which Klein discussed estate planning issues and represented himself

19  as estate planning and financial planning expert, whose target audience were the elderly and

20  religious communities. After that panel, Klein, through his representations of being an expert and

21  that he would achieve for Mr. Scott an extremely high rate of return, convinced Mr. Scott to let him

22  invest his monies.

23

24      64.    After receiving Mr. Scott's funds, Klein sent periodic letters and statements to Mr.

25  Scott representing that he had made safe and prudent investments with Mr. Scott's funds and was

26  pursuing others (such as the investments in the Gluck and Zayonts life insurance policies and LED

27  deals in China mentioned above).

28

65. Through these representations, and Mr. Scott's reliance thereon, Klein was able to obtain the initial funds and ongoing funds from Mr. Scott and the Trust.

66. Siegel believes that Klein was either a trustee pursuant to the sixth amendment to the Trust or through his actions alleged herein, he took it upon himself to act as trustee with respect to Trust assets entrusted to him.

67. As such, Siegel believes that Klein owed fiduciary duties to Mr. Scott, individually and as trustee of the Trust before Klein, and the Trust beneficiaries, and that Klein breached his various fiduciary duties, including: (1) the duty of loyalty by wrongfully taking Trust assets for his own benefit and placing said funds into trusts and entities which he operates and in which he has an interest; (2) the duty to avoid conflicts of interest by using Trust assets for his own profits and taking part in transactions that are adverse to Trust beneficiaries; (3) the duty to preserve trust property by not taking reasonable steps to preserve property, and in fact, dissipating Trust assets for his own benefit; (4) the duty to make trust property productive; (5) the duty to keep trust property separate and identified—although Klein obtained Trust funds, Klein claims that he does not have a ledger of accounts and that the accounts into which he deposited Trust funds also hold monies from numerous other clients; and (6) violating a trustee's standard of care when investing and managing trust assets.

## FIRST CLAIM FOR RELIEF
### (11 U.S.C. §523(A)(2)(a) - (Fraud, False Pretenses, False Representations))

68. Siegel realleges and incorporates by reference Paragraphs 1 through 67, inclusive, as though fully set forth herein.

69. 11 U.S.C. §523(a)(2)(A) excepts from excepts from discharge debts resulting form from "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

70. Mr. Scott entrusted his lawyer, CPA, and financial and investment advisor Klein with the Trust assets and with the responsibility to ultimately manage and account for those assets, taking

special care to make sound and sensible decisions, and to act with the utmost good faith, trust, confidence, and candor in his dealing for the benefit of himself and the Trust beneficiaries.

71.    In committing the acts alleged hereinabove, including, without limitation, Klein's using, dissipating, and taking Trust assets for his own benefit, placing said funds into trusts and entities which he operates and in which he has an interest, and taking part in transactions, many of which were not adequately document, that were adverse to the Trust beneficiaries, Klein intentionally engaged in a pattern of conduct and self-dealing perpetrated through his material, intentional misrepresentations, deceit and/or concealment of material facts with the intention of depriving Mr. Scott, individually and as the initial trustee of the Trust, and the Trust beneficiaries of their money, property and legal rights. Consequently, Klein financially benefitted from his conduct to the detriment of Mr. Klein, individually and as trustee of the Trust before Klein, and the Trust beneficiaries.

72.    Klein made these misrepresentations, omissions, and failures to disclose knowing they were false when made, and with the intent to deceive and defraud the Trust Parties.

73.    Mr. Scott reasonably and justifiably relied upon Klein's multiple, intentional misrepresentations and omissions to the detriment of himself, individually and as trustee of the Trust before Klein, and the Trust beneficiaries.

74.    In committing the acts alleged hereinabove, Klein incurred a debt to Siegel, in his capacity as Successor Trustee of the Trust, through his commission of actual fraud and, as also alleged above, likewise through false pretenses and false representations.

75.    11 U.S.C. §523(a)(2)(A) provides that money, property, or services obtain by fraud or false pretenses is not dischargeable. Klein's debt to Siegel is one for money, property, or services obtained by false pretenses, false representations, or actual fraud, and is thus excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

76.     As a direct and proximate result of the foregoing, Siegel has suffered damages in an amount not fully ascertained but believed to be in excess of $2,670,000.00, which should be exempted from discharge and deemed nondischargeable in Klein's bankruptcy case.

77.     In committing the acts alleged hereinabove, Klein acted willfully, maliciously, and with deliberate intent to deceive, and because thereof, Siegel is entitled to an award of punitive and exemplary damages in an amount to be determined at time of trial or judgment, which amount should also be deemed nondischargeable.

## SECOND CLAIM FOR RELIEF
### (11 U.S.C. §523(A)(4) - (Fraud or Defalcation in a Fiduciary Capacity))

81.     Siegel realleges and incorporates by reference Paragraphs 1 through 67, inclusive, as though fully set forth herein.

82.     11 U.S.C. §523(a)(4) excepts from discharge debts resulting from "fraud or defalcation while acting in a fiduciary capacity."

83.     At all relevant times, Klein was acting as a fiduciary on behalf of the Trust beneficiaries.

84.     The Trust is an express trust, which was imposed or created prior to the wrongdoing by Klein alleged herein. As such, a fiduciary relationship between Klein and Siegel as Successor Trustee of the Trust (who as the Probate Court-appointed Successor Trustee is the representative of the Trust and its beneficiaries), arises from an express trust.

85.     A fiduciary relationship between Klein and Siegel as Successor Trustee also arises from a technical trust arising under California law. The technical trust arises from the fiduciary nature of Klein's services, including legal, financial, and accounting services, rendered by Klein to, for, and/or on behalf of Mr. Scott, individually and as trustee of the Trust before Klein, and the Trust beneficiaries, by virtue of Klein's duties of management, control, and disclosure in rendering his services.

86.     Either as trustee of the Trust or through a technical trust arising by operation of law, Klein was a fiduciary, and, in engaging in the conduct alleged hereinabove, was acting in a fiduciary capacity with and having such fiduciary duties as, but not limited to, taking special care to make sound and sensible decisions, and to act with the utmost good faith, trust, confidence, and candor in the best interests of Mr. Scott and the Trust beneficiaries.

87.     Siegel is informed and believes and thereon alleges that Klein breached his various fiduciary duties to Mr. Scott and the Trust beneficiaries, when he engaged in the following acts among others:  (1) wrongfully taking Trust assets for his own benefit and placing said funds into trusts and entities which he operates and in which he has an interest; (2) using Trust assets for his own profits and taking part in transactions that are adverse to Trust beneficiaries; (3) not taking reasonable steps to preserve property, and in fact, dissipating Trust assets for his own benefit; (4) not making trust property productive; (5) not keeping trust property separate and identified— although Klein obtained Trust funds, Klein claims that he does not have a ledger of accounts and that the accounts into which he deposited Trust funds also hold monies from numerous other clients; and (6) violating a trustee's standard of care when investing and managing trust assets.

88.     The manner in which Klein breached his fiduciary duties was through fraudulent conduct, as it was conduct consisting of material, intentional misrepresentations, deceit and/or concealment of material facts known to Klein with the intention of depriving the Trust of its money, property and legal rights to the detriment of the Trust beneficiaries.

89.     Further, when Klein converted Mr. Scott's and the Trusts funds for his personal use and benefit, he defalcated in his role as a fiduciary.

90.     By engaging in the conduct alleged hereinabove, Klein also committed one or more acts of defalcation in that his actions constituted a misappropriation of trust funds held in a fiduciary capacity.

91.     Klein's acts of defalcation involved bad faith, moral turpitude or other immoral conduct, which conduct was intentionally improper, and in conscious disregard of the substantial and unjustifiable risk of injury and harm to Mr. Scott and the Trust beneficiaries.

92.     Klein's debt to Siegel arises from fraud or defalcation while acting in a fiduciary capacity, and is thus excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

93.     As a direct and proximate result of the foregoing, Siegel has suffered damages in an amount not fully ascertained but believed to be in excess of $2,670,000.00, which should be exempted from discharge in Klein's bankruptcy case.

94.     In committing the acts alleged hereinabove, Klein acted willfully, maliciously, and with deliberate intent to deceive Mr. Scott and the Trust beneficiaries, and because thereof, Siegel is entitled to an award of punitive and exemplary damages in an amount to be determined at time of trial or judgment, which amount should also be deemed nondischargeable.

### THIRD CLAIM FOR RELIEF
### (11 U.S.C. §523(A)(4) - (Embezzlement))

95.     Siegel realleges and incorporates by reference Paragraphs 1 through 67, inclusive, as though fully set forth herein.

96.     11 U.S.C. §523(a)(4) excepts from discharge debts resulting from "embezzlement."

97.     Klein fraudulently deprived Mr. Scott and the Trust of the money entrusted to him as Mr. Scott's and the Trust's lawyer, accountant, and investment and financial advisor. While in possession and/or control of the Mr. Scott's and the Trust's money, and in making the investments and expenditures alleged herein, Klein appropriated the Trust assets to a use other than which it they intended, namely by taking Trust assets for his own benefit and placing said funds into trusts and entities which he operates and in which he has an interest, to the detriment of Mr. Scott and the Trust beneficiaries. As a result of Klein's conduct, Klein deprived the Trust of its assets, and effectively became the owner of those assets.

98.     As alleged hereinabove, the Probate Court has ordered Klein to turn over all assets that belong to Mr. Scott, along with all documents related to the same, to Siegel forthwith, including on December 17, 2015, in BP161682 (Order dated January 22, 2016), and April 8, 2016, in BP161682 (Order dated May 20, 2016). Despite these orders, Siegel believes Klein still holds on to substantial funds of the Trust through the various alleged investments.

99.     When Klein appropriated and converted the Trust funds for his personal use and benefit, they were used for a purpose other than for which Klein was entrusted with them.

100.     In committing the hereinabove described acts with the intent to deprive the Trust of its assts, Klein's debt to Siegel as Successor Trustee constitutes embezzlement in the context of nondischargeability of debts and is thus excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

101.     As a direct and proximate result of the foregoing, Siegel has suffered damages in an amount not fully ascertained, in an amount to be ascertained and determined at the time of trial or judgment, which should be exempted from discharge and deemed nondischargeable in Klein's bankruptcy case.

102.     In committing the acts alleged hereinabove, Klein acted willfully, maliciously, and with deliberate intent to deceive Mr. Scott, individually and as trustee of the Trust before Klein, and the Trust beneficiaries, and because thereof, Siegel is entitled to an award of punitive and exemplary damages in an amount to be determined at time of trial or judgment, which amount should also be deemed nondischargeable.

## FOURTH CLAIM FOR RELIEF
### (11 U.S.C. §523(A)(4) - (Larceny))

103.     Siegel realleges and incorporates by reference Paragraphs 1 through 67, inclusive, as though fully set forth herein.

104.     11 U.S.C. §523(a)(4) excepts from discharge debts resulting from "larceny."

105.    In committing the acts alleged hereinabove, Klein's access to, taking, and misappropriation of Mr. Scott's and the Trust's funds through a series of material, intentional misrepresentations, deceit and/or concealment of material facts, was unauthorized, without consent, fraudulent, and unlawful.

106.    Klein acted with the intent to gain access to the funds to permanently deprive Mr. Scott, individually and as trustee of the Trust before Klein, and the Trust beneficiaries of the possession, use and benefit of their funds and other property. Consequently, Klein's debt to Siegel as Successor Trustee constitutes larceny in the context of nondischargeability of debts and is thus excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

107.    As a direct and proximate result of the foregoing, Siegel has suffered damages in an amount not fully ascertained, in an amount to be ascertained and determined at the time of trial or judgment, which should be exempted from discharge and deemed nondischargeable in Klein's bankruptcy case.

108.    In committing the acts alleged hereinabove, Klein acted willfully, maliciously, and with deliberate intent to deceive Mr. Scott, individually and as trustee of the Trust before Klein, and the Trust beneficiaries, and because thereof, Siegel is entitled to an award of punitive and exemplary damages in an amount to be determined at time of trial or judgment, which amount should also be deemed nondischargeable.

### FIFTH CLAIM FOR RELIEF
### (11 U.S.C. §523(A)(6) - (Willful and Malicious Injury))

109.    Siegel realleges and incorporates by reference Paragraphs 1 through 67, inclusive, as if set forth in full herein.

110.    Pursuant to 11 U.S.C. §523(a)(6), excepts from discharge debts "for willful and malicious injury by the debtor to another entity or the property of another entity."

111.    Among other things, Klein's acts of: (1) wrongfully taking Trust assets for his own benefit and placing said funds into trusts and entities which he operates and in which he has an interest; (2) using Trust assets for his own profits and taking part in transactions that are adverse to Trust beneficiaries; (3) not taking reasonable steps to preserve property, and in fact, dissipating Trust assets for his own benefit; (4) not making trust property productive; (5) not keeping trust property separate and identified—although Klein obtained Trust funds, Klein claims that he does not have a ledger of accounts and that the accounts into which he deposited Trust funds also hold monies from numerous other clients; and (6) violating a trustee's standard of care when investing and managing trust assets, in breach of his fiduciaries duties, establish a pattern or practice of willful and malicious injury actionable under 11 U.S.C. §523(a)(6).

112.    The aforementioned acts and the other acts alleged herein constitute willful and malicious injury to Mr. Scott, individually and as trustee of the Trust before Klein, and the Trust beneficiaries, sufficient to establish a non-dischargeable debt under 11 U.S.C. §523(a)(6).

113.    As a direct and proximate result of the foregoing, Siegel as Successor Trustee has suffered damages in an amount not fully ascertained but believed to be in excess of $2,670,000.00, which should be exempted from discharge in Klein's bankruptcy case.

114.    In committing the acts alleged hereinabove, Klein acted willfully, maliciously, and with deliberate intent to deceive Mr. Scott, individually and as trustee of the Trust before Klein, and the Trust beneficiaries, and because thereof, Siegel is entitled to an award of punitive and exemplary damages in an amount to be determined at time of trial or judgment, which should also be deemed nondischargeable.

WHEREFORE, Plaintiff prays for judgment against Klein as follows:

1.    For entry of a judgment that the entire debt owed by Klein to Siegel as Successor Trustee of the Trust, in an amount to be proven at time or trial or judgment, but which is believed

1   to be not less than $2,670,000, is non-dischargeable pursuant to 11 U.S.C. §523(a)(2), 523(a)(4),

2   and §523(a)(6);

3         2.     For inclusion in the judgment a directive that Klein pay as a surcharge to the Trust

4   the full amount of the judgment;

5         3.     For punitive and exemplary damages;

6

7         4.     For attorneys' fees and costs;

8         5.     For costs of suit; and

9         6.     For such other relief as the Court deems just and proper.

10

11   Dated: _____ May 12 _____, 2023       MAYER LAW GROUP, A.P.C.

12                                  By: _____

13                                  Steven M. Mayer, Esq.
                                    Attorney for Jeffrey Siegel, Successor Trustee,

14                                  Scott Trust Agreement dated December 24, 1992

15                                  and

16                                  OLDMAN, SALLUS & GOLD, L.L.P.

17                                  By: _____

18                                  Nathan Talei, Esq.
                                  Attorney for Jeffrey Siegel, Successor Trustee,

19                                  Scott Trust Agreement dated December 24, 1992

20

21

22

23

24

25

26

27

28

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Jeffrey Siegel, Successor Trustee, Scott Trust<br>Agreement dated December 24, 1992 | DEFENDANTS<br>Leslie Klein |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Steven M. Mayer, Esq. Mayer Law Group, A.P.C.<br>16133 Ventura Blvd., PH-A, Encino, CA 91436-2447<br>(818) 528-2858; and<br>Nathan Talie, Esq., Oldman, Sallus & Gold, L.L.P.<br>16133 Ventura Blvd., PH-A, Encino, CA 91436<br>(818) 986-8080 | ATTORNEYS (If Known)<br>Michael Jay Berger, Esq./Law Offices of Michael Jay Berger<br>9454 Wilshire Blvd., 6th Fl, Beverly Hills, CA 90212 |
|---|---|

| PARTY (Check One Box Only)<br>[ ] Debtor    [ ] U.S. Trustee/Bankruptcy Admin<br>[X] Creditor  [ ] Other<br>[ ] Trustee | PARTY (Check One Box Only)<br>[X] Debtor    [ ] U.S. Trustee/Bankruptcy Admin<br>[ ] Creditor  [ ] Other<br>[ ] Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUES INVOLVED)
Complaint for NonDischargeability of Debt under 11 U.S.C. 523(a)(2)(A), 11 U.S.C. 523(a)(4), and 11 U.S.C. 523(a)(6)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) - Recovery of Money/Property**
[ ]  11-Recovery of money/property - §542 turnover of property
[ ]  12-Recovery of money/property - §547 preference
[ ]  13-Recovery of money/property - §548 fraudulent transfer
[ ]  14-Recovery of money/property - other

**FRBP 7001(2) - Validity, Priority or Extent of Lien**
[ ]  21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) - Approval of Sale of Property**
[ ]  31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) - Objection/Revocation of Discharge**
[ ]  41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) - Revocation of Confirmation**
[ ]  51-Revocation of confirmation

**FRBP 7001(6) - Dischargeability**
[ ]  66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
[ 1 ] 62-Dischargeability - §523(a)(2), false pretenses,
        false representation, actual fraud
[ 2 ] 67-Dischargeability - §523(a)(4), fraud as fiduciary,
        embezzlement, larceny

        **(continued next column)**

**FRBP 7001(6) - Dischargeability (continued)**
[ ]  61-Dischargeability - §523(a)(5), domestic support
[ 3 ] 68-Dischargeability - §523(a)(6), willful and malicious injury
[ ]  63-Dischargeability - §523(a)(8), student loan
[ ]  64-Dischargeability - §523(a)(15), divorce or separation obligation
        (other than domestic support)
[ ]  65-Dischargeability - other

**FRBP 7001(7) - Injunctive Relief**
[ ]  71-Injunctive relief - imposition of stay
[ ]  72-Injunctive relief - other

**FRBP 7001(8) Subordination of Claim or Interest**
[ ]  81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
[ ]  91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
[ ]  01-Determination of removed claim or cause

**Other**
[ ]  SS-SIPA Case - 15 U.S.C. §§78aaa et.seq.
[ ]  02-Other (e.g. other actions that would have been brought in state
        court if unrelated to bankruptcy case)

| [ ] Check if this case involves a substantive issue of state law | [ ] Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| [ ] Check if a jury trial is demanded in complaint | Demand $ **estimated at not less than $2,670,000** |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | |
|---|---|
| **Leslie Klein** | BANKRUPTCY CASE NO. **2:23-bk-10990-SK** |

| DISTRICT IN WHICH CASE IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
|---|---|---|
| **Central District of California** | **Los Angeles** | **Hon. Sandra R. Klein** |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |

| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
|---|---|---|

SIGNATURE OF ATTORNEY (OR PLAINTIFF)

**Steven M. Mayer, Esq.**

| DATE  5/12/2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF) **Steven M. Mayer, Esq.** |
|---|---|

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case  Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT E

**BEFORE THE
CALIFORNIA BOARD OF ACCOUNTANCY
DEPARTMENT OF CONSUMER AFFAIRS
STATE OF CALIFORNIA**

In the Matter of the Accusation Against:

**LESLIE KLEIN**
**322 N. June Street**
**Los Angeles, CA  90004**

**Certified Public Accountant Certificate No.**
**67454**

                              Respondent.

Case No. AC-2019-62

OAH No. 2019090073

## DECISION AND ORDER

The attached Stipulated Surrender of License and Order is hereby adopted by the

California Board of Accountancy, Department of Consumer Affairs, as its Decision in this

matter.

This Decision shall become effective on _____May 13, 2020_____.

It is so ORDERED _____April 13, 2020_____.

_____
FOR THE CALIFORNIA BOARD OF ACCOUNTANCY
DEPARTMENT OF CONSUMER AFFAIRS

1  XAVIER BECERRA
   Attorney General of California
2  MARC D. GREENBAUM
   Supervising Deputy Attorney General
3  WILLIAM D. GARDNER
   Deputy Attorney General
4  State Bar No. 244817
   300 So. Spring Street, Suite 1702
5  Los Angeles, CA 90013
    Telephone: (213) 269-6292
6    Facsimile: (916) 731-2126
   *Attorneys for Complainant*

7

8                        BEFORE THE
                CALIFORNIA BOARD OF ACCOUNTANCY
9              DEPARTMENT OF CONSUMER AFFAIRS
                    STATE OF CALIFORNIA
10

11  In the Matter of the Accusation Against:    Case No. AC-2019-62

12  **LESLIE KLEIN**                            OAH No. 2019090073
    **322 N. June Street**
13  **Los Angeles, CA 90004**                   **STIPULATED SURRENDER OF
                                                LICENSE AND ORDER**
14  **Certified Public Accountant Certificate No.
    67454**
15
                              Respondent.
16

17

18        IT IS HEREBY STIPULATED AND AGREED by and between the parties to the above-

19  entitled proceedings that the following matters are true:

20                              **PARTIES**

21        1.    Patti Bowers (Complainant) is the Executive Officer of the California Board of

22  Accountancy (CBA). She brought this action solely in her official capacity and is represented in

23  this matter by Xavier Becerra, Attorney General of the State of California, by William D.

24  Gardner, Deputy Attorney General.

25        2.    Respondent Leslie Klein is represented in this proceeding by attorney Randall Dean,

26  whose address is: 11900 W. Olympic Boulevard, Suite 800, Los Angeles, California 90064.

27        3.    On or about September 30, 1994, the California Board of Accountancy issued

28  Certified Public Accountant Certificate Number 67454 to Leslie Klein ("Respondent"). The

                                      1

Certified Public Accountant Certificate was in full force and effect at all times relevant to the charges brought in Accusation No. AC-2019-62 and will expire on January 31, 2021, unless renewed.

## JURISDICTION

4.    Accusation No. AC-2019-62 was filed before the CBA, and is currently pending against Respondent.  The Accusation and all other statutorily required documents were properly served on Respondent on June 7, 2019.  Respondent timely filed his Notice of Defense contesting the Accusation.  A copy of Accusation No. AC-2019-62 is attached as Exhibit A and incorporated by reference.

## ADVISEMENT AND WAIVERS

5.    Respondent has carefully read, fully discussed with counsel, and understands the charges and allegations in Accusation No. AC-2019-62.  Respondent also has carefully read, fully discussed with counsel, and understands the effects of this Stipulated Surrender of License and Order.

6.    Respondent is fully aware of his legal rights in this matter, including the right to a hearing on the charges and allegations in the Accusation; the right to confront and cross-examine the witnesses against him; the right to present evidence and to testify on his own behalf; the right to the issuance of subpoenas to compel the attendance of witnesses and the production of documents; the right to reconsideration and court review of an adverse decision; and all other rights accorded by the California Administrative Procedure Act and other applicable laws.

7.    Respondent voluntarily, knowingly, and intelligently waives and gives up each and every right set forth above.

## CULPABILITY

8.    Respondent understands that the charges and allegations in Accusation No. AC-2019-62, if proven at a hearing, constitute cause for imposing discipline upon his Certified Public Accountant Certificate.

9.    For the purpose of resolving the Accusation without the expense and uncertainty of further proceedings, Respondent agrees that, at a hearing, Complainant could establish a factual

2

basis for the charges in the Accusation and that those charges constitute cause for discipline. Respondent hereby gives up his right to contest that cause for discipline exists based on those charges.

10.   Respondent understands that by signing this stipulation he enables the CBA to issue an order accepting the surrender of his Certified Public Accountant Certificate without further process.

## RESERVATION

11.   The admissions made by Respondent herein are only for the purposes of this proceeding, or any other proceedings in which the CBA is involved and shall not be admissible in any other criminal or civil proceeding.

## CONTINGENCY

12.   This stipulation shall be subject to approval by the CBA.  Respondent understands and agrees that counsel for Complainant and the staff of the CBA may communicate directly with the CBA regarding this stipulation and surrender, without notice to or participation by Respondent or his counsel.  By signing the stipulation, Respondent understands and agrees that he may not withdraw his agreement or seek to rescind the stipulation prior to the time the CBA considers and acts upon it.  If the CBA fails to adopt this stipulation as its Decision and Order, the Stipulated Surrender and Disciplinary Order shall be of no force or effect, except for this paragraph, it shall be inadmissible in any legal action between the parties, and the CBA shall not be disqualified from further action by having considered this matter.

13.   The parties understand and agree that Portable Document Format (PDF) and facsimile copies of this Stipulated Surrender of License and Order, including PDF and facsimile signatures thereto, shall have the same force and effect as the originals.

14.   This Stipulated Surrender of License and Order is intended by the parties to be an integrated writing representing the complete, final, and exclusive embodiment of their agreement. It supersedes any and all prior or contemporaneous agreements, understandings, discussions, negotiations, and commitments (written or oral).  This Stipulated Surrender of License and Order

3

1    may not be altered, amended, modified, supplemented, or otherwise changed except by a writing

2    executed by an authorized representative of each of the parties.

3        15.    In consideration of the foregoing admissions and stipulations, the parties agree that

4    the CBA may, without further notice or formal proceeding, issue and enter the following Order:

5                                    **ORDER**

6        IT IS HEREBY ORDERED that Certified Public Accountant Certificate No. 67454, issued

7    to Respondent Leslie Klein, is surrendered and accepted by the CBA.

8        1.    The surrender of Respondent's Certified Public Accountant Certificate and the

9    acceptance of the surrendered license by the CBA shall constitute the imposition of discipline

10   against Respondent.  This stipulation constitutes a record of the discipline and shall become a part

11   of Respondent's license history with the CBA.

12       2.    Respondent shall lose all rights and privileges as a certified public accountant in

13   California as of the effective date of the CBA's Decision and Order.

14       3.    Respondent shall cause to be delivered to the CBA his pocket license and, if one was

15   issued, his wall certificate on or before the effective date of the Decision and Order.

16       4.    If Respondent ever files an application for licensure or a petition for reinstatement in

17   the State of California, the CBA shall treat it as a petition for reinstatement.  Respondent must

18   comply with all the laws, regulations and procedures for reinstatement of a revoked or

19   surrendered license in effect at the time the petition is filed, and all of the charges and allegations

20   contained in Accusation No. AC-2019-62 shall be deemed to be true, correct and admitted by

21   Respondent when the CBA determines whether to grant or deny the petition.

22       5.    Respondent shall pay the agency its costs of investigation and enforcement in the

23   amount of $30,000.00 prior to issuance of a new or reinstated license.

24                                  **ACCEPTANCE**

25       I have carefully read the above Stipulated Surrender of License and Order and have fully

26   discussed it with my attorney.  I understand the stipulation and the effect it will have on my

27   Certified Public Accountant Certificate.  I enter into this Stipulated Surrender of License and

28   ///

                                            4

                    Stipulated Surrender of License (Case No. AC-2019-62)

1  Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order

2  of the California Board of Accountancy

DATED: __3/19/2020__    _Leslie Klein_ (signature)
                          LESLIE KLEIN
                          *Respondent*

I have read and fully discussed with Respondent Leslie Klein the terms and conditions and

other matters contained in this Stipulated Surrender of License and Order. I approve its form and

content.

DATED: _____    _____

                          *Attorney for Respondent*

### ENDORSEMENT

The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted

consideration by the California Board of Accountancy of the Department of Consumer

irs.

ED: _____    Respectfully submitted,

                          XAVIER BECERRA
                          Attorney General of California
                          MARC D. GREENBAUM
                          Supervising Deputy Attorney General


                          WILLIAM D. GARDNER
                          Deputy Attorney General
                          *Attorneys for Complainant*

9

ender of License and Order.docx

1    Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order

2    of the California Board of Accountancy.

3

4    DATED: _____   _____

5                                             LESLIE KLEIN
                                             *Respondent*

6        I have read and fully discussed with Respondent Leslie Klein the terms and conditions and

7    other matters contained in this Stipulated Surrender of License and Order.  I approve its form and

8    content.

9    DATED:  March 19, 2020            *Randall J. Dean*

10                                            *Attorney for Respondent*

11

12                              **ENDORSEMENT**

13       The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted

14   for consideration by the California Board of Accountancy of the Department of Consumer

15   Affairs.

16   DATED: _____      Respectfully submitted,

17                                            XAVIER BECERRA
                                             Attorney General of California
18                                           MARC D. GREENBAUM
                                             Supervising Deputy Attorney General
19

20

21                                           WILLIAM D. GARDNER
                                             Deputy Attorney General
22                                           *Attorneys for Complainant*

23

24   LA2019501499
     Stipulated Surrender of License and Order.docx
25

26

27

28

                                      5

Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order of the California Board of Accountancy.

DATED: _____    _____
LESLIE KLEIN
*Respondent*

    I have read and fully discussed with Respondent Leslie Klein the terms and conditions and other matters contained in this Stipulated Surrender of License and Order. I approve its form and content.

DATED: _____    _____
*Attorney for Respondent*

## ENDORSEMENT

    The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted for consideration by the California Board of Accountancy of the Department of Consumer Affairs.

DATED: _3/20/2020_

                    Respectfully submitted,

                    XAVIER BECERRA
                    Attorney General of California
                    MARC D. GREENBAUM
                    Supervising Deputy Attorney General

                    WILLIAM D. GARDNER
                    Deputy Attorney General
                    *Attorneys for Complainant*

LA2019501499
Stipulated Surrender of License and Order.docx

**Exhibit A**

**Accusation No. AC-2019-62**

1   XAVIER BECERRA
    Attorney General of California
2   ARMANDO ZAMBRANO
    Supervising Deputy Attorney General
3   KEVIN J. SCHETTIG
    Deputy Attorney General
4   State Bar No. 234240
    300 So. Spring Street, Suite 1702
5   Los Angeles, CA  90013
      Telephone:  (213) 269-6272
6     Facsimile:  (213) 897-2804
    *Attorneys for Complainant*
7

8                                **BEFORE THE**
                     **CALIFORNIA BOARD OF ACCOUNTANCY**
9                     **DEPARTMENT OF CONSUMER AFFAIRS**
                            **STATE OF CALIFORNIA**
10

11

12   In the Matter of the Accusation Against:          Case No. AC-2019-62

13   **LESLIE KLEIN**
14   322 N. June Street
     Los Angeles, CA  90004                            **ACCUSATION**
15
     **Certified Public Accountant Certificate No.**
16   **67454**

17                                  Respondent.

18

19

20

21      Complainant alleges:

22                                **PARTIES**

23      1.      Patti Bowers ("Complainant") brings this Accusation solely in her official capacity as

24   the Executive Officer of the California Board of Accountancy, Department of Consumer Affairs.

25      2.      On or about September 30, 1994, the California Board of Accountancy issued

26   Certified Public Accountant Certificate Number 67454 to Leslie Klein ("Respondent").  The

27   Certified Public Accountant Certificate was in full force and effect at all times relevant to the

28   charges brought herein and will expire on January 31, 2021, unless renewed.

                                      1

1                                    **JURISDICTION**

2        3.     This Accusation is brought before the California Board of Accountancy ("CBA"),

3 Department of Consumer Affairs, under the authority of the following laws. All section

4 references are to the Business and Professions Code unless otherwise indicated.

5        4.     Section 5100.5, subdivision (a), states, "After notice and hearing the board may, for

6 unprofessional conduct, permanently restrict or limit the practice of a licensee or impose a

7 probationary term or condition on a license, which prohibits the licensee from performing or

8 engaging in any of the acts or services described in Section 5051."

9        5.     Section 5109 states that "[t]he expiration, cancellation, forfeiture, or suspension of a

10 license, practice privilege, or other authority to practice public accountancy by operation of law or

11 by order or decision of the board or a court of law, the placement of a license on a retired status, or

12 the voluntary surrender of a license by a licensee shall not deprive the board of jurisdiction to

13 commence or proceed with any investigation of or action or disciplinary proceeding against the

14 licensee, or to render a decision suspending or revoking the license."

15                            **STATUTORY PROVISIONS**

16        6.     Section 5100 states:

17      "After notice and hearing the board may revoke, suspend, or refuse to renew any permit or

18 certificate granted under Article 4 (commencing with Section 5070) and Article 5 (commencing

19 with Section 5080), or may censure the holder of that permit or certificate for unprofessional

20 conduct that includes, but is not limited to, one or any combination of the following causes:

21      . . .

22      (g) Willful violation of this chapter or any rule or regulation promulgated by the board

23 under the authority granted under this chapter.

24      . . .

25      (i) Fiscal dishonesty or breach of fiduciary responsibility of any kind.

26      (j) Knowing preparation, publication, or dissemination of false, fraudulent, or materially

27 misleading financial statements, reports, or information.

28      . . ."

2

**REGULATORY PROVISIONS**

7.    California Code of Regulations, title 16, section 52, states:

"(a) A licensee shall respond to any inquiry by the Board or its appointed representatives within 30 days. The response shall include making available all files, working papers and other documents requested.

(b) A licensee shall respond to any subpoena issued by the Board or its executive officer or the assistant executive officer in the absence of the executive officer within 30 days and in accordance with the provisions of the Accountancy Act and other applicable laws or regulations.

(c) A licensee shall appear in person upon written notice or subpoena issued by the Board or its executive officer or the assistant executive officer in the absence of the executive officer.

(d) A licensee shall provide true and accurate information and responses to questions, subpoenas, interrogatories or other requests for information or documents and not take any action to obstruct any Board inquiry, investigation, hearing or proceeding."

8.    California Code of Regulations, title 16, section 58, states:

"Licensees engaged in the practice of public accountancy shall comply with all applicable professional standards, including but not limited to generally accepted accounting principles and generally accepted auditing standards."

**COST RECOVERY AND ADMINISTRATIVE PENALTIES**

9.    Section 5107 of the Code states, in pertinent part:

"(a)    The executive officer of the board may request the administrative law judge, as part of the proposed decision in a disciplinary proceeding, to direct any holder of a permit or certificate found to have committed a violation or violations of this chapter to pay to the board all reasonable costs of investigation and prosecution of the case, including, but not limited to, attorneys' fees.  The board shall not recover costs incurred at the administrative hearing.

(b)    A certified copy of the actual costs, or a good faith estimate of costs where actual costs are not available, signed by the executive officer, shall be prima facie evidence of reasonable costs of investigation and prosecution of the case."

///

3

(LESLIE KLEIN) ACCUSATION

10.    Section 5116 of the Code states in part:

"(a) The board, after appropriate notice and an opportunity for hearing, may order any licensee or applicant for licensure or examination to pay an administrative penalty as provided in this article as part of any disciplinary proceeding or other proceeding provided for in this chapter.

…

(d) Administrative penalties assessed under this article shall be in addition to any other penalties or sanctions imposed on the licensee or other person, including, but not limited to, license revocation, license suspension, denial of the application for licensure, denial of the petition for reinstatement, or denial of admission to the licensing examination. Payment of these administrative penalties may be included as a condition of probation when probation is ordered."

## PROFESSIONAL STANDARDS

11.    The CBA incorporates the following standards to all California licensees through California Code of Regulations, title 16, section 58.

### AICPA Code of Professional Conduct (Version 2014)

12.    The American Institute of Certified Public Accountants ("AICPA") Code of Professional Conduct is part of *AICPA Professional Standards.*  It includes The Rules of Conduct, Interpretations of Rules of Conduct, and Ethics Rulings.  The version relevant herein was effective on December 15, 2014, and among the sections relevant herein are: section 0.100 (Principles and Rules of Conduct), section 0.200 (Structure and Application of the AICPA Code), section 0.300 (Principles of Professional Conduct), section 0.400 (Definitions), section 1.000 (Members in Public Practice), section 1.110 (Conflicts of Interest), section 1.300 (Competence), and section 1.310 (Compliance with Standards).

### Statement on Standards in Personal Financial Planning

13.    Standards applicable to personal financial planning services are discussed in the Statement on Standards in Personal Financial Planning ("SSPFP").  The standards have been issued by the Personal Financial Planning Executive Committee, the senior committee of the AICPA designated to promulgate enforceable standards of Personal Financial Planning practice. The statements are codified by "SSPFP" number with the pertinent section 100 applicable to the

4

issues herein.

## **FACTUAL BACKGROUND**

14.   On or about January 9, 2017, the CBA received a complaint from consumer J.C.S. alleging issues related to her husband's trust (the "Trust Agreement"), dated December 24, 1992. Consumer J.C.S. alleged Respondent embezzled funds, comingled funds, misrepresented investments purchased, repeatedly produced quarterly financial reports that were misleading and exerted undue influence over her husband, consumer H.S.

15.   According to consumer J.C.S.'s complaint, Respondent insisted on doing all investments, taxes, and monitoring of H.S.'s financial accounts.  Further, consumer J.C.S. provided information that H.S., the trustor of the Trust Agreement, was 86 years old with dementia.  Respondent was trustee of the Trust Agreement.  Consumer H.S. died on December 4, 2016.

16.   On May 20, 2015, in a conservatorship case bearing Case No. BP161682, the Superior Court of California, County of Los Angeles, appointed a temporary conservator and suspended all powers of attorney for consumer H.S.

17.   On February 4, 2016, in Case No. BP161682, the Superior Court of California, County of Los Angeles, appointed conservators for consumer H.S.'s estate and person, suspended Respondent as trustee, and ordered Respondent not to have any direct contact with consumers H.S. and J.C.S.

18.   In 2005, consumer H.S.'s son died and H.S. received life insurance proceeds.  In 2010, H.S. inherited a substantial sum upon the death of his brother.  From 2011 to 2015, Respondent received $2,420,000 from consumer H.S.  In a declaration dated April 8, 2016, Respondent stated, "I was the financial planner for [H.S.] from 2011 to 2016."

19.   Respondent failed to act in the best interest of consumer H.S.:

a.   Respondent implemented investments that were improper due to the lack of liquidity and diversification given consumer H.S.'s age, which was 85 as of November 18, 2015.

i.   Each of the Non-Recourse Promissory Notes with an Irrevocable Life Insurance Trust ("ILIT") was due and payable only upon the death of the policyholder.  If the

5

1  premiums were not paid, the policy would lapse, rendering the Promissory Note worthless.

2  According to the accounting Respondent filed with the Los Angeles County Superior Court, as of

3  February 29, 2016, such promissory notes comprised $2,270,000, or 85% of consumer H.S.'s

4  "investments."

5        ii.    Each of the Non-Recourse Promissory Notes with Bay Area Development

6  Co. have identical terms. There were three notes in the amounts of $300,000, $100,000, and

7  $400,000. The $400,000 note was a replacement of the two prior notes. Each of the notes were

8  only due upon the sale of the property, were not recorded with the County Recorder, and did not

9  state who owned the property. There was no requirement or triggering event for the sale of the

10 property. Consequently, the borrower could hold onto the property indefinitely and never have to

11 repay the notes. In addition, the notes were poorly drafted. They each stated they were due upon

12 the sale of the real property, but also state that they were secured by the policies of life insurance.

13       iii.    The promissory note dated February 1, 2015, for $400,000, made up the

14 remaining 15% of consumer H.S.'s "investments."

15       iv.    The only liquid asset reported in Respondent's accounting was $8,100

16 held in the Leslie Klein & Associates Attorney Client Trust Account.

17     20.    Respondent made investments that were self-serving. Consumer H.S.'s funds were

18 invested in loans to companies connected to Respondent, or as loans to ILITs where Respondent

19 was the sole trustee of each ILIT. Respondent's connections to those companies and the ILITs

20 create a conflict of interest and are documented as follows:

21       i.    President of Bay Area Development Co.;

22       ii.    Member/manager/partner of BW Life Settlements LLC;

23       iii.    Member/manager/partner of GMR Life Settlements LLC;

24       iv.    President of Times Square Media Inc.; and

25       v.    Each of the ILIT loans are signed by Respondent as trustee for the ILIT.

26     21.    Respondent failed to properly manage investments. Two of the companies involved,

27 BW Life Settlement LLC and GMR Life Settlements LLC, have been suspended by the Franchise

28 Tax Board or the Secretary of State.

6

22. Respondent deceived consumer H.S. as to the actual investments as follows:

    a. In a letter to consumer H.S. dated June 10, 2011, Respondent stated funds were or will be invested as follows:

        i. $500,000 loan to purchase a $5 million policy on the life of M.G.;

        ii. $500,000 loan to purchase a $5 million policy on the life of Y.Z.;

        iii. $190,901.50 invested in Daktronics along with $209,100 from H.S.'s checking account as a loan of $400,000 to purchase a light emitting diode (LED) display in Beaumont, California;

        iv. "[T]he balance … will be invested in various stocks that will pay dividends of 5% in an account at Citibank, Smith Barney in stocks that will pay dividends. We plan to invest in the following stocks: AT&T, McDonalds, Verizon, Philip Morris, and Coca Cola."

    b. In a letter to consumer H.S. dated August 1, 2011, Respondent stated funds were or will be invested as follows:

        i. $500,000 in the M.G. policy;

        ii. $500,000 in the Y.Z. policy;

        iii. $750,000 with Times Square Media to purchase LEDs;

        iv. The balance to be invested with the next ten days either in real estate on the 1st Trust Deed on the property or in insurance policies from our various hedge funds. Respondent advised that, "All of the above will pay a minimum interest of 8% due and payable three years from today's date."

    c. There is no evidence of the Daktronics or various stock investments, and they are not reported in Respondent's accounting. In addition, the investment in Times Square Media is not reported in Respondent's accounting.

    d. When the Probate Investigator stated to Respondent, "So, in essence none of these investments are in [consumer H.S.'s] name, but all are in your name and the fact is that these are not investments, but you have borrowed these amounts of monies … and these amounts are in your name and you have agreed to pay [H.S.] 8% on these monies, but you have paid

7

1   nothing to date," Respondent indicated, in the presence of consumers H.S. and J.C.S., that the

2   Probate Investigator was correct.

3       23.   Respondent failed to maintain appropriate records of the invested funds. Respondent

4   stated in a letter dated August 1, 2011 that, "… this law firm has received from [H.S.] a total of

5   $2,860,901.50." A comparison of the funds provided to Respondent for investments with the

6   cancelled checks provided by consumer J.C.S. and Respondent's accounting indicates the subtotal

7   invested as of August 1, 2011, is $3,700,000, and the total invested as of February 1, 2015, is

8   $5,048,000. Both amounts are significantly more than the amount of $2,860,901.50 reported by

9   Respondent as received for investment. While some of the Promissory Notes may have been

10  repaid and funds reinvested, there is no documentation of any repayment of either the Promissory

11  Notes or receipt of the related interest earned.

12      24.   Despite multiple written requests from consumer H.S., Respondent failed to provide

13  accurate reports or statements to H.S. Further, Respondent provided consumer H.S. with false or

14  misleading information about the "investment" of his funds.

15      25.   Respondent, through his attorney, stated in a letter dated June 29, 2018, that

16  Respondent was not consumer H.S.'s tax preparer or advisor. In this letter, Respondent also

17  asserted that he did not have personal knowledge as to the tax treatment of the interest statements

18  or whether that was reflected on H.S.'s tax returns. These statements were not true and accurate.

19  Respondent was associated with consumer H.S.'s tax returns for 2012, 2013, and 2014. Further,

20  Respondent signed consumer H.S.'s income tax returns for 2014 as the paid tax preparer. In

21  addition, in a letter dated May 12, 2011, from Respondent to Mr. Levin of BW Life Insurance

22  Settlements LLC, Respondent stated, "You will not issue a 1099 form to [consumer H.S.] as the

23  interest payment will be paid from the death proceeds."

24      26.   Respondent exerted undue influence over consumer H.S. The Probate Investigator's

25  Report dated May 8, 2015, describes her interviews with consumers H.S., J.C.S. and Respondent

26  on May 5, 2015. The Probate Investigator noted, "There appears to be substantial undue

27  influence by the attorney/Financial Advisor/Trustee, which is not and has not been in the best

28  interest of the proposed conservatee to date."

8

1           **FIRST CAUSE FOR DISCIPLINE**

2           **(Breach of Fiduciary Responsibility)**

3       27.    Respondent is subject to disciplinary action under section 5100, subdivision (i), in

4 that Respondent breached his fiduciary responsibility as Trustee to consumer H.S. Respondent

5 implemented investments that were improper due to the lack of liquidity and diversification given

6 consumer H.S.'s advanced age, made investments that were self-serving, failed to properly

7 manage investments, deceived consumer H.S. as to the actual investments, failed to maintain

8 appropriate records of the invested funds, and despite multiple written requests from consumer

9 H.S., Respondent failed to provide accurate reports or statements to consumer H.S. Complainant

10 refers to and by this reference incorporates the allegations set forth above in paragraphs 14

11 through 26, inclusive, as though set forth fully herein.

12           **SECOND CAUSE FOR DISCIPLINE**

13      **(Knowing Preparation of Misleading Financial Information)**

14       28.    Respondent is subject to disciplinary action under section 5100, subdivision (j), in

15 that Respondent provided consumer H.S. with false or misleading information about the

16 "investment" of consumer H.S.'s funds. Complainant refers to and by this reference incorporates

17 the allegations set forth above in paragraphs 14 through 26, inclusive, as though set forth fully

18 herein.

19           **THIRD CAUSE FOR DISCIPLINE**

20       **(Failure to Comply with Professional Standards)**

21       29.    Respondent is subject to disciplinary action under section 5100, subdivision (g), in

22 conjunction with Code of Regulations, title 16, section 58, in that Respondent failed to perform

23 his responsibilities in accordance with professional standards promulgated by the AICPA Code of

24 Professional Conduct and Statement on Standards in Personal Financial Planning. Complainant

25 refers to and by this reference incorporates the allegations set forth above in paragraphs 14

26 through 26, inclusive, as though set forth fully herein.

27 ///

28 ///

(LESLIE KLEIN) ACCUSATION

1 | **FOURTH CAUSE FOR DISCIPLINE**

2 | **(Failure to Respond to CBA Inquiry)**

3     30.    Respondent is subject to disciplinary action under section 5100, subdivision (g), in

4 conjunction with Code of Regulations, title 16, section 52, in that Respondent, through his

5 attorney, made statements to the CBA that were not true and accurate. Complainant refers to and

6 by this reference incorporates the allegations set forth above in paragraphs 14 through 26,

7 inclusive, as though set forth fully herein.

8 | **FIFTH CAUSE FOR DISCIPLINE**

9 | **(Unprofessional Conduct)**

10     31.    Respondent is subject to disciplinary action under section 5100, in that Respondent

11 exerted undue influence over consumer H.S. Complainant refers to and by this reference

12 incorporates the allegations set forth above in paragraphs 14 through 26, inclusive, as though set

13 forth fully herein.

14 | **SIXTH CAUSE FOR DISCIPLINE**

15 | **(Willful Violation)**

16     32.    Respondent is subject to disciplinary action under section 5100, subdivision (g), in

17 that Respondent willfully violated provisions of Business and Professions Code, Division 3,

18 Chapter 1, failed to comply with professional standards, failed to comply with court orders, and

19 made false statements in response to the CBA's inquiry. Complainant refers to and by this

20 reference incorporates the allegations set forth above in paragraphs 14 through 26, inclusive, as

21 though set forth fully herein.

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

10

(LESLIE KLEIN) ACCUSATION

1                                       **PRAYER**

2        WHEREFORE, Complainant requests that a hearing be held on the matters herein alleged,

3 and that following the hearing, the California Board of Accountancy issue a decision:

4        1.    Revoking or suspending, restricting, limiting or otherwise imposing discipline upon

5 Certified Public Accountant Certificate Number 67454, issued to Leslie Klein;

6        2.    Ordering Leslie Klein to pay the California Board of Accountancy the reasonable

7 costs of the investigation and enforcement of this case, pursuant to Business and Professions

8 Code section 5107;

9        3.    Ordering Leslie Klein to pay the California Board of Accountancy an administrative

10 penalty pursuant to Business and Professions Code section 5116; and,

11        4.    Taking such other and further action as deemed necessary and proper.

12

13 DATED: _June 5, 2019_        _Patti Bowers_

14                           PATTI BOWERS
                          Executive Officer

15                           California Board of Accountancy
                          Department of Consumer Affairs

16                           State of California
                          _Complainant_

17

18 LA2019501499
53407725.docx

19

20

21

22

23

24

25

26

27

28

(LESLIE KLEIN) ACCUSATION

# EXHIBIT G

DONALD L. SALTZMAN (SBN 54483)
A Professional Law Corporation
10537 Butterfield Road
Los Angeles, California 90064
Telephone: (310) 617-3073
Facsimile: (310) 836-8944

Attorneys for PETITIONERS
(except Winter Petitioners)

**FILED**
Superior Court of California
County of Los Angeles

JUN 0 5 2023

David W. Slayton, Executive Officer/Clerk of Court

By: S. Miramontes, Deputy

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

In the Matter of,

**FRANKLIN HENRY MENLO IRREVOCABLE TRUST, ESTABLISHED MARCH 1, 1983**

----------------------------------------

**LESLIE KLEIN, TRUSTEE; LESLIE KLEIN & ASSOCIATES, INC.,**

**Respondents**

----------------------------------------

**AND CONSOLIDATED ACTIONS**

Case No. BP136769
(Consolidated with
23 related cases)

**INTERIM ORDER AFTER HEARING ON MOTION OF PETITIONERS FOR ORDER TO REMOVE FREEZE ON TRUST ACCOUNTS AND LIFE INSURANCE POLICIES**

Hearing: June 5, 2023
Time:    1:30 p.m.
Dept.:   3

On June 5, 2023, at 1:30 p.m. in Department 3 of the Los Angeles County Probate Court, Judge Ana Maria Luna presiding, a hearing was held on Petitioners' "Notice of Motion and Motion for Order to Remove Freeze on Trust Accounts and Life Insurance Policies and Allow Distribution thereof." Donald L. Saltzman, Esq. appeared in court for all Petitioners except the Winter family Petitioners, Alex M. Weingarten, Esq. and Steven Goodrich, Esq. appeared for the Winter Petitioners ; Eric Olson, Esq. appeared on behalf of Respondent Leslie Klein, Former/Removed Trustee; and Jeff Nolan, Esq. appeared in Court on behalf of the Chapter 11 Bankruptcy Trustee, Bradley Sharp.

1

1    The hearing was held with respect to this case, as lead case, together with the other 23 related

2 and consolidated cases in this action. [1]

3    FOLLOWING SAID HEARING, AND GOOD CAUSE APPEARING THEREFORE, THE

4 COURT ORDERED AS FOLLOWS:

5    1.  The Morgan Stanley and UBS trust accounts for the 24 named Petitioners are ordered

6 **unfrozen** and released to the co-trustees, Franklin Menlo and Jeffrey Winter.  The funds so released

7 are to be held in account(s) that are insured pursuant to FDIC limits; and shall not be disbursed to any

8 trust beneficiary without further Order of the Court.

9    2.  All life insurance policies on the lives of Sam Menlo and Vera Menlo, of which any

10 and all of the named Petitioners are beneficiaries, are ordered **unfrozen** and released to the co-

11 trustees, Franklin Menlo and Jeffrey Winter.  The respective insurance companies, including but not

12 limited to American General, Aetna/Lincoln and Phoenix Life Insurance Company, are ordered to

13 distribute the proceeds of all such policies of insurance to the co-trustees, Franklin Menlo and Jeffrey

14 Winter.  The funds so released are to be held in account(s) that are insured pursuant to FDIC limits;

15 and shall not be disbursed to any trust beneficiary without further Order of the Court.

16    3.  Counsel for the co-trustees shall immediately advise the court as to any concerns

17 regarding the manner by which the trust fund(s) and/or insurance proceeds are being held which

18 jeopardize the corpus of any such funds from being protected especially in the event of a disruption

19 in the financial/banking system.

20    4.  Counsel for the co-trustees and Leslie Klein shall provide counsel for the bankruptcy

21 trustee any documentation requested within 72 hours of being requested to do so.

22    5.  This Order shall apply to all 24 consolidated and related cases in this matter.

23

24 Dated: 6/5/23         Ana-maria Luno

25            ANA MARIA LUNA
             JUDGE OF THE SUPERIOR COURT

26

27 [1] The consolidated case numbers are:  BP139977; BP139978; BP139999; BP14000;

28 BP14001; BP14002; BP14003; BP14004; BP14005; BP14007; BP14008; BP14009; BP140010;
 BP140011; BP140012; BP140013; BP140014; BP140015; BP140016; BP140017; BP140018;
 BP140019; BP140020 and BP154676.    2

ORDER

# EXHIBIT H

1  Jeffrey W. Dulberg (State Bar No. 181200)
2  Jeffrey P. Nolan (State Bar No. 158923)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 13th Floor
   Los Angeles, CA  90067-4003
4  Telephone: 310.277.6910
   Facsimile: 310.201.0760
5  E-mail:  jnolan@pszjlaw.com

6  Counsel Specially Appearing on Behalf of Bradley D.
   Sharp, Trustee

7

**FILED**
Superior Court of California
County of Los Angeles

**JUL 0 7 2023**

David W. Slayton, Executive Officer/Clerk of Court

By: S. Miramontes, Deputy

8         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                    **COUNTY OF LOS ANGELES**

10

11  In the matter of

12  FRANKLIN HENRY MENLO IRREVOCABLE
    TRUST ESTABLISHED MARCH 1, 1983.

13

14  LESLIE KLEIN, TRUSTEE; LESLIE KLEIN &
    ASSOCIATES, INC.,

15

16                        Respondents.

17

18  AND CONSOLIDATED ACTIONS.

19

Case No.: BP136769
(AND RELATED CASES)

RESPONSE OF CHAPTER 11 TRUSTEE,
BRADLEY D. SHARP, TO THE
DECLARATION OF LESLIE KLEIN RE:
CLAIMS AGAINST UNFROZEN FUNDS
HELD BY TRUSTEES OF 24 TRUSTS

Date:        July 10, 2023
Time:        1:30 p.m.
Courtroom:   3
Location:    111 North Hill Street
             Los Angeles, CA  90012

Judge:       Hon. Ana Maria Luna

20         Bradley D. Sharp (*"Trustee"*), the duly appointed trustee for the chapter 11 estate of Leslie

21  Klein (the *"Debtor"*), hereby specially appears and files his Response (the *"Response"*) with

22  Regards to the *Interim Order* and the *Declaration of Leslie Klein Re: Claims Against Unfrozen*

23  *Funds Held By Trustees Of 24 Trusts* [filed 6/28/23] (the *"Klein Declaration"*).  In support of the

24  Response, the Trustee respectfully represents as follows:

25  **A.      Background**

26         The Debtor commenced a voluntary chapter 11 case on February 22, 2023.

27         On March 10, 2023, the Office of the United States Trustee (the *"UST"*) filed a statement

28  regarding the Debtor's failure to comply with various requirements under the Bankruptcy Code,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Bankruptcy Rules, and certain notices and guidelines promulgated by the UST. [*See* USBC Docket

2  No. 42].

3  On May 17, 2023, in response to certain motions to dismiss the Debtor's chapter 11 case, the

4  United States Bankruptcy Court, Central District, Hon. Sandra R. Klein presiding (the "Bankruptcy

5  Court"), entered an order directing the UST to appoint a chapter 11 trustee. [*See* USBC Docket No.

6  142]. On May 23, 2023, the UST filed a notice appointing Bradley D. Sharp (the "*Trustee*") as the

7  chapter 11 trustee of the Debtor's chapter 11 case. [*See USBC* Docket No. 151]. On May 24, 2023,

8  the UST filed an application for an order approving the appointment of Mr. Sharp as the Trustee.

9  [*See* USBC Docket No. 154]. On May 24, 2023, the Bankruptcy Court entered an order approving

10 the appointment of Mr. Sharp as the Trustee. [*See* USBC Docket No. 155]. On May 24, 2023, Mr.

11 Sharp accepted his appointment as Trustee. [*See* USBC Docket No. 156].

12 On June 5, 2023, the Superior Court for State of California, County of Los Angeles,

13 Department 3, the Honorable Marie Ana Luna presiding (the "Court"), issued an Interim Order After

14 Hearing of Petitioners For Order to Remove Freeze on Trust Accounts and Life Insurance Proceeds

15 (the "Interim Order"). The Interim Order directed that life insurance proceeds on the lives of Sam

16 Menlo and Vero Menlo be ordered unfrozen, not disbursed and held in an insured FDIC account,

17 pending further order of the Court. The Interim Order required the Debtor to cooperate with

18 demands by the Trustee to receive documents relative to the life insurance policies, their issuance,

19 payment and any fees/commissions.

20 The Trustee is duty-bound under the Bankruptcy Code to collect and assess information

21 regarding the Debtor's assets and liabilities, including the assets and claims at issue before this

22 Court. Accordingly, on June 7, 2023, June 14, 2023 and June 20, 2023, respectively, the Trustee

23 made written requests to the Debtor seeking documents to support various assertions he made at the

24 State Court hearing on June 5, 2023, as well as with regards to premium payments, sources of funds,

25 contracts, and fee arrangements surrounding the Menlo Life Insurance Policy proceeds. To date, the

26 Debtor has failed to produce any such documents to the Trustee. Rather, the Debtor filed the Klein

27 Declaration.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEY AT LAW
LOS ANGELES, CALIFORNIA

2

B.     <u>The Creation of a Debtor's Bankruptcy Estate is Broad and All Encompassing</u>

      When a bankruptcy petition is filed, an estate is created consisting of all legal or equitable interests of a debtor in property as of commencement of the case, as created and defined by nonbankruptcy law; in other words, the rights a debtor has in property at commencement of a case continue in bankruptcy as they existed at the commencement of the case. 11 U.S.C. § 541(a); *Frazer v. Drummond (In re Frazer)*, 377 B.R. 621, 626 (B.A.P. 9th Cir. 2007).

      The determination of whether assets are property of the estate is a core matter of bankruptcy court jurisdiction. *Bank of Los Angeles v. Official PACA Creditors' Comm. (In re Southland + Keystone)*, 132 B.R. 632, 638 (9th Cir. B.A.P. 1991) ("Clearly, a determination of whether assets are property of the bankruptcy estate concerns administration of the estate."); *In re Wash. Mutual, Inc.*, 461 B.R. 200, 217 (Bankr. D. Del. 2011) (28 U.S.C. § 1334(e) jurisdiction over property of the estate "includes jurisdiction to decide whether disputed property is, in fact, property of the estate"); *All Am. Laundry Serv. v. Ascher (In re Ascher)*, 128 B.R. 639, 643 (Bankr. N.D. Ill. 1991) ("When a debtor and its creditors assert interests in property asserted to be part of the estate, <u>the bankruptcy court has core jurisdiction to adjudicate all of those interests</u>.") (emphasis added); *Chase Manhattan Bank v. Jacobs (In re Jacobs)*, 48 B.R. 570, 572 (Bankr. S.D. Cal. 1985) (similar holding).

C.     <u>The Commencement of a Bankruptcy Case Stays All Acts Against Property of the Estate and Property from the Estate.</u>

      Congress clearly intended the automatic stay to be broad. *In re Stringer*, 847 F.2d 549, 552 (9th Cir. 1988). The purpose of the automatic stay is to effect an immediate freeze of the *status quo* by precluding and nullifying post-petition actions, judicial or nonjudicial, in nonbankruptcy fora against debtors or affecting property of the bankruptcy estate. *Hillis Motors v. Haw. Auto. Dealers' Ass'n (In re Hillis Motors)*, 997 F.2d 581, 585 and 586 (9th Cir. 1993). The automatic stay ensures that all claims against a debtor will be brought in single forum, *i.e.*, the bankruptcy court, and also protects creditors as a class from the possibility that one creditor will obtain payment on its claims to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3

the detriment of all others. *Id.* The automatic stay is "effective against the world, regardless of

notice." *Morris v. Peralta* (*In re Peralta*), 317 B.R. 381, 389 (B.A.P. 9th Cir. 2004).

Specifically, section 362(a)(3) of the Bankruptcy Code stays any act to obtain possession of

property of the estate (*i.e.*, property of the debtor as of the date of the filing of the petition) or

property from the estate (*i.e.*, property over which the estate has control or possession). *Eden Place,*

*LLC v. Perl* (*In re Perl*), 811 F.3d 1120, 1127 (9th Cir. 2016). The Debtor clearly has ignored the

terms of the Interim Order which would allow for the objective determination of certain underlying

facts by the Trustee. Rather, the Klein Declaration raises uncertainty and the potential for a

multitude of new claims which impacts the administration of the estate.    Any distribution of

property of the estate or from the estate must be by the trustee after he or she has had an opportunity

to familiarize himself or herself with the various rights and interests involved and with the property

available for distribution. Any liquidation must proceed in an orderly fashion and with finality to

preclude further claims.

### D.    The Appointment of a Chapter 11 Trustee
### Divests the Debtor of any Control over Property of the Estate

Under chapter 11 of the Bankruptcy Code, a debtor remains the debtor in possession unless

and until a trustee is appointed by court order under section 1104 of the Bankruptcy Code. The

appointment of a chapter 11 trustee pursuant to section 1104 terminates the debtor in possession's

trustee-like authority under section 1107 of the Bankruptcy Code. The appointed chapter 11

trustee then assumes the duties expressed in section 1106 of the Bankruptcy Code, including most of

the duties specified in section 704 of the Bankruptcy Code. *In re McCorhill Pub., Inc.*, 89 B.R. 393,

396 (Bankr. S.D.N.Y. 1988).

Upon his or her appointment, the trustee succeeds to all the rights and properties of the

debtor, who is thereby displaced from his or her property interests. The appointment of

a trustee effects a statutory transfer or assignment of the debtor's property, including its contractual

relationships, from the debtor to the trustee. *See* 11 U.S.C. § 323(a) ("The trustee in a case under this

title is the representative of the estate."); *Commodity Futures Trading Comm'n v. Weintraub*, 471

U.S. 343, 352-53 (1985) ("Congress contemplated that when a trustee is appointed, he assumes

4

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEY AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:349907.4 78512/001

1    control of the business, and the debtor's directors are completely ousted.") (quoting H.R. REP. No.

2    95-595, pp. 220-21 (1977)).

3       Where a chapter 11 trustee has been appointed, either for cause or in the interests of

4    creditors, the duties and obligations set forth in section 1107 of the Bankruptcy Code are transferred

5    to the trustee, in addition to the statutory duties set out in section 1106 of the Bankruptcy Code. As a

6    result, a chapter 11 trustee stands in the shoes of the debtor and thereafter performs the fiduciary

7    debtor-in-possession duties. *United States v. One 2009 Maserati Granturismo*, 2016 U.S. Dist.

8    LEXIS 119383, 2016 WL 4502457, at *4 (C.D. Cal. June 6, 2016). Because it remains in possession

9    of property of its bankruptcy estate, and because it has the rights, powers and duties of a bankruptcy

10    trustee, a Chapter 11 debtor in possession has a fiduciary responsibility to all the creditors of the

11    bankruptcy estate. *See Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 614 (9th

12    Cir. 1988). *In re Easterday Ranches, Inc.*, 647 B.R. 236, 256, ft. 27(Bankr. ED, Wash. 2022)

13    (explaining how "the duty of the trustee or debtor-in-possession is to gather estate assets for pro rata

14    distribution to all creditors, which creates "a fiduciary duty to all creditors . . . to protect the interests

15    of all creditors collectively.")

16    **E.**      **Continued Stay of Distribution of the Life Insurance Proceeds**
            **For the Twenty-Four Named Petitioners of the Menlo Trust**

17       The Trustee is mindful of the Menlo Petitioners' plight and the extensive litigation they have

18    endured with the Debtor. As documented in the State Court records and with various filed proofs of

19    claim, the Trustee is aware of the allegations that the Debtor misappropriated funds or

20    inappropriately diverted funds between the various trusts which the Debtor oversaw, commingled

21    assets for the purposes of effectuating investments in life insurance policies, or borrowed from the

22    various trusts including maintaining a line of credit for which the collateral and/or withdrawal of

23    funds are factually unclear.

24       The Debtor's lack of transparency on the immediate issues before this Court as well as in

25    other financial disclosures required under the Bankruptcy Code are the reasons the Trustee was

26    appointed to administer the Debtor's estate. Since his appointment, the Trustee has been working to

27    collect information regarding the Debtor's estate so that he can preserve assets for the purpose and

28    benefit of all the Debtor's creditors, which includes the Menlo Petitioners as well as many others.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5

1 | While not accepting the accuracy of the contentions set forth in the Klein Declaration at face value,

2 | the allegations do raise issues factual issues. As the duly appointed trustee of the Debtor's estate, his

3 | assets and assets that are in the estate, the Trustee has a fiduciary responsibility to all the creditors of

4 | the Debtor. The Trustee maintains the position that the automatic stay is in effect with respect to the

5 | Menlo policy proceeds until the Trustee has satisfactorily investigated the issues raised.

6 | **F.**    **Conclusion**

7 |    The Trustee requests the *status quo* be maintained and no life insurance policy proceeds

8 | disbursed until appropriate disclosures and/or facts are compiled in response to the Trustee's

9 | requests for documents. Thereafter, the Trustee and/or interested parties can address the issue and

10 | obtain the appropriate order from the Bankruptcy Court.

11 |

12 | Dated:  July 6, 2023                    PACHULSKI STANG ZIEHL & JONES LLP

13 |

14 |                                        By

15 |                                           Jeffrey P. Nolan
                                             Jeffrey W. Dulberg

16 |                                        Counsel Specially Appearing on Behalf of
                                         Bradley D. Sharp, Trustee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:349907.4 78512/001

## PROOF OF SERVICE

STATE OF California                    )
                                       )
COUNTY OF Los Angeles                  )

     I, Rolanda Mori, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067-4100.

     On July 6, 2023, I caused to be served the RESPONSE OF CHAPTER 11 TRUSTEE, BRADLEY D. SHARP, TO THE DECLARATION OF LESLIE KLEIN RE: CLAIMS AGAINST UNFROZEN FUNDS HELD BY TRUSTEES OF 24 TRUSTS in this action by placing a true and correct copy of said document(s) in sealed envelopes addressed as follows:

### SEE ATTACHED SERVICE LIST

☑    **(BY MAIL)** I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☑    **(BY EMAIL)** I caused to be served the above-described document by email to the parties indicated on the service list at the indicated email address.

☐    **(BY NOTICE OF ELECTRONIC FILING)** I caused to be served the above-described document by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

     I declare that I am employed in the office of a member of the bar of this Court at whose direction was made.

     Executed on July 6, 2023, at Los Angeles, California.

Rolanda

## SERVICE LIST

<u>Via U.S. Mail and Email</u>
Donald L. Saltzman
A Professional Corporation
10537 Butterfield Road
Los Angeles, CA  90064
dlslawcorp@aol.com
(Counsel for Winter Petitioners)

<u>Via U.S. Mail and Email</u>
Eric J Olson
E J Olson Law
301 E. Colorado Blvd, Suite 520
Pasadena, CA 91101
Eric@EJOlsonLaw.com
(Counsel to Debtor, Leslie Klein

<u>Via U.S. Mail and Email</u>
Paul Young
Chora Young & Manasserian, LLP
650 Sierra Madre Villa Ave., Ste 304
Pasadena, CA 91107
paul@cym.law
(Counsel to Frank H Menlo, Trustee)

<u>Via U.S. Mail and Email</u>
Alex Weingarten
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067-2905
aweingarten@willkie.com

# EXHIBIT I

## Jeffrey P. Nolan

**Subject:**        FW: Leslie Klein Bankruptcy

**From:** John W. Lucas
**Sent:** Monday, August 7, 2023 1:48 PM
**To:** paul@cym.law; Don Saltzman <dlslawcorp@aol.com>
**Cc:** Eric Held <eheld@dsiconsulting.com>; Nicholas Troszak <ntroszak@dsiconsulting.com>; Bradley Sharp
<bsharp@DSIConsulting.com>; Jeffrey Dulberg <jdulberg@pszjlaw.com>; Jeffrey P. Nolan <jnolan@pszjlaw.com>
**Subject:** RE: Leslie Klein Bankruptcy

Paul and Don:

As discussed during last Friday's call, here is a proposed stipulation that is aimed at moving the flow of information
forward so that the Trustee can make an informed and independent decision regarding your clients' requests to the
Bankruptcy Court and Judge Luna.

Also, I am not certain that I captured all of the necessary parties on the "Menlo" side. If not, please add as necessary and
we will review those changes.

Let us know if you would like to discuss.

Thank you,

John

**John W. Lucas**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 415.217.5108
Tel: 415.263.7000 | Cell: 415.306.3576 | Fax: 415.263.7010
jlucas@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

DOCS_LA-#3504...

-----Original Appointment-----
**From:** Bradley Sharp

1

**Sent:** Thursday, August 3, 2023 11:18 AM
**To:** Bradley Sharp; John W. Lucas; Jeffrey Dulberg; Jeffrey P. Nolan; paul@cym.law; Don Saltzman
**Cc:** Eric Held; Nicholas Troszak
**Subject:** FW: Leslie Klein Bankruptcy
**When:** Friday, August 4, 2023 1:00 PM-2:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting


-----Original Appointment-----
**From:** Bradley Sharp [mailto:bsharp@DSIConsulting.com]
**Sent:** Wednesday, August 2, 2023 4:32 AM
**To:** Bradley Sharp; Jeffrey Dulberg; Jeffrey P. Nolan; paul@cym.law; Don Saltzman
**Cc:** Eric Held; Nicholas Troszak
**Subject:** Re: Leslie Klein Bankruptcy
**When:** Friday, August 4, 2023 1:00 PM-2:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting


# Microsoft Teams meeting

**Join on your computer, mobile app or room device**
Click here to join the meeting
Meeting ID: 267 214 998 200
Passcode: rDcRkV
Download Teams | Join on the web
**Or call in (audio only)**
+1 469-526-4008,,668028763#   United States, Dallas
Phone Conference ID: 668 028 763#
Find a local number | Reset PIN
Learn More | Meeting options

2

1   Jeffrey W. Dulberg (CA State Bar No. 181200)
    Jeffrey P. Nolan (CA State Bar No. 158923)
2   Pachulski Stang Ziehl & Jones LLP
    10100 Santa Monica Blvd., 13th Floor
3   Los Angeles, CA 90067
    Telephone: 310/277-6910
4   Facsimile: 310/201-0760
    E-mail:jdulberg@pszjlaw.com
5          jnolan@pszjlaw.com

6   [Proposed] Counsel to Bradley D. Sharp, Chapter 11 Trustee

7                     **UNITED STATES BANKRUPTCY COURT**

8                     **CENTRAL DISTRICT OF CALIFORNIA**

9                       **LOS ANGELES DIVISION**

10   In re:                   Case No.  Case No.: 2:23-bk-10990-SK

11   LESLIE KLEIN,            Chapter 11

12                     **STIPULATION & PROPOSED ORDER
BETWEEN  BRADLEY D. SHARP, CH 11**
13          Debtor.         **TRUSTEE AND THE MENLO CO-TRUSTEES**

14

15

16

17

18   **TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE,
THE DEBTOR, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL PARTIES
19   REQUESTING SPECIAL NOTICE:**

20                          **STIPULATION**

21        Bradley D. Sharp, the duly appointed chapter 11 trustee, (the "Trustee") of the estate of Leslie

22   Klein (the "Debtor"), and the Co-Trustees of the Franklin Henry Menlo Irrevocable Trusts (the "Menlo

23   Beneficiaries" and together with the Trustee, the "Parties"), by and through their respective

24   undersigned counsel of record, file the attached stipulation (the "Stipulation") in an effort to resolve

25   the Menlo Beneficiaries' stay relief motion [Docket No. 84] and the Debtor's estate's interest, if any,

26   in the  matters currently the subject of litigation between the Debtor and the Menlo Beneficiaries.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## RECITALS

A.      On February 22, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court").

B.      On April 7, 2023, the Menlo Beneficiaries filed an amended proof of claim no. 13-2 against the Debtor's estate in the unliquidated amount of $55,421,823 (the "Filed Claim") consisting of a base claim amount owed of $30,421,823, attorney's fees in an unliquidated sum approximating $4,000,000 to $5,000,000 and prejudgment interest of an unliquidated sum approximating $20,000,000 arising from claims asserted in an action styled as [ENTER NAMES OF PARTIES], Case No.: BP136769 pending in Department 3 of the Superior Court of the State of California, Los Angeles Division (the "State Court Action") and assigned to the Honorable Ana Maria Luna, which were in part based upon a Referee's Report and Recommendation (the "Referee's Report")

C.      On May 17, 2023, at a hearing held on the Motion to Dismiss, the Court ruled that the appointment of a chapter 11 trustee, and not dismissal of the case, was in the best interests of the estate.

D.      On May 23, 2023, the Office of the United States Trustee ("UST") filed a *Notice of Appointment of Chapter 11 Trustee* [Docket No. 151].

E.      On May 24, 2023, the UST Filed an *Application for Order Approving Appointment of Trustee and Fixing Bond* [Docket No. 154], approved by order entered the same day [Docket No. 155]. On that same day, the Trustee accepted his appointment [Docket No. 156].

F.      On April 25, 2023, the Menlo Beneficiaries filed a Motion for Relief From Automatic Stay [Docket No. 84] (the "Relief from Stay Motion") to allow various litigation to proceed in the State Court Action as well as to disburse approximately $30,000,000 in life insurance policy proceeds pursuant to certain insurance policies (the "Menlo Insurance Policies") issued by American General, Aetna/Lincoln, Phoenix Life Insurance Companies, among others.

G.      In the State Court Action, the Menlo Beneficiaries alleged that the Debtor breached various fiduciary duties, improperly diverted and embezzled funds while acting as the trustee

2

1  overseeing trusts on behalf of the Menlo Beneficiaries. On the Petition Date, various matters were

2  pending in the State Court Action that included the determination of legal fees, interest, costs and the

3  entry of a judgment. The Debtor disputes the findings of the Referee's Report, the disbursement of

4  the proceeds of the Menlo Insurance Policies, the awarding of pre-judgment fees and interest, and

5  will appeal upon entry of judgment.

6        H.     On July 19, 2023, the Trustee filed a response [Docket No. 196] (the "Response") to

7  the Relief From Stay Motion. As set forth in greater detail in the Response, in light of the Trustee's

8  recent appointment, the Trustee has not had sufficient time to review and analyze the underlying

9  issues that are the subject of the State Court Action and the Relief From Stay Motion. As a result, the

10  Trustee needs more time to collect information regarding the foregoing pending matters so that he

11  can make an informed and independent decision regarding the competing claims between the Menlo

12  Beneficiaries on the one hand and the Debtor's estate on the other.

13        I.     The Parties have met and conferred in good faith in an effort to resolve various issues

14  raised in the State Court Action, in the Bankruptcy Court, and with respect to ongoing litigation by

15  the Menlo Beneficiaries against the Debtor and his estate.  To address these issues in an expeditious

16  and economic fashion, the stipulation is entered by the Parties in good faith and not for an improper

17  purpose.

18       **NOW AND THEREFORE, IT IS HEREBY STIPULATED AND AGREED:**

19        1.     Upon entry of an order approving this Stipulation, the Menlo Beneficiaries will produce

20  and exchange with the Trustee (a) documents from the State Court Litigation regarding the

21  establishment, source and payment of Menlo Insurance Policies, (b) the Menlo Beneficiaries exclusive

22  right to the Menlo Insurance Policies, (c) documents to support the Menlo Proof of Claim, and (d) any

23  other information that the Trustee requests that can be reasonably produced by the Menlo

24  Beneficiaries.

25  

26        2.     The Parties agree to continue the Relief From Stay Motion for 60 days, or to a date

27  convenient to the Bankruptcy Court's calendar, for the purpose of the production of information

28  

3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

contemplated by this Stipulation so the Trustee and his advisor can review and analyze with a goal of resolving the pending Relief from Stay Motion.

3.      Until further order of the Bankruptcy Court, the State Court Action will remain stayed while the Parties meet and confer in an effort to obviate the need for further costly litigation in the Superior Court.

4.      The Trustee and his advisors will meet and confer with the Menlo Beneficiaries and their advisors and seek to reach an agreement as to various issues raised in the State Court Action, Relief from Stay Motion, and the Filed Claim.

5.      Each person who executes this Stipulation represents that he or she is duly authorized to execute this Stipulation on behalf of the respective Parties hereto and that each such party has full knowledge and has consented to this Stipulation.  This Stipulation may be executed in one or more counterparts, any of which may be transmitted by facsimile or electronic transmission, and each of which shall be deemed an original, but all of which together shall constitute one and the same document.

Dated:      August ___, 2023           DONALD L. SALTZMAN, A Professional
                                       Corporation

                                       By_____
                                              Donald L. Saltzman

                                       Counsel for Winter Petitioners

Dated:      August ___, 2023           CHORA YOUNG & MANASSERIAN, LLOP

                                       By_____
                                              Paul Young

                                       Counsel to Frank H. Menlo, Trustee

4

Dated:    August ___, 2023                    PACHULSKI STANG ZIEHL & JONES LLP

By _____
        Jeffrey W. Dulberg
        Jeffrey P. Nolan

[Proposed] Counsel to Bradley D. Sharp, Chapter 11 Trustee

**IT IS SO ORDERED.**

DOCS_LA:350406.3 78512/001

# EXHIBIT J

## Jeffrey P. Nolan

| | |
|---|---|
| **From:** | John W. Lucas |
| **Sent:** | Monday, August 14, 2023 8:45 AM |
| **To:** | Don Saltzman; 'Paul Young' |
| **Cc:** | Jeffrey Dulberg; Jeffrey P. Nolan |
| **Subject:** | Klein - Menlo Document Request |
| **Attachments:** | Klein - Letter to D. Saltzman and P. Young re Meno Trust Info.pdf |

Don and Paul:

As a follow up from last week, please see attached.

Thank you,

John

**John W. Lucas**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 415.217.5108
Tel: 415.263.7000 | Cell: 415.306.3576 | Fax: 415.263.7010
jlucas@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston



**PACHULSKI**

**STANG**

**ZIEHL**

**JONES**

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

SAN FRANCISCO, CA
LOS ANGELES, CA
WILMINGTON, DE
NEW YORK, NY
HOUSTON, TX

ONE SANSOME STREET
34th FLOOR, SUITE 3430
SAN FRANCISCO
CALIFORNIA 94104

TELEPHONE: 415.263.7000
FACSIMILE: 415.263.7010

LOS ANGELES
10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067-4003

TELEPHONE: 310.277.6910
FACSIMILE: 310.201.0760

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302.652.4100
FACSIMILE: 302.652.4400

NEW YORK
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212.561.7700
FACSIMILE: 212.561.7777

TEXAS
440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002-1062

TELEPHONE: 713.691.9385
FACSIMILE: 713.691.9407

WEB: www.pszjlaw.com

John W. Lucas

August 14, 2023

Jlucas@pszjlaw.com

**VIA EMAIL**

Donald L. Saltzman
Professional Law Corporation
10537 Butterfield Road
Los Angeles, CA 90064
Email:  dlslawcorp@aol.com

Paul P. Young
Chora Young LLP
650 Sierra Madre Villa Ave., Suite 304
Pasadena, CA 91107
Email: paul@cym.law

Re:    **Leslie Klein – Menlo Stay Relief Motion**

Dear Don and Paul:

As you know, my firm is counsel to Bradley D. Sharp ("***Trustee***"), the duly appointed trustee for the chapter 11 estate of Leslie Klein (the "***Debtor***"). I am writing in response to the *Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362* [Docket No. 84] (the "***Motion***"), the Trustee's response to the Motion, and the various pleadings your client and my client have filed in the underling litigation regarding the "Menlo Trust."

The Trustee is aware that your clients have been engaged in a multi-year litigation over the Menlo Trust on many fronts. The Trustee has no desire to slow or unnecessarily impede your clients' objectives to distribute the proceeds from the Menlo Trust, obtain a judgment, and liquidate other claims against the Debtor.

However, as a fiduciary to the Debtor's estate and all creditors, the Trustee has an obligation to collect information regarding your clients' claims and the Debtor's defenses and any

DOCS_SF:109353.1 78512/001



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Donald L. Saltzman
August 14, 2023
Page 2

counterclaims that the Debtor might have to the extent they have an
effect on the estate.

To that end, the Trustee would like to request from your
clients the following information:

- Accounting Reports/Analyses previously prepared and
  completed by your clients' forensic accountants, and any
  documentation supporting such analyses.

- Documentation that shows the policy payment premiums for
  the Menlo Trusts life insurance policies (*e.g.*, payor(s),
  source(s) of payment, payment default(s), outstanding
  payment(s)).

- Copies of all life insurance policies owned by the Menlo
  Trusts.

- Documentation identifying the beneficiaries of each Menlo
  Trust, and their respective share or entitlements under each
  such trust.

The Trustee believes that the above information will aid him
in his determination to make an independent and informed decision
regarding the Motion, the underlying Menlo litigation, and the
claims your clients have against the Debtor. It is the Trustee's
understanding that most, if not all, of the above information has
already been prepared by your clients' accountants. At this time, the
Trustee is not asking for your clients' advisors to prepare any new
work-product but instead produce to the Trustee the information that
has been used in the underling Menlo trust litigation. The Trustee
believes that this will not only save time but also avoid unnecessary
motion practice and the cost of litigation.

After receiving the above information and having sufficient
time to review, the Trustee expects that he and his advisors will
want to meet with you and your clients' other advisors so that he can
ask follow up questions and seek clarification regarding open issues.

As the Trustee expects there will be a lot of information,
please do not wait to send until you have all of the information.
Instead, please send on a rolling basis so that we can avoid any
further delay and the Trustee and his advisors can begin their
review.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Donald L. Saltzman
August 14, 2023
Page 3

     In the meantime, if you have any questions, please do not
hesitate to contact me.

          Very truly yours,

          John W. Lucas

# EXHIBIT K

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

## Probate Division
### Stanley Mosk Dept. - 3

**BP136769**

**In re: MENLO, FRANKLIN HENRY IRREVOCABLE TRUST - TRUST**

**August 18, 2023**
**1:30 PM**

Honorable Ana Maria Luna, Judge

Grace Woo, Judicial Assistant

---

**NATURE OF PROCEEDINGS:** Petition - Trust/Pursuant Prob Code Sec 17200 (Subsequent) filed on July 28, 2023 by Jeffrey Winter.

The following parties are present for the aforementioned proceeding:

> Rafael Deutsch
> Leslie Klein
> Jeremy Winter
> Jeff Winter
> Daniel Winter via LACC
> Donald Lawrence Saltzman, Attorney
> Matthew Busch, Attorney
> Eric John Olson, Attorney
> Alex M Weingarten, Attorney
> Jeffrey P Nolan, Attorney via LACC
> Terrence S. Nunan, Attorney via LACC

The matter is called for hearing.

The Petition for Instructions filed 7/28/23 by successor co-trustee, Jeffrey Winter, is continued to September 15, 2023 at 10:30 a.m. in this department.

Petitioner shall deliver a hard copy of the Petition, and any and all supplements thereto, to the law offices of Parker, Milliken Clark, O'Hara and Samuelian and Buchalter no later than August 22, 2023 at 3:00 p.m.

Objections, if any to this Petition, are to be filed and served by September 5, 2023. Reply, if any, to be filed and served by September 11, 2023.

Counsel for the bankruptcy trustee (Pachulski, Stang, Ziehl & Jones, LLP) are to be included in the service of the Petition, Objections and/or Reply.

An Order to Show Cause re Production of any Writing that Substantiates a Claim to the Insurance Trust Proceeds Currently Held by American General and/or Lincoln National (as described in the Petition for Instructions) by Former Trustee, Leslie Klein, is set for the same date and time.

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Probate Division
### Stanley Mosk Dept. - 3

**BP136769**

**In re: MENLO, FRANKLIN HENRY IRREVOCABLE TRUST - TRUST**

**August 18, 2023**
**1:30 PM**

Notice of this OSC is given in open court to counsel for Leslie Klein (Attorneys Eric Olson and Terence Nunan) who accept notice in place of Mr. Klein as he left the courtroom prior to the court setting this OSC.

Over the objection of counsel for the bankruptcy trustee and as an interim order, the Court authorizes the sum of $6,000,000.00 to be released by American General (policy #1) to the successor co-trustees, Franklin Menlo and Jeffrey Winter, forthwith. One-half of this amount ($3,000,000.00) shall be used to satisfy a portion of the lines of credit as set forth in footnote 2 of the Petition for Instructions as the successor co-trustees deem appropriate. The other one-half ($3,000,000.00) shall be distributed proportionally by the successor co-trustees to the named beneficiaries as set forth on page 6, line 17 to page 10, line 15 of this Petition.

At the request of counsel for the bankruptcy trustee, a stay on this interim order is granted until August 30, 2023 at 1:30 p.m.

A Status Conference as to this stay is set for August 30, 2023 at 1:30 p.m.

# EXHIBIT L

DONALD L. SALTZMAN (SBN 54483)
A Professional Law Corporation
10537 Butterfield Road
Los Angeles, California 90064
Telephone: (310) 617-3073
Facsimile: (310) 836-8944

Attorneys for PETITIONERS
(Except the Winter Family Petitioners)

# SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

|  |  |
|---|---|
| In the Matter of, | Case No. BP 136769 |
| **FRANKLIN HENRY MENLO IRREVOCABLE TRUST, ESTABLISHED MARCH 1, 1983** | **DECLARATION OF DONALD L. SALTZMAN IN OPPOSITION TO KLEIN DECLARATION AND IN OPPOSITION TO BANKRUPTCY TRUSTEE RESPONSE TO REQUEST FOR ORDER TO ALLOW DISBURSAL OF TRUST FUNDS AND LIFE INSURANCE BENEFITS TO BENEFICIARIES** |
| -------------------------------------------- | |
| **LESLIE KLEIN, TRUSTEE,** | |
| **Respondent,** | |
| **LES KLEIN & ASSOCIATES, INC.,** | |
| **Respondent** | |
| | Date: July 10, 2023 |
| | Time: 1:30 p.m. |
| | Dept.: 3 |

## DECLARATION OF DONALD L. SALTZMAN

### I, DONALD L. SALTZMAN, DECLARE:

1.      I am an attorney at law, duly licensed to practice in all courts of this State.  I am the attorney for Petitioner Franklin Menlo and 18 of the remaining 24 Petitioners in the related and consolidated actions against Leslie Klein ("Klein") and Les Klein & Associates, Inc., for

1

1   accountings, surcharge and removal of trustee. I no longer represent the five Winter family

2   Petitioners.

3       2.     The facts stated herein are known to me of personal knowledge, except as to those

4   facts stated to be known upon information and belief, which I believe to be true. I could and would

5   competently testify as to the facts stated herein.

6       3.     I was the attorney who presented the case against Leslie Klein, on behalf of all

7   Petitioners (including the Winter Petitioners), throughout the entire trial before Judge Glen Reiser

8   (Ret.).

9       4.     This Declaration is filed on behalf of all Petitioners, except for the Winter Petitioners.

10

11                        **SUMMARY**

12       5.     On behalf of Franklin Menlo and the Petitioners I represent, we previously filed with

13   the Court a motion to unfreeze the Petitioner trust accounts at Morgan Stanley and UBS and to

14   unfreeze the life insurance policies currently payable to the beneficiaries in this case. At the hearing

15   on the motion of June 5, 2023, Alex Weingarten joined in this motion on behalf of the Winter

16   Petitioners.

17       6.     At the hearing in Dept. 3 on June 5, counsel for Leslie Klein opposed the motion to

18   unfreeze said accounts, on the alleged ground that the life insurance policies had been purchased in

19   connection with third parties (unnamed) and that said third parties could be entitled to some of the

20   insurance proceeds as "compensation" for unspecified services they may have rendered or

21   contributions they may have made. During the course of the hearing, I represented to the Court that

22   Klein had never made any such representations during the trial or at any other time during the entire

23   10 years this case has been in litigation. The Court allowed distribution of proceeds only to the joint-

24   trustees, pending Klein furnishing to the attorney for the bankruptcy trustee documentation to prove

25   his claims regarding the insurance policies. The Court set the matter for further hearing on July 10,

26   2023, by which time the bankruptcy attorney was to file his report with the Court.

27       7.     Leslie Klein never produced any documents to the bankruptcy trustee to support any

28   of the outrageous claims he made in court on June 5. Instead, on or about June 26, 2023, Mr. Klein

2

1  filed his own "Declaration re Claims against Unfrozen Funds" (the "Klein Declaration"). As

2  discussed below, in that declaration he promulgates more lies and commits additional perjury, in his

3  ongoing attempts to muddy the waters and prevent the beneficiaries from obtaining the property

4  designated for their benefit by the now-deceased grantors of their trusts, Sam and Vera Menlo.

5       8.     Yesterday evening Jeffrey Nolan, Esq., the attorney for the bankruptcy trustee, filed

6  with the court a "Response to the Declaration of Leslie Klein re: Claims Against Unfrozen Funds

7  held by Trustees of 24 Trusts" (the "Trustee Response"). The Trustee Response acknowledges that

8  notwithstanding repeated requests to Klein's attorney for the documents to support the claims made

9  by Klein at the hearing of June 5, no such documents were ever produced by Klein. The Trustee

10  Response discusses generally the importance of the bankruptcy proceedings and the broad power of

11  the bankruptcy court. The attorney for the Trustee also acknowledges that Klein is extremely

12  untrustworthy. Nevertheless, the Trustee Response takes the position that the Klein Declaration

13  raises issues unfamiliar to the Trustee, and hence requires "further investigation" by the Trustee.

14  Accordingly, the Trustee takes the position that the Court should maintain the status quo and not

15  presently allow disbursement of the insurance proceeds to the Petitioners.

16       9.     It is the position of all of the Petitioners that the Klein Declaration contains nothing

17  but outright lies and material totally irrelevant to the issues at hand. To the extent Klein has

18  attempted to make these arguments in the past, they have all been rejected by this Court and by Judge

19  Reiser.

20       10.     It is also the position of the Petitioners that the Trustee Response contains no law or

21  facts that would prevent this Court from unfreezing all trust funds and insurance policies and

22  allowing disbursal to the Petitioners. Of course the bankruptcy trustee has no knowledge of any

23  claims Klein might make; the trustee and his lawyers are new to this case. If every time Klein filed a

24  false declaration it would mean that the Petitioners would continue to be denied their funds, because

25  the trustee needed to "investigate," Klein could again effectively tie up all of the proceeds for another

26  10 years. This Court must not allow that to happen. It has taken the Petitioners 10 years and a four-

27  month trial to unravel all of Klein's embezzlement and web of lies. The Bankruptcy Trustee will not

28  be able to reinvent this wheel.

11. Unless Klein can provide proof positive to the Court that any of the funds in issue belong in his estate, or belong to third-parties who are not Menlo family members, this Court must give no weight at all to the Klein Declaration or to the Trustee Response. Klein has been unable to make any such showing, and will not be able to make any such showing in the future. Accordingly, this Court should allow disbursement of all trust funds and life insurance proceeds to the rightful beneficiaries.

### OPPOSITION TO THE KLEIN DECLARATION

12. It is laughable that Klein, who for all these years has taken the position that he has not taken "one dime" from Petitioners' trusts, and who in act embezzled $20 million of their funds, now claims that he knows best how the life insurance funds should be distributed. He does not support any of the claims in his declaration with any supporting documentation or material. I took every one of the depositions of Klein and cross-examined him at trial; many of the claims in his current declaration were never previously made by Klein at deposition or at trial. Most importantly, to the extent he may have raised these claims at trial, they were never proven by him to be true and were roundly rejected by Judge Reiser. In short, his current declaration is worthless for all purposes.

13. At paragraph #3 of his Declaration, Klein claims that of the insurance proceeds, $1 million should be paid to other Menlo beneficiaries plus one of the Menlo lines of credit. Again, he offers no documentation whatsoever to support such claims and such claims were not made by him at trial. **But most importantly, Klein is not claiming that any of these funds belong to him or to non-Menlo third parties.** Hence, there is no basis for the bankruptcy trustee to question whether any of these funds should properly be considered part of the Klein bankruptcy estate. The co-trustees, Frank Menlo and Jeff Winter, will carefully determine who is properly entitled to proceeds of the life insurance policies; if it turns out that some of the funds should be disbursed to other Menlo family members who are not parties to this case, they will do so. (We already know that a small portion of the insurance proceeds are properly payable to a few non-Petitioners.)

14. Klein makes assertions at paragraph numbers 4 and 5 of his declaration that he also made at trial. A review of the Reiser Report, now a formal order of the Court, shows that all of these claims were rejected by the Court.

4

15.     At paragraph #6 of his Declaration, Klein claims that "Rather than let the policies lapse….," he borrowed money from certain trusts and lines of credit to pay premiums. More outright lies by Klein. He never proved at trial that he made any of the borrowings to pay premiums. Many of these borrowings were never mentioned by Klein at trial at all. The truth of the matter is that during the first three accounting periods, he allowed the four Phoenix policies to lapse (combined face value of $20 million). Subsequent to trial, I have been personally informed by the insurance companies that Klein allowed three additional policies to lapse. He represented at trial that no other policies had lapsed. These three additional lapsed policies (one AIG, Transamerica and Union Central/Ameritas) have a combined value $5.5 million. Klein destroyed the trusts and the insurance policies. His statement that he took steps to "save the policies" is nothing but a lie.

16.     Again, if the co-trustees determine that Klein took funds from any of the trusts or lines of credit mentioned in paragraph #6 of the Klein Declaration, the co-trustees will use their discretion in making sure that all trusts and lines of credit are treated fairly. **Most importantly, Klein does not claim that any of the funds mentioned in paragraph #6 of the Klein Declaration belong to him or to non-Menlo third parties.** Hence, once again, there is no basis for the bankruptcy trustee to question whether any of these funds should properly be considered part of the Klein bankruptcy estate.

17.     Paragraph # 7 of the Klein Declaration makes no sense and does not deserve a response. To the extent that he mentions "attorneys' fees," it is obvious that there has been <u>no</u> agreement that his attorneys should be paid from any of the insurance proceeds in this case. There also has been <u>no</u> "entire payoff of the insurance."

18.     With respect to Paragraph #8 of the Klein Declaration, once again if the co-trustees determine that Menlo trusts other than the 24 Petitioners are entitled to any of the insurance proceeds, they will make such distributions to the duly-entitled beneficiaries. Klein is not claiming that any of these funds belong to him or to non-Menlo third parties.

19.     Klein's paragraph #9 is an affront to all the beneficiaries in this case. He is in no position to talk about what is "equitable" between the beneficiaries. Nor, as shown above, was there a "successful recovery of insurance proceeds." He destroyed over half of the insurance benefits.

5

1    More self-serving nonsense from Klein.

2         20.    Accordingly, not only must the Klein Declaration be given no weight by this Court, it

3    is clear that he has not claimed that <u>any</u> of the trust funds or insurance proceeds in this case belong to

4    him or to non-Menlo third parties.  **He has given the bankruptcy trustee no reason or cause to**

5    **"investigate" whether these funds may nevertheless be part of Klein's bankruptcy estate and/or**

6    **subject to the bankruptcy stay.**

7

8                      **<u>OPPOSITION TO THE TRUSTEE RESPONSE</u>**

9         21.    To be clear up-front:  The Petitioners have no interest or intent to hinder the

10   bankruptcy trustee in the performance of his duties.  In fact, Mr. Nolan has called me on several

11   occasions and I believe it is fair to say that I spent a substantial amount of time with him to try to fill

12   him in on the background of this case.

13        22.    The Trustee takes pains in his Response to point out that he "is duty bound under the

14   Bankruptcy Code to collect and assess information regarding the Debtor's assets and liabilities,

15   including the assets and claims at issue before this Court." (Response, p. 2, lines 20-22.) We do not

16   doubt that it true, <u>but there has been no showing whatsoever that the assets and claims before this</u>

17   <u>Court, or any part thereof, are part of Klein's bankruptcy estate.</u>

18        23.    It is important to point out that the Trustee admits that although he "made written

19   requests to the Debtor seeking documents to support various assertions he made at the State Court

20   hearing on June 5, 2023, as well as with regards to premium payments, sources of funds, contracts,

21   and fee arrangements surrounding the Menlo Life Insurance Policy Proceeds," to date "<u>the Debtor</u>

22   <u>has failed to produce any such documents to the Trustee.</u>" (Response, p. 2, lines 22-27, emphasis

23   added.)

24        24.    At page three of the Trustee Response, the Trustee asserts that "When a debtor and its

25   creditors *assert interests* in property asserted to be part of the estate, **the bankruptcy court has core**

26   **jurisdiction to adjudicate all of those interests.**" (Emphasis in bold in original, emphasis in italics

27   added; Response, p. 2, lines 13-17, cases omitted.)  Without questioning the trustee on the accuracy

28   <u>of this statement, it is clear that he is making a mistake in applying it to the case at hand.</u> **Nobody,**

                                          6

1   not even the debtor Klein, is "asserting an interest" in the Petitioners' trust funds and

2   insurance proceeds. Nor is anybody, even the debtor Klein, "asserting an interest" in the

3   Petitioners' insurance proceeds. At most, Klein is claiming that some of these funds belong to

4   other Menlo family members. Hence, the bankruptcy court has no "core jurisdiction" to adjudicate

5   interests in property that clearly does not belong to the estate of the debtor. As shown above, the

6   Klein Declaration provides no basis whatsoever for the bankruptcy court to attempt to impose such

7   jurisdiction.

8        25.     The Bankruptcy Attorney is simply incorrect when he claims at page 4 of his

9   Response that the Klein Declaration "raises uncertainty and the potential for a multitude of new

10   claims which impacts the administration of the estate." There is no uncertainty because Klein has not

11   claimed that any of the funds in issue belong to him or to any non-Menlo party. Hence, the funds

12   cannot be part of his bankruptcy estate. Any claims as to entitlement to the insurance proceeds are

13   properly handled by the co-trustees as they analyze all of the policies in issue to determine the correct

14   beneficiaries thereof. These are not claims that would be brought by Menlo family members in

15   bankruptcy court, because these funds are not part of Klein's estate.

16        26.     There is no doubt that Klein owes **damages** to the Menlo parties, and that such

17   damages are to be paid from Klein's estate. For this reason, they have duly filed claims in the

18   bankruptcy court. But this must not be confused with their right to receive their trust funds and

19   insurance benefits, which are outside of the bankruptcy estate and not subject to the bankruptcy stay.

20

21                     <u>CONCLUSION AND REQUEST FOR ORDER</u>

22      27.     Respectfully with respect to the Trustee, it is submitted he will *never* be able to

23   "compile more facts," as to these specific trusts and insurance policies, than have already been

24   compiled by the Petitioners over 10 years of litigation and presented to Judge Reiser at trial.

25   Petitioners have spent many millions of dollars in compiling the facts and presenting those facts at

26   trial. The trustee already questions the accuracy of the Klein Declaration. (Response, p. 6, lines 1-2.)

27   Apparently there is nothing that will prevent Klein or his attorneys from coming into Court and

28   raising unfound accusation after accusation, in his ongoing attempt to wreak havoc in this case.

7

1 Nothing, that is, except an order of this Court that shows Klein he will not be allowed to continue to

2 disrupt this case.  Respectfully to the Court, that Order should be issued now, in the form of an order

3 that the trust fund and insurance proceeds are permanently unfrozen and shall be distributed to the

4 co-trustees, who shall in turn distribute the funds to the proper beneficiaries of those funds, even if

5 such beneficiaries are Menlo family members that are not Petitioners in this case.

6

7 I declare under penalty of perjury under the laws of the State of California that the foregoing

8 is true and correct.

9 Executed this 7th day of July, 2023, at Los Angeles, California.

Donald L. Saltzman

8

1

<u>**PROOF OF SERVICE**</u>

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

At the time of service, I was over 18 years of age and **not a party to this action**. I reside in the County of Los Angeles, State of California. My business address is 11930 Tennessee Avenue, Los Angeles, CA 90064.

4

5

On July 7, 2023, I caused to be served true copies of the following document(s) described as: **DECLARATION OF DONALD L. SALTZMAN IN OPPOSITION TO KLEIN DECLARATION AND IN OPPOSITION TO BANKRUPTCY TRUSTEE RESPONSE TO REQUEST FOR ORDER TO ALLOW DISBURSAL OF TRUST FUNDS AND LIFE INSURANCE BENEFITS TO BENEFICIARIES,** on the interested parties in this action as follows:

6

7

8

**VIA E-MAIL AND E-SERVICE:** The document was sent to First Legal Attorney Service, for immediate filing with the Court and E-service on the following parties. Because the hearing is this Monday, the document was also sent by e-mail directly to Judge Luna, addressed to: **amluna@lacourt.org.** I also sent the document via e-mail to the following parties:

9

10

11

Jeffrey P. Nolan, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003          E-mail: jnolan@pszjlaw.com

12

13

14

Candice Rogers, Esq.
Hahn & Hahn LLP
301 E. Colorado Blvd., Ninth Floor
Pasadena, CA 91101-1977          E-mail: crogers@hahnlawyers.com

15

16

17

Terence S. Nunan, Esq.
Parker Milliken et al.
555 South Flower Street, 30th Floor
Los Angeles, CA 90071-2440          E-mail: tnunan@pmcos.com

18

19

20

Michael L. Wachtell, Esq.
Buchalter
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017          E-mail: mwahctell@buchalter.com

21

22

23

Alex Weingarten, Esq.          E-mail: aweingarten@willkie.com
Willkie Farr & Gallagher LLP          lelliott@willkie.com
2029 Century Park East          mbusch@willkie.com
Los Angeles, CA 90067-2905          vrodriguez@willkie.com

24

25

26

27

28

9

DECLARATION OF DONALD L. SALTZMAN IN OPPOSITION TO KLEIN DECLARATION AND BANKRUPTCY TRUSTEE
RESPONSE RE ORDER TO UNFREEZE ACCOUNTS

1    Eric J. Olson, Esq.                      E-mail:  eric@ejolsonlaw.com
     EJOlson Law
2    301 E. Colorado Blvd., Suite 520
     Pasadena, CA 91101
3

4        I declare under penalty of perjury under the laws of the State of California that the foregoing
5    is true and correct.  Executed on July 7, 2023, at Los Angeles, California.

6

7                                                    _____
                                                          Jay Nakamura
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                  10

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067**

A true and correct copy of the foregoing document entitled (*specify*):  **MOTION OF CHAPTER 11 TRUSTEE, FOR ORDER ENFORCING THE AUTOMATIC STAY AGAINST THE MENLO TRUST AND RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF JEFFREY P. NOLAN IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by lbr 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **August 28, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **August 28, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  **August 28, 2023**  , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 28, 2023 | Rolanda Mori | /s/ Rolanda Mori |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                           **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:350778.1 78512/001

In re Leslie Klein
23-10990-SK

## SERVICE LIST

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

- **Simon Aron**  saron@wrslawyers.com, moster@wrslawyers.com
- **Reem J Bello**  rbello@goeforlaw.com, kmurphy@goeforlaw.com
- **Ron Bender**  rb@lnbyg.com
- **Michael Jay Berger**  michael.berger@bankruptcypower.com,
  yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Greg P Campbell**  ch11ecf@aldridgepite.com,
  gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
- **Baruch C Cohen**  bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com
- **Theron S Covey**  tcovey@raslg.com, sferry@raslg.com
- **Jeffrey W Dulberg**  jdulberg@pszjlaw.com
- **Dane W Exnowski**  dane.exnowski@mccalla.com,
  bk.ca@mccalla.com,mccallaecf@ecf.courtdrive.com
- **Robert P Goe**  kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- **Michael I. Gottfried**  mgottfried@elkinskalt.com,
  cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
- **Brandon J Iskander**  biskander@goeforlaw.com, kmurphy@goeforlaw.com
- **Michael S Kogan**  mkogan@koganlawfirm.com
- **John W Lucas**  jlucas@pszjlaw.com, ocarpio@pszjlaw.com
- **Ron Maroko**  ron.maroko@usdoj.gov
- **Kirsten Martinez**  Kirsten.Martinez@bonialpc.com, Notices.Bonial@ecf.courtdrive.com
- **Steven M Mayer**  smayer@mayerlawla.com
- **Krikor J Meshefejian**  kjm@lnbyg.com
- **Kenneth Misken**  Kenneth.M.Misken@usdoj.gov
- **Jeffrey P Nolan**  jnolan@pszjlaw.com
- **Eric J Olson**  eric@ejolsonlaw.com
- **Jeffrey N Pomerantz**  jpomerantz@pszjlaw.com
- **Brian A Procel**  bprocel@millerbarondess.com,
  rdankwa@millerbarondess.com;docket@millerbarondess.com
- **Joshua L Scheer**  jscheer@scheerlawgroup.com, jscheer@ecf.courtdrive.com
- **Mark M Sharf (TR)**  mark@sharflaw.com,
  C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
- **Bradley D. Sharp (TR)**  bsharp@dsi.biz
- **Nikko Salvatore Stevens**  nikko@cym.law, mandi@cym.law
- **Alan G Tippie**  Alan.Tippie@gmlaw.com,
  atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.
  walker@gmlaw.com
- **Gary Tokumori**  gtokumori@pmcos.com
- **United States Trustee (LA)**  ustpregion16.la.ecf@usdoj.gov
- **Michael L Wachtell**  mwachtell@buchalter.com

- **John P. Ward**   jward@attleseystorm.com, ezhang@attleseystorm.com
- **Brett J. Wasserman**   wasserman@smcounsel.com
- **Alex M Weingarten**   aweingarten@willkie.com, lcarter@willkie.com
- **Clarisse Young**   youngshumaker@smcounsel.com, levern@smcounsel.com
- **Paul P Young**   paul@cym.law, jaclyn@cym.law
- **Roye Zur**   rzur@elkinskalt.com,
  cavila@elkinskalt.com;lwageman@elkinskalt.com;1648609420@filings.docketbird.com


**3**   <u>**SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**</u>

<u>Via Federal Express</u>
Honorable Sandra R. Klein
United States Bankruptcy Court/Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1582 / Courtroom 1575
Los Angeles, CA 90012

<u>Via Federal Express</u>
The Honorable Anna Marie Luna
Superior Court of the State of CA
County of Los Angeles, Probate Dept 3
111 North Hill Street
Los Angeles, CA 90012

<u>Via Federal Express</u>
Donald L. Saltzman
A Professional Law Corporation
10537 Butterfield Road
Los Angeles, CA 90064

<u>Via Federal Express</u>
Attys for Co-Trustee Jeffrey Winter and
Frank Menlo as Co-Trustee
Alex Weingarten, Esq.
Wilkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067-2905

- **Alex M Weingarten**    aweingarten@willkie.com, lcarter@willkie.com
- **Clarisse Young**    youngshumaker@smcounsel.com, levern@smcounsel.com
- **Paul P Young**    paul@cym.law, jaclyn@cym.law
- **Roye Zur**    rzur@elkinskalt.com,
  cavila@elkinskalt.com;lwageman@elkinskalt.com;1648609420@filings.docketbird.com


**3    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**

<u>Via Federal Express</u>
Honorable Sandra R. Klein
United States Bankruptcy Court/Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1582 / Courtroom 1575
Los Angeles, CA 90012

<u>Via Federal Express</u>
Ron Maroko
Office of the United States Trustee
915 Wilshire Blvd., Ste. 1850
Los Angeles, CA 90017

<u>Via Federal Express</u>
Kenneth Misken
Office of the United States Trustee
411 W. Fourth Street, #7160
Santa Ana, CA 92701

<u>Via Federal Express</u>
Donald L. Saltzman
A Professional Law Corporation
10537 Butterfield Road
Los Angeles, CA 90064

<u>Via Federal Express</u>
Attys for Co-Trustee Jeffrey Winter and
Frank Menlo as Co-Trustee
Alex Weingarten, Esq.
Wilkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067-2905

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

DOCS_LA:350923.1 78512/001