| Attorney or Party Name, Address, Telephone & FAX Nos. | FOR COURT USE ONLY |
|---|---|
| Jeffrey W. Dulberg (State Bar No. 181200)<br>Jeffrey P. Nolan (State Bar No. 158923)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067-4003<br>Telephone: 310.277.6910<br>Facsimile: 310.201.0760<br>E-mail:jdulberg@pszjlaw.com<br>jnolan@pszjlaw.com<br><br>Counsel to Bradley D. Sharp, Chapter 11 Trustee<br><br>☐ *Movant(s) appearing without an attorney*<br>☒ *Attorney for Movant(s)* | |

## UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| In re:<br><br>LESLIE KLEIN, | CASE NO.: 2:23-bk-10990-SK<br><br>CHAPTER: 11 |
|---|---|
| | **DECLARATION THAT NO PARTY REQUESTED A HEARING ON MOTION LBR 9013-1(o)(3)** |
| Debtor(s). | [No Hearing Required] |

1. I am the ☐ Movant(s) or ☒ attorney for Movant(s) or ☐ employed by attorney for Movant(s).

2. On (*date*):  9/15/2023   Movant(s) filed a motion or application (Motion) entitled:  Notice of Motion
*and Motion of Chapter 11 Trustee, for Order Authorizing the Examination of Bank Hapoalim, BM dba Bank Hapoalim, USA, Pursuant to Fed. R. Bankr. P. 2004; Memorandum of Points and Authorities; Declarations of Bradley D. Sharp, Nicholas Troszak and Jeffrey P. Nolan in Support Thereof [Docket No. 349].*

3. A copy of the Motion and notice of motion is attached to this declaration.

4. On (*date*): 9/15/2023   Movant(s), served a copy of ☐ the notice of motion or ☒the Motion and notice of motion on required parties using the method(s) identified on the Proof of Service of the notice of motion.

5. Pursuant to LBR 9013-1(o), the notice of motion provides that the deadline to file and serve a written response and request for a hearing is 14 days after the date of service of the notice of motion, plus 3 additional days if served by mail, or pursuant to F.R.Civ.P. 5(b)(2)(D) or (F).

6. More than  17   days have passed after Movant(s) served the notice of motion.

7. I checked the docket for this bankruptcy case and/or adversary proceeding, and no objection and request for hearing was timely filed.

8. No objection and request for hearing was timely served on Movant(s) via Notice of Electronic Filing, or at the street address, email address, or facsimile number specified in the notice of motion.

9.  Based on the foregoing, and pursuant to LBR 9013-1(o), a hearing is not required.

Movant(s) requests that the court grant the motion and enter an order without a hearing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Date:  _10/04/2023__                  _/s/ Jeffrey P. Nolan_____
                                     Signature

                                     Jeffrey P. Nolan_____
                                      Printed name

# EXHIBIT 1

Jeffrey W. Dulberg (CA State Bar No. 181200)
Jeffrey P. Nolan (CA State Bar No. 158923)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: 310/277-6910
Facsimile:  310/201-0760
E-mail:jdulberg@pszjlaw.com
       jnolan@pszjlaw.com

Counsel to Bradley D. Sharp, Chapter 11 Trustee

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>LESLIE KLEIN,<br><br>           Debtor. | Case No.: 2:23-bk-10990-SK<br><br>Chapter 11<br><br>**MOTION OF CHAPTER 11 TRUSTEE, FOR ORDER AUTHORIZING THE EXAMINATION OF BANK HAPOALIM, BM DBA BANK HAPOALIM, USA PURSUANT TO FED. R. BANKR. P. 2004; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF BRADLEY D. SHARP, NICHOLAS R. TROSZAK AND JEFFREY P. NOLAN IN SUPPORT THEREOF**<br><br>**[FED. R. BANKR. P. 2004 AND L.B.R. 2004-1]**<br><br>[No Hearing Required] |

**TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; THE PROPOSED EXAMINEE; AND PARTIES ENTITLED TO NOTICE HEREOF:**

      **PLEASE TAKE NOTICE THAT** Bradley D. Sharp, the duly appointed chapter 11 trustee (the "Trustee" or "Applicant") of the bankruptcy estate (the "Estate") of Leslie Klein (the "Debtor"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004") and Local Bankruptcy Rule 2004-1 ("LBR 2004-1"), hereby moves the Court (the "Motion") for an Order requiring that Bank Hapoalim, BM dba Bank Hapoalim, USA ("Bank Hapoalim" or Proposed

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Examinee") produce documents and answer written questions pursuant to Rule 7031, as agreed to as follows: **October 9, 2023** for production of documents and testimony, or as otherwise consensually agreed to by the parties.

## I.

## PRELIMINARY STATEMENT

The Motion is made on the grounds that pre-petition, the Debtor, was appointed and represented multiple trusts in his capacity as an attorney and a fiduciary. Numerous of his former clients have filed complaints over the past eight (8) years in the Superior Court of California, Los Angeles County ("Superior Court") in which they allege monies were diverted by the Debtor, utilized for improper purposes, and which sums are unaccounted for despite orders to show cause issued from the Superior Court. Non-Dischargeability complaints were subsequently filed before the Bankruptcy Court alleging similar fact patterns accusing the Debtor of utilizing multiple accounts to improperly make investments, collateralize investments, and/or divert monies for personal use without the permission of the beneficiaries whom entrusted said funds to the Debtor. The Debtor has indicated he maintained no hard copies of financial records and minimal personal records if any. Investigation into the bank accounts may give rise to damages, other claims and/or property recoverable by the Debtor's bankruptcy estate.

## II

## BACKGROUND

**Procedural Background and Filing of the Cases:**

On February 22, 2023, the Debtor filed a voluntary petition for relief under subchapter V of Chapter 11 of the Bankruptcy Code.

On April 24, 2023, creditors Erica and Joseph Vago filed a *Motion for Order Dismissing Debtor's Chapter 11 Bankruptcy Case* (the "Motion to Dismiss") [Docket No. 79].

On May 17, 2023, at a hearing held on the Motion to Dismiss, the Court ruled that the appointment of a chapter 11 trustee, and not dismissal of the case, was in the best interests of the estate.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    On May 23, 2023, the UST filed a *Notice of Appointment of Chapter 11 Trustee* [Docket No.

2    151].

3    On May 24, 2023, the UST Filed an *Application for Order Approving Appointment of*

4    *Trustee and Fixing Bond* [Docket No. 154], approved by order entered the same day [Docket No.

5    155].  On that same day, the Trustee accepted his appointment [Docket No. 156].

6    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28

7    U.S.C. §§ 1408 and 1409.

8    **Factual Background:**

9    On August 27, 2021, Plaintiff, ADI Vendriger, individually and on behalf of the Vendriger

10    Family Trust, filed a complaint against the Debtor and the law firm of Les Klein & Associates, Inc.

11    (the "Law Firm") asserting various tort causes of action, including fraud, conversion of property, and

12    money had and received. The complaint alleges multiple improper acts by the Debtor including

13    comingling and misappropriation of funds. (See State Court Complaint for (1) Fraud; (2) Breach of

14    Fiduciary Duty; (3) Conversion; (4) Money Had And Received; (5) Unjust Enrichment and (6)

15    Accounting (the "Vendriger Complaint"), ¶¶24, 25, 28, attached hereto as **Exhibit A.**)  On April 10,

16    2023, a Notice of Stay of Proceedings was filed.

17    On August 29, 2022, a referee appointed by the Superior Court issued an 84 page "Report

18    and Recommendation of the Court-Appointed Referee on Examination and Adjudication of the

19    Trustee's First, Second, and Third Accountings On Each of the Twenty-Four Trusts At Issue For the

20    Trust Periods September 10, 1996-June 30, 2013, July 1, 2013-December 31, 2016 And January 1,

21    2017-September 30, 2018" (the "Referee's Report", attached to the Declaration of J. Nolan as

22    **Exhibit B**).  The Referee's Report outlines a multitude of improper acts taken by the Debtor

23    including the transfer and misappropriation and commingling of funds. (See **Exhibit B**, p. 21) Large

24    financial disparities were noted to exist between what the Debtor claimed was disbursed to

25    beneficiaries and ultimately what the beneficiaries documented they received. (See **Exhibit B**, p. 18,

26    ft. note 21)

27    On May 10, 2013, Plaintiffs Erica and Joseph Vago, filed a Complaint to Determine the

28    Nondischargeability of Certain Debts owed by Debtor Leslie Klein to Erica and Joseph Vago

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Pursuant to 11 U.S.C. §523, and To Deny Discharge Pursuant to Section 727(A)(12) (See Complaint for Nondischargeability (the "Vago Complaint") against the Debtor attached to the Declaration of J. Nolan as **Exhibit C**)  The Vago Complaint alleges that the Vagos' moved 15MM in funds to the care of the Debtor between 2013 and 2017. (See **Exhibit C**, ¶¶17, 26)  In 2019, the Vagos demanded their monies be returned and the Debtor refused. (See **Exhibit C**, ¶¶36, 37)  The Vago Complaint alleges that the Debtor commingled trust funds with his personal funds. (See **Exhibit C**, ¶46) The Vago Complaint attaches a judgment in the amount of $24,334,038 as against the Debtor.

On May 12, 2023, Plaintiffs, Robert and Esther Mermelstein filed Complaint for Nondischargeability of Debt Pursuant to 11 U.S.C. §523(a)(2)(A), 11 U.S.C. §523(a)(4) & 11 U.S.C. §523(a)(6) & for Denial Of Discharge Pursuant to 11 USC §727(a)(2)(A); 11 USC §727(a)(2)(B); 11 USC §727(a)(3); 11 USC §727(a)(4); 11 USC §727(a)(5) the "Mermelstein Complaint") (See Declaration of J. Nolan as **Exhibit D**, ¶¶17, 21, 24, 28, 32). Several of the investment opportunities resulted in significant recoveries to the Debtor which sums are alleged to have been converted by the Debtor and concealed from the Mermelstein beneficiaries.  (See Mermelstein Complaint, ¶¶14, 20, 31). The Mermelstein Plaintiffs have filed proofs of claims in the Bankruptcy Case exceeding $13,000,000. (See Mermelstein Complaint, ¶41).

On May 13, 2020, the California Board of Accountancy, Department of Consumer Affairs, State of California, issued its Decision and Order in which the Debtor surrendered his license. (See Decision and Order, Stipulated Surrender of License and Order and Accusation attached to the Declaration of J. Nolan as **Exhibit E**).  The accusation documents the Debtor issuing promissory notes in the name of the Debtor, entities in which he owned a substantial interest or controlled, as well as mischaracterizing investments to clients which in reality were merely non-recourse loans utilizing the Law Firm and Law Firm IOLTA Account.  The Debtor caused to be issued promissory notes and utilized the funds as he alone directed. (See **Exhibit E**, Accusation, ¶¶ 19(iv), 22(d)).

In the single in-person meeting with the Trustee and representatives of the Trustee, the Debtor claimed he did not maintain financial records. (See Declaration of B. Sharp, ¶3; Declaration of N. Troszak, §3) This response is consistent with a finding by the referee in the Menlo case that the Debtor "had no legitimate recordkeeping system". (See **Exhibit B**, p. 23, lns. 15-18)

1    Since June 8, 2023, the Trustee has requested various financial documents including bank

2    statements, disclosure and reports of entities which he holds a financial interest.  (See

3    Correspondence dated June 8, 2023, attached to the Declaration of J. Nolan, as **Exhibit F, ¶**8; See

4    email dated June 28, 2023, attached hereto as **Exhibit G**). The demands have been repeated to

5    multiple counsel on behalf of the Debtor and has not resulted in the production of financial records.

6    (See email dated July 10, 2023, attached to the Declaration of J. Nolan as **Exhibit H**).

### III

### THE TRUSTEE IS ENTITLED TO A RULE 2004 ORDER UNDER APPLICABLE LAW

9    Bankruptcy Rule 2004 provides that "[o]n motion of any party in interest, the court may

10   order the examination of any entity." Fed. R. Bankr. P. 2004(a).  Examinations under Bankruptcy

11   Rule 2004 include within their scope, *inter alia*, any matter that may relate to the property and assets

12   of the estate, the financial condition of the debtor, and any matter that may affect the administration

13   of a debtor's estate, or to the debtor's right to a discharge.  See Fed. R. Bankr. P. 2004(b).  In

14   addition, the attendance of a person at an examination may be ordered by the Court "at any time or

15   place it designates, whether within or without the district court wherein the case is pending." Fed. R.

16   Bankr. P. 2004(d). The Bankruptcy court has broad discretion in issuing a 2004 examination. *In re*

17   *Deshetler*, 435 B.R. 295, 302 (Bankr. S.D. Ohio 2011)

18   It is the debtor's duty to provide the required information of creditors and assets to a trustee

19   which is crucial to the working of the bankruptcy system. *Clippard v. Russell (In re Russell),* 392

20   B.R. 315, 358 (Bankr. E.D. Tenn. 2008) the required information is needed for a variety of purposes

21   in the administration of the bankruptcy case.  *Id*. The debtor's obligation to provide the required

22   information is a cost imposed on the debtor for the benefit of obtaining bankruptcy relief. *Id*.

23   The Debtor has failed (or refused) to produce various financial records to support claims

24   made to the Trustee and/or evidence of the financial condition despite multiple requests.  (See

25   Declaration of N. Troszak, ¶3.)  This list includes: bank statements, payments for investments in

26   various life insurance policies, credit card statements, access to his computers, disclosure of entities

27   in which he holds a financial interest, and the list goes on.  The lack of meaningful production of

28   financial records produced to the Trustee means the Trustee must seek the financial information

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

from third parties.  Similarly, the plethora of claims by creditors in the estate, as well as various findings from sister courts and litigation pending therein, describe a picture of commingling and diversion of funds.

The purpose of a Bankruptcy Rule 2004 examination is "to allow inquiry into the debtor's acts, conduct or financial affairs so as to discover the existence or location of assets of the estate." *In re Dinbilo*, 177 B.R. 932, 940 (E.D. Cal. 1993); see also *In re N. Plaza LLC*, 395 B.R. 113, 122, n. 9 (S.D. Cal. 2008) (purpose of Bankruptcy Rule 2004 examination is "discovering assets and unearthing frauds") (internal citations omitted); *In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989) (rule's primary purpose is to ascertain "the extent and location of the estate's assets [and] examination is not limited to the debtor or his agents, but may properly extend to creditors and third parties who have had dealings with the debtor.") (internal citations omitted).  In addition, Bankruptcy Rule 2004 is a discovery tool that can be used as a pre-litigation device to determine whether there are grounds to bring an action to determine a debtor's right to discharge a particular debt.  See *In re Corso*, 328 B.R. 375, 383 (E.D.N.Y. 2005).

The scope of an examination permitted under Bankruptcy Rule 2004 is "exceptionally broad."  *In re N. Plaza LLC*, 395 B.R. at 122 n. 9; see also *In re W&S Investments, Inc.* 1993 U.S. App. LEXIS 2231 at *6 (9th Cir. Jan. 28, 1993) ("The scope of inquiry permitted under a Rule 2004 examination is generally very broad and can legitimately be in the nature of a 'fishing expedition.'") (internal citations omitted).  This broad inquiry extends to third parties as well:  "Because the purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation."  *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993); see also *In re Mittco, Inc.*, 44 B.R. 35, 36 (Bankr. D. Wis. 1984) ("When there is a showing that the purpose of the examination is to enable a party to probe into matters which may lead to the discovery of assets by examining not only the debtor, but also other witnesses, such inquiry is allowed.").  This is because "[t]he clear intent of Rule 2004 . . . is to give parties in interest an opportunity to examine individuals having knowledge of the financial affairs of the debtor in order to preserve the rights of creditors."  *In re GHR Companies, Inc.*, 41 B.R. 655, 660 (Bankr. D. Mass. 1984).  "The purpose of the Rule 2004

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  investigation is to aid in the discovery of assets, any third party who can be shown to have a

2  relationship with the debtor can be made subject to a Rule 2004 investigation." *In re Ionosphere*

3  *Clubs, Inc.*, 156 B.R. 414, 432 (Bankr. S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

4  　　In the present case, good cause exists to issue the subpoena as the Trustee must locate

5  reliable records to determine the financial affairs and condition of the Debtor in order to preserve the

6  rights of creditors.  The Debtor's statements that he does not maintain financial records regarding his

7  acts, conduct, property and financial conditions means the Trustee must go to third parties. (See

8  Declaration of N. Troszak, §3) There has been a litany of state court filings and litigation, including

9  findings of fact, calling in to question conduct of the Debtor and his financial dealings. Various

10 findings during litigation document the commingling of monies, investments, and trust accounts.

11 Allegations of misappropriation of funds and the establishment of lines of credit to burden or

12 securitize assets of clients call into question business conducted by the Debtor and the location of

13 missing assets.  This conduct has spawned a mountain of litigation which has the potential to

14 undermine the efficient and economic administration of the bankruptcy case.   For these reasons, the

15 Trustee seeks the production of records to investigate and determine the underlying facts.

16 　　The proposed examination cannot proceed at this time under Bankruptcy Rule 7030 or 9014

17 because Debtor is not a party to any pending adversary proceeding or contested matter that

18 encompasses the matters addressed in this Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**IV.**

**CONCLUSION**

For the reasons set forth above, the Trustee respectfully requests that this Court enter an order to be lodged consistent with the Motion herewith granting this Motion in its entirety and (a) authorizing the Trustee, pursuant to Bankruptcy Rules 2004 and 9016, to issue a subpoena substantially in the form attached hereto as **Exhibit I,** for the production of financial records including supporting bank statements, copies of checks, and deposit slips and (b) answer written questions on deposition; and (c) granting such other and further relief as this Court deems just and proper.

Dated:  September 15, 2023                    PACHULSKI STANG ZIEHL & JONES LLP

                                                      By: */s/ Jeffrey P. Nolan*
                                                          Jeffrey W. Dulberg
                                                          Jeffrey P. Nolan

                                                          Attorneys for Bradley D. Sharp, Chapter 11
                                                          Trustee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## DECLARATION OF BRADLEY D. SHARP

I, Bradley D. Sharp, declare:

1.       I am the President and CEO of Development Specialists, Inc. ("DSI" or the "Firm"). I have personal knowledge of the facts stated in this Declaration, and if called as a witness, I could and would testify competently to these facts.

2.        I make this declaration in support of the application (the "Application") filed by the Trustee seeking an Order Authorizing the Production of Documents and Examination of Bank Hapoalim, Pursuant to Fed. R. Bankr. P. 2004.

3.       I met with the Debtor on or about May 31, 2023.  At that time, the Debtor indicated he did not maintain personal financial records for the various assets disclosed on his schedules.  The Debtor claimed he did not maintain records for his financial affairs.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed this 15th day of September, 2023, at San Juan Capistrano, California.


_____
Bradley D. Sharp
Chapter 11 Trustee

DOCS_LA:350994.2 78512/001

1    **DECLARATION OF NICHOLAS R. TROSZAK**

2        I, Nicholas R. Troszak, declare:

3        1.       I am a Managing Director at Development Specialists, Inc. ("<u>DSI</u>" or the "<u>Firm</u>").  I

4    have personal knowledge of the facts stated in this Declaration, and if called as a witness, I could

5    and would testify competently to these facts.

6        2.       I make this declaration in support of the application (the "Application") filed by the

7    Trustee seeking an Order Authorizing the Production of Documents and Examination of Bank

8    Hapoalim, BM dba Bank Hapoalim International and Bank Hapoalim, USA pursuant To Fed. R.

9    Bankr. P. 2004.

10       3.       On or about May 31, 2023, I met with the Debtor.  I asked him a number of questions

11   about the maintenance of business records.  The Debtor indicated he did not maintain physical or

12   hard copies of his personal financial records.

13       I declare under penalty of perjury pursuant to the laws of the United States that the foregoing

14   is true and correct.

15       Executed this 15th day of September, 2023, at Camarillo, California

16

17                                   Nicholas R. Troszak

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## DECLARATION OF JEFFREY P. NOLAN

I, Jeffrey P. Nolan, declare:

1.      I am an attorney at law duly licensed to practice before all courts in the State of California.  I am an attorney with the law firm of Pachulski Stang Ziehl & Jones LLP, attorneys of record for Bradley D. Sharp, Chapter 11 Trustee of the estate of Leslie Klein ("Klein" or the "Debtor").  The facts stated herein are of my own personal knowledge, or made known to me from a review of the files and pleadings in this action which are maintained in the ordinary course of business.  If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.

2.      The examination requested through the Motion cannot proceed under Federal Rules of Bankruptcy Procedure 7030 or 9014 because no adversary proceeding or contested matter is currently pending encompassing the matters subject to inquiry.

3.      Attached hereto as **Exhibits A,** is a true and correct copy of the Complaint for (1) Fraud; (2) Breach of Fiduciary Duty; (3) Conversion; (4) Money Had And Received; (5) Unjust Enrichment and (6) Accounting filed in the Superior Court of the State of California, Case Number 21 ST CV 31915, Vendriger, et al v. Klein.

4.      Attached hereto as **Exhibit B,** is a true and correct copy of the Report and Recommendation of the Court-Appointed Referee on Examination and Adjudication of the Trustee's First, Second, and Third Accountings On Each of the Twenty-Four Trusts At Issue For the Trust Periods September 10, 1996-June 30, 2013, July 1, 2013-December 31, 2016 And January 1, 2017-September 30, 2018, as attached to proof of claim 13-2 filed by the Menlo Parties in the United States Bankruptcy Court, Central District of California, in case number 2:23-bk-10990-SK.

5.      Attached hereto as **Exhibit C** is a true and correct copy of the Vago v. Klein Complaint to Determine the Nondischargeability of Certain Debts owed by Debtor Leslie Klein to Erica and Joseph Vago Pursuant to 11 U.S.C. §523, and To Deny Discharge Pursuant to Section 727(A)(12) and filed in the United States Bankruptcy Court, Central District of California, in case number 2:23-bk-10990-SK.

6.      Attached hereto as **Exhibit D** is a true and correct copy of the Mermelstein v. Klein

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Complaint for Nondischargeability of Debt Pursuant to 11 U.S.C. §523(a)(2)(A), 11 U.S.C. §523(a)(4) & 11 U.S.C. §523(a)(6) & for Denial Of Discharge Pursuant to 11 USC §727(a)(2)(A); 11 USC §727(a)(2)(B); 11 USC §727(a)(3); 11 USC §727(a)(4)' 11 USC §727(a)(5), and filed in the United States Bankruptcy Court, Central District of California, in case number 2:23-bk-10990-SK.

7.    Attached hereto as **Exhibits E** is a true and correct copy of the Decision and Order, Stipulated Surrender of License and Order and Accusation issued by the California Board of Accountancy, Department of Consumer Affairs, State of California, as printed from the state website.

8.    Upon information and belief, the Debtor maintained a business relationship with Bank Hapoalim, BM dba Bank Hapoalim International and Bank Hapoalim, USA ("Bank Hapoalim") and maintained a number of accounts based upon my review of records.

9.    As counsel to the Trustee, we requested financial records and bank statements from the Debtor on June 8, 2023.  (See Correspondence dated June 8, 2023, attached hereto as **Exhibit F**) On June 28, 2023, the Trustee again requested the bank statements. (See email dated June 28, 2023, attached hereto as **Exhibit G**).  The Trustee made the same request when introduced to new counsel for the Debtor on July 10, 2023. (See email dated July 10, 2023, attached hereto as **Exhibit H**).  No bank statements or financial records have been received from the Debtor in response thereto.

10.    Pursuant to Local Bankruptcy Rule 2004-1(a), the Plaintiff contacted Bank Hapoalim to arrange for a mutually agreeable date, time, place, and scope of the examination sought in the Motion.  The Proposed Examinee will produce the documents requested on reasonable notice to its subpoena process serving unit. Notice of this Motion has been given to the Debtor/consumer and the United States Trustee's Office.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

11.     The Debtor therefore requests authority to issue a subpoena to the Proposed Examinee substantially in the form attached hereto as **Exhibit I.**

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed this 15th day of September, 2023, at Los Angeles, California.


_/s/ Jeffrey P. Nolan_
Jeffrey P. Nolan

# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 08/27/2021 06:09 PM Sherri R. Carter, Executive Officer/Clerk of Court, by H. Flores-Hernandez,Deputy Clerk

1  **SHUMAKER MALLORY LLP**
   Clarisse Young Shumaker (SBN 106505)
2  youngshumaker@smcounsel.com
   Brett J. Wasserman (SBN 315058)
3  wasserman@smcounsel.com
   333 S. Grand Ave., Suite 3400
4  Los Angeles, California 90071
5  **Mailing Address**
   1 Ringbit Rd. W.
6  Rolling Hills, CA 90274
   Telephone: (213) 793-2020
7  Facsimile: (213) 674-4268
8
   Attorneys for Plaintiff ADI VENDRIGER
9

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                      COUNTY OF LOS ANGELES

12  ADI VENDRIGER, an individual, as Co-      )  Case No.  21STCV31915
    Trustee of the FIRST AMENDMENT TRUST      )
13  WENDRIGER FAMILY; and ADI                 )
    VENDRIGER, an individual                  )  **COMPLAINT FOR:**
14                                            )  **1) FRAUD;**
                  Plaintiffs,                 )  **2) BREACH OF FIDUCIARY DUTY;**
15                                            )  **3) CONVERSION;**
    v.                                        )  **4) MONEY HAD AND RECEIVED;**
16                                            )  **5) UNJUST ENRICHMENT; and**
    LESLIE KLEIN, ESQ., an individual; and    )  **6) ACCOUNTING**
17  LES KLEIN & ASSOCIATES, a California      )
    Professional Law Corporation; and DOES 1- )  **(Filed concurrently with Petition to Return**
18  50, inclusive,                            )  **Trust Property; For Damages, Attorney's**
                                              )  **Fees, And Costs; and Award of Damages,**
19                Defendants.                  )  **Attorney's Fees, and Costs)**
                                              )
20                                            )
                                              )  Complaint Filed: August 27, 2021
21                                            )  Trial Date:
                                              )  Dept:
22                                            )
                                              )
23  _____  )  **DEMAND FOR JURY TRIAL**

24        Plaintiff ADI VENDRIGER, successor co-Trustee of the First Amendment Trust

25  Wendriger Family dated May 7, 1990, as amended thereafter, hereby alleges as follows:

26  ///

27  ///

**COMPLAINT**

## GENERAL ALLEGATIONS

1.      Plaintiff ADI VENDRIGER is an individual who resides in Tel Aviv, Israel.  ADI VENDRIGER is a successor co-Trustee of the First Amendment Trust Wendriger Family dated May 7, 1990, as amended.  A true and correct copy of the First Amendment Trust Wendriger Family dated May 7, 1990, as amended ("Trust"), is attached hereto as Exhibit A and made a part hereof.  At all times relevant herein, the Trust was being administered in the State of California, County of Los Angeles.

2.      Respondent LESLIE KLEIN, ESQ. ("Klein") is an individual who on information and belief resides in Los Angeles County, California.  Upon information and belief, at all times relevant herein, Klein was doing business in the State of California, County of Los Angeles.  Pursuant to the State Bar of California website, Klein is an Active member, State Bar Number 50908.  Pursuant to the California Department of Consumer Affairs website, Klein formerly held a license as a Certified Public Accountant, License No. 67454, which was surrendered on January 31, 2021.  On March 24, 2010, Klein filed an Ex Parte Application for Issuance of Letters of Special Administration in the Estate of Tania Wendriger in Los Angeles Superior Court, Case No. LP015084 ("Petition for Special Administrator").  Klein was appointed Special Administrator of the Estate of Tania Wendriger under an Ex Parte Order for Probate dated March 24, 2010 and received Letters of Special Administration dated March 24, 2010.

3.      Respondent LES KLEIN & ASSOCIATES, INC., A PROFESSIONAL LAW CORPORATION ("Firm") is a California professional corporation engaged in the practice of law with offices in the State of California, County of Los Angeles, City of Sherman Oaks.

4.      Plaintiff is ignorant of the true names and capacities, whether individual, corporate, or otherwise, of the Defendants identified in this Petition as DOES 1 through 50, inclusive, and therefore, sues such Defendants by the fictitious names.  Plaintiff will amend this Plaintiff to set forth the true names and capacities of said Defendants as soon as such names have been ascertained.  Plaintiff is informed and believes and based upon such information and belief alleges that each Defendant designated herein as DOES 1 through 50, inclusive, is responsible in

2

1    some way and/or manner for the acts and occurrences herein alleged, whether such acts and

2    occurrences were committed intentionally, negligently, recklessly, or otherwise, and that each

3    said DOE Defendant is liable to Plaintiff for the damages suffered by Plaintiff.

4                                    **JURISDICTION AND VENUE**

5           5.      Jurisdiction and venue in the Los Angeles Superior Court arises from the

6    administration of the Trust and Defendants residing and functioning in the County of Los

7    Angeles, State of California.

8                                                **FACTS**

9           6.      On May 7, 1990, OSCAR WENDRIGER and TANIA WENDRIGER established

10   the FIRST AMENDMENT TRUST WENDRIGER FAMILY ("Trust"), which replaced the prior

11   Trust Agreement dated July 10, 1986. OSCAR WENDRIGER and TANIA WENDRIGER were

12   the initial co-Trustees of the Trust. Plaintiff ADI VENDRIGER, and his brother Jacob

13   Vendriger, also known as Yaacov Vendriger, are the only children of OSCAR WENDRIGER

14   and TANIA WENDRIGER, and were named the successor co-Trustees of the Trust. Pursuant to

15   the terms of the Trust, as amended on March 18, 1993, upon the death of the Surviving Trustor,

16   the Trust Estate shall be distributed as follows: (i) each grandchild shall receive the sum of

17   $10,000, increased six percent (6%) per annum, cumulatively; and (ii) the remainder of the Trust

18   Estate shall be divided equally between ADI VENDRIGER and Jacob Vendriger.

19          7.      On May 7, 1990, OSCAR WENDRIGER and TANIA WENDRIGER contributed

20   the following three (3) real properties to the Trust as follows:

21      •   Quitclaim Deed transferring 1435 Fairfax Avenue #20, Los Angeles, CA (APN
            5554-001-033) from OSCAR WENDRIGER and TANIA WENDRIGER to
22          OSCAR WENDRIGER and TANIA WENDRIGER, Cotrustees of the Wendriger
            Family Trust, U/D/T 5-7-90, which was recorded in Official Records of Los
23          Angeles County as Instrument No. 90-923693 on May 22, 1990 ("Fairfax
            Quitclaim Deed").
24

25   ///

26   ///

27   ///

                                                      3
                                                 **COMPLAINT**

- Quitclaim Deed transferring 1217 Havenhurst Drive, Los Angeles, CA (APN 5554-016-011) from OSCAR WENDRIGER and TANIA WENDRIGER to OSCAR WENDRIGER and TANIA WENDRIGER, Co-trustees of the Wendriger Family Trust, U/D/T 5-7-90, which was recorded in Official Records of Los Angeles County as Instrument No. 90-923694 on May 22, 1990 ("Havenhurst Quitclaim Deed").
- Quitclaim Deed transferring 948 N. Martel Avenue, Los Angeles, CA (APN 5531-020-002) from OSCAR WENDRIGER and TANIA WENDRIGER to OSCAR WENDRIGER and TANIA WENDRIGER, Cotrustees of the Wendriger Family Trust, U/D/T 5-7-90, which was recorded in Official Records of Los Angeles County as Instrument No. 90-923692 on May 22, 1990 ("Martel Quitclaim Deed").

8.      On May 28, 1996, OSCAR WENDRIGER and TANIA WENDRIGER contributed the following property to the Trust as follows:

- Grant Deed transferring 1435 Fairfax Avenue #4, Los Angeles, CA (APN 5554-001-017) from OSCAR WENDRIGER and TANIA WENDRIGER to OSCAR WENDRIGER and TANIA WENDRIGER, Cotrustees of the Wendriger Family Trust dated 5/7/90, which was recorded in Official Records of Los Angeles County as Instrument No. 96-969585 on June 19, 1996 ("Fairfax Grant Deed").

9.      All four (4) Trust properties are managed by Holley Property Management Company.  Klein is not the Property Manager, but has inserted himself as a middle man between the property management company and the co-Trustees of the Trust.

10.      Pursuant to the Petition for Special Administrator filed by Klein, on October 30, 1999, OSCAR WENDRIGER and TANIA WENDRIGER executed a Note Secured by Trust Deed ("Secured Note") in the sum of $258,815.05, the terms of which provided for all unpaid principal and interest to be due and payable on October 24, 2009.  Pursuant to the Petition for Special Administrator filed by Klein, the Secured Note was secured by a Deed of Trust dated August 2, 1979, and recorded as Instrument No. 79-945848.

11.      On August 23, 2007, OSCAR WENDRIGER, also known as Oscar Vendriger, died.

12.      On November 23, 2007, TANIA WENDRIGER, also known as Tania Vendriger and Tanya Vendriger, died.

13.      Pursuant to the Petition for Special Administrator, at TANIA WENDRIGER's death there was a Chase Account (Account No. 195-248884-9), which was held by OSCAR

4

WENDRIGER and TANIA WENDRIGER, as joint tenants.  At the time of TANIA

WENDRIGER's death, the Chase Account held $194,000, which was in excess of the statutory

limits under Probate Code § 13100.

14.     On March 24, 2010, Klein filed the Petition for Special Administrator in the

Estate of Tania Wendriger in Los Angeles Superior Court, Case No. LP015084.  Klein requested

the following powers: (i) to withdraw all sums on deposit in the Chase Account; (ii) With said

sums, to apply toward payment in full, including all accrued interest until such payment that

certain Note Secured by Deed of Trust, dated October 30, 1990, in favor of Harry Halpin and

Rose Shapiro the final payment on which, in the sum of $200,330.10, was due on October 24,

2009; (iii) to execute and deliver any checks, drafts, withdrawals, or other instruments drawn on

the Chase Account for the payment of the money on deposit in the Chase Account to pay in full

including all accrued interest until such payment, the Secured Note, the final payment of which,

in the sum of $200,330.20, was due on October 24, 2009; and (iv) if necessary, to open any bank

account necessary in the name of the Estate and to deposit in such account any and all sums

withdrawn from said Chase Account.  Thereafter, to execute and deliver any checks, drafts,

withdrawals, or other instruments drawn on such Account for payment of the money on deposit

in such Account to pay in full including all accrued interest until such payment, the Secured

Note, the final payment of which, in the sum of $200,330.20, was due on October 24, 2009.

15.     On March 24, 2010, Klein was issued Letters of Special Administration.  Klein

specifically affirmed the requirement to perform the duties of personal representative according

to law in the Letters filed with the Court.

16.     The Petition for Special Administrator included Nominations of Leslie Klein by

ADI VENDRIGER and Jacob Vendriger, for the purpose of withdrawing the funds in the Chase

account and applying such funds to the payment of the Secured Note, as well as a Power of

Attorney in favor of Leslie Klein, dated February 5, 2010, signed by ADI VENDRIGER and

Jacob Vendriger.  The Petition for Special Administrator also included a Declaration by Leslie

Klein, which specifically notes the Power of Attorney dated February 5, 2010 is in regards to the

**COMPLAINT**

Chase Account for the specific purpose of obtaining the funds in the Chase Account and
applying said funds toward payment on the Secured Note.

17.     On March 24, 2010, an Order for Special Administrator was issued granting Klein
the following powers: (i) to withdraw all sums on deposit in the Chase Account; (ii) With said
sums, to apply toward payment in full, including all accrued interest until such payment that
certain Note Secured by Deed of Trust, dated October 30, 1990, in favor of Harry Halpin and
Rose Shapiro the final payment on which, in the sum of $200,330.10, was due on October 24,
2009; (iii) to execute and deliver any checks, drafts, withdrawals, or other instruments drawn on
the Chase Account for the payment of the money on deposit in the Chase Account to pay in full
including all accrued interest until such payment, the Secured Note, the final payment of which,
in the sum of $200,330.20, was due on October 24, 2009; and (iv) if necessary, to open any bank
account necessary in the name of the Estate and to deposit in such account any and all sums
withdrawn from said Chase Account.  Thereafter, to execute and deliver any checks, drafts,
withdrawals, or other instruments drawn on such Account for payment of the money on deposit
in such Account to pay in full including all accrued interest until such payment, the Secured
Note, the final payment of which, in the sum of $200,330.20, was due on October 24, 2009.

18.     To date, Klein has not filed a single accounting with the Court as Special
Administrator.

19.     On July 27, 2011, Klein sent correspondence to ADI VENDRIGER and Jacob
Vendriger which indicated Klein had received $255,792 from Holley Property Management
company from March 2010 to June 2011. Klein noted expenses as follows: (i) paying off the
Trust Deed in the amount of $205,987.15, $192,824 of which came from "monies held in various
bank accounts"; (ii) $10,000 of attorney's fees; (iii) $4,200 for CPA fees, Court costs, and
Bonding fees; and (iv) $156,684 in taxes paid for 2008, 2010, and 2011.  Klein noted a balance
of $61,349.85 in his account for the benefit of Plaintiff and Jacob after issuance of a $10,400
check to Jacob to "reimburse him for his one half of the taxes which [Klein] paid to the IRS for
the fees that were bounced by [Plaintiff]."

**COMPLAINT**

20.     To date, Klein has not filed a Petition for Discharge as Special Administrator despite acknowledging having paid off the Trust Deed prior to July 27, 2011.  Upon information and belief, Klein has charged Plaintiff and Jacob a yearly fee to act as a fiduciary.  In addition, upon information and belief, Klein has wasted Trust funds by paying $800 per year for a Bond that is entirely unnecessary.

21.     Upon information and belief, Klein represented to Holley Property Management Company that he was legally authorized as Trustee and/or Special Administrator to collect the rental income from the Trust properties.

22.     Upon information and belief, despite having no legal authority to handle the rental income of the Trust properties, Klein has collected all of the rental income from the four (4) properties titled in the name of the Trust from Holley Property Management Company from March of 2010 through March of 2021, for ADI VENDRIGER, and August of 2021, for Jacob Vendriger.

23.     Upon information and belief, Klein has failed to provide sufficient and accurate accountings to Plaintiff, as required by <u>Probate Code</u> §1060 et seq., despite numerous requests to do so.

24.     Upon information and belief, Klein has failed to accurately report the actual distributions made to the Plaintiff and/or the proper taxing authorities. For example, in 2020, Klein filed a fiduciary tax return for the Trust indicated a Distributable Net Income of $226,536 and actual distributions of $240,000 ($120,000 to ADI and $120,000 to Jacob); however, ADI only actually received distributions totaling $90,000.  In addition, statements provided by Holley Property Management Company show actual owner distributions totaling almost $346,000, which leaves $116,000 unaccounted for.

25.     Upon information and belief, Klein has engaged in a similar practice of over-reporting the actual distributions made to Plaintiff.  Upon information and belief, such over-reporting was done in efforts to cover Klein's misappropriation of client fund.

///

**COMPLAINT**

26.     Upon information and belief, Klein has failed to accurately report the reserves being held for the benefit of Plaintiff to the Plaintiff and/or the proper taxing authorities.  For example, upon information and belief, Klein should have approximately $1,400,000 held in his account for the benefit of Plaintiff and Jacob.  On March 24, 2021, Klein indicated he held a balance of only $220,000 in his attorney expense account because of an IRS claim for $80,000.

27.     Upon information and belief, Klein's failure to prepare declarations to be submitted to the Israeli Taxing Authorities indicating the reserves held by Klein, despite Plaintiff's numerous demands for Klein to do so, have put Plaintiff in jeopardy of incurring additional taxes and penalties imposed by the Israeli Taxing Authorities.

28.     Upon information and belief, Klein has misappropriated the funds that constitute the difference between the amount Klein is believed to be holding on behalf of Plaintiff and Jacob and the amount Klein is reporting to be holding on their behalf.

29.     Upon information and belief, Klein has also played favorites and has made distributions to Jacob while simultaneously withholding distributions from Plaintiff, despite Plaintiff's repeated demands for distributions to be made to avoid Plaintiff becoming destitute and filing for bankruptcy due to an inability to pay his creditors.

## RECOVERY AND DAMAGES

30.     Plaintiff hereby seeks recovery of the funds wrongfully held by Klein in full plus interest.  Plaintiff also seeks punitive damages against Klein for fraud, conversion, and breach of fiduciary duty.  Law firm trust accounts comprised of funds belonging to other people cannot be used as a lawyer's private bank account.  Misuse of an attorney's trust account is among the most egregious misconducts an attorney can commit.  This is the sort of conduct that leads to the public's mistrust of the legal profession.

31.     Plaintiff is seeking damages and attorney's fees and costs under Probate Code § 859 as a result of Klein's bad faith wrongful taking, concealing, and/or disposing of property belonging to a trust.

///

**COMPLAINT**

32.     Plaintiff also seeks recovery of attorney fees and costs against all defendants on the grounds of tort of another for fraud, breach of fiduciary duty, and conversion.  Plaintiff has been required through the tort of another to act in the protection of their interests by bringing this action against all Defendants. Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

## FIRST CAUSE OF ACTION

### (Fraud – Against All Defendants)

33.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 32, inclusive, above as if fully set forth herein.

34.     When Klein filed the Petition for Special Administrator, he expressly represented to the Court and to Plaintiff and Jacob that the powers he would exercise, including those obtained under the Power of Attorney, would be limited to paying the Trust Deed with the funds from the Chase Account, both of which were held by TANIA WENDRIGER, personally, and not in the name of the Trust.

35.     Upon information and belief, when Klein made such representation, Klein knew such representations to be false.  Upon information and belief, Klein knew that he would use the appointment as Special Administrator to gain access and control over Trust funds in order to misappropriate the same.

36.     Upon information and belief, Klein made representations to Holley Property Management Company that he had legal authority, as Special Administrator or as a Trustee, to collect and hold the rental income derived from the Trust properties.

37.     Upon information and belief, when Klein made such representation, Klein knew such representations to be false.

38.     Upon information and belief, Klein made representations to Plaintiff and the IRS, FTB, and Israeli Taxing Authorities that Klein has reported made distributions to Plaintiff in amounts differing from those actually distributed to Plaintiff.  For example, in 2020, Klein reported distributing $120,000 to Plaintiff, who actually received only $90,000 in distributions.

9

**COMPLAINT**

39.     Upon information and belief, when Klein made such representation, Klein knew such representations to be false.  Upon information and belief, Klein made such misrepresentations to cover the tracks of his misappropriation of client funds.

40.     Plaintiff justifiably relied upon Klein's representations to the Court and Plaintiff as well as Klein's reputation as an officer of the Court that Klein would follow the rules the administration of Estates and the California State Bar's Rules of Professional Conduct.

41.     Plaintiff has been damaged in an amount of not less than $780,000 plus interest as a result of funds that have been wrongfully withheld and/or improperly not distributed.  Klein had no legal authority to collect the rental income of Trust property let alone retain it.  Despite repeated demand by Plaintiff, the funds in Klein's possession have not been returned to Plaintiff.

42.     As the direct, proximate, and foreseeable consequence of the fraudulent conduct of Klein as herein alleged, Plaintiff has suffered actual damages of not less than $780,000, together with interest on that amount as allowed by law.

43.     The conduct of Klein as alleged herein is intentional, malicious, outrageous, and/or carried out with conscious disregard so as to justify an award of exemplary and punitive damages in an amount according to proof.

44.     Plaintiff also seeks recovery of attorney fees and costs against Klein on the grounds of tort of another.  Plaintiff has been required through the tort of another to act in the protection of his interests by bringing this action against Klein.  Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty – Against All Defendants)

45.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 44, inclusive, above as if fully set forth herein.

46.     Klein, as Special Administrator, as Agent under Power of Attorney, as an attorney, and as a CPA, was a fiduciary to Plaintiff and owed Plaintiff certain fiduciary duties

**COMPLAINT**

including the duties of good faith, integrity, undivided service, competence, candor, diligence, loyalty, and full and fair disclosure.

47.    Upon information and belief, Klein materially and willfully breached his fiduciary duties to Plaintiff by wrongfully representing he had legal authority to act on behalf of the Trust and collect rental income from Trust properties to third parties, including Holley Property Management Company, by wrongfully withholding Plaintiff's funds, by over-reporting distributions to Plaintiff, by paying himself a fiduciary fee despite not being a Trustee and the purpose of appointment of Special Administrator lapsing almost a decade ago, by failing to provide sufficient and accurate accountings, by failing to provide the proper requested documentation for taxing authorities, and by distributing funds in favor of Jacob while concurrently holding Plaintiff's funds without reasonable cause.

48.    Plaintiff has been harmed by Klein's conduct described herein, including the breach of his fiduciary duties to Plaintiff by wrongfully representing he had legal authority to act on behalf of the Trust and collect rental income from Trust properties to third parties, including Holley Property Management Company, by wrongfully withholding Plaintiff's funds, by over-reporting distributions to Plaintiff, by paying himself a fiduciary fee despite not being a Trustee and the purpose of appointment of Special Administrator lapsing almost a decade ago, by failing to provide sufficient and accurate accountings, by failing to provide the proper requested documentation for taxing authorities, and by distributing funds in favor of Jacob while concurrently holding Plaintiff's funds without reasonable cause.

49.    By doing the acts alleged above, Klein breached his fiduciary duties of good faith, integrity, undivided service, competence, candor, diligence, loyalty, and full and fair disclosure toward Plaintiff by acting in his own interests, and in a manner adverse to Plaintiff's best interests.

50.    As a direct, proximate, and foreseeable result of the Klein's breach of his fiduciary duties, Plaintiff has suffered actual damages of not less than $780,000, together with interest on that amount as allowed by law.

///

**COMPLAINT**

51.     Plaintiff is informed and believe and thereon allege that the aforementioned conduct of Klein, was an intentional misrepresentation, deceit, or concealment of material facts known Klein, and was despicable conduct carried out in conscious disregard of his duties and obligations to Plaintiff. Thus, Plaintiff is entitled to recover exemplary and punitive damages against Klein in an amount according to proof at the time of trial.

52.     Plaintiff also seeks recovery of attorney fees and costs Klein on the grounds of tort of another.  Plaintiff has been required through the tort of another to act in the protection of their interests by bringing this action against Klein.  Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

## THIRD CAUSE OF ACTION

### (Conversion – Against All Defendants)

53.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 52, inclusive, above as if fully set forth herein.

54.     Plaintiff, as a 50% beneficiary of the Trust, the terms of which required distribution of the Trust Estate almost one decade ago, owned and had a right to possess the Plaintiff's share of the rental income held by Klein.

55.     Klein intentionally and substantially interfered with Plaintiff's property by taking possession of the Plaintiff's share of the rental income and by refusing to return the Plaintiff's share of the rental income after demand was made for return of the same.

56.     Plaintiff did not consent to Klein's receipt or retention of Plaintiff's share of the rental income.

57.     Plaintiff was harmed by Klein's receipt and retention of the Plaintiff's share of the rental income.

58.     Klein's conduct in receiving and refusing to return the Plaintiff's share of the rental income was a substantial factor in the harm caused to Plaintiff.

///

**COMPLAINT**

59.    Plaintiff has suffered actual damages in the amount of not less than $780,000, plus costs and prejudgment interest at the maximum legal rate provided by law.

60.    Klein's acts and the conduct of Klein was engaged with oppression, malice, and/or fraud. Thus, Plaintiff is entitled to recover exemplary and punitive damages against Klein in an amount according to proof at the time of trial.

61.    Plaintiff also seeks recovery of attorney fees and costs against Klein on the grounds of tort of another.  Plaintiff has been required through the tort of another to act in the protection of their interests by bringing this action against Klein.  Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

## FOURTH CAUSE OF ACTION

### (Money Had and Received – Against All Defendants)

62.    Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 61, inclusive, above as if fully set forth herein.

63.    Klein received money in the form of the Plaintiff's share of the rental income.

64.    The Plaintiff's share of the rental income received by Klein was not used for the benefit of Plaintiff.

65.    Klein has not given the money received in the form of the Plaintiff's share of the rental income to Plaintiff.

66.    Plaintiff has suffered actual damages in the amount of not less than $780,000, plus costs and prejudgment interest at the maximum legal rate provided by law.

## FIFTH CAUSE OF ACTION

### (Unjust Enrichment– Against All Defendants)

67.    Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 66, inclusive, above as if fully set forth herein.

68.    Klein received the Plaintiff's share of the rental income from the Trust properties.

///

**COMPLAINT**

69.     Klein was not entitled to receive the Plaintiff's share of the rental income from the Trust properties.

70.     Klein's receipt of the Plaintiff's share of the rental income came at the expense of Plaintiff.

71.     Plaintiff has suffered actual damages in the amount of not less than $780,000, plus costs and prejudgment interest at the maximum legal rate provided by law.

## ACCOUNTING

72.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 71, inclusive, above as if fully set forth herein.

73.     Klein, as Special Administrator, as Agent under Power of Attorney, as an attorney, and as a CPA, was a fiduciary to Plaintiff.

74.     Plaintiff is unable to ascertain and has demanded a full accounting by Klein in order to determine the amount of Plaintiff's assets wrongfully held by Klein.

75.     Upon information and belief, Plaintiff does not have access to view the funds held by Klein since Plaintiff's assets are held in accounts titled in Klein's name or the in the Firm's name.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows:

### ON THE FIRST CAUSE OF ACTION

1.     Damages in an amount of not less than $780,000;

2.     Interest at the legal rate from and after a date to be proven at trial;

3.     Exemplary and punitive damages in an amount according to proof;

4.     Attorney fees and costs in an amount according to proof;

5.     An accounting of all funds received, disbursed, and held by Klein;

### ON THE SECOND CAUSE OF ACTION

6.     Damages in an amount of not less than $780,000;

14

**COMPLAINT**

7.      Interest at the legal rate from and after a date to be proven at trial;

8.      Exemplary and punitive damages in an amount according to proof;

9.      Attorney fees and costs in an amount according to proof;

10.     An accounting of all funds received, disbursed, and held by Klein;

## ON THE THIRD CAUSE OF ACTION

11.     Damages in an amount of not less than $780,000;

12.     Interest at the legal rate from and after a date to be proven at trial;

13.     Exemplary and punitive damages in an amount according to proof;

14.     Attorney fees and costs in an amount according to proof;

## ON THE FOURTH CAUSE OF ACTION

15.     Damages in an amount of not less than $780,000;

16.     Interest at the legal rate in an amount according to proof;

## ON THE FIFTH CAUSE OF ACTION

17.     Damages in an amount of not less than $780,000;

18.     Interest at the legal rate from and after a date to be proven at trial;

## ON THE SIXTH CAUSE OF ACTION

19.     An accounting of all funds received, disbursed, and held by Klein;

## ON ALL CAUSES OF ACTION

20.     For general damages to be proven at trial;

21.     For consequential damages to be proven at trial;

22.     For interest as allowed by law;

23.     For restitution as allowed by law;

///

///

///

///

///

15

**COMPLAINT**

24.     For reasonable attorney fees and costs; and

25.     For such other and further relief as the Court deems just and proper.

Dated:  August 27, 2021                          SHUMAKER MALLORY, LLP

By:  _____
     CLARISSE YOUNG SHUMAKER
     BRETT J. WASSERMAN
     Attorneys for Plaintiff
     ADI VENDRIGER, as Co-Trustee and
     individually

16

**COMPLAINT**

# EXHIBIT A

ADI <vendriger.prop@gmail.com>
To Jaffe Hilda <hijaffe1@verizon.net>, מדריגר ברברה <vendriger@hotmas.com>
Amendment to the amendment- AdYa

February 16 2017  11:06 AM

2 Attachments, 429 KB

ARENDMENT TO FIRST AMENDMENT DECLARATION OF TRUST
(OSCAR and TANIA WENDRIGER a.k.a.
VENDRIGER FAMILY TRUST)


THE FIRST AMENDMENT DECLARATION OF TRUST executed on
the 7th day of May 1990, by OSCAR WENDRIGER and TANIA
WENDRIGER as Trustors, and OSCAR WENDRIGER and TANIA
WENDRIGER as Trustees, is hereby amended by said Trustors and
Trustees pursuant to the right to amend reserved under the
original DECLARATION OF TRUST.  This amendment shall replace
in pertinent part any provisions to the contrary in the
original DECLARATION OF TRUST, and shall otherwise amend said
DECLARATION OF TRUST as follows:

1.   Upon the death of the Surviving Trustor, the
Trustee shall distribute the Trust Estate as follows:

(a)   Each grandchild of the Trustors shall
receive the sum of Ten Thousand Dollars ($10,000), increased
six percent (6%) per annum, cumulatively;

(b)   The remainder of the Trust Estate shall
be divided one-half (1/2) to JACOB VENDRIGER, son of the
Trustors, and one-half (1/2) to ADI VENDRIGER, son of the
Trustors, per stirpes.


IN WITNESS WHEREOF, the Original Trustor and Trustee
have executed this Amendment to the DECLARATION OF TRUST this
12'th day of March , 1991.


TRUSTOR:                     TRUSTEE:


_____      _____
OSCAR WENDRIGER              OSCAR WENDRIGER


_____      _____
TANIA WENDRIGER             TANIA WENDRIGER

STATE OF CALIFORNIA    )
                       )ss.
COUNTY OF LOS ANGELES )

On _March 18_____, 1993, before me, the undersigned, a
Notary Public, in and for said State, personally appeared
_Oscar Hernandez MEIR Guadarra_____, personally known
to me or proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed to the
within instrument, and acknowledged that he/she/they executed
the same.

                   WITNESS my hand and official seal this _18th_
day of _March_____, 1993

                        _Frances Douglas Harris_____
                        Notary Public in and for said
                        County and State

OFFICIAL SEAL
Frances Douglas Harris
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
My comm. expires APR 11, 1995

## FIRST AMENDMENT TRUST
### WENDRIGER FAMILY

THIS FIRST AMENDED TRUST AGREEMENT replaces the prior Trust
Agreement dated July 10, 1986, and is entered into by and
between OSCAR WENDRIGER and TANIA WENDRIGER, "Husband" and
"Wife," respectively, of the County of Los Angeles, in the
State of California, hereinafter called "Trustors," and OSCAR
WENDRIGER and TANIA WENDRIGER of the State of California,
hereinafter referred to as "Cotrustees."

In construing this Trust the following definitions shall
apply:

1.   Whenever used herein the expression "Trustors" shall
refer to OSCAR WENDRIGER and TANIA WENDRIGER.
2.   Whenever used herein the expression "Original
Cotrustees" shall refer to OSCAR WENDRIGER and TANIA
WENDRIGER.
3.   Whenever used herein the expression "Original Cotrustee"
shall refer to either OSCAR WENDRIGER or TANIA WENDRIGER.
4.   Whenever used herein the expression "Successor Trustee"
shall refer to JACOB a.k.a. YAACOV VENDRIGER and ADI
VENDRIGER.
5.   Whenever used herein the expression "Alternate Trustee"
shall refer to the surviving Successor Trustee and SHLOMO
MENKES.
6.   Whenever used herein the expression "Trustee" shall be
deemed a reference to whomever is serving as Trustee, or
Cotrustees, whether original, successor or alternate.
7.   The initial primary beneficiaries of this Trust Estate
shall be OSCAR WENDRIGER and TANIA WENDRIGER.
8.   The effective date of this Trust Agreement shall be its
date of execution.

I.   TRUST PROPERTY

     A.  Original Trust Estate

          The Trustors acknowledge that they have transferred
to the Trustee without consideration the sum of ten dollars,
along with the following:

PERSONAL PROPERTY:  All tangible and intangible held personal
property that the Trustors, either separately or as community
property, now own or do hereafter acquire, including but not

limited to household furniture, furnishings, and utensils;
equipment and appliances; art; clothing; cash; personal
effects; bank accounts; registered and unregistered
securities; notes receivable; security interests and liens;
interests in partnerships, firms, businesses (including
inventory), and corporations; contract rights; and amounts
due from employers; excluding, however, any and all such
property subject to any (other) trust or power of
appointment; and any property subject to a pledge, security
agreement or legal restriction on transfer.

All such property owned by Trustors shall be considered and
treated as community property unless listed as separate
property in this Trust on Schedule B (the separate property
of husband, if any), and in Schedule C (the separate property
of wife, if any).

All such property, which is hereby delivered by the Trustors
to the Trustee, shall be held, administered, and distributed
by the Trustee as hereinafter set forth.

### B.  Additions to Trust Estate

Additional property may be added to the Trust Estate
at any time by the Trustors or either of them, or by any
person or persons, by inter vivos or testamentary transfer.
All such original and additional property is referred to
herein collectively as the Trust Estate, and shall be held,
managed and distributed as herein provided.

#### 1.  Employee Benefit Plans

In the event that any designation of the Trustee
of this Trust as Beneficiary in any employee benefit plan in
which the Trustors may have an interest shall be ineffectual
in whole or in part, the Trustors specifically request that
the committee, or other group having authority to do so under
any such plans, select the Trustee of the Trust as
beneficiary of such plans to the maximum extent possible.
The Trustee may elect the mode of payment which, in the
Trustee's discretion, appears to be the most advantageous
option available to the Trust and/or its then current income,
Beneficiaries in terms of income tax, estate and inheritance
tax, and/or investment return considerations, based on the
Trustee's evaluation of the facts and circumstances relevant
to such considerations as they exist at the time the Trustee
makes such election.  Further, the Trustee may, predicated
upon the foregoing consideration, elect in writing not to
treat the death benefits as a lump sum distribution for
income tax purposes and thus exclude the maximum allowed from

estate taxes.  An election by a Trustee in good faith in the
exercise of the discretionary power conferred upon it shall
be final and binding upon all persons whomsoever and shall be
a full acquittance and discharge to the Trustee, and the
Trustee shall not be liable to any person by reason of its
exercise of such discretionary power.

## C.  Character of Property Unchanged

The property comprising the original corpus of the
Trust Estate is community property of the Trustors, except as
otherwise specifically indicated. During the joint lives of
the Trustors, any property transferred to this Trust shall
retain its original character.  All such property shall be
assumed to be community property unless otherwise
specifically indicated in writing by the Trustors.  In the
event of revocation, the Trustee shall distribute such
property to the Trustors based on the same property rights
they had prior to transfer to the Trust. Any and all gifts
made by the Trustors of Trust assets shall constitute a
revocation by the Trustors as to such property, and,
therefore, a gift by any Trustor having an interest in that
property would also constitute a revocation.

## II.  ORIGINAL AND SUCCESSOR TRUSTEES

### A.  Original Cotrustees

The Original Cotrustees under this Declaration of
Trust shall be as hereinabove defined, to serve with all of
the obligation, powers, and authority contained within this
Trust Agreement.

### B.  Death or Resignation of Original Cotrustee

In the event of the death of either Original
Cotrustee, or if for any reason whatsoever he or she ceases
to serve as Cotrustee hereunder, the Trustors nominate and
appoint the remaining Cotrustee to serve as Trustee hereunder
without the approval of any Court.

In the event of the death of both Original
Cotrustees, or if for any reason whatsoever both cease to
serve as Trustee hereunder, the Trustors nominate and appoint
the Successor Trustee as hereinabove defined to serve as
Trustee hereunder without the approval of any Court.  In the
event that the abovenamed Successor Trustee consists of more
than one person then if for any reason whatsoever any of the
aforesaid do not serve or cease to serve as Cotrustee
hereunder, the Trustors nominate and appoint whomsoever of

REVOCABLE LIVING TRUST Page 3

the aforenamed shall be available to serve as Successor
Trustee hereunder without the approval of any court.

In the event of the death of the Successor Trustee
as hereinabove defined, or if for any reason whatsoever he,
she, or they cease(s) to serve or for any reason refuses to
serve as Trustee hereunder, the Trustors nominate and appoint
the designated Alternate Trustee to serve as Trustee
hereunder without the approval of any Court.  In the event
that the Alternate Trustee consists of more than one person
then if for any reason whatsoever any of the aforesaid do not
serve or cease to serve as Cotrustee hereunder, the Trustors
nominate and appoint whomsoever of the aforenamed shall be
available to serve as Successor Trustee hereunder without the
approval of any court.

In the event of the death of the Original Trustors
hereof, and in the event that neither the aforenamed
Successor Trustee or the aforementioned Alternate Trustee is
available then the majority of then living beneficiaries
hereunder who are issue of the Original Trustors hereof shall
have the right to select another Successor Trustee hereunder
to serve without approval of any court.  In the case of minor
beneficiaries, then any guardian of such a beneficiary shall
act on behalf of such minor beneficiary to select a Successor
Trustee.

C.  Discharge or Resignation of Trustee

The Trustors shall have the right to discharge the
Trustee of any Trust hereunder.  Discharge of a Trustee shall
be by delivery to such Trustee of thirty (30) days' written
notice of discharge, accompanied by the name of the intended
Successor Trustee.

D.  Duties and Responsibilities of Successor Trustees

No Successor Trustee shall have any responsibility
for any acts or omissions of any prior Trustee and no duty to
audit or investigate the accounts or administration of any
such Trustee; nor, unless in writing requested to do so by a
person having a present or future beneficial interest under a
Trust hereunder, any duty to take action to obtain redress
for breach of trust.  It is the intent of the Original
Trustors that the Successor Trustee shall not be required to
obtain Court approval, discharge, or pursue any other Court
proceedings at the request of income Beneficiaries without
first attempting to obtain releases from the majority of the
adult income Beneficiaries with such release and discharge
being completely adequate as to all responsibilities

REVOCABLE LIVING TRUST Page 4

incumbent upon the Trustee.  However, under any
circumstances, any claim or action against any previous
Trustee must in any event be asserted or filed by any
Beneficiary within one (1) year after the appointment of a
Successor Trustee.

    E.  Bond

        No Trustee shall be required to post bond or any
other security for the faithful performance of any duties or
obligations of such office.

## III. INITIAL TRUST

        The Trustee shall hold, manage, invest, and reinvest the
Trust Estate and shall collect the income thereof, and shall,
upon demand of the Trustors, pay to the Trustors during their
joint lives all community net income of the Trust Estate and
shall pay to each Trustor all separate net income from his or
her respective share of the Trust Estate.  In the event that
the Trustors do not demand payment of the net income of
community property, or if either of the Trustors fails to
demand distribution of separate property net income, then the
Trustee may at his discretion accumulate such income, and
such income will become property of the Trust Estate.

        The Trustee shall further pay community property
principal, up to the whole thereof, to the Trustors upon
written request.  Upon the written request of the Trustor who
transferred separate estate property to the Trust, the
Trustee shall pay so much of the principal of the separate
estate established by such Trustor, up to the whole thereof,
as he or she shall request.

## IV.  REVOCATION AND AMENDMENT

        Either of the Trustors, during their joint lives, may at
any time and upon successive occasions, revoke this Trust in
whole or in part.  The Trustors may jointly alter or amend
any of its provisions.  Any Amendment may be similarly
cancelled or amended.  If a Trustor is incompetent, such
power to revoke, alter or amend the Trust may be exercised by
the guardian or conservator at the direction of a Court of
competent jurisdiction where such court approval is required.

        From and after the death of either of the Original
Trustors, this Agreement, insofar as it relates to the
SURVIVOR'S TRUST, may be revoked or amended at any time and
from time to time by the Survivor delivering written notice
of revocation or amendment to the Trustee; provided, however,

REVOCABLE LIVING TRUST Page 5

that the duties and liabilities of the Trustee cannot be
increased without its consent.  In the event of any
revocation, the revoking party or parties shall indemnify the
Trustee in a manner satisfactory to it against liabilities
lawfully incurred by the Trustee in the conduct of its
office.  If a Survivor is incompetent, such power to revoke,
alter or amend the Trust may be exercised by the guardian or
conservator at the direction of a Court of competent
jurisdiction.   Except as hereinabove provided, this
Agreement, and the Trusts evidenced hereby, are irrevocable
and shall not be subject to amendment.

V.   DISTRIBUTIONS ON DEATH OF EITHER TRUSTOR

     Upon the death of the Original Trustor hereof whose
death shall occur first, the Trustee shall make any such
distributions of specific gifts which are itemized and listed
on Schedule D (the Specific Gift Distribution Schedule) which
is attached hereto and incorporated herein by reference.
With reference to any specific gifts made in accordance with
Schedule D, whether referenced in this Article V or Article
VI below, the following shall apply.  In the event that a
Beneficiary does not survive the decedent spouse, any gift to
the deceased Beneficiary shall lapse and pass as part of the
rest and residue of the Trust Estate.

     Thereafter, the Trustee shall divide the Trust Estate,
including all property received as a result of the Decedent's
death, into two parts, each part to be administered as a
separate Trust to be known respectively as the "SURVIVOR'S
TRUST," and the "DECEDENT'S TRUST."  Reference hereafter to
the "DECEDENT" shall refer to either of the Trustors whose
death shall first occur, and reference to the "SURVIVOR"
shall refer to the Surviving Trustor.

     A.  Decedent's Trust

     The DECEDENT'S TRUST shall include an amount equal
to the lesser of the equivalent Estate Tax Exemption in
effect during the year of the death of the decedent, or one-
half (1/2) of the Trust Estate.

     As a method of illustration of specific amounts for
the Estate Tax Exemption, the Trustee is directed to

REVOCABLE LIVING TRUST Page 6

distribute to the DECEDENT'S TRUST an amount equal, in each
year, to the amounts as indicated below.

| DATE OF DEATH | EQUIVALENT ESTATE TAX EXEMPTION |
|---|---|
| 1990 and after | $600,000 |

In determining the equivalent Estate Tax Exemption,
the Trustee is to take into consideration any lifetime gifts
made which may decrease the actual amount available to
transfer to the DECEDENT'S TRUST.  The Trustors acknowledge
that their intent is that the amount to be distributed to the
DECEDENT'S TRUST shall not exceed an amount which will
provide for a zero (0) tax upon the death of the first of the
Trustors to die.

   B.  Survivor's Trust

      All of the rest and residue of the assets of the
Trust Estate shall be allocated to the SURVIVOR'S TRUST.

   C.  Other Transfers

      In the event that property is received by the
Trustee, either by Inter Vivos or Testamentary Transfer, and
directions are contained in the Instrument of Transfer for
allocation to or between the SURVIVOR'S TRUST and the
DECEDENT'S TRUST, then the Trustee shall make allocation in
accordance with such directions, anything to the contrary
notwithstanding.  In the event no specific instructions are
given as to allocation, such property as is received from a
source other than the Trustors (or either of them), shall be
placed in the SURVIVOR'S TRUST.

VI.  SURVIVOR'S TRUST

   A.  Distribution of Income

      All the net income shall be distributed in
convenient installments not less frequently than quarterly to
the Survivor during his or her lifetime.

   B.  Powers of Appointment of Principal

      During his or her lifetime, the Survivor shall have
a general power to appoint the principal and any
undistributed income of the SURVIVOR'S TRUST or any part
thereof, to himself or herself, or to any person or persons.

REVOCABLE LIVING TRUST Page 7

Upon the death of the Survivor, he or she shall have the power to appoint the principal and any undistributed income of the SURVIVOR'S TRUST or any part thereof to his or her Estate or any person or persons, or to the DECEDENT'S TRUST. Such power of appointment shall be exercised only by means of written directions executed by the Survivor and delivered to the Trustee during the lifetime of the Survivor. If the Survivor executes and delivers more than one such written direction to the Trustee, the last one shall control unless, by its context, the Survivor clearly indicates otherwise.

## C. Death of Survivor

Upon the death of the Survivor, the SURVIVOR'S TRUST shall terminate. The Trustee shall distribute the Trust Estate in accordance with and to the extent provided by the Survivor's exercise of his or her power of appointment. All specific gifts itemized and listed on Schedule D hereof to be distributed by the Trustee at that time shall then be distributed by the Trustee. Any part of the Trust Estate with respect to which the Survivor shall not have exercised his or her power of appointment shall become a part of the trust established under Article VIII hereof, and be administered by the Trustee, in accordance with the provisions set forth herein.

## VII. DECEDENT'S TRUST

### A. Distribution of Income

All of the net income shall be distributed in convenient installments, not less frequently than quarterly, to the Survivor during his or her lifetime.

### B. Distribution of Principal

The Trustee shall also distribute principal to the Survivor, which in the sole discretion of the Trustee is necessary to provide proper support for the Survivor as defined under Article IX and Article XXII. A.2.

### C. Survivor's Power of Appointment

The Survivor, during his or her lifetime, shall have the power to appoint the principal and undistributed income of the Trust Estate, or any part thereof, to himself or to herself, or to any person or persons; however, the Survivor may exercise said power of appointment during any calendar year only to the extent of Five Thousand Dollars ($5,000) or

REVOCABLE LIVING TRUST Page 8

five percent (5%) of the aggregate value of the Trust Estate,
whichever amount shall be greater. Any such power of
appointment shall not be construed to be cumulative and if
not exercised in any calendar year, such power shall be
terminated as to that year. Such power of appointment shall
be exercised only by means of written direction executed by
the Survivor and delivered to the Trustee during the lifetime
of the Survivor. If the Survivor executes and delivers more
than one such written direction to the Trustee, the last one
shall control unless, by its context, the Survivor clearly
indicates otherwise.

### D.  Death of Survivor

Upon the death of the Survivor, the DECEDENT'S TRUST
shall terminate, and shall become a part of the Trust created
under Article VIII, and be administered in accordance with
the provisions of said Article.

## VIII. CHILDREN'S TRUST

### A.  Income and Principal Prior to Division

Prior to division of the Children's Trust as
provided for in Paragraph C hereinafter, the Trustee is
directed to add any undistributed income to the principal.

### B.  Advancements

#### 1.  Request for Advancements

Any Beneficiary of this Trust may, at any time,
and upon successive occasions, by written instrument filed
with the Trustee, request an advancement or advancements on
his or her ultimate anticipated share of the Children's
Trust. If, in its sole discretion, the Trustee determines
that the requested advancement or advancements will be used
for a worthy objective then the Trustee may make such
advancement or advancements in whole or in part from the
Beneficiary's share of the Trust. As used herein, the term
"worthy objectives" may include, but not be limited to, the
purchase of a home appropriate to the needs and circumstances
of the Beneficiary; the acquisition of a business interest in
keeping with the age, training and experience of the
Beneficiary, provided that such business interest is needed
for the support of the Beneficiary and his or her family, and
further provided that there is a reasonable probability of
success in the judgment of the Trustee; and the continuance
of the education of any Beneficiary on a full-time program in
an institution of higher learning either on an undergraduate

REVOCABLE LIVING TRUST Page 9

or graduate level or at a trade or vocational school, with expenses including, but not limited to, tuition, books, laboratory fees, room, board and a reasonable spending allowance. The Trustee shall incur no liability or obligation to any Beneficiary or any other person by an exercise, or nonexercise, in good faith of its discretion hereunder.

C.  Division of Children's Trust

1.  Time of Division

The Children's Trust shall be divided into shares immediately upon the death of the survivor of the Original Trustors.

2.  Terms of Division

The Trustee shall divide two-thirds of all of the assets then remaining in the Children's Trust, without making any adjustments for payments for support and maintenance for any Beneficiary as provided for under Article X, into equal shares with one share for each of the Trustors' then living children and one share for each deceased child of the Trustors who then has issue surviving. The sole children of the Trustors are YAACOV a.k.a. JACOB VENDRIGER and ADI VENDRIGER.

The Trustee shall divide the remaining one-third of the Trust Estate into as many shares as there are then living grandchildren. The share arising out of the existence of each grandchild shall be added to the share of the parent of such grandchild for the benefit of said parent.

The division shall be on a per stirpes basis, except that if none of the Trustors' children survive and if only grandchildren survive, the division into shares shall be on a per capita basis. The share of each deceased child shall be divided into proportionate smaller shares, or subshares, for each of such deceased child's then living issue. After the division of the assets into shares and subshares as provided above, the shares shall be distributed and/or held as hereinafter provided.

D.  Distribution and Administration of Children's Trust

The Trustee shall distribute the respective share or subshare to any Beneficiary who is a child of the Trustors immediately upon the death of the Survivor of the Trustors.

REVOCABLE LIVING TRUST Page 10

Trustee shall distribute the respective share or subshare to any Beneficiary who has attained the age of thirty years old. For any Beneficiary who has not attained the age of 30, the following procedures shall govern.

Upon the division of the Children's Trust into shares and subshares and subsequent thereto; income from each share or subshare therefrom shall be paid not less than quarter-annually to or for the benefit of the respective Beneficiary. In addition to income, the Trustee shall distribute the principal from the respective share or subshare to the Beneficiary upon the Beneficiary's attaining or having attained the age of 30.

In the event a Beneficiary of the Trustors dies with funds remaining in his or her share or subshare, then such funds shall be paid to his or her then living issue, or if there be no living issue, then to the remaining Beneficiaries of the Trustors, as and in the manner provided for under "Terms of Division."

In the event a Beneficiary elects to have the Trustee continue to administer the distributed portion of the share or subshare, to which such Beneficiary is entitled as hereinbefore provided, or any part thereof, the Trustee may continue to administer such Beneficiary's interest as a separate Trust share in accordance with the terms of Article X and XI hereof, subject to the continuing right of such Beneficiary to withdraw at any time the amounts of said separate Trust share. If a Beneficiary dies with funds remaining in his or her separate Trust share, such funds shall be paid as he or she designated by testamentary or inter vivos disposition, and failing same, to his or her estate. Upon the termination of any share, if any assets are distributable to a person who is not yet entitled to distribution, then the distributable share of such Beneficiary shall at once vest in him or her, but the Trustee in its sole discretion, may continue to hold such distributable share until said Beneficiary is entitled to distribution, using so much of the income and/or principal thereof as may be necessary in the opinion of the Trustee for the support of such beneficiary and paying to such Beneficiary the then remaining assets of his or her share upon his or her becoming entitled to distribution. If the said Beneficiary dies prior to such time as he or she would be entitled to distribution, all the remaining assets of such individual's interest in the Trust share otherwise payable to him or her shall be paid to the estate of such Beneficiary.

REVOCABLE LIVING TRUST Page 11

E.   Provision for Grandchildren

If, prior to the termination of the Children's Trust, any of the Trustors' children are deceased with issue surviving, then the Trustee may, in its discretion, support such issue of deceased children as though they were children of the Trustors.

F.   Termination

1.   No Issue Surviving

In the event that no issue of the Trustors survive the Trustors' deaths, or survive the distribution of the Trust Estate, then and in that event all of the assets that would have been a part of the Trust Estate shall be distributed in the following manner: any assets of the Trust Estate which for any reason cannot be distributed in this manner shall be distributed fifty percent to the otherwise lawful heirs free of trust and fifty percent to charitable facilities in Israel for the benefit of injured soldiers.

2.   Discretionary Termination

Any time that a Trust or Trust share created under this Agreement has, in the judgment of the Trustee, a value so low that the expenses of maintaining the Trust cannot be reasonably justified, the Trustee may, in its discretion, but is not required to, terminate such Trust or Trust share.  In case of such termination, the Trustee shall distribute forthwith the share so terminated to the primary Beneficiaries thereof.

3.   Mandatory Termination

The Trust Estate shall terminate in any and all events not later than twenty-one (21) years after the death of the last surviving Beneficiary herein named who is living at the time of death of the Decedent, it being the intent of the Trustors that this Trust Agreement shall be interpreted so as not to violate the Rule Against Perpetuities.  The Trust Estate, upon such termination, shall be distributed to the Beneficiaries for whom, at that time, a share or subshare has been set aside, each such Beneficiary to receive his or her share or subshare and any accumulations thereon.

IX.   SUPPORT AND MAINTENANCE

If the Trustee of any Trust hereunder deems the net income payable from such Trust not sufficient to support any

REVOCABLE LIVING TRUST Page 12

Beneficiary entitled to receive such support pursuant to the terms of this Trust Agreement, then the Trustee may, as often as it deems necessary, pay to or apply for the use and benefit of such Beneficiary such part of the principal of such Trust, up to and including the whole thereof, as the Trustee in its discretion believes necessary for the support of such Beneficiary.

### A. Standards

In exercising its discretion hereunder, the Trustee shall take into consideration the income, earning capacity, resources and other sources of receipt of the Beneficiary, together with any other factor which the Trustee may deem pertinent, including the accustomed manner of living of such Beneficiary, but need not require the exhaustion of personal resources as a condition for making disbursements under the authority of this paragraph. The judgment of the Trustee as to the propriety and amount of all such payments shall be conclusive.

Notwithstanding any provision to the contrary, the Trustee shall not distribute principal except within the standards of Internal Revenue Code 2041.

### B. Evidence of Need

The Trustee may, in its discretion, require as a condition precedent to the distribution of any Trust assets for support or advancement, that the Beneficiary furnish evidence of his or her financial condition, income, earning capacity and assets, in form and content satisfactory to the Trustee. The Trustee shall be entitled to rely upon the written certification of such Beneficiary or the guardian of such Beneficiary as to the nature and extent of such Beneficiary's needs for support, and the inadequacy of such Beneficiary's resources apart from the Trust. The Trustee shall not be required to make further inquiry as to the authenticity of the facts so certified.

### C. Preferences

In exercising its discretion hereunder, the Trustee is to consider the needs of the Survivor for support as the primary purpose of the Trusts during his or her lifetime, even if the satisfaction of such needs requires invasion of the entire Trust Estate.

After the death of the Survivor, the support of the children shall be paramount to the conservation of the Trust

REVOCABLE LIVING TRUST Page 13

Estate for the benefit of those who will be entitled to take
it on termination.  The Trustee shall, in exercising the
discretion given herein for the benefit of the children or
their issue, do so in such a manner as will encourage thrift,
industry, and self-reliance to the maximum extent practicable
by the respective Beneficiaries, and discourage extravagance
or indolence on the part of any such Beneficiary.

### D.  Guardian's and Conservator's Expenditures

The Trustors do not desire that the guardian or
Conservator of any Beneficiary should incur personal expense
for the support of such Beneficiary.  The Trustee shall
disburse funds from such Beneficiary's Trust Estate for the
purpose of reimbursing such guardian or conservator for
reasonable expenses incurred in accommodation of such
Beneficiary.

## X.   POWERS OF TRUSTEE

The Trustee shall have the following powers, duties and
discretions in addition to those otherwise granted herein or
by law, and except as elsewhere herein specifically
restricted.

### A.  Retention

The Trustee shall have the power to retain, without
liability for loss or depreciation resulting from such
retention, the original assets and all other property
hereafter transferred, devised or bequeathed to the Trustee,
although such property may not be of the character prescribed
by law or by the terms of this instrument for the investment
of other Trust assets; and, although it represents a large
percentage or all of the Trust Estate, this said original
property may accordingly be held as a permanent investment.

The Trustee shall have the power, with respect to
any business interest that may become a part of the Trust
Estate, whether organized as a sole proprietorship,
partnership, or corporation, and upon such terms for such
time and in such manner as it may deem advisable, to hold,
retain and continue to operate such business solely at the
risk of the Trust Estate and without liability on the part of
the Trustee for any losses resulting therefrom; to dissolve,
liquidate, or sell at such time and upon such terms as the
Trustee may deem advisable; to incorporate such business and
hold the stock as an asset of the Trust Estate; to use the
general assets of the Trust for the purpose of the business;
to borrow money for business purposes and pledge or encumber

REVOCABLE LIVING TRUST Page 14

the assets of the business or the other assets of the Trust
Estate to secure the loan; to employ such officers, managers,
employees or agents as it may deem advisable in the
management of such business, including electing directors,
officers, or employees of the Trustee to take part in the
management of such business as directors or officers.

### B. General Property Powers

The Trustee shall have all such powers and is
authorized to do all such acts, take all such proceedings and
exercise all such rights and privileges in the management of
the Trust Estate as if the absolute owner thereof, including,
without limiting the generality of the terms, the right to
manage, control, sell, convey, exchange, partition, assign,
divide, subdivide, improve, or repair; to grant options and
to sell upon deferred payments; to lease for terms within or
extending beyond the duration of the Trust concerned for any
purpose, including the exploration for and removal of oil,
gas and other minerals; to enter into community oil leases,
pooling and unitization agreements; to create restrictions,
easements and other servitudes; to compromise, arbitrate or
otherwise adjust claims in favor of or against the Trust; to
institute, compromise and defend actions and proceedings at
the expense of the Trust Estate; and to carry such insurance
as the Trustee may deem advisable.

### C. Powers Regarding Securities

The Trustee shall have, respecting securities, all
the rights, powers and privileges of an owner, including the
right to vote stock, give proxies, pay assessments and other
sums deemed by the Trustee to be necessary for the protection
of the Trust Estate; to participate in voting trusts, pooling
agreements, foreclosures, reorganizations, consolidations,
mergers and liquidations, and in connection therewith, to
deposit securities with and transfer title to any protective
or other committee under such terms as the Trustee may deem
advisable; to exercise or sell stock subscription or
conversion rights; to open an account with a brokerage firm
of the choosing of the Trustee in the Trustee's name, in its
own behalf for the purpose of purchasing and selling of all
kinds of securities and authorizing such brokerage firm to
act upon any orders, including margin orders, options, both
covered and uncovered, instructions with respect to such
accounts and/or the delivery of securities or money therefrom
and received from said Trustee; and to retain as an
investment any securities or other property received through
the exercise of any of the foregoing powers. The Trustee is
further authorized to sign, deliver and/or receive any

REVOCABLE LIVING TRUST Page 15

documents necessary to carry out the powers contained within this paragraph.

### D. Exercise Stock Options

The Trustee is expressly authorized in the Trustee's sole discretion to exercise any option to purchase stock under any stock option purchase plan in which any Decedent Beneficiary is a participant or may hold such option rights to the extent that any such option rights may be exercised by the Trustee even though the stock involved is stock of a corporation which may be serving as corporate Trustee hereunder, regardless of the amount of such stock or the percentage of the Trust Estate which may be invested in such stock before or after any purchase under such option.

### E. Investment Powers

#### 1. General

The Trustee has the power to invest and reinvest principal and income, to purchase or acquire therewith every kind of property, real, personal or mixed, and every kind of investment, specifically including, but not by way of limitation, shares in one or more mutual funds, in any Common Trust Funds administered by the Trustee, corporate obligations of every kind, and stock, preferred or common, which persons of prudence and discretion and intelligence acquire for their own accounts.

The Trustee is further authorized to buy, sell and trade in securities of any nature (including short sales) on margin, and for such purposes may maintain and operate margin accounts with brokers, and may pledge any securities held or purchased by him with such brokers as security for loans and advances made to the Trustee.

#### 2. Life Insurance and Annuities

The Trustee is authorized in the Trustee's discretion to maintain and/or purchase policies of life insurance and/or annuities on the life or for the benefit of any Trust Beneficiaries and to hold and pay for the same as an investment and asset of the Trustee, at any time and upon successive occasions, the premiums to be charged against income or principal, as the Trustee shall determine.

The Trustee shall have the following powers, duties and discretions with respect to policies of life insurance held as a part of the Trust Estate:

REVOCABLE LIVING TRUST   Page 16

a.   The Trustee may pay premiums, assessments or other charges with respect to such policies together with all other charges upon such policies or otherwise required to preserve them as binding contracts, but shall be under no duty to do so.

b.   In the event that the Trustee intends not to pay any premium, assessment or other charge with respect to any policy held by it, or otherwise intends to cancel, convert or substantially modify any such policy, it shall first give the insured, or the guardian of the person of an insured under disability, at least fifteen (15) days' advance written notice of its intention to take such action.

c.   Any amounts received by the Trustee with respect to any policy as a dividend shall be treated as principal.

d.   Upon the receipt of proof of death of any person whose life is insured for the benefit of any Trust hereunder, or upon maturity of any policy payable to a Trustee prior to the death of the insured, the Trustee shall collect all sums payable with respect thereto and shall thereafter hold such sums as principal of the respective Trust Estate, except that any interest paid by the insurer for a period subsequent to maturity shall be considered as income.

e.   The Trustee may accept any payments due it under any settlement arrangement made before or after the death of the insured and may exercise any rights available to it under such arrangement.

f.   The Trustee may compromise, arbitrate or otherwise adjust claims upon any policies, and may, but shall not be required to exercise any settlement options available under such policies.  The receipt of the Trustee to the insurer shall be a full discharge and the insurer is not required to see to the application of the proceeds.

F.   Determination of Income and Principal

The Trustee shall have the power and the authority to determine income and principal, and how receipts and disbursements, including the fees of the Trustee, shall be credited, charged or apportioned as between income and principal; however, all such determination shall be made in accordance with the law of the state of the situs of the Trust and the decision and the accounts of the Trustee in

REVOCABLE LIVING TRUST   Page 17

accordance with said provisions shall be binding on all
persons in interest.

Notwithstanding the foregoing, the Trustee shall:
(1) allocate to principal all dividends or other payments
made by any corporation or mutual investment company that are
designated by the company as a distribution of capital gains;
(2) where a premium has been paid or a discount received in
connection with the purchase of a bond, amortize such premium
or discount by making an appropriate charge or credit to
income as the case may be; and (3) charge income from time to
time with a reasonable reserve for (a) depreciation of all
income-producing depreciable real or personal property, and
capital improvements and extraordinary repairs on income-
producing property; (b) depletion of all depletable natural
resources; and (c) all intangible property having a limited
economic life.  Such allocations and charges need not be
made, however, if written consents are obtained from all
income Beneficiaries and remaindermen, vested or contingent,
living and competent to act.

G.  Authority to Borrow and Encumber

Trustee shall have the power to borrow money for any
Trust purpose upon such terms and conditions as the Trustee
may deem proper, and to obligate the Trust Estate for
repayment and to encumber the Trust Estate or any of its
property by mortgage, deed of trust, pledge or otherwise,
using such procedure to consumate the transaction as the
Trustee may deem advisable.

In addition to the power to encumber property for a
loan bring made to the Trust, the Trustee is specifically
authorized and empowered to obligate, hypothecate and
encumber the estate by mortgage, deed of trust, pledge or
otherwise, or whatever form the Trustee deems appropriate, or
to act as a third party guarantor to guarantee private
borrowings of the Trustors or either of them during their
joint lifetime.  Upon the death of the decedent, such
guarantee may only be made from the Survivor's Trust.

H.  Loans

1.  To Trust

The Trustee shall have the power to, in the
Trustee's discretion, advance funds to any Trust herein
created for any Trust purpose, such advances with interest at
current rates to be a first lien on and be repaid out of
principal and as an expense of the Trust; and to reimburse

REVOCABLE LIVING TRUST   Page 18

the Trustee from principal or accumulated income for any loss
or expense incurred by reason of the Trustee's ownership or
holding of any property in this Trust.

    2.  To Beneficiaries

        The Trustee may, at any time and upon successive
occasions, loan such sums to the Beneficiaries or any of them
as the Trustee shall deem advisable and in the best interest
of the Beneficiaries, such loan or loans, if made, to bear
interest at the prevailing rate and to be unsecured or
secured, as the Trustee may, in the Trustee's discretion,
direct.  Provided, however, that the Trustee shall have wide
discretion in the making or denial of any such loan, and the
Trustee's judgment in the matter shall be conclusive and
binding on any Beneficiary requesting any such loan.

    I.  Distributions to or for Minor or Incompetent

        If at any time any Beneficiary entitled to receive
income and/or principal hereunder shall be a minor or an
incompetent or a person whom the Trustee deems to be unable,
wisely or properly, to handle funds if paid to him or her
directly, the Trustee may make any such payments, in the
Trustee's discretion, in any one or more, or any combination,
of the following ways:

        1.  Directly to such Beneficiary, or

        2.  To the natural guardian or the legally appointed
guardian, conservator or other fiduciary of the person or
estate of such Beneficiary, or

        3.  To any person or organization furnishing support
for such Beneficiary, or

        4.  By the Trustee retaining the principal and
making expenditures directly for the support of such
Beneficiary.

        The Trustee shall not be required to see to the
application of any funds so paid or applied, and the receipt
of such payee if disbursed for such purpose in the best
judgment of the Trustee shall be full acquittance to the
Trustee.  The decision of the Trustee as to direct payments
or application of funds in the manner herein prescribed shall
be conclusive and binding upon all parties in interest if
made in good faith.  The Trustee is requested to make all
such disbursements in a way calculated to dispense with the
necessity of guardianship proceedings.


                REVOCABLE LIVING TRUST  Page 19

The Trustee may, in its sole and absolute discretion, require such reports and take such steps as it may deem requisite to assure and enforce the due application of such money to the purposes aforesaid.

### J.   Disbursement for Funeral and Last Illness

The Trustee may pay for the last illness, funeral and burial expenses of either Trustor or of any other Beneficiary of this Trust unless adequate provision shall have been made therefor through his or her Probate Estate or otherwise.

### K.   Notification of Trustee

Until the Trustee shall receive written notice of any birth, marriage, death, or other event upon which the right to payment from this Trust may depend, the Trustee shall incur no liability for disbursements or distributions made or omitted in good faith.

### L.   Division of Trusts

In making the distributions to any Trust or share created under this Agreement, the judgment of the Trustee concerning the valuation of assets distributed shall be binding and conclusive upon all Beneficiaries.  The Trustee may distribute the shares to the various Trusts or to Beneficiaries by making distribution in cash, or in kind, or partly in cash and partly in kind, or in undivided interests, in such manner as the Trustee, in its sole and absolute discretion, deems advisable.  The Trustee may sell such property as it deems necessary to make any such division or distribution.  The Trustee shall not be required to make physical division of the Trust property, except when necessary for the purposes of distribution, but may, in the Trustee's discretion, maintain and keep the assets of any separate trusts in one or more consolidated trust funds, and as to each consolidated trust fund, the division into various shares comprising such trust fund used to be made only upon the Trustee's books of account, in which each separate trust shall be allotted its proportional share of the principal and income of the consolidated fund and shall be charged with its proportionate part of expenses thereof.

### M.   Provision for Taxes

Upon the death of either Trustor or of any other Beneficiary, any estate, inheritance, succession or other

REVOCABLE LIVING TRUST   Page 20

death taxes, duties, charges or assessments, together with
interest, penalties costs, Trustee's compensation and
attorney's fees which shall become due by reason of the Trust
Estate or any interest therein being includable in the Estate
of either Trustor, or of such other Beneficiary, for such tax
purposes, may be paid from the Trust Estate by the Trustee,
in its discretion, unless other adequate provision shall have
been made therefore.  Any such payments shall be charged to
the principal of the Trust Estate.  The Trustee may make such
payments directly, or to the Executor or other fiduciary of
the Trustors or such other Beneficiary, and may rely upon the
written statement of such fiduciary as to the amount and
propriety of such taxes, interest, penalties and other costs.
The decision of the Trustee as to any such payments shall be
conclusive and binding upon all parties interested in this
Trust or such Estate.  If the Trust Estate shall be then
insufficient or if it be then terminated the Trustee shall be
reimbursed by the persons to whom the Trust Estate shall have
been distributed, to the extent of the amount received by
each distributee.  The Trustee, before making any
distribution of either income or principal, may accordingly
require a refunding agreement or may withhold distribution
pending determination or release of any tax lien.

        The Trustee is authorized to acquire by purchase,
exchange or otherwise, property, real, personal or mixed.,
from the Executor or Administrator of the Estate of any
Beneficiary of this Trust, even though such property may not
be of a character prescribed by law or by the terms of the
Trust instrument for the investment of Trust funds, and
although the acquisition of such property may result in a
large percentage or all of the Trust Estate being invested in
one class of property.  The Trustee is expressly authorized
to retain the property so acquired so long as it shall deem
this advisable and to make secured or unsecured loans to the
Executor or Administrator of such Estate upon such terms as
the Trustee shall deem advisable, such procedures being
authorized to the extent that they do not adversely affect or
diminish the marital deduction available to the Estate.  Such
purchases or loans shall be without liability to the Trustee
for loss resulting to the Trust Estate therefrom.  In any
dealings with the fiduciary of the Estate, the Trustee may
rely upon the statement of such fiduciary as to all material
facts.

        Any portion of the Trust Estate which was received
from any qualified plan as described in Section 2039 of the
Internal Revenue Code of 1954, as amended, or any subsequent
like or similar law, may not be used for any purpose
described in this Article, which would result in inclusion of

REVOCABLE LIVING TRUST   Page 21

said funds in the taxable Federal Estate of the Trustor so long as other sources of funds are available.

If the Trustee considers that any distribution from a Trust hereunder other than pursuant to a power to withdraw or appoint is a taxable distribution subject to a generation-skipping tax payable by the distributee, the Trustee shall augment the distribution by an amount which the Trustee estimates to be sufficient to pay the tax and shall charge the same against the Trust to which the tax relates. If the Trustee considers that any termination of an interest in or power over Trust property hereunder is a taxable termination subject to a generation-skipping tax, the Trustee shall pay the tax from the Trust property to which the tax relates, without adjustment of the relative interests of the Beneficiaries. If the tax is imposed in part by reason of Trust property hereunder and in part by reason of other property, the Trustee shall pay that portion thereof which the value of the Trust property bears to the total property taxed, taking into consideration deductions, exemptions, and other factors which the Trustee deems pertinent.

N.  Payment of Trust Expenses

The Trustee shall have the authority to pay all costs, charges and expenses of the Trust Estate, together with reasonable compensation for the Trustee's services hereunder, including services in whole or partial distribution of the Trust Estate; and to employ and compensate from the Trust Estate such agents, assistants and attorneys as in the Trustee's judgment shall be necessary to protect and manage the Trust property.

O.  Estate Settlement

The Trustee is hereby requested to direct any legal questions or requirements concerning settlement of this Trust Estate to Stewart Levin, the Trustor's legal counsel.

P.  Right of Trustee to Probate Trust Assets

Notwithstanding any other provisions of this Trust Agreement, the Trustee may, in its sole discretion, direct the Executor of the Will of either or both of the Trustors, to subject up to and including all Trust assets to the jurisdiction of the Probate Court as if no living transfers had been made to the Trust.

REVOCABLE LIVING TRUST  Page 22

Q.   Power of Cotrustees To Act Independently

Notwithstanding any other provision to the contrary, ths Trustors specifically authorize only either of the original Cotrustees during their joint lives and while serving as Cotrustees, to act independently of the other and have the authority to perform all powers and acts as granted under this Declaration of Trust, except as affects an interest in real property, by example, but not limited thereto, to sell, transfer, assign, mortgage, hypothecate or otherwise encumber the real property of the Trust Estate, which will necessitate the concurrence of both Original Cotrustees as long as both are alive.

Notwithstanding any other provision to the contrary, the Trustors specifically do not authorize any Successor Cotrustees during their joint lives and while serving as Cotrustees, to act independently of the other with respect to performance of any and all powers and acts as granted under this Declaration of Trust.

R.   Commence or Defend Litigation

The Trustee may commence or defend such litigation with respect to the Trust or any property of the Trust Estate as the Trustee may deem advisable at the expense of the Trust.

S.   Compromise Claims

The Trustee may compromise or otherwise adjust any claims or litigation against or in favor of the Trust.

T.   Adjustment for Tax Consequences

The Trustee shall have the power, in the Trustee's absolute discretion, to take any action and to make any election to minimize the tax liabilities of this Trust and its Beneficiaries and to allocate the benefits among the various Beneficiaries and to make adjustments in the rights of any Beneficiaries or between the income and principal accounts, to compensate for the consequence of any tax election or any investment or administrative decision that the Trustee believes has had the effect of directly or indirectly preferring one Beneficiary or group of Beneficiaries over others.

REVOCABLE LIVING TRUST   Page 23

U. Budget Income and Expenses

The Trustee shall have the power to budget the
estimated annual income and expenses of the Trust or Trust
share in such manner as to equalize as far as possible
periodic income payments to Beneficiaries.

V. Interest

The Trustee shall not pay interest on any
distributions required to be made in the Trust Agreement.

XI. REPLACEMENT OF TRUSTEE

During the time that either of the Original Trustees are
acting as a Trustee, his or her capacity to continue to so
function as a Trustee may be terminated by the written
concurrence of the medical physician who is overseeing the
general health of that Trustee and the remaining Original
Cotrustee or the Successor Trustee who would next be
nominated and appointed to serve as Trustee hereunder.  In
the event that these two designated parties are in agreement,
that one of the Original Trustees or both of them should be
removed as a Trustee, they should deliver their
recommendation to the Successor Trustee who would next be
nominated and appointed to serve as Trustee hereunder, who
shall have the authority to then assume full responsibility
as Trustee of this Trust.  In the event that said Successor
Trustee is unavailable then Alternate Trustee named
hereinabove shall provide all functions of said Successor
Trustee hereunder and shall serve as Trustee.

XII. GENERAL PROVISIONS

The administration of any Trust provided for herein
shall be subject to the following general provisions.

A. Supplementary Definitions

1. Children and Issue

The words "children" and "issue" as used herein
shall include natural children and issue of children, and not
legally adopted children and the lawful issue of legally
adopted children.  The word "living" shall include unborn
persons in the persons in the period of gestation.

REVOCABLE LIVING TRUST   Page 24

2. Support

The term "support" as used herein shall include proper support, maintenance, medical care, and education, including private grade, secondary or high schools, private or public institutions of higher learning at both undergraduate and graduate levels, professional education, vocational and trade schools, depending upon the abilities and ambitions of the respective Beneficiary.

B. Annual Accounting

The Trustee shall render an annual accounting to the Beneficiary or Beneficiaries of the Trust not more than one hundred twenty (120) days following the close of the fiscal year of the Trust.

C. Spendthrift Clause

The interests of the Beneficiaries in the principal and/or income of the Trust shall not be subject to the claim or claims of their creditors or others, nor to legal process, and may not be voluntarily or involuntarily alienated or encumbered.

D. Partial Invalidity

If any provision of this instrument is void, invalid or unenforceable, the remaining provisions shall nevertheless be valid and carried into effect. If any Trust herein established exceeds the longest permissible period, it shall persist in its period for the longest period permissible, then terminate.

E. Headings

The headings in this instrument are for convenience only and are not part of the text.

F. Situs of Trust

The situs of the Trust Estate shall be the state of California. The situs of the Trust Estate may be transferred from California to such other jurisdiction as the majority of the income Beneficiaries may designate, however, only upon written notice given to the Trustee.

REVOCABLE LIVING TRUST   Page 25

G. Simultaneous Death

If there be no sufficient evidence that the Trustors died otherwise than simultaneously, then for the purposes of this Agreement and the tax effect of this Agreement, it shall be presumed that the Decedent shall be the Husband and the Survivor shall be the Wife.

H. Counterparts

The Agreement may be executed in any number of counterparts and each shall constitute an original of one and the same instrument.

I. Application to Probate Court

If any disputes arise as to interpretation of this Agreement, or there is need to obtain Court approval of any accounting or any interpretation in regard to this Agreement, the Trustors direct the Trustee to make application to the Probate Court, it being the intent of the Trustors that the Probate Court shall not assume continuing jurisdiction, except as may be required by law.

J. Number and Gender

As used in this Trust Agreement, the masculine, feminine and neuter gender, and the plural and singular number shall each be deemed to include the others when the context so indicates.

K. Trust Shares or Subshares

For purposes of simplicity, the Trustors have used in this Trust Agreement the terms "shares" and "subshares." The Trustors intend, however, that each share or subshare shall be a separate Trust.

L. No Contest Provision

If any beneficiary in any manner, directly or indirectly, contests this instrument or any of its provisions, any share or interest in the trust given to that contesting beneficiary under this instrument is revoked and shall be diposed of as if that contesting beneficiary had predeceased the Trustors.

This is to witness that We, the undersigned Trustors, respectively, have read the provisions of this Trust Agreement and understand the provisions therein, and it

REVOCABLE LIVING TRUST    Page 26



is our intent to enter into this Trust Agreement in accordance with Community Property law, allowing a Husband and Wife to enter into a contract with each other regarding community property.

IN WITNESS WHEREOF, the provisions of this Declaration of Trust shall bind OSCAR WENDRIGER and TANIA WENDRIGER as Trustors, and OSCAR WENDRIGER and TANIA WENDRIGER as Cotrustees; Successor Trustees assuming the role of Trustee hereunder, and the Beneficiaries of this Trust, as well as their successors and assigns.

Dated at Los Angeles, California, this 7 day of May, 1990.

TRUSTORS:

_Oscar Wendriger_
OSCAR WENDRIGER

_Tania Wendriger_
TANIA WENDRIGER

COTRUSTEES:

_Oscar Wendriger_
OSCAR WENDRIGER

_Tania Wendriger_
TANIA WENDRIGER

REVOCABLE LIVING TRUST   Page 27

STATE OF CALIFORNIA )
)
COUNTY OF LOS ANGELES )

On _____, 1990, before me, the
undersigned, a Notary Public in and for said County and
State, personally appeared OSCAR WENDRIGER and TANIA
WENDRIGER, personally known to me or proved to me on the
basis of satisfactory evidence to be the person(s) whose
name(s) is/are subscribed to the within instrument and
acknowledged that he/she/they executed the same.

WITNESS my hand and official seal, this ___ day of
_____, 1990.

Notary Public in and for
said County and State

OFFICIAL SEAL
Frances Dauphin Shapiro
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My comm. expires AUG 27, 1993

REVOCABLE LIVING TRUST   Page 28

# EXHIBIT B

1

# EXHIBIT 2

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF ERRATA

1   Hon. Glen M. Reiser (Ret.)
    JAMS
2   555 West 5th Street 32nd Floor
3   Los Angeles, CA 90013
    Tel: 213-253-9796
4
    COURT-ORDERED §639 REFEREE
5   ON SETTLEMENT OF ACCOUNT

6

7

8                 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

                            **COUNTY OF LOS ANGELES**
9

10  IN THE MATTER OF                    Case No.: BP136769[1]
11  THE FRANKLIN HENRY MENLO
    IRREVOCABLE TRUST                   Assigned to LASC Dept. 3
12  ESTABLISHED                         Judge: Hon. Ana Maria Luna
    MARCH 1, 1983
13                                      JAMS Reference # 1220070187
14  AND CONSOLIDATED MENLO
    FAMILY TRUST CASES
15                                      **REPORT AND RECOMMENDATION OF THE
                                        COURT-APPOINTED REFEREE ON
16                                      EXAMINATION AND ADJUDICATION OF
                                        THE TRUSTEE'S FIRST, SECOND, AND
17                                      THIRD ACCOUNTINGS ON EACH OF THE
                                        TWENTY-FOUR TRUSTS AT ISSUE FOR
18                                      THE TRUST PERIODS SEPTEMBER 10, 1996-
                                        JUNE 30, 2013, JULY 1, 2013-DECEMBER 31,
19                                      2016 AND JANUARY 1, 2017-SEPTEMBER 30,
                                        2018**
20
                                        **[Code Civ. Proc. §639]**
21
                                          Referee: Hon. Glen M. Reiser (Ret.)
22

23

24

25

26  [1] Consolidated with LASC Case Nos BP139977; BP139978; BP139999; BP140000; BP140001;
    BP140002; BP140003; BP140004; BP140005; BP140007; BP140008; BP140009; BP140010; BP140011;
27  BP140012; BP140013; BP140014; BP140015; BP140016; BP140017; BP140018; BP140019; BP140020;
    and BP154676.
28
                REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
                                            1

## MATTERS APPLICABLE TO ALL THREE REFEREE'S REPORTS and STATEMENT OF THE CASE

### The Children's Trusts

Sam Menlo ("Sam") and Vera Menlo ("Vera") raised five children: Madeline, Judith, Franklin, Deborah and Norine. In 1983, irrevocable trusts were created for the four oldest children and in 1985, an irrevocable trust was created for Norine.

The named grantor in each of the Children's Trusts is its beneficiary, not Sam or Vera. Under the trust terms, Frank's irrevocable trust, in which he is the named grantor, is to be distributed 25% of trust principal on his 30th birthday (March 1, 1990), 33% on his 35rd birthday (March 1, 1995), and the balance on his 40th birthday (March 1, 2000). Each of the four daughters' irrevocable trusts, in which each of them are the named grantor, is to be distributed 50% of trust principal on their respective 40th birthdays (extending from August 9, 1998 [Madelyn] to April 25, 2006 [Norine]), and 50% on their respective 50th birthdays (extending from August 9, 2008 [Madelyn] to April 25, 2016 [Norine].)[2]

Each of the Children's Trust agreements vests the Trustee with the management rights of an "absolute owner." Each of the Children's Trust agreements exculpates the Trustee from liability for any actions or failures to act of conducted "reasonably and in good faith." Each of the trust agreements authorizes an annual trustee fee of .05% of the sum of trust assets under management and that year's trust income.

The originally appointed co-trustees of the Children's Trusts died long ago. After a brief period of time in which family members, including Frank, served as a co-trustee, **on September 10, 1996**, Leslie Klein ("Klein"), a Beverly Hills estate planning attorney and certified public accountant, accepted his role as sole successor trustee of the Children's Trusts.

---

[2] Judith died on June 15, 2011. Accountings of Judith's trust have not been presented to the Referee nor are they part of the assigned reference determinations.

**The Grandchildrens' Trusts.**

Sam and Vera, both now deceased, had 36 grandchildren at the time of Vera's recent passing. In 1985, several months after the creation of Norine's trust, Sam and Vera had ten grandchildren: Dov Lipchitz, Rochelle Lipchitz, Avi Lipchitz, Faye Lipchitz, Asher Frankel, Yeshaya Frankel, Moishe Frankel, Mordechai Deutsch, Zev Deutsch and Jonathan Menlo. Sam and Vera established an irrevocable trust for each of them in October 1985.

Ten additional grandchildren were born between 1986 and 1993: Jeremy Winter, Michael Winter, Amanda Winter, Daniel Winter, Rochelle Deutsch, Abraham Deutsch, Samuel Deutsch, Esther Deutsch and Tanya Menlo. Sam and Vera established an irrevocable trust for each of them on various dates between November 1986 and October 1997.[3]

A trust also appears to have been created by Sam and Vera in December 2002 in favor of Jonathan Lifschutz, the husband of Sam and Vera's granddaughter, Rochelle Lipchitz. Accountings have been submitted by Klein with respect to Jonathan Lifschutz' trust, and have been the subject of objections included within the reference to the undersigned. The Jonathan Lifschutz Trust dated December 26, 2002 is intended to be included within the term "Grandchildren's Trusts."

Unlike the Children's Trusts, Sam and Vera were the named co-grantors of each of the Grandchildren's Trusts. Though virtually identical to the Children's' Trusts with respect to the breadth of trustee powers, exculpation from good faith actions or failures, and authorization for trustee fees, each of the Grandchildren's Trusts specifically articulates the Trustee's duty to account to each of the beneficiaries "annually or in other reasonable increments."

---

[3] The remaining sixteen grandchildren, all of whom were born after 1993, each have separate trusts managed by Klein; however, none of those remaining trusts are the subject of the instant accounting reference. The term "Grandchildren's Trusts" as used in this Report and Recommendation, therefore, is intended to exclude the trusts of any and all grandchildren born after 1993.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

3

The distributive calculus of the Children's Trusts is replicated in the Grandchildren's Trusts; *i.e.*, 25% principal distribution to the males at age 30, 33% at age 35, the balance at age 40, with 50% principal distribution to the females at age 40 and the balance at age 50.[4]

As with the Children's Trusts, Klein agreed to serve as sole successor trustee of each of the Grandchildren's' Trusts effective September 10, 1996, with the exception of the two subject trusts created after that date, Daniel Winter and Jonathan Lifschutz, as to which Klein accepted the appointment as sole trustee upon trust creation in October 20, 1997 and December 26, 2002, respectively.[5]

**The Accounting Petitions in Their Statutory and Procedural Contexts.**

In 1990, six years before Klein assumed trusteeship of the Children's Trusts and the Grandchildren's Trusts, the California Legislature repealed and then reenacted the California Probate Code. (Stats. 1990, ch.79.) [6] One of the provisions repealed and reenacted is Probate Code §16062(a), which stated at the time of its enactment in 1986:

> "Except as provided in Section 16064, **the trustee shall account at least annually**, at the termination of the trust, and upon a change of trustees, to each beneficiary to whom income or principal is required or authorized in the trustee's discretion to be currently distributed." (Emphasis added.) [7]

---

[4] Klein testified at trial that he has never had any intention of distributing under these terms.

[5] Klein testified at trial that, in addition to being the named Trustee, he was the draftsman of these later trusts.

[6] Section 16062 was added by 1986 Cal. Stat. ch. 820 § 40 and amended by 1987 Cal. Stat. ch. 128 § 13. Subdivision (a) superseded parts of subdivisions (b) and (c) of former Probate Code Section 1120.1a and parts of former Probate Code Sections 1121 and 1138.1(a)(5) (provisions repealed by 1986 Cal. Stat. ch. 820 § 31). The requirement of an annual account is drawn from the statute formerly applicable to testamentary trusts created before July 1, 1977. See former Prob. Code § 1120.1a (repealed by 1986 Cal. Stat. ch. 820 § 31). [California Law Revision Commission, Recommendation Proposing New Probate Code, December 1989.]

The code section preface was amended to state "Except as otherwise provided in this section and in Section 16064" in 1983 when additional code subsections, none of which are applicable here, were added to §16062. [Stats. 1993 ch 293 §6.5.]

[7] Probate Code §16064 permits the language of a trust agreement to waive an accounting, and separately authorizes a beneficiary to waive an account in writing. None of the Children's Trusts or the Grandchildren's Trusts contain language waiving an account. The Grandchildren's Trusts require an

From the time of Klein's acceptance of 22 trusteeships in 1996, one in 1997, and one in 2002, until ordered by the Court in 2013, Klein never once accounted to any of the 24 beneficiaries.

While Klein did from time-to-time forward institutional brokerage account statements to one or more of the beneficiaries, the brokerage assets represent only a fraction of the scope of the Children's and Grandchildren's Trusts, which trusts were specifically designed to subsidize and ultimately distribute tens of millions of dollars in life insurance policy benefits taken on the joint lives of Sam and Vera Menlo. Insurance policy information, loans between the trusts, and loans and withdrawals taken by Klein utilizing the accounts and insurance policies as collateral, for example, were not provided.

Probate Code §16063(a), enacted in 1997 (Stats 1997 ch 724 §26), clarifies that a trustee's required annual account *must* include a statement of receipts and disbursements of annual principal and income; a statement of the current assets and liabilities of the trust; the trustee's compensation for the last complete fiscal year; the agents hired by the trustee, their relationships to the trustee and their compensation for the last complete fiscal year; a statement that the beneficiary may petition the court under Probate Code §17200 to review the accounting and the acts of the trustee; and a statement of the three-year limitations period to bring an action after receipt of the account. Klein did none of these things beyond periodically forwarding selected banking/brokerage statements.

On September 18, 2012, nearly ten years ago, Franklin Menlo filed a petition in BP136679 attempting to file a single action on behalf of numerous Menlo trust beneficiaries against Klein, seeking Klein's removal as trustee, demanding an accounting and requesting surcharge. Upon a verified October 24, 2012 "preliminary" objection from Klein, *inter alia*, that

---

accounting "annually or in other reasonable increments," thereby providing the trustee with slightly more flexibility in the timing of those accountings than with respect to the Children's Trusts, which contain no accounting language whatsoever, thereby defaulting to the requisite annual requirement of Probate Code §16064. No evidence was submitted that any of the 24 Children's or Grandchildren's Trust beneficiaries ever waived an accounting in writing or otherwise.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

5

a single action involving multiple trusts would be "procedurally impermissible," the Menlo children and grandchildren filed 24 separate verified petitions filed with the Superior Court on March 22, 2013 [see respective case nos. at fn. 1, *ante*].

In their verified petitions, the 24 litigating Menlo children and grandchildren each petitioned to remove Klein as their trustee and for an accounting and surcharge.[8] Each verified petition alleges, at ¶ 11:

> "Respondent Klein, as Trustee of the [Name of Beneficiary] Trust, has violated the duty owed to Petitioner as beneficiary of the Trust, in that he has failed and refuses to provide an accounting for the Trust as required by law (California Probate Code §16060 et seq., §16062, §17200 et seq.), notwithstanding written and oral demands from Petitioner for such an accounting commencing in 2011. Klein has never produced an accounting in the entire 17 years he has been Trustee of the Trust. The Trust does not waive accounting."

Each petition attaches, as exhibits, written accounting demands previously submitted to Klein.

On September 18, 2013, in each of the 24 cases, Klein filed a verified first account and report of trustee and petition for approval. Klein began each of those accounting periods not in 1996 when he accepted trusteeship of the 22 of the 24 trusts in issue and/or at the time Klein began to manage trust assets, but on seemingly random dates between February 1, 2003 and April 13, 2009.[9]

---

[8] On May 22, 2013, the Hon. Roy Paul determined each of the 24 trust petitions to be "related" cases. On December 20, 2013, the Hon. David J. Cowen ruled that discovery across the related cases would apply to all of the Menlo Trust cases and would not need to be separately propounded. All 24 actions were consolidated.

Across the 24 separate cases and the three accountings in each case being litigated, the breadth of the collective register of actions is formidable. In the "lead" case BP136769, there are 1600 documents on file, consisting of many hundreds of party submissions and minute orders spanning a decade.

[9] Despite trusteeship since 1996 and many thousands of transactional activities across all 24 Children's Trusts and Grandchildren's Trusts at issue, the "opening" dates utilized in Klein's "first" and "supplemental" first accounting are as follows:
May 18, 2009 -- Abraham Deutsch
April 13, 2009 -- Jonathan Lifschultz

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

6

Each of the 24 Menlo family beneficiaries filed objections to Klein's account on November 14, 2013.

By formal order filed in the "lead" case on December 20, 2013, then-Commissioner David J. Cowan determined Klein's accountings to be inadequate, specifically directing the trustee to file with the Court a supplemental account containing "a complete accounting" of all transactions made by Klein as trustee, including withdrawals of all funds for loans, investments and purchases, all deposits of funds, and any lines of credit opened utilizing each trust for collateral; a complete accounting with respect to every trust-owned life insurance policy including premiums paid, sources of premium funds, a listing of all loans and cash advances against each policy, and a complete listing of any repayments; a complete accounting of all life insurance policy funds, including loans, utilized by Klein "in part or whole for his own purposes;" a listing of dates, amounts and lending institutions associated with Klein's personal lines of credit utilizing the resources of the trusts or any of its insurance policies; a listing of draws against Klein's personal lines of credit and repayments utilizing trust assets; a complete accounting of all funds provided to Klein by Menlo family members for purposes of subsidizing trust insurance policies or for any other purpose; all business reasons for allowing trust insurance policies to lapse; "[a ]complete and accurate account of the present fair market value of all assets of the Trust," including trust insurance policies; all fees taken by Klein with respect to the trusts,

---

February 27, 2009 -- Rachel Deutsch, Samuel Deutsch, Deborah Deutsch, Zev Deutsch, Esther Deutsch and Mordecai Deutsch
July 23, 2008 -- Franklin Menlo and Tanya Menlo
January 1, 2008 -- Jonathan Menlo
May 23, 2006 -- Rochelle Lipchutz, Yeshia Frankel and Asher Frankel
May 22, 2006 -- Madelein Lipscuitz
May 19, 2006 -- Moise Frankel, Avi Lipchutz, Faye Lipchutz and Dov Lipchutz
February 1, 2003 -- Michael Winter, Daniel Winter, Jeremy Winter, Amanda Winter and Norine Winter

and any other information necessary to be fully compliant with Probate Code §16063 and §§ 1060 *et seq.*

Commissioner Cowan's order *required Klein's supplemental accounting include "the time period commencing when Leslie Klein first became trustee of the Trust,* to the present day." To the extent Klein was unable to comply with any portion of Commissioner Cowan's order, he was directed to provide a detailed explanation for such failure by January 30, 2014.

Klein filed a verified supplement to each of his 24 verified first amended accounts on January 30, 2014, adding additional financial information *but continuing to commence his accounting periods on the same 2003-2009 dates* previously utilized. Klein's explanation in each of the verified supplements declares that "the Trustee does not currently have detailed financial records for the periods prior to the commencement date" of the respective trust accountings. As Klein goes on to declare, "This is because the Trustee sent such records to Sam Menlo, one of the two Trustors, per Sam Menlo's request. The Trustee did not keep copies of the records he sent at Sam Menlo's request."

Klein testified at trial before the undersigned that Sam Menlo continued to exclusively manage the trusts, despite Klein's sole trusteeship, until Mr. Menlo suffered a debilitating stroke in 2005.[10] Klein's claim that the 1996-2005 trust records were in files in the possession of Sam Menlo, however, could not be corroborated through any other witness or through documentary evidence. Klein also provided no credible explanation as to why all but five of Klein's 24 trust accountings have opening account dates *after* 2005.

Declarations in opposition to Klein's first amended and supplemental accountings over the 24 trusts were filed by the respective Menlo beneficiaries on June 30, 2014. Klein submitted a verified reply on August 1, 2014.

---

[10] This date was contested by Sam Menlo's son, Franklin ("Frank"), who testified that the cerebral hemmorhages rendering Sam Menlo incompetent occurred in 2001 and 2002, at which time Frank took over management of his father's businesses.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

8

On July 14, 2015, over opposition, the Hon. Maria E. Stratton granted the Menlo petitioners' applications to amend their pending petitions in order to name Les Klein & Associates, a Professional Law Corporation ("LKA") as an additional respondent. After a demurrer filed by LKA was granted with leave to amend, on March 24, 2016, the Menlo petitioners filed a second amendment to their September 18, 2013 accounting, removal and surcharge petition. Once a further demurrer filed by LKA was granted with leave to amend, on September 30, 2016, petitioners filed a third amendment to their petitions, again adding LKA as a party respondent. After LKA's successful motion to strike petitioners' third amendment, petitioners filed a fourth amendment on January 25, 2017.[11] LKA filed its answer to the respective petitions on February 21, 2017.

The various Menlo Trust principal distribution dates, as noted at the outset, were based upon the respective age and gender of each beneficiary. As of 2016, many of those dates had passed without a single distribution to any Menlo beneficiary, with the exception of Norine Winter ("Norine"). In March 2016, principal distributions were requested by the Menlo beneficiaries [see factual recitation and analysis in *Menlo v. Klein* (July 20, 2018), case B281058, 2nd Appellate District, Division 3.] As now also contended at trial (see *infra*), Klein claimed that Sam Menlo, who was no longer competent in 2016, had dictated oral instructions to Klein not to distribute, despite the express terms of the trust instruments. As summarized by the Court of Appeal:

> "Although Klein insisted he was simply following Sam's orders, the beneficiaries observed that Klein did not produce a single document corroborating Sam's oral instructions. Klein admitted he never attempted to amend the Menlo Trusts to reflect those instructions. Also, Sam's wife and seller] Vera was unaware that Klein had withheld distribution of funds ... ." [Slip opin., at 6.]

On May 23, 2016, Klein petitioned the trial court for instructions, requesting the ability to make principal distributions, but with the authority to withhold one-half of those distributions to

---

[11] At or about this time, Klein and LKA successfully moved to disqualify the law firm of Sheppard Mullin Richter & Hampton LLP from its representation of the Menlo beneficiaries.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

9

pay for his attorneys in the instant litigation, for continued trust administrative expenses and, *inter alia,* "reconciliation of amounts owned by any Trust to another Trust for money previously advanced." The Menlo beneficiaries contended:

> "[N]one of Klein's proffered reasons for withholding funds from the asset distributions was valid. First, the beneficiaries would pay their pro-rata share of the insurance premiums. They had already asked Klein for payment amounts. Second, they argued, the Trusts did not provide for creation of lines of credit, and *Klein had taken millions of dollars from the lines of credit for which he had not accounted.* Finally, they contended that Klein was not entitled to withhold 'anticipated future litigation expenses' from Trusts that by their terms had already called for a full or partial distribution to beneficiaries." (Italics added.) [Slip opin., at 7.]

On February 22, 2017, Judge Stratton denied Klein's petition for instructions. The Court of Appeal affirmed, determining that Klein, *inter alia*, was "seeking a prophylactic judicial declaration that withholding … funds from the distribution of the Trusts' principal would be in good faith and for the benefit of the Trusts so that Klein could not later be held liable for a surcharge." [Slip opin., at 12.] The California Supreme Court denied Klein's petition for review. Despite the Menlo beneficiaries' requests for principal distributions, despite the express language of the trust instruments, and despite Judge Stratton's ruling and the appellate court's affirmance, Klein to this day has failed to distribute any portion of trust principal to the litigating petitioning Menlo family members other than Norine.

The Menlo beneficiaries, based upon contentions that Klein "withdrew for his own benefit the cash value of the life insurance policies that were supposed to fund the trusts upon the death of Sam and Vera Menlo, used the trust assets to obtain lines of credit against which [Klein] borrowed money for his personal use and benefit, and misappropriated trust assets in order to pay down his personal lines of credit," issued document subpoenas for the production of Klein's personal and business records. Klein and LKA moved to quash delivery of the requested bank records. On March 13, 2017, after the issues were fully addressed before Judge Robert Letteau (Ret.) in his capacity as discovery referee, Judge Stratton approved Judge Letteau's recommendation denying Klein and LKA's motion to quash discovery.

Sam Menlo died on February 5, 2018.[12]

On April 19, 2018, Klein filed a verified Second Account and Report and Petition for Approval for each of the 24 accountings, covering the trust period June 30, 2013-December 31, 2016.[13] The Menlo petitioners filed objections to Klein's second account in the form of declarations on June 27, 2018. Klein filed verified supplements to his 24 second accountings on September 17, 2018. The Menlo petitioners submitted objections to the Klein supplements in the form of a declaration filed on November 1, 2018.

On August 3, 2018, Klein amended his response to the 24 initiating petitions to add additional affirmative defenses.

On November 27, 2018, Klein, joined by LKA, moved to dismiss all 24 initiating Menlo petitions on the procedural ground that the petitions had not been brought to trial within the statutory five years. On March 8, 2019, Judge [previously Commissioner] Cowan determined the motion to be without merit and, in light of a written stipulation by Klein not to rely on the dismissal statute, found Klein to be judicially estopped from taking such a position.[14]

On March 5, 2019, the Menlo petitioners filed a fifth amendment to their initiating pleadings, amending claims against LKA. In the fifth amendment, six Menlo trust beneficiaries -- Deborah Deutsch (through Rafael Deutsch), Madeline Lipschutz, Rochelle Lipchitz, Jonathan Lipschutz, Norine Menlo and Frank Menlo, across the approximately 16,000 Klein-initiated transactions, allege "by way of partial example only" that Klein wrote 23 specific checks totaling

---

[12] Children's Trust beneficiary Judith Frankel predeceased Sam and Vera Menlo and is not a party to this litigation. On June 27, 2015, daughter and Children's Trust beneficiary Deborah Deutsch passed away *pendente lite*. Ms. Deutsch's husband, Rafael Deutsch, formally substituted into the litigation on November 8, 2017 on Ms. Deutsch's behalf.]

[13] Despite the possible latitude of the accounting frequency language in the Grandchildren''s Trusts, the second accounting period of 3.5 years of once again contravenes the "at least annually" mandate of Probate Code §16064 as it relates to the Children's Trusts.

[14] After a denial of reconsideration on the motion to dismiss, Klein petitioned for writ of mandate with the Court of Appeal. (2nd Civil B298667.) Writ relief was denied by the Court of Appeal on September 5, 2019.

$623,500 on individual Trust accounts, including MCT, made payable to LKA. The six petitioners allege that LKA aided and abetted or otherwise conspired with Klein to misappropriate Trust assets. On April 8, 2019, LKA filed its objections and response.

On March 12, 2019, Judge Cowan issued a discovery order based upon representations of Klein and his counsel that Klein "took no part in preparation of the accountings [Klein] had filed." Rather, it was determined that each of Klein's verified accountings, which the undersigned is tasked to settle, were instead prepared by the accounting firm of White, Zuckerman, Warsavsky, Luna & Hunt ("WZ"). At deposition, Klein was directed by his counsel not to answer questions relating to WZ on the basis of attorney-client privilege and work product protection. At the same time, WZ itself was being shielded from discovery as a non-designated consultant of Klein's counsel. The Menlo petitioners claimed that they were being denied essential discovery.

In his 14-page ruling, Judge Cowan concluded in the context of verified accounting approval, Klein had impliedly waived attorney-client privilege with respect to WZ, and that work product protections were inapplicable where the beneficiaries' "understanding the transactions for which WZ prepared accountings… outweighs the interest of attorneys in not having to share their efforts with the opposing party." Klein was directed by Judge Cowan to provide all information and communications by, to and from WZ upon which the verified accounts were based, including those claimed to be privileged.[15]

On May 7, 2019, Klein filed an Amended Second Account and Report for each of the 24 trusts. The Menlo beneficiaries filed objections to the Amended Second Account through declarations filed on July 2, 2019.

---

[15] On April 16, 2019, in coordination with *amicus curiae* The Southern California Association of Defense Counsel, Klein sought appellate relief from Judge Cowan's ruling by petition for writ of mandate with request for immediate stay. (2nd Civil B296957). Writ relief was denied by the Court of Appeal on June 17, 2019. Klein's petition for review and application for stay in the California Supreme Court was denied on June 26, 2019.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

12

On October 25, 2019, as to each of the 24 trusts at issue, Klein filed a Third Account and Report and Petition for Approval for the trust period January 1, 2017-September 30, 2018.[16] On March 5, 2020, the Menlo beneficiaries filed objections to the third account in the form of declarations.

On November 4, 2019, Klein moved to dismiss every initiating petition except the petition of Franklin Menlo ("Frank"), on the theory that Frank was without authority to prosecute the remaining petitions under a written power of attorney delivered to Frank from the respective Menlo trust beneficiaries. In eight-page ruling issued by Judge Cowan on December 10, 2019, Klein's motion to dismiss was denied on a variety of grounds including, once again, judicial estoppel. No writ petition was filed.

Also on December 10, 2019, Judge Cowan granted Klein's motion to bifurcate issues to first "hold a separate trial for the review of each set of the Trustee's Accountings," with each accounting trial to "include any surcharge items resulting from the review of the Accountings at issue." Issues concerning surcharge for professional fees and liability for prejudgment interest were ordered addressed and resolved *after* the Court issues a statement of decision on the accountings.

On September 15, 2021, the Hon. Paul T. Suzuki issued an order appointing the undersigned as a Code of Civil Code Procedure §639(a)(1) referee to conduct consecutive trials on each of Klein's three accounting petitions to commence on or after December 1, 2021.

On November 16, 2021, Klein filed a verified second supplement to each of his first account approval petitions and a verified first supplement to each of his second account approval petitions. The following day, on November 17, 2021, Klein filed a verified first supplement to each of his third account approval petitions. Each of those petitions requests Trustee fees.

---

[16] While the trustee's accounting period intervals had been improving at the time of the third account, from 17 years (1996-2013) to 4½ years (6/30/13-12/31/16) to 1¾ years (1/1/17-9/30/18), the 21-month third accounting period continued to violate the 12-month accounting mandate of Probate Code §16064 as to the Children's Trusts. Currently, no accounting has been filed by Klein since the trust period ending September 30, 2018 (>3¾ years through June 30, 2022), though he continues to serve as trustee for each of the 24 trusts in question.

On January 4, 2022, Judge Suzuki issued an order prohibiting Klein from paying attorney fees and costs from loans taken against insurance policies held by the Menlo Trusts, from the lines of credit created by Klein pledged against institutional brokerage assets, or from the trusts of non-litigating Menlo family members. Judge Suzuki granted Klein's petition for attorney fees without prejudice to the Menlo beneficiaries' pending claims of surcharge.

Co-settlor Vera Menlo died on June 29, 2022, giving rise to tens of millions of dollars in payouts to the Menlo Trusts under the remaining "joint life" life insurance policies which the 24 Menlo Trusts had long subsidized through premium payments. On July 27, 2022, the Hon. Ana Maria Luna ordered that any lines of credit collateralized by the insurance policies were to be frozen.

**The Reference Hearing on the Settlement of Accounts**

Under Judge Suzuki's September 15, 2021 order for reference, the Referee's tasks are as follows:

"1. The Referee shall hold separate trials, to consider all factual and legal issues raised by the parties in connection with the Trustee's three separate acts of accountings, with certain exceptions, as further discussed and ordered below.

2. The Referee shall commence trial on December 1, 2021, or the close estate thereafter that is convenient to the Referee's calendar.

3. The Referee shall hold a separate trial for the review of each set of the Trustee's Accountings (e.g., the trial on the Trustee's First Accountings shall be conducted separate from the trial on the Trustee's Second Accountings). Except as stated below, each separate trial shall include any surcharge issues resulting from the review of the Accountings at issue.

4. Respondent Les Klein and Associates, Inc. shall be included as a respondent in all trial hearings. During the course of the trials on Trustee's accountings, the Referee shall also determine all issues raised in the Amendments to Petitions against Respondent Les Klein and Associates, Inc., including but not limited to all Probate Code Section 850 and 859 issues and all other damages mentioned in Petition's Fifth Amended Petition, except the cause of action for Removal of Trustee. Referee to designate breach cause of action for damages what the relief is.

5. The Referee shall conduct the trial of Trustee's Second Accountings immediately upon the conclusion of the Trustee's First Accountings. The Referee shall conduct the trial of the Trustee's Third Accountings immediately following the conclusion of the trial of Trustee's Second Accountings. The Referee shall have the ability to schedule reasonably brief breaks between trials, as may be necessary, with the overall goal of concluding the three trials in his brief a period of time as is convenient to the Referee's calendar.

6. Certain issues shall be excepted from the scope of trial by Referee and shall be reserved for the Trial Court, as follows: (i) surcharge of Trustee for professional fees, and (ii) liability of Trustee for prejudgment interest. These issues shall be addressed and determined by the Trial Court in a separate hearing following the trials by Referee. This separate hearing be conducted as a second phase of the trials on the accountings at issue, rather than as a completely separate trial.

7. Following the conclusion of the trial of Trustee's Third Accounting, the Referee shall report to the Court his reports concerning the trial of all three of Trustee's accountings, as specified in paragraph number 8.b.2 of [the order for reference]."

In addition to those directions, Judge Suzuki proposed dates for delivery of the Referee's reports, objections to those reports, and the ensuing trial court hearing dates, none of which delivery dates co and uld be accomplished given the schedules of the parties and the Referee, and the sheer magnitude of matters which needed to be heard and determined.

Hearing on the respective accountings was conducted in person in the presence of a certified shorthand reporter over the following days:

First Account: December 15, 2021, December 17, 2021, January 18, 2022, February 1, 2022, February 2, 2022, February 3, 2022, February 8, 2022, February 9, 2022, February 10, 2022, February 15, 2022, February 16, 2022, February 17, 2022, February 23, 2022, March 3, 2022, March 8, 2022 and March 9, 2022 [partial day].

Second account: March 9, 2022 [partial day], March 10, 2022, March 15, 2022 and March 22, 2022.

Third account: March 24, 2022, March 29, 2022 and March 30, 2022.

Petitioning trust beneficiaries Abraham Deutsch, Amanda Winter, Asher Frankel, Avi Lipschutz, Daniel Winter, Deborah Deutsch (by and through her husband, Rafael Deutsch), Dov Lipschutz, Esther Deutsch, Faye Lipschutz, Franklin Menlo, Jeremy Winter, Jonathan Lipschutz, Jonathan Menlo, Madalyn Lipschutz, Michael Winter, Moishe Frankel, Mordechai Deutsch,

Norine Winter, Rachel Deutsch, Rochelle Lipschutz, Samuel Deutsch, Tanya Menlo, Yeshia Frankel and Zev Deutsch appeared at the hearings through their attorney, Donald L. Saltzman of the Law Offices of Donald L. Saltzman. Trustee Les Klein appeared through his attorneys, Terence S. Nunan and Alan D. Weinfeld of Parker, Milliken, Clark, O'Hara and Samuelian. LKA appeared through its attorney, Candice K. Rogers of Hahn & Hahn LLP. All counsel appeared in person except Ms. Rogers, who attended each trial session remotely on the Zoom platform.

The following witnesses appeared either in person or remotely on the Zoom platform and were sworn and testified under oath:

First Account: Leslie Klein (Day 1-Day 3, Day 6-Day 9, Day 15), Dov Lipchutz (Day 4), Jeremy Winter (Day 4), Moishe Frankel (Day 4), Asher Frankel (Day 5), Faye Lipshutz (Day 5), Esther Deutsch (Day 5), Amanda Winter (Day 5)[17], Frank Menlo (Day 5-Day 6), Edward Wirtz (Day 10, Day 16), Duross O'Bryan  (Day 11-Day 14, Day 16), Jennifer Magnes (Day 12) and Irwin Lowi (Day 15).

Second Account: Leslie Klein (Day 1, Day 3-4), Duross O'Bryan  (Day 2-Day 3), Ed Wirtz (Day 2-Day 3) and Jennifer Magnes (Day 3).

Third Account: Leslie Klein (Day 1-Day 3), Duross O'Bryan  (Day 1, Day 3), Jennifer Magnes (Day 2), Ed Wirtz (Day 2) Steven Burgess (Day 2)[18] and Frank Menlo (Day 3).

Many hundreds if not thousands of pages of documentary exhibits beyond the accounts themselves were offered and received into evidence over the course of the respective trials.

---

[17] As to all Menlo family members called to testify other than Frank Menlo, the parties stipulated that their testimony during the trial of the Trustee's First Account should also be deemed testimony received during the trial of the Trustee's Second Account and the Trustee's Third Account.

[18] With respect to Mr. Burgess, the Trustee's life insurance expert, health issues precluded Mr. Burgess' attendance at the trial of the Trustee's First Account and the trial of the Trustee's Second Account. The Referee could not begin to deliberate on the First Account or the Second Account until after Mr. Burgess testified. Mr. Burgess testified during the hearing on the Third Account. The parties stipulated that Mr. Burgess' expert testimony during the Trustee's Third Account should be also deemed testimony received during the trial of the Trustee's First Account and the Trustee's Second Account.

After the final day of testimony, on May 25, 2022, Klein filed a consolidated closing brief across all three accountings. Also on May 25, 2022, LKA filed a motion for judgment.      On June 13, 2022, the Menlo petitioners filed a closing brief on the Trustee's First Account.      On June 16, 2022, the Menlo petitioners filed a closing brief on the Trustee's Second Account and a separate closing brief on the Trustee's Third Account. On July 1, 2022, Klein and LKA each submitted a consolidated reply to the Menlo petitioners' closing brief.[19]

**Klein and LKA's Post-Hearing Contentions**

In his consolidated post-hearing brief, Klein contends that the evidence established that the 24 Menlo trusts were "sabotaged" by Frank Menlo, who stopped paying Klein cash annual exemption gifts in 2012 which had been used, in part, to subsidize the various trust insurance policy payments. Klein references his own testimony that he followed the "wishes and instructions" of the Trusts' co-settlors, Sam and Vera Menlo, at all times.

While Klein did allow four large Phoenix Life Insurance policies to lapse at various points of his trusteeships, Klein contends, consistent with his expert's testimony, that he was acting prudently at the time. Claimant notes that the lapse of Phoenix policies had been recommended in 2011 by a commercial life underwriter, and that Phoenix itself had been on the verge of insolvency.[20]

Klein asks the Referee to disregard the testimony of the Menlo petitioners' forensic economic expert, Duross O'Bryan ("O'Bryan"), on the basis that O'Bryan's review was (a) "tainted" by attorney-client privilege due to the discovery authorized by Judge Cowan's March

---

[19] The Referee at the time of hearing had directed the parties to file single, simultaneous briefs to be filed on or before May 25, 2022. Due to health issues, the Menlo beneficiaries' counsel was unable to comply. Because of the unintended staggered briefing, the Referee authorized Klein and LKA to submit a reply, which they did.

[20] Klein testified that it was his standard practice as Trustee to allow all of the collective tens of millions of dollars of Menlo insurance policies to have their premiums remain unpaid until just before their respective lapse period was set to expire due to nonpayment. Evidence established that this had *not* been the practice prior to 2005, despite Klein's testimony to the contrary.

12, 2019 discovery order; and (b) based upon voluminous pages of institutional banking and insurance documents alleged to be hearsay in contravention of *People v. Sanchez* (2016) 63 Cal. 4th 665 ("*Sanchez*"). Klein further contends his fair trial rights were compromised as the Menlo petitioners filed their exhibit list late, and continued to update their exhibits throughout the hearings.

Klein argues that even if the Referee finds breach(es) of trust, the Menlo trust instruments expressly exculpate Klein from liability for all trust breaches committed "reasonably and in good faith." In this vein, Klein contends that irrespective of the written terms of the Children's Trusts and the Grandchildren's Trusts, he accepted the trusteeships with the understanding that he would do whatever was asked of him by co-settlor Sam Menlo. After Sam Menlo's stroke disabled Sam from involvement, Klein contends that he thereafter did whatever co-settlor Vera Menlo asked, including purchasing homes for a number of the Menlo trust beneficiaries, without regard to such beneficiary's right or entitlement under the respective trust instruments, or the balance in their accounts. Through a series of credit lines debited against the more robust Menlo Trusts, and through multiple loans amongst the various Menlo Trusts (with no corresponding ledgers or reconciliations), and with thousands of Trust transactions filtered through his attorney-client trust account,[21] Klein testified that he timely paid premiums on those Trust-owned insurance policies that he did not intend to lapse, while providing funds for home purchases by Menlo grandchildren as requested by Vera.

Other than a $750,000 sum which Klein paid himself from the Menlo Trusts in 2005, which Klein testified that Sam Menlo had verbally authorized him to withdraw as a retroactive

---

[21] Klein testified, and the record is unequivocal, that Klein ran literally thousands of Trust transactions, including cash from Frank Menlo intended for individual Trust beneficiary accounts, cash from the individual Trust brokerage accounts themselves, cash from funds paid from loans requested by Klein against Trust insurance policies, cash purportedly designed to reimburse one particular Trust through the assets of another, and credit line loans applied for by Klein against certain brokerage accounts, directly into LKA's attorney-client trust account, where it commingled as "one big pot" with the funds of Klein's other clients. Through the LKA attorney-client trust account, Trust disbursements were also made, but leaving the financial disparity between Trust monies received by Klein and LKA and Trust monies disbursed by them for the benefit of the Menlo beneficiaries in the millions of dollars.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
18

trustee fee, Klein contends that he is entitled to an additional $1.034,477.58 in trustee fees for the period of the First Account after 2005, $533,578.70 on the Second Account, and $180,114.70 on the Third Account; each calculated at a rate of .05% per annum of the alleged sum of trust assets under management plus that year's trust income.[22]

In its combined and consolidated motion for judgment/closing brief, LKA contends that the only evidence received at trial that LKA "aided and abetted" Klein's alleged breaches of trust was that "trust funds were deposited into its [law firm client trust account] for convenience purposes, and that payments were made from the account for the benefit of all [Menlo Trust beneficiaries]." LKA contends that there was no evidence presented that Klein's law firm either conspired with its owner or that it aided and abetted Klein in the misappropriation of assets. As noted by LKA, "LKA was presented as merely a passive bank account, money-in and money-out." LKA contends that it had no duty to the Menlo beneficiaries, fiduciary or otherwise, nor is there evidence that it financially benefited from Klein's acts. There was evidence, according to LKA and as testified by Klein at trial, that lapse period payments to Trust insurers would "clear faster" when Menlo Trust beneficiaries' brokerage checks were paid directly into the LKA trust account.

LKA contends that any actions taken by the law firm from prior to August 7, 2012 should be barred by the applicable three-year period of limitations calculated from the time of LKA's joinder by the Menlo beneficiaries. LKA contends that the inclusion of Klein's law firm as a party by the six Menlo beneficiaries adding LKA has been merely an "afterthought."

---

[22] Referee's note: There appear to be four provisions of the 24 respective Menlo Family Trusts that Klein appears to be asking the Referee to honor: (1) Klein's appointment in each Trust as sole trustee; (3) the breadth of Klein's financial powers under the Trusts; (3) the Trustee's liability preclusion for "reasonable and good faith" actions; and (4) the right of Klein to earn trustee fees based upon a percentage of trust assets. It appears Klein is simultaneously asking the Referee to disregard the fact that no Trust agreement contains an accounting waiver and/or gives either co-settlor any continued right or authority over the Trustee after appointment. It also appears Klein is asking the Referee to completely disregard the distributive provisions of each and every Trust.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
19

**The Menlo Beneficiaries' Post-Hearing Contentions on the First Accounting**

The Menlo beneficiaries contend the evidence at trial showed that "based upon a mythical 'instruction' from Sam Menlo, Trustee Klein "set up a serpentine labyrinth of transfers between trust accounts, lines of credit, insurance policies and Mr. Klein's bank accounts, both personal and business,"[23] in order to misappropriate assets.

In their closing brief on the First Account, the Menlo beneficiaries contend that Klein, as evidenced by his trial testimony after years of pre-trial statements and representations, "has no qualms about making things up as he goes along." By way of example, the Menlo beneficiaries reference proof of contradictory narratives presented by Klein over time with respect to, *inter alia*, Klein's unrepaid loans to himself paid from Trust assets secured against Trust lines of credit; the refusal by Klein to provide information on Trust insurance policies until it was discovered that "Klein ha[d] borrowed millions on these policies;" annual exclusion gift payments made to Menlo Trust beneficiaries which never found their way into the gifted beneficiaries' Trust accounts; claims by Klein of the need to borrow significant sums to cover Trust tax obligations when, according to the Trust's CPA, annual tax obligations were negligible; and Klein's continued refusal to account.

Through Frank Menlo, who succeeded management and control of Sam's businesses in the year 2000, the Menlo beneficiaries point to evidence at trial that Sam Menlo's cerebrovascular strokes, which precluded Sam's ability to conduct or comprehend business transactions, occurred in 2000 and 2001, not June 2005 as contended by Klein. It is in 2005, however, that Klein contends that that he "negotiated" a flat $750,000 trustee fee with Sam to compensate Klein for his trustee services with no written corroboration.

The Menlo beneficiaries cite trial testimony where Klein was impeached, *inter alia*, after Klein's false denial of a State Bar disciplinary record with respect to trust administration work;

---

[23] Rather than attempt to organize the Menlo beneficiaries' arguments, for purposes of identifying their contentions, the Referee addresses them in the order presented in their three-part closing brief on the First Account.

false denial of his admission to dishonesty charges leading to Klein's license revocation before

the California Board of Accountancy; and false denials that he had ever previously been sued as

a trustee, when in fact he had been so sued, and was represented in such litigation by his current

counsel.[24]

Relative to this case, the Menlo beneficiaries cite Klein's trial testimony that he had

received no commission(s) on the purchase of insurance policies for the Menlo Trusts. Klein was

subsequently impeached by his own insurance expert, Mr. Lowi, who testified that Klein had

received $326,023.78 in such commissions. (15 Tr. 2891-2892.)

Klein testified that in 2012 he created a stand-alone bank account for the "Menlo

Children's Trust of 1986" ("MCT"). Substantial evidence was presented at trial that Klein

used the MCT account as additional conduit to move substantial assets and liabilities to and from

from the 24 Menlo Trusts in question, including the transfer of Trust insurance policy loan funds

into Klein's accounts, and as a source of overdraft protection to allow Klein to charge well over

$1,175,151 in personal expenses on his own credit cards against the litigating Menlo Trusts.

Klein excluded any mention of the MCT in his accountings.

The Menlo beneficiaries reference the trial testimony of Jennifer Magnes ("Magnes"), the

CPA at WZ in charge of preparation of Klein accountings, in which she testified that inclusion of

the MCT as a Trust sourcing mechanism, though she had some of the records, was "beyond the

scope of [her] assignment." Magnes further testified at trial that she was not authorized to review

Klein's personal bank records, nor the LKA law firm records, nor was she authorized to contact

the relevant insurance companies for information, nor was she provided with the voluminous

institutional banking and insurance records subpoenaed by the parties. The Menlo beneficiaries

contend that by so artificially limiting the information upon which the verified Klein First

---

[24] When Klein testified provably falsely at trial on these collateral matters, the Referee had concern that Klein's short-term and long-term memory failures could be due to a combination of age and mild cognitive deficits. After 22 days in trial with Mr. Klein, however, the Referee concludes that Mr. Klein, while testifying, reflexively opted for any means of possible liability avoidance and scrutiny, often self-contradictory and easily disproven, over any legitimate concern for factual accuracy.

1    Account was prepared, the First Account is "virtually useless as a bellwether of Mr. Klein's true

2    activities with [the Menlo] [T]rusts."

3         The Menlo beneficiaries cite Probate Code §16014(b) for the proposition that Klein, as a

4    licensed trusts and estates attorney, until recently as a licensed CPA, and as a self-proclaimed

5    expert in life insurance investments, has special skills and must be held to the standards of those

6    special skills.

7         The Menlo beneficiaries also cite Probate Code §16000 for the further proposition that

8    **Klein, as a trustee, has a statutory duty "to administer the trust according to the trust**

9    **instrument."**

10        Each of the Menlo trust instruments are irrevocable by their terms. Neither Sam Menlo

11   nor Vera Menlo had any ability after execution to amend the trust terms or to exercise any

12   authority over the Trustee. The Menlo beneficiaries contend that any alleged oral "instructions"

13   purportedly given to Klein by Sam Menlo to ignore the terms of the Menlo Trusts are pure

14   fabrications and in contravention of Klein's statutory duties as a trustee.

15        The Menlo beneficiaries note that Klein, as an experienced estate planning practitioner,

16   testified that despite his acceptance of the Trusteeships in 1996, and Sam Menlo's subsequent

17   incapacity, Klein's deposition in this lawsuit was the first time anyone had suggested to him that

18   he stood in a fiduciary relationship to the Menlo Trust beneficiaries. (8 Tr: 1673.) Klein further

19   testified that he has never had any intention of honoring the distributive provisions of the 24

20   trusts.[25]

---

[25] Though the authorization is unclear from Judge Suzuki's September 15, 2021 order for reference, the Menlo beneficiaries ask the Referee to recommend Klein's removal as trustee. The trial court has always had removal power *sua sponte* since this action was commenced (see *Schwartz v. Labow* (2008) 164 Cal.App.4th 417), and it is possibly because Klein is a licensed member of the State Bar that suspension and removal has not already taken place. Notwithstanding Klein's rationale based upon what he claims to be the co-settlors' unwritten "wishes," as noted above, Klein concedes that he never intended to follow the express terms of the Trusts. In a case where the fiduciary's compass has had no sense of literal direction from its inception, Klein's removal appears to be a *fait accompli* regardless of whether or not it is a part and parcel of the current reference. The Referee defers determination of this issue to the trial judge.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
22

The Menlo beneficiaries take great issue with Klein's scattered selection of starting dates for each of his 24 First Accounts. The starting dates of the respective Klein First Accounts are not, as the law requires, based upon the dates Klein first received and began managing the respective Trusts and their assets, but rather based, according to Klein, upon whatever date(s) the institutional brokerage houses could locate records in their archives with respect to each of the various Menlo Trusts managed by Klein.

The Menlo beneficiaries note that Klein's verified accountings, despite utilizing "starting dates" long after Klein accepted his trusteeships, nevertheless infuse selected pre-starting date transactions into the First Accountings which infuse capital or identify legitimate disbursements, all of the while ignoring literally thousands of other Trust-related transactions evidencing malfeasance and misappropriation.

The Menlo beneficiaries recite the Trustee's statutory duty to maintain records sufficient to *fully* account to the Trust beneficiaries, and to provide all supporting data upon request, including invoices, receipts and transactional documentation.

Here, Klein maintained no trust files of his own and had no legitimate recordkeeping system. Complex loan transactions between the 24 separate Menlo Trusts were never memorialized or reconciled, nor was application of large sums taken by Klein from the MCT separately tracked. No spreadsheets were prepared by Klein identifying the recipient(s) of the loan funds for which Klein borrowed against the Trusts' insurance policies, or for identifying the recipient(s) of the funds Klein borrowed on the lines of credit debiting the Menlo beneficiaries' brokerage accounts through whose Trust accounts those loans were serviced. (The recipients, as it turned out, were principally Klein and his law firm.) At trial, Klein testified that the filed trust accountings, which he conceded he did *not* prepare, constituted his "records," while all of the many thousands of specific underlying transactions were otherwise maintained "in [his] head."

The Menlo beneficiaries contend the evidence at trial established that that their individual Trust balances had been adequate to subsidize all ongoing Trust expenses, and suggest that Klein's only reason to collateralize the brokerage accounts through interest-bearing lines of

credit was to generate capital for Klein himself, virtually none of which Klein appears to have repaid. The Menlo beneficiaries also point to evidence that Klein borrowed $3,675,000 from the Trust's insurance policies, again virtually none of which was used to pay premiums.

The Menlo beneficiaries further object to Klein's decision to allow $20,000,000 in Phoenix life insurance coverage to lapse at a time when Sam Menlo was uninsurable, and therefore the coverages could not be replicated. The evidence showed that the Phoenix policies were allowed to lapse, in part, because of the policies' significantly reduced values, *after* Klein had reduced those values through millions of dollars in loans he had taken out against those policies, which funds were for the most part, if not entirely, retained by Klein.[26]

At trial, as noted by the Menlo beneficiaries, Klein admitted taking large personal loans from the Menlo Trusts without permission. Klein conceded regularly using funds from certain Trusts to pay the obligations of other Trusts, often when Klein, according to his testimony, would feel it was "fair" to do so.

Klein also admitted at trial setting up the MCT bank account as a source of overdraft protection for the personal bank accounts of Klein and his wife, Erika. The evidence at trial established that Klein utilized $1,218,519 of MCT funds to pay his personal debts by way of the overdraft protection, with no evidence (other than Klein's uncorroborated testimony) that those funds were ever reimbursed. Nowhere in Klein's accountings is there reference to those funds at all.

Though Klein testified at trial that the $3,625,000 of loans taken against the Trusts' Phoenix Life policies was conceptualized by Sam Menlo, the written evidence established that all of these loans were personally applied for and distributed by Klein to Klein through his attorney-client trust account between 2005 and 2009. While Klein testified that the Phoenix

---

[26] At the time Klein commenced his Trusteeships in 1996, the Menlo Trusts owned $54,000,000 in prospective whole and universal life insurance policy benefits upon the deaths of Sam and Vera Menlo. Both Sam and Vera Menlo are now deceased. However, over the course of the three accounting periods which are a subject of the order of reference, Klein allowed a collective $20,000,000 of those policies to lapse due to Klein's nonpayment of premiums.

policy loan funds were used to pay premiums on other Trust insurance policies, Klein was unable to establish at trial that was in fact the case.

The Menlo beneficiaries cite the testimony of First Account preparer Magnes that she did not attempt to trace the flow of millions of dollars of insurance loan funds from the insurance companies through Klein's LKA business account toward some beneficial Trust purpose. Magnes did admit that Klein had not provided her with all records of transactions which had occurred during the periods of Klein's Trusteeships.

The Menlo beneficiaries contend the evidence was undisputed at trial that Klein, beginning in 2005, borrowed $3,625,000 from four of the Trusts' Phoenix Life Insurance policies. According to the Menlo beneficiaries, these loans, which they claim to be misappropriated by Klein in whole or in large part, each bore accruing unpaid interest to the point that the constantly increasing debt ultimately exceeded the value of retaining the four policies, given Frank and Vera's joint life expectancies and the size of the ever-increasing interest accruing from the unpaid loans. Had an insurance broker been consulted in 2005, according to the Menlo Trust beneficiaries' insurance expert Ed Wirtz ("Wirtz"), the recommendation would have been to maintain the policies' *status quo*, given Sam Menlo's then-uninsurability. Instead, Klein withdrew millions of dollars in cash from those policies, failed to repay those loans, allowed additional substantial sums to accrue in interest on those loans, failed to repay the interest, and by the time of a 2011 underwriting review, one or more of the Phoenix policies was deemed expendable.

The first of the four Phoenix Insurance policies that Klein allowed to lapse occurred during the First Accounting period. In light of the policy's face amount payouts, less amounts necessary to sustain the policies through the then-actuarial balance of Vera's life, Wirtz

determined collective damages to the Trusts, discounted to present value, to total **$1,790,231** at the time of trial by virtue of Klein's policy lapse decision.[27]

The Menlo Beneficiaries cite *Bogert's The Law of Trusts and Trustees* §961 (June 2021 Update) for the proposition that:

> "The burden of accounting for trust assets, receipts, disbursements, and exchanges is on the trustee. **Where the trustee failed to keep sufficient records, all doubts with respect to the trustee's administration of the trust are resolved against the trustee. If the trustee failed to keep adequate records for the trust, it is liable for any resulting loss. The court may also reduce or deny the trustee's compensation, or charge the trustee with part or all of the costs related to an accounting**, if the trustee does not keep adequate records. If the failure to keep records is serious enough, the trustee may be removed." (Emphasis added.)

Utilizing Klein's multiple alleged trust breaches to suggest that Klein is entitled to no trustee fees at all, the Menlo beneficiaries contend that the trustee fees demanded by Klein should not be based upon the percentage of the face value of the insurance policies when the beneficiaries pass and the policies are paid, but should rather be assessed at "no fee... or... a flat annual fee of between $500 and $1000."

At trial, the Menlo beneficiaries relied almost exclusively on the testimony of their forensic expert, O'Bryan. O'Bryan and his staff conducted exhaustive studies of all Menlo Trust monies being paid into and out of the LKA account, the beneficiary brokerage accounts, the insurance policy accounts, the various Trust lines of credit, Klein's personal bank accounts, and the MCT account, including Klein's use of the latter to pay Klein's personal debts through overdraft protection. In doing his work, O'Bryan repeatedly testified that he had not reviewed and was not relying in any way upon documents claimed privilege by Klein but ordered produced by Judge Cowan.

The O'Bryan testimony noted, without contradiction, that Klein's submitted accountings through Magnes failed to include a massive number of transactions which Klein initiated,

---

[27] The Wirtz calculation does not assume that the loan against the policy taken by Klein would be repaid. Rather, the calculation assumes that a prudent trustee would have paid the loan interest current from Trust funds until payout, along with the premium, thereby holding the death benefit at policy amount less loan principal, rather than allow the accrued loan interest to continually reduce the death benefit.

including thousands of transactions associated with the Morgan Stanley brokerage accounts, the UBS brokerage accounts, the AIG insurance statements, the UBS line of credit activities, use of the MCT account, multiple loans and debits/credits between the Trust themselves, and use of the co-mingled LKA attorney-client trust account as a further clearinghouse for Trust and intra-Trust transactions.[28]

In the trust periods after Klein accepted Trusteeships and began managing the Menlo Trusts, but before Klein arbitrarily decided to begin his reported accounting periods, O'Bryan calculated that Klein had removed $4,353,624 from the Menlo Trusts into LKA and his personal accounts and expenses as follows:

 (1) $824,652 cash from the respective Menlo beneficiaries' brokerage accounts;

 (2) $1,658,000 in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

 (3) $1,432,781 in loans taken by Klein against Trust-owned insurance policies;

 (4) $198,190 taken from the MCT account; and

 (5) $240,000 from monies payable to the Menlo trusts that Klein signed over into his law firm account.

During the same pre-accounting time period of his Menlo Trusts management, Klein used monies collected from the various trust and insurers to pay for legitimate expenses of the Menlo Trusts in the total sum of $192,736, directly and through the vehicle of Klein's attorney-client trust account. The net difference between sums taken in by Klein and the sums paid out for the benefit of the Menlo Trusts or its beneficiaries, as calculated by O'Bryan, is $4,160,888.

On top of that sum, the Trusts paid interest on Klein's pre-accounting loans secured by Klein-initiated Trust lines of credit in the sum of $125,677. The interest charged by Phoenix Life

---

[28] Klein testified at trial that funds from loans against Menlo Trust insurance policies, which policies were each owned by specific Menlo Trusts, funds from the lines of credit borrowed by Klein against certain Menlo beneficiaries' brokerage accounts, and funds received from Frank Menlo for annual exemption gifts to the various Menlo children and grandchildren, were "first" deposited into Klein's LKA attorney-client trust account. Despite the fact the funds in that general account were neither segregated between individual Menlo Trusts or from the assets of Klein's other clients, Klein nevertheless testified that he had no comingling concerns.

Insurance and Lincoln Life Insurance on the insurance policies upon which Klein took loans during this pre-accounting period was an additional $104,732. Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, before the time Klein opted to commence his formal accountings, totals $4,391,297.

In addition to those sums, according to O'Bryan's comprehensive audit, are the verified portions of the First Accounting period for which Klein *has* chosen to account. When the "refused" Klein First Accounting periods are included within the Klein-submitted First Accounting periods in order to constitute the true First Account, through and including June 30, 2013 **the full First Accounting period** audit calculations are as follows:

In the entire period of what should be Klein's first accounting across the 24 Trusts, across approximately 10,000 Trust transactions, O'Bryan calculated that Klein removed a net **$6,852,660** from the Menlo Trusts into LKA and to his personal accounts and expenses during the full First Accounting period as follows:

(1) **($105,416)** cash infused by Klein into the respective Menlo beneficiaries' brokerage accounts (credit to Klein);

(2) **$1,959,374** in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

(3) **$2,753,152** in loans taken by Klein against Trust-owned insurance policies;

(4) **$1,046,418** taken from the MCT account into Klein's personal overdraft account;

(5) **$874,550** taken from the MCT account by Klein for other non-Trust purposes; and

(6) **$324,582** from monies payable to the Menlo Trusts that Klein deposited into his law firm or personal accounts.

During the entirety of the true First Accounting time period, Klein paid monies collected from the various Trust beneficiaries' brokerage accounts and Trust life insurance policies, and monies paid to Klein as Trustee for deposit into the Menlo Trusts, directly and through the vehicle of his attorney-client trust account, to pay for legitimate expenses of the Menlo Trusts in the total sum of **$628,112** (*i.e.*, credit to Klein), consisting of insurance premiums, accounting fees, and funds paid to Madeline Lipchutz in a family law matter. The net difference between

sums taken in by Klein over and beyond the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$6,224,548.**

Beyond that vast sum of unrepaid cash from Klein to the Menlo Trusts, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit in the sum of **$300,049** during the entirety of the true First Accounting period. The interest charged by Phoenix Life Ins. and Lincoln Life Insurance on the insurance policies upon which Klein took loans during the First Account was an additional **$1,693,048.** The loss due to Klein's intentional lapse  of a Phoenix Life Insurance policy during the First Accounting period, as testified to by insurance expert Wirtz, to the extent there is liability for that policy lapse, totaled **$1,790,231.**[29] Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged damages on Klein's lapse of a Phoenix Insurance policy, totals **$3,783,328** for the period of the First Account.

The Menlo beneficiaries contend that the evidence shows that, at the end of the First Account, Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the principal amount of **$10,007,876** (*i.e.*, $6,224,548 + $3,783,328). If there is no liability to Klein on the lapse of the Phoenix life insurance policy, the only issue Klein truly contests, either because he was not negligent or because he was acting "reasonably and in good faith," the principal surcharge reduces to **$8,217,645** (*i.e.* $10,007,876 - $1,790,231) owed by Klein to the collective Trusts at the close of the First Account.[30]

---

[29] Evidence at trial established that premiums had been paid on this policy until the time of Klein's trusteeship in 1996; then never again, forcing the policy to borrow against itself to sustain both future premium payments and interest on the subsequent loans which Klein took against cash value. In insurance jargon, these obligations created a "drag" on the policy, reducing its value to the policyholder.

[30] Of that sum, Klein claims that $750,000 was a verbal "trustee fee" authorization from Sam Menlo in 2005.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

29

**The Menlo Beneficiaries' Post-Hearing Contentions on the Second Accounting**

In their opposition to Klein's Second Accounting, the Menlo beneficiaries render the following observation:

> "Neither [Klein] nor LKA introduced any witnesses at trial to dispute the accuracy of the calculations of Mr. O'Bryan and Mr. Wirtz. In fact, [Klein] did not dispute the many claims of misappropriation of trust funds to which Mr. O'Bryan testified and offered detailed damage figures."

As it relates specifically to evidence presented on the Second Account, the Menlo Beneficiaries highlight an additional point:

> "[Klein] acknowledged during the second accounting trial that, quite literally, he had created a system with the trusts where every single trust at some point transferred money to every one of the other 24 trusts usually in the form of 'loans' or 'repayment of loans' that [Klein] had created. The maze of 'loans' and 'repayments' is simply incredible. ... [Klein] did not establish that many or even most of these trusts even needed loans from another trust to pay their share of [insurance] premiums. [Klein] admitted that he never informed the [Menlo Trust] beneficiaries that he was taking loans from their trusts, whatever the purpose of the loan may be. Whereas the Probate Code requires [Klein] to keep the funds of each trust separate and accounted for, [Klein's] management was exactly the opposite. [Klein] transferred funds back and forth so often that a diagram would look like a U. S. route map for American Airlines." [31]

When asked, Klein testified during the Second Accounting trial that he failed to turn over his LKA financial records, where substantial Trust funds were deposited and dispersed, to his account-preparer Magnes, because "he did not want her looking through the records of his clients." (18 Tr. 3476.) This was confirmed by Ms. Magnes, who also was not provided information from Klein regarding his use of overdraft accounts to access the MCT accounts to cover Klein's personal credit card spending. Magnes conceded that in the Second Accounting period, significantly more monies were taken by Klein from the Trusts than were utilized to cover expenses for the benefit of the Menlo beneficiaries.

---

[31] The Referee finds, based upon circumstantial evidence, that Klein's intention in maximizing the number of intra-Trust loans and repayments within the context of an already multi-client commingled LKA attorney-client trust account was to render the scope and breadth of Klein's misappropriations incalculable and untraceable.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
30

Klein allowed two additional Phoenix insurance policies to lapse during the Second Accounting period. According to Wirtz' calculations, without regard to Klein's misappropriation of the loan proceeds themselves, a prudent trustee would have paid the policy loans current along with the premiums, the failure of Klein to accomplish resulting in damages to the Trusts of **$2,001,658** and **$2,487,533**, respectively, based upon Sam and Vera's actuarial life expectancies at the time of Klein's policy lapse decisions, discounted to present value.[32]

The Menlo beneficiaries' forensic expert, O'Bryan, testified that during the Second Accounting period, across an additional approximately 4000 Trust transactions, Klein filtered between one-third to one-half of all transactions, including countless payments between the Trusts themselves, through his LKA client trust account. Once again, without review any of the communications which Klein claimed to be privileged (though Judge Cowan held were not privileged), O'Bryan calculated that Klein had removed a net **$1,712,379** from the Menlo Trusts into LKA and his personal accounts and expenses as follows:

(1) **$254,649 in Trust** cash taken by Klein from the respective Menlo beneficiaries' brokerage accounts;

(2) **$1,282,733** in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

(3) **$172,101** taken from the MCT account into Klein's personal overdraft account;

(4) **($73,061)** net credit to Klein for funds returned to the MCT account; and

(5) **$75,956** from monies payable to the Menlo Trusts that Klein deposited into his law firm or personal accounts.

During the Second Accounting period, according to O'Bryan, Klein used monies collected from the various Trust beneficiaries' brokerage accounts, and monies paid to Klein for deposit into the Trusts, often through the vehicle of his attorney-client trust account, to pay for expenses of the Menlo Trusts in the total sum of **$559,150** (*i.e.*, credit to Klein), consisting

---

[32] Vera was still living at the time of trial. She did not survive to her calculated 2023 actuarial life expectancy as determined several months earlier. Had the trial been conducted today, Wirtz's damage calculations to the Trusts would be higher, since less interest and premium payments would be paid from the Trusts than previously calculated to her actuarial date of death.

entirely of insurance premiums. As noted by O'Bryan, the net difference between sums taken in by Klein during the Second Accounting period over and above the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$1,153,229**.

Beyond that sum, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit during the Second Accounting period in the sum of **$17,542**. The interest charged by Phoenix Life Insurance and Lincoln Life Insurance on the policies upon which Klein took loans during that period was an additional **$409,134**. The loss due to Klein's lapse of the two Phoenix policies, as testified to by insurance expert Wirtz, to the extent there is liability, totaled **$4,489,210.** Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged liability for Klein's lapse of two additional Phoenix life Insurance policies, totals **$4,915,886.**[33]

The Menlo beneficiaries contend that the evidence shows that, at the end of the second account, Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the additional principal amount of **$6,069,115** (i.e., $1,153,229 + $4,915,886). If there is no liability to Klein on the lapse of the two additional Phoenix life insurance policies, the only issue Klein truly contests, either because he was not negligent or because he was acting "reasonably and in good faith," the principal surcharge reduces to an additional **$1,579,905** (*i.e.* $6,069,115 - $4,489,210) owed by Klein to the collective Trusts at the close of the Second Account.

To summarize, according to the Menlo beneficiaries forensic expert, the "rolling" surcharge to Klein for cash taken by Klein from the Trusts, plus actual interest paid by the Trust on those Trust funds in Klein's possession, less monies Klein applied to Trust expenses, through the closing date of the Second Account, totals **$9,796,750** (*i.e.* $8,217,645 +$1,579,105). If Klein

---

[33] The Menlo beneficiaries also contend that Klein's lapse of the Phoenix insurance policies during the Second Accounting period had negative income tax ramifications to the Trust for the Second Accounting period in the sum of $1,493,423. Klein's position was that he had filed no tax returns noting such sums to be due and payable, and therefore, once the applicable statute of limitations passes, there will be no actual loss to the Trusts. The Referee is inclined only to surcharge a fiduciary where losses have been realized and are not theoretic. If such tax liabilities become an actuality, assuming liability to Klein, it is not the Referee's intention to foreclose the Menlo beneficiaries from seeking indemnity from Klein at that time, nor should Klein be discharged from that contingent liability.

is also liable for lapse of the three Phoenix insurance policies through the First and Second Accounts, the additional "rolling" claim for damages utilizing the Wirtz calculations is an additional **$6,279,441** (i.e., $1,790,231 + $4,489,210), excluding the Menlo beneficiaries' additional claim for tax liability.

### The Menlo Beneficiaries' Post-Hearing Contentions on the Third Accounting

Moving to Klein's Third Account, the closing brief of the Menlo beneficiaries challenges Klein's claim that Frank Menlo "sabotaged" the Trust by refusing in 2012 to make further annual cash exemption gifts to each of the Menlo beneficiaries. As calculated the Menlo beneficiaries, had Klein not misappropriated the insurance policy loan funds for himself, by the end of the Third Accounting period, all policy premiums could have easily been paid "without problem, with approximately $4 million left over," with no need to ever access the funds held in the Menlo beneficiaries' brokerage accounts. Klein conceded during the trial on the Third Account that "whatever cash was in this trust when I took over, by the end of the Third Accounting, all of that was gone." (21 Tr. 3943.)

Klein testified during his testimony on the Third Account that he has never used *non-petitioner* Menlo Trust funds to subsidize the asset-depleted Trusts at issue here. The Menlo beneficiaries request that the Referee to take judicial notice of a June 10, 2022 report to Judge Luna in which Klein, in contravention of his testimony and a prior court order, concedes use of non-petitioner trust funds to pay the obligations of the subject Trusts for, *inter alia*, "[m]argin interest on lines of credit," life insurance premiums, and legal fees and retainers.[34]

On the Third Accountings, the Menlo beneficiaries reiterate their claim that the accountings were artificially manufactured by inhibiting CPA Magnes' access to the LKA records, to the MCT records, and to Klein's personal bank accounts, as a strategy to avoid

---

[34] Accounting issues associated with Trusts in favor of non-petitioner Menlo beneficiaries are outside the scope of the 72 accounting petitions across the 24 Trusts being adjudicated by the Referee pursuant to the order for reference. Possible contempt issues associated with Klein's alleged disregard of orders relating to non-petitioner Trusts in this case are likewise outside the scope of the reference under consideration. The Referee declines the request for judicial notice.

detection of millions of dollars in Trustee misappropriations under the façade of verified accounts.[35]

Klein allowed a fourth Phoenix insurance policy to lapse during the Third Accounting period. According to Wirtz' calculation, without regard to Klein's misappropriation of the loan proceeds, a prudent trustee would have paid the policy loan current along with the premiums, resulting in damages to the Trusts of **$2,339,334**, respectively, based upon Vera's actuarial life expectancy at the time of trial, discounted to present value.

The Menlo beneficiaries' forensic expert, O'Bryan, testified that during the Third Accounting period, Klein filtered approximately 20% of an estimated 2000 Trust transactions, including numerous payments between the Trusts themselves, through his LKA client trust account. Once again, without review of any of the communications which Klein claimed to be privileged but Judge Cowan found to be not privileged, O'Bryan calculated that Klein had removed a net $1,055,576 from the Menlo Trusts into LKA and for his personal accounts and expenses as follows:

---

[35] At trial, Magnes testified that she was essentially a scrivener, doing whatever she was told [content of communications themselves excluded by the Referee in light of Klein's objections], having no prior experience in the preparation of Probate Code or fiduciary accountings. Magnes testified, *inter alia*, that in preparing that Klein accountings she sought but did not receive documents dating back to Klein's acceptance of the Menlo Trusteeships in 1996; was unable to access relevant Trust transactions; did not ask for permission to access data from the Trust's life insurance companies; did not access subpoenaed records; never saw Klein's Trust files, if any; never reviewed a general ledger, QuickBooks or financial statements for Klein's administration of the Menlo Trusts; did not determine the commencement date to be covered by the First Accountings; *did* use Trust fund disbursements between 1999 and 2002 to log Menlo insurance policy premium transactions for purposes of calculating Trustee fees; and *did* see Menlo Trust funds deposited into the LKA accounts but was not authorized to trace those monies to their ultimate recipient(s).

The Referee, when considering such deficiencies in light of O'Bryan's comprehensive audit and the voluminous supporting records, accepts the Menlo beneficiaries' contention that the verified Klein accountings were manipulated in order to mislead with respect to the disposition of Menlo Trust funds. The extraordinary difficulties encountered by the Menlo Trust beneficiaries in discovering, accessing and then sorting out the relevant Trust information, underscores historic trust law policy resolving "any doubt arising" from an incomplete accounting against the fiduciary.

(1) **$165,905** in Trust cash taken by Klein from the respective Menlo beneficiaries'
brokerage accounts; and

(2) **$889,671** in loans taken by Klein against letters of credit against Menlo beneficiaries'
brokerage accounts;

During the Third Accounting period, as reported by O'Bryan, Klein used monies collected from the various Trust beneficiaries' brokerage accounts, and monies paid to Klein for deposit into the Trusts, often through the vehicle of his attorney-client trust account, to pay for legitimate expenses of the Menlo Trusts in the total sum of **$547,641** (*i.e.*, credit to Klein), consisting entirely of insurance premiums, As calculated by O'Bryan, during the Third Accounting period, the net difference between sums taken in by Klein over and beyond the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$507,935**.

Beyond that sum, during the Third Accounting period, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit in the sum of **$92,252**. The interest charged by Phoenix Life Insurance and Lincoln Life Insurance on the insurance policies upon which Klein took loans was an additional **$208,454**. These interest obligations were paid by the Menlo Trusts, for apparent Trust no benefit except to Klein. The losses due to Klein's lapse of the final Phoenix policy, as testified to by insurance expert Wirtz, to the extent there is liability, discounted to present value, totaled **$2,339,334**. Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged liability for Klein's lapse of the additional Phoenix life Insurance policy, totals **$2,640,041** during the period of the Third Account.[36]

---

[36] The Menlo beneficiaries also contend that Klein's lapse of the Phoenix insurance policy during the Third Accounting period has negative income tax ramifications to the Trust in the sum of $1,483,536. Klein's position was that he had filed no tax returns noting such sums were due and payable, and therefore, once the applicable statute of limitations passes, there will be no actual loss. As noted earlier, Referee is inclined only to surcharge a fiduciary where losses have been realized and are not theoretic. To the extent such tax liabilities become an actuality, assuming liability, it is not the Referee's intention to foreclose the Menlo beneficiaries from seeking indemnity from Klein at that time, nor should Klein be discharged from that contingent liability.

The Menlo beneficiaries contend that the evidence shows, at the end of the Third Account, that Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the additional principal amount of **$3,147,976** (i.e., $507,935 + $2,640,041). If there is no liability to Klein on the lapse of the Phoenix life insurance policy, the only issue Klein truly contests, either because he was not negligent or because he was acting "reasonably and in good faith," the principal surcharge reduces to additional **$808,642** (*i.e.* $3,147,976 - $2,339,334) owed by Klein to the collective Trusts at the close of the Second Account.

To summarize, according to the Menlo beneficiaries forensic expert, the "rolling" surcharge to Klein for cash taken by Klein from the Trusts, plus actual interest paid by the Trust on those Trust funds in Klein's possession, less monies Klein applied to Trust expenses, through the September 30, 2018 closing date of the Third Account, totals **$10,605,392** (*i.e.* $8,217,645 +$1,579,105 + $808,642). If Klein is also liable for lapse of the four Phoenix insurance policies through the Third Account, the additional "rolling" claim for damages utilizing the Wirtz calculations is an additional **$8,618,775** (i.e., $1,790,231 + $4,489,210 + $2,339,334), excluding the Menlo beneficiaries' additional claims for tax liabilities.

### Klein and LKA's Contentions in Reply

In his consolidated reply to the Menlo beneficiaries' post-trial contentions on each of the three Klein accountings, Klein correctly notes that the order for reference does not encompass issues with respect to Trustee removal, but also takes the position that "claims relating to matters before the First Accountings" are outside the Referee's authority.[37]

Klein requests that the Referee strike the Menlo beneficiaries' closing briefs because they were not filed concurrently with Klein's closing briefs as previously directed, a situation resulting from the health constraints of the Menlo beneficiaries' counsel. Klein contends that the Referee's order permitting Klein to file a reply brief, a right not given or afforded to the Menlo

---

[37] To the extent Klein is asserting that he can arbitrarily commence his first accountings at arbitrary points in time, skipping years of Klein's post-Trustee acceptance, management and control, as an artifice to avoid millions of dollars in interim Trust asset misappropriation, Klein is sorely mistaken, (See analysis and discussion. *infra.*).

beneficiaries, "is insufficient to remedy" the untimely filings. The Referee considers Klein's added right to file a reply brief to be an advantage, not a disability, with absolutely no prejudice whatsoever to Klein. Klein's motion to strike the Menlo beneficiaries' closing briefs is denied.

In further reply, Klein accurately recites Probate Code §16440(b), which affords a trial court the discretion to excuse a trustee from liability for breach of trust committed reasonably and in good faith, "if it would be equitable to do so," including where the trustee believes he/she/it/they are following the wishes of the settlor, despite the language of the trust instrument, citing *Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 296.

Referencing the testimony of its insurance expert, Steven Burgess ("Burgess"), Klein suggests that the downgraded financial condition of Phoenix Life Insurance, in and of itself, is sufficient to render Klein's decision to lapse four of those policies reasonable. Further, Burgess testified that "insurance companies routinely promote and encourage borrowing from policies."

Along with the Referee, Klein takes the position that unrealized income tax liabilities arising out of the lapse of the Phoenix Insurance policies are speculative. Klein cites *Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 952.

Klein reiterates the position taken in his initial closing brief that the Referee should disregard the testimony of forensic expert O'Bryan because of (1) the alleged "taint" of Judge Cowan's order compelling disclosure of communications to and from Klein's account preparer Magnes, which communications Klein contended were protected by attorney-client privilege and work product; and (2) O'Bryan's reliance upon Trust banking and insurance documents, including Klein's own personal and law firm bank accounts, which Klein contends violate the constraints of *People v. Sanchez, supra,* 63 Cal.4th 665.

Klein also correctly notes that O'Bryan's calculations of funds not used to benefit the Menlo Trusts include lines of credit which "could have been used for, *inter alia,* [Klein's] accounting and legal fees." The Referee understands that paragraph 6 of Judge Suzuki's order for reference expressly carves out for future trial court determination the issues of "(i) surcharge of Trustee for professional fees and (ii) liability of Trustee for prejudgment interest." To the extent

the Referee recommends Klein be surcharged for breach(es) of trust, utilizing O'Bryan's calculations, Klein shall be entitled to potential credit for professional fees, including accounting and legal fees, if any, which the trial judge determines in Phase II of this bifurcated trial were properly incurred by Klein as a legitimate trust expense. Because that issue is deferred for future trial court determination, the Referee takes no position as to the propriety of any offset against surcharge for Klein's attorney fees and costs.[38]

Klein's reply reiterates his contention that he is entitled to $1,827,548.04 in trustee fees above and beyond the $750,000 which Klein paid himself in 2005. Klein contends "it makes no difference whether the $750,000 trustee fee payment was authorized at the time," as that sum has been reduced from Klein's total entitlement calculation. Klein challenges the "industry standard" testimony offered by O'Bryan with respect to trustee fees for the management of unmatured whole and life insurance policies in a trust portfolio, as hearsay.[39]

Klein asks the Referee to approve all three accountings and to award him an additional $1,748,170.98 in trustee fees.

LKA, in its reply, observes that the six Menlo Trust beneficiaries who are seeking damages against LKA "dedicate very little real estate in their Closing Briefs to issues related to LKA." Specifically, it is argued by LKA that there was "no evidence that LKA misused funds belonging to the Six Petitioners, took any funds for its own purposes, or conspired with or aided and abetted the Trustee in any way."

---

[38] "[L]itigation seeking to remove or surcharge a trustee for mismanagement of trust assets would not warrant the trustee to hire counsel at the expense of the trust. Such litigation would be for the benefit of the trustee, not the trust." *Butler v. LeBouef*, (2016) 248 Cal. App. 4th 198, 213, quoting *Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221, 1227. Fee awards have been denied or reduced, *inter alia*, where the attorneys helped prepare an inaccurate accounting (*Estate of Keyston* (1951) 102 Cal.App.2d 223, 231–232); unsuccessfully defended an accounting (*Estate of Vokal* (1953) 121 Cal.App.2d 252, 258); or unsuccessfully defended a petition to remove or surcharge the trustee (*Estate of Miller* (1968) 259 Cal.App.2d 536, 546–547).

[39] The Referee sustains Klein's hearsay objection on this particular point. Nor may forensic accountant O'Bryan testify as an expert on this specific issue, given his lack of personal experience assessing carry value on unmatured whole and universal life policies in the context of Probate Code §1060 *et seq.* accounting schedules. Both sides are actually incorrect on this issue, as the proper carry value is expressly detailed in the CEB *Fiduciary Accounting Handbook* text (see discussion, *infra*).

LKA references forensic expert O'Bryan's concession that he had "no information as to whether LKA used the Six Petitioners' funds for its own purpose or for other trust purposes." Unlike Trustee Klein, LKA is not a trustee. As correctly noted by LKA, it is the Menlo beneficiaries' burden to establish liability and damages as to LKA.

## STATEMENT OF DECISION AND
## SETTLEMENT OF THE TRUSTEE'S FIRST ACCOUNT

### When Does the Trustee's First Account Begin?

As stated above, Klein accepted 22 of his 24 trusteeships in 1996. The remaining two trusteeships were accepted by Klein in 1999 (Daniel Winter) and 2002 (Jonathan Lifschutz), respectively.

Klein, in his First Accountings, reluctantly admitted his role in paying Trust obligations as Trustee from and after **1996**. [See, *e.g.*, Supplement[s] to First Account and Report, for Frank Menlo, at verified Report, ¶ 45]. Klein, in his capacity as Trustee, conceded making all of the accounting log contribution payments from the Menlo Trust beneficiaries on Trust insurance policies beginning February 23, 1998 (American General Insurance) and January 22, 1999 (Transamerica Insurance). [*Id.*, at Exs. 8-9 and verified Report, ¶¶ 41-42]. Klein's First Accountings include written correspondence by Klein to a number of the 24 Menlo beneficiaries establishing Klein's management and control of the Trust brokerage accounts by March 11, 2002 [*Id.*, at Ex. 14], after, as credibly testified to by Frank Menlo, Sam Menlo's second stroke had rendered Sam incompetent to conduct or advise on business matters of any kind.

In addition, Klein testified at trial and reported in the First Account that he paid himself a $750,000 Trustee Fee "as a partial deposit" **for his retroactive management** of the 24 Menlo Trusts **prior to June 2005**. [See, *e.g.*, Supplement[s] to First Account and Report for Frank Menlo, at verified Report, ¶44.]

Despite Klein's acceptance of all but two of the 24 Trusteeships in 1996; Klein's post-1996 actions fully consistent with fiduciary administration and management; what the Referee

finds to be Klein's unequivocal supervision and control of all Menlo Trust decision-making no

later than 2002; and Klein's withdrawal of $750,000 from Trust insurance policies in June 2005

as compensation for *prior* Trustee services rendered, Klein's 24 First Accounts nevertheless

select arbitrary opening dates of trusteeship between February 1, 2003 and April 13, 2009, with

only the five Winter family accounts having a First Account starting date prior to May 19, 2006.

[See fn. 9, *ante*.][40]

At trial, during voir dire by Klein's counsel on the qualifications of forensic expert

O'Bryan, counsel held in his hand the CEB text *Fiduciary Accounting Handbook*, and asked

O'Bryan:

"What is a leading treatise in California on fiduciary accounting?"

And though Klein does not now cite that treatise in his closing briefs, the text is insightful

on how to set a Trustee's opening account date. Where Trustees, as here, succeed one another "in

lock step," the succeeding Trustee's account commences "the day after the ending date of the

prior account." CEB, *Fiduciary Accounting Handbook* (2022), §4.6, p. 161.

To the extent there may be one or more days vacancy between the prior trustee's

resignation(s) and Klein's acceptance, or, as here, where there was no prior accounting, the CEB

text advises that "the trustee who assumes office after vacancy may wish to use at his or her

beginning date the date he or she accepts the trust." CEB, *Fiduciary Accounting Handbook*,

*supra*, §4.8, p.164. As noted in the treatise, **"[t]he beginning date of the trustee's account**

**signifies the date that a person becomes accountable to the beneficiaries."** Here, the Referee

determines that Klein became accountable to the Menlo beneficiaries on the day he accepted

each of the 24 Trusteeships.

---

[40] Given the many hundreds of Trust transactions Klein managed and administered prior to the arbitrary starting dates of many if not most of his First Accountings, and given Klein's complete lack of any corroborating evidence, Klein's contention that Sam and/or Vera Menlo served as *de facto* trustees during these periods is not credible. The Referee factually finds that Sam Menlo was without competence in and after 2002, and that Klein kept Vera Menlo completely in the dark with respect to her understanding of the Trusts' terms and any and all actions Klein transacted within the Trusts (other than providing certain grandchildren financial assistance in home purchases).

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
40

To the extent Klein contends that *as a condition of* acceptance of the 24 trusteeships, he delegated decision-making to the co-settlors, loss becomes only a question of liability due to improper fiduciary delegation,[41] not a question of when to commence the Trustee's periods of accounting.

### How Must the Court Assess the 24 Missing Accounting Periods?

The date of Klein's acceptance of the respective Trusteeships, to the date that Klein elected to first account, are deemed periods of missing accounting, accentuated by then- Commissioner Cowan's December 20, 2013 explicit order that Klein account from *"the time period commencing when Leslie Klein first became trustee of the Trust*, to the present day."  Those missing account periods are specifically as follows:

Abraham Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Samuel Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Esther Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Rachel Deutsch – 9/10/96-2/26/09 (12 yrs., 5 mos.)

Mordechai Deutsch – 9/10/96-2/26/09 (12 yrs., 5 mos.)

Deborah Deutsch – 9/10/96-2/26/09 (12 yrs., 5 mos.)

Zev Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Tanya Menlo -- 9/10/96-7/22/08 (11 yrs., 10 mos.)

Franklin Menlo -- 9/10/96-7/22/08 (11 yrs., 10 mos.)

Jonathan Menlo – 9/10/96-12/31/07 (11 yrs., 3 mos.)

Yeshia Frankel -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Rochelle Lipschutz -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Moishe Frankel -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

---

[41] As stated in Probate Code 16012(a):

> **"The trustee has a duty not to delegate** to others the performance of acts that the trustee can reasonably be required personally to perform and may not transfer the office of trustee to another person nor delegate the entire administration of the trust to a cotrustee or other person." (Emphasis added.)

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

41

Madeline Lipschutz -- 9/10/96-5/21/06 (9 yrs., 8 mos.)

Faye Lipschutz -- 9/10/96-5/17/06 (9 yrs., 8 mos.)

Avi Lipschutz -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

Dov Lipschutz -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

Asher Frankel -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Norine Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Michael Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Jeremy Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Amanda Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Jonathan Lifschutz -- 12/26/02-4/12/09 (6 yrs., 3 mos.)

Daniel Winter -- 10/28/97-1/31/03 (5 yrs., 3 mos.)


Quoting the California Supreme Court in *Blackmon v. Hale* (1970) 1 Cal. 3d 548, 560:

**"Trustees are . . . under an obligation to render to beneficiaries a full account of all their dealings with the trust property, and where there has been a negligent failure to keep true accounts all presumptions are against them upon a settlement** [citing *Estate of McCabe* (1950) 98 Cal.App.2d 503, 505 ("*McCabe*") and *Purdy v. Johnson* (1917) 174 Cal. 521, 527 ("*Purdy*")]." (Emphasis added.)

As held in the referenced appellate opinion in *McCabe*, *supra*:

**Trustees are ... under the duty to prove every item of their account by "satisfactory evidence"; the burden of proof is on them and not on the beneficiary; and any doubt arising from [the Trustee's] failure to keep proper records, or from the nature of the proof they produce, must be resolved against them** [citing *Purdy*]. (98 Cal. App. 2nd at 505.) (Emphasis added.)

If the 24 litigating Trusts are combined, there are a collective **156 years of missing first accountings**. Klein purported to have maintain *no records* of those Trusts during the entirety of the First Accounting period, other than the court-filed accounting which was crafted after-the-fact in 2013, for certain years only, prepared someone other than Klein with very limited document access. Meanwhile, the forensic accountant retained by the Menlo beneficiaries *located records* of more than 10,000 Trust transactions across what should be the First

Accounting period, including voluminous records associated with Klein's personal bank accounts and his LKA law firm account. Klein's response is not to object to the accuracy of those thousands of transactions, but rather, to object on hearsay grounds to the consideration of *all* applicable Trust insurance, banking and personal records which were Klein's duty to make available in the first instance. No claim has been made by Klein or LKA that the underlying Trust or personal records are untrustworthy.

**Does Klein Have a Valid *Sanchez* Hearsay Defense to Undisputed Forensic Accounting Testimony?**

Under *Sanchez, supra*, where an expert testifies to "case specific" out-of-court statements to explain the basis for an opinion, the out-of-court statements must be properly admitted through an applicable hearsay exception. (63 Cal.4th at 684.)

Throughout the trial, both Klein and LKA, on behalf of the Trustee and his law firm, rendered continuing objections to prevent the admission of any records of Trust transactions procured from an institutional third party custodian of records. Most of those records were obtained directly by the Menlo beneficiaries through records subpoenas to the Trust's banks and insurance companies; while the LKA records were handed over by counsel for LKA to counsel for the Menlo beneficiaries during discovery.

In formulating his conclusions, forensic expert O'Bryan relied upon business records received from five insurers (Aetna/Lincoln; Phoenix; AIG; Transamerica and Union Central); two institutional brokerage houses (Morgan Stanley and UBS); and the Bank of America. The Bank of America records consisted of the LKA bank records, the MCT account opened by Klein, and Klein's personal bank records.

In light of the *Sanchez* objection, the Menlo beneficiaries were directed by the Referee to submit evidence of authentication of the business records relied upon by O'Bryan to establish the thousands of Trust transactions which formed the basis for his calculations

In a filing on March 9, 2022, the Menlo beneficiaries provided a sworn certification from Phoenix Insurance dated July 20, 2014 and a further certification dated October 13, 2014. Both certifications satisfy the criteria of Evidence Code §§1561-1562, rendering the Phoenix insurance records admissible as business records under Evidence Code §1271. The documents from American General Insurance (AIG) were received through its litigation counsel in a formal discovery production response on August 13, 2014. The documents from Transamerica Insurance were delivered with the certification from its custodian of records on July 21, 2014. The Referee determines those deliveries and certifications trustworthy and compliant with the Evidence Code authorization permitting verified business records to be admissible in lieu of the personal testimony of each company's custodian of records.

In the same submission, the Menlo beneficiaries provided a June 22, 2017 declaration from the authorized records custodian for Morgan Stanley, which declaration satisfies the criteria of Evidence Code §§1561-1562, rendering the Morgan Stanley records for the applicable Menlo beneficiaries admissible as business records under Evidence Code §1271. The custodian of records for the Bank of America also authenticated its records in a notarized declaration filed August 11, 2017, rendering admissible its bank records for the MCT and the bank records, credit card account statements and safe-deposit box records for Klein himself.

In a follow-up filing on March 22, 2022, the Menlo beneficiaries submitted a March 21, 2022 declaration from the authorized records custodian for Ameritas Life Insurance, verifying the records of its predecessor company, Union Central Insurance, plus a March 21, 2022 declaration from the custodian of records for Lincoln National Life Insurance (formerly Aetna); each entity properly authenticating the records of the Menlo Trusts. The Menlo beneficiaries also submitted the June 26, 2017 declaration from UBS authenticating the institutional brokerage records for those Menlo beneficiaries with Trust accounts outside of Morgan Stanley.

The only remaining set of records relied upon by O'Bryan in his compilation and analysis of Trust transactions are the bank records of Klein's law firm, LKA, which, according to the aforementioned submissions by the Menlo beneficiaries, were delivered directly to counsel for

the Menlo Beneficiaries from LKA's counsel. Evidence Code §1221 codifies the hearsay exception for adoptive admissions by providing that "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his [or her] adoption or his [or her] belief in its truth." The delivery to the Menlo beneficiaries by LKA of LKA bank records renders the documents admissible as an adoptive admission.

A California trial court has wide discretion to determine whether there is a sufficient foundation to qualify evidence as a business record. *Conservatorship of S.A.* (2018) 25 Cal. App. 5th 438, 447. As previously determined during the trial, the Referee finds that the records relied upon by O'Bryan to be trustworthy and all supported by sufficient foundation to be admissible. Klein and LKA's *Sanchez* hearsay objections to O'Bryan's reliance upon Trust records from the relevant insurance companies and brokerage houses, and Klein's personal and business records from the Bank of America, were and remain overruled.

### What are Klein and LKA's Claims of "Taint" from the Poisonous Tree?

The Menlo beneficiaries, whipsawed between Klein's claims of no Trust records and Klein's exclusion from participation in the preparation of his own verified accountings, on one hand, and Klein's tactical decision to shield his anointed account preparer, Magnes, from discovery as a privileged consultant, on the other, the Menlo beneficiaries requested and received relief from Judge Cowan, ordering Magnes' work product subject to discovery without attorney-client privilege or work product protection.

Despite Klein's unsuccessful efforts to overturn Commissioner Cowan's ruling through and including requests for extraordinary relief in the California Supreme Court, Klein asked the Referee to exclude from evidence at trial any communications between Ms. Magnes and Klein's counsel, or any communications between Magnes and Klein in the presence of or copied to counsel.

The matter was briefed and argued. While concepts of fundamental fairness had been utilized to allow the Menlo beneficiaries in pretrial discovery to learn how and under what direction Klein's accountings were prepared, the Referee determined that whatever communications Magnes may have had with or in the presence of counsel, written or verbal, would not be critical to a factual determination of the facial sufficiency of the accountings. Inasmuch as Judge Cowan's intended purpose was accomplished at the pretrial stage, the Referee found no need to expand issues for review as the accountings are by law required to be complete and supported by corroborative documentary evidence, subject to adverse presumptions where there are accounting deficiencies. Over the objection of the Menlo beneficiaries, the Referee granted Klein's requested exclusion order.

During testimony, particularly with both with Klein and Magnes, the Referee made diligent efforts to admonish witnesses not to involuntarily disclose any information which Klein's counsel contended to be privileged. To the Referee's information and belief, no such information was ever presented at trial. In the presentation of his forensic testimony, expert O'Bryan testified that he *never* reviewed information or documentation which Klein claimed to be privileged or work product, in the formulation of his calculations, opinions or otherwise. With the record so sanitized, and outside the purview of the testifying experts, the Referee is satisfied that the exclusion order was honored throughout the trial.

Despite these efforts, in his closing briefs, Klein notes that pretrial records containing such information had at some point been made available to O'Bryan's accounting firm. Despite O'Bryan's unequivocal testimony that those records had been segregated from his personal review and consideration, Klein contends that O'Bryan's opinions and calculations were nevertheless "tainted" by what Klein claims to be attorney-client and work product discovery authorized by Judge Cowan.[42]

---

[42] See, *e.g.*, 14 Tr. 2742-2743 (First Accounts), O'Bryan testifying:

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

46

The Referee finds no prejudice to Klein by virtue of Klein's involuntary compliance with Judge Cowan's order combined with the Referee's exclusion of any such evidence at trial. Arguable prejudice was directly eliminated by the Referee's refusal to entertain consideration of any document or communication which Klein contended to fall within such protections.

**The Menlo Beneficiaries' "Floating" Exhibit List**

Klein claims generic prejudice by virtue of the Menlo beneficiaries' exhibit list late filing and subsequent modifications during the course of the trial. Klein, however, points to no specific exhibit, the production of which in any way was previously undisclosed or otherwise prejudicial to Klein.

For the most part, mid-trial modifications of the Menlo beneficiaries' exhibit list consisted of previously shared illustrative exhibits of forensic expert O'Bryan, as to which the Referee ordered recalculations in order to delete factual or legal theories of liability that the Referee determined to be inapplicable. In other words, most if not all of the modified illustrative exhibits were beneficial, not prejudicial, to Klein.

---

"Q. Okay. And I think you told me earlier, though, that even though it appears that your firm spent more than 20 hours at a minimum reviewing the White Zuckerman documents, none of it was used in preparing your analysis for this case?
A. That's correct."

Also see 17 Tr. 3205 (Second Accounts), O'Bryan testifying:

"Q. Did you -- did you use any of the privilege[] log documents in the preparation of this database?
A. No, the privilege[] log documents had nothing to do with the financial transactions."

Also see 20 Tr. 2813 (Third Accounts), O'Bryan testifying:

"Q. Okay. Did you use any of [Klein's privilege log] documents in the preparation of your database?
A. No.
Q. Did you use any of those documents in your analysis of the damages cost to the trust in the third accountings?
A. No."

**Should Klein Be Surcharged on the First Account?**

The cross-account transactional audit conducted by forensic accounting expert O'Bryan on the true First Accounting periods for the 24 Trusts, as well as the lesser time periods for which Klein elected to account, were exhaustive. The approximately 10,000 transactions conducted by Klein on behalf of the Trusts during the true First Accounting periods, most of which transactions are completely ignored in Klein's verified First Accounts, were separately detailed by O'Bryan. (Ex. 828A.)

The testimony of O'Bryan was clear, convincing and credible. Thousands of the transactions conducted by Klein on behalf of the Trusts, identified by O'Bryan, were *excluded* from Klein's verified First Accounts.

The Referee finds that through an elaborate scheme to pay himself by co-mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-paying debts -- filtered with stunning frequency through Klein's personal and business accounts with multiple other sources of income and receipts and outgoing payments, Klein was able to collectively embezzle millions of dollars from the Menlo Trusts.

Menlo Trust transactional funds were moved by Klein into and out of his LKA attorney-client trust account, in the words of O'Bryan and as established in the audit, "all the time." During the entirety of the true First Accounting periods across the 24 Menlo Trusts, $2,753,152 was removed by Klein as loans taken by Klein either personally or through LKA against Menlo Trust insurance policies; $1,959,334 was removed by Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts; $1,046,418 was taken by Klein into the personal accounts of Klein and his wife Erika as overdraft protection against the Bank of America "MCT" account opened by Klein and funded by Menlo Trust assets; $874,550 was taken by Klein from the Menlo Trust-funded "MCT" into the Klein's LKA law firm account and for other Klein uses; and $324,582 in Menlo Trust checks and funds were taken by Klein directly into Klein's LKA law firm account and for other Klein uses. (Ex. 834, at 11.)

Against these sums, over the entire true First Account periods across the 24 Trusts, a net credit of ($105,416) in cash was returned by Klein to various Menlo Trusts and ($628,112) was paid by Klein for Trust insurance premiums, accounting fees and for attorney fees to Madeline Lipschutz in a family law matter. (*Ibid*.)

As noted above, subject to any Phase II credit(s) given by the trial judge to Klein on the First Accountings for attorney fees and litigation expenses in preparation of grossly and intentionally incomplete verified accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the true periods of the First Accounting, and never returned, in terms of outright misappropriations, totals $6,224,540**.

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. The 24 verified First Accountings submitted by Klein, by Magnes' admission, completely ignore funds diverted from the Menlo Trusts to and from the MCT account, the LKA account, and Klein's personal bank accounts. Magnes appears to have been spoon-fed documents and numbers that Klein, through his counsel, wanted Magnes to include, to the exclusion of the client's known business and personal accounts, and a separate Klein-created Trust bank account, through all of which the Referee finds that Klein was able to and did misappropriate $6,224,540 in funds for his personal use during the First Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon settlement rendered against Klein. where, as here, the Referee finds "a ... failure to keep true accounts" (*Blackmon v. Hale, supra,* 1 Cal. 3d at 560); and also where, as here, "any doubt from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe, supra,* 98 Cal.App.2d at 505), **Klein is surcharged in the principal sum of $6,224,540 for outright cash misappropriations across the 24 Trusts during the true periods of the First Account, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013**.

It is not simply the misappropriations, however, that damaged the Menlo Trusts during the true First Accounting periods. The misappropriations, in part, came from $2,753,152 in loans taken by Klein against the value of Trust insurance policies, and $1,959,374 in loans taken against lines of credit against Trust Brokerage Accounts. The Menlo Trusts, not Klein, serviced in some form or fashion *all of the interest* due and owing on those combined $4,712,526 in loans. The interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the true First Accounting periods totaled $1,693,048. The interest charged by brokerage houses to service Trust lines of credit taken by Klein during the true First Accounting periods totaled $300,049.

Absent the $6,224,540 in misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the appropriate First Accounting periods, there would have been no need for the Trust to borrow funds and to subsequently service those loans. In light of the massive disparity between the millions of dollars in cash debits taken by Klein and the modest credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein from Trust assets during the First Accounting periods were for purposes of non-Trust use and therefore misappropriation.

As declared in Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

> "(a)  If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:
>
> (1)  **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
> (2)  Any profit made by the trustee through the breach of trust, with interest.
> (3)  Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.
>
> (b)  If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly the combined $1,993,097 in interest obligations **paid by the Menlo Trusts** during the First Accounting periods to subsidize the $4,712,526 in loan funds taken personally by Klein during the First Accounting periods are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $1,993,097, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013, for diminution in value to the Menlo Trusts for actual interest paid by the Trusts on loan funds taken by Klein during the First Account.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts. The Referee finds unequivocally that none of Klein's acts resulting in surcharge were performed reasonably or in good faith.

The third and final surcharge question is whether Klein breached the relevant Trusts during the true First Accounting periods by causing a $5,000,000 face value Phoenix Insurance universal life policy (#2346693) to lapse. At the time of the lapse decision, Klein was represented by counsel. On April 24, 2013, Klein sent a letter to the Menlo beneficiaries asking their position with respect to the lapse of the Phoenix policies 2265404 and 2346693. (Ex. 850.) The Menlo beneficiaries, through counsel, responded that it appeared Klein, through "wrongful borrowings," had depleted the value of the policies, but without a full accounting, the propriety of lapse decisions could not be gauged. (Ex.851.) Klein, through counsel, responded (ironically) that he would need to "invade the assets of the Irrevocable Trusts to fund the premiums due."

(Ex. 852.) Klein subsequently asserted, through counsel, that he would forthwith be liquidating the Menlo beneficiaries assets to pay Phoenix premiums. (Ex.854.)[43]

The evidence was undisputed that at the time of the Phoenix 2346693 policy lapse, including through Klein's insurance expert Burgess, that it was a reasonable decision for Klein to allow the policy to lapse due to the combination of loans *taken by Klein personally* against the Phoenix policy, continued unpaid interest accruing on those loans, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, further reducing policy value.[44]

The core cause of the Phoenix policy lapse was the loan funds taken by Klein against the lapsed Phoenix policy, which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policy was exclusively the result of Klein's misappropriation of trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums (see, e.g., Ex.434, at 3). The Referee finds not credible Klein's claim that Sam Menlo had directed the Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the Phoenix loan proceeds for himself.

---

[43] By this point, Klein, through many hundreds of loan transactions and asset transfers in and out of different accounts, had been liquidating Menlo Trust assets for years for his own personal benefit.

[44] The audits establish that between 2004 and 2012, a net $4,588,152 in cash loans was taken by Klein as against Phoenix and Lincoln Life insurance policies owned by the relevant Menlo Trusts. From Lincoln, Klein withdrew $100,000 cash in 2004 and $872,153 cash in 2008. From Phoenix, Klein withdrew $750,000 cash in 2005, $1,000,000 cash in 2007, $775,000 cash in 2008, $350,000 cash in 2010, and $1,050,000 cash in 2012. $300,000 cash was returned by Klein to Phoenix in 2009. Of the net $4,588,152 cash removed by Klein from the insurers, $2,773,152 were sent to deposited to LKA or to Klein individually. The balance of $1,825,000 was deposited into Klein's "MCT" account. As noted earlier, no reference to asset dispositions into the LKA account, Klein's personal accounts, nor the MCT accounts found their way into Klein's verified accountings, nor was Magnes authorized to inquire into or examine that data. (Ex. 434.)

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the $5,000,000 policy death benefit, less the principal amount of loans, thereby retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse, and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans, according to Wirtz, there should still have been $1,790,231 remaining in policy value.

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the First Accounting period of $1,790,231. **Klein is surcharged an additional $1,790,231 for the unreasonable diminution in value of the collective corpus of the 24 Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013.**

**The total principal surcharge to Klein for the true period of the First Accountings is determined to be $10,007,876** (*i.e.*, $6,224,540 + $1,993,097 + $1,790,231) (Ex. 834, at 11), less any attorney fees and costs incurred by Klein during the period of the First Accounts determined by the trial judge in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the net surcharge, if any, as further determined by the trial judge in Phase II.

Breaking down the net collective surcharge on an individual Trust basis, the surcharge sums (or credits) for the First Account are found, based upon substantial evidence, to be allocable as follows:

1  Abraham Deutsch -- ($165,044)

2  Samuel Deutsch – ($56,424)

3  Esther Deutsch – ($67,214)

4  Rachel Deutsch – ($27,220)

5  **Mordechai Deutsch -- $696,646**

6  **Deborah Deutsch -- $1,516,890**

7  **Zev Deutsch -- $738,752**

8  **Tanya Menlo -- $66,597**

9  **Franklin Menlo -- $51,741**

10  **Jonathan Menlo -- $693,714**

11  **Yeshia Frankel -- $658,620**

12  **Rochelle Lipschutz -- $780,115**

13  **Moishe Frankel -- $739,603**

14  **Madeline Lipschutz -- $793,217**

15  **Faye Lipschutz -- $703,514**

16  **Avi Lipschutz -- $680,133**

17  **Dov Lipschutz -- $785,301**

18  **Asher Frankel -- $751,428**

19  **Norine Winter -- $145,601**

20  **Michael Winter -- $60,225**

21  **Jeremy Winter -- $60,226**

22  **Amanda Winter -- $61,333**

23  **Jonathan Lifschutz -- $30,302**

24  **Daniel Winter -- $60,224** (Ex. 834, at 12.)[45]

---

25  [45] One of the many reasons these sums are so widely variable among the 24 Menlo beneficiaries is
26  because O'Bryan was required to and did reconcile the many hundreds of cross-Trust loans and transfers
    Klein had made between and among the 24 Menlo beneficiaries. In addition, *inter alia*, only certain
27  Menlo beneficiaries' accounts were utilized to subsidize the line of credit loans taken by Klein; while
    percentage ownerships of the Menlo Trust life insurance policies varied across the 24 Trusts, with the
28  insurance policy loan funds taken by Klein affecting only certain Menlo beneficiaries.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
54

Four of the Menlo Trust beneficiaries, Abraham Deutsch, Samuel Deutsch, Esther Deutsch and Rachel Deutsch, are accordingly not entitled to surcharge judgment against Klein on the First Accounting. The remaining 20 Menlo Trust beneficiaries are entitled to surcharge judgments in the respective principal sums identified above.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 20 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's First Accountings?**

In their respective initiating accounting, removal and surcharge petitions, the 20 prevailing Menlo beneficiaries pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a... trust... the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $8,217,645 of Menlo Trust cash during the period of the true First Accountings, including interest paid for which Klein should be liable; laundering funds through many hundreds of unnecessary intra-trust transactions and multiple repositories, including, *inter alia*, the commingling of assets of 24 individual Trusts and then frequently across Klein and his other clients' assets via his law firm attorney-client trust account; the use of the MCT account as a clearinghouse for additional misappropriated funds; and use of Menlo Trust cash to pay

$1,046,418 of his own personal credit card expenses through undisclosed overdraft authorization on the surreptitious MCT fund transfer account.

The remaining surcharge award associated with Klein's lapse of the Phoenix insurance policy is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as properly adjusted. Klein's direct cash misappropriations associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the four non-prevailing beneficiaries are filtered out, total **$8,533,547, payable in the following additional sums**:

**Mordechai Deutsch -- $535,525**

**Deborah Deutsch -- $1,516,890**

**Zev Deutsch -- $577,631**

**Tanya Menlo -- $66,597**

**Franklin Menlo -- $51,741**

**Jonathan Menlo -- $532,593**

**Yeshia Frankel -- $497,507**

**Rochelle Lipschutz -- $618,994**

**Moishe Frankel -- $578,482**

**Madeline Lipschutz -- $793,217**

**Faye Lipschutz -- $542,393**

**Avi Lipschutz -- $519,012**

**Dov Lipschutz -- $624,180**

**Asher Frankel -- $590,307**

**Norine Winter -- $145,601**

**Michael Winter -- $60,225**

**Jeremy Winter -- $60,226**

**Amanda Winter -- $61,333**

**Jonathan Lifschutz -- $30,302**

**Daniel Winter -- $60,224** (Ex. 834, at 12.)

It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the First Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5th 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's First Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the First Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the First Account. While four of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the First Account, had Klein maintained and delivered an appropriate and accurate First Account for each of the 24 Menlo Trusts, they would not have had to engage in a ten-year litigation to unravel proper debits and credits as to the allocation of Klein's misappropriations. Klein breached multiple trust obligations to each of those four beneficiaries, including with respect to Klein's complete lack of record keeping and failure to timely and accurately account. (*Smith v. Szeyller, supra,* 31 Cal.App.5th at 461-462.)

## STATEMENT OF DECISION ON
## SETTLEMENT OF THE TRUSTEE'S SECOND ACCOUNT

The Referee incorporates by reference as though fully set forth herein the evidentiary rulings associated with Klein and LKA's *Sanchez* objections, allegations of "taint" associated with Judge Cowan's rulings on discovery regarding preparation of Klein's accountings, and

arguments regarding the timing of receipt of the Menlo beneficiaries' exhibits. For the reasons articulated above, those objections are again overruled.


### Should Klein Be Surcharged on the Second Account?

The cross-account transactional audit conducted by forensic accounting expert O'Bryan on Klein's Second Accounts for the 24 Trusts was extensive. The approximately 4000 transactions conducted by Klein on behalf of the Trusts during the Second Accounting period, hundreds of which transactions were completely ignored in Klein's verified Second Accounts, were separately detailed by O'Bryan. (Ex. 843.)

As previously determined in the Referee's Statement of Decision on Klein's First Accounts, the testimony of O'Bryan on Klein's Second Accounts was clear, convincing and credible. Though at the time litigating against the Menlo beneficiaries and represented by current counsel, many hundreds of transactions conducted by Klein on behalf of the Menlo Trusts, identified by O'Bryan, remained *excluded* from Klein's verified Second Accounts.

The Referee finds that through an elaborate scheme to continue to pay himself by co-mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-paying debts -- filtered with stunning frequency through Klein's personal and business accounts containing multiple other sources of income and receipts and outgoing payments, Klein was able in the Second Accounts to perpetuate and further extend his design to misappropriate funds from the Menlo Trusts.

Menlo Trust transactional funds continued to be moved by Klein into and out of his LKA attorney-client trust account. During the entirety of the Second Account across the 24 Menlo Trusts, a net $254,649 in cash was removed by Klein from the Menlo Trusts and not returned by the December 31, 2016 Second Account closing date; an additional $1,282,783 was removed by Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts; an additional $172,101 was taken by Klein into the personal accounts of Klein and his wife Erika as overdraft protection against the Bank of America "MCT" account opened by Klein and funded

by Menlo Trust assets; and $75,956 in Menlo Trust checks and funds were taken by Klein directly into Klein's LKA law firm account and for other Klein uses. (Ex. 842, at 3.)

Against these sums, over the Second Accounting across the 24 Menlo Trusts, a net credit of ($73,061) in cash was returned by Klein to his MCT Bank of America account and ($559,190) was paid by Klein for Trust insurance premiums to pay for insurance premiums on Trust insurance policies not yet lapsed (*Ibid.*)

As noted above, subject to any Phase II credit(s) given by the trial judge to Klein on the Second Accountings for attorney fees and litigation expenses in preparation of the incomplete accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the Second Accounting period, and never returned, totals $1,153,228**.

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. The 24 verified Second Accountings submitted by Klein, by Magnes' admission, once again ignore the disposition of funds diverted from the Menlo Trusts to and from the MCT account, the LKA account, and Klein's personal bank accounts. The Referee finds that Klein was able to and did misappropriate $1,153,228 in funds for his personal use during the Second Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon its settlement rendered against Klein; where, as here, the Referee finds "a … failure to keep true accounts" (*Blackmon v. Hale, supra*, 1 Cal. 3d at 560); and also where, as here, "any doubt from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe, supra*, 98 Cal.App.2d at 505). **Klein is surcharged in the principal sum of $1,153,228 for net cash misappropriations across the 24 Trusts during the Second Account, plus any interim prejudgment interest to be determined to have accrued after the close of the Second Accounting period on December 30, 2016.**

It is not only the cash misappropriations damaging the Menlo Trusts during the Second Accounting period. The misappropriations, in part, came from $1,282,783 *in additional loans* taken by Klein during the Second Accounting period against lines of credit obligating Menlo Trust Brokerage Accounts. The Menlo Trusts, not Klein, serviced *all of the interest* due and owing on those additional loans, and in continuing interest charged on the $4,712,486 in prior insurance and brokerage loans taken by Klein during the period covered by the First Account. The *additional* interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the First Accounting periods, but paid by Klein from Trust funds during the Second Accounting period, totaled $409,134. The *additional* net interest charged by brokerage houses to service Trust lines of credit taken out by Klein during either the First Accounting period or Second Accounting period, but paid by the Trusts during the Second Account, totaled $17,642.

Absent the cash misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the First Accounting and Second Accounting periods, there would have been no need for the Trusts to subsequently service those loans. In light of the disparity between the cash debits taken by Klein without repayment to the Trusts and the credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein against Trust assets during the Second Accounting period were for purposes of non-Trust use and therefore misappropriation.

Pursuant to Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

"(a)  If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:

(1)  **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
(2)  Any profit made by the trustee through the breach of trust, with interest.

(3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

(b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly $426,776 in *additional* interest obligations **paid by the Menlo Trusts** during the during the Second Accounting period to subsidize the $5,995,259 in total loan funds taken personally by Klein during the First and Second Accounting periods, are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $426,776, plus any interim prejudgment interest to be determined to have accrued after the close of the Second Accounting period on December 31, 2016, for diminution in value to the Menlo Trusts for additional interest paid by the Trusts on loan funds taken by Klein during the First and Second Account periods.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts. The Referee finds that none of Klein's acts resulting in surcharge on the Second Accounts were performed reasonably or in good faith.

The remaining surcharge question on the Second Accounts is whether Klein breached the relevant Trusts during the Second Accounting period by causing two additional $5,000,000 face value Phoenix Insurance universal life policies (#2265404 and #2356295) to lapse. The evidence was undisputed that *at the time* of those policy lapses, as defined by Klein's insurance expert Burgess, it was a reasonable decision for Klein to allow the two insurance policies to lapse due to the combination of loans *taken by Klein personally* against those Phoenix policies, continued unpaid interest accruing on those policy loans, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, significantly reducing the respective policy values.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

61

The core cause of the additional two Phoenix policy lapses was the loan funds taken by Klein against the lapsed Phoenix policies, which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policies was exclusively the result of Klein's misappropriations of Trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums. The Referee finds not credible Klein's claim that Sam Menlo had directed Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the respective Phoenix loan proceeds for himself.

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the additional $10,000,000 in policy death benefits, less the principal amount of loans all the while retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse (calculated to pay out in 2023), and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans, according to Wirtz, there should still have been $4,489,210 remaining in policy values over the two additional lapsed policies. (Ex. 844.)

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the First Accounting period of $4,489,210. **Klein is surcharged an additional**

$4,489,210 for the unreasonable diminution in value of the collective corpus of the 24 Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued after the close of the Second Accounting period on December 31, 2016.

The total principal surcharge to Klein for the Second Accountings is found to be $6,069,214 (*i.e.*, $1,153,228 + $426,776 + $4,489,210) (Ex. 842, at 3), less any attorney fees and costs incurred by Klein during the period of the Second Accounts determined by the trial judge in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the net surcharge, if any, as further determined by the trial judge in Phase II.

Breaking down the net collective surcharge on an individual Trust basis, the surcharge sums (or credits) for the Second Account are found, based upon substantial evidence, to be allocable as follows:

Abraham Deutsch -- ($7211)

Samuel Deutsch – ($7211)

Esther Deutsch – ($7211)

Rachel Deutsch – ($7211)

Norine Winter – ($7256)

**Mordechai Deutsch -- $463,492**

**Deborah Deutsch -- $533,505**

**Zev Deutsch -- $462,492**

**Tanya Menlo -- $37,179**

**Franklin Menlo -- $66,811**

**Jonathan Menlo -- $494,494**

**Yeshia Frankel -- $461,095**

**Rochelle Lipschutz -- $461,095**

**Moishe Frankel -- $461,095**

**Madeline Lipschutz -- $849,571**

**Faye Lipschutz -- $462,492**

**Avi Lipschutz -- $465,111**

Dov Lipschutz -- $462,492

Asher Frankel -- $461,095

Michael Winter -- $51

Jeremy Winter -- $51

Amanda Winter -- $51

Jonathan Lifschutz -- $2059

Daniel Winter -- $51 (Ex. 842, at 16-38.)[46]

It should be clarified that these calculations are not "running" totals, but rather, are intended to constitute separate surcharge judgments exclusively for the Second Accounting period, independent of the calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the period of the First Accountings as of June 30, 2013.

Five of the Menlo Trust beneficiaries, Abraham Deutsch, Samuel Deutsch, Esther Deutsch, Rachel Deutsch and Norine Winter, are accordingly not entitled to surcharge judgment against Klein on the Second Accounting. The remaining 19 Menlo Trust beneficiaries are entitled to additional surcharge judgments in the respective principal sums identified above.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 19 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's Second Accounts?**

In their initiating accounting, removal and surcharge petitions, the 19 prevailing Menlo beneficiaries on the Second Account pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

---

[46] The Referee's surcharge calculations are exclusive of potential adverse tax consequences associated with income realization upon lapse of the two Phoenix insurance policies during the Second Accounting period. As noted earlier, the Referee determines those potential tax losses to be speculative and not currently recoverable, while not relieving Klein of contingent liability to the extent those tax consequences become realized.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

64

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a… trust… the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $1,580,004 of Menlo Trust cash during the period of the Second Accountings, including interest paid for which Klein should be liable; laundering funds through many hundreds of unnecessary intra-trust transactions and multiple repositories, including, *inter alia*, the commingling of assets of 24 individual Trusts and then frequently across Klein and his other clients' assets via Klein's law firm attorney-client trust account; the use of the MCT account as a clearinghouse for additional misappropriated funds; and use of Menlo Trust cash to pay an additional $172,101 of his own personal expenses through undisclosed overdraft authorization on the surreptitious MCT account.

The remaining surcharge award associated with Klein's lapse of the two additional Phoenix insurance policies is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as adjusted. Klein's direct cash misappropriations associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the five non-prevailing beneficiaries are filtered out, total **$1,625,311, payable in the following additional sums:**

**Mordechai Deutsch -- $14,571**

**Deborah Deutsch -- $533,505**

**Zev Deutsch -- $13,571**

**Tanya Menlo -- $37,179**

Franklin Menlo -- $66,811

Jonathan Menlo -- $45,573

Yeshia Frankel -- $12,174

Rochelle Lipschutz -- $12,174

Moishe Frankel -- $12,174

Madeline Lipschutz -- $849,571

Faye Lipschutz -- $13,571

Avi Lipschutz -- $16,190

Dov Lipschutz -- $13,571

Asher Frankel -- $12,174

Michael Winter -- $51

Jeremy Winter -- $51

Amanda Winter -- $51

Jonathan Lifschutz -- $2059

Daniel Winter -- $51

    It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the Second Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5th 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

    To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's Second Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the Second Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the Second Account. While five of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the Second Account, had Klein maintained and delivered an appropriate and accurate Second Account for each of the 24 Menlo Trusts, they would not have had to engage in a multi-year litigation to unravel proper debits and credits as to the allocation of Klein's misappropriations. Klein breached multiple trust obligations to each of those five beneficiaries, including with respect to Klein's complete lack of record keeping and failure to timely and accurately account. (*Smith v. Szeyller*, *supra*, 31 Cal.App.5[th] at 461-462.)

## STATEMENT OF DECISION ON
## SETTLEMENT OF THE TRUSTEE'S THIRD ACCOUNT

The Referee incorporates by reference as though fully set forth herein the evidentiary rulings associated with Klein and LKA's *Sanchez* objections, allegations of "taint" associated with Judge Cowan's rulings on discovery regarding preparation of Klein's accountings, and arguments regarding the timing of receipt of the Menlo beneficiaries' exhibits. For the reasons articulated above, those objections are again overruled.

### Should Klein Be Surcharged on the Third Account?

The cross-account transactional audit conducted by forensic accounting expert O'Bryan on Klein's Third Accounts for the 24 Trusts was extensive. The approximately 2000 transactions conducted by Klein on behalf of the Trusts during the Third Accounting period, many of which transactions were ignored in Klein's verified Third Accounts, are painstakingly detailed in O'Bryan's database. (Ex. 860.)

As previously determined in the Referee's Statement of Decision on Klein's First and Second Accounts, O'Bryan's testimony on Klein's Third Accounts was clear, convincing and credible. The Referee finds that through an elaborate scheme to continue to pay himself by co-

mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-paying debts -- filtered with frequency through Klein's business account containing multiple other sources of income and receipts and outgoing payments, Klein was able to continue in the Third Accounts to perpetuate his pattern of misappropriation.

Menlo Trust transactional funds continued to be moved by Klein into and out of his LKA attorney-client trust account. During the entirety of the Second Account across the 24 Menlo Trusts, a net $165,905 in cash was removed by Klein from the Menlo Trusts and not returned by the September 30, 2018 Third Account closing date; and an additional $889,671 was removed by Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts (Ex. 862, at 3.) Against these sums, over the Third Accounting across the 24 Menlo Trusts, a net credit of ($547,641) was paid by Klein for Trust insurance premiums on policies not yet lapsed. (*Ibid.*)

As noted earlier, subject to any Phase II credit(s) given by the trial judge to Klein on the Third Accountings for attorney fees and litigation expenses in preparation of the incomplete accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the Third Accounting period, and never returned, totals $507,935**.

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. In preparation of the Third Accounts, Magnes testified that she was not asked to determine if Klein had taken funds for his own use, nor was she seeking evidence of misappropriation. Based upon O'Bryan's comprehensive audit, the Referee finds that Klein was able to and did misappropriate an additional $507,935 in funds for his personal use during the Third Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon its settlement rendered against Klein; where, as here, the Referee finds "a ... failure to keep true accounts" (*Blackmon v. Hale. supra*, 1 Cal. 3d at 560); and also where, as here, "any doubt

from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe*, *supra*, 98 Cal.App.2d at 505), **Klein is surcharged in the principal sum of $507,935 for net cash misappropriations across the 24 Trusts during the Third Account, plus any interim prejudgment interest to be determined to have accrued after the close of the Third Accounting period on September 30, 2018.**

It is not only the cash misappropriations damaging the Menlo Trusts during the Second Accounting period. The misappropriations, in part, came from $889,671 *in additional loans* taken by Klein during the Third Accounting period against lines of credit obligating Menlo Trust brokerage accounts. The Menlo Trusts, not Klein, serviced *all of the interest* due and owing on those additional loans, and in continuing the payment of interest charged on unpaid insurance and brokerage loans taken by Klein during the periods covered by the First Account and Second Account. The *additional* interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the First Accounting periods, but paid by Klein from Trust funds during the Third Accounting period, totaled $208,454. The *additional* net interest charged by brokerage houses to service Trust lines of credit taken out by Klein during either the First, Second or Third Accounting periods, but paid by the Trusts during the Third Account, totaled $92,252.

Absent the cash misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the First, Second and Third Accounting periods, there would have been no need for the Trusts to subsequently service those loans. In light of the disparity between the cash debits taken by Klein without repayment to the Trusts and the credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein against Trust assets during the Second Accounting period were for purposes of non-Trust use and therefore misappropriation.

Pursuant to Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

"(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:

(1) **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
(2) Any profit made by the trustee through the breach of trust, with interest.
(3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

(b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly $300,706 in *additional* interest obligations **paid by the Menlo Trusts** during the during the Third Accounting period to subsidize the **$6,884,930 in total loan funds taken personally by Klein during the First, Second and Third Accounting periods,** are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $300,706, plus any interim prejudgment interest to be determined to have accrued after the close of the Second Accounting period on December 31, 2016, for diminution in value to the Menlo Trusts for additional interest paid by the Trusts in the Third Accounting period on loan funds taken by Klein for his non-Trust use during the First, Second and Third Account periods.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts. The Referee finds that none of Klein's acts resulting in surcharge on the Third Accounts were performed reasonably or in good faith.

The remaining surcharge question on the Third Accounts is whether Klein breached the relevant Trusts during the Third Accounting period by causing a fourth $5,000,000 face value Phoenix Insurance universal life policy (#2499115) to lapse. The evidence was undisputed that *at*

*the time* of that policy lapse, as opined by Klein's insurance expert Burgess, it was a reasonable decision for Klein to allow the fourth Phoenix policy to lapse due to the combination of loans *taken by Klein personally* against that Phoenix policies, continued unpaid interest accruing on that policy loan, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, significantly reducing the policy's value.

The core cause of the fourth Phoenix policy lapse was the loan funds taken by Klein against the policy which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policy was exclusively the result of Klein's misappropriations of Trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums. The Referee finds not credible Klein's claim that Sam Menlo had directed Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the lapsed Phoenix loan proceeds for himself.

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the additional $5,000,000 in policy death benefits, less the principal amount of loans all the while retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse (calculated to pay out in 2023), and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans,

according to Wirtz, there should still have been $2,339,334 remaining in policy value on the fourth lapsed policy. (Ex. 873.)

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the Third Accounting period of $2,339,334. **Klein is surcharged an additional $2,339,334 for the unreasonable diminution in value of the collective corpus of the 24 Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued after the close of the Third Accounting period on September 30, 2018.**

**The total principal surcharge to Klein for the Third Accountings is found to be $3,147,975** (*i.e.*, $507,935 + $300,706 + $2,339,334) (Ex. 842, at 3), less any attorney fees and costs incurred by Klein during the period of the Second Accounts determined by the trial judge in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the net surcharge, if any, as further determined by the trial judge in Phase II.

Breaking down the collective net surcharge on an individual Trust basis, the surcharge sums (or credits) for the Third Account are found, based upon substantial evidence, to be allocable as follows:

**Abraham Deutsch -- $10,289**

**Samuel Deutsch – $10,289**

Esther Deutsch – ($1114)

Rachel Deutsch – ($1114)

Norine Winter – ($27,134)

**Mordechai Deutsch -- $195,449**

**Deborah Deutsch -- $350,436**

**Zev Deutsch -- $195,449**

**Tanya Menlo -- $10,289**

Franklin Menlo – ($15,688)

1    Jonathan Menlo -- $206,852

2    Yeshia Frankel -- $206,852

3    Rochelle Lipschutz -- $203,478

4    Moishe Frankel -- $206,852

5    Madeline Lipschutz -- $585,286

6    Faye Lipschutz -- $195,449

7    Avi Lipschutz -- $187,226

8    Dov Lipschutz -- $195,449

9    Asher Frankel -- $206,852

10    Michael Winter -- $12,316

11    Jeremy Winter -- $12,316

12    Amanda Winter -- $12,316

13    Jonathan Lifschutz -- $2047

Daniel Winter -- $12,316 (Ex. 862, at 14-37.)[47]

It should be clarified that these calculations are not "running" totals, but rather, are intended to constitute separate surcharge judgments exclusively for the Third Accounting period, independent of the calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the period of the First Accountings as of June 30, 2013, and independent of the separate calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the Second Accounting period on December 31, 2016.

Four of the Menlo Trust beneficiaries, Esther Deutsch, Rachel Deutsch, Norine Winter and Frank Menlo are accordingly not entitled to surcharge judgment against Klein on the Third Accountings. The remaining 20 Menlo Trust beneficiaries are entitled to additional surcharge judgments in the respective principal sums identified above.

---

[47] The Referee's surcharge calculations are exclusive of potential adverse tax consequences associated with income realization upon lapse of the fourth Phoenix insurance policy during the Third Accounting period. As noted earlier, the Referee determines those potential tax losses to be speculative and not currently recoverable, while not relieving Klein of contingent liability to the extent those tax consequences become realized.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 19 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's Third Accounts?**

In their initiating accounting, removal and surcharge petitions, the 19 prevailing Menlo beneficiaries on the Second Account pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a... trust... the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $808,641 of Menlo Trust cash during the period of the Third Accountings, including interest paid for which Klein should be liable; laundering funds through unnecessary intra-trust transactions and repositories, including, *inter alia*, the commingling of assets of the 24 individual Trusts, then frequently spreading those assets across Klein and his other clients' assets via his law firm attorney-client trust account.

The remaining surcharge award associated with Klein's lapse of the two additional Phoenix insurance policies is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as adjusted. Klein's direct cash misappropriations

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
74

associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the five non-prevailing beneficiaries are filtered out, total **$1,017,900, payable in the following additional sums:**

**Abraham Deutsch -- $10,289**

**Samuel Deutsch – $10,289**

**Deborah Deutsch -- $350,436**

**Tanya Menlo -- $10,289**

**Madeline Lipschutz -- $585,286**

**Michael Winter -- $12,316**

**Jeremy Winter -- $12,316**

**Amanda Winter -- $12,316**

**Jonathan Lifschutz -- $2047**

**Daniel Winter -- $12,316**

It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the Third Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5th 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's Third Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the Third Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the Second Account. While four of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the Third Account, had Klein

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

75

maintained and delivered an appropriate and accurate Third Account for each of the 24 Menlo

Trusts, they would not have had to engage in a multi-year litigation to unravel proper debits and

credits as to the allocation of Klein's misappropriations. Klein breached multiple trust

obligations to each of those five beneficiaries, including with respect to Klein's complete lack of

record keeping and failure to timely and accurately account. (*Smith v. Szeyller*, *supra*, 31

Cal.App.5[th] at 461-462.)

## STATEMENT OF DECISION ON REMAINING
## ISSUES RELATING TO ALL ACCOUNTINGS

**Is Klein Entitled to Trustee Fees, and if so, How Much?**

Long after Klein's three sets of accountings were filed in 2013, 2018 and 2019,

respectively, on November 16 and November 17, 2021, on the eve of trial before the Referee,

Klein filed 72 sets of *verified* supplements to his earlier accountings, across each of the 24 Menlo

Trusts, demanding Trustee fees in the collective sum of $1,034,477.58 beyond the $750,000

claimed by Klein in 2005.

Under the provision of Children's Trusts and the Grandchildren's Trusts authorizing an

annual trustee fee of .05% of the sum of trust assets under management, Klein attempted in the

November 2021 filings to use the *total death payout sums* of Trust life insurance policies,

including those Klein in the interim had caused to lapse, to inflate the carrying value of Trust

assets for purposes of geometrically increasing his Trustee fee.

By way of example, in the Second Supplement to the First Account for Menlo

beneficiary Asher Frankel, filed November 16, 2021, instead of relying upon the $51,387 in cash

and $72,089 in securities as the carrying value of that Trust, Klein includes in the carry value

$55,500,000 in unmatured face value life insurance policies of which that Trust was a partial

beneficiary, including the four subsequently lapsed Phoenix policies. Klein then subtracts from

the beneficiary's allocable percentages of unmatured death payments on those policies the cash

loans Klein withdrew from those policies, further reduced by anticipated premium payments

through the anticipated actuarial date of Vera Menlo's passing. In this fashion, Klein was able to

increase $123,476 in Trust assets to, in the case of Asher Frankel, a claim of $1,954,516 of

"assets on hand" for purposes of calculating Klein's Trustee fees. Klein uses this same protocol across all 24 Menlo beneficiaries and all 72 accountings.

There is a proper method to account for life insurance policies in an irrevocable insurance trust, and it is stated very clearly in the very CEB text that Klein's counsel held up as the "leading treatise in California on fiduciary accounting." In the 2021 supplement to the 2020 addition of the *Fiduciary Accounting Handbook*, and now in the main volume of the current 2022 addition, there is a separate section entitled in bold: **"How Do I Account for an Irrevocable Life Insurance Trust."** Given its use as a prop at trial, it defies credulity to suggest that Klein and his counsel were unaware of the proper accounting protocol.

According to the respective texts, at §16.28, before a life insurance policy matures (which is the case as to **all** of Klein's filed accountings), the carrying value of such a policy prior to maturity consists *solely* of the premium payments made. At the time of maturity (i.e., the death of the insured), the accounting will reference *a gain* in the amount of the policy payout over the sum of premium payments.

Klein assiduously avoided making policy premium payments whenever possible, at least according to his testimony at trial, resulting in the loss of $20,000,000 in Phoenix policies at a minimum and reduction in principal payout sums on others. While one may understand why Klein opted to invent an unorthodox accounting methodology to receive more Trustee fees than permissible, at what point does a combination of millions in cash asset misappropriations, laundering of funds, suppression of relevant documents and "creative" improper accounting become an attempted fraud upon the parties and the Court?

Klein testified that Sam Menlo directed him to take $750,000 in Trustee fees in 2005 as a lump sum for prior Trust services rendered. The Referee finds that Sam Menlo was not competent in 2005 to authorize that payment, nor is there any corroborating evidence to support Klein's claim.[48] Rather, the written record supports something entirely different.

---

[48] Per the credible testimony of Frank Menlo:

"Q. In your opinion was your -- in about June of 2005 or even earlier in 2005, was your father mentally capable of making a decision as to how to pay trustee's fees to Mr. Klein?

A. Absolutely not." (6 Tr. 1199.)

On June 6, 2005, through records produced by the successor to Phoenix, three $250,000 cash loans were requested by Klein with signature authorizations which appeared to include Frank Menlo. Whatever the amount of those authorizations as presented, the original numbers were scribbled out and altered in favor of a series of three $250,000 loan requests, which were then faxed to Phoenix Insurance. (Exs. 309-311.)

To its credit, Phoenix refused to honor what appeared to be altered documents, in favor of proper authorizations without the scribbling and interlineation of amounts. In the replacement documents faxed the following day by Klein to Phoenix Insurance (Exs. 312-314), Frank Menlo testified that the signature purporting to be his is not his signature. (6 Tr. 1217-1218.) The signatures clearly do not match.

With no further evidence, and upon Frank Menlo's unequivocal testimony that he did not authorize $750,000 in payments to Klein, the most logical inference is that Klein or someone on his behalf forged Frank Menlo's initials. The Referee finds that while Klein clearly took $750,000 in his fiduciary capacity against Menlo Trust assets, never returning one cent of those funds (or any other loan funds for that matter, or any interest on any funds), there is no credible evidence that the $750,000 was payment made to Klein for Trustee fees.

Where the trustee commits a breach of trust, the trial court may deny the trustee all compensation. *Estate of Gump* (1991) 1 Cal.App.4th 582, 597; *Butler v. LeBouef* (2016) 248 Cal. App. 4th 198, 213. It is undeniable that Klein has managed the 24 Menlo Trusts principally for his own personal benefit and enrichment.[49] Klein embezzled what has been accurately calculated to be $19,225,065 in Trust assets for which he has no response. Klein refused to account for many years until forced to do so by the Court, and, even after a decade of litigation, still refuses to account for 156 years of collective trust management. Klein has ignored the distributive terms of every single Menlo Trust except one. Klein claimed to have no Trust documents upon which to account. Klein has borrowed many millions of dollars against Trust

---

[49] During the course of the trial, Klein not uncommonly referred to Menlo Trust assets as "my" money.

assets as to which he has never shown any interest in repaying. Klein has deliberately filtered thousands of Trust transactions through his own attorney-client trust account for no legitimate reason. Klein torpedoed $20,000,000 in valuable Trust life insurance policies because of his compulsion to divert Menlo Trust assets for non-Trust purposes. Klein unabashedly used Menlo Trust accounts as overdraft protection on his personal credit cards as a means to misappropriate many additional hundreds of thousands of Trust dollars. Klein submitted 72 incomplete and misleading accountings to the Court intending to mask his many years and millions of dollars of fiduciary misappropriation.

The Referee denies all Trustee fees.


**What About LKA?**

Beyond its obvious participation as a financial clearinghouse for thousands of Trust transactions, including millions of dollars in Menlo Trust assets never returned by Klein to the Trusts for a beneficial trust purpose, it is not clear why LKA was added to trust accounting litigation on what is essentially a civil conspiracy count.

Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. _Applied Equipment Corp. v. Litton Saudi Arabia Ltd._ _(1994) 7 Cal. 4th 503, 510-511_. "A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage." _Id._, quoting _Doctors' Co._ v. _Superior Court_ (1989) 49 Cal.3d 39, 44.

It was Klein, not LKA, who moved Menlo Trust funds into and out of the LKA attorney-client trust account. There is no suggestion that LKA used Menlo Trust funds for its own purposes, or that LKA somehow had dispositional control over the funds on deposit.

LKA was not the Trustee of the Menlo Trusts. LKA was not in an attorney-client relationship with the Menlo Trusts. Klein's statutory obligations and adverse presumptions

associated with his incomplete and false accountings have nothing to do with civil conspiracy claims against LKA, which accountings LKA did not prepare and for which LKA had no participation or responsibility.

It is *the burden of the six Menlo beneficiaries* naming LKA as a party to prove both liability and damages associated with LKA. While the 24 Menlo beneficiaries established clearly and convincingly that (in addition to their consequential losses on the four lapsed Phoenix Life Insurance policies) Klein withdrew $19,225,065 in Menlo Trust cash that he never returned or applied to a beneficial Trust purpose, nowhere over the 22 days of trial did the five Menlo beneficiaries suing LKA prove that the 23 checks identified in their Fifth Amendment were among the millions of dollars in funds improperly retained by Klein.

The Menlo beneficiaries did a commendable job of specifying with certainty all transactions on funds removed by Klein from the Trusts, all transactions on funds intended for the Trusts from third party sources that were either waylaid or redirected by Klein, all transactions within the Trusts themselves, and all transactions involving funds utilized by Klein for *bona fide* Trust purposes. And no time, however, did the Menlo beneficiaries, or at least the six beneficiaries litigating against LKA, drill down to the *ultimate* disposition of LKA proceeds beyond those utilized for the legitimate Trust purposes. It is currently unknown whether the 23 checks identified in the Fifth Amendment filed March 5, 2019 were among the millions in funds misappropriated by Klein or were among the funds utilized for a proper trust purpose.[50]

---

[50] As testified by O'Bryan at trial:

"Q. As part of your scope of work for L.K.A., you essentially did a money in money out analysis, correct?
A. That's correct.
Q. Okay. So you have no idea, as you sit here today, whether any funds that landed in the L.K.A. trust account were used for L.K.A. purposes, correct?
A. I do not.
And as you sit here today, you don't know whether or not any of the funds that landed in the L.K.A. bank account were eventually used for other trust purposes, correct?
A. That's correct.
Q. And as you sit here today, you don't know whether any funds that landed in the L.K.A. bank accounts were used for payment of legal or accounting expenses related to the trust, correct?

1  The six Menlo beneficiaries failed to satisfy their burden of proof with respect to their civil

2  conspiracy claim against LKA. LKA's motion for judgment is granted.

3

4  **Allocation of Referee Fees**

5     Referee fees on settlement of the 72 contested Menlo Trust accountings have been

6  collectively charged throughout at a rate of $880 per hour. From the introductory calendaring

7  conference with counsel on September 24, 2021 through completion of this Report and

8  Recommendation on August 27, 2022, a collective 336.20 referee hours have been entered,

9  including but not limited to 22 days of trial, the subsequent sifting through trial notes, exhibits

10 and testimony, and the research and preparation of this Report and Recommendation on the

11 adjudication and settlement of each of the 72 accounting petitions. The Referee calculates total

12 professional fees to date to be $295,856,[51] with an additional $36,723.24 charged in case

13 management fees.

14    For all of the reasons set forth in this Report and Recommendation, the Referee

15 recommends that the Menlo beneficiaries be ordered reimbursed by Klein for the entirety of their

16 contributions to the Referee's invoicing, as part of a consolidated itemized cost memorandum.

17

18    **SUMMARY OF RECOMMENDATIONS ON SETTLEMENT OF ACCOUNTS**

19    **On the 24 First Accountings:**

20 1.  That Klein be **surcharged** in the net principal sum of **$10,007,876**, such sum to be
      allocated (including adjustments to be made between Trusts to eliminate the four
21    negative balances) among the 24 Menlo Trusts as specifically itemized above on the
      First Accounts;

22

23

24 A. I believe that's correct.
   Q. And as you sit here today, you have no idea whether L.K.A. is still holding onto any funds from the
   trust accounts, correct?
25 A. You mean as of today?
   Q. As of today?
26 A. Yeah, I don't know." (17 Tr. 3294-3295.)

27

28 [51] The Referee's consolidated professional fee translates to $4034 per petition.

   REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
   81

2. That Klein be **further surcharged** in the sum of **$8,533,547** under Probate Code §859, such sum to be specifically allocated among the identified 20 Menlo Trusts as itemized above on the First Accounts;

3. That the net surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the First Accountings on June 30, 2013, as contemplated by Probate Code §§16440(a)(1) and 16441;

4. That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his First Accountings and in the defense of related surcharge claims;

5. That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the 24 Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein on the First Account;

6. That Klein be denied Trustee fees;

7. That LKA's motion for judgment be granted;

8. That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the First Accounts; and that costs be awarded to LKA from the six litigating Menlo petitioners.

**On the 24 Second Accountings:**

1. That Klein be **surcharged** in the net principal sum of **$6,069,214**, such sum to be allocated (including adjustments to be made between Trusts to eliminate the five negative balances) among the 24 Menlo Trusts as specifically itemized above on the Second Accounts;

2. That Klein be **further surcharged** in the sum of **$1,625,311** under Probate Code §859, such sum to be specifically allocated among the identified 19 Menlo Trusts as itemized above on the Second Accounts;

3. That Klein be ordered to fully indemnify the applicable Menlo Trust beneficiaries for any future adverse Trust or individual beneficiary tax consequence associated with Klein's lapse of Trust life insurance policies during the period of the Second Accounts;

4. That the surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the Second Accountings on December 31, 2016, as contemplated by Probate Code §§16440(a)(1) and 16441;

5. That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his Second Accountings and in the defense of related surcharge claims;

6. That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein;

7. That Klein be denied Trustee fees;

8. That LKA's motion for judgment be granted; and

9. That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the Second Accounts; and that costs awarded to LKA from the six litigating Menlo petitioners.

**On the 24 Third Accountings:**

1. That Klein be **surcharged** in the net principal sum of **$3,147,975** such sum to be allocated among the 24 Menlo Trusts as specifically itemized above on the Third Account.

2. That Klein be **further surcharged** in the sum of **$1,017,900** under Probate Code §859, such sum to be allocated among the ten Menlo Trusts as specifically itemized above on the Third Accounts;

3. That Klein be ordered to fully indemnify the applicable Menlo Trust beneficiaries for any future adverse Trust or individual beneficiary tax consequence associated with Klein's lapse of the Trust life insurance policy during the period of the Third Account;

4. That the surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the Third Accountings on September 30, 2018, as contemplated by Probate Code §§16440(a)(1) and 16441;

5. That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his Third Accountings and in the defense of related surcharge claims;

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

83

6. That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein;

7. That Klein be denied Trustee fees;

8. That LKA's motion for judgment be granted; and

9. That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the Third Accounts; and that costs be awarded to LKA from the six litigating Menlo petitioners.[52]

Dated: August 29, 2022

*Glen M. Reiser*

Judge Glen Reiser (Ret,)
§639 Referee

IT IS SO ORDERED.

_____

Judge of the Superior Court

---

[52] Over the settlement of all 72 accountings, through the respective accounting periods presented, and deferring the prejudgment interest calculations to the trial court, the total principal surcharge recommendation against Klein is $19,225,065. The additional consolidated Probate Code §859 recommendation is $11,176,758. The recommended collective surcharge judgment, prior to Phase II interest and attorney fees/cost debits or credits, is therefore $30,401,823.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
84

## PROOF OF SERVICE BY E-Mail

Re: In re: Franklin Henry Menlo Irrevocable Trust, Established March 1, 1983
Reference No. 1220070187

I, Stephanie Barraza, not a party to the within action, hereby declare that on August 29, 2022, I served the attached REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE ON EXAMINATION AND ADJUDICATION OF THE TRUSTEE'S FIRST, SECOND, AND THIRD ACCOUNTINGS ON EACH OF THE TWENTY-FOUR TRUSTS AT ISSUE FOR THE TRUST PERIODS SEPTEMBER 10, 1996-JUNE 30, 2013, JULY 1, 2013-DECEMBER 31, 2016 AND JANUARY 1, 2017-SEPTEMBER 30, 2018 on the parties in the within action by electronic mail at Los Angeles, CALIFORNIA, addressed as follows:

Donald L. Saltzman Esq.
L/O Donald L. Saltzman
10537 Butterfield Rd
Los Angeles, CA   90064
Phone: 310-617-3073
dlslawcorp@aol.com
    Parties Represented:
    Franklin Henry Menlo, et al.

Terence S. Nunan Esq.
Alan D. Weinfeld Esq.
Parker, Milliken, Clark, et al.
555 S. Flower St.
30th Floor
Los Angeles, CA   90071-2440
Phone: 213-683-6500
tnunan@pmcos.com
aweinfeld@pmcos.com
    Parties Represented:
    Leslie Klein, Trustee, et al.

Candice K. Rogers Esq.
Hahn & Hahn
301 E. Colorado Blvd.
9th Floor
Pasadena, CA   91101
Phone: (626) 796-9123
crogers@hahnlawyers.com
    Parties Represented:
    Les Klein & Associates

Michael L. Wachtell Esq.
Buchalter, APC
1000 Wilshire Blvd.
Suite 1500
Los Angeles, CA   90017-2457
Phone: 213-891-0700
mwachtell@buchalter.com
    Parties Represented:
    Leslie Klein, Trustee, et al.

VIA ONE LEGAL TO:
Hon. Ana M. Luna
Los Angeles County Superior Court
111 N Hill St
Dept 3

Los Angeles, CA   90012
Phone: 213-830-0850

       I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles,

CALIFORNIA on  August 29, 2022.


/s/ Stephanie Barraza

—————————————————————
Stephanie Barraza
JAMS
SBarraza@jamsadr.com

### PROOF OF SERVICE

**In the Irrevocable Trust u/a/d September 26, 1990 f/b/o Abraham Deutsch**
**Case No.: 22STPB10823**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 16133 Ventura Boulevard, Penthouse Suite, Encino, CA 91436.

On November 3, 2022, I served the foregoing documents described as: **NOTICE OF ERRATA** on the interested parties in this action as stated below:

[ X ]   BY MAIL. I caused such envelope to be deposited in the mail at Encino, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Encino, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit:

Leslie Klein                                   Jeffrey Slot, Esq.
14245 Ventura Boulevard, 3rd Floor        15760 Ventura Boulevard, Suite 1600
Sherman Oaks, CA 91423                         Encino, CA 91436

Franklin Menlo                                 Jeffrey Winter
c/o Donald L. Saltzman, Esq.                   c/o Alex Weingarten, Esq.
10537 Butterfield Road                         2029 Century Park East, Suite 3400
Los Angeles, CA 90064                          Los Angeles, CA 90067

[ ]   BY ELECTRONIC MAIL TRANSMISSION (WITH ATTACHMENT). On this date, by causing transmission of the above-mentioned document(s) by electronic mail transmission, to the persons whose e-mail addresses appear below:

[ ]   BY ELECTRONIC SERVICE: I served the document(s) on the persons listed below by submitting an electronic version of the document(s) to One Legal, LLC, through the user interface at 222.onelegal.com:

[ ]   BY OVERNIGHT MAIL. I caused said document to be deposited with an express service carrier in a sealed envelope designated by the carrier as an express mail envelope, with fees and postage prepaid.

[ ]   BY FACSIMILE. I personally served this document by facsimile to the offices of the party(ies) on attached Service List.

---

PROOF OF SERVICE

1  [  ]    BY PERSONAL DELIVERY.  I delivered such document(s) by hand to the address(es) of
2  the addressee(s).

3  [ X ]    STATE.  I declare under penalty of perjury under the laws of the State of California that the
   above is true and correct.

4
5          Executed on November 3, 2022, at Encino, California.

6

7                                                    _Julie J. Thomas_
8                                                    Julie J. Thomas

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

ROBERT P. GOE (State Bar No. 137019)
rgoe@goeforlaw.com
REEM J. BELLO (State Bar No. 198840)
rbello@goeforlaw.com
**GOE FORSYTHE & HODGES LLP**
17701 Cowan Avenue, Suite 210, Bldg. D
Irvine, CA 92614
Telephone: (949) 798-2460
Facsimile: (949) 955-9437

BRIAN A. PROCEL (State Bar No. 218657)
brian@procel-law.com
MARTIN H. PRITIKIN (State Bar No. 210845)
marty@procel-law.com
**PROCEL LAW, PC**
401 Wilshire Boulevard, 12th Floor
Santa Monica, California 90401
Telephone: (424) 788-4538

Attorneys for Judgment Creditors and Plaintiffs
Erica and Joseph Vago

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:23-bk-10990-SK |
| LESLIE KLEIN, | Chapter 11 |
| Debtor. | Adv. Case No. |
| | |
| ERICA VAGO and JOSEPH VAGO, | **COMPLAINT TO DETERMINE THE NONDISCHARGEABILITY OF CERTAIN DEBTS OWED BY DEBTOR LESLIE KLEIN TO ERICA AND JOSEPH VAGO PURSUANT TO 11 U.S.C. § 523 AND TO DENY DISCHARGE PURSUANT TO SECTION 727(A)(12)** |
| Plaintiffs, | |
| vs. | |
| LESLIE KLEIN and DOES 1 through 10, | |
| Defendants. | |

1

Plaintiffs Erica ("Erica") and Joseph Vago ("Joseph") (collectively, the "Vagos"), allege as follows on personal knowledge:

## **Nature of the Case**

1.      Defendant and Debtor Leslie Klein ("Defendant" or "Debtor") stole more than $8 million from Erica in a complicated life insurance scam.

2.      Defendant was the Vagos' friend for more than 40 years.  Defendant preyed on the Vagos during a time of vulnerability and desperation.  Defendant convinced the Vagos to entrust him with Erica's $15 million inheritance.  Defendant claimed he would act as the Vagos' lawyer, accountant and investment adviser.

3.      In truth, Defendant is a con man who systematically embezzled the Vagos' money and lied to them every step of the way.  Defendant created false financial statements.  Defendant misrepresented the nature of the Vagos' "investments."  Defendant talked in circles and provided documents that were designed to confuse.  Defendant sold insurance policies without telling the Vagos.  Defendant fabricated meetings that never happened.  Defendant made himself the trustee over life insurance trusts that purportedly held the Vagos' money.

4.      In the end, Erica's money simply vanished.  Defendant forced the Vagos to take their case to trial.  Defendant attempted to derail the litigation at every possible moment.  Defendant refused to participate in discovery.  The trial court sanctioned Defendant on multiple occasions.  At trial, Defendant—who was a CPA for decades—could not account for what happened to $8 million in Erica's inheritance.  On cross-examination, Defendant admitted that he had no intention of ever giving Erica a return on her money.  This was a scam from start to finish.

5.      The jury ultimately returned a verdict holding Defendant liable for intentional fraud, fraudulent concealment, breach of fiduciary duty and elder abuse.  The jury awarded more than $8 million in punitive damages.  And the trial court entered judgment in the amount of $24.3 million.

6.      This debt is not dischargeable in bankruptcy.  The Vagos' judgment emanates from a widespread, deliberate and calculated fraud on the part of Defendant.

2

**Jurisdiction and Venue**

7.     On February 22, 2023 (the "Petition Date"), Defendant filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court, Central District of California, Los Angeles Division.

8.     This action is a civil proceeding arising in the above-captioned chapter 11 bankruptcy case, which is now pending in this judicial district, and arising under, and arising in and related to title 11 of the United States Code.

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(2)(J) to hear and determine this proceeding and to enter an appropriate final order and judgment.

10.     This matter is a core proceeding pursuant to 28 U.S.C. § 157.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

**The Parties**

12.     The Vagos are judgment creditors in the above-captioned Chapter 11 bankruptcy case.

13.     Defendant is the debtor in the above-captioned Chapter 11 bankruptcy case.

**General Allegations**

A.     **The Friendship**

14.     Joseph first met Defendant in 1970.  They are both Orthodox Jews and they were members of the same temple.

15.     Over the years, the Vagos and Defendant interacted at family and religious events, including birthdays, holidays, shabbat dinners, bar mitzvahs, and weddings.  Defendant and the Vagos were friends.

B.     **Legal Services**

16.     In June 2012, Erica's uncle died.  In October 2012, Erica's brother died.  A few months later, in July 2013, Erica's mother died.  Erica and Joseph had to deal with three lost loved ones in short succession.

3

17.     Erica's brother, Robert Schweitzer ("Schweitzer"), died on October 3, 2012. Schweitzer willed the bulk of his estate to Erica.  Schweitzer's estate included roughly $18 million in a foreign bank account.

18.     A few days following Schweitzer's death, the Vagos were at their home mourning the loss of Schweitzer.  Defendant went to the Vagos to pay his respects.  At that time, Defendant also offered his services as a lawyer and accountant.  Defendant said he could handle any issues that might come up with Schweitzer's estate.  The Vagos ultimately agreed to retain their longtime friend.   The Vagos and Defendant arranged to meet the following week.

### C.     The Life Insurance Policies

19.     About a week later, the Vagos and Defendant met to discuss Schweitzer's estate. Erica learned before the meeting that Schweitzer had left her more than $18 million, located in a foreign bank account.  The Vagos did not know how to handle the will, probate, inheritance, foreign bank accounts, and estate taxes.  At the meeting, Erica told Defendant about the inheritance.

20.     Defendant said this issue was his "specialty."  Defendant told Erica that he was a jack-of-all-trades—he was a lawyer, CPA, and financial adviser.  Defendant told Erica he could deal with the will.  Defendant told Erica he could prepare the estate tax returns.  Defendant told Erica he could figure out the best way to repatriate the money from the foreign bank account. Defendant told Erica he could even set up investments for the money once the Vagos received it.

21.     The Vagos agreed to let Defendant guide them through this unfamiliar territory. Erica wrote Defendant a $7,000 check that day for the legal services he promised to provide through his law firm Leslie Klein & Associates ("LK&A").

22.     Defendant also recommended that the Vagos invest the inheritance in life insurance policies.  Defendant explained the safety and benefits of this strategy.  Defendant said that each investment would garner 10 to 12% interest each year, plus a premium on the principal in some cases, all to be paid when the Vagos cashed out.  And Defendant emphasized how simple cashing out would be.  Defendant advised that investments in these policies were "just like cash." Defendant promised the Vagos they could "sell them for cash any time [they] wanted."

4

23.     Defendant added that the best way to effect the transaction would be to wire the money to the LK&A client trust account.  Defendant would then invest the money from the LK&A client trust account into life insurance policies.  When the Vagos mentioned they wanted to donate substantial sums to charity, Defendant suggested they wire the money to the EKLK Foundation, which Defendant set up and controlled.  Defendant said the EKLK Foundation would then distribute funds to charities the Vagos chose.

24.     Finally, Defendant said that if the Vagos wanted cash from Erica's inheritance for themselves, they should ask him for it.  He would write them a check from the LK&A client trust account.

25.     Defendant reassured the Vagos that the strategy was sound.  Defendant said he performed the same transactions for "all my clients" as well as his family.  Defendant told the Vagos that he invested his own money in the life insurance policies.  Defendant added that prominent tax attorneys and accountants "in Century City" confirmed to him that this was a safe and proper strategy.  Defendant claimed to have invested in life insurance policies for several prominent members of the Jewish community.

**D.      The Scam**

26.     Over the next four years, Erica arranged more than $15 million in wire transfers from the foreign bank account holding her inheritance.  Erica made each transfer at Defendant's direction and to accounts Defendant controlled.

27.     About $12.4 million went to the LK&A client trust account, and the rest went to Defendant's EKLK Foundation.

28.     As the money came in, Defendant represented to the Vagos that he was executing the investment strategy he had convinced them to follow.  Defendant told the Vagos he was investing much of Erica's inheritance in life insurance policies.

29.     The life insurance "investments" were not really investments; they were non-recourse loans to irrevocable life insurance trusts.  Each life insurance trust purportedly contained a life insurance policy or policies—on the life of a complete stranger to the Vagos—which served as the sole security for the Vagos' loan.  The principal and interest on each loan were not due until

the death of the policyholder.  For Erica and Joseph—who were respectively 59 and 61 when

Schweitzer passed—this term rendered the loans almost valueless.  They did not know when—if

ever—the loans would become due.

30.     The Vagos did not know the identities of the other "investors" in each life

insurance trust.  The Vagos did not know how much money Defendant received from other

"investors."  The Vagos had no way to independently verify whether Defendant was paying the

premiums on the insurance policies.  The Vagos had no way to determine whether the insureds

were alive or not.  The Vagos could not find out whether any insurance companies had paid

Defendant money in connection with the policies they "invested" in.  The Vagos had no way to

know whether Defendant sold the policies they thought they invested in.  The Vagos were

completely in the dark and at the mercy of Defendant.

31.     The Vagos' names were nowhere to be found on the promissory notes or on the life

insurance policies.  Rather, the promissory notes were executed for the benefit of the "Estate of

Robert Schweitzer."  It could not be more evident that Defendant structured these "investments" in

a manner designed to confuse and deceive the Vagos.  Defendant knew that these "investments"

were never going to pay out.

32.     Though these promissory notes were nearly worthless to the Vagos, by Defendant's

doing, they still had a huge carrying cost.  To keep the underlying life insurance policies from

lapsing, Defendant told the Vagos that they would have to pay hundreds of thousands of dollars

per year toward insurance premiums.  This money was in addition to the millions already loaned

to the life insurance policy trusts.

33.     By 2019, Defendant claimed to have "invested" $8.3 million of the Vagos' money

in life insurance policies.

**E.     The Misrepresentations**

34.     Defendant routinely visited the Vagos at their house.  During these visits,

Defendant would give the Vagos a memo on the letterhead of LK&A that purported to show the

status of their "investments."  In a July 1, 2017 memorandum, Defendant stated that the Vagos'

1    "investment" had increased in value to $9.4 million.  And the memorandum indicated that the

2    Vagos were entitled to $3,205,000 in interest since their initial "investment" in 2012.

3        35.    Defendant provided a memorandum in 2018 that indicated the Vagos'

4    "investments" were worth $10.2 million and the interest was $3,685,000.  These written

5    memoranda were all lies.

6        **F.**    **The Vagos Discover Defendant's Fraud**

7        36.    On or around September 15, 2019, Defendant went to the Vagos' home for their

8    regular meeting.  At this meeting, Erica told Defendant she needed to cash out roughly $1 million.

9    Defendant responded that the "interest" that had accrued on the Vagos' investment was all gone.

10   Defendant falsely stated that "hedge funds are not paying interest anymore" on life insurance

11   policies, so their earnings over the past seven years had vanished.

12       37.    The Vagos demanded that Defendant refund their money.  Defendant refused.

13       **G.**    **The State Board of Accountancy**

14       38.    At the same time Defendant was defrauding the Vagos, he was accused of stealing

15   money from his client Hubert Scott ("Scott").  The California State Board of Accountancy (the

16   "State Board") brought charges against Defendant in 2019.

17       39.    The State Board alleged that Scott inherited money when his brother and son died.

18   Defendant purported to serve as Scott's tax preparer, financial planner and investment adviser.

19   Scott, at that time, was 86 years old and had dementia.  Defendant had himself appointed as the

20   trustee of Scott's trust agreement.  Over the course of five years, Scott gave Defendant $2.42

21   million.

22       40.    Defendant purported to "invest" Scott's money in non-recourse promissory notes

23   with irrevocable life insurance trusts (i.e., the exact same investments that are at issue here).

24   Defendant invested 85% of Scott's money in these life insurance trusts. Even though Scott was 86

25   years old, he would only be paid out when the insured passed away.  Defendant also invested

26   Scott's money in companies with which Defendant was affiliated.  Among others, Defendant

27   purportedly invested $750,000 of Scott's money in LEDs sold by Time Square Media, Inc. ("Time

28   Square Media").  Defendant was the president of Time Square Media.  This $750,000 investment

purportedly made by Defendant was not reflected in any accounting. The State Board noted that none of the transactions were made in Scott's name. Instead, Defendant admitted that he did not invest the money in life insurance policies on behalf of his clients, but that he actually borrowed the money himself from his clients.

41.     The State Board alleged that Defendant failed to provide an accounting, and instead periodically provided documents showing inflated values that were inaccurate on their face. Defendant ultimately denied that he was Scott's tax preparer or adviser.

42.     A conservator was appointed in 2016, and Defendant was removed as trustee. The State Board filed the Accusation in 2019, based on allegations of fraud, breach of fiduciary duty, embezzlement, commingling funds and undue influence. Defendant entered into a stipulation with the State Board that resulted in the surrender of his accounting license.

### H.     The Litigation and Defendant's Failure to Comply with Court Orders

43.     The Vagos filed a state court complaint against Defendant on July 1, 2020. From day one, Defendant and LK&A engaged in a scheme to evade discovery and to derail the case.

44.     Defendant served boilerplate objections to all written discovery requests and refused to provide substantive responses. Defendant refused to produce documents. The Vagos then filed several rounds of discovery motions. The Court granted all of them and entered monetary and issue sanctions against Defendant. The Court ordered Defendant to produce a responsivity chart and a privilege log. Defendant did not. The Court ordered Defendant to produce bank records. Defendant did not. Defendant filed a motion to quash a third-party subpoena served on Bank of America, which he lost. Defendant failed to pay the court-ordered monetary sanctions by the deadline and failed to comply with court orders requiring supplemental responses. Defendant even walked out of a court ordered deposition. Defendant stalled and refused to make himself available for deposition. Defendant substituted new counsel on the eve of trial. Defendant filed numerous motions to continue the trial date, all of which were denied

### I.     The Trial, Jury Verdict and Judgment

45.     On August 29, 2022, the trial in the Vagos' state court matter commenced.

46. At trial, the Vagos presented evidence that Defendant sought out to defraud them when they were at their most vulnerable—just after Erica's brother died and while she was caring for her dying mother in the hospital. Defendant initially testified that he had no financial interest in the policies that he purportedly invested the Vagos' money in. But Defendant later admitted that he invested his own money in these same policies.

47. Defendant drafted and signed promissory notes where he agreed as trustee that the Vagos would be entitled to 12% interest on their money. But Defendant testified at trial that he never had any intention of actually paying the Vagos that interest. Defendant utterly failed to explain what these "investments" actually were; whether the Vagos were entitled to make any money from his perspective; or what he did with the Vagos' money.

48. Defendant testified at trial that he kept a contemporaneous "ledger" of all transactions relating to the Vagos. This was a lie—no such ledger was produced at trial. Defendant admitted that he provided false and inflated financials to the Vagos on a regular basis. Defendant took out a life insurance policy on an individual named Ann Radow. Ann Radow testified at trial that she had never met Defendant; that he took out an insurance policy on her life without her knowledge or consent; and that Defendant created the Ann Radow Trust and made himself the trustee without her knowledge or consent.

49. Unbeknownst to the Vagos, Defendant surrendered his license to practice accounting after he was accused of embezzling money from Scott, an 86-year-old client with dementia. The State Board disciplined Defendant at the same time he was defrauding the Vagos.

50. The jury ultimately found that Erica had proven her case against Defendant for intentional fraud, fraudulent concealment, financial elder abuse and breach of fiduciary duty. The jury awarded Erica $8.3 million in compensatory damages, plus $8.3 million more in punitive damages. And the jury awarded Joseph an additional $400,000 in emotional distress damages. The Court then awarded $7,334,038.99 in prejudgment interest and entered judgment in the amount of $24,334,038.99 ("Judgment"). A true and correct copy of the Judgment is attached as **Exhibit 1**.

## **FIRST CLAIM FOR RELIEF**

### **(Nondischargeability of Debt - 11 U.S.C. § 523(a)(2)(A))**

51.     The Vagos reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

52.     At all relevant times, Defendant acted as the Vagos' fiduciary.  Defendant was their attorney, accountant and investment adviser.  Erica entrusted Defendant implicitly with her entire inheritance (more than $15 million).

53.     Defendant owed the Vagos fiduciary duties at all relevant times, including the duty of loyalty and candor.  Defendant further owed a duty to use Erica's funds for legitimate business purposes and to refrain from using her funds and other property for his own personal non-business purposes.

54.     Defendant embezzled and stole from the Vagos.  Defendant misrepresented information to the Vagos for the purpose of convincing Erica to deposit more than $12 million into the LK&A client trust account.  Defendant then stole more than $8 million of Erica's money in a complicated life insurance scam.

55.     A jury found Defendant liable for intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse as set forth in the Judgment.  The jury awarded Erica $8.3 million in punitive damages after finding that Defendant acted with fraud, oppression and malice. The trial court ultimately entered the Judgment against Defendant in the amount of $24.3 million.

56.     Defendant's misappropriation of Erica's funds and other property was unauthorized, without her consent and fraudulent.  Defendant acted with the intent to permanently deprive Erica of the possession, use and benefit of her funds and other property.

57.     As a result of Defendant's unauthorized and fraudulent misappropriation of Erica's funds and other property and Defendant's false pretenses, false representations, and actual fraud set forth herein, the Vagos have suffered damages in the amount of not less than $26,386,891.00.

58.     Defendant's debt to the Vagos is nondischargeable under 11 U.S.C. § 523(a)(2) because it was incurred as a result of false pretenses, false representations, and actual fraud.

59.     The damages arising from Defendant's willful and malicious false pretenses, false representation and actual fraud to the Vagos constitutes a debt against Defendant that is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2).

## SECOND CLAIM FOR RELIEF

### (Nondischargeability of Debt - 11 U.S.C. § 523(a)(4))

60.     The Vagos reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

61.     At all relevant times, Defendant acted as the Vagos' fiduciary.  Defendant was their attorney, accountant and investment adviser.  Erica entrusted Defendant implicitly with her entire inheritance (more than $15 million).

62.     Defendant owed the Vagos fiduciary duties at all relevant times, including the duty of loyalty and candor.  Defendant further owed a duty to use Erica's funds for legitimate business purposes and to refrain from using her funds and other property for his own personal non-business purposes.

63.     Defendant embezzled and stole from the Vagos.  Defendant misrepresented information to the Vagos for the purpose of convincing Erica to deposit more than $12 million into the LK&A client trust account.  Defendant then stole more than $8 million of Erica's money in a complicated life insurance scam.

64.     A jury found Defendant liable for intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse as set forth in the Judgment.  The jury awarded Erica $8.3 million in punitive damages after finding that Defendant acted with fraud, oppression and malice. The trial court ultimately entered the Judgment against Defendant in the amount of $24.3 million.

65.     Defendant's misappropriation of Erica's funds and other property was unauthorized, without her consent and fraudulent.  Defendant acted with the intent to permanently deprive Erica of the possession, use and benefit of her funds and other property.

66.     As a result of Defendant's unauthorized and fraudulent misappropriation of Erica's funds and other property while acting in a fiduciary capacity and Defendant's false pretenses, false

representations, and actual fraud set forth herein while acting in a fiduciary capacity, the Vagos

have suffered damages in the amount of not less than $26,386,891.00.

67. The damages to the Vagos arising from Defendant's fraud, defalcation,

embezzlement and larceny while acting in a fiduciary capacity constitutes a debt against

Defendant that is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

## THIRD CLAIM FOR RELIEF

### (Nondischargeability of Debt - 11 U.S.C. § 523(a)(6))

68. The Vagos reallege and incorporate by reference all of the prior and subsequent

allegations in this Complaint as though fully set forth herein.

69. At all relevant times, Defendant acted as the Vagos' fiduciary. Defendant was their

attorney, accountant and investment adviser. Erica entrusted Defendant implicitly with her entire

inheritance (more than $15 million).

70. Defendant owed the Vagos fiduciary duties at all relevant times, including the duty

of loyalty and candor. Defendant further owed a duty to use Erica's funds for legitimate business

purposes and to refrain from using her funds and other property for his own personal non-business

purposes.

71. Defendant embezzled and stole from the Vagos. Defendant misrepresented

information to the Vagos for the purpose of convincing Erica to deposit more than $12 million

into the LK&A client trust account. Defendant then stole more than $8 million of Erica's money

in a complicated life insurance scam.

72. A jury found Defendant liable for intentional fraudulent, fraudulent concealment,

breach of fiduciary duty and elder abuse as set forth in the Judgment. The jury awarded Erica $8.3

million in punitive damages after finding that Defendant acted with fraud, oppression and malice.

The trial court ultimately entered the Judgment against Defendant in the amount of $24.3 million.

73. Defendant's misappropriation of Erica's funds and other property was

unauthorized, without her consent and fraudulent. Defendant acted with the intent to permanently

deprive Erica of the possession, use and benefit of her funds and other property.

12

74.     As a result of Defendant's unauthorized and fraudulent misappropriation of Erica's funds and other property while acting in a fiduciary capacity and Defendant's false pretenses, false representations, and actual fraud set forth herein while acting in a fiduciary capacity, the Vagos have suffered damages in the amount of not less than $26,386,891.00.

75.     The damages arising from Defendant's willful and malicious injury to the Vagos constitutes a debt against Defendant that is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

## FOURTH CLAIM FOR RELIEF

### (For Denial of Discharge - 11 U.S.C. § 727(a)(12))

76.     The Vagos reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

77.     Pursuant to 11 U.S.C. § 727(a)(12), the court shall grant the debtor a discharge unless- the court after notice and a hearing held not more than 10 days before the date of the entry of the order granting the discharge finds that there is reasonable cause to believe that—(A) section 522(q)(1) may be applicable to the debtor; and (B) there is pending any proceeding in which the debtor may be found guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B).

78.     On April 11, 2023, the Vagos filed a motion [Docket No. 71] seeking disallowance of Debtor's claim of exemption in the real property located at 322 N. June Street, Los Angeles, CA 90004 (the "Property") in any amount exceeding $189,050.00 pursuant to Section 522(q) of the Bankruptcy Code.

79.     Section 522(q) operates to reduce any state law homestead exemption claim to $189,050.00 where debtor owes a debt arising from "fraud, deceit, or manipulation in a fiduciary capacity." 11 U.S.C. § 522(q)(1)(B)(ii).

80.     As set forth herein, Debtor owes a debt to the Vagos in an amount of not less than $26,386,891.00 based upon the Judgment which arose from "fraud, deceit, or manipulation in a fiduciary capacity." 11 U.S.C. § 522(q)(1)(B)(ii).

81.     Accordingly, Debtor is not entitled to a discharge of his debts pursuant to 11 U.S.C. § 727(a)(12).

**Prayer for Relief**

WHEREFORE, Plaintiffs request judgment on the Complaint as follows:

1.       On the First Claim for Relief, the Vagos seek an order determining that Defendant is indebted to the Vagos in an amount not less than $26,386,891.00 and that Defendant's debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2);

2.       On the Second Claim for Relief, the Vagos seek an order determining that Defendant is indebted to the Vagos in an amount not less than $26,386,891.00 and that Defendant's debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4);

3.       On the Third Claim for Relief, the Vagos seek an order determining that Defendant is indebted to the Vagos in an amount not less than $26,386,891.00 and that Defendant's debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6);

4.       On the Fourth Claim for Relief, the Vagos seek an order denying Defendant his discharge pursuant to 11 U.S.C. § 727(a)(12);

5.       For costs of suit incurred herein; and

6.       For such other and further relief as the Court may deem appropriate.

Respectfully submitted,

Dated:  May 10, 2023                    **GOE FORSYTHE & HODGES LLP**


By:  /s/Robert P. Goe
     Robert P. Goe
     Attorneys for Plaintiffs Erica Vago and
     Joseph Vago

14

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 17701 Cowan, Bldg. D., Suite 210, Irvine, CA 92614

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF MOTION AND MOTION FOR ORDER DISMISSING DEBTOR'S CHAPTER 11 BANKRUPTCY CASE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ERICA VAGO, BRIAN PROCEL; AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF SAME** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) May 10, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒        Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) May 10, 2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒        Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) May 10, 2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- The Honorable Sandra R. Defendant, USBC, 255 E. Temple Street, Ctrm 1575, Los Angeles, CA 90012

1

1        ☐     Service information continued on attached
page

2

3   I declare under penalty of perjury under the laws of the United States that the foregoing is true and
correct.

4   May 10, 2023          Susan C. Stein                          /s/Susan C. Stein
5   *Date*                  *Printed Name*                         *Signature*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        2

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

**Mailing Information for Case 2:23-bk-10990-SK**

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Reem J Bello**    rbello@goeforlaw.com, kmurphy@goeforlaw.com
- **Michael Jay Berger**    michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Greg P Campbell**    ch11ecf@aldridgepite.com, gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
- **Theron S Covey**    tcovey@raslg.com, sferry@raslg.com
- **Dane W Exnowski**    dane.exnowski@mccalla.com, bk.ca@mccalla.com,mccallaaecf@ecf.courtdrive.com
- **Robert P Goe**    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- **Michael Jones**    michael.jones4@usdoj.gov
- **Ron Maroko**    ron.maroko@usdoj.gov
- **Joshua L Scheer**    jscheer@scheerlawgroup.com, jscheer@ecf.courtdrive.com
- **Mark M Sharf (TR)**    mark@sharflaw.com, C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
- **Alan G Tippie**    Alan.Tippie@gmlaw.com, atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Michael L Wachtell**    mwachtell@buchalter.com
- **John P. Ward**    jward@attleseystorm.com, ezhang@attleseystorm.com
- **Clarisse Young**    youngshumaker@smcounsel.com, levern@smcounsel.com
- **Paul P Young**    paul@cym.law, jaclyn@cym.law

3

# EXHIBIT 1

# EXHIBIT 1

Electronically Received 11/15/2022 10:32 AM

BRIAN A. PROCEL (State Bar No. 218657)
brian@procel-law.com
PROCEL LAW, PC
401 Wilshire Boulevard
12th Floor
Santa Monica, California 90401
Telephone:    (424) 788-4538

Attorneys for Plaintiffs
ERICA VAGO and JOSEPH VAGO

**FILED**
Superior Court of California
County of Los Angeles

**12/02/2022**

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ M. Ventura _____ Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| ERICA VAGO and JOSEPH VAGO, | **CASE NO. 20STCV25050** |
| Plaintiffs, | **[PROPOSED] JUDGMENT ON SPECIAL VERDICT** |
| v. | |
| LESLIE KLEIN; LES KLEIN & ASSOCIATES, INC.; KENNETH KOLEV KLEIN; and LAW OFFICE OF KENNETH KLEIN, P.C., | Assigned for All Purposes to: Hon. Terry A. Green, Dept. 14 |
| Defendants. | Action Filed:    July 1, 2020<br>Trial Date:    August 29, 2022 |

1      This action came on regularly for trial on August 29, 2022, in Department 14 of the

2  Superior Court, the Honorable Terry A. Green, Judge Presiding;

3      Plaintiffs Erica and Joseph Vago (collectively, "Plaintiffs") appearing by attorney Brian

4  Procel , Esq.; and Defendants Leslie Klein and Les Klein & Associates, Inc. (collectively,

5  "Defendants") appearing by attorney Jeffrey Slott.

6      A jury of twelve (12) persons was regularly impaneled and sworn and agreed to try the

7  cause. Witnesses were sworn and testified. After hearing the evidence and arguments of counsel,

8  the jury was duly instructed by the Court and the cause was submitted to the jury with directions

9  to return a special verdict. The jury deliberated and thereafter returned to court with its special

10  verdict submitted to the jury and the answers given thereto by the jury, which verdict was in words

11  and figures as follows, to wit:

12

13              **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

14                  **(BY ERICA VAGO AGAINST DEFENDNTS)**

15

16    1.  Was Mr. Klein's conduct outrageous?

17        __X___ Yes   _____ No

18        If your answer to question 1 is yes, then answer question 2. If you answered no,

19        stop here, answer no further questions, and have the presiding juror sign and date

20        this form.

21    2.  Did Mr. Klein intend to cause Erica Vago emotional distress?

22        _____ Yes   __X__ No

23        If your answer to question 2 is yes, then answer question 4. If you answered no, go

24        to question 3.

25    3.  Did Mr. Klein act with reckless disregard of the probability that Erica Vago would

26        suffer emotional distress, knowing that Erica Vago was present when the conduct

27        occurred?

28        __X___ Yes   _____ No

If your answer to question 3 is yes, then answer question 4. If you answered no,
stop here, answer no further questions, and have the presiding juror sign and date
this form.

4.  Did Erica Vago suffer severe emotional distress?

_____ Yes    __X___ No

If your answer to question 4 is yes, then answer question 5. If you answered no,
stop here, answer no further questions, and have the presiding juror sign and date
this form.

5.  Was Mr. Klein's conduct a substantial factor in causing Erica Vago's severe
emotional distress?

_____ Yes    _____ No

If your answer to question 5 is yes, then answer question 6. If you answered no,
stop here, answer no further questions, and have the presiding juror sign and date
this form.

6.  What are Erica Vago's damages for pain and suffering?

$ __N/A_____

                                                            TOTAL $

                                                        _____N/A_____


Signed: ___/Signature_____
                Presiding Juror

Dated: September 15, 2022

3

## INTENTIONAL MISREPRESENTATION

## (BY ERICA VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein make a false representation of a fact to Erica Vago?

   __X___ Yes _____No

   If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein know that the representation was false, or did he make the representation recklessly and without regard for its truth?

   _X____ Yes _____No

   If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Erica Vago reasonably rely on the representation?

   __X___ Yes _____No

   If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Erica Vago's reliance on Mr. Klein's representation a substantial factor in causing harm to Erica Vago?

   __X___ Yes _____No

   If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Erica Vago's economic damages?

   $ __8,300,000_____

Please answer question 6.

6. What are Erica Vago's noneconomic damages for pain and suffering?

$ __0_____

TOTAL $ 8,300,000

Signed: ___/Signature_____
           Presiding Juror

Dated: September 15, 2022

## CONCEALMENT
## (BY ERICA VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein intentionally fail to disclose a fact that Erica Vago did not know and could not reasonably have discovered?

  _X____ Yes   _____No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein intend to deceive Erica Vago by concealing the fact?

  __X___ Yes   _____No

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Had the omitted information been disclosed, would Erica Vago reasonably have behaved differently?

  __X___ Yes   _____No

5

If your answer to question 3 is yes, then answer question 4. If you answered no,
stop here, answer no further questions, and have the presiding juror sign and date
this form.

4. Was Mr. Klein's concealment a substantial factor in causing harm to Erica Vago?

__X___ Yes _____ No

If your answer to question 4 is yes, then answer question 5. If you answered no,
stop here, answer no further questions, and have the presiding juror sign and date
this form.

5. What are Erica Vago's economic damages?

$ 8,300,000

Please answer question 6.

6. What are Erica Vago's noneconomic damages for pain and suffering?

$ __0_____

TOTAL $ 8,300,000

Signed: __/Signature_____
              Presiding Juror

Dated: September 15, 2022

[PROPOSED] JUDGMENT

**FALSE PROMISE**

**(BY ERICA VAGO AGAINST DEFENDNTS)**

We answer the questions submitted to us as follows:

1. Did Mr. Klein make a promise to Erica Vago?

    __X___ Yes _____ No

    If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein intend to perform this promise when he made it?

    __X____ Yes _____ No

    If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Mr. Klein intend that Erica Vago rely on this promise?

    _____ Yes _____ No

    If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Did Erica Vago reasonably rely on this promise?

    _____ Yes _____ No

    If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Did Mr. Klein fail to perform the promised act?

    _____ Yes _____ No

7

If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. Was Erica Vago's reliance on Mr. Klein's promise a substantial factor in causing harm to Erica Vago?

_____ Yes       _____ No

If your answer to question 6 is yes, then answer question 7. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

7. What are Erica Vago's economic damages?

$ _N/A_____

Please answer question 8.

8. What are Erica Vago's noneconomic damages for pain and suffering?

$ __N/A_____

TOTAL $ _N/A_____

Signed: __/Signature_____
               Presiding Juror

Dated: September 15, 2022

[PROPOSED] JUDGMENT

## FINANCIAL ABUSE

## (BY ERICA VAGO AGAINST DEFENDANTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein retain Erica Vago's money or property?

   __X___ Yes  _____ No

   If your answer to question 1 is yes, then answer question 2. If you answered no,
   stop here, answer no further questions, and have the presiding juror sign and date
   this form.

2. Were Erica Vago 65 years of age or older at the time of the conduct?

   __X___ Yes  _____ No

   If your answer to question 2 is yes, then answer question 3. If you answered no,
   stop here, answer no further questions, and have the presiding juror sign and date
   this form.

3. Did Mr. Klein retain the money or property for a wrongful use or with the intent to
   defraud?

   __X___ Yes  _____ No

   If your answer to question 3 is yes, then answer question 4. If you answered no,
   stop here, answer no further questions, and have the presiding juror sign and date
   this form.

4. Were Erica Vago harmed?

   __X___ Yes  _____ No

   If your answer to question 4 is yes, then answer question 5. If you answered no,
   stop here, answer no further questions, and have the presiding juror sign and date
   this form.

5. Was Mr. Klein's conduct a substantial factor in causing Erica Vago's harm?

   __X___ Yes  _____ No

[PROPOSED] JUDGMENT

1   If your answer to question 5 is yes, then answer question 6. If you answered no,

2   stop here, answer no further questions, and have the presiding juror sign and date

3   this form.

4      6.  What are Erica Vago's economic damages?

5        $ 8,300,000

6                                     TOTAL $8,300,000

7

8   Signed:   /Signature            ,
            Presiding Juror

9

10  Dated: September 15, 2022

11

12  **PUNITIVE DAMAGES**
**(BY ERICA VAGO AGAINST DEFENDNTS)**

13

14  We answer the questions submitted to us as follows:

15     1.  Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

16      __X___ Yes   _____ No

17

18  Signed:   /Signature           
            Presiding Juror

19

20  Dated: September 15, 2022

21  **PUNITIVE DAMAGES AGAINST EMPLOYER OR PRINCIPAL FOR CONDUCT**
**OF A SPECIFIC AGENT OR EMPLOYEE**

22

23  **(BY ERICA VAGO AGAINST DEFENDNTS)**

24  We answer the questions submitted to us as follows:

25     1.  Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

26      __X___ Yes   _____ No

27

28

1   If your answer to question 1 is yes, then answer question 2. If you answered no,

2   stop here, answer no further questions, and have the presiding juror sign and date

3   this form.

4

5   Signed:   /Signature

6                 Presiding Juror

7   Dated:  September 15, 2022

8   **BREACH OF FIDUCIARY DUTY**

9   **(BY ERICA VAGO AGAINST DEFENDNTS)**

10

11  1.  Mr. Klein owed Erica Vago fiduciary duties to act with the utmost loyalty and honesty.

12  2.  Did Mr. Klein breach his fiduciary duties?

13      __X___ Yes        _____ No

14      If your answer to question 2 is yes, then answer question 3. If you answered no, stop

15      here, answer no further questions, and have the presiding juror sign and date this form.

16  3.  Was Erica Vago harmed?

17      __X___ Yes        _____ No

18      If your answer to question 3 is yes, then answer question 4. If you answered no, stop

19      here, answer no further questions, and have the presiding juror sign and date this form.

20  4.  Was Mr. Klein's conduct a substantial factor in causing Erica Vago's harm?

21      __X___ Yes        _____ No

22      If your answer to question 4 is yes, then answer question 5. If you answered no, stop

23      here, answer no further questions, and have the presiding juror sign and date this form.

24  5.  What are Erica Vago's economic damages?

25      $ 8,300,000

26

27                                      TOTAL $ 8,300,000

28

---

11

Signed:  __/Signature_____
         Presiding Juror

Dated:  September 15, 2022

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## (BY JOSEPH VAGO AGAINST DEFENDNTS)

1.  Was Mr. Klein's conduct outrageous?

    a.  _X___ Yes   _____ No

    b.  If your answer to question 1 is yes, then answer question 2. If you answered
        no, stop here, answer no further questions, and have the presiding juror sign
        and date this form.

2.  Did Mr. Klein intend to cause Joseph Vago emotional distress?

    a.  _____ Yes   ___X__ No

    b.  If your answer to question 2 is yes, then answer question 4. If you answered
        no, go to question 3.

3.  Did Mr. Klein act with reckless disregard of the probability that Joseph Vago
    would suffer emotional distress, knowing that Joseph Vago was present when the
    conduct occurred?

    a.  __X___ Yes   _____No

    b.  If your answer to question 3 is yes, then answer question 4. If you answered
        no, stop here, answer no further questions, and have the presiding juror sign
        and date this form.

4.  Did Joseph Vago suffer severe emotional distress?

    a.  __X___ Yes   _____ No

    b.  If your answer to question 4 is yes, then answer question 5. If you answered
        no, stop here, answer no further questions, and have the presiding juror sign
        and date this form.

5. Was Mr. Klein's conduct a substantial factor in causing Joseph Vago's severe emotional distress?

    a. _X____ Yes    _____ No

    b. If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. What are Joseph Vago's damages for pain and suffering?

    a. $ 400,000

                                             TOTAL $400,000

Signed: ___/Signature_____
               Presiding Juror

Dated: September 15, 2022

## INTENTIONAL MISREPRESENTATION
## (BY JOSEPH VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein make a false representation of a fact to Joseph Vago?

    a. __X___ Yes    _____ No

    b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein know that the representation was false, or did he make the representation recklessly and without regard for its truth?

    a. _X____ Yes    _____ No

b.  If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3.  Did Joseph Vago reasonably rely on the representation?

  a.  __X__ Yes  _____ No

  b.  If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4.  Was Joseph Vago's reliance on Mr. Klein's representation a substantial factor in causing harm to Joseph Vago?

  a.  __X__ Yes  _____ No

  b.  If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5.  What are Joseph Vago's economic damages?

  a.  $ __0_____

  b.  Please answer question 6.

6.  What are Joseph Vago's noneconomic damages for pain and suffering?

  a.  $ __0_____

TOTAL $ __0_____

Signed:  ___/Signature_____
              Presiding Juror

Dated: September 15, 2022

## CONCEALMENT
## (BY JOSEPH VAGO AGAINST DEFENDNTS)

14
[PROPOSED] JUDGMENT

We answer the questions submitted to us as follows:

1. Did Mr. Klein intentionally fail to disclose a fact that Joseph Vago did not know and could not reasonably have discovered?

    a. _X____ Yes    _____ No

    b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein intend to deceive Joseph Vago by concealing the fact?

    a. __X___ Yes    _____ No

    b. If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Had the omitted information been disclosed, would Joseph Vago reasonably have behaved differently?

    a. __X___ Yes    _____ No

    b. If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Mr. Klein's concealment a substantial factor in causing harm to Joseph Vago?

    a. __X___ Yes    _____ No

    b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Joseph Vago's economic damages?

    a. $____0_____

    b. Please answer question 6.

6. What are Joseph Vago's noneconomic damages for pain and suffering?

    a. $__0_____

TOTAL $____0_____

Signed: ___/Signature_____
            Presiding Juror

Dated: September 15, 2022

## FALSE PROMISE

## (BY JOSEPH VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

    1.  Did Mr. Klein make a promise to Joseph Vago?

        a.  __X___ Yes _____ No

        b.  If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

    2.  Did Mr. Klein intend to perform this promise when he made it?

        a.  _X____ Yes _____ No

        b.  If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

    3.  Did Mr. Klein intend that Joseph Vago rely on this promise?

        a.  _____ Yes _____ No

        b.  If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

    4.  Did Joseph Vago reasonably rely on this promise?

        a.  _____ Yes _____ No

b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Did Mr. Klein fail to perform the promised act?

    a. _____ Yes    _____ No

    b. If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. Was Joseph Vago's reliance on Mr. Klein's promise a substantial factor in causing harm to Joseph Vago?

    a. _____ Yes    _____ No

    b. If your answer to question 6 is yes, then answer question 7. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

7. What are Joseph Vago's economic damages?

    a. $ _N/A_____

    b. Please answer question 8.

8. What are Joseph Vago's noneconomic damages for pain and suffering?

    a. $ __N/A_____

                                    TOTAL $ _N/A_____

Signed:   /Signature_____
               Presiding Juror

Dated: September 15, 2022

17

[PROPOSED] JUDGMENT

**FINANCIAL ABUSE**

**(BY JOSEPH VAGO AGAINST DEFENDANTS)**

We answer the questions submitted to us as follows:

1. Did Mr. Klein retain Joseph Vago's money or property?

    a. _____ Yes __X___ No

    b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Were Joseph Vago 65 years of age or older at the time of the conduct?

    a. _____ Yes _____ No

    b. If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Mr. Klein retain the money or property for a wrongful use or with the intent to defraud?

    a. _____ Yes _____ No

    b. If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Were Joseph Vago harmed?

    a. _____ Yes _____ No

    b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Was Mr. Klein's conduct a substantial factor in causing Joseph Vago's harm?

    a. _____ Yes _____ No

b. If your answer to question 5 is yes, then answer question 6. If you answered
no, stop here, answer no further questions, and have the presiding juror sign
and date this form.

6. What are Joseph Vago's economic damages?

a. $___N/A_____

TOTAL $__N/A_____

Signed:  ___/Signature_____
          Presiding Juror

Dated:  September 15, 2022

**PUNITIVE DAMAGES**

**(BY JOSEPH VAGO AGAINST DEFENDNTS)**

We answer the questions submitted to us as follows:

1. Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

a.  __X___ Yes  _____ No

Signed:  ___/Signature_____
          Presiding Juror

Dated:  September 15, 2022

**PUNITIVE DAMAGES AGAINST EMPLOYER OR PRINCIPAL FOR CONDUCT
OF A SPECIFIC AGENT OR EMPLOYEE**

**(BY JOSEPH VAGO AGAINST DEFENDNTS)**

We answer the questions submitted to us as follows:

1. Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

a.  __X___ Yes  _____ No

19

[PROPOSED] JUDGMENT

b.  If your answer to question 1 is yes, then answer question 2. If you answered
no, stop here, answer no further questions, and have the presiding juror sign
and date this form.

Signed:   /Signature
           Presiding Juror

Dated:  September 15, 2022

## BREACH OF FIDUCIARY DUTY

## (BY JOSEPH VAGO AGAINST DEFENDNTS)

1.  Mr. Klein owed Joseph Vago fiduciary duties to act with the utmost loyalty and
honesty.

2.  Did Mr. Klein breach his fiduciary duties?

    a.  __X___ Yes          _____ No

    b.  If your answer to question 2 is yes, then answer question 3. If you answered no,
stop here, answer no further questions, and have the presiding juror sign and
date this form.

3.  Was Joseph Vago harmed?

    a.  __X___ Yes          _____ No

    b.  If your answer to question 3 is yes, then answer question 4. If you answered no,
stop here, answer no further questions, and have the presiding juror sign and
date this form.

4.  Was Mr. Klein's conduct a substantial factor in causing Joseph Vago's harm?

    a.  __X___ Yes          _____No

    b.  If your answer to question 4 is yes, then answer question 5. If you answered no,
stop here, answer no further questions, and have the presiding juror sign and
date this form.

5.  What are Joseph Vago's economic damages?

a.  $\underline{\$\quad 0\quad}$

i.  TOTAL $\underline{\$\quad 0\quad}$

Signed:  __/Signature_____
Presiding Juror

Dated:  September 15, 2022

It appearing by reason of said special verdict that Plaintiff Erica Vago is entitled to judgment against Defendants Leslie Klein and Leslie Klein & Associates.

NOW THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that said Erica Vago shall have and recover from Defendants, jointly and severally:

1.       Compensatory damages in the sum of $8,300,000;

2.       Prejudgment interest at the rate of 7 (seven) percent in the amount of $7,334,038.99;

3.       Punitive damages in the sum of $8,300,000,

4.       And interest thereon at the rate of ten percent per annum from the date of the verdict until paid together with costs and disbursements.

It further appearing by reason of said special verdict that Plaintiff Joseph Vago is entitled to judgment against Defendants Leslie Klein and Leslie Klein & Associates.

NOW THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that said Joseph Vago shall have and recover from Defendants, jointly and severally:

1.       $400,000 for emotional distress

2.       And interest thereon at the rate of ten percent per annum from the date of the verdict until paid together with costs and disbursements.

The total amount of the judgment against Defendants jointly and severally is **$24,334,038.99.**

Dated:    12/02/2022

**Terry Green**

Terry Green / Judge

Hon. Terry Green
Judge of the Superior Court

1 | DATED: November 15, 2022

PROCEL LAW, PC

By: _____

BRIAN PROCEL
Attorneys for Plaintiffs
JOSEPH VAGO and ERICA VAGO

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3                              **PROOF OF SERVICE**

4       **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

5             At the time of service, I was over 18 years of age and not a party to this action.  I am
        employed in the County of Los Angeles, State of California.  My business address 401 Wilshire
6       Boulevard, 12th Floor, Santa Monica, California 90401.

7             On November 15, 2022, I served true copies of the following document(s) described as:

8                    **[PROPOSED] JUDGMENT ON SPECIAL VERDICT**

9       on the interested parties in this action as follows:

10                               **SERVICE LIST**

11       Jeffrey A. Slott                                    *Attorneys for Defendants*
         LAW OFFICES OF JEFFREY A. SLOTT, APC
12       15760 Ventura Blvd., Suite 1600                     LESLIE KLEIN and
         Encino, CA 91436                                    LES KLEIN & ASSOCIATES, INC.
13       Telephone:    (818) 995-1955
         Facsimile:    (818) 995-0955
14       Email:        jslott@aol.com

15
             **BY E-MAIL:**  I caused a copy of the document(s) to be sent from e-mail address
16       johnpark@procel-law.com to the person(s) at the e-mail address(es) listed in the Service List.  I
         did not receive, within a reasonable time after the transmission, any electronic message or other
17       indication that the transmission was unsuccessful.

18            I declare under penalty of perjury under the laws of the State of California that the
         foregoing is true and correct.
19
             Executed on November 15, 2022, at Santa Monica, California.
20

21                                             /s/ Brian Procel
                                               Brian Procel
22

23

24

25

26

27

28

                                              4
                              [PROPOSED] JUDGMENT
                                   116

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| ERICA VAGO and JOSEPH VAGO, | LESLIE KLEIN and DOES 1 through 10, |

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>GOE FORSYTHE & HODGES LLP<br>17701 Cowan Avenue, Suite 210, Bldg. D, Irvine, CA 92614<br>Telephone: (949) 798-2460 / Facsimile: (949) 955-9437 | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>□ Debto          □ U.S. Trustee/Bankruptcy Admin<br>□ X Creditor     □ Other<br>□ Trustee | PARTY (Check One Box Only)<br>□ X Debtor        □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor       □ Other<br>□ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint to Determine the Nondischargeability of Certain Debts Owed by Debtor Leslie Klein to Erica and Joseph Vago
Pursuant to 11 U.S.C. § 523 and to Deny Discharge Pursuant to Section 727(a)(12)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- [ ] 11-Recovery of money/property - §542 turnover of property
- [ ] 12-Recovery of money/property - §547 preference
- [ ] 13-Recovery of money/property - §548 fraudulent transfer
- [ ] 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- [ ] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- [ ] 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- [2] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- [ ] 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- [ ] 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- [ ] 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- [1] 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny
  **(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- [ ] 61-Dischargeability - §523(a)(5), domestic support
- [ ] 68-Dischargeability - §523(a)(6), willful and malicious injury
- [ ] 63-Dischargeability - §523(a)(8), student loan
- [ ] 64-Dischargeability - §523(a)(15), divorce or separation obligation
  (other than domestic support)
- [ ] 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- [ ] 71-Injunctive relief – imposition of stay
- [ ] 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- [ ] 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- [ ] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- [ ] 01-Determination of removed claim or cause

**Other**
- [ ] SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- [ ] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $  26,386,891.00 |

| Other Relief Sought |
|---|
| |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>LESLIE KLEIN | BANKRUPTCY CASE NO.<br>2:23-bk-10990-SK | |
| DISTRICT IN WHICH CASE IS PENDING<br>CENTRAL | DIVISION OFFICE<br>LOS ANGELES | NAME OF JUDGE<br>SANDRA KLEIN |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*/s/Robert P. Goe* | | |
| DATE<br>May 10, 2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Robert P. Goe | |

## INSTRUCTIONS

    The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

    A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

    The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| ROBERT P. GOE (State Bar No. 137019) rgoe@goeforlaw.com REEM J. BELLO (State Bar No. 198840) rbello@goeforlaw.com GOE FORSYTHE & HODGES LLP 17701 Cowan Avenue, Suite 210, Bldg. D Irvine, CA 92614 Telephone: (949) 798-2460 Facsimile: (949) 955-9437 | |
| *Attorney for Plaintiff* | |

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| In re: LESLIE KLEIN, Debtor(s). | CASE NO.: 2:23-bk-10990-SK CHAPTER: 11 ADVERSARY NO.: |
| ERICA VAGO and JOSEPH VAGO, Plaintiff(s) Versus LESLIE KLEIN and DOES 1 through 10, Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| Hearing Date: _____ Time: _____ Courtroom: _1575_ | Address: ☒ 255 East Temple Street, Los Angeles, CA 90012 ☐ 3420 Twelfth Street, Riverside, CA 92501 ☐ 411 West Fourth Street, Santa Ana, CA 92701 ☐ 1415 State Street, Santa Barbara, CA 93101 ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |
|---|---|

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016                                      Page 1                              **F 7004-1.SUMMONS.ADV.PROC**

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

**KATHLEEN J. CAMPBELL
CLERK OF COURT**

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
Deputy Clerk

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

17701 Cowan Avenue, Suite 210, Bldg. D
Irvine, CA 92614

A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:

Complaint to Determine the Nondischargeability of Certain Debts Owed by Debtor Leslie Klein to Erica and Joseph Vago

Pursuant to 11 U.S.C. § 523 and to Deny Discharge Pursuant to Section 727(a)(12)

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____    _____    _____
*Date*                             *Printed Name*                          *Signature*

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016                                    Page 3                          **F 7004-1.SUMMONS.ADV.PROC**

# EXHIBIT D

Baruch C. Cohen, Esq. (SBN 159455)
LAW OFFICE OF BARUCH C. COHEN
    A Professional Law Corporation
4929 Wilshire Boulevard, Suite 940
Los Angeles, California 90010
Tel: (323) 937-4501   Fax: (888) 316-6107
email: baruchcohen@baruchcohenesq.com

*Attorney For Plaintiffs Robert & Esther Mermelstein*

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES ANA DIVISION

| | |
|---|---|
| In re | Case No. 2:23-bk-10990-SK |
| LESLIE KLEIN, | Hon.  Sandra Klein |
| Debtor and Debtor in Possession, | Chapter 11 |
| ROBERT & ESTHER MERMELSTEIN, | **COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT TO  11 USC § 523(a)(2)(A),  11 USC § 523(a)(4), & 11 USC § 523(a)(6); & FOR DENIAL OF DISCHARGE PURSUANT TO 11 USC § 727(a)(2)(A); 11 USC § 727(a)(2)(B); 11 USC § 727(a)(3); 11 USC § 727(a)(4); 11 USC § 727(a)(5)** |
| Plaintiffs | |
| vs. | |
| LESLIE KLEIN | |
| Defendant | |

**TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE, THE DEBTOR AND HIS COUNSEL, AND ALL OTHER INTERESTED PARTIES**:

Plaintiffs-Creditors, Robert & Esther Mermelstein ("Plaintiffs"), complain for nondischargeability of debt & for denial of discharge against Defendant-Debtor, Leslie Klein ("Defendant"), and alleges respectfully as follows:

**CORE/NON-CORE DESIGNATION**

1.    In accordance with Local Bankruptcy Rule 7008-1, Plaintiffs allege that this adversary proceeding constitutes a core proceeding under 28 USC § 157(b)(2). Plaintiffs acknowledge that the Court has the power to enter final orders and judgments in this

matter. Plaintiffs also consent to the Court's entry of final orders and judgments in this matter under FRBP Rule 7008..

## JURISDICTION, VENUE & STANDING

2. This adversary proceeding arises under *In re Klein*, 2:23-bk-10990-SK, a Chapter 11 case commenced in the United States Bankruptcy Court for the Central District of California ("Bankruptcy Case"). The Court has jurisdiction under 11 USC §§ 523 and 727, and 28 USC §§ 157 and 1334.

3. The venue is proper in this Court pursuant to 28 USC § 1409.

4. Plaintiffs have standing to bring this action because Plaintiffs are creditors in the Bankruptcy Case under 11 USC § 101(10).

## PARTIES

5. The following is a description of the relevant parties involved in the facts forming the basis of this Complaint.

6. Plaintiffs are individuals, senior citizens residing in Brooklyn, NY.

7. Defendant is an individual, whose principal residence is in Los Angeles County, California and who regularly conducted business from Los Angeles County, California. Defendant was a certified public accountant, formerly licensed by the State of California, and a former, and an attorney licensed by the State of California.[1] Defendant is the debtor in the above-captioned Chapter 11 bankruptcy case.

///

[1] On September 10, 1992, the Supreme Court of the State of California, in State Bar Court Case No. 86-O-14258, ordered that Defendant be suspended from the practice of law for 18 months and further ordered that he take and pass the California Professional Responsibility Examination ("CPRE"). Defendant failed the November 1993 and January 1994 CPREs. In Case No. 86-O-14258, Defendant admitted to intentional misrepresentations. On August 3, 1995, the Supreme Court of the State of California, in State Bar Court Case No. 92-O-11716 (consolidated with Case Nos. 93-O-11825, 94-O-13951, 94-O12055, and 94-O15901) ordered that Defendant be suspended from the practice of law for one year. In Case No. 92-O-11716, as consolidated, Defendant admitted to willful violations of Rules of Professional Conduct concerning client trust accounts and conflicts of interest.

-2-

**GENERAL ALLEGATIONS**

8.    The following general allegations form the background for the Plaintiffs' claims for relief against Defendant.

9.    Plaintiffs are family relatives of Defendant, are Orthodox Jews, and are the settlors and beneficiaries of the Mermelstein Charitable Remainder Unitrust Dated July 27, 2009, (the " Mermelstein Trust").

10.   Defendant,  on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") solicited Plaintiffs to invest in at least seven (7) life insurance policies: (1) Garza; (2) Times Square; (3) Ganz; (4) Spitzer; (5) Kohn; (6) Friedman; & (7) Zimmerman.

**GARZA**

11.   On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture (the "Garza Memo"). The purpose of the Garza Memo, was to purchase a $1,000,000.00 life insurance Policy ("Garza Policy"); American General on the life of Emanuel Garza ("Garza"). In furtherance of the Garza Memo, Plaintiffs paid Klein $100,000.00 towards the purchase of the Garza Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Garza Memo, Defendant promised to pay the Mermelstein Trust $500,000.00 ($400,000.00 plus return of premiums paid; plus $100,000.00).

12.   On 4-30-2021, Defendant executed a First Amendment to the Memorandum of Agreement for Joint Venture (Garza), changing the recipient of the $500,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

13.   Plaintiffs are informed and believe that Defendant sold 50% to the Garza Policy, to the Longevity Fund of NY and partially to the Longevity Fund of Michigan without their consent.

14.   Plaintiffs are informed and believe that Garza apparently died in 2018, and on or about 7-

2-2018, Defendant collected the Garza Proceeds, on the Garza Policy. Defendant concealed this information from Plaintiffs, misappropriated & kept the Garza Proceeds for himself, and failed to pay Plaintiffs the $500,00.00 per the Garza Memo.

**TIMES SQUARE**

15. On 7-16-2012, Defendant issued Plaintiffs a Non-Recourse Promissory Note, in the amount of $333,333.00, due and payable by 7-16-2013, by Defendant on behalf of the Times Square Media Inc., containing a "*Heter Iska*" document (an approved way of restructuring a loan or debt so that it becomes an investment instead of a loan, per *Halacha* - Jewish law).

16. Plaintiffs are informed and believe that Defendant had no intention of paying the Times Square Non-Recourse Promissory Note, as Plaintiffs made no payments whatseoever.

**GANZ**

17. On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with plaintiffs (the "Ganz Memo"). The purpose of the Ganz Memo, was to purchase a $1,000,000.00 life insurance Policy ("Ganz Policy"); American General on the life of Emanuel Ganz ("Ganz"). In furtherance of the Ganz Memo, Plaintiffs paid Klein $100,000.00 towards the purchase of the Ganz Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Ganz Memo, Defendant promised to pay the Mermelstein Trust $500,000.00 ($400,000.00 plus return of premiums paid; plus $100,000.00).

18. On 4-30-2021, Defendant executed a First Amendment to the Memorandum of Agreement for Joint Venture (Ganz), changing the recipient of the $500,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

19. Plaintiffs are informed and believe that Defendant apparently sold 50% to the Ganz Policy, to the Longevity Fund of NY and partially to the Longevity Fund of Michigan, without Plaintiff's consent.

20. Plaintiffs are informed and believe that Ganz apparently died in 2018, and on or about 7-2-2018, Defendant collected the Ganz Proceeds, on the Ganz Policy. Defendant concealed this information from Plaintiffs, misappropriated & kept the Ganz Proceeds for himself, and failed to pay Plaintiffs the $500,00.00 per the Ganz Memo.

**SPITZER**

21. On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with Plaintiffs (the "Spitzer Memo"). The purpose of the Spitzer Memo, was to make premium payments of a $5,000,000.00 life insurance Policy Number: US 0023546L ("Spitzer Policy"); American General on the life of Malvine Spitzer ("Spitzer"). In furtherance of the Spitzer Memo, Plaintiffs paid Defendant $250,000.00 towards the purchase of the Spitzer Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Spitzer Memo, Defendant promised to pay the Mermelstein Trust $2,250,000.00 ($2,000,000 plus $250,000 and all premiums paid of the proceeds).

22. On 4-30-2021, Defendant executed a First Amendment to the Memorandum of Agreement for Joint Venture (Spitzer), changing the recipient of the $2,250,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

23. Plaintiffs are informed and believe that Defendant apparently sold portions of the Spitzer Policy, without their consent - but Plaintiffs do not know to whom. Defendant concealed this information from Plaintiffs.

**KOHN**

24. On 3-10-2010, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with Plaintiffs (the "Kohn Memo"). The purpose of the Kohn Memo, was to make premium payments of a $3,000,000.00 life insurance Policy ("Kohn Policy"); American General on the life of Eugene Kohn ("Kohn"). In furtherance of the Kohn

Memo, Plaintiffs paid Defendant $200,000.00 towards the purchase of the Kohn Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Kohn Memo, Defendant promised to pay the Mermelstein Trust $1,200,000.00 ($200,000 and $1,000,000 and all premiums paid of the proceeds).

25.   On 4-30-2021, Klein executed a First Amendment to the Memorandum of Agreement for Joint Venture (Kohn), changing the recipient of the $1,200,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

26.   Plaintiffs are informed and believe that Defendant paid premiums of the Kohn Policy up to 2011. Thereafter, Defendant apparently sold portions or the entirety of the Kohn Policy - without Plaintiffs' consent - to Life Capital Group, LLC ("LCG"), where Shlomo Yehuda Rechnitz ("Rechnitz") was to resume paying the Kohn Policy premiums from 2011 onwards. Defendant concealed this information from Plaintiffs.

27.   According to information recently received by Plaintiffs an unsigned Amended and Restated Limited Liability Company Agreement of Life Capital Group, LLC, Defendant and Rechnitz agreed that upon the death of Kohn, Defendant and Rechnitz would be reimbursed the premiums that they paid, plus interest on the premiums. Thereafter, Defendant and Rechnitz would split the profits 50/50 of the Kohn Policy, and that Plaintiffs would receive their $1,200,000.00.

**FRIEDMAN**

28.   On 3-1-2010, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with Plaintiffs (the "Friedman Memo"). The purpose of the Friedman Memo, was to purchase a $1,500,000.00 life insurance Policy ("Friedman Policy"); American General on the life of Goldie Friedman ("Friedman"). In furtherance of the Friedman Memo, Plaintiffs paid Klein $250,000.00 towards the purchase of the Friedman Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Friedman Memo, Defendant promised to pay the

1    Mermelstein Trust $1,000,000.00 ($250,000.00 and $750,000.00 and all premiums paid

2    of the proceeds).

3  29.  On 4-30-2021, Defendant executed a First Amendment to the  Memorandum of

4    Agreement for Joint Venture (Friedman), changing the recipient of the $1,000,000.00

5    from the Mermelstein Trust to Robert & Esther Mermelstein.

6  30.  Plaintiffs are informed and believe that Defendant apparently sold portions of the

7    Friedman Policy, to the Longevity Fund of NY and partially to the Longevity Fund of

8    Michigan, without Plaintiff's consent.

9  31.  Plaintiffs are informed and believe that Friedman apparently died in 2020, and Defendant

10    collected the Friedman Proceeds, on the Friedman Policy. Defendant concealed this

11    information from Plaintiffs, misappropriated & kept the Friedman Proceeds for himself,

12    and failed to pay Plaintiffs the  $1,000,000.00 per the Friedman Memo.

13                      **ZIMMERMAN**

14  32.  On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated

15    2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint

16    Venture with Plaintiffs (the "Zimmerman Memo"). The purpose of the Zimmerman

17    Memo, was to purchase a $9,000,000.00 life insurance Policy ("Zimmerman Policy");

18    American General Policy # US 0023738L on the life of Rozy Pearl Zimmerman

19    ("Zimmerman"). In furtherance of the Zimmerman Memo, Plaintiffs paid Defendant

20    $150,000.00 towards the purchase of the Zimmerman Policy. Defendant instructed

21    Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account.

22    Per the Zimmerman Memo, Defendant promised to pay the Mermelstein Trust

23    $2,400,000.00 ($2,250,000.00 plus $150,000.00).

24  33.  On 4-30-2021, Defendant executed a First Amendment to the  Memorandum of

25    Agreement for Joint Venture (Zimmerman), changing the recipient of the $2,400,000.00

26    from the Mermelstein Trust to Robert & Esther Mermelstein.

27  34.  Plaintiffs are informed and believe that Defendant paid premiums of the Zimmerman

28

Policy up to 2011. Thereafter, Defendant apparently sold portions or the entirety of the

Zimmerman Policy to Life Capital Group, LLC ("LCG") - without Plaintiffs' consent - ,

where Shlomo Yehuda Rechnitz ("Rechnitz") was to resume paying the Zimmerman

Policy premiums from 2011 onwards. Defendant concealed this information from

Plaintiffs.

35.     Defendant, as Trustee of the Rozy Pearl Zimmerman Irrevocable Life Insurance Trust

(the "Zimmerman Trust") issued three Non-Recourse Promissory Notes  (the

"Zimmerman Notes") to Plaintiffs secured by the Zimmerman Policy in the amount of

$2,357,679.50:

a.      Non-Recourse Promissory Notes # 1, principal sum of $1,412,679.53, dated June

15, 2011 - due June 15, 2020 (the "$1,412,679.53 Zimmerman Note");

b.      Non-Recourse Promissory Notes # 2, principal sum of $570,000.00, dated

December 7, 2009 - due December 7, 2019 (the: "$570,000.00 Zimmerman

Note");

c.      Non-Recourse Promissory Notes # 2, principal sum of $375,000.00, dated

January 14, 2010 - due January 14, 2020 (the "$375,000.00 Zimmerman Note").

d.      Interest on the three Non-Recourse Zimmerman Notes until 4-30-2023 comes to

$2,939,936.84. Therefore the total amount of the claim is: $7,697,616.34

($2,400,000.00 (Zimmerman Policy) + $2,357,679.50 (3 Zimmerman Notes) +

2,939,936.84 (interest) =  $7,697,616.34.

36.     According to information recently received by Plaintiffs, an unsigned Amended and

Restated Limited Liability Company Agreement of Life Capital Group, LLC, Defendant

and Rechnitz agreed that upon the death of Zimmerman, Defendant and Rechnitz  would

be reimbursed the premiums that they paid, plus interest on the premiums. Thereafter,

Defendant and Rechnitz would split the profits 50/50 of the Zimmerman Policy, and that

Plaintiffs would receive their $2,400,000.00.  Defendant concealed this information from

Plaintiffs.

1     **PERIODIC PAYMENTS TO PLAINTIFFS FROM DEFENDANT'S IOLTA ACCOUNT**

2    37.     During this entire time, Defendant repeatedly assured Plaintiffs that their investments in

3      the 7 policies were secure and accruing interest. Defendant mailed Plaintiffs periodic

4      monthly checks of $5,000.00 issued from Defendant's IOLTA - Attorney Client Trust

5      Account.

6          **PLAINTIFFS' DISCOVERY OF DEFENDANT'S FRAUD**

7    38.     On or about 1-21-2021, Plaintiffs discovered the above-referenced frauds and

8      concealment.

9    39.     On or about 6-22-2022, Defendant wrote Plaintiffs assuring them that their investments

10      were "secure" when in reality, Defendant sold them off to third parties without Plaintiffs'

11      consent:

12      I received you e mail and I disagree. I paid in on the Zmerman policy over
$1,000,000. The interest for the last 10 years is over $2,300,000 . I also own

13      25%of the profits. ***You are well secured***. You can call me if you have any
questions. [Emphasis Added]

14

15    40.     On or about 7-18-2022, Defendant wrote Plaintiffs admitting that he used Plaintiffs'

16      monies from the Friedman Garza and Gans to pay for his legal fees in his lawsuit with

17      Rechnitz.

18      I got your email. I want to make it very clear we are family and I don't want to
fight. I think I can make a deal with Rechnitz because I have the best lawyers in

19      LA. If not we will go to court. I have big leverage on Rechnitz due to the Menlo
case. I am not assigning the Zimmerman case to you. ***I am using the money from***

20      ***the Friedman Garza and Gans cases for attorney fees in the Rechnitz case***. On
Zimmerman Rechnitz and I paid $4,000,000 in premiums but it is return of

21      premium. We also gave Mrs Zimmerman $200,000. I am sure they will sue to get
more. It is a big policy and all big policies have big fights. [Emphasis Added]

22            **PLAINTIFFS' PROOF OF CLAIMS**

23    41.     Plaintiffs timely filed seven (7) *Proofs of Claim* against Defendant totaling $13,480,949,

24      primarily based on Defendant misappropriating insurance policies and the proceeds, as

25      follows:

26      a.     Claim # 19-1 (Garza) $500,000.00;

27      b.     Claim # 20-1 (Times Square) $333,333.00;

28

c. Claim # 21-1 (Ganz) $500,000.00;

d. Claim # 22-1 (Spitzer) $2,250,000.00;

e. Claim # 23-1 (Kohn) $1,200,000.00;

f. Claim # 24-1 (Friedman) $1,000,000.00; &

g. Claim # 25-2 (Zimmerman) $7,697,616.34.

TOTAL: **$13,480,949**

### FIRST CLAIM FOR RELIEF
#### (Nondischargeability of Debt - 11 USC § 523(a)(2)(A))

42. Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

43. At all relevant times, Defendant acted as Plaintiffs' fiduciary - investment adviser. Plaintiffs entrusted Defendant implicitly with their investments in the insurance policies.

44. Defendant owed Plaintiffs fiduciary duties at all relevant times, including the duty of loyalty and candor. Defendant further owed a duty to use Plaintiffs' funds for legitimate business purposes and to refrain from using their funds and other property for his own personal non-business purposes.

45. Defendant embezzled and stole from Plaintiffs. Defendant misrepresented the above-referenced information to Plaintiffs for the purpose of convincing Plaintiffs to invest in additional policies into Defendant's IOLTA client trust account. Defendant then stole more than $13,480,949 of Plaintiffs' money in a complicated life insurance scam, constituting intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse.

46. Defendant's misappropriation of Plaintiffs' funds and other property was unauthorized, without their consent and fraudulent. Defendant acted with the intent to permanently deprive Plaintiffs of the possession, use and benefit of their funds and other property.

47. As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiffs' funds and other property and Defendant's false pretenses, false representations, and actual fraud set forth herein, Plaintiffs have suffered damages in the amount of not less

than $13,480,949.

48. Defendant's debt to Plaintiffs is nondischargeable under 11 USC § 523(a)(2) because it was incurred as a result of false pretenses, false representations, and actual fraud.

49. The damages arising from Defendant's willful and malicious false pretenses, false representation and actual fraud to Plaintiffs constitutes a debt against Defendant that is nondischargeable pursuant to 11 USC § 523(a)(2)(A).

## SECOND CLAIM FOR RELIEF
### (Nondischargeability of Debt - 11 USC § 523(a)(4))

50. Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

51. At all relevant times, Defendant acted as Plaintiffs' fiduciary - investment adviser. Plaintiffs entrusted Defendant implicitly with their investments in the insurance policies.

52. Defendant owed Plaintiffs fiduciary duties at all relevant times, including the duty of loyalty and candor. Defendant further owed a duty to use Plaintiffs' funds for legitimate business purposes and to refrain from using their funds and other property for his own personal non-business purposes.

53. Defendant embezzled and stole from Plaintiffs. Defendant misrepresented the above-referenced information to Plaintiffs for the purpose of convincing Plaintiffs to invest in additional policies into Defendant's IOLTA client trust account. Defendant then stole more than $13,480,949 of Plaintiffs' money in a complicated life insurance scam, constituting intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse.

54. Defendant's misappropriation of Plaintiffs' funds and other property was unauthorized, without their consent and fraudulent. Defendant acted with the intent to permanently deprive Plaintiffs of the possession, use and benefit of their funds and other property.

55. As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiffs' funds and other property and Defendant's false pretenses, false representations, and actual fraud set forth herein, Plaintiffs have suffered damages in the amount of not less

1     than $13,480,949.

2  56.    The damages to Plaintiffs arising from Defendant's fraud, defalcation, embezzlement and

3     larceny while acting in a fiduciary capacity constitutes a debt against Defendant that is

4     non-dischargeable pursuant to 11 USC § 523(a)(4).

5                             **THIRD CLAIM FOR RELIEF**

6              **(Nondischargeability of Debt - 11 USC § 523(a)(6))**

7  57.    Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations

8     in this Complaint as though fully set forth herein.

9  58.    At all relevant times, Defendant acted as Plaintiffs' fiduciary - investment adviser.

10     Plaintiffs entrusted Defendant implicitly with their investments in the insurance policies.

11  59.    Defendant owed Plaintiffs fiduciary duties at all relevant times, including the duty of

12     loyalty and candor. Defendant further owed a duty to use Plaintiffs' funds for legitimate

13     business purposes and to refrain from using their funds and other property for his own

14     personal non-business purposes.

15  60.    Defendant embezzled and stole from Plaintiffs. Defendant misrepresented the above-

16     referenced information to Plaintiffs for the purpose of convincing Plaintiffs to invest in

17     additional policies into Defendant's IOLTA client trust account. Defendant then stole

18     more than $13,480,949 of Plaintiffs' money in a complicated life insurance scam,

19     constituting intentional fraudulent, fraudulent concealment, breach of fiduciary duty and

20     elder abuse.

21  61.    Defendant's misappropriation of Plaintiffs' funds and other property was unauthorized,

22     without their consent and fraudulent. Defendant acted with the intent to permanently

23     deprive Plaintiffs of the possession, use and benefit of their funds and other property.

24  62.    As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiffs'

25     funds and other property and Defendant's false pretenses, false representations, and

26     actual fraud set forth herein, Plaintiffs have suffered damages in the amount of not less

27     than $13,480,949.

28  63.    The damages to Plaintiffs arising from Defendant's willful and malicious injury to

Plaintiffs constitutes a debt against Defendant that is non-dischargeable pursuant to 11 USC § 523(a)(6).

## FOURTH CAUSE OF ACTION
### (Objection to Debtor's Discharge  11 USC § 727(a)(2)(A))

64. Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

65. Plaintiffs are informed and believe that within one year before the Petition, Defendant transferred, removed, and/or concealed, or permitted to be transferred, removed, and/or concealed, Defendant's property.

66. As of the dates of the transfers, removals, and/or concealments of Defendant's property, Defendant had one or more unsecured creditors.

67. The transfers, removals, and/or concealments of Defendant's property prevented the distribution of Defendant's property to Defendant's unsecured creditors.

68. Defendant, with intent to hinder, delay, and/or defraud at least one of Defendant's creditors, including, without limitation, Plaintiffs, transferred, removed, and/or concealed, or permitted to be transferred, removed, and/or concealed, Defendant's property.

69. By transferring, removing, concealing, and/or permitting the transfer, removal, and/or concealment of Defendant's property with the intent to hinder, delay, and/or defraud at least one of Defendant's creditors, Defendant violated 11 USC § 727(a)(2)(A).

70. Defendant failed to list valuable property on his schedule of assets and failed in his statement of affairs to disclose property transfers.

71. Defendant has a reckless indifference to the truth.

## FIFTH CAUSE OF ACTION
### (Objection to Debtor's Discharge  11 USC § 727(a)(2)(B))

72. Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

73. Plaintiffs are informed and believe that After the Petition, Defendant transferred,

1  removed, concealed, and/or permitted to be transferred, removed, and/or concealed,

2  property of the Bankruptcy estate.

3  74.  As of the dates of the transfers, removals, and/or concealments of the property of the

4  estate, Defendant had one or more unsecured creditors.

5  75.  The transfers, removals, and/or concealments of the property of the estate prevented the

6  distribution of this property to Defendant's unsecured creditors.

7  76.  Defendant, with intent to hinder, delay, and/or defraud at least one of Defendant's

8  creditors, transferred, removed, and/or concealed, or permitted to be transferred,

9  removed, and/or concealed, property of the estate.

10  77.  By transferring, removing, concealing, and/or permitting the transfer, removal, and/or

11  concealment of estate property, with the intent to hinder, delay, and/or defraud at least

12  one of Defendant's creditors, Defendant violated 11 USC § 727(a)(2)(B).

13  78.  Defendant failed to list valuable property on his schedule of assets and failed in his

14  statement of affairs to disclose property transfers.

15  79.  Defendant has a reckless indifference to the truth.

16  **SIXTH CAUSE OF ACTION**
   **(Objection to Debtor's Discharge  11 USC § 727(a)(3)**

17

18  80.  Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations

19  in this Complaint as though fully set forth herein.

20  81.  Plaintiffs are informed and believe that Defendant has not maintained adequate books

21  and records from which Debtor's financial condition can be ascertained. Debtor has

22  consistently not maintained adequate books and records. His failure to keep adequate

23  books and records is not justified considering the circumstances articulated in this

24  Complaint.

25  82.  Defendant has concealed, destroyed, falsified, and/or failed to keep or preserve

26  information from which Defendant's financial condition and/or business transactions

27  might be ascertained.

28  83.  Defendant has not been cooperative with the Office of the United States Trustee

-14-

("OUST") or with his creditors. Defendant has intentionally withheld records, books, documents, and/or other papers relating to Defendant's property and/or financial affairs.

84.    Considering the foregoing, Defendant's discharge must be denied under 11 USC § 727(a)(3).

**SEVENTH CAUSE OF ACTION**
**(Objection to Debtor's Discharge  11 USC § 727(a)(4)**

85.    Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

86.    Plaintiffs are informed and believe that Defendant has not made simple isolated errors or omissions in his Bankruptcy filings. Defendant's filings, such as his schedules and statement of affairs, do not reflect inadvertence or incompetence; rather, they exhibit fraudulent intent.

87.    Defendant has a pattern of misleading conduct.

88.    Defendant has a reckless indifference to the truth.

89.    Defendant has failed to list assets in his schedules.

90.    Defendant has falsely testified in the 341 Meeting.[2]

---

[2]    At the 3-13-2023 341(a) Meeting, Defendant at circa 11:15 testified in response to omissions to be brought to the attention of the United States Trustee ("UST"), that there were only "three minor errors" which he thought that his attorney corrected. Defendant testified that there were "no" errors related to any assets that he owns. At circa 12:52, Defendant testified that he identified all assets on his schedules. Defendant at circa 1:18:30-1:09:21 testified that in the year before the Bankruptcy, he received no commissions from his third-party life insurance deals. At circa 1:20:18, Defendant testified that he has not ever collected money on his third-party life insurance deals. At circa 1:22:18, Defendant testified that he has never received a payoff on his third-party life insurance deals. At circa 1:23:21, Defendant testified that four people have died and that he has received no money. Defendant at circa 1:39:00 testified, in response to whether he had transactions with Shlomo Rechnitz in the last five or six months relating to the thirdparty life insurance policies, "nope." Defendant testified that he does not remember paying the premiums for these policies out of his attorney client trust account at any time. Defendant at circa 1:40:03 testified that he does not remember depositing his own funds into his attorney-client trust account so that these insurance premiums could be paid. In response to the question of whether Defendant traveled out of the country anywhere recently, other than Israel, Defendant at circa 2:23:00 testified, "nope." In response

91. Defendant has knowingly and fraudulently made false oaths and/or accounts in the Bankruptcy Case.

92. Defendant has failed to provide records which are necessary for the OUST and his creditors to properly understand Defendant's financial condition and/or recent business transactions.

93. Considering the foregoing, Defendant's discharge must be denied under 11 USC § 727(a)(4).

### EIGHTH CAUSE OF ACTION
### (Objection to Debtor's Discharge  11 USC § 727(a)(5))

94. Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

95. Defendant has failed to explain satisfactorily his deficiency and/or loss of assets to meet Debtor's liabilities. No determination has yet been made of an entitlement to a discharge in this Bankruptcy Case.

96. Considering the foregoing, Defendant's discharge must be denied under 11 USC § 727(a)(5).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment on the Complaint as follows:

1. On the First Claim for Relief, Plaintiffs seek an order determining that Defendant is indebted to Plaintiffs in an amount not less than $13,480,949 and that Defendant's debt is excepted from discharge pursuant to 11 USC § 523(a)(2)(A);

2. On the Second Claim for Relief, Plaintiffs seek an order determining that Defendant is indebted to Plaintiffs in an amount not less than $13,480,949 and that Defendant's debt is excepted from discharge pursuant to 11 USC § 523(a)(4);

3. On the Third Claim for Relief, Plaintiffs seek an order determining that Defendant is

---

to the question of whether Defendant has bank accounts in Israel, Defendant at circa 2:26:48 testified, "nope." Defendant at circa 2:59:15 testified that he has not transferred any assets within the last year to a third party. Defendant at circa 2:59:33 testified that he has not given any gifts more than $12,000.00 to his family.

indebted to Plaintiffs in an amount not less than $13,480,949 and that Defendant's debt is
excepted from discharge pursuant to 11 USC § 523(a)(6);

4.    On the Fourth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge
pursuant to 11 USC § 727(a)(2)(A);

5.    On the Fifth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge
pursuant to 11 USC § 727(a)(2)(B);

6.    On the Sixth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge
pursuant to 11 USC § 727(a)(3);

7.    On the Seventh Claim for Relief, Plaintiffs seek an order denying Defendant his
discharge pursuant to 11 USC § 727(a)(4);

8.    On the Eighth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge
pursuant to 11 USC § 727(a)(5);

9.    For costs of suit incurred herein; and

10.    For such other and further relief as the Court may deem appropriate.

DATED:    May 12, 2023        LAW OFFICE OF BARUCH C. COHEN
                      A Professional Law Corporation

                      By    /S/ Baruch C. Cohen
                      Baruch C. Cohen, Esq.
                      *Attorney For Creditors Robert & Esther
                      Mermelstein*

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>ROBERT & ESTHER MERMELSTEIN | DEFENDANTS<br><br>LESLIE KLEIN |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br><br>Baruch C. Cohen, Esq. (SBN 159455)   (323) 937-4501<br>LAW OFFICE OF BARUCH C. COHEN, A Professional Law Corporation<br>4929 Wilshire Boulevard, Suite 940, Los Angeles CA 90010 | **ATTORNEYS** (If Known) |

| PARTY (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor   ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☒ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 USC § 523(a)(2)(A), 11 USC § 523(a)(4), & 11 USC § 523(a)(6); & FOR DENIAL OF DISCHARGE PURSUANT TO 11 USC § 727(a)(2)(A); 11 USC § 727(a)(2)(B); 11 USC § 727(a)(3); 11 USC § 727(a)(4); 11 USC § 727(a)(5)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☒ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☒ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☒ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☒ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court
    if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 13,480,949 |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>LESLIE KLEIN | BANKRUPTCY CASE NO.<br>2:23-bk-10990-SK | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Los Angeles | NAME OF JUDGE<br>Klein |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>5/12/2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Baruch C. Cohen, Esq. | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Baruch C. Cohen, Esq. (SBN 159455)<br>LAW OFFICE OF BARUCH C. COHEN<br> A Professional Law Corporation<br>4929 Wilshire Boulevard, Suite 940<br>Los Angeles, California 90010<br>(323) 937-4501 Facsimile: (888) 316-6107<br>Email: baruchcohen@baruchcohenesq.com<br><br><br>*Attorney for Plaintiff* | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| In re:<br>LESLIE KLEIN<br><br><br><br>Debtor(s). | CASE NO.: 2:23-bk-10990-SK<br><br>CHAPTER: 11<br><br>ADVERSARY NO.: |
|---|---|
| ROBERT & ESTHER MERMELSTEIN<br><br><br><br>Plaintiff(s)<br><br>Versus<br>LESLIE KLEIN<br><br><br><br>Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING**<br>**[LBR 7004-1]** |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

> **Hearing Date:** _____
> **Time:** _____
> **Courtroom:** _____
>
> **Address:**
> ☐ 255 East Temple Street, Los Angeles, CA 90012
> ☐ 3420 Twelfth Street, Riverside, CA 92501
> ☐ 411 West Fourth Street, Santa Ana, CA 92701
> ☐ 1415 State Street, Santa Barbara, CA 93101
> ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.**  All parties must read and comply with the rule, even if you are representing yourself.  You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference.  A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH).  If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference.  **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**


**KATHLEEN J. CAMPBELL**
**CLERK OF COURT**


Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____


By: _____
Deputy Clerk


This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:



A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:

_____

_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:



☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.



☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.



☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____          _____          _____
*Date*                                         *Printed Name*                                    *Signature*

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                                         Page 3                                         **F 7004-1.SUMMONS.ADV.PROC**

# EXHIBIT E

**BEFORE THE**
**CALIFORNIA BOARD OF ACCOUNTANCY**
**DEPARTMENT OF CONSUMER AFFAIRS**
**STATE OF CALIFORNIA**

| | |
|---|---|
| In the Matter of the Accusation Against: | Case No. AC-2019-62 |
| **LESLIE KLEIN**<br>**322 N. June Street**<br>**Los Angeles, CA  90004** | OAH No. 2019090073 |
| **Certified Public Accountant Certificate No. 67454** | |
| Respondent. | |

## DECISION AND ORDER

The attached Stipulated Surrender of License and Order is hereby adopted by the

California Board of Accountancy, Department of Consumer Affairs, as its Decision in this

matter.

This Decision shall become effective on _____May 13, 2020_____.

It is so ORDERED _____April 13, 2020_____.

_____
FOR THE CALIFORNIA BOARD OF ACCOUNTANCY
DEPARTMENT OF CONSUMER AFFAIRS

<div style="float:left">

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

</div>

XAVIER BECERRA
Attorney General of California
MARC D. GREENBAUM
Supervising Deputy Attorney General
WILLIAM D. GARDNER
Deputy Attorney General
State Bar No. 244817
300 So. Spring Street, Suite 1702
Los Angeles, CA 90013
  Telephone: (213) 269-6292
  Facsimile: (916) 731-2126
*Attorneys for Complainant*

**BEFORE THE**
**CALIFORNIA BOARD OF ACCOUNTANCY**
**DEPARTMENT OF CONSUMER AFFAIRS**
**STATE OF CALIFORNIA**

| | |
|---|---|
| In the Matter of the Accusation Against: | Case No. AC-2019-62 |
| **LESLIE KLEIN**<br>**322 N. June Street**<br>**Los Angeles, CA 90004** | OAH No. 2019090073 |
| **Certified Public Accountant Certificate No. 67454** | **STIPULATED SURRENDER OF LICENSE AND ORDER** |
| Respondent. | |

IT IS HEREBY STIPULATED AND AGREED by and between the parties to the above-entitled proceedings that the following matters are true:

**PARTIES**

1.    Patti Bowers (Complainant) is the Executive Officer of the California Board of Accountancy (CBA). She brought this action solely in her official capacity and is represented in this matter by Xavier Becerra, Attorney General of the State of California, by William D. Gardner, Deputy Attorney General.

2.    Respondent Leslie Klein is represented in this proceeding by attorney Randall Dean, whose address is: 11900 W. Olympic Boulevard, Suite 800, Los Angeles, California 90064.

3.    On or about September 30, 1994, the California Board of Accountancy issued Certified Public Accountant Certificate Number 67454 to Leslie Klein ("Respondent"). The

<div align="center">1</div>

1  Certified Public Accountant Certificate was in full force and effect at all times relevant to the

2  charges brought in Accusation No. AC-2019-62 and will expire on January 31, 2021, unless

3  renewed.

4  **JURISDICTION**

5  4.    Accusation No. AC-2019-62 was filed before the CBA, and is currently pending

6  against Respondent.  The Accusation and all other statutorily required documents were properly

7  served on Respondent on June 7, 2019.  Respondent timely filed his Notice of Defense contesting

8  the Accusation.  A copy of Accusation No. AC-2019-62 is attached as Exhibit A and incorporated

9  by reference.

10  **ADVISEMENT AND WAIVERS**

11  5.    Respondent has carefully read, fully discussed with counsel, and understands the

12  charges and allegations in Accusation No. AC-2019-62.  Respondent also has carefully read, fully

13  discussed with counsel, and understands the effects of this Stipulated Surrender of License and

14  Order.

15  6.    Respondent is fully aware of his legal rights in this matter, including the right to a

16  hearing on the charges and allegations in the Accusation; the right to confront and cross-examine

17  the witnesses against him; the right to present evidence and to testify on his own behalf; the right

18  to the issuance of subpoenas to compel the attendance of witnesses and the production of

19  documents; the right to reconsideration and court review of an adverse decision; and all other

20  rights accorded by the California Administrative Procedure Act and other applicable laws.

21  7.    Respondent voluntarily, knowingly, and intelligently waives and gives up each and

22  every right set forth above.

23  **CULPABILITY**

24  8.    Respondent understands that the charges and allegations in Accusation No. AC-2019-

25  62, if proven at a hearing, constitute cause for imposing discipline upon his Certified Public

26  Accountant Certificate.

27  9.    For the purpose of resolving the Accusation without the expense and uncertainty of

28  further proceedings, Respondent agrees that, at a hearing, Complainant could establish a factual

2

1    basis for the charges in the Accusation and that those charges constitute cause for discipline.

2    Respondent hereby gives up his right to contest that cause for discipline exists based on those

3    charges.

4      10.    Respondent understands that by signing this stipulation he enables the CBA to issue

5    an order accepting the surrender of his Certified Public Accountant Certificate without further

6    process.

7                    **RESERVATION**

8      11.    The admissions made by Respondent herein are only for the purposes of this

9    proceeding, or any other proceedings in which the CBA is involved and shall not be admissible in

10    any other criminal or civil proceeding.

11                    **CONTINGENCY**

12      12.    This stipulation shall be subject to approval by the CBA. Respondent understands

13    and agrees that counsel for Complainant and the staff of the CBA may communicate directly with

14    the CBA regarding this stipulation and surrender, without notice to or participation by

15    Respondent or his counsel. By signing the stipulation, Respondent understands and agrees that he

16    may not withdraw his agreement or seek to rescind the stipulation prior to the time the CBA

17    considers and acts upon it. If the CBA fails to adopt this stipulation as its Decision and Order, the

18    Stipulated Surrender and Disciplinary Order shall be of no force or effect, except for this

19    paragraph, it shall be inadmissible in any legal action between the parties, and the CBA shall not

20    be disqualified from further action by having considered this matter.

21      13.    The parties understand and agree that Portable Document Format (PDF) and facsimile

22    copies of this Stipulated Surrender of License and Order, including PDF and facsimile signatures

23    thereto, shall have the same force and effect as the originals.

24      14.    This Stipulated Surrender of License and Order is intended by the parties to be an

25    integrated writing representing the complete, final, and exclusive embodiment of their agreement.

26    It supersedes any and all prior or contemporaneous agreements, understandings, discussions,

27    negotiations, and commitments (written or oral). This Stipulated Surrender of License and Order

28

<div align="center">3</div>

1    may not be altered, amended, modified, supplemented, or otherwise changed except by a writing

2    executed by an authorized representative of each of the parties.

3       15.    In consideration of the foregoing admissions and stipulations, the parties agree that

4    the CBA may, without further notice or formal proceeding, issue and enter the following Order:

5                                 **ORDER**

6       IT IS HEREBY ORDERED that Certified Public Accountant Certificate No. 67454, issued

7    to Respondent Leslie Klein, is surrendered and accepted by the CBA.

8       1.    The surrender of Respondent's Certified Public Accountant Certificate and the

9    acceptance of the surrendered license by the CBA shall constitute the imposition of discipline

10   against Respondent. This stipulation constitutes a record of the discipline and shall become a part

11   of Respondent's license history with the CBA.

12      2.    Respondent shall lose all rights and privileges as a certified public accountant in

13   California as of the effective date of the CBA's Decision and Order.

14      3.    Respondent shall cause to be delivered to the CBA his pocket license and, if one was

15   issued, his wall certificate on or before the effective date of the Decision and Order.

16      4.    If Respondent ever files an application for licensure or a petition for reinstatement in

17   the State of California, the CBA shall treat it as a petition for reinstatement. Respondent must

18   comply with all the laws, regulations and procedures for reinstatement of a revoked or

19   surrendered license in effect at the time the petition is filed, and all of the charges and allegations

20   contained in Accusation No. AC-2019-62 shall be deemed to be true, correct and admitted by

21   Respondent when the CBA determines whether to grant or deny the petition.

22      5.    Respondent shall pay the agency its costs of investigation and enforcement in the

23   amount of $30,000.00 prior to issuance of a new or reinstated license.

24                            **ACCEPTANCE**

25       I have carefully read the above Stipulated Surrender of License and Order and have fully

26   discussed it with my attorney. I understand the stipulation and the effect it will have on my

27   Certified Public Accountant Certificate. I enter into this Stipulated Surrender of License and

28   ///

<div align="center">4</div>

Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order

of the California Board of Accountancy

DATED: __3/19/2020__                    _____
                                         LESLIE KLEIN
                                         *Respondent*

I have read and fully discussed with Respondent Leslie Klein the terms and conditions and

other matters contained in this Stipulated Surrender of License and Order. I approve its form and

content.

DATED: _____        _____
                                 *Attorney for Respondent*

### ENDORSEMENT

The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted

consideration by the California Board of Accountancy of the Department of Consumer

irs.

ED: _____           Respectfully submitted,

                                XAVIER BECERRA
                                Attorney General of California
                                MARC D. GREENBAUM
                                Supervising Deputy Attorney General


                                WILLIAM D. GARDNER
                                Deputy Attorney General
                                *Attorneys for Complainant*


9
ender of License and Order.docx

1 | Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order

2 | of the California Board of Accountancy.

3 |

4 | DATED: _____    _____

5 |                                LESLIE KLEIN
   |                                *Respondent*

6 | I have read and fully discussed with Respondent Leslie Klein the terms and conditions and

7 | other matters contained in this Stipulated Surrender of License and Order. I approve its form and

8 | content.

9 | DATED: March 19, 2020    *Randall J. Dean*

10 |                            *Attorney for Respondent*

11 |

12 | **ENDORSEMENT**

13 | The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted

14 | for consideration by the California Board of Accountancy of the Department of Consumer

15 | Affairs.

16 | DATED: _____    Respectfully submitted,

17 |                                XAVIER BECERRA
   |                                Attorney General of California

18 |                                MARC D. GREENBAUM
   |                                Supervising Deputy Attorney General

19 |

20 |

21 |                                WILLIAM D. GARDNER
   |                                Deputy Attorney General

22 |                                *Attorneys for Complainant*

23 |

24 | LA2019501499
   | Stipulated Surrender of License and Order.docx

25 |

26 |

27 |

28 |

5

Stipulated Surrender of License (Case No. AC-2019-62)

1   Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order

2   of the California Board of Accountancy.

3

4   DATED: _____    _____

5                                      LESLIE KLEIN
                                       *Respondent*

6       I have read and fully discussed with Respondent Leslie Klein the terms and conditions and

7   other matters contained in this Stipulated Surrender of License and Order.  I approve its form and

8   content.

9   DATED: _____    _____

10                                     *Attorney for Respondent*

11

12                          **ENDORSEMENT**

13      The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted

14  for consideration by the California Board of Accountancy of the Department of Consumer

15  Affairs.

16  DATED: *3/20/2020*                 Respectfully submitted,

17                                     XAVIER BECERRA
                                       Attorney General of California
18                                     MARC D. GREENBAUM
                                       Supervising Deputy Attorney General
19

20

21                                     WILLIAM D. GARDNER
                                       Deputy Attorney General
22                                     *Attorneys for Complainant*

23

24  LA2019501499
    Stipulated Surrender of License and Order.docx
25

26

27

28

                                    5

**Exhibit A**

**Accusation No. AC-2019-62**

1   XAVIER BECERRA
    Attorney General of California
2   ARMANDO ZAMBRANO
    Supervising Deputy Attorney General
3   KEVIN J. SCHETTIG
    Deputy Attorney General
4   State Bar No. 234240
    300 So. Spring Street, Suite 1702
5   Los Angeles, CA  90013
     Telephone:  (213) 269-6272
6    Facsimile:  (213) 897-2804
   *Attorneys for Complainant*

7

8                  **BEFORE THE**
        **CALIFORNIA BOARD OF ACCOUNTANCY**
9      **DEPARTMENT OF CONSUMER AFFAIRS**
           **STATE OF CALIFORNIA**
10

11

| 12 | In the Matter of the Accusation Against: | Case No. AC-2019-62 |
|----|------------------------------------------|---------------------|
| 13 | **LESLIE KLEIN** | |
| 14 | 322 N. June Street<br>Los Angeles, CA  90004 | **ACCUSATION** |
| 15 | | |
| 16 | **Certified Public Accountant Certificate No. 67454** | |
| 17 | Respondent. | |

18

19

20

21      Complainant alleges:

22                     **PARTIES**

23      1.    Patti Bowers ("Complainant") brings this Accusation solely in her official capacity as

24  the Executive Officer of the California Board of Accountancy, Department of Consumer Affairs.

25      2.    On or about September 30, 1994, the California Board of Accountancy issued

26  Certified Public Accountant Certificate Number 67454 to Leslie Klein ("Respondent").  The

27  Certified Public Accountant Certificate was in full force and effect at all times relevant to the

28  charges brought herein and will expire on January 31, 2021, unless renewed.

<div align="center">1</div>

1      **JURISDICTION**

2      3.      This Accusation is brought before the California Board of Accountancy ("CBA"),

3    Department of Consumer Affairs, under the authority of the following laws. All section

4    references are to the Business and Professions Code unless otherwise indicated.

5      4.      Section 5100.5, subdivision (a), states, "After notice and hearing the board may, for

6    unprofessional conduct, permanently restrict or limit the practice of a licensee or impose a

7    probationary term or condition on a license, which prohibits the licensee from performing or

8    engaging in any of the acts or services described in Section 5051."

9      5.      Section 5109 states that "[t]he expiration, cancellation, forfeiture, or suspension of a

10   license, practice privilege, or other authority to practice public accountancy by operation of law or

11   by order or decision of the board or a court of law, the placement of a license on a retired status, or

12   the voluntary surrender of a license by a licensee shall not deprive the board of jurisdiction to

13   commence or proceed with any investigation of or action or disciplinary proceeding against the

14   licensee, or to render a decision suspending or revoking the license."

15     **STATUTORY PROVISIONS**

16     6.      Section 5100 states:

17     "After notice and hearing the board may revoke, suspend, or refuse to renew any permit or

18   certificate granted under Article 4 (commencing with Section 5070) and Article 5 (commencing

19   with Section 5080), or may censure the holder of that permit or certificate for unprofessional

20   conduct that includes, but is not limited to, one or any combination of the following causes:

21     . . .

22     (g) Willful violation of this chapter or any rule or regulation promulgated by the board

23   under the authority granted under this chapter.

24     . . .

25     (i) Fiscal dishonesty or breach of fiduciary responsibility of any kind.

26     (j) Knowing preparation, publication, or dissemination of false, fraudulent, or materially

27   misleading financial statements, reports, or information.

28     . . ."

2

(LESLIE KLEIN) ACCUSATION

**REGULATORY PROVISIONS**

7.    California Code of Regulations, title 16, section 52, states:

"(a) A licensee shall respond to any inquiry by the Board or its appointed representatives within 30 days. The response shall include making available all files, working papers and other documents requested.

(b) A licensee shall respond to any subpoena issued by the Board or its executive officer or the assistant executive officer in the absence of the executive officer within 30 days and in accordance with the provisions of the Accountancy Act and other applicable laws or regulations.

(c) A licensee shall appear in person upon written notice or subpoena issued by the Board or its executive officer or the assistant executive officer in the absence of the executive officer.

(d) A licensee shall provide true and accurate information and responses to questions, subpoenas, interrogatories or other requests for information or documents and not take any action to obstruct any Board inquiry, investigation, hearing or proceeding."

8.    California Code of Regulations, title 16, section 58, states:

"Licensees engaged in the practice of public accountancy shall comply with all applicable professional standards, including but not limited to generally accepted accounting principles and generally accepted auditing standards."

**COST RECOVERY AND ADMINISTRATIVE PENALTIES**

9.    Section 5107 of the Code states, in pertinent part:

"(a)    The executive officer of the board may request the administrative law judge, as part of the proposed decision in a disciplinary proceeding, to direct any holder of a permit or certificate found to have committed a violation or violations of this chapter to pay to the board all reasonable costs of investigation and prosecution of the case, including, but not limited to, attorneys' fees.  The board shall not recover costs incurred at the administrative hearing.

(b)    A certified copy of the actual costs, or a good faith estimate of costs where actual costs are not available, signed by the executive officer, shall be prima facie evidence of reasonable costs of investigation and prosecution of the case."

///

3

(LESLIE KLEIN) ACCUSATION

1    10.    Section 5116 of the Code states in part:

2    "(a) The board, after appropriate notice and an opportunity for hearing, may order any

3    licensee or applicant for licensure or examination to pay an administrative penalty as provided in

4    this article as part of any disciplinary proceeding or other proceeding provided for in this chapter.

5    …

6    (d) Administrative penalties assessed under this article shall be in addition to any other

7    penalties or sanctions imposed on the licensee or other person, including, but not limited to,

8    license revocation, license suspension, denial of the application for licensure, denial of the

9    petition for reinstatement, or denial of admission to the licensing examination. Payment of these

10    administrative penalties may be included as a condition of probation when probation is ordered."

11                               **PROFESSIONAL STANDARDS**

12    11.    The CBA incorporates the following standards to all California licensees through

13    California Code of Regulations, title 16, section 58.

14    **AICPA Code of Professional Conduct (Version 2014)**

15    12.    The American Institute of Certified Public Accountants ("AICPA") Code of

16    Professional Conduct is part of *AICPA Professional Standards.*  It includes The Rules of

17    Conduct, Interpretations of Rules of Conduct, and Ethics Rulings.  The version relevant herein

18    was effective on December 15, 2014, and among the sections relevant herein are: section 0.100

19    (Principles and Rules of Conduct), section 0.200 (Structure and Application of the AICPA Code),

20    section 0.300 (Principles of Professional Conduct), section 0.400 (Definitions), section 1.000

21    (Members in Public Practice), section 1.110 (Conflicts of Interest), section 1.300 (Competence),

22    and section 1.310 (Compliance with Standards).

23    **Statement on Standards in Personal Financial Planning**

24    13.    Standards applicable to personal financial planning services are discussed in the

25    Statement on Standards in Personal Financial Planning ("SSPFP").  The standards have been

26    issued by the Personal Financial Planning Executive Committee, the senior committee of the

27    AICPA designated to promulgate enforceable standards of Personal Financial Planning practice.

28    The statements are codified by "SSPFP" number with the pertinent section 100 applicable to the

4

issues herein.

## FACTUAL BACKGROUND

14.     On or about January 9, 2017, the CBA received a complaint from consumer J.C.S. alleging issues related to her husband's trust (the "Trust Agreement"), dated December 24, 1992. Consumer J.C.S. alleged Respondent embezzled funds, comingled funds, misrepresented investments purchased, repeatedly produced quarterly financial reports that were misleading and exerted undue influence over her husband, consumer H.S.

15.     According to consumer J.C.S.'s complaint, Respondent insisted on doing all investments, taxes, and monitoring of H.S.'s financial accounts.  Further, consumer J.C.S. provided information that H.S., the trustor of the Trust Agreement, was 86 years old with dementia.  Respondent was trustee of the Trust Agreement.  Consumer H.S. died on December 4, 2016.

16.     On May 20, 2015, in a conservatorship case bearing Case No. BP161682, the Superior Court of California, County of Los Angeles, appointed a temporary conservator and suspended all powers of attorney for consumer H.S.

17.     On February 4, 2016, in Case No. BP161682, the Superior Court of California, County of Los Angeles, appointed conservators for consumer H.S.'s estate and person, suspended Respondent as trustee, and ordered Respondent not to have any direct contact with consumers H.S. and J.C.S.

18.     In 2005, consumer H.S.'s son died and H.S. received life insurance proceeds.  In 2010, H.S. inherited a substantial sum upon the death of his brother.  From 2011 to 2015, Respondent received $2,420,000 from consumer H.S.  In a declaration dated April 8, 2016, Respondent stated, "I was the financial planner for [H.S.] from 2011 to 2016."

19.     Respondent failed to act in the best interest of consumer H.S.:

a.      Respondent implemented investments that were improper due to the lack of liquidity and diversification given consumer H.S.'s age, which was 85 as of November 18, 2015.

i.      Each of the Non-Recourse Promissory Notes with an Irrevocable Life Insurance Trust ("ILIT") was due and payable only upon the death of the policyholder.  If the

5

1  premiums were not paid, the policy would lapse, rendering the Promissory Note worthless.

2  According to the accounting Respondent filed with the Los Angeles County Superior Court, as of

3  February 29, 2016, such promissory notes comprised $2,270,000, or 85% of consumer H.S.'s

4  "investments."

5          ii.    Each of the Non-Recourse Promissory Notes with Bay Area Development

6  Co. have identical terms. There were three notes in the amounts of $300,000, $100,000, and

7  $400,000. The $400,000 note was a replacement of the two prior notes. Each of the notes were

8  only due upon the sale of the property, were not recorded with the County Recorder, and did not

9  state who owned the property. There was no requirement or triggering event for the sale of the

10  property. Consequently, the borrower could hold onto the property indefinitely and never have to

11  repay the notes. In addition, the notes were poorly drafted. They each stated they were due upon

12  the sale of the real property, but also state that they were secured by the policies of life insurance.

13          iii.    The promissory note dated February 1, 2015, for $400,000, made up the

14  remaining 15% of consumer H.S.'s "investments."

15          iv.    The only liquid asset reported in Respondent's accounting was $8,100

16  held in the Leslie Klein & Associates Attorney Client Trust Account.

17      20.    Respondent made investments that were self-serving. Consumer H.S.'s funds were

18  invested in loans to companies connected to Respondent, or as loans to ILITs where Respondent

19  was the sole trustee of each ILIT. Respondent's connections to those companies and the ILITs

20  create a conflict of interest and are documented as follows:

21          i.    President of Bay Area Development Co.;

22          ii.    Member/manager/partner of BW Life Settlements LLC;

23          iii.    Member/manager/partner of GMR Life Settlements LLC;

24          iv.    President of Times Square Media Inc.; and

25          v.    Each of the ILIT loans are signed by Respondent as trustee for the ILIT.

26      21.    Respondent failed to properly manage investments. Two of the companies involved,

27  BW Life Settlement LLC and GMR Life Settlements LLC, have been suspended by the Franchise

28  Tax Board or the Secretary of State.

6

(LESLIE KLEIN) ACCUSATION

22.    Respondent deceived consumer H.S. as to the actual investments as follows:

a.    In a letter to consumer H.S. dated June 10, 2011, Respondent stated funds were or will be invested as follows:

i.    $500,000 loan to purchase a $5 million policy on the life of M.G.;

ii.    $500,000 loan to purchase a $5 million policy on the life of Y.Z.;

iii.    $190,901.50 invested in Daktronics along with $209,100 from H.S.'s checking account as a loan of $400,000 to purchase a light emitting diode (LED) display in Beaumont, California;

iv.    "[T]he balance … will be invested in various stocks that will pay dividends of 5% in an account at Citibank, Smith Barney in stocks that will pay dividends.  We plan to invest in the following stocks: AT&T, McDonalds, Verizon, Philip Morris, and Coca Cola."

b.    In a letter to consumer H.S. dated August 1, 2011, Respondent stated funds were or will be invested as follows:

i.    $500,000 in the M.G. policy;

ii.    $500,000 in the Y.Z. policy;

iii.    $750,000 with Times Square Media to purchase LEDs;

iv.    The balance to be invested with the next ten days either in real estate on the 1st Trust Deed on the property or in insurance policies from our various hedge funds. Respondent advised that, "All of the above will pay a minimum interest of 8% due and payable three years from today's date."

c.    There is no evidence of the Daktronics or various stock investments, and they are not reported in Respondent's accounting.  In addition, the investment in Times Square Media is not reported in Respondent's accounting.

d.    When the Probate Investigator stated to Respondent, "So, in essence none of these investments are in [consumer H.S.'s] name, but all are in your name and the fact is that these are not investments, but you have borrowed these amounts of monies … and these amounts are in your name and you have agreed to pay [H.S.] 8% on these monies, but you have paid

7

1    nothing to date," Respondent indicated, in the presence of consumers H.S. and J.C.S., that the

2    Probate Investigator was correct.

3         23.    Respondent failed to maintain appropriate records of the invested funds. Respondent

4    stated in a letter dated August 1, 2011 that, "… this law firm has received from [H.S.] a total of

5    $2,860,901.50." A comparison of the funds provided to Respondent for investments with the

6    cancelled checks provided by consumer J.C.S. and Respondent's accounting indicates the subtotal

7    invested as of August 1, 2011, is $3,700,000, and the total invested as of February 1, 2015, is

8    $5,048,000. Both amounts are significantly more than the amount of $2,860,901.50 reported by

9    Respondent as received for investment. While some of the Promissory Notes may have been

10   repaid and funds reinvested, there is no documentation of any repayment of either the Promissory

11   Notes or receipt of the related interest earned.

12        24.    Despite multiple written requests from consumer H.S., Respondent failed to provide

13   accurate reports or statements to H.S. Further, Respondent provided consumer H.S. with false or

14   misleading information about the "investment" of his funds.

15        25.    Respondent, through his attorney, stated in a letter dated June 29, 2018, that

16   Respondent was not consumer H.S.'s tax preparer or advisor. In this letter, Respondent also

17   asserted that he did not have personal knowledge as to the tax treatment of the interest statements

18   or whether that was reflected on H.S.'s tax returns. These statements were not true and accurate.

19   Respondent was associated with consumer H.S.'s tax returns for 2012, 2013, and 2014. Further,

20   Respondent signed consumer H.S.'s income tax returns for 2014 as the paid tax preparer. In

21   addition, in a letter dated May 12, 2011, from Respondent to Mr. Levin of BW Life Insurance

22   Settlements LLC, Respondent stated, "You will not issue a 1099 form to [consumer H.S.] as the

23   interest payment will be paid from the death proceeds."

24        26.    Respondent exerted undue influence over consumer H.S. The Probate Investigator's

25   Report dated May 8, 2015, describes her interviews with consumers H.S., J.C.S. and Respondent

26   on May 5, 2015. The Probate Investigator noted, "There appears to be substantial undue

27   influence by the attorney/Financial Advisor/Trustee, which is not and has not been in the best

28   interest of the proposed conservatee to date."

8

1

**FIRST CAUSE FOR DISCIPLINE**

2

**(Breach of Fiduciary Responsibility)**

3     27.    Respondent is subject to disciplinary action under section 5100, subdivision (i), in

4 that Respondent breached his fiduciary responsibility as Trustee to consumer H.S.  Respondent

5 implemented investments that were improper due to the lack of liquidity and diversification given

6 consumer H.S.'s advanced age, made investments that were self-serving, failed to properly

7 manage investments, deceived consumer H.S. as to the actual investments, failed to maintain

8 appropriate records of the invested funds, and despite multiple written requests from consumer

9 H.S., Respondent failed to provide accurate reports or statements to consumer H.S.  Complainant

10 refers to and by this reference incorporates the allegations set forth above in paragraphs 14

11 through 26, inclusive, as though set forth fully herein.

12

**SECOND CAUSE FOR DISCIPLINE**

13

**(Knowing Preparation of Misleading Financial Information)**

14     28.    Respondent is subject to disciplinary action under section 5100, subdivision (j), in

15 that Respondent provided consumer H.S. with false or misleading information about the

16 "investment" of consumer H.S.'s funds.  Complainant refers to and by this reference incorporates

17 the allegations set forth above in paragraphs 14 through 26, inclusive, as though set forth fully

18 herein.

19

**THIRD CAUSE FOR DISCIPLINE**

20

**(Failure to Comply with Professional Standards)**

21     29.    Respondent is subject to disciplinary action under section 5100, subdivision (g), in

22 conjunction with Code of Regulations, title 16, section 58, in that Respondent failed to perform

23 his responsibilities in accordance with professional standards promulgated by the AICPA Code of

24 Professional Conduct and Statement on Standards in Personal Financial Planning.  Complainant

25 refers to and by this reference incorporates the allegations set forth above in paragraphs 14

26 through 26, inclusive, as though set forth fully herein.

27 ///

28 ///

9

(LESLIE KLEIN) ACCUSATION

1      **FOURTH CAUSE FOR DISCIPLINE**

2      **(Failure to Respond to CBA Inquiry)**

3          30.    Respondent is subject to disciplinary action under section 5100, subdivision (g), in

4      conjunction with Code of Regulations, title 16, section 52, in that Respondent, through his

5      attorney, made statements to the CBA that were not true and accurate.  Complainant refers to and

6      by this reference incorporates the allegations set forth above in paragraphs 14 through 26,

7      inclusive, as though set forth fully herein.

8      **FIFTH CAUSE FOR DISCIPLINE**

9      **(Unprofessional Conduct)**

10         31.    Respondent is subject to disciplinary action under section 5100, in that Respondent

11     exerted undue influence over consumer H.S.  Complainant refers to and by this reference

12     incorporates the allegations set forth above in paragraphs 14 through 26, inclusive, as though set

13     forth fully herein.

14     **SIXTH CAUSE FOR DISCIPLINE**

15     **(Willful Violation)**

16         32.    Respondent is subject to disciplinary action under section 5100, subdivision (g), in

17     that Respondent willfully violated provisions of Business and Professions Code, Division 3,

18     Chapter 1, failed to comply with professional standards, failed to comply with court orders, and

19     made false statements in response to the CBA's inquiry.  Complainant refers to and by this

20     reference incorporates the allegations set forth above in paragraphs 14 through 26, inclusive, as

21     though set forth fully herein.

22     ///

23     ///

24     ///

25     ///

26     ///

27     ///

28     ///

10

(LESLIE KLEIN) ACCUSATION

1

**PRAYER**

2      WHEREFORE, Complainant requests that a hearing be held on the matters herein alleged,

3  and that following the hearing, the California Board of Accountancy issue a decision:

4      1.      Revoking or suspending, restricting, limiting or otherwise imposing discipline upon

5  Certified Public Accountant Certificate Number 67454, issued to Leslie Klein;

6      2.      Ordering Leslie Klein to pay the California Board of Accountancy the reasonable

7  costs of the investigation and enforcement of this case, pursuant to Business and Professions

8  Code section 5107;

9      3.      Ordering Leslie Klein to pay the California Board of Accountancy an administrative

10  penalty pursuant to Business and Professions Code section 5116; and,

11      4.      Taking such other and further action as deemed necessary and proper.

12

13  DATED: _June 5, 2019_      ___Patti Bowers___

14                                    PATTI BOWERS
                                      Executive Officer
15                                    California Board of Accountancy
                                      Department of Consumer Affairs
                                      State of California
16                                    *Complainant*

17

18  LA2019501499
    53407725.docx
19

20

21

22

23

24

25

26

27

28

11

(LESLIE KLEIN) ACCUSATION

# EXHIBIT F

PACHULSKI
·
STANG
·
ZIEHL
&
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY
COSTA MESA, CA

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

TELEPHONE: 310/277 6910
FACSIMILE: 310/201 0760

SAN FRANCISCO
ONE SANSOME STREET, 34TH FLOOR, STE. 3430
SAN FRANCISCO
CALIFORNIA 94104-4436

TELEPHONE: 415/263 7000
FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100
FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700
FACSIMILE: 212/561 7777

TEXAS
440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002

TELEPHONE: 713/691 9385
FACSIMILE: 713/691 9407

WEB: www.pszjlaw.com

Jeffrey W. Dulberg

June 8, 2023

310.772.2355
jdulberg@pszjlaw.com

**Via Email**

Eric Olson
E J Olson Law
301 E. Colorado Blvd, Ste 520
Pasadena, CA 91101

Re:  **LESLIE KLEIN (Case No. 2:23-bk-10990-SK)**

Dear Mr. Olson:

As you are aware, Bradley D. Sharp is the duly-appointed trustee (the "Trustee") for the bankruptcy estate of Leslie Klein ("Mr. Klein") in the above-referenced case. The following information request is made pursuant to 11 U.S.C. § 1106 and Bankruptcy Rules 2015 and 2015.3 pertaining to information relating to Mr. Klein and his bankruptcy estate. Mr. Klein should provide answers in writing to the Trustee by the date referenced in each request below.

**Credit Cards and Other Financing**

By Monday, June 12, 2023, please provide to the Trustee a listing and copies of monthly statements of any and all credit card accounts or lines of credit open under the name of Mr. Klein or for his benefit for the time period of February 1, 2023 through today.

If there are any credit card accounts or lines of credit that remain open under Mr. Klein's name or for his benefit, Mr. Klein must close each of them **immediately** and provide proof of such account closure to the Trustee by Monday, June 12, 2023.

**Computer, E-tablet, Telephone and Email Preservation**

Mr. Klein, and any other person or entity in control of the following information (including his counsel and former counsel), shall immediately preserve, and must not destroy, any information on any of Mr. Klein's computers (laptops and desktops), hard drives, e-tablets, and telephones (collectively, the "Electronic Devices") or

DOCS_LA:349468.1 78512/001



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

June 8, 2023
Page 2

any such Electronic Devices that are used by Mr. Klein or for his benefit.

By Friday, June 9, 2023, Mr. Klein must coordinate a meeting with the Trustee's team for either Monday, June 12, 2023 or Tuesday, June 13, 2023 for the purpose of meeting with the Trustee's team and a representative of a company that specializes in preserving electronic data. Mr. Klein must come prepared with his Electronic Devices and the information necessary to access such Electronic Devices. In addition, Mr. Klein should be able to access his Gmail, EarthLink and/or any other email accounts so their contents may be preserved. The Trustee and his staff are available to meet in the Trustee's office from 9 AM to 4 PM on June 12 and 13, 2023. The Trustee and his staff are open to an alternative location as necessary.

### Doctors Marketing Group, LLC

By Friday, June 16, 2023, please provide the Trustee the following information pertaining to the gift from Doctors Marketing Group, LLC to Mr. Klein or for his benefit:

- History of Mr. Klein's (or any company in his control) relationship to Doctors Marketing Group, LLC, since the inception of Doctors Marketing Group, LLC.
- History of Mr. Klein's relationship to Mr. Eli Zobdeh.
- Explain any instances where Eli Zobdeh has ever been authorized or has ever used Mr. Klein's social security number for any purpose.
- Confirm that Mr. Klein and any of his family members or their spouses, immediate or distant, do not currently own or have any economic interest in Doctors Marketing Group, LLC, either now or in the past.
- Confirm that Mr. Klein has never held a manager, officer or director position with Doctors Marketing Group, LLC, or otherwise describe such position.

### Reports of Entities Mr. Klein Holds a Financial Interest

By June 22, provide to the Trustee financial reports of the value, operations, and profitability of each entity that is not a publicly

DOCS_LA:349468.1 78512/001



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

June 8, 2023
Page 3

traded corporation or a debtor in a case under title 11, and in which
Mr. Klein holds a substantial or controlling interest.

Please reach out to my office or the Trustee if you have any
questions.

Very truly yours,

Jeffrey W. Dulberg

cc Trustee

# EXHIBIT G

# Jeffrey P. Nolan

| | |
|---|---|
| **From:** | Jeffrey P. Nolan |
| **Sent:** | Wednesday, June 28, 2023 11:07 AM |
| **To:** | 'eric@EJOlsonLaw.com' |
| **Cc:** | John W. Lucas; Jeffrey Dulberg |
| **Subject:** | FW: Menlo Trust-Life Insurance Policies & Various other matters |
| **Importance:** | High |

Eric,

The information you provided on June 23, 2023, was not responsive to the request of the Trustee on numerous pending issues as well as to the administration of the case in general. Please remind Mr. Klein that he has a duty to produce this information as a debtor in bankruptcy. I have outlined the status of the various unfulfilled requests below.

1.      **Menlo Trust:**

The Trustee requested documents on three occasions June 7, 14, and 20, to support the contention made at the June 5th hearing that the Debtor is entitled to compensation out of the Life Insurance proceeds contemplated by Judge Luna to be disbursed to the Menlo Trust beneficiaries. I appreciate the explanation provided below but the explanation is not a substitute for the documents requested to assess and persuade the Superior Court that interests of the Debtor are involved.

As you may recall, at the hearing Mr. Weingarten specifically asked if the documents supporting the claims of Mr. Klein would be provided to counsel. You advised the Court such documents would be forthcoming "soon". I do not know if Mr. Weingarten made a formal demand upon you after the hearing, but I interpreted the exchange with the Court to mean such production by Mr. Klein would be immediately forthcoming. The Interim Order can be reasonably interpreted as demanding such documents be produced in short order or the issue viewed as abandoned or without a factual basis. The Trustee is concerned that the continued inability of Mr. Klein to produce the documents you indicated would be forthcoming, yet have not been produced, will result in the loss of such claims. Said another way, we cannot press the issue without Mr. Klein's cooperation and the production of the requested records. As you know, argument of counsel is not a substitute for evidence.

2.      **Computers/phones/lap tops:**

The Trustee provided two dates for Mr. Klein to meet representatives of the Trustee with respect to his electronic devices. Neither June 12 or 13th were satisfactory to Mr. Klein. He again ignored our request of June 22 for arranging of a meeting. We will provide one last occasion to promote the meeting before we seek intervention of the bankruptcy court: please forward the following dates for Mr. Klein's consideration: **June 30, or July 3, prior to 1:00pm.** Please select one.

3.      **Credit Cards:**

By letter dated June 8, the Trustee requested not later than June 12 a list and copies of monthly credit card statements under the Debtor's name and confirmation such accounts were closed. This is a simple request.

Please produce such records no later than **June 30th** at 5pm at the law offices of PSZJ Law, 10100 Santa Monica Blvd., Suite 1300, Century City, or by electronic submission to my attention.

5.    **Doctors Marketing Group:**

By letter dated June 8, the Trustee requested the following information pertaining to the gift from Doctors Marketing Group, LLC to Mr. Klein or for his benefit:

-History of Mr. Klein's (or any company in his control) relationship to Doctors Marketing Group, LLC, since the inception of Doctors Marketing Group, LLC.

-History of Mr. Klein's relationship to Mr. Eli Zobdeh.

-Confirm that Mr. Klein and any of his family members or their spouses, immediate or distant, do not currently own or have any economic interest in Doctors Marketing Group, LLC either now or in the past.

-Confirm that Mr. Klein has never held a manager, officer or director position with Doctors Marketing Group, LLC, or otherwise describe such position.

6.    **Reports of Entities the Debtor Holds a Financial Interest**

By letter dated June 8, the Trustee requested not later than June 22, (a)  list of entities and (b) the financial reports of value in which the Debtor holds an interest.  Again,  this request was ignored .

Please produce such records no later than **June 30:**

7.    **Palm Springs Condominium:**

Real Property located at 2560-B Whitewater Club Drive Palm Springs, CA.

According to the Debtor's schedules, the property is listed as a vacation home. We have learned that there are rental occupants in the condominium.  Are the occupants renters and if so please forward the contact information for the occupants and the lease to my attention no later than **June 30.**

8.    **Insurance:**

It is standard practice in a bankruptcy case that a debtor cooperate to insure assets are protected and that the Trustee and the United States Trustee be listed as additional insureds on various real and personal  property.
Add Bradley D. Sharp, Chapter 11 Trustee to Leslie Klein and the UST as additionally insured to all Mercury insurance policies. Insurance provided by  Mercury Insurance which we are advised to be in existence:

- Policy # 040104100290658 (Mercury Auto Policy)
- Policy # CAHP 0000757684 (Real Property policy – 3752 Ocean Drive)
- Policy # CAHP 00001156913 (Real Property policy – 322 N. June Street)
- Policy # PK 01017211 (Umbrella policy)

Please list the following as additional insureds:

Bradley S. Sharp, Chapter 11 Trustee
333 S. Grand Ave., Suite 4100
Los Angeles, CA 90071

Office of the United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

- Provide updated declaration pages.
- Date the insurance premiums are paid through.

2

Your immediate attention to this matter is requested.

Best Regards,

Jeffrey P. Nolan
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn


Los Angeles | San Francisco | Wilmington, DE | New York | Houston



-----Original Message-----
From: eric@EJOlsonLaw.com [mailto:eric@EJOlsonLaw.com]
Sent: Friday, June 23, 2023 1:29 PM
To: Jeffrey P. Nolan <jnolan@pszjlaw.com>
Cc: Jeffrey Dulberg <jdulberg@pszjlaw.com>; John W. Lucas <jlucas@pszjlaw.com>; Beth D. Dassa
<bdassa@pszjlaw.com>
Subject: RE: Menlo Trust-Life Insurance Policies

Jeff, regarding your email:
SAFE DEPOSIT BOX KEY

Mr. Klein thought that he had provided you with keys to all boxes and is searching today. If he is unable to find the key
he will cooperate with you to get a new key from the bank first thing next week..

CLAIMS AGAINST INSURANCE PROCEEDS
without claiming to be exhaustive, we take the position that at least the amounts described below should be charges
against the $32,000,000 insurance proceeds: $1,000,000 plus line of credit totaling $5,005,000.

By way of background, the plan behind the insurance policies had been that the premiums on the policies would be paid
by the trusts with the idea that if all went well the policies would eventually pay off at a profit. Obviously the downside
of such an investment was that if they stopped paying the premiums the policies would lapse.

In 2012 Frank Menlo commenced litigation and gained control over the cash flow and cut off the funds that had previous
been used to pay the premiums.

Rather than let the policies lapse (and leave the beneficiaries having made years' of premium payments but not enjoying
the proceeds of the policies) Mr. Klein did the following:

1.      he borrowed $1.000,000 from six trusts to pay premiums:
Alan Winter $300,000
Emily Winter $100,000
Hana Lipshutz $300,000
Benjamin Frankel $100,000
Rivka Nutkiwitz $100,000
Devora Frankel $100,000

3

2.	he utilized three lines of credit whose balance is $5,005,000 which was primarily (perhaps entirely) used for a combination of paying the premiums and paying attorneys' fees.

| | |
|---|---|
| Madeline Lipschutz | $1,637,000 |
| Judith Frankel | $1,206,000 |
| Deborah Deusch | $2,162,000 |

The payment of the premiums made possible the entire payoff of the insurance and it is only appropriate that those funds should be restored to those who advanced them. Insofar as they went to pay attorneys' fees the principle is agreed to that such amounts should be set aside from the insurance.

Our understanding is that under the "Interim Order" dated June 5, 2023, the insurance proceeds are delivered to the trustees of the 24 Trusts. None of the trusts referred to above are among the 24 trusts other than Madeline Lipschutz and Deborah Deusch, and in those cases the line of credit is guaranteed by other trusts not among the 24 trusts. The amounts payable (which may include interest on these amounts) should be paid to the identified trusts.

While Mr. Klein was acting as trustee, if his actions as trustee in making such payments do not result in their being repaid, even though they financed the successful recovery of the insurance proceeds, it would not only be inequitable as to the lenders, but one can easily imagine creditor claims being filed against him for such amounts.

OTHER

Mr. Klein is consulting with prospective bankruptcy counsel on Monday and we hope to have information for you on numerous matters early next week.

Note New Address

Eric J Olson
E J Olson Law
301 E. Colorado Blvd. Ste 520
Pasadena, CA 91101
T: 818 245 2246
C: 626 224 5619
Eric@EJOlsonLaw.com

-----Original Message-----
From: Jeffrey P. Nolan <jnolan@pszjlaw.com>
Sent: Thursday, June 22, 2023 6:32 PM
To: 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>
Cc: Jeffrey Dulberg <jdulberg@pszjlaw.com>; John W. Lucas <jlucas@pszjlaw.com>; Beth D. Dassa <bdassa@pszjlaw.com>
Subject: RE: Menlo Trust-Life Insurance Policies

Eric,

Please confirm the documents and key requested will be delivered no later than tomorrow close of business to our offices.

Additionally, Mr. Klein was to meet with representatives of the Trustee's office to make his electronic devices available and there has been no response form the Debtor on setting an appropriate time and place. These are issues which need to be addressed in a timely matter.

Jeffrey P. Nolan

4

Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn


Los Angeles | San Francisco | Wilmington, DE | New York | Houston

-----Original Message-----
From: Jeffrey P. Nolan
Sent: Tuesday, June 20, 2023 4:07 PM
To: 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>
Cc: Jeffrey Dulberg <jdulberg@pszjlaw.com>; John W. Lucas <jlucas@pszjlaw.com>; Beth D. Dassa
<bdassa@pszjlaw.com>
Subject: RE: Menlo Trust-Life Insurance Policies

Eric,

-The hearing on July 10th is fast  approaching and we still do not have any of the documents necessary to evaluate the
Debtor's claim of a right in the proceeds re: Menlo Trust policies,  which is  pending for the upcoming State Court
proceeding.  Per the  attached Interim Order, the documents were to be forthcoming not later than 3 days from
following the demand from the Trustee.  Please forward those documents no later than the close of this week.

-Previously, Mr. Klein delivered 5 keys to the Trustee for Bank of America safe deposit boxes.  There is an additional safe
deposit box at the Bank of America Larchmont location for which the key was not delivered: box #034300T20814.  Can
you please ask the Debtor to provide the key to the safe deposit box which can be delivered to our Law firm offices at
10100 Santa Monica, Suite 1100, LA (Century City) to my attention, or we can arrange for someone from the Trustee's
office to pick up the key.  Please let me know.

-Last week was the deadline for the Debtor was to provide information regarding the gift from Doctors Marketing
Group, LLC.  No information or documents have been received. Please forward the documentation or advise when it will
be forthcoming.

Best Regards,

Jeff

-----Original Message-----
From: Jeffrey P. Nolan
Sent: Wednesday, June 14, 2023 6:15 PM
To: 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>
Cc: Jeffrey Dulberg <jdulberg@pszjlaw.com>; John W. Lucas <jlucas@pszjlaw.com>
Subject: RE: Menlo Trust-Life Insurance Policies

Eric,

In follow up to the June 5, 2023 hearing, I requested documents to support the Debtor's legal or equitable interest in
policy proceeds from various life insurance policies discussed at the hearing.  I have not seen an email or documents to
date.

Can you please advise Re: status?

Best Regards,

Jeffrey P. Nolan
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn


Los Angeles | San Francisco | Wilmington, DE | New York | Houston

-----Original Message-----
From: Jeffrey P. Nolan
Sent: Wednesday, June 7, 2023 12:24 PM
To: 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>; kleinlaw@earthlink.net; 'Leslie Klein' <les.kleinlaw@gmail.com>
Cc: Jeffrey Dulberg <jdulberg@pszjlaw.com>
Subject: Menlo Trust-Life Insurance Policies

Eric,

Thank you for discussing this matter with me following the State Court hearing, June 5, 2023.

At the hearing, the issue was raised before Judge Luna that Mr. Klein may have a legal or equitable interest in policy proceeds from various life insurance policies on the lives of Sam Menlo and Vera Menlo which the Court was proposing to liquidate as referenced in the Court's Interim Order. It would assist the Chapter 11 Trustee to understand the issue and potential implications to the bankruptcy estate if we could review the underlying documents and any summary Mr. Klein or counsel might care to provide to best present the basis for the claim.

You may have specific documents in mind. Feel free to forward those documents. We would think such documents could include:

1.      Bank statements, cancelled checks or documentation to support premium payments on the above referenced policies by Mr. Klein or any entity which he claims an interest.

2.      Any payment acknowledgement, accounting or document issued from the above referenced policy providers memorializing any payment by Mr. Klein or any entity which he claims an interest.

3.      If the payments are from an entity other than Mr. Klein directly, the documents to support the relationship and the connection.

4.      Any contract, agreement or document which reflects the compensation scheme, commission, or fee arrangement for the acquisition or maintenance of the policies.

5.      Any document that might support the Menlo parties were aware of, consented to or ratified any fee arrangement.

6.      Any other document that you believe supports a claim for compensation or would assist us to appreciate a compensation or fee is owed.

Jeffrey P. Nolan
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn


Los Angeles | San Francisco | Wilmington, DE | New York | Houston

-----Original Message-----
From: Jeffrey P. Nolan
Sent: Tuesday, June 6, 2023 11:43 AM
To: 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>
Subject: RE: WINTER klein - winter ptn.pdf

Thank you

Jeffrey P. Nolan
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn


Los Angeles | San Francisco | Wilmington, DE | New York | Houston


-----Original Message-----
From: eric@EJOlsonLaw.com [mailto:eric@EJOlsonLaw.com]
Sent: Tuesday, June 6, 2023 11:22 AM
To: Jeffrey P. Nolan <jnolan@pszjlaw.com>
Subject: FW: WINTER klein - winter ptn.pdf


Eric Olson
EJOlsonLaw
301 E. Colorado Blvd Ste 520
Pasadena, CA 91101
T: 626 224 5619
T: 818 245 2246
Eric@EJOlsonLaw.com

-----Original Message-----
From: kleinlaw@earthlink.net <kleinlaw@earthlink.net>
Sent: Monday, June 5, 2023 4:26 PM
To: eric@EJOlsonLaw.com; 'Leslie Klein' <les.kleinlaw@gmail.com>
Subject: WINTER klein - winter ptn.pdf

   Please forward this to the attorney for the Trustee (who appeared today in Court).

Thank you.

Les Klein

# EXHIBIT H

**From:** Jeffrey P. Nolan
**Sent:** Monday, July 10, 2023 10:13 PM
**To:** 'Tnunan@pmcos.com' <Tnunan@pmcos.com>
**Cc:** 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>; Jeffrey Dulberg <jdulberg@pszjlaw.com>; John W. Lucas <jlucas@pszjlaw.com>
**Subject:** FW: Sharp - Letter to Eric Olson

Terence,

It was a pleasure to make your acquaintance at the hearing in Superior Court today. As you know, I represent the duly appointed Chapter 11 Trustee, Bradley D. Sharp.

As I indicated at the hearing, the Trustee has not been getting the cooperation of the Debtor which is required under the Bankruptcy Code and, quite frankly, customary. I appreciate your offer to facilitate the forwarding of such information.

There are a number of outstanding matters starting with the issue of apparent lapses in coverage to various estate assets. The trustee has attempted to confirm coverage directly to insurance providers but those providers are rrequesting the cooperation of the insured/Debtor. There has been no response to the attached letter dated June 30, which requested a response by July 7.

I have also included the email below which preceded it.

Best Regards,

3

**Jeffrey P. Nolan**
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**From:** Jeffrey P. Nolan
**Sent:** Wednesday, June 28, 2023 11:07 AM
**To:** 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>
**Cc:** John W. Lucas <jlucas@pszjlaw.com>; Jeffrey Dulberg <jdulberg@pszjlaw.com>
**Subject:** FW: Menlo Trust-Life Insurance Policies & Various other matters
**Importance:** High

Eric,

The information you provided on June 23, 2023, was not responsive to the request of the Trustee on numerous pending issues as well as to the administration of the case in general. Please remind Mr. Klein that he has a duty to produce this information as a debtor in bankruptcy. I have outlined the status of the various unfulfilled requests below.

1.      **Menlo Trust:**

        The Trustee requested documents on three occasions June 7, 14, and 20, to support the contention made at the June 5th hearing that the Debtor is entitled to compensation out of the Life Insurance proceeds contemplated by Judge Luna to be disbursed to the Menlo Trust beneficiaries. I appreciate the explanation provided below but the explanation is not a substitute for the documents requested to assess and persuade the Superior Court that interests of the Debtor are involved.

        As you may recall, at the hearing Mr. Weingarten specifically asked if the documents supporting the claims of Mr. Klein would be provided to counsel. You advised the Court such documents would be forthcoming "soon". I do not know if Mr. Weingarten made a formal demand upon you after the hearing, but I interpreted the exchange with the Court to mean such production by Mr. Klein would be immediately forthcoming. The Interim Order can be reasonably interpreted as demanding such documents be produced in short order or the issue viewed as abandoned or without a factual basis. The Trustee is concerned that the continued inability of Mr. Klein to produce the documents you indicated would be forthcoming, yet have not been produced, will result in the loss of such claims. Said another way, we cannot press the issue without Mr. Klein's cooperation and the production of the requested records. As you know, argument of counsel is not a substitute for evidence.

2.      **Computers/phones/lap tops:**

The Trustee provided two dates for Mr. Klein to meet representatives of the Trustee with respect to his electronic devices. Neither June 12 or 13th were satisfactory to Mr. Klein. He again ignored our request of June 22 for arranging of a meeting. We will provide one last occasion to promote the meeting before we seek intervention of the bankruptcy court: please forward the following dates for Mr. Klein's consideration: **June 30, or July 3, prior to 1:00pm.** Please select one.

3. **Credit Cards**:

By letter dated June 8, the Trustee requested not later than June 12 a list and copies of monthly credit card statements under the Debtor's name and confirmation such accounts were closed. This is a simple request.

Please produce such records no later than **June 30th** at 5pm at the law offices of PSZJ Law, 10100 Santa Monica Blvd., Suite 1300, Century City, or by electronic submission to my attention.

5. **Doctors Marketing Group**:
By letter dated June 8, the Trustee requested the following information pertaining to the gift from Doctors Marketing Group, LLC to Mr. Klein or for his benefit:

-History of Mr. Klein's (or any company in his control) relationship to Doctors Marketing Group, LLC, since the inception of Doctors Marketing Group, LLC.

-History of Mr. Klein's relationship to Mr. Eli Zobdeh.

-Confirm that Mr. Klein and any of his family members or their spouses, immediate or distant, do not currently own or have any economic interest in Doctors Marketing Group, LLC either now or in the past.

-Confirm that Mr. Klein has never held a manager, officer or director position with Doctors Marketing Group, LLC, or otherwise describe such position.

6. **Reports of Entities the Debtor Holds a Financial Interest**

By letter dated June 8, the Trustee requested not later than June 22, (a) list of entities and (b) the financial reports of value in which the Debtor holds an interest. Again, this request was ignored .

Please produce such records no later than **June 30**:

7. **Palm Springs Condominium**:

Real Property located at 2560-B Whitewater Club Drive Palm Springs, CA.
According to the Debtor's schedules, the property is listed as a vacation home. We have learned that there are rental occupants in the condominium. Are the occupants renters and if so please forward the contact information for the occupants and the lease to my attention no later than **June 30**.

8. **Insurance**:

It is standard practice in a bankruptcy case that a debtor cooperate to insure assets are protected and that the Trustee and the United States Trustee be listed as additional insureds on various real and personal property.
Add Bradley D. Sharp, Chapter 11 Trustee to Leslie Klein and the UST as additionally insured to all Mercury insurance policies. Insurance provided by Mercury Insurance which we are advised to be in existence:

5

- Policy # 040104100290658 (Mercury Auto Policy)
- Policy # CAHP 0000757684 (Real Property policy – 3752 Ocean Drive)
- Policy # CAHP 00001156913 (Real Property policy – 322 N. June Street)
- Policy # PK 01017211 (Umbrella policy)

Please list the following as additional insureds:

Bradley S. Sharp, Chapter 11 Trustee
333 S. Grand Ave., Suite 4100
Los Angeles, CA 90071

Office of the United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

- Provide updated declaration pages.
- Date the insurance premiums are paid through.

Your immediate attention to this matter is requested.

Best Regards,

Jeffrey P. Nolan
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn


Los Angeles | San Francisco | Wilmington, DE | New York | Houston

6

# UNITED STATES BANKRUPTCY COURT

### Central District of California, Los Angeles Division

In re  LESLIE KLEIN.

Debtor

Case No.    2:23-bk-10990-SK

Chapter    11

## SUBPOENA FOR RULE 2004 EXAMINATION

To:  Bank Hapoalim, BM, dba Bank Hapoalim, USA.

*(Name of person to whom the subpoena is directed)*

☐ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure. A copy of the court order authorizing the examination is attached.

| PLACE | DATE AND TIME |
|---|---|
| Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA  90067 | October 9, 2023 at 10:00 a.m. |

The examination will be recorded by this method:

☒ *Production:* **YOU ARE COMMANDED** to produce the documents set forth on **Exhibit A** hereto and complete the written questions included as **Exhibit B**.

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    September 15, 2023

CLERK OF COURT

_____
Signature of Clerk or Deputy Clerk

OF    _____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing
_____ Chapter 11 Trustee _____, who issues or requests this subpoena, are: Jeffrey P. Nolan, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California  90067, Telephone:  (310) 277-6910

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).



# PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any):* _____
on *(date)* _____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the
witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____.

     I declare under penalty of perjury that this information is true and correct.

Date: _____

 

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

American LegalNet, Inc.
www.FormsWorkFlow.com

B2540 (Form 2540 - Subpoena for Rule 2004 Examination) (Page 2)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2)For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B)*Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

American LegalNet, Inc.
www.FormsWorkFlow.com

## EXHIBIT A

### TO RULE 2004 SUBPOENA TO BANK HAPOALIM, BM

### AND BANK HAPOALIM, USA

Pursuant to Fed. R. Civ. P. 45, Bradley D Sharp, the duly appointed Chapter 11 trustee (the "Trustee") in the Chapter 11 Cases (defined below), hereby requests that **Bank Hapoalim, BM, dba Bank Hapoalim International and Bank Hapoalim, USA,** its subsidiaries and affiliates, produce and make available for inspection and copying to the Trustee each of the following documents, things, and tangible items, or categories of documents, in your possession, custody, or control which are responsive to the following requests for documents and materials (the "Requests") at the offices of Pachulski Stang Ziehl & Jones, LLP, 10100 Santa Monica Boulevard., 13th Floor, Los Angeles, California, 90067 (Attn: Jeffrey P. Nolan):

### INSTRUCTIONS

A.    You are required to conduct a thorough investigation and produce all DOCUMENTS (as defined below) in your possession, custody and control including all DOCUMENTS in the possession, custody and control of your, officers, directors, employees, agents, representatives and anyone acting on your behalf.

B.    If there are no documents in existence that are responsive to a particular Request, your response must include a statement to that effect. If documents once existed in your possession, custody, or control, but are no longer in your possession, custody, or control for any reason, please identify the specific circumstances under which you lost possession, custody, or control, and identify your understanding of the documents' [current whereabouts] or the manner in which you disposed of the documents.

C.    Electronically stored information ("ESI") responsive to these Requests shall be produced in the same manner in which it is stored, together with all associated metadata. If software not in normal, typical, commercial use is necessary to view the ESI produced in full, native, and usable form with full functionality, then a copy of or license to the necessary software shall be produced together with the ESI.

D.      Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, documents should either be organized and labeled to correspond with the categories in this Document Request or produced as they are kept in the normal course of business.

E.      If any of the requested documents fall within the scope of this Request, but have not been produced on grounds that such documents are privileged, please provide the following information as to each document to which such claim is made: (a) the privilege that is grounds for withholding the Document; (b) the nature of the Document (*e.g.*, letter, spreadsheet, memorandum); (c) the date that the Document was prepared; (d) the name/title of the author; (e) the name/title of each recipient or addressee of the Document; (f) the number of pages withheld; and (g) the name and location of the current custodian of the Document.

F.      Unless otherwise provided herein, the relevant period of inquiry for these Requests is January 1, 2015 through July 31, 2023.

## DEFINITIONS FOR DOCUMENT PRODUCTION
## AND EXAMINATION TOPICS

1.      "YOU" or "YOUR" means Bank Hapoalim, BM, dba Bank Hapoalim International, its subsidiaries and affiliates, including, but not limited to, Bank Hapoalim, USA.

2.      "CONCERNING" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

3.      "DOCUMENT" or "DOCUMENTS" is defined to have the same meaning and to be equal in scope to the terms "documents" and "electronically stored information" as used in the Federal Rules of Civil Procedure 34(a) and/or "writings" as defined in the Federal Rules of Evidence 1001, and each "duplicate" as defined in the Federal Rules of Evidence 1001. "DOCUMENTS" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whomever produced, reproduced, disseminated or made. This includes, but is not limited to, any and all originals, copies or drafts of any and all of the following: papers; books; letters; correspondence; memoranda; notes; notations; transcripts;

2

minutes; reports; appraisals; estimates; projections; charts, graphs and tables; schedules; proposals; offers; contracts; agreements; signature cards; checks, canceled checks and bank or account statements; and any information contained in any computer tape, card, disk, drive, program or other device; computer print-outs; microfilm; microfiche; any other tangible or intangible thing or item that contains any information; and, all "writings and recordings" and "photographs" (and all negatives thereof) as defined in and by the Federal Rules of Evidence, Rule 1001.

4.      "KLEIN" means the individual Leslie Klein and any alias name including Menachem Klein, and/or Lutzy Klein.

5.      "KLEIN ASSOCIATED ENTITY" means the following organizations:

The Klein Charitable Remainder Unitrust dated 2-20-1996
The Klein Trust
Klein Charitable Remainder Unitrust
Klein Charitable Remainder Annuity
Klein Living Trust dated April 8, 1990
EKLK Foundation
Doctors Marketing Group, LLC
Doctors Marketing Network LLC
Doctors Referral Service LLC
Doctors Marketing Nationwide, Inc. (MD entity)
The Patient Referral Network, LLC (MD entity)
Bay Area Development Co.
Big Boyz Legal, LLC
Litigation Financing, LLC

6.      "TRANSFERS" means any and all payments, credits, debits, deposits, in whatever form made, be it wire, check, ACH or otherwise.

## DOCUMENT REQUESTS

### Request No. 1:

All DOCUMENTS maintained by YOU, including, but not limited to, TRANSFERS, for all the following accounts, whether active or inactive:

a.      KLEIN;

b.      KLEIN ASSOCIATED ENTITY

**Request No. 2:**

All DOCUMENTS maintained by YOU, including, but not limited to, TRANSFERS,

associated with the following address, whether active or inactive (excluding accounts solely held

in the name of Barbara Roth Klein):

> 322 N. June Street
> Los Angeles, CA 90004

**Request No. 3:**

All DOCUMENTS maintained by YOU, including, but not limited to, TRANSFERS,

associated with the following taxpayer id, whether active or inactive:

- ___-__-6944[1]

**Request No. 4:**

All DOCUMENTS maintained by YOU, including, but not limited to, TRANSFERS, for

any credit card issued or underwritten by YOU to KLEIN or a KLEIN ASSOCIATED ENTITY.

---

[1] The full social security number will be provided upon request.

## EXHIBIT B

## TO DEPOSITION ON WRITTEN QUESTIONS TO SUBPOENA OF

## BANK HAPOALIM, BM dba BANK HAPOALIM, USA ("BANK")

1.      Please state your full name, occupation, official title, and business address.

Answer: _____

2.      Are you the custodian of records for BANK?

Answer: _____

3.      In your capacity as custodian of records for BANK, are you familiar with whether BANK maintains records of its business activities?

Answer: _____

4.      Are the records of BANK kept under your care, supervision, custody, or control?

Answer: _____

5.      Was it in the regular course of business activities of BANK for a person with personal knowledge of the act, event, condition, opinion, or diagnosis identified in the records requested in the attached Exhibit A, to make such records or to transmit such information to be included in the records?

Answer: _____

6.      Were the documents requested in Exhibit A made at or near the time of the act, event, condition, opinion, or diagnosis identified in the records or within a reasonable time thereafter?

Answer: _____

7.      Were the documents requested in the attached Exhibit A made and kept in the regular course of daily business activities by BANK?

Answer: _____

8.      Were the documents requested in the attached Exhibit A transmitted to your files, and did you maintain the records as part of your official duties as the custodian of records for BANK?

Answer: _____

9.      Please hand the originals or exact duplicates of the documents requested in the attached Exhibit A to the [court reporter/notary public] taking your deposition for photocopying and attachment to this deposition. Have you now given all documents requested in the attached Exhibit A to the [court reporter] taking your deposition? If not, identify for the [court reporter] the records and documents you did not produce and explain why you did not produce them.

Answer:  _____

10.     In the event you are unable to find any of the records requested in the subpoena you received, how long does BANK maintain its files, and does BANK ever destroy its files?

Answer:  _____

11.     Are you aware of any other entities or persons that may have possession of records pertaining to those identified in Exhibit A?  If so, please state the name and address of such entity or person, if known.

Answer:  _____

12.     Have you been requested or directed by any person to withhold or protect, for any reason, the records identified in Exhibit A? Has any person suggested that you should withhold or protect the records identified in Exhibit A? If so, please state the name and address of the person who conveyed this information to you and when such event occurred.

Answer:  _____

13.     Do you know or have reason to believe that the records identified in Exhibit A have in any manner been edited, purged, culled, or otherwise altered? If so, please identify the records and why they were altered or removed.

Answer:  _____

14.     If any document responsive to this subpoena was, but is no longer, in your possession, custody, or control, or no longer exists, state whether (1) it is missing or lost, (2) it was destroyed, (3) it was transferred to others, or (4) it was otherwise disposed of, and explain the circumstances surrounding its disposition, including the date of such disposition.

Answer:  _____

VERIFICATION

STATE OF _____ )
       ss.                   )
COUNTY OF _____ )

      Before me, the undersigned authority, on this day personally appeared

_____, custodian of records for Bank Hapoalim, BM and
Bank Hapoalim, USA, known to me to be the person whose named is subscribed to the foregoing
instrument in the capacity therein stated, who being first duly sworn, stated upon his/her oath
that the answers to the foregoing questions are true and correct. I further certify that the records
attached hereto are exact duplicates of the original records.


                                             _____
                                           Witness

SWORN TO ME AND SUBSCRIBED before me by _____ on
_____, _____.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067**

A true and correct copy of the foregoing document entitled (*specify*): **MOTION OF CHAPTER 11 TRUSTEE, FOR ORDER AUTHORIZING THE EXAMINATION OF BANK HAPOALIM, BM DBA BANK HAPOALIM, USA PURSUANT TO FED. R. BANKR. P. 2004; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF BRADLEY D. SHARP, NICHOLAS R. TROSZAK AND JEFFREY P. NOLAN IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **September 15, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **September 15, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Bank Hapoalim, BM
dba Bank Hapoalim USA
Kotler Dov, CEO
1120 Avenue of the Americas
New York, NY 10036

Bank Hapoalim
CT Corporation System
Agent for Bank Hapoalim
330 N. Brand Blvd, Ste 700
Glendale, CA 91203-2366

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **September 15, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 15, 2023 | Rolanda Mori | /s/ Rolanda Mori |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                           **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:351198.1 78512/001

**1.** **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Simon Aron**  saron@wrslawyers.com, moster@wrslawyers.com
- **Reem J Bello**  rbello@goeforlaw.com, kmurphy@goeforlaw.com
- **Ron Bender**  rb@lnbyg.com
- **Michael Jay Berger**  michael.berger@bankruptcypower.com,
  yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Greg P Campbell**  ch11ecf@aldridgepite.com, gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
- **Baruch C Cohen**  bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com
- **Theron S Covey**  tcovey@raslg.com, sferry@raslg.com
- **Jeffrey W Dulberg**  jdulberg@pszjlaw.com
- **Dane W Exnowski**  dane.exnowski@mccalla.com, bk.ca@mccalla.com,mccallaecf@ecf.courtdrive.com
- **Robert P Goe**  kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- **Michael I. Gottfried**  mgottfried@elkinskalt.com,
  cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
- **Brandon J Iskander**  biskander@goeforlaw.com, kmurphy@goeforlaw.com
- **Michael S Kogan**  mkogan@koganlawfirm.com
- **Marc A Lieberman**  marc.lieberman@flpllp.com, safa.saleem@flpllp.com,addy@flpllp.com
- **John W Lucas**  jlucas@pszjlaw.com, ocarpio@pszjlaw.com
- **Ron Maroko**  ron.maroko@usdoj.gov
- **Kirsten Martinez**  Kirsten.Martinez@bonialpc.com, Notices.Bonial@ecf.courtdrive.com
- **Steven M Mayer**  smayer@mayerlawla.com
- **Krikor J Meshefejian**  kjm@lnbyg.com
- **Kenneth Misken**  Kenneth.M.Misken@usdoj.gov
- **Jeffrey P Nolan**  jnolan@pszjlaw.com
- **Eric J Olson**  eric@ejolsonlaw.com
- **Jeffrey N Pomerantz**  jpomerantz@pszjlaw.com
- **Brian A Procel**  bprocel@millerbarondess.com, rdankwa@millerbarondess.com;docket@millerbarondess.com
- **Joshua L Scheer**  jscheer@scheerlawgroup.com, jscheer@ecf.courtdrive.com
- **Mark M Sharf (TR)**  mark@sharflaw.com,
  C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
- **Bradley D. Sharp (TR)**  bsharp@dsi.biz
- **Nikko Salvatore Stevens**  nikko@cym.law, mandi@cym.law
- **Alan G Tippie**  Alan.Tippie@gmlaw.com,
  atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com
  m
- **Gary Tokumori**  gtokumori@pmcos.com
- **United States Trustee (LA)**  ustpregion16.la.ecf@usdoj.gov
- **Michael L Wachtell**  mwachtell@buchalter.com
- **John P. Ward**  jward@attleseystorm.com, ezhang@attleseystorm.com
- **Brett J. Wasserman**  wasserman@smcounsel.com
- **Alex M Weingarten**  aweingarten@willkie.com, lcarter@willkie.com
- **Clarisse Young**  youngshumaker@smcounsel.com, levern@smcounsel.com
- **Paul P Young**  paul@cym.law, jaclyn@cym.law
- **Roye Zur**  rzur@elkinskalt.com,
  cavila@elkinskalt.com;lwageman@elkinskalt.com;1648609420@filings.docketbird.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                       **F 9013-3.1.PROOF.SERVICE**

DOCS_LA:351198.1 78512/001

2. **<u>SERVED BY UNITED STATES MAIL</u>**:

Nathan Talei
Oldman, Sallus & Gold, L.L.P.
16133 Ventura Blvd., PH-A
Encino, CA 91436

<u>Debtors Counsel</u>
Michael S. Kogan, Esq.
Kogan Law Firm APC
11500 W. Olympic Blvd., Suite 400
Los Angeles, CA 90064

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

DOCS_LA:351198.1 78512/001

**F 9013-3.1.PROOF.SERVICE**

# EXHIBIT 2

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Jeffrey N. Pomerantz (CA State Bar No. 143717)<br>Jeffrey W. Dulberg (CA State Bar No. 181200)<br>Jeffrey P. Nolan (CA State Bar No. 158923)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA  90067<br>Telephone:  (310) 277-6910; Facsimile:  (310) 201-0760<br>Email:  jpomerantz@pszjlaw.com, jdulberg@pszjlaw.com,<br>jnolan@pszjlaw.com<br>☐ *Debtor(s) appearing without an attorney*<br>☒ Attorney to: *Counsel to Bradley D. Sharp, Chapter 11 Trustee for Estate of Leslie Klein* | |

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

</div>

| In re:<br><br>LESLIE KLEIN, | CASE NO.:    2:23-bk-10990-SK<br>CHAPTER: 11 |
|---|---|
| | **NOTICE OF MOTION FOR ORDER WITHOUT HEARING PURSUANT TO LBR 9013-1(o)** |
| Debtor(s). | [No hearing unless requested in writing] |

## TO THE U.S. TRUSTEE AND ALL PARTIES IN INTEREST.  PLEASE TAKE NOTICE THAT:

1.  Movant(s) __Bradley D. Sharp, Chapter 11 Trustee for Estate of Leslie Klein__, has filed a motion entitled Motion of Chapter 11 Trustee, for Order Authorizing the Examination of Bank Hapoalim, BM dba Bank Hapoalim, USA Pursuant to Fed. R. Bankr. P. 2004; Memorandum of Points and Authorities; Declarations of Bradley D. Sharp, Nicholas R. Troszak and Jeffrey P. Nolan In Support Thereof

2.  Movant(s) is requesting that the court grant the motion without a hearing, as provided for in LBR 9013-1(o).

3.  The motion is based upon the legal and factual grounds set forth in the motion and briefly described in the attached description of relief sought. (*Check appropriate box below*):

    ☒ The full motion is attached hereto; or
    ☐ The full motion has been filed with the court, and a detailed description of the relief sought is attached hereto.

4.  **DEADLINE FOR FILING AND SERVING OPPOSITION PAPERS AND REQUEST FOR A HEARING**: Pursuant to LBR 9013-1(o), any party objecting to the motion may request a hearing on the motion. The deadline for filing and serving a written opposition and request for a hearing is 14 days after the date of service of this notice, plus 3

---

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

DOCS_LA:351194.1 78512/001

additional days if you were served by mail, electronically, or pursuant to F.R.Civ.P. 5(b)(2)(D), (E), or (F).  If you fail
to comply with this deadline, the court may treat such failure as a waiver of your right to oppose the motion and may
grant the motion without further hearing and notice.


Date:    September 15, 2023                                  Respectfully submitted,



                                                            /s/ Jeffrey P. Nolan
                                                            Signature of Movant or attorney for Movant


                                                            Jeffrey P. Nolan
                                                            Printed name of Movant or attorney for Movant

---

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016                              Page 2                F 9013-1.2.NO.HEARING.NOTICE

DOCS_LA:351194.1 78512/001

# ATTACHED MOTION

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                    Page 2                    **F 9013-1.2.NO.HEARING.NOTICE**

DOCS_LA:351194.1 78512/001

1   Jeffrey W. Dulberg (CA State Bar No. 181200)
    Jeffrey P. Nolan (CA State Bar No. 158923)
2   Pachulski Stang Ziehl & Jones LLP
    10100 Santa Monica Blvd., 13th Floor
3   Los Angeles, CA 90067
    Telephone: 310/277-6910
4   Facsimile: 310/201-0760
    E-mail:jdulberg@pszjlaw.com
5          jnolan@pszjlaw.com

6   Counsel to Bradley D. Sharp, Chapter 11 Trustee

7                    UNITED STATES BANKRUPTCY COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9                         LOS ANGELES DIVISION

10  In re                                | Case No.: 2:23-bk-10990-SK

11  LESLIE KLEIN,                        | Chapter 11

12            Debtor.                     | **MOTION OF CHAPTER 11 TRUSTEE, FOR**
13                                        | **ORDER AUTHORIZING THE**
                                          | **EXAMINATION OF BANK HAPOALIM, BM**
14                                        | **DBA BANK HAPOALIM, USA PURSUANT**
                                          | **TO FED. R. BANKR. P. 2004;**
15                                        | **MEMORANDUM OF POINTS AND**
                                          | **AUTHORITIES; DECLARATIONS OF**
16                                        | **BRADLEY D. SHARP, NICHOLAS R.**
                                          | **TROSZAK AND JEFFREY P. NOLAN IN**
17                                        | **SUPPORT THEREOF**

18                                        | **[FED. R. BANKR. P. 2004 AND L.B.R.**
                                          | **2004-1]**
19
                                          | [No Hearing Required]
20

21  **TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE;**

22  **THE OFFICE OF THE UNITED STATES TRUSTEE; THE PROPOSED EXAMINEE; AND**

23  **PARTIES ENTITLED TO NOTICE HEREOF:**

24          **PLEASE TAKE NOTICE THAT** Bradley D. Sharp, the duly appointed chapter 11 trustee

25  (the "Trustee" or "Applicant") of the bankruptcy estate (the "Estate") of Leslie Klein (the "Debtor"),

26  pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004") and Local

27  Bankruptcy Rule 2004-1 ("LBR 2004-1"), hereby moves the Court (the "Motion") for an Order

28  requiring that Bank Hapoalim, BM dba Bank Hapoalim, USA ("Bank Hapoalim" or Proposed

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Examinee") produce documents and answer written questions pursuant to Rule 7031, as agreed to as follows:  **October 9, 2023** for production of documents and testimony, or as otherwise consensually agreed to by the parties.

## I.

## PRELIMINARY STATEMENT

The Motion is made on the grounds that pre-petition, the Debtor, was appointed and represented multiple trusts in his capacity as an attorney and a fiduciary. Numerous of his former clients have filed complaints over the past eight (8) years in the Superior Court of California, Los Angeles County ("Superior Court") in which they allege monies were diverted by the Debtor, utilized for improper purposes, and which sums are unaccounted for despite orders to show cause issued from the Superior Court.  Non-Dischargeability complaints were subsequently filed before the Bankruptcy Court alleging similar fact patterns accusing the Debtor of utilizing multiple accounts to improperly make investments, collateralize investments, and/or divert monies for personal use without the permission of the beneficiaries whom entrusted said funds to the Debtor.  The Debtor has indicated he maintained no hard copies of financial records and minimal personal records if any. Investigation into the bank accounts may give rise to damages, other claims and/or property recoverable by the Debtor's bankruptcy estate.

## II

## BACKGROUND

**Procedural Background and Filing of the Cases:**

On February 22, 2023, the Debtor filed a voluntary petition for relief under subchapter V of Chapter 11 of the Bankruptcy Code.

On April 24, 2023, creditors Erica and Joseph Vago filed a *Motion for Order Dismissing Debtor's Chapter 11 Bankruptcy Case* (the "Motion to Dismiss") [Docket No. 79].

On May 17, 2023, at a hearing held on the Motion to Dismiss, the Court ruled that the appointment of a chapter 11 trustee, and not dismissal of the case, was in the best interests of the estate.

On May 23, 2023, the UST filed a *Notice of Appointment of Chapter 11 Trustee* [Docket No. 151].

On May 24, 2023, the UST Filed an *Application for Order Approving Appointment of Trustee and Fixing Bond* [Docket No. 154], approved by order entered the same day [Docket No. 155].  On that same day, the Trustee accepted his appointment [Docket No. 156].

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**Factual Background:**

On August 27, 2021, Plaintiff, ADI Vendriger, individually and on behalf of the Vendriger Family Trust, filed a complaint against the Debtor and the law firm of Les Klein & Associates, Inc. (the "Law Firm") asserting various tort causes of action, including fraud, conversion of property, and money had and received. The complaint alleges multiple improper acts by the Debtor including comingling and misappropriation of funds. (See State Court Complaint for (1) Fraud; (2) Breach of Fiduciary Duty; (3) Conversion; (4) Money Had And Received; (5) Unjust Enrichment and (6) Accounting (the "Vendriger Complaint"), ¶¶24, 25, 28, attached hereto as **Exhibit A.**)  On April 10, 2023, a Notice of Stay of Proceedings was filed.

On August 29, 2022, a referee appointed by the Superior Court issued an 84 page "Report and Recommendation of the Court-Appointed Referee on Examination and Adjudication of the Trustee's First, Second, and Third Accountings On Each of the Twenty-Four Trusts At Issue For the Trust Periods September 10, 1996-June 30, 2013, July 1, 2013-December 31, 2016 And January 1, 2017-September 30, 2018" (the "Referee's Report", attached to the Declaration of J. Nolan as **Exhibit B**).  The Referee's Report outlines a multitude of improper acts taken by the Debtor including the transfer and misappropriation and commingling of funds. (See **Exhibit B**, p. 21) Large financial disparities were noted to exist between what the Debtor claimed was disbursed to beneficiaries and ultimately what the beneficiaries documented they received. (See **Exhibit B**, p. 18, ft. note 21)

On May 10, 2013, Plaintiffs Erica and Joseph Vago, filed a Complaint to Determine the Nondischargeability of Certain Debts owed by Debtor Leslie Klein to Erica and Joseph Vago

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Pursuant to 11 U.S.C. §523, and To Deny Discharge Pursuant to Section 727(A)(12) (See Complaint for Nondischargeability (the "Vago Complaint") against the Debtor attached to the Declaration of J. Nolan as **Exhibit C**)  The Vago Complaint alleges that the Vagos' moved 15MM in funds to the care of the Debtor between 2013 and 2017. (See **Exhibit C**, ¶¶17, 26)  In 2019, the Vagos demanded their monies be returned and the Debtor refused. (See **Exhibit C**, ¶¶36, 37)  The Vago Complaint alleges that the Debtor commingled trust funds with his personal funds. (See **Exhibit C**, ¶46) The Vago Complaint attaches a judgment in the amount of $24,334,038 as against the Debtor.

On May 12, 2023, Plaintiffs, Robert and Esther Mermelstein filed Complaint for Nondischargeability of Debt Pursuant to 11 U.S.C. §523(a)(2)(A), 11 U.S.C. §523(a)(4) & 11 U.S.C. §523(a)(6) & for Denial Of Discharge Pursuant to 11 USC §727(a)(2)(A); 11 USC §727(a)(2)(B); 11 USC §727(a)(3); 11 USC §727(a)(4); 11 USC §727(a)(5) the "Mermelstein Complaint") (See Declaration of J. Nolan as **Exhibit D**, ¶¶17, 21, 24, 28, 32). Several of the investment opportunities resulted in significant recoveries to the Debtor which sums are alleged to have been converted by the Debtor and concealed from the Mermelstein beneficiaries.  (See Mermelstein Complaint, ¶¶14, 20, 31). The Mermelstein Plaintiffs have filed proofs of claims in the Bankruptcy Case exceeding $13,000,000. (See Mermelstein Complaint, ¶41).

On May 13, 2020, the California Board of Accountancy, Department of Consumer Affairs, State of California, issued its Decision and Order in which the Debtor surrendered his license. (See Decision and Order, Stipulated Surrender of License and Order and Accusation attached to the Declaration of J. Nolan as **Exhibit E**).  The accusation documents the Debtor issuing promissory notes in the name of the Debtor, entities in which he owned a substantial interest or controlled, as well as mischaracterizing investments to clients which in reality were merely non-recourse loans utilizing the Law Firm and Law Firm IOLTA Account.  The Debtor caused to be issued promissory notes and utilized the funds as he alone directed. (See **Exhibit E**, Accusation, ¶¶ 19(iv), 22(d)).

In the single in-person meeting with the Trustee and representatives of the Trustee, the Debtor claimed he did not maintain financial records. (See Declaration of B. Sharp, ¶3; Declaration of N. Troszak, §3) This response is consistent with a finding by the referee in the Menlo case that the Debtor "had no legitimate recordkeeping system". (See **Exhibit B**, p. 23, lns. 15-18)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Since June 8, 2023, the Trustee has requested various financial documents including bank statements, disclosure and reports of entities which he holds a financial interest. (See Correspondence dated June 8, 2023, attached to the Declaration of J. Nolan, as **Exhibit F, ¶**8; See email dated June 28, 2023, attached hereto as **Exhibit G**). The demands have been repeated to multiple counsel on behalf of the Debtor and has not resulted in the production of financial records. (See email dated July 10, 2023, attached to the Declaration of J. Nolan as **Exhibit H**).

**III**

**THE TRUSTEE IS ENTITLED TO A RULE 2004 ORDER UNDER APPLICABLE LAW**

Bankruptcy Rule 2004 provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a). Examinations under Bankruptcy Rule 2004 include within their scope, *inter alia*, any matter that may relate to the property and assets of the estate, the financial condition of the debtor, and any matter that may affect the administration of a debtor's estate, or to the debtor's right to a discharge. See Fed. R. Bankr. P. 2004(b). In addition, the attendance of a person at an examination may be ordered by the Court "at any time or place it designates, whether within or without the district court wherein the case is pending." Fed. R. Bankr. P. 2004(d). The Bankruptcy court has broad discretion in issuing a 2004 examination. *In re Deshetler*, 435 B.R. 295, 302 (Bankr. S.D. Ohio 2011)

It is the debtor's duty to provide the required information of creditors and assets to a trustee which is crucial to the working of the bankruptcy system. *Clippard v. Russell (In re Russell),* 392 B.R. 315, 358 (Bankr. E.D. Tenn. 2008) the required information is needed for a variety of purposes in the administration of the bankruptcy case. *Id*. The debtor's obligation to provide the required information is a cost imposed on the debtor for the benefit of obtaining bankruptcy relief. *Id*.

The Debtor has failed (or refused) to produce various financial records to support claims made to the Trustee and/or evidence of the financial condition despite multiple requests. (See Declaration of N. Troszak, ¶3.) This list includes: bank statements, payments for investments in various life insurance policies, credit card statements, access to his computers, disclosure of entities in which he holds a financial interest, and the list goes on. The lack of meaningful production of financial records produced to the Trustee means the Trustee must seek the financial information

from third parties.  Similarly, the plethora of claims by creditors in the estate, as well as various

findings from sister courts and litigation pending therein, describe a picture of commingling and

diversion of funds.

The purpose of a Bankruptcy Rule 2004 examination is "to allow inquiry into the debtor's

acts, conduct or financial affairs so as to discover the existence or location of assets of the estate."

*In re Dinbilo*, 177 B.R. 932, 940 (E.D. Cal. 1993); see also *In re N. Plaza LLC*, 395 B.R. 113, 122,

n. 9 (S.D. Cal. 2008) (purpose of Bankruptcy Rule 2004 examination is "discovering assets and

unearthing frauds") (internal citations omitted); *In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio

1989) (rule's primary purpose is to ascertain "the extent and location of the estate's assets [and]

examination is not limited to the debtor or his agents, but may properly extend to creditors and third

parties who have had dealings with the debtor.") (internal citations omitted).  In addition,

Bankruptcy Rule 2004 is a discovery tool that can be used as a pre-litigation device to determine

whether there are grounds to bring an action to determine a debtor's right to discharge a particular

debt.  See *In re Corso*, 328 B.R. 375, 383 (E.D.N.Y. 2005).

The scope of an examination permitted under Bankruptcy Rule 2004 is "exceptionally

broad."  *In re N. Plaza LLC*, 395 B.R. at 122 n. 9; see also *In re W&S Investments, Inc.* 1993 U.S.

App. LEXIS 2231 at *6 (9th Cir. Jan. 28, 1993) ("The scope of inquiry permitted under a Rule 2004

examination is generally very broad and can legitimately be in the nature of a 'fishing expedition.'")

(internal citations omitted).  This broad inquiry extends to third parties as well:  "Because the

purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be

shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation."  *In

re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993); see also *In re Mittco, Inc.*, 44 B.R.

35, 36 (Bankr. D. Wis. 1984) ("When there is a showing that the purpose of the examination is to

enable a party to probe into matters which may lead to the discovery of assets by examining not only

the debtor, but also other witnesses, such inquiry is allowed.").  This is because "[t]he clear intent of

Rule 2004 . . . is to give parties in interest an opportunity to examine individuals having knowledge

of the financial affairs of the debtor in order to preserve the rights of creditors."  *In re GHR

Companies, Inc.*, 41 B.R. 655, 660 (Bankr. D. Mass. 1984).  "The purpose of the Rule 2004

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

investigation is to aid in the discovery of assets, any third party who can be shown to have a

relationship with the debtor can be made subject to a Rule 2004 investigation." *In re Ionosphere

*Clubs, Inc.*, 156 B.R. 414, 432 (Bankr. S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

In the present case, good cause exists to issue the subpoena as the Trustee must locate

reliable records to determine the financial affairs and condition of the Debtor in order to preserve the

rights of creditors.  The Debtor's statements that he does not maintain financial records regarding his

acts, conduct, property and financial conditions means the Trustee must go to third parties. (See

Declaration of N. Troszak, §3) There has been a litany of state court filings and litigation, including

findings of fact, calling in to question conduct of the Debtor and his financial dealings. Various

findings during litigation document the commingling of monies, investments, and trust accounts.

Allegations of misappropriation of funds and the establishment of lines of credit to burden or

securitize assets of clients call into question business conducted by the Debtor and the location of

missing assets.  This conduct has spawned a mountain of litigation which has the potential to

undermine the efficient and economic administration of the bankruptcy case.   For these reasons, the

Trustee seeks the production of records to investigate and determine the underlying facts.

The proposed examination cannot proceed at this time under Bankruptcy Rule 7030 or 9014

because Debtor is not a party to any pending adversary proceeding or contested matter that

encompasses the matters addressed in this Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

**IV.**

2

**CONCLUSION**

3      For the reasons set forth above, the Trustee respectfully requests that this Court enter an

4  order to be lodged consistent with the Motion herewith granting this Motion in its entirety and

5  (a) authorizing the Trustee, pursuant to Bankruptcy Rules 2004 and 9016, to issue a subpoena

6  substantially in the form attached hereto as **Exhibit I,** for the production of financial records

7  including supporting bank statements, copies of checks, and deposit slips and (b) answer written

8  questions on deposition; and (c) granting such other and further relief as this Court deems just and

9  proper.

10

11  Dated:  September 15, 2023                    PACHULSKI STANG ZIEHL & JONES LLP

12

13                                               By: */s/ Jeffrey P. Nolan*
                                                     Jeffrey W. Dulberg
14                                                   Jeffrey P. Nolan

15                                                   Attorneys for Bradley D. Sharp, Chapter 11
                                                     Trustee
16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

## DECLARATION OF BRADLEY D. SHARP

2      I, Bradley D. Sharp, declare:

3      1.      I am the President and CEO of Development Specialists, Inc. ("DSI" or the "Firm").

4 I have personal knowledge of the facts stated in this Declaration, and if called as a witness, I could

5 and would testify competently to these facts.

6      2.       I make this declaration in support of the application (the "Application") filed by the

7 Trustee seeking an Order Authorizing the Production of Documents and Examination of Bank

8 Hapoalim, Pursuant to Fed. R. Bankr. P. 2004.

9      3.      I met with the Debtor on or about May 31, 2023.  At that time, the Debtor indicated

10 he did not maintain personal financial records for the various assets disclosed on his schedules.  The

11 Debtor claimed he did not maintain records for his financial affairs.

12      I declare under penalty of perjury pursuant to the laws of the United States that the foregoing

13 is true and correct.

14      Executed this 15th day of September, 2023, at San Juan Capistrano, California.

15

16

17 _____
Bradley D. Sharp

18 Chapter 11 Trustee

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF NICHOLAS R. TROSZAK

I, Nicholas R. Troszak, declare:

1.      I am a Managing Director at Development Specialists, Inc. ("DSI" or the "Firm").  I have personal knowledge of the facts stated in this Declaration, and if called as a witness, I could and would testify competently to these facts.

2.      I make this declaration in support of the application (the "Application") filed by the Trustee seeking an Order Authorizing the Production of Documents and Examination of Bank Hapoalim, BM dba Bank Hapoalim International and Bank Hapoalim, USA pursuant To Fed. R. Bankr. P. 2004.

3.      On or about May 31, 2023, I met with the Debtor.  I asked him a number of questions about the maintenance of business records.  The Debtor indicated he did not maintain physical or hard copies of his personal financial records.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed this 15th day of September, 2023, at Camarillo, California.

Nicholas R. Troszak

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:350994.1 78512/001

10

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## DECLARATION OF JEFFREY P. NOLAN

I, Jeffrey P. Nolan, declare:

1.      I am an attorney at law duly licensed to practice before all courts in the State of California.  I am an attorney with the law firm of Pachulski Stang Ziehl & Jones LLP, attorneys of record for Bradley D. Sharp, Chapter 11 Trustee of the estate of Leslie Klein ("<u>Klein</u>" or the "<u>Debtor</u>").  The facts stated herein are of my own personal knowledge, or made known to me from a review of the files and pleadings in this action which are maintained in the ordinary course of business.  If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.

2.      The examination requested through the Motion cannot proceed under Federal Rules of Bankruptcy Procedure 7030 or 9014 because no adversary proceeding or contested matter is currently pending encompassing the matters subject to inquiry.

3.      Attached hereto as **Exhibits A,** is a true and correct copy of the Complaint for (1) Fraud; (2) Breach of Fiduciary Duty; (3) Conversion; (4) Money Had And Received; (5) Unjust Enrichment and (6) Accounting filed in the Superior Court of the State of California, Case Number 21 ST CV 31915, <u>Vendriger, et al v. Klein</u>.

4.      Attached hereto as **Exhibit B,** is a true and correct copy of the Report and Recommendation of the Court-Appointed Referee on Examination and Adjudication of the Trustee's First, Second, and Third Accountings On Each of the Twenty-Four Trusts At Issue For the Trust Periods September 10, 1996-June 30, 2013, July 1, 2013-December 31, 2016 And January 1, 2017-September 30, 2018, as attached to proof of claim 13-2 filed by the Menlo Parties in the United States Bankruptcy Court, Central District of California, in case number 2:23-bk-10990-SK.

5.      Attached hereto as **Exhibit C** is a true and correct copy of the <u>Vago v. Klein</u> Complaint to Determine the Nondischargeability of Certain Debts owed by Debtor Leslie Klein to Erica and Joseph Vago Pursuant to 11 U.S.C. §523, and To Deny Discharge Pursuant to Section 727(A)(12) and filed in the United States Bankruptcy Court, Central District of California, in case number 2:23-bk-10990-SK.

6.      Attached hereto as **Exhibit D** is a true and correct copy of the <u>Mermelstein v. Klein</u>

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Complaint for Nondischargeability of Debt Pursuant to 11 U.S.C. §523(a)(2)(A), 11 U.S.C. §523(a)(4) & 11 U.S.C. §523(a)(6) & for Denial Of Discharge Pursuant to 11 USC §727(a)(2)(A); 11 USC §727(a)(2)(B); 11 USC §727(a)(3); 11 USC §727(a)(4)' 11 USC §727(a)(5), and filed in the United States Bankruptcy Court, Central District of California, in case number 2:23-bk-10990-SK.

7.    Attached hereto as **Exhibits E** is a true and correct copy of the Decision and Order, Stipulated Surrender of License and Order and Accusation issued by the California Board of Accountancy, Department of Consumer Affairs, State of California, as printed from the state website.

8.    Upon information and belief, the Debtor maintained a business relationship with Bank Hapoalim, BM dba Bank Hapoalim International and Bank Hapoalim, USA ("Bank Hapoalim") and maintained a number of accounts based upon my review of records.

9.    As counsel to the Trustee, we requested financial records and bank statements from the Debtor on June 8, 2023. (See Correspondence dated June 8, 2023, attached hereto as **Exhibit F**) On June 28, 2023, the Trustee again requested the bank statements. (See email dated June 28, 2023, attached hereto as **Exhibit G**). The Trustee made the same request when introduced to new counsel for the Debtor on July 10, 2023. (See email dated July 10, 2023, attached hereto as **Exhibit H**). No bank statements or financial records have been received from the Debtor in response thereto.

10.    Pursuant to Local Bankruptcy Rule 2004-1(a), the Plaintiff contacted Bank Hapoalim to arrange for a mutually agreeable date, time, place, and scope of the examination sought in the Motion. The Proposed Examinee will produce the documents requested on reasonable notice to its subpoena process serving unit. Notice of this Motion has been given to the Debtor/consumer and the United States Trustee's Office.

11.     The Debtor therefore requests authority to issue a subpoena to the Proposed Examinee substantially in the form attached hereto as **Exhibit I.**

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed this 15th day of September, 2023, at Los Angeles, California.


_/s/ Jeffrey P. Nolan_____
Jeffrey P. Nolan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

Assigned for all purposes to Stanley Mosk Courthouse, Judicial Officer: Teresa Traber

Electronically FILED by Superior Court of California, County of Los Angeles on 08/27/2021 06:09 PM Sherri R. Carter, Executive Officer/Clerk of Court, by H. Flores-Hernandez,Deputy Clerk

1  **SHUMAKER MALLORY LLP**
   Clarisse Young Shumaker (SBN 106505)
2  youngshumaker@smcounsel.com
   Brett J. Wasserman (SBN 315058)
3  wasserman@smcounsel.com
   333 S. Grand Ave., Suite 3400
4  Los Angeles, California 90071
5  **Mailing Address**
   1 Ringbit Rd. W.
6  Rolling Hills, CA 90274
   Telephone: (213) 793-2020
7  Facsimile: (213) 674-4268
8
   Attorneys for Plaintiff ADI VENDRIGER
9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                      COUNTY OF LOS ANGELES

12  ADI VENDRIGER, an individual, as Co-        )  Case No.   21STCV31915
    Trustee of the FIRST AMENDMENT TRUST        )
13  WENDRIGER FAMILY; and ADI                   )
    VENDRIGER, an individual                    )  **COMPLAINT FOR:**
14                                              )  **1) FRAUD;**
                   Plaintiffs,                  )  **2) BREACH OF FIDUCIARY DUTY;**
15  v.                                          )  **3) CONVERSION;**
                                                )  **4) MONEY HAD AND RECEIVED;**
16  LESLIE KLEIN, ESQ., an individual; and      )  **5) UNJUST ENRICHMENT; and**
17  LES KLEIN & ASSOCIATES, a California        )  **6) ACCOUNTING**
    Professional Law Corporation; and DOES 1-   )
18  50, inclusive,                              )  **(Filed concurrently with Petition to Return**
                                                )  **Trust Property; For Damages, Attorney's**
19                 Defendants.                  )  **Fees, And Costs; and Award of Damages,**
                                                )  **Attorney's Fees, and Costs)**
20                                              )
                                                )  Complaint Filed: August 27, 2021
21                                              )  Trial Date:
                                                )  Dept:
22                                              )
    _____        )
23                                                 **DEMAND FOR JURY TRIAL**

24       Plaintiff ADI VENDRIGER, successor co-Trustee of the First Amendment Trust

25  Wendriger Family dated May 7, 1990, as amended thereafter, hereby alleges as follows:

26  ///

27  ///

## **GENERAL ALLEGATIONS**

1.      Plaintiff ADI VENDRIGER is an individual who resides in Tel Aviv, Israel.  ADI VENDRIGER is a successor co-Trustee of the First Amendment Trust Wendriger Family dated May 7, 1990, as amended.  A true and correct copy of the First Amendment Trust Wendriger Family dated May 7, 1990, as amended ("Trust"), is attached hereto as Exhibit A and made a part hereof.  At all times relevant herein, the Trust was being administered in the State of California, County of Los Angeles.

2.      Respondent LESLIE KLEIN, ESQ. ("Klein") is an individual who on information and belief resides in Los Angeles County, California.  Upon information and belief, at all times relevant herein, Klein was doing business in the State of California, County of Los Angeles. Pursuant to the State Bar of California website, Klein is an Active member, State Bar Number 50908.  Pursuant to the California Department of Consumer Affairs website, Klein formerly held a license as a Certified Public Accountant, License No. 67454, which was surrendered on January 31, 2021.  On March 24, 2010, Klein filed an Ex Parte Application for Issuance of Letters of Special Administration in the Estate of Tania Wendriger in Los Angeles Superior Court, Case No. LP015084 ("Petition for Special Administrator").  Klein was appointed Special Administrator of the Estate of Tania Wendriger under an Ex Parte Order for Probate dated March 24, 2010 and received Letters of Special Administration dated March 24, 2010.

3.      Respondent LES KLEIN & ASSOCIATES, INC., A PROFESSIONAL LAW CORPORATION ("Firm") is a California professional corporation engaged in the practice of law with offices in the State of California, County of Los Angeles, City of Sherman Oaks.

4.      Plaintiff is ignorant of the true names and capacities, whether individual, corporate, or otherwise, of the Defendants identified in this Petition as DOES 1 through 50, inclusive, and therefore, sues such Defendants by the fictitious names.  Plaintiff will amend this Plaintiff to set forth the true names and capacities of said Defendants as soon as such names have been ascertained.   Plaintiff is informed and believes and based upon such information and belief alleges that each Defendant designated herein as DOES 1 through 50, inclusive, is responsible in

2

**COMPLAINT**

1   some way and/or manner for the acts and occurrences herein alleged, whether such acts and

2   occurrences were committed intentionally, negligently, recklessly, or otherwise, and that each

3   said DOE Defendant is liable to Plaintiff for the damages suffered by Plaintiff.

4                          **JURISDICTION AND VENUE**

5          5.      Jurisdiction and venue in the Los Angeles Superior Court arises from the

6   administration of the Trust and Defendants residing and functioning in the County of Los

7   Angeles, State of California.

8                                  **FACTS**

9          6.      On May 7, 1990, OSCAR WENDRIGER and TANIA WENDRIGER established

10  the FIRST AMENDMENT TRUST WENDRIGER FAMILY ("Trust"), which replaced the prior

11  Trust Agreement dated July 10, 1986. OSCAR WENDRIGER and TANIA WENDRIGER were

12  the initial co-Trustees of the Trust. Plaintiff ADI VENDRIGER, and his brother Jacob

13  Vendriger, also known as Yaacov Vendriger, are the only children of OSCAR WENDRIGER

14  and TANIA WENDRIGER, and were named the successor co-Trustees of the Trust. Pursuant to

15  the terms of the Trust, as amended on March 18, 1993, upon the death of the Surviving Trustor,

16  the Trust Estate shall be distributed as follows: (i) each grandchild shall receive the sum of

17  $10,000, increased six percent (6%) per annum, cumulatively; and (ii) the remainder of the Trust

18  Estate shall be divided equally between ADI VENDRIGER and Jacob Vendriger.

19         7.      On May 7, 1990, OSCAR WENDRIGER and TANIA WENDRIGER contributed

20  the following three (3) real properties to the Trust as follows:

21       • Quitclaim Deed transferring 1435 Fairfax Avenue #20, Los Angeles, CA (APN
            5554-001-033) from OSCAR WENDRIGER and TANIA WENDRIGER to
22          OSCAR WENDRIGER and TANIA WENDRIGER, Cotrustees of the Wendriger
            Family Trust, U/D/T 5-7-90, which was recorded in Official Records of Los
23          Angeles County as Instrument No. 90-923693 on May 22, 1990 ("Fairfax
            Quitclaim Deed").
24

25  ///

26  ///

27  ///

                                        3
                              **COMPLAINT**

- Quitclaim Deed transferring 1217 Havenhurst Drive, Los Angeles, CA (APN 5554-016-011) from OSCAR WENDRIGER and TANIA WENDRIGER to OSCAR WENDRIGER and TANIA WENDRIGER, Co-trustees of the Wendriger Family Trust, U/D/T 5-7-90, which was recorded in Official Records of Los Angeles County as Instrument No. 90-923694 on May 22, 1990 ("Havenhurst Quitclaim Deed").

- Quitclaim Deed transferring 948 N. Martel Avenue, Los Angeles, CA (APN 5531-020-002) from OSCAR WENDRIGER and TANIA WENDRIGER to OSCAR WENDRIGER and TANIA WENDRIGER, Cotrustees of the Wendriger Family Trust, U/D/T 5-7-90, which was recorded in Official Records of Los Angeles County as Instrument No. 90-923692 on May 22, 1990 ("Martel Quitclaim Deed").

8.     On May 28, 1996, OSCAR WENDRIGER and TANIA WENDRIGER contributed the following property to the Trust as follows:

- Grant Deed transferring 1435 Fairfax Avenue #4, Los Angeles, CA (APN 5554-001-017) from OSCAR WENDRIGER and TANIA WENDRIGER to OSCAR WENDRIGER and TANIA WENDRIGER, Cotrustees of the Wendriger Family Trust dated 5/7/90, which was recorded in Official Records of Los Angeles County as Instrument No. 96-969585 on June 19, 1996 ("Fairfax Grant Deed").

9.     All four (4) Trust properties are managed by Holley Property Management Company.  Klein is not the Property Manager, but has inserted himself as a middle man between the property management company and the co-Trustees of the Trust.

10.     Pursuant to the Petition for Special Administrator filed by Klein, on October 30, 1999, OSCAR WENDRIGER and TANIA WENDRIGER executed a Note Secured by Trust Deed ("Secured Note") in the sum of $258,815.05, the terms of which provided for all unpaid principal and interest to be due and payable on October 24, 2009.  Pursuant to the Petition for Special Administrator filed by Klein, the Secured Note was secured by a Deed of Trust dated August 2, 1979, and recorded as Instrument No. 79-945848.

11.     On August 23, 2007, OSCAR WENDRIGER, also known as Oscar Vendriger, died.

12.     On November 23, 2007, TANIA WENDRIGER, also known as Tania Vendriger and Tanya Vendriger, died.

13.     Pursuant to the Petition for Special Administrator, at TANIA WENDRIGER's death there was a Chase Account (Account No. 195-248884-9), which was held by OSCAR

4

WENDRIGER and TANIA WENDRIGER, as joint tenants.  At the time of TANIA

WENDRIGER's death, the Chase Account held $194,000, which was in excess of the statutory

limits under Probate Code § 13100.

       14.     On March 24, 2010, Klein filed the Petition for Special Administrator in the

Estate of Tania Wendriger in Los Angeles Superior Court, Case No. LP015084.  Klein requested

the following powers: (i) to withdraw all sums on deposit in the Chase Account; (ii) With said

sums, to apply toward payment in full, including all accrued interest until such payment that

certain Note Secured by Deed of Trust, dated October 30, 1990, in favor of Harry Halpin and

Rose Shapiro the final payment on which, in the sum of $200,330.10, was due on October 24,

2009; (iii) to execute and deliver any checks, drafts, withdrawals, or other instruments drawn on

the Chase Account for the payment of the money on deposit in the Chase Account to pay in full

including all accrued interest until such payment, the Secured Note, the final payment of which,

in the sum of $200,330.20, was due on October 24, 2009; and (iv) if necessary, to open any bank

account necessary in the name of the Estate and to deposit in such account any and all sums

withdrawn from said Chase Account.  Thereafter, to execute and deliver any checks, drafts,

withdrawals, or other instruments drawn on such Account for payment of the money on deposit

in such Account to pay in full including all accrued interest until such payment, the Secured

Note, the final payment of which, in the sum of $200,330.20, was due on October 24, 2009.

       15.     On March 24, 2010, Klein was issued Letters of Special Administration.  Klein

specifically affirmed the requirement to perform the duties of personal representative according

to law in the Letters filed with the Court.

       16.     The Petition for Special Administrator included Nominations of Leslie Klein by

ADI VENDRIGER and Jacob Vendriger, for the purpose of withdrawing the funds in the Chase

account and applying such funds to the payment of the Secured Note, as well as a Power of

Attorney in favor of Leslie Klein, dated February 5, 2010, signed by ADI VENDRIGER and

Jacob Vendriger.  The Petition for Special Administrator also included a Declaration by Leslie

Klein, which specifically notes the Power of Attorney dated February 5, 2010 is in regards to the

Chase Account for the specific purpose of obtaining the funds in the Chase Account and applying said funds toward payment on the Secured Note.

17.     On March 24, 2010, an Order for Special Administrator was issued granting Klein the following powers: (i) to withdraw all sums on deposit in the Chase Account; (ii) With said sums, to apply toward payment in full, including all accrued interest until such payment that certain Note Secured by Deed of Trust, dated October 30, 1990, in favor of Harry Halpin and Rose Shapiro the final payment on which, in the sum of $200,330.10, was due on October 24, 2009; (iii) to execute and deliver any checks, drafts, withdrawals, or other instruments drawn on the Chase Account for the payment of the money on deposit in the Chase Account to pay in full including all accrued interest until such payment, the Secured Note, the final payment of which, in the sum of $200,330.20, was due on October 24, 2009; and (iv) if necessary, to open any bank account necessary in the name of the Estate and to deposit in such account any and all sums withdrawn from said Chase Account.  Thereafter, to execute and deliver any checks, drafts, withdrawals, or other instruments drawn on such Account for payment of the money on deposit in such Account to pay in full including all accrued interest until such payment, the Secured Note, the final payment of which, in the sum of $200,330.20, was due on October 24, 2009.

18.     To date, Klein has not filed a single accounting with the Court as Special Administrator.

19.     On July 27, 2011, Klein sent correspondence to ADI VENDRIGER and Jacob Vendriger which indicated Klein had received $255,792 from Holley Property Management company from March 2010 to June 2011. Klein noted expenses as follows: (i) paying off the Trust Deed in the amount of $205,987.15, $192,824 of which came from "monies held in various bank accounts"; (ii) $10,000 of attorney's fees; (iii) $4,200 for CPA fees, Court costs, and Bonding fees; and (iv) $156,684 in taxes paid for 2008, 2010, and 2011.  Klein noted a balance of $61,349.85 in his account for the benefit of Plaintiff and Jacob after issuance of a $10,400 check to Jacob to "reimburse him for his one half of the taxes which [Klein] paid to the IRS for the fees that were bounced by [Plaintiff]."

20.     To date, Klein has not filed a Petition for Discharge as Special Administrator despite acknowledging having paid off the Trust Deed prior to July 27, 2011.  Upon information and belief, Klein has charged Plaintiff and Jacob a yearly fee to act as a fiduciary.  In addition, upon information and belief, Klein has wasted Trust funds by paying $800 per year for a Bond that is entirely unnecessary.

21.     Upon information and belief, Klein represented to Holley Property Management Company that he was legally authorized as Trustee and/or Special Administrator to collect the rental income from the Trust properties.

22.     Upon information and belief, despite having no legal authority to handle the rental income of the Trust properties, Klein has collected all of the rental income from the four (4) properties titled in the name of the Trust from Holley Property Management Company from March of 2010 through March of 2021, for ADI VENDRIGER, and August of 2021, for Jacob Vendriger.

23.     Upon information and belief, Klein has failed to provide sufficient and accurate accountings to Plaintiff, as required by Probate Code §1060 et seq., despite numerous requests to do so.

24.     Upon information and belief, Klein has failed to accurately report the actual distributions made to the Plaintiff and/or the proper taxing authorities. For example, in 2020, Klein filed a fiduciary tax return for the Trust indicated a Distributable Net Income of $226,536 and actual distributions of $240,000 ($120,000 to ADI and $120,000 to Jacob); however, ADI only actually received distributions totaling $90,000.  In addition, statements provided by Holley Property Management Company show actual owner distributions totaling almost $346,000, which leaves $116,000 unaccounted for.

25.     Upon information and belief, Klein has engaged in a similar practice of over-reporting the actual distributions made to Plaintiff.  Upon information and belief, such over-reporting was done in efforts to cover Klein's misappropriation of client fund.

///

COMPLAINT

26.     Upon information and belief, Klein has failed to accurately report the reserves being held for the benefit of Plaintiff to the Plaintiff and/or the proper taxing authorities. For example, upon information and belief, Klein should have approximately $1,400,000 held in his account for the benefit of Plaintiff and Jacob. On March 24, 2021, Klein indicated he held a balance of only $220,000 in his attorney expense account because of an IRS claim for $80,000.

27.     Upon information and belief, Klein's failure to prepare declarations to be submitted to the Israeli Taxing Authorities indicating the reserves held by Klein, despite Plaintiff's numerous demands for Klein to do so, have put Plaintiff in jeopardy of incurring additional taxes and penalties imposed by the Israeli Taxing Authorities.

28.     Upon information and belief, Klein has misappropriated the funds that constitute the difference between the amount Klein is believed to be holding on behalf of Plaintiff and Jacob and the amount Klein is reporting to be holding on their behalf.

29.     Upon information and belief, Klein has also played favorites and has made distributions to Jacob while simultaneously withholding distributions from Plaintiff, despite Plaintiff's repeated demands for distributions to be made to avoid Plaintiff becoming destitute and filing for bankruptcy due to an inability to pay his creditors.

## RECOVERY AND DAMAGES

30.     Plaintiff hereby seeks recovery of the funds wrongfully held by Klein in full plus interest. Plaintiff also seeks punitive damages against Klein for fraud, conversion, and breach of fiduciary duty. Law firm trust accounts comprised of funds belonging to other people cannot be used as a lawyer's private bank account. Misuse of an attorney's trust account is among the most egregious misconducts an attorney can commit. This is the sort of conduct that leads to the public's mistrust of the legal profession.

31.     Plaintiff is seeking damages and attorney's fees and costs under Probate Code § 859 as a result of Klein's bad faith wrongful taking, concealing, and/or disposing of property belonging to a trust.

///

**COMPLAINT**

32.     Plaintiff also seeks recovery of attorney fees and costs against all defendants on the grounds of tort of another for fraud, breach of fiduciary duty, and conversion.  Plaintiff has been required through the tort of another to act in the protection of their interests by bringing this action against all Defendants. Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

## FIRST CAUSE OF ACTION

### (Fraud – Against All Defendants)

33.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 32, inclusive, above as if fully set forth herein.

34.     When Klein filed the Petition for Special Administrator, he expressly represented to the Court and to Plaintiff and Jacob that the powers he would exercise, including those obtained under the Power of Attorney, would be limited to paying the Trust Deed with the funds from the Chase Account, both of which were held by TANIA WENDRIGER, personally, and not in the name of the Trust.

35.     Upon information and belief, when Klein made such representation, Klein knew such representations to be false.  Upon information and belief, Klein knew that he would use the appointment as Special Administrator to gain access and control over Trust funds in order to misappropriate the same.

36.     Upon information and belief, Klein made representations to Holley Property Management Company that he had legal authority, as Special Administrator or as a Trustee, to collect and hold the rental income derived from the Trust properties.

37.     Upon information and belief, when Klein made such representation, Klein knew such representations to be false.

38.     Upon information and belief, Klein made representations to Plaintiff and the IRS, FTB, and Israeli Taxing Authorities that Klein has reported made distributions to Plaintiff in amounts differing from those actually distributed to Plaintiff.  For example, in 2020, Klein reported distributing $120,000 to Plaintiff, who actually received only $90,000 in distributions.

9

**COMPLAINT**

39.     Upon information and belief, when Klein made such representation, Klein knew such representations to be false.  Upon information and belief, Klein made such misrepresentations to cover the tracks of his misappropriation of client funds.

40.     Plaintiff justifiably relied upon Klein's representations to the Court and Plaintiff as well as Klein's reputation as an officer of the Court that Klein would follow the rules the administration of Estates and the California State Bar's Rules of Professional Conduct.

41.     Plaintiff has been damaged in an amount of not less than $780,000 plus interest as a result of funds that have been wrongfully withheld and/or improperly not distributed.  Klein had no legal authority to collect the rental income of Trust property let alone retain it.  Despite repeated demand by Plaintiff, the funds in Klein's possession have not been returned to Plaintiff.

42.     As the direct, proximate, and foreseeable consequence of the fraudulent conduct of Klein as herein alleged, Plaintiff has suffered actual damages of not less than $780,000, together with interest on that amount as allowed by law.

43.     The conduct of Klein as alleged herein is intentional, malicious, outrageous, and/or carried out with conscious disregard so as to justify an award of exemplary and punitive damages in an amount according to proof.

44.     Plaintiff also seeks recovery of attorney fees and costs against Klein on the grounds of tort of another.  Plaintiff has been required through the tort of another to act in the protection of his interests by bringing this action against Klein.  Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty – Against All Defendants)

45.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 44, inclusive, above as if fully set forth herein.

46.     Klein, as Special Administrator, as Agent under Power of Attorney, as an attorney, and as a CPA, was a fiduciary to Plaintiff and owed Plaintiff certain fiduciary duties

**COMPLAINT**

including the duties of good faith, integrity, undivided service, competence, candor, diligence, loyalty, and full and fair disclosure.

47.     Upon information and belief, Klein materially and willfully breached his fiduciary duties to Plaintiff by wrongfully representing he had legal authority to act on behalf of the Trust and collect rental income from Trust properties to third parties, including Holley Property Management Company, by wrongfully withholding Plaintiff's funds, by over-reporting distributions to Plaintiff, by paying himself a fiduciary fee despite not being a Trustee and the purpose of appointment of Special Administrator lapsing almost a decade ago, by failing to provide sufficient and accurate accountings, by failing to provide the proper requested documentation for taxing authorities, and by distributing funds in favor of Jacob while concurrently holding Plaintiff's funds without reasonable cause.

48.     Plaintiff has been harmed by Klein's conduct described herein, including the breach of his fiduciary duties to Plaintiff by wrongfully representing he had legal authority to act on behalf of the Trust and collect rental income from Trust properties to third parties, including Holley Property Management Company, by wrongfully withholding Plaintiff's funds, by over-reporting distributions to Plaintiff, by paying himself a fiduciary fee despite not being a Trustee and the purpose of appointment of Special Administrator lapsing almost a decade ago, by failing to provide sufficient and accurate accountings, by failing to provide the proper requested documentation for taxing authorities, and by distributing funds in favor of Jacob while concurrently holding Plaintiff's funds without reasonable cause.

49.     By doing the acts alleged above, Klein breached his fiduciary duties of good faith, integrity, undivided service, competence, candor, diligence, loyalty, and full and fair disclosure toward Plaintiff by acting in his own interests, and in a manner adverse to Plaintiff's best interests.

50.     As a direct, proximate, and foreseeable result of the Klein's breach of his fiduciary duties, Plaintiff has suffered actual damages of not less than $780,000, together with interest on that amount as allowed by law.

///

---

11

**COMPLAINT**

51.     Plaintiff is informed and believe and thereon allege that the aforementioned conduct of Klein, was an intentional misrepresentation, deceit, or concealment of material facts known Klein, and was despicable conduct carried out in conscious disregard of his duties and obligations to Plaintiff. Thus, Plaintiff is entitled to recover exemplary and punitive damages against Klein in an amount according to proof at the time of trial.

52.     Plaintiff also seeks recovery of attorney fees and costs Klein on the grounds of tort of another.  Plaintiff has been required through the tort of another to act in the protection of their interests by bringing this action against Klein.  Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

## THIRD CAUSE OF ACTION

### (Conversion – Against All Defendants)

53.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 52, inclusive, above as if fully set forth herein.

54.     Plaintiff, as a 50% beneficiary of the Trust, the terms of which required distribution of the Trust Estate almost one decade ago, owned and had a right to possess the Plaintiff's share of the rental income held by Klein.

55.     Klein intentionally and substantially interfered with Plaintiff's property by taking possession of the Plaintiff's share of the rental income and by refusing to return the Plaintiff's share of the rental income after demand was made for return of the same.

56.     Plaintiff did not consent to Klein's receipt or retention of Plaintiff's share of the rental income.

57.     Plaintiff was harmed by Klein's receipt and retention of the Plaintiff's share of the rental income.

58.     Klein's conduct in receiving and refusing to return the Plaintiff's share of the rental income was a substantial factor in the harm caused to Plaintiff.

///

12

**COMPLAINT**

59.     Plaintiff has suffered actual damages in the amount of not less than $780,000, plus costs and prejudgment interest at the maximum legal rate provided by law.

60.     Klein's acts and the conduct of Klein was engaged with oppression, malice, and/or fraud. Thus, Plaintiff is entitled to recover exemplary and punitive damages against Klein in an amount according to proof at the time of trial.

61.     Plaintiff also seeks recovery of attorney fees and costs against Klein on the grounds of tort of another.  Plaintiff has been required through the tort of another to act in the protection of their interests by bringing this action against Klein.  Plaintiff is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred.

### FOURTH CAUSE OF ACTION

### (Money Had and Received – Against All Defendants)

62.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 61, inclusive, above as if fully set forth herein.

63.     Klein received money in the form of the Plaintiff's share of the rental income.

64.     The Plaintiff's share of the rental income received by Klein was not used for the benefit of Plaintiff.

65.     Klein has not given the money received in the form of the Plaintiff's share of the rental income to Plaintiff.

66.     Plaintiff has suffered actual damages in the amount of not less than $780,000, plus costs and prejudgment interest at the maximum legal rate provided by law.

### FIFTH CAUSE OF ACTION

### (Unjust Enrichment– Against All Defendants)

67.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 66, inclusive, above as if fully set forth herein.

68.     Klein received the Plaintiff's share of the rental income from the Trust properties.

///

**COMPLAINT**

69.     Klein was not entitled to receive the Plaintiff's share of the rental income from the Trust properties.

70.     Klein's receipt of the Plaintiff's share of the rental income came at the expense of Plaintiff.

71.     Plaintiff has suffered actual damages in the amount of not less than $780,000, plus costs and prejudgment interest at the maximum legal rate provided by law.

<div align="center">

**ACCOUNTING**

</div>

72.     Plaintiffs realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 71, inclusive, above as if fully set forth herein.

73.     Klein, as Special Administrator, as Agent under Power of Attorney, as an attorney, and as a CPA, was a fiduciary to Plaintiff.

74.     Plaintiff is unable to ascertain and has demanded a full accounting by Klein in order to determine the amount of Plaintiff's assets wrongfully held by Klein.

75.     Upon information and belief, Plaintiff does not have access to view the funds held by Klein since Plaintiff's assets are held in accounts titled in Klein's name or the in the Firm's name.

<div align="center">

**PRAYER FOR RELIEF**

</div>

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows:

<div align="center">

**ON THE FIRST CAUSE OF ACTION**

</div>

1.     Damages in an amount of not less than $780,000;

2.     Interest at the legal rate from and after a date to be proven at trial;

3.     Exemplary and punitive damages in an amount according to proof;

4.     Attorney fees and costs in an amount according to proof;

5.     An accounting of all funds received, disbursed, and held by Klein;

<div align="center">

**ON THE SECOND CAUSE OF ACTION**

</div>

6.     Damages in an amount of not less than $780,000;

<div align="center">

14

**COMPLAINT**

</div>

7.    Interest at the legal rate from and after a date to be proven at trial;

8.    Exemplary and punitive damages in an amount according to proof;

9.    Attorney fees and costs in an amount according to proof;

10.    An accounting of all funds received, disbursed, and held by Klein;

### ON THE THIRD CAUSE OF ACTION

11.    Damages in an amount of not less than $780,000;

12.    Interest at the legal rate from and after a date to be proven at trial;

13.    Exemplary and punitive damages in an amount according to proof;

14.    Attorney fees and costs in an amount according to proof;

### ON THE FOURTH CAUSE OF ACTION

15.    Damages in an amount of not less than $780,000;

16.    Interest at the legal rate in an amount according to proof;

### ON THE FIFTH CAUSE OF ACTION

17.    Damages in an amount of not less than $780,000;

18.    Interest at the legal rate from and after a date to be proven at trial;

### ON THE SIXTH CAUSE OF ACTION

19.    An accounting of all funds received, disbursed, and held by Klein;

### ON ALL CAUSES OF ACTION

20.    For general damages to be proven at trial;

21.    For consequential damages to be proven at trial;

22.    For interest as allowed by law;

23.    For restitution as allowed by law;

///

///

///

///

///

**COMPLAINT**

24.    For reasonable attorney fees and costs; and

25.    For such other and further relief as the Court deems just and proper.

Dated:  August 27, 2021                          SHUMAKER MALLORY, LLP

                                                 By: _____
                                                     CLARISSE YOUNG SHUMAKER
                                                     BRETT J. WASSERMAN
                                                     Attorneys for Plaintiff
                                                     ADI VENDRIGER, as Co-Trustee and
                                                     individually

**COMPLAINT**

# EXHIBIT A

ADI <vendriger.prop@gmail.com>
To Jaffe Hilda <hjaffe1@verizon.net>, מדריגר ברברה <vendriger@hotmail.com>
Amendment to the amendment- AdYa

February 16 2013  11:06 AM

2 Attachments, 429 KB

AMENDMENT TO FIRST AMENDMENT DECLARATION OF TRUST
(OSCAR and TANIA WENDRIGER a.k.a.
VENDRIGER FAMILY TRUST)

THE FIRST AMENDMENT DECLARATION OF TRUST executed on
the 7th day of May 1990, by OSCAR WENDRIGER and TANIA
WENDRIGER as Trustors, and OSCAR WENDRIGER and TANIA
WENDRIGER as Trustees, is hereby amended by said Trustors and
Trustees pursuant to the right to amend reserved under the
original DECLARATION OF TRUST.  This amendment shall replace
in pertinent part any provisions to the contrary in the
original DECLARATION OF TRUST, and shall otherwise amend said
DECLARATION OF TRUST as follows:

1.    Upon the death of the Surviving Trustor, the
Trustee shall distribute the Trust Estate as follows:

(a)    Each grandchild of the Trustors shall
receive the sum of Ten Thousand Dollars ($10,000), increased
six percent (6%) per annum, cumulatively;

(b)    The remainder of the Trust Estate shall
be divided one-half (1/2) to JACOB VENDRIGER, son of the
Trustors, and one-half (1/2) to ADI VENDRIGER, son of the
Trustors, per stirpes.

IN WITNESS WHEREOF, the Original Trustor and Trustee
have executed this Amendment to the DECLARATION OF TRUST this
12th day of March, 1994.

TRUSTOR:                          TRUSTEE:

_____           _____
OSCAR WENDRIGER                   OSCAR WENDRIGER

_____           _____
TANIA WENDRIGER                   TANIA WENDRIGER

STATE OF CALIFORNIA    )
                       )ss.
COUNTY OF LOS ANGELES  )

On _March 18_, 199, before me, the undersigned, a
Notary Public, in and for said State, personally appeared
_Oscar Woodrow Twin Goodman_, personally known
to me or proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed to the
within instrument, and acknowledged that he/she/they executed
the same.

WITNESS my hand and official seal this 18th
day of _March_, 1993

Notary Public in and for said
County and State

OFFICIAL SEAL
Frances Coughlin Shapiro
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My comm. expires APR 11, 1995

## FIRST AMENDMENT TRUST
### WENDRIGER FAMILY

THIS FIRST AMENDED TRUST AGREEMENT replaces the prior Trust
Agreement dated July 10, 1986, and is entered into by and
between OSCAR WENDRIGER and TANIA WENDRIGER, "Husband" and
"Wife," respectively, of the County of Los Angeles, in the
State of California, hereinafter called "Trustors," and OSCAR
WENDRIGER and TANIA WENDRIGER of the State of California,
hereinafter referred to as "Cotrustees."

In construing this Trust the following definitions shall
apply:

1.   Whenever used herein the expression "Trustors" shall
refer to OSCAR WENDRIGER and TANIA WENDRIGER.
2.   Whenever used herein the expression "Original
Cotrustees" shall refer to OSCAR WENDRIGER and TANIA
WENDRIGER.
3.   Whenever used herein the expression "Original Cotrustee"
shall refer to either OSCAR WENDRIGER or TANIA WENDRIGER.
4.   Whenever used herein the expression "Successor Trustee"
shall refer to JACOB a.k.a. YAACOV VENDRIGER and ADI
VENDRIGER.
5.   Whenever used herein the expression "Alternate Trustee"
shall refer to the surviving Successor Trustee and SHLOMO
MENKES.
6.   Whenever used herein the expression "Trustee" shall be
deemed a reference to whomever is serving as Trustee, or
Cotrustees, whether original, successor or alternate.
7.   The initial primary beneficiaries of this Trust Estate
shall be OSCAR WENDRIGER and TANIA WENDRIGER.
8.   The effective date of this Trust Agreement shall be its
date of execution.

## I.   TRUST PROPERTY

### A.   Original Trust Estate

The Trustors acknowledge that they have transferred
to the Trustee without consideration the sum of ten dollars,
along with the following:

PERSONAL PROPERTY:  All tangible and intangible held personal
property that the Trustors, either separately or as community
property, now own or do hereafter acquire, including but not

limited to household furniture, furnishings, and utensils;
equipment and appliances; art; clothing; cash; personal
effects; bank accounts; registered and unregistered
securities; notes receivable; security interests and liens;
interests in partnerships, firms, businesses (including
inventory), and corporations; contract rights; and amounts
due from employers; excluding, however, any and all such
property subject to any (other) trust or power of
appointment; and any property subject to a pledge, security
agreement or legal restriction on transfer.

All such property owned by Trustors shall be considered and
treated as community property unless listed as separate
property in this Trust on Schedule B (the separate property
of husband, if any), and in Schedule C (the separate property
of wife, if any).

All such property, which is hereby delivered by the Trustors
to the Trustee, shall be held, administered, and distributed
by the Trustee as hereinafter set forth.

B. Additions to Trust Estate

Additional property may be added to the Trust Estate
at any time by the Trustors or either of them, or by any
person or persons, by inter vivos or testamentary transfer.
All such original and additional property is referred to
herein collectively as the Trust Estate, and shall be held,
managed and distributed as herein provided.

1. Employee Benefit Plans

In the event that any designation of the Trustee
of this Trust as Beneficiary in any employee benefit plan in
which the Trustors may have an interest shall be ineffectual
in whole or in part, the Trustors specifically request that
the committee, or other group having authority to do so under
any such plans, select the Trustee of the Trust as
beneficiary of such plans to the maximum extent possible.
The Trustee may elect the mode of payment which, in the
Trustee's discretion, appears to be the most advantageous
option available to the Trust and/or its then current income,
Beneficiaries in terms of income tax, estate and inheritance
tax, and/or investment return considerations, based on the
Trustee's evaluation of the facts and circumstances relevant
to such considerations as they exist at the time the Trustee
makes such election.  Further, the Trustee may, predicated
upon the foregoing consideration, elect in writing not to
treat the death benefits as a lump sum distribution for
income tax purposes and thus exclude the maximum allowed from

REVOCABLE LIVING TRUST Page 2

estate taxes.  An election by a Trustee in good faith in the
exercise of the discretionary power conferred upon it shall
be final and binding upon all persons whomsoever and shall be
a full acquittance and discharge to the Trustee, and the
Trustee shall not be liable to any person by reason of its
exercise of such discretionary power.

### C.  Character of Property Unchanged

The property comprising the original corpus of the
Trust Estate is community property of the Trustors, except as
otherwise specifically indicated. During the joint lives of
the Trustors, any property transferred to this Trust shall
retain its original character.  All such property shall be
assumed to be community property unless otherwise
specifically indicated in writing by the Trustors.  In the
event of revocation, the Trustee shall distribute such
property to the Trustors based on the same property rights
they had prior to transfer to the Trust. Any and all gifts
made by the Trustors of Trust assets shall constitute a
revocation by the Trustors as to such property, and,
therefore, a gift by any Trustor having an interest in that
property would also constitute a revocation.

## II.  ORIGINAL AND SUCCESSOR TRUSTEES

### A.  Original Cotrustees

The Original Cotrustees under this Declaration of
Trust shall be as hereinabove defined, to serve with all of
the obligation, powers, and authority contained within this
Trust Agreement.

### B.  Death or Resignation of Original Cotrustee

In the event of the death of either Original
Cotrustee, or if for any reason whatsoever he or she ceases
to serve as Cotrustee hereunder, the Trustors nominate and
appoint the remaining Cotrustee to serve as Trustee hereunder
without the approval of any Court.

In the event of the death of both Original
Cotrustees, or if for any reason whatsoever both cease to
serve as Trustee hereunder, the Trustors nominate and appoint
the Successor Trustee as hereinabove defined to serve as
Trustee hereunder without the approval of any Court.  In the
event that the abovenamed Successor Trustee consists of more
than one person then if for any reason whatsoever any of the
aforesaid do not serve or cease to serve as Cotrustee
hereunder, the Trustors nominate and appoint whomsoever of

REVOCABLE LIVING TRUST Page 3

the aforenamed shall be available to serve as Successor
Trustee hereunder without the approval of any court.

In the event of the death of the Successor Trustee
as hereinabove defined, or if for any reason whatsoever he,
she, or they cease(s) to serve or for any reason refuses to
serve as Trustee hereunder, the Trustors nominate and appoint
the designated Alternate Trustee to serve as Trustee
hereunder without the approval of any Court.  In the event
that the Alternate Trustee consists of more than one person
then if for any reason whatsoever any of the aforesaid do not
serve or cease to serve as Cotrustee hereunder, the Trustors
nominate and appoint whomsoever of the aforenamed shall be
available to serve as Successor Trustee hereunder without the
approval of any court.

In the event of the death of the Original Trustors
hereof, and in the event that neither the aforenamed
Successor Trustee or the aforementioned Alternate Trustee is
available then the majority of then living beneficiaries
hereunder who are issue of the Original Trustors hereof shall
have the right to select another Successor Trustee hereunder
to serve without approval of any court.  In the case of minor
beneficiaries, then any guardian of such a beneficiary shall
act on behalf of such minor beneficiary to select a Successor
Trustee.

   C.  Discharge or Resignation of Trustee

The Trustors shall have the right to discharge the
Trustee of any Trust hereunder.  Discharge of a Trustee shall
be by delivery to such Trustee of thirty (30) days' written
notice of discharge, accompanied by the name of the intended
Successor Trustee.

   D.  Duties and Responsibilities of Successor Trustees

No Successor Trustee shall have any responsibility
for any acts or omissions of any prior Trustee and no duty to
audit or investigate the accounts or administration of any
such Trustee; nor, unless in writing requested to do so by a
person having a present or future beneficial interest under a
Trust hereunder, any duty to take action to obtain redress
for breach of trust.  It is the intent of the Original
Trustors that the Successor Trustee shall not be required to
obtain Court approval, discharge, or pursue any other Court
proceedings at the request of income Beneficiaries without
first attempting to obtain releases from the majority of the
adult income Beneficiaries with such release and discharge
being completely adequate as to all responsibilities

incumbent upon the Trustee. However, under any
circumstances, any claim or action against any previous
Trustee must in any event be asserted or filed by any
Beneficiary within one (1) year after the appointment of a
Successor Trustee.

    E.  Bond

      No Trustee shall be required to post bond or any
other security for the faithful performance of any duties or
obligations of such office.

## III. INITIAL TRUST

      The Trustee shall hold, manage, invest, and reinvest the
Trust Estate and shall collect the income thereof, and shall,
upon demand of the Trustors, pay to the Trustors during their
joint lives all community net income of the Trust Estate and
shall pay to each Trustor all separate net income from his or
her respective share of the Trust Estate.  In the event that
the Trustors do not demand payment of the net income of
community property, or if either of the Trustors fails to
demand distribution of separate property net income, then the
Trustee may at his discretion accumulate such income, and
such income will become property of the Trust Estate.

      The Trustee shall further pay community property
principal, up to the whole thereof, to the Trustors upon
written request.  Upon the written request of the Trustor who
transferred separate estate property to the Trust, the
Trustee shall pay so much of the principal of the separate
estate established by such Trustor, up to the whole thereof,
as he or she shall request.

## IV. REVOCATION AND AMENDMENT

      Either of the Trustors, during their joint lives, may at
any time and upon successive occasions, revoke this Trust in
whole or in part.  The Trustors may jointly alter or amend
any of its provisions.  Any Amendment may be similarly
cancelled or amended.  If a Trustor is incompetent, such
power to revoke, alter or amend the Trust may be exercised by
the guardian or conservator at the direction of a Court of
competent jurisdiction where such court approval is required.

      From and after the death of either of the Original
Trustors, this Agreement, insofar as it relates to the
SURVIVOR'S TRUST, may be revoked or amended at any time and
from time to time by the Survivor delivering written notice
of revocation or amendment to the Trustee; provided, however,

<div align="center">REVOCABLE LIVING TRUST Page 5</div>

that the duties and liabilities of the Trustee cannot be
increased without its consent.  In the event of any
revocation, the revoking party or parties shall indemnify the
Trustee in a manner satisfactory to it against liabilities
lawfully incurred by the Trustee in the conduct of its
office.  If a Survivor is incompetent, such power to revoke,
alter or amend the Trust may be exercised by the guardian or
conservator at the direction of a Court of competent
jurisdiction.   Except as hereinabove provided, this
Agreement, and the Trusts evidenced hereby, are irrevocable
and shall not be subject to amendment.

V.    DISTRIBUTIONS ON DEATH OF EITHER TRUSTOR

Upon the death of the Original Trustor hereof whose
death shall occur first, the Trustee shall make any such
distributions of specific gifts which are itemized and listed
on Schedule D (the Specific Gift Distribution Schedule) which
is attached hereto and incorporated herein by reference.
With reference to any specific gifts made in accordance with
Schedule D, whether referenced in this Article V or Article
VI below, the following shall apply.  In the event that a
Beneficiary does not survive the decedent spouse, any gift to
the deceased Beneficiary shall lapse and pass as part of the
rest and residue of the Trust Estate.

Thereafter, the Trustee shall divide the Trust Estate,
including all property received as a result of the Decedent's
death, into two parts, each part to be administered as a
separate Trust to be known respectively as the "SURVIVOR'S
TRUST," and the "DECEDENT'S TRUST."  Reference hereafter to
the "DECEDENT" shall refer to either of the Trustors whose
death shall first occur, and reference to the "SURVIVOR"
shall refer to the Surviving Trustor.

A.  Decedent's Trust

The DECEDENT'S TRUST shall include an amount equal
to the lesser of the equivalent Estate Tax Exemption in
effect during the year of the death of the decedent, or one-
half (1/2) of the Trust Estate.

As a method of illustration of specific amounts for
the Estate Tax Exemption, the Trustee is directed to

REVOCABLE LIVING TRUST Page 6

distribute to the DECEDENT'S TRUST an amount equal, in each year, to the amounts as indicated below.

| DATE OF DEATH | EQUIVALENT ESTATE TAX EXEMPTION |
|---|---|
| 1990 and after | $600,000 |

In determining the equivalent Estate Tax Exemption, the Trustee is to take into consideration any lifetime gifts made which may decrease the actual amount available to transfer to the DECEDENT'S TRUST. The Trustors acknowledge that their intent is that the amount to be distributed to the DECEDENT'S TRUST shall not exceed an amount which will provide for a zero (0) tax upon the death of the first of the Trustors to die.

**B. Survivor's Trust**

All of the rest and residue of the assets of the Trust Estate shall be allocated to the SURVIVOR'S TRUST.

**C. Other Transfers**

In the event that property is received by the Trustee, either by Inter Vivos or Testamentary Transfer, and directions are contained in the Instrument of Transfer for allocation to or between the SURVIVOR'S TRUST and the DECEDENT'S TRUST, than the Trustee shall make allocation in accordance with such directions, anything to the contrary notwithstanding. In the event no specific instructions are given as to allocation, such property as is received from a source other than the Trustors (or either of them), shall be placed in the SURVIVOR'S TRUST.

**VI. SURVIVOR'S TRUST**

**A. Distribution of Income**

All the net income shall be distributed in convenient installments not less frequently than quarterly to the Survivor during his or her lifetime.

**B. Powers of Appointment of Principal**

During his or her lifetime, the Survivor shall have a general power to appoint the principal and any undistributed income of the SURVIVOR'S TRUST or any part thereof, to himself or herself, or to any person or persons.

REVOCABLE LIVING TRUST Page 7

Upon the death of the Survivor, he or she shall have the power to appoint the principal and any undistributed income of the SURVIVOR'S TRUST or any part thereof to his or her Estate or any person or persons, or to the DECEDENT'S TRUST. Such power of appointment shall be exercised only by means of written directions executed by the Survivor and delivered to the Trustee during the lifetime of the Survivor. If the Survivor executes and delivers more than one such written direction to the Trustee, the last one shall control unless, by its context, the Survivor clearly indicates otherwise.

C.  Death of Survivor

Upon the death of the Survivor, the SURVIVOR'S TRUST shall terminate.  The Trustee shall distribute the Trust Estate in accordance with and to the extent provided by the Survivor's exercise of his or her power of appointment.  All specific gifts itemized and listed on Schedule D hereof to be distributed by the Trustee at that time shall then be distributed by the Trustee.  Any part of the Trust Estate with respect to which the Survivor shall not have exercised his or her power of appointment shall become a part of the trust established under Article VIII hereof, and be administered by the Trustee, in accordance with the provisions set forth herein.

VII. DECEDENT'S TRUST

A.  Distribution of Income

All of the net income shall be distributed in convenient installments, not less frequently than quarterly, to the Survivor during his or her lifetime.

B.  Distribution of Principal

The Trustee shall also distribute principal to the Survivor, which in the sole discretion of the Trustee is necessary to provide proper support for the Survivor as defined under Article IX and Article XXII. A.2.

C.  Survivor's Power of Appointment

The Survivor, during his or her lifetime, shall have the power to appoint the principal and undistributed income of the Trust Estate, or any part thereof, to himself or to herself, or to any person or persons; however, the Survivor may exercise said power of appointment during any calendar year only to the extent of Five Thousand Dollars ($5,000) or

REVOCABLE LIVING TRUST Page 8

five percent (5%) of the aggregate value of the Trust Estate, whichever amount shall be greater. Any such power of appointment shall not be construed to be cumulative and if not exercised in any calendar year, such power shall be terminated as to that year. Such power of appointment shall be exercised only by means of written direction executed by the Survivor and delivered to the Trustee during the lifetime of the Survivor. If the Survivor executes and delivers more than one such written direction to the Trustee, the last one shall control unless, by its context, the Survivor clearly indicates otherwise.

D. Death of Survivor

Upon the death of the Survivor, the DECEDENT'S TRUST shall terminate, and shall become a part of the Trust created under Article VIII, and be administered in accordance with the provisions of said Article.

VIII. CHILDREN'S TRUST

A. Income and Principal Prior to Division

Prior to division of the Children's Trust as provided for in Paragraph C hereinafter, the Trustee is directed to add any undistributed income to the principal.

B. Advancements

1. Request for Advancements

Any Beneficiary of this Trust may, at any time, and upon successive occasions, by written instrument filed with the Trustee, request an advancement or advancements on his or her ultimate anticipated share of the Children's Trust. If, in its sole discretion, the Trustee determines that the requested advancement or advancements will be used for a worthy objective then the Trustee may make such advancement or advancements in whole or in part from the Beneficiary's share of the Trust. As used herein, the term "worthy objectives" may include, but not be limited to, the purchase of a home appropriate to the needs and circumstances of the Beneficiary; the acquisition of a business interest in keeping with the age, training and experience of the Beneficiary, provided that such business interest is needed for the support of the Beneficiary and his or her family, and further provided that there is a reasonable probability of success in the judgment of the Trustee; and the continuance of the education of any Beneficiary on a full-time program in an institution of higher learning either on an undergraduate

REVOCABLE LIVING TRUST Page 9

or graduate level or at a trade or vocational school, with expenses including, but not limited to, tuition, books, laboratory fees, room, board and a reasonable spending allowance. The Trustee shall incur no liability or obligation to any Beneficiary or any other person by an exercise, or nonexercise, in good faith of its discretion hereunder.

    C.   Division of Children's Trust

       1.   Time of Division

         The Children's Trust shall be divided into shares immediately upon the death of the survivor of the Original Trustors.

       2.   Terms of Division

         The Trustee shall divide two-thirds of all of the assets then remaining in the Children's Trust, without making any adjustments for payments for support and maintenance for any Beneficiary as provided for under Article X, into equal shares with one share for each of the Trustors' then living children and one share for each deceased child of the Trustors who then has issue surviving. The sole children of the Trustors are YAACOV a.k.a. JACOB VENDRIGER and ADI VENDRIGER.

         The Trustee shall divide the remaining one-third of the Trust Estate into as many shares as there are then living grandchildren. The share arising out of the existence of each grandchild shall be added to the share of the parent of such grandchild for the benefit of said parent.

         The division shall be on a per stirpes basis, except that if none of the Trustors' children survive and if only grandchildren survive, the division into shares shall be on a per capita basis. The share of each deceased child shall be divided into proportionate smaller shares, or subshares, for each of such deceased child's then living issue. After the division of the assets into shares and subshares as provided above, the shares shall be distributed and/or held as hereinafter provided.

    D.   Distribution and Administration of Children's Trust

         The Trustee shall distribute the respective share or subshare to any Beneficiary who is a child of the Trustors immediately upon the death of the Survivor of the Trustors.

Trustee shall distribute the respective share or subshare to any Beneficiary who has attained the age of thirty years old. For any Beneficiary who has not attained the age of 30, the following procedures shall govern.

Upon the division of the Children's Trust into shares and subshares and subsequent thereto; income from each share or subshare therefrom shall be paid not less than quarter-annually to or for the benefit of the respective Beneficiary. In addition to income, the Trustee shall distribute the principal from the respective share or subshare to the Beneficiary upon the Beneficiary's attaining or having attained the age of 30.

In the event a Beneficiary of the Trustors dies with funds remaining in his or her share or subshare, then such funds shall be paid to his or her then living issue, or if there be no living issue, then to the remaining Beneficiaries of the Trustors, as and in the manner provided for under "Terms of Division."

In the event a Beneficiary elects to have the Trustee continue to administer the distributed portion of the share or subshare, to which such Beneficiary is entitled as hereinbefore provided, or any part thereof, the Trustee may continue to administer such Beneficiary's interest as a separate Trust share in accordance with the terms of Article X and XI hereof, subject to the continuing right of such Beneficiary to withdraw at any time the amounts of said separate Trust share. If a Beneficiary dies with funds remaining in his or her separate Trust share, such funds shall be paid as he or she designated by testamentary or inter vivos disposition, and failing same, to his or her estate. Upon the termination of any share, if any assets are distributable to a person who is not yet entitled to distribution, then the distributable share of such Beneficiary shall at once vest in him or her, but the Trustee in its sole discretion, may continue to hold such distributable share until said Beneficiary is entitled to distribution, using so much of the income and/or principal thereof as may be necessary in the opinion of the Trustee for the support of such beneficiary and paying to such Beneficiary the then remaining assets of his or her share upon his or her becoming entitled to distribution. If the said Beneficiary dies prior to such time as he or she would be entitled to distribution, all the remaining assets of such individual's interest in the Trust share otherwise payable to him or her shall be paid to the estate of such Beneficiary.

REVOCABLE LIVING TRUST Page 11

E. Provision for Grandchildren

If, prior to the termination of the Children's Trust, any of the Trustors' children are deceased with issue surviving, then the Trustee may, in its discretion, support such issue of deceased children as though they were children of the Trustors.

F. Termination

1. No Issue Surviving

In the event that no issue of the Trustors survive the Trustors' deaths, or survive the distribution of the Trust Estate, then and in that event all of the assets that would have been a part of the Trust Estate shall be distributed in the following manner: any assets of the Trust Estate which for any reason cannot be distributed in this manner shall be distributed fifty percent to the otherwise lawful heirs free of trust and fifty percent to charitable facilities in Israel for the benefit of injured soldiers.

2. Discretionary Termination

Any time that a Trust or Trust share created under this Agreement has, in the judgment of the Trustee, a value so low that the expenses of maintaining the Trust cannot be reasonably justified, the Trustee may, in its discretion, but is not required to, terminate such Trust or Trust share. In case of such termination, the Trustee shall distribute forthwith the share so terminated to the primary Beneficiaries thereof.

3. Mandatory Termination

The Trust Estate shall terminate in any and all events not later than twenty-one (21) years after the death of the last surviving Beneficiary herein named who is living at the time of death of the Decedent, it being the intent of the Trustors that this Trust Agreement shall be interpreted so as not to violate the Rule Against Perpetuities. The Trust Estate, upon such termination, shall be distributed to the Beneficiaries for whom, at that time, a share or subshare has been set aside, each such Beneficiary to receive his or her share or subshare and any accumulations thereon.

IX. SUPPORT AND MAINTENANCE

If the Trustee of any Trust hereunder deems the net income payable from such Trust not sufficient to support any

Beneficiary entitled to receive such support pursuant to the terms of this Trust Agreement, then the Trustee may, as often as it deems necessary, pay to or apply for the use and benefit of such Beneficiary such part of the principal of such Trust, up to and including the whole thereof, as the Trustee in its discretion believes necessary for the support of such Beneficiary.

A.  Standards

In exercising its discretion hereunder, the Trustee shall take into consideration the income, earning capacity, resources and other sources of receipt of the Beneficiary, together with any other factor which the Trustee may deem pertinent, including the accustomed manner of living of such Beneficiary, but need not require the exhaustion of personal resources as a condition for making disbursements under the authority of this paragraph.  The judgment of the Trustee as to the propriety and amount of all such payments shall be conclusive.

Notwithstanding any provision to the contrary, the Trustee shall not distribute principal except within the standards of Internal Revenue Code 2041.

B.  Evidence of Need

The Trustee may, in its discretion, require as a condition precedent to the distribution of any Trust assets for support or advancement, that the Beneficiary furnish evidence of his or her financial condition, income, earning capacity and assets, in form and content satisfactory to the Trustee. The Trustee shall be entitled to rely upon the written certification of such Beneficiary or the guardian of such Beneficiary as to the nature and extent of such Beneficiary's needs for support, and the inadequacy of such Beneficiary's resources apart from the Trust. The Trustee shall not be required to make further inquiry as to the authenticity of the facts so certified.

C.  Preferences

In exercising its discretion hereunder, the Trustee is to consider the needs of the Survivor for support as the primary purpose of the Trusts during his or her lifetime, even if the satisfaction of such needs requires invasion of the entire Trust Estate.

After the death of the Survivor, the support of the children shall be paramount to the conservation of the Trust

Estate for the benefit of those who will be entitled to take
it on termination.  The Trustee shall, in exercising the
discretion given herein for the benefit of the children or
their issue, do so in such a manner as will encourage thrift,
industry, and self-reliance to the maximum extent practicable
by the respective Beneficiaries, and discourage extravagance
or indolence on the part of any such Beneficiary.

### D.  Guardian's and Conservator's Expenditures

The Trustors do not desire that the guardian or
Conservator of any Beneficiary should incur personal expense
for the support of such Beneficiary.  The Trustee shall
disburse funds from such Beneficiary's Trust Estate for the
purpose of reimbursing such guardian or conservator for
reasonable expenses incurred in accommodation of such
Beneficiary.

### X.  POWERS OF TRUSTEE

The Trustee shall have the following powers, duties and
discretions in addition to those otherwise granted herein or
by law, and except as elsewhere herein specifically
restricted.

### A.  Retention

The Trustee shall have the power to retain, without
liability for loss or depreciation resulting from such
retention, the original assets and all other property
hereafter transferred, devised or bequeathed to the Trustee,
although such property may not be of the character prescribed
by law or by the terms of this instrument for the investment
of other Trust assets; and, although it represents a large
percentage or all of the Trust Estate, this said original
property may accordingly be held as a permanent investment.

The Trustee shall have the power, with respect to
any business interest that may become a part of the Trust
Estate, whether organized as a sole proprietorship,
partnership, or corporation, and upon such terms for such
time and in such manner as it may deem advisable, to hold,
retain and continue to operate such business solely at the
risk of the Trust Estate and without liability on the part of
the Trustee for any losses resulting therefrom; to dissolve,
liquidate, or sell at such time and upon such terms as the
Trustee may deem advisable; to incorporate such business and
hold the stock as an asset of the Trust Estate; to use the
general assets of the Trust for the purpose of the business;
to borrow money for business purposes and pledge or encumber

REVOCABLE LIVING TRUST Page 14

the assets of the business or the other assets of the Trust
Estate to secure the loan; to employ such officers, managers,
employees or agents as it may deem advisable in the
management of such business, including electing directors,
officers, or employees of the Trustee to take part in the
management of such business as directors or officers.

B.  General Property Powers

        The Trustee shall have all such powers and is
authorized to do all such acts, take all such proceedings and
exercise all such rights and privileges in the management of
the Trust Estate as if the absolute owner thereof, including,
without limiting the generality of the terms, the right to
manage, control, sell, convey, exchange, partition, assign,
divide, subdivide, improve, or repair; to grant options and
to sell upon deferred payments; to lease for terms within or
extending beyond the duration of the Trust concerned for any
purpose, including the exploration for and removal of oil,
gas and other minerals; to enter into community oil leases,
pooling and unitization agreements; to create restrictions,
easements and other servitudes; to compromise, arbitrate or
otherwise adjust claims in favor of or against the Trust; to
institute, compromise and defend actions and proceedings at
the expense of the Trust Estate; and to carry such insurance
as the Trustee may deem advisable.

C.  Powers Regarding Securities

        The Trustee shall have, respecting securities, all
the rights, powers and privileges of an owner, including the
right to vote stock, give proxies, pay assessments and other
sums deemed by the Trustee to be necessary for the protection
of the Trust Estate; to participate in voting trusts, pooling
agreements, foreclosures, reorganizations, consolidations,
mergers and liquidations, and in connection therewith, to
deposit securities with and transfer title to any protective
or other committee under such terms as the Trustee may deem
advisable; to exercise or sell stock subscription or
conversion rights; to open an account with a brokerage firm
of the choosing of the Trustee in the Trustee's name, in its
own behalf for the purpose of purchasing and selling of all
kinds of securities and authorizing such brokerage firm to
act upon any orders, including margin orders, options, both
covered and uncovered, instructions with respect to such
accounts and/or the delivery of securities or money therefrom
and received from said Trustee; and to retain as an
investment any securities or other property received through
the exercise of any of the foregoing powers.  The Trustee is
further authorized to sign, deliver and/or receive any

documents necessary to carry out the powers contained within this paragraph.

    D.  Exercise Stock Options

        The Trustee is expressly authorized in the Trustee's sole discretion to exercise any option to purchase stock under any stock option purchase plan in which any Decedent Beneficiary is a participant or may hold such option rights to the extent that any such option rights may be exercised by the Trustee even though the stock involved is stock of a corporation which may be serving as corporate Trustee hereunder, regardless of the amount of such stock or the percentage of the Trust Estate which may be invested in such stock before or after any purchase under such option.

    E.  Investment Powers

      1.  General

        The Trustee has the power to invest and reinvest principal and income, to purchase or acquire therewith every kind of property, real, personal or mixed, and every kind of investment, specifically including, but not by way of limitation, shares in one or more mutual funds, in any Common Trust Funds administered by the Trustee, corporate obligations of every kind, and stock, preferred or common, which persons of prudence and discretion and intelligence acquire for their own accounts.

        The Trustee is further authorized to buy, sell and trade in securities of any nature (including short sales) on margin, and for such purposes may maintain and operate margin accounts with brokers, and may pledge any securities held or purchased by him with such brokers as security for loans and advances made to the Trustee.

      2.  Life Insurance and Annuities

        The Trustee is authorized in the Trustee's discretion to maintain and/or purchase policies of life insurance and/or annuities on the life or for the benefit of any Trust Beneficiaries and to hold and pay for the same as an investment and asset of the Trustee, at any time and upon successive occasions, the premiums to be charged against income or principal, as the Trustee shall determine.

        The Trustee shall have the following powers, duties and discretions with respect to policies of life insurance held as a part of the Trust Estate:

<div align="center">REVOCABLE LIVING TRUST   Page 16</div>

a.    The Trustee may pay premiums, assessments or
other charges with respect to such policies together with all
other charges upon such policies or otherwise required to
preserve them as binding contracts, but shall be under no
duty to do so.

b.    In the event that the Trustee intends not to
pay any premium, assessment or other charge with respect to
any policy held by it, or otherwise intends to cancel,
convert or substantially modify any such policy, it shall
first give the insured, or the guardian of the person of an
insured under disability, at least fifteen (15) days' advance
written notice of its intention to take such action.

c.    Any amounts received by the Trustee with
respect to any policy as a dividend shall be treated as
principal.

d.    Upon the receipt of proof of death of any
person whose life is insured for the benefit of any Trust
hereunder, or upon maturity of any policy payable to a
Trustee prior to the death of the insured, the Trustee shall
collect all sums payable with respect thereto and shall
thereafter hold such sums as principal of the respective
Trust Estate, except that any interest paid by the insurer
for a period subsequent to maturity shall be considered as
income.

e.    The Trustee may accept any payments due it
under any settlement arrangement made before or after the
death of the insured and may exercise any rights available to
it under such arrangement.

f.    The Trustee may compromise, arbitrate or
otherwise adjust claims upon any policies, and may, but shall
not be required to exercise any settlement options available
under such policies.  The receipt of the Trustee to the
insurer shall be a full discharge and the insurer is not
required to see to the application of the proceeds.

F.    Determination of Income and Principal

The Trustee shall have the power and the authority
to determine income and principal, and how receipts and
disbursements, including the fees of the Trustee, shall be
credited, charged or apportioned as between income and
principal; however, all such determination shall be made in
accordance with the law of the state of the situs of the
Trust and the decision and the accounts of the Trustee in

REVOCABLE LIVING TRUST   Page 17

accordance with said provisions shall be binding on all
persons in interest.

Notwithstanding the foregoing, the Trustee shall:
(1) allocate to principal all dividends or other payments
made by any corporation or mutual investment company that are
designated by the company as a distribution of capital gains;
(2) where a premium has been paid or a discount received in
connection with the purchase of a bond, amortize such premium
or discount by making an appropriate charge or credit to
income as the case may be; and (3) charge income from time to
time with a reasonable reserve for (a) depreciation of all
income-producing depreciable real or personal property, and
capital improvements and extraordinary repairs on income-
producing property; (b) depletion of all depletable natural
resources; and (c) all intangible property having a limited
economic life.  Such allocations and charges need not be
made, however, if written consents are obtained from all
income Beneficiaries and remaindermen, vested or contingent,
living and competent to act.

G.  Authority to Borrow and Encumber

Trustee shall have the power to borrow money for any
Trust purpose upon such terms and conditions as the Trustee
may deem proper, and to obligate the Trust Estate for
repayment and to encumber the Trust Estate or any of its
property by mortgage, deed of trust, pledge or otherwise,
using such procedure to consumate the transaction as the
Trustee may deem advisable.

In addition to the power to encumber property for a
loan bring made to the Trust, the Trustee is specifically
authorized and empowered to obligate, hypothecate and
encumber the estate by mortgage, deed of trust, pledge or
otherwise, or whatever form the Trustee deems appropriate, or
to act as a third party guarantor to guarantee private
borrowings of the Trustors or either of them during their
joint lifetime.  Upon the death of the decedent, such
guarantee may only be made from the Survivor's Trust.

H.  Loans

1.  To Trust

The Trustee shall have the power to, in the
Trustee's discretion, advance funds to any Trust herein
created for any Trust purpose, such advances with interest at
current rates to be a first lien on and be repaid out of
principal and as an expense of the Trust; and to reimburse

REVOCABLE LIVING TRUST    Page 18

the Trustee from principal or accumulated income for any loss
or expense incurred by reason of the Trustee's ownership or
holding of any property in this Trust.

2.  To Beneficiaries

The Trustee may, at any time and upon successive
occasions, loan such sums to the Beneficiaries or any of them
as the Trustee shall deem advisable and in the best interest
of the Beneficiaries, such loan or loans, if made, to bear
interest at the prevailing rate and to be unsecured or
secured, as the Trustee may, in the Trustee's discretion,
direct.  Provided, however, that the Trustee shall have wide
discretion in the making or denial of any such loan, and the
Trustee's judgment in the matter shall be conclusive and
binding on any Beneficiary requesting any such loan.

I.  Distributions to or for Minor or Incompetent

If at any time any Beneficiary entitled to receive
income and/or principal hereunder shall be a minor or an
incompetent or a person whom the Trustee deems to be unable,
wisely or properly, to handle funds if paid to him or her
directly, the Trustee may make any such payments, in the
Trustee's discretion, in any one or more, or any combination,
of the following ways:

1.  Directly to such Beneficiary, or

2.  To the natural guardian or the legally appointed
guardian, conservator or other fiduciary of the person or
estate of such Beneficiary, or

3.  To any person or organization furnishing support
for such Beneficiary, or

4.  By the Trustee retaining the principal and
making expenditures directly for the support of such
Beneficiary.

The Trustee shall not be required to see to the
application of any funds so paid or applied, and the receipt
of such payee if disbursed for such purpose in the best
judgment of the Trustee shall be full acquittance to the
Trustee.  The decision of the Trustee as to direct payments
or application of funds in the manner herein prescribed shall
be conclusive and binding upon all parties in interest if
made in good faith.  The Trustee is requested to make all
such disbursements in a way calculated to dispense with the
necessity of guardianship proceedings.

REVOCABLE LIVING TRUST  Page 19

The Trustee may, in its sole and absolute discretion, require such reports and take such steps as it may deem requisite to assure and enforce the due application of such money to the purposes aforesaid.

J.  Disbursement for Funeral and Last Illness

The Trustee may pay for the last illness, funeral and burial expenses of either Trustor or of any other Beneficiary of this Trust unless adequate provision shall have been made therefor through his or her Probate Estate or otherwise.

K.  Notification of Trustee

Until the Trustee shall receive written notice of any birth, marriage, death, or other event upon which the right to payment from this Trust may depend, the Trustee shall incur no liability for disbursements or distributions made or omitted in good faith.

L.  Division of Trusts

In making the distributions to any Trust or share created under this Agreement, the judgment of the Trustee concerning the valuation of assets distributed shall be binding and conclusive upon all Beneficiaries.  The Trustee may distribute the shares to the various Trusts or to Beneficiaries by making distribution in cash, or in kind, or partly in cash and partly in kind, or in undivided interests, in such manner as the Trustee, in its sole and absolute discretion, deems advisable.  The Trustee may sell such property as it deems necessary to make any such division or distribution.  The Trustee shall not be required to make physical division of the Trust property, except when necessary for the purposes of distribution, but may, in the Trustee's discretion, maintain and keep the assets of any separate trusts in one or more consolidated trust funds, and as to each consolidated trust fund, the division into various shares comprising such trust fund nsed to be made only upon the Trustee's books of account, in which each separate trust shall be allotted its proportional share of the principal and income of the consolidated fund and shall be charged with its proportionate part of expenses thereof.

M.  Provision for Taxes

Upon the death of either Trustor or of any other Beneficiary, any estate, inheritance, succession or other

REVOCABLE LIVING TRUST  Page 20

death taxes, duties, charges or assessments, together with
interest, penalties costs, Trustee's compensation and
attorney's fees which shall become due by reason of the Trust
Estate or any interest therein being includable in the Estate
of either Trustor, or of such other Beneficiary, for such tax
purposes, may be paid from the Trust Estate by the Trustee,
in its discretion, unless other adequate provision shall have
been made therefore.  Any such payments shall be charged to
the principal of the Trust Estate.  The Trustee may make such
payments directly, or to the Executor or other fiduciary of
the Trustors or such other Beneficiary, and may rely upon the
written statement of such fiduciary as to the amount and
propriety of such taxes, interest, penalties and other costs.
The decision of the Trustee as to any such payments shall be
conclusive and binding upon all parties interested in this
Trust or such Estate.  If the Trust Estate shall be then
insufficient or if it be then terminated the Trustee shall be
reimbursed by the persons to whom the Trust Estate shall have
been distributed, to the extent of the amount received by
each distributee.  The Trustee, before making any
distribution of either income or principal, may accordingly
require a refunding agreement or may withhold distribution
pending determination or release of any tax lien.

        The Trustee is authorized to acquire by purchase,
exchange or otherwise, property, real, personal or mixed.,
from the Executor or Administrator of the Estate of any
Beneficiary of this Trust, even though such property may not
be of a character prescribed by law or by the terms of the
Trust instrument for the investment of Trust funds, and
although the acquisition of such property may result in a
large percentage or all of the Trust Estate being invested in
one class of property.  The Trustee is expressly authorized
to retain the property so acquired so long as it shall deem
this advisable and to make secured or unsecured loans to the
Executor or Administrator of such Estate upon such terms as
the Trustee shall deem advisable, such procedures being
authorized to the extent that they do not adversely affect or
diminish the marital deduction available to the Estate.  Such
purchases or loans shall be without liability to the Trustee
for loss resulting to the Trust Estate therefrom.  In any
dealings with the fiduciary of the Estate, the Trustee may
rely upon the statement of such fiduciary as to all material
facts.

        Any portion of the Trust Estate which was received
from any qualified plan as described in Section 2039 of the
Internal Revenue Code of 1954, as amended, or any subsequent
like or similar law, may not be used for any purpose
described in this Article, which would result in inclusion of

REVOCABLE LIVING TRUST  Page 21

said funds in the taxable Federal Estate of the Trustor so long as other sources of funds are available.

If the Trustee considers that any distribution from a Trust hereunder other than pursuant to a power to withdraw or appoint is a taxable distribution subject to a generation-skipping tax payable by the distributee, the Trustee shall augment the distribution by an amount which the Trustee estimates to be sufficient to pay the tax and shall charge the same against the Trust to which the tax relates.  If the Trustee considers that any termination of an interest in or power over Trust property hereunder is a taxable termination subject to a generation-skipping tax, the Trustee shall pay the tax from the Trust property to which the tax relates, without adjustment of the relative interests of the Beneficiaries.  If the tax is imposed in part by reason of Trust property hereunder and in part by reason of other property, the Trustee shall pay that portion thereof which the value of the Trust property bears to the total property taxed, taking into consideration deductions, exemptions, and other factors which the Trustee deems pertinent.

N.    Payment of Trust Expenses

The Trustee shall have the authority to pay all costs, charges and expenses of the Trust Estate, together with reasonable compensation for the Trustee's services hereunder, including services in whole or partial distribution of the Trust Estate; and to employ and compensate from the Trust Estate such agents, assistants and attorneys as in the Trustee's judgment shall be necessary to protect and manage the Trust property.

O.    Estate Settlement

The Trustee is hereby requested to direct any legal questions or requirements concerning settlement of this Trust Estate to Stewart Levin, the Trustor's legal counsel.

P.    Right of Trustee to Probate Trust Assets

Notwithstanding any other provisions of this Trust Agreement, the Trustee may, in its sole discretion, direct the Executor of the Will of either or both of the Trustors, to subject up to and including all Trust assets to the jurisdiction of the Probate Court as if no living transfers had been made to the Trust.

REVOCABLE LIVING TRUST  Page 22

Q.  Power of Cotrustees To Act Independently

        Notwithstanding any other provision to the contrary,
the Trustors specifically authorize only either of the
original Cotrustees during their joint lives and while
serving as Cotrustees, to act independently of the other and
have the authority to perform all powers and acts as granted
under this Declaration of Trust, except as affects an
interest in real property, by example, but not limited
thereto, to sell, transfer, assign, mortgage, hypothecate or
otherwise encumber the real property of the Trust Estate,
which will necessitate the concurrence of both Original
Cotrustees as long as both are alive.

        Notwithstanding any other provision to the contrary,
the Trustors specifically do not authorize any Successor
Cotrustees during their joint lives and while serving as
Cotrustees, to act independently of the other with respect to
performance of any and all powers and acts as granted under
this Declaration of Trust.

R.  Commence or Defend Litigation

        The Trustee may commence or defend such litigation
with respect to the Trust or any property of the Trust Estate
as the Trustee may deem advisable at the expense of the
Trust.

S.  Compromise Claims

        The Trustee may compromise or otherwise adjust any
claims or litigation against or in favor of the Trust.

T.  Adjustment for Tax Consequences

        The Trustee shall have the power, in the Trustee's
absolute discretion, to take any action and to make any
election to minimize the tax liabilities of this Trust and
its Beneficiaries and to allocate the benefits among the
various Beneficiaries and to make adjustments in the rights
of any Beneficiaries or between the income and principal
accounts, to compensate for the consequence of any tax
election or any investment or administrative decision that
the Trustee believes has had the effect of directly or
indirectly preferring one Beneficiary or group of
Beneficiaries over others.

REVOCABLE LIVING TRUST  Page 23

U.  Budget Income and Expenses

The Trustee shall have the power to budget the estimated annual income and expenses of the Trust or Trust share in such manner as to equalize as far as possible periodic income payments to Beneficiaries.

V.  Interest

The Trustee shall not pay interest on any distributions required to be made in the Trust Agreement.

XI.  REPLACEMENT OF TRUSTEE

During the time that either of the Original Trustees are acting as a Trustee, his or her capacity to continue to so function as a Trustee may be terminated by the written concurrence of the medical physician who is overseeing the general health of that Trustee and the remaining Original Cotrustee or the Successor Trustee who would next be nominated and appointed to serve as Trustee hereunder.  In the event that these two designated parties are in agreement, that one of the Original Trustees or both of them should be removed as a Trustee, they should deliver their recommendation to the Successor Trustee who would next be nominated and appointed to serve as Trustee hereunder, who shall have the authority to then assume full responsibility as Trustee of this Trust.  In the event that said Successor Trustee is unavailable then Alternate Trustee named hereinabove shall provide all functions of said Successor Trustee hereunder and shall serve as Trustee.

XII.  GENERAL PROVISIONS

The administration of any Trust provided for herein shall be subject to the following general provisions.

A.  Supplementary Definitions

1.  Children and Issue

The words "children" and "issue" as used herein shall include natural children and issue of children, and not legally adopted children and the lawful issue of legally adopted children.  The word "living" shall include unborn persons in the persons in the period of gestation.

2.  Support

The term "support" as used herein shall include proper support, maintenance, medical care, and education, including private grade, secondary or high schools, private or public institutions of higher learning at both undergraduate and graduate levels, professional education, vocational and trade schools, depending upon the abilities and ambitions of the respective Beneficiary.

B.  Annual Accounting

The Trustee shall render an annual accounting to the Beneficiary or Beneficiaries of the Trust not more than one hundred twenty (120) days following the close of the fiscal year of the Trust.

C.  Spendthrift Clause

The interests of the Beneficiaries in the principal and/or income of the Trust shall not be subject to the claim or claims of their creditors or others, nor to legal process, and may not be voluntarily or involuntarily alienated or encumbered.

D.  Partial Invalidity

If any provision of this instrument is void, invalid or unenforceable, the remaining provisions shall nevertheless be valid and carried into effect.  If any Trust herein established exceeds the longest permissible period, it shall persist in its period for the longest period permissible, then terminate.

E.  Headings

The headings in this instrument are for convenience only and are not part of the text.

F.  Situs of Trust

The situs of the Trust Estate shall be the state of California.  The situs of the Trust Estate may be transferred from California to such other jurisdiction as the majority of the income Beneficiaries may designate, however, only upon written notice given to the Trustee.

REVOCABLE LIVING TRUST  Page 25

G. Simultaneous Death

If there be no sufficient evidence that the Trustors died otherwise than simultaneously, then for the purposes of this Agreement and the tax effect of this Agreement, it shall be presumed that the Decedent shall be the Husband and the Survivor shall be the Wife.

H. Counterparts

The Agreement may be executed in any number of counterparts and each shall constitute an original of one and the same instrument.

I. Application to Probate Court

If any disputes arise as to interpretation of this Agreement, or there is need to obtain Court approval of any accounting or any interpretation in regard to this Agreement, the Trustors direct the Trustee to make application to the Probate Court, it being the intent of the Trustors that the Probate Court shall not assume continuing jurisdiction, except as may be required by law.

J. Number and Gender

As used in this Trust Agreement, the masculine, feminine and neuter gender, and the plural and singular number shall each be deemed to include the others when the context so indicates.

K. Trust Shares or Subshares

For purposes of simplicity, the Trustors have used in this Trust Agreement the terms "shares" and "subshares." The Trustors intend, however, that each share or subshare shall be a separate Trust.

L. No Contest Provision

If any beneficiary in any manner, directly or indirectly, contests this instrument or any of its provisions, any share or interest in the trust given to that contesting beneficiary under this instrument is revoked and shall be diposed of as if that contesting beneficiary had predeceased the Trustors.

This is to witness that We, the undersigned Trustors, respectively, have read the provisions of this Trust Agreement and understand the provisions therein, and it

REVOCABLE LIVING TRUST   Page 26

is our intent to enter into this Trust Agreement in
accordance with Community Property law, allowing a Husband
and Wife to enter into a contract with each other regarding
community property.

IN WITNESS WHEREOF, the provisions of this
Declaration of Trust shall bind OSCAR WENDRIGER and TANIA
WENDRIGER as Trustors, and OSCAR WENDRIGER and TANIA
WENDRIGER as Cotrustees; Successor Trustees assuming the role
of Trustee hereunder, and the Beneficiaries of this Trust, as
well as their successors and assigns.

Dated at Los Angeles, California,
this 7 day of May, 1990.

TRUSTORS:

_Oscar Wendriger_
OSCAR WENDRIGER

_Tania Wendriger_
TANIA WENDRIGER

COTRUSTEES:

_Oscar Wendriger_
OSCAR WENDRIGER

_Tania Wendriger_
TANIA WENDRIGER

REVOCABLE LIVING TRUST   Page 27

STATE OF CALIFORNIA    )
                       )
COUNTY OF LOS ANGELES  )

    On _____, 1990, before me, the
undersigned, a Notary Public in and for said County and
State, personally appeared OSCAR WENDRIGER and TANIA
WENDRIGER, personally known to me or proved to me on the
basis of satisfactory evidence to be the person(s) whose
name(s) is/are subscribed to the within instrument and
acknowledged that he/she/they executed the same.

    WITNESS my hand and official seal, this _____ day of
_____, 1990.

                              _____
                              Notary Public in and for
                              said County and State

OFFICIAL SEAL
Frances Dauphin Shupin
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My comm. expires AUG 27, 1993

REVOCABLE LIVING TRUST    Page 28

# EXHIBIT B

# EXHIBIT 2

NOTICE OF ERRATA

1  Hon. Glen M. Reiser (Ret.)
   JAMS
2  555 West 5th Street 32nd Floor
3  Los Angeles, CA 90013
   Tel: 213-253-9796
4
   COURT-ORDERED §639 REFEREE
5  ON SETTLEMENT OF ACCOUNT

6

7
                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
8
                              **COUNTY OF LOS ANGELES**
9

10 | IN THE MATTER OF                  | **Case No.: BP136769**[1]
11 | THE FRANKLIN HENRY MENLO
   | IRREVOCABLE TRUST                 | Assigned to LASC Dept. 3
12 | ESTABLISHED                       | Judge: Hon. Ana Maria Luna
13 | MARCH 1, 1983
   |                                   | JAMS Reference # 1220070187
14 | AND CONSOLIDATED MENLO
   | FAMILY TRUST CASES
15 |                                   | **REPORT AND RECOMMENDATION OF THE**
   |                                   | **COURT-APPOINTED REFEREE ON**
16 |                                   | **EXAMINATION AND ADJUDICATION OF**
   |                                   | **THE TRUSTEE'S FIRST, SECOND, AND**
17 |                                   | **THIRD ACCOUNTINGS ON EACH OF THE**
   |                                   | **TWENTY-FOUR TRUSTS AT ISSUE FOR**
18 |                                   | **THE TRUST PERIODS SEPTEMBER 10, 1996-**
   |                                   | **JUNE 30, 2013, JULY 1, 2013-DECEMBER 31,**
19 |                                   | **2016 AND JANUARY 1, 2017-SEPTEMBER 30,**
   |                                   | **2018**
20 |
   |                                   | **[Code Civ. Proc. §639]**
21 |
   |                                   | Referee: Hon. Glen M. Reiser (Ret.)
22 |

23

24

25

26 [1] Consolidated with LASC Case Nos BP139977; BP139978; BP139999; BP140000; BP140001;
   BP140002; BP140003; BP140004; BP140005; BP140007; BP140008; BP140009; BP140010; BP140011;
27 BP140012; BP140013; BP140014; BP140015; BP140016; BP140017; BP140018; BP140019; BP140020;
   and BP154676.
28
                  REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
                                            1

## MATTERS APPLICABLE TO ALL THREE REFEREE'S REPORTS and STATEMENT OF THE CASE

### The Children's Trusts

Sam Menlo ("Sam") and Vera Menlo ("Vera") raised five children: Madeline, Judith, Franklin, Deborah and Norine. In 1983, irrevocable trusts were created for the four oldest children and in 1985, an irrevocable trust was created for Norine.

The named grantor in each of the Children's Trusts is its beneficiary, not Sam or Vera. Under the trust terms, Frank's irrevocable trust, in which he is the named grantor, is to be distributed 25% of trust principal on his 30th birthday (March 1, 1990), 33% on his 35rd birthday (March 1, 1995), and the balance on his 40th birthday (March 1, 2000). Each of the four daughters' irrevocable trusts, in which each of them are the named grantor, is to be distributed 50% of trust principal on their respective 40th birthdays (extending from August 9, 1998 [Madelyn] to April 25, 2006 [Norine]), and 50% on their respective 50th birthdays (extending from August 9, 2008 [Madelyn] to April 25, 2016 [Norine].)[2]

Each of the Children's Trust agreements vests the Trustee with the management rights of an "absolute owner." Each of the Children's Trust agreements exculpates the Trustee from liability for any actions or failures to act of conducted "reasonably and in good faith." Each of the trust agreements authorizes an annual trustee fee of .05% of the sum of trust assets under management and that year's trust income.

The originally appointed co-trustees of the Children's Trusts died long ago. After a brief period of time in which family members, including Frank, served as a co-trustee, **on September 10, 1996**, Leslie Klein ("Klein"), a Beverly Hills estate planning attorney and certified public accountant, accepted his role as sole successor trustee of the Children's Trusts.

---

[2] Judith died on June 15, 2011. Accountings of Judith's trust have not been presented to the Referee nor are they part of the assigned reference determinations.

**The Grandchildrens' Trusts.**

Sam and Vera, both now deceased, had 36 grandchildren at the time of Vera's recent passing. In 1985, several months after the creation of Norine's trust, Sam and Vera had ten grandchildren: Dov Lipchitz, Rochelle Lipchitz, Avi Lipchitz, Faye Lipchitz, Asher Frankel, Yeshaya Frankel, Moishe Frankel, Mordechai Deutsch, Zev Deutsch and Jonathan Menlo. Sam and Vera established an irrevocable trust for each of them in October 1985.

Ten additional grandchildren were born between 1986 and 1993: Jeremy Winter, Michael Winter, Amanda Winter, Daniel Winter, Rochelle Deutsch, Abraham Deutsch, Samuel Deutsch, Esther Deutsch and Tanya Menlo. Sam and Vera established an irrevocable trust for each of them on various dates between November 1986 and October 1997.[3]

A trust also appears to have been created by Sam and Vera in December 2002 in favor of Jonathan Lifschutz, the husband of Sam and Vera's granddaughter, Rochelle Lipchitz. Accountings have been submitted by Klein with respect to Jonathan Lifschutz' trust, and have been the subject of objections included within the reference to the undersigned. The Jonathan Lifschutz Trust dated December 26, 2002 is intended to be included within the term "Grandchildren's Trusts."

Unlike the Children's Trusts, Sam and Vera were the named co-grantors of each of the Grandchildren's Trusts. Though virtually identical to the Children's' Trusts with respect to the breadth of trustee powers, exculpation from good faith actions or failures, and authorization for trustee fees, each of the Grandchildren's Trusts specifically articulates the Trustee's duty to account to each of the beneficiaries "annually or in other reasonable increments."

---

[3] The remaining sixteen grandchildren, all of whom were born after 1993, each have separate trusts managed by Klein; however, none of those remaining trusts are the subject of the instant accounting reference. The term "Grandchildren's Trusts" as used in this Report and Recommendation, therefore, is intended to exclude the trusts of any and all grandchildren born after 1993.

The distributive calculus of the Children's Trusts is replicated in the Grandchildren's Trusts; *i.e.*, 25% principal distribution to the males at age 30, 33% at age 35, the balance at age 40, with 50% principal distribution to the females at age 40 and the balance at age 50.[4]

As with the Children's Trusts, Klein agreed to serve as sole successor trustee of each of the Grandchildren's' Trusts effective September 10, 1996, with the exception of the two subject trusts created after that date, Daniel Winter and Jonathan Lifschutz, as to which Klein accepted the appointment as sole trustee upon trust creation in October 20, 1997 and December 26, 2002, respectively.[5]

**The Accounting Petitions in Their Statutory and Procedural Contexts.**

In 1990, six years before Klein assumed trusteeship of the Children's Trusts and the Grandchildren's Trusts, the California Legislature repealed and then reenacted the California Probate Code. (Stats. 1990, ch.79.) [6] One of the provisions repealed and reenacted is Probate Code §16062(a), which stated at the time of its enactment in 1986:

> "Except as provided in Section 16064, **the trustee shall account at least annually**, at the termination of the trust, and upon a change of trustees, to each beneficiary to whom income or principal is required or authorized in the trustee's discretion to be currently distributed." (Emphasis added.) [7]

---

[4] Klein testified at trial that he has never had any intention of distributing under these terms.

[5] Klein testified at trial that, in addition to being the named Trustee, he was the draftsman of these later trusts.

[6] Section 16062 was added by 1986 Cal. Stat. ch. 820 § 40 and amended by 1987 Cal. Stat. ch. 128 § 13. Subdivision (a) superseded parts of subdivisions (b) and (c) of former Probate Code Section 1120.1a and parts of former Probate Code Sections 1121 and 1138.1(a)(5) (provisions repealed by 1986 Cal. Stat. ch. 820 § 31). The requirement of an annual account is drawn from the statute formerly applicable to testamentary trusts created before July 1, 1977. See former Prob. Code § 1120.1a (repealed by 1986 Cal. Stat. ch. 820 § 31). [California Law Revision Commission, Recommendation Proposing New Probate Code, December 1989.]

The code section preface was amended to state "Except as otherwise provided in this section and in Section 16064" in 1983 when additional code subsections, none of which are applicable here, were added to §16062. [Stats. 1993 ch 293 §6.5.]

[7] Probate Code §16064 permits the language of a trust agreement to waive an accounting, and separately authorizes a beneficiary to waive an account in writing. None of the Children's Trusts or the Grandchildren's Trusts contain language waiving an account. The Grandchildren's Trusts require an

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
4

From the time of Klein's acceptance of 22 trusteeships in 1996, one in 1997, and one in 2002, until ordered by the Court in 2013, Klein never once accounted to any of the 24 beneficiaries.

While Klein did from time-to-time forward institutional brokerage account statements to one or more of the beneficiaries, the brokerage assets represent only a fraction of the scope of the Children's and Grandchildren's Trusts, which trusts were specifically designed to subsidize and ultimately distribute tens of millions of dollars in life insurance policy benefits taken on the joint lives of Sam and Vera Menlo. Insurance policy information, loans between the trusts, and loans and withdrawals taken by Klein utilizing the accounts and insurance policies as collateral, for example, were not provided.

Probate Code §16063(a), enacted in 1997 (Stats 1997 ch 724 §26), clarifies that a trustee's required annual account *must* include a statement of receipts and disbursements of annual principal and income; a statement of the current assets and liabilities of the trust; the trustee's compensation for the last complete fiscal year; the agents hired by the trustee, their relationships to the trustee and their compensation for the last complete fiscal year; a statement that the beneficiary may petition the court under Probate Code §17200 to review the accounting and the acts of the trustee; and a statement of the three-year limitations period to bring an action after receipt of the account. Klein did none of these things beyond periodically forwarding selected banking/brokerage statements.

On September 18, 2012, nearly ten years ago, Franklin Menlo filed a petition in BP136679 attempting to file a single action on behalf of numerous Menlo trust beneficiaries against Klein, seeking Klein's removal as trustee, demanding an accounting and requesting surcharge. Upon a verified October 24, 2012 "preliminary" objection from Klein, *inter alia*, that

---

accounting "annually or in other reasonable increments," thereby providing the trustee with slightly more flexibility in the timing of those accountings than with respect to the Children's Trusts, which contain no accounting language whatsoever, thereby defaulting to the requisite annual requirement of Probate Code §16064. No evidence was submitted that any of the 24 Children's or Grandchildren's Trust beneficiaries ever waived an accounting in writing or otherwise.

a single action involving multiple trusts would be "procedurally impermissible," the Menlo children and grandchildren filed 24 separate verified petitions filed with the Superior Court on March 22, 2013 [see respective case nos. at fn. 1, *ante*].

In their verified petitions, the 24 litigating Menlo children and grandchildren each petitioned to remove Klein as their trustee and for an accounting and surcharge.[8] Each verified petition alleges, at ¶ 11:

> "Respondent Klein, as Trustee of the [Name of Beneficiary] Trust, has violated the duty owed to Petitioner as beneficiary of the Trust, in that he has failed and refuses to provide an accounting for the Trust as required by law (California Probate Code §16060 et seq., §16062, §17200 et seq.), notwithstanding written and oral demands from Petitioner for such an accounting commencing in 2011. Klein has never produced an accounting in the entire 17 years he has been Trustee of the Trust. The Trust does not waive accounting."

Each petition attaches, as exhibits, written accounting demands previously submitted to Klein.

On September 18, 2013, in each of the 24 cases, Klein filed a verified first account and report of trustee and petition for approval. Klein began each of those accounting periods not in 1996 when he accepted trusteeship of the 22 of the 24 trusts in issue and/or at the time Klein began to manage trust assets, but on seemingly random dates between February 1, 2003 and April 13, 2009.[9]

---

[8] On May 22, 2013, the Hon. Roy Paul determined each of the 24 trust petitions to be "related" cases. On December 20, 2013, the Hon. David J. Cowen ruled that discovery across the related cases would apply to all of the Menlo Trust cases and would not need to be separately propounded. All 24 actions were consolidated.

Across the 24 separate cases and the three accountings in each case being litigated, the breadth of the collective register of actions is formidable. In the "lead" case BP136769. there are 1600 documents on file, consisting of many hundreds of party submissions and minute orders spanning a decade.

[9] Despite trusteeship since 1996 and many thousands of transactional activities across all 24 Children's Trusts and Grandchildren's Trusts at issue, the "opening" dates utilized in Klein's "first" and "supplemental" first accounting are as follows:
May 18, 2009 -- Abraham Deutsch
April 13, 2009 -- Jonathan Lifschultz

Each of the 24 Menlo family beneficiaries filed objections to Klein's account on November 14, 2013.

By formal order filed in the "lead" case on December 20, 2013, then-Commissioner David J. Cowan determined Klein's accountings to be inadequate, specifically directing the trustee to file with the Court a supplemental account containing "a complete accounting" of all transactions made by Klein as trustee, including withdrawals of all funds for loans, investments and purchases, all deposits of funds, and any lines of credit opened utilizing each trust for collateral; a complete accounting with respect to every trust-owned life insurance policy including premiums paid, sources of premium funds, a listing of all loans and cash advances against each policy, and a complete listing of any repayments; a complete accounting of all life insurance policy funds, including loans, utilized by Klein "in part or whole for his own purposes;" a listing of dates, amounts and lending institutions associated with Klein's personal lines of credit utilizing the resources of the trusts or any of its insurance policies; a listing of draws against Klein's personal lines of credit and repayments utilizing trust assets; a complete accounting of all funds provided to Klein by Menlo family members for purposes of subsidizing trust insurance policies or for any other purpose; all business reasons for allowing trust insurance policies to lapse; "[a ]complete and accurate account of the present fair market value of all assets of the Trust," including trust insurance policies; all fees taken by Klein with respect to the trusts,

---

February 27, 2009 -- Rachel Deutsch, Samuel Deutsch, Deborah Deutsch, Zev Deutsch, Esther Deutsch and Mordecai Deutsch
July 23, 2008 -- Franklin Menlo and Tanya Menlo
January 1, 2008 -- Jonathan Menlo
May 23, 2006 -- Rochelle Lipchutz, Yeshia Frankel and Asher Frankel
May 22, 2006 -- Madelein Lipscuitz
May 19, 2006 -- Moise Frankel, Avi Lipchutz, Faye Lipchutz and Dov Lipchutz
February 1, 2003 -- Michael Winter, Daniel Winter, Jeremy Winter, Amanda Winter and Norine Winter

and any other information necessary to be fully compliant with Probate Code §16063 and §§ 1060 *et seq.*

Commissioner Cowan's order *required Klein's supplemental accounting include "the time period commencing when Leslie Klein first became trustee of the Trust*, to the present day." To the extent Klein was unable to comply with any portion of Commissioner Cowan's order, he was directed to provide a detailed explanation for such failure by January 30, 2014.

Klein filed a verified supplement to each of his 24 verified first amended accounts on January 30, 2014, adding additional financial information *but continuing to commence his accounting periods on the same 2003-2009 dates* previously utilized. Klein's explanation in each of the verified supplements declares that "the Trustee does not currently have detailed financial records for the periods prior to the commencement date" of the respective trust accountings. As Klein goes on to declare, "This is because the Trustee sent such records to Sam Menlo, one of the two Trustors, per Sam Menlo's request. The Trustee did not keep copies of the records he sent at Sam Menlo's request."

Klein testified at trial before the undersigned that Sam Menlo continued to exclusively manage the trusts, despite Klein's sole trusteeship, until Mr. Menlo suffered a debilitating stroke in 2005.[10] Klein's claim that the 1996-2005 trust records were in files in the possession of Sam Menlo, however, could not be corroborated through any other witness or through documentary evidence. Klein also provided no credible explanation as to why all but five of Klein's 24 trust accountings have opening account dates *after* 2005.

Declarations in opposition to Klein's first amended and supplemental accountings over the 24 trusts were filed by the respective Menlo beneficiaries on June 30, 2014. Klein submitted a verified reply on August 1, 2014.

---

[10] This date was contested by Sam Menlo's son, Franklin ("Frank"), who testified that the cerebral hemmorhages rendering Sam Menlo incompetent occurred in 2001 and 2002, at which time Frank took over management of his father's businesses.

On July 14, 2015, over opposition, the Hon. Maria E. Stratton granted the Menlo petitioners' applications to amend their pending petitions in order to name Les Klein & Associates, a Professional Law Corporation ("LKA") as an additional respondent. After a demurrer filed by LKA was granted with leave to amend, on March 24, 2016, the Menlo petitioners filed a second amendment to their September 18, 2013 accounting, removal and surcharge petition. Once a further demurrer filed by LKA was granted with leave to amend, on September 30, 2016, petitioners filed a third amendment to their petitions, again adding LKA as a party respondent. After LKA's successful motion to strike petitioners' third amendment, petitioners filed a fourth amendment on January 25, 2017.[11] LKA filed its answer to the respective petitions on February 21, 2017.

The various Menlo Trust principal distribution dates, as noted at the outset, were based upon the respective age and gender of each beneficiary. As of 2016, many of those dates had passed without a single distribution to any Menlo beneficiary, with the exception of Norine Winter ("Norine"). In March 2016, principal distributions were requested by the Menlo beneficiaries [see factual recitation and analysis in *Menlo v. Klein* (July 20, 2018), case B281058, 2nd Appellate District, Division 3.] As now also contended at trial (see *infra*), Klein claimed that Sam Menlo, who was no longer competent in 2016, had dictated oral instructions to Klein not to distribute, despite the express terms of the trust instruments. As summarized by the Court of Appeal:

> "Although Klein insisted he was simply following Sam's orders, the beneficiaries observed that Klein did not produce a single document corroborating Sam's oral instructions. Klein admitted he never attempted to amend the Menlo Trusts to reflect those instructions. Also, Sam's wife and seller] Vera was unaware that Klein had withheld distribution of funds ... ." [Slip opin., at 6.]

On May 23, 2016, Klein petitioned the trial court for instructions, requesting the ability to make principal distributions, but with the authority to withhold one-half of those distributions to

---

[11] At or about this time, Klein and LKA successfully moved to disqualify the law firm of Sheppard Mullin Richter & Hampton LLP from its representation of the Menlo beneficiaries.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE

9

pay for his attorneys in the instant litigation, for continued trust administrative expenses and, *inter alia,* "reconciliation of amounts owned by any Trust to another Trust for money previously advanced." The Menlo beneficiaries contended:

> "[N]one of Klein's proffered reasons for withholding funds from the asset distributions was valid. First, the beneficiaries would pay their pro-rata share of the insurance premiums. They had already asked Klein for payment amounts. Second, they argued, the Trusts did not provide for creation of lines of credit, and *Klein had taken millions of dollars from the lines of credit for which he had not accounted.* Finally, they contended that Klein was not entitled to withhold 'anticipated future litigation expenses' from Trusts that by their terms had already called for a full or partial distribution to beneficiaries." (Italics added.) [Slip opin., at 7.]

On February 22, 2017, Judge Stratton denied Klein's petition for instructions. The Court of Appeal affirmed, determining that Klein, *inter alia*, was "seeking a prophylactic judicial declaration that withholding … funds from the distribution of the Trusts' principal would be in good faith and for the benefit of the Trusts so that Klein could not later be held liable for a surcharge." [Slip opin., at 12.] The California Supreme Court denied Klein's petition for review. Despite the Menlo beneficiaries' requests for principal distributions, despite the express language of the trust instruments, and despite Judge Stratton's ruling and the appellate court's affirmance, Klein to this day has failed to distribute any portion of trust principal to the litigating petitioning Menlo family members other than Norine.

The Menlo beneficiaries, based upon contentions that Klein "withdrew for his own benefit the cash value of the life insurance policies that were supposed to fund the trusts upon the death of Sam and Vera Menlo, used the trust assets to obtain lines of credit against which [Klein] borrowed money for his personal use and benefit, and misappropriated trust assets in order to pay down his personal lines of credit," issued document subpoenas for the production of Klein's personal and business records. Klein and LKA moved to quash delivery of the requested bank records. On March 13, 2017, after the issues were fully addressed before Judge Robert Letteau (Ret.) in his capacity as discovery referee, Judge Stratton approved Judge Letteau's recommendation denying Klein and LKA's motion to quash discovery.

1    Sam Menlo died on February 5, 2018.[12]

2    On April 19, 2018, Klein filed a verified Second Account and Report and Petition for

3    Approval for each of the 24 accountings, covering the trust period June 30, 2013-December 31,

4    2016.[13] The Menlo petitioners filed objections to Klein's second account in the form of

5    declarations on June 27, 2018. Klein filed verified supplements to his 24 second accountings on

6    September 17, 2018. The Menlo petitioners submitted objections to the Klein supplements in the

7    form of a declaration filed on November 1, 2018.

8    On August 3, 2018, Klein amended his response to the 24 initiating petitions to add

9    additional affirmative defenses.

10    On November 27, 2018, Klein, joined by LKA, moved to dismiss all 24 initiating Menlo

11    petitions on the procedural ground that the petitions had not been brought to trial within the

12    statutory five years. On March 8, 2019, Judge [previously Commissioner] Cowan determined the

13    motion to be without merit and, in light of a written stipulation by Klein not to rely on the

14    dismissal statute, found Klein to be judicially estopped from taking such a position.[14]

15    On March 5, 2019, the Menlo petitioners filed a fifth amendment to their initiating

16    pleadings, amending claims against LKA. In the fifth amendment, six Menlo trust beneficiaries

17    -- Deborah Deutsch (through Rafael Deutsch), Madeline Lipschutz, Rochelle Lipchitz, Jonathan

18    Lipschutz, Norine Menlo and Frank Menlo, across the approximately 16,000 Klein-initiated

19    transactions, allege "by way of partial example only" that Klein wrote 23 specific checks totaling

20

21    [12] Children's Trust beneficiary Judith Frankel predeceased Sam and Vera Menlo and is not a party to this

22    litigation. On June 27, 2015, daughter and Children's Trust beneficiary Deborah Deutsch passed away
      *pendente lite*. Ms. Deutsch's husband, Rafael Deutsch, formally substituted into the litigation on

23    November 8, 2017 on Ms. Deutsch's behalf.]

24    [13] Despite the possible latitude of the accounting frequency language in the Grandchildren''s Trusts, the
      second accounting period of 3.5 years of once again contravenes the "at least annually" mandate of

25    Probate Code §16064 as it relates to the Children's Trusts.

26    [14] After a denial of reconsideration on the motion to dismiss, Klein petitioned for writ of mandate with the
      Court of Appeal. (2nd Civil B298667.) Writ relief was denied by the Court of Appeal on September 5,

27    2019.

28

$623,500 on individual Trust accounts, including MCT, made payable to LKA. The six petitioners allege that LKA aided and abetted or otherwise conspired with Klein to misappropriate Trust assets. On April 8, 2019, LKA filed its objections and response.

On March 12, 2019, Judge Cowan issued a discovery order based upon representations of Klein and his counsel that Klein "took no part in preparation of the accountings [Klein] had filed." Rather, it was determined that each of Klein's verified accountings, which the undersigned is tasked to settle, were instead prepared by the accounting firm of White, Zuckerman, Warsavsky, Luna & Hunt ("WZ"). At deposition, Klein was directed by his counsel not to answer questions relating to WZ on the basis of attorney-client privilege and work product protection. At the same time, WZ itself was being shielded from discovery as a non-designated consultant of Klein's counsel. The Menlo petitioners claimed that they were being denied essential discovery.

In his 14-page ruling, Judge Cowan concluded in the context of verified accounting approval, Klein had impliedly waived attorney-client privilege with respect to WZ, and that work product protections were inapplicable where the beneficiaries' "understanding the transactions for which WZ prepared accountings... outweighs the interest of attorneys in not having to share their efforts with the opposing party." Klein was directed by Judge Cowan to provide all information and communications by, to and from WZ upon which the verified accounts were based, including those claimed to be privileged.[15]

On May 7, 2019, Klein filed an Amended Second Account and Report for each of the 24 trusts. The Menlo beneficiaries filed objections to the Amended Second Account through declarations filed on July 2, 2019.

---

[15] On April 16, 2019, in coordination with *amicus curiae* The Southern California Association of Defense Counsel, Klein sought appellate relief from Judge Cowan's ruling by petition for writ of mandate with request for immediate stay. (2nd Civil B296957). Writ relief was denied by the Court of Appeal on June 17, 2019. Klein's petition for review and application for stay in the California Supreme Court was denied on June 26, 2019.

On October 25, 2019, as to each of the 24 trusts at issue, Klein filed a Third Account and Report and Petition for Approval for the trust period January 1, 2017-September 30, 2018.[16] On March 5, 2020, the Menlo beneficiaries filed objections to the third account in the form of declarations.

On November 4, 2019, Klein moved to dismiss every initiating petition except the petition of Franklin Menlo ("Frank"), on the theory that Frank was without authority to prosecute the remaining petitions under a written power of attorney delivered to Frank from the respective Menlo trust beneficiaries. In eight-page ruling issued by Judge Cowan on December 10, 2019, Klein's motion to dismiss was denied on a variety of grounds including, once again, judicial estoppel. No writ petition was filed.

Also on December 10, 2019, Judge Cowan granted Klein's motion to bifurcate issues to first "hold a separate trial for the review of each set of the Trustee's Accountings," with each accounting trial to "include any surcharge items resulting from the review of the Accountings at issue." Issues concerning surcharge for professional fees and liability for prejudgment interest were ordered addressed and resolved *after* the Court issues a statement of decision on the accountings.

On September 15, 2021, the Hon. Paul T. Suzuki issued an order appointing the undersigned as a Code of Civil Code Procedure §639(a)(1) referee to conduct consecutive trials on each of Klein's three accounting petitions to commence on or after December 1, 2021.

On November 16, 2021, Klein filed a verified second supplement to each of his first account approval petitions and a verified first supplement to each of his second account approval petitions. The following day, on November 17, 2021, Klein filed a verified first supplement to each of his third account approval petitions. Each of those petitions requests Trustee fees.

---

[16] While the trustee's accounting period intervals had been improving at the time of the third account, from 17 years (1996-2013) to 4½ years (6/30/13-12/31/16) to 1¾ years (1/1/17-9/30/18), the 21-month third accounting period continued to violate the 12-month accounting mandate of Probate Code §16064 as to the Children's Trusts. Currently, no accounting has been filed by Klein since the trust period ending September 30, 2018 (>3¾ years through June 30, 2022), though he continues to serve as trustee for each of the 24 trusts in question.

On January 4, 2022, Judge Suzuki issued an order prohibiting Klein from paying attorney fees and costs from loans taken against insurance policies held by the Menlo Trusts, from the lines of credit created by Klein pledged against institutional brokerage assets, or from the trusts of non-litigating Menlo family members. Judge Suzuki granted Klein's petition for attorney fees without prejudice to the Menlo beneficiaries' pending claims of surcharge.

Co-settlor Vera Menlo died on June 29, 2022, giving rise to tens of millions of dollars in payouts to the Menlo Trusts under the remaining "joint life" life insurance policies which the 24 Menlo Trusts had long subsidized through premium payments. On July 27, 2022, the Hon. Ana Maria Luna ordered that any lines of credit collateralized by the insurance policies were to be frozen.

**The Reference Hearing on the Settlement of Accounts**

Under Judge Suzuki's September 15, 2021 order for reference, the Referee's tasks are as follows:

"1. The Referee shall hold separate trials, to consider all factual and legal issues raised by the parties in connection with the Trustee's three separate acts of accountings, with certain exceptions, as further discussed and ordered below.

2. The Referee shall commence trial on December 1, 2021, or the close estate thereafter that is convenient to the Referee's calendar.

3. The Referee shall hold a separate trial for the review of each set of the Trustee's Accountings (e.g., the trial on the Trustee's First Accountings shall be conducted separate from the trial on the Trustee's Second Accountings). Except as stated below, each separate trial shall include any surcharge issues resulting from the review of the Accountings at issue.

4. Respondent Les Klein and Associates, Inc. shall be included as a respondent in all trial hearings. During the course of the trials on Trustee's accountings, the Referee shall also determine all issues raised in the Amendments to Petitions against Respondent Les Klein and Associates, Inc., including but not limited to all Probate Code Section 850 and 859 issues and all other damages mentioned in Petition's Fifth Amended Petition, except the cause of action for Removal of Trustee. Referee to designate breach cause of action for damages what the relief is.

5. The Referee shall conduct the trial of Trustee's Second Accountings immediately upon the conclusion of the Trustee's First Accountings. The Referee shall conduct the trial of the Trustee's Third Accountings immediately following the conclusion of the trial of Trustee's Second Accountings. The Referee shall have the ability to schedule reasonably brief breaks between trials, as may be necessary, with the overall goal of concluding the three trials in his brief a period of time as is convenient to the Referee's calendar.

6. Certain issues shall be excepted from the scope of trial by Referee and shall be reserved for the Trial Court, as follows: (i) surcharge of Trustee for professional fees, and (ii) liability of Trustee for prejudgment interest. These issues shall be addressed and determined by the Trial Court in a separate hearing following the trials by Referee. This separate hearing be conducted as a second phase of the trials on the accountings at issue, rather than as a completely separate trial.

7. Following the conclusion of the trial of Trustee's Third Accounting, the Referee shall report to the Court his reports concerning the trial of all three of Trustee's accountings, as specified in paragraph number 8.b.2 of [the order for reference]."

In addition to those directions, Judge Suzuki proposed dates for delivery of the Referee's reports, objections to those reports, and the ensuing trial court hearing dates, none of which delivery dates co and uld be accomplished given the schedules of the parties and the Referee, and the sheer magnitude of matters which needed to be heard and determined.

Hearing on the respective accountings was conducted in person in the presence of a certified shorthand reporter over the following days:

First Account: December 15, 2021, December 17, 2021, January 18, 2022, February 1, 2022, February 2, 2022, February 3, 2022, February 8, 2022, February 9, 2022, February 10, 2022, February 15, 2022, February 16, 2022, February 17, 2022, February 23, 2022, March 3, 2022, March 8, 2022 and March 9, 2022 [partial day].

Second account: March 9, 2022 [partial day], March 10, 2022, March 15, 2022 and March 22, 2022.

Third account: March 24, 2022, March 29, 2022 and March 30, 2022.

Petitioning trust beneficiaries Abraham Deutsch, Amanda Winter, Asher Frankel, Avi Lipschutz, Daniel Winter, Deborah Deutsch (by and through her husband, Rafael Deutsch), Dov Lipschutz, Esther Deutsch, Faye Lipschutz, Franklin Menlo, Jeremy Winter, Jonathan Lipschutz, Jonathan Menlo, Madalyn Lipschutz, Michael Winter, Moishe Frankel, Mordechai Deutsch,

Norine Winter, Rachel Deutsch, Rochelle Lipschutz, Samuel Deutsch, Tanya Menlo, Yeshia Frankel and Zev Deutsch appeared at the hearings through their attorney, Donald L. Saltzman of the Law Offices of Donald L. Saltzman. Trustee Les Klein appeared through his attorneys, Terence S. Nunan and Alan D. Weinfeld of Parker, Milliken, Clark, O'Hara and Samuelian. LKA appeared through its attorney, Candice K. Rogers of Hahn & Hahn LLP. All counsel appeared in person except Ms. Rogers, who attended each trial session remotely on the Zoom platform.

The following witnesses appeared either in person or remotely on the Zoom platform and were sworn and testified under oath:

First Account: Leslie Klein (Day 1-Day 3, Day 6-Day 9, Day 15), Dov Lipchutz (Day 4), Jeremy Winter (Day 4), Moishe Frankel (Day 4), Asher Frankel (Day 5), Faye Lipshutz (Day 5), Esther Deutsch (Day 5), Amanda Winter (Day 5)[17], Frank Menlo (Day 5-Day 6), Edward Wirtz (Day 10, Day 16), Duross O'Bryan (Day 11-Day 14, Day 16), Jennifer Magnes (Day 12) and Irwin Lowi (Day 15).

Second Account: Leslie Klein (Day 1, Day 3-4), Duross O'Bryan (Day 2-Day 3), Ed Wirtz (Day 2-Day 3) and Jennifer Magnes (Day 3).

Third Account: Leslie Klein (Day 1-Day 3), Duross O'Bryan (Day 1, Day 3), Jennifer Magnes (Day 2), Ed Wirtz (Day 2) Steven Burgess (Day 2)[18] and Frank Menlo (Day 3).

Many hundreds if not thousands of pages of documentary exhibits beyond the accounts themselves were offered and received into evidence over the course of the respective trials.

---

[17] As to all Menlo family members called to testify other than Frank Menlo, the parties stipulated that their testimony during the trial of the Trustee's First Account should also be deemed testimony received during the trial of the Trustee's Second Account and the Trustee's Third Account.

[18] With respect to Mr. Burgess, the Trustee's life insurance expert, health issues precluded Mr. Burgess' attendance at the trial of the Trustee's First Account and the trial of the Trustee's Second Account. The Referee could not begin to deliberate on the First Account or the Second Account until after Mr. Burgess testified. Mr. Burgess testified during the hearing on the Third Account. The parties stipulated that Mr. Burgess' expert testimony during the Trustee's Third Account should be also deemed testimony received during the trial of the Trustee's First Account and the Trustee's Second Account.

After the final day of testimony, on May 25, 2022, Klein filed a consolidated closing brief across all three accountings. Also on May 25, 2022, LKA filed a motion for judgment.    On June 13, 2022, the Menlo petitioners filed a closing brief on the Trustee's First Account.    On June 16, 2022, the Menlo petitioners filed a closing brief on the Trustee's Second Account and a separate closing brief on the Trustee's Third Account. On July 1, 2022, Klein and LKA each submitted a consolidated reply to the Menlo petitioners' closing brief.[19]

**Klein and LKA's Post-Hearing Contentions**

In his consolidated post-hearing brief, Klein contends that the evidence established that the 24 Menlo trusts were "sabotaged" by Frank Menlo, who stopped paying Klein cash annual exemption gifts in 2012 which had been used, in part, to subsidize the various trust insurance policy payments. Klein references his own testimony that he followed the "wishes and instructions" of the Trusts' co-settlers, Sam and Vera Menlo, at all times.

While Klein did allow four large Phoenix Life Insurance policies to lapse at various points of his trusteeships, Klein contends, consistent with his expert's testimony, that he was acting prudently at the time. Claimant notes that the lapse of Phoenix policies had been recommended in 2011 by a commercial life underwriter, and that Phoenix itself had been on the verge of insolvency.[20]

Klein asks the Referee to disregard the testimony of the Menlo petitioners' forensic economic expert, Duross O'Bryan ("O'Bryan"), on the basis that O'Bryan's review was (a) "tainted" by attorney-client privilege due to the discovery authorized by Judge Cowan's March

---

[19] The Referee at the time of hearing had directed the parties to file single, simultaneous briefs to be filed on or before May 25, 2022. Due to health issues, the Menlo beneficiaries' counsel was unable to comply. Because of the unintended staggered briefing, the Referee authorized Klein and LKA to submit a reply, which they did.

[20] Klein testified that it was his standard practice as Trustee to allow all of the collective tens of millions of dollars of Menlo insurance policies to have their premiums remain unpaid until just before their respective lapse period was set to expire due to nonpayment. Evidence established that this had *not* been the practice prior to 2005, despite Klein's testimony to the contrary.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
17

12, 2019 discovery order; and (b) based upon voluminous pages of institutional banking and insurance documents alleged to be hearsay in contravention of *People v. Sanchez* (2016) 63 Cal. 4th 665 ("*Sanchez*"). Klein further contends his fair trial rights were compromised as the Menlo petitioners filed their exhibit list late, and continued to update their exhibits throughout the hearings.

Klein argues that even if the Referee finds breach(es) of trust, the Menlo trust instruments expressly exculpate Klein from liability for all trust breaches committed "reasonably and in good faith." In this vein, Klein contends that irrespective of the written terms of the Children's Trusts and the Grandchildren's Trusts, he accepted the trusteeships with the understanding that he would do whatever was asked of him by co-settlor Sam Menlo. After Sam Menlo's stroke disabled Sam from involvement, Klein contends that he thereafter did whatever co-settlor Vera Menlo asked, including purchasing homes for a number of the Menlo trust beneficiaries, without regard to such beneficiary's right or entitlement under the respective trust instruments, or the balance in their accounts. Through a series of credit lines debited against the more robust Menlo Trusts, and through multiple loans amongst the various Menlo Trusts (with no corresponding ledgers or reconciliations), and with thousands of Trust transactions filtered through his attorney-client trust account,[21] Klein testified that he timely paid premiums on those Trust-owned insurance policies that he did not intend to lapse, while providing funds for home purchases by Menlo grandchildren as requested by Vera.

Other than a $750,000 sum which Klein paid himself from the Menlo Trusts in 2005, which Klein testified that Sam Menlo had verbally authorized him to withdraw as a retroactive

---

[21] Klein testified, and the record is unequivocal, that Klein ran literally thousands of Trust transactions, including cash from Frank Menlo intended for individual Trust beneficiary accounts, cash from the individual Trust brokerage accounts themselves, cash from funds paid from loans requested by Klein against Trust insurance policies, cash purportedly designed to reimburse one particular Trust through the assets of another, and credit line loans applied for by Klein against certain brokerage accounts, directly into LKA's attorney-client trust account, where it commingled as "one big pot" with the funds of Klein's other clients. Through the LKA attorney-client trust account, Trust disbursements were also made, but leaving the financial disparity between Trust monies received by Klein and LKA and Trust monies disbursed by them for the benefit of the Menlo beneficiaries in the millions of dollars.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
18

trustee fee, Klein contends that he is entitled to an additional $1,034,477.58 in trustee fees for the period of the First Account after 2005, $533,578.70 on the Second Account, and $180,114.70 on the Third Account; each calculated at a rate of .05% per annum of the alleged sum of trust assets under management plus that year's trust income.[22]

In its combined and consolidated motion for judgment/closing brief, LKA contends that the only evidence received at trial that LKA "aided and abetted" Klein's alleged breaches of trust was that "trust funds were deposited into its [law firm client trust account] for convenience purposes, and that payments were made from the account for the benefit of all [Menlo Trust beneficiaries]." LKA contends that there was no evidence presented that Klein's law firm either conspired with its owner or that it aided and abetted Klein in the misappropriation of assets. As noted by LKA, "LKA was presented as merely a passive bank account, money-in and money-out." LKA contends that it had no duty to the Menlo beneficiaries, fiduciary or otherwise, nor is there evidence that it financially benefited from Klein's acts. There was evidence, according to LKA and as testified by Klein at trial, that lapse period payments to Trust insurers would "clear faster" when Menlo Trust beneficiaries' brokerage checks were paid directly into the LKA trust account.

LKA contends that any actions taken by the law firm from prior to August 7, 2012 should be barred by the applicable three-year period of limitations calculated from the time of LKA's joinder by the Menlo beneficiaries. LKA contends that the inclusion of Klein's law firm as a party by the six Menlo beneficiaries adding LKA has been merely an "afterthought."

---

[22] Referee's note: There appear to be four provisions of the 24 respective Menlo Family Trusts that Klein appears to be asking the Referee to honor: (1) Klein's appointment in each Trust as sole trustee; (3) the breadth of Klein's financial powers under the Trusts; (3) the Trustee's liability preclusion for "reasonable and good faith" actions; and (4) the right of Klein to earn trustee fees based upon a percentage of trust assets. It appears Klein is simultaneously asking the Referee to disregard the fact that no Trust agreement contains an accounting waiver and/or gives either co-settlor any continued right or authority over the Trustee after appointment. It also appears Klein is asking the Referee to completely disregard the distributive provisions of each and every Trust.

**The Menlo Beneficiaries' Post-Hearing Contentions on the First Accounting**

The Menlo beneficiaries contend the evidence at trial showed that "based upon a mythical 'instruction' from Sam Menlo, Trustee Klein "set up a serpentine labyrinth of transfers between trust accounts, lines of credit, insurance policies and Mr. Klein's bank accounts, both personal and business,"[23] in order to misappropriate assets.

In their closing brief on the First Account, the Menlo beneficiaries contend that Klein, as evidenced by his trial testimony after years of pre-trial statements and representations, "has no qualms about making things up as he goes along." By way of example, the Menlo beneficiaries reference proof of contradictory narratives presented by Klein over time with respect to, *inter alia*, Klein's unrepaid loans to himself paid from Trust assets secured against Trust lines of credit; the refusal by Klein to provide information on Trust insurance policies until it was discovered that "Klein ha[d] borrowed millions on these policies;" annual exclusion gift payments made to Menlo Trust beneficiaries which never found their way into the gifted beneficiaries' Trust accounts; claims by Klein of the need to borrow significant sums to cover Trust tax obligations when, according to the Trust's CPA, annual tax obligations were negligible; and Klein's continued refusal to account.

Through Frank Menlo, who succeeded management and control of Sam's businesses in the year 2000, the Menlo beneficiaries point to evidence at trial that Sam Menlo's cerebrovascular strokes, which precluded Sam's ability to conduct or comprehend business transactions, occurred in 2000 and 2001, not June 2005 as contended by Klein. It is in 2005, however, that Klein contends that that he "negotiated" a flat $750,000 trustee fee with Sam to compensate Klein for his trustee services with no written corroboration.

The Menlo beneficiaries cite trial testimony where Klein was impeached, *inter alia*, after Klein's false denial of a State Bar disciplinary record with respect to trust administration work;

---

[23] Rather than attempt to organize the Menlo beneficiaries' arguments, for purposes of identifying their contentions, the Referee addresses them in the order presented in their three-part closing brief on the First Account.

false denial of his admission to dishonesty charges leading to Klein's license revocation before the California Board of Accountancy; and false denials that he had ever previously been sued as a trustee, when in fact he had been so sued, and was represented in such litigation by his current counsel.[24]

Relative to this case, the Menlo beneficiaries cite Klein's trial testimony that he had received no commission(s) on the purchase of insurance policies for the Menlo Trusts. Klein was subsequently impeached by his own insurance expert, Mr. Lowi, who testified that Klein had received $326,023.78 in such commissions. (15 Tr. 2891-2892.)

Klein testified that in 2012 he created a stand-alone bank account for the "Menlo Children's Trust of 1986" ("MCT"). Substantial evidence was presented at trial that Klein used the MCT account as additional conduit to move substantial assets and liabilities to and from from the 24 Menlo Trusts in question, including the transfer of Trust insurance policy loan funds into Klein's accounts, and as a source of overdraft protection to allow Klein to charge well over $1,175,151 in personal expenses on his own credit cards against the litigating Menlo Trusts. Klein excluded any mention of the MCT in his accountings.

The Menlo beneficiaries reference the trial testimony of Jennifer Magnes ("Magnes"), the CPA at WZ in charge of preparation of Klein accountings, in which she testified that inclusion of the MCT as a Trust sourcing mechanism, though she had some of the records, was "beyond the scope of [her] assignment." Magnes further testified at trial that she was not authorized to review Klein's personal bank records, nor the LKA law firm records, nor was she authorized to contact the relevant insurance companies for information, nor was she provided with the voluminous institutional banking and insurance records subpoenaed by the parties. The Menlo beneficiaries contend that by so artificially limiting the information upon which the verified Klein First

---

[24] When Klein testified provably falsely at trial on these collateral matters, the Referee had concern that Klein's short-term and long-term memory failures could be due to a combination of age and mild cognitive deficits. After 22 days in trial with Mr. Klein, however, the Referee concludes that Mr. Klein, while testifying, reflexively opted for any means of possible liability avoidance and scrutiny, often self-contradictory and easily disproven, over any legitimate concern for factual accuracy.

Account was prepared, the First Account is "virtually useless as a bellwether of Mr. Klein's true activities with [the Menlo] [T]rusts."

The Menlo beneficiaries cite Probate Code §16014(b) for the proposition that Klein, as a licensed trusts and estates attorney, until recently as a licensed CPA, and as a self-proclaimed expert in life insurance investments, has special skills and must be held to the standards of those special skills.

The Menlo beneficiaries also cite Probate Code §16000 for the further proposition that **Klein, as a trustee, has a statutory duty "to administer the trust according to the trust instrument."**

Each of the Menlo trust instruments are irrevocable by their terms. Neither Sam Menlo nor Vera Menlo had any ability after execution to amend the trust terms or to exercise any authority over the Trustee. The Menlo beneficiaries contend that any alleged oral "instructions" purportedly given to Klein by Sam Menlo to ignore the terms of the Menlo Trusts are pure fabrications and in contravention of Klein's statutory duties as a trustee.

The Menlo beneficiaries note that Klein, as an experienced estate planning practitioner, testified that despite his acceptance of the Trusteeships in 1996, and Sam Menlo's subsequent incapacity, Klein's deposition in this lawsuit was the first time anyone had suggested to him that he stood in a fiduciary relationship to the Menlo Trust beneficiaries. (8 Tr: 1673.) Klein further testified that he has never had any intention of honoring the distributive provisions of the 24 trusts.[25]

---

[25] Though the authorization is unclear from Judge Suzuki's September 15, 2021 order for reference, the Menlo beneficiaries ask the Referee to recommend Klein's removal as trustee. The trial court has always had removal power *sua sponte* since this action was commenced (see *Schwartz v. Labow* (2008) 164 Cal.App.4th 417), and it is possibly because Klein is a licensed member of the State Bar that suspension and removal has not already taken place. Notwithstanding Klein's rationale based upon what he claims to be the co-settlors' unwritten "wishes," as noted above, Klein concedes that he never intended to follow the express terms of the Trusts. In a case where the fiduciary's compass has had no sense of literal direction from its inception, Klein's removal appears to be a *fait accompli* regardless of whether or not it is a part and parcel of the current reference. The Referee defers determination of this issue to the trial judge.

The Menlo beneficiaries take great issue with Klein's scattered selection of starting dates for each of his 24 First Accounts. The starting dates of the respective Klein First Accounts are not, as the law requires, based upon the dates Klein first received and began managing the respective Trusts and their assets, but rather based, according to Klein, upon whatever date(s) the institutional brokerage houses could locate records in their archives with respect to each of the various Menlo Trusts managed by Klein.

The Menlo beneficiaries note that Klein's verified accountings, despite utilizing "starting dates" long after Klein accepted his trusteeships, nevertheless infuse selected pre-starting date transactions into the First Accountings which infuse capital or identify legitimate disbursements, all of the while ignoring literally thousands of other Trust-related transactions evidencing malfeasance and misappropriation.

The Menlo beneficiaries recite the Trustee's statutory duty to maintain records sufficient to *fully* account to the Trust beneficiaries, and to provide all supporting data upon request, including invoices, receipts and transactional documentation.

Here, Klein maintained no trust files of his own and had no legitimate recordkeeping system. Complex loan transactions between the 24 separate Menlo Trusts were never memorialized or reconciled, nor was application of large sums taken by Klein from the MCT separately tracked. No spreadsheets were prepared by Klein identifying the recipient(s) of the loan funds for which Klein borrowed against the Trusts' insurance policies, or for identifying the recipient(s) of the funds Klein borrowed on the lines of credit debiting the Menlo beneficiaries' brokerage accounts through whose Trust accounts those loans were serviced. (The recipients, as it turned out, were principally Klein and his law firm.) At trial, Klein testified that the filed trust accountings, which he conceded he did *not* prepare, constituted his "records," while all of the many thousands of specific underlying transactions were otherwise maintained "in [his] head."

The Menlo beneficiaries contend the evidence at trial established that that their individual Trust balances had been adequate to subsidize all ongoing Trust expenses, and suggest that Klein's only reason to collateralize the brokerage accounts through interest-bearing lines of

credit was to generate capital for Klein himself, virtually none of which Klein appears to have repaid. The Menlo beneficiaries also point to evidence that Klein borrowed $3,675,000 from the Trust's insurance policies, again virtually none of which was used to pay premiums.

The Menlo beneficiaries further object to Klein's decision to allow $20,000,000 in Phoenix life insurance coverage to lapse at a time when Sam Menlo was uninsurable, and therefore the coverages could not be replicated. The evidence showed that the Phoenix policies were allowed to lapse, in part, because of the policies' significantly reduced values, *after* Klein had reduced those values through millions of dollars in loans he had taken out against those policies, which funds were for the most part, if not entirely, retained by Klein.[26]

At trial, as noted by the Menlo beneficiaries, Klein admitted taking large personal loans from the Menlo Trusts without permission. Klein conceded regularly using funds from certain Trusts to pay the obligations of other Trusts, often when Klein, according to his testimony, would feel it was "fair" to do so.

Klein also admitted at trial setting up the MCT bank account as a source of overdraft protection for the personal bank accounts of Klein and his wife, Erika. The evidence at trial established that Klein utilized $1,218,519 of MCT funds to pay his personal debts by way of the overdraft protection, with no evidence (other than Klein's uncorroborated testimony) that those funds were ever reimbursed. Nowhere in Klein's accountings is there reference to those funds at all.

Though Klein testified at trial that the $3,625,000 of loans taken against the Trusts' Phoenix Life policies was conceptualized by Sam Menlo, the written evidence established that all of these loans were personally applied for and distributed by Klein to Klein through his attorney-client trust account between 2005 and 2009. While Klein testified that the Phoenix

---

[26] At the time Klein commenced his Trusteeships in 1996, the Menlo Trusts owned $54,000,000 in prospective whole and universal life insurance policy benefits upon the deaths of Sam and Vera Menlo. Both Sam and Vera Menlo are now deceased. However, over the course of the three accounting periods which are a subject of the order of reference, Klein allowed a collective $20,000,000 of those policies to lapse due to Klein's nonpayment of premiums.

policy loan funds were used to pay premiums on other Trust insurance policies, Klein was unable to establish at trial that was in fact the case.

The Menlo beneficiaries cite the testimony of First Account preparer Magnes that she did not attempt to trace the flow of millions of dollars of insurance loan funds from the insurance companies through Klein's LKA business account toward some beneficial Trust purpose. Magnes did admit that Klein had not provided her with all records of transactions which had occurred during the periods of Klein's Trusteeships.

The Menlo beneficiaries contend the evidence was undisputed at trial that Klein, beginning in 2005, borrowed $3,625,000 from four of the Trusts' Phoenix Life Insurance policies. According to the Menlo beneficiaries, these loans, which they claim to be misappropriated by Klein in whole or in large part, each bore accruing unpaid interest to the point that the constantly increasing debt ultimately exceeded the value of retaining the four policies, given Frank and Vera's joint life expectancies and the size of the ever-increasing interest accruing from the unpaid loans. Had an insurance broker been consulted in 2005, according to the Menlo Trust beneficiaries' insurance expert Ed Wirtz ("Wirtz"), the recommendation would have been to maintain the policies' *status quo*, given Sam Menlo's then-uninsurability. Instead, Klein withdrew millions of dollars in cash from those policies, failed to repay those loans, allowed additional substantial sums to accrue in interest on those loans, failed to repay the interest, and by the time of a 2011 underwriting review, one or more of the Phoenix policies was deemed expendable.

The first of the four Phoenix Insurance policies that Klein allowed to lapse occurred during the First Accounting period. In light of the policy's face amount payouts, less amounts necessary to sustain the policies through the then-actuarial balance of Vera's life, Wirtz

determined collective damages to the Trusts, discounted to present value, to total **$1,790,231** at the time of trial by virtue of Klein's policy lapse decision.[27]

The Menlo Beneficiaries cite *Bogert's The Law of Trusts and Trustees* §961 (June 2021 Update) for the proposition that:

> "The burden of accounting for trust assets, receipts, disbursements, and exchanges is on the trustee. **Where the trustee failed to keep sufficient records, all doubts with respect to the trustee's administration of the trust are resolved against the trustee. If the trustee failed to keep adequate records for the trust, it is liable for any resulting loss. The court may also reduce or deny the trustee's compensation, or charge the trustee with part or all of the costs related to an accounting**, if the trustee does not keep adequate records. If the failure to keep records is serious enough, the trustee may be removed." (Emphasis added.)

Utilizing Klein's multiple alleged trust breaches to suggest that Klein is entitled to no trustee fees at all, the Menlo beneficiaries contend that the trustee fees demanded by Klein should not be based upon the percentage of the face value of the insurance policies when the beneficiaries pass and the policies are paid, but should rather be assessed at "no fee... or... a flat annual fee of between $500 and $1000."

At trial, the Menlo beneficiaries relied almost exclusively on the testimony of their forensic expert, O'Bryan. O'Bryan and his staff conducted exhaustive studies of all Menlo Trust monies being paid into and out of the LKA account, the beneficiary brokerage accounts, the insurance policy accounts, the various Trust lines of credit, Klein's personal bank accounts, and the MCT account, including Klein's use of the latter to pay Klein's personal debts through overdraft protection. In doing his work, O'Bryan repeatedly testified that he had not reviewed and was not relying in any way upon documents claimed privilege by Klein but ordered produced by Judge Cowan.

The O'Bryan testimony noted, without contradiction, that Klein's submitted accountings through Magnes failed to include a massive number of transactions which Klein initiated,

---

[27] The Wirtz calculation does not assume that the loan against the policy taken by Klein would be repaid. Rather, the calculation assumes that a prudent trustee would have paid the loan interest current from Trust funds until payout, along with the premium, thereby holding the death benefit at policy amount less loan principal, rather than allow the accrued loan interest to continually reduce the death benefit.

including thousands of transactions associated with the Morgan Stanley brokerage accounts, the UBS brokerage accounts, the AIG insurance statements, the UBS line of credit activities, use of the MCT account, multiple loans and debits/credits between the Trust themselves, and use of the co-mingled LKA attorney-client trust account as a further clearinghouse for Trust and intra-Trust transactions.[28]

In the trust periods after Klein accepted Trusteeships and began managing the Menlo Trusts, but before Klein arbitrarily decided to begin his reported accounting periods, O'Bryan calculated that Klein had removed $4,353,624 from the Menlo Trusts into LKA and his personal accounts and expenses as follows:

(1) $824,652 cash from the respective Menlo beneficiaries' brokerage accounts;

(2) $1,658,000 in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

(3) $1,432,781 in loans taken by Klein against Trust-owned insurance policies;

(4) $198,190 taken from the MCT account; and

(5) $240,000 from monies payable to the Menlo trusts that Klein signed over into his law firm account.

During the same pre-accounting time period of his Menlo Trusts management, Klein used monies collected from the various trust and insurers to pay for legitimate expenses of the Menlo Trusts in the total sum of $192,736, directly and through the vehicle of Klein's attorney-client trust account. The net difference between sums taken in by Klein and the sums paid out for the benefit of the Menlo Trusts or its beneficiaries, as calculated by O'Bryan, is $4,160,888.

On top of that sum, the Trusts paid interest on Klein's pre-accounting loans secured by Klein-initiated Trust lines of credit in the sum of $125,677. The interest charged by Phoenix Life

---

[28] Klein testified at trial that funds from loans against Menlo Trust insurance policies, which policies were each owned by specific Menlo Trusts, funds from the lines of credit borrowed by Klein against certain Menlo beneficiaries' brokerage accounts, and funds received from Frank Menlo for annual exemption gifts to the various Menlo children and grandchildren, were "first" deposited into Klein's LKA attorney-client trust account. Despite the fact the funds in that general account were neither segregated between individual Menlo Trusts or from the assets of Klein's other clients, Klein nevertheless testified that he had no comingling concerns.

Insurance and Lincoln Life Insurance on the insurance policies upon which Klein took loans during this pre-accounting period was an additional $104,732. Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, before the time Klein opted to commence his formal accountings, totals $4,391,297.

In addition to those sums, according to O'Bryan's comprehensive audit, are the verified portions of the First Accounting period for which Klein *has* chosen to account. When the "refused" Klein First Accounting periods are included within the Klein-submitted First Accounting periods in order to constitute the true First Account, through and including June 30, 2013 **the full First Accounting period** audit calculations are as follows:

In the entire period of what should be Klein's first accounting across **the** 24 Trusts, across approximately 10,000 Trust transactions, O'Bryan calculated that Klein removed a net **$6,852,660** from the Menlo Trusts into LKA and to his personal accounts and expenses during the full First Accounting period as follows:

    (1) **($105,416)** cash infused by Klein into the respective Menlo beneficiaries' brokerage accounts (credit to Klein);

    (2) **$1,959,374** in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

    (3) **$2,753,152** in loans taken by Klein against Trust-owned insurance policies;

    (4) **$1,046,418** taken from the MCT account into Klein's personal overdraft account;

    (5) **$874,550** taken from the MCT account by Klein for other non-Trust purposes; and

    (6) **$324,582** from monies payable to the Menlo Trusts that Klein deposited into his law firm or personal accounts.

During the entirety of the true First Accounting time period, Klein paid monies collected from the various Trust beneficiaries' brokerage accounts and Trust life insurance policies, and monies paid to Klein as Trustee for deposit into the Menlo Trusts, directly and through the vehicle of his attorney-client trust account, to pay for legitimate expenses of the Menlo Trusts in the total sum of **$628,112** (*i.e.*, credit to Klein), consisting of insurance premiums, accounting fees, and funds paid to Madeline Lipchutz in a family law matter. The net difference between

sums taken in by Klein over and beyond the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$6,224,548.**

Beyond that vast sum of unrepaid cash from Klein to the Menlo Trusts, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit in the sum of **$300,049** during the entirety of the true First Accounting period. The interest charged by Phoenix Life Ins. and Lincoln Life Insurance on the insurance policies upon which Klein took loans during the First Account was an additional **$1,693,048.** The loss due to Klein's intentional lapse of a Phoenix Life Insurance policy during the First Accounting period, as testified to by insurance expert Wirtz, to the extent there is liability for that policy lapse, totaled **$1,790,231.**[29] Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged damages on Klein's lapse of a Phoenix Insurance policy, totals **$3,783,328** for the period of the First Account.

The Menlo beneficiaries contend that the evidence shows that, at the end of the First Account, Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the principal amount of **$10,007,876** (*i.e.*, $6,224,548 + $3,783,328). If there is no liability to Klein on the lapse of the Phoenix life insurance policy, the only issue Klein truly contests, either because he was not negligent or because he was acting "reasonably and in good faith," the principal surcharge reduces to **$8,217,645** (*i.e.* $10,007,876 - $1,790,231) owed by Klein to the collective Trusts at the close of the First Account.[30]

---

[29] Evidence at trial established that premiums had been paid on this policy until the time of Klein's trusteeship in 1996; then never again, forcing the policy to borrow against itself to sustain both future premium payments and interest on the subsequent loans which Klein took against cash value. In insurance jargon, these obligations created a "drag" on the policy, reducing its value to the policyholder.

[30] Of that sum, Klein claims that $750,000 was a verbal "trustee fee" authorization from Sam Menlo in 2005.

**The Menlo Beneficiaries' Post-Hearing Contentions on the Second Accounting**

In their opposition to Klein's Second Accounting, the Menlo beneficiaries render the following observation:

> "Neither [Klein] nor LKA introduced any witnesses at trial to dispute the accuracy of the calculations of Mr. O'Bryan and Mr. Wirtz. In fact, [Klein] did not dispute the many claims of misappropriation of trust funds to which Mr. O'Bryan testified and offered detailed damage figures."

As it relates specifically to evidence presented on the Second Account, the Menlo Beneficiaries highlight an additional point:

> "[Klein] acknowledged during the second accounting trial that, quite literally, he had created a system with the trusts where every single trust at some point transferred money to every one of the other 24 trusts usually in the form of 'loans' or 'repayment of loans' that [Klein] had created. The maze of 'loans' and 'repayments' is simply incredible. … [Klein] did not establish that many or even most of these trusts even needed loans from another trust to pay their share of [insurance] premiums. [Klein] admitted that he never informed the [Menlo Trust] beneficiaries that he was taking loans from their trusts, whatever the purpose of the loan may be. Whereas the Probate Code requires [Klein] to keep the funds of each trust separate and accounted for, [Klein's] management was exactly the opposite. [Klein] transferred funds back and forth so often that a diagram would look like a U. S. route map for American Airlines." [31]

When asked, Klein testified during the Second Accounting trial that he failed to turn over his LKA financial records, where substantial Trust funds were deposited and dispersed, to his account-preparer Magnes, because "he did not want her looking through the records of his clients." (18 Tr. 3476.) This was confirmed by Ms. Magnes, who also was not provided information from Klein regarding his use of overdraft accounts to access the MCT accounts to cover Klein's personal credit card spending. Magnes conceded that in the Second Accounting period, significantly more monies were taken by Klein from the Trusts than were utilized to cover expenses for the benefit of the Menlo beneficiaries.

---

[31] The Referee finds, based upon circumstantial evidence, that Klein's intention in maximizing the number of intra-Trust loans and repayments within the context of an already multi-client commingled LKA attorney-client trust account was to render the scope and breadth of Klein's misappropriations incalculable and untraceable.

Klein allowed two additional Phoenix insurance policies to lapse during the Second Accounting period. According to Wirtz' calculations, without regard to Klein's misappropriation of the loan proceeds themselves, a prudent trustee would have paid the policy loans current along with the premiums, the failure of Klein to accomplish resulting in damages to the Trusts of **$2,001,658** and **$2,487,533**, respectively, based upon Sam and Vera's actuarial life expectancies at the time of Klein's policy lapse decisions, discounted to present value.[32]

The Menlo beneficiaries' forensic expert, O'Bryan, testified that during the Second Accounting period, across an additional approximately 4000 Trust transactions, Klein filtered between one-third to one-half of all transactions, including countless payments between the Trusts themselves, through his LKA client trust account. Once again, without review any of the communications which Klein claimed to be privileged (though Judge Cowan held were not privileged), O'Bryan calculated that Klein had removed a net **$1,712,379** from the Menlo Trusts into LKA and his personal accounts and expenses as follows:

(1) **$254,649 in Trust** cash taken by Klein from the respective Menlo beneficiaries' brokerage accounts;

(2) **$1,282,733** in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

(3) **$172,101** taken from the MCT account into Klein's personal overdraft account;

(4) **($73,061)** net credit to Klein for funds returned to the MCT account; and

(5) **$75,956** from monies payable to the Menlo Trusts that Klein deposited into his law firm or personal accounts.

During the Second Accounting period, according to O'Bryan, Klein used monies collected from the various Trust beneficiaries' brokerage accounts, and monies paid to Klein for deposit into the Trusts, often through the vehicle of his attorney-client trust account, to pay for expenses of the Menlo Trusts in the total sum of **$559,150** (*i.e.*, credit to Klein), consisting

---

[32] Vera was still living at the time of trial. She did not survive to her calculated 2023 actuarial life expectancy as determined several months earlier. Had the trial been conducted today, Wirtz's damage calculations to the Trusts would be higher, since less interest and premium payments would be paid from the Trusts than previously calculated to her actuarial date of death.

entirely of insurance premiums. As noted by O'Bryan, the net difference between sums taken in by Klein during the Second Accounting period over and above the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$1,153,229**.

Beyond that sum, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit during the Second Accounting period in the sum of **$17,542**. The interest charged by Phoenix Life Insurance and Lincoln Life Insurance on the policies upon which Klein took loans during that period was an additional **$409,134**. The loss due to Klein's lapse of the two Phoenix policies, as testified to by insurance expert Wirtz, to the extent there is liability, totaled **$4,489,210.** Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged liability for Klein's lapse of two additional Phoenix life Insurance policies, totals **$4,915,886.**[33]

The Menlo beneficiaries contend that the evidence shows that, at the end of the second account, Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the additional principal amount of **$6,069,115** (i.e., $1,153,229 + $4,915,886). If there is no liability to Klein on the lapse of the two additional Phoenix life insurance policies, the only issue Klein truly contests, either because he was not negligent or because he was acting "reasonably and in good faith," the principal surcharge reduces to an additional **$1,579,905** (*i.e.* $6,069,115 - $4,489,210) owed by Klein to the collective Trusts at the close of the Second Account.

To summarize, according to the Menlo beneficiaries forensic expert, the "rolling" surcharge to Klein for cash taken by Klein from the Trusts, plus actual interest paid by the Trust on those Trust funds in Klein's possession, less monies Klein applied to Trust expenses, through the closing date of the Second Account, totals **$9,796,750** (*i.e.* $8,217,645 +$1,579,105). If Klein

---

[33] The Menlo beneficiaries also contend that Klein's lapse of the Phoenix insurance policies during the Second Accounting period had negative income tax ramifications to the Trust for the Second Accounting period in the sum of $1,493,423. Klein's position was that he had filed no tax returns noting such sums to be due and payable, and therefore, once the applicable statute of limitations passes, there will be no actual loss to the Trusts. The Referee is inclined only to surcharge a fiduciary where losses have been realized and are not theoretic. If such tax liabilities become an actuality, assuming liability to Klein, it is not the Referee's intention to foreclose the Menlo beneficiaries from seeking indemnity from Klein at that time, nor should Klein be discharged from that contingent liability.

is also liable for lapse of the three Phoenix insurance policies through the First and Second Accounts, the additional "rolling" claim for damages utilizing the Wirtz calculations is an additional **$6,279,441** (i.e., $1,790,231 + $4,489,210), excluding the Menlo beneficiaries' additional claim for tax liability.

### The Menlo Beneficiaries' Post-Hearing Contentions on the Third Accounting

Moving to Klein's Third Account, the closing brief of the Menlo beneficiaries challenges Klein's claim that Frank Menlo "sabotaged" the Trust by refusing in 2012 to make further annual cash exemption gifts to each of the Menlo beneficiaries. As calculated the Menlo beneficiaries, had Klein not misappropriated the insurance policy loan funds for himself, by the end of the Third Accounting period, all policy premiums could have easily been paid "without problem, with approximately $4 million left over," with no need to ever access the funds held in the Menlo beneficiaries' brokerage accounts. Klein conceded during the trial on the Third Account that "whatever cash was in this trust when I took over, by the end of the Third Accounting, all of that was gone." (21 Tr. 3943.)

Klein testified during his testimony on the Third Account that he has never used *non-petitioner* Menlo Trust funds to subsidize the asset-depleted Trusts at issue here. The Menlo beneficiaries request that the Referee to take judicial notice of a June 10, 2022 report to Judge Luna in which Klein, in contravention of his testimony and a prior court order, concedes use of non-petitioner trust funds to pay the obligations of the subject Trusts for, *inter alia*, "[m]argin interest on lines of credit," life insurance premiums, and legal fees and retainers.[34]

On the Third Accountings, the Menlo beneficiaries reiterate their claim that the accountings were artificially manufactured by inhibiting CPA Magnes' access to the LKA records, to the MCT records, and to Klein's personal bank accounts, as a strategy to avoid

---

[34] Accounting issues associated with Trusts in favor of non-petitioner Menlo beneficiaries are outside the scope of the 72 accounting petitions across the 24 Trusts being adjudicated by the Referee pursuant to the order for reference. Possible contempt issues associated with Klein's alleged disregard of orders relating to non-petitioner Trusts in this case are likewise outside the scope of the reference under consideration. The Referee declines the request for judicial notice.

detection of millions of dollars in Trustee misappropriations under the façade of verified accounts.[35]

Klein allowed a fourth Phoenix insurance policy to lapse during the Third Accounting period. According to Wirtz' calculation, without regard to Klein's misappropriation of the loan proceeds, a prudent trustee would have paid the policy loan current along with the premiums, resulting in damages to the Trusts of **$2,339,334**, respectively, based upon Vera's actuarial life expectancy at the time of trial, discounted to present value.

The Menlo beneficiaries' forensic expert, O'Bryan, testified that during the Third Accounting period, Klein filtered approximately 20% of an estimated 2000 Trust transactions, including numerous payments between the Trusts themselves, through his LKA client trust account. Once again, without review of any of the communications which Klein claimed to be privileged but Judge Cowan found to be not privileged, O'Bryan calculated that Klein had removed a net $1,055,576 from the Menlo Trusts into LKA and for his personal accounts and expenses as follows:

---

[35] At trial, Magnes testified that she was essentially a scrivener, doing whatever she was told [content of communications themselves excluded by the Referee in light of Klein's objections], having no prior experience in the preparation of Probate Code or fiduciary accountings. Magnes testified, *inter alia*, that in preparing that Klein accountings she sought but did not receive documents dating back to Klein's acceptance of the Menlo Trusteeships in 1996; was unable to access relevant Trust transactions; did not ask for permission to access data from the Trust's life insurance companies; did not access subpoenaed records; never saw Klein's Trust files, if any; never reviewed a general ledger, QuickBooks or financial statements for Klein's administration of the Menlo Trusts; did not determine the commencement date to be covered by the First Accountings; *did* use Trust fund disbursements between 1999 and 2002 to log Menlo insurance policy premium transactions for purposes of calculating Trustee fees; and *did* see Menlo Trust funds deposited into the LKA accounts but was not authorized to trace those monies to their ultimate recipient(s).

The Referee, when considering such deficiencies in light of O'Bryan's comprehensive audit and the voluminous supporting records, accepts the Menlo beneficiaries' contention that the verified Klein accountings were manipulated in order to mislead with respect to the disposition of Menlo Trust funds. The extraordinary difficulties encountered by the Menlo Trust beneficiaries in discovering, accessing and then sorting out the relevant Trust information, underscores historic trust law policy resolving "any doubt arising" from an incomplete accounting against the fiduciary.

(1) **$165,905** in Trust cash taken by Klein from the respective Menlo beneficiaries'

brokerage accounts; and

(2) **$889,671** in loans taken by Klein against letters of credit against Menlo beneficiaries'

brokerage accounts;

During the Third Accounting period, as reported by O'Bryan, Klein used monies collected from the various Trust beneficiaries' brokerage accounts, and monies paid to Klein for deposit into the Trusts, often through the vehicle of his attorney-client trust account, to pay for legitimate expenses of the Menlo Trusts in the total sum of **$547,641** (*i.e.*, credit to Klein), consisting entirely of insurance premiums, As calculated by O'Bryan, during the Third Accounting period, the net difference between sums taken in by Klein over and beyond the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$507,935**.

Beyond that sum, during the Third Accounting period, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit in the sum of **$92,252**. The interest charged by Phoenix Life Insurance and Lincoln Life Insurance on the insurance policies upon which Klein took loans was an additional **$208,454**. These interest obligations were paid by the Menlo Trusts, for apparent Trust no benefit except to Klein. The losses due to Klein's lapse of the final Phoenix policy, as testified to by insurance expert Wirtz, to the extent there is liability, discounted to present value, totaled **$2,339,334**. Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged liability for Klein's lapse of the additional Phoenix life Insurance policy, totals **$2,640,041** during the period of the Third Account.[36]

---

[36] The Menlo beneficiaries also contend that Klein's lapse of the Phoenix insurance policy during the Third Accounting period has negative income tax ramifications to the Trust in the sum of $1,483,536. Klein's position was that he had filed no tax returns noting such sums were due and payable, and therefore, once the applicable statute of limitations passes, there will be no actual loss. As noted earlier, Referee is inclined only to surcharge a fiduciary where losses have been realized and are not theoretic. To the extent such tax liabilities become an actuality, assuming liability, it is not the Referee's intention to foreclose the Menlo beneficiaries from seeking indemnity from Klein at that time, nor should Klein be discharged from that contingent liability.

1    The Menlo beneficiaries contend that the evidence shows, at the end of the Third

2    Account, that Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the

3    additional principal amount of **$3,147,976** (i.e., $507,935 + $2,640,041). If there is no liability to

4    Klein on the lapse of the Phoenix life insurance policy, the only issue Klein truly contests, either

5    because he was not negligent or because he was acting "reasonably and in good faith," the

6    principal surcharge reduces to additional **$808,642** (*i.e.* $3,147,976 - $2,339,334) owed by Klein

7    to the collective Trusts at the close of the Second Account.

8    To summarize, according to the Menlo beneficiaries forensic expert, the "rolling"

9    surcharge to Klein for cash taken by Klein from the Trusts, plus actual interest paid by the Trust

10   on those Trust funds in Klein's possession, less monies Klein applied to Trust expenses, through

11   the September 30, 2018 closing date of the Third Account, totals **$10,605,392** (*i.e.* $8,217,645

12   +$1,579,105 + $808,642). If Klein is also liable for lapse of the four Phoenix insurance policies

13   through the Third Account, the additional "rolling" claim for damages utilizing the Wirtz

14   calculations is an additional **$8,618,775** (i.e., $1,790,231 + $4,489,210 + $2,339,334), excluding

15   the Menlo beneficiaries' additional claims for tax liabilities.

16   **Klein and LKA's Contentions in Reply**

17   In his consolidated reply to the Menlo beneficiaries' post-trial contentions on each of the

18   three Klein accountings, Klein correctly notes that the order for reference does not encompass

19   issues with respect to Trustee removal, but also takes the position that "claims relating to matters

20   before the First Accountings" are outside the Referee's authority.[37]

21   Klein requests that the Referee strike the Menlo beneficiaries' closing briefs because they

22   were not filed concurrently with Klein's closing briefs as previously directed, a situation

23   resulting from the health constraints of the Menlo beneficiaries' counsel. Klein contends that the

24   Referee's order permitting Klein to file a reply brief, a right not given or afforded to the Menlo

25

26   [37] To the extent Klein is asserting that he can arbitrarily commence his first accountings at arbitrary points
     in time, skipping years of Klein's post-Trustee acceptance, management and control, as an artifice to
27   avoid millions of dollars in interim Trust asset misappropriation, Klein is sorely mistaken, (See analysis
     and discussion. *infra*.).
28

beneficiaries, "is insufficient to remedy" the untimely filings. The Referee considers Klein's added right to file a reply brief to be an advantage, not a disability, with absolutely no prejudice whatsoever to Klein. Klein's motion to strike the Menlo beneficiaries' closing briefs is denied.

In further reply, Klein accurately recites Probate Code §16440(b), which affords a trial court the discretion to excuse a trustee from liability for breach of trust committed reasonably and in good faith, "if it would be equitable to do so," including where the trustee believes he/she/it/they are following the wishes of the settlor, despite the language of the trust instrument, citing *Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 296.

Referencing the testimony of its insurance expert, Steven Burgess ("Burgess"), Klein suggests that the downgraded financial condition of Phoenix Life Insurance, in and of itself, is sufficient to render Klein's decision to lapse four of those policies reasonable. Further, Burgess testified that "insurance companies routinely promote and encourage borrowing from policies."

Along with the Referee, Klein takes the position that unrealized income tax liabilities arising out of the lapse of the Phoenix Insurance policies are speculative. Klein cites *Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 952.

Klein reiterates the position taken in his initial closing brief that the Referee should disregard the testimony of forensic expert O'Bryan because of (1) the alleged "taint" of Judge Cowan's order compelling disclosure of communications to and from Klein's account preparer Magnes, which communications Klein contended were protected by attorney-client privilege and work product; and (2) O'Bryan's reliance upon Trust banking and insurance documents, including Klein's own personal and law firm bank accounts, which Klein contends violate the constraints of *People v. Sanchez, supra*, 63 Cal.4th 665.

Klein also correctly notes that O'Bryan's calculations of funds not used to benefit the Menlo Trusts include lines of credit which "could have been used for, *inter alia*, [Klein's] accounting and legal fees." The Referee understands that paragraph 6 of Judge Suzuki's order for reference expressly carves out for future trial court determination the issues of "(i) surcharge of Trustee for professional fees and (ii) liability of Trustee for prejudgment interest." To the extent

the Referee recommends Klein be surcharged for breach(es) of trust, utilizing O'Bryan's

calculations, Klein shall be entitled to potential credit for professional fees, including accounting

and legal fees, if any, which the trial judge determines in Phase II of this bifurcated trial were

properly incurred by Klein as a legitimate trust expense. Because that issue is deferred for future

trial court determination, the Referee takes no position as to the propriety of any offset against

surcharge for Klein's attorney fees and costs.[38]

Klein's reply reiterates his contention that he is entitled to $1,827,548.04 in trustee fees

above and beyond the $750,000 which Klein paid himself in 2005. Klein contends "it makes no

difference whether the $750,000 trustee fee payment was authorized at the time," as that sum has

been reduced from Klein's total entitlement calculation. Klein challenges the "industry standard"

testimony offered by O'Bryan with respect to trustee fees for the management of unmatured

whole and life insurance policies in a trust portfolio, as hearsay.[39]

Klein asks the Referee to approve all three accountings and to award him an additional

$1,748,170.98 in trustee fees.

LKA, in its reply, observes that the six Menlo Trust beneficiaries who are seeking damages

against LKA "dedicate very little real estate in their Closing Briefs to issues related to LKA."

Specifically, it is argued by LKA that there was "no evidence that LKA misused funds belonging

to the Six Petitioners, took any funds for its own purposes, or conspired with or aided and

abetted the Trustee in any way."

---

[38] "[L]itigation seeking to remove or surcharge a trustee for mismanagement of trust assets would not warrant the trustee to hire counsel at the expense of the trust. Such litigation would be for the benefit of the trustee, not the trust." *Butler v. LeBouef*, (2016) 248 Cal. App. 4th 198, 213, quoting *Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221, 1227. Fee awards have been denied or reduced, *inter alia*, where the attorneys helped prepare an inaccurate accounting (*Estate of Keyston* (1951) 102 Cal.App.2d 223, 231–232); unsuccessfully defended an accounting (*Estate of Vokal* (1953) 121 Cal.App.2d 252, 258); or unsuccessfully defended a petition to remove or surcharge the trustee (*Estate of Miller* (1968) 259 Cal.App.2d 536, 546–547).

[39] The Referee sustains Klein's hearsay objection on this particular point. Nor may forensic accountant O'Bryan testify as an expert on this specific issue, given his lack of personal experience assessing carry value on unmatured whole and universal life policies in the context of Probate Code §1060 *et seq.* accounting schedules. Both sides are actually incorrect on this issue, as the proper carry value is expressly detailed in the CEB *Fiduciary Accounting Handbook* text (see discussion, *infra*).

LKA references forensic expert O'Bryan's concession that he had "no information as to whether LKA used the Six Petitioners' funds for its own purpose or for other trust purposes." Unlike Trustee Klein, LKA is not a trustee. As correctly noted by LKA, it is the Menlo beneficiaries' burden to establish liability and damages as to LKA.

<div align="center">

**STATEMENT OF DECISION AND
SETTLEMENT OF THE TRUSTEE'S FIRST ACCOUNT**

</div>

**When Does the Trustee's First Account Begin?**

As stated above, Klein accepted 22 of his 24 trusteeships in 1996. The remaining two trusteeships were accepted by Klein in 1999 (Daniel Winter) and 2002 (Jonathan Lifschutz), respectively.

Klein, in his First Accountings, reluctantly admitted his role in paying Trust obligations as Trustee from and after **1996**. [See, *e.g.*, Supplement[s] to First Account and Report, for Frank Menlo, at verified Report, ¶ 45]. Klein, in his capacity as Trustee, conceded making all of the accounting log contribution payments from the Menlo Trust beneficiaries on Trust insurance policies beginning February 23, 1998 (American General Insurance) and January 22, 1999 (Transamerica Insurance). [*Id.*, at Exs. 8-9 and verified Report, ¶¶ 41-42]. Klein's First Accountings include written correspondence by Klein to a number of the 24 Menlo beneficiaries establishing Klein's management and control of the Trust brokerage accounts by March 11, 2002 [*Id.*, at Ex. 14], after, as credibly testified to by Frank Menlo, Sam Menlo's second stroke had rendered Sam incompetent to conduct or advise on business matters of any kind.

In addition, Klein testified at trial and reported in the First Account that he paid himself a $750,000 Trustee Fee "as a partial deposit" **for his retroactive management** of the 24 Menlo Trusts **prior to June 2005**. [See, *e.g.*, Supplement[s] to First Account and Report for Frank Menlo, at verified Report, ¶44.]

Despite Klein's acceptance of all but two of the 24 Trusteeships in 1996; Klein's post-1996 actions fully consistent with fiduciary administration and management; what the Referee

finds to be Klein's unequivocal supervision and control of all Menlo Trust decision-making no later than 2002; and Klein's withdrawal of $750,000 from Trust insurance policies in June 2005 as compensation for *prior* Trustee services rendered, Klein's 24 First Accounts nevertheless select arbitrary opening dates of trusteeship between February 1, 2003 and April 13, 2009, with only the five Winter family accounts having a First Account starting date prior to May 19, 2006. [See fn. 9, *ante*.][40]

At trial, during voir dire by Klein's counsel on the qualifications of forensic expert O'Bryan, counsel held in his hand the CEB text *Fiduciary Accounting Handbook*, and asked O'Bryan:

"What is a leading treatise in California on fiduciary accounting?"

And though Klein does not now cite that treatise in his closing briefs, the text is insightful on how to set a Trustee's opening account date. Where Trustees, as here, succeed one another "in lock step," the succeeding Trustee's account commences "the day after the ending date of the prior account." CEB, *Fiduciary Accounting Handbook* (2022), §4.6, p. 161.

To the extent there may be one or more days vacancy between the prior trustee's resignation(s) and Klein's acceptance, or, as here, where there was no prior accounting, the CEB text advises that "the trustee who assumes office after vacancy may wish to use at his or her beginning date the date he or she accepts the trust." CEB, *Fiduciary Accounting Handbook*, *supra*, §4.8, p.164. As noted in the treatise, **"[t]he beginning date of the trustee's account signifies the date that a person becomes accountable to the beneficiaries."** Here, the Referee determines that Klein became accountable to the Menlo beneficiaries on the day he accepted each of the 24 Trusteeships.

---

[40] Given the many hundreds of Trust transactions Klein managed and administered prior to the arbitrary starting dates of many if not most of his First Accountings, and given Klein's complete lack of any corroborating evidence, Klein's contention that Sam and/or Vera Menlo served as *de facto* trustees during these periods is not credible. The Referee factually finds that Sam Menlo was without competence in and after 2002, and that Klein kept Vera Menlo completely in the dark with respect to her understanding of the Trusts' terms and any and all actions Klein transacted within the Trusts (other than providing certain grandchildren financial assistance in home purchases).

To the extent Klein contends that *as a condition of* acceptance of the 24 trusteeships,  he delegated decision-making to the co-settlors, loss becomes only a question of liability due to improper fiduciary delegation,[41] not a question of when to commence the Trustee's periods of accounting.

### How Must the Court Assess the 24 Missing Accounting Periods?

The date of Klein's acceptance of the respective Trusteeships, to the date that Klein elected to first account, are deemed periods of missing accounting, accentuated by then- Commissioner Cowan's December 20, 2013 explicit order that Klein account from *"the time period commencing when Leslie Klein first became trustee of the Trust*, to the present day."  Those missing account periods are specifically as follows:

Abraham Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Samuel Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Esther Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Rachel Deutsch – 9/10/96-2/26/09 (12 yrs., 5 mos.)

Mordechai Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Deborah Deutsch – 9/10/96-2/26/09 (12 yrs., 5 mos.)

Zev Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Tanya Menlo -- 9/10/96-7/22/08 (11 yrs., 10 mos.)

Franklin Menlo -- 9/10/96-7/22/08 (11 yrs., 10 mos.)

Jonathan Menlo – 9/10/96-12/31/07 (11 yrs., 3 mos.)

Yeshia Frankel -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Rochelle Lipschutz -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Moishe Frankel -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

---

[41] As stated in Probate Code 16012(a):

> **"The trustee has a duty not to delegate** to others the performance of acts that the trustee can reasonably be required personally to perform and may not transfer the office of trustee to another person nor delegate the entire administration of the trust to a cotrustee or other person."
> (Emphasis added.)

Madeline Lipschutz -- 9/10/96-5/21/06 (9 yrs., 8 mos.)

Faye Lipschutz -- 9/10/96-5/17/06 (9 yrs., 8 mos.)

Avi Lipschutz -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

Dov Lipschutz -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

Asher Frankel -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Norine Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Michael Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Jeremy Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Amanda Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Jonathan Lifschutz -- 12/26/02-4/12/09 (6 yrs., 3 mos.)

Daniel Winter -- 10/28/97-1/31/03 (5 yrs., 3 mos.)


Quoting the California Supreme Court in *Blackmon v. Hale* (1970) 1 Cal. 3d 548, 560:

**"Trustees are . . . under an obligation to render to beneficiaries a full account of all their dealings with the trust property, and where there has been a negligent failure to keep true accounts all presumptions are against them upon a settlement** [citing *Estate of McCabe* (1950) 98 Cal.App.2d 503, 505 ("*McCabe*") and *Purdy v. Johnson* (1917) 174 Cal. 521, 527 ("*Purdy*")]." (Emphasis added.)

As held in the referenced appellate opinion in *McCabe, supra*:

**Trustees are ... under the duty to prove every item of their account by "satisfactory evidence"; the burden of proof is on them and not on the beneficiary; and any doubt arising from [the Trustee's] failure to keep proper records, or from the nature of the proof they produce, must be resolved against them** [citing *Purdy*]. (98 Cal. App. 2nd at 505.) (Emphasis added.)

If the 24 litigating Trusts are combined, there are a collective **156 years of missing first accountings**. Klein purported to have maintain *no records* of those Trusts during the entirety of the First Accounting period, other than the court-filed accounting which was crafted after-the-fact in 2013, for certain years only, prepared someone other than Klein with very limited document access. Meanwhile, the forensic accountant retained by the Menlo beneficiaries *located records* of more than 10,000 Trust transactions across what should be the First

Accounting period, including voluminous records associated with Klein's personal bank accounts and his LKA law firm account. Klein's response is not to object to the accuracy of those thousands of transactions, but rather, to object on hearsay grounds to the consideration of *all* applicable Trust insurance, banking and personal records which were Klein's duty to make available in the first instance. No claim has been made by Klein or LKA that the underlying Trust or personal records are untrustworthy.

### Does Klein Have a Valid *Sanchez* Hearsay Defense to Undisputed Forensic Accounting Testimony?

Under *Sanchez, supra*, where an expert testifies to "case specific" out-of-court statements to explain the basis for an opinion, the out-of-court statements must be properly admitted through an applicable hearsay exception. (63 Cal.4[th] at 684.)

Throughout the trial, both Klein and LKA, on behalf of the Trustee and his law firm, rendered continuing objections to prevent the admission of any records of Trust transactions procured from an institutional third party custodian of records. Most of those records were obtained directly by the Menlo beneficiaries through records subpoenas to the Trust's banks and insurance companies; while the LKA records were handed over by counsel for LKA to counsel for the Menlo beneficiaries during discovery.

In formulating his conclusions, forensic expert O'Bryan relied upon business records received from five insurers (Aetna/Lincoln; Phoenix; AIG; Transamerica and Union Central); two institutional brokerage houses (Morgan Stanley and UBS); and the Bank of America. The Bank of America records consisted of the LKA bank records, the MCT account opened by Klein, and Klein's personal bank records.

In light of the *Sanchez* objection, the Menlo beneficiaries were directed by the Referee to submit evidence of authentication of the business records relied upon by O'Bryan to establish the thousands of Trust transactions which formed the basis for his calculations

In a filing on March 9, 2022, the Menlo beneficiaries provided a sworn certification from Phoenix Insurance dated July 20, 2014 and a further certification dated October 13, 2014. Both certifications satisfy the criteria of Evidence Code §§1561-1562, rendering the Phoenix insurance records admissible as business records under Evidence Code §1271. The documents from American General Insurance (AIG) were received through its litigation counsel in a formal discovery production response on August 13, 2014. The documents from Transamerica Insurance were delivered with the certification from its custodian of records on July 21, 2014. The Referee determines those deliveries and certifications trustworthy and compliant with the Evidence Code authorization permitting verified business records to be admissible in lieu of the personal testimony of each company's custodian of records.

In the same submission, the Menlo beneficiaries provided a June 22, 2017 declaration from the authorized records custodian for Morgan Stanley, which declaration satisfies the criteria of Evidence Code §§1561-1562, rendering the Morgan Stanley records for the applicable Menlo beneficiaries admissible as business records under Evidence Code §1271. The custodian of records for the Bank of America also authenticated its records in a notarized declaration filed August 11, 2017, rendering admissible its bank records for the MCT and the bank records, credit card account statements and safe-deposit box records for Klein himself.

In a follow-up filing on March 22, 2022, the Menlo beneficiaries submitted a March 21, 2022 declaration from the authorized records custodian for Ameritas Life Insurance, verifying the records of its predecessor company, Union Central Insurance, plus a March 21, 2022 declaration from the custodian of records for Lincoln National Life Insurance (formerly Aetna); each entity properly authenticating the records of the Menlo Trusts. The Menlo beneficiaries also submitted the June 26, 2017 declaration from UBS authenticating the institutional brokerage records for those Menlo beneficiaries with Trust accounts outside of Morgan Stanley.

The only remaining set of records relied upon by O'Bryan in his compilation and analysis of Trust transactions are the bank records of Klein's law firm, LKA, which, according to the aforementioned submissions by the Menlo beneficiaries, were delivered directly to counsel for

the Menlo Beneficiaries from LKA's counsel. Evidence Code §1221 codifies the hearsay exception for adoptive admissions by providing that "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his [or her] adoption or his [or her] belief in its truth." The delivery to the Menlo beneficiaries by LKA of LKA bank records renders the documents admissible as an adoptive admission.

A California trial court has wide discretion to determine whether there is a sufficient foundation to qualify evidence as a business record. *Conservatorship of S.A.* (2018) 25 Cal. App. 5th 438, 447. As previously determined during the trial, the Referee finds that the records relied upon by O'Bryan to be trustworthy and all supported by sufficient foundation to be admissible. Klein and LKA's *Sanchez* hearsay objections to O'Bryan's reliance upon Trust records from the relevant insurance companies and brokerage houses, and Klein's personal and business records from the Bank of America, were and remain overruled.

### What are Klein and LKA's Claims of "Taint" from the Poisonous Tree?

The Menlo beneficiaries, whipsawed between Klein's claims of no Trust records and Klein's exclusion from participation in the preparation of his own verified accountings, on one hand, and Klein's tactical decision to shield his anointed account preparer, Magnes, from discovery as a privileged consultant, on the other, the Menlo beneficiaries requested and received relief from Judge Cowan, ordering Magnes' work product subject to discovery without attorney-client privilege or work product protection.

Despite Klein's unsuccessful efforts to overturn Commissioner Cowan's ruling through and including requests for extraordinary relief in the California Supreme Court, Klein asked the Referee to exclude from evidence at trial any communications between Ms. Magnes and Klein's counsel, or any communications between Magnes and Klein in the presence of or copied to counsel.

1     The matter was briefed and argued. While concepts of fundamental fairness had been

2  utilized to allow the Menlo beneficiaries in pretrial discovery to learn how and under what

3  direction Klein's accountings were prepared, the Referee determined that whatever

4  communications Magnes may have had with or in the presence of counsel, written or verbal,

5  would not be critical to a factual determination of the facial sufficiency of the accountings.

6  Inasmuch as Judge Cowan's intended purpose was accomplished at the pretrial stage, the Referee

7  found no need to expand issues for review as the accountings are by law required to be complete

8  and supported by corroborative documentary evidence, subject to adverse presumptions where

9  there are accounting deficiencies.  Over the objection of the Menlo beneficiaries, the Referee

10 granted Klein's requested exclusion order.

11    During testimony, particularly with both with Klein and Magnes, the Referee made

12 diligent efforts to admonish witnesses not to involuntarily disclose any information which

13 Klein's counsel contended to be privileged. To the Referee's information and belief, no such

14 information was ever presented at trial. In the presentation of his forensic testimony, expert

15 O'Bryan testified that he *never* reviewed information or documentation which Klein claimed to

16 be privileged or work product, in the formulation of his calculations, opinions or otherwise. With

17 the record so sanitized, and outside the purview of the testifying experts, the Referee is satisfied

18 that the exclusion order was honored throughout the trial.

19    Despite these efforts, in his closing briefs, Klein notes that pretrial records containing

20 such information had at some point been made available to O'Bryan's accounting firm.

21 Despite O'Bryan's unequivocal testimony that those records had been segregated from his

22 personal review and consideration, Klein contends that O'Bryan's opinions and calculations

23 were nevertheless "tainted" by what Klein claims to be attorney-client and work product

24 discovery authorized by Judge Cowan.[42]

25

26  _____

27  [42] See, *e.g.*, 14 Tr. 2742-2743 (First Accounts), O'Bryan testifying:

28

The Referee finds no prejudice to Klein by virtue of Klein's involuntary compliance with Judge Cowan's order combined with the Referee's exclusion of any such evidence at trial. Arguable prejudice was directly eliminated by the Referee's refusal to entertain consideration of any document or communication which Klein contended to fall within such protections.

**The Menlo Beneficiaries' "Floating" Exhibit List**

Klein claims generic prejudice by virtue of the Menlo beneficiaries' exhibit list late filing and subsequent modifications during the course of the trial. Klein, however, points to no specific exhibit, the production of which in any way was previously undisclosed or otherwise prejudicial to Klein.

For the most part, mid-trial modifications of the Menlo beneficiaries' exhibit list consisted of previously shared illustrative exhibits of forensic expert O'Bryan, as to which the Referee ordered recalculations in order to delete factual or legal theories of liability that the Referee determined to be inapplicable. In other words, most if not all of the modified illustrative exhibits were beneficial, not prejudicial, to Klein.

---

"Q. Okay. And I think you told me earlier, though, that even though it appears that your firm spent more than 20 hours at a minimum reviewing the White Zuckerman documents, none of it was used in preparing your analysis for this case?
A. That's correct."

Also see 17 Tr. 3205 (Second Accounts), O'Bryan testifying:

"Q. Did you -- did you use any of the privilege[] log documents in the preparation of this database?
A. No, the privilege[] log documents had nothing to do with the financial transactions."

Also see 20 Tr. 2813 (Third Accounts), O'Bryan testifying:

"Q. Okay. Did you use any of [Klein's privilege log] documents in the preparation of your database?
A. No.
Q. Did you use any of those documents in your analysis of the damages cost to the trust in the third accountings?
A. No."

**Should Klein Be Surcharged on the First Account?**

The cross-account transactional audit conducted by forensic accounting expert O'Bryan on the true First Accounting periods for the 24 Trusts, as well as the lesser time periods for which Klein elected to account, were exhaustive. The approximately 10,000 transactions conducted by Klein on behalf of the Trusts during the true First Accounting periods, most of which transactions are completely ignored in Klein's verified First Accounts, were separately detailed by O'Bryan. (Ex. 828A.)

The testimony of O'Bryan was clear, convincing and credible. Thousands of the transactions conducted by Klein on behalf of the Trusts, identified by O'Bryan, were *excluded* from Klein's verified First Accounts.

The Referee finds that through an elaborate scheme to pay himself by co-mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-paying debts -- filtered with stunning frequency through Klein's personal and business accounts with multiple other sources of income and receipts and outgoing payments, Klein was able to collectively embezzle millions of dollars from the Menlo Trusts.

Menlo Trust transactional funds were moved by Klein into and out of his LKA attorney-client trust account, in the words of O'Bryan and as established in the audit, "all the time." During the entirety of the true First Accounting periods across the 24 Menlo Trusts, $2,753,152 was removed by Klein as loans taken by Klein either personally or through LKA against Menlo Trust insurance policies; $1,959,334 was removed by Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts; $1,046,418 was taken by Klein into the personal accounts of Klein and his wife Erika as overdraft protection against the Bank of America "MCT" account opened by Klein and funded by Menlo Trust assets; $874,550 was taken by Klein from the Menlo Trust-funded "MCT" into the Klein's LKA law firm account and for other Klein uses: and $324,582 in Menlo Trust checks and funds were taken by Klein directly into Klein's LKA law firm account and for other Klein uses. (Ex. 834, at 11.)

Against these sums, over the entire true First Account periods across the 24 Trusts, a net credit of ($105,416) in cash was returned by Klein to various Menlo Trusts and ($628,112) was paid by Klein for Trust insurance premiums, accounting fees and for attorney fees to Madeline Lipschutz in a family law matter. (*Ibid.*)

As noted above, subject to any Phase II credit(s) given by the trial judge to Klein on the First Accountings for attorney fees and litigation expenses in preparation of grossly and intentionally incomplete verified accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the true periods of the First Accounting, and never returned, in terms of outright misappropriations, totals $6,224,540.**

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. The 24 verified First Accountings submitted by Klein, by Magnes' admission, completely ignore funds diverted from the Menlo Trusts to and from the MCT account, the LKA account, and Klein's personal bank accounts. Magnes appears to have been spoon-fed documents and numbers that Klein, through his counsel, wanted Magnes to include, to the exclusion of the client's known business and personal accounts, and a separate Klein-created Trust bank account, through all of which the Referee finds that Klein was able to and did misappropriate $6,224,540 in funds for his personal use during the First Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon settlement rendered against Klein. where, as here, the Referee finds "a ... failure to keep true accounts" (*Blackmon v. Hale, supra,* 1 Cal. 3d at 560); and also where, as here, "any doubt from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe, supra,* 98 Cal.App.2d at 505), **Klein is surcharged in the principal sum of $6,224,540 for outright cash misappropriations across the 24 Trusts during the true periods of the First Account, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013.**

It is not simply the misappropriations, however, that damaged the Menlo Trusts during the true First Accounting periods. The misappropriations, in part, came from $2,753,152 in loans taken by Klein against the value of Trust insurance policies, and $1,959,374 in loans taken against lines of credit against Trust Brokerage Accounts. The Menlo Trusts, not Klein, serviced in some form or fashion *all of the interest* due and owing on those combined $4,712,526 in loans. The interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the true First Accounting periods totaled $1,693,048. The interest charged by brokerage houses to service Trust lines of credit taken by Klein during the true First Accounting periods totaled $300,049.

Absent the $6,224,540 in misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the appropriate First Accounting periods, there would have been no need for the Trust to borrow funds and to subsequently service those loans. In light of the massive disparity between the millions of dollars in cash debits taken by Klein and the modest credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein from Trust assets during the First Accounting periods were for purposes of non-Trust use and therefore misappropriation.

As declared in Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

> "(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:
>
> (1) **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
> (2) Any profit made by the trustee through the breach of trust, with interest.
> (3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.
>
> (b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly the combined $1,993,097 in interest obligations **paid by the Menlo Trusts** during the First Accounting periods to subsidize the $4,712,526 in loan funds taken personally by Klein during the First Accounting periods are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $1,993,097, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013, for diminution in value to the Menlo Trusts for actual interest paid by the Trusts on loan funds taken by Klein during the First Account.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts. The Referee finds unequivocally that none of Klein's acts resulting in surcharge were performed reasonably or in good faith.

The third and final surcharge question is whether Klein breached the relevant Trusts during the true First Accounting periods by causing a $5,000,000 face value Phoenix Insurance universal life policy (#2346693) to lapse. At the time of the lapse decision, Klein was represented by counsel. On April 24, 2013, Klein sent a letter to the Menlo beneficiaries asking their position with respect to the lapse of the Phoenix policies 2265404 and 2346693. (Ex. 850.) The Menlo beneficiaries, through counsel, responded that it appeared Klein, through "wrongful borrowings," had depleted the value of the policies, but without a full accounting, the propriety of lapse decisions could not be gauged. (Ex.851.) Klein, through counsel, responded (ironically) that he would need to "invade the assets of the Irrevocable Trusts to fund the premiums due."

(Ex. 852.) Klein subsequently asserted, through counsel, that he would forthwith be liquidating the Menlo beneficiaries assets to pay Phoenix premiums. (Ex.854.)[43]

The evidence was undisputed that at the time of the Phoenix 2346693 policy lapse, including through Klein's insurance expert Burgess, that it was a reasonable decision for Klein to allow the policy to lapse due to the combination of loans *taken by Klein personally* against the Phoenix policy, continued unpaid interest accruing on those loans, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, further reducing policy value.[44]

The core cause of the Phoenix policy lapse was the loan funds taken by Klein against the lapsed Phoenix policy, which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policy was exclusively the result of Klein's misappropriation of trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums (see, e.g., Ex.434, at 3). The Referee finds not credible Klein's claim that Sam Menlo had directed the Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the Phoenix loan proceeds for himself.

---

[43] By this point, Klein, through many hundreds of loan transactions and asset transfers in and out of different accounts, had been liquidating Menlo Trust assets for years for his own personal benefit.

[44] The audits establish that between 2004 and 2012, a net $4,588,152 in cash loans was taken by Klein as against Phoenix and Lincoln Life insurance policies owned by the relevant Menlo Trusts. From Lincoln, Klein withdrew $100,000 cash in 2004 and $872,153 cash in 2008. From Phoenix, Klein withdrew $750,000 cash in 2005, $1,000,000 cash in 2007, $775,000 cash in 2008, $350,000 cash in 2010, and $1,050,000 cash in 2012. $300,000 cash was returned by Klein to Phoenix in 2009. Of the net $4,588,152 cash removed by Klein from the insurers, $2,773,152 were sent to deposited to LKA or to Klein individually. The balance of $1,825,000 was deposited into Klein's "MCT" account. As noted earlier, no reference to asset dispositions into the LKA account, Klein's personal accounts, nor the MCT accounts found their way into Klein's verified accountings, nor was Magnes authorized to inquire into or examine that data. (Ex. 434.)

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the $5,000,000 policy death benefit, less the principal amount of loans, thereby retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse, and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans, according to Wirtz, there should still have been $1,790,231 remaining in policy value.

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the First Accounting period of $1,790,231. **Klein is surcharged an additional $1,790,231 for the unreasonable diminution in value of the collective corpus of the 24 Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013.**

**The total principal surcharge to Klein for the true period of the First Accountings is determined to be $10,007,876** (*i.e.*, $6,224,540 + $1,993,097 + $1,790,231) (Ex. 834, at 11), less any attorney fees and costs incurred by Klein during the period of the First Accounts determined by the trial judge in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the net surcharge, if any, as further determined by the trial judge in Phase II.

Breaking down the net collective surcharge on an individual Trust basis, the surcharge sums (or credits) for the First Account are found, based upon substantial evidence, to be allocable as follows:

Abraham Deutsch -- ($165,044)

Samuel Deutsch – ($56,424)

Esther Deutsch – ($67,214)

Rachel Deutsch – ($27,220)

**Mordechai Deutsch -- $696,646**

**Deborah Deutsch -- $1,516,890**

**Zev Deutsch -- $738,752**

**Tanya Menlo -- $66,597**

**Franklin Menlo -- $51,741**

**Jonathan Menlo -- $693,714**

**Yeshia Frankel -- $658,620**

**Rochelle Lipschutz -- $780,115**

**Moishe Frankel -- $739,603**

**Madeline Lipschutz -- $793,217**

**Faye Lipschutz -- $703,514**

**Avi Lipschutz -- $680,133**

**Dov Lipschutz -- $785,301**

**Asher Frankel -- $751,428**

**Norine Winter -- $145,601**

**Michael Winter -- $60,225**

**Jeremy Winter -- $60,226**

**Amanda Winter -- $61,333**

**Jonathan Lifschutz -- $30,302**

**Daniel Winter -- $60,224** (Ex. 834, at 12.)[45]

---

[45] One of the many reasons these sums are so widely variable among the 24 Menlo beneficiaries is because O'Bryan was required to and did reconcile the many hundreds of cross-Trust loans and transfers Klein had made between and among the 24 Menlo beneficiaries. In addition, *inter alia*, only certain Menlo beneficiaries' accounts were utilized to subsidize the line of credit loans taken by Klein; while percentage ownerships of the Menlo Trust life insurance policies varied across the 24 Trusts, with the insurance policy loan funds taken by Klein affecting only certain Menlo beneficiaries.

Four of the Menlo Trust beneficiaries, Abraham Deutsch, Samuel Deutsch, Esther Deutsch and Rachel Deutsch, are accordingly not entitled to surcharge judgment against Klein on the First Accounting. The remaining 20 Menlo Trust beneficiaries are entitled to surcharge judgments in the respective principal sums identified above.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 20 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's First Accountings?**

In their respective initiating accounting, removal and surcharge petitions, the 20 prevailing Menlo beneficiaries pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a... trust... the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $8,217,645 of Menlo Trust cash during the period of the true First Accountings, including interest paid for which Klein should be liable; laundering funds through many hundreds of unnecessary intra-trust transactions and multiple repositories, including, *inter alia*, the commingling of assets of 24 individual Trusts and then frequently across Klein and his other clients' assets via his law firm attorney-client trust account; the use of the MCT account as a clearinghouse for additional misappropriated funds; and use of Menlo Trust cash to pay

$1,046,418 of his own personal credit card expenses through undisclosed overdraft authorization on the surreptitious MCT fund transfer account.

The remaining surcharge award associated with Klein's lapse of the Phoenix insurance policy is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as properly adjusted. Klein's direct cash misappropriations associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the four non-prevailing beneficiaries are filtered out, total **$8,533,547, payable in the following additional sums**:

**Mordechai Deutsch -- $535,525**

**Deborah Deutsch -- $1,516,890**

**Zev Deutsch -- $577,631**

**Tanya Menlo -- $66,597**

**Franklin Menlo -- $51,741**

**Jonathan Menlo -- $532,593**

**Yeshia Frankel -- $497,507**

**Rochelle Lipschutz -- $618,994**

**Moishe Frankel -- $578,482**

**Madeline Lipschutz -- $793,217**

**Faye Lipschutz -- $542,393**

**Avi Lipschutz -- $519,012**

**Dov Lipschutz -- $624,180**

**Asher Frankel -- $590,307**

**Norine Winter -- $145,601**

**Michael Winter -- $60,225**

**Jeremy Winter -- $60,226**

**Amanda Winter -- $61,333**

**Jonathan Lifschutz -- $30,302**

**Daniel Winter -- $60,224** (Ex. 834, at 12.)

It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the First Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5th 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's First Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the First Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the First Account. While four of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the First Account, had Klein maintained and delivered an appropriate and accurate First Account for each of the 24 Menlo Trusts, they would not have had to engage in a ten-year litigation to unravel proper debits and credits as to the allocation of Klein's misappropriations. Klein breached multiple trust obligations to each of those four beneficiaries, including with respect to Klein's complete lack of record keeping and failure to timely and accurately account. (*Smith v. Szeyller, supra,* 31 Cal.App.5th at 461-462.)

## STATEMENT OF DECISION ON
## SETTLEMENT OF THE TRUSTEE'S SECOND ACCOUNT

The Referee incorporates by reference as though fully set forth herein the evidentiary rulings associated with Klein and LKA's *Sanchez* objections, allegations of "taint" associated with Judge Cowan's rulings on discovery regarding preparation of Klein's accountings, and

arguments regarding the timing of receipt of the Menlo beneficiaries' exhibits. For the reasons

articulated above, those objections are again overruled.


### Should Klein Be Surcharged on the Second Account?

The cross-account transactional audit conducted by forensic accounting expert O'Bryan on Klein's Second Accounts for the 24 Trusts was extensive. The approximately 4000 transactions conducted by Klein on behalf of the Trusts during the Second Accounting period, hundreds of which transactions were completely ignored in Klein's verified Second Accounts, were separately detailed by O'Bryan. (Ex. 843.)

As previously determined in the Referee's Statement of Decision on Klein's First Accounts, the testimony of O'Bryan on Klein's Second Accounts was clear, convincing and credible. Though at the time litigating against the Menlo beneficiaries and represented by current counsel, many hundreds of transactions conducted by Klein on behalf of the Menlo Trusts, identified by O'Bryan, remained *excluded* from Klein's verified Second Accounts.

The Referee finds that through an elaborate scheme to continue to pay himself by co-mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-paying debts -- filtered with stunning frequency through Klein's personal and business accounts containing multiple other sources of income and receipts and outgoing payments, Klein was able in the Second Accounts to perpetuate and further extend his design to misappropriate funds from the Menlo Trusts.

Menlo Trust transactional funds continued to be moved by Klein into and out of his LKA attorney-client trust account. During the entirety of the Second Account across the 24 Menlo Trusts, a net $254,649 in cash was removed by Klein from the Menlo Trusts and not returned by the December 31, 2016 Second Account closing date; an additional $1,282,783 was removed by Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts; an additional $172,101 was taken by Klein into the personal accounts of Klein and his wife Erika as overdraft protection against the Bank of America "MCT" account opened by Klein and funded

by Menlo Trust assets; and $75,956 in Menlo Trust checks and funds were taken by Klein directly into Klein's LKA law firm account and for other Klein uses. (Ex. 842, at 3.)

Against these sums, over the Second Accounting across the 24 Menlo Trusts, a net credit of ($73,061) in cash was returned by Klein to his MCT Bank of America account and ($559,190) was paid by Klein for Trust insurance premiums to pay for insurance premiums on Trust insurance policies not yet lapsed (*Ibid.*)

As noted above, subject to any Phase II credit(s) given by the trial judge to Klein on the Second Accountings for attorney fees and litigation expenses in preparation of the incomplete accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the Second Accounting period, and never returned, totals $1,153,228.**

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. The 24 verified Second Accountings submitted by Klein, by Magnes' admission, once again ignore the disposition of funds diverted from the Menlo Trusts to and from the MCT account, the LKA account, and Klein's personal bank accounts. The Referee finds that Klein was able to and did misappropriate $1,153,228 in funds for his personal use during the Second Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon its settlement rendered against Klein; where, as here, the Referee finds "a ... failure to keep true accounts" (*Blackmon v. Hale, supra*, 1 Cal. 3d at 560); and also where, as here, "any doubt from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe, supra*, 98 Cal.App.2d at 505). **Klein is surcharged in the principal sum of $1,153,228 for net cash misappropriations across the 24 Trusts during the Second Account, plus any interim prejudgment interest to be determined to have accrued after the close of the** Second **Accounting period on December 30, 2016.**

It is not only the cash misappropriations damaging the Menlo Trusts during the Second Accounting period. The misappropriations, in part, came from $1,282,783 *in additional loans* taken by Klein during the Second Accounting period against lines of credit obligating Menlo Trust Brokerage Accounts. The Menlo Trusts, not Klein, serviced *all of the interest* due and owing on those additional loans, and in continuing interest charged on the $4,712,486 in prior insurance and brokerage loans taken by Klein during the period covered by the First Account. The *additional* interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the First Accounting periods, but paid by Klein from Trust funds during the Second Accounting period, totaled $409,134. The *additional* net interest charged by brokerage houses to service Trust lines of credit taken out by Klein during either the First Accounting period or Second Accounting period, but paid by the Trusts during the Second Account, totaled $17,642.

Absent the cash misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the First Accounting and Second Accounting periods, there would have been no need for the Trusts to subsequently service those loans. In light of the disparity between the cash debits taken by Klein without repayment to the Trusts and the credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein against Trust assets during the Second Accounting period were for purposes of non-Trust use and therefore misappropriation.

Pursuant to Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

"(a)  If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:

(1)  **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
(2)  Any profit made by the trustee through the breach of trust, with interest.

(3)  Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

(b)  If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly $426,776 in *additional* interest obligations **paid by the Menlo Trusts** during the during the Second Accounting period to subsidize the $5,995,259 in total loan funds taken personally by Klein during the First and Second Accounting periods, are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $426,776, plus any interim prejudgment interest to be determined to have accrued after the close of the Second Accounting period on December 31, 2016, for diminution in value to the Menlo Trusts for additional interest paid by the Trusts on loan funds taken by Klein during the First and Second Account periods.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts.  The Referee finds that none of Klein's acts resulting in surcharge on the Second Accounts were performed reasonably or in good faith.

The remaining surcharge question on the Second Accounts is whether Klein breached the relevant Trusts during the Second Accounting period by causing two additional $5,000,000 face value Phoenix Insurance universal life policies (#2265404 and #2356295) to lapse. The evidence was undisputed that *at the time* of those policy lapses, as defined by Klein's insurance expert Burgess, it was a reasonable decision for Klein to allow the two insurance policies to lapse due to the combination of loans *taken by Klein personally* against those Phoenix policies, continued unpaid interest accruing on those policy loans, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, significantly reducing the respective policy values.

The core cause of the additional two Phoenix policy lapses was the loan funds taken by Klein against the lapsed Phoenix policies, which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policies was exclusively the result of Klein's misappropriations of Trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums. The Referee finds not credible Klein's claim that Sam Menlo had directed Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the respective Phoenix loan proceeds for himself.

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the additional $10,000,000 in policy death benefits, less the principal amount of loans all the while retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse (calculated to pay out in 2023), and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans, according to Wirtz, there should still have been $4,489,210 remaining in policy values over the two additional lapsed policies. (Ex. 844.)

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the First Accounting period of $4,489,210. **Klein is surcharged an additional**

$4,489,210 for the unreasonable diminution in value of the collective corpus of the 24 Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued after the close of the Second Accounting period on December 31, 2016.

The total principal surcharge to Klein for the Second Accountings is found to be $6,069,214 (*i.e.*, $1,153,228 + $426,776 + $4,489,210) (Ex. 842, at 3), less any attorney fees and costs incurred by Klein during the period of the Second Accounts determined by the trial judge in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the net surcharge, if any, as further determined by the trial judge in Phase II.

Breaking down the net collective surcharge on an individual Trust basis, the surcharge sums (or credits) for the Second Account are found, based upon substantial evidence, to be allocable as follows:

Abraham Deutsch -- ($7211)

Samuel Deutsch – ($7211)

Esther Deutsch – ($7211)

Rachel Deutsch – ($7211)

Norine Winter – ($7256)

**Mordechai Deutsch -- $463,492**

**Deborah Deutsch -- $533,505**

**Zev Deutsch -- $462,492**

**Tanya Menlo -- $37,179**

**Franklin Menlo -- $66,811**

**Jonathan Menlo -- $494,494**

**Yeshia Frankel -- $461,095**

**Rochelle Lipschutz -- $461,095**

**Moishe Frankel -- $461,095**

**Madeline Lipschutz -- $849,571**

**Faye Lipschutz -- $462,492**

**Avi Lipschutz -- $465,111**

**Dov Lipschutz -- $462,492**

**Asher Frankel -- $461,095**

**Michael Winter -- $51**

**Jeremy Winter -- $51**

**Amanda Winter -- $51**

**Jonathan Lifschutz -- $2059**

**Daniel Winter -- $51** (Ex. 842, at 16-38.)[46]

It should be clarified that these calculations are not "running" totals, but rather, are intended to constitute separate surcharge judgments exclusively for the Second Accounting period, independent of the calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the period of the First Accountings as of June 30, 2013.

Five of the Menlo Trust beneficiaries, Abraham Deutsch, Samuel Deutsch, Esther Deutsch, Rachel Deutsch and Norine Winter, are accordingly not entitled to surcharge judgment against Klein on the Second Accounting. The remaining 19 Menlo Trust beneficiaries are entitled to additional surcharge judgments in the respective principal sums identified above.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 19 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's Second Accounts?**

In their initiating accounting, removal and surcharge petitions, the 19 prevailing Menlo beneficiaries on the Second Account pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

---

[46] The Referee's surcharge calculations are exclusive of potential adverse tax consequences associated with income realization upon lapse of the two Phoenix insurance policies during the Second Accounting period. As noted earlier, the Referee determines those potential tax losses to be speculative and not currently recoverable, while not relieving Klein of contingent liability to the extent those tax consequences become realized.

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

"If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a… trust… the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $1,580,004 of Menlo Trust cash during the period of the Second Accountings, including interest paid for which Klein should be liable; laundering funds through many hundreds of unnecessary intra-trust transactions and multiple repositories, including, *inter alia*, the commingling of assets of 24 individual Trusts and then frequently across Klein and his other clients' assets via Klein's law firm attorney-client trust account; the use of the MCT account as a clearinghouse for additional misappropriated funds; and use of Menlo Trust cash to pay an additional $172,101 of his own personal expenses through undisclosed overdraft authorization on the surreptitious MCT account.

The remaining surcharge award associated with Klein's lapse of the two additional Phoenix insurance policies is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as adjusted. Klein's direct cash misappropriations associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the five non-prevailing beneficiaries are filtered out, total **$1,625,311, payable in the following additional sums:**

**Mordechai Deutsch -- $14,571**

**Deborah Deutsch -- $533,505**

**Zev Deutsch -- $13,571**

**Tanya Menlo -- $37,179**

Franklin Menlo -- $66,811

Jonathan Menlo -- $45,573

Yeshia Frankel -- $12,174

Rochelle Lipschutz -- $12,174

Moishe Frankel -- $12,174

Madeline Lipschutz -- $849,571

Faye Lipschutz -- $13,571

Avi Lipschutz -- $16,190

Dov Lipschutz -- $13,571

Asher Frankel -- $12,174

Michael Winter -- $51

Jeremy Winter -- $51

Amanda Winter -- $51

Jonathan Lifschutz -- $2059

Daniel Winter -- $51

It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the Second Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5th 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's Second Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the Second Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the Second Account. While five of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the Second Account, had Klein maintained and delivered an appropriate and accurate Second Account for each of the 24 Menlo Trusts, they would not have had to engage in a multi-year litigation to unravel proper debits and credits as to the allocation of Klein's misappropriations. Klein breached multiple trust obligations to each of those five beneficiaries, including with respect to Klein's complete lack of record keeping and failure to timely and accurately account. (*Smith v. Szeyller, supra*, 31 Cal.App.5[th] at 461-462.)

<div align="center">

**STATEMENT OF DECISION ON
SETTLEMENT OF THE TRUSTEE'S THIRD ACCOUNT**

</div>

The Referee incorporates by reference as though fully set forth herein the evidentiary rulings associated with Klein and LKA's *Sanchez* objections, allegations of "taint" associated with Judge Cowan's rulings on discovery regarding preparation of Klein's accountings, and arguments regarding the timing of receipt of the Menlo beneficiaries' exhibits. For the reasons articulated above, those objections are again overruled.

**Should Klein Be Surcharged on the Third Account?**

The cross-account transactional audit conducted by forensic accounting expert O'Bryan on Klein's Third Accounts for the 24 Trusts was extensive. The approximately 2000 transactions conducted by Klein on behalf of the Trusts during the Third Accounting period, many of which transactions were ignored in Klein's verified Third Accounts, are painstakingly detailed in O'Bryan's database. (Ex. 860.)

As previously determined in the Referee's Statement of Decision on Klein's First and Second Accounts, O'Bryan's testimony on Klein's Third Accounts was clear, convincing and credible. The Referee finds that through an elaborate scheme to continue to pay himself by co-

mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-paying debts -- filtered with frequency through Klein's business account containing multiple other sources of income and receipts and outgoing payments, Klein was able to continue in the Third Accounts to perpetuate his pattern of misappropriation.

Menlo Trust transactional funds continued to be moved by Klein into and out of his LKA attorney-client trust account. During the entirety of the Second Account across the 24 Menlo Trusts, a net $165,905 in cash was removed by Klein from the Menlo Trusts and not returned by the September 30, 2018 Third Account closing date; and an additional $889,671 was removed by Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts (Ex. 862, at 3.) Against these sums, over the Third Accounting across the 24 Menlo Trusts, a net credit of ($547,641) was paid by Klein for Trust insurance premiums on policies not yet lapsed. (*Ibid.*)

As noted earlier, subject to any Phase II credit(s) given by the trial judge to Klein on the Third Accountings for attorney fees and litigation expenses in preparation of the incomplete accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the Third Accounting period, and never returned, totals $507,935**.

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. In preparation of the Third Accounts, Magnes testified that she was not asked to determine if Klein had taken funds for his own use, nor was she seeking evidence of misappropriation. Based upon O'Bryan's comprehensive audit, the Referee finds that Klein was able to and did misappropriate an additional $507,935 in funds for his personal use during the Third Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon its settlement rendered against Klein; where, as here, the Referee finds "a ... failure to keep true accounts" (*Blackmon v. Hale, supra,* 1 Cal. 3d at 560); and also where, as here, "any doubt

from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe*, *supra*, 98 Cal.App.2d at 505), **Klein is surcharged in the principal sum of $507,935 for net cash misappropriations across the 24 Trusts during the Third Account, plus any interim prejudgment interest to be determined to have accrued after the close of the Third Accounting period on September 30, 2018.**

It is not only the cash misappropriations damaging the Menlo Trusts during the Second Accounting period. The misappropriations, in part, came from $889,671 *in additional loans* taken by Klein during the Third Accounting period against lines of credit obligating Menlo Trust brokerage accounts. The Menlo Trusts, not Klein, serviced *all of the interest* due and owing on those additional loans, and in continuing the payment of interest charged on unpaid insurance and brokerage loans taken by Klein during the periods covered by the First Account and Second Account. The *additional* interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the First Accounting periods, but paid by Klein from Trust funds during the Third Accounting period, totaled $208,454. The *additional* net interest charged by brokerage houses to service Trust lines of credit taken out by Klein during either the First, Second or Third Accounting periods, but paid by the Trusts during the Third Account, totaled $92,252.

Absent the cash misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the First, Second and Third Accounting periods, there would have been no need for the Trusts to subsequently service those loans. In light of the disparity between the cash debits taken by Klein without repayment to the Trusts and the credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein against Trust assets during the Second Accounting period were for purposes of non-Trust use and therefore misappropriation.

Pursuant to Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

"(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:

(1) **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
(2) Any profit made by the trustee through the breach of trust, with interest.
(3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

(b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly $300,706 in *additional* interest obligations **paid by the Menlo Trusts** during the during the Third Accounting period to subsidize the **$6,884,930 in total loan funds taken personally by Klein during the First, Second and Third Accounting periods,** are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $300,706, plus any interim prejudgment interest to be determined to have accrued after the close of the Second Accounting period on December 31, 2016, for diminution in value to the Menlo Trusts for additional interest paid by the Trusts in the Third Accounting period on loan funds taken by Klein for his non-Trust use during the First, Second and Third Account periods.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts. The Referee finds that none of Klein's acts resulting in surcharge on the Third Accounts were performed reasonably or in good faith.

The remaining surcharge question on the Third Accounts is whether Klein breached the relevant Trusts during the Third Accounting period by causing a fourth $5,000,000 face value Phoenix Insurance universal life policy (#2499115) to lapse. The evidence was undisputed that *at*

*the time* of that policy lapse, as opined by Klein's insurance expert Burgess, it was a reasonable decision for Klein to allow the fourth Phoenix policy to lapse due to the combination of loans *taken by Klein personally* against that Phoenix policies, continued unpaid interest accruing on that policy loan, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, significantly reducing the policy's value.

The core cause of the fourth Phoenix policy lapse was the loan funds taken by Klein against the policy which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policy was exclusively the result of Klein's misappropriations of Trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums. The Referee finds not credible Klein's claim that Sam Menlo had directed Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the lapsed Phoenix loan proceeds for himself.

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the additional $5,000,000 in policy death benefits, less the principal amount of loans all the while retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse (calculated to pay out in 2023), and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans,

according to Wirtz, there should still have been $2,339,334 remaining in policy value on the fourth lapsed policy. (Ex. 873.)

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the Third Accounting period of $2,339,334. **Klein is surcharged an additional $2,339,334 for the unreasonable diminution in value of the collective corpus of the 24 Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued after the close of the Third Accounting period on September 30, 2018.**

**The total principal surcharge to Klein for the Third Accountings is found to be $3,147,975** (*i.e.*, $507,935 + $300,706 + $2,339,334) (Ex. 842, at 3), less any attorney fees and costs incurred by Klein during the period of the Second Accounts determined by the trial judge in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the net surcharge, if any, as further determined by the trial judge in Phase II.

Breaking down the collective net surcharge on an individual Trust basis, the surcharge sums (or credits) for the Third Account are found, based upon substantial evidence, to be allocable as follows:

**Abraham Deutsch -- $10,289**

**Samuel Deutsch – $10,289**

Esther Deutsch – ($1114)

Rachel Deutsch – ($1114)

Norine Winter – ($27,134)

**Mordechai Deutsch -- $195,449**

**Deborah Deutsch -- $350,436**

**Zev Deutsch -- $195,449**

**Tanya Menlo -- $10,289**

Franklin Menlo – ($15,688)

Jonathan Menlo -- $206,852

Yeshia Frankel -- $206,852

Rochelle Lipschutz -- $203,478

Moishe Frankel -- $206,852

Madeline Lipschutz -- $585,286

Faye Lipschutz -- $195,449

Avi Lipschutz -- $187,226

Dov Lipschutz -- $195,449

Asher Frankel -- $206,852

Michael Winter -- $12,316

Jeremy Winter -- $12,316

Amanda Winter -- $12,316

Jonathan Lifschutz -- $2047

Daniel Winter -- $12,316 (Ex. 862, at 14-37.)[47]

It should be clarified that these calculations are not "running" totals, but rather, are intended to constitute separate surcharge judgments exclusively for the Third Accounting period, independent of the calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the period of the First Accountings as of June 30, 2013, and independent of the separate calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the Second Accounting period on December 31, 2016.

Four of the Menlo Trust beneficiaries, Esther Deutsch, Rachel Deutsch, Norine Winter and Frank Menlo are accordingly not entitled to surcharge judgment against Klein on the Third Accountings. The remaining 20 Menlo Trust beneficiaries are entitled to additional surcharge judgments in the respective principal sums identified above.

---

[47] The Referee's surcharge calculations are exclusive of potential adverse tax consequences associated with income realization upon lapse of the fourth Phoenix insurance policy during the Third Accounting period. As noted earlier, the Referee determines those potential tax losses to be speculative and not currently recoverable, while not relieving Klein of contingent liability to the extent those tax consequences become realized.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 19 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's Third Accounts?**

In their initiating accounting, removal and surcharge petitions, the 19 prevailing Menlo beneficiaries on the Second Account pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a... trust... the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $808,641 of Menlo Trust cash during the period of the Third Accountings, including interest paid for which Klein should be liable; laundering funds through unnecessary intra-trust transactions and repositories, including, *inter alia*, the commingling of assets of the 24 individual Trusts, then frequently spreading those assets across Klein and his other clients' assets via his law firm attorney-client trust account.

The remaining surcharge award associated with Klein's lapse of the two additional Phoenix insurance policies is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as adjusted. Klein's direct cash misappropriations

associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the five non-prevailing beneficiaries are filtered out, total **$1,017,900, payable in the following additional sums:**

**Abraham Deutsch -- $10,289**

**Samuel Deutsch – $10,289**

**Deborah Deutsch -- $350,436**

**Tanya Menlo -- $10,289**

**Madeline Lipschutz -- $585,286**

**Michael Winter -- $12,316**

**Jeremy Winter -- $12,316**

**Amanda Winter -- $12,316**

**Jonathan Lifschutz -- $2047**

**Daniel Winter -- $12,316**

It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the Third Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5th 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's Third Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the Third Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the Second Account. While four of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the Third Account, had Klein

maintained and delivered an appropriate and accurate Third Account for each of the 24 Menlo

Trusts, they would not have had to engage in a multi-year litigation to unravel proper debits and

credits as to the allocation of Klein's misappropriations. Klein breached multiple trust

obligations to each of those five beneficiaries, including with respect to Klein's complete lack of

record keeping and failure to timely and accurately account. (*Smith v. Szeyller*, *supra*, 31

Cal.App.5[th] at 461-462.)

## STATEMENT OF DECISION ON REMAINING
## ISSUES RELATING TO ALL ACCOUNTINGS

### Is Klein Entitled to Trustee Fees, and if so, How Much?

Long after Klein's three sets of accountings were filed in 2013, 2018 and 2019,

respectively, on November 16 and November 17, 2021, on the eve of trial before the Referee,

Klein filed 72 sets of *verified* supplements to his earlier accountings, across each of the 24 Menlo

Trusts, demanding Trustee fees in the collective sum of $1,034,477.58 beyond the $750,000

claimed by Klein in 2005.

Under the provision of Children's Trusts and the Grandchildren's Trusts authorizing an

annual trustee fee of .05% of the sum of trust assets under management, Klein attempted in the

November 2021 filings to use the *total death payout sums* of Trust life insurance policies,

including those Klein in the interim had caused to lapse, to inflate the carrying value of Trust

assets for purposes of geometrically increasing his Trustee fee.

By way of example, in the Second Supplement to the First Account for Menlo

beneficiary Asher Frankel, filed November 16, 2021, instead of relying upon the $51,387 in cash

and $72,089 in securities as the carrying value of that Trust, Klein includes in the carry value

$55,500,000 in unmatured face value life insurance policies of which that Trust was a partial

beneficiary, including the four subsequently lapsed Phoenix policies. Klein then subtracts from

the beneficiary's allocable percentages of unmatured death payments on those policies the cash

loans Klein withdrew from those policies, further reduced by anticipated premium payments

through the anticipated actuarial date of Vera Menlo's passing. In this fashion, Klein was able to

increase $123,476 in Trust assets to, in the case of Asher Frankel, a claim of $1,954,516 of

"assets on hand" for purposes of calculating Klein's Trustee fees. Klein uses this same protocol across all 24 Menlo beneficiaries and all 72 accountings.

There is a proper method to account for life insurance policies in an irrevocable insurance trust, and it is stated very clearly in the very CEB text that Klein's counsel held up as the "leading treatise in California on fiduciary accounting." In the 2021 supplement to the 2020 addition of the *Fiduciary Accounting Handbook*, and now in the main volume of the current 2022 addition, there is a separate section entitled in bold: "**How Do I Account for an Irrevocable Life Insurance Trust**." Given its use as a prop at trial, it defies credulity to suggest that Klein and his counsel were unaware of the proper accounting protocol.

According to the respective texts, at §16.28, before a life insurance policy matures (which is the case as to **all** of Klein's filed accountings), the carrying value of such a policy prior to maturity consists *solely* of the premium payments made. At the time of maturity (i.e., the death of the insured), the accounting will reference *a gain* in the amount of the policy payout over the sum of premium payments.

Klein assiduously avoided making policy premium payments whenever possible, at least according to his testimony at trial, resulting in the loss of $20,000,000 in Phoenix policies at a minimum and reduction in principal payout sums on others. While one may understand why Klein opted to invent an unorthodox accounting methodology to receive more Trustee fees than permissible, at what point does a combination of millions in cash asset misappropriations, laundering of funds, suppression of relevant documents and "creative" improper accounting become an attempted fraud upon the parties and the Court?

Klein testified that Sam Menlo directed him to take $750,000 in Trustee fees in 2005 as a lump sum for prior Trust services rendered. The Referee finds that Sam Menlo was not competent in 2005 to authorize that payment, nor is there any corroborating evidence to support Klein's claim.[48] Rather, the written record supports something entirely different.

---

[48] Per the credible testimony of Frank Menlo:

"Q.  In your opinion was your -- in about June of 2005 or even earlier in 2005, was your father mentally capable of making a decision as to how to pay trustee's fees to Mr. Klein?

A.  Absolutely not." (6 Tr. 1199.)

On June 6, 2005, through records produced by the successor to Phoenix, three $250,000 cash loans were requested by Klein with signature authorizations which appeared to include Frank Menlo. Whatever the amount of those authorizations as presented, the original numbers were scribbled out and altered in favor of a series of three $250,000 loan requests, which were then faxed to Phoenix Insurance. (Exs. 309-311.)

To its credit, Phoenix refused to honor what appeared to be altered documents, in favor of proper authorizations without the scribbling and interlineation of amounts. In the replacement documents faxed the following day by Klein to Phoenix Insurance (Exs. 312-314), Frank Menlo testified that the signature purporting to be his is not his signature. (6 Tr. 1217-1218.) The signatures clearly do not match.

With no further evidence, and upon Frank Menlo's unequivocal testimony that he did not authorize $750,000 in payments to Klein, the most logical inference is that Klein or someone on his behalf forged Frank Menlo's initials. The Referee finds that while Klein clearly took $750,000 in his fiduciary capacity against Menlo Trust assets, never returning one cent of those funds (or any other loan funds for that matter, or any interest on any funds), there is no credible evidence that the $750,000 was payment made to Klein for Trustee fees.

Where the trustee commits a breach of trust, the trial court may deny the trustee all compensation. *Estate of Gump* (1991) 1 Cal.App.4th 582, 597; *Butler v. LeBouef* (2016) 248 Cal. App. 4th 198, 213. It is undeniable that Klein has managed the 24 Menlo Trusts principally for his own personal benefit and enrichment.[49] Klein embezzled what has been accurately calculated to be $19,225,065 in Trust assets for which he has no response. Klein refused to account for many years until forced to do so by the Court, and, even after a decade of litigation, still refuses to account for 156 years of collective trust management. Klein has ignored the distributive terms of every single Menlo Trust except one. Klein claimed to have no Trust documents upon which to account. Klein has borrowed many millions of dollars against Trust

---

[49] During the course of the trial, Klein not uncommonly referred to Menlo Trust assets as "my" money.

assets as to which he has never shown any interest in repaying. Klein has deliberately filtered thousands of Trust transactions through his own attorney-client trust account for no legitimate reason. Klein torpedoed $20,000,000 in valuable Trust life insurance policies because of his compulsion to divert Menlo Trust assets for non-Trust purposes. Klein unabashedly used Menlo Trust accounts as overdraft protection on his personal credit cards as a means to misappropriate many additional hundreds of thousands of Trust dollars. Klein submitted 72 incomplete and misleading accountings to the Court intending to mask his many years and millions of dollars of fiduciary misappropriation.

The Referee denies all Trustee fees.

**What About LKA?**

Beyond its obvious participation as a financial clearinghouse for thousands of Trust transactions, including millions of dollars in Menlo Trust assets never returned by Klein to the Trusts for a beneficial trust purpose, it is not clear why LKA was added to trust accounting litigation on what is essentially a civil conspiracy count.

Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal. 4th 503, 510-511. "A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage." *Id.*, quoting *Doctors' Co.* v. *Superior Court* (1989) 49 Cal.3d 39, 44.

It was Klein, not LKA, who moved Menlo Trust funds into and out of the LKA attorney-client trust account. There is no suggestion that LKA used Menlo Trust funds for its own purposes, or that LKA somehow had dispositional control over the funds on deposit.

LKA was not the Trustee of the Menlo Trusts. LKA was not in an attorney-client relationship with the Menlo Trusts. Klein's statutory obligations and adverse presumptions

associated with his incomplete and false accountings have nothing to do with civil conspiracy claims against LKA, which accountings LKA did not prepare and for which LKA had no participation or responsibility.

It is *the burden of the six Menlo beneficiaries* naming LKA as a party to prove both liability and damages associated with LKA. While the 24 Menlo beneficiaries established clearly and convincingly that (in addition to their consequential losses on the four lapsed Phoenix Life Insurance policies) Klein withdrew $19,225,065 in Menlo Trust cash that he never returned or applied to a beneficial Trust purpose, nowhere over the 22 days of trial did the five Menlo beneficiaries suing LKA prove that the 23 checks identified in their Fifth Amendment were among the millions of dollars in funds improperly retained by Klein.

The Menlo beneficiaries did a commendable job of specifying with certainty all transactions on funds removed by Klein from the Trusts, all transactions on funds intended for the Trusts from third party sources that were either waylaid or redirected by Klein, all transactions within the Trusts themselves, and all transactions involving funds utilized by Klein for *bona fide* Trust purposes. And no time, however, did the Menlo beneficiaries, or at least the six beneficiaries litigating against LKA, drill down to the *ultimate* disposition of LKA proceeds beyond those utilized for the legitimate Trust purposes. It is currently unknown whether the 23 checks identified in the Fifth Amendment filed March 5, 2019 were among the millions in funds misappropriated by Klein or were among the funds utilized for a proper trust purpose.[50]

---

[50] As testified by O'Bryan at trial:

"Q. As part of your scope of work for L.K.A., you essentially did a money in money out analysis, correct?
A. That's correct.
Q. Okay. So you have no idea, as you sit here today, whether any funds that landed in the L.K.A. trust account were used for L.K.A. purposes, correct?
A. I do not.
And as you sit here today, you don't know whether or not any of the funds that landed in the L.K.A. bank account were eventually used for other trust purposes, correct?
A. That's correct.
Q. And as you sit here today, you don't know whether any funds that landed in the L.K.A. bank accounts were used for payment of legal or accounting expenses related to the trust, correct?

The six Menlo beneficiaries failed to satisfy their burden of proof with respect to their civil conspiracy claim against LKA. LKA's motion for judgment is granted.

**Allocation of Referee Fees**

Referee fees on settlement of the 72 contested Menlo Trust accountings have been collectively charged throughout at a rate of $880 per hour. From the introductory calendaring conference with counsel on September 24, 2021 through completion of this Report and Recommendation on August 27, 2022, a collective 336.20 referee hours have been entered, including but not limited to 22 days of trial, the subsequent sifting through trial notes, exhibits and testimony, and the research and preparation of this Report and Recommendation on the adjudication and settlement of each of the 72 accounting petitions. The Referee calculates total professional fees to date to be $295,856,[51] with an additional $36,723.24 charged in case management fees.

For all of the reasons set forth in this Report and Recommendation, the Referee recommends that the Menlo beneficiaries be ordered reimbursed by Klein for the entirety of their contributions to the Referee's invoicing, as part of a consolidated itemized cost memorandum.

**SUMMARY OF RECOMMENDATIONS ON SETTLEMENT OF ACCOUNTS**

**On the 24 First Accountings:**

1. That Klein be **surcharged** in the net principal sum of **$10,007,876**, such sum to be allocated (including adjustments to be made between Trusts to eliminate the four negative balances) among the 24 Menlo Trusts as specifically itemized above on the First Accounts;

---

A. I believe that's correct.
Q. And as you sit here today, you have no idea whether L.K.A. is still holding onto any funds from the trust accounts, correct?
A. You mean as of today?
Q. As of today?
A. Yeah, I don't know." (17 Tr. 3294-3295.)

[51] The Referee's consolidated professional fee translates to $4034 per petition.

2. That Klein be **further surcharged** in the sum of **$8,533,547** under Probate Code §859, such sum to be specifically allocated among the identified 20 Menlo Trusts as itemized above on the First Accounts;

3. That the net surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the First Accountings on June 30, 2013, as contemplated by Probate Code §§16440(a)(1) and 16441;

4. That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his First Accountings and in the defense of related surcharge claims;

5. That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the 24 Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein on the First Account;

6. That Klein be denied Trustee fees;

7. That LKA's motion for judgment be granted;

8. That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the First Accounts; and that costs be awarded to LKA from the six litigating Menlo petitioners.

**On the 24 Second Accountings:**

1. That Klein be **surcharged** in the net principal sum of **$6,069,214**, such sum to be allocated (including adjustments to be made between Trusts to eliminate the five negative balances) among the 24 Menlo Trusts as specifically itemized above on the Second Accounts;

2. That Klein be **further surcharged** in the sum of **$1,625,311** under Probate Code §859, such sum to be specifically allocated among the identified 19 Menlo Trusts as itemized above on the Second Accounts;

3. That Klein be ordered to fully indemnify the applicable Menlo Trust beneficiaries for any future adverse Trust or individual beneficiary tax consequence associated with Klein's lapse of Trust life insurance policies during the period of the Second Accounts;

4. That the surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the Second Accountings on December 31, 2016, as contemplated by Probate Code §§16440(a)(1) and 16441;

5. That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his Second Accountings and in the defense of related surcharge claims;

6. That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein;

7. That Klein be denied Trustee fees;

8. That LKA's motion for judgment be granted; and

9. That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the Second Accounts; and that costs awarded to LKA from the six litigating Menlo petitioners.

**On the 24 Third Accountings:**

1. That Klein be **surcharged** in the net principal sum of **$3,147,975** such sum to be allocated among the 24 Menlo Trusts as specifically itemized above on the Third Account.

2. That Klein be **further surcharged** in the sum of **$1,017,900** under Probate Code §859, such sum to be allocated among the ten Menlo Trusts as specifically itemized above on the Third Accounts;

3. That Klein be ordered to fully indemnify the applicable Menlo Trust beneficiaries for any future adverse Trust or individual beneficiary tax consequence associated with Klein's lapse of the Trust life insurance policy during the period of the Third Account;

4. That the surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the Third Accountings on September 30, 2018, as contemplated by Probate Code §§16440(a)(1) and 16441;

5. That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his Third Accountings and in the defense of related surcharge claims;

6. That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein;

7. That Klein be denied Trustee fees;

8. That LKA's motion for judgment be granted; and

9. That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the Third Accounts; and that costs be awarded to LKA from the six litigating Menlo petitioners.[52]

Dated: August 29, 2022

*Glen M. Reiser*

Judge Glen Reiser (Ret,)
§639 Referee

IT IS SO ORDERED.

_____

Judge of the Superior Court

---

[52] Over the settlement of all 72 accountings, through the respective accounting periods presented, and deferring the prejudgment interest calculations to the trial court, the total principal surcharge recommendation against Klein is $19,225,065. The additional consolidated Probate Code §859 recommendation is $11,176,758. The recommended collective surcharge judgment, prior to Phase II interest and attorney fees/cost debits or credits, is therefore $30,401,823.

## PROOF OF SERVICE BY E-Mail

Re: In re: Franklin Henry Menlo Irrevocable Trust, Established March 1, 1983
Reference No. 1220070187

I, Stephanie Barraza, not a party to the within action, hereby declare that on August 29, 2022, I served the attached REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE ON EXAMINATION AND ADJUDICATION OF THE TRUSTEE'S FIRST, SECOND, AND THIRD ACCOUNTINGS ON EACH OF THE TWENTY-FOUR TRUSTS AT ISSUE FOR THE TRUST PERIODS SEPTEMBER 10, 1996-JUNE 30, 2013, JULY 1, 2013-DECEMBER 31, 2016 AND JANUARY 1, 2017-SEPTEMBER 30, 2018 on the parties in the within action by electronic mail at Los Angeles, CALIFORNIA, addressed as follows:

Donald L. Saltzman Esq.
L/O Donald L. Saltzman
10537 Butterfield Rd
Los Angeles, CA   90064
Phone: 310-617-3073
dlslawcorp@aol.com
   Parties Represented:
   Franklin Henry Menlo, et al.

Terence S. Nunan Esq.
Alan D. Weinfeld Esq.
Parker, Milliken, Clark, et al.
555 S. Flower St.
30th Floor
Los Angeles, CA   90071-2440
Phone: 213-683-6500
tnunan@pmcos.com
aweinfeld@pmcos.com
   Parties Represented:
   Leslie Klein, Trustee, et al.

Candice K. Rogers Esq.
Hahn & Hahn
301 E. Colorado Blvd.
9th Floor
Pasadena, CA   91101
Phone: (626) 796-9123
crogers@hahnlawyers.com
   Parties Represented:
   Les Klein & Associates

Michael L. Wachtell Esq.
Buchalter, APC
1000 Wilshire Blvd.
Suite 1500
Los Angeles, CA   90017-2457
Phone: 213-891-0700
mwachtell@buchalter.com
   Parties Represented:
   Leslie Klein, Trustee, et al.

VIA ONE LEGAL TO:
Hon. Ana M. Luna
Los Angeles County Superior Court
111 N Hill St
Dept 3

Los Angeles, CA   90012
Phone: 213-830-0850

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles,

CALIFORNIA on  August 29, 2022.


/s/ Stephanie Barraza

_____

Stephanie Barraza
JAMS
SBarraza@jamsadr.com

1

**PROOF OF SERVICE**

2

**In the Irrevocable Trust u/a/d September 26, 1990 f/b/o Abraham Deutsch
Case No.: 22STPB10823**

3

4

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

5

6          I am employed in the County of Los Angeles, State of California.  I am over the age of 18
and not a party to the within action; my business address is 16133 Ventura Boulevard, Penthouse

7   Suite, Encino, CA 91436.

8          On November 3, 2022, I served the foregoing documents described as: **NOTICE OF
ERRATA** on the interested parties in this action as stated below:

9

10  [ X ]   BY MAIL.  I caused such envelope to be deposited in the mail at Encino, California.  The
envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's

11  practice of collection and processing correspondence for mailing.  Under that practice it would be
deposited with U.S. postal service on that same day with postage thereon fully prepaid at Encino,

12  California in the ordinary course of business.  I am aware that on motion of the party served, service
is presumed invalid if postal cancellation date or postage meter date is more than one day after date

13  of deposit for mailing an affidavit:

14          Leslie Klein                                        Jeffrey Slot, Esq.

15          14245 Ventura Boulevard, 3rd Floor   15760 Ventura Boulevard, Suite 1600
            Sherman Oaks, CA 91423                 Encino, CA 91436

16
            Franklin Menlo                                  Jeffrey Winter

17          c/o Donald L. Saltzman, Esq.           c/o Alex Weingarten, Esq.
            10537 Butterfield Road                     2029 Century Park East, Suite 3400

18          Los Angeles, CA 90064                    Los Angeles, CA 90067

19  [   ]   BY ELECTRONIC MAIL TRANSMISSION (WITH ATTACHMENT).  On this date, by

20  causing transmission of the above-mentioned document(s) by electronic mail transmission, to the
persons whose e-mail addresses appear below:

21
[   ]   BY ELECTRONIC SERVICE: I served the document(s) on the persons listed below by

22  submitting an electronic version of the document(s) to One Legal, LLC, through the user interface

23  at 222.onelegal.com:

24  [   ]   BY OVERNIGHT MAIL. I caused said document to be deposited with an express service
carrier in a sealed envelope designated by the carrier as an express mail envelope, with fees and

25  postage prepaid.

26  [   ]   BY FACSIMILE.  I personally served this document by facsimile to the offices of the

27  party(ies) on attached Service List.

28

---

PROOF OF SERVICE

1   [   ]    BY PERSONAL DELIVERY.  I delivered such document(s) by hand to the address(es) of
2   the addressee(s).

3   [ X ]    STATE.  I declare under penalty of perjury under the laws of the State of California that the
    above is true and correct.

4

5          Executed on November 3, 2022, at Encino, California.

6

7

8                                          Julie J. Thomas

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

1  ROBERT P. GOE (State Bar No. 137019
   rgoe@goeforlaw.com
2  REEM J. BELLO (State Bar No. 198840)
   rbello@goeforlaw.com
3  **GOE FORSYTHE & HODGES LLP**
   17701 Cowan Avenue, Suite 210, Bldg. D
4  Irvine, CA 92614
   Telephone: (949) 798-2460
5  Facsimile: (949) 955-9437

6  BRIAN A. PROCEL (State Bar No. 218657)
   brian@procel-law.com
7  MARTIN H. PRITIKIN (State Bar No. 210845)
   marty@procel-law.com
8  **PROCEL LAW, PC**
   401 Wilshire Boulevard, 12th Floor
9  Santa Monica, California 90401
   Telephone: (424) 788-4538

10

11 Attorneys for Judgment Creditors and Plaintiffs
   Erica and Joseph Vago

12                **UNITED STATES BANKRUPTCY COURT**

13                **CENTRAL DISTRICT OF CALIFORNIA**

14                   **LOS ANGELES DIVISION**

15

16 | In re | Case No. 2:23-bk-10990-SK |

17 LESLIE KLEIN, | Chapter 11

18        Debtor. | Adv. Case No.

19 ─────────────────────────

20 ERICA VAGO and JOSEPH VAGO, | **COMPLAINT TO DETERMINE THE
                                 NONDISCHARGEABILITY OF CERTAIN
21        Plaintiffs, | DEBTS OWED BY DEBTOR LESLIE
                        KLEIN TO ERICA AND JOSEPH VAGO
22    vs. | PURSUANT TO 11 U.S.C. § 523 AND TO
              DENY DISCHARGE PURSUANT TO
23 LESLIE KLEIN and DOES 1 through 10, | SECTION 727(A)(12)**

24        Defendants.

25 ─────────────────────────

26

27

28

1

Plaintiffs Erica ("Erica") and Joseph Vago ("Joseph") (collectively, the "Vagos"), allege as follows on personal knowledge:

### Nature of the Case

1. Defendant and Debtor Leslie Klein ("Defendant" or "Debtor") stole more than $8 million from Erica in a complicated life insurance scam.

2. Defendant was the Vagos' friend for more than 40 years. Defendant preyed on the Vagos during a time of vulnerability and desperation. Defendant convinced the Vagos to entrust him with Erica's $15 million inheritance. Defendant claimed he would act as the Vagos' lawyer, accountant and investment adviser.

3. In truth, Defendant is a con man who systematically embezzled the Vagos' money and lied to them every step of the way. Defendant created false financial statements. Defendant misrepresented the nature of the Vagos' "investments." Defendant talked in circles and provided documents that were designed to confuse. Defendant sold insurance policies without telling the Vagos. Defendant fabricated meetings that never happened. Defendant made himself the trustee over life insurance trusts that purportedly held the Vagos' money.

4. In the end, Erica's money simply vanished. Defendant forced the Vagos to take their case to trial. Defendant attempted to derail the litigation at every possible moment. Defendant refused to participate in discovery. The trial court sanctioned Defendant on multiple occasions. At trial, Defendant—who was a CPA for decades—could not account for what happened to $8 million in Erica's inheritance. On cross-examination, Defendant admitted that he had no intention of ever giving Erica a return on her money. This was a scam from start to finish.

5. The jury ultimately returned a verdict holding Defendant liable for intentional fraud, fraudulent concealment, breach of fiduciary duty and elder abuse. The jury awarded more than $8 million in punitive damages. And the trial court entered judgment in the amount of $24.3 million.

6. This debt is not dischargeable in bankruptcy. The Vagos' judgment emanates from a widespread, deliberate and calculated fraud on the part of Defendant.

**Jurisdiction and Venue**

7.     On February 22, 2023 (the "Petition Date"), Defendant filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court, Central District of California, Los Angeles Division.

8.     This action is a civil proceeding arising in the above-captioned chapter 11 bankruptcy case, which is now pending in this judicial district, and arising under, and arising in and related to title 11 of the United States Code.

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(2)(J) to hear and determine this proceeding and to enter an appropriate final order and judgment.

10.    This matter is a core proceeding pursuant to 28 U.S.C. § 157.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

**The Parties**

12.    The Vagos are judgment creditors in the above-captioned Chapter 11 bankruptcy case.

13.    Defendant is the debtor in the above-captioned Chapter 11 bankruptcy case.

**General Allegations**

**A.     The Friendship**

14.    Joseph first met Defendant in 1970.  They are both Orthodox Jews and they were members of the same temple.

15.    Over the years, the Vagos and Defendant interacted at family and religious events, including birthdays, holidays, shabbat dinners, bar mitzvahs, and weddings.  Defendant and the Vagos were friends.

**B.     Legal Services**

16.    In June 2012, Erica's uncle died.  In October 2012, Erica's brother died.  A few months later, in July 2013, Erica's mother died.  Erica and Joseph had to deal with three lost loved ones in short succession.

17. Erica's brother, Robert Schweitzer ("Schweitzer"), died on October 3, 2012. Schweitzer willed the bulk of his estate to Erica. Schweitzer's estate included roughly $18 million in a foreign bank account.

18. A few days following Schweitzer's death, the Vagos were at their home mourning the loss of Schweitzer. Defendant went to the Vagos to pay his respects. At that time, Defendant also offered his services as a lawyer and accountant. Defendant said he could handle any issues that might come up with Schweitzer's estate. The Vagos ultimately agreed to retain their longtime friend. The Vagos and Defendant arranged to meet the following week.

**C.    The Life Insurance Policies**

19. About a week later, the Vagos and Defendant met to discuss Schweitzer's estate. Erica learned before the meeting that Schweitzer had left her more than $18 million, located in a foreign bank account. The Vagos did not know how to handle the will, probate, inheritance, foreign bank accounts, and estate taxes. At the meeting, Erica told Defendant about the inheritance.

20. Defendant said this issue was his "specialty." Defendant told Erica that he was a jack-of-all-trades—he was a lawyer, CPA, and financial adviser. Defendant told Erica he could deal with the will. Defendant told Erica he could prepare the estate tax returns. Defendant told Erica he could figure out the best way to repatriate the money from the foreign bank account. Defendant told Erica he could even set up investments for the money once the Vagos received it.

21. The Vagos agreed to let Defendant guide them through this unfamiliar territory. Erica wrote Defendant a $7,000 check that day for the legal services he promised to provide through his law firm Leslie Klein & Associates ("LK&A").

22. Defendant also recommended that the Vagos invest the inheritance in life insurance policies. Defendant explained the safety and benefits of this strategy. Defendant said that each investment would garner 10 to 12% interest each year, plus a premium on the principal in some cases, all to be paid when the Vagos cashed out. And Defendant emphasized how simple cashing out would be. Defendant advised that investments in these policies were "just like cash." Defendant promised the Vagos they could "sell them for cash any time [they] wanted."

23.     Defendant added that the best way to effect the transaction would be to wire the money to the LK&A client trust account.  Defendant would then invest the money from the LK&A client trust account into life insurance policies.  When the Vagos mentioned they wanted to donate substantial sums to charity, Defendant suggested they wire the money to the EKLK Foundation, which Defendant set up and controlled.  Defendant said the EKLK Foundation would then distribute funds to charities the Vagos chose.

24.     Finally, Defendant said that if the Vagos wanted cash from Erica's inheritance for themselves, they should ask him for it.  He would write them a check from the LK&A client trust account.

25.     Defendant reassured the Vagos that the strategy was sound.  Defendant said he performed the same transactions for "all my clients" as well as his family.  Defendant told the Vagos that he invested his own money in the life insurance policies.  Defendant added that prominent tax attorneys and accountants "in Century City" confirmed to him that this was a safe and proper strategy.  Defendant claimed to have invested in life insurance policies for several prominent members of the Jewish community.

**D.      The Scam**

26.     Over the next four years, Erica arranged more than $15 million in wire transfers from the foreign bank account holding her inheritance.  Erica made each transfer at Defendant's direction and to accounts Defendant controlled.

27.     About $12.4 million went to the LK&A client trust account, and the rest went to Defendant's EKLK Foundation.

28.     As the money came in, Defendant represented to the Vagos that he was executing the investment strategy he had convinced them to follow.  Defendant told the Vagos he was investing much of Erica's inheritance in life insurance policies.

29.     The life insurance "investments" were not really investments; they were non-recourse loans to irrevocable life insurance trusts.  Each life insurance trust purportedly contained a life insurance policy or policies—on the life of a complete stranger to the Vagos—which served as the sole security for the Vagos' loan.  The principal and interest on each loan were not due until

the death of the policyholder.  For Erica and Joseph—who were respectively 59 and 61 when

Schweitzer passed—this term rendered the loans almost valueless.  They did not know when—if

ever—the loans would become due.

30.     The Vagos did not know the identities of the other "investors" in each life

insurance trust.  The Vagos did not know how much money Defendant received from other

"investors."  The Vagos had no way to independently verify whether Defendant was paying the

premiums on the insurance policies.  The Vagos had no way to determine whether the insureds

were alive or not.  The Vagos could not find out whether any insurance companies had paid

Defendant money in connection with the policies they "invested" in.  The Vagos had no way to

know whether Defendant sold the policies they thought they invested in.  The Vagos were

completely in the dark and at the mercy of Defendant.

31.     The Vagos' names were nowhere to be found on the promissory notes or on the life

insurance policies.  Rather, the promissory notes were executed for the benefit of the "Estate of

Robert Schweitzer."  It could not be more evident that Defendant structured these "investments" in

a manner designed to confuse and deceive the Vagos.  Defendant knew that these "investments"

were never going to pay out.

32.     Though these promissory notes were nearly worthless to the Vagos, by Defendant's

doing, they still had a huge carrying cost.  To keep the underlying life insurance policies from

lapsing, Defendant told the Vagos that they would have to pay hundreds of thousands of dollars

per year toward insurance premiums.  This money was in addition to the millions already loaned

to the life insurance policy trusts.

33.     By 2019, Defendant claimed to have "invested" $8.3 million of the Vagos' money

in life insurance policies.

**E.     The Misrepresentations**

34.     Defendant routinely visited the Vagos at their house.  During these visits,

Defendant would give the Vagos a memo on the letterhead of LK&A that purported to show the

status of their "investments."  In a July 1, 2017 memorandum, Defendant stated that the Vagos'

1    "investment" had increased in value to $9.4 million.  And the memorandum indicated that the

2    Vagos were entitled to $3,205,000 in interest since their initial "investment" in 2012.

3        35.    Defendant provided a memorandum in 2018 that indicated the Vagos'

4    "investments" were worth $10.2 million and the interest was $3,685,000.  These written

5    memoranda were all lies.

6        **F.    The Vagos Discover Defendant's Fraud**

7        36.    On or around September 15, 2019, Defendant went to the Vagos' home for their

8    regular meeting.  At this meeting, Erica told Defendant she needed to cash out roughly $1 million.

9    Defendant responded that the "interest" that had accrued on the Vagos' investment was all gone.

10   Defendant falsely stated that "hedge funds are not paying interest anymore" on life insurance

11   policies, so their earnings over the past seven years had vanished.

12       37.    The Vagos demanded that Defendant refund their money.  Defendant refused.

13       **G.    The State Board of Accountancy**

14       38.    At the same time Defendant was defrauding the Vagos, he was accused of stealing

15   money from his client Hubert Scott ("Scott").  The California State Board of Accountancy (the

16   "State Board") brought charges against Defendant in 2019.

17       39.    The State Board alleged that Scott inherited money when his brother and son died.

18   Defendant purported to serve as Scott's tax preparer, financial planner and investment adviser.

19   Scott, at that time, was 86 years old and had dementia.  Defendant had himself appointed as the

20   trustee of Scott's trust agreement.  Over the course of five years, Scott gave Defendant $2.42

21   million.

22       40.    Defendant purported to "invest" Scott's money in non-recourse promissory notes

23   with irrevocable life insurance trusts (i.e., the exact same investments that are at issue here).

24   Defendant invested 85% of Scott's money in these life insurance trusts. Even though Scott was 86

25   years old, he would only be paid out when the insured passed away.  Defendant also invested

26   Scott's money in companies with which Defendant was affiliated.  Among others, Defendant

27   purportedly invested $750,000 of Scott's money in LEDs sold by Time Square Media, Inc. ("Time

28   Square Media").  Defendant was the president of Time Square Media.  This $750,000 investment

purportedly made by Defendant was not reflected in any accounting.  The State Board noted that none of the transactions were made in Scott's name.  Instead, Defendant admitted that he did not invest the money in life insurance policies on behalf of his clients, but that he actually borrowed the money himself from his clients.

41.     The State Board alleged that Defendant failed to provide an accounting, and instead periodically provided documents showing inflated values that were inaccurate on their face. Defendant ultimately denied that he was Scott's tax preparer or adviser.

42.     A conservator was appointed in 2016, and Defendant was removed as trustee.  The State Board filed the Accusation in 2019, based on allegations of fraud, breach of fiduciary duty, embezzlement, commingling funds and undue influence.  Defendant entered into a stipulation with the State Board that resulted in the surrender of his accounting license.

### H.     The Litigation and Defendant's Failure to Comply with Court Orders

43.     The Vagos filed a state court complaint against Defendant on July 1, 2020.  From day one, Defendant and LK&A engaged in a scheme to evade discovery and to derail the case.

44.     Defendant served boilerplate objections to all written discovery requests and refused to provide substantive responses.  Defendant refused to produce documents.  The Vagos then filed several rounds of discovery motions.  The Court granted all of them and entered monetary and issue sanctions against Defendant.  The Court ordered Defendant to produce a responsivity chart and a privilege log.  Defendant did not.  The Court ordered Defendant to produce bank records.  Defendant did not.  Defendant filed a motion to quash a third-party subpoena served on Bank of America, which he lost.  Defendant failed to pay the court-ordered monetary sanctions by the deadline and failed to comply with court orders requiring supplemental responses.  Defendant even walked out of a court ordered deposition.  Defendant stalled and refused to make himself available for deposition.  Defendant substituted new counsel on the eve of trial.  Defendant filed numerous motions to continue the trial date, all of which were denied

### I.     The Trial, Jury Verdict and Judgment

45.     On August 29, 2022, the trial in the Vagos' state court matter commenced.

46.     At trial, the Vagos presented evidence that Defendant sought out to defraud them when they were at their most vulnerable—just after Erica's brother died and while she was caring for her dying mother in the hospital.  Defendant initially testified that he had no financial interest in the policies that he purportedly invested the Vagos' money in.  But Defendant later admitted that he invested his own money in these same policies.

47.     Defendant drafted and signed promissory notes where he agreed as trustee that the Vagos would be entitled to 12% interest on their money.  But Defendant testified at trial that he never had any intention of actually paying the Vagos that interest.  Defendant utterly failed to explain what these "investments" actually were; whether the Vagos were entitled to make any money from his perspective; or what he did with the Vagos' money.

48.     Defendant testified at trial that he kept a contemporaneous "ledger" of all transactions relating to the Vagos.  This was a lie—no such ledger was produced at trial. Defendant admitted that he provided false and inflated financials to the Vagos on a regular basis. Defendant took out a life insurance policy on an individual named Ann Radow.  Ann Radow testified at trial that she had never met Defendant; that he took out an insurance policy on her life without her knowledge or consent; and that Defendant created the Ann Radow Trust and made himself the trustee without her knowledge or consent.

49.     Unbeknownst to the Vagos, Defendant surrendered his license to practice accounting after he was accused of embezzling money from Scott, an 86-year-old client with dementia. The State Board disciplined Defendant at the same time he was defrauding the Vagos.

50.     The jury ultimately found that Erica had proven her case against Defendant for intentional fraud, fraudulent concealment, financial elder abuse and breach of fiduciary duty.  The jury awarded Erica $8.3 million in compensatory damages, plus $8.3 million more in punitive damages.  And the jury awarded Joseph an additional $400,000 in emotional distress damages. The Court then awarded $7,334,038.99 in prejudgment interest and entered judgment in the amount of $24,334,038.99 ("Judgment").  A true and correct copy of the Judgment is attached as **Exhibit 1**.

## **FIRST CLAIM FOR RELIEF**

### **(Nondischargeability of Debt - 11 U.S.C. § 523(a)(2)(A))**

51.     The Vagos reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

52.     At all relevant times, Defendant acted as the Vagos' fiduciary.  Defendant was their attorney, accountant and investment adviser.  Erica entrusted Defendant implicitly with her entire inheritance (more than $15 million).

53.     Defendant owed the Vagos fiduciary duties at all relevant times, including the duty of loyalty and candor.  Defendant further owed a duty to use Erica's funds for legitimate business purposes and to refrain from using her funds and other property for his own personal non-business purposes.

54.     Defendant embezzled and stole from the Vagos.  Defendant misrepresented information to the Vagos for the purpose of convincing Erica to deposit more than $12 million into the LK&A client trust account.  Defendant then stole more than $8 million of Erica's money in a complicated life insurance scam.

55.     A jury found Defendant liable for intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse as set forth in the Judgment.  The jury awarded Erica $8.3 million in punitive damages after finding that Defendant acted with fraud, oppression and malice. The trial court ultimately entered the Judgment against Defendant in the amount of $24.3 million.

56.     Defendant's misappropriation of Erica's funds and other property was unauthorized, without her consent and fraudulent.  Defendant acted with the intent to permanently deprive Erica of the possession, use and benefit of her funds and other property.

57.     As a result of Defendant's unauthorized and fraudulent misappropriation of Erica's funds and other property and Defendant's false pretenses, false representations, and actual fraud set forth herein, the Vagos have suffered damages in the amount of not less than $26,386,891.00.

58.     Defendant's debt to the Vagos is nondischargeable under 11 U.S.C. § 523(a)(2) because it was incurred as a result of false pretenses, false representations, and actual fraud.

59.     The damages arising from Defendant's willful and malicious false pretenses, false representation and actual fraud to the Vagos constitutes a debt against Defendant that is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2).

<div align="center">

**SECOND CLAIM FOR RELIEF**

**(Nondischargeability of Debt - 11 U.S.C. § 523(a)(4))**

</div>

60.     The Vagos reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

61.     At all relevant times, Defendant acted as the Vagos' fiduciary.  Defendant was their attorney, accountant and investment adviser.  Erica entrusted Defendant implicitly with her entire inheritance (more than $15 million).

62.     Defendant owed the Vagos fiduciary duties at all relevant times, including the duty of loyalty and candor.  Defendant further owed a duty to use Erica's funds for legitimate business purposes and to refrain from using her funds and other property for his own personal non-business purposes.

63.     Defendant embezzled and stole from the Vagos.  Defendant misrepresented information to the Vagos for the purpose of convincing Erica to deposit more than $12 million into the LK&A client trust account.  Defendant then stole more than $8 million of Erica's money in a complicated life insurance scam.

64.     A jury found Defendant liable for intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse as set forth in the Judgment.  The jury awarded Erica $8.3 million in punitive damages after finding that Defendant acted with fraud, oppression and malice. The trial court ultimately entered the Judgment against Defendant in the amount of $24.3 million.

65.     Defendant's misappropriation of Erica's funds and other property was unauthorized, without her consent and fraudulent.  Defendant acted with the intent to permanently deprive Erica of the possession, use and benefit of her funds and other property.

66.     As a result of Defendant's unauthorized and fraudulent misappropriation of Erica's funds and other property while acting in a fiduciary capacity and Defendant's false pretenses, false

representations, and actual fraud set forth herein while acting in a fiduciary capacity, the Vagos
have suffered damages in the amount of not less than $26,386,891.00.

67.     The damages to the Vagos arising from Defendant's fraud, defalcation,
embezzlement and larceny while acting in a fiduciary capacity constitutes a debt against
Defendant that is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

### THIRD CLAIM FOR RELIEF

### (Nondischargeability of Debt - 11 U.S.C. § 523(a)(6))

68.     The Vagos reallege and incorporate by reference all of the prior and subsequent
allegations in this Complaint as though fully set forth herein.

69.     At all relevant times, Defendant acted as the Vagos' fiduciary.  Defendant was their
attorney, accountant and investment adviser.  Erica entrusted Defendant implicitly with her entire
inheritance (more than $15 million).

70.     Defendant owed the Vagos fiduciary duties at all relevant times, including the duty
of loyalty and candor.  Defendant further owed a duty to use Erica's funds for legitimate business
purposes and to refrain from using her funds and other property for his own personal non-business
purposes.

71.     Defendant embezzled and stole from the Vagos.  Defendant misrepresented
information to the Vagos for the purpose of convincing Erica to deposit more than $12 million
into the LK&A client trust account.  Defendant then stole more than $8 million of Erica's money
in a complicated life insurance scam.

72.     A jury found Defendant liable for intentional fraudulent, fraudulent concealment,
breach of fiduciary duty and elder abuse as set forth in the Judgment.  The jury awarded Erica $8.3
million in punitive damages after finding that Defendant acted with fraud, oppression and malice.
The trial court ultimately entered the Judgment against Defendant in the amount of $24.3 million.

73.     Defendant's misappropriation of Erica's funds and other property was
unauthorized, without her consent and fraudulent.  Defendant acted with the intent to permanently
deprive Erica of the possession, use and benefit of her funds and other property.

74.     As a result of Defendant's unauthorized and fraudulent misappropriation of Erica's funds and other property while acting in a fiduciary capacity and Defendant's false pretenses, false representations, and actual fraud set forth herein while acting in a fiduciary capacity, the Vagos have suffered damages in the amount of not less than $26,386,891.00.

75.     The damages arising from Defendant's willful and malicious injury to the Vagos constitutes a debt against Defendant that is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

## FOURTH CLAIM FOR RELIEF

### (For Denial of Discharge - 11 U.S.C. § 727(a)(12))

76.     The Vagos reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

77.     Pursuant to 11 U.S.C. § 727(a)(12), the court shall grant the debtor a discharge unless- the court after notice and a hearing held not more than 10 days before the date of the entry of the order granting the discharge finds that there is reasonable cause to believe that—(A) section 522(q)(1) may be applicable to the debtor; and (B) there is pending any proceeding in which the debtor may be found guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B).

78.     On April 11, 2023, the Vagos filed a motion [Docket No. 71] seeking disallowance of Debtor's claim of exemption in the real property located at 322 N. June Street, Los Angeles, CA 90004 (the "Property") in any amount exceeding $189,050.00 pursuant to Section 522(q) of the Bankruptcy Code.

79.     Section 522(q) operates to reduce any state law homestead exemption claim to $189,050.00 where debtor owes a debt arising from "fraud, deceit, or manipulation in a fiduciary capacity." 11 U.S.C. § 522(q)(1)(B)(ii).

80.     As set forth herein, Debtor owes a debt to the Vagos in an amount of not less than $26,386,891.00 based upon the Judgment which arose from "fraud, deceit, or manipulation in a fiduciary capacity." 11 U.S.C. § 522(q)(1)(B)(ii).

81.     Accordingly, Debtor is not entitled to a discharge of his debts pursuant to 11 U.S.C. § 727(a)(12).

**Prayer for Relief**

WHEREFORE, Plaintiffs request judgment on the Complaint as follows:

1.      On the First Claim for Relief, the Vagos seek an order determining that Defendant is indebted to the Vagos in an amount not less than $26,386,891.00 and that Defendant's debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2);

2.      On the Second Claim for Relief, the Vagos seek an order determining that Defendant is indebted to the Vagos in an amount not less than $26,386,891.00 and that Defendant's debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4);

3.      On the Third Claim for Relief, the Vagos seek an order determining that Defendant is indebted to the Vagos in an amount not less than $26,386,891.00 and that Defendant's debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6);

4.      On the Fourth Claim for Relief, the Vagos seek an order denying Defendant his discharge pursuant to 11 U.S.C. § 727(a)(12);

5.      For costs of suit incurred herein; and

6.      For such other and further relief as the Court may deem appropriate.

Respectfully submitted,

Dated:  May 10, 2023                    **GOE FORSYTHE & HODGES LLP**


By:  /s/Robert P. Goe
        Robert P. Goe
        Attorneys for Plaintiffs Erica Vago and
        Joseph Vago

14

1

# PROOF OF SERVICE OF DOCUMENT

2

3

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 17701 Cowan, Bldg. D., Suite 210, Irvine, CA 92614

4

5

6

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF MOTION AND MOTION FOR ORDER DISMISSING DEBTOR'S CHAPTER 11 BANKRUPTCY CASE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ERICA VAGO, BRIAN PROCEL; AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF SAME** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

7

8

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) May 10, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

9

10

11

12

13

☒      Service information continued on attached page

14

15

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) May 10, 2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

16

17

18

19

☒      Service information continued on attached page

20

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) May 10, 2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

21

22

23

24

25

- The Honorable Sandra R. Defendant, USBC, 255 E. Temple Street, Ctrm 1575, Los Angeles, CA 90012

26

27

28

1

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 10, 2023 | Susan C. Stein | /s/Susan C. Stein |
|--------------|----------------|-------------------|
| *Date* | *Printed Name* | *Signature* |

2

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

**Mailing Information for Case 2:23-bk-10990-SK**

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Reem J Bello**     rbello@goeforlaw.com, kmurphy@goeforlaw.com
- **Michael Jay Berger**     michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Greg P Campbell**     ch11ecf@aldridgepite.com, gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
- **Theron S Covey**     tcovey@raslg.com, sferry@raslg.com
- **Dane W Exnowski**     dane.exnowski@mccalla.com, bk.ca@mccalla.com,mccallaecf@ecf.courtdrive.com
- **Robert P Goe**     kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- **Michael Jones**     michael.jones4@usdoj.gov
- **Ron Maroko**     ron.maroko@usdoj.gov
- **Joshua L Scheer**     jscheer@scheerlawgroup.com, jscheer@ecf.courtdrive.com
- **Mark M Sharf (TR)**     mark@sharflaw.com, C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
- **Alan G Tippie**     Alan.Tippie@gmlaw.com, atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com
- **United States Trustee (LA)**     ustpregion16.la.ecf@usdoj.gov
- **Michael L Wachtell**     mwachtell@buchalter.com
- **John P. Ward**     jward@attleseystorm.com, ezhang@attleseystorm.com
- **Clarisse Young**     youngshumaker@smcounsel.com, levern@smcounsel.com
- **Paul P Young**     paul@cym.law, jaclyn@cym.law

3

# EXHIBIT 1

# EXHIBIT 1

Electronically Received 11/15/2022 10:32 AM

1  BRIAN A. PROCEL (State Bar No. 218657)
   brian@procel-law.com
2  PROCEL LAW, PC
   401 Wilshire Boulevard
3  12th Floor
   Santa Monica, California 90401
4  Telephone:    (424) 788-4538

5  Attorneys for Plaintiffs
   ERICA VAGO and JOSEPH VAGO

6

7

FILED
Superior Court of California
County of Los Angeles

12/02/2022

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ M. Ventura _____ Deputy

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            COUNTY OF LOS ANGELES, CENTRAL DISTRICT

10

11  ERICA VAGO and JOSEPH VAGO,          CASE NO. 20STCV25050

12          Plaintiffs,                  [PROPOSED] JUDGMENT ON SPECIAL
                                         VERDICT
13          v.

14  LESLIE KLEIN; LES KLEIN &            Assigned for All Purposes to:
    ASSOCIATES, INC.; KENNETH KOLEV      Hon. Terry A. Green, Dept. 14
15  KLEIN; and LAW OFFICE OF KENNETH
    KLEIN, P.C.,                         Action Filed:    July 1, 2020
16                                       Trial Date:      August 29, 2022
            Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

1  This action came on regularly for trial on August 29, 2022, in Department 14 of the

2 Superior Court, the Honorable Terry A. Green, Judge Presiding;

3  Plaintiffs Erica and Joseph Vago (collectively, "Plaintiffs") appearing by attorney Brian

4 Procel , Esq.; and Defendants Leslie Klein and Les Klein & Associates, Inc. (collectively,

5 "Defendants") appearing by attorney Jeffrey Slott.

6  A jury of twelve (12) persons was regularly impaneled and sworn and agreed to try the

7 cause. Witnesses were sworn and testified. After hearing the evidence and arguments of counsel,

8 the jury was duly instructed by the Court and the cause was submitted to the jury with directions

9 to return a special verdict. The jury deliberated and thereafter returned to court with its special

10 verdict submitted to the jury and the answers given thereto by the jury, which verdict was in words

11 and figures as follows, to wit:

12

13     **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

14      **(BY ERICA VAGO AGAINST DEFENDNTS)**

15

16  1. Was Mr. Klein's conduct outrageous?

17   __X___ Yes  _____ No

18   If your answer to question 1 is yes, then answer question 2. If you answered no,

19   stop here, answer no further questions, and have the presiding juror sign and date

20   this form.

21  2. Did Mr. Klein intend to cause Erica Vago emotional distress?

22   _____ Yes  __X__ No

23   If your answer to question 2 is yes, then answer question 4. If you answered no, go

24   to question 3.

25  3. Did Mr. Klein act with reckless disregard of the probability that Erica Vago would

26   suffer emotional distress, knowing that Erica Vago was present when the conduct

27   occurred?

28   __X___ Yes  _____ No

1     If your answer to question 3 is yes, then answer question 4. If you answered no,

2     stop here, answer no further questions, and have the presiding juror sign and date

3     this form.

4    4.  Did Erica Vago suffer severe emotional distress?

5     \_\_\_\_\_ Yes  \_\_X\_\_\_ No

6     If your answer to question 4 is yes, then answer question 5. If you answered no,

7     stop here, answer no further questions, and have the presiding juror sign and date

8     this form.

9    5.  Was Mr. Klein's conduct a substantial factor in causing Erica Vago's severe

10    emotional distress?

11    \_\_\_\_\_ Yes   \_\_\_\_\_ No

12    If your answer to question 5 is yes, then answer question 6. If you answered no,

13    stop here, answer no further questions, and have the presiding juror sign and date

14    this form.

15    6.  What are Erica Vago's damages for pain and suffering?

16    $  N/A

17

18                                    TOTAL $

19                                      N/A

20

21    Signed:  /Signature

22           Presiding Juror

23    Dated: September 15, 2022

24

25

26

27

28

3

## INTENTIONAL MISREPRESENTATION

## (BY ERICA VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein make a false representation of a fact to Erica Vago?

   __X___ Yes      _____ No

   If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein know that the representation was false, or did he make the representation recklessly and without regard for its truth?

   _X____ Yes      _____ No

   If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Erica Vago reasonably rely on the representation?

   __X___ Yes      _____ No

   If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Erica Vago's reliance on Mr. Klein's representation a substantial factor in causing harm to Erica Vago?

   __X___ Yes      _____ No

   If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Erica Vago's economic damages?

   $ __8,300,000_____

Please answer question 6.

6. What are Erica Vago's noneconomic damages for pain and suffering?

$ __0_____

TOTAL $ 8,300,000

Signed: __/Signature_____
Presiding Juror

Dated: September 15, 2022

## CONCEALMENT
## (BY ERICA VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein intentionally fail to disclose a fact that Erica Vago did not know and could not reasonably have discovered?

   _X___ Yes     _____ No

   If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein intend to deceive Erica Vago by concealing the fact?

   __X___ Yes     _____ No

   If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Had the omitted information been disclosed, would Erica Vago reasonably have behaved differently?

   __X___ Yes     _____ No

5

[PROPOSED] JUDGMENT

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Mr. Klein's concealment a substantial factor in causing harm to Erica Vago?

__X___ Yes _____ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Erica Vago's economic damages?

$ 8,300,000

Please answer question 6.

6. What are Erica Vago's noneconomic damages for pain and suffering?

$ __0_____

TOTAL $ 8,300,000

Signed: __/Signature_____
　　　　　Presiding Juror

Dated: September 15, 2022

# FALSE PROMISE

## (BY ERICA VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein make a promise to Erica Vago?

   __X___ Yes    _____ No

   If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein intend to perform this promise when he made it?

   __X____ Yes    _____ No

   If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Mr. Klein intend that Erica Vago rely on this promise?

   _____ Yes    _____ No

   If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Did Erica Vago reasonably rely on this promise?

   _____ Yes    _____ No

   If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Did Mr. Klein fail to perform the promised act?

   _____ Yes    _____ No

7

1   If your answer to question 5 is yes, then answer question 6. If you answered no,

2   stop here, answer no further questions, and have the presiding juror sign and date

3   this form.

4   6.  Was Erica Vago's reliance on Mr. Klein's promise a substantial factor in causing

5   harm to Erica Vago?

6   _____ Yes      _____ No

7   If your answer to question 6 is yes, then answer question 7. If you answered no,

8   stop here, answer no further questions, and have the presiding juror sign and date

9   this form.

10  7.  What are Erica Vago's economic damages?

11  $ _N/A_____

12  Please answer question 8.

13  8.  What are Erica Vago's noneconomic damages for pain and suffering?

14  $ __N/A_____

15

16                                                    TOTAL $ _N/A_____

17

18  Signed:  __/Signature_____
                    Presiding Juror

19

20  Dated:  September 15, 2022

21

22

23

24

25

26

27

28

**FINANCIAL ABUSE**

**(BY ERICA VAGO AGAINST DEFENDANTS)**

We answer the questions submitted to us as follows:

1. Did Mr. Klein retain Erica Vago's money or property?

   __X___ Yes  _____ No

   If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Were Erica Vago 65 years of age or older at the time of the conduct?

   __X___ Yes  _____ No

   If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Mr. Klein retain the money or property for a wrongful use or with the intent to defraud?

   __X___ Yes  _____ No

   If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Were Erica Vago harmed?

   __X___ Yes  _____ No

   If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Was Mr. Klein's conduct a substantial factor in causing Erica Vago's harm?

   __X___ Yes  _____ No

If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6.  What are Erica Vago's economic damages?

$ 8,300,000

TOTAL $8,300,000

Signed:   /Signature
          Presiding Juror

Dated:  September 15, 2022

**PUNITIVE DAMAGES
(BY ERICA VAGO AGAINST DEFENDNTS)**

We answer the questions submitted to us as follows:

1.  Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

__X___ Yes   _____ No

Signed:   /Signature
          Presiding Juror

Dated:  September 15, 2022

**PUNITIVE DAMAGES AGAINST EMPLOYER OR PRINCIPAL FOR CONDUCT
OF A SPECIFIC AGENT OR EMPLOYEE
(BY ERICA VAGO AGAINST DEFENDNTS)**

We answer the questions submitted to us as follows:

1.  Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

__X___ Yes   _____ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

Signed: __/Signature_____
           Presiding Juror

Dated: September 15, 2022

## BREACH OF FIDUCIARY DUTY

## (BY ERICA VAGO AGAINST DEFENDNTS)

1. Mr. Klein owed Erica Vago fiduciary duties to act with the utmost loyalty and honesty.

2. Did Mr. Klein breach his fiduciary duties?

   __X___ Yes      _____ No

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Was Erica Vago harmed?

   __X___ Yes      _____ No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Mr. Klein's conduct a substantial factor in causing Erica Vago's harm?

   __X___ Yes      _____ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Erica Vago's economic damages?

   $ 8,300,000

                               TOTAL $ 8,300,000

11

Signed:   /Signature
          Presiding Juror

Dated: September 15, 2022

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## (BY JOSEPH VAGO AGAINST DEFENDNTS)

1.  Was Mr. Klein's conduct outrageous?

    a.   X___ Yes   _____ No

    b.  If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2.  Did Mr. Klein intend to cause Joseph Vago emotional distress?

    a.   _____ Yes   ___X__ No

    b.  If your answer to question 2 is yes, then answer question 4. If you answered no, go to question 3.

3.  Did Mr. Klein act with reckless disregard of the probability that Joseph Vago would suffer emotional distress, knowing that Joseph Vago was present when the conduct occurred?

    a.   __X___ Yes   _____No

    b.  If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4.  Did Joseph Vago suffer severe emotional distress?

    a.   __X___ Yes   _____ No

    b.  If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Was Mr. Klein's conduct a substantial factor in causing Joseph Vago's severe emotional distress?

    a. _X____ Yes    _____ No

    b. If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. What are Joseph Vago's damages for pain and suffering?

    a. $ 400,000

                                               TOTAL $400,000

Signed:    /Signature _____
            Presiding Juror

Dated: September 15, 2022

## INTENTIONAL MISREPRESENTATION
## (BY JOSEPH VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein make a false representation of a fact to Joseph Vago?

    a. __X___ Yes    _____ No

    b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein know that the representation was false, or did he make the representation recklessly and without regard for its truth?

    a. _X____ Yes    _____ No

13
[PROPOSED] JUDGMENT

b. If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Joseph Vago reasonably rely on the representation?

   a. __X___ Yes  _____ No

   b. If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Joseph Vago's reliance on Mr. Klein's representation a substantial factor in causing harm to Joseph Vago?

   a. __X___ Yes  _____ No

   b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Joseph Vago's economic damages?

   a. $ __0_____

   b. Please answer question 6.

6. What are Joseph Vago's noneconomic damages for pain and suffering?

   a. $ __0_____

TOTAL $ __0_____

Signed: ___/Signature_____
Presiding Juror

Dated: September 15, 2022

## CONCEALMENT
## (BY JOSEPH VAGO AGAINST DEFENDNTS)

14
[PROPOSED] JUDGMENT

We answer the questions submitted to us as follows:

1. Did Mr. Klein intentionally fail to disclose a fact that Joseph Vago did not know and could not reasonably have discovered?

    a. _X____ Yes   _____ No

    b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Did Mr. Klein intend to deceive Joseph Vago by concealing the fact?

    a. __X___ Yes   _____ No

    b. If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Had the omitted information been disclosed, would Joseph Vago reasonably have behaved differently?

    a. __X___ Yes   _____ No

    b. If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Mr. Klein's concealment a substantial factor in causing harm to Joseph Vago?

    a. __X___ Yes   _____ No

    b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Joseph Vago's economic damages?

    a. $____0_____

    b. Please answer question 6.

6. What are Joseph Vago's noneconomic damages for pain and suffering?

    a. $ __0_____

15

[PROPOSED] JUDGMENT

TOTAL $____0_____

Signed:   /Signature_____
                 Presiding Juror

Dated:  September 15, 2022

## FALSE PROMISE

### (BY JOSEPH VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1.  Did Mr. Klein make a promise to Joseph Vago?

    a.   __X___ Yes   _____ No

    b.  If your answer to question 1 is yes, then answer question 2. If you answered
        no, stop here, answer no further questions, and have the presiding juror sign
        and date this form.

2.  Did Mr. Klein intend to perform this promise when he made it?

    a.  _X_____ Yes   _____ No

    b.  If your answer to question 2 is yes, then answer question 3. If you answered
        no, stop here, answer no further questions, and have the presiding juror sign
        and date this form.

3.  Did Mr. Klein intend that Joseph Vago rely on this promise?

    a.  _____ Yes   _____ No

    b.  If your answer to question 3 is yes, then answer question 4. If you answered
        no, stop here, answer no further questions, and have the presiding juror sign
        and date this form.

4.  Did Joseph Vago reasonably rely on this promise?

    a.  _____ Yes   _____ No

16

[PROPOSED] JUDGMENT

b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Did Mr. Klein fail to perform the promised act?

    a. \_\_\_\_\_ Yes      \_\_\_\_\_ No

    b. If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. Was Joseph Vago's reliance on Mr. Klein's promise a substantial factor in causing harm to Joseph Vago?

    a. \_\_\_\_\_ Yes      \_\_\_\_\_ No

    b. If your answer to question 6 is yes, then answer question 7. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

7. What are Joseph Vago's economic damages?

    a. $ \_N/A_____

    b. Please answer question 8.

8. What are Joseph Vago's noneconomic damages for pain and suffering?

    a. $ \_\_N/A_____

TOTAL $ \_N/A_____

Signed: \_\_\_/Signature_____
          Presiding Juror

Dated: September 15, 2022

17

[PROPOSED] JUDGMENT

**FINANCIAL ABUSE**

**(BY JOSEPH VAGO AGAINST DEFENDANTS)**

We answer the questions submitted to us as follows:

1. Did Mr. Klein retain Joseph Vago's money or property?

    a. _____ Yes __X___ No

    b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

2. Were Joseph Vago 65 years of age or older at the time of the conduct?

    a. _____ Yes _____ No

    b. If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Did Mr. Klein retain the money or property for a wrongful use or with the intent to defraud?

    a. _____ Yes _____ No

    b. If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Were Joseph Vago harmed?

    a. _____ Yes _____ No

    b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. Was Mr. Klein's conduct a substantial factor in causing Joseph Vago's harm?

    a. _____ Yes _____ No

[PROPOSED] JUDGMENT

b. If your answer to question 5 is yes, then answer question 6. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

6. What are Joseph Vago's economic damages?

   a.  $___N/A_____

TOTAL $__N/A_____


Signed:  /Signature_____
          Presiding Juror

Dated: September 15, 2022

## PUNITIVE DAMAGES

### (BY JOSEPH VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

   a.  __X___ Yes   _____ No


Signed:  /Signature_____
          Presiding Juror

Dated: September 15, 2022

## PUNITIVE DAMAGES AGAINST EMPLOYER OR PRINCIPAL FOR CONDUCT OF A SPECIFIC AGENT OR EMPLOYEE

### (BY JOSEPH VAGO AGAINST DEFENDNTS)

We answer the questions submitted to us as follows:

1. Did Mr. Klein engage in the conduct with malice, oppression, or fraud?

   a.  __X___ Yes   _____ No

19

b. If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

Signed: __/Signature_____
       Presiding Juror

Dated: September 15, 2022

## BREACH OF FIDUCIARY DUTY

## (BY JOSEPH VAGO AGAINST DEFENDNTS)

1. Mr. Klein owed Joseph Vago fiduciary duties to act with the utmost loyalty and honesty.

2. Did Mr. Klein breach his fiduciary duties?

    a. __X___ Yes     _____ No

    b. If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Was Joseph Vago harmed?

    a. __X___ Yes     _____ No

    b. If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. Was Mr. Klein's conduct a substantial factor in causing Joseph Vago's harm?

    a. __X___ Yes     _____ No

    b. If your answer to question 4 is yes, then answer question 5. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5. What are Joseph Vago's economic damages?

1

a.  $\underline{\ \ \ 0\ \ \ }$

2

3

i.  TOTAL $\underline{\ \ \ 0\ \ \ }$

4

5

Signed:  __/Signature_____

6

Presiding Juror

7

Dated:  September 15, 2022

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    It appearing by reason of said special verdict that Plaintiff Erica Vago is entitled to

2  judgment against Defendants Leslie Klein and Leslie Klein & Associates.

3    NOW THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that said Erica

4  Vago shall have and recover from Defendants, jointly and severally:

5    1.    Compensatory damages in the sum of $8,300,000;

6    2.    Prejudgment interest at the rate of 7 (seven) percent in the amount of

7        $7,334,038.99;

8    3.    Punitive damages in the sum of $8,300,000,

9    4.    And interest thereon at the rate of ten percent per annum from the date of the

10  verdict until paid together with costs and disbursements.

11

12    It further appearing by reason of said special verdict that Plaintiff Joseph Vago is entitled

13  to judgment against Defendants Leslie Klein and Leslie Klein & Associates.

14    NOW THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that said Joseph

15  Vago shall have and recover from Defendants, jointly and severally:

16    1.    $400,000 for emotional distress

17    2.    And interest thereon at the rate of ten percent per annum from the date of the

18  verdict until paid together with costs and disbursements.

19

20    The total amount of the judgment against Defendants jointly and severally is

21  **$24,334,038.99.**

22

23  Dated:    12/02/2022                                    **Terry Green**

24                                                Terry Green / Judge

25                                                Hon. Terry Green
                                                Judge of the Superior Court

26

27

28

1 | DATED: November 15, 2022

PROCEL LAW, PC

By: _____

BRIAN PROCEL
Attorneys for Plaintiffs
JOSEPH VAGO and ERICA VAGO

3
[PROPOSED] JUDGMENT
115

1

2

3                    **PROOF OF SERVICE**

4    **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

5        At the time of service, I was over 18 years of age and not a party to this action.  I am
     employed in the County of Los Angeles, State of California.  My business address 401 Wilshire
6    Boulevard, 12th Floor, Santa Monica, California 90401.

7        On November 15, 2022, I served true copies of the following document(s) described as:

8              **[PROPOSED] JUDGMENT ON SPECIAL VERDICT**

9    on the interested parties in this action as follows:

10                        **SERVICE LIST**

11   Jeffrey A. Slott                                 *Attorneys for Defendants*
     LAW OFFICES OF JEFFREY A. SLOTT, APC
12   15760 Ventura Blvd., Suite 1600                  LESLIE KLEIN and
     Encino, CA 91436                                 LES KLEIN & ASSOCIATES, INC.
13   Telephone:    (818) 995-1955
     Facsimile:    (818) 995-0955
14   Email:        jslott@aol.com

15

16       **BY E-MAIL:** I caused a copy of the document(s) to be sent from e-mail address
     johnpark@procel-law.com to the person(s) at the e-mail address(es) listed in the Service List.  I
17   did not receive, within a reasonable time after the transmission, any electronic message or other
     indication that the transmission was unsuccessful.

18       I declare under penalty of perjury under the laws of the State of California that the
     foregoing is true and correct.
19

20       Executed on November 15, 2022, at Santa Monica, California.

21                                          /s/ Brian Procel
                                            Brian Procel
22

23

24

25

26

27

28

                            4

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>ERICA VAGO and JOSEPH VAGO, | DEFENDANTS<br><br>LESLIE KLEIN and DOES 1 through 10, |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>GOE FORSYTHE & HODGES LLP<br>17701 Cowan Avenue, Suite 210, Bldg. D, Irvine, CA 92614<br>Telephone: (949) 798-2460 / Facsimile: (949) 955-9437 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>□ Debto          □ U.S. Trustee/Bankruptcy Admin<br>□ **X Creditor**   □ Other<br>□ Trustee | **PARTY** (Check One Box Only)<br>□ **X Debtor**    □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor      □ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint to Determine the Nondischargeability of Certain Debts Owed by Debtor Leslie Klein to Erica and Joseph Vago
Pursuant to 11 U.S.C. § 523 and to Deny Discharge Pursuant to Section 727(a)(12)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐2 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
    actual fraud
☐1 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement,
    larceny            **(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court
    if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $  26,386,891.00 |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>LESLIE KLEIN | BANKRUPTCY CASE NO.<br>2:23-bk-10990-SK | |
| DISTRICT IN WHICH CASE IS PENDING<br>CENTRAL | DIVISION OFFICE<br>LOS ANGELES | NAME OF JUDGE<br>SANDRA KLEIN |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*/s/Robert P. Goe* | | |
| DATE<br>May 10, 2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Robert P. Goe | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| ROBERT P. GOE (State Bar No. 137019)<br>rgoe@goeforlaw.com<br>REEM J. BELLO (State Bar No. 198840)<br>rbello@goeforlaw.com<br>GOE FORSYTHE & HODGES LLP<br>17701 Cowan Avenue, Suite 210, Bldg. D<br>Irvine, CA 92614<br>Telephone: (949) 798-2460<br>Facsimile: (949) 955-9437<br><br>*Attorney for Plaintiff* | |

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

</div>

| In re:<br><br>LESLIE KLEIN,<br><br><div align="right">Debtor(s).</div> | CASE NO.: 2:23-bk-10990-SK<br><br>CHAPTER: 11<br><br>ADVERSARY NO.: |
|---|---|
| ERICA VAGO and JOSEPH VAGO,<br><br><div align="right">Plaintiff(s)</div><br><div align="center">Versus</div><br>LESLIE KLEIN and DOES 1 through 10,<br><br><div align="right">Defendant(s)</div> | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| | |
|---|---|
| **Hearing Date:** _____<br>**Time:** _____<br>**Courtroom:** _1575___ | **Address:**<br>☒ 255 East Temple Street, Los Angeles, CA 90012<br>☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101<br>☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

**KATHLEEN J. CAMPBELL
CLERK OF COURT**

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
Deputy Clerk

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

17701 Cowan Avenue, Suite 210, Bldg. D
Irvine, CA 92614

A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:

Complaint to Determine the Nondischargeability of Certain Debts Owed by Debtor Leslie Klein to Erica and Joseph Vago

Pursuant to 11 U.S.C. § 523 and to Deny Discharge Pursuant to Section 727(a)(12)

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____   _____         _____
*Date*                                    *Printed Name*                                        *Signature*

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                                      Page 3                              **F 7004-1.SUMMONS.ADV.PROC**

# EXHIBIT D

Baruch C. Cohen, Esq. (SBN 159455)
LAW OFFICE OF BARUCH C. COHEN
   A Professional Law Corporation
4929 Wilshire Boulevard, Suite 940
Los Angeles, California 90010
Tel: (323) 937-4501   Fax: (888) 316-6107
email: baruchcohen@baruchcohenesq.com

*Attorney For Plaintiffs Robert & Esther Mermelstein*

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES ANA DIVISION

| | |
|---|---|
| In re | Case No. 2:23-bk-10990-SK |
| LESLIE KLEIN, | Hon.  Sandra Klein |
|     Debtor and Debtor in Possession, | Chapter 11 |
| ROBERT & ESTHER MERMELSTEIN, <br><br>    Plaintiffs <br><br> vs. <br><br> LESLIE KLEIN <br><br>    Defendant | **COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT TO  11 USC § 523(a)(2)(A),  11 USC § 523(a)(4), & 11 USC § 523(a)(6); & FOR DENIAL OF DISCHARGE PURSUANT TO 11 USC § 727(a)(2)(A); 11 USC § 727(a)(2)(B); 11 USC § 727(a)(3); 11 USC § 727(a)(4); 11 USC § 727(a)(5)** |

**TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE, THE DEBTOR AND HIS COUNSEL, AND ALL OTHER INTERESTED PARTIES**:

Plaintiffs-Creditors, Robert & Esther Mermelstein ("Plaintiffs"), complain for nondischargeability of debt & for denial of discharge against Defendant-Debtor, Leslie Klein ("Defendant"), and alleges respectfully as follows:

**CORE/NON-CORE DESIGNATION**

1.    In accordance with Local Bankruptcy Rule 7008-1, Plaintiffs allege that this adversary proceeding constitutes a core proceeding under 28 USC § 157(b)(2). Plaintiffs acknowledge that the Court has the power to enter final orders and judgments in this

matter. Plaintiffs also consent to the Court's entry of final orders and judgments in this

matter under FRBP Rule 7008..

### JURISDICTION, VENUE & STANDING

2.   This adversary proceeding arises under *In re Klein*, 2:23-bk-10990-SK, a Chapter 11 case

commenced in the United States Bankruptcy Court for the Central District of California

("Bankruptcy Case"). The Court has jurisdiction under 11 USC §§ 523 and 727, and 28

USC §§ 157 and 1334.

3.   The venue is proper in this Court pursuant to 28 USC § 1409.

4.   Plaintiffs have standing to bring this action because Plaintiffs are creditors in the

Bankruptcy Case under 11 USC § 101(10).

### PARTIES

5.   The following is a description of the relevant parties involved in the facts forming the

basis of this Complaint.

6.   Plaintiffs are individuals, senior citizens residing in Brooklyn, NY.

7.   Defendant is an individual, whose principal residence is in Los Angeles County,

California and who regularly conducted business from Los Angeles County, California.

Defendant was a certified public accountant, formerly licensed by the State of California,

and a former, and an attorney licensed by the State of California.[1] Defendant is the debtor

in the above-captioned Chapter 11 bankruptcy case.

///

---

[1]   On September 10, 1992, the Supreme Court of the State of California, in State Bar
Court Case No. 86-O-14258, ordered that Defendant be suspended from the practice
of law for 18 months and further ordered that he take and pass the California
Professional Responsibility Examination ("CPRE"). Defendant failed the November
1993 and January 1994 CPREs. In Case No. 86-O-14258, Defendant admitted to
intentional misrepresentations. On August 3, 1995, the Supreme Court of the State
of California, in State Bar Court Case No. 92-O-11716 (consolidated with Case Nos.
93-O-11825, 94-O-13951, 94-O12055, and 94-O15901) ordered that Defendant be
suspended from the practice of law for one year. In Case No. 92-O-11716, as
consolidated, Defendant admitted to willful violations of Rules of Professional
Conduct concerning client trust accounts and conflicts of interest.

### GENERAL ALLEGATIONS

8.    The following general allegations form the background for the Plaintiffs' claims for relief against Defendant.

9.    Plaintiffs are family relatives of Defendant, are Orthodox Jews, and are the settlors and beneficiaries of the Mermelstein Charitable Remainder Unitrust Dated July 27, 2009, (the " Mermelstein Trust").

10.   Defendant,  on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") solicited Plaintiffs to invest in at least seven (7) life insurance policies: (1) Garza; (2) Times Square; (3) Ganz; (4) Spitzer; (5) Kohn; (6) Friedman; & (7) Zimmerman.

### GARZA

11.   On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture (the "Garza Memo"). The purpose of the Garza Memo, was to purchase a $1,000,000.00 life insurance Policy ("Garza Policy"); American General on the life of Emanuel Garza ("Garza"). In furtherance of the Garza Memo, Plaintiffs paid Klein $100,000.00 towards the purchase of the Garza Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Garza Memo, Defendant promised to pay the Mermelstein Trust $500,000.00 ($400,000.00 plus return of premiums paid; plus $100,000.00).

12.   On 4-30-2021, Defendant executed a First Amendment to the Memorandum of Agreement for Joint Venture (Garza), changing the recipient of the $500,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

13.   Plaintiffs are informed and believe that Defendant sold 50% to the Garza Policy, to the Longevity Fund of NY and partially to the Longevity Fund of Michigan without their consent.

14.   Plaintiffs are informed and believe that Garza apparently died in 2018, and on or about 7-

2-2018, Defendant collected the Garza Proceeds, on the Garza Policy. Defendant
concealed this information from Plaintiffs, misappropriated & kept the Garza Proceeds
for himself, and failed to pay Plaintiffs the $500,00.00 per the Garza Memo.

**TIMES SQUARE**

15. On 7-16-2012, Defendant issued Plaintiffs a Non-Recourse Promissory Note, in the
amount of $333,333.00, due and payable by 7-16-2013, by Defendant on behalf of the
Times Square Media Inc., containing a "*Heter Iska*" document (an approved way of
restructuring a loan or debt so that it becomes an investment instead of a loan, per
*Halacha* - Jewish law).

16. Plaintiffs are informed and believe that Defendant had no intention of paying the Times
Square Non-Recourse Promissory Note, as Plaintiffs made no payments whatseoever.

**GANZ**

17. On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated
2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint
Venture with plaintiffs (the "Ganz Memo"). The purpose of the Ganz Memo, was to
purchase a $1,000,000.00 life insurance Policy ("Ganz Policy"); American General on
the life of Emanuel Ganz ("Ganz"). In furtherance of the Ganz Memo, Plaintiffs paid
Klein $100,000.00 towards the purchase of the Ganz Policy. Defendant instructed
Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account.
Per the Ganz Memo, Defendant promised to pay the Mermelstein Trust $500,000.00
($400,000.00 plus return of premiums paid; plus $100,000.00).

18. On 4-30-2021, Defendant executed a First Amendment to the  Memorandum of
Agreement for Joint Venture (Ganz), changing the recipient of the $500,000.00 from the
Mermelstein Trust to Robert & Esther Mermelstein.

19. Plaintiffs are informed and believe that Defendant apparently sold 50% to the Ganz
Policy, to the Longevity Fund of NY and partially to the Longevity Fund of Michigan,
without Plaintiff's consent.

20. Plaintiffs are informed and believe that Ganz apparently died in 2018, and on or about 7-2-2018, Defendant collected the Ganz Proceeds, on the Ganz Policy. Defendant concealed this information from Plaintiffs, misappropriated & kept the Ganz Proceeds for himself, and failed to pay Plaintiffs the $500,00.00 per the Ganz Memo.

**SPITZER**

21. On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with Plaintiffs (the "Spitzer Memo"). The purpose of the Spitzer Memo, was to make premium payments of a $5,000,000.00 life insurance Policy Number: US 0023546L ("Spitzer Policy"); American General on the life of Malvine Spitzer ("Spitzer"). In furtherance of the Spitzer Memo, Plaintiffs paid Defendant $250,000.00 towards the purchase of the Spitzer Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account. Per the Spitzer Memo, Defendant promised to pay the Mermelstein Trust $2,250,000.00 ($2,000,000 plus $250,000 and all premiums paid of the proceeds).

22. On 4-30-2021, Defendant executed a First Amendment to the Memorandum of Agreement for Joint Venture (Spitzer), changing the recipient of the $2,250,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

23. Plaintiffs are informed and believe that Defendant apparently sold portions of the Spitzer Policy, without their consent - but Plaintiffs do not know to whom. Defendant concealed this information from Plaintiffs.

**KOHN**

24. On 3-10-2010, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with Plaintiffs (the "Kohn Memo"). The purpose of the Kohn Memo, was to make premium payments of a $3,000,000.00 life insurance Policy ("Kohn Policy"); American General on the life of Eugene Kohn ("Kohn"). In furtherance of the Kohn

Memo, Plaintiffs paid Defendant $200,000.00 towards the purchase of the Kohn Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account.  Per the Kohn Memo, Defendant promised to pay the Mermelstein Trust $1,200,000.00 ($200,000 and $1,000,000 and all premiums paid of the proceeds).

25. On 4-30-2021, Klein executed a First Amendment to the  Memorandum of Agreement for Joint Venture (Kohn), changing the recipient of the $1,200,000.00 from the Mermelstein Trust to Robert & Esther Mermelstein.

26. Plaintiffs are informed and believe that Defendant paid premiums of the Kohn Policy up to 2011. Thereafter, Defendant apparently sold portions or the entirety of the Kohn Policy - without Plaintiffs' consent - to Life Capital Group, LLC ("LCG"), where Shlomo Yehuda Rechnitz ("Rechnitz") was to resume paying the Kohn Policy premiums from 2011 onwards. Defendant concealed this information from Plaintiffs.

27. According to information recently received by Plaintiffs  an unsigned Amended and Restated Limited Liability Company Agreement of Life Capital Group, LLC, Defendant and Rechnitz agreed that upon the death of Kohn, Defendant and Rechnitz would be reimbursed the premiums that they paid, plus interest on the premiums. Thereafter, Defendant and Rechnitz would split the profits 50/50 of the Kohn Policy, and that Plaintiffs would receive their $1,200,000.00.

**FRIEDMAN**

28. On 3-1-2010, Defendant on behalf of The Klein Charitable Remainder Unitrust dated 2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint Venture with Plaintiffs (the "Friedman Memo"). The purpose of the Friedman Memo, was to purchase a $1,500,000.00 life insurance Policy ("Friedman Policy"); American General on the life of Goldie Friedman ("Friedman"). In furtherance of the Friedman Memo, Plaintiffs paid Klein $250,000.00 towards the purchase of the Friedman Policy. Defendant instructed Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account.  Per the Friedman Memo, Defendant promised to pay the

1    Mermelstein Trust $1,000,000.00 ($250,000.00 and $750,000.00 and all premiums paid

2    of the proceeds).

3    29.    On 4-30-2021, Defendant executed a First Amendment to the  Memorandum of

4    Agreement for Joint Venture (Friedman), changing the recipient of the $1,000,000.00

5    from the Mermelstein Trust to Robert & Esther Mermelstein.

6    30.    Plaintiffs are informed and believe that Defendant apparently sold portions of the

7    Friedman Policy, to the Longevity Fund of NY and partially to the Longevity Fund of

8    Michigan, without Plaintiff's consent.

9    31.    Plaintiffs are informed and believe that Friedman apparently died in 2020, and Defendant

10    collected the Friedman Proceeds, on the Friedman Policy. Defendant concealed this

11    information from Plaintiffs, misappropriated & kept the Friedman Proceeds for himself,

12    and failed to pay Plaintiffs the  $1,000,000.00 per the Friedman Memo.

13    **ZIMMERMAN**

14    32.    On 8-3-2009, Defendant on behalf of The Klein Charitable Remainder Unitrust dated

15    2-20-1996 (the "Klein Trust") entered into a Memorandum of Agreement for Joint

16    Venture with Plaintiffs (the "Zimmerman Memo"). The purpose of the Zimmerman

17    Memo, was to purchase a $9,000,000.00 life insurance Policy ("Zimmerman Policy");

18    American General Policy # US 0023738L on the life of Rozy Pearl Zimmerman

19    ("Zimmerman"). In furtherance of the Zimmerman Memo, Plaintiffs paid Defendant

20    $150,000.00 towards the purchase of the Zimmerman Policy. Defendant instructed

21    Plaintiffs to make said payments to Defendant's IOLTA - Attorney Client Trust Account.

22    Per the Zimmerman Memo, Defendant promised to pay the Mermelstein Trust

23    $2,400,000.00 ($2,250,000.00 plus $150,000.00).

24    33.    On 4-30-2021, Defendant executed a First Amendment to the  Memorandum of

25    Agreement for Joint Venture (Zimmerman), changing the recipient of the $2,400,000.00

26    from the Mermelstein Trust to Robert & Esther Mermelstein.

27    34.    Plaintiffs are informed and believe that Defendant paid premiums of the Zimmerman

28

Policy up to 2011. Thereafter, Defendant apparently sold portions or the entirety of the Zimmerman Policy to Life Capital Group, LLC ("LCG") - without Plaintiffs' consent - , where Shlomo Yehuda Rechnitz ("Rechnitz") was to resume paying the Zimmerman Policy premiums from 2011 onwards. Defendant concealed this information from Plaintiffs.

35.     Defendant, as Trustee of the Rozy Pearl Zimmerman Irrevocable Life Insurance Trust (the "Zimmerman Trust") issued three Non-Recourse Promissory Notes  (the "Zimmerman Notes") to Plaintiffs secured by the Zimmerman Policy in the amount of $2,357,679.50:

    a.     Non-Recourse Promissory Notes # 1, principal sum of $1,412,679.53, dated June 15, 2011 - due June 15, 2020 (the "$1,412,679.53 Zimmerman Note");

    b.     Non-Recourse Promissory Notes # 2, principal sum of $570,000.00, dated December 7, 2009 - due December 7, 2019 (the: "$570,000.00 Zimmerman Note");

    c.     Non-Recourse Promissory Notes # 2, principal sum of $375,000.00, dated January 14, 2010 - due January 14, 2020 (the "$375,000.00 Zimmerman Note").

    d.     Interest on the three Non-Recourse Zimmerman Notes until 4-30-2023 comes to $2,939,936.84. Therefore the total amount of the claim is: $7,697,616.34 ($2,400,000.00 (Zimmerman Policy) + $2,357,679.50 (3 Zimmerman Notes) + 2,939,936.84 (interest) =  $7,697,616.34.

36.     According to information recently received by Plaintiffs, an unsigned Amended and Restated Limited Liability Company Agreement of Life Capital Group, LLC, Defendant and Rechnitz agreed that upon the death of Zimmerman, Defendant and Rechnitz  would be reimbursed the premiums that they paid, plus interest on the premiums. Thereafter, Defendant and Rechnitz would split the profits 50/50 of the Zimmerman Policy, and that Plaintiffs would receive their $2,400,000.00.  Defendant concealed this information from Plaintiffs.

1  **PERIODIC PAYMENTS TO PLAINTIFFS FROM DEFENDANT'S IOLTA ACCOUNT**

2  37.    During this entire time, Defendant repeatedly assured Plaintiffs that their investments in

3        the 7 policies were secure and accruing interest. Defendant mailed Plaintiffs periodic

4        monthly checks of $5,000.00 issued from Defendant's IOLTA - Attorney Client Trust

5        Account.

6  **PLAINTIFFS' DISCOVERY OF DEFENDANT'S FRAUD**

7  38.    On or about 1-21-2021, Plaintiffs discovered the above-referenced frauds and

8        concealment.

9  39.    On or about 6-22-2022, Defendant wrote Plaintiffs assuring them that their investments

10       were "secure" when in reality, Defendant sold them off to third parties without Plaintiffs'

11       consent:

12       I received you e mail and I disagree. I paid in on the Zmerman policy over
         $1,000,000. The interest for the last 10 years is over $2,300,000 . I also own
13       25%of the profits. ***You are well secured***. You can call me if you have any
         questions. [Emphasis Added]

14
15  40.    On or about 7-18-2022, Defendant wrote Plaintiffs admitting that he used Plaintiffs'

16       monies from the Friedman Garza and Gans to pay for his legal fees in his lawsuit with

17       Rechnitz.

18       I got your email. I want to make it very clear we are family and I don't want to
         fight. I think I can make a deal with Rechnitz because I have the best lawyers in
19       LA. If not we will go to court. I have big leverage on Rechnitz due to the Menlo
         case. I am not assigning the Zimmerman case to you. ***I am using the money from***
         ***the Friedman Garza and Gans cases for attorney fees in the Rechnitz case***.  On
20       Zimmerman Rechnitz and I paid $4,000,000 in premiums but it is return of
         premium. We also gave Mrs Zimmerman $200,000. I am sure they will sue to get
21       more. It is a big policy and all big policies have big fights. [Emphasis Added]

22  **PLAINTIFFS' PROOF OF CLAIMS**

23  41.    Plaintiffs timely filed seven (7) *Proofs of Claim* against Defendant totaling $13,480,949,

24       primarily based on Defendant misappropriating insurance policies and the proceeds, as

25       follows:

26       a.    Claim # 19-1 (Garza) $500,000.00;

27       b.    Claim # 20-1 (Times Square) $333,333.00;

28

-9-

c.      Claim # 21-1 (Ganz) $500,000.00;

d.      Claim # 22-1 (Spitzer) $2,250,000.00;

e.      Claim # 23-1 (Kohn) $1,200,000.00;

f.      Claim # 24-1 (Friedman) $1,000,000.00; &

g.      Claim # 25-2 (Zimmerman) $7,697,616.34.

TOTAL:      **$13,480,949**

## FIRST CLAIM FOR RELIEF
### (Nondischargeability of Debt - 11 USC § 523(a)(2)(A))

42.     Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations
in this Complaint as though fully set forth herein.

43.     At all relevant times, Defendant acted as Plaintiffs' fiduciary - investment adviser.
Plaintiffs entrusted Defendant implicitly with their investments in the insurance policies.

44.     Defendant owed Plaintiffs fiduciary duties at all relevant times, including the duty of
loyalty and candor. Defendant further owed a duty to use Plaintiffs' funds for legitimate
business purposes and to refrain from using their funds and other property for his own
personal non-business purposes.

45.     Defendant embezzled and stole from Plaintiffs. Defendant misrepresented the above-
referenced information to Plaintiffs for the purpose of convincing Plaintiffs to invest in
additional policies into Defendant's IOLTA client trust account. Defendant then stole
more than $13,480,949 of Plaintiffs' money in a complicated life insurance scam,
constituting intentional fraudulent, fraudulent concealment, breach of fiduciary duty and
elder abuse.

46.     Defendant's misappropriation of Plaintiffs' funds and other property was unauthorized,
without their consent and fraudulent. Defendant acted with the intent to permanently
deprive Plaintiffs of the possession, use and benefit of their funds and other property.

47.     As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiffs'
funds and other property and Defendant's false pretenses, false representations, and
actual fraud set forth herein, Plaintiffs have suffered damages in the amount of not less

-10-

1    than $13,480,949.

2    48.    Defendant's debt to Plaintiffs is nondischargeable under 11 USC § 523(a)(2) because it

3    was incurred as a result of false pretenses, false representations, and actual fraud.

4    49.    The damages arising from Defendant's willful and malicious false pretenses, false

5    representation and actual fraud to Plaintiffs constitutes a debt against Defendant that is

6    nondischargeable pursuant to 11 USC § 523(a)(2)(A).

7    **SECOND CLAIM FOR RELIEF**
8    **(Nondischargeability of Debt - 11 USC § 523(a)(4))**

9    50.    Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations

10    in this Complaint as though fully set forth herein.

11    51.    At all relevant times, Defendant acted as Plaintiffs' fiduciary - investment adviser.

12    Plaintiffs entrusted Defendant implicitly with their investments in the insurance policies.

13    52.    Defendant owed Plaintiffs fiduciary duties at all relevant times, including the duty of

14    loyalty and candor. Defendant further owed a duty to use Plaintiffs' funds for legitimate

15    business purposes and to refrain from using their funds and other property for his own

16    personal non-business purposes.

17    53.    Defendant embezzled and stole from Plaintiffs. Defendant misrepresented the above-

18    referenced information to Plaintiffs for the purpose of convincing Plaintiffs to invest in

19    additional policies into Defendant's IOLTA client trust account. Defendant then stole

20    more than $13,480,949 of Plaintiffs' money in a complicated life insurance scam,

21    constituting intentional fraudulent, fraudulent concealment, breach of fiduciary duty and

22    elder abuse.

23    54.    Defendant's misappropriation of Plaintiffs' funds and other property was unauthorized,

24    without their consent and fraudulent. Defendant acted with the intent to permanently

25    deprive Plaintiffs of the possession, use and benefit of their funds and other property.

26    55.    As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiffs'

27    funds and other property and Defendant's false pretenses, false representations, and

28    actual fraud set forth herein, Plaintiffs have suffered damages in the amount of not less

-11-

than $13,480,949.

56.  The damages to Plaintiffs arising from Defendant's fraud, defalcation, embezzlement and larceny while acting in a fiduciary capacity constitutes a debt against Defendant that is non-dischargeable pursuant to 11 USC § 523(a)(4).

<div align="center">

**THIRD CLAIM FOR RELIEF**
**(Nondischargeability of Debt - 11 USC § 523(a)(6))**

</div>

57.  Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

58.  At all relevant times, Defendant acted as Plaintiffs' fiduciary - investment adviser. Plaintiffs entrusted Defendant implicitly with their investments in the insurance policies.

59.  Defendant owed Plaintiffs fiduciary duties at all relevant times, including the duty of loyalty and candor. Defendant further owed a duty to use Plaintiffs' funds for legitimate business purposes and to refrain from using their funds and other property for his own personal non-business purposes.

60.  Defendant embezzled and stole from Plaintiffs. Defendant misrepresented the above-referenced information to Plaintiffs for the purpose of convincing Plaintiffs to invest in additional policies into Defendant's IOLTA client trust account. Defendant then stole more than $13,480,949 of Plaintiffs' money in a complicated life insurance scam, constituting intentional fraudulent, fraudulent concealment, breach of fiduciary duty and elder abuse.

61.  Defendant's misappropriation of Plaintiffs' funds and other property was unauthorized, without their consent and fraudulent. Defendant acted with the intent to permanently deprive Plaintiffs of the possession, use and benefit of their funds and other property.

62.  As a result of Defendant's unauthorized and fraudulent misappropriation of Plaintiffs' funds and other property and Defendant's false pretenses, false representations, and actual fraud set forth herein, Plaintiffs have suffered damages in the amount of not less than $13,480,949.

63.  The damages to Plaintiffs arising from Defendant's willful and malicious injury to

<div align="center">-12-</div>

Plaintiffs constitutes a debt against Defendant that is non-dischargeable pursuant to 11 USC § 523(a)(6).

### FOURTH CAUSE OF ACTION
#### (Objection to Debtor's Discharge  11 USC § 727(a)(2)(A))

64. Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

65. Plaintiffs are informed and believe that within one year before the Petition, Defendant transferred, removed, and/or concealed, or permitted to be transferred, removed, and/or concealed, Defendant's property.

66. As of the dates of the transfers, removals, and/or concealments of Defendant's property, Defendant had one or more unsecured creditors.

67. The transfers, removals, and/or concealments of Defendant's property prevented the distribution of Defendant's property to Defendant's unsecured creditors.

68. Defendant, with intent to hinder, delay, and/or defraud at least one of Defendant's creditors, including, without limitation, Plaintiffs, transferred, removed, and/or concealed, or permitted to be transferred, removed, and/or concealed, Defendant's property.

69. By transferring, removing, concealing, and/or permitting the transfer, removal, and/or concealment of Defendant's property with the intent to hinder, delay, and/or defraud at least one of Defendant's creditors, Defendant violated 11 USC § 727(a)(2)(A).

70. Defendant failed to list valuable property on his schedule of assets and failed in his statement of affairs to disclose property transfers.

71. Defendant has a reckless indifference to the truth.

### FIFTH CAUSE OF ACTION
#### (Objection to Debtor's Discharge  11 USC § 727(a)(2)(B))

72. Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations in this Complaint as though fully set forth herein.

73. Plaintiffs are informed and believe that After the Petition, Defendant transferred,

-13-

1   removed, concealed, and/or permitted to be transferred, removed, and/or concealed,

2   property of the Bankruptcy estate.

3   74.   As of the dates of the transfers, removals, and/or concealments of the property of the

4   estate, Defendant had one or more unsecured creditors.

5   75.   The transfers, removals, and/or concealments of the property of the estate prevented the

6   distribution of this property to Defendant's unsecured creditors.

7   76.   Defendant, with intent to hinder, delay, and/or defraud at least one of Defendant's

8   creditors, transferred, removed, and/or concealed, or permitted to be transferred,

9   removed, and/or concealed, property of the estate.

10  77.   By transferring, removing, concealing, and/or permitting the transfer, removal, and/or

11  concealment of estate property, with the intent to hinder, delay, and/or defraud at least

12  one of Defendant's creditors, Defendant violated 11 USC § 727(a)(2)(B).

13  78.   Defendant failed to list valuable property on his schedule of assets and failed in his

14  statement of affairs to disclose property transfers.

15  79.   Defendant has a reckless indifference to the truth.

16              **SIXTH CAUSE OF ACTION**
17       **(Objection to Debtor's Discharge  11 USC § 727(a)(3))**

18  80.   Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations

19  in this Complaint as though fully set forth herein.

20  81.   Plaintiffs are informed and believe that Defendant has not maintained adequate books

21  and records from which Debtor's financial condition can be ascertained. Debtor has

22  consistently not maintained adequate books and records. His failure to keep adequate

23  books and records is not justified considering the circumstances articulated in this

24  Complaint.

25  82.   Defendant has concealed, destroyed, falsified, and/or failed to keep or preserve

26  information from which Defendant's financial condition and/or business transactions

27  might be ascertained.

28  83.   Defendant has not been cooperative with the Office of the United States Trustee

-14-

("OUST") or with his creditors. Defendant has intentionally withheld records, books,

documents, and/or other papers relating to Defendant's property and/or financial affairs.

84.    Considering the foregoing, Defendant's discharge must be denied under 11 USC §

727(a)(3).

## SEVENTH CAUSE OF ACTION
### (Objection to Debtor's Discharge  11 USC § 727(a)(4))

85.    Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations

in this Complaint as though fully set forth herein.

86.    Plaintiffs are informed and believe that Defendant has not made simple isolated errors or

omissions in his Bankruptcy filings. Defendant's filings, such as his schedules and

statement of affairs, do not reflect inadvertence or incompetence; rather, they exhibit

fraudulent intent.

87.    Defendant has a pattern of misleading conduct.

88.    Defendant has a reckless indifference to the truth.

89.    Defendant has failed to list assets in his schedules.

90.    Defendant has falsely testified in the 341 Meeting.[2]

---

[2]    At the 3-13-2023 341(a) Meeting, Defendant at circa 11:15 testified in response to
omissions to be brought to the attention of the United States Trustee ("UST"), that
there were only "three minor errors" which he thought that his attorney corrected.
Defendant testified that there were "no" errors related to any assets that he owns. At
circa 12:52, Defendant testified that he identified all assets on his schedules.
Defendant at circa 1:18:30-1:09:21 testified that in the year before the Bankruptcy,
he received no commissions from his third-party life insurance deals. At circa
1:20:18, Defendant testified that he has not ever collected money on his third-party
life insurance deals. At circa 1:22:18, Defendant testified that he has never received
a payoff on his third-party life insurance deals. At circa 1:23:21, Defendant testified
that four people have died and that he has received no money. Defendant at circa
1:39:00 testified, in response to whether he had transactions with Shlomo Rechnitz
in the last five or six months relating to the thirdparty life insurance policies, "nope."
Defendant testified that he does not remember paying the premiums for these
policies out of his attorney client trust account at any time. Defendant at circa
1:40:03 testified that he does not remember depositing his own funds into his
attorney-client trust account so that these insurance premiums could be paid. In
response to the question of whether Defendant traveled out of the country anywhere
recently, other than Israel, Defendant at circa 2:23:00 testified, "nope." In response

91. Defendant has knowingly and fraudulently made false oaths and/or accounts in the
Bankruptcy Case.

92. Defendant has failed to provide records which are necessary for the OUST and his
creditors to properly understand Defendant's financial condition and/or recent business
transactions.

93. Considering the foregoing, Defendant's discharge must be denied under 11 USC §
727(a)(4).

### EIGHTH CAUSE OF ACTION
### (Objection to Debtor's Discharge  11 USC § 727(a)(5))

94. Plaintiffs reallege and incorporate by reference all of the prior and subsequent allegations
in this Complaint as though fully set forth herein.

95. Defendant has failed to explain satisfactorily his deficiency and/or loss of assets to meet
Debtor's liabilities. No determination has yet been made of an entitlement to a discharge
in this Bankruptcy Case.

96. Considering the foregoing, Defendant's discharge must be denied under 11 USC §
727(a)(5).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment on the Complaint as follows:

1. On the First Claim for Relief, Plaintiffs seek an order determining that Defendant is
indebted to Plaintiffs in an amount not less than $13,480,949 and that Defendant's debt is
excepted from discharge pursuant to 11 USC § 523(a)(2)(A);

2. On the Second Claim for Relief, Plaintiffs seek an order determining that Defendant is
indebted to Plaintiffs in an amount not less than $13,480,949 and that Defendant's debt is
excepted from discharge pursuant to 11 USC § 523(a)(4);

3. On the Third Claim for Relief, Plaintiffs seek an order determining that Defendant is

---

to the question of whether Defendant has bank accounts in Israel, Defendant at circa
2:26:48 testified, "nope." Defendant at circa 2:59:15 testified that he has not
transferred any assets within the last year to a third party. Defendant at circa 2:59:33
testified that he has not given any gifts more than $12,000.00 to his family.

1   indebted to Plaintiffs in an amount not less than $13,480,949 and that Defendant's debt is

2   excepted from discharge pursuant to 11 USC § 523(a)(6);

3   4.   On the Fourth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge

4   pursuant to 11 USC § 727(a)(2)(A);

5   5.   On the Fifth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge

6   pursuant to 11 USC § 727(a)(2)(B);

7   6.   On the Sixth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge

8   pursuant to 11 USC § 727(a)(3);

9   7.   On the Seventh Claim for Relief, Plaintiffs seek an order denying Defendant his

10   discharge pursuant to 11 USC § 727(a)(4);

11   8.   On the Eighth Claim for Relief, Plaintiffs seek an order denying Defendant his discharge

12   pursuant to 11 USC § 727(a)(5);

13   9.   For costs of suit incurred herein; and

14   10.   For such other and further relief as the Court may deem appropriate.

15   DATED:     May 12, 2023          LAW OFFICE OF BARUCH C. COHEN
16                                    A Professional Law Corporation

17                                    By ____/S/ Baruch C. Cohen_____
18                                    Baruch C. Cohen, Esq.
                                      *Attorney For Creditors Robert & Esther*
19                                    *Mermelstein*

20

21

22

23

24

25

26

27

28

-17-

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>ROBERT & ESTHER MERMELSTEIN | DEFENDANTS<br><br>LESLIE KLEIN |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br><br>Baruch C. Cohen, Esq. (SBN 159455)   (323) 937-4501<br>LAW OFFICE OF BARUCH C. COHEN, A Professional Law Corporation<br>4929 Wilshire Boulevard, Suite 940, Los Angeles CA 90010 | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>☐ Debtor            ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor          ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☒ Debtor            ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor          ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT TO  11 USC § 523(a)(2)(A),  11 USC § 523(a)(4), & 11 USC § 523(a)(6); & FOR DENIAL OF DISCHARGE PURSUANT TO 11 USC § 727(a)(2)(A); 11 USC § 727(a)(2)(B); 11 USC § 727(a)(3); 11 USC § 727(a)(4); 11 USC § 727(a)(5)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☒ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☒ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☒ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☒ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ 13,480,949 |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>LESLIE KLEIN | BANKRUPTCY CASE NO.<br>2:23-bk-10990-SK | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Los Angeles | NAME OF JUDGE<br>Klein |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>5/12/2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Baruch C. Cohen, Esq. | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Baruch C. Cohen, Esq. (SBN 159455)<br>LAW OFFICE OF BARUCH C. COHEN<br> A Professional Law Corporation<br>4929 Wilshire Boulevard, Suite 940<br>Los Angeles, California 90010<br>(323) 937-4501 Facsimile: (888) 316-6107<br>Email: baruchcohen@baruchcohenesq.com<br><br><br>*Attorney for Plaintiff* | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br>LESLIE KLEIN<br><br><br><br><br>Debtor(s). | CASE NO.: 2:23-bk-10990-SK<br><br>CHAPTER: 11<br><br>ADVERSARY NO.: |
| ROBERT & ESTHER MERMELSTEIN<br><br><br><br>Plaintiff(s)<br><br>LESLIE KLEIN       Versus<br><br><br><br>Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING**<br>**[LBR 7004-1]** |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| | |
|---|---|
| **Hearing Date:** _____<br>**Time:** _____<br>**Courtroom:** _____ | **Address:**<br>☐ 255 East Temple Street, Los Angeles, CA 90012<br>☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101<br>☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.**  All parties must read and comply with the rule, even if you are representing yourself.  You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference.  A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH).  If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference.  **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

KATHLEEN J. CAMPBELL
CLERK OF COURT

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
                          Deputy Clerk

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:

_____

_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____     _____     _____
*Date*                                      *Printed Name*                                      *Signature*

_____
This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# EXHIBIT E

**BEFORE THE
CALIFORNIA BOARD OF ACCOUNTANCY
DEPARTMENT OF CONSUMER AFFAIRS
STATE OF CALIFORNIA**

In the Matter of the Accusation Against:

**LESLIE KLEIN
322 N. June Street
Los Angeles, CA 90004**

**Certified Public Accountant Certificate No.
67454**

Respondent.

Case No. AC-2019-62

OAH No. 2019090073

## DECISION AND ORDER

The attached Stipulated Surrender of License and Order is hereby adopted by the

California Board of Accountancy, Department of Consumer Affairs, as its Decision in this

matter.

This Decision shall become effective on _____May 13, 2020_____.

It is so ORDERED _____April 13, 2020_____.

FOR THE CALIFORNIA BOARD OF ACCOUNTANCY
DEPARTMENT OF CONSUMER AFFAIRS

1   XAVIER BECERRA
    Attorney General of California
2   MARC D. GREENBAUM
    Supervising Deputy Attorney General
3   WILLIAM D. GARDNER
    Deputy Attorney General
4   State Bar No. 244817
    300 So. Spring Street, Suite 1702
5   Los Angeles, CA 90013
      Telephone: (213) 269-6292
6     Facsimile: (916) 731-2126
    *Attorneys for Complainant*

7

8                              **BEFORE THE**
                    **CALIFORNIA BOARD OF ACCOUNTANCY**
9                   **DEPARTMENT OF CONSUMER AFFAIRS**
                           **STATE OF CALIFORNIA**
10

11
    In the Matter of the Accusation Against:        Case No. AC-2019-62
12
    **LESLIE KLEIN**                                OAH No. 2019090073
13  **322 N. June Street**
    **Los Angeles, CA 90004**                       **STIPULATED SURRENDER OF**
14                                                   **LICENSE AND ORDER**
    **Certified Public Accountant Certificate No.**
15  **67454**

16                            Respondent.

17

18        IT IS HEREBY STIPULATED AND AGREED by and between the parties to the above-

19  entitled proceedings that the following matters are true:

20                                    **PARTIES**

21        1.    Patti Bowers (Complainant) is the Executive Officer of the California Board of

22  Accountancy (CBA). She brought this action solely in her official capacity and is represented in

23  this matter by Xavier Becerra, Attorney General of the State of California, by William D.

24  Gardner, Deputy Attorney General.

25        2.    Respondent Leslie Klein is represented in this proceeding by attorney Randall Dean,

26  whose address is: 11900 W. Olympic Boulevard, Suite 800, Los Angeles, California 90064.

27        3.    On or about September 30, 1994, the California Board of Accountancy issued

28  Certified Public Accountant Certificate Number 67454 to Leslie Klein ("Respondent"). The

                                          1

1    Certified Public Accountant Certificate was in full force and effect at all times relevant to the

2    charges brought in Accusation No. AC-2019-62 and will expire on January 31, 2021, unless

3    renewed.

4                                   **JURISDICTION**

5        4.    Accusation No. AC-2019-62 was filed before the CBA, and is currently pending

6    against Respondent.  The Accusation and all other statutorily required documents were properly

7    served on Respondent on June 7, 2019.  Respondent timely filed his Notice of Defense contesting

8    the Accusation.  A copy of Accusation No. AC-2019-62 is attached as Exhibit A and incorporated

9    by reference.

10                          **ADVISEMENT AND WAIVERS**

11       5.    Respondent has carefully read, fully discussed with counsel, and understands the

12   charges and allegations in Accusation No. AC-2019-62.  Respondent also has carefully read, fully

13   discussed with counsel, and understands the effects of this Stipulated Surrender of License and

14   Order.

15       6.    Respondent is fully aware of his legal rights in this matter, including the right to a

16   hearing on the charges and allegations in the Accusation; the right to confront and cross-examine

17   the witnesses against him; the right to present evidence and to testify on his own behalf; the right

18   to the issuance of subpoenas to compel the attendance of witnesses and the production of

19   documents; the right to reconsideration and court review of an adverse decision; and all other

20   rights accorded by the California Administrative Procedure Act and other applicable laws.

21       7.    Respondent voluntarily, knowingly, and intelligently waives and gives up each and

22   every right set forth above.

23                                   **CULPABILITY**

24       8.    Respondent understands that the charges and allegations in Accusation No. AC-2019-

25   62, if proven at a hearing, constitute cause for imposing discipline upon his Certified Public

26   Accountant Certificate.

27       9.    For the purpose of resolving the Accusation without the expense and uncertainty of

28   further proceedings, Respondent agrees that, at a hearing, Complainant could establish a factual

                                          2

1    basis for the charges in the Accusation and that those charges constitute cause for discipline.

2    Respondent hereby gives up his right to contest that cause for discipline exists based on those

3    charges.

4        10.    Respondent understands that by signing this stipulation he enables the CBA to issue

5    an order accepting the surrender of his Certified Public Accountant Certificate without further

6    process.

7                                    **RESERVATION**

8        11.    The admissions made by Respondent herein are only for the purposes of this

9    proceeding, or any other proceedings in which the CBA is involved and shall not be admissible in

10    any other criminal or civil proceeding.

11                                    **CONTINGENCY**

12        12.    This stipulation shall be subject to approval by the CBA.  Respondent understands

13    and agrees that counsel for Complainant and the staff of the CBA may communicate directly with

14    the CBA regarding this stipulation and surrender, without notice to or participation by

15    Respondent or his counsel.  By signing the stipulation, Respondent understands and agrees that he

16    may not withdraw his agreement or seek to rescind the stipulation prior to the time the CBA

17    considers and acts upon it.  If the CBA fails to adopt this stipulation as its Decision and Order, the

18    Stipulated Surrender and Disciplinary Order shall be of no force or effect, except for this

19    paragraph, it shall be inadmissible in any legal action between the parties, and the CBA shall not

20    be disqualified from further action by having considered this matter.

21        13.    The parties understand and agree that Portable Document Format (PDF) and facsimile

22    copies of this Stipulated Surrender of License and Order, including PDF and facsimile signatures

23    thereto, shall have the same force and effect as the originals.

24        14.    This Stipulated Surrender of License and Order is intended by the parties to be an

25    integrated writing representing the complete, final, and exclusive embodiment of their agreement.

26    It supersedes any and all prior or contemporaneous agreements, understandings, discussions,

27    negotiations, and commitments (written or oral).  This Stipulated Surrender of License and Order

28

Stipulated Surrender of License (Case No. AC-2019-62)

1    may not be altered, amended, modified, supplemented, or otherwise changed except by a writing

2    executed by an authorized representative of each of the parties.

3        15.    In consideration of the foregoing admissions and stipulations, the parties agree that

4    the CBA may, without further notice or formal proceeding, issue and enter the following Order:

5                                    **ORDER**

6        IT IS HEREBY ORDERED that Certified Public Accountant Certificate No. 67454, issued

7    to Respondent Leslie Klein, is surrendered and accepted by the CBA.

8        1.    The surrender of Respondent's Certified Public Accountant Certificate and the

9    acceptance of the surrendered license by the CBA shall constitute the imposition of discipline

10   against Respondent.  This stipulation constitutes a record of the discipline and shall become a part

11   of Respondent's license history with the CBA.

12       2.    Respondent shall lose all rights and privileges as a certified public accountant in

13   California as of the effective date of the CBA's Decision and Order.

14       3.    Respondent shall cause to be delivered to the CBA his pocket license and, if one was

15   issued, his wall certificate on or before the effective date of the Decision and Order.

16       4.    If Respondent ever files an application for licensure or a petition for reinstatement in

17   the State of California, the CBA shall treat it as a petition for reinstatement.  Respondent must

18   comply with all the laws, regulations and procedures for reinstatement of a revoked or

19   surrendered license in effect at the time the petition is filed, and all of the charges and allegations

20   contained in Accusation No. AC-2019-62 shall be deemed to be true, correct and admitted by

21   Respondent when the CBA determines whether to grant or deny the petition.

22       5.    Respondent shall pay the agency its costs of investigation and enforcement in the

23   amount of $30,000.00 prior to issuance of a new or reinstated license.

24                                  **ACCEPTANCE**

25       I have carefully read the above Stipulated Surrender of License and Order and have fully

26   discussed it with my attorney.  I understand the stipulation and the effect it will have on my

27   Certified Public Accountant Certificate.  I enter into this Stipulated Surrender of License and

28   ///

                                        4

Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order

of the California Board of Accountancy

DATED: ___3/19/2020___   _____
                         LESLIE KLEIN
                         *Respondent*

I have read and fully discussed with Respondent Leslie Klein the terms and conditions and

other matters contained in this Stipulated Surrender of License and Order. I approve its form and

content.

DATED: _____   _____

                                 *Attorney for Respondent*

## ENDORSEMENT

The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted

consideration by the California Board of Accountancy of the Department of Consumer

irs.

ED: _____          Respectfully submitted,

                                     XAVIER BECERRA
                                     Attorney General of California
                                     MARC D. GREENBAUM
                                     Supervising Deputy Attorney General


                                     WILLIAM D. GARDNER
                                     Deputy Attorney General
                                     *Attorneys for Complainant*

9
ender of License and Order.docx

1    Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order

2    of the California Board of Accountancy.

3

4    DATED: _____    _____

5                         LESLIE KLEIN
                        *Respondent*

6       I have read and fully discussed with Respondent Leslie Klein the terms and conditions and

7    other matters contained in this Stipulated Surrender of License and Order.  I approve its form and

8    content.

9    DATED:  March 19, 2020 _____    *Randall J. Dean*_____

10                        *Attorney for Respondent*

11

12                      **ENDORSEMENT**

13       The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted

14    for consideration by the California Board of Accountancy of the Department of Consumer

15    Affairs.

16    DATED: _____    Respectfully submitted,

17                         XAVIER BECERRA
                        Attorney General of California

18                         MARC D. GREENBAUM
                        Supervising Deputy Attorney General

19

20

21                         WILLIAM D. GARDNER
                        Deputy Attorney General

22                         *Attorneys for Complainant*

23

24

25    LA2019501499
   Stipulated Surrender of License and Order.docx

26

27

28

                                 5

1    Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order

2    of the California Board of Accountancy.

3

4    DATED: _____    _____

5                               LESLIE KLEIN
                               *Respondent*

6       I have read and fully discussed with Respondent Leslie Klein the terms and conditions and

7    other matters contained in this Stipulated Surrender of License and Order.  I approve its form and

8    content.

9    DATED: _____    _____

10                                *Attorney for Respondent*

11

12                      **ENDORSEMENT**

13       The foregoing Stipulated Surrender of License and Order is hereby respectfully submitted

14    for consideration by the California Board of Accountancy of the Department of Consumer

15    Affairs.

16    DATED: *3/20/2020*           Respectfully submitted,

17                             XAVIER BECERRA
                            Attorney General of California

18                             MARC D. GREENBAUM
                            Supervising Deputy Attorney General

19

20

21                             WILLIAM D. GARDNER
                            Deputy Attorney General
                            *Attorneys for Complainant*

22

23

24    LA2019501499

25    Stipulated Surrender of License and Order.docx

26

27

28

**Exhibit A**

**Accusation No. AC-2019-62**

1   XAVIER BECERRA
    Attorney General of California
2   ARMANDO ZAMBRANO
    Supervising Deputy Attorney General
3   KEVIN J. SCHETTIG
    Deputy Attorney General
4   State Bar No. 234240
    300 So. Spring Street, Suite 1702
5   Los Angeles, CA  90013
      Telephone:  (213) 269-6272
6     Facsimile:  (213) 897-2804
    *Attorneys for Complainant*
7

8                              BEFORE THE
                   CALIFORNIA BOARD OF ACCOUNTANCY
9                  DEPARTMENT OF CONSUMER AFFAIRS
                         STATE OF CALIFORNIA
10

11

12  In the Matter of the Accusation Against:        Case No. AC-2019-62
13
    **LESLIE KLEIN**
14  322 N. June Street
    Los Angeles, CA  90004                          **ACCUSATION**
15
    **Certified Public Accountant Certificate No.**
16  **67454**
17                                   Respondent.
18

19

20

21         Complainant alleges:
22                               **PARTIES**
23         1.      Patti Bowers ("Complainant") brings this Accusation solely in her official capacity as

24  the Executive Officer of the California Board of Accountancy, Department of Consumer Affairs.

25         2.      On or about September 30, 1994, the California Board of Accountancy issued

26  Certified Public Accountant Certificate Number 67454 to Leslie Klein ("Respondent").  The

27  Certified Public Accountant Certificate was in full force and effect at all times relevant to the

28  charges brought herein and will expire on January 31, 2021, unless renewed.

                                      1

                                                        (LESLIE KLEIN) ACCUSATION

1                                           **JURISDICTION**

2        3.     This Accusation is brought before the California Board of Accountancy ("CBA"),

3 Department of Consumer Affairs, under the authority of the following laws. All section

4 references are to the Business and Professions Code unless otherwise indicated.

5        4.     Section 5100.5, subdivision (a), states, "After notice and hearing the board may, for

6 unprofessional conduct, permanently restrict or limit the practice of a licensee or impose a

7 probationary term or condition on a license, which prohibits the licensee from performing or

8 engaging in any of the acts or services described in Section 5051."

9        5.     Section 5109 states that "[t]he expiration, cancellation, forfeiture, or suspension of a

10 license, practice privilege, or other authority to practice public accountancy by operation of law or

11 by order or decision of the board or a court of law, the placement of a license on a retired status, or

12 the voluntary surrender of a license by a licensee shall not deprive the board of jurisdiction to

13 commence or proceed with any investigation of or action or disciplinary proceeding against the

14 licensee, or to render a decision suspending or revoking the license."

15                                   **STATUTORY PROVISIONS**

16        6.     Section 5100 states:

17      "After notice and hearing the board may revoke, suspend, or refuse to renew any permit or

18 certificate granted under Article 4 (commencing with Section 5070) and Article 5 (commencing

19 with Section 5080), or may censure the holder of that permit or certificate for unprofessional

20 conduct that includes, but is not limited to, one or any combination of the following causes:

21      . . .

22      (g) Willful violation of this chapter or any rule or regulation promulgated by the board

23 under the authority granted under this chapter.

24      . . .

25      (i) Fiscal dishonesty or breach of fiduciary responsibility of any kind.

26      (j) Knowing preparation, publication, or dissemination of false, fraudulent, or materially

27 misleading financial statements, reports, or information.

28      . . ."

<div align="center">2</div>

**REGULATORY PROVISIONS**

7.    California Code of Regulations, title 16, section 52, states:

"(a) A licensee shall respond to any inquiry by the Board or its appointed representatives within 30 days. The response shall include making available all files, working papers and other documents requested.

(b) A licensee shall respond to any subpoena issued by the Board or its executive officer or the assistant executive officer in the absence of the executive officer within 30 days and in accordance with the provisions of the Accountancy Act and other applicable laws or regulations.

(c) A licensee shall appear in person upon written notice or subpoena issued by the Board or its executive officer or the assistant executive officer in the absence of the executive officer.

(d) A licensee shall provide true and accurate information and responses to questions, subpoenas, interrogatories or other requests for information or documents and not take any action to obstruct any Board inquiry, investigation, hearing or proceeding."

8.    California Code of Regulations, title 16, section 58, states:

"Licensees engaged in the practice of public accountancy shall comply with all applicable professional standards, including but not limited to generally accepted accounting principles and generally accepted auditing standards."

**COST RECOVERY AND ADMINISTRATIVE PENALTIES**

9.    Section 5107 of the Code states, in pertinent part:

"(a)    The executive officer of the board may request the administrative law judge, as part of the proposed decision in a disciplinary proceeding, to direct any holder of a permit or certificate found to have committed a violation or violations of this chapter to pay to the board all reasonable costs of investigation and prosecution of the case, including, but not limited to, attorneys' fees.  The board shall not recover costs incurred at the administrative hearing.

(b)    A certified copy of the actual costs, or a good faith estimate of costs where actual costs are not available, signed by the executive officer, shall be prima facie evidence of reasonable costs of investigation and prosecution of the case."

///

3

1    10.    Section 5116 of the Code states in part:

2    "(a) The board, after appropriate notice and an opportunity for hearing, may order any

3    licensee or applicant for licensure or examination to pay an administrative penalty as provided in

4    this article as part of any disciplinary proceeding or other proceeding provided for in this chapter.

5    …

6    (d) Administrative penalties assessed under this article shall be in addition to any other

7    penalties or sanctions imposed on the licensee or other person, including, but not limited to,

8    license revocation, license suspension, denial of the application for licensure, denial of the

9    petition for reinstatement, or denial of admission to the licensing examination. Payment of these

10    administrative penalties may be included as a condition of probation when probation is ordered."

11    **PROFESSIONAL STANDARDS**

12    11.    The CBA incorporates the following standards to all California licensees through

13    California Code of Regulations, title 16, section 58.

14    **AICPA Code of Professional Conduct (Version 2014)**

15    12.    The American Institute of Certified Public Accountants ("AICPA") Code of

16    Professional Conduct is part of *AICPA Professional Standards.*  It includes The Rules of

17    Conduct, Interpretations of Rules of Conduct, and Ethics Rulings.  The version relevant herein

18    was effective on December 15, 2014, and among the sections relevant herein are: section 0.100

19    (Principles and Rules of Conduct), section 0.200 (Structure and Application of the AICPA Code),

20    section 0.300 (Principles of Professional Conduct), section 0.400 (Definitions), section 1.000

21    (Members in Public Practice), section 1.110 (Conflicts of Interest), section 1.300 (Competence),

22    and section 1.310 (Compliance with Standards).

23    **Statement on Standards in Personal Financial Planning**

24    13.    Standards applicable to personal financial planning services are discussed in the

25    Statement on Standards in Personal Financial Planning ("SSPFP").  The standards have been

26    issued by the Personal Financial Planning Executive Committee, the senior committee of the

27    AICPA designated to promulgate enforceable standards of Personal Financial Planning practice.

28    The statements are codified by "SSPFP" number with the pertinent section 100 applicable to the

4

issues herein.

## **FACTUAL BACKGROUND**

14.    On or about January 9, 2017, the CBA received a complaint from consumer J.C.S. alleging issues related to her husband's trust (the "Trust Agreement"), dated December 24, 1992. Consumer J.C.S. alleged Respondent embezzled funds, comingled funds, misrepresented investments purchased, repeatedly produced quarterly financial reports that were misleading and exerted undue influence over her husband, consumer H.S.

15.    According to consumer J.C.S.'s complaint, Respondent insisted on doing all investments, taxes, and monitoring of H.S.'s financial accounts.  Further, consumer J.C.S. provided information that H.S., the trustor of the Trust Agreement, was 86 years old with dementia.  Respondent was trustee of the Trust Agreement.  Consumer H.S. died on December 4, 2016.

16.    On May 20, 2015, in a conservatorship case bearing Case No. BP161682, the Superior Court of California, County of Los Angeles, appointed a temporary conservator and suspended all powers of attorney for consumer H.S.

17.    On February 4, 2016, in Case No. BP161682, the Superior Court of California, County of Los Angeles, appointed conservators for consumer H.S.'s estate and person, suspended Respondent as trustee, and ordered Respondent not to have any direct contact with consumers H.S. and J.C.S.

18.    In 2005, consumer H.S.'s son died and H.S. received life insurance proceeds.  In 2010, H.S. inherited a substantial sum upon the death of his brother.  From 2011 to 2015, Respondent received $2,420,000 from consumer H.S.  In a declaration dated April 8, 2016, Respondent stated, "I was the financial planner for [H.S.] from 2011 to 2016."

19.    Respondent failed to act in the best interest of consumer H.S.:

a.    Respondent implemented investments that were improper due to the lack of liquidity and diversification given consumer H.S.'s age, which was 85 as of November 18, 2015.

i.    Each of the Non-Recourse Promissory Notes with an Irrevocable Life Insurance Trust ("ILIT") was due and payable only upon the death of the policyholder.  If the

5

premiums were not paid, the policy would lapse, rendering the Promissory Note worthless.
According to the accounting Respondent filed with the Los Angeles County Superior Court, as of
February 29, 2016, such promissory notes comprised $2,270,000, or 85% of consumer H.S.'s
"investments."

        ii.     Each of the Non-Recourse Promissory Notes with Bay Area Development
Co. have identical terms. There were three notes in the amounts of $300,000, $100,000, and
$400,000. The $400,000 note was a replacement of the two prior notes. Each of the notes were
only due upon the sale of the property, were not recorded with the County Recorder, and did not
state who owned the property. There was no requirement or triggering event for the sale of the
property. Consequently, the borrower could hold onto the property indefinitely and never have to
repay the notes. In addition, the notes were poorly drafted. They each stated they were due upon
the sale of the real property, but also state that they were secured by the policies of life insurance.

        iii.    The promissory note dated February 1, 2015, for $400,000, made up the
remaining 15% of consumer H.S.'s "investments."

        iv.    The only liquid asset reported in Respondent's accounting was $8,100
held in the Leslie Klein & Associates Attorney Client Trust Account.

    20.    Respondent made investments that were self-serving. Consumer H.S.'s funds were
invested in loans to companies connected to Respondent, or as loans to ILITs where Respondent
was the sole trustee of each ILIT. Respondent's connections to those companies and the ILITs
create a conflict of interest and are documented as follows:

        i.     President of Bay Area Development Co.;

        ii.    Member/manager/partner of BW Life Settlements LLC;

        iii.   Member/manager/partner of GMR Life Settlements LLC;

        iv.    President of Times Square Media Inc.; and

        v.    Each of the ILIT loans are signed by Respondent as trustee for the ILIT.

    21.    Respondent failed to properly manage investments. Two of the companies involved,
BW Life Settlement LLC and GMR Life Settlements LLC, have been suspended by the Franchise
Tax Board or the Secretary of State.

(LESLIE KLEIN) ACCUSATION

22.    Respondent deceived consumer H.S. as to the actual investments as follows:

    a.    In a letter to consumer H.S. dated June 10, 2011, Respondent stated funds were or will be invested as follows:

        i.    $500,000 loan to purchase a $5 million policy on the life of M.G.;

        ii.    $500,000 loan to purchase a $5 million policy on the life of Y.Z.;

        iii.    $190,901.50 invested in Daktronics along with $209,100 from H.S.'s checking account as a loan of $400,000 to purchase a light emitting diode (LED) display in Beaumont, California;

        iv.    "[T]he balance … will be invested in various stocks that will pay dividends of 5% in an account at Citibank, Smith Barney in stocks that will pay dividends. We plan to invest in the following stocks: AT&T, McDonalds, Verizon, Philip Morris, and Coca Cola."

    b.    In a letter to consumer H.S. dated August 1, 2011, Respondent stated funds were or will be invested as follows:

        i.    $500,000 in the M.G. policy;

        ii.    $500,000 in the Y.Z. policy;

        iii.    $750,000 with Times Square Media to purchase LEDs;

        iv.    The balance to be invested with the next ten days either in real estate on the 1st Trust Deed on the property or in insurance policies from our various hedge funds. Respondent advised that, "All of the above will pay a minimum interest of 8% due and payable three years from today's date."

    c.    There is no evidence of the Daktronics or various stock investments, and they are not reported in Respondent's accounting. In addition, the investment in Times Square Media is not reported in Respondent's accounting.

    d.    When the Probate Investigator stated to Respondent, "So, in essence none of these investments are in [consumer H.S.'s] name, but all are in your name and the fact is that these are not investments, but you have borrowed these amounts of monies … and these amounts are in your name and you have agreed to pay [H.S.] 8% on these monies, but you have paid

7

(LESLIE KLEIN) ACCUSATION

nothing to date," Respondent indicated, in the presence of consumers H.S. and J.C.S., that the Probate Investigator was correct.

23. Respondent failed to maintain appropriate records of the invested funds. Respondent stated in a letter dated August 1, 2011 that, "… this law firm has received from [H.S.] a total of $2,860,901.50." A comparison of the funds provided to Respondent for investments with the cancelled checks provided by consumer J.C.S. and Respondent's accounting indicates the subtotal invested as of August 1, 2011, is $3,700,000, and the total invested as of February 1, 2015, is $5,048,000. Both amounts are significantly more than the amount of $2,860,901.50 reported by Respondent as received for investment. While some of the Promissory Notes may have been repaid and funds reinvested, there is no documentation of any repayment of either the Promissory Notes or receipt of the related interest earned.

24. Despite multiple written requests from consumer H.S., Respondent failed to provide accurate reports or statements to H.S. Further, Respondent provided consumer H.S. with false or misleading information about the "investment" of his funds.

25. Respondent, through his attorney, stated in a letter dated June 29, 2018, that Respondent was not consumer H.S.'s tax preparer or advisor. In this letter, Respondent also asserted that he did not have personal knowledge as to the tax treatment of the interest statements or whether that was reflected on H.S.'s tax returns. These statements were not true and accurate. Respondent was associated with consumer H.S.'s tax returns for 2012, 2013, and 2014. Further, Respondent signed consumer H.S.'s income tax returns for 2014 as the paid tax preparer. In addition, in a letter dated May 12, 2011, from Respondent to Mr. Levin of BW Life Insurance Settlements LLC, Respondent stated, "You will not issue a 1099 form to [consumer H.S.] as the interest payment will be paid from the death proceeds."

26. Respondent exerted undue influence over consumer H.S. The Probate Investigator's Report dated May 8, 2015, describes her interviews with consumers H.S., J.C.S. and Respondent on May 5, 2015. The Probate Investigator noted, "There appears to be substantial undue influence by the attorney/Financial Advisor/Trustee, which is not and has not been in the best interest of the proposed conservatee to date."

8

1

## FIRST CAUSE FOR DISCIPLINE

2

### (Breach of Fiduciary Responsibility)

3      27.   Respondent is subject to disciplinary action under section 5100, subdivision (i), in

4   that Respondent breached his fiduciary responsibility as Trustee to consumer H.S.  Respondent

5   implemented investments that were improper due to the lack of liquidity and diversification given

6   consumer H.S.'s advanced age, made investments that were self-serving, failed to properly

7   manage investments, deceived consumer H.S. as to the actual investments, failed to maintain

8   appropriate records of the invested funds, and despite multiple written requests from consumer

9   H.S., Respondent failed to provide accurate reports or statements to consumer H.S.  Complainant

10   refers to and by this reference incorporates the allegations set forth above in paragraphs 14

11   through 26, inclusive, as though set forth fully herein.

12

## SECOND CAUSE FOR DISCIPLINE

13

### (Knowing Preparation of Misleading Financial Information)

14      28.   Respondent is subject to disciplinary action under section 5100, subdivision (j), in

15   that Respondent provided consumer H.S. with false or misleading information about the

16   "investment" of consumer H.S.'s funds.  Complainant refers to and by this reference incorporates

17   the allegations set forth above in paragraphs 14 through 26, inclusive, as though set forth fully

18   herein.

19

## THIRD CAUSE FOR DISCIPLINE

20

### (Failure to Comply with Professional Standards)

21      29.   Respondent is subject to disciplinary action under section 5100, subdivision (g), in

22   conjunction with Code of Regulations, title 16, section 58, in that Respondent failed to perform

23   his responsibilities in accordance with professional standards promulgated by the AICPA Code of

24   Professional Conduct and Statement on Standards in Personal Financial Planning.  Complainant

25   refers to and by this reference incorporates the allegations set forth above in paragraphs 14

26   through 26, inclusive, as though set forth fully herein.

27   ///

28   ///

9

(LESLIE KLEIN) ACCUSATION

1

## FOURTH CAUSE FOR DISCIPLINE

2

### (Failure to Respond to CBA Inquiry)

3      30.    Respondent is subject to disciplinary action under section 5100, subdivision (g), in

4  conjunction with Code of Regulations, title 16, section 52, in that Respondent, through his

5  attorney, made statements to the CBA that were not true and accurate.  Complainant refers to and

6  by this reference incorporates the allegations set forth above in paragraphs 14 through 26,

7  inclusive, as though set forth fully herein.

8

## FIFTH CAUSE FOR DISCIPLINE

9

### (Unprofessional Conduct)

10     31.    Respondent is subject to disciplinary action under section 5100, in that Respondent

11  exerted undue influence over consumer H.S.  Complainant refers to and by this reference

12  incorporates the allegations set forth above in paragraphs 14 through 26, inclusive, as though

13  forth fully herein.

14

## SIXTH CAUSE FOR DISCIPLINE

15

### (Willful Violation)

16     32.    Respondent is subject to disciplinary action under section 5100, subdivision (g), in

17  that Respondent willfully violated provisions of Business and Professions Code, Division 3,

18  Chapter 1, failed to comply with professional standards, failed to comply with court orders, and

19  made false statements in response to the CBA's inquiry.  Complainant refers to and by this

20  reference incorporates the allegations set forth above in paragraphs 14 through 26, inclusive, as

21  though set forth fully herein.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

10

1

## **PRAYER**

2     WHEREFORE, Complainant requests that a hearing be held on the matters herein alleged,

3 and that following the hearing, the California Board of Accountancy issue a decision:

4     1.     Revoking or suspending, restricting, limiting or otherwise imposing discipline upon

5 Certified Public Accountant Certificate Number 67454, issued to Leslie Klein;

6     2.     Ordering Leslie Klein to pay the California Board of Accountancy the reasonable

7 costs of the investigation and enforcement of this case, pursuant to Business and Professions

8 Code section 5107;

9     3.     Ordering Leslie Klein to pay the California Board of Accountancy an administrative

10 penalty pursuant to Business and Professions Code section 5116; and,

11     4.     Taking such other and further action as deemed necessary and proper.

12

13 DATED: _June 5, 2019_      _Patti Bowers_

14                                     PATTI BOWERS
Executive Officer

15                                     California Board of Accountancy
Department of Consumer Affairs

16                                     State of California
*Complainant*

17

18 LA2019501499
53407725.docx

19

20

21

22

23

24

25

26

27

28

# EXHIBIT F



**PACHULSKI**
·
**STANG**
·
**ZIEHL**
**JONES**

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY
COSTA MESA, CA

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

TELEPHONE: 310/277 6910
FACSIMILE: 310/201 0760

SAN FRANCISCO
ONE SANSOME STREET, 34TH FLOOR, STE. 3430
SAN FRANCISCO
CALIFORNIA 94104-4436

TELEPHONE: 415/263 7000
FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100
FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700
FACSIMILE: 212/561 7777

TEXAS
440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002

TELEPHONE: 713/691 9385
FACSIMILE: 713/691 9407

WEB: www.pszjlaw.com

---

Jeffrey W. Dulberg

June 8, 2023

310.772.2355
jdulberg@pszjlaw.com

<u>Via Email</u>

Eric Olson
E J Olson Law
301 E. Colorado Blvd, Ste 520
Pasadena, CA 91101

**Re:   LESLIE KLEIN (Case No. 2:23-bk-10990-SK)**

Dear Mr. Olson:

As you are aware, Bradley D. Sharp is the duly-appointed trustee (the "<u>Trustee</u>") for the bankruptcy estate of Leslie Klein ("<u>Mr. Klein</u>") in the above-referenced case. The following information request is made pursuant to 11 U.S.C. § 1106 and Bankruptcy Rules 2015 and 2015.3 pertaining to information relating to Mr. Klein and his bankruptcy estate. Mr. Klein should provide answers in writing to the Trustee by the date referenced in each request below.

**<u>Credit Cards and Other Financing</u>**

By Monday, June 12, 2023, please provide to the Trustee a listing and copies of monthly statements of any and all credit card accounts or lines of credit open under the name of Mr. Klein or for his benefit for the time period of February 1, 2023 through today.

If there are any credit card accounts or lines of credit that remain open under Mr. Klein's name or for his benefit, Mr. Klein must close each of them **immediately** and provide proof of such account closure to the Trustee by Monday, June 12, 2023.

**<u>Computer, E-tablet, Telephone and Email Preservation</u>**

Mr. Klein, and any other person or entity in control of the following information (including his counsel and former counsel), shall immediately preserve, and must not destroy, any information on any of Mr. Klein's computers (laptops and desktops), hard drives, e-tablets, and telephones (collectively, the "<u>Electronic Devices</u>") or

DOCS_LA:349468.1 78512/001



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

June 8, 2023
Page 2

any such Electronic Devices that are used by Mr. Klein or for his benefit.

By Friday, June 9, 2023, Mr. Klein must coordinate a meeting with the Trustee's team for either Monday, June 12, 2023 or Tuesday, June 13, 2023 for the purpose of meeting with the Trustee's team and a representative of a company that specializes in preserving electronic data. Mr. Klein must come prepared with his Electronic Devices and the information necessary to access such Electronic Devices. In addition, Mr. Klein should be able to access his Gmail, EarthLink and/or any other email accounts so their contents may be preserved. The Trustee and his staff are available to meet in the Trustee's office from 9 AM to 4 PM on June 12 and 13, 2023. The Trustee and his staff are open to an alternative location as necessary.

**Doctors Marketing Group, LLC**

By Friday, June 16, 2023, please provide the Trustee the following information pertaining to the gift from Doctors Marketing Group, LLC to Mr. Klein or for his benefit:

- History of Mr. Klein's (or any company in his control) relationship to Doctors Marketing Group, LLC, since the inception of Doctors Marketing Group, LLC.
- History of Mr. Klein's relationship to Mr. Eli Zobdeh.
- Explain any instances where Eli Zobdeh has ever been authorized or has ever used Mr. Klein's social security number for any purpose.
- Confirm that Mr. Klein and any of his family members or their spouses, immediate or distant, do not currently own or have any economic interest in Doctors Marketing Group, LLC, either now or in the past.
- Confirm that Mr. Klein has never held a manager, officer or director position with Doctors Marketing Group, LLC, or otherwise describe such position.

**Reports of Entities Mr. Klein Holds a Financial Interest**

By June 22, provide to the Trustee financial reports of the value, operations, and profitability of each entity that is not a publicly



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

June 8, 2023
Page 3

traded corporation or a debtor in a case under title 11, and in which
Mr. Klein holds a substantial or controlling interest.

Please reach out to my office or the Trustee if you have any
questions.

Very truly yours,

Jeffrey W. Dulberg

cc Trustee

# EXHIBIT G

## Jeffrey P. Nolan

| | |
|---|---|
| **From:** | Jeffrey P. Nolan |
| **Sent:** | Wednesday, June 28, 2023 11:07 AM |
| **To:** | 'eric@EJOlsonLaw.com' |
| **Cc:** | John W. Lucas; Jeffrey Dulberg |
| **Subject:** | FW: Menlo Trust-Life Insurance Policies & Various other matters |
| | |
| **Importance:** | High |

Eric,

The information you provided on June 23, 2023, was not responsive to the request of the Trustee on numerous pending issues as well as to the administration of the case in general. Please remind Mr. Klein that he has a duty to produce this information as a debtor in bankruptcy. I have outlined the status of the various unfulfilled requests below.

1.     **Menlo Trust:**

        The Trustee requested documents on three occasions June 7, 14, and 20, to support the contention made at the June 5th hearing that the Debtor is entitled to compensation out of the Life Insurance proceeds contemplated by Judge Luna to be disbursed to the Menlo Trust beneficiaries. I appreciate the explanation provided below but the explanation is not a substitute for the documents requested to assess and persuade the Superior Court that interests of the Debtor are involved.

        As you may recall, at the hearing Mr. Weingarten specifically asked if the documents supporting the claims of Mr. Klein would be provided to counsel. You advised the Court such documents would be forthcoming "soon". I do not know if Mr. Weingarten made a formal demand upon you after the hearing, but I interpreted the exchange with the Court to mean such production by Mr. Klein would be immediately forthcoming. The Interim Order can be reasonably interpreted as demanding such documents be produced in short order or the issue viewed as abandoned or without a factual basis. The Trustee is concerned that the continued inability of Mr. Klein to produce the documents you indicated would be forthcoming, yet have not been produced, will result in the loss of such claims. Said another way, we cannot press the issue without Mr. Klein's cooperation and the production of the requested records. As you know, argument of counsel is not a substitute for evidence.

2.     **Computers/phones/lap tops:**

The Trustee provided two dates for Mr. Klein to meet representatives of the Trustee with respect to his electronic devices. Neither June 12 or 13th were satisfactory to Mr. Klein. He again ignored our request of June 22 for arranging of a meeting. We will provide one last occasion to promote the meeting before we seek intervention of the bankruptcy court: please forward the following dates for Mr. Klein's consideration: **June 30, or July 3, prior to 1:00pm**. Please select one.

3.     **Credit Cards:**

By letter dated June 8, the Trustee requested not later than June 12 a list and copies of monthly credit card statements under the Debtor's name and confirmation such accounts were closed. This is a simple request.

Please produce such records no later than **June 30th** at 5pm at the law offices of PSZJ Law, 10100 Santa Monica Blvd., Suite 1300, Century City, or by electronic submission to my attention.

1

5.    **Doctors Marketing Group:**

By letter dated June 8, the Trustee requested the following information pertaining to the gift from Doctors Marketing Group, LLC to Mr. Klein or for his benefit:

-History of Mr. Klein's (or any company in his control) relationship to Doctors Marketing Group, LLC, since the inception of Doctors Marketing Group, LLC.

-History of Mr. Klein's relationship to Mr. Eli Zobdeh.

-Confirm that Mr. Klein and any of his family members or their spouses, immediate or distant, do not currently own or have any economic interest in Doctors Marketing Group, LLC either now or in the past.

-Confirm that Mr. Klein has never held a manager, officer or director position with Doctors Marketing Group, LLC, or otherwise describe such position.


6.    **Reports of Entities the Debtor Holds a Financial Interest**

By letter dated June 8, the Trustee requested not later than June 22, (a) list of entities and (b) the financial reports of value in which the Debtor holds an interest. Again, this request was ignored .

Please produce such records no later than **June 30:**

7.    **Palm Springs Condominium:**

Real Property located at 2560-B Whitewater Club Drive Palm Springs, CA.
According to the Debtor's schedules, the property is listed as a vacation home. We have learned that there are rental occupants in the condominium.  Are the occupants renters and if so please forward the contact information for the occupants and the lease to my attention no later than **June 30.**

8.    **Insurance:**

It is standard practice in a bankruptcy case that a debtor cooperate to insure assets are protected and that the Trustee and the United States Trustee be listed as additional insureds on various real and personal  property.
Add Bradley D. Sharp, Chapter 11 Trustee to Leslie Klein and the UST as additionally insured to all Mercury insurance policies. Insurance provided by  Mercury Insurance which we are advised to be in existence:

- Policy # 040104100290658 (Mercury Auto Policy)
- Policy # CAHP 0000757684 (Real Property policy – 3752 Ocean Drive)
- Policy # CAHP 00001156913 (Real Property policy – 322 N. June Street)
- Policy # PK 01017211 (Umbrella policy)

Please list the following as additional insureds:

Bradley S. Sharp, Chapter 11 Trustee          Office of the United States Trustee
333 S. Grand Ave., Suite 4100                 915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90071                         Los Angeles, CA 90017

- Provide updated declaration pages.
- Date the insurance premiums are paid through.

Your immediate attention to this matter is requested.

Best Regards,

Jeffrey P. Nolan
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn


Los Angeles | San Francisco | Wilmington, DE | New York | Houston


-----Original Message-----
From: eric@EJOlsonLaw.com [mailto:eric@EJOlsonLaw.com]
Sent: Friday, June 23, 2023 1:29 PM
To: Jeffrey P. Nolan <jnolan@pszjlaw.com>
Cc: Jeffrey Dulberg <jdulberg@pszjlaw.com>; John W. Lucas <jlucas@pszjlaw.com>; Beth D. Dassa
<bdassa@pszjlaw.com>
Subject: RE: Menlo Trust-Life Insurance Policies

Jeff, regarding your email:
SAFE DEPOSIT BOX KEY

Mr. Klein thought that he had provided you with keys to all boxes and is searching today. If he is unable to find the key
he will cooperate with you to get a new key from the bank first thing next week..

CLAIMS AGAINST INSURANCE PROCEEDS
without claiming to be exhaustive, we take the position that at least the amounts described below should be charges
against the $32,000,000 insurance proceeds: $1,000,000 plus line of credit totaling $5,005,000.

By way of background, the plan behind the insurance policies had been that the premiums on the policies would be paid
by the trusts with the idea that if all went well the policies would eventually pay off at a profit. Obviously the downside
of such an investment was that if they stopped paying the premiums the policies would lapse.

In 2012 Frank Menlo commenced litigation and gained control over the cash flow and cut off the funds that had previous
been used to pay the premiums.

Rather than let the policies lapse (and leave the beneficiaries having made years' of premium payments but not enjoying
the proceeds of the policies) Mr. Klein did the following:

1.      he borrowed $1.000,000 from six trusts to pay premiums:
Alan Winter $300,000
Emily Winter $100,000
Hana Lipshutz $300,000
Benjamin Frankel $100,000
Rivka Nutkiwitz $100,000
Devora Frankel $100,000

3

2.     he utilized three lines of credit whose balance is $5,005,000 which was primarily (perhaps entirely) used for a combination of paying the premiums and paying attorneys' fees.

| | |
|---|---|
| Madeline Lipschutz | $1,637,000 |
| Judith Frankel | $1,206,000 |
| Deborah Deusch | $2,162,000 |

The payment of the premiums made possible the entire payoff of the insurance and it is only appropriate that those funds should be restored to those who advanced them. Insofar as they went to pay attorneys' fees the principle is agreed to that such amounts should be set aside from the insurance.

Our understanding is that under the "Interim Order" dated June 5, 2023, the insurance proceeds are delivered to the trustees of the 24 Trusts. None of the trusts referred to above are among the 24 trusts other than Madeline Lipschutz and Deborah Deusch, and in those cases the line of credit is guaranteed by other trusts not among the 24 trusts. The amounts payable (which may include interest on these amounts) should be paid to the identified trusts.

While Mr. Klein was acting as trustee, if his actions as trustee in making such payments do not result in their being repaid, even though they financed the successful recovery of the insurance proceeds, it would not only be inequitable as to the lenders, but one can easily imagine creditor claims being filed against him for such amounts.

OTHER

Mr. Klein is consulting with prospective bankruptcy counsel on Monday and we hope to have information for you on numerous matters early next week.

Note New Address

Eric J Olson
E J Olson Law
301 E. Colorado Blvd. Ste 520
Pasadena, CA 91101
T: 818 245 2246
C: 626 224 5619
Eric@EJOlsonLaw.com

-----Original Message-----
From: Jeffrey P. Nolan <jnolan@pszjlaw.com>
Sent: Thursday, June 22, 2023 6:32 PM
To: 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>
Cc: Jeffrey Dulberg <jdulberg@pszjlaw.com>; John W. Lucas <jlucas@pszjlaw.com>; Beth D. Dassa <bdassa@pszjlaw.com>
Subject: RE: Menlo Trust-Life Insurance Policies

Eric,

Please confirm the documents and key requested will be delivered no later than tomorrow close of business to our offices.

Additionally, Mr. Klein was to meet with representatives of the Trustee's office to make his electronic devices available and there has been no response form the Debtor on setting an appropriate time and place. These are issues which need to be addressed in a timely matter.

Jeffrey P. Nolan

4

Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | San Francisco | Wilmington, DE | New York | Houston

-----Original Message-----
From: Jeffrey P. Nolan
Sent: Tuesday, June 20, 2023 4:07 PM
To: 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>
Cc: Jeffrey Dulberg <jdulberg@pszjlaw.com>; John W. Lucas <jlucas@pszjlaw.com>; Beth D. Dassa <bdassa@pszjlaw.com>
Subject: RE: Menlo Trust-Life Insurance Policies

Eric,

-The hearing on July 10th is fast approaching and we still do not have any of the documents necessary to evaluate the Debtor's claim of a right in the proceeds re: Menlo Trust policies, which is pending for the upcoming State Court proceeding. Per the attached Interim Order, the documents were to be forthcoming not later than 3 days from following the demand from the Trustee. Please forward those documents no later than the close of this week.

-Previously, Mr. Klein delivered 5 keys to the Trustee for Bank of America safe deposit boxes. There is an additional safe deposit box at the Bank of America Larchmont location for which the key was not delivered: box #034300T20814. Can you please ask the Debtor to provide the key to the safe deposit box which can be delivered to our Law firm offices at 10100 Santa Monica, Suite 1100, LA (Century City) to my attention, or we can arrange for someone from the Trustee's office to pick up the key. Please let me know.

-Last week was the deadline for the Debtor was to provide information regarding the gift from Doctors Marketing Group, LLC. No information or documents have been received. Please forward the documentation or advise when it will be forthcoming.

Best Regards,

Jeff

-----Original Message-----
From: Jeffrey P. Nolan
Sent: Wednesday, June 14, 2023 6:15 PM
To: 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>
Cc: Jeffrey Dulberg <jdulberg@pszjlaw.com>; John W. Lucas <jlucas@pszjlaw.com>
Subject: RE: Menlo Trust-Life Insurance Policies

Eric,

In follow up to the June 5, 2023 hearing, I requested documents to support the Debtor's legal or equitable interest in policy proceeds from various life insurance policies discussed at the hearing. I have not seen an email or documents to date.

Can you please advise Re: status?

Best Regards,

Jeffrey P. Nolan
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn


Los Angeles | San Francisco | Wilmington, DE | New York | Houston

-----Original Message-----
From: Jeffrey P. Nolan
Sent: Wednesday, June 7, 2023 12:24 PM
To: 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>; kleinlaw@earthlink.net; 'Leslie Klein' <les.kleinlaw@gmail.com>
Cc: Jeffrey Dulberg <jdulberg@pszjlaw.com>
Subject: Menlo Trust-Life Insurance Policies

Eric,

Thank you for discussing this matter with me following the State Court hearing, June 5, 2023.

At the hearing, the issue was raised before Judge Luna that Mr. Klein may have a legal or equitable interest in policy proceeds from various life insurance policies on the lives of Sam Menlo and Vera Menlo which the Court was proposing to liquidate as referenced in the Court's Interim Order. It would assist the Chapter 11 Trustee to understand the issue and potential implications to the bankruptcy estate if we could review the underlying documents and any summary Mr. Klein or counsel might care to provide to best present the basis for the claim.

You may have specific documents in mind. Feel free to forward those documents. We would think such documents could include:

1.      Bank statements, cancelled checks or documentation to support premium payments on the above referenced  policies by Mr. Klein or any entity which he claims an interest.
2.      Any payment acknowledgement, accounting or document issued from the above referenced  policy providers memorializing any payment by Mr. Klein or any entity which he claims an interest.
3.      If the payments are from an entity other than Mr. Klein directly, the documents to support the relationship and the connection.
4.      Any contract, agreement or  document which reflects the compensation scheme, commission, or fee arrangement for the acquisition or maintenance of the policies.
5.      Any document that might support the Menlo parties were aware of, consented to or ratified any fee arrangement.
6.      Any other document that you believe supports a claim for compensation or would assist us to appreciate a compensation or fee is owed.

Jeffrey P. Nolan
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn


Los Angeles | San Francisco | Wilmington, DE | New York | Houston

-----Original Message-----
From: Jeffrey P. Nolan
Sent: Tuesday, June 6, 2023 11:43 AM
To: 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>
Subject: RE: WINTER klein - winter ptn.pdf

Thank you

Jeffrey P. Nolan
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn


Los Angeles | San Francisco | Wilmington, DE | New York | Houston


-----Original Message-----
From: eric@EJOlsonLaw.com [mailto:eric@EJOlsonLaw.com]
Sent: Tuesday, June 6, 2023 11:22 AM
To: Jeffrey P. Nolan <jnolan@pszjlaw.com>
Subject: FW: WINTER klein - winter ptn.pdf


Eric Olson
EJOlsonLaw
301 E. Colorado Blvd Ste 520
Pasadena, CA 91101
T: 626 224 5619
T: 818 245 2246
Eric@EJOlsonLaw.com

-----Original Message-----
From: kleinlaw@earthlink.net <kleinlaw@earthlink.net>
Sent: Monday, June 5, 2023 4:26 PM
To: eric@EJOlsonLaw.com; 'Leslie Klein' <les.kleinlaw@gmail.com>
Subject: WINTER klein - winter ptn.pdf

Please forward this to the attorney for the Trustee (who appeared today in Court).

Thank you.

Les Klein

# EXHIBIT H

**From:** Jeffrey P. Nolan
**Sent:** Monday, July 10, 2023 10:13 PM
**To:** 'Tnunan@pmcos.com' <Tnunan@pmcos.com>
**Cc:** 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>; Jeffrey Dulberg <jdulberg@pszjlaw.com>; John W. Lucas <jlucas@pszjlaw.com>
**Subject:** FW: Sharp - Letter to Eric Olson

Terence,

It was a pleasure to make your acquaintance at the hearing in Superior Court today. As you know, I represent the duly appointed Chapter 11 Trustee, Bradley D. Sharp.

As I indicated at the hearing, the Trustee has not been getting the cooperation of the Debtor which is required under the Bankruptcy Code and, quite frankly, customary. I appreciate your offer to facilitate the forwarding of such information.

There are a number of outstanding matters starting with the issue of apparent lapses in coverage to various estate assets. The trustee has attempted to confirm coverage directly to insurance providers but those providers are rrequesting the cooperation of the insured/Debtor. There has been no response to the attached letter dated June 30, which requested a response by July 7.

I have also included the email below which preceded it.

Best Regards,

3

**Jeffrey P. Nolan**
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**From:** Jeffrey P. Nolan
**Sent:** Wednesday, June 28, 2023 11:07 AM
**To:** 'eric@EJOlsonLaw.com' <eric@EJOlsonLaw.com>
**Cc:** John W. Lucas <jlucas@pszjlaw.com>; Jeffrey Dulberg <jdulberg@pszjlaw.com>
**Subject:** FW: Menlo Trust-Life Insurance Policies & Various other matters
**Importance:** High

Eric,

The information you provided on June 23, 2023, was not responsive to the request of the Trustee on numerous pending issues as well as to the administration of the case in general. Please remind Mr. Klein that he has a duty to produce this information as a debtor in bankruptcy. I have outlined the status of the various unfulfilled requests below.

1.      **Menlo Trust:**

        The Trustee requested documents on three occasions June 7, 14, and 20, to support the contention made at the June 5th hearing that the Debtor is entitled to compensation out of the Life Insurance proceeds contemplated by Judge Luna to be disbursed to the Menlo Trust beneficiaries. I appreciate the explanation provided below but the explanation is not a substitute for the documents requested to assess and persuade the Superior Court that interests of the Debtor are involved.

        As you may recall, at the hearing Mr. Weingarten specifically asked if the documents supporting the claims of Mr. Klein would be provided to counsel. You advised the Court such documents would be forthcoming "soon". I do not know if Mr. Weingarten made a formal demand upon you after the hearing, but I interpreted the exchange with the Court to mean such production by Mr. Klein would be immediately forthcoming. The Interim Order can be reasonably interpreted as demanding such documents be produced in short order or the issue viewed as abandoned or without a factual basis. The Trustee is concerned that the continued inability of Mr. Klein to produce the documents you indicated would be forthcoming, yet have not been produced, will result in the loss of such claims. Said another way, we cannot press the issue without Mr. Klein's cooperation and the production of the requested records. As you know, argument of counsel is not a substitute for evidence.

2.      **Computers/phones/lap tops:**

4

The Trustee provided two dates for Mr. Klein to meet representatives of the Trustee with respect to his electronic devices. Neither June 12 or 13th were satisfactory to Mr. Klein. He again ignored our request of June 22 for arranging of a meeting. We will provide one last occasion to promote the meeting before we seek intervention of the bankruptcy court: please forward the following dates for Mr. Klein's consideration: **June 30, or July 3, prior to 1:00pm.** Please select one.

### 3.    Credit Cards:

By letter dated June 8, the Trustee requested not later than June 12 a list and copies of monthly credit card statements under the Debtor's name and confirmation such accounts were closed. This is a simple request.

Please produce such records no later than **June 30th** at 5pm at the law offices of PSZJ Law, 10100 Santa Monica Blvd., Suite 1300, Century City, or by electronic submission to my attention.

### 5.    Doctors Marketing Group:

By letter dated June 8, the Trustee requested the following information pertaining to the gift from Doctors Marketing Group, LLC to Mr. Klein or for his benefit:

-History of Mr. Klein's (or any company in his control) relationship to Doctors Marketing Group, LLC, since the inception of Doctors Marketing Group, LLC.

-History of Mr. Klein's relationship to Mr. Eli Zobdeh.

-Confirm that Mr. Klein and any of his family members or their spouses, immediate or distant, do not currently own or have any economic interest in Doctors Marketing Group, LLC either now or in the past.

-Confirm that Mr. Klein has never held a manager, officer or director position with Doctors Marketing Group, LLC, or otherwise describe such position.

### 6.    Reports of Entities the Debtor Holds a Financial Interest

By letter dated June 8, the Trustee requested not later than June 22, (a) list of entities and (b) the financial reports of value in which the Debtor holds an interest. Again, this request was ignored .

Please produce such records no later than **June 30**:

### 7.    Palm Springs Condominium:

Real Property located at 2560-B Whitewater Club Drive Palm Springs, CA.

According to the Debtor's schedules, the property is listed as a vacation home. We have learned that there are rental occupants in the condominium. Are the occupants renters and if so please forward the contact information for the occupants and the lease to my attention no later than **June 30**.

### 8.    Insurance:

It is standard practice in a bankruptcy case that a debtor cooperate to insure assets are protected and that the Trustee and the United States Trustee be listed as additional insureds on various real and personal property.
Add Bradley D. Sharp, Chapter 11 Trustee to Leslie Klein and the UST as additionally insured to all Mercury insurance policies. Insurance provided by Mercury Insurance which we are advised to be in existence:

- Policy # 040104100290658 (Mercury Auto Policy)
- Policy # CAHP 0000757684 (Real Property policy – 3752 Ocean Drive)
- Policy # CAHP 00001156913 (Real Property policy – 322 N. June Street)
- Policy # PK 01017211 (Umbrella policy)

Please list the following as additional insureds:

Bradley S. Sharp, Chapter 11 Trustee
333 S. Grand Ave., Suite 4100
Los Angeles, CA 90071

Office of the United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

- Provide updated declaration pages.
- Date the insurance premiums are paid through.

Your immediate attention to this matter is requested.

Best Regards,

Jeffrey P. Nolan
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
jnolan@pszjlaw.com
vCard | Bio | LinkedIn


Los Angeles | San Francisco | Wilmington, DE | New York | Houston

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (12/15)

# UNITED STATES BANKRUPTCY COURT

### Central District of California, Los Angeles Division

In re  LESLIE KLEIN.

Debtor

Case No.    2:23-bk-10990-SK

Chapter    11

## SUBPOENA FOR RULE 2004 EXAMINATION

To:  Bank Hapoalim, BM, dba Bank Hapoalim, USA.

*(Name of person to whom the subpoena is directed)*

☐ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure. A copy of the court order authorizing the examination is attached.

| PLACE<br>Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA  90067 | DATE AND TIME<br>October 9, 2023 at 10:00 a.m. |
|---|---|

The examination will be recorded by this method:

☒ *Production:* **YOU ARE COMMANDED** to produce the documents set forth on **Exhibit A** hereto and complete the written questions included as **Exhibit B**.

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    September 15, 2023

CLERK OF COURT

O

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing

_____Chapter 11 Trustee_____, who issues or requests this subpoena, are: Jeffrey P. Nolan, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California  90067, Telephone:  (310) 277-6910

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).



B2540 (Form 2540 - Subpoena for Rule 2004 Examination) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any):* _____
on *(date)* _____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____.

      I declare under penalty of perjury that this information is true and correct.

Date: _____

                                        _____
                                                  *Server's signature*

                                        _____
                                                *Printed name and title*

                                        _____
                                               *Server's address*

Additional information concerning attempted service, etc.:


American LegalNet, Inc.
www.FormsWorkFlow.com

DOCS_LA:350995.2 78512/001

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2)For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B)Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)



**EXHIBIT A**

**TO RULE 2004 SUBPOENA TO BANK HAPOALIM, BM**

**AND BANK HAPOALIM, USA**

Pursuant to Fed. R. Civ. P. 45, Bradley D Sharp, the duly appointed Chapter 11 trustee (the "Trustee") in the Chapter 11 Cases (defined below), hereby requests that **Bank Hapoalim, BM, dba Bank Hapoalim International and Bank Hapoalim, USA,** its subsidiaries and affiliates, produce and make available for inspection and copying to the Trustee each of the following documents, things, and tangible items, or categories of documents, in your possession, custody, or control which are responsive to the following requests for documents and materials (the "Requests") at the offices of Pachulski Stang Ziehl & Jones, LLP, 10100 Santa Monica Boulevard., 13th Floor, Los Angeles, California, 90067 (Attn: Jeffrey P. Nolan):

**INSTRUCTIONS**

A.     You are required to conduct a thorough investigation and produce all DOCUMENTS (as defined below) in your possession, custody and control including all DOCUMENTS in the possession, custody and control of your, officers, directors, employees, agents, representatives and anyone acting on your behalf.

B.     If there are no documents in existence that are responsive to a particular Request, your response must include a statement to that effect. If documents once existed in your possession, custody, or control, but are no longer in your possession, custody, or control for any reason, please identify the specific circumstances under which you lost possession, custody, or control, and identify your understanding of the documents' [current whereabouts] or the manner in which you disposed of the documents.

C.     Electronically stored information ("ESI") responsive to these Requests shall be produced in the same manner in which it is stored, together with all associated metadata. If software not in normal, typical, commercial use is necessary to view the ESI produced in full, native, and usable form with full functionality, then a copy of or license to the necessary software shall be produced together with the ESI.

D.      Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, documents should either be organized and labeled to correspond with the categories in this Document Request or produced as they are kept in the normal course of business.

E.      If any of the requested documents fall within the scope of this Request, but have not been produced on grounds that such documents are privileged, please provide the following information as to each document to which such claim is made: (a) the privilege that is grounds for withholding the Document; (b) the nature of the Document (*e.g.*, letter, spreadsheet, memorandum); (c) the date that the Document was prepared; (d) the name/title of the author; (e) the name/title of each recipient or addressee of the Document; (f) the number of pages withheld; and (g) the name and location of the current custodian of the Document.

F.      Unless otherwise provided herein, the relevant period of inquiry for these Requests is January 1, 2015 through July 31, 2023.

<div align="center">

### DEFINITIONS FOR DOCUMENT PRODUCTION

### AND EXAMINATION TOPICS

</div>

1.      "YOU" or "YOUR" means Bank Hapoalim, BM, dba Bank Hapoalim International, its subsidiaries and affiliates, including, but not limited to, Bank Hapoalim, USA.

2.      "CONCERNING" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

3.      "DOCUMENT" or "DOCUMENTS" is defined to have the same meaning and to be equal in scope to the terms "documents" and "electronically stored information" as used in the Federal Rules of Civil Procedure 34(a) and/or "writings" as defined in the Federal Rules of Evidence 1001, and each "duplicate" as defined in the Federal Rules of Evidence 1001. "DOCUMENTS" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whomever produced, reproduced, disseminated or made. This includes, but is not limited to, any and all originals, copies or drafts of any and all of the following: papers; books; letters; correspondence; memoranda; notes; notations; transcripts;

minutes; reports; appraisals; estimates; projections; charts, graphs and tables; schedules; proposals; offers; contracts; agreements; signature cards; checks, canceled checks and bank or account statements; and any information contained in any computer tape, card, disk, drive, program or other device; computer print-outs; microfilm; microfiche; any other tangible or intangible thing or item that contains any information; and, all "writings and recordings" and "photographs" (and all negatives thereof) as defined in and by the Federal Rules of Evidence, Rule 1001.

4.     "KLEIN" means the individual Leslie Klein and any alias name including Menachem Klein, and/or Lutzy Klein.

5.     "KLEIN ASSOCIATED ENTITY" means the following organizations:

The Klein Charitable Remainder Unitrust dated 2-20-1996
The Klein Trust
Klein Charitable Remainder Unitrust
Klein Charitable Remainder Annuity
Klein Living Trust dated April 8, 1990
EKLK Foundation
Doctors Marketing Group, LLC
Doctors Marketing Network LLC
Doctors Referral Service LLC
Doctors Marketing Nationwide, Inc. (MD entity)
The Patient Referral Network, LLC (MD entity)
Bay Area Development Co.
Big Boyz Legal, LLC
Litigation Financing, LLC

6.     "TRANSFERS" means any and all payments, credits, debits, deposits, in whatever form made, be it wire, check, ACH or otherwise.

## DOCUMENT REQUESTS

### Request No. 1:

All DOCUMENTS maintained by YOU, including, but not limited to, TRANSFERS, for all the following accounts, whether active or inactive:

a.      KLEIN;

b.      KLEIN ASSOCIATED ENTITY

**Request No. 2:**

All DOCUMENTS maintained by YOU, including, but not limited to, TRANSFERS,

associated with the following address, whether active or inactive (excluding accounts solely held

in the name of Barbara Roth Klein):

322 N. June Street
Los Angeles, CA 90004

**Request No. 3:**

All DOCUMENTS maintained by YOU, including, but not limited to, TRANSFERS,

associated with the following taxpayor id, whether active or inactive:

• ___-__-6944[1]

**Request No. 4:**

All DOCUMENTS maintained by YOU, including, but not limited to, TRANSFERS, for

any credit card issued or underwritten by YOU to KLEIN or a KLEIN ASSOCIATED ENTITY.

---

[1] The full social security number will be provided upon request.

# EXHIBIT B

## TO DEPOSITION ON WRITTEN QUESTIONS TO SUBPOENA OF

## BANK HAPOALIM, BM dba BANK HAPOALIM, USA ("BANK")

1.      Please state your full name, occupation, official title, and business address.

Answer:  _____

2.      Are you the custodian of records for BANK?

Answer:  _____

3.      In your capacity as custodian of records for BANK, are you familiar with whether BANK
maintains records of its business activities?

Answer:  _____

4.      Are the records of BANK kept under your care, supervision, custody, or control?

Answer:  _____

5.      Was it in the regular course of business activities of BANK for a person with personal
knowledge of the act, event, condition, opinion, or diagnosis identified in the records
requested in the attached Exhibit A, to make such records or to transmit such information
to be included in the records?

Answer:  _____

6.      Were the documents requested in Exhibit A made at or near the time of the act, event,
condition, opinion, or diagnosis identified in the records or within a reasonable time
thereafter?

Answer:  _____

7.      Were the documents requested in the attached Exhibit A made and kept in the regular
course of daily business activities by BANK?

Answer:  _____

8.      Were the documents requested in the attached Exhibit A transmitted to your files, and did
you maintain the records as part of your official duties as the custodian of records for
BANK?

Answer:  _____

9.      Please hand the originals or exact duplicates of the documents requested in the attached
        Exhibit A to the [court reporter/notary public] taking your deposition for photocopying
        and attachment to this deposition. Have you now given all documents requested in the
        attached Exhibit A to the [court reporter] taking your deposition? If not, identify for the
        [court reporter] the records and documents you did not produce and explain why you did
        not produce them.

Answer:  _____

10.     In the event you are unable to find any of the records requested in the subpoena you
        received, how long does BANK maintain its files, and does BANK ever destroy its files?

Answer:  _____

11.     Are you aware of any other entities or persons that may have possession of records
        pertaining to those identified in Exhibit A?  If so, please state the name and address of
        such entity or person, if known.

Answer:  _____

12.     Have you been requested or directed by any person to withhold or protect, for any reason,
        the records identified in Exhibit A? Has any person suggested that you should withhold
        or protect the records identified in Exhibit A? If so, please state the name and address of
        the person who conveyed this information to you and when such event occurred.

Answer:  _____

13.     Do you know or have reason to believe that the records identified in Exhibit A have in
        any manner been edited, purged, culled, or otherwise altered? If so, please identify the
        records and why they were altered or removed.

Answer:  _____

14.     If any document responsive to this subpoena was, but is no longer, in your possession,
        custody, or control, or no longer exists, state whether (1) it is missing or lost, (2) it was
        destroyed, (3) it was transferred to others, or (4) it was otherwise disposed of, and explain
        the circumstances surrounding its disposition, including the date of such disposition.

Answer:  _____

VERIFICATION

STATE OF_____)
      ss.                    )
COUNTY OF_____)

      Before me, the undersigned authority, on this day personally appeared

_____, custodian of records for Bank Hapoalim, BM and Bank Hapoalim, USA, known to me to be the person whose named is subscribed to the foregoing instrument in the capacity therein stated, who being first duly sworn, stated upon his/her oath that the answers to the foregoing questions are true and correct. I further certify that the records attached hereto are exact duplicates of the original records.


_____
Witness

SWORN TO ME AND SUBSCRIBED before me by _____ on
_____, _____.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA  90067

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION FOR ORDER WITHOUT HEARING PURSUANT TO LBR 9013-1(o) [WITH ATTACHED MOTION OF CHAPTER 11 TRUSTEE, FOR ORDER AUTHORIZING THE EXAMINATION OF BANK HAPOALIM, BM DBA BANK HAPOALIM, USA PURSUANT TO FED. R. BANKR. P. 2004; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF BRADLEY D. SHARP, NICHOLAS R. TROSZAK AND JEFFREY P. NOLAN IN SUPPORT THEREOF]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **September 15, 2023**   , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) **September 15, 2023** , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

3.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  **September 15, 2023**   , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 9/15/2023 | Rolanda Mori | /s/ Rolanda Mori |
| *Date* | *Printed Name* | *Signature* |

---

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                           Page 3              **F 9013-1.2.NO.HEARING.NOTICE**

DOCS_LA:351194.1 78512/001

**ADDITIONAL SERVICE LIST:**

1. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:
   - **Simon Aron**    saron@wrslawyers.com, moster@wrslawyers.com
   - **Reem J Bello**    rbello@goeforlaw.com, kmurphy@goeforlaw.com
   - **Ron Bender**    rb@lnbyg.com
   - **Michael Jay Berger**    michael.berger@bankruptcypower.com,
     yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
   - **Greg P Campbell**    ch11ecf@aldridgepite.com, gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
   - **Baruch C Cohen**    bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com
   - **Theron S Covey**    tcovey@raslg.com, sferry@raslg.com
   - **Jeffrey W Dulberg**    jdulberg@pszjlaw.com
   - **Dane W Exnowski**    dane.exnowski@mccalla.com,
     bk.ca@mccalla.com,mccallaecf@ecf.courtdrive.com
   - **Robert P Goe**    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
   - **Michael I. Gottfried**    mgottfried@elkinskalt.com,
     cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
   - **Brandon J Iskander**    biskander@goeforlaw.com, kmurphy@goeforlaw.com
   - **Michael S Kogan**    mkogan@koganlawfirm.com
   - **Marc A Lieberman**    marc.lieberman@flpllp.com, safa.saleem@flpllp.com,addy@flpllp.com
   - **John W Lucas**    jlucas@pszjlaw.com, ocarpio@pszjlaw.com
   - **Ron Maroko**    ron.maroko@usdoj.gov
   - **Kirsten Martinez**    Kirsten.Martinez@bonialpc.com, Notices.Bonial@ecf.courtdrive.com
   - **Steven M Mayer**    smayer@mayerlawla.com
   - **Krikor J Meshefejian**    kjm@lnbyg.com
   - **Kenneth Misken**    Kenneth.M.Misken@usdoj.gov
   - **Jeffrey P Nolan**    jnolan@pszjlaw.com
   - **Eric J Olson**    eric@ejolsonlaw.com
   - **Jeffrey N Pomerantz**    jpomerantz@pszjlaw.com
   - **Brian A Procel**    bprocel@millerbarondess.com,
     rdankwa@millerbarondess.com;docket@millerbarondess.com
   - **Joshua L Scheer**    jscheer@scheerlawgroup.com, jscheer@ecf.courtdrive.com
   - **Mark M Sharf (TR)**    mark@sharflaw.com,
     C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
   - **Bradley D. Sharp (TR)**    bsharp@dsi.biz
   - **Nikko Salvatore Stevens**    nikko@cym.law, mandi@cym.law
   - **Alan G Tippie**    Alan.Tippie@gmlaw.com,
     atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gm
     law.com
   - **Gary Tokumori**    gtokumori@pmcos.com
   - **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
   - **Michael L Wachtell**    mwachtell@buchalter.com
   - **John P. Ward**    jward@attleseystorm.com, ezhang@attleseystorm.com
   - **Brett J. Wasserman**    wasserman@smcounsel.com
   - **Alex M Weingarten**    aweingarten@willkie.com, lcarter@willkie.com
   - **Clarisse Young**    youngshumaker@smcounsel.com, levern@smcounsel.com
   - **Paul P Young**    paul@cym.law, jaclyn@cym.law
   - **Roye Zur**    rzur@elkinskalt.com,
     cavila@elkinskalt.com;lwageman@elkinskalt.com;1648609420@filings.docketbird.com

---

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                                    Page 3                    **F 9013-1.2.NO.HEARING.NOTICE**

DOCS_LA:351194.1 78512/001

2.  <u>**SERVED BY UNITED STATES MAIL**</u>:

Nathan Talei
Oldman, Sallus & Gold, L.L.P.
16133 Ventura Blvd., PH-A
Encino, CA 91436

<u>Counsel for Debtor</u>
Michael Kogan, Esq.
Kogan Law Firm
11500 W. Olympic Blvd., Suite 400
Los Angeles, CA  90064

---

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                          Page 3                **F 9013-1.2.NO.HEARING.NOTICE**

DOCS_LA:351194.1 78512/001

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
10100 Santa Monica Boulevard, Suite 1300, Los Angeles, CA  90067

A true and correct copy of the foregoing document entitled: **DECLARATION THAT NO PARTY REQUESTED A HEARING ON MOTION [LBR 9013-1(o)(3)]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On *(date)* ___10/04/23___ , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On *(date)* _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on *(date)* ___10/04/23___ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**Via FedEx**
Hon. Sandra R. Klein
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1582
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 10/04/2023 | Maria R. Viramontes | /s/Maria R. Viramontes |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

American LegalNet, Inc.
www.FormsWorkFlow.com

**SERVICE INFORMATION FOR CASE NO. 2:23-bk-19090-SK**

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

- **Simon Aron**    saron@wrslawyers.com, moster@wrslawyers.com
- **Reem J Bello**    rbello@goeforlaw.com, kmurphy@goeforlaw.com
- **Ron Bender**    rb@lnbyg.com
- **Michael Jay Berger**    michael.berger@bankruptcypower.com,
  yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Greg P Campbell**    ch11ecf@aldridgepite.com, gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
- **Baruch C Cohen**    bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com
- **Theron S Covey**    tcovey@raslg.com, sferry@raslg.com
- **Jeffrey W Dulberg**    jdulberg@pszjlaw.com
- **Dane W Exnowski**    dane.exnowski@mccalla.com, bk.ca@mccalla.com,mccallaecf@ecf.courtdrive.com
- **Robert P Goe**    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- **Michael I. Gottfried**    mgottfried@elkinskalt.com,
  cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
- **Brandon J Iskander**    biskander@goeforlaw.com, kmurphy@goeforlaw.com
- **Michael S Kogan**    mkogan@koganlawfirm.com
- **John W Lucas**    jlucas@pszjlaw.com, ocarpio@pszjlaw.com
- **Ron Maroko**    ron.maroko@usdoj.gov
- **Kirsten Martinez**    Kirsten.Martinez@bonialpc.com, Notices.Bonial@ecf.courtdrive.com
- **Steven M Mayer**    smayer@mayerlawla.com
- **Krikor J Meshefejian**    kjm@lnbyg.com
- **Kenneth Misken**    Kenneth.M.Misken@usdoj.gov
- **Jeffrey P Nolan**    jnolan@pszjlaw.com
- **Eric J Olson**    eric@ejolsonlaw.com
- **Jeffrey N Pomerantz**    jpomerantz@pszjlaw.com
- **Brian A Procel**    bprocel@millerbarondess.com, rdankwa@millerbarondess.com;docket@millerbarondess.com
- **Joshua L Scheer**    jscheer@scheerlawgroup.com, jscheer@ecf.courtdrive.com
- **Mark M Sharf (TR)**    mark@sharflaw.com, C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
- **Bradley D. Sharp (TR)**    bsharp@dsi.biz
- **Nikko Salvatore Stevens**    nikko@cym.law, mandi@cym.law
- **Alan G Tippie**    Alan.Tippie@gmlaw.com,
  atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com
- **Gary Tokumori**    gtokumori@pmcos.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Michael L Wachtell**    mwachtell@buchalter.com
- **John P. Ward**    jward@attleseystorm.com, ezhang@attleseystorm.com
- **Alex M Weingarten**    aweingarten@willkie.com, lcarter@willkie.com
- **Clarisse Young**    youngshumaker@smcounsel.com, levern@smcounsel.com
- **Paul P Young**    paul@cym.law, jaclyn@cym.law
- **Roye Zur**    rzur@elkinskalt.com, cavila@elkinskalt.com;lwageman@elkinskalt.com;1648609420@filings.docketbird.com

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                                         Page 3                    **F 9013-1.2.NO.REQUEST.HEARING.DEC**
DOCS_LA:351611.1 78512/001


American LegalNet, Inc.
www.FormsWorkFlow.com