# EXHIBIT A

## COUNTER-OFFER

This agreement (the "Agreement" or "Counter-Offer") is intended to set forth the terms and conditions of a contract for the purchase by and sale to Robert Crown (the "Buyer") from Bradley D. Sharp (the "Seller" or "Trustee"), solely in his capacity as the duly appointed, qualified, and acting chapter 11 trustee for the bankruptcy estate of Leslie Klein ("the "Debtor"), of the real property more commonly known as 3752 Ocean Drive, Oxnard, California (the "Property").  When executed below, this Agreement will constitute conclusive evidence and the exclusive terms and conditions of the contract for such purchase and sale (the "Sale") of the Property and will supersede and replace in its entirety Buyer's written Purchase Agreement and all attachments in support thereof dated September 18, 2023 (the "Offer") and any oral or written negotiations since the Offer.

**PURCHASE PRICE; DEPOSIT; ESCROW.**  The purchase price for the Property shall be $ 1,800,000 (the "Purchase Price"). Buyer shall make an initial deposit of $ 54000 (the "Initial Deposit") in the form of cashier's check or wire transfer made payable to "A&A Escrow Services, Inc." (the "Escrow Holder") which shall be delivered to A&A Escrow Services, Inc., 15250 Ventura Blvd, suite 715, Sherman Oaks, California, within two (2) business days of (i) acceptance of this Counter-Offer by Buyer, (ii) Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and (iii) Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement.

**FINANCIAL WHEREWITHAL.**  Buyer shall deliver to the Seller, within two (2) business days of (i) acceptance of this Counter-Offer by Buyer, (ii) Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and (iii) Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement, proof of committed funds available to Buyer sufficient to enable Buyer to consummate the acquisition contemplated herein, which proof shall be in the form of a letter of credit, loan commitment, or other form acceptable to Seller in Seller's sole discretion.  In the event that either (i) Buyer fails timely to provide any such proof, or (ii) Seller determines, in Seller's sole discretion, that any proof of funds provided to Seller by Buyer is unacceptable, Seller shall have the right, at Seller's option, to provide written notice to Buyer that this Counter-Offer is terminated.  In the event that Seller exercises such termination right, this Counter-Offer shall terminate effective as of the date of Seller's written notice to Buyer, whereupon the Initial Deposit (if theretofore deposited with the Escrow Holder) shall be returned to Buyer and Buyer and Seller shall each be relieved of any further obligations hereunder.

**ESCROW INSTRUCTIONS.**  Escrow instructions corresponding to the terms of this Agreement shall be provided by the Escrow Holder and signed by the parties within five (5) business days of the date of Buyer's and Seller's receipt of said escrow instructions.  Buyer and Seller shall deposit such documents and instruments with the Escrow Holder as and when reasonably required to complete the sale.  Prior to the Trustee's filing of his motion to approve the sale of the Property, Buyer shall be free to assign this Agreement to another person or entity (the "Assignee") subject to Seller's prior review and written approval (which

approval Seller may grant or withhold in his sole discretion), but Buyer shall remain liable hereunder, together with such Assignee, in the event that such Assignee fails to perform any of Buyer's obligations hereunder.  Buyer shall not assign this Agreement to another person or entity after the Trustee has filed his motion for approval of the sale of the Property with the Bankruptcy Court.

**BUYER'S DUE DILIGENCE AND CANCELLATION RIGHT.**  Buyer shall have 0 calendar days from the date of execution hereof to perform, complete, and satisfy all contingencies, inspections, investigations, tests and reviews of reports, and to complete all due diligence which Buyer desires for the Sale of the Property, including, but not limited to performing and completing any geological, soil, structural, environmental, or other tests, inspections, and investigations desire by Buyer.  Buyer may, not later than the end of the 0 calendar day due diligence period, provide Seller written notice of Buyer's election to withdraw from this Agreement because of Buyer's inability to complete or dissatisfaction with the results of any of those matters (the "Notice of Cancellation"), in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of Buyer's deposit.  If Buyer fails to give such Notice of Cancellation within such due diligence period, all such contingencies shall be automatically removed and Buyer's obligation to proceed shall be non-contingent except as provided herein for (i) Buyer's review of a preliminary title report and underlying documents respecting the title to the Property (as set forth below), and (ii) Bankruptcy Court approval of this Agreement and the Sale (as set forth below).

**APPRAISAL AND FINANCING CONTINGENCIES.**  Buyer waives the financing and appraisal contingencies.

**TITLE; TITLE INSURANCE.**   Within three (3) business days after acceptance of this Agreement, Stewart Title Company or such other title company of Seller's choice (the "Title Company") will be instructed to provide a preliminary report of the condition of title to the Property, including copies of underlying documents referred to in Schedule B thereof, for Buyer's review.  Buyer shall have 3 business days after receipt of the preliminary title report and underlying documents in which to provide Seller written notice (the "Notice of Title Disapproval") that Buyer disapproves the condition of title with respect to a material matter(s) that interfere with the use or marketability of the Property for the purpose for which it is currently used or intended to be used.  Such notice must refer to the specific exception(s) in Schedule B of the preliminary title report and the specific underlying document(s) which are the basis for Buyer's disapproval.  Within five (5) business days after receipt of the Notice of title Disapproval, Seller may, in Seller's sole discretion, either (i) cancel this Agreement and the Sale, in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of the Initial Deposit, or (ii) elect to correct the item(s) that were disapproved by Buyer, in which event the Sale shall proceed.  Seller may correct such item by any means that will result in the Title Company either removing the disapproved exception(s) from the preliminary report, providing title insurance coverage by endorsement against such exception(s), or providing that the order approving the Sale entered by the Bankruptcy Court shall resolve such exception.  At the close of the Sale, Seller shall convey and Buyer shall accept title to the Property as shown in Schedule B of the preliminary title report, subject to any corrections as in this paragraph above, free and clear of

all monetary liens, subject to the terms of the Agreement and the order approving the Sale. Seller shall pay the costs of a CLTA Standard Owner's policy of title insurance.

**REMOVAL OF CONTINGENCIES; COURT CONFIRMATION; CLOSING; DELIVERY OF POSSESSION.** If Buyer does not give Seller written Notice of Cancellation or Notice of Title Disapproval as and when provided in this Agreement, Buyer's silence shall be deemed acceptance and Buyer shall be deemed to have satisfied and removed all of Buyer's contingencies and to proceed with the Sale. Seller shall then file a motion with the Bankruptcy Court to confirm the Sale, which sale shall be subject to qualified overbids as approved by the Bankruptcy Court. Upon such removal of contingencies, Buyer shall be unconditionally obligated to proceed with the Sale, subject only to Bankruptcy Court confirmation as set forth below. If the Bankruptcy Court confirms the Sale to Buyer, the closing shall take place as soon as practicable after entry of the order approving the Sale, but no later than the later to occur of (i) the first business day after fourteen (14) calendar days following the entry of the operative Order of the Bankruptcy Court approving the Sale or (ii) if the effectiveness of the Order of the Bankruptcy Court approving the Sale is stayed, the first business day after the Order is no longer stayed (the "Closing Date"). The closing shall occur on the date the deed transferring the Property to Buyer is recorded with the County Recorder where the Property is located.

**BANKRUPTCY SALE.** Buyer acknowledges that Seller is a trustee duly appointed to administer the Debtors' bankruptcy estate, and is a party to this Agreement solely in that capacity. Seller and his brokers and agents (collectively, the "Seller's Brokers") have not and will not determine the condition or fitness for use of the Property for any particular purpose. The Sale shall be "as is," "where is," "with all faults," and with no warranty by or recourse whatsoever to Seller or Seller's Brokers herein. Transfer of the Property shall be by Quitclaim Deed. All parties acknowledge that Seller is a party to this Agreement solely in his capacity as trustee of the Debtors' estate and that in the event of any default in the performance of any of Seller's obligations under the Offer (as modified hereby) or in the event that any other claim is asserted against Seller, the Trustee, or the estate in connection with this transaction, the Trustee shall in no event have any personal liability whatsoever (whether in his individual capacity or otherwise), it being expressly understood and agreed that Buyer's sole recourse, if any, in such event shall be to the assets of the Debtors' estate.

**TAXES; PRORATIONS; COSTS OF SALE.** All real property taxes and assessments for the current tax year shown in the current County Tax Bill shall be prorated between Seller and Buyer and charged as of the closing date to the applicable accounts of Seller and Buyer. The Sale shall be free and clear of any homeowner's association assessments and all real property taxes (other than those prorated as provided above) enforceable against the Property through the closing date of the Sale. Escrow fees shall be split between Buyer and Seller in the manner customary in the County where the Property is located. Seller shall pay any real property transfer tax. Seller shall pay the cost of a Natural Hazard Disclosure Report, from a vendor selected by Seller, to be furnished to Buyer through escrow. Buyer shall pay and have sole responsibility for compliance with any requirements imposed on the Property or this Sale by any governmental agency(ies), including compliance with any applicable governmental retrofit requirements. Buyer shall pay the cost of recording the deed. Buyer and Seller shall each pay their own expenses of every other type except as specifically provided in this Agreement.

**BANKRUPTCY COURT APPROVAL; OVERBIDDING.** The Sale is subject to notice to creditors, approval by the Bankruptcy Court, and better qualified bids received by Seller through and including the Bankruptcy Court hearing to confirm the Sale. Payment of any and all real estate brokers' commissions is also subject to notice to creditors and approval by the Bankruptcy Court. Buyer acknowledges and agrees that Seller may not seek to obtain the Bankruptcy Court's approval if Seller has determined that it would be in the best interest of the bankruptcy estate not to do so. Buyer acknowledges and agrees that if the Bankruptcy Court approves the Sale to a different buyer (the "Successful Overbidder") at the hearing on the Sale, the Trustee may hold the Buyer's deposit pending close of the Sale to the Successful Overbidder and, if the Successful Overbidder does not timely close its purchase of the Property, the Trustee has the right to close the Sale to the Buyer at the Purchase Price hereunder, or such higher price as the Buyer may have bid at the hearing on the Sale.

**BROKERS.** Seller is represented by Real Brokerage Technologies and Coldwell Banker. Buyer is represented by RE/MAX Gold Coast Realtors. Subject to Bankruptcy Court approval, Seller will pay a real estate broker's commission aggregating 5% of net sales price of the Property as follows: 1.25% to Coldwell Banker, 1.25% to Real Brokerage Technologies and 2.5% to RE/MAX Gold Coast Realtors in connection with the closing of the Sale. Seller's Brokers and Buyer's Brokers are collectively referred to herein as the "Brokers". No commission or compensation shall be due or payable to Brokers in connection with this Agreement or Sale except from the cash proceeds of an actual Sale of the Property that closes to Buyer. Buyer hereby represents and warrants that, other than the Brokers, Buyer has not dealt with any broker, finder, or other person entitled to any fee, commission, or other compensation in connection with the Sale and Buyer shall indemnify, defend, protect, and hold Seller and the related bankruptcy estate harmless of, from, and against any claims, demands, actions, causes of action, losses, liabilities, costs, and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Seller may suffer or incur in the event that any claims for any such fees, commissions, or other compensation of any kind are hereafter asserted.

**MATERIAL CHANGE OF CONDITION.** In the event of any material change in the condition of the Property after the date of acceptance of this Counter-Offer, if Buyer demands repair of any resulting actual damage to the Property, Seller may, at Seller's sole option: (i) elect to terminate this Agreement, in which event Buyer's and Seller's obligations to buy or sell shall terminate and the Initial Deposit shall be refunded to Buyer without interest; or (ii) make required repairs at the bankruptcy estate's expense; or (iii) assign any insurance proceeds for the damage to the Property to Buyer as of the close of the Sale; or (iv) credit the cost of such repairs to Buyer through escrow, it being agreed that in the event that Seller elects and complies with subpart (b), (c), or (d) of this paragraph, Buyer's obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property. Buyer's obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property.

**REMEDY FOR BUYER'S OR SELLER'S FAILURE TO CLOSE.** Buyer's sole remedy in the event that the Sale fails to close as a result of Seller's inability or failure to close for any reason, including but not limited to the reason of failure to obtain approval of the Sale by the Bankruptcy Court, shall be the mutual release of Buyer's and Seller's obligations to buy or

sell and a full refund of the Initial Deposit (plus any increase thereof by Buyer). In the event Buyer fails to close the Sale for any reason other than Seller's default, after Buyer's contingencies have been removed as under this Agreement, Buyer's Initial Deposit (plus any increase thereof by Buyer) shall be paid over to Seller and retained by Seller as liquidated damages without further legal action. This provision shall apply equally to the Initial Deposit (and any increase thereof by Buyer) without interest. If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. Buyer and Seller agree that this amount is a reasonable sum given that it is impractical or extremely difficult to establish the amount of damages that would actually be suffered by Seller in the event Buyer were to breach this Agreement. Release of funds will require mutual, signed release instructions from both Buyer and Seller, judicial decision or arbitration award. AT TIME OF ANY INCREASED DEPOSIT, BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION INCORPORATING THE INCREASED DEPOSIT AS LIQUIDATED DAMAGES (C.A.R.FORM RID). _____ als]

**BANKRUPTCY COURT JURISDICTION.** The United States Bankruptcy Court for the Central District of California, Los Angeles Division shall have sole and exclusive jurisdiction to interpret and enforce the terms of this Agreement and Buyer hereby consents and submits to such exclusive jurisdiction. This Agreement shall be interpreted and enforced pursuant to the laws of the State of California, the United States of America, and title 11 of the United States Code.

**"AS-IS," "WHERE-IS" CONDITION; NO WARRANTIES.** Buyer acknowledges and agrees that, to the maximum extent permitted by law, the sale contemplated by this Agreement is made "as-is," "where-is," and "with all faults," except as specifically provided in this Agreement. Seller and Seller's Brokers have not made, do not make, and specifically negate and disclaim any representations, warranties, promises, covenants, agreements, or guaranties of any kind or character whatsoever, whether express or implied, oral or written, concerning or respecting (i) the value of the Property; (ii) the income to be derived from the Property; (iii) the suitability of the Property, or lack thereof for any activity or use which Buyer may intend to conduct thereon, including any possibilities or limitations for future development; (iv) the habitability, merchantability, marketability, profitability, or fitness for a particular purpose, of the Property, or lack thereof; (v) the manner, quality, state of repair, or lack of repair of the Property; (vi) the nature, quality, or condition of the Property, or any portion, system, or component thereof, including without limitation, water, soil, and geology; (vii) the compliance of the Property or its operation, or lack thereof, with any laws, ordinances, regulations, rules, or orders of any applicable governmental authority or body; (viii) the manner or quality of engineering, design, construction or materials, if any, incorporated into the Property; (ix) the compliance or lack of compliance with any land use, building and safety, or other laws, ordinances, regulations, rules, orders, or other requirements imposed or enforced by any governmental or non-governmental body, including without limitation the Americans with Disabilities Act of 1990; (x) the presence or absence at, on, under, or adjacent to the Property, of materials described as "hazardous substances, hazardous

materials, or toxic substances" or by similar terms under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, et seq.), the Toxic Substance Control Act (15 U.S.C. § 2601, et seq.), the Clean Water Act (33 U.S.C. § 1251, et seq.), California Health and Safety Code §§ 25117 or 25316, or other statutes and laws, all as amended and including all regulations issued thereunder; (xi) the content, completeness or accuracy of any due diligence materials or preliminary report regarding title to the Property; (xii) the conformity or lack of conformity of the improvements to any plans or specifications for the Property, including any plans and specifications that may have been or may be provided to Buyer; (xiii) the conformity or lack of conformity of the Property to past, current, or future applicable zoning or building requirements; (xiv) any deficiency of any undershoring, drainage, or other aspects, systems, or components of or affecting the Property; (xv) the fact, if applicable, that all or a portion of the Property may be located on or near any natural hazard zone as determined by any governmental agency or body; (xvi) the existence of vested land use, zoning, or building entitlements affecting the Property or any other property; or (xvii) any other matter.  Without in any manner limiting the foregoing, Buyer hereby acknowledges and agrees that (i) Seller's Brokers have provided (and will hereafter provide) to Buyer various materials and information relating to the Property, including, without limitation, information and materials relating to the condition of the Property, and (ii) all such materials and information so provided to Buyer by Seller's Brokers shall, for all purposes of this Agreement, be deemed to have been disclosed to Buyer by the Seller, as well.

**BROKERS.**  Seller's Brokers herein have not and will not perform any inspections, investigations, or due diligence on behalf of Buyer unless otherwise specified herein.  Buyer is informed that Buyer must arrange for any inspections and investigations desired by Buyer utilizing suitable third party professionals selected and compensated by Buyer.  In no event shall Seller have any liability or responsibility for any representation, warranty, statement made, or information furnished by Seller's Brokers, or any other person or entity, concerning the Property, this Agreement, or any other matter, unless expressly set forth in writing and signed personally by Seller.

**OPPORTUNITY TO INSPECT; BUYER'S SOLE RELIANCE.**  Buyer represents, warrants, acknowledges, and agrees that Buyer has been given the opportunity to inspect and investigate the Property and all other facts and circumstances deemed by Buyer relevant and significant, and to review information and documentation affecting the Property.  In deciding to proceed with the Sale, Buyer is relying solely on Buyer's own inspections and investigation of the Property (including by any outside professionals whom Buyer has elected to engage for such services) and review of such information and documentation, and not on any information provided or to be provided by Seller.  Buyer further acknowledges and agrees that any information made available to Buyer or provided or to be provided by or on behalf of Seller with respect to the Property was obtained from a variety of sources and that neither Seller nor Seller's Brokers nor any other person has made or makes any representations as to the accuracy or completeness of such information.  Buyer hereby fully and irrevocably

releases all such sources and preparers of information and documentation affecting the Property which were retained or engaged by Seller or Seller's Brokers from any and all claims that Buyer may now or hereafter have against such sources and preparers of information, for any costs, expenses, losses, liabilities, damages, demands, actions, or causes of action arising from any such information or documentation. NEITHER SELLER NOR BROKERS HAVE PROVIDED OR WILL PROVIDE ANY LEGAL OR TAX ADVICE TO BUYER. Buyer is informed that Buyer must obtain any such advice, if desired by Buyer, from independent professionals selected and engaged by Buyer.

**PHYSICAL, GEOLOGICAL, PEST CONTROL, AND ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS.**

    A. BUYER SHALL CONDUCT THOROUGH PHYSICAL, GEOLOGICAL, PEST CONTROL, ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS MAY BE DETERMINED BY BUYER, THROUGH QUALIFIED PROFESSIONALS SELECTED BY BUYER. Seller and Seller's Brokers strongly recommend that Buyer fully exercise and not waive such inspections and investigations.

    B. Buyer shall select and employ, at Buyer's sole expense, a licensed engineer(s), architect(s), contractor(s), geologist(s), pest control licensee(s), environmental consultant(s), or other qualified professional(s), to make inspection(s) and investigations of the Property, including, but not limited to, (i) its general structure, plumbing, heating, air conditioning (if any), electrical system, built-in appliances, cesspool/sewer/septic system, well, roof, soils, foundation, mechanical systems, pool, spa, related equipment and filters, sprinklers, and those other matters affecting the desirability of the Property (all if and only to the extent any such structures, systems, and components are presently a part of the Property); (ii) any actual or potential wood destroying pests or other conditions damaging to the Property or any portion thereof; (iii) environmental hazards, substances, products, or conditions, including without limitation, asbestos, formaldehyde, lead, lead-based paint, contaminated soil or water, fuel, chemical storage tanks, hazardous waste, electromagnetic fields, and radon gas, any of which may constitute a health risk; (iv) the presence or absence of any required governmental permits, inspections, applications, approvals, and certificates of occupancy, and compliance or lack of compliance with building codes and laws applicable to the Property; (v) plans and specifications for the Property; (vi) all applicable zoning, municipal, county, state, and federal, including those affecting the past, current, or any future use of the Property; (vii) deed restrictions and other matters of public record which may govern, restrict, condition, or prohibit the use, alteration, or development of the Property; and (viii) generally, without limitation, any and all other items and matters of whatsoever nature, character, or description, which Buyer deems material to Buyer's interests, in, on, or affecting the Property, and to approve or disapprove said inspection within the period and in the manner set forth in this Agreement.

**RETROFITTING.** All required retrofitting including but not limited to the payment of City Report (if report is required), installation of smoke and carbon monoxide detectors, low flow toilets and compliance with all governmental agencies shall be Buyer's responsibility for cost and completion.

**PERSONAL PROPERTY.** After close of escrow, Buyer shall be responsible for the removal of all personal property located on the premises.

**ITEMS INCLUDED.** The following items shall be included: Stove, refrigerator, dishwasher, bathroom mirrors.

**COMPLETE AGREEMENT; NO OTHER REPRESENTATIONS OR WARRANTIES.** Seller shall not be liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Property, or the operation thereof, furnished by any real estate broker, agent, employee, contractor, or other person. Buyer further acknowledges and agrees Seller has no obligations to make repairs, replacements, or improvements to the Property except as may otherwise be expressly stated herein. Without limiting any other provision hereof, Buyer represents, warrants, and covenants to Seller that, except for Seller's express representations and warranties specified in this Agreement, Buyer is relying solely upon Buyer's own investigation of the Property.

**WRITTEN AFFIRMATION OF SELLER REQUIRED.** Buyer understands that Seller may continue to receive and respond to other offers on the Property and may be making several counter-offers concurrently containing the same or different terms. This Counter-Offer shall not be binding until accepted by Buyer and executed by Buyer and Seller on the signature page below; and then approved by Seller, in Seller's sole discretion, in the form of the Seller's "Affirmation of Agreement" attached hereto as Exhibit "A" which, if so executed by Seller, will constitute Seller's agreement that Seller will sell the Property to Buyer, subject to Bankruptcy Court approval, the rights of any overbidding parties, and the terms and conditions of this Agreement. Buyer further acknowledges that it would be imprudent and unrealistic to rely upon the expectation of entering into a binding agreement regarding the subject matter of this Counter-Offer prior to receipt of Seller's Affirmation of Agreement, and further represents to Seller that any efforts to complete due diligence, or to perform any of the obligations provided herein shall not be considered as evidence of binding intent without Seller's Affirmation of Agreement, and understands that BUYER'S ACCEPTANCE HEREOF SHALL HAVE NO FORCE OR EFFECT PRIOR TO BUYER'S RECEIPT OF SUCH AFFIRMATION OF AGREEMENT SIGNED BY SELLER.

**ATTORNEYS' FEES.** In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

**EXPIRATION OF COUNTER-OFFER.** This Counter-Offer shall expire if not accepted by Buyer by delivering a copy hereof, fully signed and initialed by Buyer, to Seller, on or before 5:00 p.m., Pacific time, on September 23, 2023. Such acceptance shall nevertheless be subject to the receipt of Seller's Affirmation of Agreement.

**AGREED AND ACCEPTED:**

BUYER:

Dated: 9/20/2023 | 12:07 PM PDT

By: _____
Robert Crown


SELLER (subject to execution of Seller's Affirmation of Agreement):

Dated: September 20, 2023

By: _____
Bradley D. Sharp solely in capacity as Chapter 11 Trustee for Leslie Klein

## EXHIBIT "A"

## SELLER'S AFFIRMATION OF AGREEMENT

      Seller hereby acknowledges Buyer's acceptance of the foregoing Counter-Offer and affirmatively agrees to sell the Property to Buyer on the terms and conditions of the foregoing Agreement, but subject to Bankruptcy Court approval and any qualified overbidders. Seller shall revoke any other outstanding Counter-Offers made to other prospective buyers or make the same subject and subordinate to this Agreement.

SELLER

Dated: 9/20/2023

By: _____
Bradley D. Sharp solely in capacity as Chapter 11 Trustee for Leslie Klein