1  Jeffrey W. Dulberg (State Bar No. 181200)
   John W. Lucas (State Bar No. 271038)
2  Jeffrey P. Nolan (State Bar No. 158923)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 13th Floor
   Los Angeles, CA 90067
4  Telephone: 310.277.6910
   Facsimile: 310.201.0760
5  E-mail:  jdulberg@pszjlaw.com
            jlucas@pszjlaw.com
6            jnolan@pszjlaw.com

7  *Counsel to Bradley D. Sharp,*
   *Chapter 11 Trustee*

8

9                    **UNITED STATES BANKRUPTCY COURT**

10                    **CENTRAL DISTRICT OF CALIFORNIA**

11                          **LOS ANGELES DIVISION**

| | |
|---|---|
| 12  In re | Case No. 2:23-bk-10990-SK |
| 13  LESLIE KLEIN, | Chapter 11 |
| 14          Debtor. | **RESPONSE TO THIRD-PARTY LIFE CAPITAL GROUP, LLC'S LIMITED OPPOSITION TO CHAPTER 11 TRUSTEE'S MOTION FOR ORDER AUTHORIZING 2004 EXAMINATION TO LIFE CAPITAL GROUP, LLC** |

Date:        January 10, 2023
Time:        9:00 a.m.
Courtroom: 1575
Location:    255 E. Temple Street
             Los Angeles, CA 90012
Judge:       Hon. Sandra R. Klein

        Bradley D. Sharp ("***Trustee***"), the duly appointed trustee for the chapter 11 estate of Leslie

Klein (the "***Debtor***"), hereby files this reply (the "***Reply***") to Life Capital Group, LLC's ("***LCG***")

*Limited Opposition and Request for Hearing on Chapter 11 Trustee's Motion for Order*

*Authorizing 2004 Examination of Life Capital Group, LLC* [Docket No. 482] and Declaration of

Richard Steelman [Docket No. 523] (together, the "***Opposition***") to the Trustee's *Motion for*

*Order Authorizing 2004 Examination of Life Capital Group, LLC* [Docket No. 468] (the "***2004***

***Motion***"). In support of the Reply, the Trustee respectfully represents as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**I.**

**PRELIMINARY STATEMENT**

LCG might be one of the largest assets of the Debtor's estate. It is the Trustee's understanding that LCG owns approximately fourteen (14) unmatured life insurance policies that have a face value in excess of $30,000,000. The Debtor's estate is entitled to approximately 50% of the net policy proceeds when those policies mature. Both the Trustee and LCG agree that the Debtor is a 50% co-owner of LCG which was co-founded by the Debtor in 2011 to hold the above-referenced life insurance policies in addition to others that have matured. Also, the Debtor, as a "Member" of LCG, essentially functions as a board member of LCG where certain changes to the operating agreement that governs LCG must be approved by the Debtor and the other member.

Indeed, LCG's characterization of the 2004 Motion is all the more frustrating and baffling given that LCG sought the Court's direction regarding cash to be paid by LCG to the Debtor's estate [Docket Nos. 89 and 90] and thereafter entered into a stipulation with the Trustee regarding the turnover of cash distributions to the Trustee [Docket No. 205]. It is undeniable that the Trustee is entitled to information from LCG regarding its assets, liabilities, administration, and member distributions. However, LCG characterizes the 2004 Motion as, "a wholesale investigation of a third-party, non-debtor LCG's private business affairs **lacking in any reasonable connection to Debtor** over the requested period." *See* Opposition at ｜2 (emphasis added). This is far from correct as arguably the largest asset of the Debtor's estate.

As set forth in the 2004 Motion, the Trustee's request relates to an entity that is co-owned by the Debtor that owns life insurance policies having an aggregate face amount of more than $30,000,000. Material assets of the Debtor's estate are suitable targets for Bankruptcy Rule 2004 discovery. The Trustee has not been able to obtain any information about this estate asset, which has presumably been made available to LCG's other member but not to the Trustee as the Court appointed representative of the Debtor's estate. Consequently, LCG must be fully investigated.

As the Court is aware, the Trustee has faced an uphill battle obtaining information regarding property of the estate, whether it be from the Debtor or others. As a result, the Trustee has been required to file more than two dozen motions seeking information pursuant to

Bankruptcy Rule 2004. The present 2004 Motion is no different, except here LCG contends, without any legal or factual basis, that it can refuse to produce information regarding one of the largest assets of the Debtor's estate. For the reasons set forth herein and the hearing on the 2004 Motion, the Opposition should be overruled and the 2004 Motion granted.

**II.**

**THE 2004 MOTION SHOULD BE GRANTED REQUIRING
LIFE CAPITAL GROUP TO PRODUCE THE REQUESTED INFORMATION**

**A.**    **Life Capital Group, LLC**

In April 2011, the Debtor and Schlomo Rechnitz ("**Rechnitz**" and together with the Debtor, the "**Members**" and each a "**Member**") formed LCG by filing a certificate of formation with the Secretary of State of California. The Members agreed to operate LCG as a limited liability company pursuant to the provisions of the California Uniform Limited Liability Company Act (the "**Act**") and the terms of that certain *Limited Liability Company Agreement of Life Capital Group, LLC* (as amended from time to time, the "**Operating Agreement**"). A copy of the Operating Agreement is annexed hereto as **Exhibit A**.

The primary if not sole purpose of LCG is to acquire life insurance policies (presumably at a discount) and maintain them (by paying premiums, etc.) until a policy matures upon the death of an insured, which would result in the payment of the policy proceeds to LCG.

The Operating Agreement appears to describe how distributions are made to the Members (*i.e.*, the Debtor and Rechnitz). However, it is unclear whether the Operating Agreement has been amended, or is subject to any accounting reconciliation or disputes that were resolved or remain outstanding between the co-founders

**B.**    **2004 Motion**

As with nearly every other aspect of this chapter 11 case, the Trustee filed the 2004 Motion because he and his advisors have not been able to obtain information from the Debtor or others about LCG.  To that end, the Trustee used the Operating Agreement to formulate the document requests that are set forth in the 2004 Motion. In other words, each document request stems from particular provisions in the Operating Agreement. Given that the Debtor is the co-founder and co-

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

owner of LCG, and that the Debtor's ownership of LCG (and his various membership and management rights) are property of the estate, the document requests are specifically tailored toward the discovery of information <u>about property of the estate</u>.

Remarkably, LCG relies upon boilerplate recitations of the law in the following cases where the outcomes *support* the Trustee's 2004 Motion request, not refute it. For example, LCG cites *In re Mastro*, 585 B.R. 587, 597 n.12 (B.A.P. 9th Cir. 2018) and *In re Wilcher*, 56 B.R. 428, 434 (Bankr. N.D. Ill. 1985) for the proposition that "Rule 2004 may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs." Opposition, 2:10-11. However, in *Mastro*, the court approved a chapter 7 trustee's 2004 request compelling the uncooperative debtor to execute a "consent directive" that permitted the trustee to obtain documents from third parties because it furthered investigation of the Debtor's financial affairs as required by the Bankruptcy Code, which is at the root of the trustee's statutory duties. Meanwhile, in *Wilcher*, the court denied the 2004 request because the "discovery [was] sought from a party who has not been shown to have been involved in the debtor's business affairs **in any way** . . .." (emphasis added). Both *Mastro* and *Wilcher* undermine LCG's position rather than advance it. Here, LCG has a direct relationship to the Debtor; he owns it!

Similarly, LCG cites *In re Financial Corporation of America*, 119 B.R. 728, 733 (Bankr. C.D. Cal. 1990) for the proposition that "matters have no relationship to the debtor's affairs, or administration of the bankruptcy case estate are not proper subjects of a Rule 2004 examination." However, in *Fin. Corp.*, the chapter 7 trustee of a holding company that owned a failed savings and loan bank was granted access to documents over the objection of the FDIC who raised numerous inapplicable privileges. Like *Fin. Corp.*, Debtor's ownership of LCG is similar and the Trustee of the Debtor's estate is entitled to information regarding material assets of the estate.

And the holding in *In re Farris-Ellison*, 2015 Bankr. LEXIS 3057 (Bankr. C.D. Cal. Sept. 10, 2015) has no application to the fact here because that motion was denied for numerous reasons that included failing to meet and confer and the proponent sought documents in an adversary proceeding where Bankruptcy Rule 2004 does not apply. Here, the Trustee's counsel has met and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

conferred with LCG counsel no less than four times but has not been able reach a comprehensive resolution that addresses each of the Trustee's discovery requests.

Last, LCG cites *In re Yahweh Center, Inc.*, Bankr. LEXIS 193 (Bankr. E.D.N.C. Jan. 23, 2017) for the proposition that a third party should not be ordered to produce "private financial information involving its operating expenses or LCG's distributions and transactions with non-debtor affiliated members and creditors." Opposition, 3:1-2. However, LCG is co-owned by the Debtor who, along with Rechnitz, has made numerous capital contributions for the purpose of maintaining various life insurance policies that, upon their maturity, will be used to make distributions to the Debtor and Rechnitz in accordance with the terms of the Operating Agreement. Unless there is an accounting of LCG it is not possible for the Trustee to determine whether the Debtor's estate is receiving the benefits the Debtor is entitled to receive per the terms of the Operating Agreement.

## C.     <u>Attorney Client Privilege</u>

In nearly every response, LCG objects to the informational request on the basis of attorney-client, or some other privilege. The party asserting a privilege defense in response to an information request has the burden of establishing the privilege is enforceable. *United States v. Martin*, 278 F.3d 988, 999-1000 (9th Cir. 2002). LCG has not established an applicable or enforceable privilege that would prohibit the production of any communication or document.

First, as a co-owner, co-founder, and board member of LCG, the Debtor was presumably part of numerous privileged communications. In that context, LCG's privilege defense does not apply because the Debtor has presumably *already* been entitled to the information or has already seen the information. The Trustee is not taking the position that any applicable privilege has been waived but instead that the Trustee, as the estate's representative, steps into the shoes of the Debtor who already has had access to the privileged information and LCG has no basis to withhold the production of any such documents or communications.

Second, the Debtor's role as a co-owner, Member, co-founder, and director of the LCG entitles his estate access to privileged documents and communications. For example, in *Gottlieb v. Wiles*, 143 F.R.D. 241 (D. Colo. 1992), a former director and CEO sued the corporation. The

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  corporation withheld documents from the plaintiff during discovery based on the attorney-client

2  privilege. The court stated "It is certainly true that the attorney-client privilege belongs to the

3  corporation, or its Trustee, and that [the plaintiff] has no power to either assert or waive it" on

4  behalf of the corporation. *Id.* at 247. However, the court stated that whether the plaintiff could

5  assert or waive the privilege on behalf of the corporation was not the dispositive issue -- the issue

6  was whether he could access those privileged documents that had been originally created during

7  the time he had been a director and officer. *Id.* The court noted that while the plaintiff had been a

8  director, he was "squarely within the class of persons who could receive communications" from

9  the corporation's counsel "without adversely impacting the privileged or confidential nature of

10 such material." *Id.* Thus, the court held that former director and CEO had the right to access the

11 documents that had been created while he was a director and officer at the corporation. *Id.*

12 Other courts have reached similar conclusions. *See Kirby v. Kirby*, 1987 Del. Ch. LEXIS

13 463, 1987 WL 14862, *7 (Del.Ch. 1987) (unreported) (holding that the directors of a closely held

14 corporation, collectively, were the client and that joint clients may not assert the attorney-client

15 privilege against one another); *Harris v. Wells*, 1990 U.S. Dist. LEXIS 13215, 1990 WL 150445,

16 *3-4 (D. Conn. 1990) (unreported) (holding that because the corporation's directors are entrusted

17 with the responsibility of managing the corporation, the corporation's directors hold the attorney-

18 client privilege and therefore cannot assert the privilege against each other); *Glidden Company v.

19 J. Jandernoa*, 173 F.R.D. 459, 473-74 (W.D. Mich. 1997) (directors have a right to access

20 attorney communications relating to the time that they served as directors); *Inter-Fluve v. Montana

21 Eighteenth Judicial District Court*, 112 P.3d 258, 264 (Mont. 2005) (closely held corporation and

22 directors were joint clients because a corporation can act only through its agents; therefore, the

23 corporation could not assert the attorney-client privilege against its joint client directors).

24 The Debtor's role in LCG is no different than the roles the directors held in the cases cited

25 above. Plus, the Debtor continues to co-own LCG, continues to hold his director decision-making

26 role for LCG, and will receive distributions when LCG realizes the proceeds of any of the existing

27 policies. The Trustee acknowledges that the Debtor sued LCG and Rechnitz in 2022, which

28 resulted in adversity with respect to those disputes. The Trustee concedes that the Debtor would

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  not be entitled to communications protected by privilege when they were adverse. However, the

2  dispute did not arise until 2022 and was purportedly resolved in December 2022, which means

3  that communications prior to or after this time (or unrelated to the subject matter) should be turned

4  over to the Debtor's estate.

5      Third, to the extent LCG raises a privilege defense, LCG must produce a privilege log as

6  follows:  (a)  the name and capacity of each individual from whom or to whom a document and

7  any attachments were sent (including designating which persons are lawyers for LCG); (b) the

8  date of the document and any attachments; (c) the type of document; (d) the Bates numbers of the

9  documents; (e) the nature of the privilege asserted; and (f) a description of the subject matter of

10  the information contained in the document in sufficient detail to determine if legal advice was

11  sought or received or if the document constitutes attorney work product (collectively, a "***Privilege***

12  ***Log***").

13  **D.**      **The Discovery Period Must Begin When LCG Was Formed**

14      With respect to Request No. 1, LCG is proposing to produce documents dated no earlier

15  than January 1, 2019 and through September 30, 2023. LCG's arbitrary production timeline is

16  unacceptable.

17      LCG's Operating Agreement was executed in June 2011. At around that time, the Debtor

18  and Rechnitz agreed that LCG would acquire approximately 22 life insurance policies. It is the

19  Trustee's understanding that the Debtor proposed to contribute other life insurance policies to

20  LCG but Rechnitz (as LCG's other board member) did not agree. The Trustee is entitled to

21  communications and other documents that go back to the formation of LCG as they relate to the

22  formation, administration, assets and liabilities, and distributions to LCG's sole Members and co-

23  owners, which includes the Debtor.

24      In addition, two creditors (together, "***Gestetner***") filed secured proofs of claim against the

25  Debtor's estate. The Gestetners loaned millions of dollars to the Debtor and the Debtor

26  purportedly encumbered his interest in LCG to secure the repayment of the loan. The subject

27  transaction closed in 2016 and was amended several times. This transaction, which required the

28  consent of LCG, arose more than three years prior to the January 1, 2019.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

In the end, the Debtor's interest in LCG and the rights this estate holds with respect to distributions are significant. It is the Trustee's understanding that the face value of the remaining 14 life insurance policies is more than $30,000,000. As a result, it is important for the Trustee to understand the estate's rights to this substantial asset and arbitrarily limiting the timeframe for relevant documents compromises the immediate need the Trustee has so that he can better understand the assets and other rights the Debtor's estate holds.

**E.**    **Trustee's Responses to LCG's Objections**

LCG objected to each of the Trustee's twenty-five document requests. The Trustee responds to each objection as set forth below and incorporates the general objections outlined above. As reflected in the Objection and Supplemental Objection, LCG's responses are boilerplate and fail to explain why a particular request is "not relevant," "harassing," "burdensome," or subject to an applicable privilege that prohibits disclosure.

**Request No. 1**

The Trustee acknowledges that the term "KLEIN" as used in this request and others was not defined. However, it is patently obvious that the request refers to the **Debtor**. Thus, any refusal to produce information on the basis that the term "KLEIN" was not understood should be overruled.

The objection fails to explain why the request is not relevant or will not reasonably lead to discoverable evidence when the request seeks communications and documents related to the Debtor or one of the Debtor's associated entities. The Trustee has learned that the Debtor uses his associated entities to transact personal business for himself. It should not be burdensome for LCG to produce any such information.

Last, LCG contends that it cannot produce communications and documents exchanged with the Debtor or one of the Debtor's associated entities because an assortment of privileges prevents the disclosure of such communications and documents. The foregoing makes no sense. The Trustee is seeking communications and documents exchanged between LCG and the **Debtor**, or one of **his** associated entities. It is left unexplained how any privilege would prevent LCG from producing such information when the Debtor is one of the exchanging parties or a non-debtor

party that is one of the exchanging parties. If, for example, there are communications between LCG and Rechnitz about the Debtor, LCG needs to demonstrate why such communications would be privileged. To the extent there are any privileged communications or documents, LCG must produce a Privilege Log. To the extent LCG cannot demonstrate an enforceable privilege the Objection should be overruled.

In its Supplemental Response, LCG agrees that it will produce responsive emails "regarding Debtor's interest in LCG," which again is insufficient. This appears to be a very narrow response that is limited to the Debtor's ownership interest in LCG, which on its face should not be complicated. The Debtor is the co-owner and co-formed LCG with Rechnitz. It is reasonable to assume that LCG holds documents and other communications from the Debtor, one of his companies, or about either that relates to topics other than his ownership interests.

**Request No. 5**

The Debtor acknowledges that LCG only has two members: the Debtor and Rechnitz. Their respective capital contributions are an integral part of the Operating Agreement and Article III of the Operating Agreement is devoted to this topic. Capital contributions affect distributions to LCG's Members and the allocation of losses between them. LCG offers that it will only "produce a spreadsheet showing all capital contributions made to LCG." Supplemental Objection, 6:18. If LCG has information other than a mere spreadsheet regarding the capital contribution of either Member that information should be produced. Plus, it is unclear how this request is "overly broad, harassing and unduly burdensome" when capital contributions are an essential element of how insurance policies are maintained by the Members and the amount of distributions are determined for each of them. Further, to the extent there are any privileged responsive documents, LCG must produce a Privilege Log.

**Request No. 6**

LCG states that it will produce the Operating Agreement that reflects all the "Interests" held by the Members. However, LCG contends that this request seeks "confidential, financial, proprietary, trade secret and/or other competitively sensitive business information protected by the right to privacy." Naturally, this leads the Trustee to question if LCG holds other information

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  about the Members' "Interests" that it is refusing to produce. It is unclear how the above can be

2  the basis for an objection to producing basic information regarding the ownership holdings of

3  LCG that are held exclusively buy the two individuals that formed it. Last, to the extent there is

4  any confidential information the Trustee is prepared to enter into an appropriate confidentiality

5  agreement to safeguard such information.

6  **Request Nos. 8 and 9**

7       The Trustee is seeking the production of documents regarding the return of capital

8  contributions, distributions, and repayment of loans. Like the request regarding capital

9  contributions, LCG contends that this request is "overbroad," "harassing," "unduly burdensome,"

10  "privileged," and "confidential." Again, LCG offers nothing to show how this can be the basis for

11  an objection to producing basic information regarding the return of capital, which is another

12  central component of the Operating Agreement (*i.e.*, the repayment of capital affects future

13  distributions and allocations of losses). LCG fails to respond to any documents or communications

14  regarding "loans." The Operating Agreement reflects that LCG was the borrower on numerous

15  loans. If any of the loans have been paid off, the Trustee is entitled to information regarding such

16  loans. If any of the loans remain outstanding, the Trustee is entitled to information regarding any

17  partial payments and the status of such loans and communications and documents with the

18  respective lenders.

19       It is also unclear how any privilege can protect the disclosure of information relating to this

20  request; however, any privilege must be documented in a Privilege Log. Last, to the extent there is

21  any confidential information the Trustee is prepared to enter into a confidentiality agreement to

22  safeguard such information.

23  **Request No. 10**

24       By this request, the Trustee is seeking bank or financial account information used by LCG.

25  In response, LCG states that it will produce such information but only those that are related to the

26  Debtor. This is unacceptable.

27       All bank financial account information of LCG is directly relevant to the Debtor's estate.

28  LCG is a primary asset of the Debtor's estate and a portion of the bank and financial account

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

information provides the Trustee with only half the picture (or what LCG "considers" is related to the Debtor), which will leave the Trustee guessing to fill in the blanks or missing pieces. It the Trustee's understanding that Rechnitz as the other co-owner has access to all LCG information. The Trustee, as the representative of the Debtor's estate, should have the same access from an operational perspective. Plus, there is no legal reason why any of this information should not be subject to disclosure.

It is also unclear how any privilege can protect the disclosure of information relating to this request; however, any privilege must be documented in a Privilege Log. Last, to the extent there is any confidential information the Trustee is prepared to enter into a confidentiality agreement to safeguard such information.

**Request No. 11**

LCG objects to this request on the grounds that it is "vague," "not relevant," "subject to privilege," and is "confidential" but fails to explain how any of the foregoing apply. For example, Section 9.1 of the Operating Agreement provides:

> Rechnitz shall determine the accounting method to be used by the Company. The Company shall maintain such accounting records as shall reflect all Company transactions and as shall be appropriate and adequate for the Company's business.

Operating Agreement § 9.1.

The Operating Agreement expressly calls for LCG to use an "accounting method" determined by Rechnitz and that LCG shall maintain such records, and Section 9.2 of the Operating Agreement provides that the accounting shall be made available to the Debtor. The Trustee presumes that this information is relevant since any "accounting method" will arguably affect how distributions (or allocations of losses) are paid to or attributed to each Member. LCG's response fails to identify any documents regarding the accounting method that Rechnitz used and was employed by LCG. If there is responsive information other than the Operating Agreement then such information must be produced.

1    Claims of "privilege" cannot be permitted to restrict the disclosure of this information. If

2    LCG is going to rely upon any privilege, then it must produce a Privilege Log. Last, to the extent

3    there is any confidential information the Trustee is prepared to enter into a confidentiality

4    agreement to safeguard such information.

5

6    **Request No. 12**

7    LCG contends that this request is "vague" and subject to the same litany of objections as

8    nearly all of the others and LCG refuses to produce any information. However, Section 9.3 of the

9    Operating Agreement provides that:

10
> The Company shall cause to be furnished to each Member and each
11
> other Person who was a Member during the period in question (a)
> such reports and financial statements as may be reasonably required
12
> for his financial reporting requirements, including, without
> limitation, copies of all annual, quarterly and monthly financial
13
> statements, and (b) detailed financial statements and information and
> documents (including Form K-1) necessary or desirable for the
14
> preparation or support of such Member's tax returns required in any
> jurisdiction, as soon as practicable after the end of each Fiscal Year.
15

16   Operating Agreement § 9.3.

17   Again, it is unclear how requesting documents regarding LCG's financial reporting is

18   vague. In short, LCG should be required to produce its ledger, which should not be burdensome by

19   any means. In addition, Section 9.3 of the Operating Agreement requires the preparation and

20   disclosure of this type of information. Accordingly, it should be produced. Any claims of privilege

21   should be subject to a Privilege Log and to the extent there is any confidential information the

22   Trustee is prepared to enter into a confidentiality agreement to safeguard such information.

23   **Request No. 13**

24   LCG contends that this request is "overbroad," "harassing," "unduly burdensome,"

25   "privileged," and "confidential." The transfer of "Interests" in or assets of LCG during its

26   existence should not be burdensome or privileged since the admission of new members is subject

27   to the approval of both the Debtor and Rechnitz. Presumably, the transfer of any assets of LCG

28   includes only the transfer of insurance policies since this was the primary, if not sole, purpose of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

LCG. The sale of insurance policies or any other asset would have been subject to the approval of the Debtor and Rechnitz. Also, Section 10.1 of the Operating Agreement prohibits the assignment or encumbrance of a Member's interest in LCG.  It is the Trustee's understanding that the Debtor did transfer or encumber his interest in LCG to Gestetner. Given the prohibition on such transfers, it is reasonable to assume that LCG was involved in that transaction. It is unclear how privilege can serve to restrict the production of this information. Any claims of privilege should be subject to Privilege Log and to the extent there is any confidential information, the Trustee is prepared to enter into a confidentiality agreement to safeguard such information.

**Request No. 14**

LCG must clarify whether it has information responsive to this request other than the Operating Agreement. It is unclear how the production of information relating to loans (when loans are to be repaid as part of the distribution scheme in the Operating Agreement) can be overly broad, harassing, or unduly burdensome. If LCG has information other than the Operating Agreement, it should be produced. Any claims of privilege should be subject to a Privilege Log and to the extent there is any confidential information the Trustee is prepared to enter into a confidentiality agreement to safeguard such information.

**Request No. 15**

The Trustee is seeking the insurance policies owned by LCG that will pay distributions upon their maturity to the Debtor and Rechnitz. LCG is only willing to produce "documents sufficient to identify the insurance policies it owns in which the policyholder is alive" (emphasis added). If LCG has the policies, those policies should be produced as they are the primary assets of LCG. Moreover, "sufficiency" is not the applicable standard for production. LCG must produce all information responsive to this request. The policies should include *all* policies, not simply policies of individuals that are alive. The Trustee must confirm which policies have matured and are subject to distributions to the Debtor and Rechnitz. Claims of privilege should not restrict disclosure of this information. Any claims of privilege should be subject to a Privilege Log and to the extent there is any confidential information the Trustee is prepared to enter into a confidentiality agreement to safeguard such information.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Request No. 16**

The Trustee is seeking information about the life insurance policies that LCG invested in. Given that both the Debtor and Rechnitz oversaw such investments and that they have already reviewed this information, there is no legitimate objection to the production of such information. Presumably LCG maintained a ledger or other standard accounting system to administer and maintain the business. Those documents should be produced. Once again, it is unclear how privilege can serve to restrict disclosure in this instance. Any claims of privilege should be subject to a Privilege Log and to the extent there is any confidential information the Trustee is prepared to enter into a confidentiality agreement to safeguard such information.

**Request No. 17**

The Trustee is seeking minutes and resolutions regarding changes to LCG's business. In the Supplemental Objection, LCG contends that it does not have any responsive documents and that LCG refuses to produce on the basis that this request is "overbroad," "harassing," "unduly burdensome," "privileged," and "confidential." Given that any changes to the business would have been subject to the approval of the Debtor and Rechnitz it is not clear how any of the above objections apply. Any claims of privilege should be subject to Privilege Log and to the extent there is any confidential information the Trustee is prepared to enter into a confidentiality agreement to safeguard such information.

**Request No. 18**

The Trustee is seeking the general ledger of LCG, which appears to be one of the items LCG maintains pursuant to Article 9. Given that Article 9 of the Operating Agreement entitles the Debtor to such information, it is unclear how any of the stated objections apply. Any claims of privilege should be subject to a Privilege Log and to the extent there is any confidential information the Trustee is prepared to enter into a confidentiality agreement to safeguard such information.

**Request No. 19**

The Trustee, as co-founder and co-owner of LCG, is entitled to information regarding who LCG makes transfers to whether they be to day-to-day trade creditors, lenders, or any member of

1    LCG. All transfers by LCG have a bearing on the Debtor because in general terms his estate is

2    entitled to 50% of the net assets of LCG. Limiting any production to the transfers made to the

3    Debtor again only provides the Trustee with a partial picture of the Debtor's largest asset.

4    In addition to the foregoing, the Trustee is attempting to identify any accounts the Debtor

5    (or an entity associated with the Debtor) might have used to accept distributions or other transfers

6    from LCG. The Trustee is not confident that the Debtor has disclosed all the accounts he is using

7    or has used to accept distributions from LCG. Once again, it is unclear how claims of privilege

8    would serve to restrict disclosure.

9    Any claims of privilege should be subject to a Privilege Log and to the extent there is any

10    confidential information the Trustee is prepared to enter into a confidentiality agreement to

11    safeguard such information.

12    **Request No. 22**

13    The Trustee is seeking information regarding loans between the Members that involved

14    LCG. Given that any loans between the Members that involved the business would have been

15    subject to the approval of the Debtor and Rechnitz, it is unclear how any of the stated objections

16    apply. Any claims of privilege should be subject to a Privilege Log and to the extent there is any

17    confidential information the Trustee is prepared to enter into a confidentiality agreement to

18    safeguard such information.

19

20    Dated:    January 3, 2024          PACHULSKI STANG ZIEHL & JONES LLP

21

22    By:    _/s/ John W. Lucas_____
              John W. Lucas

23            *Counsel for Bradley D. Sharp,*
              *Chapter 11 Trustee*

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

EXHIBIT A

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## LIFE CAPITAL GROUP, LLC

### A California Limited Liability Company

Dated as of June 1, 2011

# TABLE OF CONTENTS

## ARTICLE I
## FORMATION AND BUSINESS OF THE COMPANY

| Section 1.1 | Formation | 1 |
| Section 1.2 | Name | 1 |
| Section 1.3 | Purpose | 1 |
| Section 1.4 | Term | 1 |
| Section 1.5 | Place of Business | 1 |
| Section 1.6 | Registered Office and Agency | 2 |
| Section 1.7 | Fiscal Year | 2 |

## ARTICLE II
## MEMBERS

| Section 2.1 | Members | 2 |
| Section 2.2 | Company Property; Company Interest | 2 |

## ARTICLE III
## CAPITAL CONTRIBUTIONS

| Section 3.1 | Initial Capital Contribution of Members, Capital Accounts | 2 |
| Section 3.2 | Additional Capital Contributions | 2 |
| Section 3.3 | Withdrawal and Return of Capital Contributions | 3 |
| Section 3.4 | Interest | 3 |
| Section 3.5 | Negative Capital Accounts | 3 |

## ARTICLE IV
## DISTRIBUTIONS AND ALLOCATIONS

| Section 4.1 | Allocation of Net Income and Net Losses | 3 |
| Section 4.2 | Cash Available for Distribution | 4 |
| Section 4.3 | Proceeds of Policies | 4 |
| Section 4.4 | Constructive Trust | 4 |
| Section 4.5 | Sale of Policies | 4 |
| Section 4.6 | Lenders | 4 |

## ARTICLE V
## COMPANY ACCOUNT

| Section 5.1 | Establishing a Reserve Account | 4 |
| Section 5.2 | Distribution of Reserve Account | 5 |

## ARTICLE VI
## MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

| Section 6.1 | Rights and Powers of Manager | 5 |

i

Section 6.2    Number, Tenure and Qualifications ....................................................5
Section 6.3    Officers ......................................................................................5
Section 6.4    Reliance .....................................................................................5
Section 6.5    Indemnification of Manager, Members and Officers. ...........................6
Section 6.6    Exculpation .................................................................................7
Section 6.7    No Duties ....................................................................................7
Section 6.8    Protection of Insured's Private Information ......................................7
Section 6.9    Delivery of Policy Files .................................................................7
Section 6.10   Change Forms ..............................................................................7
Section 6.11   Further Assurances .......................................................................7
Section 6.12   Indemnification of Rechnitz .........................................................8

### ARTICLE VII
### REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Section 7.1    Representations and Warranties of Klein. .........................................8
Section 7.2    Representations and Warranties of Rechnitz ....................................10

### ARTICLE VIII
### ADMISSION OF MEMBERS

Section 8.1    Admission of Members ................................................................11
Section 8.2    Admission of Non-Payment Policy Members ..................................11

### ARTICLE IX
### MAINTENANCE OF BOOKS AND RECORDS; REPORTS TO MEMBERS; TAX RETURNS

Section 9.1    Accounting Method and Records ..................................................12
Section 9.2    Company Records........................................................................12
Section 9.3    Company Reports ........................................................................12
Section 9.4    Designation of Tax Matters Member...............................................13
Section 9.5    Tax Treatment and Elections .........................................................13

### ARTICLE X
### TRANSFER OF INTERESTS; SPECIAL PROVISIONS

Section 10.1   Transfers and Assignments...........................................................13
Section 10.2   Permitted Transfers.....................................................................13
Section 10.3   Substitute Members .....................................................................13
Section 10.4   Right of First Refusal. .................................................................14
Section 10.5   Tag-Along Rights and Obligations. ...............................................15
Section 10.6   Miscellaneous Provisions Affecting Transfer. ................................16

### ARTICLE XI
### DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

Section 11.1   Dissolution, etc ..........................................................................16
Section 11.2   Winding Up. ..............................................................................16

ii

Section 11.3   Final Distribution.................................................................................17
Section 11.4   Time for Liquidation, etc......................................................................17
Section 11.5   Termination ..........................................................................................17
Section 11.6   Return of Contribution Nonrecourse to Other Members......................17

## ARTICLE XII
## DISPUTE RESOLUTION

Section 12.1   Rabbinical Counsel................................................................................17

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1   Entire Agreement...................................................................................17
Section 13.2   Other Ventures......................................................................................18
Section 13.3   Amendments..........................................................................................18
Section 13.4   Choice of Law .......................................................................................18
Section 13.5   Successors and Assigns; Third Party Beneficiaries..............................18
Section 13.6   Interpretation ........................................................................................18
Section 13.7   Captions.................................................................................................18
Section 13.8   Severability............................................................................................18
Section 13.9   Counterparts..........................................................................................19
Section 13.10  Non-Waiver............................................................................................19
Section 13.11  Notices ...................................................................................................19

## ARTICLE XIV
## DEFINITIONS

Section 14.1   Definitions. ...........................................................................................19

LIMITED LIABILITY COMPANY AGREEMENT of LIFE CAPITAL GROUP, LLC (this "**Agreement**"), a California limited liability company (the "**Company**"), dated as of June 1, 2011, among Shlomo Rechnitz, an individual residing in the State of California ("**Rechnitz**"), Leslie Klein, an individual residing in the State of California ("**Klein**"), and the Persons that become Members from time to time after the date hereof in accordance with the terms hereof.

## WITNESSETH:

WHEREAS, the Members desire to operate the Company as a limited liability company under Title 2.5 of the California Corporations Code, as amended from time to time (the "**Act**"), in order to accomplish certain lawful business objectives;

WHEREAS, the Certificate of Formation of Life Capital Group, LLC was filed with the Secretary of State of the State of California on April 8, 2011, in accordance with the provisions of the Act; and

WHEREAS the Members desire to set forth herein the manner in which the Company shall be governed and operated.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

## ARTICLE I
## FORMATION AND BUSINESS OF THE COMPANY

Section 1.1     Formation.  The Company was formed on April 8, 2011 by the filing of a Certificate of Formation (the "**Certificate**") with the Secretary of State of California.  The Members hereby agree to operate the Company as a limited liability company pursuant to the provisions of the Act and upon and subject to the terms and conditions set forth in this Agreement.  Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

Section 1.2     Name.  The name of the Company shall be Life Capital Group, LLC, under which name all business and affairs of the Company shall be conducted.

Section 1.3     Purpose.  The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act.

Section 1.4     Term.  The term of the Company shall continue until terminated in accordance with the provisions of Article XI of this Agreement or otherwise dissolved and wound up pursuant to the Act.

Section 1.5     Place of Business.  The Company shall have its principal place or places of business at such place or places as the Manager may, from time to time, select.

Section 1.6    Registered Office and Agency.  The address of the registered office of the Company in the State of California is 5697 W. 3rd Street, Suite 200, Los Angeles, California 90036.  The name and address of the registered agent for service of process on the Company in the State of California is Shlomo Rechnitz, ▓▓▓▓▓▓▓▓▓▓▓▓

Section 1.7    Fiscal Year.  The term "Fiscal Year" shall mean, subject to the provisions of Section 706 of the Code, each of (a) the period commencing on the date of formation of the Company and ending on December 31, 2011, (b) any subsequent 12-month period commencing on January 1 and ending on December 31 and (c) the period commencing on January 1 and ending on the Dissolution Date.

## ARTICLE II
## MEMBERS

Section 2.1    Members.  The Company shall consist of the Members executing this Agreement and any substitute or additional Members admitted to the Company in accordance with the terms hereof.  Each initial Member shall be deemed admitted as a Member of the Company at such time as such Member has made its Initial Capital Contribution to the Company.

Section 2.2    Company Property; Company Interest.  No property of the Company shall be deemed to be owned by any Member individually, but all of such property shall be owned by, and title thereto shall be vested solely in, the Company.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

Section 3.1    Initial Capital Contribution of Members, Capital Accounts.  Each Member has contributed to the capital of the Company, as such Member's Initial Capital Contribution, the amount of cash, or property with a value, set forth on Schedule A.  The Company shall maintain a record of:  (a) the number of Interests held by each Member and (b) the respective Percentage Interest of each Member.  The Manager shall update such Schedule A from time to time to reflect changes in such information.  The Members agree that Klein's Initial Capital Contribution associated with each Policy shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement.  The Members agree that Rechnitz's Initial Capital Contribution associated with the Policies (in the order of each Policy that first generates proceeds) shall be deemed to be $3,800,000. The Company will establish and maintain a Capital Account for each Member throughout the full term of the Company.

Section 3.2    Additional Capital Contributions.   Other than the Initial Capital Contributions made by the Members upon admission to the Company in accordance with Section 3.1 and Article VIII, the Members shall not be required to make any additional contributions to the Company; except that Rechnitz shall be obligated to contribute to the Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the Policies which are not Non-Payment Policies after the date of this Agreement and each Non-Payment Policy Member shall be obligated to contribute to the

Company all premium payments and all other costs and expenses incurred by the Company in servicing and maintaining the applicable Non-Payment Policy after the date such Non-Payment Policy Member was admitted to the Company as a Member.

Section 3.3    Withdrawal and Return of Capital Contributions.

(a)    No Member shall be entitled to demand a return of such Member's Capital Contribution (including any earnings thereon) or to withdraw any portion of such Member's Capital Account except as expressly provided in this Agreement. Except as expressly provided herein, no Member shall have the right to demand a distribution of property other than cash for its Interest. Each Member hereby waives any right such Member may otherwise have to cause any asset of the Company to be partitioned or to file a complaint or institute any proceeding at law or in equity seeking the partition of any such asset. Except as otherwise provided herein, no Member shall have priority over any other Member, either as to a return of such Member's Capital Contribution or as to Net Income, Net Losses, any other item of Company income, gain, loss or deduction, or Company distributions.

(b)    No Member shall be personally liable for the return of the Capital Contributions of any other Member or any portion thereof, it being expressly understood that any such return shall be made solely from available Company assets, if any.

Section 3.4    Interest.   Interest, if any, earned on funds contributed or held by the Company shall inure to the benefit of the Company. The Members shall not be entitled to receive interest or any other payments from the Company with respect to their Capital Contributions or Capital Accounts, except as otherwise provided for herein.

Section 3.5    Negative Capital Accounts.   Except as may be required by the provisions of the Act or in respect of any negative balance resulting from a withdrawal of capital or distribution in contravention of this Agreement, at no time shall any Member with a negative Capital Account balance have any obligation to the Company or the other Members to restore such negative balance, and such negative balance shall not be treated as an asset of the Company.

ARTICLE IV
DISTRIBUTIONS AND ALLOCATIONS

Section 4.1    Allocation of Net Income and Net Losses.

(a)    Net Income with respect to a Policy for any Fiscal Year shall be allocated (i) first, to Rechnitz to the extent of Rechnitz's Priority Return with respect to such Policy; (ii) second, to Rechnitz until $3,800,000 of Net Income has been allocated to Rechnitz in the aggregate (without regard to allocations of Net Income under subclause (i)); (iii) third, to Klein, to the extent of Klein's Priority Return with respect to such Policy; and (iv) thereafter, to Klein and Rechnitz in proportion to their Percentage Interests.

(b)    Net Losses with respect to a Policy for any Fiscal Year shall be allocated to Klein and Rechnitz in proportion to their Capital Contributions associated with such Policy.

Section 4.2     <u>Cash Available for Distribution</u>. Subject to <u>Article XI</u>, the Company shall distribute Available Cash to the Members at such times and in such amounts as determined by Rechnitz in accordance with this Agreement.

Section 4.3     <u>Proceeds of Policies</u>. If at any time the Company receives any proceeds from any Policy that is not a Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

(a)     first, to Rechnitz by wire transfer into an account designated by Rechnitz, in an amount up to the Rechnitz Amount for such Policy;

(b)     second, (A) first, to each of the Lenders, pro-rata, based on the outstanding principal balance owed to such Lender as set forth on <u>Schedule C</u>, until such outstanding principal balance is equal to zero, in an aggregate amount up to the Klein Amount for such Policy and (B) second, any remaining Klein Amount with respect to such Policy to Klein by wire transfer into an account designated by Klein;

(c)     third, (i) 50% to Rechnitz by wire transfer into an account designated by Rechnitz and (ii) 50% to Klein by wire transfer into an account designated by Klein, provided, however, that if the balance of the Reserve Account is less than $2,500,000, then proceeds distributable to Klein under clause (ii) above shall be deposited in the Reserve Account until such balance is equal to $2,500,000.

Section 4.4     <u>Constructive Trust</u>. If any Member receives any proceeds in respect of any Policy (following the death of an Insured or otherwise), such Member shall hold such proceeds in a constructive trust for the Company and shall within one (1) Business Day inform the other Members and the Manager and deposit such proceeds in the Reserve Account.

Section 4.5     <u>Sale of Policies</u>. The Company shall be entitled to sell any Policy to any Person with the prior written consent of each of the Members. Notwithstanding the immediately preceding sentence, upon Klein's written consent, Rechnitz or his designee shall be entitled to purchase any Policy that is not a Non-Payment Policy from the Company by transferring an amount equal to the Klein Amount for such Policy to the Company, which for administrative convenience shall be subsequently distributed to an account designated by Klein.

Section 4.6     <u>Lenders</u>. The Members agree that (i) the Company may pay amounts pursuant to <u>Section 4.3(b)</u> directly to the Lenders, and in such event, the payments will be treated as distributions by the Company to Klein and subsequently transferred by Klein to the Lenders, (ii) nothing herein is intended to grant to the Lenders an equity interest in the Company, and (iii) nothing herein is intended to imply that the Company is assuming the obligations owed to the Lenders.

ARTICLE V
RESERVE ACCOUNT

Section 5.1     <u>Establishing a Reserve Account</u>. As soon as practicable the Company shall establish the Reserve Account with the Account Bank in the name of Company.

Section 5.2   <u>Distribution of Reserve Account</u>. Amounts in the Reserve Account shall be distributed to certain Members in certain specified amounts under the following circumstances: (a) if the amount of Net Income allocated to Klein with respect to a Policy under Section 4.1 for a Fiscal Year exceeds the amount of proceeds distributed to Klein with respect to such Policy pursuant to Section 4.3; then 40% of such excess shall be distributed to Klein from the Reserve Account; (b) if upon a disposition of a Policy or the receipt of proceeds from such policy, the Rechnitz Amount with respect to the Policy exceeds the amount of proceeds distributed to Rechnitz with respect to such Policy pursuant to Section 4.3, then the amount of such excess shall be distributed to Rechnitz from the Reserve Account; and (c) if agreed upon by the Members, then the amount agreed upon by the Members shall be distributed to Klein from the Reserve Account.

ARTICLE VI

MANAGEMENT; CONDUCT OF MEMBERS; GOVERNANCE OF THE COMPANY

Section 6.1   <u>Rights and Powers of Manager</u>. The business and affairs of the Company shall be managed by the Manager. The Manager shall direct, manage, and control the business of the Company to the best of the Manager's ability. Except for situations in which the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all acts or activities customary or incident to the management of the Company's business. Nothing contained in this Agreement shall require any person to inquire into the authority of the Manager to execute and deliver any document on behalf of the Company or to bind the Company pursuant to such document.

Section 6.2   <u>Number, Tenure and Qualifications</u>. The Company shall have one Manager, which initially shall be Jonathon Polter ("Polter"), an individual residing at ██████████████████████████████████████ Polter shall remain as the Manager unless he resigns from such position, is relieved of his duties by (i) if there are two Members or less, a unanimous vote of the Members and (ii) otherwise, an affirmative vote of Members holding a majority of the Interests. Subsequent Managers shall be elected by the affirmative vote of Members holding a majority of the Interests. Managers need not be residents of the State of California.

Section 6.3   <u>Officers</u>. The Manager may delegate the management of the Company's day-to-day business affairs to a Chief Executive Officer and other officers of the Company designated by the Manager and approved by an affirmative vote of Members holding a majority of the Interests and, unless otherwise decided by the Manager, all actions of the Company may be taken by the appropriate duly authorized officers.

Section 6.4   <u>Reliance</u>. The Manager shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any officers, employees, or committees of the Company, or by any other Person as to matters such Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including, without limitation, information, opinions, reports or

statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

Section 6.5    <u>Indemnification of Manager, Members and Officers.</u>

(a)    <u>General.</u>    The Company shall indemnify any Person (a "**Covered Person**") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including an action by or in the right of the Company) by reason of the fact that he is or was a Manager, Member or officer of the Company, or is or was serving at the request of the Company as a director, manager or officer of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith with no willful misconduct or gross negligence and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.    The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of <u>nolo contendere</u> or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b)    <u>Indemnification in Certain Cases.</u>    To the extent that a Covered Person has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in clause (a) of this <u>Section 6.5</u>, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

(c)    <u>Advances for Expenses.</u>    Expenses (including attorneys' fees) incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be ultimately determined that he is not entitled to be indemnified by the Company as authorized in this <u>Section 6.5</u>.

(d)    <u>Rights Non-Exclusive.</u>    The indemnification and advancement of expenses provided by, or granted pursuant to, the other subparagraphs of this <u>Section 6.5</u> shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law, agreement or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

(e)    <u>Insurance.</u>    The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was a Covered Person against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such,

whether or not the Company would have the power to indemnify him against such liability under the provisions of this Section 6.5.

(f)    Survival of Rights.  The indemnification and advancement of expenses provided by, or granted pursuant to this Section 6.5 shall continue as to a Person who has ceased to be an officer, Manager or Member and shall inure to the benefit of the heirs, executors and administrators of such Person.

Section 6.6    Exculpation.  No Member, Manager or officer of the Company shall be liable, in damages or otherwise, to the Company or its Members for any act or omission performed or omitted by such Member, Manager or officer pursuant to authority granted by this Agreement except to the extent such Person fails to meet the standard for indemnification set forth in Section 6.5(a).

Section 6.7    No Duties.  Any duties (including fiduciary duties) of a Covered Person to the Company or to any other Covered Person that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, provided, that (i) the foregoing shall not eliminate the obligation of each Member and the Manager to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied covenant of good faith and fair dealing.

Section 6.8    Protection of Insured's Private Information.  Manager and each Member acknowledge that insurance regulations and other applicable Laws are structured to provide confidentiality to policy owners and insureds with respect to Consumer Information in connection with ownership or sale of their policies, and that the Manager and each Member and all of their respective agents and representatives, are obligated to keep Consumer Information confidential in accordance with applicable Laws.  The Manager and each Member agree to comply with all applicable Laws with respect to the confidentiality of Consumer Information; provided, that (i) the Manager and each Member may disclose such information to their internal or external auditors and attorneys and as required or permitted by Law, and (ii) Klein may take all necessary and appropriate actions to transfer ownership of the Policies to the Company.

Section 6.9    Delivery of Policy Files.  Klein shall deliver each Policy File as directed by the Manager within thirty (30) Business Days of the date of this Agreement.

Section 6.10    Change Forms.  On the date of this Agreement, Klein shall execute and deliver Change Forms to the Company or at the Company's direction, changing the owner and Beneficiary of the Policy to the Company or the Company's designee.  In addition, Klein shall execute and deliver any additional instruments of transfer that the Company may reasonably request necessary to evidence the assignment of the Policy and any rights therein to the Company or its designee.

Section 6.11    Further Assurances.  From and after the date hereof, each Member shall execute and deliver such other documents and instruments, and take such further actions, as may be reasonably requested from time to time by another Member to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby.  Without limiting the foregoing, Klein shall cooperate with Rechnitz in causing the Company or its designee to be

50028620.3

recorded as the owner and beneficiary of each Policy on the books and records of the relevant issuing insurance companies.

Section 6.12    Indemnification of Rechnitz.    Klein shall indemnify and hold harmless (which indemnification shall survive any termination of this Agreement and the dissolution of the Company) Rechnitz and his Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an **"Indemnified Person"**), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and actual expenses incurred (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person, and in connection with or arising out of (i) any breach of any representation, covenant or other obligation of Klein hereunder, (ii) the transactions contemplated hereunder, (iii) any actions or failures to act in connection therewith or (iv) and any and all reasonable legal costs and actual expenses arising out of or incurred in connection with disputes between or among Klein and Rechnitz (collectively, **"Indemnified Liabilities"**); provided, that Klein shall not be liable for any indemnification to an Indemnified Person to the extent that any such Indemnified Liability results from that Indemnified Person's gross negligence or willful misconduct; provided, further, that the aggregate amount of Klein's liability under this Section 6.12 shall be limited to the aggregate of the Rechnitz Amounts for all of the Policies.

ARTICLE VII
REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Section 7.1    Representations and Warranties of Klein.

(a)    Power and Authority.    Klein has full power, authority and right to execute and deliver this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of its obligations hereunder.

(b)    Binding Obligation.    This Agreement constitutes the legal, valid and binding obligations of Klein enforceable against Klein in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(c)    Consent of Third Parties.    No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by Klein in connection with the execution of this Agreement and the compliance by Klein with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Klein of any other action contemplated hereby.

(d)    Policies.    With respect to each Policy, to the best of Klein's knowledge:

(i)      at the issuance of such Policy, the related Insured or Original Owner thereof was not a party to any written or oral agreement or arrangement to cause the same or interests therein to be issued, assigned, sold, transferred, or otherwise disposed of in violation of applicable law or public policy;

(ii)     at the issuance of such Policy, the related Insured or Original Owner thereof had the financial capacity to pay the premiums necessary to maintain such Policy in force;

(iii)    at the issuance of such Policy the related Original Owner had an insurable interest in the life of the Insured;

(iv)     the material medical or financial information supplied by or on behalf of the Insured or Original Owner of such Policy in the application and related materials delivered to the applicable issuing insurance company in connection with the issuance of such Policy was not false, incomplete or misleading in any material respect;

(v)      Klein does not possess or control any material documentation or information related to such Policy, or the acquisition or maintenance thereof by Klein, that has not been delivered or disclosed in writing to Rechnitz or his agents;

(vi)     prior to the date of this Agreement and the consummation of the transactions contemplated by [insert transfer agreement title], Klein was trustee of the applicable Original Owner which held sole legal and beneficial title thereto;

(vii)    Klein, in his capacity as trustee of the applicable Original Owner, acquired sole legal and beneficial title thereto and had the power and authority to enter into this Agreement;

(viii)   Immediately prior to its transfer to the Company hereunder, Klein held sole legal and beneficial title thereto;

(ix)     upon the transfer of such Policy, Company or its designee, will hold good and marketable title to and ownership of such Policy free and clear of any liens, charges, rights, encumbrances or other interests;

(x)      such Policy was acquired in a manner in compliance, in all material respects, with the Laws applicable to the purchase of life insurance policies, as then in effect and as then interpreted by the relevant regulators or in case law;

(xi)     except as disclosed to Rechnitz in writing, no previous owner of such Policy has waived, amended or terminated any material provision of, or any material rights in relation to, such Policy;

(xii)    except as disclosed on Schedule 7.1(d)(xii), the premiums for such Policy have been paid such that such Policy will not be in a grace period as of the date of this Agreement and such Policy has not been cancelled as of the date of this Agreement;

9

(xiii)    Klein has disclosed or delivered to Rechnitz and the Company in writing all information received by Klein or any of his agents from the related issuing insurance company related to any change in the terms of such Policy, including with respect to an intent to increase the cost of insurance for such Policy;

(xiv)    there is no current or pending written notice that has been issued to Klein by the related issuing insurance company of such issuing insurance company's intention to cancel, contest, rescind or refuse payment under such Policy;

(xv)    all the information contained in each of the documents in the related Policy File or otherwise delivered by or on behalf of Klein to the Company and Rechnitz in connection with such Policy is true, complete and correct in all material respects;

(xvi)    the related Policy File contains the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

(xvii)    there is not any pending or threatened Proceeding challenging the validity, ownership or enforceability of such Policy or Klein's ownership rights in such Policy;

(xviii)    such Policy was not issued pursuant to or in connection with an agreement whereby the premiums required to be paid on such Policy were paid by any Person pursuant to a recourse or non-recourse premium financing program;

(xix)    Klein has not required any broker to sign an agreement offering Klein or any other Person the "right of last offer" in connection with the purchase of such Policy; and

(xx)    such Policy has been issued by the related issuing insurance company and is in force and any related contestability period and any suicide exclusion period has expired.

Section 7.2    <u>Representations and Warranties of Rechnitz</u>.  Rechnitz hereby represents and warrants that:

(i)    <u>Authority</u>.  Rechnitz has full power, authority and right to execute this Agreement and has, and will continue to have during the entire term of this Agreement, full power and authority to perform his obligations hereunder, and has taken all necessary action to authorize the execution and delivery of this Agreement, as well as the performance of his obligations hereunder.

(ii)    <u>Binding Obligation</u>.  This Agreement constitutes Rechnitz's legal, valid and binding obligation, enforceable against Rechnitz in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

(iii)    <u>Consent of Third Parties</u>.  No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or

Governmental Authority is required by Rechnitz in connection with the execution of this Agreement and the compliance by Rechnitz with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Rechnitz of any other action contemplated hereby.

ARTICLE VIII
ADMISSION OF MEMBERS

Section 8.1    Admission of Members.  Subject to Section 8.2, upon the approval of the Members by majority vote, one or more Persons may be admitted to the Company as Members. The Members by majority vote shall determine the number of Interests and the Percentage Interest to be offered to any such Member and the Initial Capital Contribution to be made by any such Member.  Each such Person shall be admitted as a Member at the time such Person (a) executes and delivers a copy of this Agreement to the Manager and (b) if applicable, makes its Initial Capital Contribution to the Company.  The Manager shall update Schedule A to reflect the admission of any such Members.

Section 8.2    Admission of Non-Payment Policy Members.    It is agreed and acknowledged by the Members that Rechnitz's sole obligation with respect to the Company is making Capital Contributions for the payment of premiums on the Policies and the expenses associated with the Policies, in each case after the date of this Agreement.  Rechnitz shall provide the Company and Klein with six (6) months prior written notice if Rechnitz elects to cease paying premiums in respect of any Policy (such Policy, a **"Non-Payment Policy"**).  After delivery of such notice, Rechnitz or Klein shall have the right to introduce any Person to the Company as a potential Member who agrees in writing to assume Rechnitz's obligations for the payment of premiums and other costs and expenses with respect to such Non-Payment Policy, which person shall be admitted as a Member upon the approval of the Members by [majority] vote (such a Member, a **"Non-Payment Policy Member"**).  With respect to any Non-Payment Policy, any payment of premiums and other costs and expenses shall be contributed to the capital of the Company by the applicable Non-Payment Policy Member.  If at any time the Company receives any proceeds from any Non-Payment Policy (following the death of an Insured or otherwise), then any such proceeds shall be distributed as follows:

> (a)    First, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount up to (x) the total amount of Capital Contributions made on such Policy by such Non-Payment Policy Member and (y) the Priority Return of such Non-Payment Policy Member on such Policy computed starting on the date such Non-Payment Policy Member was admitted as a Member;

> (b)    Second, by wire transfer into an account designated by Rechnitz, in an amount equal to the Rechnitz Amount for such Policy;

> (c)    Third, by wire transfer into an account designated by Klein, in an amount equal to the Klein Amount for such Policy;

50028620.3

(d)     Fourth, to the applicable Non-Payment Policy Member by wire transfer into an account designated by such Non-Payment Policy Member, in an amount equal to fifty percent (50%) of all remaining proceeds from such Policy;

(e)     Fifth, to Rechnitz and Klein by wire transfers into accounts respectively designated by them in proportion to the Capital Contributions made by them with respect to each such Non-Payment Member Policy; provided, however that if Klein introduced the related Non-Payment Policy Member to the Company, then 25% of the amount distributable under this clause (e) to Rechnitz shall be distributed to Klein instead.

Notwithstanding Section 4.1 hereof, Net Income associated with a Non-Payment Policy shall be allocated to each Member to the extent of any Priority Return distributed to such Member with respect to the Non-Payment Policy and to the extent of any distributions made to a Member pursuant to Section 8.2(d) or Section 8.2(e) above with respect to such Non-Payment Policy . Notwithstanding Section 4.1 hereof, Net Losses associated with a Non-Payment Policy shall be allocated to each Member in proportion to the Capital Contributions made by such Member with respect to such Non-Payment Policy.

ARTICLE IX
MAINTENANCE OF BOOKS AND RECORDS;
REPORTS TO MEMBERS; TAX RETURNS

Section 9.1   Accounting Method and Records.   Rechnitz shall determine the accounting method to be used by the Company.  The Company shall maintain such accounting records as shall reflect all Company transactions and as shall be appropriate and adequate for the Company's business.

Section 9.2   Company Records.  The Company shall maintain the following records, within or outside the State of California: (a) a copy of the Company's accounting records and federal, state, local and foreign income tax or information returns and reports, if any, for the five most recent Fiscal Years; and (b) all other records and reports required by the Act or otherwise to be maintained by the Company.   Each Member, and such Member's duly authorized representatives or agents, shall, for any purpose reasonably related to his interest as a Member, have reasonable access to such books and records at such office and shall have the right to inspect and copy such books and records; provided, however, that if a Member was an officer, consultant or employee of the Company received his/her Interest pursuant to a profits interests grant agreement ceases to be an employee, consultant or officer of the Company, such Member shall only have the right to receive books and records that he/she has the right to require the Company to provide to him/her in accordance with applicable law.

Section 9.3   Company Reports.  The Company shall cause to be furnished to each Member and each other Person who was a Member during the period in question (a) such reports and financial statements as may be reasonably required for his financial reporting requirements, including, without limitation, copies of all annual, quarterly and monthly financial statements, and (b) detailed financial statements and information and documents (including Form K-1) necessary or desirable for the preparation or support of such Member's tax returns required in any jurisdiction, as soon as practicable after the end of each Fiscal Year.

50028620.3

Section 9.4    <u>Designation of Tax Matters Member</u>.  Rechnitz is designated the "**Tax Matters Member**" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

Section 9.5    <u>Tax Treatment and Elections</u>.  The Company shall be treated as a partnership for federal income tax purposes, the Members shall be treated as partners for federal income tax purposes, and each of the Members agrees to report consistently with such treatment. The Manager shall make all elections necessary to give effect to such treatment.

ARTICLE X
TRANSFER OF INTERESTS; SPECIAL PROVISIONS

Section 10.1    <u>Transfers and Assignments</u>.

(a)    No Member shall be permitted to Transfer any Interest to a Person other than a Permitted Transferee, except in accordance with the provisions set forth in this <u>Article X</u>.

Section 10.2    <u>Permitted Transfers</u>.

(a)    Each Member shall notify the Manager and the other Members of any proposed Transfer to a Permitted Transferee by such Member, or by any of its Affiliates, in the case of an indirect Transfer of an Interest, which notice shall set forth the name and address of the Permitted Transferee and the nature of the relationship between such Member and such Permitted Transferee, at least ten (10) calendar days prior to the proposed date of such Transfer. Each Member shall be responsible for paying all transfer, gains or similar taxes, if any, and all reasonable costs and expenses of the Company, including reasonable attorneys' fees, arising out of any Transfer by such Member of all or a portion of its Interest (or by any of its Affiliates in the case of an indirect Transfer of an Interest) to a Permitted Transferee.  As a condition to any Transfer of all or any portion of an Interest in the Company to a Permitted Transferee shall execute and deliver to the Company a joinder agreement, in form of <u>Exhibit A</u> (a "**Joinder Agreement**").  All of the provisions of this Agreement, including without limitation, the provisions of this <u>Article X</u>, shall be applicable to and binding upon each Permitted Transferee.

(b)    The transfer by a Member of all or any portion of its Interest (including, without limitation, any transfer to a Permitted Transferee) shall not release such Member from any or all of its obligations under this Agreement arising prior to the date of such Transfer.

Section 10.3    <u>Substitute Members</u>.  A Permitted Transferee of the Interest of a Member or a transferee of the Interest of a Member pursuant to <u>Sections 10.4</u> and <u>10.5</u> of this Agreement, or any portion thereof, shall become a substitute Member entitled to all the rights, and subject to all of the obligations and restrictions, of the transferor Member if, and only if:

(a)    the transferor assigns the transferee such right;

13

(b)    the transferor or transferee pays to the Company all reasonable costs and expenses incurred by the Company in connection with such substitution; and

(c)    the transferee executes and delivers a Joinder Agreement.

Section 10.4    Right of First Refusal.

(a)    Except for Transfers pursuant to or contemplated by Section 10.2, if any Member (a "**Selling Member**") receives a bona fide written offer from an independent third party (a "**Third Party**") to purchase any or all of such Selling Member's Interests for cash and such Selling Member desires to Transfer any or all of such Interests (the "**Offered Interests**") pursuant to such offer, prior to any Transfer it shall give written notice of the proposed Transfer (the "**Notice of Intention**") to the Company and the other Members (the "**Remaining Members**") specifying the number of Offered Interests which such Selling Member wishes to Transfer, the proposed transferee, the proposed purchase price for the Offered Interests (the "**Offer Price**") and the other material terms and conditions of the proposed Transfer.

(b)    For a period of thirty (30) days after receipt of the Notice of Intention (the "**Option Period**"), each of the Remaining Members shall have the irrevocable option to purchase at the Offer Price and on the other terms specified in the Notice of Intention, all of the Offered Interests pro rata based on the Percentage Interest of each Remaining Member; provided, however, that if any Remaining Member does not purchase any or all of its pro rata portion of such Offered Interests, the other Remaining Members shall have the right to purchase such portion, pro rata, until all of such Offered Interests are purchased. The option of a Remaining Member pursuant to this Section 10.4(b) (the "**Remaining Members Option**") shall be exercisable by delivery of a notice (the "**Remaining Members Notice**") setting forth the maximum number of Offered Interests that such Remaining Member wishes to purchase, including any number which would be allocated to such Remaining Member if any other Remaining Member does not purchase all or any portion of its pro rata portion, to the Selling Member, the Company and the other Remaining Members and shall expire if the Remaining Members Notice is not delivered prior to the expiration of the Option Period.

(c)    If all notices required to be given pursuant to this Section 10.4 have been duly given, and the Remaining Members determine not to exercise their respective options to purchase all of the Offered Interests at the Offer Price and on the other terms specified in the Notice of Intention or determine, with the consent of the Selling Member, to exercise their options to purchase less than all of the Offered Interests, then the Selling Member shall have the right, for a period of ninety (90) days from the earlier of (a) the expiration of the Option Period and (b) the date on which such Selling Member receives notice from the Remaining Members that they will not exercise the option granted pursuant to this Section 10.4, to accept the bona fide offer from the Third Party and enter into an agreement to sell the Offered Interests remaining unsold under this Section 10.4 at a price not less than the Offer Price and on the same terms as set forth in the Notice of Intention; provided that prior to any such Transfer to a Third Party, such Third Party executes and delivers to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby becomes a party to this Agreement.

14

(d)    The closing of any purchase and sale of any Interests to a Remaining Member pursuant to this Section 10.4 shall take place at the offices of the Company on such date, not later than sixty (60) days after the delivery to the Selling Member of the Remaining Members Notice. At the closing of such purchase and sale, the Secretary or such other officer of the Company shall record such Transfer in the books of the Company against evidence of such Transfer, delivery of the Offer Price therefor and an executed Joinder Agreement.

(e)    If the Remaining Members Option is not exercised, and the Offered Interests are not sold pursuant to Section 10.4(c) within the ninety (90) day period referred to therein, such sale may not be carried out without complying again with the terms of this Section 10.4.

Section 10.5    Tag-Along Rights and Obligations.

(a)    In the event that after complying with the terms of Section 10.4, the Selling Member desires to sell (the "Disposition") the Offered Securities to a Third Person (the "Acquirer"), the Selling Member's right to accept such offer to purchase the Offered Securities shall be conditioned on each Remaining Member being offered the right to sell to the Acquirer its pro rata portion of the Offered Securities (based on the Percentage Interest of each Remaining Member) in such Disposition in accordance with this Section 10.5. The Selling Member shall give notice (the "Disposition Notice") to each Remaining Member at least thirty (30) days prior to the consummation of the Disposition specifying the number of Offered Interests which such Selling Member wishes to Transfer in the proposed Disposition, the proposed transferee, the proposed purchase price for the Offered Interests and the other material terms and conditions of the proposed Disposition.

(b)    The election to participate in the Disposition by the Remaining Members pursuant to Section 10.5(a) shall be exercised by notice to the Selling Member given within the time period specified in the Disposition Notice, which time period shall not be less than fifteen (15) days after such Disposition Notice is given. If any Remaining Member gives notice of its election to sell, it shall be obligated to sell the number of Interests specified in such Remaining Member's notice upon the terms and subject to the conditions specified in Section 10.5(a) to the Acquirer (which shall be the same for the other Remaining Members and the Selling Member), conditional upon the closing of the Disposition.

(c)    The sale or Transfer of Interests to the Acquirer by the Selling Member and by the Remaining Members electing to participate in the Disposition pursuant to this Section 10.5 shall occur simultaneously and be on the same terms and at the same price as the Interests sold by the Selling Member; provided that prior to any such Transfer to an Acquirer, such Acquirer shall execute and deliver to the Company, for the benefit of the Company and all Members, a Joinder Agreement and thereby become a party to this Agreement.

(d)    If the Acquirer declines to purchase from such Remaining Members their respective proportionate number of Interests calculated in accordance with this Section 10.5, the Selling Member will not sell any Interests to the Acquirer.

Section 10.6    <u>Miscellaneous Provisions Affecting Transfer</u>.

(a)    Upon the Transfer of all or any portion of a Member's Interests as permitted or required under this Agreement, including, without limitation, as provided in this <u>Article X</u>, (i) the income, loss, gain, deduction and credit attributable to the Interests so transferred shall be allocated between the transferor and transferee based upon the number of days during the applicable Fiscal Year that the Interests so transferred was held by each of them, without regard to the results of Company activities during the period in which each was the holder; provided that the Manager shall, at the request and expense of the transferring Member, cause an interim closing of the Company's books as of the effective date of Transfer for purposes of allocating such items between the transferor and transferee; and (ii) the transferor shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods preceding the date of Transfer, and the transferee shall be entitled to all cash distributions in respect of the Interests so transferred, to the extent allocable to periods on and after the date of Transfer based upon the number of days during the applicable Fiscal Year that the Interests so transferred were held by each of them, without regard to the results of Company activities during the period in which each was the holder.

(b)    The Company shall be entitled to treat the record owner of any Interests as the absolute owner thereof, and shall incur no liability for distributions of cash or other property or allocations of income, gain, loss, deduction or credit made in good faith to such owner until such time as a written assignment of such Interests has been received, accepted and recorded on the books of the Company.

ARTICLE XI

DISSOLUTION, LIQUIDATION, TERMINATION AND CONVERSION

Section 11.1    <u>Dissolution, etc</u>. The Company shall be dissolved upon the occurrence of any of the following events (the date of such occurrence, the "**Dissolution Date**"):

(a)    As approved by the majority vote of the Members; or

(b)    As otherwise required by applicable law.

Section 11.2    <u>Winding Up</u>.

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company in accordance with this <u>Section 11.2</u>.

(b)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be

16

considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(c)    The Members shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

Section 11.3    Final Distribution.    After the application or distribution of the proceeds of the liquidation of the Company's assets in one or more installments to the satisfaction of the liabilities to creditors of the Company, including to the satisfaction of the expenses of the winding-up, liquidation and dissolution of the Company (whether by payment or the making of reasonable provision for payment thereof), the remaining proceeds, if any, plus any remaining assets of the Company shall be distributed to the Members in accordance with Sections 4.3 and 8.2, as applicable.

Section 11.4    Time for Liquidation, etc.    A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Company to seek to minimize potential losses upon such liquidation. The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of a certificate of cancellation of the certificate with the Secretary of State of the State of California.

Section 11.5    Termination.    Upon completion of the winding up of the Company, the Manager (or any duly elected liquidating trustee or other duly designated representative) shall execute, acknowledge and cause to be filed a certificate of cancellation of the Certificate with the Secretary of State of the State of California.    Upon the cancellation of the Certificate, this Agreement and the Company shall terminate.

Section 11.6    Return of Contribution Nonrecourse to Other Members.    Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

## ARTICLE XII
## DISPUTE RESOLUTION

Section 12.1    Rabbinical Counsel.    If any dispute arises between the Members regarding this Agreement or any provision hereof, that dispute shall be resolved through a binding arbitration proceeding to be conducted in the State of California in accordance with the commercial arbitration rules of the Rabbinical Council of California.

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1    Entire Agreement.    This Agreement, taken together with the other documents expressly referred to herein, each as amended or supplemented, constitutes the entire

17

agreement among the parties with respect to the subject matter herein or therein and supersedes any prior agreement or understanding among the parties hereto.

Section 13.2    Other Ventures.  The Manager or any Member, and any firm, corporation or association with which the Manager or any Member is in any way interested or connected, may act as attorney for, deal and contract with, and be employed by the Company, and the Manager or any Member may be, in any manner, interested in or connected with any corporation, association or business in which the Company is directly or indirectly interested, all in the same manner and with the same freedom as though not a Manager or a Member, as the case may be, and without accountability for any profit, benefit or compensation received in connection with such actions or relationships, none of which shall be void or voidable.

Section 13.3    Amendments.  This Agreement may be amended only with the written consent of a Majority in Interest; provided that any such amendment that materially adversely affects the rights and privileges of any Member (other than any amendment effected in connection with the making of a Capital Contribution to the Company by, and/or the issuance of additional Interests to, any Member, including, without limitation, any amendment to the rights and privileges of the Interests to reflect dilution resulting from such Capital Contributions or issuance of additional Interests) must be consented to by each of the Members so affected[; provided further, that any amendment to this Agreement shall not be effective without the consent of Rechnitz].

Section 13.4    Choice of Law.  This Agreement shall be construed in accordance with the laws of the State of California, without regard to the choice of laws rules thereof, and the obligations, rights and remedies of the Members hereunder shall be determined in accordance with such laws.

Section 13.5    Successors and Assigns; Third Party Beneficiaries.  This Agreement shall be binding upon, and, subject to Article X, shall inure to the benefit of, the parties and their legal representatives, heirs, administrators, executors, successors and permitted assigns.  Except as otherwise expressly provided herein, none of the provisions of this Agreement shall be for the benefit of or enforceable by any Person not a party hereto.

Section 13.6    Interpretation.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or neuter gender shall include the masculine, the feminine and the neuter.

Section 13.7    Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend or otherwise affect the scope or intent of this Agreement or any provision hereof.

Section 13.8    Severability.  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement, or the application of such provision in jurisdictions or to Persons or circumstances other than those to which it is held invalid, illegal or unenforceable, shall not be affected thereby.

18

Section 13.9    Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Section 13.10    Non-Waiver.  No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in a written notice given to the party claiming such waiver has occurred; provided that no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

Section 13.11    Notices.  All notices, requests, demands, claims and other communications that are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by confirmed facsimile with a copy sent by another means specified herein; the business day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five business days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

> if to the Company:
>
> c/o Shlomo Rechnitz
>
> ███████████████████████████████
>
>
> with a copy to:
>
> Leslie Klein
>
> ███████████████████████████████

and if to a Member, to the Member's address or facsimile number on the books records of the Company, or to such other address with respect to the Company or a Member as the Company or such Member, as applicable, notifies the Company and the other Members in writing as provided above.

## ARTICLE XIV
## DEFINITIONS

Section 14.1    Definitions.

References in this Agreement to an "Exhibit" are intended to refer, unless otherwise specified, to an Exhibit attached to this Agreement, and references in this Agreement to an "Article" or a "Section" are intended to refer, unless otherwise specified, to an Article or a Section of this Agreement.  As used in this Agreement, the following terms shall have the respective meanings set forth below:

19

S0028620.3

"**Account Bank**" means PrivateBancorp, Inc.

"**Act**" shall have the meaning specified in the recitals to this Agreement.

"**Affiliate**" means any Person that, directly or indirectly, through one or more intermediaries, is Controlled by one or more Members. As used in this definition, "Control" means either (a) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting stock of a corporation, or in the case of any Person which is not a corporation, the ownership, directly or indirectly, of at least fifty percent (50%) of the beneficial ownership interests in such Person, or (b) irrespective of stock ownership or other beneficial ownership, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person.

"**Agreement**" means this Limited Liability Company Agreement, as the same may be amended hereafter from time to time as provided herein.

"**Available Cash**" means, at the time of determination, cash generated from revenues from the Company's operations, after provision has been made for (a) all expenditures paid or to be paid by the Company to non-Members and (b) such amounts as the Manager, in his sole discretion, shall deem reasonable in order to provide for any anticipated, contingent or unforeseen expenditures or liabilities of the Company. Available Cash shall be determined without regard to (i) Capital Contributions and (ii) principal advanced on Company indebtedness.

"**Beneficiary**" means, with respect to the Policy, the legal person or persons designated as the recipients of the Death Benefit for such Policy.

"**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Member by crediting such Member's Capital Contributions, such Member's share of Net Income, and the amount of any Company liabilities that are assumed by such Member (other than liabilities that are secured by any Company property distributed to such Member) and by debiting the amount of cash and the gross fair market value of any Company property distributed to such Member pursuant to any provision of this Agreement (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752), such Member's share of Net Losses, and the amount of any liabilities of such Member that are assumed by the Company (other than liabilities that are secured by any property contributed by such Member to the Company).

"**Capital Contribution**" means, with respect to any Member, the amount of money and the initial gross fair market value of any property contributed (or deemed contributed) from time to time by such Member to the Company (net of any liabilities secured by such property or to which such property is otherwise subject). The initial gross fair market value of each Policy contributed by Klein shall equal the sum of the total amount of premium payments made on such Policy by Klein and all other costs and expenses incurred by Klein in servicing and maintaining such Policy as of the date of this Agreement. Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution made

20

by any predecessor of a Member. For purposes of this Agreement, a Capital Contribution shall include, without limitation, any Initial Capital Contribution.

"**Certificate**" has the meaning set forth in Section 1.1.

"**Change Forms**" means the forms changing the owner and Beneficiary of the Policy using such form as is required by each of the relevant issuing insurance companies.

"**Code**" means the Internal Revenue Code of 1986, as amended, and as the same may be amended hereafter from time to time.

"**Company**" shall have the meaning specified in the preamble hereto.

"**Consumer Information**" means medical, health, financial and personal information about an Insured, an Original Owner, a Beneficiary under a Policy or a person designated by an Insured to provide periodic information regarding the medical status of the Insured, or any spouse or other individual closely related by blood or law to any such person (each, a "**Consumer**"), including, without, limitation, a Consumer's name, street or mailing address, email address, telephone or other contact information, employer, social security or tax identification number, date of birth, driver's license number, photograph or documentation of identity or residency (whether independently disclosed or contained in any disclosed document such as a Policy, life expectancy evaluation, life insurance application or life settlement application).

"**Covered Person**" shall have the meaning specified in Section 6.5(a).

"**Death Benefit**" means the cash amount of a Policy to be paid upon the death of the applicable Insured under such Policy, which amount will be net of any policy loans made under such Policy (and accrued interest thereon).

"**Disposition**" shall have the meaning specified in Section 10.5(a).

"**Disposition Notice**" shall have the meaning specified in Section 10.5(a).

"**Dissolution Date**" shall have the meaning specified in Section 11.1.

"**Fiscal Period**" means, subject to the provisions of Section 706 of the Code, (i) any Fiscal Year and (ii) any portion of a Fiscal Year for which the Company is required to allocate Net Income, Net Losses or other items of Company income, gain, loss or deduction pursuant to Article IV.

"**Fiscal Year**" shall have the meaning specified in Section 1.7.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Indemnified Liabilities**" shall have the meaning specified in Section 6.12.

"**Indemnified Person**" shall have the meaning specified in Section 6.12.

"**Initial Capital Contribution**" means, with respect to each Member, such Member's Initial Capital Contribution set forth on Schedule A.

"**Insured**" means, with respect to a Policy, each person whose life is insured under such Policy.

"**Interest**" means, with respect to any Member, (a) such Member's share of the profits and losses of the Company and a Member's rights to receive distributions from the Company in accordance with the provisions of this Agreement and the Act and (b) such Member's other rights and privileges in respect of the Company as herein provided.

"**Joinder Agreement**" shall have the meaning specified in Section 10.2(a).

"**Klein Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Klein related to such Policy and (y) the Priority Return for Klein on such Policy.

"**Law**" means any law, constitution, statute, ordinance, code, rule, regulation, decision, order, consent, decree, judgment, ordinance, release, license, permit, stipulation or other pronouncement having the effect of law enacted or issued by any Governmental Authority, any foreign country, or domestic or foreign state, country, city or other political subdivision, which includes binding judicial precedent and principles of common law.

"**Lender**" shall mean each lender identified on Schedule C.

"**Majority in Interest**" means Members that at the time in question together hold a Percentage Interest greater than 50% in the aggregate.

"**Manager**" means one or more persons designated as such pursuant to this Agreement.

"**Members**" means, collectively, the members signatory to this Agreement, and any other Persons admitted to the Company as members after the date hereof in accordance with the terms of this Agreement.

"**Net Income**" and "**Net Losses**" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss and each item of income, gain, expense, deduction and loss shall be allocable to the Members in accordance herewith).

"**Non-Payment Policy**" shall have the meaning as specified in Section 8.2.

"**Non-Payment Policy Member**" shall have the meaning as specified in Section 8.2.

50028620.3

"**Notice of Intention**" shall have the meaning as specified in Section 10.4(a).

"**Offer Price**" shall have the meaning as specified in Section 10.4(a).

"**Offered Interests**" shall have the meaning specified in Section 10.4(a).

"**Option Period**" shall have the meaning as specified in Section 10.4(b)

"**Original Owner**" means, with respect to a Policy, the Person to which the Policy was initially issued and who was listed as owner on the initial declarations page of such Policy or the policy application, as applicable.

"**Percentage Interest**" means, with respect to any Member as of any date of determination, a fraction (expressed as a percentage) having as its numerator the aggregate number of Interests held by such Member at such time, and having as its denominator the aggregate number of Interests held by all Members at such time. Each Member's Percentage Interest as of the date hereof, and as adjusted from time to time, is set forth on Schedule A.

"**Permitted Transferee**" means (a) with respect to any Member who is an individual, such member's siblings, parents, spouse (former spouse, if any), and children, and trusts solely for the benefit of any of the foregoing, and (b) with respect to any Member that is an entity, an Affiliate of such Member. [**Anyone else?**]

"**Person**" means any individual or any corporation, partnership, limited liability company, limited liability partnership, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other legal entity.

"**Policy**" means each of the life insurance policies contributed to the capital of the Company by Klein, as specified in Schedule B hereto.

"**Policy File**" means, with respect to a Policy, the file relating to such Policy which file shall include, without limitation, the Policy, the original application for such Policy, any Policy Illustration and any other documentation in Klein's possession.

"**Policy Illustration**" means, with respect to a Policy, a policy illustration from the related issuing insurance company.

"**Polter**" shall have the meaning set forth in Section 6.2.

"**Priority Return**" of a Member with respect to any Policy shall mean an annual rate of return of 12% on the total amount of Capital Contributions made by a Member with respect to such Policy from the date such Capital Contribution were made but computed no earlier than from the date of this Agreement. .

"**Rechnitz Amount**" shall mean, with respect to any Policy, (x) the total amount of Capital Contributions made by Rechnitz related to such Policy and (y) the Priority Return for Rechnitz on such Policy.

23

"**Remaining Members**" shall have the meaning specified in Section 10.4(a).

"**Remaining Members Notice**" shall have the meaning specified in Section 10.4(b).

"**Remaining Members Option**" shall have the meaning specified in Section 10.4(b).

"**Reserve Account**" means account number [___] established at Account Bank.

"**Selling Member**" shall have the meaning specified in Section 10.4(a).

"**Third Party**" shall have the meaning as specified in Section 10.4(a).

"**Transfer**" means, as a noun, any voluntary or involuntary, and direct or indirect, assignment, transfer, pledge, syndication, sale, hypothecation, contribution, encumbrance or other disposition or purported disposition, and, as a verb, voluntarily or involuntarily, and directly or indirectly, to assign, transfer, pledge, syndicate, sell, hypothecate, contribute, encumber or otherwise dispose of.

"**Tax Matters Member**" shall have the meaning specified in Section 9.4.

"**Treasury Regulations**" means the Income Tax Regulations promulgated under the Code, as the same may be amended hereafter from time to time.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the undersigned have executed this Limited Liability Company Agreement as of the date first set forth above.

SHLOMO RECHNITZ

_____

LESLIE KLEIN

_____

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California  90067**

A true and correct copy of the foregoing document entitled (*specify*): **RESPONSE TO THIRD-PARTY LIFE CAPITAL GROUP, LLC'S LIMITED OPPOSITION TO CHAPTER 11 TRUSTEE'S MOTION FOR ORDER AUTHORIZING 2004 EXAMINATION TO LIFE CAPITAL GROUP, LLC** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **January 3, 2024,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒    Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:  On (*date*) **January 3, 2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒    Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **January 3, 2024**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

| **Via Federal Express** | **Via Email:** |
|---|---|
| Honorable Sandra R. Klein | Simon Aron on behalf of Kenneth Klein and Shoshana Shrifa Klein:  saron@wrslawyers.com; moster@wrslawyers.com |
| United States Bankruptcy Court/Central District of California | |
| Edward R. Roybal Federal Building and Courthouse | |
| 255 E. Temple Street, Suite 1582 / Courtroom 1575 | Leslie Klein:  les.kleinlaw@gmail.com; leskleinlaw@gmail.com; kleinlaw@earthlink.net |
| Los Angeles, CA 90012 | |

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 3, 2024 | Nancy H. Brown | /s/ Nancy H. Brown |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
LA:4855-7325-5821.1 78512.001

**F 9013-3.1.PROOF.SERVICE**

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Case 2:23-bk-10990-SK

- **Simon Aron**   saron@wrslawyers.com, moster@wrslawyers.com
- **Reem J Bello**   rbello@goeforlaw.com, kmurphy@goeforlaw.com
- **Ron Bender**   rb@lnbyg.com
- **Michael Jay Berger**   michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Greg P Campbell**   ch11ecf@aldridgepite.com, gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
- **Baruch C Cohen**   bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com
- **Theron S Covey**   tcovey@raslg.com, sferry@raslg.com
- **Jeffrey W Dulberg**   jdulberg@pszjlaw.com
- **Dane W Exnowski**   dane.exnowski@mccalla.com, bk.ca@mccalla.com,mccallaecf@ecf.courtdrive.com
- **Alan W Forsley**   alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-lawyers.net,addy@flpllp.com
- **Robert P Goe**   kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- **Michael I. Gottfried**   mgottfried@elkinskalt.com, cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
- **Brandon J. Iskander**   biskander@goeforlaw.com, kmurphy@goeforlaw.com
- **Michael S Kogan**   mkogan@koganlawfirm.com
- **Marc A Lieberman**   marc.lieberman@flpllp.com, safa.saleem@flpllp.com,addy@flpllp.com
- **John W Lucas**   jlucas@pszjlaw.com, ocarpio@pszjlaw.com
- **Armen Manasserian**   armen@cym.law, jennifer@cym.law;cameron@cym.law;paul@cym.law
- **Ron Maroko**   ron.maroko@usdoj.gov
- **Kirsten Martinez**   Kirsten.Martinez@bonialpc.com, Notices.Bonial@ecf.courtdrive.com
- **Steven M Mayer**   smayer@mayerlawla.com
- **Christopher M McDermott**   ch11ecf@aldridgepite.com, CMM@ecf.inforuptcy.com;cmcdermott@aldridgepite.com
- **Krikor J Meshefejian**   kjm@lnbyg.com
- **Kenneth Misken**   Kenneth.M.Misken@usdoj.gov
- **Jeffrey P Nolan**   jnolan@pszjlaw.com
- **Eric J Olson**   eric@ejolsonlaw.com
- **Jeffrey N Pomerantz**   jpomerantz@pszjlaw.com
- **Brian A Procel**   bprocel@millerbarondess.com, rdankwa@millerbarondess.com;docket@millerbarondess.com
- **Joshua L Scheer**   jscheer@scheerlawgroup.com, jscheer@ecf.courtdrive.com
- **Mark M Sharf (TR)**   mark@sharflaw.com, C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
- **Bradley D. Sharp (TR)**   bsharp@dsi.biz
- **Richard P Steelman**   rps@lnbyg.com, john@lnbyb.com
- **Nikko Salvatore Stevens**   nikko@cym.law, mandi@cym.law
- **Alan G Tippie**   Alan.Tippie@gmlaw.com, atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com
- **Gary Tokumori**   gtokumori@pmcos.com
- **United States Trustee (LA)**   ustpregion16.la.ecf@usdoj.gov
- **Michael L Wachtell**   mwachtell@buchalter.com
- **John P. Ward**   jward@attleseystorm.com, ezhang@attleseystorm.com
- **Brett J. Wasserman**   wasserman@smcounsel.com
- **Alex M Weingarten**   aweingarten@willkie.com, lcarter@willkie.com
- **Clarisse Young**   youngshumaker@smcounsel.com, levern@smcounsel.com
- **Paul P Young**   paul@cym.law, jaclyn@cym.law
- **Roye Zur**   rzur@elkinskalt.com, cavila@elkinskalt.com;lwageman@elkinskalt.com;1648609420@filings.docketbird.com

## 2. SERVED BY UNITED STATES MAIL:

Peter C. Anderson, U.S. Trustee
Michael Jones, Assistant U.S. Trustee
Office of the U.S. Trustee
915 Wilshire Boulevard, Suite 1850
Los Angeles, CA  90017

Leslie Klein & Associates, Inc.
c/o Parker Milliken
555 Flower Street
Los Angeles, CA  90071

Nathan Talei
Oldman, Sallus & Gold, L.L.P.
16133 Ventura Blvd., PH-A
Encino, CA 91436

Leslie Klein
322 N. June Street
Los Angeles, CA 90001

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
LA:4855-7325-5821.1 78512.001

**F 9013-3.1.PROOF.SERVICE**