# EXHIBIT B

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2

NOTICE OF ERRATA

1  Hon. Glen M. Reiser (Ret.)
   JAMS
2  555 West 5th Street 32nd Floor
3  Los Angeles, CA 90013
   Tel: 213-253-9796
4
   COURT-ORDERED §639 REFEREE
5  ON SETTLEMENT OF ACCOUNT
6
7
                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
8
                      **COUNTY OF LOS ANGELES**
9

10 IN THE MATTER OF                    **Case No.: BP136769**[1]
11 THE FRANKLIN HENRY MENLO
   IRREVOCABLE TRUST               Assigned to LASC Dept. 3
12 ESTABLISHED                     Judge: Hon. Ana Maria Luna
   MARCH 1, 1983
13                                 JAMS Reference # 1220070187
14 AND CONSOLIDATED MENLO
   FAMILY TRUST CASES
15                                 **REPORT AND RECOMMENDATION OF THE
                                   COURT-APPOINTED REFEREE ON
16                                 EXAMINATION AND ADJUDICATION OF
                                   THE TRUSTEE'S FIRST, SECOND, AND
17                                 THIRD ACCOUNTINGS ON EACH OF THE
                                   TWENTY-FOUR TRUSTS AT ISSUE FOR
18                                 THE TRUST PERIODS SEPTEMBER 10, 1996-
                                   JUNE 30, 2013, JULY 1, 2013-DECEMBER 31,
19                                 2016 AND JANUARY 1, 2017-SEPTEMBER 30,
                                   2018**
20
                                   **[Code Civ. Proc. §639]**
21
                                     Referee: Hon. Glen M. Reiser (Ret.)
22
23
24
25
26 [1] Consolidated with LASC Case Nos BP139977; BP139978; BP139999; BP140000; BP140001;
   BP140002; BP140003; BP140004; BP140005; BP140007; BP140008; BP140009; BP140010; BP140011;
27 BP140012; BP140013; BP140014; BP140015; BP140016; BP140017; BP140018; BP140019; BP140020;
   and BP154676.
28
                REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
                                         1

**MATTERS APPLICABLE TO ALL THREE REFEREE'S REPORTS and
STATEMENT OF THE CASE**

**The Children's Trusts**

Sam Menlo ("Sam") and Vera Menlo ("Vera") raised five children: Madeline, Judith, Franklin, Deborah and Norine. In 1983, irrevocable trusts were created for the four oldest children and in 1985, an irrevocable trust was created for Norine.

The named grantor in each of the Children's Trusts is its beneficiary, not Sam or Vera. Under the trust terms, Frank's irrevocable trust, in which he is the named grantor, is to be distributed 25% of trust principal on his 30th birthday (March 1, 1990), 33% on his 35rd birthday (March 1, 1995), and the balance on his 40th birthday (March 1, 2000). Each of the four daughters' irrevocable trusts, in which each of them are the named grantor, is to be distributed 50% of trust principal on their respective 40th birthdays (extending from August 9, 1998 [Madelyn] to April 25, 2006 [Norine]), and 50% on their respective 50th birthdays (extending from August 9, 2008 [Madelyn] to April 25, 2016 [Norine].)[2]

Each of the Children's Trust agreements vests the Trustee with the management rights of an "absolute owner." Each of the Children's Trust agreements exculpates the Trustee from liability for any actions or failures to act of conducted "reasonably and in good faith." Each of the trust agreements authorizes an annual trustee fee of .05% of the sum of trust assets under management and that year's trust income.

The originally appointed co-trustees of the Children's Trusts died long ago. After a brief period of time in which family members, including Frank, served as a co-trustee, **on September 10, 1996**, Leslie Klein ("Klein"), a Beverly Hills estate planning attorney and certified public accountant, accepted his role as sole successor trustee of the Children's Trusts.

---

[2] Judith died on June 15, 2011. Accountings of Judith's trust have not been presented to the Referee nor are they part of the assigned reference determinations.

**The Grandchildrens' Trusts.**

Sam and Vera, both now deceased, had 36 grandchildren at the time of Vera's recent passing. In 1985, several months after the creation of Norine's trust, Sam and Vera had ten grandchildren: Dov Lipchitz, Rochelle Lipchitz, Avi Lipchitz, Faye Lipchitz, Asher Frankel, Yeshaya Frankel, Moishe Frankel, Mordechai Deutsch, Zev Deutsch and Jonathan Menlo. Sam and Vera established an irrevocable trust for each of them in October 1985.

Ten additional grandchildren were born between 1986 and 1993: Jeremy Winter, Michael Winter, Amanda Winter, Daniel Winter, Rochelle Deutsch, Abraham Deutsch, Samuel Deutsch, Esther Deutsch and Tanya Menlo. Sam and Vera established an irrevocable trust for each of them on various dates between November 1986 and October 1997.[3]

A trust also appears to have been created by Sam and Vera in December 2002 in favor of Jonathan Lifschutz, the husband of Sam and Vera's granddaughter, Rochelle Lipchitz. Accountings have been submitted by Klein with respect to Jonathan Lifschutz' trust, and have been the subject of objections included within the reference to the undersigned. The Jonathan Lifschutz Trust dated December 26, 2002 is intended to be included within the term "Grandchildren's Trusts."

Unlike the Children's Trusts, Sam and Vera were the named co-grantors of each of the Grandchildren's Trusts. Though virtually identical to the Children's' Trusts with respect to the breadth of trustee powers, exculpation from good faith actions or failures, and authorization for trustee fees, each of the Grandchildren's Trusts specifically articulates the Trustee's duty to account to each of the beneficiaries "annually or in other reasonable increments."

---

[3] The remaining sixteen grandchildren, all of whom were born after 1993, each have separate trusts managed by Klein; however, none of those remaining trusts are the subject of the instant accounting reference. The term "Grandchildren's Trusts" as used in this Report and Recommendation, therefore, is intended to exclude the trusts of any and all grandchildren born after 1993.

The distributive calculus of the Children's Trusts is replicated in the Grandchildren's Trusts; *i.e.*, 25% principal distribution to the males at age 30, 33% at age 35, the balance at age 40, with 50% principal distribution to the females at age 40 and the balance at age 50.[4]

As with the Children's Trusts, Klein agreed to serve as sole successor trustee of each of the Grandchildren's' Trusts effective September 10, 1996, with the exception of the two subject trusts created after that date, Daniel Winter and Jonathan Lifschutz, as to which Klein accepted the appointment as sole trustee upon trust creation in October 20, 1997 and December 26, 2002, respectively.[5]

**The Accounting Petitions in Their Statutory and Procedural Contexts.**

In 1990, six years before Klein assumed trusteeship of the Children's Trusts and the Grandchildren's Trusts, the California Legislature repealed and then reenacted the California Probate Code. (Stats. 1990, ch.79.)[6] One of the provisions repealed and reenacted is Probate Code §16062(a), which stated at the time of its enactment in 1986:

> "Except as provided in Section 16064, **the trustee shall account at least annually**, at the termination of the trust, and upon a change of trustees, to each beneficiary to whom income or principal is required or authorized in the trustee's discretion to be currently distributed." (Emphasis added.)[7]

---

[4] Klein testified at trial that he has never had any intention of distributing under these terms.

[5] Klein testified at trial that, in addition to being the named Trustee, he was the draftsman of these later trusts.

[6] Section 16062 was added by 1986 Cal. Stat. ch. 820 § 40 and amended by 1987 Cal. Stat. ch. 128 § 13. Subdivision (a) superseded parts of subdivisions (b) and (c) of former Probate Code Section 1120.1a and parts of former Probate Code Sections 1121 and 1138.1(a)(5) (provisions repealed by 1986 Cal. Stat. ch. 820 § 31). The requirement of an annual account is drawn from the statute formerly applicable to testamentary trusts created before July 1, 1977. See former Prob. Code § 1120.1a (repealed by 1986 Cal. Stat. ch. 820 § 31). [California Law Revision Commission, Recommendation Proposing New Probate Code, December 1989.]

The code section preface was amended to state "Except as otherwise provided in this section and in Section 16064" in 1983 when additional code subsections, none of which are applicable here, were added to §16062. [Stats. 1993 ch 293 §6.5.]

[7] Probate Code §16064 permits the language of a trust agreement to waive an accounting, and separately authorizes a beneficiary to waive an account in writing. None of the Children's Trusts or the Grandchildren's Trusts contain language waiving an account. The Grandchildren's Trusts require an

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
4

From the time of Klein's acceptance of 22 trusteeships in 1996, one in 1997, and one in 2002, until ordered by the Court in 2013, Klein never once accounted to any of the 24 beneficiaries.

While Klein did from time-to-time forward institutional brokerage account statements to one or more of the beneficiaries, the brokerage assets represent only a fraction of the scope of the Children's and Grandchildren's Trusts, which trusts were specifically designed to subsidize and ultimately distribute tens of millions of dollars in life insurance policy benefits taken on the joint lives of Sam and Vera Menlo. Insurance policy information, loans between the trusts, and loans and withdrawals taken by Klein utilizing the accounts and insurance policies as collateral, for example, were not provided.

Probate Code §16063(a), enacted in 1997 (Stats 1997 ch 724 §26), clarifies that a trustee's required annual account *must* include a statement of receipts and disbursements of annual principal and income; a statement of the current assets and liabilities of the trust; the trustee's compensation for the last complete fiscal year; the agents hired by the trustee, their relationships to the trustee and their compensation for the last complete fiscal year; a statement that the beneficiary may petition the court under Probate Code §17200 to review the accounting and the acts of the trustee; and a statement of the three-year limitations period to bring an action after receipt of the account. Klein did none of these things beyond periodically forwarding selected banking/brokerage statements.

On September 18, 2012, nearly ten years ago, Franklin Menlo filed a petition in BP136679 attempting to file a single action on behalf of numerous Menlo trust beneficiaries against Klein, seeking Klein's removal as trustee, demanding an accounting and requesting surcharge. Upon a verified October 24, 2012 "preliminary" objection from Klein, *inter alia*, that

---

accounting "annually or in other reasonable increments," thereby providing the trustee with slightly more flexibility in the timing of those accountings than with respect to the Children's Trusts, which contain no accounting language whatsoever, thereby defaulting to the requisite annual requirement of Probate Code §16064. No evidence was submitted that any of the 24 Children's or Grandchildren's Trust beneficiaries ever waived an accounting in writing or otherwise.

a single action involving multiple trusts would be "procedurally impermissible," the Menlo children and grandchildren filed 24 separate verified petitions filed with the Superior Court on March 22, 2013 [see respective case nos. at fn. 1, *ante*].

In their verified petitions, the 24 litigating Menlo children and grandchildren each petitioned to remove Klein as their trustee and for an accounting and surcharge.[8] Each verified petition alleges, at ¶ 11:

> "Respondent Klein, as Trustee of the [Name of Beneficiary] Trust, has violated the duty owed to Petitioner as beneficiary of the Trust, in that he has failed and refuses to provide an accounting for the Trust as required by law (California Probate Code §16060 et seq., §16062, §17200 et seq.), notwithstanding written and oral demands from Petitioner for such an accounting commencing in 2011. Klein has never produced an accounting in the entire 17 years he has been Trustee of the Trust. The Trust does not waive accounting."

Each petition attaches, as exhibits, written accounting demands previously submitted to Klein.

On September 18, 2013, in each of the 24 cases, Klein filed a verified first account and report of trustee and petition for approval. Klein began each of those accounting periods not in 1996 when he accepted trusteeship of the 22 of the 24 trusts in issue and/or at the time Klein began to manage trust assets, but on seemingly random dates between February 1, 2003 and April 13, 2009.[9]

---

[8] On May 22, 2013, the Hon. Roy Paul determined each of the 24 trust petitions to be "related" cases. On December 20, 2013, the Hon. David J. Cowen ruled that discovery across the related cases would apply to all of the Menlo Trust cases and would not need to be separately propounded. All 24 actions were consolidated.

Across the 24 separate cases and the three accountings in each case being litigated, the breadth of the collective register of actions is formidable. In the "lead" case BP136769. there are 1600 documents on file, consisting of many hundreds of party submissions and minute orders spanning a decade.

[9] Despite trusteeship since 1996 and many thousands of transactional activities across all 24 Children's Trusts and Grandchildren's Trusts at issue, the "opening" dates utilized in Klein's "first" and "supplemental" first accounting are as follows:
May 18, 2009 -- Abraham Deutsch
April 13, 2009 -- Jonathan Lifschultz

Each of the 24 Menlo family beneficiaries filed objections to Klein's account on November 14, 2013.

By formal order filed in the "lead" case on December 20, 2013, then-Commissioner David J. Cowan determined Klein's accountings to be inadequate, specifically directing the trustee to file with the Court a supplemental account containing "a complete accounting" of all transactions made by Klein as trustee, including withdrawals of all funds for loans, investments and purchases, all deposits of funds, and any lines of credit opened utilizing each trust for collateral; a complete accounting with respect to every trust-owned life insurance policy including premiums paid, sources of premium funds, a listing of all loans and cash advances against each policy, and a complete listing of any repayments; a complete accounting of all life insurance policy funds, including loans, utilized by Klein "in part or whole for his own purposes;" a listing of dates, amounts and lending institutions associated with Klein's personal lines of credit utilizing the resources of the trusts or any of its insurance policies; a listing of draws against Klein's personal lines of credit and repayments utilizing trust assets; a complete accounting of all funds provided to Klein by Menlo family members for purposes of subsidizing trust insurance policies or for any other purpose; all business reasons for allowing trust insurance policies to lapse; "[a ]complete and accurate account of the present fair market value of all assets of the Trust," including trust insurance policies; all fees taken by Klein with respect to the trusts,

---

February 27, 2009 -- Rachel Deutsch, Samuel Deutsch, Deborah Deutsch, Zev Deutsch, Esther Deutsch and Mordecai Deutsch
July 23, 2008 -- Franklin Menlo and Tanya Menlo
January 1, 2008 -- Jonathan Menlo
May 23, 2006 -- Rochelle Lipchutz, Yeshia Frankel and Asher Frankel
May 22, 2006 -- Madelein Lipscuitz
May 19, 2006 -- Moise Frankel, Avi Lipchutz, Faye Lipchutz and Dov Lipchutz
February 1, 2003 -- Michael Winter, Daniel Winter, Jeremy Winter, Amanda Winter and Norine Winter

and any other information necessary to be fully compliant with Probate Code §16063 and §§ 1060 *et seq.*

Commissioner Cowan's order *required Klein's supplemental accounting include "the time period commencing when Leslie Klein first became trustee of the Trust,* to the present day." To the extent Klein was unable to comply with any portion of Commissioner Cowan's order, he was directed to provide a detailed explanation for such failure by January 30, 2014.

Klein filed a verified supplement to each of his 24 verified first amended accounts on January 30, 2014, adding additional financial information *but continuing to commence his accounting periods on the same 2003-2009 dates* previously utilized. Klein's explanation in each of the verified supplements declares that "the Trustee does not currently have detailed financial records for the periods prior to the commencement date" of the respective trust accountings. As Klein goes on to declare, "This is because the Trustee sent such records to Sam Menlo, one of the two Trustors, per Sam Menlo's request. The Trustee did not keep copies of the records he sent at Sam Menlo's request."

Klein testified at trial before the undersigned that Sam Menlo continued to exclusively manage the trusts, despite Klein's sole trusteeship, until Mr. Menlo suffered a debilitating stroke in 2005.[10] Klein's claim that the 1996-2005 trust records were in files in the possession of Sam Menlo, however, could not be corroborated through any other witness or through documentary evidence. Klein also provided no credible explanation as to why all but five of Klein's 24 trust accountings have opening account dates *after* 2005.

Declarations in opposition to Klein's first amended and supplemental accountings over the 24 trusts were filed by the respective Menlo beneficiaries on June 30, 2014. Klein submitted a verified reply on August 1, 2014.

---

[10] This date was contested by Sam Menlo's son, Franklin ("Frank"), who testified that the cerebral hemmorhages rendering Sam Menlo incompetent occurred in 2001 and 2002, at which time Frank took over management of his father's businesses.

On July 14, 2015, over opposition, the Hon. Maria E. Stratton granted the Menlo petitioners' applications to amend their pending petitions in order to name Les Klein & Associates, a Professional Law Corporation ("LKA") as an additional respondent. After a demurrer filed by LKA was granted with leave to amend, on March 24, 2016, the Menlo petitioners filed a second amendment to their September 18, 2013 accounting, removal and surcharge petition. Once a further demurrer filed by LKA was granted with leave to amend, on September 30, 2016, petitioners filed a third amendment to their petitions, again adding LKA as a party respondent. After LKA's successful motion to strike petitioners' third amendment, petitioners filed a fourth amendment on January 25, 2017.[11] LKA filed its answer to the respective petitions on February 21, 2017.

The various Menlo Trust principal distribution dates, as noted at the outset, were based upon the respective age and gender of each beneficiary. As of 2016, many of those dates had passed without a single distribution to any Menlo beneficiary, with the exception of Norine Winter ("Norine"). In March 2016, principal distributions were requested by the Menlo beneficiaries [see factual recitation and analysis in *Menlo v. Klein* (July 20, 2018), case B281058, 2nd Appellate District, Division 3.] As now also contended at trial (see *infra*), Klein claimed that Sam Menlo, who was no longer competent in 2016, had dictated oral instructions to Klein not to distribute, despite the express terms of the trust instruments. As summarized by the Court of Appeal:

> "Although Klein insisted he was simply following Sam's orders, the beneficiaries observed that Klein did not produce a single document corroborating Sam's oral instructions. Klein admitted he never attempted to amend the Menlo Trusts to reflect those instructions. Also, Sam's wife and seller] Vera was unaware that Klein had withheld distribution of funds ... ." [Slip opin., at 6.]

On May 23, 2016, Klein petitioned the trial court for instructions, requesting the ability to make principal distributions, but with the authority to withhold one-half of those distributions to

---

[11] At or about this time, Klein and LKA successfully moved to disqualify the law firm of Sheppard Mullin Richter & Hampton LLP from its representation of the Menlo beneficiaries.

pay for his attorneys in the instant litigation, for continued trust administrative expenses and, *inter alia,* "reconciliation of amounts owned by any Trust to another Trust for money previously advanced." The Menlo beneficiaries contended:

> "[N]one of Klein's proffered reasons for withholding funds from the asset distributions was valid. First, the beneficiaries would pay their pro-rata share of the insurance premiums. They had already asked Klein for payment amounts. Second, they argued, the Trusts did not provide for creation of lines of credit, and *Klein had taken millions of dollars from the lines of credit for which he had not accounted.* Finally, they contended that Klein was not entitled to withhold 'anticipated future litigation expenses' from Trusts that by their terms had already called for a full or partial distribution to beneficiaries." (Italics added.) [Slip opin., at 7.]

On February 22, 2017, Judge Stratton denied Klein's petition for instructions. The Court of Appeal affirmed, determining that Klein, *inter alia*, was "seeking a prophylactic judicial declaration that withholding … funds from the distribution of the Trusts' principal would be in good faith and for the benefit of the Trusts so that Klein could not later be held liable for a surcharge." [Slip opin., at 12.] The California Supreme Court denied Klein's petition for review. Despite the Menlo beneficiaries' requests for principal distributions, despite the express language of the trust instruments, and despite Judge Stratton's ruling and the appellate court's affirmance, Klein to this day has failed to distribute any portion of trust principal to the litigating petitioning Menlo family members other than Norine.

The Menlo beneficiaries, based upon contentions that Klein "withdrew for his own benefit the cash value of the life insurance policies that were supposed to fund the trusts upon the death of Sam and Vera Menlo, used the trust assets to obtain lines of credit against which [Klein] borrowed money for his personal use and benefit, and misappropriated trust assets in order to pay down his personal lines of credit," issued document subpoenas for the production of Klein's personal and business records. Klein and LKA moved to quash delivery of the requested bank records. On March 13, 2017, after the issues were fully addressed before Judge Robert Letteau (Ret.) in his capacity as discovery referee, Judge Stratton approved Judge Letteau's recommendation denying Klein and LKA's motion to quash discovery.

1    Sam Menlo died on February 5, 2018.[12]

2    On April 19, 2018, Klein filed a verified Second Account and Report and Petition for

3    Approval for each of the 24 accountings, covering the trust period June 30, 2013-December 31,

4    2016.[13] The Menlo petitioners filed objections to Klein's second account in the form of

5    declarations on June 27, 2018. Klein filed verified supplements to his 24 second accountings on

6    September 17, 2018. The Menlo petitioners submitted objections to the Klein supplements in the

7    form of a declaration filed on November 1, 2018.

8    On August 3, 2018, Klein amended his response to the 24 initiating petitions to add

9    additional affirmative defenses.

10    On November 27, 2018, Klein, joined by LKA, moved to dismiss all 24 initiating Menlo

11    petitions on the procedural ground that the petitions had not been brought to trial within the

12    statutory five years. On March 8, 2019, Judge [previously Commissioner] Cowan determined the

13    motion to be without merit and, in light of a written stipulation by Klein not to rely on the

14    dismissal statute, found Klein to be judicially estopped from taking such a position.[14]

15    On March 5, 2019, the Menlo petitioners filed a fifth amendment to their initiating

16    pleadings, amending claims against LKA. In the fifth amendment, six Menlo trust beneficiaries

17    -- Deborah Deutsch (through Rafael Deutsch), Madeline Lipschutz, Rochelle Lipchitz, Jonathan

18    Lipschutz, Norine Menlo and Frank Menlo, across the approximately 16,000 Klein-initiated

19    transactions, allege "by way of partial example only" that Klein wrote 23 specific checks totaling

20

21    ───────────────

22    [12] Children's Trust beneficiary Judith Frankel predeceased Sam and Vera Menlo and is not a party to this
litigation. On June 27, 2015, daughter and Children's Trust beneficiary Deborah Deutsch passed away

23    *pendente lite*. Ms. Deutsch's husband, Rafael Deutsch, formally substituted into the litigation on
November 8, 2017 on Ms. Deutsch's behalf.]

24    [13] Despite the possible latitude of the accounting frequency language in the Grandchildren''s Trusts, the
second accounting period of 3.5 years of once again contravenes the "at least annually" mandate of

25    Probate Code §16064 as it relates to the Children's Trusts.

26    [14] After a denial of reconsideration on the motion to dismiss, Klein petitioned for writ of mandate with the
Court of Appeal. (2nd Civil B298667.) Writ relief was denied by the Court of Appeal on September 5,

27    2019.

28

$623,500 on individual Trust accounts, including MCT, made payable to LKA. The six petitioners allege that LKA aided and abetted or otherwise conspired with Klein to misappropriate Trust assets. On April 8, 2019, LKA filed its objections and response.

On March 12, 2019, Judge Cowan issued a discovery order based upon representations of Klein and his counsel that Klein "took no part in preparation of the accountings [Klein] had filed." Rather, it was determined that each of Klein's verified accountings, which the undersigned is tasked to settle, were instead prepared by the accounting firm of White, Zuckerman, Warsavsky, Luna & Hunt ("WZ"). At deposition, Klein was directed by his counsel not to answer questions relating to WZ on the basis of attorney-client privilege and work product protection. At the same time, WZ itself was being shielded from discovery as a non-designated consultant of Klein's counsel. The Menlo petitioners claimed that they were being denied essential discovery.

In his 14-page ruling, Judge Cowan concluded in the context of verified accounting approval, Klein had impliedly waived attorney-client privilege with respect to WZ, and that work product protections were inapplicable where the beneficiaries' "understanding the transactions for which WZ prepared accountings... outweighs the interest of attorneys in not having to share their efforts with the opposing party." Klein was directed by Judge Cowan to provide all information and communications by, to and from WZ upon which the verified accounts were based, including those claimed to be privileged.[15]

On May 7, 2019, Klein filed an Amended Second Account and Report for each of the 24 trusts. The Menlo beneficiaries filed objections to the Amended Second Account through declarations filed on July 2, 2019.

---

[15] On April 16, 2019, in coordination with *amicus curiae* The Southern California Association of Defense Counsel, Klein sought appellate relief from Judge Cowan's ruling by petition for writ of mandate with request for immediate stay. (2nd Civil B296957). Writ relief was denied by the Court of Appeal on June 17, 2019. Klein's petition for review and application for stay in the California Supreme Court was denied on June 26, 2019.

On October 25, 2019, as to each of the 24 trusts at issue, Klein filed a Third Account and Report and Petition for Approval for the trust period January 1, 2017-September 30, 2018.[16] On March 5, 2020, the Menlo beneficiaries filed objections to the third account in the form of declarations.

On November 4, 2019, Klein moved to dismiss every initiating petition except the petition of Franklin Menlo ("Frank"), on the theory that Frank was without authority to prosecute the remaining petitions under a written power of attorney delivered to Frank from the respective Menlo trust beneficiaries. In eight-page ruling issued by Judge Cowan on December 10, 2019, Klein's motion to dismiss was denied on a variety of grounds including, once again, judicial estoppel. No writ petition was filed.

Also on December 10, 2019, Judge Cowan granted Klein's motion to bifurcate issues to first "hold a separate trial for the review of each set of the Trustee's Accountings," with each accounting trial to "include any surcharge items resulting from the review of the Accountings at issue." Issues concerning surcharge for professional fees and liability for prejudgment interest were ordered addressed and resolved *after* the Court issues a statement of decision on the accountings.

On September 15, 2021, the Hon. Paul T. Suzuki issued an order appointing the undersigned as a Code of Civil Code Procedure §639(a)(1) referee to conduct consecutive trials on each of Klein's three accounting petitions to commence on or after December 1, 2021.

On November 16, 2021, Klein filed a verified second supplement to each of his first account approval petitions and a verified first supplement to each of his second account approval petitions. The following day, on November 17, 2021, Klein filed a verified first supplement to each of his third account approval petitions. Each of those petitions requests Trustee fees.

---

[16] While the trustee's accounting period intervals had been improving at the time of the third account, from 17 years (1996-2013) to 4½ years (6/30/13-12/31/16) to 1¾ years (1/1/17-9/30/18), the 21-month third accounting period continued to violate the 12-month accounting mandate of Probate Code §16064 as to the Children's Trusts. Currently, no accounting has been filed by Klein since the trust period ending September 30, 2018 (>3¾ years through June 30, 2022), though he continues to serve as trustee for each of the 24 trusts in question.

On January 4, 2022, Judge Suzuki issued an order prohibiting Klein from paying attorney fees and costs from loans taken against insurance policies held by the Menlo Trusts, from the lines of credit created by Klein pledged against institutional brokerage assets, or from the trusts of non-litigating Menlo family members. Judge Suzuki granted Klein's petition for attorney fees without prejudice to the Menlo beneficiaries' pending claims of surcharge.

Co-settlor Vera Menlo died on June 29, 2022, giving rise to tens of millions of dollars in payouts to the Menlo Trusts under the remaining "joint life" life insurance policies which the 24 Menlo Trusts had long subsidized through premium payments. On July 27, 2022, the Hon. Ana Maria Luna ordered that any lines of credit collateralized by the insurance policies were to be frozen.

**The Reference Hearing on the Settlement of Accounts**

Under Judge Suzuki's September 15, 2021 order for reference, the Referee's tasks are as follows:

"1. The Referee shall hold separate trials, to consider all factual and legal issues raised by the parties in connection with the Trustee's three separate acts of accountings, with certain exceptions, as further discussed and ordered below.

2. The Referee shall commence trial on December 1, 2021, or the close estate thereafter that is convenient to the Referee's calendar.

3. The Referee shall hold a separate trial for the review of each set of the Trustee's Accountings (e.g., the trial on the Trustee's First Accountings shall be conducted separate from the trial on the Trustee's Second Accountings). Except as stated below, each separate trial shall include any surcharge issues resulting from the review of the Accountings at issue.

4. Respondent Les Klein and Associates, Inc. shall be included as a respondent in all trial hearings. During the course of the trials on Trustee's accountings, the Referee shall also determine all issues raised in the Amendments to Petitions against Respondent Les Klein and Associates, Inc., including but not limited to all Probate Code Section 850 and 859 issues and all other damages mentioned in Petition's Fifth Amended Petition, except the cause of action for Removal of Trustee. Referee to designate breach cause of action for damages what the relief is.

5. The Referee shall conduct the trial of Trustee's Second Accountings immediately upon the conclusion of the Trustee's First Accountings. The Referee shall conduct the trial of the Trustee's Third Accountings immediately following the conclusion of the trial of Trustee's Second Accountings. The Referee shall have the ability to schedule reasonably brief breaks between trials, as may be necessary, with the overall goal of concluding the three trials in his brief a period of time as is convenient to the Referee's calendar.

6. Certain issues shall be excepted from the scope of trial by Referee and shall be reserved for the Trial Court, as follows: (i) surcharge of Trustee for professional fees, and (ii) liability of Trustee for prejudgment interest. These issues shall be addressed and determined by the Trial Court in a separate hearing following the trials by Referee. This separate hearing be conducted as a second phase of the trials on the accountings at issue, rather than as a completely separate trial.

7. Following the conclusion of the trial of Trustee's Third Accounting, the Referee shall report to the Court his reports concerning the trial of all three of Trustee's accountings, as specified in paragraph number 8.b.2 of [the order for reference]."

In addition to those directions, Judge Suzuki proposed dates for delivery of the Referee's reports, objections to those reports, and the ensuing trial court hearing dates, none of which delivery dates co and uld be accomplished given the schedules of the parties and the Referee, and the sheer magnitude of matters which needed to be heard and determined.

Hearing on the respective accountings was conducted in person in the presence of a certified shorthand reporter over the following days:

First Account: December 15, 2021, December 17, 2021, January 18, 2022, February 1, 2022, February 2, 2022, February 3, 2022, February 8, 2022, February 9, 2022, February 10, 2022, February 15, 2022, February 16, 2022, February 17, 2022, February 23, 2022, March 3, 2022, March 8, 2022 and March 9, 2022 [partial day].

Second account: March 9, 2022 [partial day], March 10, 2022, March 15, 2022 and March 22, 2022.

Third account: March 24, 2022, March 29, 2022 and March 30, 2022.

Petitioning trust beneficiaries Abraham Deutsch, Amanda Winter, Asher Frankel, Avi Lipschutz, Daniel Winter, Deborah Deutsch (by and through her husband, Rafael Deutsch), Dov Lipschutz, Esther Deutsch, Faye Lipschutz, Franklin Menlo, Jeremy Winter, Jonathan Lipschutz, Jonathan Menlo, Madalyn Lipschutz, Michael Winter, Moishe Frankel, Mordechai Deutsch,

Norine Winter, Rachel Deutsch, Rochelle Lipschutz, Samuel Deutsch, Tanya Menlo, Yeshia Frankel and Zev Deutsch appeared at the hearings through their attorney, Donald L. Saltzman of the Law Offices of Donald L. Saltzman. Trustee Les Klein appeared through his attorneys, Terence S. Nunan and Alan D. Weinfeld of Parker, Milliken, Clark, O'Hara and Samuelian. LKA appeared through its attorney, Candice K. Rogers of Hahn & Hahn LLP. All counsel appeared in person except Ms. Rogers, who attended each trial session remotely on the Zoom platform.

The following witnesses appeared either in person or remotely on the Zoom platform and were sworn and testified under oath:

First Account: Leslie Klein (Day 1-Day 3, Day 6-Day 9, Day 15), Dov Lipchutz (Day 4), Jeremy Winter (Day 4), Moishe Frankel (Day 4), Asher Frankel (Day 5), Faye Lipshutz (Day 5), Esther Deutsch (Day 5), Amanda Winter (Day 5)[17], Frank Menlo (Day 5-Day 6), Edward Wirtz (Day 10, Day 16), Duross O'Bryan  (Day 11-Day 14, Day 16), Jennifer Magnes (Day 12) and Irwin Lowi (Day 15).

Second Account: Leslie Klein (Day 1, Day 3-4), Duross O'Bryan  (Day 2-Day 3), Ed Wirtz (Day 2-Day 3) and Jennifer Magnes (Day 3).

Third Account: Leslie Klein (Day 1-Day 3), Duross O'Bryan  (Day 1, Day 3), Jennifer Magnes (Day 2), Ed Wirtz (Day 2) Steven Burgess (Day 2)[18] and Frank Menlo (Day 3).

Many hundreds if not thousands of pages of documentary exhibits beyond the accounts themselves were offered and received into evidence over the course of the respective trials.

_____

[17] As to all Menlo family members called to testify other than Frank Menlo, the parties stipulated that their testimony during the trial of the Trustee's First Account should also be deemed testimony received during the trial of the Trustee's Second Account and the Trustee's Third Account.

[18] With respect to Mr. Burgess, the Trustee's life insurance expert, health issues precluded Mr. Burgess' attendance at the trial of the Trustee's First Account and the trial of the Trustee's Second Account. The Referee could not begin to deliberate on the First Account or the Second Account until after Mr. Burgess testified. Mr. Burgess testified during the hearing on the Third Account. The parties stipulated that Mr. Burgess' expert testimony during the Trustee's Third Account should be also deemed testimony received during the trial of the Trustee's First Account and the Trustee's Second Account.

After the final day of testimony, on May 25, 2022, Klein filed a consolidated closing brief across all three accountings. Also on May 25, 2022, LKA filed a motion for judgment.    On June 13, 2022, the Menlo petitioners filed a closing brief on the Trustee's First Account.    On June 16, 2022, the Menlo petitioners filed a closing brief on the Trustee's Second Account and a separate closing brief on the Trustee's Third Account. On July 1, 2022, Klein and LKA each submitted a consolidated reply to the Menlo petitioners' closing brief.[19]

**Klein and LKA's Post-Hearing Contentions**

In his consolidated post-hearing brief, Klein contends that the evidence established that the 24 Menlo trusts were "sabotaged" by Frank Menlo, who stopped paying Klein cash annual exemption gifts in 2012 which had been used, in part, to subsidize the various trust insurance policy payments. Klein references his own testimony that he followed the "wishes and instructions" of the Trusts' co-settlers, Sam and Vera Menlo, at all times.

While Klein did allow four large Phoenix Life Insurance policies to lapse at various points of his trusteeships, Klein contends, consistent with his expert's testimony, that he was acting prudently at the time. Claimant notes that the lapse of Phoenix policies had been recommended in 2011 by a commercial life underwriter, and that Phoenix itself had been on the verge of insolvency.[20]

Klein asks the Referee to disregard the testimony of the Menlo petitioners' forensic economic expert, Duross O'Bryan ("O'Bryan"), on the basis that O'Bryan's review was (a) "tainted" by attorney-client privilege due to the discovery authorized by Judge Cowan's March

---

[19] The Referee at the time of hearing had directed the parties to file single, simultaneous briefs to be filed on or before May 25, 2022. Due to health issues, the Menlo beneficiaries' counsel was unable to comply. Because of the unintended staggered briefing, the Referee authorized Klein and LKA to submit a reply, which they did.

[20] Klein testified that it was his standard practice as Trustee to allow all of the collective tens of millions of dollars of Menlo insurance policies to have their premiums remain unpaid until just before their respective lapse period was set to expire due to nonpayment. Evidence established that this had *not* been the practice prior to 2005, despite Klein's testimony to the contrary.

12, 2019 discovery order; and (b) based upon voluminous pages of institutional banking and insurance documents alleged to be hearsay in contravention of *People v. Sanchez* (2016) 63 Cal. 4th 665 ("*Sanchez*"). Klein further contends his fair trial rights were compromised as the Menlo petitioners filed their exhibit list late, and continued to update their exhibits throughout the hearings.

Klein argues that even if the Referee finds breach(es) of trust, the Menlo trust instruments expressly exculpate Klein from liability for all trust breaches committed "reasonably and in good faith." In this vein, Klein contends that irrespective of the written terms of the Children's Trusts and the Grandchildren's Trusts, he accepted the trusteeships with the understanding that he would do whatever was asked of him by co-settlor Sam Menlo. After Sam Menlo's stroke disabled Sam from involvement, Klein contends that he thereafter did whatever co-settlor Vera Menlo asked, including purchasing homes for a number of the Menlo trust beneficiaries, without regard to such beneficiary's right or entitlement under the respective trust instruments, or the balance in their accounts. Through a series of credit lines debited against the more robust Menlo Trusts, and through multiple loans amongst the various Menlo Trusts (with no corresponding ledgers or reconciliations), and with thousands of Trust transactions filtered through his attorney-client trust account,[21] Klein testified that he timely paid premiums on those Trust-owned insurance policies that he did not intend to lapse, while providing funds for home purchases by Menlo grandchildren as requested by Vera.

Other than a $750,000 sum which Klein paid himself from the Menlo Trusts in 2005, which Klein testified that Sam Menlo had verbally authorized him to withdraw as a retroactive

---

[21] Klein testified, and the record is unequivocal, that Klein ran literally thousands of Trust transactions, including cash from Frank Menlo intended for individual Trust beneficiary accounts, cash from the individual Trust brokerage accounts themselves, cash from funds paid from loans requested by Klein against Trust insurance policies, cash purportedly designed to reimburse one particular Trust through the assets of another, and credit line loans applied for by Klein against certain brokerage accounts, directly into LKA's attorney-client trust account, where it commingled as "one big pot" with the funds of Klein's other clients. Through the LKA attorney-client trust account, Trust disbursements were also made, but leaving the financial disparity between Trust monies received by Klein and LKA and Trust monies disbursed by them for the benefit of the Menlo beneficiaries in the millions of dollars.

trustee fee, Klein contends that he is entitled to an additional $1,034,477.58 in trustee fees for the period of the First Account after 2005, $533,578.70 on the Second Account, and $180,114.70 on the Third Account; each calculated at a rate of .05% per annum of the alleged sum of trust assets under management plus that year's trust income.[22]

In its combined and consolidated motion for judgment/closing brief, LKA contends that the only evidence received at trial that LKA "aided and abetted" Klein's alleged breaches of trust was that "trust funds were deposited into its [law firm client trust account] for convenience purposes, and that payments were made from the account for the benefit of all [Menlo Trust beneficiaries]." LKA contends that there was no evidence presented that Klein's law firm either conspired with its owner or that it aided and abetted Klein in the misappropriation of assets. As noted by LKA, "LKA was presented as merely a passive bank account, money-in and money-out." LKA contends that it had no duty to the Menlo beneficiaries, fiduciary or otherwise, nor is there evidence that it financially benefited from Klein's acts. There was evidence, according to LKA and as testified by Klein at trial, that lapse period payments to Trust insurers would "clear faster" when Menlo Trust beneficiaries' brokerage checks were paid directly into the LKA trust account.

LKA contends that any actions taken by the law firm from prior to August 7, 2012 should be barred by the applicable three-year period of limitations calculated from the time of LKA's joinder by the Menlo beneficiaries. LKA contends that the inclusion of Klein's law firm as a party by the six Menlo beneficiaries adding LKA has been merely an "afterthought."

---

[22] Referee's note: There appear to be four provisions of the 24 respective Menlo Family Trusts that Klein appears to be asking the Referee to honor: (1) Klein's appointment in each Trust as sole trustee; (3) the breadth of Klein's financial powers under the Trusts; (3) the Trustee's liability preclusion for "reasonable and good faith" actions; and (4) the right of Klein to earn trustee fees based upon a percentage of trust assets. It appears Klein is simultaneously asking the Referee to disregard the fact that no Trust agreement contains an accounting waiver and/or gives either co-settlor any continued right or authority over the Trustee after appointment. It also appears Klein is asking the Referee to completely disregard the distributive provisions of each and every Trust.

**The Menlo Beneficiaries' Post-Hearing Contentions on the First Accounting**

The Menlo beneficiaries contend the evidence at trial showed that "based upon a mythical 'instruction' from Sam Menlo, Trustee Klein "set up a serpentine labyrinth of transfers between trust accounts, lines of credit, insurance policies and Mr. Klein's bank accounts, both personal and business,"[23] in order to misappropriate assets.

In their closing brief on the First Account, the Menlo beneficiaries contend that Klein, as evidenced by his trial testimony after years of pre-trial statements and representations, "has no qualms about making things up as he goes along." By way of example, the Menlo beneficiaries reference proof of contradictory narratives presented by Klein over time with respect to, *inter alia*, Klein's unrepaid loans to himself paid from Trust assets secured against Trust lines of credit; the refusal by Klein to provide information on Trust insurance policies until it was discovered that "Klein ha[d] borrowed millions on these policies;" annual exclusion gift payments made to Menlo Trust beneficiaries which never found their way into the gifted beneficiaries' Trust accounts; claims by Klein of the need to borrow significant sums to cover Trust tax obligations when, according to the Trust's CPA, annual tax obligations were negligible; and Klein's continued refusal to account.

Through Frank Menlo, who succeeded management and control of Sam's businesses in the year 2000, the Menlo beneficiaries point to evidence at trial that Sam Menlo's cerebrovascular strokes, which precluded Sam's ability to conduct or comprehend business transactions, occurred in 2000 and 2001, not June 2005 as contended by Klein. It is in 2005, however, that Klein contends that that he "negotiated" a flat $750,000 trustee fee with Sam to compensate Klein for his trustee services with no written corroboration.

The Menlo beneficiaries cite trial testimony where Klein was impeached, *inter alia*, after Klein's false denial of a State Bar disciplinary record with respect to trust administration work;

---

[23] Rather than attempt to organize the Menlo beneficiaries' arguments, for purposes of identifying their contentions, the Referee addresses them in the order presented in their three-part closing brief on the First Account.

false denial of his admission to dishonesty charges leading to Klein's license revocation before the California Board of Accountancy; and false denials that he had ever previously been sued as a trustee, when in fact he had been so sued, and was represented in such litigation by his current counsel.[24]

Relative to this case, the Menlo beneficiaries cite Klein's trial testimony that he had received no commission(s) on the purchase of insurance policies for the Menlo Trusts. Klein was subsequently impeached by his own insurance expert, Mr. Lowi, who testified that Klein had received $326,023.78 in such commissions. (15 Tr. 2891-2892.)

Klein testified that in 2012 he created a stand-alone bank account for the "Menlo Children's Trust of 1986" ("MCT"). Substantial evidence was presented at trial that Klein used the MCT account as additional conduit to move substantial assets and liabilities to and from from the 24 Menlo Trusts in question, including the transfer of Trust insurance policy loan funds into Klein's accounts, and as a source of overdraft protection to allow Klein to charge well over $1,175,151 in personal expenses on his own credit cards against the litigating Menlo Trusts. Klein excluded any mention of the MCT in his accountings.

The Menlo beneficiaries reference the trial testimony of Jennifer Magnes ("Magnes"), the CPA at WZ in charge of preparation of Klein accountings, in which she testified that inclusion of the MCT as a Trust sourcing mechanism, though she had some of the records, was "beyond the scope of [her] assignment." Magnes further testified at trial that she was not authorized to review Klein's personal bank records, nor the LKA law firm records, nor was she authorized to contact the relevant insurance companies for information, nor was she provided with the voluminous institutional banking and insurance records subpoenaed by the parties. The Menlo beneficiaries contend that by so artificially limiting the information upon which the verified Klein First

---

[24] When Klein testified provably falsely at trial on these collateral matters, the Referee had concern that Klein's short-term and long-term memory failures could be due to a combination of age and mild cognitive deficits. After 22 days in trial with Mr. Klein, however, the Referee concludes that Mr. Klein, while testifying, reflexively opted for any means of possible liability avoidance and scrutiny, often self-contradictory and easily disproven, over any legitimate concern for factual accuracy.

Account was prepared, the First Account is "virtually useless as a bellwether of Mr. Klein's true activities with [the Menlo] [T]rusts."

The Menlo beneficiaries cite Probate Code §16014(b) for the proposition that Klein, as a licensed trusts and estates attorney, until recently as a licensed CPA, and as a self-proclaimed expert in life insurance investments, has special skills and must be held to the standards of those special skills.

The Menlo beneficiaries also cite Probate Code §16000 for the further proposition that **Klein, as a trustee, has a statutory duty "to administer the trust according to the trust instrument**."

Each of the Menlo trust instruments are irrevocable by their terms. Neither Sam Menlo nor Vera Menlo had any ability after execution to amend the trust terms or to exercise any authority over the Trustee. The Menlo beneficiaries contend that any alleged oral "instructions" purportedly given to Klein by Sam Menlo to ignore the terms of the Menlo Trusts are pure fabrications and in contravention of Klein's statutory duties as a trustee.

The Menlo beneficiaries note that Klein, as an experienced estate planning practitioner, testified that despite his acceptance of the Trusteeships in 1996, and Sam Menlo's subsequent incapacity, Klein's deposition in this lawsuit was the first time anyone had suggested to him that he stood in a fiduciary relationship to the Menlo Trust beneficiaries. (8 Tr: 1673.) Klein further testified that he has never had any intention of honoring the distributive provisions of the 24 trusts.[25]

---

[25] Though the authorization is unclear from Judge Suzuki's September 15, 2021 order for reference, the Menlo beneficiaries ask the Referee to recommend Klein's removal as trustee. The trial court has always had removal power *sua sponte* since this action was commenced (see *Schwartz v. Labow* (2008) 164 Cal.App.4th 417), and it is possibly because Klein is a licensed member of the State Bar that suspension and removal has not already taken place. Notwithstanding Klein's rationale based upon what he claims to be the co-settlors' unwritten "wishes," as noted above, Klein concedes that he never intended to follow the express terms of the Trusts. In a case where the fiduciary's compass has had no sense of literal direction from its inception, Klein's removal appears to be a *fait accompli* regardless of whether or not it is a part and parcel of the current reference. The Referee defers determination of this issue to the trial judge.

The Menlo beneficiaries take great issue with Klein's scattered selection of starting dates for each of his 24 First Accounts. The starting dates of the respective Klein First Accounts are not, as the law requires, based upon the dates Klein first received and began managing the respective Trusts and their assets, but rather based, according to Klein. upon whatever date(s) the institutional brokerage houses could locate records in their archives with respect to each of the various Menlo Trusts managed by Klein.

The Menlo beneficiaries note that Klein's verified accountings, despite utilizing "starting dates" long after Klein accepted his trusteeships, nevertheless infuse selected pre-starting date transactions into the First Accountings which infuse capital or identify legitimate disbursements, all of the while ignoring literally thousands of other Trust-related transactions evidencing malfeasance and misappropriation.

The Menlo beneficiaries recite the Trustee's statutory duty to maintain records sufficient to *fully* account to the Trust beneficiaries, and to provide all supporting data upon request, including invoices, receipts and transactional documentation.

Here, Klein maintained no trust files of his own and had no legitimate recordkeeping system. Complex loan transactions between the 24 separate Menlo Trusts were never memorialized or reconciled, nor was application of large sums taken by Klein from the MCT separately tracked. No spreadsheets were prepared by Klein identifying the recipient(s) of the loan funds for which Klein borrowed against the Trusts' insurance policies, or for identifying the recipient(s) of the funds Klein borrowed on the lines of credit debiting the Menlo beneficiaries' brokerage accounts through whose Trust accounts those loans were serviced. (The recipients, as it turned out, were principally Klein and his law firm.) At trial, Klein testified that the filed trust accountings, which he conceded he did *not* prepare, constituted his "records," while all of the many thousands of specific underlying transactions were otherwise maintained "in [his] head."

The Menlo beneficiaries contend the evidence at trial established that that their individual Trust balances had been adequate to subsidize all ongoing Trust expenses, and suggest that Klein's only reason to collateralize the brokerage accounts through interest-bearing lines of

credit was to generate capital for Klein himself, virtually none of which Klein appears to have repaid. The Menlo beneficiaries also point to evidence that Klein borrowed $3,675,000 from the Trust's insurance policies, again virtually none of which was used to pay premiums.

The Menlo beneficiaries further object to Klein's decision to allow $20,000,000 in Phoenix life insurance coverage to lapse at a time when Sam Menlo was uninsurable, and therefore the coverages could not be replicated. The evidence showed that the Phoenix policies were allowed to lapse, in part, because of the policies' significantly reduced values, *after* Klein had reduced those values through millions of dollars in loans he had taken out against those policies, which funds were for the most part, if not entirely, retained by Klein.[26]

At trial, as noted by the Menlo beneficiaries, Klein admitted taking large personal loans from the Menlo Trusts without permission. Klein conceded regularly using funds from certain Trusts to pay the obligations of other Trusts, often when Klein, according to his testimony, would feel it was "fair" to do so.

Klein also admitted at trial setting up the MCT bank account as a source of overdraft protection for the personal bank accounts of Klein and his wife, Erika. The evidence at trial established that Klein utilized $1,218,519 of MCT funds to pay his personal debts by way of the overdraft protection, with no evidence (other than Klein's uncorroborated testimony) that those funds were ever reimbursed. Nowhere in Klein's accountings is there reference to those funds at all.

Though Klein testified at trial that the $3,625,000 of loans taken against the Trusts' Phoenix Life policies was conceptualized by Sam Menlo, the written evidence established that all of these loans were personally applied for and distributed by Klein to Klein through his attorney-client trust account between 2005 and 2009. While Klein testified that the Phoenix

---

[26] At the time Klein commenced his Trusteeships in 1996, the Menlo Trusts owned $54,000,000 in prospective whole and universal life insurance policy benefits upon the deaths of Sam and Vera Menlo. Both Sam and Vera Menlo are now deceased. However, over the course of the three accounting periods which are a subject of the order of reference, Klein allowed a collective $20,000,000 of those policies to lapse due to Klein's nonpayment of premiums.

policy loan funds were used to pay premiums on other Trust insurance policies, Klein was unable to establish at trial that was in fact the case.

The Menlo beneficiaries cite the testimony of First Account preparer Magnes that she did not attempt to trace the flow of millions of dollars of insurance loan funds from the insurance companies through Klein's LKA business account toward some beneficial Trust purpose. Magnes did admit that Klein had not provided her with all records of transactions which had occurred during the periods of Klein's Trusteeships.

The Menlo beneficiaries contend the evidence was undisputed at trial that Klein, beginning in 2005, borrowed $3,625,000 from four of the Trusts' Phoenix Life Insurance policies. According to the Menlo beneficiaries, these loans, which they claim to be misappropriated by Klein in whole or in large part, each bore accruing unpaid interest to the point that the constantly increasing debt ultimately exceeded the value of retaining the four policies, given Frank and Vera's joint life expectancies and the size of the ever-increasing interest accruing from the unpaid loans. Had an insurance broker been consulted in 2005, according to the Menlo Trust beneficiaries' insurance expert Ed Wirtz ("Wirtz"), the recommendation would have been to maintain the policies' *status quo*, given Sam Menlo's then-uninsurability. Instead, Klein withdrew millions of dollars in cash from those policies, failed to repay those loans, allowed additional substantial sums to accrue in interest on those loans, failed to repay the interest, and by the time of a 2011 underwriting review, one or more of the Phoenix policies was deemed expendable.

The first of the four Phoenix Insurance policies that Klein allowed to lapse occurred during the First Accounting period. In light of the policy's face amount payouts, less amounts necessary to sustain the policies through the then-actuarial balance of Vera's life, Wirtz

determined collective damages to the Trusts, discounted to present value, to total **$1,790,231** at the time of trial by virtue of Klein's policy lapse decision.[27]

The Menlo Beneficiaries cite *Bogert's The Law of Trusts and Trustees* §961 (June 2021 Update) for the proposition that:

"The burden of accounting for trust assets, receipts, disbursements, and exchanges is on the trustee. **Where the trustee failed to keep sufficient records, all doubts with respect to the trustee's administration of the trust are resolved against the trustee. If the trustee failed to keep adequate records for the trust, it is liable for any resulting loss. The court may also reduce or deny the trustee's compensation, or charge the trustee with part or all of the costs related to an accounting**, if the trustee does not keep adequate records. If the failure to keep records is serious enough, the trustee may be removed." (Emphasis added.)

Utilizing Klein's multiple alleged trust breaches to suggest that Klein is entitled to no trustee fees at all, the Menlo beneficiaries contend that the trustee fees demanded by Klein should not be based upon the percentage of the face value of the insurance policies when the beneficiaries pass and the policies are paid, but should rather be assessed at "no fee... or... a flat annual fee of between $500 and $1000."

At trial, the Menlo beneficiaries relied almost exclusively on the testimony of their forensic expert, O'Bryan. O'Bryan and his staff conducted exhaustive studies of all Menlo Trust monies being paid into and out of the LKA account, the beneficiary brokerage accounts, the insurance policy accounts, the various Trust lines of credit, Klein's personal bank accounts, and the MCT account, including Klein's use of the latter to pay Klein's personal debts through overdraft protection. In doing his work, O'Bryan repeatedly testified that he had not reviewed and was not relying in any way upon documents claimed privilege by Klein but ordered produced by Judge Cowan.

The O'Bryan testimony noted, without contradiction, that Klein's submitted accountings through Magnes failed to include a massive number of transactions which Klein initiated,

---

[27] The Wirtz calculation does not assume that the loan against the policy taken by Klein would be repaid. Rather, the calculation assumes that a prudent trustee would have paid the loan interest current from Trust funds until payout, along with the premium, thereby holding the death benefit at policy amount less loan principal, rather than allow the accrued loan interest to continually reduce the death benefit.

including thousands of transactions associated with the Morgan Stanley brokerage accounts, the UBS brokerage accounts, the AIG insurance statements, the UBS line of credit activities, use of the MCT account, multiple loans and debits/credits between the Trust themselves, and use of the co-mingled LKA attorney-client trust account as a further clearinghouse for Trust and intra-Trust transactions.[28]

In the trust periods after Klein accepted Trusteeships and began managing the Menlo Trusts, but before Klein arbitrarily decided to begin his reported accounting periods, O'Bryan calculated that Klein had removed $4,353,624 from the Menlo Trusts into LKA and his personal accounts and expenses as follows:

(1) $824,652 cash from the respective Menlo beneficiaries' brokerage accounts;

(2) $1,658,000 in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

(3) $1,432,781 in loans taken by Klein against Trust-owned insurance policies;

(4) $198,190 taken from the MCT account; and

(5) $240,000 from monies payable to the Menlo trusts that Klein signed over into his law firm account.

During the same pre-accounting time period of his Menlo Trusts management, Klein used monies collected from the various trust and insurers to pay for legitimate expenses of the Menlo Trusts in the total sum of $192,736, directly and through the vehicle of Klein's attorney-client trust account. The net difference between sums taken in by Klein and the sums paid out for the benefit of the Menlo Trusts or its beneficiaries, as calculated by O'Bryan, is $4,160,888.

On top of that sum, the Trusts paid interest on Klein's pre-accounting loans secured by Klein-initiated Trust lines of credit in the sum of $125,677. The interest charged by Phoenix Life

---

[28] Klein testified at trial that funds from loans against Menlo Trust insurance policies, which policies were each owned by specific Menlo Trusts, funds from the lines of credit borrowed by Klein against certain Menlo beneficiaries' brokerage accounts, and funds received from Frank Menlo for annual exemption gifts to the various Menlo children and grandchildren, were "first" deposited into Klein's LKA attorney-client trust account. Despite the fact the funds in that general account were neither segregated between individual Menlo Trusts or from the assets of Klein's other clients, Klein nevertheless testified that he had no comingling concerns.

Insurance and Lincoln Life Insurance on the insurance policies upon which Klein took loans during this pre-accounting period was an additional $104,732. Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, before the time Klein opted to commence his formal accountings, totals $4,391,297.

In addition to those sums, according to O'Bryan's comprehensive audit, are the verified portions of the First Accounting period for which Klein *has* chosen to account. When the "refused" Klein First Accounting periods are included within the Klein-submitted First Accounting periods in order to constitute the true First Account, through and including June 30, 2013 **the full First Accounting period** audit calculations are as follows:

In the entire period of what should be Klein's first accounting across **the 24 Trusts**, across approximately 10,000 Trust transactions, O'Bryan calculated that Klein removed a net **$6,852,660** from the Menlo Trusts into LKA and to his personal accounts and expenses during the full First Accounting period as follows:

(1) **($105,416)** cash infused by Klein into the respective Menlo beneficiaries' brokerage accounts (credit to Klein);

(2) **$1,959,374** in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

(3) **$2,753,152** in loans taken by Klein against Trust-owned insurance policies;

(4) **$1,046,418** taken from the MCT account into Klein's personal overdraft account;

(5) **$874,550** taken from the MCT account by Klein for other non-Trust purposes; and

(6) **$324,582** from monies payable to the Menlo Trusts that Klein deposited into his law firm or personal accounts.

During the entirety of the true First Accounting time period, Klein paid monies collected from the various Trust beneficiaries' brokerage accounts and Trust life insurance policies, and monies paid to Klein as Trustee for deposit into the Menlo Trusts, directly and through the vehicle of his attorney-client trust account, to pay for legitimate expenses of the Menlo Trusts in the total sum of **$628,112** (*i.e.*, credit to Klein), consisting of insurance premiums, accounting fees, and funds paid to Madeline Lipchutz in a family law matter. The net difference between

sums taken in by Klein over and beyond the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$6,224,548.**

Beyond that vast sum of unrepaid cash from Klein to the Menlo Trusts, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit in the sum of **$300,049** during the entirety of the true First Accounting period. The interest charged by Phoenix Life Ins. and Lincoln Life Insurance on the insurance policies upon which Klein took loans during the First Account was an additional **$1,693,048.** The loss due to Klein's intentional lapse  of a Phoenix Life Insurance policy during the First Accounting period, as testified to by insurance expert Wirtz, to the extent there is liability for that policy lapse, totaled **$1,790,231.**[29] Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged damages on Klein's lapse of a Phoenix Insurance policy, totals **$3,783,328** for the period of the First Account.

The Menlo beneficiaries contend that the evidence shows that, at the end of the First Account, Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the principal amount of **$10,007,876** (*i.e.*, $6,224,548 + $3,783,328). If there is no liability to Klein on the lapse of the Phoenix life insurance policy, the only issue Klein truly contests, either because he was not negligent or because he was acting "reasonably and in good faith," the principal surcharge reduces to **$8,217,645** (*i.e.* $10,007,876 - $1,790,231) owed by Klein to the collective Trusts at the close of the First Account.[30]

---

[29] Evidence at trial established that premiums had been paid on this policy until the time of Klein's trusteeship in 1996; then never again, forcing the policy to borrow against itself to sustain both future premium payments and interest on the subsequent loans which Klein took against cash value. In insurance jargon, these obligations created a "drag" on the policy, reducing its value to the policyholder.

[30] Of that sum, Klein claims that $750,000 was a verbal "trustee fee" authorization from Sam Menlo in 2005.

**The Menlo Beneficiaries' Post-Hearing Contentions on the Second Accounting**

In their opposition to Klein's Second Accounting, the Menlo beneficiaries render the following observation:

> "Neither [Klein] nor LKA introduced any witnesses at trial to dispute the accuracy of the calculations of Mr. O'Bryan and Mr. Wirtz. In fact, [Klein] did not dispute the many claims of misappropriation of trust funds to which Mr. O'Bryan testified and offered detailed damage figures."

As it relates specifically to evidence presented on the Second Account, the Menlo Beneficiaries highlight an additional point:

> "[Klein] acknowledged during the second accounting trial that, quite literally, he had created a system with the trusts where every single trust at some point transferred money to every one of the other 24 trusts usually in the form of 'loans' or 'repayment of loans' that [Klein] had created. The maze of 'loans' and 'repayments' is simply incredible. … [Klein] did not establish that many or even most of these trusts even needed loans from another trust to pay their share of [insurance] premiums. [Klein] admitted that he never informed the [Menlo Trust] beneficiaries that he was taking loans from their trusts, whatever the purpose of the loan may be. Whereas the Probate Code requires [Klein] to keep the funds of each trust separate and accounted for, [Klein's] management was exactly the opposite. [Klein] transferred funds back and forth so often that a diagram would look like a U. S. route map for American Airlines." [31]

When asked, Klein testified during the Second Accounting trial that he failed to turn over his LKA financial records, where substantial Trust funds were deposited and dispersed, to his account-preparer Magnes, because "he did not want her looking through the records of his clients." (18 Tr. 3476.) This was confirmed by Ms. Magnes, who also was not provided information from Klein regarding his use of overdraft accounts to access the MCT accounts to cover Klein's personal credit card spending. Magnes conceded that in the Second Accounting period, significantly more monies were taken by Klein from the Trusts than were utilized to cover expenses for the benefit of the Menlo beneficiaries.

---

[31] The Referee finds, based upon circumstantial evidence, that Klein's intention in maximizing the number of intra-Trust loans and repayments within the context of an already multi-client commingled LKA attorney-client trust account was to render the scope and breadth of Klein's misappropriations incalculable and untraceable.

Klein allowed two additional Phoenix insurance policies to lapse during the Second Accounting period. According to Wirtz' calculations, without regard to Klein's misappropriation of the loan proceeds themselves, a prudent trustee would have paid the policy loans current along with the premiums, the failure of Klein to accomplish resulting in damages to the Trusts of **$2,001,658** and **$2,487,533**, respectively, based upon Sam and Vera's actuarial life expectancies at the time of Klein's policy lapse decisions, discounted to present value.[32]

The Menlo beneficiaries' forensic expert, O'Bryan, testified that during the Second Accounting period, across an additional approximately 4000 Trust transactions, Klein filtered between one-third to one-half of all transactions, including countless payments between the Trusts themselves, through his LKA client trust account. Once again, without review any of the communications which Klein claimed to be privileged (though Judge Cowan held were not privileged), O'Bryan calculated that Klein had removed a net **$1,712,379** from the Menlo Trusts into LKA and his personal accounts and expenses as follows:

(1) **$254,649 in Trust** cash taken by Klein from the respective Menlo beneficiaries' brokerage accounts;

(2) **$1,282,733** in loans taken by Klein against letters of credit against Menlo beneficiaries' brokerage accounts;

(3) **$172,101** taken from the MCT account into Klein's personal overdraft account;

(4) **($73,061)** net credit to Klein for funds returned to the MCT account; and

(5) **$75,956** from monies payable to the Menlo Trusts that Klein deposited into his law firm or personal accounts.

During the Second Accounting period, according to O'Bryan, Klein used monies collected from the various Trust beneficiaries' brokerage accounts, and monies paid to Klein for deposit into the Trusts, often through the vehicle of his attorney-client trust account, to pay for expenses of the Menlo Trusts in the total sum of **$559,150** (*i.e.*, credit to Klein), consisting

---

[32] Vera was still living at the time of trial. She did not survive to her calculated 2023 actuarial life expectancy as determined several months earlier. Had the trial been conducted today, Wirtz's damage calculations to the Trusts would be higher, since less interest and premium payments would be paid from the Trusts than previously calculated to her actuarial date of death.

entirely of insurance premiums. As noted by O'Bryan, the net difference between sums taken in by Klein during the Second Accounting period over and above the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$1,153,229.**

Beyond that sum, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit during the Second Accounting period in the sum of **$17,542.** The interest charged by Phoenix Life Insurance and Lincoln Life Insurance on the policies upon which Klein took loans during that period was an additional **$409,134.** The loss due to Klein's lapse of the two Phoenix policies, as testified to by insurance expert Wirtz, to the extent there is liability, totaled **$4,489,210.** Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged liability for Klein's lapse of two additional Phoenix life Insurance policies, totals **$4,915,886.**[33]

The Menlo beneficiaries contend that the evidence shows that, at the end of the second account, Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the additional principal amount of **$6,069,115** (i.e., $1,153,229 + $4,915,886). If there is no liability to Klein on the lapse of the two additional Phoenix life insurance policies, the only issue Klein truly contests, either because he was not negligent or because he was acting "reasonably and in good faith," the principal surcharge reduces to an additional **$1,579,905** (*i.e.* $6,069,115 - $4,489,210) owed by Klein to the collective Trusts at the close of the Second Account.

To summarize, according to the Menlo beneficiaries forensic expert, the "rolling" surcharge to Klein for cash taken by Klein from the Trusts, plus actual interest paid by the Trust on those Trust funds in Klein's possession, less monies Klein applied to Trust expenses, through the closing date of the Second Account, totals **$9,796,750** (*i.e.* $8,217,645 +$1,579,105). If Klein

---

[33] The Menlo beneficiaries also contend that Klein's lapse of the Phoenix insurance policies during the Second Accounting period had negative income tax ramifications to the Trust for the Second Accounting period in the sum of $1,493,423. Klein's position was that he had filed no tax returns noting such sums to be due and payable, and therefore, once the applicable statute of limitations passes, there will be no actual loss to the Trusts. The Referee is inclined only to surcharge a fiduciary where losses have been realized and are not theoretic. If such tax liabilities become an actuality, assuming liability to Klein, it is not the Referee's intention to foreclose the Menlo beneficiaries from seeking indemnity from Klein at that time, nor should Klein be discharged from that contingent liability.

is also liable for lapse of the three Phoenix insurance policies through the First and Second Accounts, the additional "rolling" claim for damages utilizing the Wirtz calculations is an additional **$6,279,441** (i.e., $1,790,231 + $4,489,210), excluding the Menlo beneficiaries' additional claim for tax liability.

### The Menlo Beneficiaries' Post-Hearing Contentions on the Third Accounting

Moving to Klein's Third Account, the closing brief of the Menlo beneficiaries challenges Klein's claim that Frank Menlo "sabotaged" the Trust by refusing in 2012 to make further annual cash exemption gifts to each of the Menlo beneficiaries. As calculated the Menlo beneficiaries, had Klein not misappropriated the insurance policy loan funds for himself, by the end of the Third Accounting period, all policy premiums could have easily been paid "without problem, with approximately $4 million left over," with no need to ever access the funds held in the Menlo beneficiaries' brokerage accounts. Klein conceded during the trial on the Third Account that "whatever cash was in this trust when I took over, by the end of the Third Accounting, all of that was gone." (21 Tr. 3943.)

Klein testified during his testimony on the Third Account that he has never used *non-petitioner* Menlo Trust funds to subsidize the asset-depleted Trusts at issue here. The Menlo beneficiaries request that the Referee to take judicial notice of a June 10, 2022 report to Judge Luna in which Klein, in contravention of his testimony and a prior court order, concedes use of non-petitioner trust funds to pay the obligations of the subject Trusts for, *inter alia*, "[m]argin interest on lines of credit," life insurance premiums, and legal fees and retainers.[34]

On the Third Accountings, the Menlo beneficiaries reiterate their claim that the accountings were artificially manufactured by inhibiting CPA Magnes' access to the LKA records, to the MCT records, and to Klein's personal bank accounts, as a strategy to avoid

---

[34] Accounting issues associated with Trusts in favor of non-petitioner Menlo beneficiaries are outside the scope of the 72 accounting petitions across the 24 Trusts being adjudicated by the Referee pursuant to the order for reference. Possible contempt issues associated with Klein's alleged disregard of orders relating to non-petitioner Trusts in this case are likewise outside the scope of the reference under consideration. The Referee declines the request for judicial notice.

detection of millions of dollars in Trustee misappropriations under the façade of verified accounts.[35]

Klein allowed a fourth Phoenix insurance policy to lapse during the Third Accounting period. According to Wirtz' calculation, without regard to Klein's misappropriation of the loan proceeds, a prudent trustee would have paid the policy loan current along with the premiums, resulting in damages to the Trusts of **$2,339,334**, respectively, based upon Vera's actuarial life expectancy at the time of trial, discounted to present value.

The Menlo beneficiaries' forensic expert, O'Bryan, testified that during the Third Accounting period, Klein filtered approximately 20% of an estimated 2000 Trust transactions, including numerous payments between the Trusts themselves, through his LKA client trust account. Once again, without review of any of the communications which Klein claimed to be privileged but Judge Cowan found to be not privileged, O'Bryan calculated that Klein had removed a net $1,055,576 from the Menlo Trusts into LKA and for his personal accounts and expenses as follows:

---

[35] At trial, Magnes testified that she was essentially a scrivener, doing whatever she was told [content of communications themselves excluded by the Referee in light of Klein's objections], having no prior experience in the preparation of Probate Code or fiduciary accountings. Magnes testified, *inter alia*, that in preparing that Klein accountings she sought but did not receive documents dating back to Klein's acceptance of the Menlo Trusteeships in 1996; was unable to access relevant Trust transactions; did not ask for permission to access data from the Trust's life insurance companies; did not access subpoenaed records; never saw Klein's Trust files, if any; never reviewed a general ledger, QuickBooks or financial statements for Klein's administration of the Menlo Trusts; did not determine the commencement date to be covered by the First Accountings; *did* use Trust fund disbursements between 1999 and 2002 to log Menlo insurance policy premium transactions for purposes of calculating Trustee fees; and *did* see Menlo Trust funds deposited into the LKA accounts but was not authorized to trace those monies to their ultimate recipient(s).

The Referee, when considering such deficiencies in light of O'Bryan's comprehensive audit and the voluminous supporting records, accepts the Menlo beneficiaries' contention that the verified Klein accountings were manipulated in order to mislead with respect to the disposition of Menlo Trust funds. The extraordinary difficulties encountered by the Menlo Trust beneficiaries in discovering, accessing and then sorting out the relevant Trust information, underscores historic trust law policy resolving "any doubt arising" from an incomplete accounting against the fiduciary.

(1) **$165,905** in Trust cash taken by Klein from the respective Menlo beneficiaries'
brokerage accounts; and

(2) **$889,671** in loans taken by Klein against letters of credit against Menlo beneficiaries'
brokerage accounts;

During the Third Accounting period, as reported by O'Bryan, Klein used monies collected from the various Trust beneficiaries' brokerage accounts, and monies paid to Klein for deposit into the Trusts, often through the vehicle of his attorney-client trust account, to pay for legitimate expenses of the Menlo Trusts in the total sum of **$547,641** (*i.e.,* credit to Klein), consisting entirely of insurance premiums, As calculated by O'Bryan, during the Third Accounting period, the net difference between sums taken in by Klein over and beyond the sums paid out for the benefit of the Menlo Trusts or its beneficiaries is **$507,935**.

Beyond that sum, during the Third Accounting period, the Trusts paid interest on Klein's loans secured by the trust beneficiaries' lines of credit in the sum of **$92,252**. The interest charged by Phoenix Life Insurance and Lincoln Life Insurance on the insurance policies upon which Klein took loans was an additional **$208,454**. These interest obligations were paid by the Menlo Trusts, for apparent Trust no benefit except to Klein. The losses due to Klein's lapse of the final Phoenix policy, as testified to by insurance expert Wirtz, to the extent there is liability, discounted to present value, totaled **$2,339,334**. Total net Trust withdrawals by Klein, plus interest paid on those withdrawals by the Trusts, plus alleged liability for Klein's lapse of the additional Phoenix life Insurance policy, totals **$2,640,041** during the period of the Third Account.[36]

---

[36] The Menlo beneficiaries also contend that Klein's lapse of the Phoenix insurance policy during the Third Accounting period has negative income tax ramifications to the Trust in the sum of $1,483,536. Klein's position was that he had filed no tax returns noting such sums were due and payable, and therefore, once the applicable statute of limitations passes, there will be no actual loss. As noted earlier, Referee is inclined only to surcharge a fiduciary where losses have been realized and are not theoretic. To the extent such tax liabilities become an actuality, assuming liability, it is not the Referee's intention to foreclose the Menlo beneficiaries from seeking indemnity from Klein at that time, nor should Klein be discharged from that contingent liability.

The Menlo beneficiaries contend that the evidence shows, at the end of the Third Account, that Klein is indebted to the Menlo Trusts, and should therefore be surcharged, in the additional principal amount of **$3,147,976** (i.e., $507,935 + $2,640,041). If there is no liability to Klein on the lapse of the Phoenix life insurance policy, the only issue Klein truly contests, either because he was not negligent or because he was acting "reasonably and in good faith," the principal surcharge reduces to additional **$808,642** (i.e. $3,147,976 - $2,339,334) owed by Klein to the collective Trusts at the close of the Second Account.

To summarize, according to the Menlo beneficiaries forensic expert, the "rolling" surcharge to Klein for cash taken by Klein from the Trusts, plus actual interest paid by the Trust on those Trust funds in Klein's possession, less monies Klein applied to Trust expenses, through the September 30, 2018 closing date of the Third Account, totals **$10,605,392** (i.e. $8,217,645 +$1,579,105 + $808,642). If Klein is also liable for lapse of the four Phoenix insurance policies through the Third Account, the additional "rolling" claim for damages utilizing the Wirtz calculations is an additional **$8,618,775** (i.e., $1,790,231 + $4,489,210 + $2,339,334), excluding the Menlo beneficiaries' additional claims for tax liabilities.

**Klein and LKA's Contentions in Reply**

In his consolidated reply to the Menlo beneficiaries' post-trial contentions on each of the three Klein accountings, Klein correctly notes that the order for reference does not encompass issues with respect to Trustee removal, but also takes the position that "claims relating to matters before the First Accountings" are outside the Referee's authority.[37]

Klein requests that the Referee strike the Menlo beneficiaries' closing briefs because they were not filed concurrently with Klein's closing briefs as previously directed, a situation resulting from the health constraints of the Menlo beneficiaries' counsel. Klein contends that the Referee's order permitting Klein to file a reply brief, a right not given or afforded to the Menlo

---

[37] To the extent Klein is asserting that he can arbitrarily commence his first accountings at arbitrary points in time, skipping years of Klein's post-Trustee acceptance, management and control, as an artifice to avoid millions of dollars in interim Trust asset misappropriation, Klein is sorely mistaken, (See analysis and discussion. *infra*.).

beneficiaries, "is insufficient to remedy" the untimely filings. The Referee considers Klein's added right to file a reply brief to be an advantage, not a disability, with absolutely no prejudice whatsoever to Klein. Klein's motion to strike the Menlo beneficiaries' closing briefs is denied.

In further reply, Klein accurately recites Probate Code §16440(b), which affords a trial court the discretion to excuse a trustee from liability for breach of trust committed reasonably and in good faith, "if it would be equitable to do so," including where the trustee believes he/she/it/they are following the wishes of the settlor, despite the language of the trust instrument, citing *Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 296.

Referencing the testimony of its insurance expert, Steven Burgess ("Burgess"), Klein suggests that the downgraded financial condition of Phoenix Life Insurance, in and of itself, is sufficient to render Klein's decision to lapse four of those policies reasonable. Further, Burgess testified that "insurance companies routinely promote and encourage borrowing from policies."

Along with the Referee, Klein takes the position that unrealized income tax liabilities arising out of the lapse of the Phoenix Insurance policies are speculative. Klein cites *Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 952.

Klein reiterates the position taken in his initial closing brief that the Referee should disregard the testimony of forensic expert O'Bryan because of (1) the alleged "taint" of Judge Cowan's order compelling disclosure of communications to and from Klein's account preparer Magnes, which communications Klein contended were protected by attorney-client privilege and work product; and (2) O'Bryan's reliance upon Trust banking and insurance documents, including Klein's own personal and law firm bank accounts, which Klein contends violate the constraints of *People v. Sanchez, supra*, 63 Cal.4th 665.

Klein also correctly notes that O'Bryan's calculations of funds not used to benefit the Menlo Trusts include lines of credit which "could have been used for, *inter alia*, [Klein's] accounting and legal fees." The Referee understands that paragraph 6 of Judge Suzuki's order for reference expressly carves out for future trial court determination the issues of "(i) surcharge of Trustee for professional fees and (ii) liability of Trustee for prejudgment interest." To the extent

the Referee recommends Klein be surcharged for breach(es) of trust, utilizing O'Bryan's calculations, Klein shall be entitled to potential credit for professional fees, including accounting and legal fees, if any, which the trial judge determines in Phase II of this bifurcated trial were properly incurred by Klein as a legitimate trust expense. Because that issue is deferred for future trial court determination, the Referee takes no position as to the propriety of any offset against surcharge for Klein's attorney fees and costs.[38]

Klein's reply reiterates his contention that he is entitled to $1,827,548.04 in trustee fees above and beyond the $750,000 which Klein paid himself in 2005. Klein contends "it makes no difference whether the $750,000 trustee fee payment was authorized at the time," as that sum has been reduced from Klein's total entitlement calculation. Klein challenges the "industry standard" testimony offered by O'Bryan with respect to trustee fees for the management of unmatured whole and life insurance policies in a trust portfolio, as hearsay.[39]

Klein asks the Referee to approve all three accountings and to award him an additional $1,748,170.98 in trustee fees.

LKA, in its reply, observes that the six Menlo Trust beneficiaries who are seeking damages against LKA "dedicate very little real estate in their Closing Briefs to issues related to LKA." Specifically, it is argued by LKA that there was "no evidence that LKA misused funds belonging to the Six Petitioners, took any funds for its own purposes, or conspired with or aided and abetted the Trustee in any way."

---

[38] "[L]itigation seeking to remove or surcharge a trustee for mismanagement of trust assets would not warrant the trustee to hire counsel at the expense of the trust. Such litigation would be for the benefit of the trustee, not the trust." *Butler v. LeBouef*, (2016) 248 Cal. App. 4th 198, 213, quoting *Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221, 1227. Fee awards have been denied or reduced, *inter alia*, where the attorneys helped prepare an inaccurate accounting (*Estate of Keyston* (1951) 102 Cal.App.2d 223, 231–232); unsuccessfully defended an accounting (*Estate of Vokal* (1953) 121 Cal.App.2d 252, 258); or unsuccessfully defended a petition to remove or surcharge the trustee (*Estate of Miller* (1968) 259 Cal.App.2d 536, 546–547).

[39] The Referee sustains Klein's hearsay objection on this particular point. Nor may forensic accountant O'Bryan testify as an expert on this specific issue, given his lack of personal experience assessing carry value on unmatured whole and universal life policies in the context of Probate Code §1060 *et seq.* accounting schedules. Both sides are actually incorrect on this issue, as the proper carry value is expressly detailed in the CEB *Fiduciary Accounting Handbook* text (see discussion, *infra*).

LKA references forensic expert O'Bryan's concession that he had "no information as to whether LKA used the Six Petitioners' funds for its own purpose or for other trust purposes." Unlike Trustee Klein, LKA is not a trustee. As correctly noted by LKA, it is the Menlo beneficiaries' burden to establish liability and damages as to LKA.

## STATEMENT OF DECISION AND
## SETTLEMENT OF THE TRUSTEE'S FIRST ACCOUNT

### When Does the Trustee's First Account Begin?

As stated above, Klein accepted 22 of his 24 trusteeships in 1996. The remaining two trusteeships were accepted by Klein in 1999 (Daniel Winter) and 2002 (Jonathan Lifschutz), respectively.

Klein, in his First Accountings, reluctantly admitted his role in paying Trust obligations as Trustee from and after **1996**. [See, *e.g.*, Supplement[s] to First Account and Report, for Frank Menlo, at verified Report, ¶ 45]. Klein, in his capacity as Trustee, conceded making all of the accounting log contribution payments from the Menlo Trust beneficiaries on Trust insurance policies beginning February 23, 1998 (American General Insurance) and January 22, 1999 (Transamerica Insurance). [*Id.*, at Exs. 8-9 and verified Report, ¶¶ 41-42]. Klein's First Accountings include written correspondence by Klein to a number of the 24 Menlo beneficiaries establishing Klein's management and control of the Trust brokerage accounts by March 11, 2002 [*Id.*, at Ex. 14], after, as credibly testified to by Frank Menlo, Sam Menlo's second stroke had rendered Sam incompetent to conduct or advise on business matters of any kind.

In addition, Klein testified at trial and reported in the First Account that he paid himself a $750,000 Trustee Fee "as a partial deposit" **for his retroactive management** of the 24 Menlo Trusts **prior to June 2005**. [See, *e.g.*, Supplement[s] to First Account and Report for Frank Menlo, at verified Report, ¶44.]

Despite Klein's acceptance of all but two of the 24 Trusteeships in 1996; Klein's post-1996 actions fully consistent with fiduciary administration and management; what the Referee

finds to be Klein's unequivocal supervision and control of all Menlo Trust decision-making no later than 2002; and Klein's withdrawal of $750,000 from Trust insurance policies in June 2005 as compensation for *prior* Trustee services rendered, Klein's 24 First Accounts nevertheless select arbitrary opening dates of trusteeship between February 1, 2003 and April 13, 2009, with only the five Winter family accounts having a First Account starting date prior to May 19, 2006. [See fn. 9, *ante*.][40]

At trial, during voir dire by Klein's counsel on the qualifications of forensic expert O'Bryan, counsel held in his hand the CEB text *Fiduciary Accounting Handbook*, and asked O'Bryan:

"What is a leading treatise in California on fiduciary accounting?"

And though Klein does not now cite that treatise in his closing briefs, the text is insightful on how to set a Trustee's opening account date. Where Trustees, as here, succeed one another "in lock step," the succeeding Trustee's account commences "the day after the ending date of the prior account." CEB, *Fiduciary Accounting Handbook* (2022), §4.6, p. 161.

To the extent there may be one or more days vacancy between the prior trustee's resignation(s) and Klein's acceptance, or, as here, where there was no prior accounting, the CEB text advises that "the trustee who assumes office after vacancy may wish to use at his or her beginning date the date he or she accepts the trust." CEB, *Fiduciary Accounting Handbook*, *supra*, §4.8, p.164. As noted in the treatise, **"[t]he beginning date of the trustee's account signifies the date that a person becomes accountable to the beneficiaries."** Here, the Referee determines that Klein became accountable to the Menlo beneficiaries on the day he accepted each of the 24 Trusteeships.

---

[40] Given the many hundreds of Trust transactions Klein managed and administered prior to the arbitrary starting dates of many if not most of his First Accountings, and given Klein's complete lack of any corroborating evidence, Klein's contention that Sam and/or Vera Menlo served as *de facto* trustees during these periods is not credible. The Referee factually finds that Sam Menlo was without competence in and after 2002, and that Klein kept Vera Menlo completely in the dark with respect to her understanding of the Trusts' terms and any and all actions Klein transacted within the Trusts (other than providing certain grandchildren financial assistance in home purchases).

To the extent Klein contends that *as a condition of* acceptance of the 24 trusteeships, he delegated decision-making to the co-settlors, loss becomes only a question of liability due to improper fiduciary delegation,[41] not a question of when to commence the Trustee's periods of accounting.

### How Must the Court Assess the 24 Missing Accounting Periods?

The date of Klein's acceptance of the respective Trusteeships, to the date that Klein elected to first account, are deemed periods of missing accounting, accentuated by then- Commissioner Cowan's December 20, 2013 explicit order that Klein account from *"the time period commencing when Leslie Klein first became trustee of the Trust*, to the present day."  Those missing account periods are specifically as follows:

Abraham Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Samuel Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Esther Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Rachel Deutsch – 9/10/96-2/26/09 (12 yrs., 5 mos.)

Mordechai Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Deborah Deutsch – 9/10/96-2/26/09 (12 yrs., 5 mos.)

Zev Deutsch -- 9/10/96-2/26/09 (12 yrs., 5 mos.)

Tanya Menlo -- 9/10/96-7/22/08 (11 yrs., 10 mos.)

Franklin Menlo -- 9/10/96-7/22/08 (11 yrs., 10 mos.)

Jonathan Menlo – 9/10/96-12/31/07 (11 yrs., 3 mos.)

Yeshia Frankel -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Rochelle Lipschutz -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Moishe Frankel -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

---

[41] As stated in Probate Code 16012(a):

> **"The trustee has a duty not to delegate** to others the performance of acts that the trustee can reasonably be required personally to perform and may not transfer the office of trustee to another person nor delegate the entire administration of the trust to a cotrustee or other person." (Emphasis added.)

Madeline Lipschutz -- 9/10/96-5/21/06 (9 yrs., 8 mos.)

Faye Lipschutz -- 9/10/96-5/17/06 (9 yrs., 8 mos.)

Avi Lipschutz -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

Dov Lipschutz -- 9/10/96-5/18/06 (9 yrs., 8 mos.)

Asher Frankel -- 9/10/96-5/22/06 (9 yrs., 8 mos.)

Norine Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Michael Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Jeremy Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Amanda Winter -- 9/10/96-1/31/03 (6 yrs., 4 mos.)

Jonathan Lifschutz -- 12/26/02-4/12/09 (6 yrs., 3 mos.)

Daniel Winter -- 10/28/97-1/31/03 (5 yrs., 3 mos.)

Quoting the California Supreme Court in *Blackmon v. Hale* (1970) 1 Cal. 3d 548, 560:

**"Trustees are . . . under an obligation to render to beneficiaries a full account of all their dealings with the trust property, and where there has been a negligent failure to keep true accounts all presumptions are against them upon a settlement** [citing *Estate of McCabe* (1950) 98 Cal.App.2d 503, 505 ("*McCabe*") and *Purdy v. Johnson* (1917) 174 Cal. 521, 527 ("*Purdy*")]." (Emphasis added.)

As held in the referenced appellate opinion in *McCabe, supra*:

**Trustees are ... under the duty to prove every item of their account by "satisfactory evidence"; the burden of proof is on them and not on the beneficiary; and any doubt arising from [the Trustee's] failure to keep proper records, or from the nature of the proof they produce, must be resolved against them** [citing *Purdy*]. (98 Cal. App. 2nd at 505.) (Emphasis added.)

If the 24 litigating Trusts are combined, there are a collective **156 years of missing first accountings**. Klein purported to have maintain *no records* of those Trusts during the entirety of the First Accounting period, other than the court-filed accounting which was crafted after-the-fact in 2013, for certain years only, prepared someone other than Klein with very limited document access. Meanwhile, the forensic accountant retained by the Menlo beneficiaries *located records* of more than 10,000 Trust transactions across what should be the First

Accounting period, including voluminous records associated with Klein's personal bank accounts and his LKA law firm account. Klein's response is not to object to the accuracy of those thousands of transactions, but rather, to object on hearsay grounds to the consideration of *all* applicable Trust insurance, banking and personal records which were Klein's duty to make available in the first instance. No claim has been made by Klein or LKA that the underlying Trust or personal records are untrustworthy.

### Does Klein Have a Valid *Sanchez* Hearsay Defense to Undisputed Forensic Accounting Testimony?

Under *Sanchez, supra*, where an expert testifies to "case specific" out-of-court statements to explain the basis for an opinion, the out-of-court statements must be properly admitted through an applicable hearsay exception. (63 Cal.4th at 684.)

Throughout the trial, both Klein and LKA, on behalf of the Trustee and his law firm, rendered continuing objections to prevent the admission of any records of Trust transactions procured from an institutional third party custodian of records. Most of those records were obtained directly by the Menlo beneficiaries through records subpoenas to the Trust's banks and insurance companies; while the LKA records were handed over by counsel for LKA to counsel for the Menlo beneficiaries during discovery.

In formulating his conclusions, forensic expert O'Bryan relied upon business records received from five insurers (Aetna/Lincoln; Phoenix; AIG; Transamerica and Union Central); two institutional brokerage houses (Morgan Stanley and UBS); and the Bank of America. The Bank of America records consisted of the LKA bank records, the MCT account opened by Klein, and Klein's personal bank records.

In light of the *Sanchez* objection, the Menlo beneficiaries were directed by the Referee to submit evidence of authentication of the business records relied upon by O'Bryan to establish the thousands of Trust transactions which formed the basis for his calculations

In a filing on March 9, 2022, the Menlo beneficiaries provided a sworn certification from Phoenix Insurance dated July 20, 2014 and a further certification dated October 13, 2014. Both certifications satisfy the criteria of Evidence Code §§1561-1562, rendering the Phoenix insurance records admissible as business records under Evidence Code §1271. The documents from American General Insurance (AIG) were received through its litigation counsel in a formal discovery production response on August 13, 2014. The documents from Transamerica Insurance were delivered with the certification from its custodian of records on July 21, 2014. The Referee determines those deliveries and certifications trustworthy and compliant with the Evidence Code authorization permitting verified business records to be admissible in lieu of the personal testimony of each company's custodian of records.

In the same submission, the Menlo beneficiaries provided a June 22, 2017 declaration from the authorized records custodian for Morgan Stanley, which declaration satisfies the criteria of Evidence Code §§1561-1562, rendering the Morgan Stanley records for the applicable Menlo beneficiaries admissible as business records under Evidence Code §1271. The custodian of records for the Bank of America also authenticated its records in a notarized declaration filed August 11, 2017, rendering admissible its bank records for the MCT and the bank records, credit card account statements and safe-deposit box records for Klein himself.

In a follow-up filing on March 22, 2022, the Menlo beneficiaries submitted a March 21, 2022 declaration from the authorized records custodian for Ameritas Life Insurance, verifying the records of its predecessor company, Union Central Insurance, plus a March 21, 2022 declaration from the custodian of records for Lincoln National Life Insurance (formerly Aetna); each entity properly authenticating the records of the Menlo Trusts. The Menlo beneficiaries also submitted the June 26, 2017 declaration from UBS authenticating the institutional brokerage records for those Menlo beneficiaries with Trust accounts outside of Morgan Stanley.

The only remaining set of records relied upon by O'Bryan in his compilation and analysis of Trust transactions are the bank records of Klein's law firm, LKA, which, according to the aforementioned submissions by the Menlo beneficiaries, were delivered directly to counsel for

the Menlo Beneficiaries from LKA's counsel. Evidence Code §1221 codifies the hearsay exception for adoptive admissions by providing that "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his [or her] adoption or his [or her] belief in its truth." The delivery to the Menlo beneficiaries by LKA of LKA bank records renders the documents admissible as an adoptive admission.

A California trial court has wide discretion to determine whether there is a sufficient foundation to qualify evidence as a business record. *Conservatorship of S.A.* (2018) 25 Cal. App. 5th 438, 447. As previously determined during the trial, the Referee finds that the records relied upon by O'Bryan to be trustworthy and all supported by sufficient foundation to be admissible. Klein and LKA's *Sanchez* hearsay objections to O'Bryan's reliance upon Trust records from the relevant insurance companies and brokerage houses, and Klein's personal and business records from the Bank of America, were and remain overruled.

### What are Klein and LKA's Claims of "Taint" from the Poisonous Tree?

The Menlo beneficiaries, whipsawed between Klein's claims of no Trust records and Klein's exclusion from participation in the preparation of his own verified accountings, on one hand, and Klein's tactical decision to shield his anointed account preparer, Magnes, from discovery as a privileged consultant, on the other, the Menlo beneficiaries requested and received relief from Judge Cowan, ordering Magnes' work product subject to discovery without attorney-client privilege or work product protection.

Despite Klein's unsuccessful efforts to overturn Commissioner Cowan's ruling through and including requests for extraordinary relief in the California Supreme Court, Klein asked the Referee to exclude from evidence at trial any communications between Ms. Magnes and Klein's counsel, or any communications between Magnes and Klein in the presence of or copied to counsel.

The matter was briefed and argued. While concepts of fundamental fairness had been utilized to allow the Menlo beneficiaries in pretrial discovery to learn how and under what direction Klein's accountings were prepared, the Referee determined that whatever communications Magnes may have had with or in the presence of counsel, written or verbal, would not be critical to a factual determination of the facial sufficiency of the accountings. Inasmuch as Judge Cowan's intended purpose was accomplished at the pretrial stage, the Referee found no need to expand issues for review as the accountings are by law required to be complete and supported by corroborative documentary evidence, subject to adverse presumptions where there are accounting deficiencies. Over the objection of the Menlo beneficiaries, the Referee granted Klein's requested exclusion order.

During testimony, particularly with both with Klein and Magnes, the Referee made diligent efforts to admonish witnesses not to involuntarily disclose any information which Klein's counsel contended to be privileged. To the Referee's information and belief, no such information was ever presented at trial. In the presentation of his forensic testimony, expert O'Bryan testified that he *never* reviewed information or documentation which Klein claimed to be privileged or work product, in the formulation of his calculations, opinions or otherwise. With the record so sanitized, and outside the purview of the testifying experts, the Referee is satisfied that the exclusion order was honored throughout the trial.

Despite these efforts, in his closing briefs, Klein notes that pretrial records containing such information had at some point been made available to O'Bryan's accounting firm. Despite O'Bryan's unequivocal testimony that those records had been segregated from his personal review and consideration, Klein contends that O'Bryan's opinions and calculations were nevertheless "tainted" by what Klein claims to be attorney-client and work product discovery authorized by Judge Cowan.[42]

---

[42] See, *e.g.*, 14 Tr. 2742-2743 (First Accounts), O'Bryan testifying:

1    The Referee finds no prejudice to Klein by virtue of Klein's involuntary compliance with

2    Judge Cowan's order combined with the Referee's exclusion of any such evidence at trial.

3    Arguable prejudice was directly eliminated by the Referee's refusal to entertain consideration of

4    any document or communication which Klein contended to fall within such protections.

5

6    **The Menlo Beneficiaries' "Floating" Exhibit List**

7    Klein claims generic prejudice by virtue of the Menlo beneficiaries' exhibit list late filing

8    and subsequent modifications during the course of the trial. Klein, however, points to no specific

9    exhibit, the production of which in any way was previously undisclosed or otherwise prejudicial

10   to Klein.

11   For the most part, mid-trial modifications of the Menlo beneficiaries' exhibit list consisted

12   of previously shared illustrative exhibits of forensic expert O'Bryan, as to which the Referee

13   ordered recalculations in order to delete factual or legal theories of liability that the Referee

14   determined to be inapplicable. In other words, most if not all of the modified illustrative exhibits

15   were beneficial, not prejudicial, to Klein.

16

17

18

---

19   "Q. Okay. And I think you told me earlier, though, that even though it appears that your firm spent more

20   than 20 hours at a minimum reviewing the White Zuckerman documents, none of it was used in preparing
     your analysis for this case?

21   A.   That's correct."

22   Also see 17 Tr. 3205 (Second Accounts), O'Bryan testifying:

23   "Q.   Did you -- did you use any of the privilege[] log documents in the preparation of this database?
     A.   No, the privilege[] log documents had nothing to do with the financial transactions."

24

25   Also see 20 Tr. 2813 (Third Accounts), O'Bryan testifying:

26   "Q.   Okay.  Did you use any of [Klein's privilege log] documents in the preparation of your database?
     A.   No.

27   Q.   Did you use any of those documents in your analysis of the damages cost to the trust in the third
     accountings?

28   A.   No."

**Should Klein Be Surcharged on the First Account?**

The cross-account transactional audit conducted by forensic accounting expert O'Bryan on the true First Accounting periods for the 24 Trusts, as well as the lesser time periods for which Klein elected to account, were exhaustive. The approximately 10,000 transactions conducted by Klein on behalf of the Trusts during the true First Accounting periods, most of which transactions are completely ignored in Klein's verified First Accounts, were separately detailed by O'Bryan. (Ex. 828A.)

The testimony of O'Bryan was clear, convincing and credible. Thousands of the transactions conducted by Klein on behalf of the Trusts, identified by O'Bryan, were *excluded* from Klein's verified First Accounts.

The Referee finds that through an elaborate scheme to pay himself by co-mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-paying debts -- filtered with stunning frequency through Klein's personal and business accounts with multiple other sources of income and receipts and outgoing payments, Klein was able to collectively embezzle millions of dollars from the Menlo Trusts.

Menlo Trust transactional funds were moved by Klein into and out of his LKA attorney-client trust account, in the words of O'Bryan and as established in the audit, "all the time." During the entirety of the true First Accounting periods across the 24 Menlo Trusts, $2,753,152 was removed by Klein as loans taken by Klein either personally or through LKA against Menlo Trust insurance policies; $1,959,334 was removed by Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts; $1,046,418 was taken by Klein into the personal accounts of Klein and his wife Erika as overdraft protection against the Bank of America "MCT" account opened by Klein and funded by Menlo Trust assets; $874,550 was taken by Klein from the Menlo Trust-funded "MCT" into the Klein's LKA law firm account and for other Klein uses; and $324,582 in Menlo Trust checks and funds were taken by Klein directly into Klein's LKA law firm account and for other Klein uses. (Ex. 834, at 11.)

Against these sums, over the entire true First Account periods across the 24 Trusts, a net credit of ($105,416) in cash was returned by Klein to various Menlo Trusts and ($628,112) was paid by Klein for Trust insurance premiums, accounting fees and for attorney fees to Madeline Lipschutz in a family law matter. (*Ibid.*)

As noted above, subject to any Phase II credit(s) given by the trial judge to Klein on the First Accountings for attorney fees and litigation expenses in preparation of grossly and intentionally incomplete verified accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the true periods of the First Accounting, and never returned, in terms of outright misappropriations, totals $6,224,540.**

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. The 24 verified First Accountings submitted by Klein, by Magnes' admission, completely ignore funds diverted from the Menlo Trusts to and from the MCT account, the LKA account, and Klein's personal bank accounts. Magnes appears to have been spoon-fed documents and numbers that Klein, through his counsel, wanted Magnes to include, to the exclusion of the client's known business and personal accounts, and a separate Klein-created Trust bank account, through all of which the Referee finds that Klein was able to and did misappropriate $6,224,540 in funds for his personal use during the First Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon settlement rendered against Klein. where, as here, the Referee finds "a … failure to keep true accounts" (*Blackmon v. Hale, supra,* 1 Cal. 3d at 560); and also where, as here, "any doubt from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe, supra,* 98 Cal.App.2d at 505), **Klein is surcharged in the principal sum of $6,224,540 for outright cash misappropriations across the 24 Trusts during the true periods of the First Account, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013.**

It is not simply the misappropriations, however, that damaged the Menlo Trusts during the true First Accounting periods. The misappropriations, in part, came from $2,753,152 in loans taken by Klein against the value of Trust insurance policies, and $1,959,374 in loans taken against lines of credit against Trust Brokerage Accounts. The Menlo Trusts, not Klein, serviced in some form or fashion *all of the interest* due and owing on those combined $4,712,526 in loans. The interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the true First Accounting periods totaled $1,693,048. The interest charged by brokerage houses to service Trust lines of credit taken by Klein during the true First Accounting periods totaled $300,049.

Absent the $6,224,540 in misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the appropriate First Accounting periods, there would have been no need for the Trust to borrow funds and to subsequently service those loans. In light of the massive disparity between the millions of dollars in cash debits taken by Klein and the modest credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein from Trust assets during the First Accounting periods were for purposes of non-Trust use and therefore misappropriation.

As declared in Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

> "(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:
>
> (1) **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
> (2) Any profit made by the trustee through the breach of trust, with interest.
> (3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.
>
> (b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly the combined $1,993,097 in interest obligations **paid by the Menlo Trusts** during the First Accounting periods to subsidize the $4,712,526 in loan funds taken personally by Klein during the First Accounting periods are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $1,993,097, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013, for diminution in value to the Menlo Trusts for actual interest paid by the Trusts on loan funds taken by Klein during the First Account.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts. The Referee finds unequivocally that none of Klein's acts resulting in surcharge were performed reasonably or in good faith.

The third and final surcharge question is whether Klein breached the relevant Trusts during the true First Accounting periods by causing a $5,000,000 face value Phoenix Insurance universal life policy (#2346693) to lapse. At the time of the lapse decision, Klein was represented by counsel. On April 24, 2013, Klein sent a letter to the Menlo beneficiaries asking their position with respect to the lapse of the Phoenix policies 2265404 and 2346693. (Ex. 850.) The Menlo beneficiaries, through counsel, responded that it appeared Klein, through "wrongful borrowings," had depleted the value of the policies, but without a full accounting, the propriety of lapse decisions could not be gauged. (Ex.851.) Klein, through counsel, responded (ironically) that he would need to "invade the assets of the Irrevocable Trusts to fund the premiums due."

(Ex. 852.) Klein subsequently asserted, through counsel, that he would forthwith be liquidating the Menlo beneficiaries assets to pay Phoenix premiums. (Ex.854.)[43]

The evidence was undisputed that at the time of the Phoenix 2346693 policy lapse, including through Klein's insurance expert Burgess, that it was a reasonable decision for Klein to allow the policy to lapse due to the combination of loans *taken by Klein personally* against the Phoenix policy, continued unpaid interest accruing on those loans, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, further reducing policy value.[44]

The core cause of the Phoenix policy lapse was the loan funds taken by Klein against the lapsed Phoenix policy, which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policy was exclusively the result of Klein's misappropriation of trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums (see, e.g., Ex.434, at 3). The Referee finds not credible Klein's claim that Sam Menlo had directed the Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the Phoenix loan proceeds for himself.

---

[43] By this point, Klein, through many hundreds of loan transactions and asset transfers in and out of different accounts, had been liquidating Menlo Trust assets for years for his own personal benefit.

[44] The audits establish that between 2004 and 2012, a net $4,588,152 in cash loans was taken by Klein as against Phoenix and Lincoln Life insurance policies owned by the relevant Menlo Trusts. From Lincoln, Klein withdrew $100,000 cash in 2004 and $872,153 cash in 2008. From Phoenix, Klein withdrew $750,000 cash in 2005, $1,000,000 cash in 2007, $775,000 cash in 2008, $350,000 cash in 2010, and $1,050,000 cash in 2012. $300,000 cash was returned by Klein to Phoenix in 2009. Of the net $4,588,152 cash removed by Klein from the insurers, $2,773,152 were sent to deposited to LKA or to Klein individually. The balance of $1,825,000 was deposited into Klein's "MCT" account. As noted earlier, no reference to asset dispositions into the LKA account, Klein's personal accounts, nor the MCT accounts found their way into Klein's verified accountings, nor was Magnes authorized to inquire into or examine that data. (Ex. 434.)

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the $5,000,000 policy death benefit, less the principal amount of loans, thereby retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse, and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans, according to Wirtz, there should still have been $1,790,231 remaining in policy value.

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the First Accounting period of $1,790,231. **Klein is surcharged an additional $1,790,231 for the unreasonable diminution in value of the collective corpus of the 24 Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued after the close of the First Accounting periods on June 30, 2013.**

**The total principal surcharge to Klein for the true period of the First Accountings is determined to be $10,007,876** (*i.e.*, $6,224,540 + $1,993,097 + $1,790,231) (Ex. 834, at 11), less any attorney fees and costs incurred by Klein during the period of the First Accounts determined by the trial judge in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the net surcharge, if any, as further determined by the trial judge in Phase II.

Breaking down the net collective surcharge on an individual Trust basis, the surcharge sums (or credits) for the First Account are found, based upon substantial evidence, to be allocable as follows:

1    Abraham Deutsch -- ($165,044)

2    Samuel Deutsch – ($56,424)

3    Esther Deutsch – ($67,214)

4    Rachel Deutsch – ($27,220)

5    **Mordechai Deutsch -- $696,646**

6    **Deborah Deutsch -- $1,516,890**

7    **Zev Deutsch -- $738,752**

8    **Tanya Menlo -- $66,597**

9    **Franklin Menlo -- $51,741**

10   **Jonathan Menlo -- $693,714**

11   **Yeshia Frankel -- $658,620**

     **Rochelle Lipschutz -- $780,115**

12   **Moishe Frankel -- $739,603**

13   **Madeline Lipschutz -- $793,217**

14   **Faye Lipschutz -- $703,514**

15   **Avi Lipschutz -- $680,133**

16   **Dov Lipschutz -- $785,301**

17   **Asher Frankel -- $751,428**

18   **Norine Winter -- $145,601**

19   **Michael Winter -- $60,225**

20   **Jeremy Winter -- $60,226**

21   **Amanda Winter -- $61,333**

22   **Jonathan Lifschutz -- $30,302**

23   **Daniel Winter -- $60,224** (Ex. 834, at 12.)[45]

24

     _____

25   [45] One of the many reasons these sums are so widely variable among the 24 Menlo beneficiaries is
     because O'Bryan was required to and did reconcile the many hundreds of cross-Trust loans and transfers
26   Klein had made between and among the 24 Menlo beneficiaries. In addition, *inter alia*, only certain
     Menlo beneficiaries' accounts were utilized to subsidize the line of credit loans taken by Klein; while
27   percentage ownerships of the Menlo Trust life insurance policies varied across the 24 Trusts, with the
     insurance policy loan funds taken by Klein affecting only certain Menlo beneficiaries.

28

Four of the Menlo Trust beneficiaries, Abraham Deutsch, Samuel Deutsch, Esther Deutsch and Rachel Deutsch, are accordingly not entitled to surcharge judgment against Klein on the First Accounting. The remaining 20 Menlo Trust beneficiaries are entitled to surcharge judgments in the respective principal sums identified above.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 20 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's First Accountings?**

In their respective initiating accounting, removal and surcharge petitions, the 20 prevailing Menlo beneficiaries pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a... trust... the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $8,217,645 of Menlo Trust cash during the period of the true First Accountings, including interest paid for which Klein should be liable; laundering funds through many hundreds of unnecessary intra-trust transactions and multiple repositories, including, *inter alia*, the commingling of assets of 24 individual Trusts and then frequently across Klein and his other clients' assets via his law firm attorney-client trust account; the use of the MCT account as a clearinghouse for additional misappropriated funds; and use of Menlo Trust cash to pay

$1,046,418 of his own personal credit card expenses through undisclosed overdraft authorization on the surreptitious MCT fund transfer account.

The remaining surcharge award associated with Klein's lapse of the Phoenix insurance policy is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as properly adjusted. Klein's direct cash misappropriations associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the four non-prevailing beneficiaries are filtered out, total **$8,533,547, payable in the following additional sums**:

**Mordechai Deutsch -- $535,525**

**Deborah Deutsch -- $1,516,890**

**Zev Deutsch -- $577,631**

**Tanya Menlo -- $66,597**

**Franklin Menlo -- $51,741**

**Jonathan Menlo -- $532,593**

**Yeshia Frankel -- $497,507**

**Rochelle Lipschutz -- $618,994**

**Moishe Frankel -- $578,482**

**Madeline Lipschutz -- $793,217**

**Faye Lipschutz -- $542,393**

**Avi Lipschutz -- $519,012**

**Dov Lipschutz -- $624,180**

**Asher Frankel -- $590,307**

**Norine Winter -- $145,601**

**Michael Winter -- $60,225**

**Jeremy Winter -- $60,226**

**Amanda Winter -- $61,333**

**Jonathan Lifschutz -- $30,302**

**Daniel Winter -- $60,224** (Ex. 834, at 12.)

It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the First Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5th 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's First Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the First Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the First Account. While four of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the First Account, had Klein maintained and delivered an appropriate and accurate First Account for each of the 24 Menlo Trusts, they would not have had to engage in a ten-year litigation to unravel proper debits and credits as to the allocation of Klein's misappropriations. Klein breached multiple trust obligations to each of those four beneficiaries, including with respect to Klein's complete lack of record keeping and failure to timely and accurately account. (*Smith v. Szeyller, supra,* 31 Cal.App.5th at 461-462.)

**STATEMENT OF DECISION ON
SETTLEMENT OF THE TRUSTEE'S SECOND ACCOUNT**

The Referee incorporates by reference as though fully set forth herein the evidentiary rulings associated with Klein and LKA's *Sanchez* objections, allegations of "taint" associated with Judge Cowan's rulings on discovery regarding preparation of Klein's accountings, and

arguments regarding the timing of receipt of the Menlo beneficiaries' exhibits. For the reasons

articulated above, those objections are again overruled.

### Should Klein Be Surcharged on the Second Account?

The cross-account transactional audit conducted by forensic accounting expert O'Bryan on Klein's Second Accounts for the 24 Trusts was extensive. The approximately 4000 transactions conducted by Klein on behalf of the Trusts during the Second Accounting period, hundreds of which transactions were completely ignored in Klein's verified Second Accounts, were separately detailed by O'Bryan. (Ex. 843.)

As previously determined in the Referee's Statement of Decision on Klein's First Accounts, the testimony of O'Bryan on Klein's Second Accounts was clear, convincing and credible. Though at the time litigating against the Menlo beneficiaries and represented by current counsel, many hundreds of transactions conducted by Klein on behalf of the Menlo Trusts, identified by O'Bryan, remained *excluded* from Klein's verified Second Accounts.

The Referee finds that through an elaborate scheme to continue to pay himself by co-mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-paying debts -- filtered with stunning frequency through Klein's personal and business accounts containing multiple other sources of income and receipts and outgoing payments, Klein was able in the Second Accounts to perpetuate and further extend his design to misappropriate funds from the Menlo Trusts.

Menlo Trust transactional funds continued to be moved by Klein into and out of his LKA attorney-client trust account. During the entirety of the Second Account across the 24 Menlo Trusts, a net $254,649 in cash was removed by Klein from the Menlo Trusts and not returned by the December 31, 2016 Second Account closing date; an additional $1,282,783 was removed by Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts; an additional $172,101 was taken by Klein into the personal accounts of Klein and his wife Erika as overdraft protection against the Bank of America "MCT" account opened by Klein and funded

by Menlo Trust assets; and $75,956 in Menlo Trust checks and funds were taken by Klein directly into Klein's LKA law firm account and for other Klein uses. (Ex. 842, at 3.)

Against these sums, over the Second Accounting across the 24 Menlo Trusts, a net credit of ($73,061) in cash was returned by Klein to his MCT Bank of America account and ($559,190) was paid by Klein for Trust insurance premiums to pay for insurance premiums on Trust insurance policies not yet lapsed (*Ibid.*)

As noted above, subject to any Phase II credit(s) given by the trial judge to Klein on the Second Accountings for attorney fees and litigation expenses in preparation of the incomplete accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the Second Accounting period, and never returned, totals $1,153,228.**

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. The 24 verified Second Accountings submitted by Klein, by Magnes' admission, once again ignore the disposition of funds diverted from the Menlo Trusts to and from the MCT account, the LKA account, and Klein's personal bank accounts. The Referee finds that Klein was able to and did misappropriate $1,153,228 in funds for his personal use during the Second Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon its settlement rendered against Klein; where, as here, the Referee finds "a ... failure to keep true accounts" (*Blackmon v. Hale, supra*, 1 Cal. 3d at 560); and also where, as here, "any doubt from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe, supra*, 98 Cal.App.2d at 505). **Klein is surcharged in the principal sum of $1,153,228 for net cash misappropriations across the 24 Trusts during the Second Account, plus any interim prejudgment interest to be determined to have accrued after the close of the** Second **Accounting period on December 30, 2016.**

It is not only the cash misappropriations damaging the Menlo Trusts during the Second Accounting period. The misappropriations, in part, came from $1,282,783 *in additional loans* taken by Klein during the Second Accounting period against lines of credit obligating Menlo Trust Brokerage Accounts. The Menlo Trusts, not Klein, serviced *all of the interest* due and owing on those additional loans, and in continuing interest charged on the $4,712,486 in prior insurance and brokerage loans taken by Klein during the period covered by the First Account. The *additional* interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the First Accounting periods, but paid by Klein from Trust funds during the Second Accounting period, totaled $409,134. The *additional* net interest charged by brokerage houses to service Trust lines of credit taken out by Klein during either the First Accounting period or Second Accounting period, but paid by the Trusts during the Second Account, totaled $17,642.

Absent the cash misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the First Accounting and Second Accounting periods, there would have been no need for the Trusts to subsequently service those loans. In light of the disparity between the cash debits taken by Klein without repayment to the Trusts and the credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein against Trust assets during the Second Accounting period were for purposes of non-Trust use and therefore misappropriation.

Pursuant to Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

"(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:

(1) **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
(2) Any profit made by the trustee through the breach of trust, with interest.

(3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

(b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly $426,776 in *additional* interest obligations **paid by the Menlo Trusts** during the during the Second Accounting period to subsidize the $5,995,259 in total loan funds taken personally by Klein during the First and Second Accounting periods, are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $426,776, plus any interim prejudgment interest to be determined to have accrued after the close of the Second Accounting period on December 31, 2016, for diminution in value to the Menlo Trusts for additional interest paid by the Trusts on loan funds taken by Klein during the First and Second Account periods.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts. The Referee finds that none of Klein's acts resulting in surcharge on the Second Accounts were performed reasonably or in good faith.

The remaining surcharge question on the Second Accounts is whether Klein breached the relevant Trusts during the Second Accounting period by causing two additional $5,000,000 face value Phoenix Insurance universal life policies (#2265404 and #2356295) to lapse. The evidence was undisputed that *at the time* of those policy lapses, as defined by Klein's insurance expert Burgess, it was a reasonable decision for Klein to allow the two insurance policies to lapse due to the combination of loans *taken by Klein personally* against those Phoenix policies, continued unpaid interest accruing on those policy loans, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, significantly reducing the respective policy values.

The core cause of the additional two Phoenix policy lapses was the loan funds taken by Klein against the lapsed Phoenix policies, which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policies was exclusively the result of Klein's misappropriations of Trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums. The Referee finds not credible Klein's claim that Sam Menlo had directed Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the respective Phoenix loan proceeds for himself.

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the additional $10,000,000 in policy death benefits, less the principal amount of loans all the while retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse (calculated to pay out in 2023), and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans, according to Wirtz, there should still have been $4,489,210 remaining in policy values over the two additional lapsed policies. (Ex. 844.)

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the First Accounting period of $4,489,210. **Klein is surcharged an additional**

1    **$4,489,210 for the unreasonable diminution in value of the collective corpus of the 24**

2    **Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued**

3    **after the close of the Second Accounting period on December 31, 2016.**

4       The total principal surcharge to Klein for the Second Accountings is found to be

5    **$6,069,214** (*i.e.*, $1,153,228 + $426,776 + $4,489,210) (Ex. 842, at 3), less any attorney fees and

6    costs incurred by Klein during the period of the Second Accounts determined by the trial judge

7    in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the

8    net surcharge, if any, as further determined by the trial judge in Phase II.

9       Breaking down the net collective surcharge on an individual Trust basis, the surcharge

10    sums (or credits) for the Second Account are found, based upon substantial evidence, to be

11    allocable as follows:

12    Abraham Deutsch -- ($7211)

13    Samuel Deutsch – ($7211)

14    Esther Deutsch – ($7211)

15    Rachel Deutsch – ($7211)

16    Norine Winter – ($7256)

17    **Mordechai Deutsch -- $463,492**

18    **Deborah Deutsch -- $533,505**

19    **Zev Deutsch -- $462,492**

20    **Tanya Menlo -- $37,179**

21    **Franklin Menlo -- $66,811**

22    **Jonathan Menlo -- $494,494**

23    **Yeshia Frankel -- $461,095**

   **Rochelle Lipschutz -- $461,095**

24    **Moishe Frankel -- $461,095**

25    **Madeline Lipschutz -- $849,571**

26    **Faye Lipschutz -- $462,492**

27    **Avi Lipschutz -- $465,111**

28

**Dov Lipschutz -- $462,492**

**Asher Frankel -- $461,095**

**Michael Winter -- $51**

**Jeremy Winter -- $51**

**Amanda Winter -- $51**

**Jonathan Lifschutz -- $2059**

**Daniel Winter -- $51** (Ex. 842, at 16-38.)[46]

It should be clarified that these calculations are not "running" totals, but rather, are intended to constitute separate surcharge judgments exclusively for the Second Accounting period, independent of the calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the period of the First Accountings as of June 30, 2013.

Five of the Menlo Trust beneficiaries, Abraham Deutsch, Samuel Deutsch, Esther Deutsch, Rachel Deutsch and Norine Winter, are accordingly not entitled to surcharge judgment against Klein on the Second Accounting. The remaining 19 Menlo Trust beneficiaries are entitled to additional surcharge judgments in the respective principal sums identified above.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 19 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's Second Accounts?**

In their initiating accounting, removal and surcharge petitions, the 19 prevailing Menlo beneficiaries on the Second Account pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

---

[46] The Referee's surcharge calculations are exclusive of potential adverse tax consequences associated with income realization upon lapse of the two Phoenix insurance policies during the Second Accounting period. As noted earlier, the Referee determines those potential tax losses to be speculative and not currently recoverable, while not relieving Klein of contingent liability to the extent those tax consequences become realized.

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a… trust… the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $1,580,004 of Menlo Trust cash during the period of the Second Accountings, including interest paid for which Klein should be liable; laundering funds through many hundreds of unnecessary intra-trust transactions and multiple repositories, including, *inter alia*, the commingling of assets of 24 individual Trusts and then frequently across Klein and his other clients' assets via Klein's law firm attorney-client trust account; the use of the MCT account as a clearinghouse for additional misappropriated funds; and use of Menlo Trust cash to pay an additional $172,101 of his own personal expenses through undisclosed overdraft authorization on the surreptitious MCT account.

The remaining surcharge award associated with Klein's lapse of the two additional Phoenix insurance policies is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as adjusted. Klein's direct cash misappropriations associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the five non-prevailing beneficiaries are filtered out, total **$1,625,311, payable in the following additional sums:**

**Mordechai Deutsch -- $14,571**

**Deborah Deutsch -- $533,505**

**Zev Deutsch -- $13,571**

**Tanya Menlo -- $37,179**

**Franklin Menlo -- $66,811**

**Jonathan Menlo -- $45,573**

**Yeshia Frankel -- $12,174**

**Rochelle Lipschutz -- $12,174**

**Moishe Frankel -- $12,174**

**Madeline Lipschutz -- $849,571**

**Faye Lipschutz -- $13,571**

**Avi Lipschutz -- $16,190**

**Dov Lipschutz -- $13,571**

**Asher Frankel -- $12,174**

**Michael Winter -- $51**

**Jeremy Winter -- $51**

**Amanda Winter -- $51**

**Jonathan Lifschutz -- $2059**

**Daniel Winter -- $51**

It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the Second Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5th 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's Second Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the Second Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the Second Account. While five of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the Second Account, had Klein maintained and delivered an appropriate and accurate Second Account for each of the 24 Menlo Trusts, they would not have had to engage in a multi-year litigation to unravel proper debits and credits as to the allocation of Klein's misappropriations. Klein breached multiple trust obligations to each of those five beneficiaries, including with respect to Klein's complete lack of record keeping and failure to timely and accurately account. (*Smith v. Szeyller, supra*, 31 Cal.App.5th at 461-462.)

## STATEMENT OF DECISION ON
## SETTLEMENT OF THE TRUSTEE'S THIRD ACCOUNT

The Referee incorporates by reference as though fully set forth herein the evidentiary rulings associated with Klein and LKA's *Sanchez* objections, allegations of "taint" associated with Judge Cowan's rulings on discovery regarding preparation of Klein's accountings, and arguments regarding the timing of receipt of the Menlo beneficiaries' exhibits. For the reasons articulated above, those objections are again overruled.

### Should Klein Be Surcharged on the Third Account?

The cross-account transactional audit conducted by forensic accounting expert O'Bryan on Klein's Third Accounts for the 24 Trusts was extensive. The approximately 2000 transactions conducted by Klein on behalf of the Trusts during the Third Accounting period, many of which transactions were ignored in Klein's verified Third Accounts, are painstakingly detailed in O'Bryan's database. (Ex. 860.)

As previously determined in the Referee's Statement of Decision on Klein's First and Second Accounts, O'Bryan's testimony on Klein's Third Accounts was clear, convincing and credible. The Referee finds that through an elaborate scheme to continue to pay himself by co-

mingling assets; cross-borrowing among 24 Trusts; taking loans against trust assets and cross-paying debts -- filtered with frequency through Klein's business account containing multiple other sources of income and receipts and outgoing payments, Klein was able to continue in the Third Accounts to perpetuate his pattern of misappropriation.

Menlo Trust transactional funds continued to be moved by Klein into and out of his LKA attorney-client trust account. During the entirety of the Second Account across the 24 Menlo Trusts, a net $165,905 in cash was removed by Klein from the Menlo Trusts and not returned by the September 30, 2018 Third Account closing date; and an additional $889,671 was removed by Klein as loans against lines of credit taken by Klein against Menlo Trust brokerage accounts (Ex. 862, at 3.) Against these sums, over the Third Accounting across the 24 Menlo Trusts, a net credit of ($547,641) was paid by Klein for Trust insurance premiums on policies not yet lapsed. (*Ibid.*)

As noted earlier, subject to any Phase II credit(s) given by the trial judge to Klein on the Third Accountings for attorney fees and litigation expenses in preparation of the incomplete accountings and in unsuccessfully defending against surcharge, **the collective net cash taken by Klein himself from the 24 Trusts during the Third Accounting period, and never returned, totals $507,935**.

Klein provided no evidence whatsoever to counter O'Bryan's testimony beyond his unsupported and factually disproven contention that he did not take "one penny" from the Menlo Trusts. In preparation of the Third Accounts, Magnes testified that she was not asked to determine if Klein had taken funds for his own use, nor was she seeking evidence of misappropriation. Based upon O'Bryan's comprehensive audit, the Referee finds that Klein was able to and did misappropriate an additional $507,935 in funds for his personal use during the Third Accounting period.

Given the applicable standards of review of a trustee's accounting, with all presumptions upon its settlement rendered against Klein; where, as here, the Referee finds "a ... failure to keep true accounts" (*Blackmon v. Hale, supra,* 1 Cal. 3d at 560); and also where, as here, "any doubt

from [Klein's] failure to keep proper records" must be resolved against Klein (*McCabe*, *supra*, 98 Cal.App.2d at 505), **Klein is surcharged in the principal sum of $507,935 for net cash misappropriations across the 24 Trusts during the Third Account, plus any interim prejudgment interest to be determined to have accrued after the close of the Third Accounting period on September 30, 2018**.

It is not only the cash misappropriations damaging the Menlo Trusts during the Second Accounting period. The misappropriations, in part, came from $889,671 *in additional loans* taken by Klein during the Third Accounting period against lines of credit obligating Menlo Trust brokerage accounts. The Menlo Trusts, not Klein, serviced *all of the interest* due and owing on those additional loans, and in continuing the payment of interest charged on unpaid insurance and brokerage loans taken by Klein during the periods covered by the First Account and Second Account.    The *additional* interest charged by Phoenix Life Insurance and Lincoln Life on direct cash policy loans taken by Klein during the First Accounting periods, but paid by Klein from Trust funds during the Third Accounting period, totaled $208,454. The *additional* net interest charged by brokerage houses to service Trust lines of credit taken out by Klein during either the First, Second or Third Accounting periods, but paid by the Trusts during the Third Account, totaled $92,252.

Absent the cash misappropriations taken personally by Klein from the Menlo Trusts and its intended beneficiaries during the First, Second and Third Accounting periods, there would have been no need for the Trusts to subsequently service those loans. In light of the disparity between the cash debits taken by Klein without repayment to the Trusts and the credits utilized by Klein for legitimate Trust expenses, the Referee finds by clear and convincing evidence that the excess funds taken by Klein against Trust assets during the Second Accounting period were for purposes of non-Trust use and therefore misappropriation.

Pursuant to Probate Code 16400, "[a] violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." The measure of liability for such a breach is found in Probate Code §16440:

"(a)  If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:

(1)  **Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.**
(2)  Any profit made by the trustee through the breach of trust, with interest.
(3)  Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

(b)  If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

The reference order from Judge Suzuki defers the question of *prejudgment interest on any surcharge judgment* to Phase II of the hearing, to be determined by the trial court. But certainly $300,706 in *additional* interest obligations **paid by the Menlo Trusts** during the during the Third Accounting period to subsidize the **$6,884,930 in total loan funds taken personally by Klein during the First, Second and Third Accounting periods**, are direct losses in value to the Menlo Trust estates within the meaning of Probate Code §16440(a)(1), on which a calculation of prejudgment interest can ultimately be rendered. **Klein is surcharged an additional $300,706, plus any interim prejudgment interest to be determined to have accrued after the close of the Second Accounting period on December 31, 2016, for diminution in value to the Menlo Trusts for additional interest paid by the Trusts in the Third Accounting period on loan funds taken by Klein for his non-Trust use during the First, Second and Third Account periods.**

The "reasonably and in good faith" language of Probate Code §16440(b) mirrors the standards of the Trustee exculpation provisions of both the Children's Trusts and the Grandchildren's Trusts.  The Referee finds that none of Klein's acts resulting in surcharge on the Third Accounts were performed reasonably or in good faith.

The remaining surcharge question on the Third Accounts is whether Klein breached the relevant Trusts during the Third Accounting period by causing a fourth $5,000,000 face value Phoenix Insurance universal life policy (#2499115) to lapse. The evidence was undisputed that *at*

*the time* of that policy lapse, as opined by Klein's insurance expert Burgess, it was a reasonable decision for Klein to allow the fourth Phoenix policy to lapse due to the combination of loans *taken by Klein personally* against that Phoenix policies, continued unpaid interest accruing on that policy loan, and no paid premiums since Klein's acceptance of the Trusteeships in 1998, significantly reducing the policy's value.

The core cause of the fourth Phoenix policy lapse was the loan funds taken by Klein against the policy which loan sums Klein removed from the Trusts without repayment and, the Referee finds, with no intention to repay. The "drag" on the lapsed Phoenix policy was exclusively the result of Klein's misappropriations of Trust funds. The record is unequivocal that absent Klein's misappropriations, the otherwise available millions of dollars in Menlo Trust brokerage funds could have and would have paid for each of the unpaid Phoenix policy premiums. The Referee finds not credible Klein's claim that Sam Menlo had directed Phoenix policies toward lapse as a mechanism to finance the purchase of additional policies, nor does the Referee find credible, based upon review of the financial records, that Klein utilized Phoenix loan proceeds to purchase additional Trust insurance coverages. The Referee finds that Klein took the lapsed Phoenix loan proceeds for himself.

As testified to by insurance expert Wirtz, without considering the disposition of the loan proceeds, which numbers are included in the cash misappropriation surcharge calculations above, given Sam Menlo's uninsurability after 2001, a reasonable policy owner would have maintained current the loan interest obligations on the policies in order to properly receive the additional $5,000,000 in policy death benefits, less the principal amount of loans all the while retaining a level premium. Because of industrywide life insurance guarantee obligations and practices, liquidity issues as to Phoenix itself should not have been a deterrent. Given the actuarial joint life expectancies of Sam and Vera Menlo at the time of Phoenix policy lapse (calculated to pay out in 2023), and prospective payments made to cover the policy loan and premiums over that time discounted to present value, less the principal amount of the loans,

according to Wirtz, there should still have been $\underline{2,339,334}$ remaining in policy value on the fourth lapsed policy. (Ex. 873.)

The Referee finds that Klein's misappropriation of Phoenix insurance policy loan funds, combined with Klein's unreasonable refusal to pay for any interest obligations on the Phoenix policy loan funds that he misappropriated, resulted in an additional loss to the Menlo Trusts during the Third Accounting period of $2,339,334. **Klein is surcharged an additional $2,339,334 for the unreasonable diminution in value of the collective corpus of the 24 Menlo Trusts, plus any interim prejudgment interest to be determined to have accrued after the close of the Third Accounting period on September 30, 2018.**

**The total principal surcharge to Klein for the Third Accountings is found to be $3,147,975** (*i.e.*, $507,935 + $300,706 + $2,339,334) (Ex. 842, at 3), less any attorney fees and costs incurred by Klein during the period of the Second Accounts determined by the trial judge in Phase II to be properly chargeable to the Menlo Trusts, plus any prejudgment interest on the net surcharge, if any, as further determined by the trial judge in Phase II.

Breaking down the collective net surcharge on an individual Trust basis, the surcharge sums (or credits) for the Third Account are found, based upon substantial evidence, to be allocable as follows:

**Abraham Deutsch -- $10,289**

**Samuel Deutsch – $10,289**

Esther Deutsch – ($1114)

Rachel Deutsch – ($1114)

Norine Winter – ($27,134)

**Mordechai Deutsch -- $195,449**

**Deborah Deutsch -- $350,436**

**Zev Deutsch -- $195,449**

**Tanya Menlo -- $10,289**

Franklin Menlo – ($15,688)

Jonathan Menlo -- $206,852

Yeshia Frankel -- $206,852

Rochelle Lipschutz -- $203,478

Moishe Frankel -- $206,852

Madeline Lipschutz -- $585,286

Faye Lipschutz -- $195,449

Avi Lipschutz -- $187,226

Dov Lipschutz -- $195,449

Asher Frankel -- $206,852

Michael Winter -- $12,316

Jeremy Winter -- $12,316

Amanda Winter -- $12,316

Jonathan Lifschutz -- $2047

Daniel Winter -- $12,316 (Ex. 862, at 14-37.)[47]

It should be clarified that these calculations are not "running" totals, but rather, are intended to constitute separate surcharge judgments exclusively for the Third Accounting period, independent of the calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the period of the First Accountings as of June 30, 2013, and independent of the separate calculations adjudicated as to each of the 24 Menlo beneficiaries at the conclusion of the Second Accounting period on December 31, 2016.

Four of the Menlo Trust beneficiaries, Esther Deutsch, Rachel Deutsch, Norine Winter and Frank Menlo are accordingly not entitled to surcharge judgment against Klein on the Third Accountings. The remaining 20 Menlo Trust beneficiaries are entitled to additional surcharge judgments in the respective principal sums identified above.

---

[47] The Referee's surcharge calculations are exclusive of potential adverse tax consequences associated with income realization upon lapse of the fourth Phoenix insurance policy during the Third Accounting period. As noted earlier, the Referee determines those potential tax losses to be speculative and not currently recoverable, while not relieving Klein of contingent liability to the extent those tax consequences become realized.

**Are Double Damages and/or an Award of Reasonable Attorney Fees and Costs Applicable to the 19 Menlo Beneficiaries Awarded a Surcharge Judgment on Klein's Third Accounts?**

In their initiating accounting, removal and surcharge petitions, the 19 prevailing Menlo beneficiaries on the Second Account pray, *inter alia*, "[t]hat Klein be made to pay punitive damages, in an amount to be determined by the Court, for his intentional, willful and malicious breaches of fiduciary duty," and "[c]ompelling respondent Klein to pay to Petitioner all reasonable attorney's fees and costs incurred by Petitioner in bringing and prosecuting this action."

While punitive damages, as such, are not a cognizable remedy in matters concerning the internal affairs of a trust, there is an allowance for enhanced recourse against a trustee under Probate Code §859, which states in pertinent part:

> "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a... trust... the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs."

The Referee expressly finds that Klein has, in bad faith, wrongfully taken, concealed and disposed of Menlo Trust assets in contravention of Probate Code §859, by virtue of his direct misappropriation of a net $808,641 of Menlo Trust cash during the period of the Third Accountings, including interest paid for which Klein should be liable; laundering funds through unnecessary intra-trust transactions and repositories, including, *inter alia*, the commingling of assets of the 24 individual Trusts, then frequently spreading those assets across Klein and his other clients' assets via his law firm attorney-client trust account.

The remaining surcharge award associated with Klein's lapse of the two additional Phoenix insurance policies is more in the nature of consequential loss than a misappropriation, and so the Referee accordingly limits the non-attorney fee portion of the **Probate Code §859** award on the First Account to the base sum, as adjusted. Klein's direct cash misappropriations

associated with the 20 prevailing Menlo Trust Beneficiaries, once the credit balances of the five non-prevailing beneficiaries are filtered out, total **$1,017,900, payable in the following additional sums:**

**Abraham Deutsch -- $10,289**

**Samuel Deutsch – $10,289**

**Deborah Deutsch -- $350,436**

**Tanya Menlo -- $10,289**

**Madeline Lipschutz -- $585,286**

**Michael Winter -- $12,316**

**Jeremy Winter -- $12,316**

**Amanda Winter -- $12,316**

**Jonathan Lifschutz -- $2047**

**Daniel Winter -- $12,316**

It is apparent from the Referee's extensive review of the file and management of the trial itself that the legal work performed by counsel for the Menlo beneficiaries is" completely intertwined" for purposes of possible apportionment of attorney fees and costs on the Third Account, which is all the consequence of Klein's bad faith conduct. (See discussion in *Smith v. Szeyller* (2019) 31 Cal.App.5th 450, 462-663.) It is unclear from Judge Suzuki's order for reference, however, whether the deferral of surcharge for professional fees is inclusive of *all parties* fees and costs incurred, or solely those incurred by Klein.

To the extent it has been delegated to the Referee, it is also determined that the litigating Menlo beneficiaries shall be entitled to all of their reasonable attorney fees and costs incurred with respect to Klein's Third Account pursuant to Probate Code §859. To the extent that issue has been reserved for Phase II, the Referee takes no position, and defers to the trial judge.

Costs are awarded on the Third Account to each of the 24 Menlo beneficiaries, who are all deemed prevailing parties for purposes of the Second Account. While four of the 24 Menlo beneficiaries will not be entitled to a surcharge judgment on the Third Account, had Klein

maintained and delivered an appropriate and accurate Third Account for each of the 24 Menlo

Trusts, they would not have had to engage in a multi-year litigation to unravel proper debits and

credits as to the allocation of Klein's misappropriations. Klein breached multiple trust

obligations to each of those five beneficiaries, including with respect to Klein's complete lack of

record keeping and failure to timely and accurately account. (*Smith v. Szeyller, supra*, 31

Cal.App.5[th] at 461-462.)

## STATEMENT OF DECISION ON REMAINING
## ISSUES RELATING TO ALL ACCOUNTINGS

**Is Klein Entitled to Trustee Fees, and if so, How Much?**

Long after Klein's three sets of accountings were filed in 2013, 2018 and 2019,

respectively, on November 16 and November 17, 2021, on the eve of trial before the Referee,

Klein filed 72 sets of *verified* supplements to his earlier accountings, across each of the 24 Menlo

Trusts, demanding Trustee fees in the collective sum of $1,034,477.58 beyond the $750,000

claimed by Klein in 2005.

Under the provision of Children's Trusts and the Grandchildren's Trusts authorizing an

annual trustee fee of .05% of the sum of trust assets under management, Klein attempted in the

November 2021 filings to use the *total death payout sums* of Trust life insurance policies,

including those Klein in the interim had caused to lapse, to inflate the carrying value of Trust

assets for purposes of geometrically increasing his Trustee fee.

By way of example, in the Second Supplement to the First Account for Menlo

beneficiary Asher Frankel, filed November 16, 2021, instead of relying upon the $51,387 in cash

and $72,089 in securities as the carrying value of that Trust, Klein includes in the carry value

$55,500,000 in unmatured face value life insurance policies of which that Trust was a partial

beneficiary, including the four subsequently lapsed Phoenix policies. Klein then subtracts from

the beneficiary's allocable percentages of unmatured death payments on those policies the cash

loans Klein withdrew from those policies, further reduced by anticipated premium payments

through the anticipated actuarial date of Vera Menlo's passing. In this fashion, Klein was able to

increase $123,476 in Trust assets to, in the case of Asher Frankel, a claim of $1,954,516 of

"assets on hand" for purposes of calculating Klein's Trustee fees. Klein uses this same protocol across all 24 Menlo beneficiaries and all 72 accountings.

There is a proper method to account for life insurance policies in an irrevocable insurance trust, and it is stated very clearly in the very CEB text that Klein's counsel held up as the "leading treatise in California on fiduciary accounting." In the 2021 supplement to the 2020 addition of the *Fiduciary Accounting Handbook*, and now in the main volume of the current 2022 addition, there is a separate section entitled in bold: **"How Do I Account for an Irrevocable Life Insurance Trust."** Given its use as a prop at trial, it defies credulity to suggest that Klein and his counsel were unaware of the proper accounting protocol.

According to the respective texts, at §16.28, before a life insurance policy matures (which is the case as to **all** of Klein's filed accountings), the carrying value of such a policy prior to maturity consists *solely* of the premium payments made. At the time of maturity (i.e., the death of the insured), the accounting will reference *a gain* in the amount of the policy payout over the sum of premium payments.

Klein assiduously avoided making policy premium payments whenever possible, at least according to his testimony at trial, resulting in the loss of $20,000,000 in Phoenix policies at a minimum and reduction in principal payout sums on others. While one may understand why Klein opted to invent an unorthodox accounting methodology to receive more Trustee fees than permissible, at what point does a combination of millions in cash asset misappropriations, laundering of funds, suppression of relevant documents and "creative" improper accounting become an attempted fraud upon the parties and the Court?

Klein testified that Sam Menlo directed him to take $750,000 in Trustee fees in 2005 as a lump sum for prior Trust services rendered. The Referee finds that Sam Menlo was not competent in 2005 to authorize that payment, nor is there any corroborating evidence to support Klein's claim.[48] Rather, the written record supports something entirely different.

---

[48] Per the credible testimony of Frank Menlo:

"Q.   In your opinion was your -- in about June of 2005 or even earlier in 2005, was your father mentally capable of making a decision as to how to pay trustee's fees to Mr. Klein?

A.   Absolutely not." (6 Tr. 1199.)

On June 6, 2005, through records produced by the successor to Phoenix, three $250,000 cash loans were requested by Klein with signature authorizations which appeared to include Frank Menlo. Whatever the amount of those authorizations as presented, the original numbers were scribbled out and altered in favor of a series of three $250,000 loan requests, which were then faxed to Phoenix Insurance. (Exs. 309-311.)

To its credit, Phoenix refused to honor what appeared to be altered documents, in favor of proper authorizations without the scribbling and interlineation of amounts. In the replacement documents faxed the following day by Klein to Phoenix Insurance (Exs. 312-314), Frank Menlo testified that the signature purporting to be his is not his signature. (6 Tr. 1217-1218.) The signatures clearly do not match.

With no further evidence, and upon Frank Menlo's unequivocal testimony that he did not authorize $750,000 in payments to Klein, the most logical inference is that Klein or someone on his behalf forged Frank Menlo's initials. The Referee finds that while Klein clearly took $750,000 in his fiduciary capacity against Menlo Trust assets, never returning one cent of those funds (or any other loan funds for that matter, or any interest on any funds), there is no credible evidence that the $750,000 was payment made to Klein for Trustee fees.

Where the trustee commits a breach of trust, the trial court may deny the trustee all compensation. *Estate of Gump* (1991) 1 Cal.App.4th 582, 597; *Butler v. LeBouef* (2016) 248 Cal. App. 4th 198, 213. It is undeniable that Klein has managed the 24 Menlo Trusts principally for his own personal benefit and enrichment.[49] Klein embezzled what has been accurately calculated to be $19,225,065 in Trust assets for which he has no response. Klein refused to account for many years until forced to do so by the Court, and, even after a decade of litigation, still refuses to account for 156 years of collective trust management. Klein has ignored the distributive terms of every single Menlo Trust except one. Klein claimed to have no Trust documents upon which to account. Klein has borrowed many millions of dollars against Trust

---

[49] During the course of the trial, Klein not uncommonly referred to Menlo Trust assets as "my" money.

assets as to which he has never shown any interest in repaying. Klein has deliberately filtered thousands of Trust transactions through his own attorney-client trust account for no legitimate reason. Klein torpedoed $20,000,000 in valuable Trust life insurance policies because of his compulsion to divert Menlo Trust assets for non-Trust purposes. Klein unabashedly used Menlo Trust accounts as overdraft protection on his personal credit cards as a means to misappropriate many additional hundreds of thousands of Trust dollars. Klein submitted 72 incomplete and misleading accountings to the Court intending to mask his many years and millions of dollars of fiduciary misappropriation.

The Referee denies all Trustee fees.


**What About LKA?**

Beyond its obvious participation as a financial clearinghouse for thousands of Trust transactions, including millions of dollars in Menlo Trust assets never returned by Klein to the Trusts for a beneficial trust purpose, it is not clear why LKA was added to trust accounting litigation on what is essentially a civil conspiracy count.

Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal. 4th 503, 510-511. "A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage." *Id.*, quoting *Doctors' Co.* v. *Superior Court* (1989) 49 Cal.3d 39, 44.

It was Klein, not LKA, who moved Menlo Trust funds into and out of the LKA attorney-client trust account. There is no suggestion that LKA used Menlo Trust funds for its own purposes, or that LKA somehow had dispositional control over the funds on deposit.

LKA was not the Trustee of the Menlo Trusts. LKA was not in an attorney-client relationship with the Menlo Trusts. Klein's statutory obligations and adverse presumptions

associated with his incomplete and false accountings have nothing to do with civil conspiracy claims against LKA, which accountings LKA did not prepare and for which LKA had no participation or responsibility.

It is *the burden of the six Menlo beneficiaries* naming LKA as a party to prove both liability and damages associated with LKA. While the 24 Menlo beneficiaries established clearly and convincingly that (in addition to their consequential losses on the four lapsed Phoenix Life Insurance policies) Klein withdrew $19,225,065 in Menlo Trust cash that he never returned or applied to a beneficial Trust purpose, nowhere over the 22 days of trial did the five Menlo beneficiaries suing LKA prove that the 23 checks identified in their Fifth Amendment were among the millions of dollars in funds improperly retained by Klein.

The Menlo beneficiaries did a commendable job of specifying with certainty all transactions on funds removed by Klein from the Trusts, all transactions on funds intended for the Trusts from third party sources that were either waylaid or redirected by Klein, all transactions within the Trusts themselves, and all transactions involving funds utilized by Klein for *bona fide* Trust purposes. And no time, however, did the Menlo beneficiaries, or at least the six beneficiaries litigating against LKA, drill down to the *ultimate* disposition of LKA proceeds beyond those utilized for the legitimate Trust purposes. It is currently unknown whether the 23 checks identified in the Fifth Amendment filed March 5, 2019 were among the millions in funds misappropriated by Klein or were among the funds utilized for a proper trust purpose.[50]

---

[50] As testified by O'Bryan at trial:

"Q. As part of your scope of work for L.K.A., you essentially did a money in money out analysis, correct?
A. That's correct.
Q. Okay. So you have no idea, as you sit here today, whether any funds that landed in the L.K.A. trust account were used for L.K.A. purposes, correct?
A. I do not.
And as you sit here today, you don't know whether or not any of the funds that landed in the L.K.A. bank account were eventually used for other trust purposes, correct?
A. That's correct.
Q. And as you sit here today, you don't know whether any funds that landed in the L.K.A. bank accounts were used for payment of legal or accounting expenses related to the trust, correct?

The six Menlo beneficiaries failed to satisfy their burden of proof with respect to their civil conspiracy claim against LKA. LKA's motion for judgment is granted.

**Allocation of Referee Fees**

Referee fees on settlement of the 72 contested Menlo Trust accountings have been collectively charged throughout at a rate of $880 per hour. From the introductory calendaring conference with counsel on September 24, 2021 through completion of this Report and Recommendation on August 27, 2022, a collective 336.20 referee hours have been entered, including but not limited to 22 days of trial, the subsequent sifting through trial notes, exhibits and testimony, and the research and preparation of this Report and Recommendation on the adjudication and settlement of each of the 72 accounting petitions. The Referee calculates total professional fees to date to be $295,856,[51] with an additional $36,723.24 charged in case management fees.

For all of the reasons set forth in this Report and Recommendation, the Referee recommends that the Menlo beneficiaries be ordered reimbursed by Klein for the entirety of their contributions to the Referee's invoicing, as part of a consolidated itemized cost memorandum.

**SUMMARY OF RECOMMENDATIONS ON SETTLEMENT OF ACCOUNTS**

**On the 24 First Accountings:**

1. That Klein be **surcharged** in the net principal sum of **$10,007,876**, such sum to be allocated (including adjustments to be made between Trusts to eliminate the four negative balances) among the 24 Menlo Trusts as specifically itemized above on the First Accounts;

---

A. I believe that's correct.
Q. And as you sit here today, you have no idea whether L.K.A. is still holding onto any funds from the trust accounts, correct?
A. You mean as of today?
Q. As of today?
A. Yeah, I don't know." (17 Tr. 3294-3295.)

[51] The Referee's consolidated professional fee translates to $4034 per petition.

2. That Klein be **further surcharged** in the sum of **$8,533,547** under Probate Code §859, such sum to be specifically allocated among the identified 20 Menlo Trusts as itemized above on the First Accounts;

3. That the net surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the First Accountings on June 30, 2013, as contemplated by Probate Code §§16440(a)(1) and 16441;

4. That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his First Accountings and in the defense of related surcharge claims;

5. That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the 24 Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein on the First Account;

6. That Klein be denied Trustee fees;

7. That LKA's motion for judgment be granted;

8. That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the First Accounts; and that costs be awarded to LKA from the six litigating Menlo petitioners.

**On the 24 Second Accountings:**

1. That Klein be **surcharged** in the net principal sum of **$6,069,214**, such sum to be allocated (including adjustments to be made between Trusts to eliminate the five negative balances) among the 24 Menlo Trusts as specifically itemized above on the Second Accounts;

2. That Klein be **further surcharged** in the sum of **$1,625,311** under Probate Code §859, such sum to be specifically allocated among the identified 19 Menlo Trusts as itemized above on the Second Accounts;

3. That Klein be ordered to fully indemnify the applicable Menlo Trust beneficiaries for any future adverse Trust or individual beneficiary tax consequence associated with Klein's lapse of Trust life insurance policies during the period of the Second Accounts;

4. That the surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the Second Accountings on December 31, 2016, as contemplated by Probate Code §§16440(a)(1) and 16441;

5. That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his Second Accountings and in the defense of related surcharge claims;

6. That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein;

7. That Klein be denied Trustee fees;

8. That LKA's motion for judgment be granted; and

9. That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the Second Accounts; and that costs awarded to LKA from the six litigating Menlo petitioners.

**On the 24 Third Accountings:**

1. That Klein be **surcharged** in the net principal sum of **$3,147,975** such sum to be allocated among the 24 Menlo Trusts as specifically itemized above on the Third Account.

2. That Klein be **further surcharged** in the sum of **$1,017,900** under Probate Code §859, such sum to be allocated among the ten Menlo Trusts as specifically itemized above on the Third Accounts;

3. That Klein be ordered to fully indemnify the applicable Menlo Trust beneficiaries for any future adverse Trust or individual beneficiary tax consequence associated with Klein's lapse of the Trust life insurance policy during the period of the Third Account;

4. That the surcharge sum identified in paragraph 1 be subject to a Phase II award of prejudgment interest, if any, from and after the closing date of the Third Accountings on September 30, 2018, as contemplated by Probate Code §§16440(a)(1) and 16441;

5. That the surcharge sum identified in paragraph 1 above be subject to a Phase II offset, if any, for attorney fees and costs awardable to Klein in the preparation of his Third Accountings and in the defense of related surcharge claims;

6. That the trial court in Phase II consider an award of reasonable attorney fees and costs against Klein under Probate Code §859 in favor of the Menlo beneficiaries in their prosecution of accounting and surcharge claims against Klein;

7. That Klein be denied Trustee fees;

8. That LKA's motion for judgment be granted; and

9. That costs be awarded to each of the 24 Menlo beneficiaries from Klein as discussed above, on the Third Accounts; and that costs be awarded to LKA from the six litigating Menlo petitioners.[52]

Dated: August 29, 2022

*Glen M. Reiser*

Judge Glen Reiser (Ret,)
§639 Referee

IT IS SO ORDERED.

_____
Judge of the Superior Court

---

[52] Over the settlement of all 72 accountings, through the respective accounting periods presented, and deferring the prejudgment interest calculations to the trial court, the total principal surcharge recommendation against Klein is $19,225,065. The additional consolidated Probate Code §859 recommendation is $11,176,758. The recommended collective surcharge judgment, prior to Phase II interest and attorney fees/cost debits or credits, is therefore $30,401,823.

REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE
84

## PROOF OF SERVICE BY E-Mail

Re: In re: Franklin Henry Menlo Irrevocable Trust, Established March 1, 1983
Reference No. 1220070187

I, Stephanie Barraza, not a party to the within action, hereby declare that on August 29, 2022, I served the attached REPORT AND RECOMMENDATION OF THE COURT-APPOINTED REFEREE ON EXAMINATION AND ADJUDICATION OF THE TRUSTEE'S FIRST, SECOND, AND THIRD ACCOUNTINGS ON EACH OF THE TWENTY-FOUR TRUSTS AT ISSUE FOR THE TRUST PERIODS SEPTEMBER 10, 1996-JUNE 30, 2013, JULY 1, 2013-DECEMBER 31, 2016 AND JANUARY 1, 2017-SEPTEMBER 30, 2018 on the parties in the within action by electronic mail at Los Angeles, CALIFORNIA, addressed as follows:

Donald L. Saltzman Esq.
L/O Donald L. Saltzman
10537 Butterfield Rd
Los Angeles, CA   90064
Phone: 310-617-3073
dlslawcorp@aol.com
    Parties Represented:
    Franklin Henry Menlo, et al.

Terence S. Nunan Esq.
Alan D. Weinfeld Esq.
Parker, Milliken, Clark, et al.
555 S. Flower St.
30th Floor
Los Angeles, CA   90071-2440
Phone: 213-683-6500
tnunan@pmcos.com
aweinfeld@pmcos.com
    Parties Represented:
    Leslie Klein, Trustee, et al.

Candice K. Rogers Esq.
Hahn & Hahn
301 E. Colorado Blvd.
9th Floor
Pasadena, CA   91101
Phone: (626) 796-9123
crogers@hahnlawyers.com
    Parties Represented:
    Les Klein & Associates

Michael L. Wachtell Esq.
Buchalter, APC
1000 Wilshire Blvd.
Suite 1500
Los Angeles, CA   90017-2457
Phone: 213-891-0700
mwachtell@buchalter.com
    Parties Represented:
    Leslie Klein, Trustee, et al.

VIA ONE LEGAL TO:
Hon. Ana M. Luna
Los Angeles County Superior Court
111 N Hill St
Dept 3

Los Angeles, CA   90012
Phone: 213-830-0850

       I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles,

CALIFORNIA on  August 29, 2022.

/s/ Stephanie Barraza

_____

Stephanie Barraza
JAMS
SBarraza@jamsadr.com

**PROOF OF SERVICE**

**In the Irrevocable Trust u/a/d September 26, 1990 f/b/o Abraham Deutsch**
**Case No.: 22STPB10823**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 16133 Ventura Boulevard, Penthouse Suite, Encino, CA 91436.

     On November 3, 2022, I served the foregoing documents described as: **NOTICE OF ERRATA** on the interested parties in this action as stated below:

[ X ]    BY MAIL.  I caused such envelope to be deposited in the mail at Encino, California.  The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Encino, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit:

| | |
|---|---|
| Leslie Klein<br>14245 Ventura Boulevard, 3rd Floor<br>Sherman Oaks, CA 91423 | Jeffrey Slot, Esq.<br>15760 Ventura Boulevard, Suite 1600<br>Encino, CA 91436 |
| Franklin Menlo<br>c/o Donald L. Saltzman, Esq.<br>10537 Butterfield Road<br>Los Angeles, CA 90064 | Jeffrey Winter<br>c/o Alex Weingarten, Esq.<br>2029 Century Park East, Suite 3400<br>Los Angeles, CA 90067 |

[  ]    BY ELECTRONIC MAIL TRANSMISSION (WITH ATTACHMENT).  On this date, by causing transmission of the above-mentioned document(s) by electronic mail transmission, to the persons whose e-mail addresses appear below:

[  ]    BY ELECTRONIC SERVICE: I served the document(s) on the persons listed below by submitting an electronic version of the document(s) to One Legal, LLC, through the user interface at 222.onelegal.com:

[  ]    BY OVERNIGHT MAIL.  I caused said document to be deposited with an express service carrier in a sealed envelope designated by the carrier as an express mail envelope, with fees and postage prepaid.

[  ]    BY FACSIMILE.  I personally served this document by facsimile to the offices of the party(ies) on attached Service List.

1  [  ]    BY PERSONAL DELIVERY.  I delivered such document(s) by hand to the address(es) of
2  the addressee(s).

3  [ X ]    STATE.  I declare under penalty of perjury under the laws of the State of California that the
   above is true and correct.

4

5      Executed on November 3, 2022, at Encino, California.

6

7

8      _____
            Julie J. Thomas

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28