ROBERT P. GOE (State Bar No. 137019)
rgoe@goeforlaw.com
REEM J. BELLO (State Bar No. 198840)
rbello@goeforlaw.com
**GOE FORSYTHE & HODGES LLP**
17701 Cowan Avenue, Suite 210, Bldg. D
Irvine, CA 92614
Telephone: (949) 798-2460
Facsimile: (949) 955-9437

BRIAN A. PROCEL (State Bar No. 218657)
brian@procel-law.com
MARTIN H. PRITIKIN (State Bar No. 210845)
marty@procel-law.com
**PROCEL LAW, PC**
401 Wilshire Boulevard, 12th Floor
Santa Monica, California 90401
Telephone: (424) 788-4538

Attorneys for Judgment Creditors
Erica and Joseph Vago

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

In re:

LESLIE KLEIN,

      Debtor and Debtor in Possession,

Case No. 2:23-bk-10990-SK

Chapter 11 Proceeding

**OPPOSITION OF JUDGMENT CREDITORS ERICA AND JOSEPH VAGO TO [*RENEWED*] MOTION OF CHAPTER 11 TRUSTEE FOR ORDER APPROVING SETTLEMENT BETWEEN THE TRUSTEE AND A. GESTETNER FAMILY TRUST AND GESTETNER CHARITABLE REMAINDER UNITRUST PURSUANT TO BANKRUPTCY RULE 9019; DECLARATION OF BRIAN PROCEL IN SUPPORT THEREOF**

**[Evidentiary Objections Filed Concurrently Herewith]**

Date:       February 12, 2025
Time:       9:00 a.m.
Place:      Courtroom 1575
            U.S. Bankruptcy Court
            255 E. Temple Street
            Los Angeles, CA 90012

**TO THE HONORABLE SANDRA R. KLEIN, JUDGE OF THE UNITED STATES BANKRUPTCY COURT, OFFICE OF THE UNITED STATES TRUSTEE, CHAPTER 11 TRUSTEE, AND TO ALL PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that Judgment Creditors Erica and Joseph Vago (the "Vagos"), hereby file this opposition to the Chapter 11 Trustee's Motion for Order Approving Settlement Between the Trustee and A. Gestetner Family Trust and Gestetner Charitable Remainder Unitrust Pursuant to Bankruptcy Rule 9019 ("Motion"), and respectfully represent as follows:

## I.    INTRODUCTION

The Trustee's renewed Motion is no better than the first one. It should be denied.

Rather than settling, Trustee should have long ago filed an adversary proceeding, pursuant to Sections 510(b) and (c) and Sections 544 and 548 to subordinate the claims and/or avoid any alleged security interest.

The Trustee originally filed this Motion back in September 2024. That Motion sought to grant Andor Gestetner and the Gestetner Charitable Remainder Unitrust (collectively, "Gestetner"), an insider and alleged investor and not a purported creditor, a $4.2 million secured interest in half of Debtor Leslie Klein's ("Klein") ownership interest in Life Capital Group LLC ("LCG"). Andor Gestetner is now deceased. He was Klein's brother-in-law. In short, the Motion sought to provide Klein's brother-in-law with a multi-million dollar secured claim, taking priority over all other victims of Klein's Ponzi scheme.

The original Motion attached *no evidence* (other than the proposed settlement agreement itself). The Vagos and several other creditor-victims (the "Objecting Creditors") opposed the Trustee's Motion. In response, the Trustee impermissibly attached evidence for the first time in connection with his reply brief.

At the hearing, the Court allowed the Trustee to withdraw his defective Motion (rather than have it be summarily denied). The Court advised the Trustee to resolve the issues with the Objecting Creditors. Shortly afterwards, in October 2024, the Trustee and his counsel met with the Objecting Creditor to discuss the bases for their concerns. The Objecting Creditors believed that the Trustee's counsel was going to provide them with additional evidence supporting the

settlement ("Settlement") with Gestetner, as well as visibility into the discussions with Gestetner. These things never happened.

Instead, the Objecting Creditors were surprised when the Trustee went ahead and refiled the Motion. The Objecting Creditors were even more surprised that the only substantive difference between the renewed Motion and the prior proposal is that Gestetner is now willing to take a 13% haircut—the Settlement was reduced from $4.2 million to $3.65 million. This was apparently due to a concession on the part of the Trustee that there was no evidentiary basis for the $550,000 portion of the Settlement in the first instance.

The Trustee still provides no analysis of how Gestetner would prove his claim at trial. At trial, Gestetner would have the burden of proof. The only living witness is Klein, a fraudster who routinely forged documents and lies under oath. In fact, Klein *testified at his examination pursuant to Rule 2004* that he paid off the bulk of the any money owed to Gestetner; that the promissory note relied upon by the Trustee contains "bogus" figures; and that Klein was merely trying to do favors for his brother-in-law.  If his testimony can be believed at all, it only hurts Gestetner's claim rather than corroborates it.

More importantly, the Motion presents entirely inconsistent evidence about Gestetner's investment with Klein. The second sentence of the Motion claims that "[o]riginally, the Gestetners invested in certain life insurance policies owned or controlled by the Debtor . . ." That statement is contradicted by the Trustee's own evidence. The only contemporaneous document (from 2005) indicates that Klein invested in stocks and bonds—not insurance policies—in the amount of $4,267,507 on behalf of the Gestetner Charitable Trust and the Gestetner Living Trust. More than a decade later, Gestetner and Klein claimed for the first time that there was an initial investment of $3.7 million exclusively by the Gestetner Charitable Trust in undefined life insurance policies at 10 percent interest. Then a few months later, the investment morphed into a promissory note for a loan in the amount of $9.6 million relating to a purported initial investment of $4.2 million to be repaid at 13 percent interest and giving Andor Gestetner and the Gestetner Charitable Trust a security interest in a portion of Life Capital Group ("LCG"). In other words, the transaction evolved over time—it pertained to different individuals and entities; different dollar amounts;

different investments; different security interests; and different rates of return. The Trustee makes no attempt whatsoever to resolve or even discuss these obvious discrepancies.

Instead, the Trustee assumes that the transaction between Klein and Gestetner was legitimate. The Trustee assumes that Klein's brother-in-law is somehow entitled to a security interest and that the "low end" of Gestetner's claim entitles him to $8.9 million, including more than 17 years of fixed interest. In fact, the true "low end" is that Gestetner is entitled to nothing more than an **unsecured, subordinated claim of next to nothing**. The mere fact that Gestetner filed a UCC-1[1] does not—and should not—prevent the Trustee from seeking to equitably subordinate his claim. The Trustee should not simply ignore the fact that Klein gave Gestetner a security interest more than a decade after the initial transaction occurred—with no new consideration—and only after Klein was getting sued by other investor-victims for orchestrating a massive fraud.

This is precisely what is not permitted under the law. Debtors are not allowed to start handing out security instruments to family members when it becomes clear that their empire is on the verge of crumbling. It shocks the conscience that the Trustee has decided to honor documents created by Klein and his family members when virtually everything Klein did was a fraud. There is no basis to permit Gestetner to jump ahead of all other creditors. This Settlement is a slap in the face to Klein's non-insider fraud victims.

## II.    ARGUMENT

### A.    The Trustee Relies On Case Law Where The Court Rejected Settlements Because the Relevant Factors Were Not Met

"As the proponent of the settlement, the trustee bears the burden of demonstrating to the bankruptcy court that the settlement is fair and equitable and should be approved." *In re Arkoosh Produce, Inc.*, 2003 WL 25273746, *8 (Bankr. D. Idaho July 1, 2003) (quoting *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1981 (9th Cir. 1986)).

In determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the court must consider: (a) the probability of success in the litigation; (b) the

---

[1] The Trustee's deadline for filing avoidance actions to challenge the UCC-1 or any other transfer pursuant to Section 546 of the Bankruptcy Code is February 21, 2025, which needs to be filed.

difficulties to be encountered in the matter of collection; (c) the complexity and expense of the

litigation involved; and (d) the interests of the creditors. *In re A & C Props.*, 784 F.2d at 1381.

While the Court gives "some deference" to the Trustee's judgment in seeking to settle a claim, "the

Court is required to exercise independent judgment regarding the factors relevant to the

reasonableness of the settlement." *In re McInerney*, 499 B.R. 574, 595 (Bankr. E.D. Mich. 2013).

The Motion cites numerous cases where courts invalidated, in whole or in part, settlements

proposed by a trustee. *See e.g., Protective Committee v. Anderson*, 390 U.S. 414 (1968). There, the

Supreme Court chastised the bankruptcy court for merely accepting "the bald conclusions of the

trustee," and remanded for further findings. *Id.* at 433. Using language that is particularly

applicable here, the Court expounded:

> It is essential . . . that a reviewing court have some basis for distinguishing
>
> between well-reasoned conclusions arrived at after a comprehensive consideration
>
> of all relevant factors, and mere boilerplate approval phrased in appropriate
>
> language but unsupported by evaluation of the facts or analysis of the law. Here
>
> there is no explanation of how the strengths and weaknesses of the debtor's causes
>
> of action were evaluated or upon what grounds it was concluded that a settlement
>
> which allowed the creditor's claims in major part was 'fair and equitable.'
>
> Although we are told that the alternative to settlement was 'extensive litigation at
>
> heavy expense' and 'unnecessary delay,' there is no evidence that this conclusion
>
> was based upon an educated estimate of the complexity, expense, and likely
>
> duration of the litigation. Litigation [a]nd delay are always the alternative to
>
> settlement, and whether that alternative is worth pursuing necessarily depends
>
> upon a reasoned judgment as to the probable outcome of litigation.

*Id.* at 434.

Courts routinely reject compromises that are not shown to be in the best interest of

creditors. *See Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir.

1988). There, the Ninth Circuit upheld the district court order *reversing* the bankruptcy court's

approval of a compromise, where there was an insufficient benefit to creditors.  And in *In re TCI2*

*Holdings, LLC*, 428 B.R. 117, 138 (Bankr. D.N.J. 2010), the bankruptcy court rejected certain

releases in the proposed arrangement that it found did not benefit creditors. *See id.* at 138 ("On

this record, the AHC/Debtors have failed to establish sufficient facts to demonstrate that the

release of the Guaranty is fair and necessary to the debtors' reorganization, or that fair

consideration has been tendered in exchange for the release."); *see also In re Douglas J. Roger,*

*M.D., Inc., APC, ("Roger")*, 393 F. Supp. 3d 940, 963 (C.D. Cal. 2019) (remanding case to

bankruptcy court on ground that there was insufficient attention paid to "the most important" of

the four factors—whether the proposed compromise is in "the paramount interest of the

creditors.").

Even in the cases cited by Trustee where a compromise was approved, the courts required

very detailed information concerning the underlying facts and the benefit to the creditors. *See In re*

*Pacific Gas & Elec. Co*, 304 B.R. 395 (Bankr. N.D. Cal. 2004) (approving compromise only after

taking testimony from multiple witnesses, and fact that "the overwhelming majority of creditors"

were in favor of it); *(In re A & C Props.*, 784 F.2d at 1382 (approving compromise after a five-day

evidentiary hearing involving over 1,000 pages of testimony and the parties submitted a brief

which was "twenty-five pages in length, sets forth in detail the claims which it purports to settle . .

. and the cost-benefit analysis of the relative merits of pursuing or settling the various claims.").

**B.**     **Gestetner Has Little or No Probability of Success on his Claim**

The renewed Motion contains only a conclusory analysis of the Rule 9019 factors. This is

insufficient to sustain the Trustee's burden. *See In re Hyloft*, 451 B.R. at 115 ("It is difficult to

evaluate the probability of success in litigating the claims when the Trustee has not provided a

substantive and specific analysis of the risk factors in pursuing the claims other than it will save

the bankruptcy estate ("Estate") money and be in the best interest of the creditors.").

The Trustee examined Klein pursuant to Rule 2004 of the Federal Rules of Bankruptcy

Procedure ("2004 Examination"). And over the last dozen or so years, Klein has been sued by the

Vagos and multiple other creditors. The Trustee's Motion does not contain a single citation to

Klein's 2004 Examination testimony in this case. Nor are there any cites to Klein's testimony in any other case. The Trustee does not address the admissibility of any evidence cited in his own Motion. The Motion does not analyze the significance of the fact that the relevant transactions and Settlement pertain to Klein's brother-in-law. There is no discussion of the fact that Klein granted a security interest to his brother-in-law after Klein was already being accused of and sued for orchestrating a massive fraud. These are gaping holes in the Motion.

1.    **There Is No Contemporaneous Evidence Suggesting Gestetner Loaned Klein Any Money**

The Motion asserts that Gestetner's grandson located a "ledger" after Gestetner passed away. (Motion (Dkt. 882) at 6:25-7:1; Morsel Decl. (Dkt. 884), ¶¶ 2-4 and Exh. A thereto). That "ledger" reflects a purported wire to Klein in the amount of $3,659,507.10. The Trustee does not indicate how or why this "ledger" would be admissible. The "Gestetner Ledger" is actually a one-page, unsigned, undated spreadsheet with the simple header "Gestetner." (Morsel Decl. (Dkt. 884), Exh. A at p. 20.) It is not clear when this document was created or when it was purportedly found (other than the assertion that it was located sometime after Gestetner died). Gestetner's grandson has no foundation to authenticate the document. These documents also show Klein was acting as "attorney-in-fact" for Gestetner further evidencing the insider relation (Morsel Decl. (Dkt. 884), Exh. A at p. 11).

And it is hearsay. It does not constitute a business record, which requires a showing that the document was prepared and kept in "the course of a regularly conducted activity" of a "business" or "organization" as established "by the testimony of the custodian or another qualified witness." *See* Fed. R. Evid. 803(6). Nor would it have sufficient indicia of reliability to meet the residual hearsay exception. *See* Fed. R. Evid. 807.

Moreover, even if Gestetner wired money to Klein in 2005, the "ledger" does not indicate what that wire was for. For that, the Motion first cites to a letter from Klein to Gestetner in December 2005 (the "2005 Letter"). (Declaration of Bradley Sharp ("Sharp Decl."), Exh. 3 (Dkt. 882) at pp. 38-39.) The 2005 Letter reflects a series of underlined investments in *stocks and bonds* in the amount of $2,267,507 purchased on behalf of the Gestetner Charitable Trust and $2,000,000 by

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49

the Gestetner Living Trust. (Sharp Decl., Exh. 3 (Dkt. 882) at p. 39.) There is nothing in the 2005

Letter from Klein that reflects a wire in the amount of $3,659,507.10, as indicated in the "ledger."

Nor is there anything relating to insurance policies in the 2005 Letter. Based on the only

contemporaneous evidence in the record, the "original" investment by Gestetner was in stocks and

bonds, not insurance policies as represented by the Trustee.

The Trustee then cites to a document entitled "Agreement" dated June 20, 2016, ostensibly

between the Gestetner Charitable Trust and Klein (the "LCG Transfer Agreement"), but which

was signed only by Klein. (Sharp Decl., Exh. 4 (Dkt. 882), at p. 42). The LCG Transfer

Agreement states that Klein invested $3.7 million in certain undefined life insurance policies on

behalf of the Gestetner Charitable Trust. There is no indication when these investments were

purportedly made. There is no identification of any specific policies. The LCG Transfer

Agreement states that Gestetner is entitled to repayment only when the insureds of the underlying

policies die.  The document also states that once the unspecified insureds die, the Gestetner

Charitable Trust "shall receive their funds with 10% interest from the date of the investment,"

without specifying what exactly "the investment" was or what "the date of the investment" was.

Then the Trustee cites to a "Non-Recourse Promissory Note" dated September 1, 2016 in

the amount of $9,630,000 (the "Promissory Note"). This Promissory Note states that Klein

actually invested $4.2 million on behalf of Andor Gestetner and the Gestetner Charitable Trust

beginning in 2005 and is to be repaid at 13 percent interest. (Motion at 22:11-15 and Exh. 6.) This

Promissory Note from 2016 is the first time Gestetner was purportedly given a security interest by

Klein. The Promissory Note does not reference or discuss the LCG Transfer Agreement, signed by

Klein just three months earlier. And the Promissory Note obligated Klein to start making monthly

payments to Gestetner, even though the LCG Transfer Agreement states that Gestetner is only

entitled to repayment when the insureds die.

The Trustee does not appear to be dissuaded by the fact that Gestetner cannot account for

what happened to his money between 2005 and 2016, or that his claim is based on documents and

facts that do not line up. The principal went from $4,267,507 to $3.7 million to $4.2 million. The

interest rate evolved from no fixed rate in 2005 to 10% in June 2016 to 13% in September 2016.

The investments went from stocks to insurance policies to loans. Gestetner's interest went from unsecured in 2005 to secured in 2016. The paper trail is all over the place.

Klein has a well-established history of drafting false documents—and here he simply gave his brother-in-law new and better terms at each iteration. It is well-settled that transactions with family members and other insiders must be closely scrutinized for these very reasons. *See In re HyLoft, Inc.*, 451 B.R. 104, 114 (Bankr. D. Nev. 2011) (rejecting proposed compromise with an insider; "a bankruptcy court should scrutinize insider agreements more closely than agreements between debtor and non-insider parties").

## 2.    Gestetner is not entitled to a fixed rate of interest since 2005

The Trustee contends that allowing Gestetner a $3.65 million secured claim is in the best interest of creditors because the "low end" of Gestetner's claim is $8.9 million.  But to arrive at that $8.9 million figure, the Trustee assumes that Gestetner would be able to prove that he was entitled to a fixed rate of return of 10% interest on his investment going back to 2005. But there is simply no basis to assume this.

Gestetner's entitlement to interest beginning in 2005 is predicated on the Trustee's inaccurate claim that "[o]riginally, the Gestetners invested in certain life insurance policies owned or controlled by the Debtor . . ." (Motion (Dkt. 882) at 4:5-9.) The Trustee then assumes that the "low end" of Gestetner's recovery entitles him to 17 and a half years of interest (i.e., beginning in 2005) at the rate of 10% interest. There is no evidentiary basis whatsoever for that contention. There is no document or agreement that supports the Trustee's position.

As indicated above, the only document that existed in 2005 was a letter from Klein stating that he invested Gestetner's money in stocks and bonds with no fixed rate of interest. Gestetner was not "originally" invested in insurance policies ("2005 Letter"). The LCG Transfer Agreement dated June 2016 is the first document suggesting Gestetner had an investment in insurance policies. But for all one can tell from the face of that document, Gestetner might have invested in life insurance policies the week before, not in 2005.

The Trustee cannot pick and choose terms from the various agreements. Here, the Trustee wants to use the dollar figure from the "ledger"; the interest rate in the LCG Transfer Agreement;

and the security pledge from the Promissory Note. In doing so, the Trustee is rejecting the dollar figures in the LCG Transfer Agreement and the Promissory Note. And he is rejecting the rate of return from the 2005 Letter and the Promissory Note.

The Trustee assumes there must be some legitimate interpretation of the underlying documents. There is not. The facts suggest that Gestetner leveraged his relationship with Klein to get better and better terms, including a security interest, knowing that Klein was being sued for fraud. The obvious interpretation is that both "agreements" from 2016 were fabricated. If someone tells two lies, the fact that the second one is even more extreme doesn't make the first one true. The hopeless inconsistencies between the documents should be a reason to *deny* Gestetner's claim in its entirety, not guarantee a security interest worth millions of dollars.

### 3.    Klein's testimony undermines the settlement

The only witness currently alive with knowledge of the alleged 2005 transaction flatly refuted any suggestion that Gestetner is owed millions of dollars, or that he was entitled to interest as of 2005. When asked about the structure of the transaction, Klein testified:

> Q:      Did you borrow money from Mr. Gestetner?
>
> A:      No.

(Klein 2004 Examination Transcript attached to the declaration of Brian Procel ("Procel Decl.") at Exh. A at 212:16-17.) After some prompting by the Trustee's counsel, Klein then started to characterize the transaction as a loan. But Klein testified that Gestetner *was not entitled to any interest* on his investment because the policies had not yet paid off. (*Id*. at 217:3-12.)

Klein testified that Gestetner had invested a total of $3.3 million (not $3.65 million or $3.7 million or $4.2 million). (*Id.* at 215:24-216:1.) And Klein testified that he *repaid Gestetner more than $3 million.* (*Id*. at 207:9-11.) During the 2004 Examination, the Trustee's counsel did not follow up on Klein's contention that he repaid nearly all of the principal allegedly paid by Gestetner in his claim. The Trustee's counsel did not ask any further questions about Klein repaying $3 million.

Klein is known to have engaged in off-the-books transactions, cash payouts, transfers of property, and more. The issue of an almost complete repayment has not been addressed by either

the Trustee or Gestetner. There is no basis for the Trustee to give credence to documents authored by Klein (like the security interest), while simultaneously ignoring Klein's contention that he repaid $3 million.

Klein also testified that the $9 million outstanding balance reflected in the Promissory Note "is some ***bogus number*** with interest." (*Id.* at 215:21-24) (emphasis added.) Klein testified that he made payments to Gestetner from 2016 onward because "Gestetner was having financial problems and serious health issues" and so "needed money desperately. And he's my brother-in-law." (*Id*. at 207:7-8.) In other words, *Klein admitted that the Promissory Note with Gestetner was fake and that he was merely trying to do favors for his brother-in-law*.

### 4. <u>Gestetner Cannot Establish a Valid Security Interest</u>

The Trustee concedes that the Promissory Note is not reliable and admits that the 13 percent interest rate recited therein is likely not enforceable. *See* Motion (Dkt. 882) at 13:14-16. This is why the Trustee calculated a "low end" value of the Gestetner claim—rejecting the principal and interest figures reflected in the Promissory Note. And Klein testified that the Promissory Note contains "bogus" figures; that Klein agreed to start repaying money to Gestetner even though it was not owed; and that he was merely trying to do favors for his brother-in-law. (Procel Decl., Exh. A at 215:21-24).

And yet at the same time, the Trustee seemingly *believes* the Promissory Note when it says that Klein was granting Gestetner a security interest. This makes no sense. The Trustee cannot simultaneously adopt it and reject it as the basis for allowing Gestetner's claim. The Promissory Note is a fabricated document created more than a decade after the alleged payments to help Gestetner survive a sinking ship. The Trustee should have challenged every facet of the Promissory Note, rather than relying on it to legitimize a fabricated security interest.

The Trustee appears to put stock in the fact that the supposed security interest first identified in the Promissory Note was subsequently "ratified" by LCG in a Memorandum of Understanding ("MOU") and in a UCC financing statement first filed in 2017 and renewed in 2021. *See* Sharp Decl. (Dkt. 882), Exhs. 7, 8 and 11. But these documents were created by the individuals who admittedly fabricated the underlying documents in the first place. The MOU is

unavailing. It merely shows that Klein's partner in LCG, Shlomo Rechnitz, was willing to sign a document that assumed *Klein* had promised Gestetner a valid security interest in *his* share of LCG proceeds (which obviously wouldn't impact Rechnitz directly). So, too, the UCC filings are simply additional documents created by Klein and Gestetner to substantiate a bogus secured interest purportedly granted to Gestetner for the first time in late 2016.

Moreover, assuming arguendo that these documents from 2016 and later were legitimate, the underlying security interest itself was invalid. There was no new consideration between the LCG Agreement from June of 2016 and the "Promissory Note" from September of 2016 to support Klein offering a new secured interest to Gestetner. According to Klein, Gestetner was owed no money in 2016. No insureds had passed away.  (Procel Decl., Exh. A at 217:3-12). Gestetner was not entitled to recover his principal or interest at that time. As a result, there was no basis for Klein to gratuitously promise to convert the investment to a loan or to start making monthly payments. There was no reason to increase the interest rate from 10% to 13%. There was no reason to gratuitously give Gestetner a security interest (other than the fact that he was trying to do a favor for his brother-in-law).

Klein's gratuitous agreement to convert Gestetner's investment to a secured loan in 2016 is not an enforceable promise. *See Olick v. Lawyers' Mut. Ins. Co.*, 2001 WL 1643301, at *8 (Cal. App. 2001) (affirming trial court order refusing to enforce agreement and holding "there could be no modification because there was no new consideration.") The Trustee does not address the lack of new consideration in his Motion, even though this argument was raised by the Objecting Creditors previously.

5.    **The Motion Does Not Address Equitable Subordination Pursuant to Section 510(c) or Subordination Pursuant to Section 510 (b)**

Equitable subordination requires a showing that: (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct injured creditors or conferred an unfair advantage on the holder of the claim sought to be subordinated and (3) subordination would not be inconsistent with the Bankruptcy Code. *In re Farrell*, 610 B.R. 317, 324 (Bankr. C.D. Cal. 2019).

Gestetner's claim should be equitably subordinated. Gestetner was Klein's brother-in-law, i.e., an insider. *See* 11 U.S.C.A. § 101(31)(A)(i). Gestetner leveraged that relationship to obtain an advantage of other creditors—he obtained a secured interest more than a decade after making his investment with Klein. And he obtained that secured interest at a time when Klein was already being sued for orchestrating a massive fraud. Franklin H. Menlo, Co-Trustee of the Franklin Menlo Irrevocable Trust Established March 1, 1983 (the "Menlos") had sued Klein for fraud a few years before Klein purportedly granted Gestetner a security interest via the Promissory Note. And the Vagos sued Klein in 2020, shortly before Klein "renewed" his UCC filing statement in Gestetner's favor.

To make matters worse, Klein testified that the Promissory Note in favor of Gestetner contained "bogus" calculations and that he agreed to the repayment terms merely because Gestetner was his brother-in-law and experiencing financial hardship. Gestetner filed a $17 million claim in this case based on the "bogus" Promissory Note. And he filed a UCC-1 based on this "bogus" Promissory Note.

Furthermore, Gestetner's initial investment was in stocks and bonds in the amount of $4,267,507. More than a decade later, Gestetner and Klein claimed for the first time that there was an initial investment of $3.7 million exclusively by the Gestetner Charitable Trust in undefined life insurance policies at 10 percent interest. Then a few months later, the investment morphed into the Promissory Note for an alleged loan in the amount of $9.6 million relating to a purported initial investment of $4.2 million to be repaid at 13 percent interest and giving Andor Gestetner and the Gestetner Charitable Trust a security interest in a portion of Life Capital Group ("LCG"). As such, pursuant to Section 510(b) of the Bankruptcy Code, the Gestetner claim should be subordinated.  Section 510(b) provides as follows:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

*See* 11 U.S.C. ¶ 510(b).

And Gestetner cannot rely on the UCC-1 filing to defeat equitable subordination. *See e.g.*, *In re Farrell*, 610 B.R. at 324. The court in *In re Farrell* rejected a similar argument:

> Ms. Farrell argues that subordination of her claim would be inconsistent with the Bankruptcy Code because it would deprive her of the priority position to which she is entitled under 11 U.S.C. § 507(a)(1). If this were the law, then no priority claim could ever be subordinated, and 11 U.S.C. § 510(c) would be a dead letter as to this class of claims. The whole point of an equitable subordination of an allowed claim under section 510(c) is to change the order of distribution . . . to the extent necessary to offset the harm suffered.

*In re Farrell*, 610 B.R. at 324.

Moreover, Gestetner would not be able to avail himself of the in pari delicto defense. See *Official Committee of Unsecured Creditors v. Austin Fin. Serv., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 518 (Bankr.S.D.N.Y.1999) (holding, in context of equitable subordination, that the "*in pari delicto* doctrine is inapplicable where a cause of action is brought against an insider.").

His claim should be subordinated because he attempted to inflate a claim and falsify evidence.

### C.    **"Difficulties with Collection" Does Not Support Approving the Compromise**

The Motion asserts in conclusory fashion that "[t]he Trustee believes that litigation against the Gestetners would subject the Estate to a significant collection risk with respect to LCG." Motion at 14:13-14. But this is not what "difficulties with collection" means. It is not as if the Trustee is asserting that it would seek a judgment against LCG but that LCG would be insolvent. The Trustee should have just admitted that this factor does not affirmatively weigh in favor of approving the proposed settlement (as he did with the recently-filed motion to approve the compromise with Menlos (Dkt. 885)).

### D.    **"Complexity of Litigation" Does Not Support Approving the Compromise**

The Trustee concedes that "the issues involved in adjudicating the Gestetner claims are not necessarily overly complex." (Motion (Dkt. 822) at 14:20-21). The lack of witnesses and documents suggest that this dispute could be resolved in one day of trial. Other than Klein (if he decides to appear), it is unclear that there would be any witnesses who would testify at trial. And

the Trustee has offered only a handful of documents supporting the settlement. This is largely an open and shut factual dispute for which Gestetner would have trouble presenting any admissible evidence to substantiate his claim. The Motion concedes as much when it states that "the Debtor is not a reliable party or witness and the documentation available regarding the Gestetner Claims is unclear." (Motion (Dkt. 822) at 14:21-22.) Gestetner would not be able to satisfy his burden and a trial would be far from complex.

E.     **"Interests of Creditors" Do Not Support Approving the Settlement**

The Trustee argues creditors will benefit because the Settlement "reduces" Gestetner's claims to $3.65 million, and "retains" for the Estate Klein's 50% interest in the proceeds from the LCG-owned policies. But the elephant in the room is that the Trustee has barely even *garnered* $3.65 million for the Estate in total. Courts are particularly reluctant to approve a compromise that will yield no appreciable recovery for unsecured creditors. *See In re McInerny*, 499 B.R. at 598 (rejecting settlement where, if the compromise was approved, "the general unsecured creditors will get very little or nothing from the settlement . . .").

The Motion states that "the Trustee estimates that the value of the Estate's interest in LCG is $15,200,000.00." (Motion (Dkt. 822) at 5:17-18.) First, the Trustee fails to set forth how this dollar amount was calculated. The Trustee fails to identify which policies he factored into this analysis. Second, the $15.2 million figure is apparently the future interest of the Estate after all of the insureds have died. It is not clear when or how the premiums will be paid until then. Third, there is no discussion about whether there are any disputes concerning Klein's interest in LCG or the policies at issue (Klein and his business partners have been involved lawsuits relating to these very issues). Indeed, the Trustee has taken no depositions of the principals of LCG. The Trustee's decision to throw out a $15.2 million figure with no explanation whatsoever cannot be the basis for evaluating the proffered settlement. The contingent nature of this "benefit"—coupled with the lack of detail provided about the benefits and risks—is reason alone to reject the compromise. *See In re Myers*, 425 B.R. 296, 307 (Bankr. S.D. Miss. 2010*)* ("In addition to not being apprised of the relevant facts and law, the Court finds that the Myers' Settlement is too contingent for the Court to approve.").

The Trustee posits that guaranteeing Gestetner a $3.65 million secured claim is a good deal for creditors because the "low end" of Gestetner's claim would be an $8.9 million claim secured by Klein's interest in the proceeds of LCG. To get to the $8.9 million figure, the Trustee uses the initial investment reflected in the "ledger" (and rejecting the initial investment figures in the LCG Agreement and Promissory Note); he uses the interest rate reflected in the LCG Agreement (not the rate in the Promissory Note or undefined rate in the 2005 Letter); and the secured interest pledge reflected in the Promissory Note. That is not how agreements work. Gestetner would not be entitled to create a Frankenstein's monster of contract provisions—the law does not permit a grab bag of million-dollar deals.

In fact, the "low end" of Gestetner's claim is an *unsecured and subordinated* claim worth next to nothing (at least according to Klein's testimony during the 2004 Examination that Gestetner was nearly repaid nearly in full).

And the "high-end" of Gestetner's claim is an unsecured claim of no more than about $2.6 million. According to the very evidence the Trustee attached to the Motion, Gestetner transferred roughly $3.65 million to Klein, and Klein repaid at least $1 million. This is based on the objective evidence, without crediting *anything* Klein wrote or said. For the reasons outlined above, there is simply no basis to suggest Gestetner would be entitled to contractual interest. The contractual interest rates are all over the map; there is no basis to conclude when the interest started to accrue, if ever; and the initial investment by Gestetner did not provide any fixed rate of interest.

A secured claim of $3.65 million under the circumstances is not a benefit to creditors and the Motion should be denied.

### F.    Klein's Trial Testimony Indicates He Was Engaged in a Massive Ponzi Scheme

The facts regarding Klein's dealings with his other non-insider investors further corroborates that there is no basis for the Trustee to conclude that he should be relying on the documents Klein issued in Gestetner's favor. Klein's fraud oozed into every document he created, every investor he spoke to, and every transaction he touched.

Klein presented conflicting testimony as to the Vagos' interest in the relevant insurance policies. On some occasions, Klein represented to the Vagos that they would be entitled to 12% interest on their investments. Klein periodically provided the Vagos with memos that reflected millions of dollars in interest that Vagos purportedly earned from the insurance policies sold by Klein. But Klein testified at trial that his own memos were false and never intended to pay the Vagos any interest.

Klein also admitted at trial that he forged Ms. Vago's signature on documents that he filed with the Court. He lied on tax returns filed with IRS by claiming that the Vagos invested in one of his fake corporations, Time Square Media, Inc. He testified that numerous insurance policies the Vagos invested in were cancelled or lapsed for nonpayment. But Klein never sent the Vagos written notice at any time of these cancellations.

At trial, Klein testified that the Vagos held an interest in a life insurance policy for Ernest and Hedy Weinberger; but at his deposition in connection with the Vagos' lawsuit, Klein testified that the Vagos had no interest in that policy. Klein claimed he had the right to buy, sell, and trade the policies in which the Vagos held an interest based on a written agreement that the Vagos never signed.

Klein claimed that he used some of his own money to pay the insurance premiums, but he had no accounting to identify the dates or dollar amounts. Klein presented conflicting testimony on whether he possessed an interest in the relevant policies or whether he would receive any money when the policies paid off.

Klein engaged in similar misconduct with respect to the other creditors in this case. According to the Opposition to the Motion filed by creditors Robert and Esther Mermelstein, Klein engaged in similar shenanigans regarding a $3 million life insurance policy taken out on Eugne Kohn, which Klein purported to transfer to LCG even though he had no ownership interest in it and only held it as trustee for the Mermelsteins, who paid the premiums. *See* Dkt. 805.

Based on the foregoing, it would be absurd to treat as legitimate the documents executed by Klein in favor of his brother-in-law. There is no credible basis to recognize a secured promissory note executed in 2016 in connection with a loan that Gestetner purportedly made in (or

about) 2005.  The Motion blindly takes on faith that Klein's purported transfers of assets to LCG, and Gestetner's security interest in the same, were legitimate and valid. And the Motion seeks to substantially disadvantage all unsecured creditors based on this narrow, one-sided view.

In short, the Motion seeks to grant Klein's brother-in-law a secured interest in a Ponzi scheme.  The Court should not countenance such an inequitable and illogical result.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, the Vagos respectfully request that the Court deny the Motion.

Respectfully submitted,

Dated:  January 21, 2025          **GOE FORSYTHE & HODGES LLP**

By:  /s/Robert P. Goe
     Robert P. Goe
     Attorneys for Judgment Creditors Erica Vago
     and Joseph Vago

## <u>DECLARATION OF BRIAN PROCEL</u>

I was lead trial counsel for Erica and Joseph Vago (collectively, the "Vagos") in the action they filed against Debtor Leslie Klein ("Klein") in Los Angeles Superior Court (Case No. 20STCV25050) ("Fraud Action"). I prosecuted the case on behalf of the Vagos from July 2020 to the present. I handled all related lawsuits and appeals. I am familiar with the facts related to this declaration. I make this declaration based on my own personal knowledge and if called as a witness I could and would testify thereto.

1.       Attached hereto as **<u>Exhibit A</u>** is a true and correct copy of the transcript of the 2004 Examination of Debtor Leslie Klein.

2.       In the Vagos' trial of the Fraud Action, I argued to the jury that Klein was operating a Ponzi scheme. He commingled millions of dollars in client money in his attorney-client trust account. He then used his attorney-client trust account to pay premiums on insurance policies. Klein bought, sold and traded insurance policies without the Vagos' knowledge or consent, even though he had purportedly given the Vagos secured interests in those very same policies.

3.       At the Vagos' trial of the Fraud Action, Klein admitted that he took millions of dollars from the Vagos that he purportedly used to pay life insurance premiums. Klein failed and refused at trial in the Fraud Action to produce an accounting that traced the Vagos' money.

4.       The jury ultimately returned a verdict against Klein on every cause of action, including fraud, breach of fiduciary duty and elder abuse. The jury awarded the Vagos more than $23 million.

5.       Klein presented conflicting testimony as to the Vagos' interest in the relevant insurance policies.

6.       Klein admitted, though, that he used the Vagos' money to pay the insurance premiums. And he used his client trust account to funnel that money. Klein commingled client funds in his trust account.

7.       Klein claimed that he used some of his own money to pay the insurance premiums, but he had no accounting to identify the dates or dollar amounts. Klein presented conflicting

testimony on whether he possessed an interest in the relevant policies or whether he would receive any money when the policies paid off.

8.    Klein admitted at trial in the Fraud Action that material information in the documents he drafted and sent to the Vagos was false and inaccurate, including, but not limited to, the interest to which they were entitled on their investments in the life insurance policies and their holdings in the relevant policies.


EXECUTED this 21st day of January 2025, at Los Angeles, California.



_____

Brian Procel

# EXHIBIT A

Deposition of

# Leslie Klein

November 16, 2023

In re Leslie Klein



www.aptusCR.com | 866.999.8310

1                  UNITED STATES BANKRUPTCY COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                      LOS ANGELES DIVISION

4

5    In re                        )
                                  )
6    Leslie Klein                 ) No:  2:23-bk-10990-SK
                                  )
7              Debtor.            )
                                  )
8                                 )
                                  )
9                                 )
     _____)

10

11

12

13

14

15                RULE 2004 EXAMINATION OF

16                      LESLIE KLEIN

17                LOS ANGELES, CALIFORNIA

18                   NOVEMBER 16, 2023

19

20

21

22

23

     Reported by:
24   Susan Myong
     CSR 13365

25
     Job No. 10130772

1    Gestetner from the law firm for $14,000.

2        Q    And what account would that come out of?

3        A    9404.

4        Q    The operating account.

5        A    That is correct.  And that's an advance to him.

6    Because he lost his money.  And the insurance didn't pay

7    off to him.  And he needed money desperately.  And he's

8    my brother-in-law.

9        Q    So you feel a special connection to

10   Mr. Gestetner.

11       A    That is correct.  I paid him over $3 million.

12            MR. LIEBERMAN:  Counsel, it is about seven

13   minutes to 4:00 o'clock.

14            MR. NOLAN:  Yeah.  I'm just going to finish up

15   on Mr. Gestetner then.

16            MR. LIEBERMAN:  Okay.

17            MR. NOLAN:  I think so.  Otherwise, I'll just

18   see if we can knock that out.

19   BY MR. NOLAN:

20       Q    I don't mean to get sidetracked.  But I just

21   want to put this on the record, and I don't want to

22   forget.  Because I'm super forgetful at this age.

23            I sent you an e-mail about getting your

24   property, removing -- remember the property you tagged

25   at the Oxnard property?

Leslie Klein                                                              In re Leslie Klein

1    into insurance policies.  And he retired and he's not

2    feeling well.  He's sick.  And needs money right now

3    from the insurance policies.  So I started giving him

4    money every month.  And this month, which is January of

5    2016, I gave him $10,000.

6        Q    And what insurance policies did he invest in?

7        A    He basically had an investment in -- I don't

8    know from the top of my head.  But whatever policies he

9    invested in, haven't died yet.  They're all alive.  And

10   then he had a heart attack and -- very serious heart

11   attack.  He almost died in maybe '17 or '18.  I'm not

12   sure.  So I increased his draw from 10,000 to 14,000 a

13   month.  So the last thing that you showed me, exhibit --

14   I forget the number.  I -- that month I gave him

15   $14,000.

16       Q    Okay.  Did you borrow money from Mr. Gestetner?

17       A    No.

18       Q    You didn't execute a promissory note with

19   Mr. Gestetner or the Gestetner Trust to borrow monies?

20       A    Well, I borrowed money to invest it in the

21   insurance policies.

22       Q    Right.  You or the law firm borrowed the money?

23       A    Me.

24       Q    You personally borrowed the money.

25       A    Me personally, not the law firm.

EXHIBIT A

1     Q      January 4th.

2     A      January what?

3     Q      Fourth.

4     A      Okay.  So it -- not to be January 4th or 3rd.

5     It could have been different time, like in December.

6     Q      Okay.  Why not just issue the payment to

7     Mr. Gestetner out of your personal account?  Why use the

8     law firm?

9     A      Because I wanted to have a record on the law

10    firm so that he knows he's going to pay this back.  When

11    he's going to get his money from the policy, he's going

12    to have to pay me back all the money that I paid to him.

13    This was not a gift.  If I'm issuing from my personal

14    account, he would assume this was a gift to him.

15    Q      Even though you signed a promissory note.

16    A      Well, that promissory note is nonrecourse.  So

17    that promissory note doesn't mean that I owe him

18    whatever it is $3 million.  I think the total amount

19    that he invested in policies was 3.3 million.  And he

20    got so far back very close to his money.

21    Q      You believe Mr. Gestetner's gotten back the --

22    I thought he invested 9 million.

23    A      No.  He didn't.  He invested -- 9 million is

24    some bogus number with interest.  He invested -- I think

25    the total -- I mean, I don't know right as I sit here.

EXHIBIT A

1   amount that was owed and paid was pretty much even and

2   it was about 3 million or 4 million.

3            THE WITNESS:  Oh, it's 3 million.  This is with

4   interest.  And, basically, I haven't gotten any interest

5   from Rachnitz.  So he's not entitled to any interest.

6   All he's entitled to so far is just his money back.

7   BY MR. NOLAN:

8       Q    So Mr. Gestetner is not entitled to his

9   interest until the policy --

10      A    That is correct.  Until people die.  And nobody

11  has died on these policies.  He thinks every person is

12  his policy, but it's not.

13      Q    And do you have somewhere identified what

14  policies it is that Mr. Gestetner --

15      A    Yes, I do.

16      Q    -- has interest?  And where is that?

17      A    I know exactly who owns which policy.

18           MR. LIEBERMAN:  That wasn't the question.  Do

19  you have something in writing?

20           THE WITNESS:  Yes, I do.

21  BY MR. NOLAN:

22      Q    And does the law firm maintain that record?

23      A    No, not the law firm.  Leslie Klein maintains

24  the record.

25      Q    Okay.  So the law firm makes the payments,

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 17701 Cowan, Bldg. D., Suite 210, Irvine, CA 92614

A true and correct copy of the foregoing document entitled (*specify*): **OPPOSITION OF JUDGMENT CREDITORS ERICA AND JOSEPH VAGO TO [RENEWED] MOTION OF CHAPTER 11 TRUSTEE FOR ORDER APPROVING SETTLEMENT BETWEEN THE TRUSTEE AND A. GESTETNER FAMILY TRUST AND GESTETNER CHARITABLE REMAINDER UNITRUST PURSUANT TO BANKRUPTCY RULE 9019; DECLARATION OF BRIAN PROCEL IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) January 21, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒    Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On (*date*) January 21, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐    Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) January 21, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- The Honorable Sandra R. Klein, USBC, 255 E. Temple Street, Ctrm 1575, Los Angeles, CA 90012

☐    Service information continued on attached page

3

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

January 21, 2025       Susan C. Stein       /s/Susan C. Stein

*Date*       *Printed Name*       *Signature*

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

**Mailing Information for Case 2:23-bk-10990-SK**

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Simon Aron**   saron@wrslawyers.com, moster@wrslawyers.com;jlee@wrslawyers.com
- **Reem J Bello**   rbello@goeforlaw.com, kmurphy@goeforlaw.com
- **Ron Bender**   rb@lnbyg.com
- **Michael Jay Berger**   michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Greg P Campbell**   ch11ecf@aldridgepite.com, gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
- **Baruch C Cohen**   bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com
- **Theron S Covey**   tcovey@raslg.com
- **Jeffrey W Dulberg**   jdulberg@pszjlaw.com
- **Dane W Exnowski**   dane.exnowski@mccalla.com, bk.ca@mccalla.com,mccallaecf@ecf.courtdrive.com
- **Todd S. Garan**   ch11ecf@aldridgepite.com, TSG@ecf.inforuptcy.com;tgaran@aldridgepite.com
- **Robert P Goe**   kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com;ajohnston@goeforlaw.com
- **Michael I. Gottfried**   mgottfried@elkinskalt.com, cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com,tparizad@elkinskalt.com
- **Brandon J. Iskander**   biskander@goeforlaw.com, kmurphy@goeforlaw.com
- **Michael S Kogan**   mkogan@koganlawfirm.com
- **John W Lucas**   jlucas@pszjlaw.com, ocarpio@pszjlaw.com
- **Armen Manasserian**   armen@ml-apc.com, jennifer@ml-apc.com,maria@ml-apc.com
- **Ron Maroko**   ron.maroko@usdoj.gov
- **Kirsten Martinez**   Kirsten.Martinez@bonialpc.com, Notices.Bonial@ecf.courtdrive.com
- **Steven M Mayer**   smayer@mayerlawla.com
- **Christopher M McDermott**   ch11ecf@aldridgepite.com, CMM@ecf.inforuptcy.com;cmcdermott@aldridgepite.com
- **Krikor J Meshefejian**   kjm@lnbyg.com
- **Kenneth Misken**   Kenneth.M.Misken@usdoj.gov
- **Jeffrey P Nolan**   jnolan@pszjlaw.com
- **Eric J Olson**   eric@ejolsonlaw.com
- **Jeffrey N Pomerantz**   jpomerantz@pszjlaw.com
- **Brian A Procel**   bprocel@millerbarondess.com, rdankwa@millerbarondess.com;docket@millerbarondess.com
- **Kevin Ronk**   Kevin@portilloronk.com, jaclyn@cym.law,karen@cym.law

1    • **Joshua L Scheer    jscheer@scheerlawgroup.com, jscheer@ecf.courtdrive.com**
2    • **Mark M Sharf (TR)    mark@sharflaw.com,**
3      **C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com**
4    • **Bradley D. Sharp (TR)    bsharp@dsi.biz**
5    • **Richard P Steelman    RPS@LNBYG.COM**
6    • **Nikko Salvatore Stevens    nikko@cym.law, karen@cym.law**
7    • **Alan G Tippie    Alan.Tippie@gmlaw.com,**
8      **atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,**
9      **denise.walker@gmlaw.com**
10   • **Gary Tokumori    gtokumori@pmcos.com**
11   • **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
12   • **Michael L Wachtell    mwachtell@buchalter.com,**
13     **marias@buchalter.com;docket@buchalter.com**
14   • **John P. Ward    jward@attleseyward.com, ephuong@attleseyward.com**
15   • **Brett J. Wasserman    wasserman@smcounsel.com**
16   • **Alex M Weingarten    aweingarten@willkie.com, lcarter@willkie.com**
17   • **Beth Ann R. Young    bry@lnbyg.com, bry@lnbyb.com**
18   • **Clarisse Young    youngshumaker@smcounsel.com, levern@smcounsel.com**
19   • **Paul P Young    paul@cym.law, jaclyn@cym.law**
20   • **Roye Zur    rzur@elkinskalt.com,**
21     **TParizad@elkinskalt.com;lwageman@elkinskalt.com;1648609420@filings.docketbir**
22     **d.com**